UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **16 -20897-CR-SEITZ**

**UNITED STATES OF AMERICA**

v.

**PRINCESS CRUISE LINES, LTD.,**

**Defendant.**
_____/

## GOVERNMENT'S STATUS REPORT

The United States, by and through undersigned counsel, respectfully submits this status report concerning the defendant's remedial measures and compliance with the terms of probation. As set forth below and in the attached materials, the ECP got off to a slower than expected start as the result of positions taken by Carnival with regard to establishing the Court Appointed Monitor (CAM) and the Third Party Auditor (TPA). The government credits the reports and representations made by Carnival, the CAM and TPA that significant progress has been made in remedying failures that led to the offenses of conviction, including upgrading environmental equipment and procedures, and improving management controls. At the same time, the government remains very concerned that the company's senior leadership does not understand the full nature and extent of the root causes of the company's criminal conduct. Despite the significant efforts and accomplishments of many engineers and managers, there appears to be a continuing reluctance at the very top of the corporation to accept responsibility and court supervision.

The most significant issue to date, and one which the parties have been unable to resolve without the Court's assistance, concerns Carnival's efforts to limit the role of the CAM. Additionally, there have been a number of environmental violations which we view as problematic.

1

## I.     Delays in Establishing the CAM and TPA

There were significant delays in formalizing the relationship with the CAM and TPA. These would not ordinarily merit mention, but for the fact that they appear to be indicative of the reluctance of the company to accept external oversight during the period of probation. The government found it necessary to review and comment on multiple draft contracts proposed by Carnival with the CAM and TPA. Carnival sought provisions in both agreements that raised concerns regarding the independence of the CAM and TPA. In both cases, Carnival raised roadblocks to unannounced inspections by the CAM and TPA, something that the Court specifically endorsed at the sentencing hearing. In both cases, the approach taken by Carnival caused delay in establishing the outside supervision. The government addressed these issues in a letter to Carnival and copied to the Office of Probation dated June 12, 2017.

## II.    Carnival and CAM Issues

Princess was sentenced on April 19, 2017, and the Court issued a written Judgement, including Special Conditions of Supervision the following day. [D.E.-30]. Carnival's contract with the CAM was effective starting March 21, 2017, but it took until May 2017 to finalize and sign the contract.

In a recent exchange of letters the CAM and Carnival have differed on 6 important issues. The CAM sent two letters to Carnival's counsel dated September 22, 2017, one concerning ship visits by the CAM and the other addressing other issues. Carnival responded by letter dated October 4, 2017. All three letters have been provided to the Office of Probation. Carnival's letter also details various remedial measures it has taken to address the criminal conviction and the ECP.

From the government's perspective, the most significant difference in position concerned independent audits to be performed by the CAM of both vessels and shore-side offices. The ECP

does not specifically address CAM visits to ship and shore side facilities as it does TPA audits. However, the ECP and the Court's Judgment grant the CAM wide latitude to board and inspect all vessels covered by the ECP and all shore side offices. The Monitor Agreement with the CAM specifically allows the team to "board, audit or inspect" covered vessels. A key concern for the government has been to preserve the independence and discretion of the CAM.

The CAM has advised Carnival and the government that its ship visits are not intended to duplicate the TPA audits or Carnival's internal audits performed by the parent company's Risk Advisory and Assurance Services ("RAAS" department). Noting that the CAM is tasked with monitoring Carnival's compliance overall with the ECP (§ VI.A), the adequacy of TPA audits (§VI.F.2) and reviewing the RAAS audits, the CAM stated that its visits are designed to: (1) assess the adequacy, quality, and value of TPA and RAAS audits; (2) assess whether Carnival has addressed observations and non-conformities identified in RPA and RAAS audits (or by other regulators); and (3) assess the overall effectiveness of Carnival's training, equipment resources, and support of ships. The CAM has advised the government that in his judgment the optimum way to perform these core tasks is for the CAM Team to attend some of the TPA and RAAS audits, visit some ships after they have been audited by the TPA and/or RAAS department, and visit some ships not audited by the TPA (which visits only 20 percent of the vessels outside of the Princess brand). The CAM has further advised that it cannot effectively do the job set forth in the ECP by merely riding along with the TPA or RAAS auditors. Consistent with the Monitor Agreement, the CAM proposed a work plan in which the CAM would conduct approximately 15 audits per year to include CAM Team attendance at selected audits performed by the TPA and RAAS units.

In its letter dated October 4, 2017, Carnival took the position that the CAM should not conduct any independent audits and be restricted purely to an observational role of the TPA and

RAAS audits. The government held discussions with Carnival and the CAM regarding their respective positions.

