UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-20897-CR-SEITZ

UNITED STATES OF AMERICA

v.

PRINCESS CRUISE LINES, LTD.,

Defendant.

_____/

JOINT STATUS REPORT TO BE CONSIDERED
DURING STATUS CONFERENCE ON DECEMBER 4, 2017

In advance of the status conference to be held before this Court on December 4, 2017 (the "Status Conference"), Defendant, Princess Cruise Lines, LTD. ("Princess"), the wholly owned subsidiary of Carnival Corporation & plc ("Carnival") (collectively referred to herein as the "Company"), respectfully submits this joint status report pursuant to the Court's Order [DE-49] dated November 14, 2017, and would show:

I.    **Agreement Discussed During October 18, 2017 Status Conference**

As noted in the Court's Order [DE-49], this matter came before the Court for a status conference on October 18, 2017. One of the issues raised during the status conference was a dispute among the parties and the Court Appointed Monitor, Steven Solow ("CAM"), regarding the role of the CAM under the Environmental Compliance Plan ("ECP").  After substantial discussions off-the-record, the parties and the CAM indicated to the Court that an agreement had been reached as to the relevant dispute and outlined that agreement, pending the CAM's presentation of a new work plan outlining the work to be performed by the CAM and the Company's response and acceptance of that proposal. These actions were subsequently completed and the agreement outlined in Court

1

on October 18, 2017, was accepted by the parties and the CAM.

**Response of the United States:** The United States agrees that this issue is resolved. However, the government further notes the following. The CAM produced a Superseding Work Plan on October 20, 2017, and that Work Plan was accepted by the Company, after correspondence with the government. In the correspondence, Carnival stated that notwithstanding its agreement on the CAM's budget and Superseding Work Plan, Carnival continues to maintain its views regarding the scope of the CAM's mandate under the ECP, as set for in the Company's Memorandum on Issues to be Considered on October 18, 2017 and reserves its right to make objections to specific requests by the CAM if Carnival feels they fall outside of the CAM's mandate. The government notes that the Court explicitly rejected the position expressed in Carnival's filing with regard to the CAM's mandate. As the Court explained at the hearing, Carnival did not object to the imposition of sentence, which included the ECP, as well as the special conditions of supervision, or timely file an appeal. Carnival is bound to comply with the Court's Judgment & Commitment Order. Accordingly, the government expects that any such objections by Carnival will be brought to the attention of the Court, Office of Probation and the government without undue delay. The United States reserves its right to propose that Carnival be found in violation of probation if there is any unreasonable failure to cooperate with the CAM (or Third Party Auditor), or unreasonable failure to respond to requests for access to records or facilities.

II.    **Status of the Issues Raised on Pages 4-11 of the Government's Status Report, dated October 17, 2017 [DE-43]**

The Court's Order [DE-49] also requested that the parties file a joint status report setting out how and when the issues raised on pages 4-11 of DE-43, the United States of America's Status Report filed on October 17, 2017 (the "Government's Submission"), were addressed by the

Company.  If the issues have not been addressed, the Court requested that the Company set out its response to the issues and what, if anything, the Company intends to do to address the issues.  Below is the Company's update on the status of the various issues raised in the Government's Submission.

### A. Notices of Violation [1]

In its submission, the Government noted that the Company has submitted ten notices of violations to the Office of Probation as of October 17, 2017.  *See* DE-43 at 4.  Since October 24, 2017, the Company has submitted notices of violation to all of the Interested Parties[2] and will continue to do so if future notices are required.[3]  In the Company's submission to the Court on October 17, 2017 [DE-44] (the "Company's Submission"), the Company acknowledged these notices of violations, which it will discuss in more detail below.  *See* DE-44 at 21-23.  Further, on October 16, 2017, the Company submitted an Update on Notices of Violation letter to the Office of Probation, CAM, and the Third Party Auditor ("TPA") that addressed Notices of Violation #3, #6, #7, and #8.  Since that time, the Company also submitted an eleventh notice of violation to the Interested Parties, which it will also address here.

### a. Notice of Violation 01-2017 (May 25, 2017) – *Costa Deliziosa*

This Notice of Violation reflected that the *Costa Deliziosa* was fined 5,000 euro for a violation related to a missing fuel sample that was observed on April 9, 2017, before the Company

---

[1] The following issues were raised by the Government on pages 4-7 of the Government's Submission [DE-43].

[2] Under the ECP, the "Interested Parties" are defined as the Government, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis.  *See* ECP § I.D [DE 2-2].

[3] Prior to this, the Company did not submit notices of violation directly to the Government due to its understanding of Special Condition 13 of the Judgment in this case [DE-30], which reads: "Required Notification – Breach of Compliance: The defendant corporation is to inform the U.S. Probation Officer, CAM and TPA of any breach of the ECP involving the defendant company."  DE-30 at 4.  As noted above, the Company will continue to submit the notices to the Government as well.

was sentenced by this Court. For context, the governing procedure, TEC-1402, requires three samples to be taken: one is kept by the supplier, one is retained onboard the ship ("MARPOL" sample), and one is sent shoreside for lab analysis.  After an internal review in which relevant individuals were interviewed, it was determined that the Company did in-fact purchase environmentally compliant fuel and stored it onboard but the shipboard personnel were unable to locate the sample for the Italian Coast Guard due to confusion regarding the serial number. Nevertheless, shortly after the incident was reported, the onboard sample was found.  Following the incident, preventative training was conducted to mitigate the risk that samples would actually be misplaced and to prevent related issues.  Further, the Staff Engineer hosted a meeting with all relevant personnel regarding management of fuel samples during bunkering and emphasized its importance.  The Company has also since issued an Environmental Compliance Notice to the fleet regarding this issue; added a section to both the Environmental Officer ("EO") CSMART training course and the new Compliance to Commitment course at CSMART for all deck and technical officers; and is currently updating the Global HESS procedure.

**Response of the United States**: Carnival's response treats this as an isolated issue. The government is aware of other instances where samples were missing. As a result, the government believes that this is a more widespread problem that requires attention. Carnival's response in this instance does not identify the timing and method of the corrective actions taken, or explain where the fuel was found, and where it was during the period when it could not be located.

b.        Notice of Violation 02-2017 (May 25, 2017) – Alaska Settlement

This Notice of Violation reflected an administrative proceeding relating to a settlement agreement entered into on May 22, 2017 between Holland America Line and Princess Cruises and the State of Alaska regarding alleged violations of air emission standards from 2009-2014.  The

4

Company took these issues very seriously, investigated each incident, and collaborated with the Alaska Department of Environmental Conservation to resolve the violations.  The Company also had self-reported many of these violations.

