CONFIDENTIAL                                                    September 21, 2018

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: <u>16-20897-CR-SEITZ</u>

**UNITED STATES OF AMERICA**

> **v.**

**PRINCESS CRUISE LINES, LTD.,**

> **Defendant.**

_____/

### <u>QUARTERLY REPORT OF THE COURT APPOINTED MONITOR (SEPTEMBER 2018)</u>

I.   **Introduction** ...................................................................................................... 1

   A. Overview of CAM Quarterly Report ............................................................ 1

   B. Areas of Focus ............................................................................................. 2

II.  **CAM Methodology and Activities** ................................................................... 6

   A. CAM Second Annual Work Plan ................................................................. 6

      1.   Additional Court-Ordered Vessel Visits .............................................. 6

      2.   Unannounced CAM and TPA Vessel Visits and Audits ...................... 8

   B. CAM Team Activities during the First Quarter of ECP Year Two ................ 8

   C. TPA Audit Activities .................................................................................... 9

   D. RAAS Audit Activities ................................................................................ 10

III. **Updates on Company Capabilities to Meet ECP Objectives and ECP Year Two Areas of Focus** ................................................................... 10

   A. Environmental Incidents ............................................................................ 10

   B. Implementation of ECP Requirements ...................................................... 15

   C. Initiatives beyond ECP Requirements ....................................................... 16

   D. Personnel .................................................................................................. 17

   E. Corporate Structure and CCM Authority ................................................... 18

      1.   Centralization ..................................................................................... 18

      2.   CCM Authority .................................................................................... 21

   F. Culture ....................................................................................................... 22

      1.   Compliance Culture Assessment ....................................................... 22

   G. Investigations ............................................................................................ 23

H. Training ................................................................................................................ 25

I. Strategic Planning and Resources for Operations and Compliance ............................... 27

    1. CAM Interactions with Company Representatives .................................................. 27

    2. CAM Retention of Forensic Accountant .................................................................. 28

J. Company Vessel Visit Programs ..................................................................................... 29

    1. Context ................................................................................................................... 29

    2. Review of Company Document Production ............................................................ 30

Appendix A: ECP Year Two CAM Recurrent Incident Categories ............................................ 32

Attachment 1: CAM Second Annual Work Plan ...................................................................... 35

CONFIDENTIAL                                                        September 21, 2018

## I.    INTRODUCTION

Pursuant to the Court's Orders of April 26, 2018, Dkt. No. 66, and July 13, 2018, Dkt.

No. 75, the Court Appointed Monitor ("CAM") submits this first quarterly report for ECP Year

Two ("CAM Quarterly Report" or "Report").[1]

### A.    Overview of CAM Quarterly Report

The Court ordered that the CAM submit Quarterly Reports to provide updates about

issues identified by the CAM and the Court.[2]  This Report focuses on events and developments

occurring during the period from April 19, 2018 through August 18, 2018.  However, certain

notable developments occurring after August 18, 2018 are included in the discussions below, as

appropriate.

Part II of this Report provides an overview of the current CAM Team methodology and

activities so far in ECP Year Two, and will cover additional audits and visits by the TPA and

CAM conducted pursuant to the Court's Order of July 13, 2018, Dkt. No. 75.  Part II also

presents an overview of the CAM's oversight of the TPA and of the Company's audit function

conducted by its Risk Advisory and Assurance Services ("RAAS") department.

Part III of this Report provides updates on the Company's capabilities to meet ECP

objectives, the Company's efforts with respect to ECP compliance, and other areas of focus.  Part

III also provides updates on other actions ordered in the Court's Order of July 13, 2018, Dkt. No.

75.  This Quarterly Report does not provide the more detailed assessments or findings regarding

the Company's performance in the areas of focus that will be found in the Annual Report for

---

[1] Any terms not defined in this Report take the definitions provided in the First Annual Report of
the Court Appointed Monitor (2017-2018) ("CAM First Annual Report"), the ECP, or the Joint
Glossary of Terms, Dkt. No. 58-1.

[2] There will be no Quarterly Report for quarters in which the CAM issues an Annual Report.

each year.  This is consistent with the CAM's approach of avoiding assessments or findings based on limited amounts of information and also furthers the CAM's ability to maintain the promised confidentiality of information received from Company personnel during CAM interviews.  Consistent with the above, however, in certain circumstances the CAM may provide assessments and findings in subsequent Quarterly or Annual Reports.

### B.    Areas of Focus

The CAM First Annual Report, submitted on June 21, 2018, made a total of twelve findings:  eight findings describing progress with respect to the Company's capabilities to meet ECP requirements and objectives (including efforts beyond requirements of the ECP) and four findings of as yet unresolved barriers to sustainable compliance and opportunities for improvement.

In brief, the CAM First Annual Report's findings related to the Company's progress regarding ECP objectives were:

(1)  **No Repeat of the Underlying Offenses.**  The CAM was not aware of any Covered Vessels having repeated the conduct for which the sentence was imposed (although other types of prohibited discharges and record falsifications had occurred).

(2)  **Substantial Implementation of Enumerated ECP Year One Requirements.**  The Company appeared to have substantially implemented the many ECP Year One requirements, involving significant effort by hundreds of employees, on ship and on shore.

(3)  **Qualified and Dedicated Compliance Personnel.**  The Company selected a CCM and OLCMs with significant maritime experience and clear dedication to their work.

(4)  **Employee Cooperation and Awareness of Environmental Obligations.**  Employees, both on ship and on shore, were nearly universally cooperative and evidenced broad comprehension of their environmental obligations.

September 21, 2018

(5) **Initiatives Beyond the Enumerated ECP Requirements.** The Company has implemented a variety of initiatives related to environmental compliance that go beyond the enumerated requirements of the ECP.

(6) **CSMART Training Center.** The Company used its existing training resource, the Center for Simulator Maritime Training ("CSMART") in Almere, The Netherlands, to implement some of the training required by the ECP.

(7) **Review and Improvements to Internal Investigation Process.** The Company engaged a third party to help address identified weaknesses in the internal investigation capability across the company.

(8) **Culture Survey.** The Company agreed to the CAM's request to conduct an environmental compliance culture survey in order to set a benchmark for the Company's current culture.

*See* CAM First Annual Report at 3-4.

The CAM's findings of unresolved barriers to compliance and opportunities for

improvement were:

(1) **Challenges of the Complex Corporate Structure.** The complex corporate structure and lack of centralization has been widely identified as a barrier to continuous improvement on compliance issues. In addition, there is a lack of clarity as to responsibility, accountability, and authority for environmental compliance. Nor does the CCM possess the ECP-required "authority to ensure full implementation of [the] ECP." ECP § III.A.2.

(2) **Blame Culture and Lack of Learning Culture.** A blame culture, with a focus on identifying errors and disciplining individuals rather than also evaluating systemic issues that may need to be addressed, appears widespread.

(3) **Ineffective Internal Investigations.** As noted above, the Company's internal investigations are critically flawed, with no consistent, reliable means to investigate incidents or near misses and identify root causes that can lead to meaningful corrective actions.

(4) **Environmental and ECP Violations.** During ECP Year One, the Company violated environmental laws and the ECP.

*See* CAM First Annual Report at 4-5.

CONFIDENTIAL                                           September 21, 2018

Based on the CAM's findings and observations, the CAM also identified the following

seven areas of focus for ECP Year Two:  (1) an initial culture survey; (2) internal investigations;

(3) training; (4) resources for operations and compliance; (5) shoreside support for vessels;

(6) personnel, in particular Environmental Officers, engineers, and ratings; and (7) Company

vessel visit programs.  *See* CAM First Annual Report at 68-74.

On June 18, 2018, the Third Party Auditor ("TPA") submitted its Third Party Auditor

Year One Annual Report ("TPA First Annual Report").  Based on audits of thirty-one vessels

and six shoreside facilities, the TPA First Annual Report made a number of observations and

recommendations that were consistent with the findings in the CAM First Annual Report.  The

TPA made the following six recommendations:

(1)  **Policies and Procedures.**  Update incomplete, vague or non-existent policies or procedures within Global HESS.

(2)  **Vulnerabilities.**  Re-evaluate the "vulnerability assessment" (which is the methodology for the placement of seals, welds, locks and other controls) for all covered vessels to a more manageable and realistic approach to risks of an overboard discharge as described by the ECP.

(3)  **Record Keeping.**  Training should emphasize the importance of and legal obligation of factual, accurate, and timely log entries.  Consider incorporating electronic record keeping where applicable and authorized by regulatory requirements.

(4)  **Training.**  Adopt a single IT platform across the Organization to allow for consistency and effective record keeping.  Update all ECP training modules to reflect current state and effectively cover basic ECP requirements.

(5)  **Investigation.**  Update investigations Policies and Procedures.  Adopt a centralized Root Cause Analysis program with procedure and implement it throughout the corporation.  Make this program the standard for all personnel conducting investigations at all levels.

(6)  **Critical Spare Part[s].**  Adopt a single centralized IT platform across the Organization to improve consistency and effective part management, identify specifically required critical spare parts and improve tracking and delivery of critical spare parts.

TPA First Annual Report at 3.

September 21, 2018

Following the submission of the CAM and TPA annual reports, a Status Conference was held on July 11, 2018.  During that hearing, the Court took notice of several efforts by the Company to send teams to ships in advance of TPA audits (described informally as "vessel visit programs"), and concluded that these actions by the Company's management had resulted in a "taint" on the ability of the audits to provide a reliable benchmark to the Court of current ship conditions.  *See* Status Conf. Tr. at 11 (July 11, 2018).  In order to address this issue and others, and with the agreement of the Interested Parties, on July 13, 2018, the Court entered an Order requiring, among other things, that:

(1)   All future audits and vessel visits by the TPA and CAM be unannounced and that, by August 1, 2018, the Company propose a plan as to whether and how these unannounced audits and vessel visits can be facilitated;

(2)   During ECP Year Two, ten additional vessel and five additional shoreside facility audits and/or visits by the TPA and/or CAM be conducted and that, by August 1, 2018, the Parties inform the Court of a plan as to how these additional audits and/or visits will be conducted and by whom;

(3)   By September 5, 2018,[3] the Company provide a plan for how Carnival and its brands will address the challenge of corporate structure set forth in the CAM First Annual Report, including prioritizing and standardizing environmental compliance across the Company and establishing a Corporate Compliance Manager ("CCM") with both responsibility and authority over environmental policy and the ECP;

(4)   By September 5, 2018, the Company complete production of records responsive to the Government's pending document requests regarding the Company's "vessel visit programs";

(5)   By September 21, 2018, the Company provide a proposed timeline for establishing and implementing the recommendations made by third party consultants DNV-GL for improving and standardizing the Company's internal investigation processes across all brands; and

---

[3] The Court extended this deadline until September 17, 2018 for the plan addressing the first part of the order—*i.e.*, the challenge of corporate structure and the prioritization and standardization of environmental compliance.  *See* Dkt. No. 83; *see also infra*, Part III.E.

(6)     By the next Quarterly Status Conference, currently scheduled for October 3, 2018, Company representatives meet and confer with the CAM to discuss how the Company's long-term strategic plans are formulated, including how environmental compliance has been made part of those plans and how environmental protection is being incorporated as a priority into the Company's strategic plans and culture in a long-term sustainable manner.

Dkt. No. 75 at 1-3.

## II.     CAM METHODOLOGY AND ACTIVITIES

### A.     CAM Second Annual Work Plan

As provided for in the Monitor Agreement, the CAM prepared a Second Annual Work Plan and Budget of the Court Appointed Monitor ("Second Annual Work Plan"), attached as Attachment 1.  The work of the CAM during ECP Year Two was categorized into the following thirteen primary work streams:  (1) management and contingencies; (2) document and data review; (3) interviews, site visits, and events; (4) vessel visits; (5) shoreside facility visits; (6) compliance culture assessment; (7) reporting; (8) strategic planning and resources for operations and compliance; (9) corporate structure and CCM authority; (10) investigations; (11) training; (12) personnel; and (13) review and analysis of the Company's "vessel visit programs."  These work streams reflect the CAM's current plan for work to be done during ECP Year Two, but, as noted in the Second Annual Work Plan, this plan may be modified if required by the Court or by circumstances that arise during the course of the year.

