**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: <u>16-20897-CR-SEITZ</u>**

**UNITED STATES OF AMERICA**

       **v.**

**PRINCESS CRUISE LINES, LTD.,**

       **Defendant.**
_____/

<u>QUARTERLY REPORT OF THE COURT APPOINTED MONITOR (APRIL 2019)</u>

I.   **Introduction** ..................................................................................................1

   A. Overview of CAM Quarterly Report ........................................................ 1

   B. Probation Revocation Petition .................................................................. 2

   C. Areas of Focus ........................................................................................ 2

   D. ECP Modifications .................................................................................. 3

      1.   January 10, 2019 Modifications .......................................................... 3

      2.   Forthcoming Proposed Modifications .................................................. 6

      3.   Definition of "Major Non-Conformity" ............................................... 10

II.  **CAM Team Activities during the Third Quarter of ECP Year Two** ............................14

   A. TPA Audit Activities ............................................................................... 16

   B. RAAS Audit Activities ............................................................................ 17

III. **Updates on Company Capabilities to Meet ECP Objectives and ECP Year Two Areas of Focus** ...................................................................................................................17

   A. Environmental Incidents ........................................................................... 17

      1.   Significant Incidents ........................................................................... 18

      2.   Company Efforts to Prevent or Reduce Environmental Incidents .......................... 26

   B. Implementation of ECP Requirements ....................................................... 28

   C. Initiatives beyond Specified ECP Requirements .......................................... 28

   D. Personnel ................................................................................................ 29

   E. Corporate Structure and CCM Authority .................................................... 30

   F. Compliance Culture Assessment ............................................................... 33

G.  Investigations ..................................................................................................... 36

H.  Training ............................................................................................................... 38

    1.  Updates on Company Initiatives................................................................... 38

    2.  Other Updates .............................................................................................. 39

I.  Strategic Planning and Resources for Operations and Compliance................................ 40

J.  Company Vessel Visit Programs .............................................................................. 41

    1.  Pre-December 2017 Program........................................................................ 41

    2.  Post-December 2017 Programs ..................................................................... 42

    3.  Court and Government Concerns ................................................................... 44

    4.  Company Inquiry and Presentation................................................................ 46

    5.  CAM Team Review ....................................................................................... 47

    6.  CAM Observations ........................................................................................ 51

**Attachments:**

    **Attachment 1**:  Letter from C. Donald, *Re: Proposed Modifications to the Environmental Compliance Plan* (Jan. 10, 2019), PCL_ECP00086780-85

    **Attachment 2**:  Chart, *Proposed Modifications to Environmental Compliance Plan* (Jan. 10, 2019), PCL_ECP00086786-91

    **Attachment 3**:  Letter from S. Solow, *Re: Environmental Compliance Plan ("ECP") Environmental Control System ("ECS")* (Jan. 25, 2019)

    **Attachment 4:**  *Attachment to CAM Letter Regarding ECP Environmental Control System (01/25/2019)*

## I.  INTRODUCTION

Pursuant to the Court's Orders of April 26, 2018, Dkt. No. 66, February 6, 2019, Dkt. No. 90, and February 22, 2019, Dkt. No. 91, the CAM submits this third quarterly report for ECP Year Two ("CAM April 2019 Quarterly Report" or "Report").[1]

### A.  Overview of CAM Quarterly Report

The Court ordered that the CAM submit Quarterly Reports to provide updates on the monitorship and to address issues identified by the Court and the CAM.  *See* CAM September 2018 Quarterly Report at 1.  This Report focuses on events and developments occurring during the period from November 19, 2018, through February 18, 2019.  However, certain notable developments occurring after February 18, 2019, are included in the discussions below, as appropriate.

Part I.B describes the petition filed by the U. S. Probation Office to revoke the Company's probation.  Part I.C provides an overview of the CAM's areas of focus and goals for this Report.  Part I.D discusses several recent ECP modifications, as well as other forthcoming proposed ECP modifications the CAM expects the Company to submit in the coming months.  In addition, this section examines exchanges between the Company, CAM, TPA, and Interested Parties regarding the term "Major Non-Conformity" in the ECP.

Part II of this Report provides an overview of the CAM Team's activities during the third quarter of ECP Year Two, as well as an overview of the CAM's oversight of the TPA and of the Company's audit function conducted by its Risk Advisory and Assurance Services ("RAAS")

---

[1] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1, or the First Annual Report of the Court Appointed Monitor (2017-2018) ("CAM First Annual Report").

department.  Part III of this Report provides updates on the Company's capabilities to meet ECP

objectives, the Company's efforts with respect to ECP compliance, and other areas of focus.

**B.      Probation Revocation Petition**

On March 8, 2019, the U.S. Probation Officer filed a petition with the Court alleging

three violations of the terms and conditions of probation by the Company:  (1) "On or about

December 9, 2017 continuing through March 13, 2018, [committing] the offense of:  Criminal

Contempt of Court, contrary to 18 U.S.C. j 401(3)" for "fail[ing] to follow a Judicial Order

issued on December 4, 201[7] by United States District Judge Patricia A. Seitz regarding the

cessation of preaudit vessel visit program(s);" (2) failing "to designate a senior corporate officer

as [CCM] with responsibility and authority for implementation of the [ECP] . . . as evidenced by

the defendant corporation implementing a vessel visit program without authorization or

knowledge from the [CCM] after the December 4, 201[7] status hearing;" and (3) on or about

June 8, 2017, falsifying training records onboard two vessels pursuant to Carnival Corp. Notice

of Violations #04-2017 and #06-2017.  Dkt. No. 93 (Court only) at 4.

An Initial Appearance was held on March 18, 2019.  *See* Dkt. No. 98.  As of the date of

this Report, the Company is engaged in discussions with the Interested Parties, CAM, and TPA

regarding potential options for addressing or resolving the allegations in the petition.

**C.      Areas of Focus**

The CAM has continued to gather information with respect to the areas of focus

identified in the CAM First Annual Report and the prior Quarterly Reports.  *See* CAM First

Annual Report at 68-74; CAM September 2018 Quarterly Report at 2-6; CAM December 2018

Quarterly Report at 1-2.  This Report focuses on providing updates for those areas of interest in

which significant developments occurred during the covered time period of November 19, 2018,

CONFIDENTIAL                                               April 2, 2019

through February 18, 2019.  This Report does not provide the more detailed assessments or findings regarding the Company's performance in the areas of focus that the CAM expects to provide in the Annual Report for ECP Year Two.  *See id.* at 2.

### D.   ECP Modifications

#### 1.   January 10, 2019 Modifications

On January 10, 2019, the CCM submitted to the Interested Parties proposed modifications to the ECP.  *See* Letter from C. Donald, *Re: Proposed Modifications to the Environmental Compliance Plan* (Jan. 10, 2019) ("Proposed ECP Modification Letter"), PCL_ECP00086780-85, included with this Report as Attachment 1.  The stated goal of these modifications "is to better achieve the overall purpose of the ECP—sustained environmental compliance and continuous improvement—while eliminating some of the inefficiencies that can often interfere with that goal."  *Id.* at 2.  While many of the modifications are of a relatively minor nature (*e.g.*, correcting typographical errors, formally codifying existing practices), the more significant modifications are discussed below.  As noted in the Company's letter, these modifications were developed in consultation with the CAM and TPA.  *See id.* at 1.

Under the ECP, proposed modifications become effective after thirty days, unless the Interested Parties provide written comments on the proposal within this time period.  *See* ECP § I.H.  The Interested Parties did not provide written comments on the Company's Proposed ECP Modification Letter.  Therefore, the CAM understands that these modifications became effective on February 11, 2019 (*i.e.*, thirty days from the date of the Proposed ECP Modification Letter).

#### i.   *Environmental Officer Unannounced Machinery Space Visits*

The most significant proposed modification was to ECP Section IV.A.2.j, which previously required Environmental Officers to "[c]onduct unannounced machinery space visits at

least twice per week to observe the operation of the [Oily Water Separator] and [Oil Content Meter] (when in operation) for a period of one hour, including start and stop times." ECP § IV.A.2.j.ii (original 2017 text). At least one of the two required weekly visits was required to be conducted "outside of normal day work hours." *Id.*

As discussed in the prior Quarterly Report, many Environmental Officers reported that this provision was unclear, impractical, and burdensome to implement. *See* CAM December 2018 Quarterly Report at 19-20; *see also* Proposed ECP Modification Letter at 2-3.[2] Likewise, the TPA reported that the provision was difficult to audit to because of its lack of clarity. After these issues were raised at the September 2018 "Environmental Commitment Conference," the CCM, several Environmental Officers, and other Company employees coordinated with the CAM and the TPA on developing revised language for this provision.

As described in the Company's letter, the modification "designs the [Environmental Officer's] visits so as to maximize the opportunity that the [Environmental Officer] will observe the [Oily Water Separator] and [Oil Content Meter] in operation without providing advance notice, provides guidance for how the [Environmental Officer] should manage to observe start or stop times of the system,[3] and preserves the requirement that at least one weekly visit fall outside of normal work hours." *Id.* at 2-3. The CAM supports this modification. The CAM will

---

[2] For instance, the requirement to observe the equipment "for a period of one hour, including start and stop times" appears to require the Environmental Officer to be present for both start and stop times. However, "the system does not stop after one hour but instead lasts many hours." *Id.* at 2. Therefore, requiring the Environmental Officer to attend both start and stop times "would require that he or she remain in the engine room for much longer than one hour, which would significantly impede [his or her] ability to meet other important obligations under the ECP." *Id.*

[3] Specifically, the modification clarifies that "[d]uring the hour visit the [Environmental Officer] shall observe any [Oily Water Separator/Oil Content Meter] and White Box that is in operation. The hour time period *does not require continuous operation*, and *can* include time used to start *or* stop the equipment." *Id.* at 3 (emphasis added).

4

CONFIDENTIAL                                                    April 2, 2019

continue to engage with Environmental Officers, the CCM, and the TPA to assess whether the modified language is successful in reducing the uncertainty and burden associated with this task for Environmental Officers, and in aiding the ability of the TPA to audit this requirement.

### ii.   Staggering of ECP Video Messages

The Company also proposed to modify ECP Section III.F.1, which previously required the Carnival Corp. CEO and operating line presidents, respectively, to advise all employees during the first quarter of each fiscal year of "i) Defendant's criminal conviction and probation; ii) CARNIVAL's commitment to environmental compliance; and iii) to the existence of this ECP, its material provisions, and how to access a copy of it."  ECP § III.F.1 (original 2017 text). To fulfill this requirement, the Company issues communications in the form of video messages from the CEO and operating line presidents.  The modification allows the Company to stagger these video messages throughout the fiscal year (rather than issuing both during the first quarter), so that each operating line shows the video featuring the CEO during the first quarter of each fiscal year and a video featuring the operating line president during the third quarter of each fiscal year.  According to the Company, staggering the videos allows the Company "to refresh its environmental compliance message more frequently and provide more opportunities to update that message."  Proposed ECP Modification Letter at 4.  The CAM does not object to this change.

### iii.   Other Modifications

The Company proposed a number of other ECP modifications, a chart of which is included with this Report as Attachment 2.  *See* Chart, *Proposed Modifications to Environmental Compliance Plan* (Jan. 10, 2019), PCL_ECP00086786-91.  The CAM does not object to these other changes.

2. <u>Forthcoming Proposed Modifications</u>

In addition to the ECP modifications proposed on January 10, 2019, the Company has indicated that it intends to propose further modifications, including changes to provisions regarding the (1) Environmental Control System ("ECS") program; and (2) structure of the internal investigations department. As described below, the CAM appreciates the need for modifications to these sections of the ECP and awaits further action from the Company.

i. *ECS Program*

The Company's January 10, 2019 letter stated that the Company was engaged in discussions with the CAM and TPA regarding "changes to several provisions in the ECP relating to [the ECS program],"[4] as well as discussions "related to the efficiency of the ECS monitoring." Proposed ECP Modification Letter at 1. The Company further stated that it plans to "submit any proposed modifications concerning the ECS once it reaches alignment with the CAM and the TPA on how best to improve that system." *Id.*

The CAM has been actively engaged with the Company and the TPA on issues related to the ECS program since at least the summer of 2018. In August 2018, the CAM Team and TPA, at the invitation of the CCM, attended an ECS workshop at Holland America Group's offices in Seattle, Washington. *See* CAM September 2018 Quarterly Report at 20. Among other things, the workshop concluded that the clarity and value of the ECP program could be improved. *See id.* That same month, the Company launched a survey of a sample of ships at each brand to

---

[4] *See* ECP § IX.B (requiring Carnival Corp. to implement an ECS "to help prevent unauthorized usage or connections within the engine room and machinery spaces," under which Carnival Corp. "shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or overboard discharge connections"); *see also* CAM First Annual Report at 14, 52-53.

evaluate each ship's ECS program implementation.  On January 8, 2019, the CCM formally

notified the CAM and TPA of the results of the survey, which found "implementation

inconsistencies" with the program.  *See* Letter from C. Donald, *Re: Court Appointed Monitor*

*and Third Party Auditor Communication* (Jan. 8, 2019), PCL_ECP00086778-79.  Specifically,

the survey confirmed that most ships surveyed "did not fully comply with Company procedures

for the control of vulnerable connections and had deviated from the methodology that should

have been utilized."  *Id.* at 1.  Further, "[s]ome ships installed more seals than required making

onboard management of the program quite challenging."  *Id.*  These implementation issues were

attributed, among other factors, to the "condensed timeline" on which the program had to be

implemented on more than one hundred ships.  *Id.*  The letter further stated that the Company

was in the process of "developing plans to improve ECS compliance and increase application

consistency across our fleet."  *Id.*

Recognizing that ECS program implementation has been an ongoing challenge for the

ships, the CAM sent a letter on January 25, 2019 to the Interested Parties outlining four

significant flaws in the current ECS program identified by the CAM and TPA.  *See* Letter from

S. Solow, *Re: Environmental Compliance Plan ("ECP") Environmental Control System*

*("ECS")* (Jan. 25, 2019) ("CAM ECS Letter") and *Attachment to CAM Letter Regarding ECP*

*Environmental Control System (01/25/2019)*, included with this Report as Attachments 3 and 4.

Among these flaws were that "the broad language of the ECP, coupled with the overall lack of

centralization within the Company on compliance matters, has led to a wide variety of

interpretations of the ECS requirements [with some ships having as many as 2,000 seals, and

others having as few as five]" and that "the lack of clarity and consistency of the current ECS

program has made the TPA's auditing job difficult, and frustrated both the TPA auditors and the

ships' crews."  CAM ECS Letter at 2.

The CAM's letter also describes an alternative approach to the ECS program—fleshed

out over a period of several months with the Company and the TPA—that would require a

revision of the ECP.  This alternative approach would consist of:

1. Revised language to ECP § IX.B.1 to reflect the role of the ECS to "deter and detect" (rather than "prevent") unauthorized usage or connections.

2. Revised language to allow for the use of pump (portable) and hose control as an effective means of deterring and detecting unauthorized usage or connections.[5]

3. Revised language to limit the locations where seals or locks are required to be installed to:  (1) overboard discharge points back to the first valve on the line connection (for "dirty" systems only—e.g., bilge/oil residue (sludge), grey, black water, food waste); (2) emergency direct bilge suctions, emergency bilge suction valves, crossover valves, and eductors; and (3) any identified internal "dirty-to-clean" cross connections.

4. In addition to revisions to the ECP, a revision of the company's Global HESS Procedure ENV-1204 to reflect these changes, and (consistent with the Company's goal to provide meaningful compliance authority for the CCM) new language in ENV-1204 and INT-10005 that would give the CCM authority over any revision to this approach.

