**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 16-20897-CR-SEITZ**

**UNITED STATES OF AMERICA**

**v.**

**PRINCESS CRUISE LINES, LTD.,**

**Defendant.**

_____/

**SECOND ANNUAL REPORT**
**OF THE COURT APPOINTED MONITOR (APRIL 19, 2018 – APRIL 18, 2019)**

I.   **Preliminary Statement on the Probation Revocation Petition** ......................................... 1

II.  **Executive Summary** ......................................................................................................... 3

    A. Overview of the Current Case ..................................................................................... 4

    B. Overview of this Report ............................................................................................... 7

    C. CAM ECP Year Two Findings .................................................................................... 8
        1.  CAM Findings:  Progress ..................................................................................... 9
        2.  CAM Findings:  Unresolved Barriers and Opportunities for Improvement ........... 10

III. **Background** ................................................................................................................... 12

    A. Legal Background and Context .................................................................................. 12
        1.  Prior Vessel Pollution Cases and Court-Imposed Compliance Programs ............. 12
        2.  Court Oversight and CAM Reports ...................................................................... 12
        3.  Other Legal Proceedings Arising Since the Start of the ECP ................................ 13

    B. CAM Team Methodology and Activities ................................................................... 15
        1.  CAM Team Visits ................................................................................................ 16
        2.  Other CAM Team Activities ................................................................................ 19
        3.  Oversight of the External Audit Function (TPA) .................................................. 20
        4.  Oversight of the Internal Audit Function (RAAS) ................................................ 20

IV.  **Updates on Company Capabilities to Meet ECP Objectives:  Progress** ........................ 20

    A. No Repeat of the Underlying Offenses ..................................................................... 20

B. Continuing Efforts to Comply with the ECP and Other Legal Requirements ................ 21
   1. Employee Efforts to Comply with Environmental Requirements ......................... 21
   2. Employee Cooperation ..................................................................................... 24
   3. Employee Willingness to Raise Issues ............................................................. 24
   4. Continued Efforts by Qualified and Dedicated Compliance Personnel ................. 26
   5. Environmental Initiatives Beyond Enumerated ECP Requirements ...................... 31

C. Efforts to Understand the Causes of Continuing Challenges ........................................... 43
   1. New Internal Investigations Group ................................................................... 43
   2. Retention of a Corporate Compliance Consultant ............................................. 46
   3. Holland America Group Human Factors Study .................................................. 49

D. Development and Implementation of an Environmental Compliance Culture Survey of More Than Seventy Thousand Employees ..................................................................... 53

E. Strong Relationship with Global Talent Partners Provides a Unique Opportunity to Develop a More Diverse Officer Corps .......................................................................... 54
   1. Background .................................................................................................... 54
   2. Compliance Context ....................................................................................... 56
   3. CAM Team Visits .......................................................................................... 58
   4. CAM Observations ........................................................................................ 60
   5. Ongoing CAM Team Examination ................................................................... 63

V. **Updates on Company Capabilities to Meet ECP Objectives: Unresolved Barriers and Opportunities for Improvement** ........................................................................... 63

A. Environmental Compliance is Not Adequately Supported at the Highest Levels .......... 63
   1. The Company Does Not Provide Effective Leadership on Environmental Compliance ................................................................................................... 64
   2. The Company's Strategic Planning Processes Are Strong But Do Not Effectively Support HESS Compliance ............................................................................ 71

B. Environmental and ECP Violations ............................................................................. 86
   1. Probation Violations ...................................................................................... 86
   2. Other Environmental Violations ...................................................................... 93

VI. **Environmental Incident Data Collection** ............................................................. 99

VII. **Evaluation of the External Audit Function (TPA)** ............................................ 100

A. Engagement with the TPA ........................................................................................ 100

B. TPA Audit Process .................................................................................................... 101

C. TPA Audit Reports ................................................................................................... 102

ii

D. TPA Independence ................................................................................................. 102

E. TPA Receptiveness to CAM Feedback .................................................................. 102

VIII. **Evaluation of the Internal Audit Function (RAAS)** ............................................ 102

A. Overview of the Internal Audit Process .................................................................. 102

B. CAM Assessment of Internal Audits and Audit Reports ........................................ 104
   1. Ship and Shoreside Office Audits ..................................................................... 105
   2. Audit Reports ...................................................................................................... 105
   3. Employee Views of RAAS ................................................................................. 107

C. Overall CAM Observations and Ongoing CAM Team Examination ...................... 109

IX. **Areas of Focus for ECP Year Three** ..................................................................... 110

A. Restructuring of the Company's Compliance Function .......................................... 110

B. Support for Operations and Compliance ................................................................ 110

C. Investigations ......................................................................................................... 111

D. Training ................................................................................................................... 111

E. Personnel ............................................................................................................... 111

F. Company Response to Internal and External Findings ........................................... 111

**Appendix A:** Company Initiatives

**Attachment 1:** *Proposed Agreement For The Court's Consideration Resolving Superseding Petition For Summons For Offender Under Supervision Dated April 26, 2019*, Dkt. No. 134

**Attachment 2:** Letter from C. Donald, *Proposed Modifications to the Environmental Compliance Plan (May 3, 2019)*, PCL_ECP00115036-40

**Attachment 3:** Letter from C. Donald, *Attachment – Proposed Modifications to Environmental Compliance Plan (5/3/2019)* (May 3, 2019), PCL_ECP00115041-52

July 3, 2019

I.      **PRELIMINARY STATEMENT ON THE PROBATION REVOCATION PETITION**[1]

This Report comes out at a time when the Company is at a critical juncture.  On June 3, 2019, the President and CEO of Carnival Corp. pleaded guilty on behalf of the Company to six violations of the terms and conditions of probation.  The Company reached an agreement with the Government, which was approved by the Court, to resolve these violations.  This agreement includes various commitments from the Company, among them a restructuring of its compliance function, with several key deadlines over the coming months.  The CAM will be monitoring the Company's performance of these commitments.

It is evident that the catalyst for the Company's recent efforts was the probation revocation petition filed by the Probation Office and approved by the Court.  As the Government recently observed, despite prior findings from the CAM, including "that the company has failed to establish a [Corporate Compliance Manager] with responsibility and authority over environmental compliance, a core part of the plea agreement, a core part of the conditions of probation . . . [I]t was not until the Court indicated that it was considering banning ships from U.S. ports that we have real change, or apparently real change happening within the company."  Settlement Hearing Tr. at 36 (June 3, 2019).

Both the Court and the Government have emphasized that the main impetus for the probation revocation petition was the failure of the Company's leadership to take appropriate action on environmental compliance, and not any specific incident or incidents on a ship.  Media coverage of the recent Court hearings and the now-public CAM reports has focused on reports of violations, such as discharges or air emissions.  Such incidents are an understandable source of

---

[1] Capitalized and abbreviated terms in this Preliminary Statement take the definitions provided in the remainder of this Report.

July 3, 2019

public concern.  But to address these repeated violations, the Court has made clear that its focus
is on rectifying the failures at the highest levels of the Company to embrace compliance and
support the ships.  As the Court stated, "I am interested in . . . evidence of systemic inability to
follow through on the commitment that this company made.  I don't think the company at the
senior level . . . sees this other than something that the lower-level guys will take care of.  And
until I see that commitment, I'm going to do the best that I can to get the company's attention."
Status Conference Tr. at 5-6 (Apr. 10, 2019).  The Government echoed this view, noting that
"[t]he reason that we're here is not because of the rank-and-file employees, it's not because of
ship-board employees making a mistake, or even an act of pollution.  We're here because [] at
the very senior-most levels of this corporation there was not a commitment to compliance equal
to the other commitments that the company has that would place compliance first."  Settlement
Hearing Tr. at 22 (June 3, 2019).

A range of Company executives were present at the June 3 hearing to hear this message.
The Court ordered that the three members of the Executive Committee of the Company's Board
of Directors attend the hearing in person.  However, it was apparently the decision of the
Company's President and CEO to have over a dozen executives present, including Presidents and
CEOs of the Company's operating lines and brands, and members of the Company's Board of
Directors.  This was a notable step by the President and CEO—to have almost the entire
leadership of the Company from around the world present to hear directly from the Court, and to
witness his own acceptance of responsibility.

At the hearing, the CEO told the Court that "[w]e've heard your call to action, we really
have."  *Id.* at 94.  What remains to be seen, not only by the Court and the Parties but also by the
Company's many thousands of employees, is whether the Court's message has truly been

July 3, 2019

received and will result in meaningful change.  The CAM believes that the Company has the talent, skill, and dedication among its workforce to be a leader on environmental compliance.  It is up to the Company's leadership to provide employees with the support and resources they need to succeed.

The Court has indicated that it would have little patience for delays or additional chances, given that the Company has been on notice about the need to improve its environmental performance for decades.  This case is neither the Company's first environmental criminal conviction, nor its first court-mandated environmental compliance program.  As the Court stated at the June 3 hearing, "what's terrifying to me is, I feel like we're starting at square one, and this has been going on since when, 1993 . . . I hope you all appreciate that . . . we're not starting at the point of we just entered into the plea agreement.  We're way passed that."  *Id.* at 65.

## II.   EXECUTIVE SUMMARY

Consistent with the Court's Order of April 26, 2018, Dkt. No. 66, the Court Appointed Monitor ("CAM") submits this second annual Environmental Compliance Plan ("ECP") report ("CAM Second Annual Report" or "Report").[2]  This Report focuses on events and developments

---

[2] Any terms not defined in this Report take the definitions provided in the ECP, Joint Glossary of Terms, Dkt. No. 58-1, or prior CAM reports.  The CAM has submitted the following reports: (1) First Annual Report of the Court Appointed Monitor (2017-2018) (June 21, 2018) ("CAM First Annual Report"), Dkt. No. 105; (2) Quarterly Report of the Court Appointed Monitor (September 2018) (Sept. 21, 2018) ("CAM September 2018 Quarterly Report"), Dkt No. 114; (3) Quarterly Report of the Court Appointed Monitor (December 2018) (Dec. 18, 2018) ("CAM December 2018 Quarterly Report"), Dkt. No. 115; and (4) Quarterly Report of the Court Appointed Monitor (April 2019) (Apr. 2, 2019) ("CAM April 2019 Quarterly Report"), Dkt No. 116.

July 3, 2019

during ECP Year Two:  April 19, 2018 through April 18, 2019.[3]  However, certain notable developments since the end of ECP Year Two are included below.

### A.    Overview of the Current Case

On December 20, 2016, Princess Cruise Lines ("Princess"),[4] the defendant in this case, pleaded guilty to seven felony counts arising out of vessel pollution from oily waste water discharges and efforts to conceal that pollution carried out on the *Caribbean Princess* from 2005-2013:  one count of conspiracy; four counts of failure to maintain accurate records; and two counts of obstruction of justice.  *See* Dkt. No. 30; *see also* CAM First Annual Report at 8-11 (providing an overview of the factual and legal background of the current case).  On April 19, 2017, this Court sentenced Princess to pay a $40 million criminal penalty and community service payment, and to serve a five-year term of probation.  *See* Dkt. No. 30.  Among the Special Conditions of Supervision, Princess and Carnival Corp. must fund, implement, and abide by an ECP for five years.  *See id.*  The terms of the ECP apply to the Company's ships authorized to operate in United States waters ("Covered Vessels"[5]), *see* ECP §§ I.A, I.D, and XI, and to

---

[3] ECP Year One was April 19, 2017 through April 18, 2018.  ECP Year Three will be April 19, 2019 through April 18, 2020.

[4] Princess is a wholly-owned indirect subsidiary of Carnival Corporation & plc ("Carnival Corp.").  Carnival Corp. is structured to include four operating lines that each operate one or more brands:  (1) Carnival Cruise Line, which manages the Carnival Cruise Line brand; (2) Carnival UK, which manages the Cunard and P&O Cruises UK brands; (3) Costa Group, which manages the Costa Cruises ("Costa") and AIDA Cruises ("AIDA") brands; and (4) Holland America Group, which manages the Princess, Holland America Line, Seabourn, and P&O Australia brands.  Carnival Corp. also has an office in Miami, Florida, that houses the Company's All Brands Group, a corporate umbrella group that oversees all of the Company's operating lines and brands (collectively, the operating lines, brands, and All Brands Group are the "Company").  *See* CAM First Annual Report at 1.

[5] The list of Covered Vessels has changed throughout the ECP period.  As of April 18, 2019, there were seventy-two Covered Vessels spanning eight of the Company's brands:  twenty-six for Carnival Cruise Line; seventeen for Princess; fifteen for Holland America Line; five for

July 3, 2019

shoreside and shipboard employees involved with the operation and technical management of those ships ("Covered Personnel"). *See* ECP §§ I.B and I.D. The Company also must retain an outside independent third party auditor ("TPA")[6] and fund a CAM[7] to report to the Court and the Interested Parties.[8] *See* Dkt. No. 30. The role of the CAM is to "monitor [the Company's] compliance with this ECP." ECP § VI.A. The Court has also charged the CAM with overseeing both the external TPA audit function, *see* ECP §§ VI.F.1-3, and the Company's internal audit function, *see* ECP § VI.F.4-5, which is housed in Carnival Corp.'s Risk Advisory and Assurance Services ("RAAS") department.

On June 3, 2019, the President and CEO of Carnival Corp. pleaded guilty on behalf of the Company to six violations of the terms and conditions of probation. *See* Dkt. No. 137 (Paperless Minute Entry). The violations related to: (1) conducting an undisclosed ship visit program to prepare ships shortly in advance of TPA audits; (2) conducting an undisclosed ship visit program after the Court had disapproved of the prior undisclosed ship visit program;[9] (3) a continuing failure to provide the Corporate Compliance Manager with the requisite authority to implement

---

Seabourn; three for AIDA; three for P&O Cruises UK; three for Costa; and three for Cunard. *See* PCL_ECP00121819-24.

[6] The TPA is ABSG Consulting Inc. ("ABSG"), an advisory and technical services provider for the marine and other sectors.

[7] The CAM is Steven P. Solow, a partner at the law firm Katten Muchin Rosenman LLP ("Katten"). The CAM retained Katten and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[8] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida [("Probation Office")], the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis." ECP § I.D.

[9] These undisclosed ship visit programs have been discussed in detail in prior CAM reports. *See* CAM First Annual Report at 73-74; CAM September 2018 Quarterly Report at 29-30; CAM December 2018 Quarterly Report at 28; CAM April 2019 Quarterly Report at 41-52 (discussing findings resulting from the CAM Team's review of these ship visit programs).

the ECP; (4) falsifying training records on two ships during ECP Year One; (5) contacting

officials of the United States Coast Guard seeking agreement with the Company's position on the

definition of an ECP term, outside of the specified protocol for modifying the ECP; and

(6) illegally discharging plastic mixed with food waste in Bahamian waters and failing to

accurately record the discharge in the ship's records.  *See Proposed Agreement For The Court's*

*Consideration Resolving Superseding Petition For Summons For Offender Under Supervision*

*Dated April 26, 2019,* Dkt. No. 134 at 10-11, attached to this Report as Attachment 1; *see also*

*infra*, Part V.B.1 (discussing the probation violations).

      The Court accepted an agreement between the Government and the Company to resolve

the probation violations that includes:  the payment of a $20 million criminal penalty; the

issuance of a statement to employees by Company leadership personally accepting responsibility

for the probation violations, *see Important Message from Chairman Micky Arison and CEO*

*Arnold Donald* (July 1, 2019) (stating that "Chairman Arison, Mr. [Stuart] Subotnick and I

[Arnold Donald] take full responsibility for these violations"); enhanced CAM and TPA

oversight, including additional visits and/or audits;[10] restructuring of the Company's corporate

compliance function; enhancements to the Company's policies for reporting regulatory

violations; other enhanced reporting requirements; and improvements to the Company's waste

management practices.  *See* Dkt. No. 134 at 1-8 (proposed agreement); Dkt. No. 143 (Order

accepting agreement).  On July 1, 2019, the Company submitted to the Court an interim report

on its progress toward meeting the requirements of the agreement.  *See Interim Progress Report*

*on Probation Settlement Goals* (July 1, 2019).

---

[10] As discussed below in Part III.B.1, the TPA conducts ship and shoreside *audits*, while the
CAM Team conducts ship and shoreside *visits*.

July 3, 2019

### B.     Overview of this Report

The Court tasked the CAM with serving as its "eyes and ears" within the Company and to provide the "big picture" of the Company's compliance efforts.  Status Conf. Tr. at 16 (Oct. 18, 2017); Status Conf. Tr. at 45 (Dec. 4, 2017).  The TPA's reports provide a more granular review of ship and shoreside audit findings related to ECP requirements.

Part II.C of this CAM Second Annual Report summarizes the CAM's findings for ECP Year Two on the Company's "capabilities to meet the objectives of this ECP."  *See* ECP § VI.F.3.b.  Part III provides additional background, including:  (1) legal background and context for the current criminal case, including prior vessel pollution cases, the Court's oversight in the current case, and other legal proceedings involving the Company arising since the start of the ECP; and (2) an overview of the CAM Team's methodology and activities during ECP Year Two, including its oversight of the TPA external audit function and the RAAS internal audit function.  Parts IV and V then describe the CAM's findings for ECP Year Two in greater detail, both in Part IV as to the Company's progress toward meeting ECP objectives, and in Part V as to unresolved barriers and opportunities for improvement.  Next, Part VI addresses environmental incident data collection and describes the CAM's focus on broader corporate leadership and culture issues.  Part VII evaluates the performance and independence of the external TPA audit function, while Part VIII evaluates the Company's internal RAAS audit function.  Finally, Part IX identifies areas of focus for the CAM in ECP Year Three.[11]

---

[11] The CAM provided the Company and the United States Department of Justice ("DOJ") a copy of this CAM Second Annual Report in advance of its submission and received comments from both parties.  The CAM took these comments into account; however, the comments did not alter the substance of the Report.

July 3, 2019

### C.    CAM ECP Year Two Findings

For ECP Year Two, the CAM makes the following findings on the Company's capabilities to meet ECP objectives and attain continuous improvement.  *See* ECP § VI.F.3.b. These findings are based on the CAM Team's activities during ECP Year Two, which included: visits to more than forty ships, shoreside offices, and sites; interviews and discussions with hundreds of employees, both ship and shore; and reviews of thousands of documents.  *See infra*, Part III.B (discussing the CAM Team's methodology and activities during ECP Year Two). These findings also build upon findings and observations from ECP Year One.[12]

The CAM's findings are based on multiple sources of support and corroboration, such as views expressed by a large number of employees across operating lines or brands, or documentation of similar findings in the Company's own studies, surveys, and assessments—including the investigations process assessment, Holland America Group human factors study, Fleet Engineering Survey, and Operational Excellence training course participant feedback survey, all discussed throughout this Report.

The CAM relies throughout this Report on information gathered from Company employees.  **The CAM is careful to protect the anonymity of communications made in**

---

[12] The CAM First Annual Report made twelve findings for ECP Year One.  *See* CAM First Annual Report at 3-5; CAM September 2018 Quarterly Report at 2-4.  The CAM's findings related to the Company's progress were:  (1) no repeat of the underlying offense; (2) substantial implementation of enumerated ECP Year One requirements; (3) qualified and dedicated compliance personnel; (4) employee cooperation and awareness of environmental obligations; (5) initiatives beyond the enumerated ECP requirements; (6) CSMART training center; (7) review and improvements to the internal investigations process; and (8) agreement to conduct an environmental compliance culture survey.  The CAM's findings related to unresolved barriers and opportunities for improvement were:  (1) challenges of the complex corporate structure, including failure to give the Corporate Compliance Manager authority to ensure implementation of the ECP; (2) presence of a blame culture and lack of a learning culture; (3) ineffective internal investigations; and (4) environmental and ECP violations.  *See* CAM First Annual Report at 3-5.

July 3, 2019

**confidence to the CAM or the CAM Team**.  Citations to interviews with Company employees

do not identify the employee(s) interviewed, and are referred to as "Employee Interview Notes."

 1. <u>CAM Findings:  Progress</u>

The CAM's findings related to the Company's progress regarding ECP objectives are:

(1) **No Repeat of the Underlying Offenses.**  As in ECP Year One, the CAM is not aware of any Covered Vessels that have repeated the misconduct that occurred on the *Caribbean Princess* and gave rise to the Company's conviction.  Specifically, there were no known instances during ECP Year Two where employees on a Covered Vessel intentionally bypassed pollution prevention equipment to discharge oily waste water coupled with falsification of records and conspiracy to conceal such illegal acts.  But, as discussed below under Unresolved Barrier Finding #2 ("Environmental and ECP Violations"), other types of prohibited discharges and record falsifications or potential falsifications have continued to occur.

(2) **Continuing Efforts to Comply with the ECP and Other Legal Requirements.**  The Company's employees have undertaken tremendous efforts to comply with the ECP and other legal requirements, including: working to implement a complex array of environmental requirements; cooperating and engaging with the CAM Team; and being willing to raise compliance issues and concerns.  The Company's Corporate Compliance Manager and Operating Line Compliance Managers continue to display a commitment to environmental compliance, and to spearhead efforts to improve the efficiency and effectiveness of the ECP.  The Company also continues to develop and implement numerous initiatives that go beyond the enumerated ECP requirements.

(3) **Efforts to Understand the Causes of Continuing Challenges.**  The Company has undertaken efforts to better understand the causes of some of its continuing environmental compliance challenges, both in response to CAM findings and in response to the Company's own identification of similar issues or challenges.  These efforts include:  (1) creating a new internal investigations group, called the Incident Analysis Group, and related efforts designed to improve the Company's internal investigations program; (2) retaining an outside corporate compliance consultant to advise the Company on how to best improve its corporate compliance program and corporate governance structure; and (3) the commissioning by Holland America Group of a study by a third-party consultant on the human factors (*e.g.*, workload, training, communication, and culture) that may contribute to prohibited discharges from ships.

July 3, 2019

(4)    **Development and Implementation of an Environmental Compliance Culture Survey of More Than Seventy Thousand Employees.**  The Company has supported the efforts of the CAM's independent consultant to develop and implement a survey to assess both the strengths and the opportunities for improvement in the Company's environmental compliance culture.  The survey was, to the best of the CAM's knowledge, a first-of-its-kind effort within the maritime industry.  The survey closed with a final participation rate of approximately 79% (over seventy thousand respondents).  The Corporate Compliance Manager, his Working Group, and hundreds of Company personnel supported this accomplishment.

(5)    **Strong Relationship with Global Talent Partners Provides a Unique Opportunity to Develop a More Diverse Officer Corps.**  The Company appears to have strong relationships with the agencies, referred to in this Report as Global Talent Partners, that it uses to recruit and train many of the non-officer crew members on its ships.[13]  The Company has unique opportunities to leverage these existing relationships to:  address staffing shortfalls through the development of a more diverse officer corps; enhance HESS-related training; and address cultural barriers to "speaking up," or raising compliance concerns or complaints to supervisors.

    2.    <u>CAM Findings:  Unresolved Barriers and Opportunities for Improvement</u>

The CAM's findings of unresolved barriers and opportunities for improvement are:

(1)    **Environmental Compliance is Not Adequately Supported at the Highest Levels.**  The Company's leadership has now admitted that it failed to adequately support environmental compliance.  This failure of the Company's leadership was at the core of the probation revocation petition.  It is reflected by a "tone at the top" that does not emphasize environmental compliance in its communications of core values, ethical standards, or the criteria used for employee incentive programs.  It is also evidenced in the Company's failure to commit adequate resources and support toward environmental compliance, including its failure to provide the Corporate Compliance Manager with the requisite authority and resources to implement the ECP.

In addition, at the Court's direction, the CAM Team reviewed the Company's strategic planning processes.  This review revealed that the

---

[13] Recently, Holland America Group has sought to move from calling these businesses "manning agencies" to "Global Talent Partners," to shift from an overtly gendered nomenclature to one that focuses on the notion that the individuals hired from these agencies provide needed skills or talent, and that the agencies are partners in the Company's efforts.  In support of that effort, this Report adopts that term.

July 3, 2019

Company's processes are strong, but are not integrated with, and do not effectively support, environmental compliance. The Company's strategic planning approach to financial goals appears to be well-understood and well-structured across the operating lines and brands. In contrast, its approach to Health, Environmental, Safety, & Security ("HESS") compliance appears to be inconsistent and lacking an overarching strategy.

(2)   **Environmental and ECP Violations.** During ECP Year Two, the Company continued to violate environmental laws and the ECP. This included the probation violations to which the Company recently pleaded guilty: (1) an illegal discharge of plastic mixed with food waste and failure to properly record the discharge, an incident that is symptomatic of broader food waste management challenges across the Company's operating lines and ships; (2) a continuing failure to give the Corporate Compliance Manager the requisite authority to implement the ECP; and (3) other violations related to undisclosed ship visit programs, falsification of training records during ECP Year One, and improper communications with United States Coast Guard officials.

In addition, the Company had numerous other incidents on Covered Vessels during ECP Year Two that violated environmental laws and/or the ECP, including: (1) prohibited discharges of various waste streams, including discharges into protected areas such as marine sanctuaries and Alaskan waters; (2) falsification or potential falsification of records; and (3) other incidents related to issues such as air emissions, discharges to the sea (in addition to those discussed above), Environmental Control System program requirements,[14] pollution prevention equipment maintenance and operation, and recordkeeping.

The CAM continues to appreciate the opportunity to serve the Court in this matter. As in ECP Year One, the CAM could not have performed his work during ECP Year Two without the extensive support and cooperation of the Company's employees, both ship and shore. The CAM recognizes the significant efforts undertaken by the Company's employees to implement the ECP. The leadership and culture issues

---

[14] The Environmental Control System program requires the control (*e.g.*, installation of seals, locks, or welds) of certain vulnerable points on ships that could be used to make an unauthorized overboard discharge. *See* ECP § IX.B; CAM First Annual Report at 14, 52-53; *infra*, Part IV.B.4.ii.

July 3, 2019

discussed in this Report, as well as in prior CAM reports, remain the Company's most significant barriers to creating a sustainable compliance culture.

## III.   BACKGROUND

### A.   Legal Background and Context

1.   Prior Vessel Pollution Cases and Court-Imposed Compliance Programs

As discussed in the CAM First Annual Report, this case arose against a backdrop of numerous prior vessel pollution prosecutions and court-imposed compliance programs.[15]  *See* CAM First Annual Report at 6-8 (discussing history of vessel pollution cases); *id.* at 8-11 (discussing history of the current case); *id.* at 12-13 (providing an overview of the regulatory regime in which cruise ship companies operate).  Indeed, other Company entities have pleaded guilty in the past to felony charges for conduct similar to that in the present case.  *See id.* at 7-8 (discussing the Company's prior environmental criminal convictions and court-mandated compliance programs).  As the Court recently emphasized, "[t]he Defendant is a criminal. It is a recidivist criminal."  Status Conf. Tr. at 4 (Apr. 10, 2019).

2.   Court Oversight and CAM Reports

As part of its oversight of the Company's compliance with the ECP and other conditions of probation, the Court ordered the Company and the Government (collectively, the "Parties"), as well as the Probation Office, the CAM, and the TPA, to hold quarterly Status Conferences with the Court.  *See* Dkt. No. 54.  The Court also ordered the Parties to file Status

---

[15] These prosecutions have involved violations of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), an international environmental treaty implemented in the United States by the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901-12, and associated criminal offenses, such as obstruction of justice, 18 U.S.C. § 1505, false statements, *id.* § 1001, and conspiracy, *id.* § 371.

Reports prior to each quarterly Status Conference.  *See id.*  Status Conferences were held on: October 18, 2017, December 4, 2017, and April 3, 2018, during ECP Year One; and July 11, 2018, October 3, 2018, and April 10, 2019, during ECP Year Two.  In addition, on June 3, 2019, a hearing was held on the Parties' proposed agreement resolving the probation revocation petition.

At the April 3, 2018, hearing, the Parties, the CAM, and the Court agreed that the CAM would prepare CAM Quarterly Reports beginning with the first quarter of ECP Year Two, in addition to the CAM Annual Reports required by the ECP.  *See* Dkt. No. 66; ECP § VI.F.3.  The CAM submitted Quarterly Reports on:  September 21, 2018, for the first quarter of ECP Year Two; December 18, 2018, for the second quarter of ECP Year Two; and April 2, 2019, for the third quarter of ECP Year Two.  Annual Reports, as opposed to Quarterly Reports, are prepared at the conclusion of each year of the ECP.  Therefore, this CAM Second Annual Report also serves as the report for the fourth quarter of ECP Year Two.  The CAM's next Quarterly Report is due by September 18, 2019, for the first quarter of ECP Year Three.  *See* Dkt. No. 66.

On April 10, 2019, immediately following the Status Conference held on that date, the Court ordered that the CAM First Annual Report be filed in the public record.  *See* Dkt. No. 104.  On May 1, 2019, the Court ordered that prior and future CAM Quarterly Reports also be filed in the public record.  *See* Dkt. No. 113.

3.     Other Legal Proceedings Arising Since the Start of the ECP

Other legal proceedings involving the Company have arisen since the start of the ECP, including:  (1) an administrative agreement between Princess and the United States Department of the Interior ("DOI") regarding suspension and debarment; and (2) a criminal guilty plea by

July 3, 2019

Princess to a violation of the New Zealand Maritime Transport Act in connection with a workplace fatality incident.[16]

> *i.*   *Princess Administrative Agreement with DOI*

On August 31, 2018, DOI entered into an administrative agreement with Princess to resolve concerns raised by the April 2017 felony criminal convictions in this case.   *See In the Matter of: Princess Cruise Lines, Ltd.*, Administrative Agreement, DOI Case No. OI-AI-18-0829-E (Aug. 31, 2018).   Specifically, the agreement seeks to address the conditions under which Princess could be excluded from contracting with the federal government as a result of the convictions.   *See id.* at 1.   Since 1968, Princess has had concession contracts with DOI National Park Service to operate cruise ships in Glacier Bay National Park and Preserve, Alaska.   *Id.*

The agreement requires that Princess "comply in full with the terms and conditions of probation [in this case], including the Special Conditions of Supervision."   *Id.* at 3.   It also requires, among other things, that Princess include DOI on all communications to the Interested Parties and notify DOI within ten days if the Court finds Princess in violation of the Special Conditions of Supervision.   *Id.*   If there is a material breach of the agreement by Princess, DOI may initiate suspension and/or debarment proceedings against Princess.   *Id.* at 4.[17]   Such

---

[16] In addition, on November 26, 2018, the Captain of a non-Covered P&O Cruises UK ship and Carnival Corp. were collectively fined €100,000 by the Criminal Court of Marseilles for burning fuel in the port of Marseilles with a higher sulfur content than allowed under European Union law.   *See P&O Cruises Captain Fined for Air Pollution*, https://worldmaritimenews.com/archives/266013/po-cruises-captain-fined-for-air-pollution/.

