UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **16 -20897-CR-SEITZ**

**UNITED STATES OF AMERICA**

v.

**PRINCESS CRUISE LINES, LTD.,**

**Defendant.**
_____/

**GOVERNMENT'S STATUS REPORT**

The United States, by and through undersigned counsel, respectfully submits this status report in anticipation of the Court's hearing scheduled for June 19, 2019.

This status hearing marks the end of the second year of the defendant's five year period of probation and the submission of annual reports by Court Appointed Monitor ("CAM")[D.E.-150] and Third Party Auditor ("TPA")[D.E.-153]. This is also the first quarterly report since the defendant's admission of violations of probation and settlement agreement imposing additional conditions of probation and an additional criminal fine of $20,000,000.

**I.     The 2nd Annual CAM Report**

There is much good news in the CAM report. It recounts a large variety of significant efforts being made within Carnival and its brands to improve environmental compliance. These are to be fully credited. At the same time, the CAM appropriately places these positive improvements in the fuller context of serious violations of probation. Most importantly, the CAM found that leadership and corporate culture were the primary obstacles to creating a sustainable compliance culture. The CAM focused on two unresolved barriers.

First, the CAM criticized the "tone at the top" and concluded that the failure to prioritize

environmental compliance was a leadership failure that was the root cause of the probation violations, including the failure to provide the Corporate Compliance Manager with the requisite authority and resources necessary to implement the Environmental Compliance Plan (ECP). The Company has now admitted to this failure. However, this admission came begrudgingly, and only after the Office of Probation filed a petition to revoke probation, after the Court announced it was considering banning Carnival vessels from U.S. ports, and after the Court ordered that the Chairman of the Board, Chief Executive Officer, and Chief Finance Officer must attend the last hearing. Obvious in the way it conducts its highly successful business operations, Carnival is fully capable of the effective centralized planning, goal setting, and organizational commitment necessary to prioritize compliance and environmental stewardship. We look forward to seeing Carnival begin to prioritize environmental compliance in the same manner as it does serving its customers and safely navigating from point A to point B. The CAM is correct to target top leadership and corporate culture as the most significant barriers to a sustainable compliance culture.

  Like the CAM, the government has observed the company's tone deaf response to the conviction (press release and statements blaming it on a "few" bad apples), its opposition to the CAM and TPA conducting unannounced ship visits/audits, the CEO's minimalist treatment of the conviction and ECP in a video message, the first and second undisclosed pre-audit programs, its public statement to the Miami Herald in response to the Court's comments at the hearing on June 4, 2019 (initially blaming it on someone misinforming the Court), and, most recently, the difficulty in drafting the required statement accepting leadership responsibility for the probation violations. Though the top three officers were present at the last hearing because their presence was compelled by Court order, only the Chief Executive Officer spoke, and he only spoke after the Court

effectively required him to do so. Despite his mandated attendance, the Chairman of the Board did not address the Court and made no public statement. In view of the context and reasons for the hearing, the government remains concerned.

Second, the CAM found that continuing environmental and ECP violations continue to be a major problem. During the second year of probation, Carnival continued to violate environmental laws and the ECP, including numerous probation violations. One of those problems concerns the overboard discharge of plastic and other non-food waste. As the Court has expressed, it is disconcerting to learn that Carnival did not have a better handle on this problem prior to the ECP. As we have learned, Carnival has simply accepted routine and illegal discharges in violation of international law as part of "normal" ship operations. The result has been to leave the company's destinations worse off. Because the harm posed by plastic in the marine environment is apparently not fully appreciated, the Government's Status Report will provide some additional background. *See infra*. Other prohibited discharges have occurred and are summarized in the CAM report. *See* pp. 93-97, 98-99.

As the Court has often observed, some violations of probation were bound to occur in a company of this size and activity. The government appreciates the way in which the CAM has examined these issues in its report by focusing on those issues that reflect a management failure and/or were in some other way extraordinarily serious (e.g., the discharge of grey water from the Westerdam in Glacier Bay National Park, the discharge of garbage containing plastic from the Carnival Elation).

