UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. <u>16 -20897-CR-SEITZ</u>

**UNITED STATES OF AMERICA**

      v.

**PRINCESS CRUISE LINES, LTD.,**

               **Defendant.**

_____/

**GOVERNMENT'S STATUS REPORT**

The United States, by and through undersigned counsel, respectfully submits this status report in anticipation of the Court's hearing scheduled for October 2, 2019, and addresses those items specified in this Honorable Court's Order related thereto [D.E.157].

**I.      The Quarterly Report of the Court Appointed Monitor (September 2019)**

The CAM report continues the tradition of identifying areas in which improved performance and concerted effort to abide by and implement the ECP have occurred over the covered time period. The CAM sounds cautionary notes in light of persistent significant violations of ECP requirements, and continuing concerns of the "tone at the top" and regular ECP violations.

In reviewing the Second Quarterly Report of the CAM, the government is again struck by the helpful contribution of the CAM to the Court, the Office of Probation, the government, and the defendant.

## II. Metrics

At the July 19, 2019 Status Hearing, the Court directed the United States to supply the Company with its suggestions of areas of compliance that might be amenable to the establishment of fixed metrics to allow a more objective analysis and measurement of the Company's performance under the ECP. On July 24, 2019, the United States provided the company with proposed areas where it was believed that newly established or additional metrics would be helpful. The United States also identified subject areas in which additional information was needed in order to establish a benchmark. Carnival only responded on September 25, 2019. As set forth below, some of its responses are incomplete or unacceptable. Given the belated response, more work needs to be done by Carnival in the next 30 days to enable the government to meet the Court's directive to identify appropriate metrics.

The government's suggestions and requests, and the Company's responses, received on September 25, 2019 included:

**Government request re food waste reduction.** Please provide the volume of food waste generated, discharged overboard, landed per brand, per covered ship, and per day/month in 2018, and propose metrics along with the food waste implementation plan required under the Probation Revocation Settlement Agreement. Additionally, please provide a deadline for assessing staffing levels for operation and compliance of food waste management required pursuant to the Agreement. Provide data and analysis of Costa "4 Good Food" program, including what would be necessary for all brands and ships to meet Costa's proposed 50% reduction in food waste by 2020.

1. **Carnival Response.** The Company noted that it has been providing food waste disposal data pursuant to the ECP on a quarterly basis, with waste being reported by volume in cubic meters. It was further advised that reporting will be adjusted to weight instead of volume as a result of acquisition of new digester equipment. The staffing level issue is apparently under Assessment by contract with Lloyd's Register with a final report not

expected until approximately April 2020. The Company indicated its commitment to the 10% reduction in food waste by December 31, 2021 already set forth in the Settlement Agreement and suggested brands other than Costa face obstacles to achieving the 50% reduction goal being pursued by Costa.

**Government's Reply.** Carnival did not provide in its response the requested information required in order to establish meaningful metrics. The government reiterates its request for information showing the volume of food waste generated, discharged overboard, landed per brand, per covered ship, and per day/month in 2018. The response appears to indicate that the best that Carnival hopes for is a 10 % reduction of food waste by December 31, 2021. The government reiterates its request for metrics and a proposed implementation plan to achieve this goal. Without further explanation, the April 2020 date for a final report from Lloyd's Register is unacceptable. We ask that Carnival provide a written response and that the CAM and TPA review the contract and schedule.

2. **Government request re single use plastic reduction/elimination.** Please provide the quantity, type, number and volume of single use plastic products being purchased per brand, per covered ship, in 2018, to include the total number of water bottles, plastic cups, plastic straws, plastic bags, plastic food containers (including butter, jam, yogurt) purchased.

    **Carnival Response.** The Company provided aggregated data for purchases in 2018, which it intends to use as a baseline and advised it will provide such data annually after the conclusion of each fiscal year. Plastic gloves and plastic bottles were excluded from the data.