As clearly as we can ascertain, Carnival appears willing to agree to 15 CAM vessel visits, including ride-along audits with the TPA or RAAS department, and 5 shore side visits per annum, so long as costs are contained and do not exceed on average $150,000 per audit, not including travel expenses. According to an exchange of emails on October 13, 2013, the CAM apparently agrees to this while Carnival has requested greater assurance regarding the cost of the shore side audits and CAM costs in implementing a survey of corporate culture.

The government supports this possible resolution, but continues to be concerned by delays caused by the dialogue between Carnival and the CAM. The current back and forth has delayed implementation of the ECP and the work of the CAM. In the future, the government has requested that Carnival promptly advise the Office of Probation and the government of any proposals or costs it views as unreasonable so they can be promptly addressed. Carnival is otherwise obligated to pay the cost of implementing the ECP. The Court's sentencing order leaves no room for Carnival to refuse reasonable ship and shore visits and document requests. [D.E.-30; Special Conditions 11-12]. Thus, the government has similarly advised the CAM that if such requests are unreasonably refused or encumbered that it too should promptly notify the Court's Probation Office and the government.

**III.   Notices of Violation Submitted by Carnival**

Carnival Corporation has submitted ten notices of violations to the Office of Probation as of the date of this filing. The CAM was copied on these reports, but the TPA and the government were not. Carnival has promised to correct this oversight.

Of the ten notices of violation submitted by Carnival, there are several that are particularly

noteworthy or that warrant follow-up by Carnival and/or the CAM.

Notice of Violation 01-2017: The *Costa Deliziosa* was fined 5,000 Euro for a violation discovered on April 9, 2017. A required sample of MARPOL compliant low-sulfur fuel was missing. The underlying conduct occurred shortly before sentencing, but after the company pleaded guilty. It is not known whether the company has conducted an investigation of this MARPOL violation. As a result, it is not known whether the violation may be more serious than losing track of a required sample. Key unanswered questions include: (1) did the ship purchase and a sufficient quantity of environmentally compliant fuel; (2) whether the cognizant crew was interviewed; (3) whether relevant records have been examined to ascertain whether they are true and accurate and maintained as required. The TPA has observed a similar situation involving missing samples on another ship in a recent audit.

Notice of Violation 03-2017: This notice, dated June 2, 2017, states that Carnival identified approximately 100 illegal discharges from five cruise ships between September 2015 and October 2016, as well as one on April 4, 2017, made inside the Greater Farallones National Marine Sanctuary. Carnival's Notice to Probation also states that "the discharges were determined to be unintentional and that the voyage planning and execution process was not as effective as it should have been." Apparently the four Princess (*Grand Princess, Star Princess, Golden Princess, Island Princess*) and one Holland America (*Oosterdam*) cruise ships making illegal discharges in the Cordell Bank and Greater Farallones National Marine Sanctuary were unaware that the boundaries of the sanctuary had been expanded effective June 15, 2015. Voyage planning is a core environmental and safety requirement that requires the crew to undertake various procedures to avoid hazards and maintain situational awareness necessary to avoid exactly this type of illegal discharge.

On May 19, 2017, Carnival reported the violations to the National Oceanic and Atmospheric Administration's (NOAA) Office of Law Enforcement. In a letter dated July 10, 2017, Carnival reported the actual number of discharges was 190. The substances discharged included food waste, processed permeate, untreated grey water, membrane bioreactor sludge (not oil), advanced wastewater treatment system permeate, exhaust gas cleaning system ("EGCS") wash water, and treated sewage.

These discharges raise significant questions that can only be answered by a thorough investigation. Some key questions include the following: (1) were these cruise ships utilizing up-to-date navigational charts on the bridge and if not, why not; (2) if the ships were utilizing up-to-date navigational charts on the bridge, did the engineering officers and Environmental Officers ("EOs") have up-to-date navigational charts; (3) were engineering officers and the EOs adequately trained regarding the applicable discharge rules of National Marine Sanctuaries and other limited and/or no discharge areas; (4) was voyage planning properly conducted and properly documented on these ships and voyages; and (5) what were the root causes of these violations and did Carnival promptly and fully investigate those causes and take appropriate remedial measures. An overarching question regarding these violations and the discharges in Bahamian waters discussed below is whether Carnival has sufficiently prioritized environmental compliance.

Notices of Violation 04-2017 and 06-2017: Both of these notifications report that training records were apparently falsified. On June 11, 2017, the EO of the *Diamond Princess*, was dismissed without notice by the Captain for apparently failing to provide required training and falsifying training records. Based upon Carnival's initial notification, it appears that similar misconduct took place on the *Costa Luminosa*. The TPA has also reported an issue with maintaining accurate training records on the *Sapphire Princess*.