**Response of the United States**: The government views this response as inadequate and not fully responsive. In the first instance, Carnival needs to identify what standards were violated, how often, what preventative measures have been taken, and whether any similar conduct or violations have recurred. Additionally, it remains unknown whether Carnival's investigation determined a root cause of air pollution violations. The government further notes that it understands that the Company's challenge of some violations and mitigation of penalties does not necessarily mean that the violations did not occur.

    c.  Notice of Violation 03-2017 (June 2, 2017) – Greater Farallones National Marine Sanctuary

In the Notice of Violation, the Company explained that four Princess Cruise Line ships and one Holland America Line ship had made illegal discharges inside the expanded boundaries of the Greater Farallones National Marine Sanctuary, in contravention of the National Oceanic and Atmospheric Administration's ("NOAA") marine sanctuary regulations.  The underlying conduct occurred before the probationary period began in this case and was due in part to ineffective voyage planning and inadequate review of the appropriate and up to date electronic charts.[4]

Once the potential sanctuary violations came to management's attention in or about December 2016, an internal review was conducted to determine the scope and root cause of the

---

[4] This issue was brought to the Company's attention by a Voyage Planning Officer and an EO who were reviewing a voyage plan through this area.  The issue was reported to management, following which an internal review was undertaken and the Company subsequently self-reported.

possible violations.  Ultimately, Company management self-reported the incident to the NOAA on May 19, 2017.   Management sent messages to the fleet shortly thereafter, including an Environmental Compliance Notice and a Must See Message, re-emphasizing the importance of voyage planning and the fact that the sanctuary boundaries were expanded effective June 15, 2015. Since that time, long-term corrective actions have also been undertaken at the Company, including: (1) implementing a voyage planning section within the training courses given to EOs (who are not trained as bridge officers); (2) requiring Fleet Chief Engineers and Fleet Captains to review the voyage planning process during ship visits; (3) launching a Top 5 risks initiative to drive down the number of future incidents; (4) requiring that EOs across all vessels in the Company, including the Covered Vessels, participate in the Voyage Planning Process and review and confirm the voyage plan; (5) Carnival Cruise Lines ("CCL") undertaking a time/motion study for EOs, the findings of which will be shared with other operating lines who likely will do the same; (6) instituting a supplemental six hour environmental training program (called "Compliance to Commitment") for all deck and technical officers when they attend their annual training at CSMART, the Company's global training center in Almere, Netherlands; and (7) modified the CSMART courses relating to voyage planning and electronic navigation to increase the focus on scrutinizing environmental information (including incorporating a marine sanctuary area in a simulated exercise to assess attendees).  The goal of these endeavors, and others, was both to remediate the relevant and address its root cause.

It should also be noted that NOAA has also commenced its own investigation, with which the Company has fully cooperated.  NOAA has expressed its satisfaction with the Company's level of cooperation.

**Response of the United States**: It appears from Carnival's response that it has taken various remedial measures.  However, it is not clear that the remedial measures listed above are all related to voyage planning.  The government would like to be informed why it took from December to May to self-report and send messages to the fleet? Carnival's response does not fully address the questions set forth in the government's pleading, including what was the root cause of these illegal discharges. As set forth in our prior pleading, we think key questions include: (1) were these cruise ships utilizing up-to-date navigational charts on the bridge and if not, why not; (2) if the ships were utilizing up-to-date navigational charts on the bridge, did the engineering officers and Environmental Officers ("EOs") have up-to-date navigational charts; (3) were engineering officers and the EOs adequately trained regarding the applicable discharge rules of National Marine Sanctuaries and other limited and/or no discharge areas; and (4) was voyage planning properly conducted and properly documented on these ships and voyages. Both the TPA and CAM have expressed more generic concerns about voyage planning, particularly because there are multiple incidents, including discharge events, that suggest a larger problem.  Accordingly, the government renews its request that Carnival address the issues above with greater specificity.

   d.  Notice of Violation 04-2017 (June 26, 2017) & Notice of Violation 06-2017 (July 26, 2017) –  Issues Related to Training Records

   In Notice of Violation 4, the Company explained that on June 8, 2017, the Captain of the *Diamond Princess* launched an investigation regarding the EO onboard after concerns of poor performance and improper recordation of training tracking documentation had been raised.  During the investigation, it was discovered that the EO had not properly initiated the viewing of an Environmental Compliance and Stewardship video, an ECP requirement, and improperly tracked task completion.  On June 11, based on the findings from the Captain's investigation, the EO was

dismissed and disembarked from the ship.  The Company made every effort to identify and ultimately find a replacement EO in a timely fashion.

In addition to the disciplinary action, the Company also took corrective and preventative actions as a result of this incident, including conducting a fleet-wide review of training and training record accuracy.  No issues were found with any of the Covered Vessels during this review. Through this review, the Company also determined that one of the root causes of the issue was the tight timeline to implement ECP requirements and video program, which was exacerbated by the fact that the corporate-wide learning management system has yet to be implemented by all operating lines.  The Company has been and will continue to work on implementing such a system.

Further, in order to ensure that it's EOs are not overloaded in their job responsibilities, a concern raised by the Government in its submission, *see* DE-43 at 7, the Company has revised the role of the EO and more tightly defined the role as 100% focused on compliance, allowing EOs to focus on environmental and ECP compliance, including the new activities imposed on EOs by the ECP.  The Company also employs an Environmental Training program that is designed to support the EOs in their role.  Further, the Company has structured the EO position so that it is supported by both vessel (reporting to the Captain of each ship) and onshore management.  Finally, the Company is also reviewing the EO career path and recruiting statement to ensure that it employs the most qualified EOs and encourage company officers to serve in this important position. Overall, the Company has engaged in a corporate wide effort to review and verify records, complete training, and underscore the importance of accuracy in record keeping.

Similarly, Notice of Violation 6 related to the falsification of training records by an EO on *Costa Luminosa*.  Since notification of this issue on July 22, 2017, multiple interviews were conducted by the Company with those onboard, who have confirmed that they never took part in

the alleged training and that the signatures are not theirs.  Also, since the Environmental Compliance Manager ("ECM") was informed of the issue, he raised it to the Costa Group Operating Line Compliance Manager, the ship Captain, Staff Captain, HR Director, and a representative of the Unions.  The Costa Group Operating Line Manager has since informed the necessary parties shoreside and a review and disciplinary procedures were immediately put into action.  Further, interviews of potential employees involved or witnesses were conducted to determine the extent of the problem and the root cause.

The fact that this was the second falsification related issue has caused the Company to take additional action:

- All Operating Lines were directed to conduct a review on all vessels to determine whether required environmental training has been completed as reported.  To the extent the Company identified gaps in required training, every effort was made to remedy those gaps in a timely manner.

- Incomplete training, if any, should have been completed no later than August 10, 2017.  As of this writing, the Company believes that the training has been substantially completed except for so called "new joiners," who will be required to take the training upon boarding.

- Inaccurate reporting of training completion rates will be reported to Chris Donald, the ECP Corporate Compliance Manager, and immediately investigated.

- The Company communicated to the fleet the importance of the training, including accurate and truthful record keeping, and in particular the Master's responsibility to ensure training is completed.

- The Company will be reviewing the Company's procedures for rolling out training to determine whether there may be opportunities to improve the process both at launch and in confirming completion.

- The Company is also working to establish an improved recordkeeping infrastructure to receive data and record/report training activity on an ongoing basis.  This would include crafting a standard roster for each environmental/ECP training course, ensuring that there are written procedures for uploading training roster data in the electronic systems of record appropriate for each fleet, providing reports/feedback to each fleet to verify system or record

reflects training activity on board and identify discrepancies early, and working towards daily-auto-generated ECP training status reports.