### 1.     Additional Court-Ordered Vessel Visits

In accordance with the Court's Order described above, the Second Annual Work Plan includes a plan, developed in consultation with the TPA, for performing the ten additional vessel and five additional shoreside facility audits and/or visits[4] ordered in the Court's Order of July 13,

---

[4] The TPA conducts vessel and shoreside *audits*, while the CAM conducts vessel and shoreside *visits*.  The distinction being that the ECP requires the TPA to conduct specified technical reviews, *see* ECP §§ VIII-IX, while the CAM is required to oversee the audits of the TPA, the

CONFIDENTIAL                                      September 21, 2018

2018.  *See* Dkt. No. 75 at 1-2.  The Company and the Government have proposed this plan to the

Court.  *See* Dkt. No. 78.

     For the ten additional vessel visits and/or audits, the CAM and the TPA will each conduct

five vessel visits or audits.  *See* Second Annual Work Plan at 8.  The CAM Team may

accompany the TPA on one or more of the five additional TPA vessel audits, and the TPA may

accompany the CAM Team on one or more of the five additional CAM vessel visits.  The CAM

Team and the TPA are collaborating on the logistics for these additional visits and audits.  *See id.*

     For the five additional shoreside facility visits and/or audits, the CAM Team will lead all

five visits.  *Id.* at 9.  The TPA may participate in some or all of the five visits.  *Id.*  The CAM

Team will use these visits to concentrate on its ECP Year Two areas of focus, as well as to

comply with the Court's Order to explore how "long-term strategic plans are formulated,

including how environmental compliance has been made part of those plans and how

environmental protection is being incorporated as a priority into the Company's strategic plans

and culture in a long-term sustainable manner."  Dkt. No. 75 at 3.  These visits may also involve

assessment of systemic issues identified by the TPA, such as deficiencies in policies and

procedures and continuous improvement efforts, or other areas of inquiry that may arise during

the course of ECP Year Two.  *See* Second Annual Work Plan at 10.  In support of this effort, the

CAM received approval from the company for the CAM to retain AlixPartners, a forensic

accounting and investigations firm with extensive domestic and international experience, to

provide the CAM with consulting support on corporate compliance issues related to strategic

planning, finance, and budget.

---

Company's internal audit function (RAAS), as well as the Company's overall efforts at
developing a sustainable compliance approach.  *See* ECP § VI.

CONFIDENTIAL                                          September 21, 2018

      2.        Unannounced CAM and TPA Vessel Visits and Audits

As required by the Court, and noted in the Second Annual Work Plan, on August 2, 2018, the Company provided an interim proposal to facilitate unannounced TPA and CAM audits and vessel visits in response to the Court's Order of July 13, 2018.  The Company's proposal stated:

> Although the exact details of the plan for unannounced ship visits or audits are still being finalized, the parties have agreed on an interim basis to a general proposal, pending approval from this Court, whereby the CAM and TPA will continue to follow many of the same procedures employed in the past, namely that the CAM or TPA will notify the Company of their respective ship visits or audits on 'short notice,' generally no more than a week before the CAM or TPA is prepared to begin their respective ship visits or audits. The CAM or TPA shall contact Christopher Donald, the Company's Corporate Compliance Manager, who will serve as the primary point of contact to facilitate the CAM's or TPA's ship visits or audits. Mr. Donald will also work with a designated representative(s) of the Company who is not associated with the implementation of the Environmental Compliance Plan (hereinafter 'Designated Persons') to assist the CAM and TPA in completing all necessary booking obligations. Mr. Donald and the Designated Persons will be required to keep all booking information in strict confidence.

Dkt. No. 78 at 1-2.

The CAM Team visited two vessels following the Court's July 13, 2018, Order and before the date of this Report.[5]  The CAM gave notice of these visits to Mr. Donald a week in advance of the date of embarkation, and, although the Company had not at the time identified the designated representatives (it has since done so), when the CAM Teams arrived onboard, there was no indication that any vessel personnel had been made aware of the CAM Teams' impending visits.

**B.**    **CAM Team Activities during the First Quarter of ECP Year Two**

During the period covered by this Report—April 19, 2018 through August 18, 2018—the CAM Team conducted five vessel visits (two CAM-specific visits and three TPA follow-up

---

[5] The visits were conducted on the *Carnival Triumph* and the *P&O UK Aurora*.

visits) and one shoreside facility visit (during which the CAM Team monitored a RAAS audit).[6] In addition, on July 12, 2018, the CAM Team accompanied representatives from the Court, the Company, and the U.S. Coast Guard, for a brief vessel visit in the Port of Miami, designed to familiarize the Court with relevant ship systems and operations.

Outside of CAM vessel and shoreside facility visits, the CAM Team has attended various Company meetings, conferences, and events, and conducted additional formal and informal interviews with Company personnel, as discussed below. The CAM Team also continues to engage in regular communication with the Company and performs ongoing review of documents produced by the Company in relation to the work streams identified in the Second Annual Work Plan and in response to information requests by the Department of Justice.

### C.     TPA Audit Activities

From the period covered by this report— April 19, 2018 through August 18, 2018—the TPA conducted ten vessel audits and two shoreside audits. The CAM continues to communicate regularly with the TPA, review TPA audit reports, and evaluate the adequacy and independence of the TPA.

From August 25 to August 28, 2018, the CAM Team accompanied TPA auditors during a shoreside audit of CUK's headquarters in Southampton, United Kingdom. During the audit, the CAM Team accompanied the TPA auditors during their interviews, while also performing a limited number of CAM-specific interviews. CUK also provided the CAM Team with a preview of SeaEvent, an incident and near miss reporting system that is under development, as well as several media projects related to CUK's compliance culture. Both the CAM and TPA teams

---

[6] Since August 18, 2018, the CAM Team accompanied the TPA on a shoreside visit to Carnival UK ("CUK").

explored CUK's implementation of the ECP, as well as the operating line's ECP Year One challenges and successes with environmental compliance.

The CAM's oversight of the TPA during ECP Year Two has affirmed the CAM's assessment that the TPA acts with independence and performs adequate ECP-required audits.

### D.     RAAS Audit Activities

During the first quarter of ECP Year Two, RAAS conducted thirty-five vessel audits[7] and three shoreside audits.  The CAM Team attended the shoreside RAAS audit of the Carnival Maritime Group ("CMG") headquarters in Hamburg, Germany from June 19 to June 22, 2018. During the audit, the CAM Team accompanied RAAS auditors during their audit activities, while also performing a limited number of CAM-specific interviews.  The CAM-specific discussions focused on CMG's budget process, incident reporting mechanisms, and systems for tracking environmental waste streams.  CMG provided the RAAS and CAM Team with a tour and overview of the Fleet Operations Center, which supports both CMG and CUK fleets.  The CAM Team also spent time observing the RAAS auditors' process, including the approach to finalizing audit report findings.  The observations of RAAS made during this visit were consistent with those in the CAM First Annual Report.  *See* CAM First Annual Report at 63-67.

### III.    UPDATES ON COMPANY CAPABILITIES TO MEET ECP OBJECTIVES AND ECP YEAR TWO AREAS OF FOCUS

### A.     Environmental Incidents

The CAM is unaware of any evidence of a recurrence on the Company's Covered Vessels, since the start of the ECP, of the same criminal conduct that occurred on the *Caribbean*

---

[7] This number includes an audit that began on August 17, 2018, and ended on August 25, 2018.

CONFIDENTIAL                                         September 21, 2018

*Princess—i.e.*, intentional bypass of pollution prevention equipment to discharge oily waste

water coupled with intentional falsification of records and conspiracy to conceal such illegal acts.

However, as in ECP Year One, there continue to be environmental violations and ECP

compliance issues, including discharges in restricted areas or discharges of prohibited wastes.

The CAM Team continues to track the type and frequency of incidents reported through formal

and informal reporting mechanisms, including TPA audit findings, Notices of Violation, Open

Environmental Reporting, and Flash Reports.  As part of this tracking, the CAM Team trends

both total reported incidents and categories of recurrent incidents that the CAM Team has

identified, such as training issues, non-compliant discharges, and bilge leaks, as described more

fully below.

However, as noted in the CAM First Annual Report, however, the data, even when trended, do not

paint a full picture of the effectiveness of the Company's compliance efforts.  It is important to

consider that higher numbers of incident reports may well reflect greater willingness to report,

and even when the issues reported appear to be of a minor or even inconsequential nature, such a

willingness to report is significant.[8]  Thus, the data provided are to be considered with these

caveats and perspectives in mind.

During the period covered by this Report,[9] the CAM Team tracked and analyzed 909

Flash Report incidents, thirteen Notices of Violation, one Environmental Open Report, thirteen

Major Non-Conformity findings from TPA and/or CAM vessel audits and/or visits, and 353

---

[8] Notably, criminal violations on the Caribbean Princess went on for years, and yet no one made any documented internal reports.  It remains to be seen whether the Company will foster a culture of more open reporting.

[9] Tables 1-3 are based on data from April 19 through August 28, 2018.

CONFIDENTIAL                                              September 21, 2018

incidents determined to be Major Non-Conformities from all sources, including Company Flash

Reports.  Table 1 shows these incidents for Covered Vessels by operating line:

| Table 1:  Incident Report Counts | | | | | |
|---|---|---|---|---|---|
| Brand | Flash Report Incidents[10] | Notices of Violation | Environmental Open Reports | Major Non-Conformity Vessel Visit/ Audit Findings[11] | Total Major Non-Conformities[12] |
| AIDA | 39 | 2 | 0 | 2 | 20 |
| Carnival Cruise Line | 323 | 1 | 0 | 4 | 146 |
| Costa | 32 | 0 | 0 | 1 | 11 |
| Cunard | 62 | 1 | 0 | 1 | 15 |
| Holland America Line | 119 | 1 | 0 | 2 | 51 |
| P&O Cruises UK | 130 | 2 | 0 | 2 | 18 |
| Princess | 162 | 6 | 0 | 1 | 68 |
| Seaborn | 42 | 0 | 1 | 0 | 24 |
| **Total** | **909** | **13** | **1** | **13** | **353** |

The total number of incidents are also a function of the relative sizes of the respective

fleets.  For example, there are twenty-five vessels in Carnival Cruise Line covered by this data,

but only three vessels from Cunard.  Weighted ratios to reflect the rates of Flash Report incidents

relative to the size of each fleet are shown in Table 2.

[*See Table 2 on following page.*]

---

[10] This category includes incidents categorized as "near misses."  *See* Appendix A.

[11] This category only includes Major Non-Conformity findings from the TPA and the CAM in connection with vessel or shoreside audits and/or visits.  It does not include self-reported incidents from the Company (*e.g.*, Flash Reports) that also are determined to be Major Non-Conformities.

[12] This category reflects the total number of incidents determined to be Major Non-Conformities, regardless of the form of the initial report (*e.g.*, Flash Report).  This column is based on data from April 19 through September 7, 2018.

CONFIDENTIAL                                                    September 21, 2018

| Table 2:  Weighted Index of Flash Report Incidents by Operating Line | | | | | |
|---|---|---|---|---|---|
| Brand | Incident Count | Covered Vessels | % Total Incidents | % Total Covered Vessels | Incident Index[13] (% Incidents / % Covered Vessels) |
| AIDA | **39** | 4 | 4.29% | 5.26% | 0.82 |
| Carnival Cruise Line | **323** | 26 | 35.53% | 33.77% | 1.05 |
| Costa | **32** | 3 | 3.52% | 3.95% | 0.89 |
| Cunard | **62** | 3 | 6.82% | 3.95% | 1.73 |
| Holland America Line | **119** | 14 | 13.09% | 18.42% | 0.71 |
| P&O Cruises UK | **130** | 8 | 14.30% | 10.00% | 1.43 |
| Princess | **162** | 18 | 17.82% | 23.68% | 0.75 |
| Seabourn | **42** | 5 | 4.62% | 6.17% | 0.75 |
| **Total** | **909** | 76 | 100.00% | 100.00% | |

Table 3 provides an overview of the recurrent incidents.[14]  Discharges and training issues are the most prevalent incidents across all brands.

[*See Table 3 on following page.*]

---

[13] A brand with an index below "1" is reporting fewer incidents per vessel than anticipated for its respective fleet size.  Conversely, a ratio above "1" is reporting more incidents per vessel than anticipated for its respective fleet size.

[14] The CAM Team continues to develop its categories of recurrent incidents to better analyze and assess reported incidents.  A table with definitions of the current incident categories is included as Appendix A.