*Id.* at 3.  The goal of this approach "is to have an ECS program that can be consistently

implemented, is objectively auditable, and is sustainable beyond the span of the ECP."  *Id.*  The

CAM's letter urges the Interested Parties to support any proposed ECP modifications that are

---

[5] As noted in the CAM's letter, the ECP currently requires the use of seals or locks (not pump and hose control) to secure vulnerable connections.  Based on the CAM's discussions with the TPA and the Company, "all agree that the use of pump (portable) and hose control (so-called virtual seals or locks) would be more effective and more efficient than seals.  However, because of the current ECP requirements, if ships have used pump and hose control, the TPA has been (properly) issuing audit non-conformities in ECP Year Two."  *Id.* (citations to TPA audit reports omitted).  Resolving these repeated audit findings in a reasonable way—*i.e.*, by allowing the use of pump and hose control in lieu of seals or locks—appears to require revision of the ECP.  *See id.*

CONFIDENTIAL                                                                    April 2, 2019

consistent with this approach "and indeed consider them as an approach appropriate for use in subsequent ECP agreements." *Id.*

Now that the CAM, TPA, and Company appear to have reached "alignment . . . on how best to improve [the ECS] system," *see* Proposed ECP Modification Letter at 1, the CAM looks forward to further engagement with the Company on proposed revisions to the ECP and the Company's related Global HESS procedures. *See also* February 2019 USPO Supervision Report, Attachment 3, at 2 (noting that the CCM "has developed revised ECS language that [the Company] hope[s] will be incorporated into the ECP through a change request in the coming months, this effort will be undertaken in collaboration with the TPA and CAM with the goal of developing a robust, sustainable and auditable approach to controlling vulnerable connections within the machinery spaces, as well as to implement improved and enhanced portable pump control procedures"). On March 29, 2019, the CCM provided the CAM and TPA with draft proposed modifications to ECP provisions regarding the ECS program. The CAM Team is reviewing this draft proposal.

<em>ii.    Investigations Department</em>

The Company's January 10, 2019 letter also stated that the Company was engaged in discussions with the CAM and TPA regarding "a restructuring of the Company's department responsible for incident investigations." Proposed ECP Modification Letter at 1.[6] At the time of

---

[6] As discussed in prior CAM Reports, the Company has recognized the need to improve its internal investigations function and has proposed to create a new Global HESS Investigations Department that would be separate from RAAS and would take over from RAAS responsibility for all significant HESS incident investigations. *See* CAM December 2018 Quarterly Report at 30-31. To allow for this re-structuring, the Company has stated that it intends to propose modifications to ECP Sections III.B.1(b) and (c)—which currently provide for RAAS (rather than the new Global HESS Investigations Department) to investigate Covered Vessel casualties and oil pollution incidents and Hotline reports. *See id.* The CAM generally supports this approach.

the letter, the Company reported that it was "finalizing the exact structure of its investigations department as it continues its search for a Vice President to oversee the restructured investigation function," and that it planned "to submit its proposed modification of its investigative function shortly after this hiring process is complete, most likely during the first quarter of 2019." Proposed ECP Modification Letter at 1.  As discussed *infra*, Part III.G, the Company has since hired a Vice President of Global HESS Investigations, who began work on March 25, 2019.  The CAM looks forward to further engagement from the Company on proposed revisions to ECP Sections III.B.1(b) and (c).  On March 29, 2019, the CCM provided draft proposed ECP modifications to these provisions to the CAM and TPA.  The CAM Team is reviewing this draft proposal.

### 3.    Definition of "Major Non-Conformity"

Since ECP Year One, the Company has raised objections (both in writing and informally) to certain aspects of the term "Major Non-Conformity"[7] in the ECP—in particular, as to whether the discovery of inoperable pollution prevention equipment should qualify as a Major Non-Conformity if "redundant" equipment performing the same function remains operable.  On March 9, 2018, the Company sent a letter to the CAM to discuss, among other proposals, a potential proposed ECP modification to the term.  *See* Letter from D. Kelley, *Proposed Amendments to the ECP* (Mar. 9, 2018).  Specifically, the Company's proposal would have added a sentence to the definition of a Major Non-Conformity "to make clear that an inoperable

---

[7] The ECP defines "Major Non-Conformity" as "an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water.  It may also include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process."  ECP § I.D; *see also* CAM First Annual Report at 42-43.

CONFIDENTIAL                                                                April 2, 2019

piece of pollution prevention equipment does not rise to the level of a Major Non-Conformity if redundant equipment remains operable and satisfies all of the Company's pollution prevention obligations under MARPOL or any other applicable federal, state, or local laws or regulations." *Id.* at 2.[8]

In a separate set of correspondence between the Company and the Government, the Government disputed the Company's position that "inoperable pollution prevention equipment should not be designated a major non-conformity if a 'redundant' component is operational." Letter from R. Udell, *United States v. Princess* (Case 1:16-cr-20897) (Mar. 27, 2018), at 2. Among other things, the Government noted that ships are required to carry certificates which "identify the equipment and procedures used to handle pollutants and their waste streams" and that the "inoperability of this equipment is unquestionably a very significant event" which "generally results in the detention of a ship. *See* 33 U.S.C. § 1904(e)(2) (stating the Secretary of Homeland Security '*shall*' detain ships 'whose condition or whose equipment's condition does not substantially agree with the particulars of the certificate aboard.'); and MARPOL, Art. 5." *Id.* at 3 (emphasis in original). In addition, the Government observed that "the failure of such ['redundant'] components had systemic consequences and played a significant role in the [conduct on the *Caribbean Princess*] leading to conviction." *Id.* The Government also remarked that the ECP category of a Major Non-Conformity "was intended to provide the [Company] with remedial guidance by *highlighting the most significant problems, problems that need prompt*

---

[8] That sentence, appended to the end of the existing ECP definition, would have read: "Notwithstanding the foregoing sentence, a Major Non-Conformity shall not include the discovery of inoperable pollution prevention equipment if the vessel is equipped with a redundant system or equipment, or if the vessel possesses operable pollution prevention equipment of the same type or capability sufficient to satisfy all Marine Environmental Protection Requirements; any such discovery shall be recorded as an Observation." *Id.*, ECP Proposed Amendments Chart Attachment.

CONFIDENTIAL                                                        April 2, 2019

*attention, and problems that warrant consideration as to whether they represent a more systemic problem*.” *Id.* (emphasis added).  Likewise, “the category can be helpful to the Court, Office of Probation, government, CAM and TPA.”  *Id.*  The Government further observed that “Carnival’s complaints about the use of this designation, when viewed in context, appear to reflect *an antagonistic corporate culture where management prizes avoiding adverse findings more than achieving actual compliance and progress*.”  *Id.* at 3-4 (emphasis added).  The Government concluded by stating that it would oppose the Company’s proposal to modify the definition of Major Non-Conformity.  *See id.* at 4.

On March 29, 2018, the CAM and TPA provided joint comments in response to the Company’s proposal, which noted that the issue was “the subject of separate correspondence between the government and the Company” and that the CAM and TPA “will follow whatever course is agreed to by the government and the Company.”  *See* Email from S. Solow, *Re: Proposed ECP Amendments -- U.S. v. Princess Cruise Lines, Ltd., 1:16-cr-20897* (S.D. Fla.) (Mar. 29, 2018), Attachment (“CAM/TPA Joint Comments”), at 2.  The CAM and TPA further noted that “the term ‘Major Non-Conformity’ is a term of art in the maritime industry and that the definition assigned to it under this ECP differs from that used under the [International Safety Management (“ISM”)] Code and the Coast Guard regulations.[9]  To the extent the nomenclature is causing confusion, the CAM and TPA do not object to changing ‘non-conformity’ to ‘non-

---

[9] For example, the ISM Code defines a Major Non-Conformity as “an identifiable deviation that poses a serious threat to the safety of personnel or the ship or *a serious risk to the environment that requires immediate corrective action* or the lack of effective and systematic implementation of a requirement of this Code.”  ISM Code, Part A, § 1.1.10 (2014) (emphasis added).  Similarly, U.S. Coast Guard regulations define a Major Non-Conformity as “an identifiable deviation which poses a serious threat to personnel or vessel safety or *a serious risk to the environment and requires immediate corrective action*; in addition, the lack of effective and systematic implementation of a requirement of the ISM Code is also considered a major non-conformity.” 33 C.F.R. § 96.120.

compliance' or other similar term."  CAM/TPA Joint Comments at 2-3.  In addition, the CAM and TPA observed that "the failure of 'redundant' pollution prevention equipment preceded the illegal discharges leading to the plea in this matter."  *Id.* at 3.

It has been nearly a year since these exchanges with the Government, CAM, and TPA. During this time, the Company has not communicated with any of these parties with regard to a formal proposal to modify the definition of Major Non-Conformity (although the Company has maintained its position on the subject during discussions between the CAM and Company management).  However, on February 27, 2019, the Government informed the Company that it was "recently surprised to learn" that on June 19, 2018, a senior executive at Holland America Group had contacted former colleagues at the U.S. Coast Guard[10] "directly seeking support for Carnival's position."  Letter from R. Udell, *Re: United States v. Princess (Case No. 1:16-cr-20897)* (Feb. 27, 2019), at 1.  The Government reiterated that "any change to the ECP needs to be raised with the government and the interested parties, and ultimately, with the Court."  *Id.* at 1-2.  The Government further requested that the Company "confirm that any such requests will be properly channeled through [the] government's representatives and the other designated interested parties going forward so that may be considered in context" and "inform us whether any of the individuals that have been representing Carnival in Court were aware of or otherwise involved in this effort, or any related efforts."  *Id.* at 2.  To date, the CAM is unaware of any response from the Company.

This effort seems to underscore the Government's concern, noted above, that the current attitude of Company management "appear[s] to reflect *an antagonistic corporate culture where*

---

[10] As far as the CAM is aware, the individuals at the U.S. Coast Guard who were contacted are not the same individuals who have been assigned to the instant *United States v. Princess* criminal matter before the Court.

*management prizes avoiding adverse findings more than achieving actual compliance and progress*"—*i.e.*, by seeking to revise the definition of Major Non-Conformity to exclude some non-working pollution prevention equipment.  *See* Letter from R. Udell, *United States v. Princess (Case 1:16-cr-20897)* (Mar. 27, 2018), at 3-4 (emphasis added).  Given the role that non-working pollution prevention equipment played in the felony convictions in this matter, it would seem more appropriate for the Company to provide ships with the support and resources needed to keep all pollution prevention equipment on board in good operating condition.  In addition, given the convictions related to obstruction of justice and false statements, it is concerning that in pursuit of its position, the Company apparently sought to lobby the U.S. Coast Guard through communications that were not shared with the CAM or the Department of Justice and Coast Guard individuals directly responsible for this matter.  Finally, it appears that this communication regarding a contentious matter that is integral to the implementation of the ECP was made without the permission or knowledge of the CCM—further evidence that the role of the CCM is undermined by the Company itself.  *See infra*, Part III.E.

## II.  CAM TEAM ACTIVITIES DURING THE THIRD QUARTER OF ECP YEAR TWO

As discussed in the prior Quarterly Report, the CAM Team and the TPA continue to conduct the vessel and shoreside facility visits and audits anticipated by the CAM Second Annual Work Plan and the ECP, along with the additional vessel and shoreside facility visits and audits mandated in the Court's Order of July 13, 2018 as a result of the Court's concern that certain undisclosed Company vessel visit programs had "tainted" TPA audits from ECP Year One.  *See* Dkt. No. 75; *see also* CAM September 2018 Quarterly Report at 6-8 and Attachment 1 (describing the CAM Team's ECP Year Two methodology); CAM December 2018 Quarterly Report at 2 (describing the additional court-ordered visits and audits).

In compliance with the Court's direction, the CAM Team conducted the following visits during the period covered by this Report (November 19, 2018 through February 18, 2019):

- Seven vessel visits,[11] including:

    o Six CAM Team-only visits;[12] and

    o One TPA ride-along visit.[13]

- Two shoreside facility visits,[14] including:

    o One CAM Team-led visit focused on issues related to strategic planning and budgets, as discussed below in Part III.I.  This visit was conducted with AlixPartners, the CAM's forensic accounting consultant, and a TPA representative;[15] and

    o One RAAS shoreside audit attended by the CAM Team.[16]  During this visit, the CAM Team performed a limited number of CAM Team-only interviews.

---

[11]  In addition to these visits, on February 6, 2019, members of the CAM Team were given a tour of the *Queen Victoria* by the Carnival UK OLCM and another corporate representative while the vessel was in port in San Francisco, California.  Further, the CAM's retained maritime culture expert PROPEL SAYFR AS ("Propel") conducted focus groups for the environmental compliance culture survey on the *AIDAperla*, *Seabourn Odyssey*, *Royal Princess*, and *Costa Pacifica* during the week of February 5, 2019, and on the *Carnival Paradise* and *Regal Princess* during the week of February 11, 2019.  *See infra*, Part III.F.  Additional focus groups are planned to take place on the *Pacific Aria, Noordam*, and *Queen Elizabeth II* during the week of March 25, 2019.

[12]  These visits were on the *Island Princess* from December 5-8, 2018, *Ruby Princess* from December 8-12, 2018, *Royal Princess* from January 19-23, 2019, *Carnival Pride* from January 24-27, 2019, *Seabourn Encore* from February 6-10, 2019, and *Oosterdam* from February 9-12, 2019.

[13]  This visit was on the *Carnival Vista* from January 6-10, 2019.

[14]  In addition to these visits, between March 19, 2019, and March 29, 2019, the CAM's retained maritime culture expert, Propel, conducted focus groups for the environmental compliance culture survey in Company shoreside offices for Carnival UK, Holland America Group and Line, Princess, Carnival Cruise Line, and the All Brands Group.  An additional focus group at the Carnival Maritime Group offices is scheduled for April 8, 2019.

[15]  This visit was to Carnival Maritime Group's shoreside offices in Genoa, Italy, Rostock, Germany, and Hamburg, Germany from January 21-25, 2019.

[16]  This audit was of Holland America Group shoreside offices in Seattle, Washington and Santa Clarita, California from February 18-22, 2019.

Outside of vessel and shoreside facility visits, the CAM Team has continued to: communicate frequently with the CCM team; work with the Company on the environmental compliance culture survey; attend various Company meetings, conferences, and events; and conduct additional formal and informal interviews and communications with Company personnel.  The CAM Team is in regular communication with the Company, the TPA, and the Interested Parties, and continues to perform ongoing review of documents produced by the Company in relation to the work streams identified in the CAM Second Annual Work Plan and in response to information requests by the Government.

In addition, the Company requested that the Office of Probation, the Department of Justice, the U.S. Coast Guard, the TPA, and the CAM attend a presentation by the Company's outside counsel regarding the undisclosed vessel visit programs conducted by the Company during ECP Year One.  *See infra*, Part III.J.  On February 19, 2019, the Company's outside counsel made this presentation at the U.S. Attorney's Office in Miami, Florida.

A.      **TPA Audit Activities**

During the third quarter of ECP Year Two, the TPA conducted ten vessel audits (including one on which the CAM Team "rode-along")[17] and one shoreside office audit.[18]  The CAM continues to communicate regularly with the TPA, review TPA audit reports, and evaluate the adequacy and independence of the TPA.

---

[17] In addition, the TPA conducted follow-up visits to the *Carnival Elation*, *see infra* Part III.A.1.i, and *Carnival Vista* to check on the status of corrective actions from prior audit findings on those ships.

[18] In addition, as noted above, a TPA representative attended the CAM Team visit to Carnival Maritime Group's shoreside offices in Genoa, Italy, Rostock, Germany, and Hamburg, Germany from January 21-25, 2019.

In addition, on January 28, 2019, the CAM Team hosted a meeting at its Washington, DC offices with representatives of the TPA.  Among other items, the parties discussed lessons learned from ECP Year Two, as well as goals and areas of focus for ECP Year Three.

The CAM plans to provide an assessment of the TPA's activities during ECP Year Two in the next Annual Report.