[17] Suspensions and debarments "are administrative remedies used to prevent the Government from working with parties who are not 'presently responsible' – i.e., those that have engaged in criminal or other improper conduct of such a compelling and serious nature that it would lead one to question their honesty, ethics, or competence.   Federal agencies, exercising their inherent authority as consumers of good and services, lessors, or awarding officials, use these remedies to prevent non-responsible parties from obtaining new Federal contracts and certain subcontracts (procurement) or discretionary assistance, lease, loan, or benefit program (nonprocurement) awards."   DOI, *Suspension and Debarment: Frequently Asked Questions*, *available at*

July 3, 2019

proceedings could put at risk Princess's concession contracts with DOI National Park Service, as well as other current or future contracts with the federal government.

        ii.    *Princess Criminal Guilty Plea to Violation of New Zealand Maritime Transport Act*

On June 28, 2018, Princess pleaded guilty to a criminal charge filed by Maritime New Zealand "in connection with an incident that led to the death of a crewmember when a high-pressure nitrogen cylinder burst while being re-pressurized." Letter from C. Donald, *Re: Emerald Princess Notice Update* (June 28, 2018), PCL_ECP00053339-41. Specifically, Princess pleaded guilty to "caus[ing] or permit[ting] a maritime product, namely a pressurised nitrogen cylinder forming part of a lifeboat davit stored energy system, to be maintained or serviced in a manner that caused unnecessary danger or risk to other people," in violation of the New Zealand Maritime Transport Act. *Id.* at PCL_ECP00053339; PCL_ECP00053342-45.

### B.    CAM Team Methodology and Activities

The CAM Team's planned methodology and activities for ECP Year Two were outlined in the Second Annual Work Plan and Budget of the Court Appointed Monitor ("Second Annual Work Plan"). *See* CAM September 2018 Quarterly Report at 6-8 (discussing the work plan in detail); *id.* at Attachment 1 (copy of work plan). The CAM Team's work streams included: ship visits; shoreside facility visits; interviews, site visits, and events; document and data review; reporting; compliance culture assessment (*i.e.*, the Environmental Compliance Culture Survey, discussed below in Part IV.D); and review and analysis of the Company's undisclosed ship visit programs. *See* Second Annual Work Plan at 3-17. In addition, the CAM Team continued to evaluate the external TPA audit function and the internal RAAS audit function.

---

https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/FAQ_Suspension%20and%20Debarment%20%20with%20color%20logo.pdf.

The Second Annual Work Plan also included a plan, developed and conducted in coordination with the TPA, for performing ten additional ship and five additional shoreside facility visits and/or audits during ECP Year Two, in addition to those originally anticipated by the ECP, as ordered in the Court's Order of July 13, 2018. *See id.*; Dkt. No. 75. The Court ordered these additional visits and audits out of concern that the Company's efforts to send teams to ships in advance of TPA audits during ECP Year One had resulted in a "taint" on the ability of these audits to provide a reliable benchmark to the Court of current ship conditions. *See* Status Conf. Tr. at 11 (July 11, 2018). The Court also ordered that future ship visits and audits by the CAM Team and TPA be unannounced. *See* Dkt. No. 75; Dkt. No. 78; CAM September 2018 Quarterly Report at 8. Further, the Court instructed the CAM to examine the Company's strategic planning processes, including "how environmental compliance has been made part of those [strategic] plans and how protection of the environment is being incorporated as a priority into the companies' strategic plans and culture in a long-term, sustainable manner." Dkt. No. 75 at 3. The additional shoreside facility visits performed by the CAM Team during ECP Year Two were consistent with this direction from the Court, as discussed below in Part V.A.2.

        1.    <u>CAM Team Visits</u>

In accordance with the Second Annual Work Plan and the Court's Order of July 13, 2018, the CAM Team performed the following ship, shoreside office, and site visits during ECP Year Two:

- Twenty-four ship visits, including:
  - Seventeen CAM Team-only visits;
  - Three TPA audit ride-along visits;
  - Three RAAS audit ride-along visits;

July 3, 2019

  - One visit, jointly with the TPA, in response to an incident notice.  *See* CAM December 2018 Quarterly Report at 6-8 (discussing the incident in detail); and

  - Other brief (less than one day) tours or familiarization visits on Company ships with Company representatives, including one visit joined by members of the Court and Interested Parties.  *See* CAM September 2018 Quarterly Report at 9; CAM April 2019 Quarterly Report at 15, n.11.

- Three shoreside office visits conducted with the TPA or RAAS.  During these visits, the CAM Team performed a limited number of CAM Team-only interviews:

  - One TPA audit attended by the CAM Team; and

  - Two RAAS audits attended by the CAM Team.

- Six CAM Team-led shoreside office visits focused on issues related to strategic planning and budgets.  These visits were conducted with AlixPartners, the CAM's forensic accounting consultant, and a TPA representative.

- Various additional site visits and Company conferences, meetings, and other events, including:

  - Six visits on two separate trips to Global Talent Partners in the Philippines and Indonesia that the Company uses to recruit and train non-officer crew members.  *See infra*, Part IV.E;

  - Two visits to Almere, Netherlands, to both:  (1) attend Environmental Commitment Conferences that brought together Environmental Officers from across the fleet with shoreside environmental compliance, environmental operations, technical, and training personnel, *see infra*, Part IV.B.5.ii; and (2) attend courses at the Company's CSMART training center.  *See infra*, Part IV.B.5.i;

  - One subject matter expert workshop in Seattle, Washington, regarding efforts to improve the Environmental Control System program.  *See infra*, Part IV.B.4.ii;

  - One presentation given to the Interested Parties on February 19, 2019, by the Company's outside counsel in Miami, Florida, regarding the Company's undisclosed ship visit programs.  This presentation was joined by the CAM Team and the TPA.  *See* CAM April 2019 Quarterly Report at 41-52;

  - One meeting with Company representatives, including the Corporate Compliance Manager, Operating Line Compliance Managers, and Operating Line Training Managers, in Ft. Lauderdale, Florida, regarding the role of Operating Line Training Managers.  *See* CAM December 2018 Quarterly Report at 31, 36; and

July 3, 2019

  o One meeting with the HESS Committee of Carnival Corp.'s Board of Directors in Los Angeles, California, to discuss, among other things, the findings of the CAM First Annual Report.  *See* CAM December 2018 Quarterly Report at 4.

In addition to these visits, the CAM's retained maritime culture expert conducted focus groups on multiple ships and at multiple shoreside facilities for the Environmental Compliance Culture Survey.  *See* CAM April 2019 Quarterly Report at 15, n.11.  The CAM Team did not attend these meetings in order to preserve the independence of the analysis and review of the survey results.

When the CAM Team conducts its visits, it does not perform audits.  The TPA does perform audits, as directed by the ECP.  *See* ECP §§ VIII-IX.  The CAM Team's role is to assess broader issues related to environmental compliance and to gauge support for, and barriers to, a sustainable compliance culture.  To make these assessments, the CAM Team reviews engineering, training, organizational, and procedural records and requirements.  CAM Team members also speak with a wide range of employees.  During visits to shoreside offices, the CAM Team speaks with:

- CEOs, Presidents, and other senior executives;

- The Corporate Compliance Manager, Operating Line Compliance Managers, and Operating Line Training Managers; and

- Other maritime, finance, accounting, human resources, training, compliance, operations, and technical personnel.

During ship visits, the CAM Team speaks with:

- Environmental Officers;[18]

---

[18] The ECP requires an Environmental Officer to be onboard each Covered Vessel and specifies their roles and responsibilities, qualifications, training requirements, and reporting lines.  *See* ECP § IV.A.

- Other members of a ship's leadership team, such as the Captain,[19] Staff Captain,[20] Chief Engineer,[21] Staff Chief Engineer,[22] Hotel Director, Human Resources Director, and Food & Beverage Director;

- Other engineering officers and personnel, including refrigeration engineers, electricians, and engine room ratings;[23]

- Other deck (also called bridge) officers and personnel, including navigational officers;[24]

- Other safety, security, and training officers and personnel; and

- Other non-officer crew members, such as cabin stewards, restaurant servers, and galley/kitchen staff (*e.g.*, food preparers and dishwashers).

2.   Other CAM Team Activities

Outside of visits to ships, shoreside offices, and sites, the CAM Team has continued to:

communicate frequently with the Corporate Compliance Manager team; work with the Company

on the Environmental Compliance Culture Survey; and conduct additional formal and informal

interviews and communications with Company personnel, including receiving confidential

---

[19] The Captain, sometimes called the Master, is "the person having command of a ship."  *See* International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, *as amended*, Annex, Ch. 1, Reg. I/1.3.

[20] The Staff Captain is "the officer next in rank to the master and upon whom the command of the ship will fall in the event of the incapacity of the master."  *Id.* at Reg. I/1.6.

[21] The Chief Engineer is "the senior engineer officer responsible for the mechanical propulsion and the operation and maintenance of the mechanical and electrical installations of the ship."  *Id.* at Reg. I/1.8.

[22] The Staff Chief Engineer is "the engineer officer next in rank to the chief engineer and upon whom the responsibility for the mechanical propulsion and the operation and maintenance of the mechanical and electrical installations of the ship will fall in the event of the incapacity of the chief engineer officer."  *Id.* at Reg. I/1.9.

[23] Ratings are members of a ship's crew other than the Captain or an officer.  *See id.* at Reg. I/1.13.  Engine room ratings include wipers, motormen, plumbers, and fitters.

[24] The bridge of a ship is the area from which the ship is commanded and where navigational equipment is housed.  *See* MI News Network, *10 Types of Decks Every Seafarer Should Know* (Oct. 9, 2017), https://www.marineinsight.com/marine-navigation/10-types-of-decks-every-seafarer-should-know/.

communications from Company employees at almost every level, from ratings to executives. The CAM Team has also: remained in regular communication with the TPA and the Interested Parties; performed ongoing review of documents produced by the Company; and reported to the Interested Parties and the Court as required by the ECP.

### 3. Oversight of the External Audit Function (TPA)

The CAM Team has continued to communicate regularly with the TPA (including phone conferences and in-person meetings), review TPA audit reports, and evaluate the adequacy and independence of the TPA through both observations during ride-along ship and shoreside facility visits and interviews with Company employees who have interacted with the TPA auditors. Part VII of this Report provides an assessment of the TPA's activities.

### 4. Oversight of the Internal Audit Function (RAAS)

The CAM Team has continued to review RAAS audit reports and evaluate the effectiveness of RAAS audits through both observations during ride-along ship and shoreside facility visits and interviews with Company employees who have interacted with RAAS auditors. Part VIII of this Report provides an assessment of RAAS's audit activities.

## IV. UPDATES ON COMPANY CAPABILITIES TO MEET ECP OBJECTIVES: PROGRESS

### A. No Repeat of the Underlying Offenses

The CAM is not aware of any evidence of a recurrence on any of the Company's Covered Vessels during ECP Years One or Two of the same criminal conduct that occurred on the *Caribbean Princess*. Based on the CAM Team's ship and shoreside facility visits and interviews, review of TPA and RAAS audit reports, and assessment of environmental incident reports, there has been no observed evidence of employees on a Covered Vessel intentionally

bypassing pollution prevention equipment to discharge oily waste water coupled with falsification of records and conspiracy to conceal such illegal acts.

However, there have been continued violations of environmental laws and the ECP, including numerous instances of prohibited discharges and at least three instances of record falsification or potential falsification.  *See infra*, Part V.B.

### B.      Continuing Efforts to Comply with the ECP and Other Legal Requirements

The Company's employees have undertaken tremendous efforts during ECP Years One and Two to comply with the ECP and other legal requirements.  These ongoing efforts include: working to implement a complex array of environmental requirements; cooperating and engaging with the CAM Team; and being willing to raise issues related to ECP implementation and environmental compliance.  In addition, the Company's Corporate Compliance Manager and Operating Line Compliance Managers continue to display a commitment to environmental compliance, and to spearhead efforts to improve the efficiency and effectiveness of the ECP. The Company also continues to develop and implement a number of initiatives that go beyond the enumerated ECP requirements.

### 1.      Employee Efforts to Comply with Environmental Requirements

As discussed in the CAM First Annual Report, cruise ship companies operate within a complex regulatory regime and face unique operating and environmental compliance challenges.

July 3, 2019

*See* CAM First Annual Report at 12-13.  Akin to floating cities, cruise ships generate a number of regulated waste streams, including:

- Air emissions;

- Ballast water, which is sea water that is pumped in and out of tanks to stabilize ships at sea;[25]

- Black water, which is "sewage including drainage from:  toilets, urinals, medical area wash water, spaces containing animals, and other waste waters mixed with these drainages."  Dkt. No. 58-1, at 2;

- Food waste;

- Garbage, including plastics;

- Grey water, which is a "drainage from dishwater, shower, laundry, bath, wash bin basins, and the production of food.  [It does] not include drainage from toilets, urinals, hospitals, animal spaces, and cargo spaces."  *Id.* at 6;

- Oily bilge water, which is water "that may be contaminated by oil resulting from things such as leakage or maintenance work in machinery spaces."  *Id.* at 2.  Any liquid entering the bilge system (including bilge wells, bilge piping, tank top or bilge holding tanks)[26] is considered oily bilge water and must be managed and disposed of in accordance with MARPOL Annex I and other applicable regulations.  *Id.* at 2; and

- Other waste oils.

Numerous international, national, state, and local laws, permits, and other legal requirements govern environmental compliance matters.  These requirements can change regularly.  *See* CAM First Annual Report at 12-13.  In addition, the Company's own policies and procedures, including those implementing the ECP, may establish requirements that are more stringent than those set by regulatory bodies.  *See id.* at 13-14.  These can also change regularly.

---

[25]  While ballast water "is essential for safe and efficient modern shipping operations, it may pose serious ecological, economic and health problems due to the multitude of marine species carried in ships' ballast water."  *IMO, Ballast Water Management,* http://www.imo.org/en/OurWork/Environment/BallastWaterManagement/Pages/Default.aspx.

[26] Bilges are the lowest portion of a ship inside the ship hull where liquids, including oil, accumulate.  *Id.* at 1.

Moreover, cruise ships face another unique challenge:  a ship's crew will rotate on a regular

basis.  Crew members sign contracts requiring them to be onboard for anywhere from three to

ten months (on average).  Those crew members may not return to the same ship on their next

contract, or may not return to the Company at all.  The Company estimates that it hires more than

twenty thousand new employees each year.  *See* Employee Interview Notes.  Land-based

facilities that also deal with complex regulatory regimes, such as power plants or chemical

plants, do not face employee rotation or turnover rates of this magnitude or frequency.

The Company's employees, both ship and shore, have made considerable efforts toward

meeting environmental requirements during ECP Years One and Two.  In general, levels of

environmental awareness and commitment among employees during CAM Team interactions

have been high, and even more so during ECP Year Two.  Many individuals—including, but

going beyond, the Corporate Compliance Manager, Operating Line Compliance Managers, and

Environmental Officers—have exhibited a strong commitment to creating a sustainable

environmental compliance culture.  *See* Employee Interview Notes.  The Court has recognized

these efforts, observing that, along with the Corporate Compliance Manager, "the rank and file

. . . based on what the CAM has shared with me . . . have really been trying to do the best for the

company and the best for the environment.  They are focused on doing good so that the company

does well."  Settlement Hearing Tr. at 66 (June 3, 2019).

At times, these efforts have fallen short, resulting in environmental and ECP violations.

*See infra*, Part V.B.  In pleading guilty to the probation violations, the Company's leadership has,

for the first time, recognized and accepted its responsibility for these and other failures as a

product of its own failure to provide effective leadership, support, and resources for compliance.

*See* Dkt. No. 134; *see also Important Message from Chairman Micky Arison and CEO Arnold*

July 3, 2019

*Donald* (July 1, 2019) (stating that "Chairman Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these [probation] violations"); *infra*, Part V.A.

    2.  Employee Cooperation

   The CAM's ability to fulfill his broad mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, depends on the Company's cooperation in facilitating the CAM Team's access to the Company's ships, facilities, personnel, and records.  Overall, the CAM Team's visits during ECP Year Two have proceeded smoothly with high levels of cooperation and engagement from Company employees, both ship and shore.  This has included the unannounced ship visits,[27] which the Corporate Compliance Manager, along with his team and a limited number of designated reservation points of contact at each brand, has facilitated with one week or less of notice from the CAM Team.  During the unannounced ship visits by the CAM Team to date, the crew revealed no apparent advanced notice of the impending visit.  Once onboard, the ships' officers and other crew have been almost universally cooperative and accommodating (despite their busy schedules), including facilitating the CAM Team's access to ship records, personnel, and spaces such as the bridge and engine room.  Shoreside employees have been similarly helpful and generous with their time, and have responded promptly to extensive requests for information and records.  The CAM and CAM Team again express thanks for the support, cooperation, and open communication of the Company's employees.

    3.  Employee Willingness to Raise Issues

   Company employees have been willing, and often eager, to engage with the CAM Team about issues related to environmental compliance, in both formal interviews and informal

---

[27] As discussed above in Part III.B, the Court ordered in July 2018 that future CAM ship visits (as well as TPA ship audits) be unannounced.  *See* Dkt. No. 75; Dkt. No. 78.  Shoreside office and site visits have remained announced.

July 3, 2019

interactions.  Many ship crew members have offered frank assessments of what they consider to be aids, challenges, or barriers to their ability to perform their tasks, many of which relate to the level of support to the ships from shoreside management.  *See* Employee Interview Notes. Shoreside employees have likewise suggested areas of inquiry, and have been candid about positive and negative experiences with respect to the Company's approach to environmental compliance.  *See id.*  This candor is essential to identifying what is, and is not, working to support environmental compliance.

Individuals have used other means to raise issues as well, including:  hotline reports via the Company's Open Reporting System;[28] direct outreach to the Corporate Compliance Manager, Operating Line Compliance Managers, or CAM Team, including informal confidential communications to the CAM Team; and feedback during conferences and events, such as the two Environmental Commitment Conferences held during ECP Year Two.  *See* CAM September 2018 Quarterly Report at 17-18; CAM December 2018 Quarterly Report at 19-21.

The CAM's observation from the first two years of the ECP is that, despite a culture in which many employees express a fear about "speaking up" to supervisors, employees have been willing to come forward to the CAM Team to identify issues that create compliance risks and performance challenges for them.  These concerns are reflected in the findings discussed in this Report and prior CAM reports.

---

[28] The Open Reporting System is the Company's ethics and compliance reporting hotline and website.  *See* ECP § I.D.  The ECP requires the Company to maintain this system through a contractually independent organization, and to make it available on all Covered Vessels.  ECP § III.D.1.  Through this system, "shore-side and vessel personnel may anonymously report via a free website portal, independent email account, or toll-free phone number issues of non-compliance with this ECP, the [Environmental Management System], and Marine Environmental Protection Requirements."  *Id.*

July 3, 2019

Some senior managers have expressed skepticism of the CAM's findings, contending that the CAM reports on only the "bad stuff" by focusing on negative views expressed by some employees.[29]  However, as noted above in Part II.C, the CAM does not pass along each observation or complaint that is received.  The CAM Team conducts inquiry and investigation into concerns to determine whether they have substantial support before making findings.  Many of the CAM's findings are further corroborated by those in the Company's own studies, surveys, and assessments, including the investigations process assessment, *see infra*, Part IV.C.1, Holland America Group human factors study, *see infra*, Part IV.C.3, Fleet Engineering Survey, *see infra*, Part V.A.2.ii(2) and Part V.B.1.i, and Operational Excellence training course participant feedback survey.  *See infra*, Part IV.B.5.i.

4.      Continued Efforts by Qualified and Dedicated Compliance Personnel

As discussed in the CAM First Annual Report, the individuals selected for the Corporate Compliance Manager and Operating Line Compliance Manager positions have significant maritime experience and display a commitment to environmental compliance.  *See* CAM First Annual Report at 14-16.  The Corporate Compliance Manager is also supported by a dedicated, qualified, and capable team of people.  During ECP Year Two, these individuals have continued to demonstrate themselves to be knowledgeable, forthright, and committed to the goal of

---

[29] This attitude by a handful of senior managers appears to be a form of an "organizational defensive routine," which is described as "actions . . . that prevent individuals or segments of the organization from experiencing embarrassment or threat.  Simultaneously, they prevent people from identifying and getting rid of the causes of the potential embarrassment or threat.  Organizational defensive routines are antilearning, overprotective, and self-sealing."  *See* Chris Argyris, OVERCOMING ORGANIZATIONAL DEFENSES: FACILITATING ORGANIZATIONAL LEARNING 25 (1990).  The undisclosed ship visit programs, discussed below in Part V.A.1.i(2) and Part V.B.1.iii, may have been a manifestation of this same mindset.

achieving a sustainable environmental compliance program.[30]  This has included working to facilitate CAM Team visits and promoting a constructive and open attitude towards the CAM Team among both ship and shore employees.

The Corporate Compliance Manager and Operating Line Compliance Managers communicate via video or audio conference calls at least bi-weekly, and meet in person at least once per quarter.  May 2019 Probation Supervision Report, Attachment 3, at 6.  In addition, they communicate with Environmental Officers during monthly conference calls held by each of the four operating lines, which include personnel with compliance, training, and operational functions.  *Id.*  The Corporate Compliance Manager also communicates directly with Environmental Officers via the Environmental Hub online chat forum, discussed below in Part IV.B.5.vi, which is a simple and effective tool developed by the Corporate Compliance Manager. *Id.*  Although cross-brand and cross-departmental communications on environmental compliance matters have increased during ECP Year Two, some employees have indicated that there may be additional opportunities to increase the frequency and/or effectiveness of such communications. *See* Employee Interview Notes.

### i.    ECP Modifications

The Corporate Compliance Manager and his team led efforts during ECP Year Two to revise provisions of the ECP that were inefficient or ineffective in practice.[31]  To date, the

---

[30] As discussed below in Part IV.C.2, Part V.B.1.ii, and Part IX.C, however, the Corporate Compliance Manager has not been given the ECP-required "authority to ensure full implementation of [the] ECP."  ECP § III.A.2.  Questions also remain regarding whether some of the Operating Line Compliance Managers have sufficient staff and resources.

[31] The ECP provides a mechanism for the Corporate Compliance Manager to submit proposed ECP modifications in writing to the Interested Parties, who have thirty days to provide any written comments.  If no written objections are provided within the thirty day period, the modifications become effective.  *See* ECP § I.H.

July 3, 2019

Corporate Compliance Manager has submitted two sets of proposed ECP modifications to the

Interested Parties, both of which were developed in consultation with the CAM Team and TPA:

(1) one set submitted on January 10, 2019, that became effective on February 11, 2019; and

(2) one set submitted on May 3, 2019, that became effective on June 3, 2019.  The CAM

supported the modifications, and the Interested Parties did not provide any written objections.

The first set of modifications, discussed in the most recent CAM Quarterly Report,

related to:

- The requirement under ECP § IV.A.2.j that Environmental Officers conduct unannounced visits to the engine room to observe pollution prevention equipment, which was modified to reduce the uncertainty and burden associated with this task for Environmental Officers and aid the ability of the TPA to audit this requirement;

- The requirement under ECP § III.F.1 that ECP video messages from the Carnival Corp. President and CEO and operating line Presidents be released during the first quarter of each fiscal year, which was modified to allow the staggering of these video messages throughout the fiscal year; and

- Other modifications of a relatively minor nature (*e.g.*, correcting typographical errors and formally codifying existing agreed practices).

*See* CAM April 2019 Quarterly Report at 3-5 (discussing the modifications in detail).

The second set of modifications related to:

- The requirement under ECP §§ III.B.1.b-c that RAAS investigate environmental incidents on Covered Vessels and environmental hotline reports, which was modified to reflect a restructuring of the Company's incident investigations program.  As discussed below in Part IV.C.1, investigations into HESS incidents (including environmental incidents) are being conducted by a new department called the Incident Analysis Group, which is independent from RAAS;

- The requirements under ECP § IV.A.2 setting forth Environmental Officer candidate qualifications, which were modified to expand the pool of potential candidates;

- The requirements under ECP §§ IX.A-F for the Environmental Control System program, which were modified to address concerns shared by the Company, CAM, and TPA about the current program's lack of clarity, consistency, and realistic expectations.  *See* CAM April 2019 Quarterly Report at 6-9 and Attachment 3 (discussing these concerns in detail); and

July 3, 2019

- The requirement under ECP § VIII.B.h that the TPA assess machinery spaces for vulnerabilities that could lead to unauthorized discharges, which was modified to specify a risk-based approach that would not require auditors to review every single potential vulnerable point (which could number in the thousands).

*See* Letter from C. Donald, *Proposed Modifications to the Environmental Compliance Plan* (May 3, 2019), PCL_ECP00115036-40, attached to this Report as Attachment 2; Letter from C. Donald, *Attachment – Proposed Modifications to Environmental Compliance Plan (5/3/2019)* (May 3, 2019), PCL_ECP00115041-52, attached to this Report as Attachment 3; *see also* May 2019 Probation Supervision Report, Attachment 3, at 2-3.  The CAM appreciates the hard work and collaborative approach of the Corporate Compliance Manager's team and other Company personnel who provided input and feedback to make these sensible changes to ECP requirements.  These modifications were designed to create sustainable practices that could continue past the end of the probation period.

> ii.     *Efforts to Improve the Environmental Control System Program*

The Corporate Compliance Manager and his team have also led an effort to improve the implementation of the Environmental Control System program across the Company's fleet.  The program requires that certain vulnerable points (*e.g.*, pipes and valves) on ships that could be used to make an unauthorized discharge into the sea are "controlled," such as by installing seals. *See* ECP § IX.B.1 (as modified effective June 3, 2019) (requiring the Company to implement an Environmental Control System program to "deter and detect unauthorized discharge of vessel waste streams through vulnerable pipework connections").  The Company developed a methodology, referred to as a "vulnerability assessment," to identify the vulnerable points required to be controlled under the program.  *See* Environmental Compliance Notice #09-2017-A1 at 2.

July 3, 2019

When the Company began implementing the Environmental Control System program in January 2017, vulnerability assessments were overseen independently by each of the operating lines and were conducted by various external parties and Company employees who did not perform them consistently.  *See* Letter from C. Donald, *Court Appointed Monitor and Third Party Auditor Communication* (Jan. 8, 2019), PCL_ECP00086778-79.  A survey of a sample of ships at each brand, which began in August 2018, revealed that "[m]ost of the ships surveyed did not fully comply with Company procedures for the control of vulnerable connections and had deviated from the methodology that should have been utilized."  *Id.* at 1.  This led some ships to install more seals than required, "making onboard management of the program quite challenging."  *Id.*  On some ships, for instance, there were thousands of seals, "leading to an excess amount of time spent performing ECP-required inspections [*i.e.*, seal checks].  Moreover, many of the seals provide[d] little by way of value towards the goal of preventing unauthorized discharges."  CAM April 2019 Quarterly Report, Attachment 3, at 1.

To help address concerns with the Environmental Control System program, the Corporate Compliance Manager launched an Environmental Control System "get well plan."  *See Corporate Compliance Manager Annual Environmental Compliance Report* (2018-2019), PCL_ECP00110654-66 ("Corporate Compliance Manager Annual Report"), at PCL_ECP00110658.  The first phase of this plan focuses on "reducing the number of seals onboard to a manageable level that still acts as an effective means to deter and detect improper discharges."  *Id.*  As part of these efforts, the Corporate Compliance Manager added a dedicated ECP Technical Consultant to his team to, among other things, visit ships to review and assist in revising vulnerability assessments.  *See* July 2018 Probation Supervision Report, Attachment 3, at 4; CAM September 2018 Quarterly Report at 20.  The CAM understands that this process has

July 3, 2019

often resulted in significant reductions in the number of seals onboard ships, which, in turn, has reduced the workload of Environmental Officers, Chief Engineers, and others by freeing up time that would otherwise be spent on seal checks and replacement, recordkeeping, and other related tasks. *See* Employee Interview Notes; CAM April 2019 Quarterly Report at 6-9. The CAM continues to support the efforts of the Corporate Compliance Manager and his team to improve the consistency and effectiveness of the Environmental Control System program.

5.   Environmental Initiatives Beyond Enumerated ECP Requirements

The Company continues to develop and implement numerous initiatives that go beyond the enumerated ECP requirements. Many of these initiatives have been discussed in prior CAM reports. *See* CAM First Annual Report at 4, 19-21 and Appendix B; CAM September 2018 Quarterly Report at 16-17; CAM December 2018 Quarterly Report at 16-18; CAM April 2019 Quarterly Report at 26-29. Notable recent developments are summarized below.

*i.  Training Programs*

Urged on by the Corporate Compliance Manager, the Company continues to invest resources in environmental and ECP-related training, including engaging outside consultants to assist in developing new, and improving existing, training programs. *See* CAM First Annual Report at 21-23, 69-70; CAM September 2018 Quarterly Report at 25-27; CAM December 2018 Quarterly Report at 31-36; CAM April 2019 Quarterly Report at 38-40. These efforts include:

- **CSMART Training Center.** The Company owns and operates a state-of-the-art training academy in Almere, Netherlands, called CSMART, which it uses to conduct ECP-required environmental training (among other types of training) for Environmental Officers, engineers, and deck officers. *See* CAM First Annual Report at 21-23. As of May 2019, the Company has conducted over thirty "Environmental Officer 1" training courses (required for individuals in their first year as an Environmental Officer under the ECP) and over twenty "Environment Officer 2" training courses (required for individuals in their second year as an Environmental Officer under the ECP). May 2019 Probation Supervision Report, Attachment 3, at 7;

July 3, 2019

- **Environmental Excellence "EO3" Training Program**.  The Corporate Compliance Manager and his team, in collaboration with CSMART personnel and Operating Line Training Managers, recognized a need to make Environmental Officer training more interactive and innovative, and obtained the Company's approval to retain the University of West Florida to assist in developing the third-year Environmental Officer training course given at CSMART (known as "EO3" training and required for individuals in their third year as an Environmental Officer under the ECP).  *See id.* at 8.  This course, called Environmental Excellence, will be delivered as a five-day program to be held five times a year as part of hybrid "EO3/Environmental Commitment" conferences, as discussed below in Part IV.B.5.ii.  *See id.*  The program will be interactive and challenge-based, rather than the traditional lecture-based format of prior Environmental Officer training courses.  *See id.*  Environmental Officers attending these trainings will also attend the Operational Excellence course discussed below.  *Id.*;

- **Tool Box Talks**.  In January 2019, the Company began implementing a series of Tool Box Talks for shipboard engineering departments.  *See* December 2018 Probation Supervision Report, Attachment 3, at 1-2.  These talks are supervisor-led sessions that include training on various environmental and technical requirements, including the Environmental Control System program and bilge water and portable pump procedures.  The sessions are mandatory for engineering officers and ratings.  *See CCL Investigation Report Template: Carnival Ecstasy* (Dec. 15, 2018), PCL_ECP00088393-433, at PCL_ECP00088397.  The Company plans to implement similar sessions in the deck and hotel departments.  *See* Employee Interview Notes; and

- **Augmented Reality Oily Water Separator Training.**  The Company has completed pilot testing on an augmented (virtual) reality Oily Water Separator[32] training that will be delivered at CSMART.  May 2019 Probation Supervision Report, Attachment 3, at 8.  According to the Company, this training "will allow employees attending CSMART to be able to utilize an iPad with augmented reality software to gain a better understanding of the purpose, function, and features of an Oily Water Separator."  *Id.*  Its features will include:  (1) animations overlaid onto the physical equipment, showing the interior workings and flows; (2) a 3D model of the system showing how it fits into the ship's systems; and (3) a challenge mode allowing users to test their knowledge.  *Id.*

---

[32] An Oily Water Separator is a piece of pollution prevention equipment used to separate oil and water mixtures into their separate components.  Dkt. No. 58-1 at 12.  The equipment is designed to produce effluent with oil content not exceeding fifteen parts per million, as required by MARPOL Annex I.  *Id.*  An integral part of an Oily Water Separator is an Oil Content Meter, a device that measures and records the oil content in a moving stream of water to determine if it meets regulatory standards prior to discharge.  *Id.* at 8-9.