In reviewing the Second Annual Report of the CAM, the government is struck by the helpful contribution of the CAM to the Court, the Office of Probation, the government, and, yes, to the defendant. It has helped to illustrate in a case of this magnitude how difficult it would have

3

been to properly monitor the defendant's probation without the additional resources, close review, and prioritization brought to the process by the CAM. Though helpful, neither Carnival's Quarterly Tracking Reports, notices of violation, nor the TPA ship specific audit reports provide the Court with the context of what issues are most serious and what matters need the most attention.

II. <u>The 2nd Annual TPA Report</u>

In the "ABSG Consulting Third Party Auditor Year Two Annual Report (July 3, 2019)," the Third Party Auditor (TPA) again has provided an overview of both observations and recommendations, derived from the audit of 36 vessels and six shore-side facilities:

| TECHNICAL APPROACH | RECOMMENDATIONS |
|---|---|
| **Policies and Procedures** Some identified procedures last audit year have not been updated or personnel are not following procedure. | **Policies and Procedures** Continue efforts to improve and maintain the Environmental Management System (EMS) through; the collection and evaluation of adequate HESS related information; assessing goals, measurable objectives and targets to improve environmental performance; and ongoing activities to monitor and verify progress toward achieving environmental goals, objectives and targets. |
| **Vulnerabilities** Inconsistent application of the ECS and the use of "Virtual Locks" not in compliance with the ECP. | **Vulnerabilities** Address inconsistencies within processes across all brands to assess, identify, and mitigate environmental risk. |
| **Record Keeping** Documentation, Checklists, and other records were found to be poorly managed, not following proper procedures, and not following proper log entry requirements and protocols. | **Record Keeping** Identify and implement measures that to better ensure entries within logbook and training records are complete, accurate, and timely. |
| **Waste Management** The Garbage Management Plan was not being followed regarding garbage segregation, food waste separation, hazardous materials handling and proper documentation. | **Waste Management** Garbage Management Plan should address all aspects of waste handling, ensure regulatory requirements are addressed, and provide consistent practices across all brands. |

4

**Pollution Prevention**
Pollution Prevention Equipment found or reported not operational.



**Pollution Prevention** Continue efforts to minimize risk of "out of service" pollution prevention equipment. Build in a reliability, availability, and maintainability solution into the design, procurement, installation, and operation of pollution prevention equipment.

**Corrective & Preventative Action**
Corrective and Preventive actions found ineffective or incomplete. No root cause analysis program in place to identify root causes.



**Corrective & Preventative Action**
Develop an effective root cause analysis program which should drive the development of effective preventative actions to address identified causes.



The analysis presented in the TPA Report is naturally informed and derived from the extended effort involved in conducting audits on what amounts to a daily basis, around the world. Since the individual audit results have been made available to the Interested Parties, the government is somewhat discouraged at the similarities apparent in the current analysis to criticisms and short-comings identified in the Third Party Auditor Year One Annual Report (June 18, 2018).[1]

Despite the clear recommendations by the TPA last year, and identification of the areas of priority concern to be addressed in the audits to be conducted in year two of probation, significant problems continue to be identified in the many audit procedures documented in the Appendices of the current report. While the TPA, as with CAM, supra, noted some areas of improvement and attention to specific problems, the pace of improvements in several critical areas appears snail-like at best.

---

[1] Unlike the current year report, the Third Party Auditor Year One Annual Report has not as yet been filed in the public record. The United States has been advised by the Company that it has no objection to the filing of a minimally redacted copy of that report in the public record. The government is prepared to provide that document to the Court.

Notably the reports for both years found significant shortcomings in the area of "Policies and Procedures" with the failure to update incomplete, vague, and non-existent policies continuing into the second year – a short-coming compounded by instances of personnel simply not abiding by procedures that were in place. The Company's reliance on a partially implemented incident reporting system as a future solution to shortfalls in the collection and evaluation of HESS related information seems somewhat problematic in light of the commentary by the TPA that procedural defects identified in year one persisted through the end of year two. Enacting and implementing curative procedures seems to be a leadership issue, less than an informational gap.