    **Government's Reply.** Carnival's summary did not provide the information requested, especially the level of detail requested. This level of detail is necessary in order to confirm the summary information provided and to establish meaningful metrics that can be assessed going forward, and to identify positive and negative trends within such a large corporation. Given the massive volume of single use plastics and the high number of violations involving the overboard discharge of plastics, the government does not agree with the approach that data will be provided on only an annual basis. This response seems oriented toward running out the clock rather than striving to make progress. Accordingly, the government renews its request for the information requested on July 24, 2019.

    Here is the summary table Carnival provided:

**Single Use Items FY2018 Baseline**

| CATEGORY | SINGLE USE ITEM | QUANTITIES PURCHASED (in Millions) |
|---|---|---|
| Plastic items | BALLOONS - DECK ONLY | 2.7 |
| | PLASTIC BAGS - RETAIL | 2.6 |
| | PLASTIC COCKTAIL STIRRERS | 4 |
| | PLASTIC CUP LIDS (HOT/COLD BEVERAGES) | 14 |
| | PLASTIC CUPS (HOT/COLD BEVERAGES) | 16 |
| | PLASTIC CUTLERY | 11 |
| | PLASTIC STIR STICKS (ANY BEVERAGE) | 4 |
| | PLASTIC STRAWS | 67 |
| | PLASTIC TOOTHPICKS | 0 |
| | INDIVIDUAL AMENITY BOTTLES | 11 |
| | PLASTIC BAG – GARBAGE + LAUNDRY + CABIN | 37 |
| | PLASTIC Q-TIPS | 1.2 |
| | PLASTIC GARNISH STICK | 0.06 |
| | CHOPSTICKS | 0.8 |
| | YOGURT - PLASTIC IND CONTAINER | 18 |
| | PLASTIC WRAP | 0.1 |
| **Plastic items Total** | | **189** |
| Non-Plastic items | SUGAR - PACKETS | 248 |
| | BUTTER - FOIL WRAPPED | 49 |
| | INDIVIDUAL SAUCE PACKETS | 48 |
| **Non-Plastic Items Total** | | **345** |
| **Grand Total** | | **534** [2] |

Letter from D. Kelley to R. Udell (September 25, 2019 (footnote omitted).

Carnival's report that in FY 2018, it purchased 67 million plastic straws, 16 million plastic hot/cold cups, and 15 million plastic cup lids is unsupported and not the level of detail that was proposed. A meaningful monitoring system would look at the single use plastic items in use on each ship and articulate a specific reduction goal by stages/vessels. Carnival has provided no information as to how and when it will reduce each of the categories per operating line.

The government has several additional concerns of significance.

First, the government assumes that single use plastic water bottles comprise the largest single use plastic item on board Carnival vessels. Carnival's assertion that it need not provide data concerning the number of plastic water bottles purchased because the majority are recycled is just that – an unverified assertion. The whole point of metrics is to measure and verify so that measurable and certain progress is made. Knowing the total volume of plastic water bottles purchased and recycled per ship per year is needed to determine whether Carnival's assertion is well founded, and even so, whether the volume of non-recycled bottles is nevertheless so astronomical, that Carnival should be looking at other solutions given the nature of its business rather than responding – without any metrics – that there is no problem, and by implication, no alternative.

4

Additionally, as noted in the government's last status report and below, there remains a very real issue about whether Carnival has any assurance that its vendors are actually performing recycling or appropriate waste disposal. Carnival dodged this question in its response to both this question and question #3. It does not appear from the response that Carnival is giving any thought whatsoever to reducing or eliminating what is no doubt the most significant volume of single use plastic on board its ships.