6

Falsification of records is the underlying offense of conviction in this case and the government views falsification of records required pursuant to the ECP as particularly serious and a likely felony offense (regardless of the location). Indeed, a Carnival manager was prosecuted for falsifying ECP related documents following Carnival's 2002 conviction.

The misconduct, and the manner in which the shipboard investigation took place and was reported, leaves many unanswered questions which the government has asked the TPA and CAM to explore. Given the lack of obvious motive for such a crime, one concern is that the job of the EO remains overloaded. As set forth in the government's Memorandum in Aid of Sentencing [D.E.-26 at 7], after Carnival completed serving probation in the prior prosecution, EOs were given ever increasing and unrelated responsibilities that made it impossible for them to play a meaningful role in assuring environmental compliance. The EO program touted by Carnival became window dressing because it was not possible to perform all of the assigned tasks. This is a lesson learned that cannot be forgotten and needs to be carefully assessed. The redesign of the EO program is one of the critical remedial measures required by the Plea Agreement.

From a management viewpoint, the discovery of records falsification by an EO should be treated as a near miss warranting a careful investigation to determine the nature and extent of the misconduct and more importantly, its root cause. The government has asked the TPA and CAM for their views on this issue and both have expressed some concern that the EOs may still be overloaded and that there is a reluctance within the ranks of company officers to serve in this important position. The government also is interested in learning how Carnival is assessing task saturation and whether EOs have complained about the issue. The results of Carnival's response, as set forth in Notice of Violation 06-2017, is unknown, but the actions being taken appear focused on determining the extent of the violations by EOs and not focused on identifying root causes.

**IV.     CAM Notifications to Interested Parties**

The CAM has made twelve notifications to the government pursuant to the ECP. Several of these raise significant concerns and have been summarized below.

CAM Notification 06-26-2017: The CAM advised the interested parties of information reported to him by Carnival indicating that the Staff Captain of the *Sea Princess* cruise ship had directed a discharge of untreated ballast water while in port in Hawaii in early May 2017. The discharge took place without the use of the Ballast Water Treatment System as required. Carnival informed the CAM that it was conducting an investigation, had notified the authorities, and had taken disciplinary action against the Staff Captain. An intentional discharge of untreated ballast water in U.S. waters is a felony violation of the Aquatic Nuisance Act, 16 U.S.C. 4711. The government plans to inquire further about the particular of this event, Carnival's notification of unnamed authorities, and the results of Carnival's investigation. The required reports submitted to the National Ballast Information Clearinghouse for this vessel do not report any discharge of untreated ballast water as was reported to the CAM.

CAM Notifications 07-07-2017 and 08-01-2017:  On July 7, 2017, Carnival informed the CAM that the *Carnival Elation* had made a discharge of untreated sewage in violation of MARPOL Annex IV (sewage and garbage) inside Bahamian Archipelagic waters. A month later, on August 1, 2017, the CAM notified the interested parties that there had been at least three additional discharges of food waste and treated black water (i.e., sewage) inside Bahamian waters in violation of MARPOL. This notice and the TPA's shore-side audit revealed that illegal discharges in violation of MARPOL Annex IV were being made from other Carnival ships as well, including *Carnival Freedom, Carnival Liberty, Carnival Magic, Carnival Conquest, Carnival Splendor and Carnival Vista*. These discharges, like those in the Greater Farallones Marine

Sanctuary, are significant both because they represent violations of MARPOL, but also because they may be indicative of larger problems or a breakdown in the voyage planning process.

## V.    TPA Audits and Trends

The government is in receipt of seven reports of vessel audits and one shore-side audit performed by the TPA. In general, the audits provide many positive observations of shipboard activity, awareness and attitudes. However, significant problems have been observed.

The audit reports to date show that two Princess vessels may be lagging behind vessels of other operating lines.  The *Sapphire Princess* and *Diamond Princess* had the largest number of non-conformities (7, 10) as compared to other operating lines (3, 5, and 3). Some of the audit issues observed were highly significant. There have been a number of incidents involving poor recordkeeping. Another common observation has been the failure on multiple vessels to identify fittings susceptible to unauthorized discharges and/or to take appropriate preventative measures, including the finding of fittings on two vessels leading to sewage and gray water systems. As referenced above, improper discharges of sewage, garbage, and other wastes have been noted and may be indicative of systemic issues with voyage planning.