In its discussion of these Notices of Violation, the Government also noted that the "TPA has also reported an issue with maintaining accurate training records on the *Sapphire Princess*." DE-43 at 6. The TPA audit findings on the *Sapphire Princess* are discussed *infra*.

**<u>Response of the United States</u>**: The government appreciates the response above but has not verified the information. The government requests that Carnival provide the CAM and TPA with documentation of the above and the changes in policy and procedures so that they can be evaluated and audited.

The United States is concerned that there appear to be instances in which Environmental Officers intentionally falsified training records for training required pursuant to the ECP. The government views deliberate falsification of records as apparent crimes. We understand that there are at least two other vessels where similar falsification of records have occurred.

The government is concerned that Carnival terminated employees prior to making the disclosures to the government, the Court, or the CAM, and before determining the root cause of the violations. The government requests that Carnival identify all root causes that have been identified. The government understands that there are other instances involving the falsification of training records and requests that Carnival produce a list of all instances in which training records have been falsified on any vessel within the period of probation. Additionally, if the terminated EO in this instance was interviewed, the government would like to be informed regarding the details of his statement and any rationale offered for his actions.

e. <u>Notice of Violation 05-2017 (July 21, 2017) – Time to Replace EO</u>

On July 5, 2017, the Company became aware that it was operating without an EO onboard

for more than 7 days on two Holland America Line ships, in violation of the ECP.  Throughout this time, the Company made best efforts to replace the EOs as quickly as possible, including the temporary reassignment of EO duties onboard until replacement EOs joined the vessels.  The Company considers the issue closed.

**Response of the United States**: It is not evident from this notice or response why the violations took place or what is being done to avoid future violations. The government asks that Carnival develop and provide a written plan to ensure the replacement of EOs on vessels within the time period required by the ECP.

f.   Notice of Violation 07-2017 (August 14, 2017) – *Carnival Spirit*

In Notice of Violation 7, the Company explained that on July 22, 2017, the EO onboard *Carnival Spirit* reported to shore-side environmental operations that the ship's Technical team had not recorded the periodic maintenance of the Oil Content Monitors ("OCMs") in the Oil Record Book ("ORB") since the ECP requirement came into force on April 19, 2017.  However, while the maintenance of the OCMs was not recorded in the ORB, the actual maintenance was being conducted and recorded in the Planned Maintenance System ("PMS").   In response to this issue, the necessary entry was made in the ORB, the PMS was updated across the CCL fleet to remind personnel to record OCM maintenance in the ORB, and a communication was sent to the CCL fleet on August 1, 2017 reiterating the requirement to record OCM maintenance in the ORB and review current records to verify that all other ships have been implementing this practice.

Following the above referenced communication, it was identified that five other ships (*Carnival Breeze*, *Carnival Freedom*, *Carnival Glory*, *Carnival Pride*, and *Carnival Miracle*) had also not implemented the OCM maintenance recordation requirement.   As a result, an Environmental Compliance Notice was circulated throughout the entire Company fleet.  All ships

were also required to discuss the recordation requirement with pertinent technical officers onboard and the Chief Engineer was required to conduct a review of all ORB entries made since April 19, 2017 to ensure the OCM maintenance is being logged.

   **Response of the United States**: The United States understands that at least five vessels have not implemented this requirement which suggests a larger problem. A key component of prudent management and goal of the ECP is to identify trends and root causes rather than address each issue in isolation. The government requests that the results of the Chief Engineer's review of ORB entries be provided. Was a similar analysis done on the other vessels that have been identified to have the same issue? The government further notes that no notice of violation was submitted for the other ships. The government requests that the communication sent to the fleet be provided to the interested parties, the TPA and the CAM.

   g.   Notice of Violation 08-2017 (September 1, 2017) – Failure to Sign ORB

   As discussed in Notice of Violation 8, in August 2017, the Company discovered that the EOs on two ships within the Costa Group did not sign pages in the ORB, as required under the ECP, during certain periods.  However, both the Captain and Chief Engineer continued to sign each page during the relevant periods. The Costa Group Operating Line Compliance Manager has reached out via phone and email to each AIDA and Costa ECP-Covered Vessel individually and confirmed with its EO that he/she has been signing each completed page of the ORB.  Management also organized the signing of the missing ORB pages as soon as practicable.  The failure to sign the ORB pages appeared to be related to a misunderstanding about the requirement and EO handoff of responsibilities.  The Company ultimately circulated an Environmental Compliance Notice to remind all EOs of the requirement to review and sign each completed page of the ORB.

   **Response of the United States**: The government requests that the referenced notice be

12

provided to the interested parties. The government further questions why the Captain and Chief Engineer continued to sign and sign off on the ORB without the required EO signatures.   The government also observes that several similar non-conformities have been identified in the TPA audit reports (Grand Princess; Seabourne Encore).

h.   Notice of Violation 09-2017 – *Seabourn Odyssey*

As explained in Notice of Violation 9, on August 26, 2017, the EO onboard the *Seabourn Odyssey* had to disembark due to compassionate leave to tend to his wife.  During his absence, the Senior First Officer was appointed to take over his role and an exception request was issued to shoreside and approved.  The EO returned to the ship on September 5, 2017, three days longer than the seven calendar days allocated under the ECP.   The Company employed its best efforts to find a replacement EO within the seven day allotment but was unable to.

i.   Notice of Violation 10-2017 – *AIDAluna*

According to Notice of Violation 10, in August 2017, as part of an internal Company review into another matter, the Company separately found that the Environmental Control System ("ECS") Log on the *AIDAluna* had not been implemented onboard per the requirements of the ECP. Following this discovery, the ship's Chief Engineer implemented and began maintaining an ECS Log.  Also, the ship's Master instructed the Chief Engineer on the importance of ECP compliance and required that a working group be assembled, including an engineer appointed to focus exclusively on ECP compliance, and that the EO provide a daily report regarding the working group. An Environmental Compliance Notice was also issued reminding all shipboard employees of these, and other, requirements.

**Response of the United States**: The summary of this violation is confusing. The government understands that one issue was the failure to maintain a log concerning environmental

seals. Seals and a log documenting their use are both essential parts of the ECP.

      j.   Notice of Violation 11-2017 – *Prinsendam*

      As explained in Notice of Violation 11, on October 12, 2017, while the *Prinsendam* was alongside in Venice, Italy, Italian Coast Guard agents requested the ship to produce sample bottles of recent bunker operations.  The ship was unable to locate a MARPOL sample, resulting in a 5,000 euro fine.  The results of the sample set ashore related to this issue were within the regulatory limits. Nevertheless, given the missing sample onboard, the Company is taking the following corrective and preventative action: (1) refer employees to the Environmental Compliance Notice issued on September 22, 2017 that emphasized the importance of TEC-1402; (2) the Chief Engineer onboard the ship will now maintain the keys and control of the Bunker Samples cabinet to ensure each Bunker Delivery Note matches the accompanying MARPOL sample onboard; and (3) a revised Oil Bunkering Checklist will be issued to the fleet to further clarify that the retained sample that is identified by the MARPOL seal number should be identified on the Bunker Delivery Note.