CONFIDENTIAL                                        September 21, 2018

| Table 3:  Incidents by Recurrent Issues | |
| --- | --- |
| **Row Labels** | **Incident Count[15]** |
| Discharges | 429 |
| Training | 273 |
| Bilge Leaks/Overflows | 114 |
| Passenger Issue | 109 |
| Pollution Prevention Equipment | 102 |
| Near Miss | 96 |
| Seals or Locks | 73 |
| Lifeboat/Tender | 43 |
| Recordkeeping | 36 |
| Vendor Issue | 35 |
| EGCS | 29 |
| Refrigerants | 23 |
| Voyage Planning | 21 |
| Disciplinary Action | 18 |
| Emissions/Opacity | 15 |
| Environmental Officer | 15 |
| Alarms (Faulty) | 12 |
| Spare Parts (Non-Critical) | 9 |
| Alaska Permit Sampling | 8 |
| Fuel Sulphur Content | 7 |
| Portable Pumps | 7 |
| Contractor Issue | 6 |
| Fuel Leak (Internal) | 4 |
| Manning | 4 |
| Not Applicable | 4 |
| Shoreside Support/Resources | 4 |
| Ballast Tank | 2 |
| Hotline | 1 |
| Marine Mammal/Whale Strike | 1 |

---

[15] A single incident may fall under one or more recurrent issue categories.  For example, a discharge attributable to a failure to follow a Company procedure may be tagged as both a "discharge" and a "training" issue.  Similarly, a discharge that subsequently is recovered may be tagged as both a "discharge" (although not a Major Non-Conformity) and a "near miss." Therefore, the total number of incidents reflected in Table 3 will be greater than the incident counts in Tables 1 and 2.

CONFIDENTIAL                                            September 21, 2018

### B.      Implementation of ECP Requirements

As discussed in the CAM First Annual Report, the Company appears to have substantially complied with enumerated ECP Year One requirements.  *See* CAM First Annual Report at 13-14 and Appendix D.  Two additional requirements apply to the period covered by this Report.  The Company was required to develop and submit a response to the TPA's First Annual Report.  ECP § VIII.E.3.  The Company was also required to update the Environmental Management System as necessary within 60 days of receipt of TPA's First Annual Report and to submit its updated Environmental Management System to the Interested Parties, the TPA, and the CAM.  ECP § X.A.2.  The Company submitted letters in response to these requirements on August 16, 2018.

The CAM Team met with the TPA to discuss the Company's response to the TPA's First Annual Report.  Overall, in its response, the Company did not challenge the TPA's findings and observations and was receptive to the TPA's recommendations.  The response noted that "the Company welcomes this opportunity to improve its Environmental Management system.  The observations and recommendations identified in the TPA report will serve as the template to enhance the Company's compliance procedures and processes beyond the probation period."  Letter from C. Donald, *Company Response to the Third Party Auditor Year One Annual Report* 5 (Aug. 16, 2018), PCL_DOJ_00005728 at 1 ("Response to TPA First Annual Report").

As evidenced by the Company's responses, many of the TPA's recommendations call for significant undertakings by the Company.  For example, the TPA recommended that the Company "[r]eview all Policies and Procedures, update incomplete or vague policies and procedures and develop new and effective policies and procedures where none exist as required per our audit findings."  *See* TPA Year One Annual Report at 5.  In its response, the Company

outlined a multi-pronged approach through which it asserted it will seek to address this TPA recommendation and incorporate enhancement of its policies and procedures "as part of our ongoing commitment to continuous improvement."  Response to TPA First Annual Report at 1-4.  Given the extended timeframe necessary to comprehensively address this TPA recommendation, it is not possible to assess the effectiveness of the Company's efforts at this time.  The CAM is similarly constrained in assessing the Company's efforts to address the TPA's recommendations in the areas of vulnerability assessments, recordkeeping, training, investigations, and critical spare parts.  The Company's letter describing its Environmental Management System is detailed and incorporates hundreds of policies, procedures, and supporting documentation.  The CAM Team is currently evaluating this submission, and will continue to track the Company's progress and provide updates.

### C.      Initiatives beyond ECP Requirements

The Company also continues to develop and implement a number of additional initiatives that go beyond the enumerated ECP requirements.  Many of these efforts are related to the Operation Oceans Alive program, which launched in January 2018, and includes the "Top 5" and "Environmental Excellence Awards" programs.[16]  *See* CAM First Annual Report at 19-21 and Appendix B.  The Company has communicated that it is "developing a plan to sustain and grow the [Operation Oceans Alive] program in 2019."  *See* July 2018 USPO Supervision Report, Attachment 3, at 3.  Beyond the Operation Oceans Alive program, the Company continues to

---

[16] The Top 5 list recently was updated in the June ECP newsletter from Carnival's Chief Maritime Officer.  The current Top 5 list is: (1) Ensure compliant waste stream and ballast water discharges; (2) Ensure no tampering or unauthorized modifications to pollution prevention equipment; (3) Properly identify and control vulnerable vales, fittings and portable pumps; (4) Ensure use of compliant fuels and EGCS operation; and (5) Report leaks to the bilge and make timely repairs.  *See* June 2018 ECP Newsletter.

pursue a variety of initiatives related to communication, engineering, training, environmental policies and procedures, and incident investigations. *See, e.g.*, *id.* at 1-4. The CAM will continue to evaluate these initiatives and provide updates as appropriate.

### D.    Personnel

During ECP Year One, the CAM received information suggesting that the Company may face challenges with respect to the availability and retention of qualified personnel. This challenge may be a broader industry issue as well.[17] The CAM First Annual Report identified personnel issues related to compliance, including the Environmental Officer position, staffing and training of engineers, and hiring and training of ratings as an area of focus for ECP Year Two. *See* CAM First Annual Report at 72-73. The CAM is examining these issues during shoreside and vessel visits, and is planning to visit one or more manning agencies in ECP Year Two.[18]

From September 11-13, 2018, the CAM Team attended the Company's first Environmental Commitment Conference in Almere, The Netherlands. The conference was organized by the CCM and his team and provided Environmental Officers a forum to gather and share their experiences, challenges, and suggestions, both with one another and with shoreside

---

[17] In the maritime labor market generally, demand for qualified personnel, especially officers, may outpace supply. *See, e.g.*, Int'l Chamber of Shipping, *Global Supply and Demand for Seafarers*, http://www.ics-shipping.org/shipping-facts/shipping-and-world-trade/global-supply-and-demand-for-seafarers (noting that, for merchant shipping, "[w]hile the global supply of officers is forecast to increase steadily, this trend is expected to be outpaced by increasing demand"). The industry and relevant stakeholders "should not expect there to be an abundant supply of qualified and competent seafarers without concerted efforts and measures to address key manpower issues, through promotion of careers at sea, enhancement of maritime education and training worldwide, addressing the retention of seafarers." *Id.*

[18] Manning agencies are "companies that act as an employment agency for seafarers. Seafarers use them to find employment at sea and shipping companies use them to source crew." http://sea-jobs.net/encyclopediaen/163.

CONFIDENTIAL                                                September 21, 2018

and other shipboard staff.  Attendees included several dozen Environmental Officers; corporate

shoreside personnel from each of the Company's operating lines, including the CCM, OLCMs,

and multiple Vice Presidents, managers, and directors with environmental functions; various

shipboard personnel, including Fleet Chief Engineers and a Chief Engineer; CSMART training

instructors; and members of the CAM and TPA teams.

Overall, the CAM Team concluded that the conference was informative and productive

for the attendees.  In particular, the Environmental Officer attendees were energized and

engaged, and actively shared concerns and ideas for improvement related to their job position.

The nature of the concerns expressed related to training, work load, job position and status,

career path, shoreside support, shipboard support, corporate culture, "tone from the top," and

unclear or unworkable policies and procedures.  The CCM committed to following up on a

number of these issues.  The CAM continues to examine and engage with the Company on

personnel issues related to the Environmental Officer position.

### E.       Corporate Structure and CCM Authority

#### 1.       Centralization

The CAM First Annual Report noted a widespread concern within the company that a

lack of centralization impeded efforts at consistency of performance, clarity of roles, and robust

communication, and thereby created impediments to the Company's efforts towards continuous

improvement.  *See e.g.*, CAM First Annual Report at 4.  In its Order of July 13, 2018, the Court

ordered the Company to provide, by September 5, 2018, "a plan as to how Carnival and its

brands will address the challenge of corporate structure set forth in the [CAM First Annual

Report], including prioritizing and standardizing environmental compliance across the company

and establishing a Corporate Compliance Manager with both responsibility and authority over

environmental policy and the Environmental Compliance Plan." Dkt. No. 75 at 2; *see also* CAM First Annual Report at 25-30.

The Company addressed the Court's order in two parts:

(1)    As to the Company's establishment of a CCM with both responsibility and authority over environmental policy and the ECP, on September 5, 2018, the Company provided the CAM, the TPA, and the Interested Parties with a new procedure—"HMP-1005 Corporate Compliance Manager Responsibilities and Authority." It was represented that: "Carnival has designed the attached procedure to address Princess's obligations under the July 12 Order." *See* Email from D. Kelley, *CCM Procedure* (Sept. 5, 2018). The CAM is reviewing this procedure and will provide feedback. *See infra*, Part III.E.2.

(2)    On September 17, 2018, in accord with the Court's order granting the Company's unopposed motion for an extension, *see* Dkt. No. 83, the Company submitted a document in connection with the first part of the order—*i.e.*, the challenge of the Company's corporate structure and the prioritization and standardization of environmental compliance. *See* Letter from Vice Admiral (Ret.) B. Burke, USN, *Company Response to the Order issued on July 12, 2018* (Sept. 17, 2018), PCL_DOJ_00005737. The CAM is reviewing this document and will provide feedback.

In its Monthly Supervision Reports to the Office of Probation, the Company has described a number of efforts to standardize or centralize environmental compliance functions across the Company, including:

CONFIDENTIAL                                                    September 21, 2018

- **Standardizing Application of Environmental Control System ("ECS") Seal/Lock Program.**[19]  The Company reports that "[p]lans are being developed to help improve the consistency of ECS application fleet wide. An additional team member [a dedicated ECP Technical Consultant] has been added to the Corporate Environmental Compliance team starting August 20, 2018 for the following 12 months to focus on ECS compliance and consistency across the entire fleet."  July 2018 USPO Supervision Report, Attachment 3, at 4.  In addition, the Company held a subject matter expert workshop at Holland America Group offices in Seattle, Washington from August 28-30, 2018 "to further discuss the future of ECS compliance."  *Id.*; *see also* Response to TPA First Annual Audit Report at 5.  Members from the CAM and TPA teams attended this workshop.  Among other things, the workshop concluded that some ECS requirements in the ECP can be made clearer.  The Company will propose revisions to the ECP, as well as to its ECS methodology and portable pump procedure.  *See* Employee Interview Notes.  The CAM generally supports efforts to improve the clarity and value of the ECS program, and will review and provide feedback on proposed revisions to the ECP and Company procedures.

- **Developing a Corporate-Wide Incident and Near Miss Reporting System.**  The Company reports that it is developing a corporate-wide incident and near miss reporting system called SeaEvent.  July 2018 USPO Supervision Report, Attachment 3, at 3.  Pilot testing is scheduled to take place from October 2018 – May 2019.  Roll-out across the fleet is expected to be complete by the end of 2019.  *See id.*

- **Obtaining a Single Corporate-Wide ISO-14001 Certification.**[20]  The Company reports that Carnival Corp. and the operating lines have received a single corporate-wide ISO-14001 certification.  *See* Employee Interview Notes; *see also* July 2018 USPO Supervision Report, Attachment 3, at 4.  According to the Company, this "new centralized approach to the certification is based on the Global HESS system where we have aligned all HESS procedures and policies across the Corporations."  *Id.*

- **Implementing a Single Oily Water Separator and Oil Content Meter Service and Maintenance Contract.**  The Company reports that a "single [Oily Water Separator] and [Oil Content Meter] service and maintenance contract for the entire corporate fleet is currently in discussion.  It would potentially include training for engineers."  July 2018 USPO Supervision Report, Attachment 3, at 4.

---

[19] *See* ECP § IX.B; *see also* CAM First Annual Report at 14, 52-53.

[20] Developed and published by the International Organization for Standardization ("ISO"), ISO-14001 is an international standard that "sets out the criteria for an environmental management system and can be certified to.  It maps out a framework that a company or organization can follow to set up an effective environmental management system."  ISO, *ISO 14000 family – Environmental Management*, ISO.ORG, https://www.iso.org/iso-14001-environmental-management.html.