### B.    RAAS Audit Activities

During the third quarter of ECP Year Two, RAAS conducted thirteen[19] vessel audits on Covered Vessels and three audits of shoreside offices (including one with the CAM Team in attendance).[20]  As noted above, the CAM Team observed the RAAS audit of the Holland America Group shoreside offices in Seattle, Washington and Santa Clarita, California from February 18-22, 2019.  During the audit, the CAM Team accompanied RAAS auditors during their activities, observing the auditors' process, including their approach to finalizing audit report findings.  The CAM plans to provide an assessment of RAAS's activities during ECP Year Two in the next Annual Report.

### III.   UPDATES ON COMPANY CAPABILITIES TO MEET ECP OBJECTIVES AND ECP YEAR TWO AREAS OF FOCUS

### A.    Environmental Incidents

As in ECP Year One, the Company continues to have environmental violations and ECP compliance challenges during ECP Year Two, even while efforts aimed at compliance are underway.  These include repeated instances of prohibited discharges—including what appears

---

[19] This includes two vessel audits that began on February 12, 2019 and ended on February 19, 2019, and one vessel audit that began on February 18, 2019 and ended on February 22, 2019.

[20] This includes an audit of the P&O Australia shoreside office, which does not operate any Covered Vessels.  It also includes one office audit that began on February 18, 2019 and ended on February 22, 2019.

to be a knowing instance of illegal discharge of contaminated food waste, and an instance of an alleged offer to falsify records to cover-up an illegal discharge.

The CAM Team continues to note increased levels of incident reporting during ECP Year Two—although it is not possible to determine whether that is due to an increase in reporting or an increase in incidents or both.  The extent to which the Company is able to utilize this information to drive continuous improvement remains to be seen.  *See* CAM December 2018 Quarterly Report at 6.  It is important to note that these issues have arisen in the context of widespread expressions of frustration by shipboard personnel related to their view that the Company's management prioritizes enhancing revenue over ensuring the adequacy of shipboard staffing and resources.  *See* Employee Interview Notes.

      1.    <u>Significant Incidents</u>

          i.    *Prohibited Discharge of Contaminated Food Waste on the* Carnival Elation *(TPA Major Non-Conformity Finding)*

On December 18, 2018, the TPA notified the CCM, the CAM, and the Interested Parties of a Major Non-Conformity finding during an audit of the *Carnival Elation* from December 13-17, 2018.  *See* Letter from J. Francic, *Subj: Major Non-Conformity Finding on the Carnival Elation* (Dec. 18, 2018) ("TPA MNC Letter"); *see also* ABSG, *Carnival Cruise Line Environmental Compliance Audit Report, Carnival Elation* (Jan. 23, 2019).  According to the TPA finding, the auditor observed food waste containers that "had other items such as plastic straws, plastic wrap, aluminum butter wrappers, wooden stir sticks and other miscellaneous items mixed in the food waste that was processed through the pulpers and into the food waste tanks, ready to be discharged while at sea.  This was confirmed with the [Environmental Officer] who agreed the food waste was not being segregated at the early stages but failed to take action as the food waste was discharged into the sea on December 16, 2018."  *Id.* at 5 (Major Non-

CONFIDENTIAL                                                                          April 2, 2019

Conformity-01).  The auditors appended photos to the *Carnival Elation* audit report, including the following:



**Paper/wooden sticks/paper wrappers inside pulper.**



**Scrubbing pad/sticks inside pulper.**



**Food waste container.**

Discharge of food waste contaminated with plastics and other non-food items is a

violation of MARPOL Annex V, which generally prohibits the discharge of all garbage,[21]

including all plastics, into the sea.  *See* MARPOL Annex V, Reg. 3.1-3.2.[22]  During the course of

the audit, on December 15, 2018, the auditor brought the issue to the Environmental Officer's

---

[21] Garbage is broadly defined under MARPOL to include, among other things, "domestic wastes and operational wastes" and "all plastics," with certain exceptions that do not appear to apply here.  MARPOL Annex V, Reg. 1.9.

[22] Although MARPOL permits the discharge of certain food wastes under specified conditions, *see*, *e.g.*, MARPOL Annex V, Reg. 4.1.1-4.1.2, whenever such food wastes are "mixed with or contaminated by other substances [*e.g.*, plastics] prohibited from discharge or having different discharge requirements, the more stringent requirements shall apply."  MARPOL Annex V, Reg. 4.1.4.  Therefore, a food waste discharge that might otherwise be permitted under MARPOL is not permitted if the food waste is contaminated with plastics or other garbage that cannot be discharged.

attention, who confirmed the presence of plastic and other non-food items mixed with the food waste and agreed that non-food waste was not being properly segregated.  *See* TPA MNC Letter at 1.  However, the TPA letter alleges that the Environmental Officer "failed to take action," *id.*, such as by instructing the crew not to discharge the contaminated food waste at sea. Consequently, it appears that the food waste that the auditor observed to be contaminated with plastics and other non-food items was discharged into the sea the following day, on December 16, 2018.  *Id.*[23]

The CAM understands that the Company did not launch a full investigation into this incident.  *See* Employee Interview Notes.  The Company reported that it implemented corrective actions following the TPA finding in the form of re-training the individuals involved in the incident, as well as re-training employees fleetwide who are involved in food waste segregation on Carnival Cruise Line ships.  *See id.*

On February 21-22, 2019, the TPA performed a follow-up visit to the ship to check on the status of correction actions.  The TPA shared with the Company that the ship continues to have challenges sorting food and non-food waste.[24]  After the TPA's follow-up visit, the

---

[23] The TPA auditor did not directly witness the discharge.  However, he reviewed the Garbage Record Book and confirmed with bridge officers that approximately 6.0 cubic meters of food waste were discharged from the food waste tank on the morning of December 16, 2018.  *See* 16 DEC 18 Carnival Elation Garbage Log.

[24] Such challenges may represent a systemic issue.  In prior audits, the TPA has made similar findings regarding poor food waste segregation practices on other ships.  *See, e.g.*, ABSG, *Carnival Cruise Line Environmental Compliance Audit Report, Sea Princess* (Dec. 19, 2017), at 4 (Major Non-Conformity-03) ("It was witnessed that the Food Waste Chute had several unauthorized items in the food waste that is going down the chute and overboard, items such as plastic straws, corn on the cob holders, wooden stir sticks, plastic tea bag packages, and plastic knives.  The unauthorized waste was not being segregated at the early stage of the collecting the food waste.  This was noted during the galley inspection as it was found that there is plastic straws, paper, wood stir sticks and rubber bands in the pulpers."); ABSG, *Carnival Cruise Line Environmental Compliance Audit Report, Ruby Princess* (Feb. 15, 2018), at 4 (Major Non-Conformity-01) ("Auditor witnessed 55-gallon containers held several unauthorized items

Company reported that Carnival Cruise Line will assemble a review team to visit certain ships, including the *Carnival Elation*, "with the goal of further assessing and dissecting the food waste process to identify further enhancements such as reducing the volume of single serve items and better sorting setup."  Email from C. Donald, *Elation Update* (Mar. 6, 2019).  According to the Company, the results "will lead to additional short and longer term actions that will be applied across the [Carnival Cruise Line] fleet to help prevent non-compliance . . . The [Carnival Cruise Line] team will also consult with [Holland America Group] who appear to be doing a better job of compliance in this area of operation[.]"  *Id.*  One such action, implemented on March 7, 2019, is discontinuing the use of individually foil-wrapped butter packets on Carnival Cruise Line ships.  *See* Email from C. Donald, *FW: Butter Chiplits -102152 BUTTER PATTY SALTED IND WRAPPED 10 GR .35 OZ* (Mar. 7, 2019).

On March 20, 2019, the Company reported a near miss incident concerning food waste segregation practices on the *Carnival Elation* that occurred on March 5, 2019.  *See* Carnival Corporation & plc HESS Weekly Flash Report (Mar. 20, 2019).  According to the Company's report, the Environmental Officer "observed plastic wrap and packaging in the pulper of the lido galley [*i.e.*, the main passenger dining hall kitchen], the pulper of the crew galley [*i.e.*, the crew dining hall kitchen], in the pot wash, and in a red bin in the lido galley.  Supervisors were

---

destined to go down the waste chute and overboard.  These items were plastic straws, plastic corn on the cob holders, wooden stir sticks, toothpicks, wooden steak identifiers, paper, paper clips and aluminum foil wrappers.  The unauthorized waste was not being segregated at the early stage of segregating the food waste."); ABSG, *Carnival Cruise Line Environmental Compliance Audit Report, Carnival Dream* (Aug. 24, 2018), at 5 (Major Non-Conformity-01) ("In the marshalling area of the garbage handling space, it was found that disposal of food waste [*sic*] were several unauthorized items mixed in waste containers that were ready to be discharged down the chute and then overboard while at sea.  These items are but not limited to:  aluminum bottle caps, broken plastic cups, cotton swabs (Q-tips), emery cloth, plastic straws, napkins, paper and umbrellas for drinks.").

informed to take strict corrective actions." *Id.* The Company reported that it considers this incident a near miss, rather than a prohibited discharge, because "the pulper had not been started." *See id.* This incident indicates that food waste segregation remains a challenge on the ship.

ii. *Prohibited Discharge of Ballast Water and Cover-Up Offer on the Carnival Conquest*

In a November 2018 Flash Report, the Company reported that on November 24, 2018, the *Carnival Conquest* made a prohibited discharge of over 250 cubic meters of ballast water in violation of international law while sailing in Bahamian archipelagic waters. *See* Carnival Corporation & plc HESS Weekly Flash Report (Nov. 28, 2018). According to the preliminary findings described in the Flash Report, the Company attributed the incident to the failure of the watchkeeping engineer to attend a meeting with the Bridge,[25] "to follow the instructions provided by the Bridge during the briefing at the start of the watch as well as the Chief Engineer's standing orders," or "to inform the Bridge before conducting the discharge operation." Carnival Corporation & plc HESS Weekly Flash Report (Nov. 28, 2018).

While the prohibited discharge is significant in and of itself, the Flash Report goes on to state that a Bridge officer "offered to cover up the occurrence and change the time and location of the discharge to indicate it had occurred in a permitted area." *Id.* Approximately ten minutes after making this offer, the Bridge officer reportedly called the engineer back to say that he was going to (properly) report the violation to the Staff Captain. *Id.* Any purported offer to falsify records to conceal an illegal discharge is highly concerning, both in light of the recordkeeping

---

[25] The bridge of a ship is the room or platform from which the ship is commanded and where navigational equipment is housed. *See* https://www.marineinsight.com/marine-navigation/10-types-of-decks-every-seafarer-should-know/.

CONFIDENTIAL                                                          April 2, 2019

falsifications that were part of the underlying criminal conduct on the *Caribbean Princess* and because such an offer raises significant concerns about the presence of a blame culture within the Company.

On December 19, 2018, the CAM received an oral briefing from the RAAS investigator assigned to investigate the prohibited ballast water discharge. *See* Call Notes. The investigator reported that the Company split the investigation into two parts: (1) RAAS was assigned to investigate the prohibited discharge; and (2) Carnival Cruise Line's Compliance Department was assigned to investigate the alleged cover-up offer. *Id.* On March 21, 2019, the Company provided the CAM with the final investigation reports addressing both aspects of the investigation. *See Investigation Report: Carnival Conquest Discharge of Ballast Water Within 12 nm of the Bahamas Baseline* (Feb. 21, 2019) ("Prohibited Discharge Investigation Report"); *Investigation Report: Carnival Conquest Discharge of Ballast Water Within 12 nm of the Bahamas Baseline – Cover up allegation 24th November 2018* (Feb. 21, 2019) ("Cover-Up Allegation Investigation Report").

This event, coupled with repeated similar events,[26] suggests that a comprehensive investigation and root cause analysis would look beyond the actions of the involved ship personnel to consider whether systemic issues played a meaningful role in this incident, including issues related to: training, voyage planning, workload/insufficient manning, and culture. However, the Company's investigation does not appear to do so.

The investigation report addressing the prohibited ballast water discharge focuses on the actions of the involved ship personnel. It concludes that the watchkeeping engineer "improperly

---

[26] *See* Prohibited Discharge Investigation Report at 9 (noting six other instances of "inappropriate bulk liquids (ballast/grey and black water) overboard discharges" on Carnival Cruise Line ships since January 2016).

discharged overboard the ballast *of his own free will*" and that "the Root Cause can be classified as *Human Error*, decision based."  *Id.* at 1 (emphasis added).  The report also identifies several "contributive factors:" (1) failure of the outgoing and incoming watchkeeping engineers to sufficiently address environmental matters during the handover process (when the incoming watchkeeping engineer took over the shift); (2) "[s]ubstandard communication" between the Engine Control Room and the Bridge prior to the discharge; (3) "[i]neffective identification of environmental standards applicable to the relevant geographical area" by the watchkeeping engineer; and (4) the "[u]ncorroborated decision to assign watch leader duties" to the watchkeeping engineer, despite prior performance evaluations and statements by the Chief Engineer indicating that he might not be ready for these duties.  *Id.*  Notably, these findings appear to attribute blame for the incident to the watchkeeping engineer and other involved ship personnel.  The report does not evaluate the role of broader, systemic issues that may have contributed to the incident, such as the Company's possible failures to provide adequate training to engineers and Bridge officers; to provide ships with adequate voyage planning tools and support; to hire sufficient numbers of engineers to ensure that the workload of watchkeeping engineers is manageable; or to hire sufficiently experienced and trained engineers such that watchkeeping duties are assigned to individuals able to competently discharge their duties.

Similarly, the investigation report addressing the cover-up offer focuses on the actions and motivations of the involved Bridge officer without exploring potential underlying systemic causes.  It concludes that the Bridge officer "most likely offered to cover up the occurrence, due to fear of having made a mistake and the consequences of possibly losing his job," and that "[w]ith all likelihood, fear factor was the root cause of the alleged cover up."  Cover-Up

Allegation Investigation Report at 1, 5.[27]  The report does not, however, go deeper to evaluate the reasons *why* the Bridge officer had a "fear of having made a mistake" and was so driven by this "fear factor" that he considered falsifying records—a potentially criminal offense.[28]  For instance, the report does not acknowledge or address that the true root cause of the incident might be the presence (or perception) of a blame culture within the Company.

### iii.    Other Recurrent Incidents

The CAM Team continues to identify and track numerous incidents on Covered Vessels falling under the general categories of recurrent incidents identified by the CAM.  These include issues related to training, prohibited discharges, voyage planning, pollution prevention equipment (including Oily Water Separators, Oil Content Meters, and White Boxes), recordkeeping, manning/staffing, lifeboat and tender systems, and seals and locks.  *See* CAM First Annual Report at 44-55; CAM September 2018 Quarterly Report at 13-14 and Appendix A; CAM December 2018 Quarterly Report at 13.  The CAM plans to report more fully on its analysis of these incidents in the next Annual Report.

### 2.    Company Efforts to Prevent or Reduce Environmental Incidents

As discussed in the prior Quarterly Report, the Company is engaged in various initiatives with the aim of preventing or reducing environmental incidents.[29]  *See* CAM December 2018 Quarterly Report at 12.  Notable recent developments include:

---

[27] The Bridge officer stated to the investigator "that fear of losing his job due to making a mistake was the only reason why he thought about the cover-up.  However he then realized that it (covering up) is not the right thing to do and went ahead and promptly reported the incident to the Staff captain." *Id.* at 4.  The investigation found "no evident signs of attempts to falsify records." *Id.*

[28] *See* N. Krigslunc, *Lawyer warns of ballast water falsification* (May 22, 2018), https://shippingwatch.com/carriers/article10587366.ece.

[29] The CAM Team has begun an effort to more effectively track the Company's numerous initiatives related to environmental compliance and sustainability.  To date, the CAM Team has

- **Completing Installation of New Oily Water Separators and White Boxes.**  The Company reports that it completed the installation of new Oily Water Separator and White Box equipment on ships ahead of its corporate deadline of January 31, 2019.  *See* November 2018 USPO Supervision Report, Attachment 3, at 3.  This equipment is designed to be "more effective at separating oil from water and [] more resistant to tampering."  February 2019 USPO Supervision Report, Attachment 3, at 10.