July 3, 2019

In addition, as discussed in the most recent CAM Quarterly Report, the Company retained the University of West Florida to assist in redesigning its Compliance to Commitment environmental training program, a six-hour course required for Environmental Officers, engineers, and deck officers attending CSMART.  The revamped program was launched in January 2019 under the new title of Operational Excellence.  *See* CAM April 2019 Quarterly Report at 38 (discussing criticisms of and efforts to revamp the former Compliance to Commitment course); May 2019 Probation Supervision Report, Attachment 3, at 7.

The CAM Team attended a session of the new Operational Excellence course on April 27, 2019.  The course consisted of four moderator-led modules through which participants rotated:  (1) Ownership; (2) Environment; (3) Ethics; and (4) Technology.  In general, each module (with the exception of Technology) consisted of brief videos dramatizing an environmental incident based on a real-life incident reported on a Company ship.[33]  Each video was followed by question prompts and small group discussions, with each group later sharing their responses and feedback with the room.  A second moderator recorded this feedback and provided a summary at the end of the session.  Overall, the CAM Team found the redesigned course to be responsive to criticisms over the prior course, which attendees complained was not interactive, "not a pleasant experience for either Participants or Instructors," and provided "little useful feedback from Participants on how [] violations could be avoided in the future."  *See* J. Ritchie, *Operational Excellence: The Evolution of C2C* (Jan. 14, 2019), PCL_ECP00088071-76 ("Operational Excellence Overview"), at PCL_ECP00088073.  In contrast, the CAM Team's limited observations of the new Operational Excellence course indicated that it appeared to

---

[33] The Technology module included a short lecture, interactive quiz, and mini-case study.

July 3, 2019

engage participants and prompt substantive discussions about compliance challenges and best practices.

The CAM understands that the Corporate Compliance Manager and his team, in coordination with CSMART personnel, plan to continuously evaluate and modify as needed the Operational Excellence program, and will issue quarterly reports based on feedback from participants.  The first such report was issued on April 11, 2019, based on feedback from over one-hundred-seventy sessions during the first eleven weeks of the new course.  *See* J. Ritchie, *Operational Excellence: Participant Survey Results Q1 2019* (Apr. 11, 2019), PCL_ECP00117937-42 ("Participant Survey Results"); J. Ritchie, *Operational Excellence: Participant Feedback Q1 2019* (Apr. 11, 2019), PCL_ECP00117930-36 ("Participant Feedback").  In general, participant feedback "confirm that [Operational Excellence] represents a substantial improvement upon its predecessor," but also "indicate that there are still areas where [the Company] can improve."  Participant Survey Results at PCL_ECP00117938.  Some of these areas identified for potential improvement include:  better streamlining of content (*e.g.*, less repetition); increased input and insight from shoreside personnel; and inclusion of participants from other departments beyond deck and engineering, such as shoreside or hotel personnel.  *See id.* at PCL_ECP00117938-39.

Participants also expressed a desire "to standardize culture, problem solving, process, and procedure between and among brands and increase opportunities for communication between ship and home personnel."  *Id.* at PCL_ECP00117939.  The report notes that this "indicates that there continues to be a perception of a 'silo' mentality across the corporation," and that "the number of times 'shore' is mentioned as something that needs to be addressed indicates a desire for substantial improvements to sea-shore relationships."  *Id.*  Other "common feedback items"

relate to "[p]erceptions of a blame culture and concerns about speaking up or challenging supervisors or other authorities combin[ing] to create an environment where errors or mistakes grow until there is a big issue/problem.  Underlying factors of budget/cost, staffing, workload, meeting structure, knowledge/skills, communication, rewards/bonus system, and transparency influence a complex work environment and subsequent ability of staff to respond to emergencies and abnormal events."  Participant Feedback at PCL_ECP00117931-32.  It remains to be seen how effectively the Company will respond to this feedback, or whether the new course will be successful in the goal of demonstrating that the Company is "ready to move past blame culture and autocracy towards a co-operative approach to change."  *See* Operational Excellence Overview at PCL_ECP00088073.  The Company's efforts around ECP and environmental compliance training will continue to be an area of focus during ECP Year Three.  *See infra*, Part IX.D.

### ii.    Environmental Commitment Conferences

As discussed in prior CAM Quarterly Reports, the Company held two Environmental Commitment Conferences in Almere, Netherlands, from September 11-13, 2018, and April 24-26, 2019.  The CAM Team attended both conferences.  These conferences, led by the Corporate Compliance Manager and his team, "brought together Environmental Officers from across the fleet with shoreside environmental compliance, environmental operations, technical, and training personnel."  August 2018 Probation Supervision Report, Attachment 3, at 4; CAM September 2018 Quarterly Report at 17-18; CAM December 2018 Quarterly Report at 19-21; CAM April 2019 Quarterly Report at 39-40.

The CAM Team observed widespread expressions from attendees that both events were valuable and informative.  Participants used the opportunity to share concerns and ideas for

July 3, 2019

improvement related to the Environmental Officer position and the Company's broader compliance culture and efforts.  Going forward, the Environmental Commitment Conferences will be replaced with hybrid EO3/Environmental Commitment conferences, as noted above in Part IV.B.5.ii, which will be delivered five times per year.  *See* May 2019 Probation Supervision Report, Attachment 3, at 8.  The first two hybrid training conferences are planned for August and November 2019.

> ### iii.  *Incident and Near Miss Reporting and Case Management System (SeaEvent)*

The Company is rolling out across its fleet a new centralized, corporate-wide incident and near miss reporting and case management system, called SeaEvent.  *See* May 2019 Probation Supervision Report, Attachment 3, at 10.  As of May 2019, forty-five ships across the AIDA, Carnival Cruise Line, Costa, and Holland America Group fleets have SeaEvent onboard.  *Id.* The Company expects for the system to be rolled out to all ships by the end of 2019.  *Id.*

If successfully implemented, SeaEvent could improve the consistency of the Company's incident reporting, and enable better fleetwide information-sharing and tracking/trending of incident data.  The Company has recognized that the current process "is cumbersome, involving many manual interventions and duplicate efforts," with each brand "left to develop actions and track events to close out."  Corporate Compliance Manager Annual Report at PCL_ECP00110662.  The Company's efforts to develop and implement information technology ("IT") tools in support of compliance, such as SeaEvent, will be an area of focus during ECP Year Three.  *See infra*, Part IX.B.

July 3, 2019

     *iv.*    *Voyage Planning Software to Identify Environmental Boundaries on Navigational Charts*

The Company is working with a vendor to develop new software that could help address voyage planning challenges.[34]  These challenges often relate to misunderstandings or miscommunications as to the location of environmental boundary lines and/or the applicable requirements within a set of environmental boundary lines.  Accuracy of this information, and effective onboard communication between deck and engineering personnel, is essential for preventing illegal discharges.  *See* CAM First Annual Report at 41, 54-55 (discussing voyage planning-related incidents on Covered Vessels); CAM December 2018 Quarterly Report at 10-11 (same).  The new software would, among other things, aim to integrate information about environmental boundaries and standards—including the Company's own requirements, which may be more stringent than those set by regulatory bodies—into the electronic navigational charts used by ships.  The CAM understands that software with such capabilities does not currently exist.

The Company's existing procedure for the management and communication of environmental requirements is ENV-1001, titled "Worldwide Cruising Environmental Standards."  May 2019 Probation Supervision Report, Attachment 3, at 2.  This procedure requires an Environmental Policy team within Carnival Corp.'s Maritime Policy & Analysis group to "receive, assess and process feedback from ships, Operating Companies and/or regulatory bodies regarding changes to environmental regulations and to update the Worldwide

---

[34] A voyage plan identifies, among other things, the locations where discharges or emissions are allowed or prohibited based on a ship's location and the applicable requirements (such as the special restrictions that apply in United States marine sanctuary waters and in Emission Control Areas).  The ship's route must take into account "the marine environmental protection measures that apply, and avoid[], as far as possible, actions and activities which could cause damage to the environment."  Dkt. No. 58-1, at 10.

July 3, 2019

Cruising Environmental Standards accordingly." *Id.* These standards are communicated from the Maritime Policy & Analysis group to ships in the form of an Excel spreadsheet, known informally within the Company as "the Matrix." *See ENV-1001-F1 Worldwide Cruising Environmental Standards - Requirements.* The Matrix is organized by geographic region and waste stream. *See id.* Deck officers in charge of voyage planning, in consultation with Environmental Officers, rely on the Matrix to develop the environmental portion of each voyage plan. *Id.* Currently, the environmental boundaries and standards contained in the Matrix are not automatically integrated into the ships' electronic navigational chart systems.

Numerous crew members have raised concerns to the CAM Team about this process, including that: information in the Matrix is often incomplete, inaccurate, or unclear;[35] the process of reviewing and incorporating information from the Matrix into the ship's environmental plan and navigational charts is burdensome, error-prone, and inefficient;[36] and updates to environmental standards are not always communicated to the ships in a timely or effective manner.[37] *See* Employee Interview Notes.

---

[35] *See, e.g.*, Case Study #03-2018 (ship discharged permeate in Alaskan waters while traveling below the minimum speed required by its Alaskan Wastewater Discharge Permit, where the Matrix did not adequately instruct crew members to refer to ship-specific Alaskan permit requirements).

[36] *See, e.g.*, Carnival Corp. HESS Weekly Flash Report (Sept. 12, 2018) (ship used incinerator for approximately 3.5 hours in an area of the Baltic Sea where the use of incinerators is prohibited because this restriction "had not been correctly copied across into the appropriate decision support tools"—*i.e.*, from the Matrix into the environmental portion of the voyage plan).

[37] *See, e.g.*, Case Study #03-2019 (ship discharged food waste in violation of MARPOL Annex V, and permeate in violation of Company policy, in Bahamian waters, in part because a notice "highlighting the importance of the Bahamas baselines and related updates to ENV-1001" were not read by the engineer involved in the incident and "it was unclear if the other watch keepers also understood the Bahamas baselines requirements").

The Company reports that it is finalizing negotiations with a vendor for a contingent contract to develop new software "to improve how our shipboard teams identify the areas where [] discharges are allowed."  Corporate Compliance Manager Annual Report at PCL_ECP00110660.  Such software would "automate and streamline the current environmental and voyage planning process, including the replacement of the WorldWide Cruising Standards spreadsheet [*i.e.*, the Matrix] approach with a chart-based software solution."  May 2019 Probation Supervision Report, Attachment 3, at 11.  The Company believes this may "simplify and automate a significant portion of the planning process and reduce the risk of errors," while recognizing that "any solution will not absolve Carnival from risk or liability" from voyage-planning related incidents.  October 2018 Probation Supervision Report, Attachment 3, at 1.

Once an agreement is executed with the vendor, "it is expected that up to six months of software development time and 2-3 months of testing time will be needed before a decision to adopt and deploy the solution will be taken."  May 2019 Probation Supervision Report, Attachment 3, at 11.  Full fleet rollout is expected by mid- to late 2020.  *See id.*

The Company's efforts to develop and implement IT tools in support of compliance, including new voyage planning software, will be an area of focus during ECP Year Three.  *See infra*, Part IX.B.  The CAM will also continue to monitor more generally the Company's efforts to improve its voyage planning process and address workplace and staffing issues that may contribute to voyage planning-related incidents.

### *v.    Fleet Environmental Officer Program*

The Company reports that it is developing a "fleet environmental compliance trainer officer program."  May 2019 Probation Supervision Report, Attachment 3, at 5.  This program "will provide training, coaching, and mentoring to environmental officers as well as

July 3, 2019

environmental training to employees of the Deck, Technical, and Hotel departments." *Id.* A similar program for Fleet Captains and Fleet Chief Engineers has existed for many years under the direction of the Chief Maritime Officer. The most recent CAM Quarterly Report discussed the Company's initial refusal to fund the Fleet Environmental Officer program when it was first proposed by the Corporate Compliance Manager. *See* CAM April 2019 Quarterly Report at 31-32.[38] Following the filing of the initial petition for probation revocation on March 8, 2019, Dkt. No. 94, and the Status Conference held on April 10, 2019, the Company reversed itself and announced that it would fund the program.

If successfully implemented and supported, a Fleet Environmental Officer program could help address the ECP obligation to have a sufficient number of Environmental Officers to meet fleet needs, *see* ECP § IV.A.1, and provide the advantage of having a group of Fleet Environmental Officers who could provide support, consistency, and oversight to the more than two hundred Environmental Officers across the Company. The program could also provide broader career opportunities for individuals in the unique Environmental Officer role. *See* CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer position, including lack of a clear career path). The CAM will continue to monitor and report on the development and implementation of this program, which relates to several ECP Year Three areas of focus discussed in Part IX below.

     *vi.* *Operation Oceans Alive*

The Company continues to implement its environmental compliance and stewardship program, called Operation Oceans Alive. Launched in January 2018, the program is described

---

[38] The CAM April 2019 Quarterly Report incorrectly identified the date of the initial proposal as January 2018 instead of January 2019.

by the Company as "the backbone for all Environmental compliance programs . . . designed to promote the right behavior, attitude and a culture of compliance and learning as it relates to environmental compliance and excellence through getting to the hearts and minds of our employees."  May 2019 Probation Supervision Report, Attachment 3, at 5.  The program includes a "hearts and minds" communication program consisting of compliance notices, newsletters, case studies, infographics, and video messages from the Corporate Compliance Manager and the Company's leadership, including the latest annual ECP-required video message from the Carnival Corp. President and CEO released in February 2019.  *Id.* at 5-6.

As part of the case study initiative under Operation Oceans Alive, the Corporate Compliance Manager's team has issued four new case studies since January 2019, for a total of eight case studies since the program began in January 2018.  The case studies are described as "a way of sharing lessons learned from incidents as part of our commitment to establish a culture of learning."  *Id.* at 6; CAM December 2018 Quarterly Report at 16-17.  The Corporate Compliance Manager reports that his team recently hired an additional manager (a former Environmental Officer from the AIDA brand) whose responsibilities will include managing the case study program.  *See* Employee Interview Notes.

Another component of Operation Oceans Alive is the online chat forum for Environmental Officers, called the Environmental Hub, which was launched in November 2018. It is a result of the efforts of the Corporate Compliance Manager and his team to respond to feedback from Environmental Officers.  The Environmental Hub is described as a platform "to share environmental compliance and stewardship information as well as solicit[] feedback on training, procedures and best practices."  May 2019 Probation Supervision Report, Attachment 3,

at 6.  Initial feedback about the Hub from Environmental Officers to the CAM Team has been

positive.  *See* Employee Interview Notes.

The Company reports that, while Operation Oceans Alive has primarily been geared

toward employees, "[p]lans are in development to further expand the program to the guest-facing

side of the business."  Corporate Compliance Manager Annual Report at PCL_ECP00110657.

The CAM will continue to monitor and report on the Company's efforts related to Operation

Oceans Alive.

### vii.    Other Efforts

The Company has instituted a number of additional initiatives related to environmental

compliance and sustainability.  To date, the CAM Team has identified over fifty different

initiatives, including policies, programs, surveys, IT projects, studies, trainings, and other efforts.

These include:

- Replacing paper-based HESS notice boards on ships across the fleet with flat screen televisions to broadcast "[m]edia and color rich important HESS compliance messages" to employees.  Implementation is expected to be complete by December 2019.  May 2019 Probation Supervision Report at 6-7;

- Installing HESS "feedback stations" on ships to "provide a simple means for all crew members to submit valuable HESS feedback."  *Id.* at 7.  Currently, these stations are installed on all Carnival UK and Carnival Cruise Line ships.  Holland America Group and Costa Group are in the process of installing the stations across their fleets.  *Id.*;

- Implementing a reward and recognition program, called the Environmental Excellence Awards program, "where employees who exceed environmental compliance and stewardship expectations are praised, rewarded and recognized."  *Id.* at 9.  Under this program, awards are given to ships "achieving the highest levels of compliance," based on a standard scoring criteria that was developed in 2018.  *Id.*  In addition, "[c]ollectable environmental challenge coins and certificates are given out regularly to employees who go above and beyond environmental compliance and stewardship expectations."  *Id.*  A HESS employee of the month award has also been rolled out at all operating lines.  *Id.*; and

- Undertaking efforts to reduce the volume of bilge water that accumulates in ships across the fleet.  The Company reports that "[v]arious technical solutions are being

adopted and we have placed a particular focus on the need to promptly report and repair leaks to the bilge."  *Id.* at 11.

Appendix A of this Report provides an overview of these and additional Company initiatives. The CAM will continue to track and report on the Company's various initiatives, including potential concerns,[39] during ECP Year Three.

### C.   Efforts to Understand the Causes of Continuing Challenges

The Company has undertaken efforts to better understand the causes of some of its continuing environmental compliance challenges, in response to both CAM findings and the Company's own identification of issues or challenges.  These efforts include:  (1) creating a new internal investigations group and related efforts designed to improve the Company's internal investigations program; (2) retaining an outside corporate compliance consultant to advise the Company on how to best improve its corporate compliance program and corporate governance structure; and (3) the commissioning by Holland America Group of a study by a third-party consultant on the human factors (*e.g.*, workload, training, communication, and culture) that may contribute to prohibited discharges from ships.

### 1.   New Internal Investigations Group

The CAM made a finding in ECP Year One that the "Company's internal investigations are critically flawed."  *See* CAM First Annual Report at 5; *see also* CAM September 2018 Quarterly Report at 23-25; CAM December 2018 Quarterly Report at 30-31; CAM April 2019 Quarterly Report at 36-38.  As DOJ has observed in recent guidance on evaluating corporate

---

[39] The CAM supports efforts to enhance the Company's environmental compliance culture. However, the vast number of disparate initiatives may present concerns, including whether these initiatives are:  well-coordinated; developed with sufficient consideration of the additional strain or workload they put on the ships; and based on accurate understandings of the root causes of the issue(s) they are designed to address.  *See infra*, Part IV.C.

compliance programs, a "hallmark of a compliance program that is working effectively is the existence of a well-functioning and appropriately funded mechanism for timely and thorough investigations."  DOJ Criminal Division, *Evaluation of Corporate Compliance Programs* (Apr. 30, 2019), *available at* https://www.justice.gov/criminal-fraud/page/file/937501/download ("DOJ Corporate Compliance Guidance"), at 15.

In early 2018, the Company engaged a third party, DNV GL AS Maritime ("DNV GL"), to assess the Company's internal incident investigation processes, and make recommendations for improving and standardizing the program.  In May 2018, DNV GL delivered a report with four overall recommendations and twenty-eight specific areas for improvement to assist the Company in improving the quality and efficiency of investigations, including the need for:  (1) a more clearly defined and consistent incident investigation process, with clear lines of authority across the brands; (2) a more structured approach to root cause analysis and reporting; (3) improved training on investigations; (4) consistent investigation and reporting methodology; and (5) methods for tracking and trending this information across the fleet to identify and manage key areas of risk.  *See* DNV GL, *Towards improving Carnival's incident investigation process,* Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-2050, at PCL_ECP00052035-39.

In recognition of the central role that investigations and root cause analyses play in sustainable environmental compliance, the Court entered an Order on July 13, 2018, requiring, among other things, that the Company provide by September 21, 2018, a proposed timeline for establishing and implementing the DNV GL recommendations.  *See* Dkt. No. 75 at 1-3.  On September 21, 2018, the Company provided the Court with its proposed timeline for implementing a number of the recommendations over the remaining quarter of 2018 through the

second quarter of 2019.  *See Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21, 2018).  Leading up to the Company's submission to the Court, the Company shared its plan to seek modification of the ECP to reflect the creation of a new group that would perform investigations into HESS incidents (including environmental incidents) and that would be independent of the Company's audit function (RAAS).[40]  *See* Letter from C. Donald, *Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at 1.

As noted in prior CAM Quarterly Reports, both the implementation of the investigations timeline and the launch of a restructured investigations department awaited the hiring of an individual to lead the new department, now called the Incident Analysis Group.  *See* CAM December 2018 Quarterly Report at n.39; CAM April 2019 Quarterly Report at 37.  The Company filled this position in late March 2019, hiring a former official from the United States National Transportation Safety Board to be the new Vice President of the Incident Analysis Group.[41]  *See* May 2019 Probation Supervision Report, Attachment 3, at 4.  According to the Company, this Vice President "is currently finalizing new investigation procedures" as well as "progressing with the development of a new investigator training and certification program, and standardized root cause analysis tools for use across the organization."  *Id.*  In addition, the Company has hired a new investigator for the group and is in the process of filling an additional three investigator positions.  *See id.*

_____

[40] Previously, both the internal HESS investigations function and the internal audit function were housed within RAAS.

[41] On May 3, 2019, the Company proposed ECP revisions to reflect the new investigations program structure, and these revisions went into effect on June 3, 2019.  *See supra*, Part IV.B.4.i.

July 3, 2019

The Company's efforts to improve its investigations program remain a work in progress. The CAM will continue to monitor and report on these efforts during ECP Year Three. *See infra*, Part IX.C.

2.    Retention of a Corporate Compliance Consultant

In ECP Year One, the CAM identified the Company's complex corporate structure, including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance, as an unresolved barrier to environmental compliance. *See* CAM First Annual Report at 4, 25-30.  As of the time of the writing of this Report, compliance is handled by different departments at the Carnival Corp. level.  For example:

| Department | Compliance Function(s) |
|---|---|
| Maritime (including the Corporate Compliance Manager and his team) | HESS compliance, including ECP and environmental compliance |
| Legal (including the new Incident Analysis Group) | Office of Foreign Asset Control, anti-corruption, and anti-money laundering compliance; HESS investigations; Open Report (hotline) system |
| RAAS | Financial, IT, and HESS auditing; non-HESS (financial/fraud) investigations |
| Finance | Securities and Exchange Commission (including Sarbanes-Oxley Act) compliance |
| IT | Privacy and cybersecurity compliance |
| Human Resources | Employment (including harassment and discrimination) compliance |

This decentralized compliance structure is generally replicated at the brand/operating line levels.  The CAM also found in ECP Year One that the Company had not provided the Corporate Compliance Manager with the ECP-required "authority to ensure full implementation of [the] ECP."  *See id.* (citing ECP § III.A.2).  On June 3, 2019, the Company pleaded guilty to "failing to provide sufficient responsibility and authority to the [Corporate Compliance Manager] to implement the ECP," Dkt. No. 134 at 10, and "acknowledge[d] that it failed to establish a

July 3, 2019

[Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP." *Id.* at 2.

Under the agreement resolving the probation violations, the Company agreed "to restructure its existing corporate compliance governing authority." *See* Dkt. No. 134 at 2. It engaged an outside consultant "to advise it of the best options to improve its corporate compliance program, and to achieve a change in corporate governance." *Id.* at 2-3; *see also* May 2019 Probation Supervision Report, Attachment 3, at 1. The individual retained as the compliance consultant has experience in internal investigations and corporate compliance counseling.

On June 1, 2019, the Company provided the Court, Interested Parties, CAM, and TPA with the consultant's recommendations for restructuring the Company's compliance function. *See Summary and Recommendations from Compliance Program Assessment* (May 31, 2019). These recommendations include:

- Creating a new Chief Compliance Officer position for the entire Company to oversee the implementation of the Company's overall compliance functions, including environmental compliance and the ECP.[42] The Corporate Compliance Manager will remain responsible for overseeing the ECP and will report to the Chief Compliance Officer;[43]

- Reorganizing the current corporate compliance structure, including create a new Corporate Compliance Office/Group;

- Strengthening the compliance qualifications, training, engagement, and tone of the Company's Board of Directors; and

---

[42] The Company has announced that it is hiring the same individual who is serving as the compliance consultant to be the new Chief Compliance Officer. *See Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 1.

[43] On May 17, 2019, the Corporate Compliance Manager was promoted from Vice President to Senior Vice President.

- Enhancing the compliance commitment, oversight, training, and tone of the Company's leadership.

*See Summary and Recommendations from Compliance Program Assessment* (May 31, 2019), at 8-11.  By August 14, 2019, the Company is required to submit to the Interested Parties, CAM, and TPA a proposed action plan, prepared in collaboration with the consultant, that will include "a detailed statement explaining how and when the improvements to the compliance program will be implemented."  Dkt. No. 134 at 3.  The Company reports that, among other actions, it is "developing a draft Charter that will outline the reorganization of the new Corporate Compliance Department, and establish the mission, stature, authority and specific job descriptions and responsibilities" of the Chief Compliance Officer and Corporate Compliance Manager.  *See Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 1-7.

The recommendations of the compliance consultant provide important opportunities for the Company's leadership, including its Board of Directors, to understand and address compliance challenges.  The CAM will continue to monitor and report on the status of the Company's implementation of these new probation obligations, including the consultant's recommendations and action plan.  *See infra*, Part IX.A.

Importantly, for any organization undergoing improvements in a critical compliance area, such as environmental, there is a risk that the organization will engage in trade-offs in other compliance areas, such as safety.  Indeed, members of Company management have expressed concerns to the CAM Team that as more attention and resources are devoted to environmental compliance, less attention and resources will be devoted to safety, security, or public health compliance.  *See* Employee Interview Notes.  This need not be the case, but could present a serious risk.  One function of a centralized compliance function is to take a holistic, risk-based approach to management and provide clear guidance to employees to avoid inappropriate trade-

July 3, 2019

offs between compliance areas.  *See, e.g.*, David L. Olson and Desheng Dash Wu, ENTERPRISE

RISK MANAGEMENT v (2d ed. 2015) (describing risk management as "the identification,

assessment, and prioritization of risks followed by coordinated and economical application of

resources to minimize, monitor, and control the probability and/or impact of unfortunate

events").  This is an important consideration for the Company as it develops a corporate-wide

compliance structure.

### 3.  Holland America Group Human Factors Study

As discussed in prior CAM reports, one of the Company's operating lines, Holland

America Group, retained a third-party consultant in September 2018 to perform a study of the

human factors related to prohibited discharges, in response to a noted increase in prohibited

discharge incidents on its ships.  *See* Email from C. Donald, *MTO Proposal – Human Factors*

*Study* (Sept. 22, 2018); CAM December 2018 Quarterly Report at 9-10 (discussing incidents

which prompted Holland America Group to commission the study); CAM April 2019 Quarterly

Report at 27-28 (discussing preliminary findings from the study); May 2019 Probation

Supervision Report, Attachment 3, at 14.  The study was completed in two phases, with a

preliminary Phase 1 report issued in December 2018, and a final Phase 2 report issued in May

2019.  *See* MTO Safety, *Ship operations and environmental discharges: An action plan for*

*continuous improvement and learning – report from phase 1,* Report MTO-2018-349 (Dec. 14,

2018), PCL_ECP00101877-937 ("Phase 1 Report"); MTO Safety, *Ship Operations and*

*environmental discharges: An action plan for continuous improvement – final report*, Report

MTO-2018-349 (May 31, 2019), PCL_ECP00118647-739 ("Phase 2 Report").

The Phase 1 Report identified "latent conditions contributing to non-compliant

discharges" related to the following seven themes:  (1) regulations and procedures; (2) culture

July 3, 2019

and attitudes; (3) workload balance; (4) competence, training, and qualifications;

(5) communication, teamwork, and distribution of accountabilities; (6) work tasks and support

systems; and (7) technical status of the ships.  *See* Phase 1 Report at PCL_ECP00101880.  In

Phase 2, "the latent conditions identified in phase 1 were validated."  *See* Phase 2 Report at

PCL_ECP00118656.

Notable findings from the Phase 2 Report on these "latent conditions" include:

- **Regulations and Procedures**.  Regulations (including external legal requirements as well as Company procedures) are "complex and ambiguous," and Company procedures undergo "frequent changes."  *Id.* at PCL_ECP00118650, 72-83.  Further, employees report that "information in the environmental matrix is not aligned with information on the internet," *id.* at PCL_ECP00118672, and that "[u]pdates are sometimes sent out very late, only hours before entering the affected zone where the procedure should be applied."  *Id.* at PCL_ECP00118675;

- **Culture and Attitudes**.  There are "variations in commitment, understanding, and language proficiency" and "issues related to prioritization of environmental discharge tasks[] and sense-making of environmental compliance activities."  *Id.* at PCL_ECP00118650, 83-85.  Further, "it was observed that there was a widespread fear of making errors and mistakes on all ships."  *Id.* at PCL_ECP00118683;

- **Workload Balance**.  There is a "high workload" in the Engine Control Room with "frequent interruptions" and "low staffing, being on or under [the Table of Personnel, a list of positions allocated to each ship], [] working overtime."  *Id.* at PCL_ECP00118650, 85-91.  Further, "the workload and work situation" in the Engine Control Room is "at times unmanageable and measures must be taken to reduce workload and improve quality for voyage planning tasks."  *Id.* at PCL_ECP00118685;

- **Competence, Training, and Qualifications**.  "Less experienced staff [is being] hired," there is a "lack of ship specific technical training" on systems used for discharge operations, fuel handling, and navigation, and "the ECP training scope" does not address "the environmental aspects of different job positions."  *Id.* at PCL_ECP00118650, 91-93.  The "problems related to inadequate experience and qualifications seem to be bigger in [the Engine Control Room] than on the bridge." *Id.* at PCL_ECP00118691;

- **Communication, Teamwork, and Distribution of Accountabilities**.  There are "misunderstandings in communication[s] between the bridge and [Engine Control Room] which occurred regularly," and Engine Control Room officers "lack proper

July 3, 2019

support for maintaining situational awareness[] and lack cues for initiating critical tasks related to environmental discharges." *Id.* at PCL_ECP00118650, 93-97;

- **Work Tasks and Support Systems**. Information is duplicated on several screens, systems are not replaced, and new systems are implemented as add-ons. *Id.* at PCL_ECP00118651, 97-04. Further, "many displays and logs require manual updates" and "displays, alarms and [the] design of equipment" does not provide "adequate information or support for task execution." *Id.* at PCL_ECP00118651, 715. As a result, "[t]here is a risk of confusion, not knowing where to look for accurate information, and perhaps not adopting a new approach/way of working, that was intended with the introduction of a new system." *Id.* at PCL_ECP00118697; and

- **Technical Status of the Ships**. Some ships do not have a technical platform that gives "adequate support for the tasks related to discharge and fuel changeover operations." *Id.* at PCL_ECP00118651, 705-09. Further, "[t]here were several problems related to the supply of spare parts such as not a large enough budget for spare parts . . . These may lead to systems being inoperable for a long time." *Id.* at PCL_ECP00118705.

These findings are in accord with the findings and other observations by the CAM Team and the TPA.

For each "latent condition" theme, the Phase 2 Report provides "suggestions [for] how to improve performance and prioritiz[e] improvement opportunities." *See id.* at PCL_ECP00118716-25. For example, suggestions related to regulations and procedures include: applying simplified, standardized, and stricter rules in the HESS procedures; providing a more useful template and format for the environmental portion of voyage plans; and avoiding the introduction of additional procedures unless there is staff available to carry out the additional tasks. *See id.* at PCL_ECP00118716-18. Suggestions related to culture and attitudes include integrating environmental discharge tasks in ship operations to ensure that there are no rules or messages that could lead to conflicting goals between safe ship operations and environmental compliance. *See id.* at PCL_ECP00118718-19.