Within the "Vulnerabilities" assessment, it is clear that the systems for control of critical valves and installations by environmental seals remained inconsistent across the brands and not in compliance with the ECP. This issue has been a recurrent theme in vessel Audit Reports throughout year two, and is reflected in part, in the TPA report note that Environmental Control System non-conformities and observations accounted for 38 audit discrepancies over the year-long period. This implies that on average, every ship visited had one or more of such violations of the ECP and consistency was lacking even amongst vessels of a single operating line. See D.E.-153, Section 3.1.3.

The recent amendments to the ECP referenced in the Company's Response, D.E.-151 at 4, appears to be the central element of their effort to address this area of concern by establishing a new training program to "make sure that the ECS is correctly implemented and maintained." The fundamental problem in the past was the company's internal, strained "interpretation" of the clear language of the ECP regarding acceptable control methods. The government is aware that efforts have been underway to design a comprehensive solution to this issue and awaits the results of that effort. It is believed that a successful resolution should be apparent within just a few vessel audits.

The government intends to monitor this area closely as the third year of probation progresses.

"Waste Management," as briefly addressed, *supra*, is an area that has been categorically ignored by the Company. The Company, in its Response, D.E.-151 at 4, acknowledges that this issue has been identified by the TPA as a "critical area of risk." The Company goes on to suggest that vessel design features, signage, and training explain the woeful performance of its fleet in dealing with waste disposal issues. A more thorough consideration of this entire issue appears, infra.

"Pollution Prevention" and Corrective & Preventive Action," as report categories, should be considered in a unitary fashion. The inability to make greater strides in reducing discrepancies associated with the on-board pollution prevention equipment is an artifact of the Company's enduring failure to implement an efficacious Root Cause Analysis (RCA) program that properly assesses failures, develops sound preventive action plans against recurring and systemic problems, and eliminates or reduces future non-conformities.

During the first two years of probation, the TPA has found that failure of required Pollution Prevention Equipment was the most prevalent cause for findings of Major Non-conformities. *See* D.E.-153, Section 3.2.5. The Company's statement that it now "intends to conduct a full-review analysis" of the relevant equipment speaks volumes about the insufficiency of its RCA program that over the course of two years – and presumptively before the imposition of probation – has yet to generate preventive action ashore or on the vessel to address these problems.

The salient conclusion from the TPA's efforts throughout year two of probation is that are corrective and preventative action measures have been and remain deficient, and that the lack of verifiable commitment by senior management remains a major concern in improving ECP compliance. That conclusion closely mirrors the expressed views of the 2nd Annual CAM Report.

To address the continuing concerns recognized in the Year Two Annual Report, the TPA has identified the areas where they intend to place significant focus in the coming year:

- Failure of Pollution Prevention Equipment
- Waste Management aboard ships
- Waste Management Vendors ashore
- Corrective and Preventive Actions
- Training platform GLADIS
- Investigation Program

These "priority" areas comport very closely with the conclusions the United States has drawn from the pair of Second Annual Reports, the experience gleaned from the recently concluded probation violations proceedings, and its independent assessment of the vessel and shore-side audit reports. The government, as well, will be looking for quantifiable improvement in these areas over year three of probation.

### III.   Special Condition 13

As part of the recent settlement of probation violations, the Court imposed new reporting requirements. These were necessary because the government had found that numerous significant violations of probation were not being reported to the Office of Probation and/or the United States as a result of Carnival's interpretation of the ECP and the Court's original Judgment & Commitment Order.

Pursuant to Exhibit B of the settlement agreement [D.E.-134], the defendant is required to provide notification of searched "breaches of compliance."