The Second Annual Report of the Third Party Auditor noted a significant issue with regard to the vetting of waste vendors. While Carnival Corporation's published Sustainability Report states "that shore-side waste facilities are evaluated prior to offloading the waste from the ships," the TPA was unable to find any supporting evidence for this claim. To the contrary, employees interviewed by the TPA stated that in actuality, they have no option to select or vet waste vendors in some countries. It is not known what if anything Carnival has done to remedy this situation. Along the same lines, Carnival's procedures (Global Hess procedure ENV-1004) includes a program to assess the waste vendors that ships use to discharge waste ashore. However, according to the TPA's Second Annual Report, shore-side waste facilities are not being identified and a systematic process for their evaluation had not been implemented. At the Carnival brand level, vendor evaluations have been sighted by the TPA during audits. When asked how these evaluations are completed, the response from Carnival brands was that an e-mail was sent with a copy of a checklist to the vendor for the vendor to fill out. Carnival claims that it evaluates the documentation to ascertain and validate vendor suitability for receiving waste. However, the TPA found that there was little evidence that in-person interviews or visits with vendors were actually taking place in coordination with the purported evaluations. *See* TPA Second Annual Report at 21. The TPA Second Annual Report identified shoreside waste management vendors as a focus area for the coming year.

Carnival's oft repeated mantra that "we aspire to make every place we go even better than it was before we went there" is worth citing in this context. As noted in the CAM Second Annual Report, this statement, uttered frequently, including in the context of the probation revocation and in the company's latest sustainability report, contains an unresolved comparative – better in what ways, and by what measure? The CAM report suggested that Carnival did not have metrics to measure baseline environmental conditions and the impact of the Company's activities on those conditions. That was the impetus for the government's proposal that Carnival should propose appropriate metrics.

Establishing a program to ensure that its massive waste disposal in various ports are being appropriately handled and not, for example, being dumped into the marine environment, is one important way that Carnival can give substance to its slogan. If it

5

does not do this promptly and in a meaningful way, then it would be fraudulent to continue to advertise itself with an empty slogan.

1. **Government request re shoreside disposal of plastic**. Provide metrics per brand and per covered ship regarding the volume/weight of plastic waste disposed ashore in 2018. Determine method by which the Company will qualify approved vendors in each port where waste containing plastic is recycled/disposed to ensure proper waste handling.

    **Carnival Response.** The Company does not separately measure plastic disposed ashore. Aggregate amounts of recycled and non-recycled materials disposed of ashore are available through of the Company's Sustainability Report for each Covered Vessel. Because the Company views the qualification of shore-side vendors as a policy issue it declined to address this subject as a metrics issue.

    **Government's Reply.** In order to be a good environmental steward, and especially with a corporation as large as Carnival, a corporation needs to know how much waste it generates, what kinds, and how it will be appropriately disposed. Not knowing means not caring. Not knowing means no ability to reduce, consider alternatives, establish metrics or monitor progress. As highlighted in the government's last status report and comments at the last hearing, Carnival apparently has no knowledge – and is apparently seeking to remain willfully blind – regarding what happens with the waste it lands ashore. Many of the places visited by Carnival's vessels have minimal infrastructure or capability to recycle or dispose of the waste landed ashore. What the government is proposing is that Carnival make a point of learning whether the waste it lands ashore is processed in that country, transported to some other location, or tossed in the ocean. Such cradle to grave or "lifecycle" management programs are not novel, but they are part of responsible corporate governance.

2. **Government request re Passenger related incidents.** In view of the number of passenger related incidents involving overboard discharge of plastic, consider passenger related initiatives and possible metrics for the development of policies to reduce violations due to passenger actions.

    **Carnival Response.** The Company reports that based on current tracking, incidents of all-item discharges involving passengers are one event per 130,000 passenger days. Incidents involving non-food items and plastic items are smaller sub-sets of that rate. Plastics are not separately tracked. The Company proposes to continue its current tracking program and report the results quarterly.