The most recent shipboard audit report of the *Sapphire Princess* cruise ship by the TPA is of particular concern. Unlike some of the other audits, indicating overall good ship management, this vessel appears to have multiple compliance and management issues. The TPA found that there were overdue purchase orders for critical spare parts, including two designated as urgent by the ship. One of the most obvious signs of the past management problems at Princess, and directly related to its conviction, was the perception that the criminal conduct was financially motivated. The Chief Engineer who ordered the dumping off the coast of England told subordinate engineers that it cost too much to properly offload the waste in port and that the shore-side superintendent to

whom he reported would not want to pay the expense. As set forth in the factual statement, there were significant delays in providing spare parts and many requests for parts and equipment were never even opened by the shore-side superintendent. Princess has acknowledged that the superintendent's "mismanagement was a contributing factor" in the criminal conduct." Determining the root cause of overdue purchase orders for important spare parts post-conviction is nothing short of urgent.

The TPA also found other significant problems during the *Sapphire Princess*s audit. According to the TPA, "[c]onsistently, throughout the audit, engineering logs, record keeping, and checklists were found sub-standard as evident in the number of non-conformities issued for these items." Various documents intended to achieve environmental compliance were found to have been improperly filled out or not completed, with times, dates, facilities, and signatures missing in contravention of the ECP. Furthermore, the TPA was unable to audit whether required training was performed because of inadequate recordkeeping contrary to the ECP.

The TPA audit of Carnival's corporate office found many aspects of the ECP were being implemented but also disclosed some mixed results. Of concern to the government is that the RAAS department appears to be having difficulty reviewing and resolving issues in a timely fashion. The TPA noted that there had been multiple pollution incident investigations that remained open without proper feedback or updating to the RAAS Director of Investigations, even though requested by the responsible officer. The TPA also expressed concern that the problem of discharges of food waste and treated sewage by Carnival vessels in Bahamian archipelagic waters had not been resolved and that lessons learned and updated procedures had not been communicated to other Carnival brands as required.

The TPA has also advised the government of a concern that Carnival has declined to

provide certain information requested by the TPA. The TPA has requested corrective actions be required or taken as a result of the non-conformities discovered during vessel audits. A Carnival executive expressed to the TPA the view that there was no requirement for it to submit corrective action plans, and also questioned the TPA's authority to conduct follow-up visits to assure the implementation and effectiveness of the corrective actions. The government has asked Carnival and the TPA for additional information to determine the nature and extent of any dispute. The ECP contemplates corrective action be taken to eliminate the cause of all deficiencies identified by the audits. Under the terms of the ECP, corrective action plan(s) for all nonconformities, are due within forty-five (45) days of an audit closing meeting, and should include documentation to support the item corrected. ECP § VIII.F. The government will bring to the Court's attention any unreasonable refusal to provide the TPA (or the CAM) with relevant records.

While the TPA has designated certain findings as non-conformities and observations, it has not as yet designated any as major non-conformities, a term of art that refers to an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by the ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water. It may also include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process. ECP Section I.D. Counsel for the United States has requested the CAM consult with the Coast Guard, and determine whether certain of the TPA findings are in fact major-nonconformities.

**VI.   Conclusion**

As the Court knows, the ECP and Special Conditions of probation are intended to serve the

core purposes of sentencing consistent with 18 U.S.C. 3553 and Chapter 8 of the Sentencing Guidelines. Carnival is a very large and complex international corporation that requires an unusual level of supervision. The scheduling of this hearing, in and of itself, has helped to motivate Carnival, the CAM, and the TPA to accelerate the process of identifying and resolving differences. At the hearing, the government respectfully suggests that it will be helpful for the Court to hear from each regarding the issues identified above and any others that concern them. The United States supports regular status hearings as part of the supervision process.

Respectfully submitted,

BENJAMIN G. GREENBERG
Acting United States Attorney

JEFFREY W. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

By: /s/ Thomas A. Watts-FitzGerald
Assistant United States Attorney

By: /s/ Richard A. Udell
Senior Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 17, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ Thomas A. Watts-FitzGerald
Assistant United States Attorney

## SERVICE LIST

**UNITED STATES v. PRINCESS CRUISE LINES, LTD.,**
**Case No. <u>16-20897-CR-SEITZ</u>**
**United States District Court, Southern District of Florida**

David N. Kelley, Esq.
Dechert, LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone:   212-698-3500
Counsel for Princess Cruise Lines, Ltd.


Catherine J. MacIvor, Esq.
Foreman Friedman, PA
2 South Biscayne Blvd., Ste. 2300
Miami, FL 33131
Counsel for Princess Cruise Lines, Ltd.