      **Response of the United States**:   Carnival's above statement fails to recognize that the problem is larger than simply missing samples. In addition to Notice of Violation 1, the government understands that at least 5 vessels have been found to have missing samples and that there are additional failures to maintain bunker delivery notes. This is not only an ECP issue; this is an international requirement set forth in MARPOL Annex VI.

      **Further comment of the United States**: There is an additional violation that Carnival has reported, although it was not technically labeled a "Notice of Violation" and, thus, was not described in the October filings. On July 2, 2017, Carnival notified the interested parties of a missing solenoid valve on the Sun Princess centrifugal Oily Water Separator stating that an unauthorized modification to an engine room waste system had taken place and was reportable

pursuant to the ECP. The removal of this piece of equipment on a key component in the bilge water treatment system is a significant matter. The government requests that Carnival provide the interested parties, CAM and TPA with an update regarding this violation.

**B. CAM Notifications to Interested Parties [5]**

In its submission, the Government noted that the CAM had made twelve notifications to the Government pursuant to the ECP as of October 17, 2017. *See* DE-43 at 8. It is important to note that these notifications might not always have been shared with the Company, although the Company has received some, and the Company does not know whether additional notifications have been made to the Interested Parties since October. As such, the Company will address the notifications specifically discussed in the Government's Submission. Of course, the Company would be happy to address other CAM notifications, if any, upon identification and request.

**Response of the United States**: Absent unusual and exceptional circumstances, the government understands that the CAM's notifications to interested parties will be provided to Carnival.

a. CAM Notification 06-26-2017 – *Sea Princess*

The CAM advised the Interested Parties of information reported to him by the Company indicating that the Staff Captain of the *Sea Princess* had directed a discharge of untreated ballast water while in port in Hawaii in early May 2017. Although the discharge was approved by the Honolulu Ballast and Biofouling Coordination Manager, the discharge took place without the use of the Ballast Water Treatment System, as required. In response, in addition to notifying the CAM, the Company conducted and concluded an investigation, has notified the authorities (the U.S.

_____

[5] The following issues were raised by the Government on pages 8-9 of the Government's Submission [DE-43].

Environmental Protection Agency), and has taken disciplinary action against the Staff Captain who was found to have circumvented the Company's requirements prohibiting his actions. The Company has also required that all officers involved receive additional training in ballast operations and that additional instructions be provided to officers that the Ballast Water Treatment System should be utilized at all times during ballasting and de-ballasting operations.

**Response of the United States**: Carnival informed the CAM that it was conducting an investigation, had notified the authorities and had taken disciplinary action against the Staff Captain. The prosecutors and Coast Guard officers monitoring probation were not advised of the discharge by Carnival. An intentional discharge of untreated ballast water in U.S. waters is felony violation of the Aquatic Nuisance Act, 16 U.S.C. 4711. The government requests documentation in support of Carnival's above representations. The government further notes that Carnival has not provided the results of its investigation or amended required reports that were submitted to the National Ballast Information Clearinghouse but which fail to report the discharge of untreated ballast water. Finally, the record above does not indicate whether Carnival has determined whether this has been an issue on other vessels or in other ports.

**Further Comment of the United States**: The government requests that Carnival submit and adopt policies and procedures during the period of probation that will ensure that all future notifications, disclosures, and "self-disclosures" to, and communications from federal and/or state agencies be contemporaneously provided to the interested parties, and to the Office of Probation, CAM and TPA.

     b.  CAM Notifications 07-07-2017 & 08-01-2017 – Discharge in Bahamian Waters

On July 7, 2017, the Company informed the CAM that the *Carnival Elation* had made a discharge of untreated sewage inside Bahamian Archipelagic waters. At the time of the incident,

the vessel was twelve miles away from the nearest shore but was still inside the Bahamian Archipelagic waters.  The vessel realized the error shortly thereafter and stopped operations.  After conducting an investigation, the Company determined that the voyage planning for this voyage was completed, the voyage plan was posted in the vessel and sent via email to relevant parties, and the issue occurred because the First Officer mistakenly believed that he was ordering the discharge of grey water.  The Company took immediate action, which included meetings with all deck and engine officers to discuss the issue and applicable rules, creating an action plan regarding the discharge of sewage and food waste, monitoring the future cruises to ensure that the action plan was being followed and addressed the issues, and updating the environmental schedule for the voyage to reflect updated procedures, which were made available on the vessels.

On August 1, 2017, the CAM notified the Interested Parties that there had been at least three additional discharges of food waste and treated black water (i.e. sewage) inside Bahamian waters in violation of MARPOL.  After immediately conducting an internal review, the Company determined that one accidental discharge of Jacuzzi water was due to a failure of a valve automatic timer which is used for pool cleaning purposes.  The other two discharges resulted from errors in voyage passage planning, namely a misinterpretation of Archipelagic Maritime Jurisdiction, causing baselines to not be clearly defined and taken into consideration.  In all three incidents, the Company self-reported, conducted internal reviews and implemented detailed and immediate corrective actions such as repairing valves, changing valve procedures, and updating the voyage passage plan regarding the discharge of food waste and sewage in Bahamian waters.  In addition, each operating line of the Company issued a communication to their fleet regarding archipelagic baselines, the Company engaged in an effort to identify all such baselines and needed itinerary changes, and the corporate Maritime Policy & Analysis team issued a fleet-wide Environmental

Compliance Notice that communicated the lessons learned from these incidents.

In the Government's Submission, the Government also suggested that these incidents may be indicative of a large problem regarding the voyage planning process. As discussed *supra* in Notice of Violation 3, the Company recognizes these issues and has taken several steps to remediate any concerns regarding voyage planning. The Company is committed to remediating these issues and getting it right.

The foregoing provides the Company's update on the CAM Notifications specifically referenced in the Government's Submission. It should also be noted that, in regard to new or future potential issues, in addition to the Company's other reporting obligations, the Company has been providing the CAM with full weekly "Flash Reports" containing summaries of HESS incidents that occur Company-wide on vessels and on-shore. The Company has also been diligent in responding to any follow-up inquiries that the CAM has raised after reviewing the Flash Reports, and the Company will continue to facilitate the CAM's review.

**<u>Response of the United States</u>**:  The government cannot verify the accuracy of the above recitation provided by Carnival.

The government views the issues presented as extremely significant and is concerned that the violations and underlying causes are systemic and ongoing. According to Carnival's report, approximately 1,270 cubic meters of treated black water and 22 cubic meters of comminuted food waste were discharged inside Bahamian waters in violation of MARPOL and in violation of company procedures between June 4 - June 16. The most recent violations occurred in August and October 2017 on two vessels.

The above response does not provide comfort that these violations are fully understood or under control. The government request that Carnival provide the interested parties, the CAM and

TPA, with a written plan to address systemically address the illegal discharges, and to ensure that Carnival vessels are keeping current and in full compliance with international and domestic regulations in all geographical zones.

### C. TPA Audits and Trends [6]

In its submission, the Government stated that it was in receipt of seven reports of vessel audits and one shore-side audit performed by the TPA as of October 17, 2017.  *See* DE-43 at 9. The Government noted that, in general, the TPA audit reports provide many positive observations of shipboard activity, awareness, and attitudes.  However, the Government also stated that significant problems have been observed, which are addressed in this section.