CONFIDENTIAL                                                          September 21, 2018

The CAM will continue to monitor and evaluate the Company's efforts to prioritize and standardize environmental compliance across the Company during ECP Year Two.

         2.     <u>CCM Authority</u>

The CAM First Annual Report found that the CCM did not possess the ECP-required "authority to ensure full implementation of this ECP," ECP § III.A.2.  Notably, most senior executives asked about this issue acknowledged that the CCM lacked such authority.  CAM First Annual Report at 4, 28-30, 42.

In response to this finding, the Company reports that a new procedure "describing the CCM's responsibility and authority is expected to be implemented by October 15, 2018." Response to TPA First Annual Report at 4.  According to the Company, this procedure "will, among other things, formalize the CCM's practice of reviewing and endorsing all proposed revisions to existing [Environmental Management System] procedures as well as the implementation of any new [Environmental Management System] procedures."  *Id.*

On September 5, 2018, the Company provided to the CAM, the TPA, and the Interested Parties the proposed CCM procedure.  *See* HMP-1005, *Corporate Compliance Manager Responsibilities and Authority* (Sept. 4, 2018).  The procedure aims to define the "authority, roles, responsibilities, and interrelationships" of the CCM.  *Id.* at 1.  The CAM is reviewing this procedure, and the CAM will continue to monitor and evaluate the Company's efforts to provide the CCM with the ECP-mandated authority during ECP Year Two.

CONFIDENTIAL                                                    September 21, 2018

### F.      Culture

#### 1.      Compliance Culture Assessment

As directed by the Court, and consistent with discussions held by the CAM with the Government and with the Company, the CAM will oversee the implementation of a culture survey to assess both the strengths and the opportunities for improvement in the Company's compliance culture.  *See* Second Annual Work Plan at 10-11.  This culture survey effort supports the CAM's mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A., and to assess whether the Company has adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance, *see* ECP § VI.B.2.

On June 27, 2018, as agreed by the Company, the CAM retained a culture consultant, Propel, to develop and implement the CAM's compliance culture survey.  Propel has experience developing and delivering maritime culture surveys.  Propel is working with the CAM, and through the CAM with the Company, to develop a survey instrument designed to measure the Company's compliance culture.  Safety culture surveys have been routinely conducted in the maritime and many other industries.  This culture assessment will focus more broadly on the corporate culture attributes that relate to the interrelated obligations of safety, health, and environmental compliance.  The Company and the CAM are collaborating on this effort.

Some of Propel's prior survey questions used with maritime entities are appropriately used here.  Use of these prior questions allows for the benchmarking of responses against the data collected elsewhere.  Other questions are being developed specifically for this effort.  To assist in both the development and administration of the survey, the CCM assembled a working group with subject-matter expertise in the Company's prior survey administration efforts.  The CAM and Propel are engaging with this group and with other Company personnel to develop a

September 21, 2018

survey whose questions and terms will be widely understood, and which can be administered smoothly and efficiently.  The Company sought approval from the CAM to expand the survey beyond the population central to compliance functions covered during probation.  While commendable, it is also important that such an expansion not lead to delay or significant technical issues in the administration of the survey.  The CAM and the Company are still working cooperatively to address the scope issues as it relates to survey administration.

Planning and development of the survey instrument is scheduled to be completed by the end of October 2018.  The survey is to be conducted from November 2018 to March 2019.  From January 2019 to April 2019, Propel will conduct focus group sessions on ships and at shoreside locations to clarify observed survey trends and responses.  Results from the survey administration and focus groups, as well as analysis of the results will be presented to the CAM and the Company in a mutually agreed reporting format, with a target date of May 2019.

Propel will conduct a second survey before the completion of the five-year probationary period in order to assess the Company's progress in creating a sustainable culture of compliance.

### G.    Investigations

In early 2018, in response to widespread recognition of the inadequacy of existing incident investigations, the Company engaged a third party, DNV-GL, to assess the internal incident investigation process.  In May 2018, DNV-GL delivered a report with four overall recommendations and twenty-eight specific areas for improvement to assist the Company in improving the quality and efficiency of investigations, such that true root cause analyses can be obtained.  *See* DNV-GL, *Towards improving Carnival's incident investigation process*, Report

No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-52050.  The CAM is seeking to follow the Company's progress in this area during ECP Year Two.

In advance of the Company's report to the Court on its timeline for implementation of the DNV-GL recommendations, provided on September 21, 2018, *see* Email from B. Herrmann, *Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21, 2018), the CAM received several updates from the Company regarding its progress.  The CAM understands that the Company has engaged DNV-GL to develop an Investigator Accreditation program, and to assist the Company in revising its corporate policies and procedures regarding incident investigations to incorporate DNV-GL's recommendations.

In addition, on September 5, 2018, the Company provided the CAM with a "proposed plan to enhance the internal incident investigation program employed within the Company and its respective brands."  Letter from C. Donald, *Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at 1 ("Proposed Change to Maritime Investigations").  The plan proposes to create a new Global HESS Investigations Department that would be independent of the Company's audit function (RAAS) and sit within the Company's Global Ethics & Compliance Department.  *See id.* at 2.  Responsibility for "all significant HESS incident investigations, including but not limited to 'Covered Vessel casualties,' 'oil pollution incidents,' and Environmental Open Reports," would be reassigned from RAAS to the new Global HESS Investigations Department.  *See id.* at 2-3.[21]  The Company intends to propose

---

[21] The Company currently uses a tiered approach to the classification of incident severity. Tier 3 environmental incidents are defined to include, among other things, unintended releases above specified quantities of pollutants or an intentional deviation from Company policy regarding discharge control.  *See* HMP-1302-A1.  Tier 4 environmental incidents are violations of "MARPOL or Environmental procedures, at the same levels listed in Severity level 3, which are believed or alleged to be a result of misconduct."  *Id.*  At this time, the CAM has no information regarding whether the Company intends to revise its tiered approach to incident severity.

CONFIDENTIAL                                                September 21, 2018

corresponding modifications to ECP Sections III.B.1(b) and (c).  *See* Proposed Change to

Maritime Investigations, at 3-4.  The CAM is reviewing the Company's proposal and will

provide feedback as appropriate.

### H.    Training

The Company continues to invest resources in environmental and ECP-related training.

*See* CAM First Annual Report at 21-23, 69-70.  Recent updates and other developments include:

- **CSMART Training Courses.**  As of July 2018, the Company has conducted thirty "Environmental Officer 1" training courses and eight "Environment Officer 2" training courses at the CSMART training center in Almere, The Netherlands.  These courses are taught by two full-time Environmental Officer course instructors and two operating line instructors.  *See* July 2018 USPO Supervision Report, Attachment 3, at 2.

- **Compliance to Commitment Training Program.**  The Company has retained training experts from the University of West Florida to help develop the second phase of this program, which began in October 2017 and provides environmental training to all engineers and deck officers attending CSMART.  *See* Employee Interview Notes; *see also* July 2018 USPO Supervision Report, Attachment 3, at 2.

- **Shipboard Training Review.**  The Company also has retained training experts from the University of West Florida to "conduct a focused review of shipboard training," including training materials and training procedures, and identify areas for improving this training going forward.  This review will start in November 2018.  Response to TPA First Annual Report at 7; *see also* Employee Interview Notes.

- **Environmental Induction Training Materials.**  The Company is in the process of finalizing a new ECP training video and presentation slides for the onboard environmental "induction" training that Environmental Officers give to newly joined crew members.  This new training should be implemented by November 2018.  *See* Response to TPA First Annual Report at 7; *see also* July 2018 USPO Supervision Report, Attachment 3, at 2; *see also* Employee Interview Notes.

- **GLADIS System.**  The Company continues to roll out its "single electronic learning management system," called the Global Learning and Development Information System ("GLADIS").  GLADIS is designed "to facilitate completion and tracking of the basic environmental training for shoreside employees and pre-learning training for Environmental Officers.  It will eventually be used for all HESS related trainings."  July 2018 USPO Supervision Report, Attachment 3, at 2.  GLADIS is being rolled out in two phases; phase one should be implemented by November 2018, while the roll-out date for phase two is not yet confirmed.  *See* Response to TPA First Annual Report at 7.

September 21, 2018

- **CrewTube.**  The trial phase of CrewTube, a smart phone/tablet training application, is complete, and the app is available for crew members to download.  The app "provides general HESS information to crew members and includes the ECP messaging videos from the CEO and Presidents as well as basic environmental awareness information."  *Id.* The app "will allow a number of HESS awareness trainings to be conducted prior to joining the ship."  July 2018 USPO Supervision Report, Attachment 3, at 2.[22]

- **HESS First.**  The Company reports that it is "assessing the feasibility of a new training approach called HESS First that incorporates all HESS training aspects under one program that provides opportunities to improve how [the Company] conduct[s] and measure[s] training."  Response to TPA First Annual Report at 7.

As discussed in the CAM First Annual Report, the CAM Team visited the Company's CSMART training center in June 2017, when the ECP-required Environmental Officer training was just beginning.  *See* CAM First Annual Report at 69-70.  While in Almere for the Environmental Commitment Conference from September 11-13, 2018, discussed *supra*, Part III.D, the CAM Team returned to CSMART and observed portions of various training courses, including (1) Continuous Development Engineering, which "comprises a review and consolidation of technical and non-technical skills/competence expected for the [engineer's] rank;" and (2) Leadership, which aims "to set a common and consistent approach to operational leadership on board ships."  *See* PCL_ECP00055978.[23]  Environmental Officer training courses were not offered during the CAM Team visit due to the Environmental Commitment Conference being held the same week.

In October 2018, the CAM Team plans to attend a meeting with the CCM, OLCMs, and Operating Line Training Managers.  The Company reports that, during this meeting, "the compliance team will be developing a long term plan to strengthen its culture of compliance,"

---

[22] The CAM is aware of concerns related to the fact that the proposed use of CrewTube appears designed to have employees complete training during times when they are not being paid.

[23] While the Leadership course appeared to be well-designed and well-run, the CAM notes that attendance is not mandatory.  *See id.*

which will include "a plan to develop engaging and motivated trainings" over a two year period. Response to TPA First Annual Report at 5.

The CAM will continue to evaluate the environmental and ECP-related training and provide an assessment in the next CAM annual report.  In addition, as noted in Part III.D of this Report, the CAM plans to explore the training of ratings, which primarily is conducted by third-party manning agencies.

## I.      Strategic Planning and Resources for Operations and Compliance

In its Order of July 13, 2018, the Court ordered appropriate representatives from the Company, before the next Quarterly Status Conference, to "meet and confer with the [CAM] to discuss how the companies' long-term strategic plans are formulated and, specifically, to discuss how environmental compliance has been made part of those plans and how protection of the environment is being incorporated as a priority into the companies' strategic plans and culture in a long-term, sustainable manner."  Dkt. No. 75 at 3.  As discussed below, the CAM has had initial meetings with the Company on this topic.  During ECP Year Two, the CAM Team intends to review the Company's current strategic planning process, including how the strategic plans provide for long-term sustainable environmental compliance.  *See* Second Annual Work Plan at 13.  The CAM Team will include a review of how and to what extent the strategic planning process appears designed to support sustainable environmental compliance.

### 1.      CAM Interactions with Company Representatives

On August 8, 2018, Carnival's Chief Maritime Officer provided a draft document to the CAM Team that provided his high-level overview of the Company's general planning process, including strategic planning, new build planning, capital appropriations planning, operating plan planning, and recent significant HESS/marine capital and operating expenditures.  On August 9,

2018, the Chief Maritime Officer, CCM, and CAM Team had an initial call to answer

preliminary questions from the CAM and discuss how the CAM could obtain further information

on the strategic and financial planning process at both the corporate level and the operating line

and/or brand level.  On the call, it was agreed that further conversations at the brand and

operating line levels would provide valuable information with respect to the strategic planning

process.  The CAM is in the process of working with the CCM to plan additional shoreside visits

focused on strategic planning and budgeting, including a discussion with the Company's Chief

Financial Officer and its Comptroller scheduled for late September 2018.

### 2.   CAM Retention of Forensic Accountant

As noted above, the CAM has identified a qualified forensic accountant firm,

AlixPartners, to assist with the CAM's review of the Company's strategic planning process and

process for funding capital expenditures, operations, and compliance.  *See* Second Annual Work

Plan at 12-13.  This work will require, among other things, the review of the budget process and

funding decisions that impact the allocation of financial resources for compliance in the context

of the overall strategic planning, budget, and funding practices of the Company.  The CAM

Team will be "examining Company expenditures, including but not limited to the ECP-required

Covered Vessel budgets and the process for OLCM budget certifications per ECP Sections

III.A.9 and III.A.10."  *Id*. at 13.[24]

On August 13, 2018, the CAM submitted written notification to the Company advising of

the planned retention of AlixPartners pursuant to the requirements of the Monitor Agreement.