- **Developing New Voyage Planning Software.**  The Company reports that it has selected a vendor for a contingent contract to develop new software "to automate and streamline the current environmental and voyage planning[30] process."  February 2019 USPO Supervision Report, Attachment 3, at 9.  The new software tool would, among other things, integrate information about environmental boundaries and restrictions into the electronic navigational charts used by ships.  *See* Employee Interview Notes.  Once an agreement is executed with the vendor, "it is expected that up to six months of software development time and 2-3 months of testing time will be needed before a decision to adopt and deploy the solution will be taken."  February 2019 USPO Supervision Report, Attachment 3, at 9.  If successfully adopted, such software could "simplify and automate a significant portion of the planning process and reduce the risk of errors."  October 2018 USPO Supervision Report, Attachment 3, at 1; *see also* CAM December 2018 Quarterly Report at 10-11 (discussing voyage planning-related incidents on multiple ships).

- **Developing a Corporate-Wide Incident and Near Miss Reporting System.**  The Company reports that its new corporate-wide incident and near miss reporting and case management system, called SeaEvent, is "nearing final stages of development."  February 2019 USPO Supervision Report, Attachment 3, at 9.  Beginning in January 2019, pilot testing was rolled out on several ships across multiple brands, with testing expected to be completed by March 2019.  *Id.*  Once pilot testing is complete, the Company plans to have a staggered roll out to all ships by the end of 2019.  *See id.*  If successfully implemented, SeaEvent could improve the consistency of the Company's incident reporting, and enable better fleetwide information-sharing and tracking/trending of incident data.

- **Completing a Study on Human Factors and Prohibited Discharges (Holland America Group Initiative).**  In September 2018, Holland America Group announced that it retained a third-party consultant "to develop a review program into the human

---

identified over seventy different initiatives, including various policies, programs, surveys, Information Technology ("IT") projects, studies, trainings, and other efforts.

[30] A voyage plan identifies, among other things, the locations in the ocean where certain discharges or emissions are allowed or prohibited based on a ship's location and the applicable restrictions (such as the special requirements that apply in U.S. marine sanctuary waters and in Emission Control Areas). The ship's route must take into account "the marine environmental protection measures that apply, and avoid[], as far as possible, actions and activities which could cause damage to the environment."  Joint Glossary of Terms at 10.

factor aspects associated with the challenge of non-compliant waste stream discharges."  *See* Email from C. Donald, *MTO Proposal – Human Factors Study* (Sept. 22, 2018); CAM December 2018 Quarterly Report at 10.  The study was completed in two phases, with a preliminary Phase 1 report issued in December 2018. *See* MTO Safety, *Ship operations and environmental discharges: An action plan for continuous improvement and learning – report from phase 1*, Report MTO-2018-349 (Dec. 14, 2018), PCL_ECP00101877-937 ("HAG Human Factors Phase 1 Report"). That report found that "latent conditions contributing to non-compliant discharges were identified related to the [following] seven themes":  (1) regulations and procedures; (2) culture and attitudes; (3) workload balance; (4) competence, training, and qualifications; (5) communication, teamwork, and distribution of accountabilities; (6) work tasks and support systems; and (7) technical status of the ships.  *Id.* at Executive Summary; *see also id.* at 45-46.  During Phase 2, "the latent conditions identified in phase 1 will be validated and some selected issues will be investigated in-depth."  *Id.* at 9.  The Company reports that the final Phase 2 report is expected to be finalized in April 2019.

### B.    Implementation of ECP Requirements

The CAM Team continues to monitor the Company's implementation of ECP requirements.  No significant new ECP requirements came into effect during the third quarter of ECP Year Two.

### C.    Initiatives beyond Specified ECP Requirements

As discussed in prior CAM Reports, the Company is developing and implementing a number of initiatives that go beyond the explicitly enumerated ECP requirements.  *See* CAM First Annual Report at 4, 19-21; CAM September 2018 Quarterly Report at 16-17; CAM December 2018 Quarterly Report at 16-18.  In addition to several of the initiatives discussed *supra*, Part III.A.2., notable recent developments include:

- **Operation Oceans Alive.**  The Company continues to implement its environmental compliance and stewardship program, called Operation Oceans Alive.  The Company describes the program as "the backbone for all Environmental compliance programs [which] is designed to promote the right behavior, attitude and a culture of compliance as it relates to environmental compliance and stewardship through getting to the hearts and minds of our employees."  February 2019 USPO Supervision Report, Attachment 3, at 5.  The program includes "a 'hearts and minds'

communication program consisting of compliance notices, newsletters, case studies, info-graphics and video messages from the CCM and the Company's leadership." *Id.*

- **Case Study Program.** The Company has issued three new case studies since January 2019 (for a total of seven case studies since the program began in January 2018). The Company describes the case studies as "a way of sharing lessons learned from incidents as part of our commitment to establish a culture of learning." *Id.*; *see also* CAM December 2018 Quarterly Report at 16-17. The CCM reports that his team recently hired a new manager (likely to begin in mid/late April 2019) whose key responsibilities will include managing the case study program and issuing at least two case studies a month. *See* Employee Interview Notes.

- **The "Environmental Hub" Online Chat Forum.** The Company continues to report high levels of activity on the online chat forum for Environmental Officers, launched in November 2018. The "Environmental Hub" is described as a platform "to share environmental compliance and stewardship information as well as solicit[] feedback on training, procedures and best practices." February 2019 USPO Supervision Report, Attachment 3, at 5. Feedback from Environmental Officers to the CAM Team on the Hub has generally been positive. *See* Employee Interview Notes.

### D.    Personnel

The CAM Team continues to examine personnel issues related to compliance, including the Environmental Officer position, staffing and training of engineers, and hiring and training of ratings. *See* CAM First Annual Report at 72-73; CAM September 2018 Quarterly Report at 17-18; CAM December 2018 Quarterly Report at 18-23. Notably, several of the "latent conditions contributing to non-compliant discharges" identified in the HAG Human Factors Phase 1 Report related to systemic personnel issues, primarily:

*Workload balance*

Latent conditions identified were high workload in the [Engine Control Room] with frequent interruptions, sometimes even during red manning [*i.e.*, periods of time, such as port arrivals/departures, emergencies, or other high-risk maneuvering, when access to the Engine Control Room and the Bridge is restricted to specific personnel with necessary vessel operational functions for safety and security reasons]. Refurbishment projects requiring supervision of many contractors will also add to workload. In addition, low staffing levels, being on or under TOP ["Table of Personnel," which is a list of positions allocated to each ship], and working overtime, will lead to fatigue and sleepiness and thus becomes latent conditions. Also, in [the Engine Control Room], performance of multiple, concurrent tasks could be considered a major contributor to non-compliant discharges.

*Competence, training and qualifications*

Latent conditions identified were that lately less experienced staff has been hired, since it is difficult to find staff with adequate experience and qualifications. Moreover, lack of ship specific technical training on systems used for discharge operations and fuel handling could be a latent condition as well as lack of ECDIS [Electronic Chart Display and Information System, which is a nautical navigation system] training. The ECP training scope is very broad and does not address the environmental aspects of different job positions.

HAG Human Factors Phase 1 Report at 45-46.

### E.      Corporate Structure and CCM Authority

The CAM Team continues to examine the Company's efforts to respond to the Court's Order of July 13, 2018, requiring the Company to provide "a plan as to how Carnival and its brands will address the challenge of corporate structure set forth in the [CAM First Annual Report], including prioritizing and standardizing environmental compliance across the company and establishing a Corporate Compliance Manager with both responsibility and authority over environmental policy and the Environmental Compliance Plan."  Dkt. No. 75 at 2; *see also* CAM First Annual Report at 72-73; CAM September 2018 Quarterly Report at 17-18; CAM December 2018 Quarterly Report at 23-28.  Providing the Court more information and visibility into these efforts is part of the strategic planning and budgeting review that the CAM Team is exploring in its visits to Company shoreside offices.  *See infra*, Part III.I.  The CAM plans to assess these issues and the Company's related efforts in the next Annual Report.

On the issue of CCM authority, the CAM made a finding in the first Annual Report that the Company has not given the CCM the "authority to ensure full implementation of [the] ECP," as required under ECP Section III.A.2.  *See* CAM First Annual Report at 4-5, 27-30.  In a subsequent Quarterly Report, the CAM analyzed the Company's procedure, issued in response to the Court's Order of July 13, 2018, that purports to set out the "authority, roles, responsibilities,

and interrelationships" of the CCM.  *See* HMP-1005, *Corporate Compliance Manager Responsibilities and Authority* (Sept. 4, 2018) ("CCM Procedure"); CAM December 2018 Quarterly Report at 26-28.  The CAM concluded that the CCM Procedure "limits the CCM's authority in a number of ways," *id.* at 17, "does not establish the CCM as a position with both responsibility and authority over environmental policy and the ECP," *id.* at 18 (citations, quotations, and alterations omitted), and "does not provide for a sustainable CCM role that is fully integrated into the Company's compliance efforts and structure, with actual authority over critical components of compliance." *Id.* at 28.

One example of the Company's apparent lack of support for the CCM role involves the CCM's proposed global Fleet Environmental Officer program that would support all of the Company's brands.  Fleet Environmental Officers would work at the direction of the CCM and would be assigned to provide training and mentorship to onboard Environmental Officers.  *See* Employee Interview Notes.  A similar program for Fleet Captains and Fleet Chief Engineers has existed for many years under the direction of the Chief Maritime Officer ("CMO").  Fleet Environmental Officers would also be available to fill any unexpected vacancies in the Environmental Officer position on a ship.  *See id.*  The ability to have a pool of Environmental Officers able to fill vacancies is directly related to the ability of the Company to comply with ECP Section IV.A.1.  That section provides (emphasis added):

> An Environmental Officer ("EO") shall be on board all Covered Vessels, unless an exception is granted under CARNIVAL's internal policy governing an EO's roles and responsibilities. In the event that a Covered Vessel must operate without an EO on board, the CCM and the cognizant OLCM shall be notified and the Master must assign the EO duties to the Chief Engineer, the Staff Captain, and/or another senior, non-watch standing officer. A corrective action plan must be developed in accordance with CARNIVAL's internal EO policy, **with the requirement that a qualified replacement EO will join the Covered Vessel within seven (7) calendar days**.

CONFIDENTIAL                                                          April 2, 2019

To date, the Company has reported at least six instances in which a ship sailed without an Environmental Officer for more than seven days.

In January 2018, the CCM proposed a Fleet Environmental Officer program to Company leadership.  *See* Global Cross Brand Fleet EO Program Proposal.  However, the CCM was unable to get the program included in the Fiscal Year 2019 budget.  *See* Employee Interview Notes.  The CCM is again attempting to obtain support for a Fleet Environmental Officer program to be included in the Fiscal Year 2020 budget.  *See id.*  Presumably, the CCM seeks to implement this program because he believes it is necessary to address both the ECP obligation to have a sufficient number of Environmental Officers to meet fleet needs, and to have a group of Fleet Environmental Officers to provide support, consistency, and oversight to the more than 200 Environmental Officers across the Company.  This is an example of a situation where the CCM appears to lack both the authority and the budget[31] to implement a program, which in this instance was designed to help "ensure full implementation of this ECP."  ECP § III.A.2.[32]

In addition, there are examples of ECP/environmental compliance-related programs being implemented without the CCM's direct oversight or approval.[33]  For instance, the undisclosed

---

[31] At a July 3, 2018 meet-and-confer with representatives from the Government, Company, CAM, and TPA, the CCM acknowledged that the majority of his budget goes toward professional and legal fees (*i.e.*, paying the CAM, TPA, and outside counsel) rather than toward compliance programs and other compliance efforts over which he has management authority. *See* Notes of July 3, 2018, Meet-and-Confer.

[32] As noted in this Report, *see e.g.*, *supra*, Part III.A.2 and Part III.C, there are many CCM initiatives that are being funded by the Company.  What appears to separate the initiatives that are funded from this initiative is that the other initiatives typically involve training programs, signage, and other efforts that would not involve the kind of investment and personnel support that would be required for the Fleet Environmental Officer program.

[33] As discussed in the prior Quarterly Report, the CCM Procedure dilutes the CCM's ECP oversight and implementation authority among multiple other parties, including the CMO, the Carnival Corp. Vice President of Ethics and Compliance, and "all other Operating Line departments that have any responsibility concerning environmental compliance including, but

Environmental Ship Assistance Visit Program ("ESAVP"), implemented by Holland America Group following the December 4, 2017 Status Conference, was neither designed by, approved by, nor managed by the CCM.  *See infra*, Part III.J.  This is consistent with the CCM Procedure which, as currently written, does not appear to prevent people within individual operating lines or brands from implementing such a program without obtaining approval from the CCM or being required to operate under the CCM's oversight.

Further, there is a notable contrast between the Company's reluctance to fund the CCM's Fleet Environmental Officer program and its willingness to divert funds and resources to vessel visit programs (such as the ESAVP and the earlier pre-TPA audit program, *see infra*, Part III.J), designed to prepare vessels for TPA audits.  The Company funded short-term, ECP-focused efforts to avoid TPA audit findings, but did not fund a Fleet Environmental Officer program sought by the CCM, which would have constituted a broad, long-term effort to support and sustain the Environmental Officer program.

### F.    Compliance Culture Assessment

After extensive discussions with the Government and the Company, the CAM retained maritime culture expert Propel to develop and implement a culture survey designed to assess the strengths and the opportunities for improvement in the Company's environmental compliance culture.  *See* CAM Second Annual Work Plan at 10-11; CAM September 2018 Quarterly Report at 22-23; CAM December 2018 Quarterly Report at 28-30.  Propel developed a survey instrument aimed at measuring corporate culture attributes that relate to environmental

---

not limited to, Maritime Policy and Analysis (MPA), [Maritime Quality Assurance (MQA)], CSMART, [RAAS], Corporate Ship Building, Marine Technology, and Operating Line Marine, Technical, Environmental, Supply, and Human Resources teams."  CAM December 2018 Quarterly Report at 27 (citations omitted).

compliance.  Propel engaged with the Company throughout the survey development period, and the Company's specialized knowledge and perspectives were considered and incorporated into the survey effort.  For example, Propel consulted with the CCM's Working Group, composed of over sixty CCM representatives from across the Company, including members of the CCM team, all OLCMs, and individuals from various functions including human resources, IT, training, communications, and compliance.

Furthermore, beginning in September 2018, Propel piloted drafts of the survey instrument through Company focus groups and discussions with Company personnel, and through multiple ship visits across the Company's various brands.  This piloting sought to ensure that:  (1) the survey questions, terms, and phrases would be readily understood by the Company's employees;[34] (2) the survey length was appropriate; (3) the survey language translations were accurate; (4) the survey implementation plan was compatible with the Company's IT platforms; and (5) the purpose of the survey was widely understood.  Feedback from these efforts (including wording modifications suggested by Company personnel) was incorporated and the survey instrument was finalized in November 2018.

The final survey instrument (for both shipboard and shoreside personnel) contained approximately sixty questions and was designed to take roughly fifteen to twenty minutes to complete.  In addition, each survey contained a "free text" response section to enable respondents to share their ideas, concerns, or suggestions about how to improve the environmental compliance culture within the Company.  To accommodate non-native English speakers who might prefer to take the survey in their native language, experts translated the

---

[34] There were two versions of the instrument:  one for shoreside personnel and one for shipboard personnel.  The questions differed slightly to account for the different roles and terminology applicable to the two groups.

survey from English into eight additional languages:  Bahasa, German, Italian, Mandarin, Portuguese, Russian, Spanish, and Tagalog.  Propel selected these languages in consultation with the Company and after reviewing crew demographic information.