The Phase 2 Report also identifies "nine different areas where identified problems could be reduced by implementation of suggested actions." *See id.* at PCL_ECP00118725-33. Those

July 3, 2019

action areas are:  (1) restructuring work tasks in the Engine Control Room; (2) developing a

training program on discharge management; (3) restructuring voyage planning and

environmental schedule preparation; (4) improving procedures by restructuring;

(5) implementing support for planning and monitoring of discharge operations; (6) improving

support for situational awareness; (7) improving the technical status of equipment and

simplifying systems; (8) improving environmental awareness and commitment among crew; and

(9) establishing a human-centered system design process.  *See id.*  For each area, the report

provides recommended actions (*e.g.*, for Area 3, improve internet connectivity onboard to allow

crew members to look up information swiftly on demand).  *See id.*

Finally, the Phase 2 Report makes the following three recommendations to the Company

"for sustainable, long term improvement":  (1) Consider "new concepts for ship design and

retrofitting old ships to proactively manage stricter environmental regulations"; (2) Build "a

sustainable environmental awareness and commitment culture and move away from a culture

based only on compliance and procedures"; and (3) Make use of "new technology to facilitate

management of discharge operations."  *Id.* at PCL_ECP00118733-34.

The CAM understands that Holland America Group has begun to develop action items

for the nine areas identified in the Phase 2 Report, including creating a business plan that will

contain a timeline and indicate the resources necessary to execute the plan.  *See* Employee

Interview Notes.  The CAM Team will continue to monitor and report as appropriate on Holland

America Group's responses to the Phase 2 Report's suggested actions and recommendations,

July 3, 2019

including the sharing of any lessons learned or best practices to other operating lines or brands.
*See infra*, Part IX.F.[44]

> **D.**    **Development and Implementation of an Environmental Compliance Culture Survey of More Than Seventy Thousand Employees**

As discussed in prior CAM reports, the Company has supported the efforts of the CAM's retained maritime culture expert, Propel SAYFR AS ("Propel"), to develop and implement a survey to assess the Company's environmental compliance culture—both the strengths and the opportunities for improvement.  *See* Second Annual Work Plan at 10-11; CAM First Annual Report at 24-25, 68; CAM September 2018 Quarterly Report at 22-23; CAM December 2018 Quarterly Report at 28-30; CAM April 2019 Quarterly Report at 33-36.  The Court has recognized the importance of a strong organizational culture in achieving sustainable compliance, and has emphasized its interest in evaluating the Company's progress and growth in this area.  *See* CAM First Annual Report at 24.  The survey effort also supports the CAM's mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, and to assess whether the Company has adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.  *See* ECP § VI.B.2.  Aspects of the survey represent, to the best of the CAM's knowledge, a first-of-its-kind effort within the maritime industry.  While safety culture surveys are routine, the CAM is unaware of a prior culture survey in the maritime industry with a focus on environmental compliance.

---

[44] Holland America Group has retained a third-party consultant to conduct a work load study "that will complement the human factors review to determine whether the work load expectations are reasonable or whether staffing changes need to be made to allow crewmembers to complete required tasks in compliance with work and rest requirements."  May 2019 Probation Supervision Report, Attachment 3, at 14.  A report is expected to be issued by July 2019.  *Id.*

July 3, 2019

The survey, referred to as the Environmental Compliance Culture Survey, was launched on December 4, 2018, to shipboard and covered shoreside personnel—a total of over ninety thousand people.[45]  It closed for most ships and shoreside employees on January 17, 2019,[46] with a final participation rate of approximately 79% (over seventy thousand respondents).[47]  The CAM commends the hard work and cooperation of the Corporate Compliance Manager, his Working Group, and hundreds of Company personnel who supported this accomplishment.

From February to April 2019, Propel held focus group sessions on ships and at shoreside locations to review and clarify preliminary, observed survey trends and responses.  As noted above in Part III.B.1, the CAM Team did not attend these sessions in order to preserve the independence of Propel's analysis and review.  Propel is in the process of preparing a final assessment report, with a target date of July 2019.  Propel will conduct a second survey before the completion of the five-year ECP period to assess the Company's progress in supporting a sustainable compliance culture.

### E.    Strong Relationship with Global Talent Partners Provides a Unique Opportunity to Develop a More Diverse Officer Corps

#### 1.    Background

On each of the Company's ships, there are hundreds of crew members who fulfill two critical functions.  One group, the "hotel" side, consists of guest-facing crew who cook and serve meals, prepare and clean rooms, and provide hospitality and entertainment services.  There is a

---

[45] The Company sought, and the CAM agreed, to expand the survey beyond only those personnel central to compliance functions.  The Company stated that it viewed this survey as a tool through which it could increase broad employee engagement on environmental issues.

[46] Two newly launched ships began survey in January and February 2019, respectively.

[47] Over twenty thousand free text responses were received, the majority of which were fifty characters or longer.  Propel is analyzing these free text responses along with the survey data.

July 3, 2019

second group, many of whom are never seen by the guests.  This group consists of the "deck"

and "technical" crew.  Deck, or bridge, crew plan voyages and navigate the ship from port to

port.  Technical, or engineering, crew run the ship's engines and other equipment and systems,

including heating/air conditioning, electrical, and waste treatment systems.  All of these

groups—hotel, deck, and technical—must work together if a ship is to operate safely and comply

with environmental and other obligations.

  Carnival Corp., like others in the maritime industry, depends on agencies located around

the world to recruit and train many of its hotel, deck, and technical crew members.[48]  These

agencies are typically referred to as "manning" or "crewing" agencies; however, as noted above

in Part II.C.1, this Report adopts the term Global Talent Partners proposed by Holland America

Group.  Some of these agencies have sophisticated, state-of-the-art training facilities and serve a

range of clients both within and outside of the maritime industry—from cruise companies to oil

and gas businesses to health care providers.[49]  The Company maintains long-standing

---

[48] Many of these agencies are required to comply with the Maritime Labour Convention 2006.
Known as the "seafarers' bill of rights," the Maritime Labour Convention is an international
convention that "establishes minimum working and living standards for all seafarers working on
ships flying the flags of ratifying countries."  *See* ILO, *Basic facts on the Maritime Labour
Convention 2006*, https://www.ilo.org/global/standards/maritime-labour-convention/what-it-
does/WCMS_219665/lang--en/index.htm.  Over ninety countries have ratified the Maritime
Labour Convention, including the Flag States for the Company's Covered Vessels (*i.e.*, the
Bahamas, Bermuda, Italy, Malta, Panama, the Netherlands, and the United Kingdom).  *See* ILO,
*Ratifications of MLC, 2006 - Maritime Labour Convention, 2006 (MLC, 2006)*,
https://www.ilo.org/dyn/normlex/en/f?p=1000:11300:11758854203652::::P11300_INSTRUME
NT_SORT:1.

[49] For example, as discussed below, the CAM Team was able to visit the Magsaysay Maritime
Corporation, a large and sophisticated organization that encompasses several entities, including:
(1) the MOL Magsaysay Maritime Academy, a new facility that trains deck and engine officers,
including a small number of officers for the Company; (2) the Magsaysay Institute of Shipping,
which provides technical training primarily for engine ratings and security officers; and (3) the
Magsaysay Center for Hospitality and Culinary Arts, which provides training for hotel and
culinary crew members.

relationships with many Global Talent Partners around the world, including with agencies located in the Philippines, Indonesia, and India.  These agencies play a crucial role in sourcing and vetting a steady pool of crew members for the Company's ships.

Global Talent Partners offer a range of services, including providing (or ensuring that crew members have received) a wide range of training, from STCW training[50] to training in the culinary arts and housekeeping.  These agencies also ensure that crew members have necessary qualifications and certifications, such as STCW and health (medical fitness) certifications, as well as visas and other immigration clearances.[51]  As discussed below, the Company's Global Talent Partners may be able to further support the Company's environmental compliance efforts through enhanced training programs.

### 2.    Compliance Context

The CAM First Annual Report identified issues related to personnel and training as playing a role in the Company's compliance efforts.  *See* CAM First Annual Report at 69-70 (discussing training as an ECP Year Two area of focus); *id.* at 72-73 (discussing personnel issues

---

[50] STCW stands for the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978.  The "main purpose of the Convention is to promote safety of life and property at sea and the protection of the marine environment by establishing in common agreement international standards of training, certification and watchkeeping for seafarers."  IMO, *International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978*, http://www.imo.org/en/OurWork/HumanElement/TrainingCertification/Pages/STCW-Convention.aspx.  Anyone seeking to work on large commercial vessels must obtain certain STCW qualifications, which vary by position.  STCW courses cover topics such as basic safety, fire prevention and firefighting, survival techniques (*e.g.*, use of liferafts and lifejackets), and first aid.  *See What is STCW and who needs it?*, https://www.stcwdirect.com/stcw-training/.

[51] Many of these agencies hold certifications that their services meet various internationally-recognized standards, including OSHAS 18001:2007 (Occupational Health and Safety Management System standard), ISO 9001:2015 (Quality Management System standard), and ISO 14001:2015 (Environmental Management System standard).

as an ECP Year Two area of focus).  Two of the Company's compliance challenges connected to these areas are:

- Insufficient numbers of deck and technical officers on ships, especially of engineering officers; and

- Inadequately trained or under-qualified engineering officers, including junior officers who are promoted to more senior positions before they are ready due to a need to fill gaps in the more senior ranks.

These challenges are not unique to the Company.  Finding and retaining qualified personnel, especially deck and engineering officers, is a challenge across the entire maritime industry.  The International Chamber of Shipping estimates that, for merchant ships, there is a shortage of over sixteen thousand officers, and a surplus of over one hundred thousand ratings. *See* Int'l Chamber of Shipping, *Global Supply and Demand for Seafarers*, http://www.ics-shipping.org/shipping-facts/shipping-and-world-trade/global-supply-and-demand-for-seafarers. It is expected that the "anticipated demand for seafarers[] will likely continue the trend of an overall shortage in the supply of officers."  *Id.*

Likewise, the cruise industry faces a similar concern about officer shortages.  *See* William C. Terry, *Geographic limits to global labor market flexibility: The human resources paradox of the cruise industry*, 42 Geoforum 660 (2011).  It has been observed that this shortage is connected to issues of ethnicity, race, and gender.  Historically, officer positions on cruise ships have been filled predominantly by men from European or other "developed" countries, while non-officer positions have been filled predominantly by men from Asian or other "developing" countries.  As described in Terry's article:

While cruise ship personnel are ethnically diverse, they are not apportioned randomly. Even a rudimentary analysis of crew composition reveals that they are highly stratified based on ethnicity, race and gender.  Certain ethnic groups tend to work in specific roles. Workers from developed countries tend to occupy higher positions within a ship's organizational hierarchy.  These tend to be well remunerated and have either greater

July 3, 2019

> responsibility, better working conditions, or some combination of the two. The rest of
> the workers, especially those in positions involving more menial tasks, almost universally
> come from the developing world.

*Id*. at 662.

Indeed, it has been recognized that the current shortage of qualified officers within the

cruise industry is really a shortage of qualified European officers. At an industry conference

held in the Philippines in late 2018 and attended by Company personnel, attendees raised

concerns about "the availability of skilled deck officers and engineers, most of who[m] until now

were sourced in Europe." Jonathan Boonzaier, *Cruise industry concerned about skills shortage*

(Nov. 5, 2018), https://www.tradewindsnews.com/passengerships/1624041/cruise-industry-

concerned-about-skills-shortage. Attendees further noted that "it is becoming increasingly

challenging to recruit younger generations of Europeans as seafarers as there are good job

opportunities ashore that fit in with their lifestyle expectations." *Id.* Panel experts "stressed the

need to widen the source base for officers and engineers, and to begin investing in training *right*

*now*." *Id.* (emphasis added).

Although the Company can point to some isolated instances of diversity and inclusion

efforts within its officer corps, CAM Team interviews with employees from various positions

across the Company have yielded consistent expressions of frustration over the longstanding and

continuing lack of ethnic, racial, and gender diversity and inclusion within the officer ranks. *See*

Employee Interview Notes. As discussed below, the Company may be poised to take significant

steps to rectify these issues.

### 3.   CAM Team Visits

During ECP Year Two, the CAM Team visited six Global Talent Partners on two

separate trips. Laudably, in response to the CAM's request to better understand the role of the

July 3, 2019

Global Talent Partners, the Company promptly facilitated and supported the ability of the CAM Team to visit these agencies.  Although Company personnel do not typically accompany the CAM Team on its visits, a member of the Corporate Compliance Manager team joined both trips, and senior Holland America Group Human Resources personnel also attended several of the visits.  Their presence did not appear to influence the CAM Team's communications with personnel at the Global Talent Partners.  Those who spoke with the CAM Team were open and cooperative, including raising concerns about employment issues.

The first round of visits took place from November 11-14, 2018.  During this time, the CAM Team visited the following agencies in Manilla, Philippines:  (1) Magsaysay Maritime Corporation; (2) Bahia Shipping Services; and (3) United Philippine Lines.  The second round of visits took place from March 19-20, 2019, to the following agencies in Jakarta, Indonesia: (1) PT SBI Sumber Bakat Insani; (2) PT Alpha Magsaysay International; and (3) CTI Group Jakarta.  In addition, while in Jakarta, the CAM Team visited Holland America Line's dedicated training center, the MS Nieuw Jakarta, run in cooperation with PT SBI Sumber Bakat Insani. Together, these agencies provide a mixture of deck, technical, and hotel crew for the Company's AIDA, Costa, Carnival Cruise Line, Holland America Line, and Princess brands (in addition to providing crew to other companies).

During these visits, the CAM Team met with executive leadership from each agency, as well as with agency personnel working directly on crewing for the Company.  The meetings focused on how these agencies recruit and train crew for the Company's brands and on what types of training are offered to other maritime companies who use the agencies.  The CAM Team also learned about the desire and capabilities of these agencies to help address shortages of deck and technical officers.  In addition, the meetings addressed whether, and to what extent, the

July 3, 2019

recruitment and training process covers marine environmental protection requirements and deals with cultural barriers relating to "speaking up," or raising compliance concerns or complaints to supervisors.  Each agency also gave the CAM Team a tour of its training facilities.

While each agency is different, at a high level each follows the same process to provide crew for the Company's ships.  In general, the process begins with the Company providing minimum hiring qualifications to the agencies (for instance, completion of certain STCW training programs).  The agencies use these qualifications to identify potential candidates for the Company's ships.  After candidates are screened and selected as crew members for ships on one of the Company's brands, the agency will either provide, or arrange for, the crew member to receive training in any general or Company-specific training that is required prior to joining the ship.

    4.    <u>CAM Observations</u>

        i.    *Opportunity to Fill Officer Staffing Shortfalls with a Diverse Workforce*

As noted above, the CAM Team's visits to the Global Talent Partners highlighted the strong relationships the Company has with these agencies.  The Company appears to recognize that it has a significant opportunity to leverage these existing relationships to address the staffing issues on its ships through developing a more diverse and inclusive officer corps.

The President and CEO of Carnival Corp. has explained the critical importance of diversifying the Company's workforce, noting that:

> Diversity is a business imperative.  The key to innovation is diversity of thinking . . . having people from different backgrounds and different cultural experiences who are organized around a common objective are far more likely to create breakthrough innovation than a homogenous group.  That same diversity of thinking is a powerful advantage.

July 3, 2019

Carnival Corp., *Diversity & Inclusion*,

http://www.carnivalcorp.com/phoenix.zhtml?c=200767&p=irol-diversity.

A large-scale and sustained effort will be required to achieve this vision.  Personnel at the Global Talent Partners echoed a common theme that the CAM Team has heard during many ship and shoreside visits:  there are large numbers of ratings who are interested in climbing the ranks to fill officer positions, but there is no established pathway to these positions for Asian crew members.  *See* Employee Interview Notes.  Some of the Company's operating lines have made efforts in this area.  Costa Group, for example, has implemented a program to hire and promote diverse officers, and currently has several cadets being trained at the MOL Magsaysay Maritime Academy.  *See id.*

The industry-wide staffing shortage for officer positions provides the Company with an extraordinary opportunity to be a leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry, and to address compliance challenges related to labor supply.  In interviews with the CAM Team, senior Company executives have expressed support for developing a program to widen the range of countries and nationalities from which to recruit and develop future officers, observing that the talent opportunity is huge and that the Company could have the benefit of being the first mover.  *See id.*  The CAM will continue to observe and report on these efforts.

### ii.     Opportunity to Enhance HESS Training

The Company's strong relationships with its Global Talent Partners also provides opportunities to enhance training on HESS-related issues, including environmental compliance, before crew members join ships.  During CAM Team ship visits, crew members have consistently raised concerns about the effectiveness of environmental training delivered onboard

July 3, 2019

to newly arrived crew members.  *See id*.  Ship-based environmental training often occurs after a crew member has just spent a long time travelling, and is scheduled among many other trainings and orientation activities.  Personnel at the Global Talent Partners echoed these concerns on behalf of their recruits, and believed that HESS training could be better absorbed and more effective if more of it was provided before crew members join a ship.  This could also reduce some of the other pressures associated with arriving onboard and starting a new job.  *See id*.

### iii.    *Opportunity to Address Cultural Barriers to "Speaking Up"*

The Company also has the opportunity to use its Global Talent Partners to provide training on how to report compliance concerns or "speak up" about prohibited or questionable activities.  One of the central issues on the *Caribbean Princess* was the failure, over the course of many years, for a wide range of crew members to speak up about the illegal activities onboard that ship.  Personnel at the Global Talent Partners acknowledged that some employees are reluctant to speak up for a variety of reasons, including cultural barriers such as:  differing social norms and attitudes toward challenging authority; issues of race and class; and language barriers. *See id*.

Currently, the Company does not appear to require the Global Talent Partners to provide training designed to overcome these barriers to reporting.  Global Talent Partner personnel stated that other maritime companies who use their agencies do require such training.  This training takes a variety of forms, ranging from classroom training to role playing.  *See id*.  The Global Talent Partners indicated they would be willing to incorporate similar such training into the courses provided to the Company's employees.  *See id.*[52]

---

[52] One idea relates to the Company's requirement that crew members have sufficient proficiency with the English language.  Personnel at the Global Talent Partners noted that some otherwise-qualified crew members require further language training to meet this requirement.  *See id.*  They

July 3, 2019

>               5.      Ongoing CAM Team Examination

During ECP Year Three, the CAM Team plans to continue to examine personnel and training issues related to the use of Global Talent Partners.  *See infra*, Parts IX.D-E.

## V.    UPDATES ON COMPANY CAPABILITIES TO MEET ECP OBJECTIVES:  UNRESOLVED BARRIERS AND OPPORTUNITIES FOR IMPROVEMENT

### A.    Environmental Compliance is Not Adequately Supported at the Highest Levels

The Company's leadership recently acknowledged, for the first time, its failure to adequately support environmental compliance.  *See* Dkt. No. 134.  This admitted failure of the Company's leadership was at the core of the probation revocation petition.  It is reflected by a "tone at the top" that does not promote environmental compliance in its communications of core values, ethical standards, or the criteria used for employee incentive programs.  It is also evidenced in the Company's failure to commit adequate resources and support toward environmental compliance, including its failure "to establish a [Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP."  Dkt. No. 134 at 2.

In addition, the CAM Team conducted a review, at the Court's instruction, *see infra*, Part III.B, of the Company's strategic planning processes.  This review revealed that the Company's processes are strong, but are not integrated with, and do not effectively support, environmental compliance.  The Company's strategic planning approach to financial goals appears to be well-

---

discussed the possibility of infusing English-language training with techniques for raising concerns and having difficult conversations with supervisors.  Using language teaching to teach cultural norms has a long history in the teaching of foreign languages.  *See* Oxana Dema and Aleidine Kramer Moeller, *Teaching culture in the 21st century language classroom* (2012), *available at* http://digitalcommons.unl.edu/teachlearnfacpub/181, and references cited therein.

July 3, 2019

understood and well-structured across the operating lines and brands.  In contrast, its approach to HESS compliance appears to be inconsistent and lacking an overarching strategy.

        1.    <u>The Company Does Not Provide Effective Leadership on Environmental Compliance</u>

The Court observed that "[c]ompliance, to be a core value, has to emanate from the top." Status Conf. Tr. at 5 (Apr. 10, 2019).  This sentiment is not new, or uncommon.  Among other places, it is reflected in Chapter 8 of the United States Sentencing Guidelines, which advise that "the promotion of an organizational culture that encourages ethical conduct and a commitment to compliance with the law . . . *minimally* require . . . [that] . . . *[h]igh-level personnel of the organization shall ensure that the organization has an effective compliance and ethics program*." U.S. Sentencing Comm'n, *Guidelines Manual* § 8B2.1(b) (emphasis added).  This sentiment was echoed again this year in the DOJ Criminal Division's April 30, 2019, guidance, which states that "[t]he effectiveness of a compliance program requires a high-level commitment by company leadership to implement a culture of compliance from the top."  DOJ Corporate Compliance Guidance at 9.  A relevant factor is "the extent to which senior management ha[s] clearly articulated the company's ethical standards, conveyed and disseminated them in clear and unambiguous terms, and demonstrated rigorous adherence by example."  *Id*.; *see also* U.S. Sentencing Comm'n, *Guidelines Manual* § 8B2.1(b)(4)-(6).  Another relevant factor is the extent to which employee incentive programs support compliance.  *See id.* § 8B2.1(b)(6).  As of the date of this Report, the Company has not effectively communicated that environmental compliance is a core value, an ethical imperative, or a defining characteristic for its employees.

July 3, 2019

      *i.*    *Tone at the Top*

      *(1) Core Values*

The Company does not express protection of the environment as a core value, or one that takes precedence over revenue generation, in its communications of corporate values.  As the Court recently observed, "this is a company that is blessed with a number of committed rank and file to preserving the environment.  The frustration has been that it did not appear that those involved in the ultimate management decisions were interested in making this a core value; that they were interested in how it would affect their reputation, but not because it was the right thing to do as a core value."  Settlement Hearing Tr. at 12 (June 3, 2019).

For example, employees across the Company know the basic tenets of the following mission statement:  "Together, we deliver joyful vacation experiences and breakthrough shareholder returns by exceeding guest expectations and leveraging our industry-leading scale."  Carnival Corp., *Corporate Information, Mission and History*, http://www.carnivalcorp.com/phoenix.zhtml?c=200767&p=irol-history.  This statement emphasizes guest experience and revenue generation, but does not make environmental protection a conscious value.  Similarly, Princess's core value statements do not expressly encompass environmental compliance.  The core value of "[w]e do it right" includes statements that "[w]e never compromise on things that matter" and that "*safety and security* are our most important responsibilities," but is silent on environmental compliance.  *See* Princess, *Our Core Values*, https://www.princess.com/careers/about-princess/core-values/ (emphasis added).[53]  As

---

[53] However, several of the Company's other brands do have core value statements that incorporate environmental compliance to some degree.  Carnival UK has a value that they "are heroes of 'safe and well,'" which includes being "guardians, leading, protecting and speaking up for our people, the environment and our brands."  *See* Carnival UK, *Our Core Values*, https://carnivalukcareers.co.uk/who-we-are/our-core-values/.  Holland America Line and

July 3, 2019

DOJ recently stated, the goal of the agreement resolving the probation revocation petition "is to put compliance up there with the other things that the company prioritizes." Settlement Hearing Tr. at 73 (June 3, 2019).[54]

In other places, the Company does acknowledge environmental compliance, but appears to frame it as more of a rule-following exercise than a core value. For instance, the Company's Code of Business Conduct and Ethics states that the "Company is committed to meeting or exceeding all applicable environmental laws, regulations and permit conditions—particularly those that relate to preserving our marine environment." *See* Carnival Corp., *Code of Business Conduct and Ethics*, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=140690&p=irol-govconduct, at 23. This statement does not express a straightforward value (*e.g.*, a commitment to environmental protection), but instead places a demand on employees to comply with a complex array of environmental requirements.

When the Company *does* make an imperative statement in the area of environmental compliance, it is vague and without meaningful benchmarks: "we aspire to make every place we go even better than it was before we went there." *See* Carnival Corp., *Sustainability from Ship to Shore FY 2017 Sustainability Report*, *available at* http://carnivalsustainability.com/download-

---

Seabourn have a value of "Uncompromising Commitment to Safety and Sustainability," which emphasizes that they "have a great responsibility to safeguard the well-being of people and the oceans [they] sail upon." *See* Holland America Line, *About Us*, https://www.hollandamerica.com/en_US/our-company/mission-values.html; Seabourn, *Mission & Values*, https://www.seabourn.com/en_US/our-company/mission-values.html.

[54] The Company recently reported that it "has collected, and is reviewing the current core values of each operating line and will explore options, and possible guidance, for developing a uniform set of core values that will apply throughout the entire organization and further drive compliance performance." *Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 7.

files/2017-carnival-sustainability-full.pdf, at 10.[55]  This statement, repeated frequently, contains

an unresolved comparative ("better" in what ways, by what measure?), and the Company admits

it has adopted no metrics to measure baseline environmental conditions and the impact of the

Company's activities on those conditions.  *See* Employee Interview Notes.

*(2) COMMUNICATION OF ETHICAL STANDARDS*

The Company's leadership has failed to communicate or "demonstrate rigorous

adherence by example" to "clear and unambiguous" ethical standards on the importance of

environmental protection.  *See* DOJ Corporate Compliance Guidance at 9; *see also* U.S.

Sentencing Comm'n, *Guidelines Manual* § 8B2.1(b)(4)-(6).  This is evident, for example, in the

implementation of the undisclosed ship visit programs that were the basis for multiple counts of

the probation revocation petition.  *See* Dkt. No. 134 at 10-11.  By carrying out these programs

with the express or perceived purpose of avoiding TPA audit findings, leadership communicated

to its employees that the Company valued the *perception* of compliance more than the need to

actually address compliance issues openly and directly.  Indeed, the stated purpose of these visits

was to "avoid this type of poor audit," and shipboard employees whose ships were visited as part

of these programs understood that to be the purpose.  *See* Email from Chief Maritime Officer to

Carnival Cruise Line Senior Vice President (Oct. 20, 2017), PCL_DOJ_ESAVP_00059931-32;

Employee Interview Notes.

Although the Company pleaded guilty to violating its probation through the

implementation of these undisclosed ship visit programs, it is not clear that the Company's

---

[55] A similar statement appears in the Company's recently released sustainability report for 2018:
"we want to make every place we visit even better than it was before we went there."  *See*
Carnival Corp., *Sustainability from Ship to Shore FY 2018 Sustainability Report*, *available at*
http://carnivalsustainability.com/download-files/2018-carnival-sustainability-full.pdf, at 6.

July 3, 2019

leadership yet understands why these efforts were problematic.  Even after the probation

revocation petition was filed, some senior Company managers likened the pre-audit visits to

studying for a test, stating that one should expect that they prepare for TPA audits just as one

expects a student to prepare for a test.  *See id*.  This mindset reflects a failure to appreciate that

the Company is a criminal defendant on probation and therefore obligated to give the Court and

Interested Parties an unvarnished view of how it is doing.  As DOJ observed, the Company

"failed to appreciate the fact that [the pre-audit ship visit program] was taking place, not in a

normal compliance structure, but in the context of being on probation . . . [O]bviously, you can't

fake a urine test if you are an individual defendant on probation.  Well, you can't fake an

inspection either."  Settlement Hearing Tr. at 27-28 (June 3, 2019).

As another example, Company leadership has only gradually moved away from

emphasizing the limited, five-year timeframe of the ECP in communications to employees.  At

the beginning of probation, senior Company leadership frequently conveyed the message that

compliance efforts were to support the "5 year ECP."  *See, e.g.*, ECP Implementation &

Compliance Verification Form, PCL_DOJ_ESAVP_00000456-63, at

PCL_DOJ_ESAVP_00000462; Covered Personnel Environmental Training TRG 2304 A1,

PCL_DOJ_00005530-50, at PCL_DOJ_00005545.  More recently, some senior managers have

stated that they have not been involved in explicit discussions about the how the Company will

approach compliance after the probation period ends.  *See* Employee Interview Notes.  Notably,

the illegal activity on the *Caribbean Princess* began while the Company was still under a prior

ECP, and many employees who worked for the Company at the time have reported to the CAM

Team that there was slack in commitment and support for environmental compliance after (and,

according to some employees, even before) that ECP ended.  *See id.*  Some shipboard employees

have expressed to the CAM Team similar concerns about a possible reduction in the Company's

support for environmental compliance, such as the timely provision of spare parts to repair

pollution prevention equipment, after the current ECP ends.  *See id*.  In contrast, some senior

managers point out that almost all ECP requirements are incorporated into the Company's

Global HESS policies and procedures, suggesting that these requirements will outlive the period

of probation.  *See id.*

*(3) EMPLOYEE INCENTIVE PROGRAMS*

The Company has not incorporated the value of protecting the environment into

employee incentive programs in a widespread or consistent way.  *See* U.S. Sentencing Comm'n,

*Guidelines Manual* § 8B2.1(b)(6).  For example, the White Star Program created by Carnival UK

describes the behaviors of model employees and awards employees who exhibit these behaviors.

Those behaviors are:

1. We smile; we are always in the spotlight.
2. We use correct body language.
3. We are immaculate in our appearance.
4. We support and assist colleagues.
5. We respect each other as individuals.
6. We are always positive with guests and colleagues.
7. We are knowledgeable about our ships and services.
8. We exceed our guests' expectations.
9. We maintain formality in our service style.
10. We use proper telephone etiquette.
11. We always speak English in guest areas.
12. We never say 'no' we offer alternatives.

The compliance aspects of an employee's job are not included in this list.

Since the start of the ECP, and following observations from the CAM that there were no

employee incentive programs to reward environmental compliance, the Corporate Compliance

Manager and his team have developed some programs to recognize both individuals and ships

for their environmental compliance efforts.  These include the Environmental Excellence Awards

and the HESS Employee of the Month programs.  *See supra*, Part IV.B.5.vii; Appendix A.

However, the Company has not conducted a full evaluation of incentive programs and structures

to determine if they create appropriate incentives on compliance—including if they may create

perverse incentives to "cover up" or fail to report environmental incidents.  *See* Employee

Interview Notes; *see also infra*, Part V.A.2.ii(3) (discussing how the Company's current bonus

and incentive plans may not effectively incentivize environmental compliance).

ii.   *Commitment of Resources and Support*

The Company has admitted that it did not commit adequate resources and support for

environmental compliance programs.  The Company's leadership has acknowledged that it

"fail[ed] to provide sufficient responsibility and authority to the [Corporate Compliance

Manager] to implement the ECP," Dkt. No. 134 at 10, and "that it failed to establish a [Corporate

Compliance Manager] with authority (including resources, budget, and staff) as required to

implement the ECP."  *Id.* at 2.  As discussed above in Part IV.C.2, the Company agreed "to

restructure its existing corporate compliance governing authority," and engaged an outside

consultant "to advise it of the best options to improve its corporate compliance program, and to

achieve a change in corporate governance."  Dkt. No. 134 at 2-3.  As part of these efforts, the

Company has committed to establishing a new Chief Compliance Officer position "with

authority and substantial control to oversee the implementation of the Company's overall

compliance functions including environmental compliance and the ECP."  *Id.* at 2.  In addition,

the Company has agreed to provide the Chief Compliance Officer and Corporate Compliance

Manager "each with:  the appropriate budget and staff; a substantive role in financial, strategic,

and sustainability planning processes; and compliance authority over regulatory obligations and

operations across and within all brands."  *Id.*  It is not yet known how this commitment will play

July 3, 2019

out over time, and whether and to what extent the Company's leadership will come to have a better understanding of how best to support compliance.

2. <u>The Company's Strategic Planning Processes Are Strong But Do Not Effectively Support HESS Compliance</u>

The Court's Order of July 13, 2018, directed the Company to "meet and confer with the [CAM] to discuss how the companies' long-term strategic plans are formulated and, specifically, to discuss how environmental compliance has been made part of those plans and how protection of the environment is being incorporated as a priority into the companies' strategic plans in a long-term, sustainable manner." Dkt. No. 75 at 3. As discussed in prior CAM Quarterly Reports, Company personnel held a series of discussions and meetings with the CAM Team and the CAM's retained forensic accountant firm, AlixPartners, to fulfill the Court's direction. *See* CAM September 2018 Quarterly Report at 27-29; CAM December 2018 Quarterly Report at 36-38; CAM April 2019 Quarterly Report at 40-41.