13)   *Required Notification — Breach of Compliance*:

a)   The defendant organization is to inform the Interested Parties, CAM, and TPA of any:

   i)   breach of the ECP;

   ii)   breach of the plea agreement;

8

      iii)      violation of the conditions of probation;

      iv)      violation of any Marine Environmental Protection Requirement;

      v)      violation of any applicable United States (federal or state) environmental law;

      vi)      violation of the Ballast Water Convention, the London Dumping Convention, or any future maritime environmental law convention to which the United States becomes a party and which goes into effect during the period of Princess's probation; or

      vii)      credible allegations, to include any Environmental Open Reports, involving a violation of the ECP or any Marine Environmental Protection Requirement or applicable international, flag state, port state, coastal state, or United States (federal, state or local) environmental law involving any Covered Vessel or Covered Personnel (as defined in the ECP) as soon as reasonably practicable but no later than seven days of when the defendant organization learns of the occurrence. The notification shall include a description of the nature, date and time, and location, including the country, of the breach of compliance or violation.

On June 28, 2019, in advance of the deadline set forth in Special Condition 13, the defendant submitted for approval a proposed process, including criteria for determining which incidents to report and how they would be reported. We have now had the benefit of a month of Carnival's reporting under the new system. Evidently Carnival is reporting what is required, but it is impossible to tell, because it is reporting numerous irrelevant and unreportable incidents. The proposed policy does not track the aforementioned categories or indicate which category is implicated by each entry. Among other things, Carnival's submissions include "near misses" which Carnival has defined as "an event or situation that could have resulted in a HESS Event, but did not, either by chance, through timely intervention or because preventative measures were in place." Letter dated June 28, 2019.

In the last month, Carnival has sent an email to the Office of Probation, the CAM, the TPA, the government, and Carnival's defense counsel virtually every day. Each email states: "Pursuant to Special Condition No. 13 of the Judgment, the attached report details possible breaches of

compliance and other Company reportable items." Whereas the government sought accurate and timely reporting of *actual* violations of law, violations of probation, and violations of the ECP, it is now receiving daily reports of a large number of other matters, many of which are at best "near misses," but not reportable violations pursuant to Special Condition 13. Recent submissions to the Court and interested parties have trivialized the Court ordered reporting requirement by including the following:

- ■ "During the weekly grease tanks inspection, a condom was found in grease tank#2 and removed." Carnival Sensation (June 7, 2019).

- ■ "While the Grand Princess was enroute towards San Francisco, USA a guest noted that a gust of wind blown a deck chair cushion overboard. The guest informed the Deck Supervisor, who [found] the cushion on the lower deck, Promenade Deck 7. The Cushion was recovered and secured." Grand Princess (June 13, 2019).

- ■ "While the ship was alongside in Galveston, Texas, a pallet containing bags of onions broke during provision loading and 13 bags of onions fell onto the net underneath the loading platform. One bag containing onions fell into the sea. All the bags were recovered including the bag that fell into the sea. None of the onions were left in the water." Carnival Vista (June 15, 2019).

- ■ "While the Noordam was cruising in Glacier Bay, AK at approximately 11:15 a crew member observed some guests throwing a piece of bread from a balcony on Deck 4 Port Aft, into the water. Seagulls then ate the piece of bread. ADEC, USCG, and Park Services will be informed. An entry has been made in the Garbage Record Book." Noordam (June 28, 2019).

- ■ "While the Sea Princess was alongside in Portland, UK at 16:00 approximately 0.5 liters of hydraulic oil leaked from the Hydraulic pipe of the Starboard side Officer's platform. While moving materials in the area, the hydraulic pipe was accidentally hit, causing it to break. The deck was cleaned with absorbent pads. No oil went into the sea during the event. The damaged pipe was replaced with a new one." Sea Princess (July 10, 2019).

- ■ "On 10 July 2019 at 00:01hrs, [a] security officer on duty was informed that a guest threw a white object overboard. Upon enquiry it was found that a guest was eating a pizza on the balcony, while doing that a slice of pizza accidentally slid from the plate of the guest and fell overboard." Carnival Miracle (July 10, 2019).