3. **Government request re Investigations.** Benchmarks and deadlines for finalizing investigative structure, investigative procedures, designating investigative levels, assigning/tasking of matters to be investigated, formalizing root cause analysis

methodology, and implementing SeaEvent. The United States notes that this Court's Order, D.E.-157 at 1.d.i-vii, addresses many specifics with respect to this issue and require the Company to discuss these matters at the up-coming hearing.

**Carnival Response.** The Company referenced its report to the Court on September 13, 2019 discussing the strengthening of HESS-related investigations in the action plan to restructure its existing corporate compliance authority and expressed its commitment to meet the requirements of the April 26, 2019 Settlement Agreement. A chart reflecting the status of SeaEvent Rollout, through September 2, 2019 was included in the response. SeaEvent is discussed further under item # 10, infra.

4. **Government request re Pollution Prevention Equipment.** Provide out of service metrics for each type of pollution prevention equipment per brand during 2018, and propose methods and metrics for reduction per brand.

   **Carnival Response.** In its response, the Company states that it "does not have an automated process to determine whether a piece of pollution prevention equipment is functioning on any particular day."

   **Government's Reply.** The Company did not provide the requested information, which was limited to pollution prevention equipment, or explain why it did not. Simply asserting that there is no automated process is not a complete answer. Could such a process be developed or implemented? Would that be helpful to ensuring environmental compliance? How much time would it take to develop this capacity?

   Carnival's response offered to provide reports on pollution prevention equipment going forward on a quarterly basis, but provided none of the requested historical data from which metrics might be developed. This would result in substantial delay in establishing metrics. Certain data was provided only for the month of August 2019. The United States continues to seek the more relevant historic data from 2018, which we understand Carnival collected and possesses, though apparently not through an automated process.

5. **Government request re Grey Water generation and discharge**. Review and provide metrics regarding grey water generation and overboard discharge during 2018, and propose methods and metrics for reduction.

   **Carnival Response.** The Company's response was to note that grey water discharge data is already being provided quarterly, but provided but ignored the request for suggestions and proposed metrics for a reduction in that waste stream.

   **Government's Reply.** Carnival's response and failure to make a proposal as to how to reduce this waste stream is concerning. Given the role of gray water in the underlying case as well as subsequent discharges, the government reiterates this request and seeks

a proposal within the next 30 days. To the extent that the data sought is being maintained quarterly, the government seeks Carnival's assistance in compiling this data in a more meaningful way and proposing metrics for reduction.

6. **Government request re Spare parts**. Delivery of spare parts and sailing days in operation without minimum spare parts.

    **Carnival Response.** The Company stated that it does not have an automated process for detecting on any particular day the total number of critical spare parts not on board a particular ship. Carnival provided the government with a single page report for the month of August 2019 reflecting ten vessels with a shortage of critical spare parts that month that exceeded 2%, five of which were covered vessels. The report also indicated that 68 additional unidentified covered vessels had a critical parts deficiency that month ranging from 0% to 2%. The report also included the history of covered and non-covered vessels for the past 6 months with shortages at or exceeding 2%. The company has offered to provide on a quarterly basis the results of those monthly surveys.

    Government's Reply. Simply asserting that there is no automated process is not a helpful answer. Could such a process be developed or implemented? Would that be of value to the company? How much time would it take to do so? The single page report (Appendix C) that the Company provides appears to be taken from the monthly CMO HESS Dashboard.

    The single page report has a number of short comings, including: it does not cover the entire period of probation; it does not indicate what parts are missing and what are the associated pieces of equipment; it does not indicate how long parts have been missing (an important issue in the underlying case leading to conviction); it does not indicate whether and to what extent there are repeated instances or trends on certain ships or brands and whether Carnival has the ability to identify and evaluate chronic or repeated issues. Given the role that unavailable pollution prevention equipment played in the case leading to conviction, it would appear very important for Carnival's management to be able to readily determine persistent issues with certain parts on ships or brands

9. **Government request re TPA Audit Findings.** Time to commence corrective/preventative action; days to complete corrective/preventative action; and time to respond to TPA annual report.