As an initial matter, the Company believes that it is important to note, as the Government did in its submission, that none of the findings made by the TPA during the audits referenced by the Government were considered to be major non-conformities, as defined by the ECP.[7]  *See* DE-43 at 11.  Nevertheless, the Government expressed concerns that two vessels, *Sapphire Princess* and *Diamond Princess*, "may be lagging behind vessels of other operating lines," noting that the vessels had the largest number of non-conformities and some of those observations were "highly significant."  *See* DE-43 at 9.  The Government particularly highlighted issues found during the *Sapphire Princess*, highlighting the TPA's general concern that "[c]onsistently, throughout the

---

[6] The following issues were raised by the Government on pages 9-11 of the Government's Submission [DE-43].

[7] Under ECP § I.D, there are three types of audit findings, ranging in least severe to most severe: Observation, Non-Conformity, or Major Non-Conformity.  ECP § I.D defines a Major Non-Conformity as "an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water. It may also include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process."

audit, engineering logs, record keeping, and checklists were found sub-standard as evident in the number of non-conformities issues for these items." DE-43 at 10.  The Company's update on how it addressed the TPA's findings of non-conformities on the *Diamond Princess* and *Sapphire Princess*, which incorporate the TPA's general concerns, are as follows.  Of course, for each non-conformity, the Company reviewed the issue to develop corrective and preventative actions.

**Response of the United States**: Pursuant to ECP Sec. 8.F., the Company is supposed to address all Audit Findings, and that includes Observations as well as Non-conformities. The Company's response does not speak to its obligation to address all Audit Findings, including Observations.

Since the status hearing there have been several significant developments.  First, on November 13, 2017, the TPA made a finding of a major non-conformity following an audit of the Sun Princess. The government has made follow-up inquiries regarding apparent discharges in U.S. ports of pollutants used to clean the decks of vessels and is awaiting the Company's response. Carnival has advised that it has banned deck cleaning and the use of the identified chemicals in port pending its investigation. The government has requested that Carnival explain whether the discharges in U.S. ports that have taken place violate the Clean Water Act.

Second, following the status hearing and based on the Coast Guard's review of the TPA's audit report findings, the Coast Guard, TPA and CAM have had discussions which have determined that the TPA was misinterpreting the definition of a major non-conformity. As a result, the TPA was considering Carnival's response to a finding and remedial measures in defining whether there was a major non-conformity. As a result of those discussions, all have agreed that the definition is an objective one and does not consider the response. The TPA will be using the correct objective standard going further and will be amending past audit reports to accurately report and characterize

the severity of past findings.

   a. _Diamond Princess Findings_

- **Non-Conformity-01:** "The sampling line leading from the discharge line just prior to the three way valve to the sampling unit on the Centrifugal OWS (Alfa Laval unit) was not painted international orange as required by the ECP. All other sampling lines on this unit and the Static OWS (RWO unit) were properly marked.  The non-conformity was corrected on the spot."
   o **Corrective and Preventative Actions:**
      ▪ The non-conformity was corrected on the spot.  The ship painted the sampling line international orange during the audit.
      ▪ Requirements of DER-2002 were reiterated to the fleet by email.

- **Non-Conformity-02:** "The Garbage Record Book is not being accurately maintained as required.   Objective Evidence: Several discrepancies sighted between the quantities reported on the garbage receipts and those reported in the Garbage Record Book (GRB). Additionally, descriptions and amounts were not detailed. One receipt indicated 12 kg of batteries were disposed; the type and size was not documented. Objective Evidence: Auditors observed entries for different wastes under a single Category were not clearly indicated in the Garbage Record Book.  One entry indicated 17 m³ of Category C items were disposed.  It was not indicated if this was Glass, general waste, wood, etc.  Receipts from vendors do not always break down items properly and errors occurred when converting the quantities to cubic meters as required by the Garbage Record Book; further errors in adding amounts together in the GRB were noted."
   o **Corrective and Preventative Actions:**
      ▪ Implemented policy for EOs to provide better scrutiny when reviewing entries of GRB to ensure waste receipts match volumes in GRB.
      ▪  Chief Engineer's have undertaken a spot check of GRB on a weekly basis for a period of 2 months to ensure compliance.

- **Non-Conformity-03:** "Environmental familiarization training for the vendors/contractors on board the vessel is not being carried out as required under the ECP. Objective Evidence: The ECP audit team did not receive any familiarization or briefing when we boarded.  In addition, there was a contractor team on board doing AC chiller work that did not receive any briefings or familiarization. The senior management on the ship stated they did not give the contractors any familiarization training. The ship's crew stated they had been told by the company offices via email they didn't have to do it. The email was not available for review."
   o **Corrective and Preventative Actions:**
      ▪ Heads of Department have carried out all familiarization training for contractors and have offered said training to ECP Auditors.
      ▪ By December 20, 2017, Safety Training requirements are to be added to Monthly Safety Self Assessments / ISM Monitoring report, and all ships to confirm that

21

required training is being carried out in accordance with OHS-1302 by all vendors and offered to ECP Auditors.

- **Non-Conformity-04:** "Bunker plan not being retained in records as prescribe in policy number: TEC-1402-Oil Bunkering. Objective Evidence: Observed copy of Bunker Plan posted in the Bunker Station. During review of bunker records, checklists and receipts, no copies of the Bunker Plan for each occurrence were being retained with the other documents required under HESS policy TEC-1402-Oil Bunkering.  All other documents were being retained in accordance with the policy guidance."
  - **Corrective and Preventative Actions:**
    - Director of HESS-MS has liaised with the Corporate Maritime Policy and Analysis Department ("MPA")  regarding the update of TEC-1401 and the subsequent release to the fleet of the updated policy.   The update of TEC-1402 is to be completed.
    - The MPA will also conduct a full review of the procedures and take corrective actions as necessary.

- **Non-Conformity-05:** "Bunker Station Piping System not labeled in accordance with company standards HESS: DER-1401."
  - **Corrective and Preventative Actions:**
    - Chief Engineer has ensured that Bunker Station piping is clearly labelled and identified as per DER-1401.

- **Non-Conformity-06:** "Sample points required by the ECP were not properly identified by the Chief Engineer. This led to insufficient sample bottles being on hand to carry out the sampling.  In addition, the ECP requires one (1) sample per grey water/black water tank in the first year while the company sampling procedure developed by the third-party testing facility requires 3 samples per tank."
  - **Corrective and Preventative Actions:**
    - The vessel has reviewed ABSG sampling guidance and ensured that sufficient bottles are held and sampling valves are fitted.
    - ABSG sampling plan guidance has been circulated fleet-wide with instruction to ensure sufficient bottles are held and sampling valves are fitted.