On August 20, 2018, the CAM Team had a call, at the Company's request, with Carnival's Chief

---

[24] On July 18, 2018, the CAM issued its Eighth Document Request to the Company, requesting
ten different categories of financial documents and revising its standing request for budgetary
information.

CONFIDENTIAL                                                September 21, 2018

Financial Officer and Corporate Comptroller regarding the retention of AlixPartners.  On August

23, 2018, the Company consented in writing to the retention.

     **J.**     **Company Vessel Visit Programs**

         1.     <u>Context</u>

As discussed in the CAM First Annual Report, and as considered by the Court during the

July 11, 2018, Status Conference, two vessel visit programs created by the Company came to

light during ECP Year One.  The first program, implemented during the first half of ECP Year

One, involved the Company sending engineers—including contract personnel[25]—to vessels to

find and correct compliance issues that might be identified during TPA audits.  Following the

December 4, 2017, Status Conference, the Company represented that it had terminated this

approach.  *See* CAM First Annual Report at 73-74.

Shortly thereafter, it appears that Holland America Group began implementing a second

vessel visit program called the Environmental Ship Assistance Visit Program ("ESAV program"

or "ESAVP"), in response to an effort by Company management to instigate the development of

an additional vessel visit program.  Like the initial pre-TPA audit program, the ESAVP was not

disclosed to the Interested Parties, the CAM, the TPA, or the Court.  *See id.*  Both programs

came to light only when employees, concerned about these practices, revealed them to the CAM.

During the April 3, 2018, Status Conference, the Court and the Government expressed concern

about the nature and lack of transparency of these programs.  As noted above, at the July 11,

2018, Status Conference, the Court concluded that these efforts had "tainted" the audits

performed in their wake, and had thereby diminished the Court's ability to rely upon the TPA

---

[25] It appears that the Company retained Alba Marine Technical Consultancy to perform certain
pre-TPA audit visits.  *See* PCL_DOJ_ESAVP_00000400 (Alba Marine Technical Consultancy
Pre-TPA Audit Ship Visit for the Sun Princess).

audits to provide an accurate benchmark of the compliance challenges faced by the ships.  *See*

Status Conf. Tr. at 11 (July 11, 2018); *see also id.* at 39 (the pre-audit programs raised "concerns

as to whether or not the audit findings that we have are really the true picture").

The Company reports that the ESAV program "has been suspended pending internal

review and reporting to the court and Interested Parties."  July 2018 USPO Supervision Report,

Attachment 3, at 4.

### 2.   Review of Company Document Production

In response to requests made by DOJ regarding the ship visit programs, the Company

produced documents over eight productions, including productions on August 7, 2018, August

28, 2018, and September 5, 2018.  The Company stated that the documents provided on

September 5, 2018 completed the production of vessel visit documents, as required by the

Court's Order of July 13, 2018.  *See* Letter from D. Kelley, *Environmental Ship Assist Visit*

*Program – Seventh & Eighth Production of Documents* (Sept. 5, 2018).  The Company "does not

anticipate making any further productions at this time."  *Id.* at 1.  On September 10, 2018, the

Company provided a privilege log setting forth descriptions of responsive documents over which

the Company intends to assert a privilege.  *See* Email from B. Herrmann, *FW: Privilege Log –*

*U.S. v. Princess Cruise Lines, Ltd., No. 1:16-cr-20897 (S.D. Fla.)* (Sept. 10, 2018).

The CAM is reviewing the documents produced by the Company and will report further,

as appropriate.  The Company also has offered to provide a presentation with respect to these,

and other, vessel visit programs.  Once the CAM Team has analyzed the documents produced

and the privilege log, the CAM will consider whether, and to what extent, further inquiries are

necessary.

CONFIDENTIAL                                                September 21, 2018

Respectfully Submitted,

Steven P. Solow
Court Appointed Monitor

September 21, 2018

September 21, 2018

APPENDIX A:  ECP YEAR TWO CAM RECURRENT INCIDENT CATEGORIES

| Category | Description |
|---|---|
| **Alarms** | Incidents related to alarms (*e.g.*, high level tank alarms), including both (i) technical malfunctions and errors, such as a failure of an alarm to go off; and (ii) human errors, such as a failure to notice or respond to an alarm. |
| **Alaska Permit Sample** | Incidents related to violations or potential violations of Alaska Department of Environmental Conservation effluent limit exceedances (*e.g.*, fecal coliform, pH). |
| **Ballast Tank** | Incidents related to ballast tank issues, such as leaks. |
| **Bilge Leaks/Overflows** | Incidents related to leaks or overflows of liquids from tanks (*e.g.*, grey water, ballast, sewage), pipes, and other vessel equipment and spaces into the bilges. |
| **Contractor Issue** | Incidents that may be attributable to the action(s) or inaction(s) of third-party contractors on the vessel (*e.g.*, work crews) rather than Company personnel. |
| **Deadline Issue** | Incidents related to failures to meet ECP-mandated deadlines, such as the requirement to conduct monthly testing of Oily Water Separator units. |
| **Discharges** | Incidents related to prohibited discharges or potential discharges of all media (*e.g.*, garbage, sewage, food waste, grey water, oily bilge water, etc.), including discharges governed by Marine Environmental Protection Requirements. |
| **Disciplinary Action** | Incidents involving disciplinary action against a Company employee as part of the response to the incident.  These actions may range from verbal warnings to termination.  The nature of the disciplinary action often is not specified in the reports received from the Company. |
| **Emissions/Opacity** | Incidents related to air emissions (*e.g.*, exhaust gas) that violate local, national, or international emissions or opacity requirements. |
| **Environmental Officer** | Incidents related to the Environmental Officer position, including (i) sailing without an Environmental Officer for longer than the seven-day period prescribed in the ECP; (ii) failure of an individual Environmental Officer to fully or adequately perform his or her duties (*e.g.*, failure to review log books); and (iii) failure of an Environmental Officer to receive, perform, or log ECP-required trainings. |

CONFIDENTIAL                                            September 21, 2018

| | |
|---|---|
| **Exhaust Gas Cleaning Systems ("EGCSs")**[26] | Incidents related to the EGCSs on vessels, including, for example, (i) EGCS washwater discharges;[27] (ii) EGCS equipment malfunctions; and (iii) failures to use the EGCS in protected Emission Control Areas. |
| **Fuel Leak** | Incidents related to internal fuel leaks (*e.g.*, from diesel generators).  These incidents do not result in overboard discharges, but they may result in leaks into the bilges. |
| **Fuel Sulphur Content** | Incidents related to burning fuel with a sulphur content that exceeds the level set by relevant requirements.  These incidents typically also involve violations of air emissions or opacity requirements. |
| **Hotline** | Incidents related to the Open Reporting System hotline not working (*e.g.*, technical failures).  Environmental Officers are required to check the hotline periodically. |
| **Lifeboat and Tender Systems**[28] | Incidents related to discharges from lifeboats, tenders, liferafts, rescue boats, and associated equipment.  This includes discharges of oil, as well as discharges of items that may qualify as "garbage" under MARPOL Annex V (*e.g.*, glass panes, doors, plastic containers, canvas covers). |
| **Manning** | Incidents related to inadequate "manning" or staffing levels on a vessel, including incidents that appear to be attributable to overwork or failure of crew members to have the training or experience necessary to perform their assigned duties. |
| **Marine Mammals/Whale Strike** | Incidents resulting in harm to or killing of marine mammals, including whales. |
| **Near Miss** | Events that do not result in environmental incidents, but could have. |
| **Passenger Issue** | Incidents that may be attributable to action(s) by passengers rather than Company personnel.  Many of these incidents involve the loss of items overboard (*e.g.*, hats, phones, glasses), both intentional and unintentional. |
| **Pollution Prevention Equipment** | Incidents related to failures or other malfunctions of pollution prevention requirement, such as the Oily Water Separator, the White Box, or their component parts. |
| **Portable Pumps** | Incidents related to failures to use or maintain portable pumps in accordance with ECP engineering requirements, including ECS requirements. |

---

[26] An EGCS is a cleaning system (often referred to as a scrubber) that removes sulphur oxides from a vessel's engine and boiler exhaust gases.  *See* EPA, Exhaust Gas Scrubber Washwater Effluent (Nov. 2011), *available at* https://www3.epa.gov/npdes/pubs/vgp_exhaust_gas_scrubber.pdf.

[27] EGCS washwater is waste water generated by an EGCS that can contain various contaminants, including combustion by-products, fuel, and lubricants.  *See id.* at 2.

[28] A tender is a ship used to transport people or supplies to and from shore or another ship.  *See* http://www.memidex.com/tender+ship-boat.

CONFIDENTIAL                                        September 21, 2018

| | |
|---|---|
| **Recordkeeping** | Incidents related to inaccurate or incomplete recordkeeping or document maintenance, including in an Oil Record Book, Garbage Record Book,[29] or any other log or record required under the ECP, Company policy, MARPOL, or other international, national, or local law or regulation. |
| **Refrigerants** | Incidents related to refrigerant gas leaks, including recordkeeping issues. |
| **Seals and Locks** | Incidents related to ECP ECS seal and lock requirements.  This includes missing or damaged seals as well as recordkeeping issues (*e.g.*, the Critical Valves, Fittings, and Tank Hatches List and Seal Log required under ECP Section IX.B). |
| **Shoreside Support/Resources** | Incidents that may be attributable to a failure by shoreside offices to provide adequate or timely support or resources to vessels, including delays in responding to requests for parts or labor. |
| **Spare Parts** | Incidents related to the unavailability of spare parts, including ECP critical spare parts, on vessels. |
| **Training** | Incidents related to inadequate or missed training.  This includes (i) failures to perform required ECP trainings; (ii) recordkeeping issues, including falsification of training records; and (iii) incidents which appear to be attributable to inadequate training, including incidents where additional training is implemented as a part of the Company's corrective action or other response. |
| **Vendor Issue** | Incidents that may be attributable to the action(s) or inaction(s) of third-party shoreside vendors (*e.g.*, forklift operators, garbage offload truck operators, bunker barge operators), rather than the vessel. |
| **Voyage Planning** | Incidents related to prohibited discharges or emissions that appear to be attributable to voyage planning (*e.g.*, inaccurate boundary maps or miscommunication between deck and engine room). |

---

[29] A Garbage Record Book is a log where a ship records the discharge, disposal, or incineration of garbage.  It is required under MARPOL Annex V.

CONFIDENTIAL                                                    September 21, 2018

ATTACHMENT 1:  CAM SECOND ANNUAL WORK PLAN

[*See following pages*]

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

**Second Annual Work Plan and Budget of the Court Appointed Monitor**
*United States v. Princess Cruise Lines, Ltd.*, 1:16-cr-20897-PAS (S.D. Fla.)
**For the Period April 2018 – April 2019**
**Submitted August 3, 2018**

      Pursuant to the Monitor Agreement in the matter of *United States v. Princess Cruise Lines, Ltd.*, 1:16-cr-20897-PAS (S.D. Fla.), the Court Appointed Monitor ("CAM" or "Monitor") submits this Second Annual Work Plan and Budget ("Second Annual Work Plan" or "Work Plan").  This Second Annual Work Plan incorporates by reference the Superseding First Annual Work Plan and Budget of the Court Appointed Monitor, submitted October 20, 2017 ("Superseding First Annual Work Plan").[1]

      As to budget, the parties came to an agreement that was described by the U.S. Department of Justice ("DOJ") to the Court during the Status Conference held on October 18, 2017, and memorialized in the Superseding First Annual Work Plan.  In brief, there were three categories of CAM Team fees (excluding associated costs and expenses[2]):  (1) fees associated with vessel and shoreside visits; (2) fees for work not associated with vessel and shoreside visits; and (3) fees excluded from the anticipated budget.  With respect to vessel and shoreside visits, the CAM Team agreed to a maximum of fifteen vessel visits and five shoreside visits per year, and agreed that the fees of the CAM Team for those vessel and shoreside visits would not exceed $3,000,000 for the first year of the monitorship.[3]  With respect to fees for work not associated with vessel and shoreside visits, the CAM and the parties anticipated that the fees for work described in the Superseding First Annual Work Plan would fall between $3,000,000 and $4,000,000.[4]  For the final category of fees, the CAM, the Company, and the Government agreed that fees associated with the following categories of work would not be counted towards the anticipated fee amount:  (1) fees associated with any Monitor Work Plan and Budget (such as work plan drafting, the preparation of explanatory letters or documents, the preparation of addenda, or work plan negotiation); (2) fees incurred in preparation for the October 28, 2017, Status Conference; (3) fees associated with Carnival contesting bills; and (4) major contingencies that may arise during the course of the monitorship.  The Company, the CAM, and the

---

[1] Any terms not defined in this Second Annual Work Plan take the definitions provided in the Monitor Agreement, the ECP, or the First Annual Report of the Court Appointed Monitor (2017-2018) ("CAM First Annual Report").