To encourage open and honest feedback, the survey instrument and associated materials made clear that all survey data would be kept confidential by Propel.  Specifically, the survey instrument and related communications informed respondents that Propel would not share individual responses (meaning the underlying data) with the Company, that only Propel would have access to participants' responses to the survey questions, and that Propel did not have access to personal demographic information that would allow them to link individuals to their survey responses.  Respondents were further assured that no one in the Company (or the CAM) would be provided with information as to how any individual responded or information regarding a participant's age, nationality, position, or department.

The survey was administered from December 5, 2018, through January 17, 2019.[35]  As of that date, Propel received 67,871 responses, which is a participation rate of approximately 75%.[36]  Beginning in February 2019, Propel began conducting focus group sessions on ships and at shoreside locations to clarify and contextualize the preliminary observed survey trends and responses.  *See supra*, n. 11.  The target date for receipt of Propel's report is May 2019.  The results from this survey will serve to assess the current state of the Company's environmental compliance culture.  Propel will conduct a second survey before the completion of the five-year

---

[35] Two newly launched ships began the survey effort in January and February 2019, respectively. Responses from these will be included in the final survey analysis.

[36] Included in this figure is a total of 3,416 "incomplete" responses, where parts of the demographic portions of the survey were missing from the response but the substantive portion of the survey instrument was completed.

ECP period that will assess the Company's improvement in the area of environmental

compliance culture.

### G.    Investigations

As discussed in prior CAM Reports, the CAM concluded, and the Company agreed, that

the Company's internal investigations program is inadequate.  *See* CAM First Annual Report at 5

(finding that the "Company's internal investigations are critically flawed.  There is no consistent,

reliable means to investigate incidents or near misses and identify root causes that can lead to

meaningful corrective actions"); *id.* at 4 (noting that the "Company engaged a third party, DNV

GL, to assess the Company's investigation process, identify areas and options for improvement,

and identify the stakeholders at Carnival Corp. responsible for performing incident investigations

and implementing action plans"); CAM September 2018 Quarterly Report at 23-25; CAM

December 2018 Quarterly Report at 30-31.  Starting in ECP Year One, the Company began

taking various steps toward improving its investigations program, including:

- Engaging a third party, DNV-GL, to assess its internal incident investigation process.
  In May 2018, DNV-GL delivered a report with four overall recommendations and
  twenty-eight specific areas for improvement to assist the Company in improving the
  quality and efficiency of investigations, such that true root cause analyses can be
  obtained.  *See* DNV-GL, *Towards improving Carnival's incident investigation
  process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-
  52050;

- Engaging DNV-GL to develop an Investigator Accreditation program, and to assist
  the Company in revising its corporate policies and procedures regarding incident
  investigations to incorporate DNV-GL's recommendations.  *See* CAM September
  2018 Quarterly Report at 24;

- On September 5, 2018, submitting to the CAM a letter with a "proposed plan to
  enhance the internal incident investigation program employed within the Company
  and its respective brands."  Letter from C. Donald, *Company's Proposed Change to
  Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at 1.  Among
  other things, this plan proposes to create a new Global HESS Investigations
  Department that would be separate from RAAS and would take over from RAAS
  responsibility for all significant HESS incident investigations.  *See* CAM December

2018 Quarterly Report at 30-31.  As discussed above, *supra*, Part I.C.2.ii, this re-structuring would require modifications to ECP Sections III.B.1(b) and (c)—which currently provide for RAAS (rather than the new Global HESS Investigations Department) to investigate Covered Vessel casualties and oil pollution incidents and Hotline reports.  *See id.*;[37]

- On September 21, 2018, submitting to the Interested Parties, CAM, and TPA a "proposed timeline for establishing and implementing the recommendations made by third party consultants DNV-GL for improving and standardizing Defendant's internal investigation processes across all brands."  Email from B. Herrmann, *Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21, 2018); and

- On September 25, 2018, providing the CAM with copies of draft "procedures and policies regarding the updated investigations program" prepared by DNV-GL.  Email from K. Jamieson, *Carnival - Investigation Policies and Procedures* (Sept. 25, 2018).

These efforts appear to have stalled during the third quarter of ECP Year Two.

According to the Company, the implementation of its September 5, 2018, proposed plan was put on hold while it searched for someone to lead the new investigations department.  *See* CAM December 2018 Quarterly Report at n.39.  In February 2019, the Company hired a Vice President of Global HESS Investigations, who began work on March 25, 2019.  *See* Employee Interview Notes; *see also* February 2019 USPO Supervision Report, Attachment 3, at 3.  Now that this position has been filled, the CAM awaits further action and updates from the Company regarding its efforts to address the problems with the investigations function.  According to the Company, a "new project plan and timeline to finalize new procedures and processes for

---

[37] On September 22, 2018, the CAM responded to the Company's September 5 letter, expressing support for the proposed ECP modifications, noting that "[a]s we have discussed, and to be clear, if the Company has determined that the best approach to implementing these efforts is a restructure of RAAS and the creation of a new Investigations unit, I agree that it would make sense to modify the ECP so that it reflects the existence of an investigation unit residing outside of RAAS."  Email from S. Solow, *CCM to CAM Letter Detailing Investigation Overhaul* (Sept. 22, 2018).

investigations is being developed." *Id.* The CAM will assess the Company's efforts in this area in the next Annual Report.

## H.    Training

As part of its ongoing examination of training, the CAM Team continues to monitor relevant training-related initiatives. *See* CAM First Annual Report at 21-23, 69-70; CAM September 2018 Quarterly Report at 25-27; CAM December 2018 Quarterly Report at 31-36.

### 1.    Updates on Company Initiatives

The Company continues to invest resources in environmental and ECP-related training. *See id.* Notable recent updates include:

- **CSMART Training Courses.** As of February 2019, the Company has conducted thirty-one "Environmental Officer 1" training courses and twenty "Environment Officer 2" training courses at the CSMART training center in Almere, The Netherlands. February 2019 USPO Supervision Report, Attachment 3, at 6.

- **Operational Excellence Training Program (formerly Compliance to Commitment ("C2C")).** In January 2019, the Company launched its redesigned C2C environmental training program, required for all engineers and deck officers attending CSMART, under the new title of Operational Excellence. *Id.* at 6-7. The Company plans to continue the program, which began in October 2017, at CSMART through 2019 and beyond. *Id.* at 7. To assist in the redesign of the course, the Company retained an expert training team from the University of West Florida. *Id.* at 6-7. According to the Company, the redesigned course was "informed by feedback from [C2C] Instructors, Participants and visiting staff," as well as by the CAM First Annual Report, which found that the Company appeared to have a blame culture "with a focus on identifying errors and disciplining individuals rather than also evaluating systemic issues that may need to be addressed." J. Ritchie, *Operational Excellence: The Evolution of C2C* (Jan. 14, 2019), at 3, PCL_ECP00088071-76. Other feedback from C2C participants included that the program "was lecture-based and addressed the symptoms of past violations rather than their root causes;" "provided little useful feedback from Participants on how such violations could be avoided in the future;" and "was not a pleasant experience for either Participants or Instructors." *Id.* In response to this feedback, the new course is intended:

  > [T]o present the Corporation to participants as an institution that was ready to move past blame culture and autocracy towards a co-operative approach to change, with the focus on both what participants thought and the overall culture within ships, brands and the corporation as a whole . . . In order to

effect genuine, lasting change, the reasons for people choosing to actively
break environmental laws, or knowingly comply with those so doing, needed
to be examined and countered.

*Id.* The CAM Team plans to attend a session of the redesigned Operational
Excellence course on April 27, 2019.

- **"EO3" Training.** The Company has retained the University of West Florida to
  develop the third-year Environmental Officer training course given at CSMART,
  known as "EO3" training. *See* February 2019 USPO Supervision Report, Attachment
  3, at 7.[38] This course, which is to be titled "Environmental Excellence," will be
  delivered as a five-day program to be held four times a year as part of hybrid
  "EO3/Environmental Commitment" conferences. *See id.* The program will be
  designed around an interactive, challenge-based model, rather than the traditional
  lecture-based model on which prior Environmental Officer training courses have been
  based. *See id.* Environmental Officers attending these trainings will also attend the
  same Operational Excellence course that the deck and technical personnel attend. *Id.*
  The first of these conferences is planned for the week of August 12, 2019. *Id.*

- **Environmental Induction Training Materials.** During January and February 2019,
  the Company rolled out the new ECP training video and presentation slides for the
  onboard environmental induction training that Environmental Officers give to newly
  joined crew members. *See id.*

- **Tool Box Talks**. In January 2019, the Company began implementing a series of Tool
  Box Talks for the shipboard engineering departments. *See id.*; December 2018 USPO
  Supervision Report, Attachment 3, at 1-2. These talks are supervisor-led sessions that
  include training on various environmental and technical requirements, including the
  ECS and bilge water and portable pump procedures. The sessions are mandatory for
  all engineering officers and ratings. *See CCL Investigation Report Template:
  Carnival Ecstasy* (Dec. 15, 2018), at 5, PCL_ECP00088393-8433. The Company
  plans to implement similar sessions in the deck and hotel departments. *See* Employee
  Interview Notes.

    2.    <u>Other Updates</u>

As discussed in prior Quarterly Reports, the CAM Team attended the Company's first

"Environmental Commitment Conference" in Almere, The Netherlands from September 11-13,

2018, which "brought together Environmental Officers from across the fleet with shoreside

---

[38] New hire Environmental Officers will still be required to attend the original "EO1" and "EO2"
courses as prerequisites to the "EO3" course. *Id.*

environmental compliance, environmental operations, technical, and training personnel."  August 2018 USPO Supervision Report, Attachment 3, at 4; CAM September 2018 Quarterly Report at 17-18; CAM December 2018 Quarterly Report at 19-21.  The Company reports that it plans to host an additional "Environmental Commitment Conference" in Almere from April 24-26, 2019, which the CAM Team plans to attend (in advance of attending an Operational Excellence course to be held on April 27, 2019).  *See* PCL_ECP00087071.  This is expected to be the last of the "Environmental Commitment Conferences," as it is planned that they will be replaced with the hybrid "EO3/Environmental Commitment" conferences discussed above.  *See* Employee Interview Notes.  The Company is planning to convene the first two hybrid training conferences in August and November 2019.

## I.      Strategic Planning and Resources for Operations and Compliance

Pursuant to the Court's Order of July 13, 2018, the CAM Team—accompanied by AlixPartners, a forensic accounting and investigations firm with particular expertise in corporate compliance and compliance governance—continues to meet with various representatives from Carnival Corp. and its operating lines to seek answers to the Court's inquiry as to "how the Company's long-term strategic plans are formulated and, specifically . . . how environmental compliance has been made part of those plans and how protection of the environment is being incorporated as a priority into the Company's strategic plans and culture in a long-term, sustainable manner."  Dkt. No. 75 at 3.

As discussed in the prior Quarterly Report, the CAM Team met with Carnival Corp.'s CMO, Chief Financial Officer, and Controller for an overview of the annual planning processes before visiting Carnival UK's shoreside office in Southampton, UK in October 2018 and

Carnival Cruise Line's shoreside office in Miami, Florida in November 2018.  *See* CAM

December 2018 Quarterly Report at 36-38.

Since the last Quarterly Report, the CAM Team visited Carnival Maritime Group's

shoreside offices in Genoa, Italy, Rostock, Germany, and Hamburg, Germany from January 21-

25, 2019, and Holland America Group's shoreside offices in Seattle, Washington (with

employees from the Santa Clarita, California office participating via video and phone

conference) from February 26-March 1, 2019.  During these visits, the CAM Team interviewed

the Group CEOs, brand presidents, OLCMs, senior maritime and finance management personnel,

and other maritime, finance, and accounting personnel from each operating line.  Discussions

included how these operating lines develop and revise their respective New Build Plan, Strategic

Plan, Capital Plan, and Operating Plan from year to year and how compliance is considered

during these various planning processes.

The CAM will report on findings as to the Company's strategic planning processes and

environmental compliance integration in the next Annual Report.

**J.      Company Vessel Visit Programs**

As discussed in prior CAM reports, two undisclosed Company vessel visit programs were

brought to the Court's attention during ECP Year One.  *See* CAM First Annual Report at 73-74;

CAM September 2018 Quarterly Report at 29-30.

**1.      Pre-December 2017 Program**

The first effort, which involved conducting vessel visits to ensure that ships would be

prepared for TPA audits, was implemented during the first half of ECP Year One, from

approximately June 2017 until December 2017.  *See id.* at 29.  This pre-TPA audit program was

not voluntarily disclosed by the Company to the Court, Office of Probation, Interested Parties,

TPA, or CAM.  During the December 4, 2017 Status Conference, the Company described this program as "one or two people who have gone to try to get the ship in a position where they prepared or are ready for the audit."  Status Conf. Tr. at 69 (Dec. 4, 2017).[39]  The Company committed to the Court that, with respect to the pre-audit ship visits, "we will do it no more."  Status Conf. Tr. at 23-24 (Dec. 4, 2017); *see also* Email from B. Burke, *preparatory ship visits* (Dec. 5, 2017), PCL_DOJ_ESAVP_00029883 (email from CMO to senior management across the Company, including environmental compliance personnel, stating that "[i]n court yesterday, we agreed to no more preparatory ship visits that are ECP specific.  This means [operating lines] cannot send people to any ship with the purpose of preparing the ship for a TPA or CAM audit.").

### 2.    Post-December 2017 Programs

Shortly after the December 4, 2017 Status Conference, and despite the CMO's commitment to the Court to stop preparing ships for TPA audits, the CMO almost immediately began developing plans for a new vessel visit program without informing the Court, Office of Probation, Interested Parties, TPA, or CAM.  *See* CAM September 2018 Quarterly Report at 29.

In the week following the Status Conference, the CMO proposed a new vessel visit program to the Carnival Corp. Leadership Team (*i.e.*, the Carnival Corp. CEO, Carnival Corp. Chief Financial Officer, and the CEOs of each operating group).  This initial proposal involved a cross-brand program of ship visits "[t]o allow us to improve on shipboard HESS performance

---

[39] Records produced by the Company regarding the program, however, show that the Company's effort was more extensive than could be inferred from this statement.  The CAM Team's review of Company documents suggests that the Company deployed Fleet Chief Engineers and other shoreside employees (and at least one outside consultant) in advance of TPA audits to systematically review the ship's readiness for a TPA audit.  In at least one instance, a ship was visited three times in advance of a TPA audit.  *See* Email from C. Donald, *RE: Inspiration – ECP Audit Day 4 Summary and draft report*, PCL_DOJ_ESAVP_00034897.

while still giving ship and shore management an accurate picture of compliance and performance."  Email from B. Burke, *HESS Riding Teams* (Dec. 9, 2017), PCL_DOJ_ESAVP_00054971.  In an e-mail sharing the proposal more broadly across the Company, the CMO wrote that:  "All identified corrective actions will be documented and provided to management, internal audit and external audit."  Email from B. Burke, *HESS Riding Teams* (Dec. 10, 2017), PCL_DOJ_ESAVP_00028608.  The CAM understands that the reference to "external audit" included the CAM and the TPA.

After leadership of some operating lines resisted certain aspects of the CMO's proposed program (including cross-brand visits), on January 15, 2018, the CMO solicited proposals from each operating line for vessel visit programs that would focus on providing HESS support to the ships.  *See* Presentation to U.S. DOJ, CAM, TPA by Dechert LLP, *Pre-Audit Visits and Environmental Ship Assist Visit Program* (Feb. 19, 2019), at 72-75, 89, 92-93 ("February 2019 Vessel Visit Program Presentation").

Holland America Group's response was to develop and implement the Environmental Ship Assistance Visit Program or "ESAVP."  In connection with this program, five ship visits were conducted between February 12 and March 13, 2018.  *See id.* at 79.  After the CAM was informed confidentially that the Company was again doing visits to prepare for TPA audits, the CAM asked the Company about the existence of these visits on March 12, 2018.  *See id.* at 123. The Company has represented that neither the CMO nor the CCM authorized or was informed of these vessel preparation visits, and that the CMO believed that Holland America Group was still developing its program proposal and would present it to him before moving forward with any visits.  *See id.* at 124.