Initially, in late August 2018, the Chief Maritime Officer provided the CAM Team with an overview of the strategic planning processes—which, as described below, are part of the Company's four-phase annual planning process. Then, in September 2018, the CAM Team and AlixPartners met with the Chief Financial Officer and the Controller of Carnival Corp. These meetings illuminated that the majority of planning is done at the brand/operating line level. Between October 2018 and April 2019, the CAM Team and AlixPartners met with senior management and personnel in the finance and maritime departments at each of the operating lines to better understand the Company's planning processes. Employees were highly cooperative during these meetings.

July 3, 2019

### i.    *The Company Has a Strong, Centralized Finance Function*

The Company has experienced continued financial success due, in part, to the leadership of its financial organization, which develops clear goals and processes and follows a strong centralized approach.  The financial organization, which is centralized at Carnival Corp., establishes a defined annual planning process with four phases, one of which is strategic planning, dedicated to different aspects of the financial plan.  These processes have been effectively communicated throughout the Company and are carried out by a large number of sophisticated and engaged employees.

### (1) FOUR PHASES OF THE ANNUAL PLANNING PROCESS

The Company's annual planning process consists of four phases.  For each of these phases, brands/operating lines develop and submit plans to Carnival Corp. for approval based on guidelines provided by Carnival Corp.:

- **New Build Planning**:  This process, which is reviewed by Carnival Corp. leadership in February of each year, benchmarks the expenditures on ships under construction in the same class of ship against one another;

- **Strategic Planning**:  This process, which is reviewed by Carnival Corp. leadership in April of each year, sets the strategy and provides a three-year high-level overview of the Company's plans to achieve that strategy;

- **Capital Planning (Excluding New Build Planning)**:  This process, which is reviewed by Carnival Corp. leadership in May of each year, evaluates and budgets for the capital projects planned by each brand for the coming two years; and

- **Operating Planning**:  This process, which is reviewed by Carnival Corp. leadership in October of each year, evaluates and budgets for the expenditures necessary to operate the Company, including routine maintenance on the ships, food, labor, and fuel.

A group within Carnival Corp., called the Financial, Planning, and Analysis group, manages each of these planning processes and provides written guidelines to the brands/operating lines setting forth, among other things, timelines, information required to be

July 3, 2019

submitted, assumptions to be used, and financial templates.  *See* Employee Interview Notes.

Each brand/operating line has its own Financial, Planning, and Analysis group which then

manages the processes in accordance with the guidelines from Carnival Corp.  These

brand/operating line groups are required to provide Carnival Corp. with updated forecasts

throughout the year to enable it to monitor, report, and track performance.

*(2) CLEAR METRICS AND GOALS FOR FINANCIAL PERFORMANCE*

Carnival Corp. establishes clear financial performance metrics for the annual plan

submissions from the brands/operating lines.  For example, Carnival Corp. requires these

submissions to include certain statistics, such as Available Lower Berth Days (a metric used in

the cruise industry to determine passenger capacity) and Fuel Consumption.  *See, e.g.*, Carnival

Corp., *2018-2020 Operating Plan Submission Guidelines*, PCL_ECP00078527-39, at

PCL_ECP00078529.  Carnival Corp. then monitors and uses these metrics for comparison and

analysis.  In addition, the brands/operating lines use other key performance indicators, such as

Operating Income, Net Yield, and Net Cruise Cost to monitor their performance throughout the

year.  *See* Carnival Corp., *Strategy Plan Meeting* (Apr. 11, 2018), PCL_ECP00091730-891, at

PCL_ECP00091757.

Similarly, Carnival Corp. has established a clear, overarching financial goal for all of the

brands:  a long-term return on invested capital of greater than ten percent.  *See, e.g.*, Carnival

Corp. & plc 10-K (2018); Carnival Corp. Q4 2018 Earnings Report at 1 (noting target of

"double-digit return on invested capital"); Carnival Corp., Form 10-Q First Quarterly Report

2019, *available at*

https://www.sec.gov/Archives/edgar/data/815097/000081509719000011/a1q201910-q.htm, at 27

(noting that "[o]ur primary financial goals are to profitably grow our cruise business and sustain

Page **73** of **112**

July 3, 2019

and grow our double-digit return on invested capital ('ROIC'), while maintaining a strong

balance sheet and strong investment grade credit ratings").  This goal is widely circulated and

well-understood by employees, even those who do not have financial planning as their primary

role.  *See* Employee Interview Notes.  Given the absence of clear metrics and widely-understood

messaging on HESS compliance goals, *see supra*, Part V.A.1.i, it is understandable that

employees could be left with the impression that achieving financial goals takes precedence.

### (3)  CLEAR LINES OF AUTHORITY IN FINANCE AND ACCOUNTING STRUCTURE

The Company's finance and accounting structure is led by the Carnival Corp. Chief

Financial Officer, and the reporting lines from the brands to Carnival Corp. and within the

brands are clear and structured (although each brand/operating line structures its finance

department differently).  *See* Carnival Corp. Chief Financial Officer Organization Chart (Sept.

24, 2018).  The well-defined structure establishes a clear delegation of authority and facilitates

communication and information flow.  The CAM Team perceived that this has led to high

morale, work satisfaction, and drive for innovation within the financial organization.  The

monthly reporting process epitomizes this efficiency, as the brands are able to close their books

and records within days and provide the information to Carnival Corp.  *See* Employee Interview

Notes.[56]

Furthermore, the Company's finance and accounting functions take overall direction and

guidance from the Carnival Corp. Chief Financial Officer, who is a universally respected leader

within the Company and a member of the Carnival Corp. Executive Leadership Team.  *See id.*

He sets the tone for financial compliance, communicates explicit Company financial goals,

---

[56] Per interviews with finance personnel in the brands/operating lines, information is sent to Carnival Corp. within five to six business days after month-end closing.  *See id.*

July 3, 2019

develops consistent policies and procedures, determines whether each brand/operating line's finance department has adequate staffing to accomplish its responsibilities, and drives initiatives for continuous improvement. *See id.* His approach appears to provide support and opportunity for individuals to raise new ideas and to ask questions. *See id.*

Under the Chief Financial Officer's leadership, there has been a drive to automate processes and develop tools to establish consistency among the brands/operating lines. While the finance and accounting departments have some manual processes (including the use of Excel spreadsheets) to process financial data, all brands/operating lines utilize the same accounting system, Oracle, which facilitates the consolidation, analysis, and reporting of financial information. The Company is also in the process of making Hyperion, a financial planning tool, available to all brands/operating lines by 2020. As of the date of this report, three brands (AIDA, Carnival Cruise Line, and Costa) are using Hyperion. *See id.*

ii. *The Company Lacks a Strong, Centralized HESS Compliance Function*

In contrast to the strong, centralized finance function, the Company lacks a strong, centralized HESS compliance function. Within the annual planning processes, each brand/operating line takes its own approach to HESS compliance, with limited oversight, guidance, communication, or support from Carnival Corp. As a result, HESS compliance is not effectively integrated into the processes. Moreover, outside of the annual planning processes, the Company's approach to environmental compliance is fragmented and decentralized, and there is a general lack of clarity as to responsibility, accountability, and authority for environmental compliance. In addition, the Company's current bonus and incentive plans are focused primarily on financial metrics and may not effectively incentivize compliance. These issues are important

July 3, 2019

for the Company to consider as it restructures its corporate compliance function.  *See supra*, Part
IV.C.2.

### *(1) HESS COMPLIANCE IS NOT EFFECTIVELY INTEGRATED INTO THE ANNUAL PLANNING PROCESSES*

The Company does not effectively integrate HESS compliance into its annual planning
processes, as demonstrated by the lack of formal guidance on HESS considerations, the
fragmented nature of the Company's HESS compliance data, and the lack of clear roles for
compliance personnel in the planning processes.

The guidelines that Carnival Corp. issues each year to the brands/operating lines for
annual plan submissions do not provide clear guidance on HESS considerations.  For instance,
guidelines for the 2019-2021 financial years contained, for the first time,[57] the following
message from the Carnival Corp. President and CEO:

> A Message from Arnold Donald, President and CEO.  At Carnival Corporation &
> plc and our world leading cruise brands, we hold ourselves to the highest standards
> of character and integrity.  We must remain resolute to these high expectations if
> we are to enjoy continued success and if we are to continue to enjoy our freedom
> to operate.  As a company, we exist to deliver out-standing value to our
> shareholders while delivering joyful vacations and exceptional experiences to our
> guests.  Along the way, we strive to be an employer of choice while earning the
> respect of regulators and our many other external stakeholders and importantly, **we
> always strive to leave the places in the world we touch better than when we
> first arrived**.
>
> **We must never compromise in these principles – committing the resources
> necessary to safeguard our crew, our guests, our assets and the environment**.
> **And we must never compromise in our methods, in our operations or in our
> compliance with the laws and regulations under which we operate – with a
> foundational commitment to always doing the right thing**.
>
> As a business leader, you are expected to deliver this message clearly and
> unambiguously to your team members.  And in practice, your strategic & operating

---

[57] The CAM notes that these guidelines were issued in June 2018 and revised in August 2018,
after the Court's Order of July 13, 2018, directing the CAM's inquiry into the role of compliance
in the Company's strategic planning processes.

plans, forecasted costs, prioritized capital appropriations, newbuilding designs and
everything else you do should directly reflect the expectations stated above.

*See*, *e.g.*, Carnival Corp., *2019-2021 Operating Plan Submissions Guidelines (Updated)*

(Aug. 24, 2018) (emphasis added).

According to this statement, Carnival Corp. expects the plan submissions to reflect an

appropriate spending level to enable the Company to: "leave the places in the world we touch

better than when we first arrived," "never compromise . . . [on] committing the resources

necessary to safeguard . . . the environment," and "always do[] the right thing." *Id.* To the

extent that these statements represent HESS compliance goals, they are vague and lack

meaningful benchmarks or key performance indicators. *See also supra*, Part V.A.1.i(1). To an

outside observer, the statement reads more like a reactive response to the ongoing Court-ordered

inquiry written by a public relations person, rather than guidance developed by a skilled

compliance professional.

Likewise, the Carnival Corp. guidelines do not give clear guidance on what data or

information regarding environmental compliance the brands/operating lines are required to

provide as part of the plan submissions. *See*, *e.g.*, Carnival Corp., *Strategy Meeting 2019-2021*

*Submissions Guidelines (due Mar. 23, 2018)*; Carnival Corp., *2019-2021 Operating Plan*

*Submissions Guidelines (Updated)* (Aug. 24, 2018); Carnival Corp., *April/May 2018 Capital*

*Appropriation Plan Submissions & Guidelines* (Feb. 12, 2018).[58] Therefore, there is no easy

---

[58] For instance, while Attachments 3.2 and 3.4 to the April/May 2018 Capital Appropriation Plan
Submissions & Guidelines identify specific capital segment categories (including HESS,
Regulatory Requirement, Energy Efficiency, and Marine/Technical) that brands/operating lines
must identify for each capital project submitted for consideration, they do not provide a category
for "environmental compliance" projects, nor do they explain how to treat projects that may fall
into one or more category (*e.g.*, HESS and Regulatory Requirement). This approach makes it
difficult to identify capital costs associated with environment compliance or to assess whether
individual brands/operating lines are applying the categories in a uniform way. In addition, the

way for the Company to review a uniform set of environmental compliance data or related costs across its brands/operating lines.  Nor is there an easily discernable method for the Company to analyze its environmental compliance performance or spending between brands/operating lines in a given year, or against spending from previous years, to determine if the proposed plans are consistent with the CEO's message.  The Company does review a variety of HESS statistics throughout the year regarding maritime operations and sustainability goals.  However, the CAM Team found no evidence that this data is considered in a consistent and transparent fashion in the annual planning processes, including in the strategic planning processes.  The only environmental compliance costs that are currently tracked across brands/operating lines in a uniform manner according to written guidance by Carnival Corp. are the Covered Vessel budgets and the Operating Line Compliance Manager budget certifications, which are mandated under the ECP and are developed separately from the annual plans.

Review of strategic plans presented to Carnival Corp.'s Executive Leadership Team in 2018 demonstrated that the lack of guidance in the planning processes regarding environmental compliance resulted in limited attention to the topic.[59]  For example, Carnival Corp.'s 2018 Strategic Plan Overview focused on financial and business key performance indicators across brands/operating lines and did not include any specific HESS or ECP related data.  *See* Carnival

---

summary of fleetwide maritime capital costs presented during the May 2018 capital plan meeting did not use the same categories identified in the submission guidelines.  Instead, the proposed capital costs were broken down by Environmental, Technical, Energy, and Exhaust Gas Cleaning System (along with Deck, Fire Safety, Health, and Security), and these categories were not defined in the plan presentation.  *See* Carnival Corp., *Capital Plan Meeting* (May 15, 2018), PCL_ECP00092162-329, at PCL_ECP00092176, 79.

[59] Additionally, there appeared to be some confusion among senior management as to whether HESS compliance topics were within the ambit of what should be addressed in plan presentations, or if they were more appropriately addressed to the HESS Committee of the Board of Directors.  *See* Employee Interview Notes.

Corp., *Strategy Plan Meeting* (Apr. 11, 2018), PCL_ECP00091730-891, at PCL_ECP00091732-52.  Reference to environmental compliance in individual strategic plans presented by the brands/operating lines in 2018 ranged from simple statements (*e.g.*, Carnival Cruise Line's reference to "Regulatory and environmental compliance cost pressures," *id.* at PCL_ECP00091755), to several slides providing a high-level approach to achieving HESS compliance (*e.g.*, Carnival UK's "Roadmap to HESS commitment culture by YE21," *see id.* at PCL_ECP00091775-781).  This year, for the first time, the presentation of the strategic plans has been organized by topic (instead of by brand/operating line), and HESS is one topic that each brand/operating line is expected to address.  *See* Employee Interview Notes.

In addition to a lack of formal guidance on HESS considerations, the CAM Team observed no uniform way in which environmental compliance personnel participate in the development of the annual plans.  For instance:

- **Chief Maritime Officer.**  At Carnival Corp., the Chief Maritime Officer attends the presentations of all the plans by the brands/operating lines as part of the Carnival Corp. Executive Leadership Team.  *See id.*  Additionally, the Chief Maritime Officer conducts a review of the capital plans for maritime projects for each brand/operating line prior to the plan presentations.  *See id.*  In 2019, the Chief Maritime Officer will also be providing a maritime subject matter review of operating plans prior to the plan presentations.  *See id.*  The Chief Maritime Officer does not perform a subject matter review of the strategic plans.  *See id.*;

- **Corporate Compliance Manager.**  The Corporate Compliance Manager, who currently reports to the Chief Maritime Officer, did not participate in the annual planning process in 2017 or 2018, and had no visibility into the plans reviewed in those years.  *See id.*  However, in 2019—again, after the Court-ordered inquiry began—the Corporate Compliance Manager was invited to attend the presentation of the plans to the Carnival Corp. Executive Leadership Team and will now be asked to participate in the Chief Maritime Officer's subject matter review of the maritime spending in the capital and operating plans prior to the plan presentations.  *See id.*; and

- **Operating Line Compliance Managers.**  At some operating lines, Operating Line Compliance Managers are present at several stages of plan reviews at the operating line level before the plans are submitted to Carnival Corp.  *See id.*  At other operating

lines, Operating Line Compliance Managers receive a notification of the relevant portion of the plans after the plans have been developed and approved by brand or operating line management.  *See id.*

The role of the new Corporate Compliance Officer in these processes remains to be seen.

### (2) APPROACH TO ENVIRONMENTAL COMPLIANCE OUTSIDE OF THE ANNUAL PLANNING PROCESSES IS FRAGMENTED AND DECENTRALIZED

Outside of the annual planning processes, the Company's approach to environmental compliance is fragmented and decentralized.  This is a profound barrier to improvement that is made more problematic by the Company's admitted lack of effective leadership on environmental compliance issues, including its failure to "provide sufficient responsibility and authority to the [Corporate Compliance Manager] to implement the ECP."  *See* Dkt. No. 134 at 10.

As discussed in prior CAM reports, responsibility for environmental compliance issues is distributed among various parties at the Carnival Corp., operating line, and brand levels.  *See, e.g.*, CAM December 2018 Quarterly Report at 26-28.  As a result, a variety of individuals in different parts of the Company perform environmental compliance tasks, such as tracking environmental requirements, drafting policies and procedures, and developing environmental compliance projects and initiatives.  Although the Company uses subject matter working groups (consisting of members from Carnival Corp. and brands/operating lines who work to exchange best practices and enhance coordination on specific topics), ultimate decision making authority remains intentionally diffused.[60]

---

[60] Currently, the Company has sixteen different working groups on topics that intersect with environmental compliance, including:  Data Management; Emerging Technology; Drydocking; Voyage Planning & Environmental Solutions; Environmental Procedures & Regulatory Issues; Deck, Technical & Environmental Officer Psychometric Program; SeaEvent Incident Investigation Software; Sustainability; and Food Waste.  *See Working Group Members*, PCL_ECP00117663.

July 3, 2019

This decentralized approach can lead to ineffective or delayed responses to critical

environmental issues.  One notable example is the Company's response to food waste

management concerns, discussed further below in Part V.B.1.i.  In February 2018, the ECP-

mandated Fleet Engineering Survey[61] identified concerns related to food waste management

across operating lines and ships, including poor food waste segregation practices leading to the

discharge or potential discharge of non-food items mixed with food waste, as well as broken or

problematic food waste equipment (*e.g.*, pulpers and shredders).  *See Carnival Corp Engineering

Survey Final Comments and Suggestions* (Feb. 2018), PCL_ECP00045496-658 (over twenty

comments related to food waste management concerns).[62]  The Company tasked each

brand/operating line with identifying corrective actions based on the survey results, and each

took a different approach.[63]  These divergent corrective actions did not resolve the Company's

food waste management challenges.  Not until findings by both the TPA and the CAM in

---

[61] The ECP required the Company to "issue a survey to all shipboard engineering officers and all
Environmental Officers on its vessels for information on how to improve MARPOL compliance,
to include what new equipment, maintenance, parts, and procedures would be beneficial" that
included an "assessment requesting the frank opinions of the vessels' engineers as to their ability
to adequately maintain the vessels' systems, equipment, and components."  ECP § IX.N.1. The
ECP further required the Operating Line Compliance Managers to "evaluate the responses and,
together with the [Corporate Compliance Manager], establish a plan to evaluate, test, and
implement viable ideas for improvement."  ECP § IX.N.2; *see also* CAM December 2018
Quarterly Report at 15-16 (discussing the Company's implementation of the Fleet Engineering
Survey and development of corrective actions).

[62] Noteworthy comments included:  "I have a huge concern about the food waste chute and its
potential for mis-use or abuse to discharge anything and or everything"; "If inspectors open food
waste tank and see the amount of plastic that is in tank and it is getting discharged o[ver] board it
will be [the n]ext big bill to pay"; and "Plastic contamination of food waste. Due to the large
volume of food waste processed this is relatively inevitable without contentiously [*sic*]
offloading food waste."  *See id.*

[63] For example, Carnival UK and Costa Group determined no action was necessary on food
waste issues, while Holland America Group and Carnival Cruise Line identified a narrow set of
action items limited to the systems on specific ships.  *See Carnival Corporation Engineering
Survey Actions*, PCL_ECP00083509-538.

July 3, 2019

December 2018 and April 2019, respectively, related to food waste issues on two different ships did the Company begin to take a centralized approach to food waste management.  Notably, most senior Company managers interviewed by the CAM in June 2019 said they had not been aware of the Fleet Engineering Survey observations and were surprised at the food waste problem when it started to receive a heightened focus at the end of ECP Year Two.  *See* Employee Interview Notes.

Another example of how a decentralized approach limits the Company's environmental compliance efforts is the Company's current inability to collect and perform sophisticated analysis on uniform environmental compliance data across the entire fleet, similar to the way it collects and analyzes financial and business data.  Currently, each brand/operating line has discretion to determine the type of software used for environmental compliance purposes.  As a result, similar types of data are kept in different software systems that do not easily communicate with each other, if at all, which makes trend analysis of data across the entire fleet difficult.  For example, each brand/operating line is required to report HESS incidents and near misses (including environmental incidents and near misses), to Carnival Corp., but the Company does not dictate how this information is tracked and reported.  *See COM-1101 Reporting of HESS and Operational Events, Near Misses and Ship Inspections.*  Each brand therefore has different reporting systems, ranging from manual spreadsheets to databases.  *See* Employee Interview Notes.  Fleet-wide data is compiled manually for tracking and reporting, including for the weekly Flash Reports, and is not in compatible formats to allow for sophisticated analysis.  *See id.*  The Company has acknowledged this deficiency.  It is now in the process of rolling out software, called SeaEvent, for use across the brands/operating lines that should allow the Company to compile consistent data for every HESS event, including root causes, preventative actions, and

corrective actions.  *See supra*, Part IV.B.5.iii; Appendix A.  Housing this data in a centralized software tool should enable the Company to better understand the causes of environmental compliance incidents across the entire fleet and devise consistent strategies to prevent future occurrences Company-wide.

There are other areas where the Company has recognized that a more centralized approach could improve its environmental compliance efforts.  For example, the Company is in the process of rolling out a single planned maintenance and spare parts management system, called Marine Asset Strategies Transformation or "MAST," that would, among other things, allow the Company to monitor the location and status of its entire spare parts inventory across the entire fleet.  *See MAST Update* (Nov. 13, 2018), PCL_ECP00083937-40; May 2019 Probation Supervision Report, Attachment 3, at 11.  This is designed to improve the Company's ability to efficiently deliver to ships whatever spare parts are needed to keep onboard pollution prevention equipment in working order.  Similarly, the Company has begun rolling out a single learning management system, called GLADIS, for use in conjunction with mobile devices that would deploy and track training of its workforce across brands/operating lines, including environmental training.  *See* Employee Interview Notes; May 2019 Probation Supervision Report, Attachment 3, at 10; Appendix A.

### (3) EMPLOYEE INCENTIVE PLANS MAY NOT EFFECTIVELY INCENTIVIZE HESS COMPLIANCE

The Company's current bonus and incentive plans for applicable employees are focused primarily on financial metrics (*e.g.*, operating income/profit targets).  *See e.g.*, *Carnival Corporation & plc Management Incentive Plan (adopted 2015)*, PCL_ECP00020362-67, at PCL_ECP00020362; Carnival Corp. and Carnival Cruise Lines, *Management Bonus Plan*, *as amended* (Dec. 1, 2016), PCL_ECP00020396-99, at PCL_ECP00020396; [*Holland America*]

*Group Management Incentive Plan* (Mar. 31, 2016) PCL_ECP00020794-97, at

PCL_ECP00020794; *Carnival UK Exec[utive] Incentive Plan 2017 Addendum*, PCL_

ECP00020707-12, at PCL_ECP00020707.

      Consideration of HESS targets or compliance issues vary depending on the incentive

plan.  For example, under the Company's Management Incentive Plan, which applies to Carnival

Corp. and operating line management at the Vice President level and above, "management of

health, environment, safety and security matters" is a discretionary consideration.  *See Carnival*

*Corporation & plc Management Incentive Plan (adopted 2015)*, PCL_ECP00020362-67, at

PCL_ECP00020366.  The Company uses a "HESS modifier" to increase and/or decrease the

overall bonus of participants in the Management Incentive Plan based on the HESS performance

of each brand or operating line.  *See e.g.*, Employee Interview Notes.[64]  The Chief Maritime

Officer is responsible for the HESS modifier, and its application has changed over time,

including the specific HESS data components and their relative percentage weighting.  *See*

Employee Interview Notes.[65]

      There is no consensus that the HESS modifier has incentivized changes in HESS

performance.  While members of senior management at some operating lines indicated that the

---

[64] Some operating lines have chosen to apply the HESS modifier to employee incentive plans outside of the Management Incentive Plan as well.  *See e.g.*, Holland America Group, *2017 Management Incentive Plan Structure Overview* (Jan. 23, 2017), PCL_ECP00020785-89, at PCL_ECP00020787; *Carnival UK Exec[utive] Incentive Plan 2017 Addendum*, PCL_ECP00020707-12, at PCL_ECP00020708, 10-12.

[65] The 2018 HESS modifier components and percentage weight were:  (1) **Safe Ships 40%** (Audit 13%, Repeat Findings 4%, Overdue Action Items 2%, Significant Incidents 5%, Potentially Significant Fires 3%, CSMART 10%, LMS Implementation 1%, LSA 2%); (2) **Safe Passengers/Crew 25%** (Passenger Injuries 5%, Crew Injuries 5%, Security 5%, Public Health 10%); and (3) **Safe Environment 35%** (Oil Discharges MARPOL Annex I 4%, Sewage Discharges MARPOL Annex IV 3%, Other Water Discharges 3%, Food and Other Discharges MARPOL Annex V 2%, Refrigerant Emissions 2%, Airborne Discharges MARPOL Annex VI 2%, Significant Environmental Events 2%, Bilge Water Volume 4%, EGCS Usage Rate 5%, In

July 3, 2019

HESS modifier has brought attention to specific HESS factors, many senior managers were not able to explain how the HESS modifier works or viewed it as something determined subjectively by the Chief Maritime Officer.  *See* Employee Interview Notes.  Others were not sure it resulted in positive behavior modification, particularly when it affected compensation for employees that do not have direct HESS responsibilities.  *See id.*  DNV GL, the maritime consulting firm that the Company hired to assess its incident investigations program, expressed similar concerns about whether the HESS modifier disincentivized reporting and sharing of lessons learned.[66]  In fact, certain brands/operating lines have specifically excluded consideration of HESS, environmental compliance, or environmental operations performance targets from incentive compensation for shipboard employees altogether.  *See e.g.*, Costa Group, *Performance Management Run 2016* (Oct. 2016), PCL_ECP00020454-65, at PCL_ECP00020463; Carnival Cruise Lines, *Carnival Shipboard Incentive Program (CSIP)*, PCL_ECP00020410-20, at PCL_ECP00020415.

---

Port Energy Use 3%).  *See* Carnival Corp., HESS Modifier to [Management Incentive Plan] (Oct. 14, 2018).  Based on available information, the CAM understands that in recent years the Chief Maritime Officer has held discussions with maritime Executive Vice Presidents on proposed HESS modifier data components and weightings, before presenting the results to the Carnival Corp. CEO and HESS Committee of the Board of Directors for annual approval.

[66] For instance, DNV GL observed that "[a]nother issue that counteracts Carnival's learning culture is the 'HESS modifier' that senior managers have as a component of their bonus.  This appears to start with a modifier of 1 which is then eroded based upon the severity and number of incidents that occur through the year.  Whilst it is right that there is an impact on remuneration based on HESS performance, it is important that it drives the right behaviour.  Other organisations have found that such approaches disincentivize reporting and sharing of lessons learned."  DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-2050, at PCL_ECP00052032.

July 3, 2019

## B.    Environmental and ECP Violations

During ECP Year Two, the Company continued to violate environmental laws and the

ECP.  As discussed above in Part II.A, the Company pleaded guilty to six violations of probation

on June 3, 2019, most of which were based on events occurring at least in part during ECP Year

Two.  In addition to the admitted probation violations, the Company had numerous other

incidents on Covered Vessels involving violations of environmental law and/or the ECP.  These

incidents were reported through various formal and informal reporting mechanisms, including

TPA and RAAS audit findings, Notices of Violation to the Probation Office, Environmental

Open Reports (*i.e.*, hotline reports), Flash Reports, and email notifications from the Corporate

Compliance Manager.

### 1.    Probation Violations

#### i.    *Discharge of Plastics in Commingled Food Waste*

On June 3, 2019, the Company pleaded guilty to Count 5 of the probation revocation

petition, which alleged that:  "(1) on or about December 16, 2018, the M/V Carnival Elation

discharged plastic mixed with food waste in violation of [MARPOL Annex V],[67] and the ECP in

Bahamian waters; and (2) on or about December 18, 2018, the M/V Carnival Elation failed to

---

[67] MARPOL Annex V prohibits the discharge of garbage, including plastics, into the sea, with
limited exceptions.  *See* MARPOL Annex V, Reg. 3.1-3.2.  Although MARPOL permits the
discharge of certain food wastes under specified conditions, *see, e.g.*, MARPOL Annex V, Reg.
4.1.1-4.1.2, whenever such food wastes are "mixed with or contaminated by other substances
[*e.g.*, plastics] prohibited from discharge or having different discharge requirements, the more
stringent requirements shall apply."  MARPOL Annex V, Reg. 4.1.4.  Therefore, a food waste
discharge that might otherwise be permitted under MARPOL is not permitted if the food waste is
contaminated with plastics or other garbage that cannot legally be discharged.

maintain a Garbage Record Book[68] in which all overboard discharges of garbage were accurately recorded, in violation [of MARPOL Annex V], and the ECP." *See* Dkt. No. 134 at 11.

This Count was based on a TPA finding from an audit conducted on December 13-17, 2018. *See* ABSG, *Carnival Cruise Line Environmental Compliance Audit Report, Carnival Elation* (Jan. 23, 2019), at 5 (issuing a Major Non- Conformity after non-food items, including plastics, were found in food waste that was later discharged to the sea); ABSG, *Carnival Cruise Line Environmental Compliance Supplemental Audit Report, Carnival Elation* (Apr. 4, 2019), at 8 (noting in follow-up audit that "[t]he [food] segregation problem has yet to be fully corrected"); *see also* CAM April 2019 Quarterly Report at 18-23 (discussing the incident in detail).

The incident on the *Carnival Elation* is symptomatic of broader food waste management challenges facing the Company. Approximately four months following the TPA audit finding, on April 14, 2019, the CAM Team observed a similar incident during a visit on another ship, although there was no subsequent observed overboard discharge because the ship immediately suspended food waste discharges and cleaned out the tank. *See* Email from S. Solow, *Interested Parties Notification* (April 19, 2019).

Following the TPA and CAM findings, the Company began a concerted effort to enhance the monitoring of food waste management practices on its ships, including increased inspections of food waste tanks and other parts of food waste systems for the presence of plastics and other non-food items. Since April 24, 2019, the Company has reported more than three hundred[69]

---

[68] A Garbage Record Book is a log where a ship records the discharge, disposal, or incineration of garbage. It is required under MARPOL Annex V. *See* MARPOL Annex V, App. II.

[69] Most of these incidents occurred after the end of ECP Year Two and are included in this Report to give context for the ongoing nature of this issue.

July 3, 2019

additional similar incidents on Covered Vessels across its fleet.  These incidents involved the

discovery of comingled waste, including plastics, in various parts of the ships' food waste

systems (including food waste tanks, pulpers, grease traps, magnetic traps, filters, chutes,

dewatering units, and red bins) that have resulted in actual or potential prohibited discharges.

*See, e.g.*, Carnival Corp. HESS Weekly Flash Report (Apr. 24, 2019, May 1, 2019, May 8, 2019,

May 15, 2019, May 22, 2019, May 29, 2019, June 5, 2019, June 12, 2019, June 19, 2019, June

26, 2019).  The majority of these incidents were characterized as near misses, although at least

two were characterized as discharges in violation of MARPOL Annex V.  Although the

Company characterized most of these incidents as near misses, the CAM notes that it is generally

not possible to confirm whether or not prior prohibited discharges from the food waste systems

at issue occurred.