With the benefit of this experience, the defendant needs to revise its proposed policy to comply with Special Condition 13, and to more narrowly track the applicable criteria. The government stands ready to assist in this process. While a meaningful near miss reporting system is vitally important to identify the root cause(s) of weaknesses and to avoid more serious incidents, it is not what the Court ordered. Near misses have been reported to the CAM and TPA through internal Flash Reports. But reporting of every near miss to the Court and the government does not advance the supervision of this defendant's probation, but rather, has the potential to obscure serious violations of law. Due to the volume of extraneous information, the daily reports are not actually appropriate or helpful in monitoring the probation of this criminal defendant.

**IV.     Carnival's Plastic Pollution Problem**

Count 5 of the Petition to Revoke Probation was based on a TPA finding from an audit conducted from December 13-17, 2018, after plastic and other non-food items were discharged overboard from the Carnival Elation in Bahamian waters, notwithstanding that the problem had been pointed out by the TPA. A Supplemental Audit of the ship in February 2019 found that plastic was still not being properly segregated. *See CAM Annual Report* at 86-87; *CAM April 2019 Quarterly Report* at 18-23.

As the government explained at the last hearing, the MARPOL violation involving the Carnival Elation is representative of a much more widespread problem. Many similar problems have been identified by the TPA and by the CAM which have caused Carnival to begin monitoring and cataloguing similar problems across the fleet. Since April 24, 2019, Carnival has reported more than 300 similar incidents on Covered Vessels across its fleet. Every ship and every Carnival brand cruise line is implicated.

On July 9, 2019, the TPA circulated a new audit report for the Carnival Breeze reflecting

11

an audit conducted May 11-15, 2019. This audit found three major non-conformities, all related to compliance with MARPOL Annex V. The auditors conducted a visual inspection of the ship's galley grey water drain tank and found non-food items floating on its surface, including plastic items. The audit concluded that these items were being washed down the deck drains of the galleys because the covers had been removed from the drains. The fact that approximately 28 drain bells and 137 screws were missing, allowing the non-food waste to pass, was cited as a major-nonconformity, as was the finding of non-food waste and plastic inside the grey water tank. Grey water is discharged overboard without treatment on Carnival ships. A third major non-conformity was cited because numerous non-food waste items including some plastic were found in the shredder/pulper and mixing tank/food waste tank of the Carnival Breeze.

 A review of recent reports reveals that the plastic and non-food waste items found inside of food waste containers destined for overboard discharge included the following: plastic bags, water bottles, straws, stirrers, bottle caps, latex gloves, coffee cup lids, aprons, food label stickers, pens, shrink wrap, film wrap, candy wrappers, plastic cutlery, metal cutlery, foil, garbage bin liners, coffee capsules, cake icing cone tip, packaging, individual sauce packets, milk and other food sachets, and pieces of plastic from various items. The large number of incidents involving the discovery of plastic and other non-food waste in various stages of the ship food waste systems leads to the inevitable but unfortunate conclusion that for many years the normal operation of Carnival vessels has resulted in the routine discharge of plastics into the marine environment in violation of MARPOL Annex V.

 As mentioned in the government's factual basis in support of the probation violations, Carnival has long been on notice regarding MARPOL Annex V issues. In addition to the fact that MARPOL Annex V entered into force in 1988, Princess was convicted in 1993 in the Southern

District of Florida of a felony violation of the Act to Prevent Pollution from Ships related to the deliberate overboard discharge of plastic bags. As mentioned in the CAM's report, the recent violations should not have come as a surprise to senior management because numerous employees identified plastic and other non-food waste being co-mingled with food waste as a problem in the DuPont Fleet Engineering Survey commissioned by the Company. *See CAM Second Annual Report, at 88; Carnival Corp Engineering Survey Final Comments and Suggestions* (Feb. 2018). Carnival's own engineers suggested during the DuPont Survey that Carnival should minimize the use of plastic, minimize food waste, and find better technology and procedures.