    **Carnival Response.** The Company appears to have focused on the number of audits, the number of findings, and the number of major non-conformities by brand and year rather than on the gravamen of the government's request, which intended the focus be on the commencement of corrective or preventative action upon notification of an audit finding. The Company does track and did provide in tabular form information showing the time to close out findings track and dings, broken down amongst four brands, for the first two years of Probation. In an unfortunate trend-line, for three of the four brands the close-

out period increased in year two, while the fourth brand close-out time was static. With regard to response periods for the TPA Annual Report, the Company noted the ECP, as written, provides a sixty-day period. IN Year 1 the Company utilized 59 of the 60 days, while in Year 2, at the request of the government that period was reduced to 11 days from receipt of the Report. No suggestion for a reduction of the sixty-day period has been offered.

**Government's Reply.** In the absence of a proposal by the defendant to identify and track these metrics, the government proposes that the Court ask the CAM and TPA for recommendations.

10. **Government request re Internal Initiatives** and Tracking: SeaEvent; GLADIS; E-Key Management; HESS Environmental Procedure.

    **Carnival Response.** The Company advised that it currently lacks any metrics for tracking HESS Environmental procedures and offered no ideas or suggestions regarding developing such metrics. SeaEvent, a replacement under development to be used across brands for event reporting and other purposes as noted, supra, was addressed through a chart reflecting the roll out status, through September 2, 2019. The Company further advised that system rollout is expected to be complete by November 30, 2019. The Company reports that the GLADIS learning management system is now aboard all Company vessels and HESS courses are being loaded into the system. Carnival anticipates that all brands will be able to use most HESS courses by November 30, 2019. E-Key implementation, to reduce the use of physical seals in favor of electronic keys on board Company vessels is reported to range from 57% to 87%, depending on brand, as of August 2019, with a full implementation by January 1, 2020. The implementation goal is the reduction of actual seals on any single vessel to less than one hundred.

    Government's Reply. The government proposes that Carnival submit a recommendation to the Interested Parties, CAM and TPA within the next 30 days. The IPs, CAM, and TPA would then have 14 days to provide comment. Carnival would be accorded an additional 14 days thereafter within which to submit a final plan to the Court.

### III.    Condition 13

As part of the recent settlement of probation violations, the Court imposed new reporting requirements to insure that significant violations of probation were in fact being reported to the Office of Probation and/or the United States. Exhibit B of the settlement agreement [D.E.-134],

9

required notification in the following categories:

> The defendant organization is to inform the Interested Parties, CAM, and TPA of any:
>
> i) breach of the ECP;
>
> ii) breach of the plea agreement;
>
> iii) violation of the conditions of probation;
>
> iv) violation of any Marine Environmental Protection Requirement;
>
> v) violation of any applicable United States (federal or state) environmental law;
>
> vi) violation of the Ballast Water Convention, the London Dumping Convention, or any future maritime environmental law convention to which the United States becomes a party and which goes into effect during the period of Princess's probation; or
>
> vii) credible allegations, to include any Environmental Open Reports, involving a violation of the ECP or any Marine Environmental Protection Requirement or applicable international, flag state, port state, coastal state, or United States (federal, state or local) environmental law involving any Covered Vessel or Covered Personnel (as defined in the ECP) as soon as reasonably practicable but no later than seven days of when the defendant organization learns of the occurrence. The notification shall include a description of the nature, date and time, and location, including the country, of the breach of compliance or violation.

As discussed with the Court and Parties at the last Quarterly Status Hearing, the Company began providing notices, on essentially a daily basis, of incidents that the government found to be of limited relevance or in fact unreportable under the articulated standards. Through the collective discussion and the decisions of this Honorable Court, it was determined that "near miss" events which did not rise to the level of a violation, and those incidents involving passenger activities independent of vessel crew or equipment, should not be reported through the new system.