- **Non-Conformity-07:** "Reporting of OWS monthly test not being sent to OLCM as required.  Last report was sent in June 2017. OLCM has sent email stating reports to be taken from AMOS. This contradicts ECP and HESS ENV 1201."
  - **Corrective and Preventative Actions:**
    - Ship has provided July and August reports to the OLCM.
    - AMOS work order has been updated to include notation to email OLCM with the monthly report.

b. *Sapphire Princess Findings*

- **Non-Conformity-01:** "Environmental Management System for Bunkering and Sludge Procedures found to be inconsistent, containing errors, and out dated forms. Objective Evidence [1]: TEC-1401 - Disposal of Sludge. Oily Water, Grey Water and Sewage Oil Bunkering Procedure Paragraph 4.2: states: 'in lieu of Appendix 1 use the following link:' However, Appendix 1 is still listed in procedure with active links leading to obsolete forms, resulting in improper forms being used by crew.  [Objective Evidence 2] TEC-1401- Disposal of Sludge. Oily Water, Grey Water and Sewage Oil Bunkering Procedure Paragraph 4.2: provides a link to the Discharge Disposal Plan but does not provide instruction regarding when to fill out, posting or retention. [Objective Evidence 3] TEC-1401-Disposal of Sludge. Oily Water, Grey Water and Sewage Oil Bunkering Procedure Paragraph 5: does not clearly state the length of time documents should be retained and each document has different retention times resulting in records not being properly maintained. The Disposal Plan is not listed. [Objective Evidence 4] TEC-1402- Oil Bunkering: Paragraph 5 does not clearly state the time documents should be retained and each document has different retention times resulting in records being properly maintained."
    - **Corrective and Preventative Actions:**
        - TEC-1401 has been reviewed, in consultation with the TPA, in an effort to standardize the forms.  It has since been published and all ships are required to use the newly updated forms.  All vessels have also been advised of the updated TEC-1401 forms and were required to confirm its usage.  The same process is underway regarding TEC-1402.

- **Non-Conformity-02:** "Overdue purchase orders for critical spare parts are not being effectively followed up and updated delivery dates obtained from the vendor. Objective Evidence: Two overdue purchase orders (THER12212A and T714170947) identified as urgent were observed in the AMOS system.  On board delivery dates were reported to be 1 August 2017 and 8 August 2017.  At the time of the audit, the storekeeper confirmed neither order had been received.  The only procedure in place for the storekeeper to track overdue purchase orders was for the crew member to review AMOS and to send an email to the individual in shore side purchasing responsible for expediting and following up on the order."
    - **Corrective and Preventative Actions:**
        - Ship to confirm orders have been received and to scan delivery notes as evidence.
        - In order to track raised purchase orders for ECP critical items, the Company will require that buyers set the ECP Order Forms Alert on their respective vessels' AMOS Dashboard.  The Company will also require that the status of orders be checked on a daily basis.  The Company will further require that onboard delivery dates be verified with the freight forwarder, and any changes should be recorded in the Supply Chain notes and the onboard delivery date field should be updated.

- **Non-Conformity-03:** "Unplanned maintenance or repairs are not being effectively recorded in AMOS. Objective Evidence: The Oil to sea Interface log indicates a significant quantity of hydraulic oil is lost from Bow Thruster #1 every week, reportedly due to internal leakages. No documentation was available to show that the cause of the leak was investigated, identified, and repaired. A review of the AMOS maintenance tracking system indicated that no unplanned maintenance has been carried out on the machinery since the oil leaks were first entered into the log book. An email showing the bow thruster was scheduled for a minor overhaul during the upcoming dry dock in March 2018 as part of the regular maintenance schedule in AMOS."
  - **Corrective and Preventative Actions:**
    - Work Order has been submitted for the overhaul/replacement of Bow Thruster #1 Pinion Shaft Seal at dry dock in March 2018. Dry Dock specification procedures require work orders to be created for all jobs at dry dock, meaning that this work order will be in addition to the one that will be required/created for thruster "Minor Overhaul."
    - The ship has instructed relevant crew members that the addition of oil, including cleaned/collected oil, be recorded as additional notes in the Oil to Sea Interface log.
    - The fleet has been reminded to review ENV-1202 with regard to the addition of oil, which will be promulgated by the EO during the next EO Conference Call to the engineers.

- **Non-Conformity-04:** "Pulper Piping Not Properly Identified. Objective Evidence: Two (2) unsecured valves with quick disconnect valves located on the food waste discharge line leading directly overboard. One on each Food Waste Tank discharge line. Valves not recorded in the Vessel Vulnerability Assessment (VVA)."
  - **Corrective and Preventative Actions:**
    - During the TPA audit itself, the Company addressed this issue by removing valves, adding and welding flanges, and adding locations to the Vessel's VA.
    - Audit findings have been shared with the fleet. An Environmental Compliance Notice has been issued to provide guidance on reviewing and conducting vulnerability assessments.

- **Non-Conformity-05:** "Training records not properly maintained. Members signing for multiple courses with one signature. Object Evidence: Training is being provided the day new crew members come on board. ECP required training segments are provided to technical and non-technical members simultaneously as well as the segments for all members. Only one sign in sheet is provided for the day of training and does not indicate which training(s) members attended. The training is entered into personnel records based on job title, not by actual course/segments attended. Therefore, no objective evidence available showing which course/segment(s) the members attended. Additionally, upon cross referencing the sign in sheets over a 3-month period to the personnel management system (MAPS) with the HR Director, it was noted the majority of the members cross-referenced have missing entries. Therefore, it cannot be verified that the crew members (technical and non-technical) have received the required training in accordance with

24

company and ECP polices.  However, it should also be noted that during the official interviews of the crewmembers as well as random questioning, knowledge of the ECP, environmental regulations, opening reporting and company polices was evident."

- o **Corrective and Preventative Actions:**
  - ▪ The Operating Line Training Manager has worked with the EOs so that they understand the requirement for separate logs to document separate training even if the trainings were conducted at the same session.
  - ▪ A standard roster form for ECP training has been distributed to the fleet to ensure compliance with the policy.
  - ▪ The Operating Line Training Manager has worked with the MAPS data team to ensure that the correct data is able to be inputted into MAPS to facilitate the tracking and proper maintenance of training records.
  - ▪ For additional corrective and preventative actions relating to the falsification or mismanagement of training records, see *supra* regarding Notice of Violation 4 and Notice of Violation 6.

- • **Non-Conformity-06:** "The Oil to Sea Interface log is not being properly maintained and reviewed.  Objective Evidence: The Oil to Sea Interface log book indicates that since March 2017, Bow Thruster #1 head tank and power pack have routinely lost oil.  The log indicates that the loss was due to internal leakages, but no description of the leakage was provided. Each entry was signed by the officer responsible for the soundings and refilling of the equipment. The Chief Engineer reviewed and signed the log weekly as required by HESS procedures but was not aware of the source of the oil leak."
  - o **Corrective and Preventative Actions:**
    - ▪ Retraining of all Technical Officers on the "Oil to Sea Interface Log" procedures and the importance of ascertaining the source of any leaks if any system requires topping up has been completed.
    - ▪ The corrective actions here are linked to those employed in Non-Conformity 3, *supra*, which are intended to address the relevant issue on a fleet-wide basis.