[2] In order to reduce travel expenses, for travel booked on or after September 27, 2017, the CAM Team agreed to use the Company's travel service, except for unannounced vessel visits and other unanticipated circumstances.

[3] For purposes of tracking fees, the Company and the CAM agreed that budget years would run from April 1–March 31 (as opposed to ECP years which run from April 19–April 18, which is the final day of the ECP year).

[4] The CAM will continue to use $3,000,000 to $4,000,000 (as adjusted for hourly rate increases in accordance with Section 4.5 of the Monitor Agreement) as a target for this category of fees from April 2018 through March 2019.  However, as described in this Work Plan, the number of CAM Team work streams has expanded as a result of the findings and areas of focus identified in the CAM First Annual Report.  The CAM will continue to monitor the fee amounts incurred and will alert the Company if it seems that the target amounts are no longer realistic.

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

Government also agreed that the fee amounts described would be adjusted periodically, in accordance with Section 4.5 of the Monitor Agreement, entitled "Fee Increases," to take into account regular increases in rates for members of the CAM Team—with the exception of the CAM who agreed to freeze his rate for the duration of the monitorship.[5]

For the second year of the ECP, the CAM notes that there are significant categories of work that will be excluded from the targeted fee amounts as major contingencies that have arisen during the course of the monitorship. These significant categories of work identified to date include: (1) the new CAM Quarterly Report requirement requested by the Company and ordered by the Court; (2) the assessment of the Company's vessel visit programs; (3) activities associated with complying with the Court's directive that the CAM inquire into how the Company's long-term strategic plans are formulated and the place of environmental compliance in those plans; and (4) the additional vessel and shoreside visits conducted in accordance with the Court's Order of July 13, 2018.

I.    **Introduction to Second Annual Work Plan**

On June 21, 2018, the CAM submitted the CAM First Annual Report. During ECP Year One, the CAM Team visited more than twenty vessels and shoreside offices, conducted hundreds of interviews, and reviewed thousands of documents. Based on its review, the CAM made findings regarding the Company's capabilities to meet ECP objectives and attain continuous improvement.

The CAM made the following eight findings related to the Company's progress regarding ECP objectives: (1) there was no repeat of the underlying offenses; (2) the Company appears to have substantially implemented the many ECP Year One requirements, such as installation of seals and locks, delivery of training, and development of a sampling program; (3) the Company selected qualified and dedicated compliance personnel; (4) employees, both on ship and on shore, were nearly universally cooperative and forthcoming in their interactions with the CAM Team and the TPA and evidenced broad comprehension of their environmental obligations; (5) the Company has implemented a variety of initiatives related to environmental compliance that go beyond the enumerated requirements of the ECP; (6) the Company has used its existing sophisticated training resource, the Center for Simulator Maritime Training ("CSMART"), to implement some of the training required by the ECP; (7) the Company engaged DNV GL to assess—and subsequently to help implement recommendations related to—the Company's investigation process; and (8) the Company agreed to the CAM's request to conduct an environmental compliance culture survey.

---

[5] In accordance with Section 4.5 of the Monitor Agreement, a revised fee schedule is attached to this Work Plan. The firm increased its rates effective January 2018. The attached chart reflects what will be the 2018 Carnival rate. Note that the 2018 Carnival rate preserves any previously applied discounts. Pursuant to Section 4.5 of the Monitor Agreement, the 2018 Carnival rate will be made effective 60 days from August 3, 2018.

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

The CAM made the following four findings related to unresolved barriers and opportunities for improvement:  (1) the Company's complex corporate structure serves as an impediment to implementation of a sustainable environmental compliance program and to efforts at continuous improvement; (2) the Company appears to have a blame culture, with a focus on identifying errors and disciplining individuals rather than also evaluating systemic issues that may need to be addressed; (3) the Company's internal investigations are critically flawed in that there is no consistent, reliable means to investigate incidents or near misses and identify root causes that can lead to meaningful corrective actions; and (4) during ECP Year One, the Company violated environmental laws and the ECP, including that the Company has not given the CCM the ECP-required "authority to ensure full implementation of [the] ECP."  ECP § III.A.2.

Based on the CAM's findings and observations, the CAM also identified the following seven areas of focus for ECP Year Two:  (1) the culture survey; (2) internal investigations; (3) training; (4) resources for operations and compliance; (5) shoreside support for vessels; (6) personnel, in particular Environmental Officers, engineers, and ratings; and (7) Company vessel visit programs.  This Work Plan includes those areas of focus, as well as the responsibilities and obligations placed upon the CAM by the ECP and by the Court.

## II.    Monitorship Methodology and Work Streams

This Work Plan is tailored to meet the CAM's obligations imposed by the ECP and the Court.  The work of the CAM during ECP Year Two is described below and categorized into thirteen primary work streams:  (1) management and contingencies; (2) document and data review; (3) interviews, site visits, and events; (4) vessel visits; (5) shoreside facility visits; (6) compliance culture assessment; (7) reporting; (8) strategic planning and resources for operations and compliance; (9) corporate structure and CCM authority; (10) investigations; (11) training; (12) personnel; and (13) Company vessel visit programs.  These work streams reflect the CAM's current plan for work to be done during ECP Year Two, but this plan may be modified if required by the Court or by circumstances that arise during the course of the year.

### *1.    Management and Contingencies*

Undergirding the successful execution of the CAM's responsibilities will be the management and oversight of monitorship work streams.  These functions will include: (1) planning; (2) budgeting; (3) coordination; (4) tasking; (5) supervision; (6) knowledge management; and (7) organization.  This work stream also will encompass the time spent by the CAM and CAM Team coordinating with the U.S. Probation Office, discussing the monitorship with DOJ and other government agencies as needed, and preparing for and appearing in court.

The "Contingencies" category will encompass unexpected issues that arise that implicate the CAM's mandate.  For example, Major Non-Conformity findings or incidents involving

violations of the ECP or Marine Environmental Protection Requirements may require additional vessel visits, interviews, document review, or other unplanned work.

### 2.   *Document and Data Review*

The CAM must review and analyze records and information to determine, among other things, the extent and nature of the Company's compliance with the ECP and regulatory requirements.  The ECP requires, for instance, that the CAM:  monitor the Company's compliance with the ECP, *see* ECP § VI.A; review reports and notifications as established in the ECP, *see* ECP § VI.E; review records necessary to perform the CAM's duties, *see* ECP § VI.F.2; review TPA audit reports and related documents, *see* ECP § VI.F.3; review the Company's internal environmental audits and audit processes, *see* ECP § VI.F.4; review "information regarding a Major Non-Conformity" or failure of the Company to "consider and act upon, as appropriate, an Audit Finding or recommendation of the TPA," *see* ECP §§ III.A.6, VI.F.6; review TPA reports, *see* ECP § VIII.D.10; and review the Company's EMS, *see* ECP § X.A.II.

During ECP Year One, the CAM Team worked with the Company to implement a streamlined and cost effective review of documents and data.  Accordingly, the CAM Team and the Company developed an agreed-upon protocol for requesting information and documents, responding to information and document requests, and managing produced information and documents in coordination with designated Discovery Liaisons.  As part of this effort, the Company and the CAM Team agreed to utilize a Relativity-based platform through the Company's preferred vendor, Strategic Legal Solutions, to process and house the records provided in response to CAM information and document requests.  Access to the platform is being provided to the Company, the CAM Team, and the TPA.

During ECP Year Two, the CAM Team will continue to utilize the agreed-upon methods for requesting and producing records and information.  The primary method involves submitting formal document requests to the Company.  As of the date of this Work Plan submission, the Company has produced records in response to eight formal CAM requests for documents and information, which include discrete requests as well as standing requests (*i.e.*, those requests for which the Company has a continuing obligation to provide documents to the CAM throughout the remainder of the monitorship period).

In connection with the Company's financial and budget information, the CAM's requests and review will focus on the budgeting process for ongoing expenditures, including capital expenditures.  This review will include an assessment of the OLCM Annual Budget Certifications required by the ECP, *see* ECP § III.A.9, and related Company budget practices, including the process for developing and revising ECP-related and environmental compliance budgets.  As directed by the Court, the CAM will review the Company's overall strategic planning process (including resource allocation and budgeting) to examine how the Company has integrated compliance into its business planning and operations.  This, of course, includes

4

whether compliance is appropriately prioritized and allocated sufficient resources and management attention to address the Company's current and future compliance obligations. The CAM intends to engage advisors with forensic accounting expertise to assist with this aspect of document review and analysis, and will seek the Company's consent as required by the Monitor Agreement.

The CAM also will continue to rely on informal methods for requesting records and information. The Company has agreed to provide the CAM with the Company's weekly report of incidents ("Flash Report"), which is maintained in the general course of business, as well as information regarding Major Non-Conformities, Non-Conformities, and other Observations reported by employees. *See* ECP § III.A.11. The CAM will continue to review, track, and assess such information (including requesting follow-up information about particular incidents), and will report to the Interested Parties as required by the ECP. Additionally, the CAM informally will request information from the Company during meetings, interviews, or site visits, as well as via email.

Finally, in connection with the CAM's obligation to assess both the TPA and the Company's internal audit function, *see* ECP § VI.F.1-5, the CAM Team will review and analyze audit reports and related documents generated by the TPA and the Company's Risk Advisory and Assurance Services ("RAAS") department. Through this review, the CAM will seek to, among other things: evaluate the adequacy and independence of the TPA; identify trends in the audit findings; consider whether findings reveal issues with respect to personnel, policies, corporate governance, training, systems, or equipment; assess whether a continual improvement process is in place to address audit findings; and determine whether the Company's internal audit process is sufficient to accomplish the objectives of the ECP. The CAM also will utilize information gathered during vessel and shoreside visits to evaluate TPA and RAAS audit reports.

### *3. Interviews, Site Visits, and Events*

During the first year of the monitorship, the Company and the CAM agreed that the CAM should conduct interviews of corporate executives and key personnel from each of the operating groups, each of the brands, and the CSMART training facility. Consistent with the ECP, *see e.g.*, ECP §§ III.-V., VI.A., VI.B.2., VI .F.6-7., the purpose of these interviews was to gather and assess information on the structure, management, culture, and systems of each operating line, as well as the All Brands Group and the Company as a whole; engage with corporate executives and employees on their role in implementing the ECP and corporate compliance generally; explore management views on compliance-related issues; and gather additional information regarding identified concerns or incidents.

While the CAM does not intend to repeat these foundational interviews conducted during ECP Year One, the CAM does intend to continue conversations with management and key personnel as necessary. The CAM also has been invited to attend certain corporate meetings and

events, such as:  the August 2018 Environmental Control System Working Group meeting in Seattle; the September 2018 Environmental Officers' Environmental Commitment Conference in Almere; the October 2018 Carnival Corporation Board Meeting; and the October 2018 OLCM/CCM Quarterly Meeting.  The CAM will consider attending additional Company meetings and events during the course of ECP Year Two.  In addition, the CAM intends to visit Company offices consistent with gathering information relevant to the CAM's ECP Year Two areas of focus.

### 4.  *Vessel Visits*

The Superseding First Annual Work Plan provided for the CAM Team to conduct up to fifteen vessel visits per year for the duration of the monitorship.  On July 13, 2018, the Court, "in response to Defendant's violations of the Environmental Compliance Plan (ECP), including the continued use of undisclosed pre-audit teams," "amended with the consent of the parties" the Special Conditions of Probation and the ECP to provide for an additional ten vessel and five shoreside visits during ECP Year Two.  *See* Dkt. No. 75 at 1-2.