At least one other operating line, Carnival Cruise Line, also began developing its own vessel visit program following the December 2017 Status Conference. *See id.* at 125. One pilot ship visit for the Carnival Cruise Line program was conducted from March 5-10, 2018, and the Company has similarly asserted that this visit was conducted without CMO or CCM approval. *See id.* at 131. The Company has represented that the CMO expected that no visits would occur until Carnival Cruise Line addressed feedback he had provided on the program. *See id.* As noted above, neither the ESAVP nor the Carnival Cruise Line post-December 2017 vessel visit programs were disclosed by the Company to the Court, Office of Probation, Interested Parties, TPA, or CAM.[40]

### 3.   Court and Government Concerns

Both the Court and the Government have expressed concerns about the undisclosed vessel visit programs, including the lack of transparency surrounding their development and implementation. At the April 3, 2018 Status Conference, the Court raised concerns "that we are not all on the same page as the importance of transparency and collective learning from our mistakes. I'm concerned that I am seeing a blame game, a problem coverup we need to protect because we are concerned that we'll be docked." Status Conf. Tr. at 10 (Apr. 3, 2018).[41] The Government has raised similar concerns, including that the vessel visit programs present "a

---

[40] In addition to the Holland America Group and Carnival Cruise Line programs, Carnival UK and Carnival Maritime Group began developing a joint vessel visit program following the December 2017 Status Conference that was more in line with the CMO's initial cross-brand proposal. *See id.* at 133. Three vessel visits had been scheduled (all on Non-Covered Vessels) before the program was suspended in March 2018. *See id.* at 135-36. This program also was not disclosed by the Company to the Court, Office of Probation, Interested Parties, TPA, or CAM.

[41] At the April 2018 Status Conference, the Court also requested that the CAM be involved in Company meetings that were planned for the following week with the CMO, CCM, and Executive Vice Presidents to "talk about how we move on from here to improve." *Id.* at 22. The CAM was not invited to take part in any such meetings if they took place.

problem because of the lack of transparency.  A fundamental part of auditing is that when auditors go to a ship, they know the history.  That didn't happen here.  The auditors were deprived of that information, it was swept under the rug."  Status Conf. Tr. at 10 (July 11, 2018).[42]

Another concern expressed by both the Court and the Government was the CCM's apparent lack of direct authority and oversight over the ESAVP program.  At the April 2018 Status Conference, the Court noted its concern that the CCM "is supposed to be the chief compliance officer . . . and if he's not involved in this plan as to how are we going to make things better, you're sort of . . . pulling the rug out from underneath yourself."  Status Conf. Tr. at 11 (Apr. 3, 2018).  In its March 26, 2018 document request, the Government observed that the CCM's lack of oversight over the ESAVP "raises a host of questions given the role of the CCM as established by the ECP."  DOJ Vessel Visit Program Document Request Letter at 2.

The Court and the Government have also articulated a shared concern that the pre-TPA audit program "tainted" the audits performed in its wake, and thereby diminished the Court's ability to rely upon ECP Year One TPA audits to provide an accurate benchmark of the compliance challenges faced by the ships.  *See* Status Conf. Tr. at 29 (Apr. 3, 2018) ("we [the Government] remain concerned that the first year of audits were compromised"); *see also* Status Conf. Tr. at 11 (July 11, 2018) (Court and Government agreeing that "[t]hey're all tainted," referring to first-year TPA audits); *id.* at 39 (noting "concerns as to whether or not the audit findings that we have are really the true picture").  As a result of these concerns, following the

---

[42] As noted in prior CAM reports and discussed further below, *infra*, Part III.J.4, the Government issued a document request to the Company on March 26, 2018, to understand the nature of both the pre- and post-December 2017 vessel visit programs. *See* Letter from R. Udell, *Re: United States v. Princess (Case No. 1:16-cr-20897)* (Mar. 26, 2018) ("DOJ Vessel Visit Program Document Request Letter").

July 11, 2018 Status Conference, the Court issued an order requiring that the CAM and TPA

perform additional vessel and shoreside facility visits and audits during ECP Year Two, and that

all future vessel audits and visits be unannounced.  *See* Dkt. No. 75.

        4.     <u>Company Inquiry and Presentation</u>

      In response to the Court's and Government's concerns and the Government's March 26,

2018, request for documents, the Company launched an inquiry with the assistance of outside

counsel.  According to the Company, it interviewed 39 personnel to identify relevant custodians;

conducted substantive interviews with 29 employees; collected documents and information from

101 custodians (former and current employees, as well as contractors); and produced on a rolling

basis over 17,000 documents to the Interested Parties in response to the Government's document

requests.  Notably, outside counsel informed the Department of Justice, the Office of Probation,

the U.S. Coast Guard, the TPA and the CAM that it conducted no interviews with shipboard

employees, such as Captains, Staff Captains, Environmental Officers, Chief Engineers, or Staff

Chief Engineers.  On September 5, 2018, the Company completed its initial production of

materials.  *See* Dkt. No. 75; *see also* Letter from D. Kelley, *Environmental Ship Assist Visit*

*Program – Seventh & Eighth Production of Documents* (Sept. 5, 2018).  On September 10, 2018,

the Company provided a privilege log.[43]  The CAM Team conducted a review of these

documents.

---

[43] The Company initially withheld 1,278 records under a claim of privilege and produced 289
redacted records.  Following a review of the Company's privilege log, the Government
challenged certain entries—specifically, those records that did not appear to include counsel or
personnel that routinely act in their capacity as an attorney for the Company.  *See* Email from R.
Udell, *Ship Visit Programs & Privilege Log* (Jan. 2, 2019).  In response, the Company has
produced some documents that it had either previously withheld as privileged or produced in
redacted form.  *See* Email from B. Herrmann, *Production of Documents – U.S. v. Princess
Cruise Lines, Ltd., 1:16-cr-20897 (S.D. Fla.)* (Feb. 24, 2019).

On February 19, 2019, the Company's outside counsel gave a presentation of the Company's view of the vessel visit programs to the Interested Parties, CAM, and TPA.  The Company argued that the initial pre-TPA audit program was merely an evolution of its pre-existing Fleet Chief Engineer visit program, which the Company says was designed to assist Covered Vessels with implementing HESS requirements, including environmental and ECP requirements.  Similarly, the Company argued that the ESAVP was designed to support the ships generally with regard to environmental compliance, including ECP requirements.  The Company also claimed that the ESAVP was distinguishable from the pre-TPA audit program in part because the ESAVP visits were not to be scheduled within sixty days before a TPA audit.  The Company maintained that the purpose of both the pre-TPA audit and ESAVP programs was educational and that the programs were designed to discover and understand the kind of support that the ships needed.  *See, e.g.*, February 2019 Vessel Visit Program Presentation at 37, 40, 80.

### 5.   CAM Team Review

Based on the CAM Team's review of the documents produced in response to the Government's document requests, the presentation provided by the Company's outside counsel, and confidential communications with shipboard employees, the purpose of these vessel visit programs appears to have been to avoid negative TPA audit findings on ECP-specific issues.

First, the contemporaneous documents produced to the Department of Justice support a view that the primary goal of the vessel visits—both before and after December 2017—was to minimize TPA audit findings.  Examples include:

- A document titled "Proactive Preparation for TPA Visit (Conducted During Day Visit)" was used during the Fleet Chief Engineer visits conducted between June and September 2017.

- In connection with the Holland America Group ESAVP conducted in 2018, the shoreside employees visiting the ships utilized an Excel workbook with three tabs as

follows:  the first tab was titled "Pre-Audit Checklist."  It contained a worksheet that referenced ECP sections and related company procedures.  The second tab contained a list of Company procedures referenced in the first tab and the corresponding ECP requirement(s).  The third tab contained a list of prior TPA audit findings.  *See, e.g.,* PCL_DOJ_ESAVP_00000238.

- Messages from Fleet Chief Engineers (both before and after the December 2017 Status Conference) to the ships notifying them of upcoming visits specifically referenced the TPA audits, and some stressed the desirability of avoiding TPA audit findings.  *See, e.g.*, *Email from Fleet Chief to Caribbean Princess Senior Officers* (June 18, 2017), PCL_DOJ_ESAVP_00002416 ("As you should be aware, I will be joining you . . . in order to assess the status of your implementation of recent HESS-MS ENV procedural changes, to discuss the planned TPA visits and to provide guidance and obtain your feed back.  This will assist you in preparation for any forthcoming audits."); *see also Email from Holland America Group Fleet Chief Engineer to ms Rotterdam Senior Officers* (Mar. 2, 2018), PCL_DOJ_ESAVP_00000308 ("Additionally, the ECP requires our ships and personnel, including shoreside, to use environmental Best Practice policies and procedures that are based on experience and research, to meet or exceed marine environmental protection requirements and to prevent audit findings.  Vessel visits will allow for the exchange of information to ensure compliance with the ECP.  We really want to avoid repeat ABSG TPA findings in 2018.").

- Shoreside staff described the visits as designed to prepare for audits and to avoid audit findings.  *See, e.g.*, *E-mail from CMG OLCM to AIDA Business Trip Service Center* (August 8, 2017) ("[Name redacted] urgently needs to visit AIDAluna in preparation of the audits that will be carried out by the US authorities for the Environmental Compliance Plan in September.  It would be really important to go onboard on August 12 for one week in order to have time to manage issues before the audits and avoid findings.").

- In October 2017, the CMO wrote to Carnival Cruise Line's Senior Vice President for Marine Operations:  "After our court hearing this week, we cannot afford audits like this that show lack of attention to detail by the ship and management. . . I think it is time for CCL to enhance your proactive work to avoid this type of poor audit."  *E-mail from CMO to CCL* SVP (Oct. 20, 2017), PCL_DOJ_ESAVP_00059931.  The CMO also forwarded this e-mail to Carnival Cruise Line's President, who replied:  "This is very disappointing especially since I understand we sent a shoreside manager to the ship to prepare them for the audit.  I have a difficult time understanding how we can have findings related to the issues highlighted below."

- The February 19, 2019, presentation materials prepared by the Company's counsel acknowledged that:  "Once the TPA's audits commenced, Day Visits had a clearer pre-audit verification purpose."  February 2019 Vessel Visit Program Presentation at 34.

- After the December 2017 Court hearing during which the Company committed to cease its pre-TPA audits, Carnival UK's OLCM wrote to the CMO directly to advocate for the discontinuation of audit preparation for all audits: "Forgive me for writing directly, but I wanted to highlight a significant 'compliance to commitment' opportunity here. The court has called us out on an activity which has long hindered our company which I saw first hand a[t] RAAS and indeed took part in which at [Holland America Line] years ago. Audit preparation skews the reality, confuses ships and gives management false confidence in audit results. The opportunity here is to send the same directive for opco's [operating companies] not to carry out Audi[t] preparations activities for any audits. You wouldn't have to be too prescriptive as companies know the difference between routing, healthy fleet support an[d] QA [quality assurance] and audit prep. . . . If we don't get to see the real issues highlighted, we'll never know what needs fixed. . ." *E-mail from CUK OLCM to CMO* (Dec. 12, 2017), PCL_DOJ_ESAVP_00008567.

- As Holland America Group was designing the ESAVP, a draft concept document explained that: "Additionally, the ECP requires our ships and personnel, including shoreside, to use environmental Best Practice policies and procedures that are based on experience and research, to meet or exceed marine environmental protection requirements and to prevent audit findings." *Vessel Environmental and Safety Visits* (Jan. 3, 2018), PCL_DOJ_ESAVP_00000030. This exact language was used by at least one Fleet Chief Engineer e-mailing a ship before his visits. *See* PCL_DOJ_ESAVP_00000308.

- In reviewing slides on Carnival Cruise Line's 2018 proposed program, it was observed that "the difference between another audit and a true quality assurance program doesn't come through the slide deck that clearly to me, lot of mention of avoiding audit findings and repeat findings as opposed to avoiding incidents and ensuring compliance." *Email from C. Donald to B. Burke* re: CCL QA teams.pptx (Feb. 15, 2018), PCL_DOJ_ESAVP_00011884.

Second, there are references in contemporaneous documents that suggest that the ESAVP was an extension of the previously discontinued pre-TPA audit program. For example, a Holland America Group Fleet Technical Director wrote to his counterpart at Carnival Australia: "DOJ took a dim view of this and we had to stop this pre-audit activity. Yesterday in a discussion between Seattle & Santa Clarita [the two locations of Holland America Group's shoreside offices], *we agreed to continue these support visits, well in advance of the audit*, *under the name of* Environmental Excellence Program Visits." Email from Holland America Group Fleet Technical Director to Carnival Australia Director, Technical Operations (Jan. 12, 2018),

PCL_DOJ_ESAVP_00000191 (emphasis added).  Similarly, a Fleet Chief Engineer e-mailed a

ship with information about his upcoming ESAVP visit, explaining that:  "The Environmental

Ship Assistant Visit program was recently developed when the Department of Justice stopped us

from doing Pre-TPA audit ship visits.  The ship assistant visits will not coincide with the ABSG

TPAudit [*sic*].  The purpose of the Ship Assistant visit is to meet and work with officers and

crewmembers to provide environmental training, record checks, and ECP familiarization. . . .

Vessel visits will allow for the exchange of information to ensure compliance with the ECP.  *We*

*really want to avoid repeat ABSG TPA findings in 2018*."  Email from Holland America Group

Fleet Chief Engineer to ms Rotterdam Senior Officers (Mar. 2, 2018),

PCL_DOJ_ESAVP_00000308 (emphasis added).

   Third, the Company's position that the vessel visits were designed to support the ships is

not supported by any documentation produced to date that would demonstrate corresponding

shoreside efforts to provide resources or support to ships based on information learned during

these visits.  Indeed, the CAM specifically asked the Company to "identify whether and to what

extent there are contemporaneous records that have not otherwise been produced in which:

findings and observations from the vessel visits were consolidated and shared; corrective actions

found on vessels were consolidated and tracked; or information learned from the vessel visits

was analyzed or trended."  Letter from S. Solow, *Re: Court Appointed Monitor Communication*

*Vessel Visit Program Documents and Requests* (Jan. 25, 2019), at 2.  The Company has to date

not identified any such documents.  The CAM further requested:  "[A]lthough the government's

request focused on the vessel visit programs, we are interested to know whether there were also

similar parallel programs implemented to have teams assess shore-side support for the ships.  If

contemporaneous documents regarding such efforts were generated, please either provide the

Bates-numbers or privilege log IDs for the relevant records, provide additional records, or confirm that no such additional records exist." *Id.*  Again, to date no such documents have been identified or provided.

Overall, the CAM Team's review of the vessel visit document production yielded the following observations:  the ships had little to no input into the programs; the shoreside teams that visited the ships left no documentation on corrective actions from the visits; the programs were not developed or implemented by or with the approval or direct oversight of the CCM, *see supra*, Part III.E (CCM appears to lack authority over the ECP and environmental compliance); and the programs generally appeared designed to address ECP and environmental issues as they arose on particular ships, rather than to uncover systemic or ongoing compliance challenges affecting ships on a fleetwide basis, including issues that might stem from inadequate resources or shoreside support.  Based on a review of the available information, it is fair to conclude that the vessel visit programs at issue were, to a large extent, focused on preparing vessels for TPA audits, including those that could occur at some future date.  Rather than supporting the ships, the purpose of the vessel visits appears to primarily have been an effort to allow the Company's management to avoid the potential pressure to expend additional resources in support of the ships if the TPA audits continued to find recurring compliance issues.

### 6.    CAM Observations

At their core, these visits are illuminating.  They indicate that there is a substantial failure on the part of the highest levels of Company management to understand the value of learning from mistakes, and a failure to understand the obligation during a period of probation to provide the Court with an unvarnished view of the challenges faced by the ships and the Company. These vessel visit programs were developed and implemented without notice to the Court, Office

CONFIDENTIAL                                             April 2, 2019

of Probation, Interested Parties, TPA, or CAM.  The post-December 2017 visits came to light

because the continued vessel visit program was understood by the Company's own employees to

be contrary to the CMO's representation made to the Court.  If not for these employees, as in the

case of the *Caribbean Princess*, it is unknown how long this conduct would have continued in

secret.