      The fact that ships are struggling to properly manage food waste should have come as no

surprise to the Company.  As discussed above in Part V.A.2.ii(2), the Fleet Engineering Survey

results from February 2018 identified concerns related to food waste management across

multiple operating lines and ships.  *See Carnival Corp Engineering Survey Final Comments and*

*Suggestions* (Feb. 2018), PCL_ECP00045496-658.  There were also more than forty incidents on

Covered Vessels throughout ECP Year Two reported through Flash Reports, audit reports,

Notices of Violation, hotline reports, and other reporting mechanisms related to either:  (1) food

waste mixed with non-food items, including plastics; or (2) food waste system equipment, such

as pulpers and shredders, being out of service or not operating correctly.

      The Company has recognized "that there is a need to improve waste management of non-

food waste, including plastic garbage, on Covered Vessels and by Covered Personnel."  Dkt. No.

134 at 5.  The Company has further "agreed to prioritize this issue through the creation of 'tiger

teams,' and the establishment of a three-part program," both discussed further below.  *Id*.  In addition, the Company has launched a Food Waste Task Force, led by the Corporate Compliance Manager and made up of a wide range of stakeholders from multiple departments across the Company, as well as external consultants and experts.  *See* April 2019 Probation Supervision Report, Attachment 3, at 13; *Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 8.

The Company's tiger teams are made up of a combination of subject matter experts from both within and outside of the Company.  Initial kick-off meetings were held from June 3-6, 2019.  *See id.*  The teams plan to visit at least thirty ships between June and August 2019 to: (1) benchmark processes, setup, procedures, design, and equipment across ships and brands; (2) review adequacy of staffing; (3) review technical aspects, including equipment redundancy and adequacy; (4) review food waste volume management; (5) review single-serve/use items; (6) engage crew and solicit good ideas and best practices; and (7) provide recommendations to enhance food waste compliance and further standardize processes, procedures, design, and equipment.  Dkt. No. 134 at 6.  The Corporate Compliance Manager will oversee the implementation of the recommendations and "will task at least one of the individuals on the tiger teams to serve as a dedicated manager of implementation on a day-to-day basis."  *Id.*

In addition, the Company plans to implement a three-part program to improve its food waste practices:

- **Part One.**  Part One will focus on improving training, supervision, staffing, and culture.  The Company will:  "(1) develop and implement clearer and more effective procedures regarding the disposal of food waste; (2) develop new training and signage to ensure that the proper procedures are understood; and (3) use appropriate media, in particular video, to call attention to the new training, procedures, and the renewed commitment to handling of food waste.  The Company will also (4) assess the staffing levels for both the operational and compliance aspects of food waste management using a qualified third party to determine appropriate resources to

comply with the updated procedures." *Id.* at 6-7.  For the first three items, the Company will provide the Interested Parties, CAM, and TPA an implementation plan by August 1, 2019.  *Id.* at 7;

- **Part Two.**  Part Two will focus on decreasing single-use plastics[70] and food waste volumes.  The Company will "design and implement procedures to reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent by December 31, 2021.  It will also design strategies to reduce the total weight of food waste that the Company creates by 10 percent by December 31, 2021." *Id.* (footnote omitted); and

- **Part Three.**  Part Three will focus on technology and design improvements.  By October 31, 2019, the Company "will review and provide an analysis of:  (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes." *Id.*  Further, by January 31, 2020, the Company "shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones." *Id.*

As the Company has acknowledged, food waste management—in particular, the separation of non-food items, including plastics, from food waste before it is discharged overboard—is one of its most pressing environmental challenges as it moves into ECP Year Three.  The CAM recognizes that this issue is complex, and that, as of the date of this Report, the Company is making significant efforts to address the problem.  That said, discharge of plastics into the ocean has long been illegal, and concerns about the problem are not new.  As in other areas, it has been action from the outside that led the Company to focus on this issue.  The CAM will continue to monitor and report on the Company's efforts to improve its food waste management.

---

[70] The Company describes single-use plastic items as including "among others, the following: straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events." *Id.*

July 3, 2019

    ii.    *Failure to Provide the Corporate Compliance Manager with ECP-Required Authority*

On June 3, 2019, the Company pleaded guilty to Count 2 of the probation revocation petition, which alleged a "fail[ure] to provide sufficient responsibility and authority to the [Corporate Compliance Manager] to implement the ECP." Dkt. No. 134 at 10. The Company also "acknowledge[d] that it failed to establish a [Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP," and agreed to hire an outside compliance consultant as part of its efforts to restructure its compliance function. *Id.* at 2-4; *see also supra*, Part IV.C.2 (discussing the Company's retention of a corporate compliance consultant).

This failure to provide the Corporate Compliance Manager with ECP-required authority was identified by the CAM at the end of ECP Year One. *See* CAM First Annual Report at 4-5, 28 (observing that the Corporate Compliance Manager "is not in control of environmental compliance. He does not have authority over environmental capital or operating budgets, does not have authority to fully direct the operating lines' compliance activities, and does not have authority over the Company's development and dissemination of environmental policies and procedures."). The CAM continued to report on the Company's failure to remedy this finding throughout ECP Year Two. *See, e.g.*, CAM December 2018 Quarterly Report at 26-28 (finding that the Company's new procedure purporting to set out the Corporate Compliance Manager's role and authority "limits the [Corporate Compliance Manager]'s authority in a number of ways," "does not establish the [Corporate Compliance Manager] as a position with 'both responsibility and authority over environmental policy and the [ECP]'" and "does not provide for a sustainable [Corporate Compliance Manager] role that is fully integrated into the Company's compliance efforts and structure, with actual authority over critical components of compliance");

July 3, 2019

CAM April 2019 Quarterly Report at 30-33 (discussing examples of the Company's apparent lack of support for the Corporate Compliance Manager role, including the reluctance to fund a Fleet Environmental Officer program and the development of an undisclosed ship visit program without the Corporate Compliance Manager's direct oversight or approval).

As of the end of ECP Year Two, the Company had not taken steps necessary to provide the Corporate Compliance Manager with this ECP-required authority.  The Company acknowledged this failure in pleading guilty to the probation violation.  The Company recently reported that, as of May 17, 2019, it has promoted the Corporate Compliance Manager from the level of Vice President to Senior Vice President and "will be increasing the size of his team by adding positions including Senior Manager Environmental Training, Manager Environmental Compliance & Continuous Improvement, [and] Director Fleet Environmental Compliance & Training Officer program."  May 2019 Probation Supervision Report at 13-14.  The CAM will continue to monitor and report on the Company's efforts to address this issue during ECP Year Three, as well as its broader efforts to restructure its corporate compliance function.  *See infra*, Part IX.A.

### iii.      *Other Probation Violations*

The Company pleaded guilty to four additional probation violations on June 3, 2019.

These violations related to:

- Conducting an undisclosed ship visit program between June 2017 and December 4, 2017, to visit ships shortly in advance of TPA audits to find and remedy environmental compliance issues without disclosing these findings to the TPA and the CAM, and failing to promptly notify the Court, Interested Parties, and CAM about the program.  *See* CAM April 2019 Quarterly Report at 41-52 (discussing the CAM's findings resulting from the review of the undisclosed ship visit programs).  This pre-audit program "tainted" the audits performed in its wake, and thereby diminished the Court's ability to rely on ECP Year One TPA audits to provide an accurate benchmark of the compliance challenges faced by the ships.  *See* Status Conf. Tr. at 29 (Apr. 3, 2018); Status Conf. Tr. at 11 (July 11, 2018) (Court and Government

agreeing that "[t]hey're all tainted," referring to first-year TPA audits); *id.* at 39 (noting "concerns as to whether or not the audit findings that we have are really the true picture"). In pleading guilty to this violation, the Company acknowledged that the pre-audit ship visit program "interfere[ed] with the implementation of the ECP, TPA audits, and the Court's supervision of probation." Dkt. No. 134 at 11;

- Conducting an undisclosed ship visit program between December 9, 2017, and March 13, 2018, after the Court had disapproved of the prior undisclosed ship visit program, and failing to promptly notify the Court, Interested Parties, and CAM about the program. *See* CAM April 2019 Quarterly Report at 41-52 (discussing the CAM's findings resulting from the review of the undisclosed ship visit programs). The Company acknowledged that this program, like the prior one, interfered with the implementation of the ECP, TPA audits, and the Court's supervision of probation. *See* Dkt. No. 134 at 10;

- Falsifying ECP-required training records on two Covered Vessels during ECP Year One. *See* Carnival Corp. Notice of Violations #04-2017 and #06-2017; CAM First Annual Report at 47-48 (discussing the incidents in detail); and

- Contacting United States Coast Guard officials seeking agreement with the Company's position on the definition of the term "Major Non-Conformity" in the ECP, without notifying the Interested Parties and outside of the specified protocol for modifying the ECP. *See* CAM April 2019 Quarterly Report at 10-14 (discussing the disagreement between the Company and the Government on the term and the Company's efforts to seek support for its position).

*See* Dkt. No. 134 at 10-11.

## 2.   Other Environmental Violations

In addition to the probation violations discussed above, there were numerous incidents on Covered Vessels during ECP Year Two that violated environmental laws and/or the ECP, including: (1) numerous prohibited discharges of various waste streams, including discharges into protected areas such as marine sanctuaries and Alaskan waters; (2) at least three instances of record falsification or potential falsification; and (3) numerous other environmental incidents.[71]

---

[71] Although this Report identifies the ships involved in some of these incidents, the Company's compliance challenges are not limited to incidents occurring on the named ships. Rather, the incidents discussed below are a symptom of the broader, systemic issues—discussed throughout this Report—regarding the failure of the Company's leadership to adequately support the ships and take appropriate action on compliance.

July 3, 2019

Overall, the CAM Team noted higher numbers of incidents reported during ECP Year Two than in ECP Year One.  But, as previously observed, this does not mean that more incidents occurred during ECP Year Two.  *See* CAM April 2019 Quarterly Report at 18.  The increase may simply reflect higher rates of reporting due to increased vigilance and commitment to transparency.

These incidents are, of course, concerning.  However, as emphasized throughout this Report, the Company's deeper and more pressing barriers to compliance relate not to individual incidents on ships, but to the Company's broader corporate leadership and culture issues.  It is important to note that these incidents have occurred in the context of widespread expressions of frustration by shipboard personnel that the Company's management prioritizes enhancing revenue over ensuring the adequacy of shipboard staffing and resources.  *See* Employee Interview Notes.

### i.   *Prohibited Discharges*

Each of the Company's four operating lines—Carnival Cruise Line, Carnival UK, Costa Group, and Holland America Group—had numerous instances of prohibited discharges on Covered Vessels during ECP Year Two.  These incidents involved a variety of different waste streams and occurred in locations around the world, including protected areas such as marine sanctuaries and Alaskan waters.[72]  Two significant incidents discussed in prior CAM Quarterly Reports are discussed below.

---

[72] These incidents included discharges of:  untreated or partially treated sewage in violation of MARPOL Annex IV; ballast water in violation of local regulations; ballast water that had not been fully treated in violation of United States federal regulations; permeate and biomass in violation of local requirements; and treated bilge water in violation of international law.  *See* Dkt. No. 71-1 (Company's Quarterly Issue Tracker for second quarter of 2018); Dkt. No. 84-1 (Company's Quarterly Issue Tracker for third quarter of 2018); Dkt. No. 99-1 (Company's Quarterly Issue Tracker for fourth quarter of 2018 and first quarter of 2019).

July 3, 2019

In one incident, approximately eighty-five cubic meters of grey water was discharged inside of Glacier Bay National Park and Preserve in Alaska by the Holland America Line *Westerdam* in violation of federal and state law. *See* Carnival Corp. HESS Weekly Flash Report (Sept. 19, 2018); CAM December 2018 Quarterly Report at 9-10 (discussing the incident).[73]  The Company's investigation concluded that the discharge was unintentional and occurred after a junior engineer inadvertently directed the grey water to the wrong tank—a tank that happened to already be full, resulting in an overflow that led to the discharge. *See* Investigation Memo No. 66/2018, PCL_ECP00085758-78.  The report concluded that the "root cause of the non-compliant discharge was human error," and identified a number of factors which may have contributed to the incident, including:  unclear ship diagrams; problematic layout and design of the ship's grey water treatment and collection system; lack of experience of the junior engineer; and an insufficient "manning level" (*i.e.*, the number of engineers required to be present) in the Engine Control Room. *See id.* at PCL_ECP00085760, 69-71.  As with many other investigation reports reviewed by the CAM, this report appeared to attribute the root cause to human error without more fully examining the possible role of broader, systemic issues, such as the Company's possible failures to:  hire sufficient numbers of engineers; establish adequate

---

[73] This was one of several incidents noted by Holland America Group in the fall of 2018 as evidence of "an increase in improper discharge incidents" affecting multiple ships operating in various locations around the world, including Alaskan waters and other protected United States waters such as marine parks and marine sanctuaries. *See id.*  As part of its response, Holland America Group commissioned the human factors study, discussed above in Part IV.C.3.  The Company has also since reported that Holland America Group "put into action a multi-prong approach to eliminate non-compliant discharges in the future.  The action plan focuses on preventing discharges in Alaskan waters as a matter of priority as well as other itineraries," based on feedback from ten ships at the end of the 2018 Alaska season "regarding workload, communication, administrative burdens, and potentially problematic policies contributing to improper discharges."  May 2019 Probation Supervision Report, Attachment 3, at 14.

July 3, 2019

manning levels for operations in environmentally sensitive areas;[74] hire sufficiently experienced or trained engineers; or ensure that ships' systems for collecting, treating, storing, and/or discharging or offloading wastes are designed to facilitate compliant operations, especially for ships operating in environmentally sensitive areas.

The *Westerdam* incident was reported to various authorities, including the Alaska Department of Environmental Conservation and the DOI National Park Service.  However, it was not initially reported to the United States Coast Guard, in violation of federal regulations requiring that "[i]n the event of an emergency, accidental or other exceptional discharge of sewage or graywater . . . an immediate notification of the discharge shall be made to the [United States Coast Guard Captain of the Port]."  33 C.F.R. § 159.315(d).  The failure to immediately notify the Coast Guard indicates a deficiency in the Company's procedures and/or training related to external reporting requirements following environmental incidents.  As part of the agreement to resolve the probation revocation petition, the Company has agreed to "reorganize and enhance existing policies in the Company's Environmental Management System regarding how violations of Marine Environmental Protection Requirements, and United States federal and state laws, including the Certain Alaska Cruise Ship Operations statute, are reported to external regulators in the United States and to each vessel's flag state and recognized organization."  Dkt. No. 134 at 5; *Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 10; *see also* Carnival Corp., *Instructional Notice – Alaska External Reporting Requirements for Improper Grey Water and Sewage Discharges*, IN ENV-06-2019 (Apr. 26, 2019).

---

[74] The Company has since reported that it enhanced its procedures "to require additional senior-level officers to be present in the Engine Control Room for certain operations," including for certain inboard liquid transfers like the one that led to this incident.  May 2019 Probation Supervision Report, Attachment 3, at 3.

July 3, 2019

In another incident, over two hundred and fifty cubic meters of ballast water were discharged by the *Carnival Conquest* in Bahamian archipelagic waters in violation of international law.  *See* CAM April 2019 Quarterly Report at 23-26 (discussing the incident in detail).  A deck officer reportedly "offered to cover up the occurrence and change the time and location of the discharge to indicate it had occurred in a permitted area," although the officer retracted this offer soon thereafter and properly reported the violation.  *Id.* at 23.  As the CAM previously observed, the Company's investigation of this incident classified the root causes, respectively, as "human error" (for the prohibited discharge) and "fear factor" (for the cover-up offer), without adequately analyzing the role that broader, systemic issues may have played, such as inadequate training, inadequate resources and tools for voyage planning, or the presence of a blame culture.  *See id.* at 24-26.[75]

### ii.    Falsification of Records

The Company reported at least three instances of record falsification or potential falsification on Covered Vessels during ECP Year Two, including an incident involving what appears to have been an intentional falsification of internal Company records.  Those incidents were:

- The creation of false entries related to oily bilge water management in the Company's internal Planned Maintenance System on the Holland America Line *Westerdam*.  *See* CAM December 2018 Quarterly Report at 6-8 (discussing the incident in detail).  The Company's investigation report concluded, among other things, that "[i]ncreased work-load/administration" on engineers for environmental-related jobs and "pressure from the company on no overdue planned maintenance" contributed to the incident.  RAAS, *Investigation Report* (Mar. 4, 2019), PCL_ECP00101938-52, at PCL_ECP00101948-49.  The CAM previously observed that factors which may have

---

[75] In recent public statements, the Company has continued to characterize the situation as one of "human error" and "mistake" by a crew member.  *See* R. Wells, *We Want to Improve, Says Carnival After Yet Another Dumping* (May 7, 2019), http://www.tribune242.com/news/2019/may/06/we-want-improve-says-carnival-after-yet-another-du/ (quoting Carnival Corp. Senior Vice President & Chief Communications Officer).

July 3, 2019

played a role in this incident are similar to workplace issues that the CAM and the TPA have identified on ships across all operating lines.  These include:  work-load and time pressure; insufficient shoreside support; insufficient manning/staffing; inadequate training or qualifications of junior engineers; and lack of a "speak up" culture, such that someone would risk making incorrect entries rather than feel comfortable enough to reveal a problem and seek assistance.  *See* CAM December 2018 Quarterly Report at 8;

- The potential falsification of signatures in the Hazardous Waste Log[76] of the *Caribbean Princess*.  *See* Carnival Corp. HESS Weekly Flash Report (Mar. 13, 2019).  An internal investigation is ongoing.  *See 13 MAR 19 Flash Report Follow-up*, Attachment to Letter from C. Donald re: *Court Appointed Monitor and Third Party Auditor Communication* (Apr. 18, 2019); *2019.05.30 Monthly Tracking Spreadsheet as of April 30, 2019*; and

- The use of an erasable pen to make entries in the Oil Record Book[77] of the *Crown Princess*.  *See* Carnival Corp. HESS Weekly Flash Report (Nov. 21, 2018).  The Company's internal investigation determined that the engineer who used the erasable pen "was not changing entries to hide illegal transfers/discharges.  The changes made were corrections that the [Environmental Officer] had already identified and changes to text that were made while entering the record . . . to correct minor grammatical mistakes."  *21 NOV 18 Flash Report Follow-up*, Attachment to Letter from C. Donald re: *Court Appointed Monitor and Third Party Auditor Communication* (Jan. 4, 2019).  A case study under the Operation Oceans Alive program, *see supra*, Part IV.B.5.vi, was based on this incident.  The case study provided key lessons learned and reminders, including that Oil Record Book entries must be made in permanent ink and that recordkeeping mistakes must be corrected in accordance with Company procedures.  *See* Case Study #02-2019.

### iii.    Other Environmental Violations

Each of the Company's four operating lines had numerous additional incidents on

Covered Vessels during ECP Year Two that violated environmental laws and/or the ECP.  These

included incidents related to air emissions, discharges to the sea (in addition to those discussed

---

[76] A Hazardous Waste Log is used to record the offload of hazardous wastes from a ship.  *See* Alaska Department of Environmental Conservation, *2018 Ocean Ranger Guidebook* (Jan. 22, 2018), *available at* https://dec.alaska.gov/media/5310/or-guidebook2018.pdf, at 42.

[77] An Oil Record Book is a log in which a ship's overboard discharges of oily waste water, among other items, must be recorded.  It is required by MARPOL, Annex I, reg. 17 and 36, as well as United States Coast Guard regulations at 33 C.F.R. § 151.25.  Dkt. No. 58-1 at 9.

above),[78] Environmental Control System program requirements, pollution prevention equipment maintenance and operation, and recordkeeping.  *See, e.g.*, Dkt. No. 71-1 (Company's Quarterly Issue Tracker for second quarter of 2018); Dkt. No. 84-1 (Company's Quarterly Issue Tracker for third quarter of 2018); Dkt. No. 99-1 (Company's Quarterly Issue Tracker for fourth quarter of 2018 and first quarter of 2019).[79]

The CAM will continue to monitor and report on the Company's compliance with ECP and environmental requirements, including as it relates to broader issues such as culture and resources and support for compliance.  *See infra*, Part IX.B.

## VI.   ENVIRONMENTAL INCIDENT DATA COLLECTION

The CAM Team has continued to collect and track incidents reported through formal and informal reporting mechanisms, including audit findings, Flash Reports, and other notifications. The CAM First Annual Report provided an analysis of the CAM Team's incident data for ECP Year One.  *See* CAM First Annual Report at 42-58.  This Report does not provide a similar analysis for ECP Year Two.  As the Court has observed, focusing on individual incidents on

---

[78] These included air emissions and discharges of washwater associated with the use of scrubbers, or Advanced Air Quality Systems (formerly referred to as Exhaust Gas Cleaning Systems).  These systems remove sulphur oxide compounds from a ship's engine and boiler exhaust gases.  *See* EPA, *Exhaust Gas Scrubber Washwater Effluent* (Nov. 2011), *available at* https://www3.epa.gov/npdes/pubs/vgp_exhaust_gas_scrubber.pdf.  The Company's Advanced Air Quality Systems use an open loop design, in which seawater drawn from the ocean is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulphur oxide compounds from the exhaust.  The seawater is then treated and discharged back to the ocean as washwater.  *See* Employee Interview Notes.  The Company currently has Advanced Air Quality Systems on over seventy ships.  April 2019 Probation Supervision Report, Attachment 3, at 9.  The CAM intends to further examine issues related to Advanced Air Quality Systems during ECP Year Three.

[79] Not all incidents listed in the Company's Quarterly Issue Trackers constituted regulatory violations.  For instance, many of these incidents involved violations of Company policy or procedure only.

July 3, 2019

ships can distract from the most pressing barriers to compliance, which are the Company's broader corporate leadership and culture issues. *See*, *e.g.*, Status Conference Tr. at 5-6 (Apr. 10, 2019). It is those issues that are the focus of this Report.

## VII.   EVALUATION OF THE EXTERNAL AUDIT FUNCTION (TPA)

### A.   Engagement with the TPA

The ECP requires the CAM to oversee the TPA to confirm that the TPA acts with independence and performs adequate ECP-required audits. *See* ECP §§ VI.F.1-3. The CAM Team has undertaken a number of efforts during ECP Years One and Two to carry out this function. *See* CAM First Annual Report at 58-59 (discussing the CAM Team's engagement with the TPA during ECP Year One).

The CAM Team has continued to be in regular contact with the TPA through both weekly calls and periodic in-person meetings. On October 11, 2018, the CAM Team hosted a meeting at its Washington, DC offices with twelve members of the TPA team to share feedback and discuss lessons learned and areas of focus going forward. The CAM Team hosted another similar meeting with TPA representatives on January 28, 2019. The CAM Team plans to continue these meetings with the TPA during ECP Year Three.

The CAM Team has also continued to oversee the TPA's work through attending TPA ship and shoreside facility audits; speaking with Company employees who have experienced a TPA audit; reviewing TPA audit reports; and tracking TPA audit report findings.

July 3, 2019

### B.      TPA Audit Process

During ECP Year Two, the CAM Team attended three ship and one shoreside TPA audit.[80]  As in ECP Year One, the CAM Team has not identified any significant shortcomings with the TPA's audit process.  *See* CAM First Annual Report at 59-60 (assessing TPA audit process).  Based on the CAM Team's observations during ship and shoreside audits, follow-up visits after TPA audits, and discussions with Company personnel, the TPA teams are highly qualified, well-organized, methodical, and thoughtful.  The TPA auditors continue to demonstrate the technical ability and maritime experience to identify a wide range of issues. During ECP Year Two, the TPA also made extra efforts to conduct follow-up visits on certain ships to assess the Company's response to audit findings.  For example, after discovering the co-mingled food waste issues on the *Carnival Elation* in December 2018, the TPA returned to this ship in February 2019 to check on the status of corrective actions.  *See infra*, Part V.B.1.i; CAM April 2019 Quarterly Report at 18-23 (discussing the incident in detail).

Feedback from Company employees, both ship and shore, who underwent a TPA audit has generally been positive, especially during ECP Year Two.  In general, employees have expressed that the TPA auditors focus on the right areas and issue findings that are fair and result in meaningful opportunities for learning and improvement.  *See* Employee Interview Notes. They have also indicated that the TPA auditors act in a professional manner that is respectful of employees' schedules and competing demands.  *See id.*

---

[80] In addition, in October 2018, a representative from the CAM Team and two members of the TPA team travelled to Alaska in response to an allegation of record falsification on a Covered Vessel.  *See* CAM December 2018 Quarterly Report at 6-8 (discussing the incident in detail); *see also supra*, Part V.B.2.ii.

July 3, 2019

### C.    TPA Audit Reports

As in ECP Year One, the CAM Team has found that TPA audit reports are clear, cover the necessary areas, and document the TPA's findings.

### D.    TPA Independence

The CAM Team has not seen any indication during ECP Years One or TPA that the TPA does not act independently in conducting audits or issuing audit findings, even when findings are met with disagreement.

### E.    TPA Receptiveness to CAM Feedback

As noted above, the CAM Team has provided ongoing feedback to the TPA via regular phone calls and periodic in-person meetings.  TPA representatives have been receptive to the CAM Team's feedback.  For example, one concern the CAM Team has occasionally raised during ECP Years One and Two relates to the challenge of being an auditor.  In a handful of instances, the TPA auditors have provided advice, similar to a role of a consultant, rather than acting only in the role of an auditor.  When the CAM Team has raised this issue, the TPA has agreed with the CAM Team's concerns and instructed its auditors accordingly.

## VIII.   EVALUATION OF THE INTERNAL AUDIT FUNCTION (RAAS)

### A.    Overview of the Internal Audit Process

As described in the CAM First Annual Report, the Company's internal HESS audits are conducted by RAAS, an independent department that reports directly to Carnival Corp.'s Board of Directors.  *See* CAM First Annual Report at 61-63 (providing an overview of the RAAS audit process).[81]  RAAS audits assess compliance with applicable codes (*e.g.*, the International Safety

---

[81] The RAAS audit function is distinct from its investigatory function.  Prior to the restructuring of the Company's internal investigation function, discussed *supra*, Part IV.C.1, RAAS was also responsible for HESS investigations.

July 3, 2019

Management Code), regulations, and internal policies and procedures.  *See HMP-1301 - Internal Audits* (June 1, 2018).

Each ship and operating line shoreside office is audited by RAAS once per year.  Unlike TPA ship audits, RAAS audits are "announced"—*i.e.*, ships and shoreside offices know in advance when an audit will occur.[82]  The annual audit schedule is set approximately six months in advance of each year's audits.  Draft audit schedules are shared with the ship or shoreside office at least fifteen days prior to the audit.  Audits typically last for one week.

For ship audits, the RAAS audit teams generally consist of three auditors, one of whom is dedicated to focusing on environmental compliance issues, while the other auditors focus on the remaining HESS factors of health, safety, and security.  Shoreside audit teams, on the other hand, vary depending on the shoreside facility being audited, but generally consist of five to six auditors, and do not include a dedicated environmental auditor.  Each audit team is required to hold certain auditor qualifications/certifications (either individually with each auditor or across the audit team).  The auditors' activities during each audit are guided by "work-steps," which are tied to Company policies and procedures.  *See HMP-1301-A1 Shipboard HESS Audit Work Steps* (June 26, 2019); *HMP-1301-A2 Office HESS Audit Work Steps* (Jan. 2019).  These work steps assign risk-based weights to various compliance areas on a scale from one through five, with five being the highest risk (*e.g.*, fire prevention).

RAAS audits typically follow the following format:  an opening meeting with relevant personnel on the first day of the audit; interviews, physical inspections, and document review throughout the course of the audit; and a closing meeting at the completion of the audit where

---

[82] The CAM understands that it has been regular Company practice at least among some brands for ships to prepare in advance of RAAS audits.  *See* PCL_DOJ_ESAVP_00043885.

July 3, 2019

findings and recommendations are discussed. *See* CAM First Annual Report at 62 (describing typical audit process for a shipboard audit). For a ten-day period following the audit, the ship or shoreside office personnel may review the audit findings and raise any disagreements with the Audit Review Committee of the relevant operating line. *See id.* Within three weeks of completing the audit, the relevant Audit Review Committee holds a meeting where final corrective action plans, including deadlines, for each finding are agreed upon. *See id.* at 63.

Each audit finding is associated with a category (*e.g.*, environmental) and severity (*e.g.*, Major Non-Conformity, Non-Conformity (High, Medium, or Low), or Observation). After the audit is complete, RAAS generates a score for each finding based on its severity and risk, following the Company's internal risk matrix. *See HMP-1301-A3 Finding Risk Assessment Matrix* (June 1, 2018). Repeat findings are graded at one and half times the standard grade. The individual finding scores are then deducted from a total score of 1000 (the starting baseline score) to generate the overall audit grade. The spectrum of audit grades ranges from "excellent" (900 – 1000) to "follow-up required" (below 549). *See id.* Audit findings are entered into the Company's Global HESS's audit tracking system, which also tracks the status of the implementation of corrective actions.

### B.   CAM Assessment of Internal Audits and Audit Reports

The ECP requires the CAM to "conduct a review of [the Company's] internal environmental audits with respect to Covered Vessels and Covered Personnel." ECP § VI.F.4. This review "shall assess the ability of [the Company's] internal audit process to accomplish the objectives of the ECP, including any inadequacies with respect to [the Company's] performance, whether personnel-based or related to any of its Covered Vessels, systems, equipment, or components." *Id.*

July 3, 2019

1.      Ship and Shoreside Office Audits

During ECP Year Two, the CAM Team attended three ship and two shoreside RAAS audits.  During these audits, the CAM Team spent the majority of its time accompanying the auditor(s) covering the environmental compliance components of the audit.  The CAM Team also spent time observing the auditors' overall process, including their approach to finalizing audit findings.

Overall, as in ECP Year One, the RAAS auditors appeared knowledgeable about HESS systems, conducted themselves professionally, and had the technical expertise required for the audit.  The auditors also appeared to be provided with access to relevant documents, personnel, and physical spaces.  However, at times, the RAAS auditors appeared to be constrained by their numerous work steps, which may prevent them from fully assessing systemic issues or underlying root causes for repeat or cross-brand findings.