In 2014, there were an estimated 5.25 trillion plastic particles in the world's oceans, weighing 269,000 metric tons,[2] but this could be a severe underestimate.[3] By 2025, if plastic production and consumer negligence remain unchanged, for every three metric tons of fish in the ocean, there is expected to be one metric ton of plastic.[4] By the year 2050, the weight of plastic is expected to well exceed the weight of fish in the ocean according to some accounts.[5]

Marine debris, primarily plastic, is known to impact approximately 700 living species from

---

[2] Walker, Tony R. and Dirk Xanthos, "International policies to reduce plastic marine pollution from single-use plastics (plastic bags and microbeads): A review," (15 May 2017), 17-26 (available at: https://doi.org/10.1016/j.marpolbul.2017.02.048).

[3] Eriksen, Marcus, et. al, "Plastic Pollution in the World's Oceans: More than 5 Trillion Plastic Pieces Weighing over 250,000 Tons Afloat at Sea," (10 Dec 2014) 1-15 (available at: https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0111913).

[4] Andrady, Anthony L., "Microplastics in the Marine Environment," (Aug 2011) 1596-1605 (available at: https://doi.org/10.1016/j.marpolbul.2011.05.030).

[5] CNN, Gerretsen, Isabelle, "You could be swallowing a credit card's weight in plastic every week", (June 17, 2019) (summarizing recent studies) (available at: https://www.cnn.com/2019/06/11/health/microplastics-ingestion-wwf-study-scn-intl/index.html).

coastal vegetation, to plankton, invertebrates, fish, cetaceans, sea turtles and seabirds.[6] Balloons,[7] plastic bags, bottle caps and utensils are known to be particularly harmful when ingested, leading to starvation, suffocation, infection and death.[8] Entanglement can inhibit the normal growth and/or mobility of marine wildlife and result in physical harm and death. Virtually all species of marine wildlife, many of which are threatened or endangered, including seabirds, mammals, sea turtles and fish are known to ingest plastic.[9] Plastic pollution in the ocean is of epidemic proportions and has the potential to threaten the health of the ocean, coral reefs, food safety and tourism.[10] Nanoplastic particles and toxins from ingesting plastic have also been found to cross the blood-brain barrier, causing harm to organisms' reproductive and immune health and are believed to be

---

[6] *See, e.g.*, Gall SC, Thompson RC. 2015. *The Impact of Debris on Marine Life.* Marine Pollution Bulletin 92:170–179 (available at: https://doi.org/10.1016/j.marpolbul.2014.12.041); Reddy, S, *Plastic Pollution Affects Sea Life Throughout the Ocean* (2018) (available at: https://www.pewtrusts.org/en/research-and-analysis/articles/2018/09/24/plastic-pollution-affects-sea-life-throughout-the-ocean).

[7] In an apparent violation of probation shortly after sentencing in this case, Princess cruises celebrated the maiden voyage of the Majestic Princess with the mass release of balloons. *See* Cruise Law News (July 4, 2017) (available at: https://www.cruiselawnews.com/2017/07/articles/cruise-pollution/princess-cruises-causes-uproar-with-balloon-release/) (last viewed July 18, 2019).

[8] *See, e.g.,* Wilcox C, Mallos NJ, Leonard GH, Rodriguez A, Hardesty BD. 2016. Using expert elicitation to estimate the impacts of plastic pollution on marine wildlife. *Marine Policy* 65:107-114 (available at: http://dx.doi.org/10.1016/j.marpol.2015.10.014; *see also* World Wildlife Fund, "No Plastic in Nature: Assessing Plastic Ingestion from Nature to People," (2019), 1-17.

[9] See, e.g., Gregory, M, "Environmental Implications of Plastic Debris in Marine Settings" (2009) (available at: https://royalsocietypublishing.org/doi/full/10.1098/rstb.2008.0265).