As a result of the refinements directed by the Court, the Company's reporting process under the Settlement Agreement has reduced some extraneous reporting. The Special Condition 13 reports, still being received on almost a daily basis, now rarely exceed two pages and more

obviously reflect cognizable events.

The United States is continuing its evaluation of the reports being received, and will, if appropriate, discuss further refinements with the Company as they manifest themselves.

## IV. Electronic Record Books

A significant issue the United States wishes to highlight for the Court concerns the extended and knowing violation of law that occurred with the full knowledge of the Company with respect to covered vessels operating in Alaskan waters. As a result of the illegal discharge of gray water into Glacier National Park by Holland America's *Westerdam* on September 11, 2018, the United States learned that Carnival vessels had been operating in violation of the Certain Alaskan Cruise Ships Operation Act (CACSO), 33 U.S.C. 1901 (Note). Carnival cruise ships operating in Alaska had been utilizing an electronic sewage and gray water record keeping system that did not meet the requirements of CACSO and its accompanying regulations in 33 CFR 159.315, for maintaining a hard copy sewage and graywater discharge record book. Carnival ships appear to have utilized the software to create an electronic-only discharge record book for many years, despite the requirements to maintain a book of entries signed and dated by both the person responsible for the discharge and the master in 33 CFR 159.315 (e).

This issue was brought to Carnival's attention in the government's filing in April 2019, and also discussed at the Court's status hearing on April 10, 2019. As pointed out in the government's April filing, the electronic log being used aboard the *Westerdam* at the time of the illegal discharge last September failed to include certain required information, in addition to not being a hard copy record. The government noted that a knowing violation of CACSO is a felony offense. *See* CACSO, Sec. 1409(d)(2).

This, combined with Carnival's failure to immediately report the *Westerdam* discharge to the Coast Guard as required by CACSO, revealed that Carnival had failed to comply with this legislation. The violation by the *Westerdam* was unfortunately not unique, but apparently common to all brands operating in Alaska. Of principle concern is that this longstanding violation continued after the government brought this to the defendant's attention in April 2019, and even after the Court conducted the Probation Revocation hearing on June 3, 2019.

On August 8, 2019, Holland America Group issued a directive to all vessels to print the daily log of the electronic record book for the master's signature and maintain a hard copy book of printed and signed pages. However, this remedy does not appear acceptable and still leaves significant questions about the company's present compliance with the law. The PDF version of the log being printed out is in chronological order, free from edits, and digitally signed by the person logged into the system at the time, which may or may not be not be the person actually responsible for the discharge. Where a traditional hardcopy log has clearly marked edits, the printed pages of the Holland America log appear to be a rubber-stamped and finalized version that has been edited without notation. Additionally, there are "free text" entries that do not appear to report all required information and an explanation of circumstances required for accidental or significant discharges. 33 CFR 159.315(c)-(d). The printed copy of the electronic log reflects only the final version of an entry, at the time it is printed. The "clean" and finalized PDF version of this record book understandably gives a viewer reason to believe that one can edit and change entries in the program without oversight, unlike the paper version of a record book where those edits are visible on the page. Additionally, the printed version presented to the captain for signature is the

same "clean" version of the record book.

                Respectfully submitted,

                ARIANA FAJARDO ORSHAN
                UNITED STATES ATTORNEY

By:   /s/ Thomas A. Watts-FitzGerald
      Assistant United States Attorney
      Florida Bar No. 0273538
      99 Northeast 4th Street
      Miami, Florida 33132-2111
      Tel: (305) 961-9413

      /s/ Richard A. Udell
      Senior Litigation Counsel
      Environmental Crime Section
      U.S. Department of Justice
      601 D. Street, NW
      Washington, DC 20004
      Tel: (202) 305-0361

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October __1__, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                s/ Thomas A. Watts-FitzGerald
                Assistant United States Attorney