- • **Non-Conformity-07:** "Oil Bunkering Procedures records found to be missing and incomplete.  Objective Evidence: MARPOL Annex V1 Bunker Sample Record form, TEC-1402-A1not being used or retained in records as prescribe in policy TEC-1402 - Oil Bunkering.  Bunker Plan TEC-1402-A5 not being used or retained in records as prescribe[d] in policy TEC-1402 - Oil Bunkering.  The Bunker Plans are not[] being completed or posted as required during transfer operation. Bunker Checklist TEC-1402-A4 not properly filled out or completed as prescribe[d] in policy number: TEC-1402 - Oil Bunkering. Times and Facility PIC items missing, [s]ignatures missing times and sometimes dates."
  - o **Corrective and Preventative Actions:**
    - ▪ Retraining of all personnel involved with the Fuel Oil Bunkering process in the Company's Policy and Procedures, which included the review of all required documentation, has been completed
    - ▪ Entries were corrected where personnel remained onboard.  If that was not possible, then a late entry was to be made by the Chief Engineering Officer.

- The Company also conducted spot checks which revealed that the vessel was now completing the Bunker Plan correctly.

- **Non-Conformity-08:** "Sludge and Oily Water Disposal records found to be missing and incomplete.  Objective Evidence: Sludge and Oily Water Disposal Plan TEC-1401-A5 not properly filled out or completed as prescribe[d] in policy TEC -1402 Disposal of Sludge.  Sludge and Oily Water Disposal Checklist TEC-1401-A1 not properly filled out or completed as prescribe[d] in policy TEC -1402 Disposal of Sludge.  Times and Facility PIC items missing, [s]ignatures missing times and sometimes dates."
  - **Corrective and Preventative Actions:**
    - Chief Engineer to instruct Engineer Officer of the Watch on the importance of the disposal plan and proper recordation under TEC-1401-A5.
    - By mid-December 2017, weekly spot checks are to be completed by the Chief Engineering Officer for a period of two months from the issuance of this report.

- **Non-Conformity-09:** "Records Not Being Maintained in Accordance with Polices and Procedure.  Objective Evidence: Bunker plan not being retained in records as prescribe in policy number: TEC-1402 - Oil Bunkering."
  - **Corrective and Preventative Actions:**
    - As per the requirements of TEC-1402 paragraph 3.1, the Chief Engineer will ensure that correct and up-to-date detailed instructions are in use onboard and the contents of these instructions are known and understood by all relevant members of the Technical Department.
    - The corrective actions here are linked to those employed in Non-Conformity 7, *supra*.
    - As per the Company's correctives actions regarding Non-Conformity 1, TEC-1402 will be updated to address the issues found by the TPA.  The update is underway and will also include indications of retention times.

- **Non-Conformity-10:** "Ship was not prepared to properly take samples as prescribed by ECP.  Objective Evidence: Sample points required by the ECP were not properly identified by the Chief Engineer.  Sampling not able to be carried out in accordance with the ECP requirements and company sampling procedures.  Recent interpretation regarding sampling of grey/black water collection tanks resulted in insufficient sample bottles on hand.  Email sent to sampling coordinator incorrectly identified numerous sample points.  In addition, due to the recent changes regarding sampling of collection tanks, an urgent shipment of additional bottles was ordered by shore side but failed to arrive prior to the ship's departure.  Therefore, insufficient bottles were available to take the 150 samples required to be taken from all overboard discharges (including OWS) and from all tanks (double bottom holding tanks and grey/black water collecting tanks)."
  - **Corrective and Preventative Actions:**
    - New sample points were installed during the TPA audit to allow for OWS sampling.
    - Fleet-wide guidance has been transmitted to instruct other vessels on appropriate procedures.

- The vessel has reviewed ABSG sampling guidance and ensured that sufficient bottles are held and sampling valves are fitted.
- ABSG sampling plan guidance has been circulated fleet-wide with instruction to ensure sufficient bottles are held and sampling valves are fitted.

    c. Carnival's Corporate Office Findings

The Government's Submission also specifically noted the findings of non-conformities in the TPA's shoreside audit of Carnival's Corporate Office from August 14-18, 2017.  DE-43 at 10. The Company's update on how it addressed the TPA's findings of non-conformities are as follows. Of course, for each non-conformity, the Company conducted internal reviews in order to review the issue and develop corrective and preventative actions.

- **Non-Conformity-01:** Regarding the Company's Risk Advisory and Assurance Services department ("RAAS"), the TPA found: "At the time of the audit, multiple level 3 investigations relevant to pollution incidents have occurred from September 2016 to July 2017, 24 investigations were found to still remain open.  Evidence was provided by the RAAS Director of Investigation showing where he has requested follow up from the Lead Investigators residing at the Line level on a regular basis.  However no recent feedback or investigation updates had been provided to the RAAS Director of Investigations at the time of this audit."
  - **Corrective and Preventative Actions:**
    - The Company will now require that a monthly update on the status of all Severity 3 investigations in progress at all brands be provided to the RAAS Director of Investigations in order to ensure that all issues are being reviewed and resolved in a timely manner.  The first update is to be provided by November 30, 2017.
    - RAAS will update HMP 1303 to define: (1) Operating Line progress report frequency based on the investigation's complexity (Severity 1 to 4); (2) the VP of RAAS Maritime will be required to discuss Severity 4 investigations during the quarterly EVP meetings; and (3) VP of RAAS Maritime will provide a factual statement on the incident to the MPA within 15 days of commencing a Severity 4 investigation.
    - Overall, the Company acknowledges the difficulties observed by the TPA and is revising its HESS investigation procedure to ensure more timely investigation results.

- **Non-Conformity-02:** Regarding RAAS, the TPA found: "Incidents in violation of Marpol Annex IV and V regulations and company procedure ENV 1001 due to discharge overboard of comminuted food waste and treated black water inside 12 nautical miles of the Bahamas baseline were reported on the vessel Carnival Elation on voyages between June 4 and June 16, 2017.  Reference is to the environmental incident report 005_2017-EL.  Further

27

investigation revealed the existence of similar reports issued to other Carnival Cruise Line vessels (Carnival Freedom, Carnival Liberty, Carnival Magic, Carnival Conquest, Carnival Splendor and Carnival Vista). At the time of the audit the investigation about these incidents was found open. The HESS-MS procedure ENV 1001 was found revised and containing additional information to the vessel to avoid future incidents. A copy of the internal Carnival Cruise Line internal communication sent to the Line feet requiring Masters and Chief Engineers to confirm awareness and updates of the procedure was also provided. However the information learned from the ongoing investigation, including the notification of procedure change, has not been circulated to all the Operating Lines as required by the HESS-MS Procedure."

- o **Corrective and Preventative Actions:**
  - ▪ Environmental Compliance Notice # 10 was issued on August 22, 2017 to specifically address the Bahamas baseline incidents. The Company also employed the Safety and Environmental Awareness Bulletin for communicating lessons learned.
  - ▪ A Working Group has been established to identify non-shoreline claims.
  - ▪ RAAS will update HMP 1303 to define: (1) Operating Line progress report frequency based on the investigation complexity (Severity 1 to 4); (2) the VP of RAAS Maritime will be required to discuss Severity 4 investigations during the quarterly EVP meetings; and (3) VP of RAAS Maritime will provide a factual statement on the incident to the MPA within 15 days of commencing a Severity 4 investigation.