During vessel visits, the CAM gathers information in an effort to "monitor CARNIVAL's compliance with [the] ECP," *see* ECP § VI.A; "to assess whether CARNIVAL has adequate management systems, particularly human and fiscal resources, in place to ensure regulatory compliance, correct non-compliance, and prevent future noncompliance," *see* ECP § VI.B.2; to oversee the independence and activities of the TPA, *see* ECP § VI.F.1-2; and to "conduct a review of CARNIVAL internal environmental audits," *see* ECP § VI.F.4.

In its July 13, 2018, Order, the Court also ordered that "all future audits and ship visits by the Third Party Auditor and Court Appointed Monitor shall be unannounced," and "[t]he parties are further directed to confer and inform the Court on or before August 1, 2018, regarding a plan as to how these additional audits and visits will be conducted. . . ."  Dkt. No. 75 at 1-2.  On August 2, 2018, the Company filed an Amended Notice with the Court stating: "Although the exact details of the plan for unannounced ship visits or audits are still being finalized, the parties have agreed on an interim basis to a general proposal, pending approval from this Court, whereby the CAM and TPA will continue to follow many of the same procedures employed in the past, namely that the CAM or TPA will notify the Company of their respective ship visits or audits on 'short notice,' generally no more than a week before the CAM or TPA is prepared to begin their respective ship visits or audits.  The CAM or TPA shall contact Christopher Donald, the Company's Corporate Compliance Manager, who will serve as the primary point of contact to facilitate the CAM's or TPA's ship visits or audits.  Mr. Donald will also work with a designated representative(s) of the Company who is not associated with the implementation of the Environmental Compliance Plan (hereinafter 'Designated Persons') to assist the CAM and TPA in completing all necessary booking obligations.  Mr. Donald and the Designated Persons will be required to keep all booking information in strict confidence."  Dkt. No. 78 at 1-2.  The CAM will follow the procedure that is agreed to by the Parties and the Court.

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

The CAM Team vessel visits are not audits.  The CAM Team visits are designed to, among other things:  (1) assess the adequacy, quality, and value of TPA and RAAS audits; (2) assess whether the Company has adequately and promptly addressed Observations, Non-Conformities, or Major Non-Conformities previously identified in TPA or RAAS audits, or by classification societies, or in other findings related to environmental pollution control obligations; (3) evaluate the Company's responses to the findings in the CAM and TPA First Annual Reports; (4) gather data relevant to the focus areas identified in the CAM First Annual Report; and (5) assess the overall effectiveness of the Company's efforts to provide the training, equipment, resources, and support to the ships, so that those onboard are in a position to meet the ECP obligations to which the Company agreed.  To do so, the CAM expects that these vessel visits generally will involve opportunities:  to speak with shipboard personnel; to review incident investigation processes and corrective actions; to review actions taken in response to prior audit findings; to review vulnerability assessments and their implementation; to review training and supervision efforts and their effectiveness; and to look at machinery spaces, pollution prevention equipment, and documents.

Because the activities outlined above will take place simultaneously in various areas of the ship, the CAM anticipates that two to four CAM Team members will attend each visit.  Consistent with past practice, vessel visit participants will include the CAM or a designee, a CAM attorney, and at least one technical consultant.  Vessels may be visited more than once.

Below is a description of the types of vessel visits planned by the CAM.  In connection with each of these types of vessel visits, there will be work conducted to prepare for the visit and work conducted to memorialize and follow up on items from the visit.  In addition, twice per year, the CAM and key CAM Team members will meet with the TPA team to review and discuss the conduct and findings of the vessel and shoreside audits and visits.

###### a.     *TPA Audit Ride-Alongs*

The CAM Team plans to accompany the TPA on a certain number of TPA vessel audits.  The purpose of these visits will be to inform the CAM's assessment of the independence and rigor of the TPA audits and auditors.[6]  During these audit ride-alongs, CAM Team members primarily will observe the TPA's audit activities, and may gather information independently.

###### b.     *TPA Follow-up Visits*

The CAM Team plans to perform follow-up visits to vessels previously audited by the TPA.  The purpose of these visits will be two-fold.  First, the CAM Team will assess whether the TPA's prior audit on a particular vessel was independent, rigorous, and in accordance with the TPA's planned audit process.  Second, the CAM Team will assess the Company's support for

---

[6] During ECP Year One, the CAM Team accompanied the TPA on three TPA vessel audits.

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

and compliance with the ECP by, among other things: (1) gathering information from interviews with crew-members; (2) reviewing whether adequate systems and resources are in place and are designed to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; (3) reviewing the substance and effectiveness of prior RAAS audits; (4) reviewing actions taken in response to audit findings and other identified violations of the ECP, including Marine Environmental Protection Requirements; and (5) gathering information relevant to the CAM's ECP Year Two areas of focus.

        c.      *CAM-Specific Vessel Visits*

The CAM Team plans to visit vessels that the TPA has not audited. During these visits, the CAM Team will assess the Company's support for and compliance with the ECP by, among other things: (1) gathering relevant information from interviews with crew-members; (2) reviewing whether adequate systems and resources are in place and are designed to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; (3) reviewing the substance and effectiveness of prior RAAS audits; (4) reviewing actions taken in response to audit findings and other identified violations of the ECP, including Marine Environmental Protection Requirements; and (5) gathering information relevant to the CAM's ECP Year Two areas of focus.

        d.      *RAAS Audit Ride-Alongs*

The CAM Team plans to accompany the RAAS auditors on scheduled RAAS vessel audits. The purpose of the CAM Team visits will be to fulfill the requirement that the CAM assess whether the RAAS audit process accomplishes the objectives of the ECP, including any areas for improvement with respect to the performance of RAAS audits. During these ride-along visits, CAM Team members primarily will observe the RAAS audit activities, and may gather information independently.

        e.      *Additional Court-Ordered Vessel Visits*

During the Court Status Conference held on July 11, 2018, the Court ordered the CAM and/or TPA to perform an additional ten vessel visits during ECP Year Two; this was memorialized in the Court's Order of July 13, 2018. *See* Dkt. No. 75 at 1-2. Based on consultation with the TPA, the CAM and the TPA will conduct five visits each. The CAM Team may accompany the TPA on some of the court-ordered vessel visits the TPA performs, and some vessel visits may be conducted jointly by the CAM and TPA. The CAM Team and the TPA are collaborating on the logistics for these additional visits.

      **5.   Shoreside Facility Visits**

The Superseding First Annual Work Plan provides for the CAM to conduct up to five shoreside visits annually in order to "monitor CARNIVAL's compliance with [the] ECP," *see*

ECP § VI.A; "to assess whether CARNIVAL has adequate management systems, particularly human and fiscal resources, in place to ensure regulatory compliance, correct non-compliance, and prevent future noncompliance," *see* ECP § VI.B.2; to oversee the independence and activities of the TPA," *see* ECP § VI.F.1-2; and to "conduct a review of CARNIVAL internal environmental audits," *see* ECP § VI.F.4.

On July 13, 2018, "in response to Defendant's violations of the Environmental Compliance Plan (ECP), including the continued use of undisclosed pre-audit teams," the Court ordered five additional shoreside visits for the CAM and/or TPA. *See* Dkt. No. 75 at 1-2. After consultation with the TPA, the CAM and the TPA determined that the CAM would lead these shoreside visits, and that the TPA may participate in some or all of these shoreside visits as appropriate.

The CAM Team shoreside visits are not audits. The CAM Team visits are designed to, among other things: (1) assess the structure, management, culture, and systems of the All Brands Group and each operating line or group; (2) review the Company's commitment and efforts to create a sustainable environmental compliance program; (3) assess the adequacy, quality, and value of TPA and RAAS audits; (4) assess whether the Company has adequately and promptly addressed Observations, Non-Conformities, or Major Non-Conformities previously identified in TPA or RAAS audits, or by classification societies, or in other findings related to environmental compliance obligations; (5) evaluate the Company's responses to the findings in the CAM and TPA First Annual Reports; and (6) gather data relevant to the focus areas identified in the CAM First Annual Report. To do so, the CAM expects that these shoreside visits generally will involve opportunities to speak with shoreside management and personnel and to review relevant systems, policies, procedures, initiatives, databases, and documents. These visits will not, however, track the extensive checklist examinations conducted by TPA and RAAS auditors.

The CAM anticipates that most shoreside visits will require two to four CAM Team members. Participants will include the CAM or a designee, CAM attorneys, and one or two technical or accounting advisors to the CAM. There may, however, be occasions where it is necessary for more than four CAM Team members to attend a shoreside visit.

Below is a description of the types of shoreside visits planned by the CAM. In connection with each of these types of shoreside visits, there will be work conducted to prepare for the visit and work conducted to memorialize and follow up on items from the visit. In addition, twice per year, the CAM and key CAM Team members will meet with the TPA team to review and discuss the conduct and findings of the vessel and shoreside audits and visits.

        a.     *Attending TPA Shoreside Audits*

During at least one shoreside visit, the CAM Team will accompany the TPA on a regularly-scheduled TPA shoreside audit. Pursuant to the ECP, the CAM will assess whether the

TPA is conducting independent and rigorous audits in accordance with its planned audit process by observing the TPA's audit activities and its interactions with the Company. During attendance at TPA shoreside audits, CAM Team members primarily will observe the TPA's audit activities, and may gather information independently.

      *b.*      *Attending RAAS Shoreside Audits*

During at least one shoreside visit, the CAM Team will accompany the Company's internal RAAS personnel on a scheduled RAAS shoreside audit. Pursuant to the ECP, the CAM will assess the quality of the RAAS audit, the effectiveness of prior RAAS audits, and the ability of Carnival's internal audit process to accomplish the objectives of the ECP. During attendance at RAAS shoreside audits, CAM Team members primarily will observe the RAAS's audit activities, and may, to a limited extent, gather information independently.

      *c.*      *CAM Team Shoreside Visits*

CAM Team shoreside visits will address the resources designated to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance. Accordingly, the CAM Team's visits will include: (1) gathering relevant information from interviews with management and employees; (2) reviewing the resources devoted to environmental compliance and relevant operations; (3) reviewing actions taken in response to the CAM's ECP Year One findings; (4) assessing the rigor and adequacy of prior TPA and RAAS audits; (5) reviewing actions taken in response to prior audit or CAM findings; (6) following-up regarding certain identified violations of the ECP, including Marine Environmental Protection Requirements; and (7) collecting information relevant to the CAM's Year Two areas of focus.

      *d.*      *Additional Court-Ordered Shoreside Visits*

For the five additional shoreside visits ordered by the Court, the CAM Team—in collaboration with the TPA, as appropriate—primarily will concentrate on the ECP Year Two areas of focus that relate to shoreside responsibilities. These areas are: (1) internal investigations; (2) training; (3) resources for operations and compliance; (4) shoreside support for vessels; (5) personnel, in particular Environmental Officers, engineers, and ratings; and (6) Company vessel visit programs. In addition, these additional visits may involve follow-up on additional systemic issues identified by the TPA, such as deficiencies in policies and procedures and continuous improvement efforts, or areas of inquiry that arise during the course of the year.

### 6. *Compliance Culture Assessment*

As directed by the Court, and consistent with discussions held by the CAM with the DOJ and with the Company, the CAM will oversee the implementation of a culture survey to aid the efforts of all parties in assessing both the strengths and the opportunities for improvement in the Company's compliance culture. *See* Superseding First Annual Work Plan, n. 3. This culture

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

survey effort supports the CAM's mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, and to assess whether the Company has adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance, *see* ECP § VI.B.2.

In connection with this effort, the CAM is examining prior Company culture survey findings and the Company's responses to those findings. This review will assist the CAM in identifying potentially recurring culture issues and help inform the development of the CAM's compliance culture survey. The CAM also will review actions the Company has taken to address prior survey findings, and will assess the effectiveness of those actions.

On June 27, 2018, as agreed by the Government and the Company, the CAM retained culture consultant Propel AS to develop and implement the CAM's compliance culture survey. Propel AS is skilled in the delivery of maritime culture surveys and is developing an appropriate survey instrument designed to measure the Company's compliance culture. While safety culture surveys routinely are conducted in the maritime and many other industries, the focus of this culture assessment will be the interrelated obligations of safety, health, and environmental compliance. It also will be tailored to account for the issues and challenges particular to maritime operations. The Company and the CAM are working closely and collaboratively on this effort.