The Company has represented that the Holland America Group ESAVP vessel visits were

conducted without the knowledge or approval of the CMO or the CCM.  As noted above, *supra*,

Part III.E, decisions were made to fund these efforts, but the CCM's request to fund a

comprehensive Fleet Environmental Officer program was denied.  Further, as described above,

*supra*, Part I.D.3, a senior Holland America Group executive apparently lobbied the U.S. Coast

Guard about a specific ECP issue without the authorization or knowledge of the CCM.  These

and other issues described in this Report indicate that the largest compliance challenge facing the

Company comes not from the compliance issues on the ships, but from the actions, and failures

to act, at the Company's highest levels of management—the most obvious manifestation of

which is the now years-long failure to comply with the condition of probation requiring the

Company to provide the CCM with actual authority over environmental compliance.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor

April 2, 2019

CONFIDENTIAL

ATTACHMENT 1:

LETTER FROM C. DONALD, *RE: PROPOSED MODIFICATIONS TO THE ENVIRONMENTAL COMPLIANCE PLAN* (JAN. 10, 2019), PCL_ECP00086780-85

[*See following pages*]



**CARNIVAL**
CORPORATION & PLC

Chris Donald
Vice President
Corporate Environmental Compliance
ECP Corporate Compliance Manager
Carnival Corporation & plc
3655 NW 87th Avenue
Miami, Florida 33178

January 10, 2019

Re:   **U.S. v. Princess Cruise Lines, Ltd. – 1:16-cr-20897**
      **Proposed Modifications to the Environmental Compliance Plan**

Dear Interested Parties:

Pursuant to Section I.H of the Environmental Compliance Plan (the "ECP"), I write on behalf of Carnival Corporation & plc and its wholly owned subsidiary, Princess Cruise Lines, Ltd. (collectively the "Company"), to propose several modifications to the Company's ECP.

As established in Section I.H of the ECP, any proposed modification must be submitted in writing to the Interested Parties for their consideration over a thirty-day comment period. If no comments are provided during that period, the modifications shall become effective. Over the past several months, including during our meet-and-confer on September 24, 2018 and on the record during the last status conference on October 3, 2018, the Company has, at various times since March 2018, consulted with the Court Appointed Monitor ("CAM") and Third Party Auditor ("TPA") in order to develop a common set of modifications with which both the CAM and the TPA feel comfortable and which the Company feels are needed.

Those discussions have focused largely on changes to several provisions in the ECP relating to the Environmental Control Systems ("ECS") and a restructuring of the Company's department responsible for incident investigations. The Company is continuing discussions with the CAM and the TPA related to the efficiency of the ECS monitoring, and the Company is also finalizing the exact structure of its investigations department as it continues its search for a Vice President to oversee the restructured investigation function.

The Company plans to submit its proposed modification of its investigative function shortly after this hiring process is complete, most likely during the first quarter of 2019, and will submit any proposed modifications concerning the ECS once it reaches alignment with the CAM and the TPA on how best to improve that system.

1

Our discussions, however have focused on other provisions of the ECP as well. Based on those conversations and various exchanges with the CAM and TPA, the Company is now proposing modifications to which we understand neither the CAM nor TPA object. In many respects these proposed modifications are borne of over a year and a half of CAM visits, TPA audits, and communications with the Interested Parties, during which it has become evident that many well-intentioned provisions in the ECP have proven to be unclear on their face or ineffective in practice. Our goal in proposing these modifications is to better achieve the overall purpose of the ECP—sustained environmental compliance and continuous improvement—while eliminating some of the inefficiencies that can often interfere with that goal.

Enclosed for your review is a chart listing the Company's proposed modifications to the ECP. This chart also compares the ECP's original language to the proposed amended language and provides a short explanation for the Company's overall rationale for the proposed change. Although the chart provides more specific explanations of each individual modification, I set forth below in more general terms some of the most significant modifications. If you would find it helpful, I would also be happy to schedule an in-person or telephonic meeting with certain Company employees who have relevant subject matter expertise who can provide more granular information regarding the need for these proposed modifications and can further assist you in your assessment.

I also would like to thank the CAM and TPA for their helpful insight, comments, and edits to the proposed modifications. The Company looks forward to continued collaborative engagements with the CAM and TPA to continue to improve the efficiency and effectiveness of the Company and its environmental compliance and implementation of the ECP.

## I.   Environmental Officers' Unannounced Machinery Space Visits

The Company has proposed a modification to ECP § IV.A.2.j—without objection from the CAM or TPA—concerning the procedures by which an Environmental Officer (an "EO") must visit and inspect machinery spaces. Under the current text of the ECP, an EO is required to both make unannounced visits and ensure that he or she is present for the start/stop time of the OWS and the OCM, which we have found from experience to be impractical, if not virtually impossible. In order to implement this provision of the ECP as currently written, the EO needs to be able to coordinate with the Engineering Officer On Watch to find out when the OWS and OCM will be in operation, which necessarily provides notice of his visit. Even if the EO is present for the system's start time, the system does not stop after one hour but instead lasts many hours. Requiring the EO to attend both start and stop phases would, therefore, require that he or she remain in the engine room for much longer than one hour, which would significantly impede the EO's ability to meet other important obligations under the ECP.

As the CAM pointed out in his most recent quarterly report, his conversations with EOs at Carnival's first Environmental Commitment Conference in Almere this past September underscored the "[l]ack of clarity associated with th[is] ECP provision." *See* Quarterly Report of the Court Appointed Monitor (December 2018) at 19. Since that conference, the CAM, the TPA, several Company employees, and I have worked to design the proposed modified version of ECP § IV.A.2.j below. This modified version designs the EO's visits so as to maximize the

2

opportunity that the EO will observe the OWS and OCM in operation without providing advance notice, provides guidance for how the EO should manage to observe start or stop times of the system, and preserves the requirement that at least one weekly visit fall outside of normal work hours.

I wholeheartedly agree with the CAM's statement that this modification would "clarify what Environmental Officers must do to fulfill this requirement and reduce the current uncertainty, stress, and time associated with this task." *Id.* at 20. Furthermore, the modification would "make compliance more easily audited by the TPA." *Id.*

2. An EO shall:

. . .

j. During underway periods:

. . .

ii. Conduct two (2) unannounced machinery space visits per week in an effort to observe the operation of the OWS/OCM and the White Box. Each visit shall have a duration of at least one hour.

- The timing of the visit shall be based on potential discharge times as per the Environmental Matrix to optimize the opportunity to view the OWS/OCM and the White Box in operation.
- During the hour visit the EO shall observe any OWS/OCM and White Box that is in operation. The hour time period does not require continuous operation, and can include time used to start or stop the equipment.
- During the unannounced visits (whether or not the OWS/OCM and the White Box are operating) the EO shall also review records to identify any problems related to the operation of the OWS/OCM and the White Box. The records may include the ORB and the machinery space automation system (such as Integrated Monitoring Alarm Control Systems (IMAC), Valmarine, ABB, or Engine Room alarm printout), for the time period since the most recent operation or the prior 24 hours (whichever is shorter).
- At least one (1) of the two (2) required weekly visits will be conducted outside of normal day work hours.

3

## II.    Additional Miscellaneous Modifications

Accompanying this letter is the previously-mentioned chart listing all of the Company's proposed modifications and providing a side-by-side comparison between the modifications and the original text of the ECP. Again, this letter describes only generally the Company's most significant modifications. Please refer to the chart for the full set of proposed modifications, along with the overall rationale for each modification.

I would, however, like to call your particular attention to one of the miscellaneous modifications included in the chart that is comparatively minor but nevertheless time sensitive. As you likely recall, Section III.F.1 of the ECP requires Carnival to produce two communications reminding employees of Princess's criminal conviction and emphasizing the importance of the ECP and environmental compliance more generally: one communication from Carnival's CEO, Arnold Donald, and another set of communications from the President (or equivalent senior executive) of each Operating Line. As currently drafted, the ECP requires that both types of communications be issued during the first quarter of each year.

Carnival believes its communications in the form of videos are a very effective mechanism for heightening employees' awareness of the importance of environmental compliance. However, I believe that these video messages would be more effective if they were staggered throughout the year rather than shown at the same time. Staggering the videos would allow the Company to refresh its environmental compliance message more frequently and provide more opportunities to update that message. The Company would, therefore, propose the following modification illustrated below in track changes to allow each Operating Line to show the video featuring Arnold Donald during the first quarter of each year and a video featuring each Operating Line's President (or equivalent senior executive) during the third quarter of each year. I conferred with the CAM and the TPA about this modification last year, and they have no objection to the staggering of the videos.

> At least annually, in the first quarter of every fiscal year, the CEO of Carnival Corporation & plc ~~and the President (or equivalent senior executive) of each Operating Line~~ shall advise all employees of i) Defendant's criminal conviction and probation; ii) CARNIVAL's commitment to environmental compliance; and iii) to the existence of this ECP, its material provisions, and how to access a copy of it. <u>Additionally, the President (or equivalent senior executive) of each Operating Line shall also advise all employees of the items referenced above in the third quarter of every fiscal year.</u>

Given that Carnival needs to produce in the immediate future this year's set of videos to ensure that the CEO's video—or both messages if the proposed modification is rejected—can be shown during the first quarter of 2019, I would appreciate if you could provide your input on this proposed modification as soon as practicable. To the extent that you approve of this modification but would like to confer about the Company's other proposed modifications, I would respectfully propose that you provide your approval for this modification and consent to

4

de-linking this modification from the process of approving the remaining proposed modifications.

* * *

Together, these proposed modifications are based on the experience and expertise of the Company, CAM, and TPA, and we hope that we can work together with you as well to make the ECP more efficient and effective.  Thank you for your careful attention to this matter.

Sincerely,

Christopher Donald
ECP Corporate Compliance Manager
Carnival Corporation & plc

Richard Udell
Senior Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice
Richard.Udell@usdoj.gov

Thomas Watts-FitzGerald
Assistant U.S. Attorney
U.S. Attorney's Office for the Southern District of Florida
Thomas.Watts-Fitzgerald@usdoj.gov

Brendan Sullivan
Lieutenant Commander
District Seven Legal Office
U.S. Coast Guard
Brendan.Sullivan@uscg.mil

Niya J. Williams
Lieutenant Commander
Office of Investigations and Analysis
U.S. Coast Guard
Niya.J.Williams@uscg.mil

5

Anthony M. DeStefano
Lieutenant Commander
Office of Maritime and International Law, Environmental Law Division
U.S. Coast Guard
Anthony.M.DeStefano@uscg.mil

Philip Jones
Lieutenant
District Seven Legal Office
Philip.A.Jones@uscg.mil

Jeffrey Feldman
U.S. Probation Officer
U.S. Probation Office for the Southern District of Florida
Jeffrey_Feldman@flsp.uscourts.gov


cc:  Steven P. Solow, ECP Court Appointed Monitor
     Thomas M. Nolan, ECP Third Party Auditor
     John Francic, ECP Third Party Auditor
     CG-INV (uscgecp@uscg.mil)
     solowmonitor@kattenlaw.com
     david_sims@ios.doi.gov
     stanley_stocker@doioig.gov
     Admiral William Burke, Carnival Corporation & plc Chief Maritime Officer
     Arnaldo Perez, Carnival Corporation & plc General Counsel
     Kelly W. Clark, Holland America Group Chief Ethics Officer & General Counsel
     David N. Kelley, Dechert LLP


Attachment

6

PCL_ECP00086785

CONFIDENTIAL                                                                April 2, 2019

ATTACHMENT 2:

CHART, *PROPOSED MODIFICATIONS TO ENVIRONMENTAL COMPLIANCE PLAN* (JAN. 10, 2019),
PCL_ECP00086786-91

[*See following pages*]

**Proposed Modifications to Environmental Compliance Plan**

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| Section I.D – Definition of "Brands" | **Brands** means CARNIVAL's cruise ship brands as of the date of the Plea Agreement, as may be modified when necessary: Princess Cruise Lines, Carnival Cruise Line, Holland America Line, Seabourn, Fathom, Costa Cruises, AIDA Cruises, Cunard, P&O Cruises UK, and P&O Cruises Australia. | **Brands** means CARNIVAL's cruise ship brands as of the date of the Plea Agreement, as may be modified when necessary: Princess Cruise Lines, Carnival Cruise Line, Holland America Line, Seabourn, ~~Fathom,~~ Costa Cruises, AIDA Cruises, Cunard, P&O Cruises UK, and P&O Cruises Australia. | Removed the Fathom brand because it no longer has any vessels. |
| Section III.F.1 – Full Cooperation | At least annually, in the first quarter of every fiscal year, the CEO of Carnival Corporation & plc and the President (or equivalent senior executive) of each Operating Line shall advise all employees of i) Defendant's criminal conviction and probation; ii) CARNIVAL's commitment to environmental compliance; and iii) to the existence of this ECP, its material provisions, and how to access a copy of it. | At least annually, in the first quarter of every fiscal year, the CEO of Carnival Corporation & plc ~~and the President (or equivalent senior executive) of each Operating Line~~ shall advise all employees of i) Defendant's criminal conviction and probation; ii) CARNIVAL's commitment to environmental compliance; and iii) to the existence of this ECP, its material provisions, and how to access a copy of it. Additionally, the President (or equivalent senior executive) of each Operating Line shall also advise all employees of the items referenced above in the third quarter of every fiscal year. | Staggering the two videos throughout the year would be better than having two videos shown at the same time every year.  The staggered approach allows the Company to refresh its message about the ECP and update that message to timely discuss recent challenges more frequently than every 12 months. |
| Section IV.A.2.j – Environmental Officers | An EO shall:<br>. . .<br><br>During underway periods . . . Conduct unannounced machinery space visits at least twice per week to observe the operation of the OWS and OCM (when in operation) for a period of one hour, including start and stop times. At least one (1) of the two (2) required weekly visits will be conducted outside of normal day | An EO shall:<br>. . .<br><br>During underway periods . . . Conduct two (2) unannounced machinery space visits ~~at least twice~~ per week in an effort to observe the operation of the OWS ~~and /~~OCM and the White Box~~(when in operation) for a period of one hour, including start and stop times.~~ Each visit shall have a duration of at least one hour. ~~At~~ | The EO cannot both make unannounced visits and ensure that he or she is present for the start/stop time of the OWS and the OCM. He or she needs to be able to coordinate with the EOOW to find out when the OWS and OCM will be in operation, |

Page 1 of 6

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| | work hours. During his observation period, the EO shall also review Engine Control Room display data relevant to waste management such as the Integrated Monitoring Alarm Control Systems (IMAC) and Engine Room alarm printouts. | least one (1) of the two (2) required weekly visits will be conducted outside of normal day work hours. During his observation period, the EO shall also review Engine Control Room display data relevant to waste management such as the Integrated Monitoring Alarm Control Systems (IMAC) and Engine Room alarm printouts.<br><br>• The timing of the visit shall be based on potential discharge times as per the Environmental Matrix to optimize the opportunity to view the OWS/OCM and the White Box in operation.<br>• During the hour visit the EO shall observe any OWS/OCM and White Box that is in operation. The hour time period does not require continuous operation, and can include time used to start or stop the equipment.<br>• During the unannounced visits (whether or not the OWS/OCM and the White Box are operating) the EO shall also review records to identify any problems related to the operation of the OWS/OCM and the White Box. The records may include the ORB and the machinery space automation system (such as Integrated Monitoring Alarm Control Systems (IMAC), Valmarine, ABB, or Engine Room alarm printout), for the time period since the most recent operation | which necessarily provides notice of his visit. Even if the EO is present for the system's start time, the system does not stop after one hour but instead lasts many hours. Requiring the EO to attend both start and stop phases would, therefore, require that he or she remain in the engine room for much longer than one hour. |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E                                                                     PCL_ECP00086787