2.      Audit Reports

The CAM Team reviewed the environmental component of RAAS audit reports for ECP Year Two for seventy-five Covered Vessels and five shore side office locations.  The RAAS audit reports cover a wide range of environmental issues, including policies and procedures, training, recordkeeping, and the physical condition of the vessels.  There were several notable findings, regardless of operating line or brand, including findings related to:

*i.    Ships*

- DER-2002 – Failure to paint sample lines of the Oily Water Separator properly; failure to set bilge tank alarms at proper volume; posting of unapproved bilge arrangement drawings;

- EMR-1801 – Failure to address all amendments in the Shipboard Oil Pollution Emergency Plan; failure to keep inventory, records of exercises, and list of port contacts in the plan up to date;

July 3, 2019

- ENV-1007/ECR-1.1 – Failure to properly fill out the Oil to Sea Interface Log; failure to provide all required documentation with the log;

- ENV-1008 – Assigning the Environmental Officer inappropriate tasks and responsibilities; failure to give Environmental Officer key access to all areas of the ship; failure to accurately maintain records of Environmental Officer weekly reports and Professional Development Records;

- ENV-1011/TEC 1402 – Failure of ship drawings to accurately reflect onboard systems in place;

- ENV-1102 – Advanced Air Quality System out of service awaiting spare parts; issues related to defining the critical spare parts for the Advanced Air Quality System; failure of shoreside office to provide sample washwater analysis results and calibration certificates;

- ENV-1201 – Failure to accurately maintain the Oil Record Book (including incorrect or missed entries and incorrect signatures); failure to record portable pump use in the Oil Record Book; failure to record all required information in the Planned Maintenance System;

- ENV-1203/4 – Failure to list portable pumps on the inventory log; failure to properly log out or control portable pumps; failure to properly fit or install seals or locks on vulnerable points;

- ENV-1204 – Failure to identify vulnerable points in the vulnerability assessment;

- ENV-1301 – Discrepancies between Garbage Record Book entries and shoreside disposal receipts; failure to complete Hazardous Waste Log entries; missing information in the Garbage Record Book;

- ENV-1402 – Failure to carry out required inspections and tests; lack of Company-specific detailed instructions for operation of plant equipment (*e.g.*, recovery units);

- ENV-1403 – Opacity meters with different settings on different pieces of machinery;

- ENV-1404 – Failure to keep the Ship Energy Efficiency Management Plan up to date; failure of the plan to indicate quantitative ship-specific energy saving measures and key performance indicators;

- ENV-1502 – Failure to complete ballast water management logs;

- ENV-1502 – Failure to keep biofouling management plans up to date;

- HOT-1402 – Failure to register sharps boxes in salons or spas;

July 3, 2019

- OHS-1102 – Failure to provide secondary containment for chemicals and/or failure to plug drain holes; storing incompatible chemicals together; and

- TEC-1401/2 – Failure to properly complete sludge/fuel bunker checklists; failure to complete fuel bunkering plan and logs.

### ii. *Shoreside Offices*

- ENV-1006 – Failure to make Quarterly Environmental Performance Monitoring Data available to ships;

- ENV-1102 – Issues related to critical spare parts for Advanced Air Quality Systems;

- ENV-1404-4.3 – Failure to conduct the annual review of the Ship Energy Efficiency Management Plan;

- HMP-1105 – Failure to track findings in the Global HESS system;

- HMP-1106 – Self Reported Non-Conformities in open and overdue status;

- HMP-1302 – Issues related to training for incident investigations;

- HMP-1303 – Issues related to tracking of incident investigations;

- TEC-1501/ENV-1001 – Failure to provide direction or guidance in Global HESS to ships regarding overboard discharge management related to permeate sample results;

- TEC-1502 – Failure to make specific technical operation procedures for various systems available onboard or in the Global HESS system; and

- TRG-2310 – Failure of Professional Development Record (Training Qualification Card) to provide the possibility in the tick box form if a section is not applicable to the person filling it out.

### 3. Employee Views of RAAS

During CAM Team ship and shoreside office visits (including, but not limited to, RAAS ride-along visits), the CAM Team has spoken with Company personnel about their perspectives on the Company's internal audit process. As in ECP Year One, the responses have been mixed. The CAM Team has observed while attending certain RAAS audits—especially shoreside office audits—that some personnel resist the audit, seeing it as an inconvenience or source of frustration. The most common criticisms reported to the CAM Team related to: (1) the

July 3, 2019

substance of audit findings; (2) the allocation of responsibility for audit findings and corrective actions between ships and shoreside offices; and (3) the impact of audit findings on compensation and bonuses.

> i.   *Substance of Audit Findings*

As in ECP Year One, the CAM Team continues to hear concerns from Company personnel that RAAS audit findings are unfair or "nit-picky."  *See* Employee Interview Notes; CAM First Annual Report at 66 (providing examples).  The CAM Team understands that RAAS is aware of, and is working to address, such perceptions.  *See* Employee Interview Notes; *see also* Carnival Corp., *Cruise Control: Risk Advisory & Assurance Services' Quarterly Newsletter* (3rd Quarter 2018), at 4 (observing that "we need to ensure that any finding is looked at as an opportunity to improve rather than an opportunity for blame . . . the RAAS approach is one where we want to be more like a physician than a police officer, where we highlight risks to maintain good health vs. issuing citations").

> ii.   *Allocation of Responsibility for Audit Findings and Corrective Actions*

Shipboard employees have expressed concerns to the CAM Team that some RAAS ship audit findings are the result of actions (or inaction) by a shoreside office, such as findings related to missing spare parts, unapproved ship system drawings, or inadequate or unclear policies and procedures.  *See* Employee Interview Notes.  As a result, the shipboard crew feel that they are held accountable (including being responsible for ensuring that corrective actions are implemented) for an issue that rests outside of their control.  *See id*.  Again, the CAM Team understands that RAAS is aware of, and is working to address, such perceptions.  *See* Employee Interview Notes.

July 3, 2019

iii.    *Impact of Audit Findings on Compensation and Bonuses*

Both ship and shoreside office employees have continued to express concerns to the CAM Team about the impact of RAAS audit findings and audit scores on compensation and bonuses.  *See id*; CAM First Annual Report at 67; *see also supra*, Part V.A.2.ii(3) (discussing the HESS modifier).  A senior Company executive has observed that some employees feel negatively toward RAAS audits because of the perception that audit scores translate into HESS modifiers, which, in turn, reduce compensation and/or bonuses.  *See* Employee Interview Notes. Consistent with this observation, the CAM Team has noted that many employees view RAAS audit findings with resentment, rather than as useful learning opportunities.  *See id.*

C.    **Overall CAM Observations and Ongoing CAM Team Examination**

As in ECP Year One, the CAM Team has observed that RAAS has experienced and hardworking auditors who follow a comprehensive review process.

During ECP Year Three, the CAM intends to further explore how RAAS supports a sustainable compliance culture.  This will involve learning more about the role of Company leadership, including the Board of Directors, in supporting the RAAS function, such as its role in:  (1) ensuring that RAAS can provide its auditors with the training, support, and resources they need to perform effective audits; (2) ensuring that ship and shoreside employees are provided with the training, support, and resources they need to address any findings; and (3) shaping perceptions and attitudes of employees throughout the Company toward the RAAS audit process. The CAM will also seek to learn more about the various tracking and reporting systems and other metrics that RAAS uses, and its ongoing efforts to continue to develop such tools.  In addition, the CAM intends to learn more about RAAS's efforts to incorporate "audits that can gauge risk culture" into its 2020 draft audit plan.  *See* Carnival Corp., *Cruise Control: Risk*

July 3, 2019

*Advisory & Assurance Services' Quarterly Newsletter* (2nd Quarter 2019) at 2 (observing that "[w]e need to be sure that our company can identify the signs of risk manifestation and has a strong risk identification, evaluation and communication culture").

 As part of this evaluation, the CAM plans to attend a conference with RAAS auditors, called the RAAS Maritime Retreat, in August 2019. *See* May 2019 Probation Supervision Report, Attachment 3, at 5.

## IX. AREAS OF FOCUS FOR ECP YEAR THREE

 In planning ECP Year Three, the CAM Team has identified the following areas for focused attention and review.

### A. Restructuring of the Company's Compliance Function

 In the agreement resolving the probation violation petition, the Company agreed "to restructure its existing corporate compliance governing authority." Dkt. No. 134 at 2. That document, adopted by the Court as a special condition of probation, also provides that "all future quarterly reports by the Company and the CAM will contain a section advising the Court of the status of implementation with this condition of probation." *Id.* at 4. This will be a continuing area of focus for the CAM.

### B. Support for Operations and Compliance

 During ECP Year Three, the CAM Team will continue to examine the Company's support for operations and compliance. As noted above in Part VIII.C, this will include further exploration of how the Company's internal audit function (RAAS) supports a sustainable compliance culture. It will also include the topic of shoreside support for ships, as well as the extent to which shoreside has adequate resources to provide the support needed by the ships. One particular area of focus will be IT in support of compliance both on shore and at sea.

July 3, 2019

### C.      Investigations

As described above in Part IV.C.1, the Company has recognized the need to improve its internal investigations function.  In response, it created the Incident Analysis Group and hired a Vice President to lead the effort.  During ECP Year Three, the Company will develop new procedures and processes for investigations, and the CAM Team will continue to monitor and report on the Company's efforts.

### D.      Training

As noted throughout this Report, employee training is essential to supporting environmental compliance in a variety of ways.  Not only does the ECP contain certain training requirements, *see, e.g.*, ECP, Attachment 3, but training is an important component of employee support and continuous improvement.  In addition, the Company's compliance consultant identified the need for compliance training for the Company's Board of Directors and leadership. *See supra,* Part IV.C.2.  In ECP Year Three, the CAM Team will continue to examine the issue of training in support of environmental compliance.

### E.      Personnel

The CAM Team will continue to examine several areas related to personnel going forward.  These will include tracking the development of the Fleet Environmental Officer program, *see supra*, Part IV.B.5.v, as well as further exploring the hiring, training, workload, and employment conditions of both officer and non-officer crew members.  The CAM Team will also continue to explore the Company's relationship with its Global Talent Partners.  *See supra*, Part IV.E.

### F.      Company Response to Internal and External Findings

As described throughout this Report, the Company has received feedback relevant to its environmental compliance performance from both internal and external sources.  This includes,

July 3, 2019

for example, findings and/or recommendations from:  the CAM; the TPA; the Company's

corporate compliance consultant; the ECP-mandated Fleet Engineering Survey; the human

factors study commissioned by Holland America Group; and the participant feedback surveys

and reports from the Operational Excellence training course.  In addition, Propel's final

Environmental Culture Compliance Survey assessment report is expected in July 2019.  The

CAM Team will examine the Company's response (including by the HESS Committee of the

Board of Directors) to such findings, including whether corrective and preventative actions

support learning and continuous improvement.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor

July 3, 2019

July 3, 2019

## APPENDIX A: COMPANY INITIATIVES

| Category | Initiative | Description |
|---|---|---|
| Communications | **Case Study Initiative** | An initiative to share lessons learned from incidents. Case studies typically take the form of a short document summarizing a notable environmental incident that occurred on a Company ship, along with lessons learned and reminders to avoid similar incidents in the future.  *See* PCL_ECP00121808-09. |
| Communications | **ECP Newsletter** | A monthly newsletter from the Chief Maritime Officer covering issues and developments related to environmental compliance.  *See* PCL_ECP00121812. |
| Communications | **Electronic HESS Notice Boards** | A program to replace paper-based HESS notice boards on ships with flat screen televisions.  *See* PCL_ECP00121809-10. |
| Communications | **Environmental Compliance Notices** | Fleetwide communications from the Corporate Compliance Manager's team that raise awareness about environmental compliance-related matters and typically require shipboard personnel to take certain actions to promote compliance.  *See* PCL_ECP00118355-56; PCL_ECP00121808-09. |
| Communications | **Flash Reports** | Weekly reports summarizing HESS-related incidents and near misses on Company ships.  *See* PCL_ECP00121807. |
| Communications | **Global HESS** | A computer-based, corporate-wide management system that contains the Company's HESS-related policies and procedures and other HESS-related communications (including newsletters, case studies, compliance notices, RAAS and third-party audit reports, and the CAM Annual and Quarterly Reports).  It also contains modules that allow for managing and tracking audit findings and corrective actions, managing tasks, and viewing a calendar of ship visits.  *See* PCL_ECP00121804-06, 13. |
| Communications | **HESS Feedback Stations** | A program to install HESS feedback stations on ships to allow to crew members to submit written feedback, concerns, and suggestions on HESS-related issues.  *See* PCL_ECP00121810. |

July 3, 2019

| Category | Initiative | Description |
|---|---|---|
| Communications | Operation Oceans Alive | A trademarked brand name for the Company's environmental compliance and stewardship program. It includes a communications program consisting of compliance notices, newsletters, case studies, info-graphics and video messages.  It also includes the Top 5 Program, the Environmental Excellence Awards, and the Environmental Hub online chat forum.  *See* PCL_ECP00121808-10. |
| Communications | Safety and Environmental Awareness Bulletin | A quarterly bulletin providing information related to marine safety, technical safety, and environmental incidents and near misses that took place on Company ships.  *See* PCL_ECP00121815. |
| Communications | Speak Up Posters | A program to install info-graphic posters encouraging employees to "speak up" and report compliance concerns.  The posters are refreshed each year.  *See* PCL_ECP00121809. |
| Communications | Stand in Compliance Program | A program to install signage on and around Oily Water Separator and White Box[83] equipment to make the equipment stand out and remind crew members to follow procedures when operating it.  *See* PCL_ECP00118364. |
| Communications | The Environmental Hub | An online chat forum for Environmental Officers and other compliance personnel that is designed as a platform to share environmental compliance information, as well as solicit feedback on training, procedures, and best practices.  *See* PCL_ECP00121809. |
| Employee Incentive Programs | Environmental Challenge Coins and Certificates | A program to give away collectible environmental "challenge coins" to employees who go above and beyond environmental compliance and stewardship expectations.  *See* PCL_ECP00121812. |

[83] The White Box, also known as a Bilge Control Discharge Box, is a locked metal cage.  The White Box contains an Oil Content Meter, which is in addition to the Oil Content Meter on the Oily Water Separator.  The White Box is the final check on the oil content of bilge water before such water can be discharged overboard.  In addition to oil content, the White Box records data such as: discharge volume, valve positions, flow through the Oil Content Meter, overboard flow, door position, vessel position, and time.  *See* Dkt. No. 58-1 at 1-2.

July 3, 2019

| Category | Initiative | Description |
|---|---|---|
| **Employee Incentive Programs** | **Environmental Excellence Awards** | A reward and recognition program for employees who exceed environmental compliance expectations. Awards are given to ships achieving the highest levels of compliance, based on a standard scoring criteria. *See* PCL_ECP00121812. |
| **Employee Incentive Programs** | **HESS Employee of the Month Program** | A program to reward employees for their HESS-related compliance performance or leadership. The criteria and rewards differ by brand. *See* PCL_ECP00121812. |
| **Incident Data Tracking and Analysis** | **HESS Monthly Dashboard** | The Chief Maritime Officer's monthly dashboard analyzing HESS compliance-related key performance indicators. *See* PCL_ECP00121807. |
| **Incident Data Tracking and Analysis** | **HESS Quarterly Reports** | A quarterly report provided to the HESS Committee of the Carnival Corp. Board of Directors and other senior Company leadership that covers HESS performance and compliance trends, as well as compliance initiatives. *See* PCL_ECP00121807. |
| **Incident Data Tracking and Analysis** | **SEAevent** | A new corporate-wide incident and near miss reporting and case management system that is currently being rolled out across the Company's fleet. *See* PCL_ECP00121813. |
| **Investigations** | **Investigation Program Improvements** | Efforts by the Company's new Incident Analysis Group to develop new investigation procedures, a new investigator training and certification program, and standardized root cause analysis tools. *See* PCL_ECP00121807. The Company is also developing training courses on conducting investigations for those not assigned to the Incident Analysis Group. *See id.* |
| **Mentoring and Support** | **Fleet Environmental Officer Program** | A program that will provide training, coaching, and mentoring to Environmental Officers as well as environmental training to deck, technical, and hotel employees. *See* PCL_ECP00121808. |
| **Mentoring and Support** | **Quality Assurance Program** | A program of ship visits from the Chief Maritime Officer, as well as Fleet Captains and Fleet Chief Engineers. *See* PCL_ECP00121808. |

July 3, 2019

| Category | Initiative | Description |
|---|---|---|
| Other | Environmental Control System "Get Well" Program | A program to address concerns with the Environmental Control System (seal/lock) program. The first phase focuses on reducing the number of seals on ships to a manageable level that still acts to deter and detect improper discharges. The Corporate Compliance Manager and his team also collaborated with the CAM Team and TPA to develop ECP revisions to improve the effectiveness of the Environmental Control System program.  *See* PCL_ECP00118352-53. |
| Studies | Holland America Group Human Factors Study | A third-party review completed in May 2019 of the human factors associated with discharge incidents to determine what the Company can do to reduce the risk of improper discharges and better consider root causes.  *See* PCL_ECP00121817. |
| Studies | Holland America Group Work Load Study | A third-party review expected to be completed in July 2019 that will complement the human factors study to determine whether work load expectations for crew members are reasonable or whether staffing changes need to be made to allow crew members to complete required tasks in compliance with work and rest requirements.  *See* PCL_ECP00121815, 17. |
| Studies | Investigations Process Assessment | A third-party review completed in May 2018 of the Company's internal incident investigation process. *See* DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-2050. |
| Studies | Ship Superintendent Review | A review completed in August 2018 of the ship superintendent position, including organization (*e.g.*, reporting lines and work allocation), roles and responsibilities, qualifications, and resources and tools to perform duties (including training).  *See* RAAS, *Cross-Brand Ship Superintendent* (Aug. 29, 2018), PCL_ECP00082011-53. |
| Training | CrewTube | A smart phone/tablet application that allows certain HESS trainings to be conducted prior to joining a ship.  *See* PCL_ ECP00121813. |

July 3, 2019

| Category | Initiative | Description |
|---|---|---|
| Training | CSMART Training Programs | CSMART is the Company's state-of-the-art training academy in Almere, Netherlands, which is used to conduct environmental (and other) training.  The Company has retained the University of West Florida to develop both:  (1) a revamped "Operational Excellence" course for Environmental Officers, engineers, and deck officers; and (2) an "Environmental Excellence" course for third-year Environmental Officers.  The Company has also completed pilot testing on an augmented (virtual) reality Oily Water Separator training that will be delivered at CSMART.  *See* PCL_ECP00121810-11, 15. |
| Training | Environmental Commitment Conferences | Two multi-day conferences held in Almere, Netherlands, during ECP Year Two that brought together Environmental Officers from across the fleet with shoreside environmental compliance, environmental operations, technical, and training personnel.  Going forward, these conferences will be combined with the third-year Environmental Officer training course to create hybrid "EO3/Environmental Commitment" conferences.  *See* PCL_ECP00121811. |
| Training | Global Learning and Development Information System (GLADIS) | A corporate-wide electronic learning management system that allows for the completion and tracking of certain environmental training.  Eventually, it is planned to be used for all HESS trainings.  *See* PCL_ECP00121813, 16. |
| Training | Tool Box Talks | A series of supervisor-led training sessions held onboard ships for engineers that cover various environmental and technical requirements, including the Environmental Control System program and bilge water and portable pump procedures.  The Company plans to implement similar sessions in the deck and hotel departments.  *See* PCL_ECP00118358. |
| Voyage Planning | Voyage Planning Software | A new software that the Company is working with a vendor to develop that could help address voyage planning challenges by, among other things, integrating information about environmental |

July 3, 2019

| Category | Initiative | Description |
|---|---|---|
| | | boundaries and requirements (including the Company's own requirements) into the electronic navigational charts used by ships. *See* PCL_ECP00121814. |
| **Waste Management and Reduction** | **Bilge Water Minimization Initiative** | An initiative to reduce the volume of bilge water that accumulates in ships across the fleet. It includes a focus on the need to promptly report and repair leaks to the bilge. *See* PCL_ECP00121814. |
| **Waste Management and Reduction** | **Food Waste Task Force** | An initiative to address the Company's current food waste management challenges. *See* PCL_ECP00118363-64. |
| **Waste Management and Reduction** | **Oily Water Separator and White Box Upgrades** | A fleetwide initiative to install updated Oily Water Separator and White Box equipment on ships. The updated equipment is designed to be more effective at separating oil from water and more resistant to tampering. The Company reported that these installations were completed by January 31, 2019. *See* PCL_ECP00121814. |
| **Waste Management and Reduction** | **Top 5 Program** | An initiative to address five key areas of environmental concern/risk related to: (1) waste stream and ballast water discharges; (2) tampering or unauthorized modifications to pollution prevention equipment; (3) identification and control of vulnerable vales, fittings and portable pumps; (4) use of compliant fuels and Advanced Air Quality System operation; and (5) reporting leaks to the bilge and making timely repairs. *See* PCL_ECP00121809; Carnival Corp., ECP Newsletter Issue #3 2019. |

July 3, 2019

**ATTACHMENT 1:**

**PROPOSED AGREEMENT FOR THE COURT'S CONSIDERATION RESOLVING SUPERSEDING PETITION FOR SUMMONS FOR OFFENDER UNDER SUPERVISION DATED APRIL 26, 2019**

[*See following pages*]

**ATTACHMENT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-20897-CR-SEITZ

UNITED STATES OF AMERICA

v.

PRINCESS CRUISE LINES, LTD.,

Defendant.

_____/

PROPOSED AGREEMENT FOR THE COURT'S CONSIDERATION RESOLVING
SUPERSEDING PETITION FOR SUMMONS FOR OFFENDER UNDER
SUPERVISION DATED APRIL 26, 2019

I.     Allegations in the Superseding Petition

The defendant organization, Princess Cruise Lines, Ltd. ("Princess"), hereby admits that it
committed the violations alleged in the Superseding Petition, as amended and attached hereto as
Exhibit A. It further admits that defendant, its corporate parent (Carnival Corporation & plc), and
related subsidiaries and entities (collectively referred to herein as the "Company"), violated terms
of probation and the Environmental Compliance Plan ("ECP"), as set forth in the proposed Second
Superseding Petition, and pursuant to Special Condition of Probation 4 and ECP Section III.E.1
because their violations are deemed to be violations by Princess.

II.    Additional TPA Audits and CAM Visits

During the third, fourth, and fifth years of Princess's probation, the Court Appointed Monitor
("CAM") and the Third Party Auditor ("TPA") will conduct fifteen (15) audits and/or visits
annually in addition to the number of audits specified in Section VIII.A.1 of the ECP and the CAM
First and Second Annual Work Plan. The CAM and the TPA will decide among themselves which
of those additional fifteen (15) visits will be TPA audits or CAM visits and whether they will
involve Covered Vessels or shore-side facilities. The CAM team will continue its past practice of
meeting with management and key personnel as necessary, conducting site visits, and attending
certain corporate meetings, programs and events.

III.   Statement Accepting Responsibility

The Company agrees that within 30 days of the signing of this agreement it will issue a statement
to all employees in which the CEO of Carnival Corporation & plc (and other senior management
if they so choose) personally accepts management responsibility for the probation violations in
connection with the Court's acceptance of the proposed joint resolution of the Superseding
Petition. The content, format, and mode of distribution of this statement will be subject to prior
review and comment by the Government and review and approval by the Court. The statement

1

will also urge all employees to continue to cooperate with the CAM and TPA, and to continue to report incidents, near misses, and other compliance-related concerns, including making Open Reports (i.e., hotline reports) per the Company's Open Report procedure. In addition, the statement will emphasize that the Company recognizes and supports that the CAM will continue to protect the anonymity of communications made in confidence to the CAM or the CAM team.

## IV.    Restructuring of Compliance Function

The Company acknowledges that it failed to establish a Corporate Compliance Manager ("CCM") with authority (including resources, budget and staff) as required to implement the ECP. Accordingly, the Company agrees to restructure its existing corporate compliance governing authority. The Company will appoint a Chief Compliance Officer ("CCO") and establish this senior corporate officer position with authority and substantial control to oversee the implementation of the Company's overall compliance functions including environmental compliance and the ECP. The Company has promoted the CCM, who will report to the CCO, to a position of Senior Vice President. The CCM will remain responsible for overseeing all legal obligations set forth in the ECP and in the conditions of probation.

The Company commits to providing the CCO and the CCM each with: the appropriate budget and staff; a substantive role in financial, strategic, and sustainability planning processes; and compliance authority over regulatory obligations and operations across and within all brands.

   a)     CCO:

   The CCO will have direct line reporting to the CEO, and dotted line reporting to the Audit and HESS Committees of the Board of Directors. In addition, the CCO will join the meetings of the Company's leadership team. The CCO will oversee the review, revision and development of policies and procedures in all compliance areas, implementation of such policies and procedures, and will develop and oversee the implementation of budgets that assure adequate resources for compliance within and across all brands. The CCO will also develop a written compliance strategy that will provide an overview of the Company's various compliance functions and describe a plan to achieve these goals described in the compliance strategy.

   b)     CCM:

   The CCM will report directly to the CCO and have a dotted line reporting relationship to the HESS Committee of the Board of Directors and the CEO. The CCM will assist the CCO with the development and implementation of the environmental-compliance aspects of the compliance strategy and plan.

Additionally, the Company will create an Executive Compliance Committee made up of executives at both Carnival Corporation & plc and its various brands, to include participation by the CCO and CCM, that will meet monthly to discuss compliance issues, share and evaluate data and trends, and set compliance priorities.

The Company will further develop an annual training curriculum for members of its Board of Directors that would include corporate compliance topics.  The Board will adopt a new written statement that reiterates the Company's and the Board's commitment to compliance.  The Company will immediately engage a search firm to assist the Board of Directors to recruit a new board member with significant corporate compliance experience.

The parties understand that the Company has engaged an outside consultant to advise it of the best options to improve its corporate compliance program, and to achieve a change in corporate governance (including establishing a CCO).  The parties also understand that many of the provisions noted above reflect that consultant's preliminary recommendations.  The Company shall provide the Court, CAM, TPA and Interested Parties[1] with the consultant's further recommendations on or before June 1, 2019, and with the Company's proposed action plan to restructure its existing corporate compliance governing authority not later than August 14, 2019.  The Company's action plan, prepared in collaboration with the consultant, will include a detailed statement explaining how and when the improvements to the compliance program will be implemented.  This action plan will explain how corporate governance will be restructured to:

    a)  provide the CCO and CCM each with the authority and stature, budgets, staff, and the ability to implement changes, including the ability to direct change and action in each of the brands (while allowing for consultation and input from all brands).  This analysis will include:

        i.  a description and rationale for the change of governance structure (including where the compliance function is independently housed with sufficient autonomy and direct access to the Board and Board Committees); the revised job descriptions, qualifications, and relative seniority of the CCO and CCM within the organization; the reporting lines and frequency of required reporting;

        ii.  a preliminary annual compliance budget for the various compliance responsibilities;

        iii.  a summary and description of the changes in budget/resources – (actual for 2019; and proposed for 2020);

    b) establish reporting obligations within the Company.

The Interested Parties, CAM and TPA will provide any comments or suggestions about the Company's action plan to the Company not later than August 28, 2019, and the Company will provide a final version of its action plan to the Court not later than September 13, 2019.  The

---

[1]    The term "Interested Parties," as defined in the ECP, refers to the United States Attorney's Office for the Southern District of Florida, the Environmental Crimes Section of the United States Department of Justice, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis.

Company, upon demonstrated good cause as determined by the Court, may seek Court approval to extend these deadlines. The Company will provide interim reports on its progress toward these goals on a monthly basis, specifically on or before July 1, and August 1, 2019. The Company's action plan will specify deadlines going forward for implementing specific actions to restructure the Company's corporate compliance function, and must contain several of the changes that will be completed not later than October 9, 2019, including the:

    i.      elevation of the CCM;

    ii.     creation of the CCO charter and job description;

    iii.    appointment of the CCO;

    iv.    creation of the Executive Compliance Committee;

    v.     creation of the annual compliance training curriculum for the Board of Directors; and

    vi.    issuance of a statement by the Board of Directors reiterating the Board's and the Company's commitment to compliance.

If the Company fails to meet these deadlines, the Company agrees that the Court, may impose the following sanctions, at its discretion:

    Failure to meet the initial deadline of September 13, 2019, to submit an action plan to restructure compliance: up to $1,000,000.00 per day, until the date of compliance, as determined by the Court. Failure to submit an action plan to restructure compliance by September 23, 2019: up to $10,000,000.00 per day, until the date of compliance, as determined by the Court.

    Failure to meet the initial deadline of October 9, 2019, to complete implementation of certain tasks to restructure compliance specified in the action plan: up to $1,000,000.00 per day, until the date of compliance, as determined by the Court. Failure to implement those aspects of the action plan by November 1, 2019: up to $10,000,000.00 per day, until the date of compliance, as determined by the Court.

The Company will provide information and access necessary for the CAM to monitor and report on compliance with the ECP and obligations of probation. Additionally, all future quarterly reports by the Company and the CAM will contain a section advising the Court of the status of implementation with this condition of probation. Failure to comply with these obligations as determined by the Court will be grounds for a revocation of probation.

The parties anticipate that changes to the Company's corporate governance may require conforming modifications to the ECP. The Company will propose any such modifications to the ECP promptly after providing its action plan in response to the compliance consultant's recommendations.

## V.   Financial Penalty

If the terms of this agreement are accepted by the Court, then the defendant agrees to pay an additional financial penalty of $20 million within seven days of acceptance. Because this payment is designated as a criminal payment by Princess, the Company further agrees that it will not seek any reduction in its tax obligations as a result of the payment. In addition, because the payment is part of Princess's admission of its violations of the conditions of its probation, neither defendant nor any related entity or agent will characterize, publicize or refer to the payment in any other way.

## VI.   Unified Regulatory Reporting Policy

The Company will reorganize and enhance existing policies in the Company's Environmental Management System regarding how violations of Marine Environmental Protection Requirements, and United States federal and state laws, including the Certain Alaska Cruise Ship Operations statute, are reported to external regulators in the United States and to each vessel's flag state and recognized organization. The new policy will govern the reporting requirements for discharges according to United States federal and state laws and be submitted for review and comment to the Interested Parties, CAM and TPA within 60 days of the signing of this agreement. The Interested Parties, CAM and TPA will provide comments, if any, to the Company within 21 days. The Company will adopt and implement a final policy within 30 days of the expiration of that 21-day period that addresses the comments it receives from the Interested Parties, the CAM, and the TPA. The parties, upon demonstrated good cause as determined by the Court, may seek Court approval to extend the deadlines described in this paragraph.

The Company acknowledges that there have been discharges and other releases made in violation of MARPOL during the period of probation that have not been reported to the country in whose waters the violation occurred. Accordingly, the Company agrees to a Special Condition of Probation that includes a new obligation governing the reporting of environmental discharges and releases in violation of MARPOL, the Ballast Water Convention, the London Dumping Convention, or any future maritime environmental convention to which the United States becomes a party and which goes into effect during the period of Princess's probation. This reporting requirement also will be reflected in the Company's Environmental Management System. The text of this new Special Condition of Probation Section 13 is in Exhibit B.

## VII.   Proposed Amended Special Condition of Probation No. 13

The Company agrees to enhanced reporting requirements to be memorialized in a revised Special Condition No. 13, as set forth in Exhibit B, annexed hereto.

## VIII.   Improvements to Waste Management

The Company acknowledges that there is a need to improve waste management of non-food waste, including plastic garbage, on Covered Vessels and by Covered Personnel. Accordingly, the Company has agreed to prioritize this issue through the creation of "tiger teams," and the establishment of a three-part program as set forth below:

5

**Tiger Teams**

The Company will create two "tiger teams," each made up of approximately 5-7 individuals, at least four of whom are subject matter experts in food and beverage ("SMEs") and two of whom are third party consultants with established credentials related to food waste processing systems and galley designs. All of these individuals will report directly to the CCM on matters related to this project, and the SMEs will be dedicated to the project on a full-time basis through August 2019 or until such time as necessary to develop an action plan for implementation across all brands.

The tiger teams intend to meet in Washington D.C. on June 3-7, 2019 for planning workshops in which most of the inner workings and plans will be finalized. The tiger teams will be dedicated to visiting at least 30 ships between June and August as part of an effort to do the following:

        1.    Benchmark process, setup, procedures, design and equipment across ships and brands
        2.    Review adequacy of manning
        3.    Review technical aspects including equipment redundancy and adequacy
        4.    Review food waste volume management
        5.    Review single-serve/use items
        6.    Engage crew, solicit good ideas and best practices
        7.    Provide recommendations to enhance food waste compliance and further standardize on process, procedures, design and equipment.