[10] *See e.g.*, https://www.unenvironment.org/news-and-stories/story/marine-plastic-new-and-growing-threat-coral-reefs; https://oceana.org/our-campaigns/plastics; https://www.iucn.org/resources/issues-briefs/marine-plastics; https://www.pewtrusts.org/en/research-and-analysis/articles/2018/09/24/plastic-pollution-affects-sea-life-throughout-the-ocean; https://agua.org.mx/wp-content/uploads/2017/11/The-pollution-of-the-marine-environment-by-plastic-debris-a-review.pdf (all last viewed April 4, 2019).

responsible for behavior disorders in certain fish. [11]

As previously documented, the Company's initial reaction to the violation of probation by the Carnival Elation was to blame the lowest level employees with failing to sort through tons of food waste to find plastic. This begs the question of whether more could be done to limit the use of single use plastic on board Carnival's floating cities. Certainly one obvious answer is to ban or dramatically reduce the types and quantities of single use plastic. It is apparent that prior to the current effort, Carnival did not actually know the universe of single use plastic on board its vessels.

Based on the government's discussions with the CAM and TPA teams, it is also apparent that Carnival does not know if the plastic garbage offloaded in port is being properly disposed. Some of the Company's destinations may lack the infrastructure and oversight to ensure proper handling. The volumes are considerable. For example, the recent TPA audit report of the Carnival Breeze found that vessel disposed of 452 cubic meters of plastic waste in a 3-month period in 2019. It is our expectation that part of Carnival's new work in this area also will include consideration of where it disposes of its waste and the vendors it utilizes, so it can ensure that the waste is being handled properly from cradle to grave.

The use of certain single use plastic products such as plastic straws and plastic bags have been banned by many governments and corporations in the United States and elsewhere.[12] These products remain in use on Carnival vessels. Royal Caribbean announced last year that it would eliminate the use of plastic straws and stirrers by the end of 2018. Hurtigruten, a small specialty cruising company, announced that it had eliminated plastic straws, drink mixers, plastic glasses,

---

[11] *See* Mattsson K, Johnson EV, Malmendal A, Linse S, Hansson L-A, Cedervall T. 2017 (Brain damage and behavioral disorders in fish induced by plastic nanoparticles delivered through the food chain) Scientific Reports 7:11452 | DOI:10.1038/s41598-017-10813-0.

[12] *See* http://plasticbaglaws.org/ (last viewed July 17, 2019).

coffee lids, and plastic bags from all of its ships in 2018.[13] Prior to its single-use plastic ban, Hurtigruten's small fleet annually consumed 6,200 pounds of plastic straws, 11,000 pounds of plastic cups, 1,800 pounds of single-use butter packages, and 9,500 pounds of plastic aprons.[14]

The government does not know what approach makes the most sense for Carnival, but it certainly appears that after years of being on notice, the company did not engage in a comprehensive and serious approach to addressing waste management and plastic pollution until faced with the Petition to Revoke Probation. Going forward, the government seeks to confirm that the defendant knows the universe of single use plastic products it utilizes, the volumes purchased per ship/fleet, the volume of plastic disposed ashore, and that shore side disposal and recycling are being handled in a legal and responsible manner.

                    Respectfully submitted,

                    ARIANA FAJARDO ORSHAN
                    UNITED STATES ATTORNEY

By:   /s/ Thomas A. Watts-FitzGerald
       Assistant United States Attorney
       Florida Bar No. 0273538
       99 Northeast 4th Street
       Miami, Florida 33132-2111
       Tel: (305) 961-9413

       /s/ Richard A. Udell
       Senior Litigation Counsel
       Environmental Crime Section
       U.S. Department of Justice
       601 D. Street, NW
       Washington, DC 20004
       Tel: (202) 305-0361

---

[13] *See* https://www.hurtigruten.com/us/press-releases/2018/hurtigruten-wages-war-on-plastic-bans-single-use-plastic-by-this-summer/ (last viewed July 17, 2019).

[14] *Id.*

## **CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on July 18, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ Thomas A. Watts-FitzGerald
Assistant United States Attorney