**Response of the United States**: The United States has not had sufficient time to review and analyze the above assertions. The government is evaluating whether the remedial measures are documented, whether the remedial measures respond to the underlying causes of identified problems, whether there are generic trends, and whether the identification of problems and implementation of remedial measure are being comprehensively tracked.

d. Concern Regarding Failure to Provide Information Requested by TPA

The Government's Submission also noted that the TPA advised the Government of a concern that the Company had declined to provide certain information requested by the TPA, specifically information related to corrective actions regarding non-conformities. *See* DE-43 at 10-11. The Company believes that this issue simply reflected a miscommunication and misunderstanding between the Company and the TPA. This issue has been clarified and relayed to

the Government.  Namely, the TPA has access to the Company's corrective action plans through the Global HESS system.  Further, the Company asserts that it has been and will continue to support the TPA's efforts and provide the TPA with all necessary information, including information regarding corrective actions, as it has in this status report.  Certainly the quarterly status reports requested by this Court will also provide a manner by which the Company can provide all of the Interested Parties with information regarding its corrective actions to non-conformities discovered during vessel and shoreside audits.

**Response of the United States**:  The government appreciates the above statement but has not yet had an opportunity to verify that the TPA's concerns have been fully resolved. With regard to quarterly status reports, the government views the Court's request as a method to inform the Court. However, the government does not view the quarterly reports as the primary method of keeping the interested parties fully informed. The United States expects that Carnival will provide fulsome and up-to-date information to the interested parties, CAM and TPA.

e.   TPA Audit Reports Received After October 17, 2017

Since October 17, 2017, the TPA has completed several additional audits of Company vessels and shore-side facilities.  The Company will be prepared to address any concerns arising from those and future audits in subsequent quarterly reports.  However, it should also be noted that, to date, the TPA has only identified one major non-conformity during its audits, which was found on the TPA's audit onboard the *Sun Princess* on November 5-9, 2017, for which there is currently no final report.  On November 13, 2017, the TPA notified the company by letter that it had identified a major non-conformity regarding the discharge of two deck cleaning chemicals – Deck Clean NP and Metal Brite HD (the "Identified Chemicals") – while the vessel was moored in port and underway.  Subsequently, the Government made several documentary requests in an email to the

Company on November 16, 2017 relating to the TPA's finding.  Carnival is evaluating whether the Identified Chemicals were in-fact improperly discharged.

Given the uncertainty and the importance given to these matters by the Company, upon receipt of the TPA's letter, the Company took action in the first 24 hours to discontinue all deck cleaning in port and to permit the use of only fresh water to clean decks while in international waters.  Following initial review, the Company authorized ships to resume using fresh water in port if permitted by local rules.  In other words, the Company took steps to ensure that all deck cleaning with the identified chemicals, Deck Clean NP and Metal Brite HD, was discontinued while at port and at sea as the Company was conducting its review of the finding.  The Company also promptly engaged in a positive dialogue with the TPA and has been working diligently to both provide the TPA with a written response to the TPA's letter and to provide the Government with the information sought by its requests.  In the interim, on November 20, 2017, the Company subsequently notified all Interested Parties that, based on its initial review, the Company would resume the use of the Identified Chemicals for their intended purpose *exclusively* while its vessels are in international waters and consistent with MARPOL Annex V and related guidance, specifically the 2012 Guidelines for the Implementation of MARPOL Annex V, Resolution MEPC.219(63) (the "MEPC Resolution").   The Company is continuing to undertake a thorough review of the issue and its records in order to assist all involve in coming to a conclusion regarding the use and disposal of these deck cleaning chemicals.

**Response of the United States**: Carnival's statement regarding the Sun Princess contains facts and assertions that appear premature and have not been verified by the government.  The government has asked questions and requested records that will help to evaluate Carnival's discharges in U.S. ports, including possible violations of the Clean Water Act during the period of

probation. In addition to the pending request, the government takes this opportunity to ask that Carnival inform the interested parties, CAM and TPA as to what steps it took prior to the TPA's finding of a major non-conformity to assess the propriety and legality of using cleaning chemicals on its ships and discharging them in U.S. ports.

### D. The Company's Broad Efforts to Address Concerns and Ensure ECP Compliance

As an initial matter, the Company feels that it is important to state that it takes full responsibility for any non-conformities by its employees thus far and, as discussed, has taken immediate action to remedy any issues and prevent future incidents.  The Company believes that these deviations are largely reflective of the growing-pains that reasonably would be anticipated and which come with the early implementation stages of a massive and comprehensive compliance plan like the ECP.  There is no indication that these issues are symptomatic of broader issues, but to the extent that trends have emerged, the Company is doing everything it can to prevent and remediate them.  As part of this process, the Company feels it is important to not simply highlight the Company's issue specific corrective actions above, but to also remind the Court and the Interested Parties of the extensive list of efforts discussed in the Company's October 17, 2017 Submission. *See* DE-44 at 14-20 (noting, among other things, that the Company had already spent or committed $30,000,000 towards ECP compliance, implementation, and environmental initiatives as of October 17, 2017 and anticipates an estimated $10,000,000 in recurring costs annually).  The Company has invested significant effort and resources, including investments of millions of dollars, to improve corporate structure and governance, policies and procedures, technology, training, auditing, and corporate culture.  In addition to complying with the ECP, the goal of these efforts has been twofold: to enhance oversight and accountability, and to drive the message from top to bottom of the Company that environmental compliance is a fundamental corporate value and

priority.  The Company is committed to continuing this progress into the next years of Princess's probation and beyond.

**Response of the United States**:  The government objects to the inclusion of this section in a joint filing regarding facts. It contains assertions that are unverified and incomplete. If this section is retained, the government notes that the applicable laws are not new and that Carnival and its brands have been previously convicted of environmental crimes and previously served period of probation and been subject to ECPs.

## III.    Conclusion

The parties hope that the foregoing provides this Court with sufficient information regarding the status of the outstanding issues raised in the Court's Order [DE-49].  The parties will be prepared to discuss the contents of this joint status report further at the Status Conference.  Pursuant to the Court's Order [DE-49], at the Status Conference, the parties will also be prepared to (1) discuss the parties' plans for the contents of the quarterly reports that were discussed at the October 18, 2017 status conference and the timetable for filing the reports, and (2) address the logistics of holding quarterly status conferences, including specific dates and whether the parties prefer to attend the conferences in person or via video-conference.

Dated: November 29, 2017

Respectfully submitted,

FOREMAN FRIEDMAN, P.A.

By: */s/ Catherine J. MacIvor*_____
        Catherine J. MacIvor (FBN 932711)
        cmacivor@fflegal.com
        One Biscayne Tower, Suite 2300
        2 South Biscayne Boulevard
        Miami, FL  33131

Tel: 305-358-6555/Fax: 305-374-9077

Counsel:

*Attorneys for Defendant*

David N. Kelley (pro hac vice)
Conrad A. Johnson IV (pro hac vice)
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

<u>**CERTIFICATE OF SERVICE**</u>

I, Catherine J. MacIvor, hereby certify that on November 29, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

By:  <u>*Catherine J. MacIvor*</u>
　　　 Catherine J. MacIvor