Planning and development of the survey instrument will be completed by the end of October 2018. An initial survey will be conducted from November 2018 to March 2019. The survey administration will be conducted in two phases to increase participation, and is intended to provide a baseline for assessing the Company's corporate compliance culture. Following the first survey administration, from January 2019 to April 2019, Propel AS will conduct focus groups. These sessions are intended to clarify observed survey trends and responses. While the CAM and the Company will work collaboratively to identify the final target population, Propel AS has the capability to survey over 124,100 individuals, and plans to conduct focus groups on nine vessels and five shoreside locations. Propel AS will prepare a report to be presented to the CAM and the Company. The target date for this report is April 2019. Propel AS will conduct a second survey before the completion of the five-year probationary period in order to assess the Company's progress in creating a sustainable culture of compliance.

### 7. *Reporting*

The ECP provides for two types of CAM reporting obligations: (1) annual reports, *see* ECP § VI.F.3; and (2) reporting of specified events to the Interested Parties, *see* ECP §§ III.D, VI.F.6. In addition, the Court ordered the CAM to provide quarterly reports (except during quarters in which an annual report is prepared). *See* Orders dated April 10, 2018, and April 26, 2018.

### a. Annual Reports

In accordance with ECP Section VI.F.3, the CAM will prepare an annual report for submission to the Company and Interested Parties regarding: (1) the audits conducted by the TPA; (2) information pertaining to the Company's capabilities to meet the objectives of the ECP; and (3) the Company's internal audits and trend analyses. *See* ECP § VI.3.-5. Consistent with the CAM First Annual Report, the CAM's report will contain findings and describe future areas of focus. This report is scheduled to be submitted for non-binding comments to the Company and the Government by June 5, 2019. A final report is to be submitted by June 19, 2019.

### b. Interested Party Reporting

ECP Sections III.D and VI.F.6 require the CAM to report the following categories of information to the Interested Parties: Major Non-Conformities; certain Environmental Open Reports; and failures of the Company to act on, as appropriate, an Audit Finding or TPA recommendation. In connection with this requirement, the CAM Team members assess and track incidents and findings reported by the Company, identified by the TPA, or otherwise identified by the CAM Team. The CAM provides the required information to the Interested Parties on a regular basis.

### c. Quarterly Reports

In accordance with the Court's Orders of April 10, 2018, and April 26, 2018, the CAM will prepare quarterly reports (except in quarters during which an annual report is due). The CAM anticipates that these quarterly reports may, among other things, provide: (1) an update on issues identified by the Court; (2) an update on the CAM's identified areas of focus; (3) an update on any actions taken by the Company to address the CAM's annual report findings; (4) an update on any significant actions or initiatives related to the Company's progress toward meeting the objectives of the ECP; and (5) an analysis of significant environmental incidents and audit findings that occurred during the quarter. The CAM will provide copies of the quarterly reports for non-binding comment to the Company and Government ten business days prior to finalizing the quarterly reports. The first CAM quarterly report is due September 21, 2018, and will be provided to the Company and Government for comment by September 7, 2018.

### 8. Strategic Planning and Resources for Operations and Compliance

During the July 11, 2018, Status Conference, the Court identified the Company's strategic planning as an additional area of focus for the CAM: "[O]ne thing that I'm grappling with is how do I—how does the company demonstrate that environmental is really a part of its overall strategic plan for the company? . . . [M]aybe it would be helpful if Mr. Solow could speak with you about and be more educated as to understanding the big picture, because that's at the—that's what drives the goals for the company." Status Conf. Tr. at 87 (July 11, 2018). The

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

Court further instructed:  "I need for Mr. Solow to understand how the strategic plan is formulated, how it receives input, how it is carried out."  *Id.* at 92.

In this context, the Court, in particular, seemed concerned about how resources are allocated to environmental compliance.  *See id.* at 34 ("When the company is looking at its strategic planning, that needs to be, what is the component there.  And I'm concerned, as I looked at Admiral Burke's assessment of one particular problem, is that it was excessive frugality, is that there is, unfortunately, the drive to maximize revenues and profits at the expense of being a good corporate citizen across the world."); *see also id.* at 46-47 ("[W]hen you hear 'excessive frugality,' then you only spend the money on what you value. . . . And what it's saying is you don't value the environment, and how do I get that to be something that one is willing to pay for?  We all make those decisions with our pocketbook.")

The Court's July 13, 2018, Order further provided:  "Before the next Quarterly Status Conference, the appropriate representatives from Defendant shall meet and confer with the Court Appointed Monitor to discuss how the companies' long-term strategic plans are formulated and, specifically, to discuss how environmental compliance has been made part of those plans and how protection of the environment is being incorporated as a priority into the companies' strategic plans and culture in a long-term, sustainable manner."  Dkt. No. 75 at 3.

In accordance with this Order, the CAM intends to review the Company's current strategic planning process and how the strategic plans provide for long-term sustainable environmental compliance.  The CAM anticipates that it will analyze a variety of inputs to assess the Company's strategic plans, including how the Company allocates financial resources for compliance as compared with other areas.

Consistent with the Court's inquiry about how the Company incorporates environmental compliance into its strategic planning, an important aspect of the CAM's assessment will be examining Company expenditures, including but not limited to the ECP-required Covered Vessel budgets and the process for OLCM budget certifications per ECP Sections III.A.9 and III.A.10. The CAM intends to retain a forensic accountant to assist in this effort.

### 9.   *Corporate Structure and CCM Authority*

One of the CAM's findings in the CAM First Annual Report was that individuals throughout the Company report that the Company's complex corporate structure and lack of centralization impede efforts towards continuous improvement.  The CAM also found that many individuals sought greater clarity as to responsibility, accountability, and authority for environmental compliance.  Part of this finding grew out of the recognition that the Company has not given the CCM the ECP-required "authority to ensure full implementation of [the] ECP." ECP § III.A.2.

The Court viewed this finding as one of significant concern during the July 11, 2018, Status Conference. *See* Status Conf. Tr. at 42 (July 11, 2018) ("the lack of centralization issue and the authority of Chris Donald; and my concern there is, I can see the problem, I don't know how to fix it"). The Court's July 13, 2018, Order further required: "On or before September 5, 2018, the Defendant will provide a plan as to how Carnival and its brands will address the challenge of corporate structure set forth in the First Annual Report of the Court Appointed Monitor, including prioritizing and standardizing environmental compliance across the company and establishing a Corporate Compliance Manager with both responsibility and authority over environmental policy and the Environmental Compliance Plan." Dkt. No. 75 at 2.

The CAM will review the Company's plan provided in response to the Court's Order. The CAM expects to discuss the plan with the Company, and will follow the implementation of the plan over time. The CAM also may observe the CCM (or other personnel with key environmental compliance roles) at work over the course of up to a week in an effort to ascertain how the role of environmental compliance fits within the Company's operations. The CAM will also assess the effectiveness of the plan, as implemented, in remedying the finding that the Company's structure, including the authority of the CCM, is a barrier to sharing of best practices and to the goal of continuous improvement.

### 10. Investigations

As discussed in the CAM First Annual Report, the Company, recognizing weaknesses in its internal incident investigation process, engaged DNV GL, a classification society with maritime advisory services, to review the Company's investigation process and to provide recommendations for improvement. DNV GL issued a report with detailed findings and recommendations in May 2018. Following the July 11, 2018, Status Conference, the Company was ordered to provide, on or before September 21, 2018, a proposed timeline for establishing and implementing these recommendations. *See* Dkt. No. 75 at 2. Prior to the Court's deadline of September 21, 2018, the CAM expects to meet with the CCM and the Chief Audit Officer to learn about the proposed timeline for implementing the DNV GL recommendations.

The CAM Team will work closely with the CCM and the Chief Audit Officer to develop methods to track the Company's progress in implementing these recommendations in ECP Year Two. In coordination with this review, the CAM plans to focus on a RAAS Level 3 or 4 investigation. The CAM's work will include meetings to discuss the challenges of the investigations process. In addition, during visits to vessels and shoreside facilities, the CAM Team will also focus on incident investigation processes and related training.

14

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

### 11. Training

As noted in the CAM First Annual Report, during the April 19, 2017, Sentencing Hearing, the Court emphasized the importance of training, noting that "training needs to be for everyone and it needs to be on an annual basis and it needs to be training similar to that in the military where it becomes instinctive that there is a call and a response; it is so ingrained in the individuals, each member of the crew is committed to the environment." Sentencing Hr'g Tr. at 13 (Apr. 19, 2017).

The ECP has numerous training requirements, and the Company invested significant resources in this training. The Company reports that it is employing a third party to review and revise the substance of its Environmental Officer and other trainings. The Company also reports that it is integrating environmental requirements and related issues into the existing training for its deck and technical officers. Going forward, the CAM will continue to review the Company's environmental and ECP-related training for all personnel. The CAM will do this by visiting the Company's CSMART training center; holding discussions with key employees and consultants involved in developing relevant trainings; gathering information on training content and efficacy during vessel and shoreside visits; and reviewing the Company's training materials and initiatives.

The CAM Team is scheduled to visit the Company's CSMART training facility in Almere in September 2018 to attend the Environmental Officers' Environmental Commitment Conference. While there, the CAM Team also will observe ongoing trainings and meet with personnel involved in trainings. The CAM Team anticipates that it will return to CSMART later in ECP Year Two to review trainings revised after third party review and to assess the Company's response to TPA audit findings related to its Environmental Officer courses.

In addition, the CAM plans to examine the training of ratings, which primarily is conducted by third-party manning agencies. This will be done during one or more visits to manning agencies, as described below.

### 12. Personnel

The ECP recognizes the critical role personnel play in ensuring compliance with environmental requirements. For example, pursuant to the ECP, the Company has agreed to supplement vessel crews in the event inadequacies in the size or capability of the crew contributes to an inability to meet the objectives of the ECP. *See* ECP § I.F. During ECP Year One, the CAM received information suggesting the Company faces challenges with respect to availability and retention of qualified personnel.

To assess whether personnel issues are impacting the Company's ability to meet the objectives of the ECP, the CAM primarily will examine the following three categories of personnel: (1) Environmental Officers; (2) engineers; and (3) ratings. For each category, the

15

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

CAM will evaluate whether and how the Company is managing personnel in a manner that provides for long-term sustainable compliance with the ECP and with Marine Environmental Protection Requirements.  This will include analyzing a variety of factors, including staffing levels, qualification levels, retention levels, workload, job satisfaction, and compensation.

The CAM Team will gather information relevant to this area of focus primarily through: document and data requests; discussions with employees, particularly Environmental Officers, engineers, and ratings; discussions with shipboard and shoreside personnel involved in the recruitment, employment, training, management, and retention of Environmental Officers, engineers, and ratings; and one or more visits to a manning agency engaged by the Company to recruit and train ratings.

### 13. Company Vessel Visit Programs

As detailed in the CAM First Annual Report, two Company-created vessel visit programs came to light during ECP Year One that attracted the attention of the Court.  The first program, implemented during the first-half of ECP Year One, involved the Company sending engineers to vessels in order to inspect and correct ECP issues shortly before TPA audits.  Following the December 4, 2017, Status Conference, the Company terminated this initial pre-TPA audit program.

Shortly thereafter, it appears that Holland America Group launched a second vessel visit program called the Environmental Ship Assistance Visit Program ("ESAVP").  Like the initial pre-TPA audit program, the Company did not disclose the ESAVP to the Interested Parties, the CAM, the TPA, or the Court.[7]  During the April 3, 2018, Status Conference, the Court and the Government expressed concern about the nature of these programs and the lack of transparency about these programs. The Court observed that these efforts "tainted" the integrity of audits performed in the wake of ship visits.  *See* Status Conf. Tr. at 11 (July 11, 2018) ("They're all tainted."); *see also id.* at 39 (the pre-audit programs raised "concerns as to whether or not the audit findings that we have are really the true picture.")  The CAM committed to review these programs and to report back to the Court and the Interested Parties.

In response to requests made by DOJ regarding the vessel visit programs, the Company has produced 10,233 responsive documents to date.  The CAM is conducting a review of these documents to identify records of interest.  The Company has indicated that there will be further production of documents, as well as the production of a privilege log.  The Court ordered that the remaining documents and privilege log be produced by September 5, 2018.  The Company also offered to provide a presentation with respect to these, and other, vessel visit programs.  Once

---

[7] The CAM understands that other operating lines and/or brands also may have launched, or started to develop, vessel visit programs similar to the ESAVP.  These programs also were not disclosed to the Interested Parties, the CAM, the TPA, or the Court.

NOT FOR DISCLOSURE BEYOND INTENDED RECIPIENTS

the CAM Team has reviewed the documents produced and the privilege log, the CAM will consider whether further inquiries are needed.