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| | | or the prior 24 hours (whichever is shorter).<br>• At least one (1) of the two (2) required weekly visits will be conducted outside of normal day work hours. | |
| Section IV.A.5 – Environmental Officers | Within three (3) months of sentencing, CARNIVAL share hire an EO training manager, who shall have an Engine Officer license, will have prior experience having sailed and served at the level of 2nd Engineer or higher, and has demon- strated knowledge of and experience with the Marine Environmental Protection Requirements.  The EO training manager shall: | Within three (3) months of sentencing, CARNIVAL shallre hire an EO training manager, who shall have an Engine Officer license, will have prior experience having sailed and served at the level of 2nd Engineer or higher, and has demon- strated knowledge of and experience with the Marine Environmental Protection Requirements.  The EO training manager shall: | This revision fixes a minor typo in the original ECP. |
| Section VIII.D.1 – Audit Reports | The TPA shall produce an audit report for each vessel and shore-side facility audit that (i) identifies each audited item and whether it was Satisfactory or resulted in an Audit Finding, and (ii) contains detailed Audit Findings, including the factual basis for each Failure in narrative form. Audit Findings that the audited vessel or facility was able to immediately rectify shall still be included in the audit report. | The TPA shall produce an audit report for each vessel and shore-side facility audit within forty-five (45) days of the completion of each audit that (i) identifies each audited item and whether it was Satisfactory or resulted in an Audit Finding, and (ii) contains detailed Audit Findings, including the factual basis for each Failure in narrative form. Audit Findings that the audited vessel or facility was able to immediately rectify shall still be included in the audit report.  During the Audit Closing meeting or at least prior to departing the vessel or shore-side facility after completing an audit, the TPA shall provide CARNIVAL with an initial summary of its Audit Findings.  Such summary may deviate from the findings articulated in the final audit report. | This amendment simply formalizes the TPA's and the Company's current practice. Initial summaries of the Audit Findings will allow the Company to learn earlier about the results of each audit, thereby enabling the Company to more quickly commence corrective actions. Requiring that the final audit report be received within 45 days will allow the Company to make corrective actions to issues identified in the final audit but not in an initial summary or draft report without information about the |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00086788

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| | | | violation having become stale. |
| Section VIII.F.2 – TPA Audit Findings and Corrective and Preventative Actions | CARNIVAL will provide the funding and resources required to facilitate implementation of corrective and preventive actions. Corrective action for Major Non-Conformities shall commence as soon as is reasonably practicable. Corrective action for other Audit Findings shall commence within forty-five (45) days of the respective audit closing meeting. | CARNIVAL will provide the funding and resources required to facilitate implementation of corrective and preventive actions. Corrective action for Major Non-Conformities shall commence as soon as is reasonably practicable. Corrective action for other Audit Findings shall commence within forty-five (45) days of ~~the respective audit closing meeting~~CARNIVAL's receipt of the TPA's respective final audit report. Notwithstanding the foregoing requirements of this subsection, CARNIVAL will use its reasonable best efforts to commence corrective actions for Non-Conformities and Observations as soon as is reasonably practicable following the respective audit closing meeting. | The Company needs more time to commence corrective actions in situations where the root cause of an Audit Finding is not immediately apparent, especially for Audit Findings contained in the TPA's final audit report but not contained in any prior draft shared with the Company. |
| Section IX.D.2 – Bilge-Main Cross Connections | The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only." | The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange or bright green. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only." | The International Convention for the Safety of Life at Sea requires that damage control and emergency flooding protection systems be painted orange on newer ships built to Safe Return to Port ("SRTP") regulations. In order to distinguish between ECP equipment and SRTP equipment on vessels covered by the Convention, the Company uses bright green instead of orange to identify |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00086789

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| | | | ECP equipment.<br><br>The Department of Justice and Coast Guard have already issued the Company a letter in 2017 confirming that the use of different colored tape is acceptable, but the Company would like to formally codify this variance in the ECP. |
| Section IX.E – Emergency Bilge Suctions | All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges like those which may be connected to sea water circulating pumps, shall be painted international orange on all vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance. | All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges like those which may be connected to sea water circulating pumps, shall be painted international orange or bright green on all vessels and labeled in a manner similar to "Emergency Bilge Suction__- Emergency Use Only."  The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance. | Same as immediately above. |
| Section IX.F.2 – Blank Flanges | The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS. | The blank flange or valve securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS. | Most Princess Cruise Lines ships do not have blank flanges, but instead they have valves with hose connections. As such, valves should be added. |
| Section IX.H.4 – Additional OWS / OCM Requirements | Every vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer, the EO, and one other engineer. The test shall be logged in the vessel's Oil Record Book (Part I) and co-signed by the EO and all present. The Chief | Every vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer, the EO, and one other engineer. The test shall be logged in the PMS and the vessel's Oil Record Book (Part I) and co-signed by the EO and all | It is difficult to keep track of all of the emails sent to each OLCM reporting that monthly operational tests have taken place.  This suggested edit |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| | Engineer shall send a report to the cognizant OLCM. | present.  The cognizant OLCM will check the ships' PMS to ensure testing is being performed on a monthly basis and certify each month that he has completed this review of the PMS.  Such certifications are to be made available to the CAM and TPA upon request. ~~Chief Engineer shall send a report to the cognizant OLCM.~~ | introduces efficiency without potentially compromising compliance. |
| Attachment 3 | Shore-side Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period). Shore-side Covered Personnel hired after the implementation of the training program must complete it before they assume their duties. | Shore-side Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period). Shore-side Covered Personnel hired after the implementation of the training program must complete it within seven (7) days of ~~before they assume~~ commencing their duties. | This revision would align the timing requirements for shore-side and shipboard Covered Personnel to complete the environmental training. |
| Attachment 3 | Shipboard Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period) or within seven (7) days of coming aboard a vessel on a new contact, whichever is earlier. Shipboard Covered Personnel hired after the implementation of the training program must complete it within seven (7) days of commencing their duties on a new contact. | Shipboard Covered Personnel who are employed as of the date of the implementation of the training program must complete it within three (3) months from that date (that is, within the first six (6) months of the probationary period) or within seven (7) days of coming aboard a vessel on a new contract, whichever is earlier.  Shipboard Covered Personnel hired after the implementation of the training program must complete it within seven (7) days of commencing their duties on a new contract. | This revision fixes a minor typo in the original ECP. |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

CONFIDENTIAL                                                                                   April 2, 2019

**ATTACHMENT 3:**

**LETTER FROM S. SOLOW, *RE: ENVIRONMENTAL COMPLIANCE PLAN ("ECP")
ENVIRONMENTAL CONTROL SYSTEM ("ECS")* (JAN. 25, 2019)**

[*See following pages*]

# Katten

KattenMuchinRosenman LLP

**2900 K Street NW
North Tower - Suite 200
Washington, DC  20007-5118
202.625.3500 tel
www.kattenlaw.com**

STEVEN P. SOLOW
steve.solow@kattenlaw.com
202.625.3550 direct
202.295.1171 fax

January 25, 2019

Richard.Udell@usdoj.gov
Thomas.Watts-Fitzgerald@usdoj.gov
Jeffrey_Feldman@flsp.uscourts.gov
Anthony.M.DeStefano@uscg.mil
Philip.a.jones@uscg.mil
Niya.J.Williams@uscg.mil

CONFIDENTIAL

Re:     **Environmental Compliance Plan ("ECP") Environmental Control System ("ECS")**

Dear All,

Below and attached is a notice from the Company regarding their efforts with respect to the Environmental Compliance Plan ("ECP") Environmental Control System ("ECS").   As the attached notice states, the Company is "currently developing plans to improve ECS compliance and increase application consistency across [their] fleet."  2019-1-8 CAM and TPA Production Letter_PCL_ECP00086778.

As you know, the ECS program is a requirement of the ECP that was agreed upon as a condition of probation.  *See* ECP § IX.B.  The Court Appointed Monitor ("CAM") Team (supported by our maritime engineers from Martin & Ottaway) has reviewed and analyzed dozens of Company flash reports and Third Party Auditor ("TPA") audit reports, visited ships, and held numerous conversations with crew members, the TPA and the Company regarding the ECS program. Based on this review, the CAM and TPA concluded that the current ECS program has four significant flaws:

First, the language of the ECP creates an unrealistic expectation for the role of the ECS.  The ECP states that the Company shall:

> implement an [ECS] to help *prevent* unauthorized usage or connections within the engine room and machinery spaces . . . [and] use numbered seals, locks, or welds (on flanges) *to prevent* the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or overboard discharge connections

ECP § IX.B.1 (emphasis added).  It is the opinion of the marine engineers we have spoken to (inside and outside of the Company) that no seal system can be relied upon to *prevent*



January 25, 2019
Page 2

unauthorized usage or connections. Rather, an ECS system can help to both *deter* and *detect* unauthorized usage or connections, and the ECP could be changed to reflect this reality.

Second, the broad language of the ECP, coupled with the overall lack of centralization within the Company on compliance matters, has led to a wide variety of interpretations of the ECS requirements. Some ships have as many as 2,000 seals, while others have as few as five. A ship with 2,000 seals—coupled with the seal inspections and documentation requirements of the ECP—distorts the importance of this obligation, resulting in an excess of Environmental Officer and Chief Engineer time spent on seal checking, documentation, replacement, and so forth. For the purpose of illustration, attached to this letter are photographs and descriptions of a seal found on a vessel that could not reasonably be considered a meaningful means of preventing, deterring *or* detecting unauthorized discharges. Implementation of seals in this way, however, results in a significant amount of time—and even some safety concerns—to perform the ECP-required inspections.

Third, the lack of clarity and consistency of the current ECS program has made the TPA's auditing job difficult, and frustrated both the TPA auditors and the ships' crews. Most notably, the ECP requires the use of seals or locks to secure vulnerable connections. Based on discussion with the TPA and the Company, all agree that the use of pump (portable) and hose control (so-called virtual seals or locks) would be more effective and more efficient than seals. However, because of the current ECP requirements, if ships have used pump and hose control, the TPA has been (properly) issuing audit non-conformities in ECP Year 2. *See, e.g.,* Carnival Splendor Audit Report (May 2, 2018); Golden Princess Audit Report (May 30, 2018); Oosterdam Audit Report (July 27, 2018); Caribbean Princess Audit Report (Sept. 12, 2018); AIDAmar Audit Report (Sept. 19, 2018); Ventura Audit Report (Oct. 24, 2018); Ruby Princess Audit Report (Oct. 31, 2018); Carnival Horizon Audit Report (Nov. 7, 2018); Star Princess Audit Report (Nov. 24, 2018). The ECP requires that the Company address audit findings, *see* ECP § VIII.F.1, and that the CAM is obliged to report when audit findings have not been resolved. *See* ECP § VI.F.6. Resolving these repeated audit findings in a reasonable way appears to require revision of the ECP.

Fourth and finally, the current system is not sustainable. It is not reasonable to expect the Company to continue the current system after the expiration of the term of probation. In some ways, this may be the largest problem, as a compliance program recognized as problematic can undercut support for compliance as a whole.

One of the goals of the ECP is "continuous improvement in environmental performance." *See* ECP ¶¶ X.A.1.j.; Attachment 2. The CAM and TPA believe that a revision to the language of the ECP would help meet this goal.



January 25, 2019
Page 3

The CAM and the TPA would support the following ECP revisions and other changes noted below regarding the ECS program:

1. Revised language to ECP § IX.B.1 to reflect the role of the ECS to "deter and detect" (rather than "prevent") unauthorized usage or connections.

2. Revised language to allow for the use of pump (portable) and hose control as an effective means of deterring and detecting unauthorized usage or connections.

3. Revised language to limit the locations where seals or locks are required to be installed to: (1) overboard discharge points back to the first valve on the line connection (for "dirty" systems only—*e.g.*, bilge/oil residue (sludge), grey, black water, food waste); (2) emergency direct bilge suctions, emergency bilge suction valves, crossover valves, and eductors; and (3) any identified internal "dirty-to-clean" cross connections.

4. In addition to revisions to the ECP, a revision of the company's Global HESS Procedure Env-1204 to reflect these changes, and (consistent with the Company's goal to provide meaningful compliance authority for the Corporate Compliance Manager ("CCM")) new language in Env-1204 and INT-10005 that would give the CCM authority over any revision to this approach.

The CAM Team has actively engaged with the TPA and the Company over the last several months to flesh out these approaches. The parties agree that the goal is to have an ECS program that can be consistently implemented, is objectively auditable, and is sustainable beyond the span of the ECP. Notably, we credit the CCM and his team with their pursuit of this effort.

Because the alternative approach described in this letter would require a revision of the ECP, the TPA and the CAM are awaiting proposed ECP changes from the Company. If those proposed changes are consistent with the approach described above, it is urged that the Interested Parties support such changes, and indeed consider them as an approach appropriate for use in subsequent ECP agreements. It is believed that doing so will reduce the time (and anxiety) associated with managing the current program, thereby freeing up time for ship personnel to perform other oversight duties, and help create a sustainable and consistent program designed to support compliance in the future.



January 25, 2019
Page 4


Please let me know if you would like to discuss.

Regards,

Steven P. Solow

cc:   tnolan@absconsulting.com
        jfrancic@absconsulting.com
        CDonald@carnival.com
        KJamieson@carnival.com
        KClark@HollandAmericaGroup.com
        AWright@HollandAmericaGroup.com
        David.kelley@dechert.com
        Conrad.Johnson@dechert.com
        Brendan.herrmann@dechert.com
        solowmonitor@kattenlaw.com

Attachments:

        2019-1-8 CAM and TPA Production Letter_PCL_ECP00086778

        Attachment to CAM Letter Regarding ECP Environmental Control System

CONFIDENTIAL                                                                    April 2, 2019

**ATTACHMENT 4:**

***ATTACHMENT TO CAM LETTER REGARDING ECP ENVIRONMENTAL CONTROL SYSTEM (01/25/2019)***

[*See following pages*]

CONFIDENTIAL
ATTACHMENT TO CAM LETTER REGARDING ECP ENVIRONMENTAL CONTROL SYSTEM (01/25/2019)

As noted in the attached letter, the current ECS program has resulted in ships applying hundreds or thousands of seals, leading to an excess amount of time spent performing ECP-required inspections. Moreover, many of the seals provide little by way of value towards the goal of preventing unauthorized discharges.

During one ship visit, the CAM Team observed that, consistent with the current ECP approach, a seal had been placed on a manhole cover to one of the oily bilge tanks (annotated on the Critical valves, Fittings, and Tank Hatches List as Tank hatch Intermediate Oily Bilge Tank 15P – with location as Provision corridor B-deck cofferdam).  This manhole cover is located within a void space (cofferdam).  The access manhole cover to the void space is located on A Deck (I-95).

Access to this seal (which must be examined weekly) requires the following:

The seal is located in a void space beneath the heavily trafficked main corridor (I-95).  Accessing the seal in this highly public space requires cordoning off the area and creating a large opening in the deck.




Removing the access manhole cover requires loosening and removing twenty (20) large nuts.




CONFIDENTIAL
ATTACHMENT TO CAM LETTER REGARDING ECP ENVIRONMENTAL CONTROL SYSTEM (01/25/2019)

Once the nuts are removed, the access manhole cover must be removed for access to the void space below.



Notably, to truly examine the seal (pictured below), the EO must obtain a confined space entry permit, which requires the time and approval of the Captain / Staff Captain.



CONFIDENTIAL
ATTACHMENT TO CAM LETTER REGARDING ECP ENVIRONMENTAL CONTROL SYSTEM (01/25/2019)


This entire process is required to be repeated on a weekly basis under the current program.  While not all seals are so difficult to reach, this example helps to illustrate the need to reform the existing ECS program to one that limits the use of seals to those most likely to help deter or detect unauthorized discharges.