After the visits are completed and report and recommendations made in August 2019, the CCM will oversee the implementation of the recommendations and will task at least one of the individuals on the tiger teams to serve as a dedicated manager of implementation on a day-to-day basis.

The tiger teams will be a subset of a larger Task Force across all brands charged with the implementation of the action plan developed though the work of the tiger teams.

The Company and the CAM will update the Interested Parties and the Court about the status of implementing this project in their quarterly status reports. The Company will provide the CAM with all information and access requested to monitor and assess this program.

**The Three-Part Program**

    Part One - Improved Training, Supervision, Staffing, and Culture

    The Company will (1) develop and implement clearer and more effective procedures regarding the disposal of food waste; (2) develop new training and signage to ensure that the proper procedures are understood; and (3) use appropriate media, in particular video, to call attention to the new training, procedures, and the renewed commitment to handling of food waste. The Company will also (4) assess the staffing levels for both the operational and compliance aspects of food waste management using a qualified third party to determine appropriate resources to comply with the updated procedures. The Company will use the results of the third party's assessment to improve the direct operational

supervision provided to employees who handle food waste, as well as enhanced compliance oversight by the Environmental Officer.

For the first three items set forth in the paragraph above, by August 1, 2019, the Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables.

With respect to the fourth item, the Company will retain a qualified third party to assess the necessary staffing. The Company will provide a copy of the third party assessment to the Interested Parties, CAM and TPA within seven days of receipt. Within 45 days after receiving that third party's assessment, the Company will provide the Interested Parties, TPA, and the CAM with its plan in response to the assessment. This plan will address the workload of the Environmental Officer.

<u>Part Two - Decrease in Single-Use Plastics and Food Waste</u>

The Company will design and implement procedures to reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent by December 31, 2021.[2] It will also design strategies to reduce the total weight of food waste that the Company creates by 10 percent by December 31, 2021. The Company has already begun working with its supply chain partners to determine what alternatives exist for specific single-use plastic items and how quickly the Company could substitute those alternatives for its current single-use plastics.

<u>Part Three - Technology and Design Improvements</u>

By October 31, 2019, the Company will review and provide an analysis of: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes. By January 31, 2020, the Company shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones. The Company has committed a minimum of $20 million in capital expenditures throughout the remainder of Princess's probation to optimize food waste management, including food waste disposal systems and associated processes.

---

[2]     Single-use plastic items include, among others, the following: straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company-provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events. Please note that the complete elimination of some items could pose public health concerns (e.g., plastic trash bag liners, plastic water bottles, and single-serving yogurt containers).

**IX.     Proposal Binding on the Government**

The United States Attorney's Office for the Southern District of Florida and the Environmental Crimes Section of the U.S. Department of Justice agree to forgo additional probation violation proceedings in *U.S. v. Princess Cruises Lines, LTD*, Case No. 16-CR-20897 (S.D.Fla) for violations that took place prior to May 1 2019, and which are known to the United States Attorney's Office for the Southern District of Florida and the Environmental Crimes Section of the U.S. Department of Justice at the time of the signing of this agreement.

AGREED AND ACCEPTED

ARIANA FAJARDO ORSHAN
United States Attorney

By: _____
Thomas Watts-FitzGerald
Assistant United States Attorney

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environmental & Natural Resources Division
U.S. Department of Justice

By: _____
Richard A. Udell
Senior Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice

8

ON BEHALF OF DEFENDANT:

David N. Kelley                                    Date
Benjamin E. Rosenberg
Counsel for Defendant

David Oscar Markus                                 Date
Counsel for Defendant


ON BEHALF OF DEFENDANT:

Micky Arison                                       Date

Member of the Executive Committees of the Boards of Directors
Carnival Corporation and Carnival plc


ON BEHALF OF DEFENDANT:

Arnold Donald                                      Date

Member of the Executive Committees of the Boards of Directors
Carnival Corporation and Carnival plc


ON BEHALF OF DEFENDANT:

Stuart Subotnick                                   Date

Member of the Executive Committees of the Boards of Directors
Carnival Corporation and Carnival plc

9

## Exhibit A

### Proposed Second Superseding Petition

1. **Violation of Special Condition**; by interfering with the implementation of the Environmental Compliance Plan ("ECP"), Third Party Auditor ("TPA") audits, and the Court's supervision of probation, as set forth in the plea agreement, Special Condition 13, and Section VIII.B.1 of the ECP. From on or about December 9, 2017, through on or about March 13, 2018, the defendant corporation and related entities (a) conducted an undisclosed program to visit ships for the purpose of finding and remedying environmental compliance issues, and after being advised by the Court that it disapproved of a previous undisclosed ship visit program; and (b) violated the ECP Section I.G, by failing to promptly notify the Court, the Court Appointed Monitor ("CAM") and the Interested Parties[1] about the existence of the vessel visit program.

2. **Violation of Special Condition**; by failing to provide sufficient responsibility and authority to the Corporate Compliance Manager ("CCM") to implement the ECP, as required by Section III.A of the ECP. For example, the defendant corporation and related entities subject to the ECP implemented a vessel visit program without authorization or knowledge of the CCM after the December 4, 2017 status hearing.

3. **Violation of Special Condition**; by failing to comply with the Required Compliance Program. On or about June 8, 2017, the defendant corporation and Costa Cruises falsified training records on board the M/V Diamond Princess and M/V Costa Luminosa pursuant to Carnival Corporation Notice of Violations #04-2017 and #06-2017.

4. **Violation of Special Condition**; by failing to comply with the Required Compliance Program. Specifically, between in or about March 2018, to in or about May 2018, the defendant and related entities sought an amendment to the definition of a "Major Non-Conformity" in the ECP, but were advised that the Coast Guard, the Department of Justice, the CAM and the TPA disagreed with the proposed change and that the Company should file a motion with the Court if they wished to modify the definition of an ECP Major Non-Conformity or its application by the TPA. On or about June 19, 2018, after the proposed change had been rejected by the Interested Parties, without notifying the Interested Parties, and outside of the specified protocol for modifying the ECP, a senior Company official, who is a retired United States Coast Guard officer, contacted former colleagues at the U.S. Coast Guard seeking their agreement with the Company's position concerning the definition of an ECP Major Non-Conformity and its application by the TPA.

---

[1]    The term "Interested Parties," as defined in the ECP, refers to the United States Attorney's Office for the Southern District of Florida, the Environmental Crimes Section of the United States Department of Justice, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis.

5.      **Violation of Special Condition**; by failing to comply with the Required Compliance
        Program and failing to comply with Special Condition 2 (defendant and related entities
        shall not commit any further violations of the International Convention for the Prevention
        of Pollution from Ships, 1973 as modified by the Protocol of 1978 (MARPOL 73/78) or
        the laws of the United States).  Specifically, (1) on or about December 16, 2018, the M/V
        Carnival Elation discharged plastic mixed with food waste in violation of MARPOL 73/78,
        Annex V, and the ECP in Bahamian waters; and (2) on or about December 18, 2018, the
        M/V Carnival Elation failed to maintain a Garbage Record Book in which all overboard
        discharges of garbage were accurately recorded, in violation MARPOL 73/78, Annex V,
        and the ECP.

6.      **Violation of Special Condition**; by interfering with the implementation of the ECP, TPA
        audits, and the Court's supervision of probation, as set forth in the plea agreement, Special
        Condition 13, and Section VIII.B.1 of the ECP.  Specifically, between on or about June
        2017, and on or about December 4, 2017, the defendant and related entities: (a) conducted
        an undisclosed program to visit ships shortly in advance of audits required pursuant to the
        ECP and Special Conditions of Probation and for the purpose of finding and remedying
        environmental compliance issues and without disclosure of the findings to the TPA and
        CAM; and (b) violated the ECP Section I.G., by failing to promptly notify the Court, the
        CAM and the Interested Parties about the existence of the pre-audit vessel visit program.

## Exhibit B

Special Condition No. 13 of the judgment against Princess Cruise Lines, Ltd. shall be amended to read as follows:

13) *Required Notification — Breach of Compliance*:

    a)    The defendant organization is to inform the United States Attorney's Office for the Southern District of Florida, the Environmental Crimes Section of the United States Department of Justice, the United States Probation Office for the Southern District of Florida, the U.S. Coast Guard (collectively, the "Interested Parties"), CAM, and TPA of any:

        i)    breach of the ECP;

        ii)    breach of the plea agreement;

        iii)    violation of the conditions of probation;

        iv)    violation of any Marine Environmental Protection Requirement;

        v)    violation of any applicable United States (federal or state) environmental law;

        vi)    violation of the Ballast Water Convention, the London Dumping Convention, or any future maritime environmental law convention to which the United States becomes a party and which goes into effect during the period of the defendant organization's probation; or

        vii)    credible allegations, to include any Environmental Open Reports, involving a violation of the ECP or any Marine Environmental Protection Requirement or applicable international, flag state, port state, coastal state, or United States (federal, state or local) environmental law

    involving any Covered Vessel or Covered Personnel (as defined in the ECP) as soon as reasonably practicable but no later than seven days of when the defendant organization learns of the occurrence. The notification shall include a description of the nature, date and time, and location, including the country, of the breach of compliance or violation. The defendant organization shall submit for approval to the Interested Parties, by June 30, 2019, a proposed process, including the criteria for determining which incidents to report and how they will be reported in compliance with this Special Condition.

    b)    The defendant organization shall provide on a weekly basis to the CAM and TPA the complete and un-redacted internal HESS Weekly Flash Reports created by Carnival Corp. & plc. The Flash Reports shall include any violation of:

        i)    any Marine Environmental Protection Requirement;

ii)     applicable international environmental treaties; or

iii)    United States (federal or state) environmental law

involving any Covered Vessel or Covered Personnel as defined in the ECP.  The Flash Report shall describe the nature, date and time, and location (if available) of the incident; how the incident was reported (both internally and externally, including government and regulatory bodies); and the source of the information.

c)      The defendant organization shall provide the Interested Parties, CAM, and TPA with the monthly reports submitted to the Office of Probation.

d)      The defendant organization shall within seven days inform the Interested Parties, CAM, and TPA of any notifications or submissions regarding violations, whether communicated voluntarily (including any "self-reports") or pursuant to a legal requirement, made to any United States (federal or state) regulatory authority involving any violation of ECP or any Marine Environmental Protection Requirement or applicable United States (federal or state) environmental law involving any Covered Vessel or Covered Personnel.

e)      The defendant organization and its related entities will not resolve any enforcement action with a United States federal or state regulatory authority related to an incident covered by section 13 until they: (i) inform the Interested Parties and (ii) inform the regulatory authority that Carnival Corporation & plc and its related entities are operating under a Court Supervised ECP in this case in the Southern District of Florida, including a reference to the case number.

July 3, 2019

ATTACHMENT 2:

LETTER FROM C. DONALD, *PROPOSED MODIFICATIONS TO THE ENVIRONMENTAL COMPLIANCE PLAN* (MAY 3, 2019), PCL_ECP00115036-40

[*See following pages*]

ATTACHMENT 2



# CARNIVAL
## CORPORATION&PLC

Chris Donald
Vice President
Corporate Environmental Compliance
ECP Corporate Compliance Manager
Carnival Corporation & plc
3655 NW 87th Avenue
Miami, Florida 33178

May 3, 2019

Re:  **U.S. v. Princess Cruise Lines, Ltd. – 1:16-cr-20897**
     **Proposed Modifications to the Environmental Compliance Plan**

Dear Interested Parties:

Pursuant to Section I.H of the Environmental Compliance Plan (the "ECP"), I write on behalf of Carnival Corporation & plc and its wholly owned subsidiary, Princess Cruise Lines, Ltd. (collectively the "Company"), to propose a few modifications to the Company's ECP.

As established in Section I.H of the ECP, any proposed modification must be submitted in writing to the Interested Parties for their consideration over a thirty-day comment period.  If no comments are provided during that period, the modifications shall become effective.  Over the past several months the Company has consulted with the Court Appointed Monitor ("CAM") and the Third Party Auditor ("TPA") in order to develop a common set of modifications with which both the CAM and the TPA feel comfortable and which the Company feels are needed.

Those discussions have focused largely on changes to multiple provisions in the ECP relating to restructuring the Company's incident investigations department, Environmental Officer candidate qualifications, the Environmental Control Systems ("ECS"), and the machinery space vulnerabilities review conducted by the TPA.

Based on those conversations and various exchanges with the CAM and TPA, the Company is now proposing several modifications to which we understand neither the CAM nor TPA object. In many respects, these proposed modifications are borne of over a year and a half of CAM visits, TPA audits, and communications with the Interested Parties, during which it has become evident that many well-intentioned provisions in the ECP have proven to be unclear on their face or ineffective in practice.  Our goal in proposing these modifications is to better achieve the overall purpose of the ECP—sustained environmental compliance and continuous improvement—while eliminating some of the inefficiencies that can often interfere with that goal.

1

Enclosed for your review is a chart listing the Company's proposed modifications to the ECP. This chart also compares the ECP's current language to the proposed amended language and provides short explanations for the Company's overall rationale for the proposed changes. Although the chart provides more specific details regarding each individual modification, I set forth below general explanations for each modification. If you would find it helpful, I would also be happy to schedule an in-person or telephonic meeting to provide more granular information regarding the need for these proposed modifications and can further assist you in your assessment.

I also would like to thank the CAM and TPA for their helpful insight, comments, and edits to the proposed modifications. The Company looks forward to continued collaborative engagements with the CAM and TPA to continue to improve the efficiency and effectiveness of the Company and its environmental compliance and implementation of the ECP.

## I.      Investigation Program

The Company has proposed a modification to ECP § III.B.1.B & C. As you are aware, the CAM and TPA have previously reported that the Company's internal investigation program is inadequate. Over the past several months the Company has consulted with the CAM and TPA to develop a plan to restructure the Company's investigation program. Based on these discussions, the suggested plan for restructuring is detailed below.

Although Section III.B. of the Environmental Compliance Plan requires that the Risk Advisory and Assurance Services ("RAAS") department conduct internal HESS investigations, we believe a department dedicated solely to investigations could provide stronger, more effective improvements to adequately address the current concerns. This new department will be called the Incident Analysis Group.

Newly hired Sandy Rowlett, formerly of the United States National Transportation Safety Board, will lead the new department. So far, Ms. Rowlett has started reviewing and will comment on investigation procedures that have been drafted by DNV-GL, a well-known maritime consultant and classification society that the Company retained in 2018 to advise on how to improve its internal investigations efforts. Additionally, Ms. Rowlett will also develop a new investigator training and certification program, and standardized root cause analysis tools for use across the organization. The Company is also in the process of creating training courses for Level 1-2 shipboard investigators, has hired one additional Level 3-4 shipboard investigator, and is assessing staffing needs for adequacy.

Due to the urgency of this matter and the unanimous positive feedback we have received to date regarding the suggested restructuring plan, we are currently taking steps to implement this new program as quickly as possible. If you have any reservations or comments, please let us know as soon as possible so we can immediately integrate them into the restructuring process.

## II.      Environmental Officer Qualifications

The Company has proposed a modification to ECP § IV.A.2. Finding good Environmental Officer candidates is challenging, as the pool of options that meet the ECP requirements is quite

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

small. We believe some additional background qualifications should be considered suitable for the Environmental Officer position. This includes breaking qualifications into five potential options: 1) marine engineer who has achieved specific rank; 2) deck officer who has achieved specific rank; 3) former Navy/Coast Guard engineer who has achieved specific rank; 4) environmental science degree with specific experience; and 5) engineer with specific experience.

These options expand the pool of potential candidates and strengthen the wealth of knowledge we are able to bring in to ensure we are hiring the best possible candidates. Prior experience with mechanically-minded personnel of this stature has proven they can be molded into strong Environmental Officers.

**III.    Environmental Control System**

The Company has proposed a modification to ECP § IX.A–F. We believe this suggested ECS modification addresses the current concerns expressed in the Company's ECS letter from January 8, 2019, and the CAM's ECS letter from January 25, 2019. This includes the "unrealistic expectation for the role of the ECS" and "the lack of clarity and consistency of the current ECS program." *See* CAM Letter *Re: Environmental Compliance Plan ("ECP") Environmental Control System ("ECS")*(Jan. 25, 2019).

**IV.    Machinery Space Vulnerabilities Review**

The Company has proposed a modification to ECP § VIII.B.h. As currently written, the TPA must assess thousands of machinery space vulnerabilities to meet the requirement. This includes not only equipment vulnerable points (e.g., valves, etc.), but also sinks, toilets, and even buckets lying around the engine room. To lighten the auditor's burden of reviewing every single potential vulnerable point during each audit, we have proposed a risk-based approach.

Together, these proposed modifications are based on the experience and expertise of the Company, CAM, and TPA, and we hope that we can work together with you as well to make the ECP more efficient and effective. Thank you for your careful attention to this matter.

Sincerely,

Christopher Donald
ECP Corporate Compliance Manager
Carnival Corporation & plc

3

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

Richard Udell
Senior Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice
Richard.Udell@usdoj.gov

Thomas Watts-FitzGerald
Assistant U.S. Attorney
U.S. Attorney's Office for the Southern District of Florida
Thomas.Watts-Fitzgerald@usdoj.gov

Brendan Sullivan
Lieutenant Commander
District Seven Legal Office
U.S. Coast Guard
Brendan.Sullivan@uscg.mil

Niya J. Williams
Lieutenant Commander
Office of Investigations and Analysis
U.S. Coast Guard
Niya.J.Williams@uscg.mil

Anthony M. DeStefano
Lieutenant Commander
Office of Maritime and International Law, Environmental Law Division
U.S. Coast Guard
Anthony.M.DeStefano@uscg.mil

Peter Link
Lieutenant
District Seven Legal Office
Peter.W.Link@uscg.mil

Jeffrey Feldman
U.S. Probation Officer
U.S. Probation Office for the Southern District of Florida
Jeffrey_Feldman@flsp.uscourts.gov


cc:  Steven P. Solow, ECP Court Appointed Monitor
     Thomas M. Nolan, ECP Third Party Auditor
     John Francic, ECP Third Party Auditor
     CG-INV (uscgecp@uscg.mil)
     solowmonitor@kattenlaw.com
     david_sims@ios.doi.gov

Confidential Business Information Pursuant to ECP Sections VI.D
and VI.E                                              PCL_ECP00115039

stanley_stocker@doioig.gov
Admiral William Burke, Carnival Corporation & plc Chief Maritime Officer
Arnaldo Perez, Carnival Corporation & plc General Counsel
Kelly W. Clark, Holland America Group Chief Ethics Officer & General Counsel
David N. Kelley, Dechert LLP


Attachment

5

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115040

July 3, 2019

**ATTACHMENT 3:**

**LETTER FROM C. DONALD,** *ATTACHMENT – PROPOSED MODIFICATIONS TO ENVIRONMENTAL COMPLIANCE PLAN (5/3/2019)* **(MAY 3, 2019), PCL_ECP00115041-52**

[*See following pages*]

**Attachment - Proposed Modifications to Environmental Compliance Plan (5/3/2019)**

| ECP Section | Original Provision | Revised Provision | Reason for Change |
|---|---|---|---|
| III.B.1.B & C | CARNIVAL shall maintain its independent Risk Advisory and Assurance Services ("RAAS") department. This department shall report directly to Carnival Corporation & plc's Board of Directors. This department shall:<br><br>a. Conduct fully independent internal audits of all Covered Vessels annually to ISM Code requirements (incorporating safety, environmental, and operational criteria).<br><br>b. Investigate Covered Vessel casualties and oil pollution incidents in accordance with CARNIVAL's incident investigation policy.<br><br>c. Investigate Environmental Open Reports, as defined below, in accordance with CARNIVAL's incident investigation policy.<br><br>d. Make recommendations to the CCM regarding improvements to the EMS. | CARNIVAL shall maintain its independent Risk Advisory and Assurance Services ("RAAS") department. This department shall report directly to Carnival Corporation & plc's Board of Directors. This department shall:<br><br>a. Conduct fully independent internal audits of all Covered Vessels annually to ISM Code requirements (incorporating safety, environmental, and operational criteria).<br><br>~~b. Investigate Covered Vessel casualties and oil pollution incidents in accordance with CARNIVAL's incident investigation policy.[1]~~<br><br>~~c. Investigate Environmental Open Reports, as defined below, in accordance with CARNIVAL's incident investigation policy.~~<br><br>~~d.~~b. Make recommendations to the CCM regarding improvements to the EMS.<br><br>CARNIVAL shall establish and maintain an independent Incident Analysis Group. This | To establish a new independent investigations department that is separate from RAAS. |

---

[1] Blue Font – current proposed modifications

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| | | | |
|---|---|---|---|
| | | department shall report directly to the Vice President Global Compliance & Ethics. This department shall:<br><br>a.  Investigate Covered Vessel casualties and oil pollution incidents in accordance with CARNIVAL's incident investigation policy.<br>b.  Investigate Environmental Open Reports, as defined below, in accordance with CARNIVAL's incident investigation policy.<br>c.  Make recommendations to the CCM regarding improvements to the EMS. | |
| IV.A.2 | An EO shall:<br><br>a.  Unless an incumbent EO, have an Engine Officer license and/or an environmental or science-based bachelor's degree or higher. | An EO shall:<br><br>a.  Unless an incumbent EO, have at least one of the following backgrounds/qualifications: ~~an Engine Officer license and/or an environmental or science-based bachelor's degree or higher.~~<br>i.  Marine Engineering Officer who has achieved 2nd Engineer rank or higher with an STCW A-III/2 certificate of competency<br>ii.  Deck Officer who has achieved the rank of 1st Officer or equivalent with an STCW A-II/2 certificate | Finding good candidates that want to be Environmental Officers is no easy task.<br><br>By casting the net wider we are better able to find candidates who are a great fit for the position onboard.<br><br>These 5 backgrounds will help us find candidates who are mechanically-minded (pollution prevention equipment) and easily moldable into the role of a Carnival Environmental Officer. |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| | | | |
|---|---|---|---|
| | | of competency<br><br>iii.   Former Navy/Coast Guard engineer who has achieved Chief Petty Officer rank or higher<br><br>iv.   Environmental science degree or higher with at least 3 years of relevant experience<br><br>i.v.   Engineer with experience of operating/maintaining technical systems similar to those found on cruise ships with at least 3 years of relevant experience and an engineering degree or higher | |
| IX.A through F | **ENGINEERING REQUIREMENTS**<br><br>**A.   Time of Implementation**<br><br>Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than three (3) months from the date of sentencing.<br><br>**B.   Environmental Control System**<br>   1.   CARNIVAL shall implement an Environmental Control System ("ECS") to help prevent unauthorized usage or connections within the engine | **ENGINEERING REQUIREMENTS**<br><br>**A.   Time of Implementation**<br><br>Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than three (3) months from the date of sentencing.<br><br>**NOTE:** Revisions to the Environmental Control System (effective June 3, 2019) shall be implemented on Covered Vessels no later than December 31, 2019.<br><br>The CCM shall maintain a schedule of implementation that shall be provided to the TPA, CAM, and RAAS prior to | |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115043

| | | | |
|---|---|---|---|
| | | room and machinery spaces. Under the ECS, CARNIVAL shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or overboard discharge connections.<br>2. Seals used as part of the ECS seals shall be non-reusable and uniquely numbered. An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal / replacement. The keys used to open locks utilized as a part of the ECS shall be controlled.<br>3. Any existing seals that are found to have deteriorated or had their numbers partially/completely erased shall be replaced immediately, with the reason for replacement entered in the ECS Seal Log.<br>4. The Chief Engineer of each vessel shall retain | shipboard audits and oversight visits.<br>**B. Environmental Control System**<br>1. CARNIVAL shall ~~require implement implementation of~~ an Environmental Control System ("ECS") to ~~help~~ deter and detect~~prevent~~ unauthorized discharge of vessel waste streams~~disposal of bilge water and/or oily waste overboard through vulnerable pipework connections. usage or connections within the engine room and machinery spaces.~~<br>Under the ECS, ~~CARNIVAL shall require crew members to use numbered~~ numbered seals, locks, or welds shall be required ~~(to control~~on vulnerable pipe work connections ~~shall be installed~~ (blank flanges, open ended connections and plugged fittings) on systems located in the machinery spaces that discharge overboard.<br>~~1.~~2. ~~)~~ "Virtual locks" – i.e., the control of portable pumps and designated hoses that could be used to perform an unauthorized discharge – are also permitted, ~~where control of portable pumps and designated hoses an unauthorized discharge.~~<br>3. Seals used as part of the ECS ~~seals~~ | |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115044

environmental seals replaced for any reason. Used seals shall be retained under the Chief Engineer's control in a secure location for one (1) year. The cognizant OLCM will be responsible for ensuring — fleet wide — that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each vessel.

**C. Waste Tank Piping**
1. To prevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, vessels shall maintain Classification Society- approved drawings that reflect all approved modifications made to waste management systems.
2. Vessels shall implement corporate approval procedures for any modifications made to waste management tanks or their systems. Those procedures shall require prior Operating Line approval for all non-emergency modifications and shall require prompt approval or removal of modifications after an emergency. Any emergency

shall be non-reusable and uniquely numbered.
4. An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for ~~any~~ seal removal / replacement.
5. The keys used to open locks utilized as a part of the ECS shall be controlled. Seals must be used to control emergency bilge suction valves and crossover valves, except for electric or hydraulic remotely operated valves which cannot be fitted with a seal.
~~2.~~6. Portable pumps and designated hoses shall be stored in one secured ~~a central~~ location.  If more secured locations are needed, they must be approved by the CCM ~~in the engine room.~~ (Excluding portable pumps used for emergency damage control purposes)
~~3.~~7. Any existing seals that are found to have deteriorated or had their numbers partially/completely erased shall be replaced immediately, with the reason for replacement entered in the ECS Seal Log.

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115045

modification must be reported to the TPA and CAM promptly after work is performed.

3. Within thirty (30) days of sentencing, the CCM and OLCMs shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized stub pipes, cross connections, or piping on engine room waste systems.

4. Covered Personnel shall promptly notify the EO, who shall in turn promptly notify the cognizant OLCM and the CCM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste systems in a Covered Vessel. Within seven (7) days of receiving such information, the CCM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

5. Any system changes or modifications must have prior approval from the senior shore-side Technical Management. Classification Society-approved drawing(s) representing the current physical layout of the

8. The Chief Engineer of each vessel shall retain environmental seals replaced for any reason in a secure location for one (1) year. Used seals shall be retained under the Chief Engineer's control in a secure location for one (1) year.

4.9. The cognizant OLCM will be responsible for ensuring — fleet wide — that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each vessel.

C. **Waste Tank Piping**

1. To deter and detectprevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, vessels shall maintain Classification Society-approved drawings that reflect all approved modifications made to waste management systems.

2. CARNIVALVessels shall implement corporate include an approval procedures for any modifications made to waste management tanks or their systems. Theose procedures shall require prior Operating Line approval for all non-emergency modifications and shall require prompt approval or

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115046

system shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing. Copies of this documentation and drawing(s) shall be maintained aboard the vessel and provided to the TPA and CAM upon request.

6. To prevent unauthorized usage of bilge water tanks or oily waste tanks, CARNIVAL shall require that ECS seals or locks be placed on tank hatches, valves, or flanges that could allow for an external connection to the system. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank is opened.

**D. Bilge-Main Cross Connections**

1. Within thirty (30) days of sentencing, the CCM and OLCMs shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump"

removal of modifications after an emergency. Any emergency modification must be reported to the TPA and CAM promptly after work is performed.

3. Within thirty (30) days of sentencing, the CCM and OLCMs shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized stub pipes, cross connections, or piping on engine room waste systems.

4. Covered Personnel shall promptly notify the EO, who shall in turn promptly notify the cognizant OLCM and the CCM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste systems in a Covered Vessel. Within seven (7) days of receiving such information, the CCM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

5. Any system changes or modifications must have prior approval from the senior shore-side Technical Management. Classification Society-approved drawing(s) representing the current physical layout of the

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited. Cross connections to eductor systems or any other system capable of pumping out bilge and wastes will also be referenced, with the exception of Classification Society and/or Flag Administration-approved food waste educator systems. Any method to discharge overboard via the soot collection tank and soot eductor must be disabled and locked out.

2. The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange or bright green[2]. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only."

3. To prevent unauthorized usage of those valves, CARNIVAL shall

system shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing. Copies of this documentation and drawing(s) shall be maintained aboard the vessel and provided to the TPA and CAM upon request.

6. To deter and detect~~prevent~~ unauthorized usage of bilge water tanks or oily waste tanks, CARNIVAL shall require that ECS seals or locks be placed on tank hatches, valves, or flanges that could allow for an external connection to the system. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank is opened.

**D. Bilge-Main Cross Connections**

1. Within thirty (30) days of sentencing, the CCM and OLCMs shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and

---

[2] Purple Font – modifications effective as of February 11, 2019

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

require that ECS seals be placed on such valves. The ECS Seal Log shall track any time a crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal. Except that where a seal cannot be affixed to either the valve or associated push button or switch, the EO must review the valve position history to determine if the valve has been opened, and if it has, make a record in the ECS Seal Log.

**E.   Emergency Bilge Suctions**

All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges like those which may be connected to sea water circulating pumps, shall be painted international orange <u>or bright green</u> on all vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.

**F.   Blank Flanges**

general service pump" or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited. Cross connections to eductor systems or any other system capable of pumping out bilge and wastes will also be referenced, with the exception of Classification Society and/or Flag Administration-approved food waste educator systems. Any method to discharge <u>vessel waste streams</u><s>bilge water or oily waste</s> overboard via the soot collection tank and soot eductor must be disabled and locked out.

2.   The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange <u>or bright green</u>. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only."

3.   To prevent unauthorized usage of those valves, CARNIVAL shall require that ECS seals be placed on such valves. The ECS Seal Log

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| | 1. To prevent unauthorized connections within the engine room and machinery spaces of vessels, every blank flange connected to overboard piping, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil- coated sticker seals for flanges, may also be used.<br>2. The blank flange or valve securing the bilge and sludge transfer system shore connection ~~discharge valve~~ at the discharge stations shall also require controls as part of the ECS. | shall track any time a crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal. Except that where a seal cannot be affixed to either the valve or associated push button or switch, the EO must review the valve position history to determine if the valve has been opened, and if it has, make a record in the ECS Seal Log.<br>**E.  Emergency Bilge Suctions**<br>All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges like those which may be connected to sea water circulating pumps, shall be painted international orange or bright green on all vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only."  The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.<br>**F.  Blank Flanges**<br>1. To prevent unauthorized connections within the engine room and machinery spaces of | |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| | | vessels, every blank flange connected to overboard piping, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil- coated sticker seals for flanges, may also be used.<br><br>2. The blank flange or valve securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS. | |
|---|---|---|---|
| VIII.B.h | Assess the machinery spaces for vulnerabilities to unauthorized ways to dispose of waste, and document any methods or vulnerabilities so identified. | Verify that Assess the machinery spaces for vulnerabilities to (unauthorized ways to dispose of waste) are controlled in accordance with the ECP and Carnival's policies and procedures, and document any methods or vulnerabilities so identified. | As currently written, the auditor is required to assess the thousands of machinery space vulnerabilities that exist in large complex cruise ship machinery spaces. In reality, a sink and toilet are vulnerabilities, as are buckets lying around the Engine Room. The new ECS |

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

| | | | approach is risk-based. |
|---|---|---|---|

Confidential Business Information Pursuant to ECP Sections VI.D and VI.E

PCL_ECP00115052