# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No.: 16-20897-CR-SEITZ

UNITED STATES OF AMERICA

      v.

PRINCESS CRUISE LINES, LTD.,

      Defendant.

_____/

## QUARTERLY REPORT

## OF THE COURT APPOINTED MONITOR (SEPTEMBER 2019)

I.   **Introduction** ....................................................................................................1

   A. Overview of CAM Quarterly Report ............................................................... 1

   B. Court Oversight ................................................................................................ 2
     1.   Probation Agreement Deadlines ............................................................ 2
     2.   July 19, 2019 Status Conference ........................................................... 6
     3.   July 24, 2019, Order re: October 2, 2019 Status Conference ................... 8

II.   **CAM Methodology and Activities** ................................................................10

   A. CAM Third Annual Work Plan....................................................................... 10

   B. CAM Team Activities During the First Quarter of ECP Year Three .............. 11

   C. Oversight of the External Audit Function (TPA)............................................ 13

   D. Oversight of the Internal Audit Function (RAAS)......................................... 14

III.   **Updates on Company Capabilities to Meet ECP Objectives and ECP Year Three Areas of Focus** ....................................................................................15

   A. Culture Survey and Assessment..................................................................... 15
     1.   Background ............................................................................................ 15
     2.   Overview of Assessment Findings ....................................................... 17
     3.   Prior Surveys and Reports .................................................................... 19
     4.   Assessment Methodology ..................................................................... 22
     5.   Assessment Findings............................................................................. 24
     6.   Ongoing CAM Team Examination........................................................ 29

B. Corporate Compliance Structure ................................................................. 30
   1.   Background ........................................................................................ 30
   2.   Probation Agreement Requirements ................................................. 31
   3.   Proposed Action Plan ....................................................................... 33
   4.   Final Action Plan ............................................................................. 37
   5.   Ongoing CAM Team Examination .................................................. 41

C. Investigations .............................................................................................. 44
   1.   Background ........................................................................................ 44
   2.   Incident Analysis Group ................................................................... 47
   3.   Revised Timeline .............................................................................. 50
   4.   Investigation Reports ........................................................................ 55
   5.   Ongoing CAM Team Examination .................................................. 59

D. Food Waste Management ............................................................................ 60
   1.   Background ........................................................................................ 60
   2.   Probation Agreement Requirements ................................................. 61
   3.   Other Food Waste Initiatives ............................................................ 68
   4.   Ongoing CAM Team Examination .................................................. 68

E. Training ...................................................................................................... 69
   1.   General Updates on Company Initiatives ......................................... 69
   2.   Personnel Changes ............................................................................ 70
   3.   CAM Team Attendance at Environmental Excellence EO3 Course ..... 71
   4.   CAM Team Attendance at Operational Excellence Course ............... 76
   5.   Operational Excellence Course Participant Feedback ....................... 77
   6.   Ongoing CAM Team Examination .................................................. 80

F. Implementation of Enumerated ECP Requirements ..................................... 80

G. Initiatives Beyond Enumerated ECP Requirements ..................................... 82
   1.   IT Initiatives ..................................................................................... 82
   2.   Fleet Environmental Officer Program ............................................... 85
   3.   Other Initiatives ................................................................................ 86

H. Environmental and ECP Violations ............................................................ 86
   1.   Significant Incidents ......................................................................... 86
   2.   Unified Regulatory Reporting Policy ................................................ 93
   3.   Environmental Incident Data Collection ........................................... 95

I. Other Ongoing CAM Areas of Focus .......................................................... 96

**Attachment 1:** Third Annual Work Plan and Budget of the Court Appointed Monitor

September 18, 2019

## I.   INTRODUCTION

Consistent with the Court's Order of April 26, 2018, Dkt. No. 66, the Court Appointed

Monitor ("CAM")[1] submits this first Quarterly Report for Year Three of the Environmental

Compliance Plan ("ECP") ("CAM September 2019 Quarterly Report" or "Report").[2]  This

Report focuses on events and developments during the first quarter of ECP Year Three[3]:  April

19, 2019 – July 18, 2019.  However, notable developments since the end of this period are

included below.[4]

### A.   Overview of CAM Quarterly Report

The Court ordered that the CAM submit Quarterly Reports to provide updates on the

monitorship and to address issues identified by the Court and the CAM.  *See* Dkt. No. 62; Status

Conf. Tr. at 32-33, 42-45, 93-95 (Apr. 3, 2018).

---

[1] The CAM is Steven P. Solow, a partner at the law firm Katten Muchin Rosenman LLP ("Katten").  The CAM retained, *inter alia*, Katten and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[2] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1, or prior CAM Reports.  The CAM has submitted the following reports:  (1) First Annual Report of the Court Appointed Monitor (2017-2018) (June 21, 2018) ("CAM First Annual Report"), Dkt. No. 105; (2) Quarterly Report of the Court Appointed Monitor (September 2018) (Sept. 21, 2018) ("CAM September 2018 Quarterly Report"), Dkt No. 114;  (3) Quarterly Report of the Court Appointed Monitor (December 2018) (Dec. 18, 2018) ("CAM December 2018 Quarterly Report"), Dkt No. 115; (4) Quarterly Report of the Court Appointed Monitor (April 2019) (Apr. 2, 2019) ("CAM April 2019 Quarterly Report"), Dkt No. 116; and (5) Second Annual Report of the Court Appointed Monitor (April 19, 2018-April 18, 2019), Dkt. No. 150 ("CAM Second Annual Report").

[3] ECP Year Three is April 19, 2019, through April 18, 2020.  ECP Year Two was April 19, 2018, through April 18, 2019, and ECP Year One was April 19, 2017, through April 18, 2018.

[4] The CAM provided the Company and the United States Department of Justice ("DOJ") a copy of this Report in advance of its submission.  The CAM took comments from these parties into account; however, the comments did not alter the substance of the Report.

Part I.B of this Report summarizes recent case developments, including: (1) the

Company's performance of commitments under the agreement resolving the probation violations

to which it pleaded guilty; (2) updates from the Status Conference held on July 19, 2019; and

(3) the Court's order regarding the upcoming Status Conference scheduled for October 2, 2019.

Part II of this Report provides an overview of the CAM's work plan for ECP Year Three.

It also describes the CAM Team's activities during the first quarter of ECP Year Three,

including observations from the CAM Team's oversight of the external audit function performed

by the Third Party Auditor ("TPA")[5] and the internal audit function performed by Carnival

Corp.'s Risk Advisory and Assurance Services ("RAAS") group.

Finally, Part III of this Report provides updates on the Company's capabilities to meet

ECP objectives, *see* ECP § VI.F.3.b,[6] and its performance in other areas of focus identified by

the Court and the CAM.  *See* CAM Second Annual Report at 8-11, 110-12.  This Report does not

provide the more detailed assessments or findings that the CAM will provide in the Annual

Report for ECP Year Three.

### B.  Court Oversight

#### 1.  Probation Agreement Deadlines

As discussed in the CAM Second Annual Report, on June 3, 2019, the President and

Chief Executive Officer ("CEO") of Carnival Corp. pleaded guilty on behalf of the Company to

six violations of the terms and conditions of probation.  *See* Dkt. No. 137 (Paperless Minute

---

[5] The TPA is ABSG Consulting Inc. ("ABSG"), an advisory and technical services provider for the marine and other sectors.  On July 3, 2019, the TPA submitted its annual report for ECP Year Two.  *See* ABSG, *ABSG Consulting Third Party Auditor Year Two Annual Report* (July 3, 2019), Dkt. No. 153 ("TPA Second Annual Report").

[6] Unless otherwise specified, all citations to ECP provisions in this Report are to the second amended version of the ECP that went into effect on June 3, 2019.

September 18, 2019

Entry); CAM Second Annual Report at 5-6, 86-94 (discussing the probation violations).  The

Court had required that the CEO, the Chairman of the Board of Directors, and a member of the

Board of Directors (together, the Executive Committee of the Board of Directors) be present at

the June 3, 2019, hearing.  Notably, the CEO, on his own initiative, required almost all of the

Company's senior leadership be present in the courtroom, including the CEO of Holland

America Group and key officers (presidents, financial officers, and others) from the individual

operating lines and brands.  Additional members of the Board of Directors attended as well.

The Court accepted an agreement between the Government and the Company to resolve

the probation violations.  *See Proposed Agreement For The Court's Consideration Resolving*

*Superseding Petition For Summons For Offender Under Supervision Dated April 26, 2019*, Dkt.

No. 134 (proposed agreement); Dkt. No. 143 (Order accepting agreement) (collectively,

"Probation Agreement").  Both the Court and the Government have emphasized that the main

impetus for the probation revocation petition was the failure of the Company's leadership to take

appropriate action on environmental compliance.  As the Court has stated, "I don't think the

company at the senior level . . . sees this other than something that the lower-level guys will take

care of.  And until I see that commitment, I'm going to do the best that I can to get the

company's attention."  Status Conference Tr. at 5-6 (Apr. 10, 2019).  The Government echoed

this view, noting that "[t]he reason that we're here is not because of the rank-and-file employees,

it's not because of ship-board employees making a mistake, or even an act of pollution.  We're

here because [] at the very senior-most levels of this corporation there was not a commitment to

compliance equal to the other commitments that the company has that would place compliance

first."  Settlement Hearing Tr. at 22 (June 3, 2019).

September 18, 2019

The Probation Agreement requires the Company to undertake a range of remedial and other actions, including the following actions with deadlines falling within the first quarter of ECP Year Three and up until the date of this Report:

- **Corporate Compliance Consultant Recommendations (June 1, 2019):**  By June 1, 2019, provide the Court, Interested Parties,[7] CAM, and TPA with its outside corporate compliance consultant's recommendations to improve its corporate compliance program.  The Company provided these recommendations on June 1, 2019.  *See Summary and Recommendations from Compliance Program Assessment* (May 31, 2019); CAM Second Annual Report at 47-48 (discussing recommendations); *see also infra*, Part III.B (discussing the Company's corporate compliance function re-structuring efforts);

- **$20 Million Penalty (June 10, 2019):**  By June 10, 2019, pay an additional financial penalty of $20 million.  The Company reports that this was paid on schedule.  *See* Status Conf. Tr. at 16 (July 19, 2019);

- **Special Condition of Probation 13(a) Reporting Process (June 30, 2019):**  By June 30, 2019, submit for approval to the Interested Parties a proposed process for meeting the enhanced reporting requirements of the revised Special Condition of Probation 13(a).[8]  The Company submitted its proposed process on June 28, 2019.  *See Proposed Process for Compliance with Special Condition of Supervision No. 13(a)* (June 28, 2019).  The Government expressed concerns that under this process, the Company was "reporting numerous irrelevant and unreportable incidents." *Government Status Report*, Dkt. No. 155, at 9.  Following discussion of these concerns at the July 19, 2019, Status Conference, the Company discontinued its practice of including near misses and passenger incidents in its reports.  The CAM understands that the Company is continuing to evaluate and may modify, as necessary

---

[7] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida [("Probation Office")], the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis."  ECP § I.D.

[8] As part of the Probation Agreement, the Judgment in this matter was amended to include a revised Special Condition of Probation 13 that establishes enhanced reporting requirements for the Company.  Among other things, the Company must, under Special Condition of Probation 13(a), inform the Interested Parties, CAM, and TPA of any:  (i) breach of the ECP; (ii) breach of the plea agreement; (iii) violation of the conditions of probation; (iv) violation of any Marine Environmental Protection Requirement; (v) violation of any applicable United States (federal or state) environmental law; (vi) violation of certain international maritime environmental law conventions; or (vii) credible allegations, including Environmental Open (Hotline) Reports, of violations of the ECP or environmental law.  *See* Dkt. No. 134, at 12-13 (Ex. B).

and in consultation with the Interested Parties, its approach to reporting under Special Condition of Probation 13(a);

- **Management Acceptance of Responsibility Statement (July 3, 2019):** By July 3, 2019, issue a statement to all Company employees in which the CEO of Carnival Corp. (and other senior management if they so choose) accepts management responsibility for the probation violations. The Company issued this statement on July 1, 2019. *See Important Message from Chairman Micky Arison and CEO Arnold Donald* (July 1, 2019) (stating that "Chairman [Micky] Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these violations");

- **Food Waste Management Implementation Plan (August 1, 2019):** By August 1, 2019, provide the Interested Parties, CAM, and TPA with an implementation plan specifying the project, project owner, and timetables for Part One of its three-part program addressing food waste management issues. The Company provided this plan on August 1, 2019. *See Food Waste Task Force: Tiger Team Report, Recommendations, and Implementation Plan* (Aug. 1, 2019) ("Food Waste Management Implementation Plan"). On September 4, 2019, the Company provided the Interested Parties, CAM, and TPA with an update to the Food Waste Management Implementation Plan. *See Cover Letter, Tiger Team Implementation Plan* (Sept. 4, 2019), PCL_ECP00134212-14 ("Cover Letter"); *Tiger Team Implementation Plan Update*, PCL_ECP00134215-19 ("Update"); *see also infra*, Part III.D (discussing the Company's food waste management efforts);

- **Unified Regulatory Reporting Policy (August 2, 2019):** By August 2, 2019, submit for review to the Interested Parties, CAM, and TPA a new draft internal policy in the Company's Environmental Management System governing the reporting requirements for discharges according to United States federal and state laws. The Company provided this draft policy on July 31, 2019. *See Submission of new Environmental Management System policy governing reporting requirements for discharges according to United States federal and state laws per Section VI. Unified Regulatory Reporting Policy*, PCL_ECP00124954-56 (July 31, 2019); *[Draft] COM-1103 United States Environmental Reporting Requirements*, PCL_ECP00124889-90; *[Draft] COM-1103-A1 United States Environmental Regulatory Requirements Details*, PCL_ECP00124891-928; *[Draft] Flag State Reporting Requirements*, PCL_ECP00124881-88; *Draft Vessel External Reporting Policy Sources*, PCL_ECP00124929-53 (collectively, "Proposed Unified Regulatory Reporting Policy"). The CAM and TPA provided joint comments on this submission on August 23, 2019. The final policy is required to go into effect by September 22, 2019. *See infra*, Part III.H.2 (discussing the Proposed Unified Regulatory Reporting Policy);

- **Proposed Action Plan for Corporate Compliance Re-Structuring (August 14, 2019):** By August 14, 2019, submit for review to the Court, Interested Parties, CAM, and TPA a proposed action plan to restructure its existing corporate compliance function. The Company provided this proposed plan on August 14, 2019. *See Carnival Ethics and Compliance Submission* ("Proposed Submission Letter");

September 18, 2019

*Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("Proposed Charter"); *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("Proposed Strategic Plan") (collectively, "Proposed Action Plan"). The CAM and TPA provided joint comments on the Proposed Action Plan on August 28, 2019. *See Joint CAM/TPA Comments on August 14, 2019, Proposed Action Plan Submission* (Aug. 28, 2019) ("Joint CAM/TPA Proposed Action Plan Comments"); *see also infra*, Part III.B (discussing the Company's corporate compliance re-structuring efforts); and

- **Final Action Plan for Corporate Compliance Re-Structuring (September 13, 2019):** By September 13, 2019, provide the Court with a final version of its action plan to restructure its existing corporate compliance function. The Company provided this final plan on September 13, 2019. *See Revised EC Submission Cover Letter (for 8 14 Court Filing)* ("Final Submission Letter"); *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("Final Charter"); *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("Final Strategic Plan") (collectively, "Final Action Plan"). *See infra*, Part III.B (discussing the Company's corporate compliance re-structuring efforts).

*See* Dkt. No. 134, at 1-8; Dkt. No. 154-1, at 1-3.

In addition, the Probation Agreement required the Company to file two monthly interim reports on its progress toward completing a proposed action plan to restructure its existing corporate compliance function. The Company filed these reports on July 1, 2019, and August 1, 2019. *See Interim Progress Report on Probation Settlement Goals* (July 1, 2019), Dkt. No. 149; *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019).

The Company appears to have met all filing and submission deadlines to date under the Probation Agreement. Additional details about the Company's efforts to perform its obligations under the Agreement are discussed in the relevant sections of Part III below.

2.    July 19, 2019 Status Conference

Following the submission of the CAM and TPA Second Annual Reports, the Court held a quarterly Status Conference on July 19, 2019. Representatives from the Company, DOJ, the CAM Team, and the TPA were present. Among other items, the parties discussed the status of

September 18, 2019

the Company's efforts to re-structure its corporate compliance function, improve its internal investigations function, and address its food waste management challenges.  *See generally* Status Conf. Tr. (July 19, 2019).

In its status report filed prior to the hearing, the Company also expressed its commitment to "strive to increase the diversity of its shipboard workforce across certain positions," in response to the finding in the CAM Second Annual Report of "the unique opportunities that the Company has to leverage its strong relationship with its Global Talent Partners,"[9] including "the opportunity to develop a more diverse corps of shipboard officers who would help to promote and enhance environmental compliance."  *Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 6.  The Company stated that it "plan[s] to continue to engage with the CAM to seize on this opportunity discussed in the CAM's Second Annual Report and to set an example for the industry."  *Id.* at 7.[10]

The Company also indicated that its senior leadership "has heard the Court's concerns, sincerely accepted responsibility, and will strive to demonstrate that focus and commitment to

---

[9] Global Talent Partners (commonly referred to as "manning agencies" within the maritime industry) are agencies located around the world that the Company uses to recruit and train many of the (generally non-officer) crew members on its ships.  *See* CAM Second Annual Report at 10.

[10] The CAM notes the recent release by the Business Roundtable of an updated *Statement on the Purpose of a Corporation*.  The statement adopts the view that corporations "share a fundamental commitment to all of our stakeholders," not just shareholders.  *See* Business Roundtable, https://opportunity.businessroundtable.org/ourcommitment/.  It makes an express commitment to, among other things:  "Investing in our employees.  This starts with compensating them fairly and providing important benefits.  It also includes supporting them through training and education that help develop new skills for a rapidly changing world.  We foster diversity and inclusion, dignity and respect."  *Id.*  It also commits to "protect the environment by embracing sustainable practices across our businesses."  *Id.*  To the best of the CAM's knowledge, neither the Carnival Corp. President and CEO, nor the CEOs of other cruise companies, is a member of the Business Roundtable and therefore is not a signatory to the statement.

September 18, 2019

the Court, CAM, TPA, and Interested Parties, particularly in the coming year." *Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 5.  Following the hearing, during meetings the CAM Team held with the Carnival Corp. Board of Directors and senior leadership from July 9-11, 2019, *see infra*, Part II.B, the Board of Directors made a commitment to closer communication and coordination with the CAM.

           3.      <u>July 24, 2019, Order re: October 2, 2019 Status Conference</u>

Following the July 19, 2019, hearing, the Court issued an order on July 24, 2019, setting additional deadlines and requirements for the next Status Conference scheduled for October 2, 2019.  *See* Dkt. No. 157.  The Order requires that both the Company and DOJ be prepared to discuss the Company's compliance with the terms of the Probation Agreement.  *See id.*  In addition, the Company must be prepared to describe its efforts related to the following areas:

- **Re-Structuring the Corporate Compliance Function**

  - Describe the current state of its compliance and ethics program; the changes to that program the Company will make to have a "world class compliance and ethics program," as the Company said at the July 19 hearing, *see* Status Conf. Tr. at 33 (July 19, 2019); and how it will measure the success of these efforts;[11]

  - Describe the content and frequency of compliance and compliance-culture training for the Carnival Corp. Board of Directors and for executives of

---

[11] The Company's September 13, 2019, Final Action Plan notes that the "Leadership roster" for the new Ethics and Compliance Department at the All Brands Group is "nearly complete, and these leaders will attend the upcoming Court hearing on October 2, 2019."  Final Submission at 2.

> Carnival Corp. and its brands, and the measures that will be used to evaluate
> the effectiveness of the training; and

- o   Describe the Company's plan for ongoing meetings between the CAM and its
      Board of Directors, including the frequency of these meetings.

- **Improving the Internal Investigations Function**

  - o   Through the Carnival Corp. Vice President of the Incident Analysis Group,
        *see infra*, Part III.C, describe the actions and timetables to address the
        weaknesses in the Company's internal investigations and related root cause
        analyses and corrective and preventive actions, including the status of the
        milestones the Company previously put forward in its timetable submitted to
        the Court on September 26, 2018, *see* Dkt. No. 84, and a description of the
        Company's process for determining whether corrective and preventive actions
        require changes to allocation of resources, strategic and financial plans, levels
        of staffing and crew, training content or methods, and work conditions; and

  - o   Through the Carnival Corp. President and CEO, Arnold Donald, and
        Chairman of the Board, Micky Arison, explain the Company's plan to
        implement the necessary changes identified as a result of root cause findings.

*See* Dkt. No. 157, at 1-3.  The Order also requires that the Carnival Corp. President and CEO and

Chairman of the Board attend all future Court conferences and hearings.  *Id.* at 3.

Further, the Order requires that at the October 2, 2019, hearing, DOJ must be prepared to

take the lead on describing the jointly agreed-upon metrics and targets on environmental

compliance that the Court directed DOJ and the Company to develop at the July 19, 2019,

hearing.  *See* Status Conf. Tr. at 60-61 (July 19, 2019); Dkt. No. 157, at 3.  As of the date of this

Report, the CAM understands that DOJ and the Company are working to develop such metrics.

Potential areas under consideration for metrics include:  food waste reduction; single use plastic

reduction; pollution prevention equipment performance and reliability; grey water generation and

discharge; delivery of spare parts; commencement and completion of corrective and preventive

actions in response to TPA audit findings; benchmarking and deadlines for improvements to the

internal investigations program; and benchmarking and deadlines for the roll-out of various

Company initiatives.  *See Re: Metrics* (July 24, 2019) and attachment.

## II.    CAM METHODOLOGY AND ACTIVITIES

### A.    CAM Third Annual Work Plan

As provided for in the Monitor Agreement, the CAM prepared a work plan for ECP Year

Three.  *See Third Annual Work Plan and Budget of the Court Appointed Monitor* United States

v. Princess Cruise Lines, Ltd*., 1:16-cr-20897-PAS (S.D. Fla.) For the Period April 2019 – April

2020* (Aug. 1, 2019) ("Third Annual Work Plan"), attached as Attachment 1.  The Third Annual

Work Plan categorizes the work of the CAM Team during ECP Year Three into the following

thirteen primary areas of work and inquiry:  (1) management and contingencies; (2) interviews,

site visits, and events; (3) document and data review; (4) vessel visits; (5) shoreside facility

visits; (6) the Company's support for operations and compliance; (7) RAAS oversight;

(8) corporate structure, including the compliance function, and Corporate Compliance Manager

authority; (9) the Environmental Compliance Culture Assessment; (10) investigations;

(11) training; (12) personnel; and (13) reporting.  *See id.* at 5.  Incorporated into these areas of

work is also evaluation of the external TPA audit function, as required by the ECP.  These work

streams reflect the CAM's current plan for work to be done during ECP Year Three, but, as

noted in the Third Annual Work Plan, this plan may be modified if required by the Court or by

circumstances that arise during the course of the year.  *Id.*

The Third Annual Work Plan also includes a plan, developed in collaboration with the

TPA, for conducting the fifteen additional audits and/or visits required by the Probation

Agreement, in addition to those originally anticipated by the ECP and the CAM First and Second

Annual Work Plans.  *See id.* at 8-11; Dkt. No. 134, at 1; Dkt. No. 143; *see also* Dkt. No. 75

(ordering that the CAM and TPA perform fifteen additional visits and/or audits during ECP Year Two out of concern that certain undisclosed Company vessel visit programs had "tainted" TPA audits from ECP Year One). As in ECP Year Two, all ship visits and audits are unannounced, meaning that they occur without advanced notice to the ships' management and personnel. Shoreside office and site visits and audits remain announced.

**B.      CAM Team Activities During the First Quarter of ECP Year Three**

Consistent with the Third Annual Work Plan and the Probation Agreement, the CAM Team performed the following ship, shoreside office, and site visits during the first quarter of ECP Year Three (April 19, 2019 – July 18, 2019):

- Two ship visits:
    - One CAM Team-only visit;[12] and
    - One TPA ride along visit.[13]

- Attendance at various Company meetings and events, including:[14]
    - An Environmental Commitment Conference that brought together Environmental Officers from across the fleet with shoreside environmental compliance, environmental operations, technical, and training personnel, held at the Company's CSMART training facility in Almere, Netherlands, from April 24-26, 2019. *See infra*, Part III.E;
    - A session of the Company's redesigned Operational Excellence training course required for all deck, technical, and environmental officers attending

---

[12] This visit was to a Cunard ship from June 20-24, 2019.

[13] This visit was to a Holland America Line ship from July 7-13, 2019.

[14] The CAM Team did not conduct any shoreside office visits during the first quarter of ECP Year Three. However, the CAM Team has conducted two shoreside office visits between the end of the first quarter of ECP Year Three and the date of this Report: (1) a visit to the Carnival Corp. offices in Miami, Florida, from July 23-26, 2019; and (2) a visit to the Holland America Group offices in Seattle, Washington, from August 19-21, 2019

CSMART, held at the Company's CSMART training facility in Almere, Netherlands, on April 27, 2019.  *See infra*, Part III.E;

o   A bi-annual meeting with the CAM Team, Corporate Compliance Manager team, and Operating Line Compliance Managers, held at Katten's Washington, DC, offices on June 5, 2019; and

o   Meetings with the Carnival Corp. Board of Directors and senior leadership, held in Barcelona, Spain, from July 9-11, 2019.

Between the end of the first quarter of ECP Year Three and the date of this Report, the

CAM Team also attended the following additional site visits, meetings, and events:

o   A meeting with members of the Corporate Compliance Manager's Food Waste Tiger Teams, held at the TPA's offices in Houston, Texas, on August 7, 2019.  *See infra*, Part II.C and Part III.D;

o   An Environmental Excellence hybrid training/conference event with third-year Environmental Officers and shoreside training and compliance personnel, held at the Company's CSMART training facility in Almere, Netherlands, from August 12-16, 2019.  *See infra*, Part III.E;

o   An annual RAAS auditor workshop, called the RAAS Maritime Retreat, held at the Company's CSMART training facility in Almere, Netherlands, from August 12-16, 2019.  *See infra*, Part II.D;

o   An additional session of the Company's redesigned Operational Excellence training course required for all deck, technical, and environmental officers attending CSMART, held at the Company's CSMART training facility in Almere, Netherlands, on August 17, 2019.  *See infra*, Part III.E; and

o   Presentations by PROPEL SAYFR AS ("Propel"), the CAM's retained maritime culture survey expert, on the results of the Environmental Compliance Culture Assessment.  The first presentation was held in person with the Company's Executive Leadership Team in New York City, New York, on September 3, 2019.  A second presentation was held via WebEx with approximately fifty shoreside senior-level employees from the All Brands Group, operating lines, and brands on September 5, 2019.  The CAM understands that additional presentations at operating line and brand shoreside offices will be scheduled.  *See infra*, Part III.A.

Outside of visits to ships, shoreside offices, and other sites, the CAM Team has continued

to communicate frequently with the Corporate Compliance Manager and his team.  The CAM

Team also communicates with other personnel, including the Chief Maritime Officer, the Chief

Audit Officer, the Chief Financial Officer, the new Chief Ethics and Compliance Officer, the new Vice President of the Incident Analysis Group; and with Propel and the Company on the delivery of the Environmental Compliance Culture Assessment.  The CAM Team performs an ongoing review of documents produced by the Company, and conducts additional formal and informal interviews and communications with personnel from all ranks across the Company, including receiving confidential communications from Company employees.  The CAM Team also remains in regular communication with the TPA and the Interested Parties and reports to the Interested Parties and the Court as required by the ECP and the Court.

### C. Oversight of the External Audit Function (TPA)

During the first quarter of ECP Year Three, the TPA conducted ten ship audits[15] (including one with the CAM Team in attendance, as noted above) and two shoreside office audits.[16]  In addition, on August 7, 2019, the TPA hosted a meeting with Company representatives at the TPA's offices in Houston, Texas.  The CAM Team also attended.  At this meeting, the Company provided an overview of developments related to:  (1) the updated Environmental Control System methodology, *see* CAM Second Annual Report at 29-31, including revised guidance being shared with the fleet and updates to several procedures; and (2) the ongoing food waste management initiatives, including the Tiger Team ship visits and the Food Waste Management Implementation Plan.  *See infra*, Part III.D.

Following the Company's presentation on August 7, 2019, the TPA hosted a meeting

---

[15] This includes two ship audits that spanned the first and second quarters of ECP Year Three, beginning on July 13, 2019, and ending on July 20, 2019.

[16] These TPA shoreside office audits were of:  (1) Carnival Corp. offices in Miami, Florida, from May 6-10, 2019; and (2) Carnival Maritime Group offices in Hamburg, Germany, from June 11-14, 2019.

with the CAM Team.  Among other items, the parties discussed goals and areas of focus for ECP Year Three.

The CAM Team continues to communicate regularly with the TPA (including phone conferences and in-person meetings), review TPA reports, and evaluate the adequacy and independence of the TPA through both observations during ride-along ship and shoreside facility visits and interviews with Company employees who have interacted with the TPA auditors.  The CAM will provide an assessment of the TPA's activities during ECP Year Three in the next Annual Report.

### D.    Oversight of the Internal Audit Function (RAAS)

During the first quarter of ECP Year Three, RAAS conducted twenty-four audits of Covered Vessels and five audits of shoreside offices.[17]  In addition, from August 12-16, 2019, the Company held a RAAS Maritime Retreat with RAAS auditors at its CSMART training facilities in Almere, Netherlands.  The CAM Team and the TPA attended the retreat.  Key agenda items included "Continuous Improvement," "Root Cause," "Handling Conflict," "Audit Consistency," and "[Health, Environment, Safety, and Security ("HESS")] Audit Worksteps" (*i.e.*, the Company's internal guidelines for performing audits).  *See* RAAS Maritime Retreat Agenda.  Related discussion topics included:  improving the effectiveness of corrective and preventive actions for audit findings by enhancing root cause analysis; improving the consistency and quality of RAAS audits and reports; de-emphasizing RAAS audit scores; and refining the

---

[17] These RAAS shoreside office audits were of:  (1) Carnival Maritime Group offices in Shanghai, China, from May 20-22, 2019, Genoa, Italy, on May 29, 2019, Rostock, Germany, on June 3, 2019, and Hamburg, Germany, from June 4-7, 2019; and (2) Carnival Cruise Line offices in Miami, Florida, from May 20-24, 2019.

HESS Audit Work Steps.  *See* Event Notes.  RAAS has hired a consultant to assist with an action plan for these and other areas for improvement identified at the retreat.  *See id.*

As discussed in the Third Annual Work Plan, the CAM Team intends to build upon its observations of RAAS during ECP Years One and Two to further explore the role of RAAS in supporting a sustainable compliance culture during ECP Year Three.  To do so, among other activities, the CAM Team expects to review and assess:  (1) training, support, and resources provided to RAAS auditors; (2) training, support, and resources provided to ship and shoreside employees to address and track RAAS findings; and (3) the role of corporate leadership, including the Board of Directors, in supporting and promoting the RAAS function.  *See* Third Annual Work Plan at 12.  The CAM will provide an assessment of its oversight of the RAAS function in the next Annual Report.

III.    **UPDATES ON COMPANY CAPABILITIES TO MEET ECP OBJECTIVES AND ECP YEAR THREE AREAS OF FOCUS**

   A.    **Culture Survey and Assessment**

      1.    Background

The Company's compliance culture has been a consistent area of focus for the Court and the CAM, with the Court emphasizing its interest in evaluating the Company's progress and growth in this area.  *See* CAM First Annual Report at 24; CAM Second Annual Report at 53. When accepting the Company's guilty plea in December 2016, the Court stated that it wanted to know "what was in the culture" because "there obviously was a culture, at least on [the *Caribbean Princess*], if not on other Princess ships, that promoted dishonesty and the willingness to help each other out in getting around doing the right thing."  *See* Plea Hearing Tr. at 32 (Dec. 20, 2016).  At the sentencing hearing in April 2017, the Court observed that "the culture really needs to be changed and [I'm] looking to [the CAM] to assist."  Sentencing Hearing Tr. at 13

September 18, 2019

(Apr. 19, 2017). The Company appeared to agree, stating that "we're committed to working with the court-appointed monitor and the third-party auditor over the next five years to continue to enhance our compliance program even more, and our focus is a culture of compliance." *Id.* at 36. At an April 2019 Status Conference following the filing of the probation revocation petition, the Court stated that "I am interested in . . . evidence of systemic inability to follow through on the commitment that this company made." Status Conference Tr. at 5-6 (Apr. 10, 2019). At the probation revocation settlement hearing on June 3, 2019, the Company indicated that "[w]e've heard [the Court's] call to action, we really have." Settlement Hearing Tr. at 94 (June 3, 2019).

As discussed in prior CAM reports, the CAM, in consultation with the Company, retained Propel, a Norwegian consulting company that specializes in culture assessment in the maritime and energy industries, to conduct an Environmental Compliance Culture Survey (or "Survey") and to prepare an Environmental Compliance Culture Assessment (or "Assessment") to illuminate both the strengths and opportunities for improvement in the Company's environmental compliance culture. *See* CAM First Annual Report at 24-25, 68; CAM September 2018 Quarterly Report at 22-23; CAM December 2018 Quarterly Report at 28-30; CAM April 2019 Quarterly Report at 33-36; CAM Second Annual Report at 53-54. This effort also supports the CAM's broad mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, and to assess whether the Company has adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance. *See* ECP § VI.B.2.

The Environmental Compliance Culture Survey was conducted from December 2018 through January 2019. It closed with a final participation rate of approximately 79% (over

seventy thousand respondents).[18]  From February to April 2019, Propel held focus group sessions on ships and at shoreside locations to review and contextualize preliminary Survey trends and responses.  The CAM Team did not attend these sessions in order to preserve the independence of Propel's analysis and review.  On August 28, 2019, Propel provided the Company and the CAM with the final report of its Environmental Compliance Culture Assessment.  *See* Propel, *Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019* (Aug. 28, 2019) ("Assessment").

2.   Overview of Assessment Findings

The Assessment's findings, discussed in more detail in Part III.A.5 below, indicate that "employees across all of Carnival, from its All Brands Group ('ABG') to the various brands, have identified the Company as having a compliance culture with a low level of maturity and significant potential for improvement."  *Id.* at 3.  In particular:

> Carnival's employees have described a culture where people who are involved in failures are blamed, and where management does not take required steps to learn from failures. They also describe Carnival's culture as one where interpersonal dynamics are ignored, where management is narrowly focused on professional competence, and where management is insensitive as to how culture, attitudes and interpersonal dynamics influence operational performance.  In short, the employees have identified a culture that is neither open to feedback nor one that sees failure as a vital source of learning.

*Id.* at 3-4.  The Company's greatest opportunity for improvement, as evidenced by low scores, was in the area of Trust, indicating a "lack of confidence between employees, supervisors and managers."  *Id.* at 19.  Propel notes that "[s]ignificant leadership efforts will be required to create a mature and sustainable compliance culture."  *Id.* at 3.  While prescriptive measures were

---

[18] The Company sought, and the CAM agreed, to expand the survey beyond only those personnel central to compliance functions.  The Company stated that it viewed this survey as a tool through which it could increase broad employee engagement on environmental issues.

outside of Propel's scope of work, the report "describes a roadmap approach that has successfully been used in connection with other [Propel] assessments." *Id.* at 4.

Propel's report warns of a phenomenon known as "SARA: Shock, Anger, Resistance, and Acceptance." *See id.* at 4, 43.  Because "it is common for some members in the organization – often the higher management – to have a biased positive expectation of what the results will show," the initial response to negative assessment results may consist of:  (1) Shock ("cannot believe the negative results"); (2) Anger ("feeling of being misunderstood"); and (3) Resistance ("explaining away the results").  *Id.* at 43.  As a result, "active and dedicated leadership is necessary to reach the final stage of Acceptance and to develop a strategy for change."  *Id.* at 4.  It is important to recognize that "[n]egative results mean that important gaps have been identified, which makes it possible to do something about them.  Accepting a negative result is the first step toward achieving better performance."  *Id.* at 43.

Propel's report also identifies "a list of key success factors" that are important for implementing a meaningful culture change program.  *Id.* at 42.  These include:

- "Top Management takes ownership for compliance failures;"[19]

- "Top Management accepts that changes are needed;" and

- "Management dedicates necessary time and resources to implement cultural changes."

*Id.* at 42.

The CAM notes that the Company's most senior management has issued a statement acknowledging its responsibility for the compliance failures that led to the recent Probation Agreement.  *See Important Message from Chairman Micky Arison and CEO Arnold Donald*

---

[19] Propel defines Top Management as the "Board of Directors and the executive management teams of [All Brands Group], Groups and [Operating Lines]."  *Id.* at 2.

September 18, 2019

(July 1, 2019) (stating that "Chairman [Micky] Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these violations").  That same statement notes that "Chairman Arison, Mr. Subotnick, I [Arnold Donald] and the rest of our Leadership Team are focused on continuous improvement, not just to comply with probation and the law, but *to make lasting changes in our Company* that will promote a clean ocean environment now and in the future." *Id.* (emphasis added).  Perhaps rather than a SARA response, the Company's most senior management, including the Board of Directors, will view the results of the Environmental Compliance Culture Assessment as a tool to assist in the Company's stated commitment to improve its culture and compliance performance—and to demonstrate that this commitment is real.

### 3.   Prior Surveys and Reports

It may help the Company avoid a SARA response to consider that the findings of the Environmental Compliance Culture Assessment are consistent with prior surveys and reports generated by and for the Company, as discussed further below.  These surveys and reports have also consistently identified concerns regarding a blame culture and lack of trust between employees, supervisors and managers.  These issues—raised by employees and made evident by Company actions—were described in the CAM First Annual Report, which observed that the Company "appears to have a blame culture, with a focus on identifying errors and disciplining individuals rather than also evaluating systemic issues that may need to be addressed."  CAM First Annual Report at 4, 30-32.

For example, a July 2019 participant feedback report from the Operational Excellence CSMART training course for deck, technical, and environmental officers identified "blame culture, and in particular [the Company's] approach to mistakes (as opposed to violations)" as an

"uppermost" discussion theme.  *See Operational Excellence: Participant Feedback Q2 2019* (July 31, 2019), PCL_ECP00132923-56 ("Operational Excellence Participant Feedback Report 2019 Q2"), at PCL_ECP00132926.  The report notes that participants "accept that there is a difference between no blame and no responsibility – there is a general consensus that deliberate violations should not be consequence-free."  *Id.*  However, "mistakes are not deliberate, and they feel there needs to be a substantive shift in [the Company's] approach - actively encouraging mistake reporting by ensuring people feel safe to admit making them."  *Id.* (footnote omitted).  Responses to questions of how participants would respond to an incident also "implie[d] an urge to avoid blame above all other concerns."  *Id.* at PCL_ECP00132928.  In addition, the report found that "25% [of participants] believe that they are not empowered to report non-compliance, and 24% think that if they reported something it would not be acted upon . . . [T]here is a general sense that whilst the means to report is definitely available, even reporting anonymously has consequences to the reporter if the subsequent investigation is focused on blame rather than cause."  *Id.* at PCL_ECP00132927.[20]  When asked what barriers the whistleblower on the *Caribbean Princess* overcame, "the predominant theme [of the responses] is of the overall work environment, with culture, interpersonal relationships and resources significant factors within that theme."  Operational Excellence Participant Feedback Report 2019 Q2 at PCL_ECP00132925.

---

[20] Further, an accompanying report notes that the number of participants who choose to provide negative feedback anonymously "suggests an ingrained lack of trust.  It would appear that some still do not feel that it is safe to be open and honest if that honesty reflects badly on their superiors or displays personal opinions that disagree with corporate messaging."  *Operational Excellence: Participant Survey Results Q2 2019* (Aug. 1, 2019), PCL_ECP00132957-70 ("Operational Excellence Participant Survey Results Report 2019 Q2"), at PCL_ECP00132960.

September 18, 2019

An April 2019 participant feedback report from the same course observed that "perceptions of a blame culture and concerns about speaking up or challenging supervisors or other authorities combine to create an environment where errors or mistakes grow until there is a big issue/problem." *Operational Excellence: Participant Feedback Q1 2019* (Apr. 11, 2019), PCL_ECP00117930-36, at PCL_ECP00117931; *see also infra*, Part III.E.5 (discussing these and other findings from Operational Excellence participant feedback surveys and reports).

Additional examples of similar findings from prior surveys and reports include:

- A 2018/2019 human factors study commissioned by Holland America Group noted "a *widespread fear* of making errors and mistakes on all ships," including a fear among officers of "getting blamed" for mistakes in interpreting rules and regulations. *See* MTO Safety, *Ship Operations and environmental discharges: An action plan for continuous improvement – final report*, Report MTO-2018-349 (May 31, 2019), PCL_ECP00118647-739, at PCL_ECP00118683, 92-94 (emphasis added); *see also* CAM Second Annual Report at 49-53 (discussing study findings in detail);

- A 2018 report assessing the Company's internal investigations process observed that "[f]rom the interviews, it has become clear that Carnival as an organization is struggling with converting a blame culture to a just culture." DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-52050, at PCL_ECP00052030. While "interviewees mentioned that Carnival has policies stating that there will be no retaliation for reporting, and anonymous reporting is permitted to the extent that national laws allow it to," the interviewees also indicated that "management has not convinced the work force that this is the case in practice." *Id.* The report further noted that the "overall lack of trust towards open reporting can, in many ways, be interpreted as fear of retaliation. This fear has been fuelled [*sic*] by examples where management has not always held their word (e.g. firing an individual who had been told [he] would not be fired if he was open about a particular event), or did not 'walk the talk' (e.g. expressing the need to prioritize safety without increasing investigation budget or resources)." *Id.* The report found that "[t]his culture can be found in Carnival, both onshore and at sea." *Id.* In addition, the report recommended, among other actions, that the Company "[f]ocus effort on building bridges between the brands and between corporate and the brands to create a shared identity that encourages collaboration and engenders mutual trust." *Id.* at PCL_ECP00052028;

- A 2017/2018 ECP-Required Fleet Engineering Survey identified concerns about "a culture of fear [that] has developed regarding environmental equipment." *See* DuPont

Sustainable Solutions, *Environmental Compliance Survey Final Results* (Feb. 2018), PCL_ECP00042039-95, at PCL_ECP00042086;

- A 2017 safety culture change survey for Carnival UK revealed that "[t]hose involved [in safety incidents] often feel there is an interrogation to find who is to blame, rather than just looking to prevent further incidents happening." *See* Tribe, *Safety Culture Assessment: Carnival UK 2017 - Feedback Report* PCL_ECP00047056-140, at 16. The survey also reported that "[p]eople don't look out for each other routinely because they are not sure what response they might get if they were to challenge an unsafe behavior[.]" *Id.* at 21;

- A 2014/2015 safety maturity survey for AIDA and Costa reported that 33-37% of respondents agreed that "[s]ome colleagues cover-up for mistakes so that no-one will notice it," and that 21-28% of respondents agreed that "[i]f severe violations of procedures occur[], managers sometimes ignore disciplinary actions." *See* Propel Maritime Management Consulting, *Costa Crociere and AIDA Cruises Safety Maturity Index* (Oct. 28, 2018), PCL_ECP00024565-590, at PCL_ECP00024534, 65; and

- A 2014 safety culture enhancement survey for Carnival Cruise Line revealed that nearly 20% of crew members reported "often" or "very often" seeing their supervisors violate safety procedures or checklists "whilst the Supervisors claim they are [following the procedures/checklists]." *See* DNV GL, *CCL Safety Culture Enhancement: Results and Analysis* (Aug. 20, 2014), PCL_ECP00018220-72, at PCL_ECP00018245-46.

### 4. Assessment Methodology

The Environmental Compliance Culture Assessment was designed to evaluate the

Company's environmental compliance culture along two related metrics:

- **Organizational Culture Maturity Score**. The Organizational Culture Maturity score measures an organization's overall compliance culture maturity along a five-level scale, ranging from the lowest level of culture maturity to highest: (1) Defeatist; (2) Apathetic; (3) Avoidant; (4) Normative; and (5) Collaborative. *See* Assessment at 9-10; and

- **Leadership Behaviors Scores**. The Leadership Behavior scores measure aspects of an organization's culture along the eight categories of: (1) Trust; (2) Care;

September 18, 2019

(3) Openness; (4) Learn; (5) Feedback; (6) Speak Up; (7) Teamwork; and (8) Manage Dilemmas.[21]  *See id.* at 12.

Significantly, Propel identifies three of these Leadership Behaviors as "Foundational" Leadership Behaviors:  Trust, Care, and Openness.  According to Propel, these behaviors "are the necessary foundation upon which a sustainable compliance culture is built."  *See id.* at 14. As a result, "while Learn, Feedback, Speak-Up, Teamwork, and Manage Dilemmas are important, their success in supporting compliance are dependent (conditional) on strong Foundational Leadership Behaviors."  *Id.*

Leadership Behavior scores are calculated separately from the Organizational Culture Maturity score, but both metrics are based on the same underlying survey response data.  *Id.* at 5. They each provide insight into the Company's overall compliance culture and improvement potential.  *Id.* at 8-9, 20.  In general, "the Organizational Culture Maturity score indicates the size of the improvement potential in an organization's compliance culture," while the Leadership Behavior scores "indicate what needs to be addressed in order to improve."  *Id.* at 8, 20.

For both Organizational Culture Maturity and Leadership Behavior scores, the final scores are expressed as percentiles based on comparison of survey response results with a database (developed and maintained by Propel) of prior survey responses from approximately forty companies to substantially identical questionnaire items.  *Id.* at 9, 15-16.  For example, "a score of 40% means that a company has a higher score than approximately 40% of other

---

[21] The first seven Leadership Behaviors were previously developed by Propel for prior safety culture surveys of maritime and energy companies.  The eighth Leadership Behavior, Manage Dilemmas, was developed specifically for this Assessment to measure environmental compliance culture.  *See id.* at 23.

September 18, 2019

companies (or, conversely, that approximately 60% of other companies have a higher score)." *Id.* at 9.[22]

In addition to analyzing the survey response data, Propel reviewed free text responses and conducted focus groups with both ship and shore employees following the survey. *Id.* at 17. This feedback did not factor into the score calculations but served to contextualize the survey results and identify areas for improvement. *Id.*

     5.    <u>Assessment Findings</u>

     *i.*   *Organizational Culture Maturity Score*

On the Organizational Culture Maturity scale, the Company as a whole scored at the 27th percentile. *Id*. at 19. This places the Company in the Apathetic category, the second lowest of the five-level scale. *Id*. When the brands were assessed evaluated individually, the Organizational Culture Maturity scores varied, but all of the brands fell into either the Apathetic (second-lowest) or Defeatist (lowest) categories. *Id*. at 29-38.

According to Propel, organizations with an Apathetic organizational culture maturity have some typical characteristics, including:

---

[22] For the Environmental Compliance Culture Assessment, Propel "was able to benchmark the first seven Leadership Behaviors against [its] database to derive Leadership Behavior scores. However, because the eighth Leadership Behavior (Manage Dilemmas) was developed for the first time specifically for the [Environmental Compliance Culture] Survey, there were no prior database results to serve as a benchmark reference. Therefore . . . the data for this category was collected and analyzed primarily to establish a baseline for measuring changes in the Company's performance in this area [in the second Survey and Assessment that will be performed prior to the end of the probationary period]." *Id.* at 12-13.

- Failures are seen as a sign of "complacency and incompetence;"

- People who are involved in failures are "blamed and the organization does not take steps to learn from the failure;"

- People who share interpersonal concerns "are ignored;" and

- Managers are focused "on professional competence [*i.e.*, the ability to perform one's job] and are insensitive to how culture, attitudes and interpersonal skills influence the operational performance."

*Id*. at 10.

Organizations with a Defeatist organizational culture maturity have some typical characteristics, including:

- Failures are seen as a sign of "carelessness and irresponsible acts of 'bad apples;'"[23]

- People who are involved in failures are "pointed out as scapegoats;"

- People who share interpersonal concerns "are seen as weak and can be sanctioned and can even face retaliation;" and

- Managers are focused on "micro-management, pointing fingers, written warnings or other means to focus attention only on an individual."

Assessment at 10.

According to Propel, a low Organizational Culture Maturity score "indicates that much can be achieved in terms of operational performance and engagement if the organizational culture is nurtured to a higher maturity level.  Furthermore, the maturity score gives indications about how to start making improvements."  *Id.*  The report outlines "some challenges, focus areas, goals and actions that are relevant to making improvements in companies with each maturity level."  *Id.*  For an organization with an Apathetic culture, these include "creating a working atmosphere that nurtures social safety" and "prais[ing] people who are open, share

---

[23] As the CAM has noted, the Company's leadership has ascribed the crimes on the *Caribbean Princess* to a "few bad apples."  *See* CAM First Annual Report at 31.

mistakes and learn." *Id.* at 11. For an organization with a Defeatist culture, these include

making people "feel seen, listened to and understood with no hidden agendas" and "prais[ing]

people that work for the team." *Id.*

*ii.*      *Leadership Behavior Scores*

On the seven Leadership Behaviors benchmarked against the Propel database, the

Company as a whole had the highest scores on:

- Speak Up (83rd percentile);

- Learn (70th percentile); and

- Teamwork (60th percentile).

The Company as a whole had the lowest scores on:

- Feedback (48th percentile);

- Care (42nd percentile);

- Openness (38th percentile); and

- Trust (21st percentile).[24]

*Id.* at 19-21. Leadership Behavior scores across the brands varied but generally followed a

similar trend. *See id.* at 29-38.

As noted above, the Company's three lowest scores were on the three Foundational

Leadership Behaviors: Trust, Care, and Openness. These tended to be the lowest scoring

Leadership Behaviors at the brands as well. According to Propel, these scores "reveal that it will

be critical for leadership to build a cultural foundation of Trust, Care and Openness in order to

enhance compliance. It is within these areas that employees have identified the greatest

---

[24] As explained above, there is no score for the eighth Leadership Behavior of Manage Failures because this metric was developed for the first time specifically for this Survey and Assessment, and there were no prior database results to serve as a benchmark reference.

opportunities and the biggest need for improvement." *Id.* at 3.  Propel also notes that the

Company's high score on Speak Up (83rd percentile) "should be considered in light of the score

for Trust, which (at the 21st Percentile) is the lowest score" and indicates a "lack of confidence

between employees, supervisors and managers." *Id.* at 19.  As a result, "awareness of Speak-Up

as a behavior may be strong (perhaps as a result of the Company's ongoing 'See. Say. Do.

Something' campaign) but may not reach the desired result of reducing compliance risks due to

the lack of foundational trust and the presence of fear amongst employees if they speak up about

failures or significant concerns." *Id.*[25]

The Leadership Behavior scores for shoreside personnel were "significantly different

from the pattern for onboard [ship] personnel results."  Assessment at 19, 40.  For instance,

shoreside had "significantly higher scores on the Foundational Leadership Behaviors" of Trust,

Care, and Openness and lower scores on Teamwork, Speak Up, and Learn.  According to Propel,

however, focus group discussions revealed that "participants were concerned about giving

responses that would reflect lower levels of Trust and Care because of their prior experience . . .

[in] situations where they had given critical remarks in previous surveys and afterwards

experienced retribution based on these comments." *Id.*  This caused Propel "to view some of the

shoreside results as less representative of actual views." *Id.* at 19-20.

---

[25] Such concerns are reflected in the Operational Excellence participant feedback report
discussed above, which notes that "there is a general sense that whilst the means to report is
definitely available, even reporting anonymously has consequences to the reporter if the
subsequent investigation is focused on blame rather than cause," and that "25% [of participants]
believe that they are not empowered to report non-compliance, and 24% think that if they
reported something it would not be acted upon."  Operational Excellence Participant Feedback
Report 2019 Q2 at PCL_ECP00132927.  The CAM Team has received comments from
employees that are consistent with this finding—specifically, that while they are encouraged to
"speak up," they are specifically encouraged to not do so about "serious things." *See* Employee
Interview Notes.

   *iii.*  *Free Text Responses*

   Approximately 30% of survey respondents (about twenty thousand people) provided a free text response.  *Id.* at 25.  The majority of these free text responses were fifty characters or more, indicating a high level of engagement by these individuals in Propel's view.  *Id.*  Propel analyzed the free text responses in addition to the survey response data; however, as noted above, the free text responses did not directly factor into the Organizational Culture Maturity and Leadership Behavior score calculations.  Instead, these responses were used, in conjunction with the focus groups, to contextualize the survey findings and identify areas for improvement.  *Id*. at 17.

   Common themes in the free text responses included:  (1) the "need for more environmental awareness, practices and equipment (e.g., installations, garbage separation and consumables)," *id.* at 25; and (2) the "need to eliminate harassment or discrimination" in the workplace, including preferential treatment by supervisors for those who share the same nationality or those with whom supervisors have romantic relationships.  *Id.* at 28; *see also Internal Key Workplace Own-Will Exit Employees Interview Survey* (Feb. 2018), PCL_ECP00047298 (a survey of approximately one hundred former Holland America Group employees where "discrimination and favoritism," "a lot of favoritism when the Supervisor is same nationality as the crew," and "not treating me fairly because of my nationality" were among the reasons cited for leaving the Company).[26]

---

[26] The CAM has separately observed that "issues of ethnicity, race, and gender" affect the cruise industry as a whole.  *See* CAM Second Annual Report at 57.  For example, on ships "[c]ertain ethnic groups tend to work in specific roles," where "[w]orkers from developed countries tend to occupy higher positions within a ship's organizational hierarchy" while the "rest of the workers, especially those in positions involving more menial tasks, almost universally come from the developing world."  *Id.* at 57-58 (quoting academic article).  The CAM has also noted that these

September 18, 2019

In addition to providing criticisms or suggestions for improvement, some respondents also used the free text field "to express their appreciation for the company they work for." Assessment at 26.  For example, these commenters expressed that they work for a "great company," are "happy with [their] job," and "experience our commitment to environmental stewardship every day."  *See id.*  Such comments "demonstrate that many employees are proud of their work and are thankful for the opportunities that the Carnival brands have given them." *Id.*

      6.    <u>Ongoing CAM Team Examination</u>

The CAM looks forward to observing the nature of the Company's response to the findings in the Environmental Compliance Culture Assessment.  The nature of the response will impact whether, and to what extent, the Company is capable of using these findings to support its stated aim of producing a sustainable and world-class culture of compliance.  The Company has hired an outside consultant to "assist the company in further reviewing, analyzing and interpreting the results" and to "lead action planning sessions with the Carnival leadership to discuss the results, define short- and long-term priorities and next steps."  Letter from Ethics & Compliance Initiative to Propel (Sept. 16, 2019), at 1.

During Propel's September 3 and 5, 2019, presentations to the Company's Executive Leadership Team and senior shoreside leadership, respectively, *see supra*, Part II.B, Propel highlighted that the involvement of Top Management is critical to a successful culture change

---

issues provide the Company "with an extraordinary opportunity to be a leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry" through developing a more diverse and inclusive workforce.  *Id.* at 61.  As noted above, the Company has stated that it intends to "strive to increase the diversity of its shipboard workforce across certain positions" and "to continue to engage with the CAM to seize on this opportunity . . . and to set an example for the industry."  *Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 6-7.

program, and that a change in culture cannot be effected without the active and sustained

engagement of leadership.  Propel also reiterated the key success factors noted above—*i.e.*, that

Top Management "takes ownership for compliance failures;" "accepts that changes are needed;"

and "dedicates necessary time and resources to implement cultural changes."  *See supra*, Part

III.A.2 (citing Assessment at 42).

By agreement and design, Propel will conduct a second survey and assessment before the

end of the five-year ECP period to assess the Company's progress in supporting a sustainable

compliance culture.

### B.   Corporate Compliance Structure

#### 1.   Background

One of the CAM's most significant findings in ECP Year One was the Company's failure

to provide the Corporate Compliance Manager with the authority required by the ECP.  *See*

CAM First Annual Report at 4-5, 28 (citing ECP § III.A.2).  The CAM also found that the

Company's complex corporate structure, including the lack of centralization and lack of clarity

as to responsibility, accountability, and authority for environmental compliance, was an

unresolved barrier to environmental compliance.  *See id.* at 4-5, 25-30.  The CAM continued to

report on the Company's failure to remedy these issues throughout ECP Year Two.  *See* CAM

Second Annual Report at 46-49, 91-92.  However, the Company took limited actions in response

to these findings until after it faced a probation revocation petition filed by the Office of

Probation on March 8, 2018.  *See* Dkt. Nos. 93, 110, 134, 143.

In resolving the probation revocation petition, on June 3, 2019, the Company pleaded

guilty to "failing to provide sufficient responsibility and authority to the [Corporate Compliance

Manager] to implement the ECP," Dkt. No. 134, at 10, and "acknowledge[d] that it failed to

establish a [Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP." *Id.* at 2.  As part of the Probation Agreement, the Company committed "to restructure its existing corporate compliance governing authority." *Id.* It engaged an outside compliance consultant "to advise it of the best options to improve its corporate compliance program, and to achieve a change in corporate governance." *Id.* at 2-3. Many of the provisions in the Probation Agreement "reflect that consultant's preliminary recommendations." *Id.* at 3.

### 2.    Probation Agreement Requirements

The Probation Agreement requires the Company to undertake a number of actions associated with the re-structuring of its corporate compliance function.  These include appointing a Chief Ethics and Compliance Officer[27] and promoting the Corporate Compliance Manager to a position of Senior Vice President.[28]  Among other obligations, the Company commits to providing the Chief Ethics and Compliance Officer and Corporate Compliance Manager "***each*** with: the appropriate budget and staff; a substantive role in financial, strategic, and sustainability planning processes; and compliance authority over regulatory obligations and operations across and within all brands." *Id.* at 2 (emphasis added).  Other commitments include:

- Creating an Executive Compliance Committee "made up of executives at both Carnival Corporation & plc and its various brands, to include participation by the [Chief Ethics and Compliance Officer] and [Corporate Compliance Manager], that

---

[27] The Probation Agreement refers to this position as "Chief Compliance Officer."  The Company has elected to title this role "Chief Ethics and Compliance Officer."  On August 12, 2019, the new Chief Ethics and Compliance Officer, who is the same individual who served as the compliance consultant, officially assumed duties.

[28] On May 17, 2019, the Corporate Compliance Manager was promoted from Vice President to Senior Vice President.

September 18, 2019

will meet monthly to discuss compliance issues, share and evaluate data and trends, and set compliance priorities;"

- Developing "an annual training curriculum for members of its Board of Directors that would include corporate compliance topics;"

- Adopting "a new written statement [by the Board of Directors] that reiterates the Company's and the Board's commitment to compliance;" and

- Engaging "a search firm to assist the Board of Directors to recruit a new board member with significant corporate compliance experience."

*Id.* at 2-3.

The Probation Agreement also requires the Company to:  (1) provide the Court, CAM, TPA, and Interested Parties with a "proposed action plan to restructure its existing corporate compliance governing authority," including a "detailed statement explaining how and when the improvements to the compliance program will be implemented," by August 14, 2019, with the Interested Parties, CAM, and TPA to provide "any comments or suggestions" by August 28, 2019; and (2) to provide the Court with a final action plan by September 13, 2019.  *Id.* at 3.  The action plan must:

explain how corporate governance will be restructured to:

a) provide the [Chief Ethics and Compliance Officer] and [Corporate Compliance Manager] each with the authority and stature, budgets, staff, and the ability to implement changes, including the ability to direct change and action in each of the brands (while allowing for consultation and input from all brands). This analysis will include:

i. a description and rationale for the change of governance structure (including where the compliance function is independently housed with sufficient autonomy and direct access to the Board and Board Committees); the revised job descriptions, qualifications, and relative seniority of the [Chief Ethics and Compliance Officer] and [Corporate Compliance Manager] within the organization; the reporting lines and frequency of required reporting;

ii. a preliminary annual compliance budget for the various compliance responsibilities;

iii. a summary and description of the changes in budget/resources —
(actual for 2019; and proposed for 2020);

b) establish reporting obligations within the Company.

*Id.*

### 3.   Proposed Action Plan

Consistent with the Probation Agreement, on August 14, 2019, the Company submitted

to the Court, CAM, TPA and Interested Parties its proposed action plan for the re-structuring of

its corporate compliance function.  *See* Proposed Action Plan.  As noted above, *supra* Part I.B.1,

the submission consisted of three documents:  a Proposed Submission Letter, a Proposed

Charter, and a Proposed Strategic Plan.  *See id.*  These documents describe a significant re-

structuring effort that includes:

- **Corporate Ethics and Compliance Officer.**  Appointing a Corporate Ethics and
  Compliance Officer.  This position reports directly to the Carnival Corp. CEO, with a
  dotted line to the Special Compliance Committee,[29] HESS Committee, and Audit
  Committee of the Carnival Corp. Board of Directors.  Proposed Submission at 1-2;
  Proposed Strategic Plan at 5-6; Proposed Charter at 4, 11;

- **Corporate Ethics and Compliance Department and Ethics and Compliance
  Program.**  Creating an All Brands Group Corporate Ethics and Compliance
  Department that is "part of a broader Ethics and Compliance Program."  *Id.* at 1-2.
  The new department will include the Chief Ethics and Compliance Officer; a Deputy
  Chief Ethics and Compliance Officer; three Corporate Compliance Managers, each
  with a separate area of responsibility: (1) Environmental, (2) Health, Safety, and
  Security, and (3) General; the Incident Analysis Group (reporting directly to the
  General Compliance Corporate Compliance Manager), *see infra*, Part III.C; a
  Compliance Risk Group (reporting directly to the Deputy Chief Ethics and
  Compliance Officer); a Communications Group (reporting directly to the Deputy
  Chief Ethics and Compliance Officer); and a Training Group (reporting directly to the

---

[29] Although the organizational chart in the Proposed Charter does not expressly include the
Special Compliance Committee, the text of the Proposed Charter states that "[t]he Special
Compliance Committee of the Company Boards of Directors will be responsible for overseeing
the [Ethics and Compliance] Program, and the [Chief Ethics and Compliance Officer] will report
to this Committee, as well as the Audit Committee and HESS Committee (as directed and as
necessary)."  Proposed Charter at 4.

Environmental Corporate Compliance Manager). *See* Proposed Submission at 8-9; Proposed Charter at 11. The department will consist of at least approximately fifty-nine positions. *See* Proposed Submission at 8-9;

- **Operating Company Compliance Personnel.** Hiring approximately fourteen new compliance positions at the Company's operating lines and brands, including four Operating Company Chief Ethics and Compliance Officers for each of the Company's four operating lines (reporting directly to the Chief Ethics and Compliance Officer, with a dotted line to their respective operating line CEO/President). *See id.* at 9; Proposed Charter at 11. Each operating line will also continue to have the ECP-mandated positions of an Operating Line Compliance Manager (reporting directly to the Environmental Corporate Compliance Manager) and an Operating Line Training Manager (reporting directly to their respective Operating Line Compliance Manager, with a dotted line to the Corporate Training Manager). *Id.* The functions of the Operating Company Chief Ethics and Compliance Officers will encompass health, safety, and security compliance; general compliance; risk; training; and communications. *Id.* The function of the Operating Line Compliance Managers will encompass environmental compliance and training. *Id.*; and

- **Strategic Plan Initiatives.** Implementing Strategic Plan initiatives. The Proposed Strategic Plan identifies four overarching goals, and within each goal, explains initiatives intended to accomplish those goals. Over twenty initiatives are identified, with more than eighty associated tasks. *See* Proposed Strategic Plan at 4-36. The initiatives include: hiring individuals to fill the new Ethics and Compliance Department positions; hiring and training investigators; implementing investigations training; developing a "just culture" plan; and recommending changes to performance evaluation methodologies to reward compliance. *See id.*

On August 28, 2019, the CAM and TPA provided joint comments on the Proposed Action Plan. *See* Joint CAM/TPA Proposed Action Plan Comments. The comments stated that "the Company appears to have met many of the discrete obligations of the Probation Agreement" and provides an extensive (but non-exhaustive) list of those requirements that appear to be satisfied or reasonably on track to be satisfied. *Id.* at 1. These included the requirements to: (1) appoint a Chief Ethics and Compliance Officer; (2) elevate the Corporate Compliance Manager to a Senior Vice President level; (3) create an Executive Compliance Committee; (4) develop an annual training curriculum for members of the Board of Directors (under development); (5) adopt a new written statement by the Board of Directors reiterating the

September 18, 2019

Company's and the Board's commitment to compliance (under development); and (6) engage a search firm to assist the Board of Directors to recruit a new board member with significant corporate compliance experience.  *See id.* at 6-7.

However, the comments also identified "concerns about whether the Proposed Action Plan satisfies certain critical commitments," in particular those relating to:  (1) the role and authority of the (Environmental) Corporate Compliance Manager and Chief Ethics and Compliance Officer; and (2) budgetary resources for compliance."  *Id.* at 1.  On the first issue, the comments provided several examples of how the proposed plan did not appear to give the Corporate Compliance Manager independent compliance authority—in particular, the "ability to implement changes" and "direct change and action," including the ability to do so "in each of the brands."  *See id.* at 1-3 (citations omitted).  The comments also noted that the proposed plan did not clearly provide the Chief Ethics and Compliance Officer or the Corporate Compliance Manager with a "substantive role" in financial planning processes, or make clear the nature and extent of their authority over the operating companies, including over the Operating Line Compliance Managers and Operating Company Chief Ethics and Compliance Officers.  *See id.* at 2-5 (citations omitted).  Further, the comments raised questions about the proposal for the Ethics and Compliance Department to have "split" compliance oversight authority, with: (1) direct oversight only of compliance issues involving HESS and other "general prioritized compliance risks that will be determined and periodically re-evaluated;" and (2) indirect or "line of sight" oversight of other compliance areas, such as Human Resources and finance.  *See id.* at 3 (citations omitted).  It was "not clear that this division of oversight fulfills the commitment to appoint a [Chief Ethics and Compliance Officer] with *authority and substantial control* to

oversee the implementation of the Company's *overall* compliance functions." *Id.* (citations omitted) (emphasis in original).

On the second issue of compliance budgets, the comments noted the Company's position that it was "not currently able to provide a detailed forecast for the overall [Ethics and Compliance] Program for 2020" and that its "annual plan process [was] still underway for 2020," with the preliminary plan expected to be "available (and provided) on or before November 1, 2019, and approved by December 10, 2019." *Id.* at 5 (citations omitted).  The CAM and TPA stated that they understood "that the Company seeks to align its development of the preliminary 2020 compliance budget/plan with its current annual plan process and await the detailed preliminary plan that will be available on or before November 1, 2019." *Id.*  The comments also noted that "the information in the Proposed Action Plan on the budgets/plans for both 2019 and 2020 are for the [Ethics and Compliance] Department as a whole" and that it was "not clear if the Company plans to provide separate budgets/plans, or, at minimum, separate line items, for the environmental compliance function." *Id.* at 5.  Without such information, it would be "difficult to assess whether the Company has provided the CCM 'with authority (***including resources, budget, and staff***) as required to implement the ECP.'" *Id.* (citations omitted) (emphasis in original).

Other comments and concerns from the CAM and TPA included:

September 18, 2019

- The relationship between the Ethics and Compliance Department and the legal departments of both the All Brands Group and the operating companies was unclear, including respective authorities and responsibilities;

- The relationship between the Operating Line Compliance Managers and Operating Company Chief Ethics and Compliance Officers was unclear, including respective authorities and responsibilities; and

- It was unclear if all of the new Ethics and Compliance Department positions would be dedicated to compliance full-time, or if these resources would be shared with other departments.

*See id.* at 6.

In addition, although not specifically covered in the joint CAM/TPA comments, the role of the new Chief Ethics and Compliance Officer *vis a vis* the Chief Maritime Officer regarding compliance management and oversight was unclear, including respective authorities and responsibilities.

4.      Final Action Plan

Consistent with the Probation Agreement, on September 13, 2019, the Company submitted to the Court its final action plan for the re-structuring of its corporate compliance function.  *See* Final Action Plan.  As with the Proposed Action Plan, the submission consists of three documents:  a Final Submission Letter, a Final Charter, and a Final Strategic Plan.  *See id.* Overall:

- The basic structure of the Corporate Ethics and Compliance Department is consistent with the structure described in the Proposed Action Plan.  In particular, the reporting relationships of the Chief Ethics and Compliance Officer,[30] Deputy Chief Ethics and

---

[30] The organizational chart in the Final Charter expressly includes the Special Compliance Committee of the Carnival Corp. Board of Directors as one of committees to which the Chief Ethics and Compliance Officer reports, along with the HESS Committee and Audit Committee. *See* Final Charter at 16.  It further states that the Special Compliance Committee "as part of its remit, will recommend to the full Board a 'steady-state' framework for Board oversight of the Company's compliance activities.  Accordingly, the identity and responsibilities of the various

September 18, 2019

Compliance Officer, three Corporate Compliance Managers (Environmental, General, and Health, Safety, and Security), Incident Analysis Group, Compliance Risk Group, Communications Group, and Training Group are consistent with those described above.  *See id.* at 16-17; [31]

- Likewise, the reporting relationships and basic functions of the Operating Company Chief Ethics and Compliance Officers, Operating Line Compliance Managers, and Operating Line Training Managers are consistent with those described above.  *See id.* at 17.  The Final Action Plan also provides for one additional new compliance position (for a total of fifteen, compared to fourteen in the Proposed Action Plan) at the operating line and brand level.  *See* Final Submission at 10;

- Apart from minor edits and clarifications, the overarching goals, initiatives, and associated tasks described in the Final Strategic Plan are consistent with those described in the Proposed Action Plan.  *See* Final Strategic Plan at 1-26; and

- The Company continues to appear to have met or be reasonably on track to meet many of the discrete obligations of the Probation Agreement, including those listed above.  However, the CAM notes that, in contrast to the Proposed Action Plan, the membership of the Executive Compliance Committee in the Final Action Plan does not expressly include participation by the Corporate Compliance Manager, as required by the Probation Agreement.  *See* Dkt. No. 134, at 2; Final Charter at 10; *Cf.* Proposed Charter at 10.  Regarding the requirement for the Board of Directors to adopt a new written statement on corporate compliance, the Final Action Plan notes that the Board recently retained a private law firm to provide separate representation, and "the Board has asked this firm to assist them in developing a revised version [of

---

Board committees involved in oversight of the [Ethics and Compliance] Program may change sometime in the future."  *Id.* at 4.

[31] There are, however, changes to the compliance committees established in the Final Charter. The Proposed Charter provided for:  (1) an Executive Compliance Committee; and (2) a Compliance Leadership Team, meeting "on a regular basis" to help the Ethics and Compliance Department "to become more strategic and proactive," with membership that included the Chief Maritime Officer (or representative) and Operating Company Chief Ethics & Compliance Officers (or representatives).  *See* Proposed Charter at 9-10.  The Final Charter provides for: (1) an Executive Compliance Committee; (2) an Ethics and Compliance Leadership Team, meeting weekly to "focus on the most granular, day-to-day details" of leading the Department, with membership that appears limited to leaders within the Ethics and Compliance Department, as well as a representative from RAAS; and (3) a Cross-Functional ("Line of Sight") Compliance Leadership Group, discussed further below.  *See* Final Charter at 3, 10-12.

the statement]," which the Company expects to issue prior to the October 9, 2019, deadline.  Final Submission at 3.

In addition, the Final Action Plan includes changes in response to concerns expressed by the CAM and TPA on the Proposed Action Plan.  These include:

- **Role and Authority of the (Environmental) Corporate Compliance Manager and Chief Ethics and Compliance Officer**.  The Final Action Plan includes various changes and additions to descriptions of the Corporate Compliance Manager and Chief Ethics and Compliance Officer positions, including (all emphasis below added to reflect changes from the proposed text):

  - **Independent Compliance Authority for the Corporate Compliance Manager.**  The Final Action Plan includes statements relating to the Corporate Compliance Manager's independent authority over environmental compliance.  For example, the Corporate Compliance Manager will "*[d]evelop and implement* the environmental compliance aspects of the Strategic Plan *(in conjunction with the [Chief Ethics and Compliance Officer]* . . . and *exercise environmental* compliance authority over regulatory obligations and operations across and within all brands, *which includes the ability to implement necessary changes and actions*."  Final Strategic Plan at 29.[32]  In addition, the Corporate Compliance Manager will "*[o]versee and implement* all legal obligations set forth in the ECP and conditions of probation, and probation agreement *(in consultation with [the All Brands Group]'s General Counsel – as needed or appropriate)*[.]"  *Id.* at 28;

  - **Role in Financial/Strategic Planning.**  The Final Action Plan makes explicit that the Chief Ethics and Compliance Officer and Corporate Compliance Manager will have a "substantive role" in financial/strategic planning processes.  *See* Dkt. No. 134, at 2.  For example, the Chief Ethics and Compliance Officer will "*participat[e] in the financial planning processes, and play[] a substantive role in the full plan cycle*, including strategic planning, operating plan, capital appropriations and newbuilds."  Final Submission at 8.  In addition, the Chief Ethics and Compliance Officer will "[e]nsure that the overall [Ethics and Compliance] Department and Program have the financial resources and staff necessary to perform the required ethics and compliance functions *including developing budgets and overseeing their implementation within and across Operating Companies*."  Final Strategic Plan at 27.  The Corporate Compliance Manager will "participate in *and perform [a] substantive role in* financial, strategic, and sustainability planning processes."  *Id.* at 29.  The Final Charter also includes a new section on "[Chief Ethics and Compliance Officer] Involvement in Financial Planning,"

---

[32] Although not explicit, presumably the reference to "necessary" changes and actions means necessary in the judgment of the Corporate Compliance Manager.

which states that the Chief Ethics and Compliance Officer and the Ethics and Compliance Department, including the Environmental Corporate Compliance Manager, "*will play a substantial part in the annual financial and strategic planning process. The Company's leadership and boards of directors expect that financial planning discussions will involve affirmative discussions about the adequacy of a proposed plan to meet compliance obligations in every aspect of the plan spectrum: the strategic plan, the operating plan, the capital expenditure plan, and the newbuild plan.*" Final Charter at 12. Further, the Ethics and Compliance Department "*will explore additional ways to carefully monitor any materials changes to the financial plan throughout the year that might have HESS-related impacts.*" *Id.* at 13; and

o **Authority Over Operating Companies.** The Final Action Plan includes statements on the authority and control of the Chief Ethics and Compliance Officer and Corporate Compliance Manager over the operating companies. For example, the Chief Ethics and Compliance Officer will "[a]ssume compliance authority *and substantial control to oversee and implement the Company's overall ethics and compliance functions – including the ability to direct change and actions* across and within all brands *(if, and when, necessary*[33]*). This authority and control extends over [Operating Company Chief Ethics and Compliance Officers]. The Environmental [Corporate Compliance Manager] will maintain authority and control over [Operating Line Compliance Managers].*" Final Strategic Plan at 27. The Corporate Compliance Manager will "*exercise environmental* compliance authority over regulatory obligations and operations across and within all brands, *which includes the ability to implement necessary changes and actions*," *id.* at 29, and will "*[e]xercise authority and directly supervise*" the Operating Line Compliance Managers and Operating Line Training Managers. *Id.* The Final Action Plan declares that the "intent of this structure is to allow the [operating company] leadership to continue to have direct responsibility for the ships owned and operated within each [operating company's] respective fleet, while ensuring that the authority, responsibility, and accountability for adequate resources and oversight of compliance issues and activities is vested in the [All Brands Group Chief Ethics and Compliance Officer] and the [All Brands Group Environmental Corporate Compliance Manager] (with respect to environmental matters)." Final Charter at 15.

• **Relationship between the Ethics and Compliance Department and the Legal Department and Chief Maritime Officer**. The Final Charter includes a new section addressing "Interactions between the [Chief Ethics and Compliance Officer] and Other [All Brands Group] Leaders (General Counsel and Chief Maritime Officer)." *See id.* at 13-14. This section largely appears to be a placeholder for more detailed information on the respective roles, responsibilities, authorities, and accountabilities

---

[33] As above, presumably the reference to "necessary" changes and actions means necessary in the judgment of the Chief Ethics and Compliance Officer.

September 18, 2019

of the Chief Ethics and Compliance Officer, Legal Department, and Chief Maritime Officer.  For instance, the Company recognizes the need "to develop more detailed protocols to provide clarity and guidance to various Company leaders and employees on where to direct certain questions or problems that may arise in addressing how such over-lapping [environmental legal or regulatory and maritime operations and compliance] issues should be addressed."  *Id.* at 14;

- **Whether New Ethics and Compliance Department Positions Will be Dedicated to Compliance Full-Time.**  The Final Action Plan clarifies that certain of the Chief Ethics and Compliance Officer's direct reports at the All Brands Group level (*i.e.*, the Deputy Chief Ethics and Compliance Officer and the three Corporate Compliance Managers) will be dedicated to compliance full-time.  *See* Final Strategic Plan at 27. The plan does not appear to specify if the additional positions in the Ethics and Compliance Department, or the compliance positions at the operating line level (such as the Operating Company Chief Ethics and Compliance Officers), will also be dedicated to compliance full-time; and

- **Compliance Budgets/Plans**.  The information on compliance budgets/plans for 2019 (historical) and 2020 (proposed) is substantially the same as that provided in the Proposed Action Plan.  *See* Final Submission at 4-11.  The Final Action Plan notes that the Chief Ethics and Compliance Officer, the Corporate Compliance Manager, and other members of the Ethics and Compliance Department leadership team "are being integrated into the process of reviewing and commenting on proposed plans in order to ensure they have a substantive role in the plan process for 2020 and to establish patterns of engagement that can be leveraged for 2021 and beyond."  *Id.* at 7.  The CAM awaits the preliminary plan for 2020 expected to be "available (and provided) on or before November 1, 2019, and approved by December 10, 2019."  *Id.* at 7.

The CAM Team is continuing to review the Final Action Plan submission, and, as discussed below, will monitor the implementation of the Plan in practice.

### 5.    Ongoing CAM Team Examination

A tremendous amount of effort has gone into developing the Ethics and Compliance Department and Program, including its design, roles, and responsibilities.  The Final Action Plan lays out a complex web of positions, reporting lines, and interactions in and among Company organizations and hierarchies, along with myriad initiatives, with the stated goal of enhancing compliance.  It is not knowable if these new compliance structures and systems will succeed. Two steps, however, could be crucial towards strengthening corporate compliance:  (1) the

September 18, 2019

Company's top leadership (*i.e.*, the CEO and Board of Directors) taking personal responsibility for establishing and promoting a culture of compliance; and (2) leadership using the Company's Global HESS system to drive specific compliance efforts consistent with the Company's obligations under the International Safety Management ("ISM") Code.[34]

First, as the Company notes in the Final Action Plan, the effort to create a Chief Ethics and Compliance Officer to lead an Ethics and Compliance Department and Program was designed to "address a key gap in the Company's compliance organization," specifically the lack of "an executive at the most senior level of the corporation with the authority to set the overall tone for compliance." Final Submission at 1. The Company's narrative goes on to say that this senior executive's role "to monitor, challenge and correct decisions that may be inconsistent with a culture that values ethics and compliance" is ultimately "subject to the overall judgment and authority of the CEO and the board of directors." *Id.* It is, however, the CEO and the Board themselves who have the power to "set the overall tone for compliance." They cannot delegate that leadership role, and if they do not clearly and unequivocally promote a culture of compliance, no one else can successfully do so.

Second, as noted in a footnote to the Final Charter, the ISM Code obligates the Company to have a system to "avoid[] damage to the environment." Final Charter at n.1. For the

---

[34] The ISM Code is the "International Management Code for the Safe Operation of Ships and Pollution Prevention, Chapter IX of the Annex to the International Convention for the Safety of Life at Sea (SOLAS), 1974." Joint Glossary of Terms, Dkt. No. 58-1, at 7; 33 C.F.R. § 96.120(b). The ISM Code is "an international standard for the safe management and operation of ships and for pollution prevention." ISM Code, Resolution A.741(18) *as amended by* MSC.104(73), MSC.179(79), MSC.195(80), and MSC.273(85), § 1. It states that companies should implement and maintain a safety management system which includes, among other things: a safety and environmental protection policy; instructions and procedures to ensure safe operation of ships and protection of the environment; procedures for reporting accidents and non-conformities; and procedures for internal audits and management reviews. *Id.* at § 1.4.

September 18, 2019

Company, that ISM-required system exists in its Global HESS, which is self-described as a program designed to "clearly document the Company requirements for Policy and Procedures on Health, Environment, Safety and Security matters to the Captain and Senior Officers on each vessel the Company operates, in accordance with the requirements of the ISM Code." *INT-1001 Introduction to Global HESS*. Therefore, a straightforward path to support environmental compliance is for the Company to utilize the Global HESS system to meet its compliance obligations under the ISM Code.[35]

The CAM Team will continue to monitor the implementation of the Final Action Plan and overall restructuring of the compliance function, including the roles of the Chief Ethics and Compliance Officer and the Corporate Compliance Manager, the role of compliance in strategic planning, and how compliance fits within the corporate governance structure. Consistent with the Court's direction, *see* Dkt. No. 157, at 1, the CAM Team will also track the Company's efforts to create benchmarks and use empirical measures to assess its stated aim of establishing a "world class compliance and ethics program." *See* Third Annual Work Plan at 12; Status Conf. Tr. at 33 (July 19, 2019).

---

[35] For example, if the Company's leadership recognizes that ships need to be adequately manned in order to meet ISM Code requirements, the Company could incorporate manning requirements sufficient to support compliance into Global HESS. If shoreside operations do not provide a ship with an appropriate number of qualified crew members to meet these requirements, that performance gap could be reported to senior management through an internal or external audit. If such an audit finding were made, corrective action would be required and tracked. The CAM understands that, at present, Global HESS does not obligate action in response to manning shortfalls.

## C. Investigations

### 1. Background

Another of the CAM's most significant findings in ECP Year One was that the "Company's internal investigations are critically flawed." *See* CAM First Annual Report at 5; *see also id.* at 33-40. Throughout ECP Year Two, the CAM continued to report on the Company's efforts to address this finding—which, as discussed below, became stalled and failed to meet certain self-imposed deadlines. *See* CAM September 2018 Quarterly Report at 23-25; CAM December 2018 Quarterly Report at 30-31; CAM April 2019 Quarterly Report at 36-38; CAM Second Annual Report at 43-46. The CAM observed that: (1) investigations repeatedly failed to identify root cause(s), and the Company lacked a procedure or standard methodology for performing root cause analysis;[36] (2) investigation reports often sought to attribute blame to specific shipboard personnel, rather than evaluate the role of broader, systemic issues that may have contributed to the incident;[37] (3) the investigation program was still largely decentralized, despite being housed in the RAAS function; (4) relevant policies and procedures provided little guidance on how to conduct investigations, including with respect to preservation of evidence; (5) there was inconsistent information sharing regarding operating line investigation findings

---

[36] The TPA made a similar finding in ECP Year One that the Company's investigations procedures "are inconsistent, non-conclusive and ineffective. There is no formal 'Root Cause Analysis' process for investigation[s]." TPA First Annual Report at 3; *see also id.* at 5, 21-23. At the end of ECP Year Two, the TPA found that there is still "no effective procedure in place to identify or develop preventive actions or Root Cause and Analysis." TPA Second Annual Report at 3.

[37] The CAM also observed that the tiered approach to classifying the level of environmental incident investigations relied on discharge size and/or the presumed intent of those deemed responsible for incidents, which further illuminated how the structure of the Company's approach is skewed towards blame for individuals and not towards identifying possible systemic issues. *See* CAM First Annual at 34, n.32.

between operating line investigators and RAAS; (6) there were delays in the conduct of investigations led by operating lines; and (7) the Company failed to follow existing procedures or guidance as part of its internal investigations, or to provide adequate guidance and direction to external investigators in third-party led investigations. *See* CAM First Annual Report at 33-40.

As discussed in prior CAM reports, the Company acknowledged the weaknesses in its internal investigations program and committed to take steps in ECP Years One and Two toward improving the program. In early 2018, the Company engaged a third party, DNV GL AS Maritime ("DNV GL"), to assess its internal investigations process and make recommendations for improving and standardizing the program. In May 2018, DNV GL delivered a report with four overall recommendations and twenty-eight specific areas for improvement. *See* DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-52050. These included the need for: (1) a more clearly defined and consistent incident investigation process, with clear lines of authority across the brands; (2) a more structured approach to root cause analysis and reporting; (3) improved training on investigations; (4) consistent investigation and reporting methodology; and (5) methods for tracking and trending this information across the fleet to identify and manage key areas of risk. *See id.* at PCL_ECP00052035-39.[38]

On September 21, 2018, in response to the Court's Order of July 13, 2018, *see* Dkt. No. 75, at 2, the Company submitted to the Court, Interested Parties, CAM, and TPA a proposed

---

[38] The Company also engaged DNV GL to assist in revising its corporate policies and procedures on incident investigations. *See* CAM September 2018 Quarterly Report at 24. On September 25, 2018, the Company provided the CAM Team with a draft policy and procedures prepared by DNV GL. *See Carnival - Investigation Policies and Procedures* (Sept. 25, 2018). These procedures were not finalized, and, as discussed below, the Company's new investigations group continues to work on finalizing new investigation procedures.

timeline for implementing a number of the DNV GL recommendations over the remaining quarter of 2018 through the second quarter of 2019, including the revision of relevant procedures and implementation of a structured approach to root cause analysis. *See Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21, 2018). Prior to this submission, on September 5, 2018, the Company also provided to the CAM a "proposed plan to enhance the internal incident investigation program employed within the Company and its respective brands." *Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at 1. Among other things, this plan proposed to create a new, independent department that would be responsible for significant HESS incident investigations.[39]

Following the September 21, 2018, submission, the Company's efforts to implement its timeline and proposed plan were delayed during a six-month search for someone to lead the new investigations department. *See* CAM Second Annual Report at 45. This process was not complete until late March 2019, when the Company hired a former official from the United States National Transportation Safety Board to be the new Vice President of the newly named "Incident Analysis Group." *See id.*; July 2019 Probation Supervision Report, Attachment 3, at 4. During this time period, the original timeframes in the September 21, 2018, timeline lapsed.[40]

---

[39] Previously, RAAS handled both the internal HESS investigations function and the internal audit function. Under the revised structure, the new investigations department handles the internal HESS investigations function. RAAS continues to perform certain non-HESS (*e.g.*, financial/fraud) investigations, as well as internal audits (both HESS and non-HESS).

[40] Following the hire of the new Vice President, on May 3, 2019, the Company submitted proposed ECP revisions to reflect the new investigations program structure, which went into effect on June 3, 2019. *See* CAM Second Annual Report at 45; ECP § I.H. The CAM understands that further ECP modifications may be necessary as a result of the Company's recent corporate restructuring efforts. *See supra*, Part III.B and *infra*, Part III.C.2.

September 18, 2019

At the July 19, 2019, Status Conference, the Court indicated that it is eager to understand the Company's current approach to, and to be provided with an updated timeline for, enhancing the investigations function. *See* Status Conf. Tr. at 11-12 (July 19, 2019) ("The first year we identified the risk assessment in the investigation [as] one of the key issues . . . and we have sort of been waiting until you hired the right person. But what else has been going on? . . . Is it something that you, Mr. [Arnold] Donald, ask about every day? . . . I really expected the investigation process and the root cause analysis to be much more robust . . ."); *id.* at 41-44 ("This is something that I wished we had started two years ago. It didn't happen. So now we are behind the gun, and [the Vice President of the Incident Analysis Group] is coming into a very tough situation."); *id.* at 53-55. Following the hearing, the Court ordered the new Vice President of the Incident Analysis Group to attend the next Status Conference, scheduled for October 2, 2019, to provide the Court with an overview of the Company's efforts to address the weaknesses in the Company's internal investigations, root cause analyses, and corrective and preventive actions. *See* Dkt. No. 157, at 2-3; *supra* Part I.B.3.

        2.       <u>Incident Analysis Group</u>

               *i.*    *Structure*

As described above, since late 2018, the Company has created an Incident Analysis Group to handle investigations into significant HESS incidents, and hired a Vice President of the Incident Analysis Group. Currently, the Incident Analysis Group is housed within the Company's Global Legal function, with the Vice President of the Incident Analysis Group reporting directly to the Vice President of Global Ethics and Compliance, who has a direct reporting line to the Company's General Counsel. *See* ECP § III.C; Global Legal Organization

Chart, PCL_ECP00124796-97, at PCL_ECP00124796; VP, Incident Analysis Group Job

Description, PCL_ECP00124825-27, at PCL_ECP00124826.

However, under the action plan for re-structuring the Company's corporate compliance

function, the Incident Analysis Group will be housed within the All Brands Group Ethics and

Compliance Department, with the Vice President of the Incident Analysis Group reporting

directly to the General Compliance Corporate Compliance Manager (a newly created position

that the CAM understands will be filled by the individual currently serving as the Vice President

of Global Ethics and Compliance), who will have a direct reporting line to the Chief Ethics and

Compliance Officer.  *See supra*, Part III.B; Final Charter at 16.

The CAM notes that within this structure, the Company does not year appear to have

provided clear guidance or delineation of the roles and authority of key corporate leaders—such

as the Vice President of the Incident Analysis Group, Chief Maritime Officer, and Chief Ethics

and Compliance Officer—with respect to the determination as to whether to investigate an

incident and the communication of findings and lessons learned to executive leadership or more

broadly across the global fleet.  This gap includes the absence of a clear delineation as to which

matters will be investigated by the Incident Analysis Group, and which will be investigated by

others (such as operating lines or ships), and what plans there are for training and enhancing the

role of investigators outside of the Incident Analysis Group.

Further, it is not yet clear how the Company's IT tools that track incident and HESS

requirements, such as SeaEvent and Global HESS, *see infra*, Part III.G.1, will be utilized in the

new investigations program, including:  how incidents will be reported and flagged/assigned for

investigation; how near misses will be reported and flagged/assigned for investigation; how root

causes will be assessed and tracked; and how the status of investigations and corrective and preventive actions will be tracked.

   *ii.* *Staffing*

   Since beginning work in March 2019, the Vice President of the Incident Analysis Group has been responsible for, among other things, "implementing [the Incident Analysis Group's] new structure and hiring additional investigators." *Response by Princess Cruise Lines, Ltd. To Third Party Auditor Year Two Annual Report* (July 16, 2019), Dkt. No. 151, at 6.

   The current plan is for the Incident Analysis Group to include a total of eight investigators, each of whom has the title of Director of Investigations and is under the supervision of the Vice President of the Incident Analysis Group.[41]  While the Vice President is based in the Carnival Corp. offices in Miami, Florida, the eight investigators will be based out of various brands across the Company's global operations. *See* PCL_ECP00124796.  Four of these investigators are former RAAS investigators who were transferred to the Incident Analysis Group,[42] while the other four are new hires with start dates from August to September 2019.  *See* July 2019 Probation Supervision Report, Attachment 3, at 4; Global Legal Organization Chart, PCL_ECP00124796-97, at PCL_ECP00124797.  The four new Incident Analysis Group investigators come from a varied background in the marine industry, and include a senior marine surveyor, a compliance manager for Carnival Australia, a RAAS auditor, and an investigator

---

[41] In ECP Year One, the TPA found that the former investigations program was "extremely undermanned."  TPA First Annual Report at 21.  It remains to be seen if eight investigators will be a sufficient number for the Incident Analysis Group.

[42] The CAM understands that one of these former RAAS investigators has been promoted to Deputy Vice President of the Incident Analysis Group, and that the Company is seeking to hire someone to fill the vacant investigator position.  *See* Employee Interview Notes.

from the United Kingdom Marine Accident Investigation Branch.  *See* IAG Investigator

Resumes, PCL_ECP-124811-22.

The Incident Analysis Group investigators will be expected to lead investigations,

"including event recognition and classification, data collection, data analysis, recommendation

development and disposition, report composition and presentation," collaborate with subject

matter experts, perform root cause analyses, and train and mentor other subject matter experts

assigned to lead investigations.[43]  *See* Job Description Shore, Director Investigation,

PCL_ECP00124798-99, at PCL_ECP00124798.  According to the Company, the Vice President

is engaged in various efforts to support these functions, including finalizing new investigations

procedures, evaluating root cause analysis methodologies, and developing a new investigator

training and accreditation program for use across the organization that will cover the Incident

Analysis Group investigators, as well as operating line personnel.  *See* July 2019 Probation

Supervision Report, Attachment 3, at 4; *Court Appointed Monitor Communication – Twelfth &*

*Thirteenth Requests for Documents and Information* (Sept. 13, 2019); *see also* Employee

Interview Notes.

3.   Revised Timeline

On August 30, 2019, the CAM Team requested an updated timeline and additional

information from the Company on its investigations program-related efforts, including

information related to training, budgets, and policies and procedures.  *See Court Appointed*

*Monitor Communication Thirteenth Request for Documents and Information* (Aug. 30, 2019).

---

[43] It is not clear whether the mentoring performed by Incident Analysis Group investigators will
be of other Incident Analysis Group investigators, including new hires, and/or personnel
assigned to perform investigations at the operating lines.

September 18, 2019

The Company's response included a revised timeline with the following anticipated completion dates:

- By September 16, 2019, finalizing revised investigation procedures, report templates, and relevant appendices;

- By September 16, 2019, developing a procedure for accreditation of incident investigators;

- By September 16, 2019, implementing a competency development process;

- By November 1, 2019, finalizing investigator training courses that are under development or planned; and

- By November 1, 2019, developing a root cause analysis tool.

*See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019).

### i.   Revised Investigation Procedures

As of the date of this Report, the Company continues to work on finalizing its revised investigation procedures, report templates, and relevant appendices, which had a target completion date of September 16, 2019.  *See id.* at 5; *see also* Employee Interview Notes.  The CAM Team will review these procedures when they are available.

The CAM Team, in consultation with the TPA, previously reviewed and assessed an initial draft set of revised investigation procedures provided by the Vice President of the Incident Analysis Group in July 2019.  *See [Draft] HMP-1302 HESS Incident Investigations*; *[Draft] HMP-1302-A1 Internal HESS Investigation Matrix*; *[Draft] HMP-1302-A2 Guidelines for Operating Line-Led Investigations*; *[Draft] HMP-1302-A3 Guidelines for IAG-Led Investigations*; *[Draft] HMP-1302-A3-1 Marine Casualty Investigation: Investigators' In-the-Field Job Aid, MAIIF/IMO*; *[Draft] HMP-1302-B High Potential Worksheet*; *[Draft] HMP-1302-C IAG Preliminary Report Template*; *[Draft] HMP-1302-D IAG Final Report Template*.

The CAM Team and TPA observed that overall, the draft revised procedures appeared to provide greater guidance and context for conducting effective investigations, including preservation of evidence, than the current procedures.  However, they continued to lack guidance regarding key areas, including root cause analysis, training and accreditation, IT tools, and corporate roles and authority.

<em>ii.   Root Cause Analysis Methodology</em>

The lack of an effective root cause analysis methodology designed to lead to meaningful corrective and preventive actions has been a widespread criticism of the Company's internal investigations program.  In ECP Year One, the CAM found that "[t]here is no consistent, reliable means to investigate incidents or near misses and identify root causes that can lead to meaningful corrective actions."  CAM First Annual Report at 5; *see also id.* at 33-40.  This observation has been echoed by the TPA, as well as by the Company's own consultants, including DNV GL and the University of West Florida:

- In ECP Year One, the TPA found that the lack of a formal root cause analysis program resulted in "investigation reports [that] are inconsistent and inaccurate in many cases" and recommended that the Company "[a]dopt a centralized Root Cause Analysis program and procedure and implement it throughout the corporation."  TPA First Annual Report at 3, 5, 21-23.  In ECP Year Two, the TPA found that there is still "no effective procedure in place to identify or develop preventive actions or Root Cause and Analysis" and recommended that the Company develop "an effective root cause analysis program which should drive the development of effective preventive actions to address identified causes."  TPA Second Annual Report at 3, 6, 19-22.  In particular, the TPA observed that preventive action plans "to address systemic or policy related findings are poor or non[-]existent in most cases and ineffective in addressing findings as required by the ECP."  *Id.* at 19.

- In its May 2018 report, DNV GL observed that most interviewees identified causal analysis as "the weakest area of the whole investigation process," and that a common theme among interviewees was that "we (the organi[z]ation) don't seem to get to the root causes."  DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-52050, at PCL_ECP00052018.  As DNV GL further observed, "[c]ausal analysis is critical to understanding why the incident happened.  Done correctly it will identify

September 18, 2019

opportunities to prevent reoccurrence of the incident in question, but it can also uncover systemic issues that allow more fundamental weaknesses to be addressed." *Id.* In addition, "[a]nother important role of causal analysis is codification of the outcomes in a consistent manner. This is useful for historical analysis of the incidents, enhancing the value extracted from the investigations. This is clearly not completed in a systematic manner within Carnival." *Id.*; and

- The University of West Florida, in a report providing an independent assessment of CSMART's programming and initiatives performed in May 2018, found that "[d]iscussions with instructors, staff and senior participants as well as senior corporate staff identified a potential weakness in exercising root cause analysis skills to identify specific causes of common problems experienced across all brands." University of West Florida Innovation Institute, *Report to Carnival Corporation, University of West Florida, Innovation Institute Visit to CSMART, May 14-19, 2018*, PCL_ECP00055987-6009, at PCL_ECP00055997. The report recommended that the Company "[d]evelop and adopt a root cause analysis protocol standardized across all brands to identify causal factors." *Id.*

As of the date of this Report, the Company continues to work toward adopting a root cause analysis methodology (or set of methodologies). *See, e.g.*, *Response by Princess Cruise Lines, Ltd. To Third Party Auditor Year Two Annual Report* (July 16, 2019), Dkt. No. 151, at 6; *see also* Employee Interview Notes. As noted above, the Company's most recent timeline indicates that by November 1, 2019, it expects to both: (1) develop a root cause analysis tool; and (2) finalize an in-person investigator training course that will include root cause analysis. *See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at 4-5. In addition, the Company has a target date of December 2019 for finalizing a computer-based root cause analysis training course. *See id.*; *see also* Employee Interview Notes.

As discussed below, the CAM Team's review of approximately ten Incident Analysis Group investigation reports since March 2019 indicates that these reports continue to lack effective root cause analyses and do not yet appear to be substantially improved over the pre-Incident Analysis Group investigation reports. *See infra*, Part III.C.4.

### iii.    Training and Accreditation

The Company has recognized the need to improve its investigations training,[44]  and

tasked the Incident Analysis Group with developing a new investigator training and accreditation

program, including developing new root cause analysis trainings.  According to the Company, a

"combination of in-person and online trainings will be developed for use onboard ships, shore-

side headquarters, and at the Company's CSMART training academy."  *See Response by*

*Princess Cruise Lines, Ltd. To Third Party Auditor Year Two Annual Report* (July 16, 2019),

Dkt. No. 151, at 6.

As of the date of this Report, the Company continues to work on finalizing its new

procedures for incident investigator accreditation and competency development, which had a

target completion date of September 16, 2019.  *See Court Appointed Monitor Communication –*

*Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at 5.  The CAM

Team will review these procedures when they are available.

The Company also continues to work on developing new investigations trainings,

including root cause analysis training.  The Company's efforts to date include:

- Working with an external consultant, MTO Safety, to develop a Maritime Accident
  and Incident Investigation Course.  The Company plans to finalize the course by
  November 1, 2019.  *See id.*  It will be held at Carnival Corp.'s offices in Miami,
  Florida, from November 11-14, 2019, and twice yearly at CSMART after that.  The
  course will be required for Incident Analysis Group investigators "[u]nless the
  investigator has already completed investigator training provided by another such as
  the National Transportation Safety Board or Cranfield University" and for operating
  line and ship-based investigators "who have not received investigator training."  *Id.*
  at 3-4.  An August 2019 proposal from MTO Safety indicates that "causal analysis"
  and "[a]nalysis framework to identify systemic causes" will be components of the
  course.  *See* MTOSäkerhet, *Maritime Accident and Incident Investigation Course for*
  *Company Investigators: Proposal* (Aug. 2019), PCL_ECP00134732-52, at

---

[44] In ECP Year One, the TPA found that, in addition to the former investigations program being
"extremely undermanned," that the "personnel assigned to conduct investigations may or may
not have had any formal training."  TPA First Annual Report at 21.

September 18, 2019

PCL_ECP00134736, 39, 41-42; *see also* MTO Safety, *Handbook: MTO Causal Analysis* (Oct. 2014), PCL_ECP00134704-31; and

- Conducting a Request for Proposal for a third-party vendor to work on developing a computer-based root cause analysis training course for operating line and ship-based investigators.  The Company is aiming for this course to be completed by December 2019.  *See* Employee Interview Notes.

*See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at 3-5.

4.   Investigation Reports

The CAM Team has reviewed investigation reports for environmental incidents prepared by the new Incident Analysis Group.  Overall, these reports do not appear to be substantially improved when compared with the pre-Incident Analysis Group investigation reports.  They continue to lack meaningful analysis of root causes or potential systemic issues, and may miss opportunities to address broader concerns.

Notably, an early example of an investigation report approved by the Incident Analysis Group identified, but failed to comprehensively consider, findings of apparent falsifications of Planned Maintenance System records over a period of several years on two Covered Vessels: the *Coral Princess* and the *Crown Princess*.[45]  *See Investigation Memo No. HAG201904, Caribbean Princess – OWS Absorber Filter*, PCL_ECP00122468-85 ("Memo No. HAG201904").  The report did not identify the falsifications on these two ships in its first-page executive summary (which, as discussed below, focused on the primary investigation into a separate but related incident involving missing pollution prevention equipment components), and

---

[45] Although this Report, like prior CAM reports, identifies the ships involved in certain incidents, the Company's compliance challenges are not limited to incidents occurring on the named ships. Rather, such incidents stem from the broader, systemic issues regarding the failure of the Company's leadership to adequately support the ships and take appropriate action on compliance.

did not explore the potential broader concerns raised by these and a similar recordkeeping falsification incident on another Holland America Group ship that occurred in ECP Year Two. *See id.*

The underlying incident involved the discovery in January 2019 that a required component (a filter element) was missing from an Oily Water Separator[46] on the *Caribbean Princess*.  The investigation found that a work order in the ship's Planned Maintenance System for monthly equipment inspections that would have revealed the missing element had been deleted in 2010, prior to the installation of the new Oily Water Separator in 2014, and was never added back into the system after the new equipment was installed.  Memo No. HAG201904 at PCL_ECP00122474, 84.[47]  Because this work order was absent from the Planned Maintenance System (and the work was therefore not being performed), the missing filter element was not discovered sooner.  *See id.* at PCL_ECP00122471.  The investigation was unable to determine when the missing filter element was removed from the Oily Water Separator.  *See id.* at PCL_ECP00122484.

Further investigation revealed that two other ships were also missing the same required element from their Oily Water Separators: the *Coral Princess* and the *Crown Princess*.  *Id.* at PCL_ECP00122479, 84.  On these two ships, however, the relevant work order was *not* missing

---

[46] An Oily Water Separator is a piece of pollution prevention equipment used to separate oil and water mixtures into their separate components.  Dkt. No. 58-1, at 12.  The equipment is designed to produce effluent with oil content not exceeding fifteen parts per million, as required by MARPOL Annex I.  *Id.*  An integral part of an Oily Water Separator is an Oil Content Meter, a device that measures and records the oil content in a moving stream of water to determine if it meets regulatory standards prior to discharge.  *Id.* at 8-9.

[47] The work order was deleted and never re-instated for reasons not directly relevant here, but that raise separate concerns about the Company's project management process for new equipment installations.  *See id.* at PCL_ECP00122471, 85.

from the Planned Maintenance System, as it was on the *Caribbean Princess*, and had remained in the system after the new equipment was installed on these two ships in 2015. *Id.* This means that the equipment inspections called for by the work order should have been performed on a monthly basis, and, as a result, the missing filter elements should have been discovered. This was not the case. The investigation found that crew members on these two ships had logged the work orders as complete in the Planned Maintenance Systems without performing the required work. *Id.* at PCL_ECP00122482-83, 85.[48] This practice appears to have lasted for several years, as the missing filter elements were not discovered until early 2019. *See id.*

The investigation report identified these "incomplete/inaccurate" recordkeeping issues on the *Coral Princess* and *Crown Princess*. It also recognized that these issues are similar to a recordkeeping falsification incident on the *Westerdam* that occurred in ECP Year Two and that attracted significant attention from the CAM, TPA, and Government. *See id.* at PCL_ECP00122471, 85; CAM Second Annual Report at 97-98; CAM December 2018 Quarterly Report at 6-8 (discussing incident in detail). On the *Westerdam*, an engineer was discovered to have logged three work orders in the Planned Maintenance System related to oily bilge water management as complete without having performed the work. *See* RAAS, *Investigation Report* Westerdam *Planned Maintenance False Entries* (Mar. 4, 2019), PCL_ECP00101938-52. As the CAM observed, the *Westerdam* incident raised concerns about workplace challenges that may have contributed to the incident, including: workload and time pressure; insufficient shoreside support; insufficient staffing; inadequate training; and lack of a "speak up" culture. *See* CAM December 2018 Quarterly Report at 8.

---

[48] There is no similar finding of recordkeeping falsification on the *Caribbean Princess* because the relevant work order was absent from the Planned Maintenance System in the first place, as noted above. Therefore, it could not be logged as complete.

September 18, 2019

However, the recordkeeping issues from the *Coral Princess* and *Crown Princess* were not included in the Executive Summary on the first page of the report, and appeared only as the final item in the list of "factors contribut[ing] to the delay in recognizing that system components were missing."  *See* Memo No. HAG201904, at PCL_ECP00122471.  The report did not appear to grapple with the potential broader significance of these findings, which, in combination with the *Westerdam* incident, indicate that the Company may have a systemic problem with the completeness and integrity of Planned Maintenance System records across multiple ships. Having given these issues scant attention, it is unsurprising that the report provided no new corrective actions designed to address these issues.  Instead, it noted that "[t]his issue has been identified in the Westerdam 'falsification of records' investigation report and actions from that investigation are being tracked in the Global HESS."  *Id.* at PCL_ECP00122485.  The report did not assess, nor suggest any future plan to assess, whether these existing corrective actions are sufficient or may require modification.[49]

---

[49] As a separate issue, the report noted that the equipment manufacturer confirmed to the Company that the "Type Approval Certification to MEPC.107(49) [a MARPOL regulation providing guidelines and specifications for oily bilge water filtering equipment]" for the Oily Water Separators was "considered invalid" without the missing elements in place.  *Id.* at PCL_ECP00122484.  However, the report did not discuss the potential risk of a violation of MARPOL or the United States Act to Prevent Pollution from Ships ("APPS") as a result of sailing without approved oily bilge water filtering equipment.  For instance, MARPOL and APPS require that a ship's equipment substantially agree with the particulars of the equipment documentation, including the ship's International Pollution Prevention Certificate ("IOPP").  *See e.g.*, MARPOL Annex I, Ch. 2; 33 U.S.C. § 1904; 33 C.F.R. §§ 151.23, 151.10, 155.380.  An IOPP is a certificate required by MARPOL that is issued to a ship as confirmation that the vessel is in compliance with MARPOL requirements; it provides details regarding the operation of the ship's pollution prevention equipment, including the types and specifications of Oily Water Separators.  It specifically notes the resolution under which such equipment is approved (*e.g.*, MEPC.107(49)).  Therefore, a ship sailing without a Type-Approved Oily Water Separator under MEPC.107(49) may be sailing with equipment that does not substantially agree with its IOPP.

The CAM recognizes that this investigation report was prepared early in the restructuring of the Incident Analysis Group, before the revised investigation procedures and a standardized approach to root cause analysis have been finalized. Nonetheless, it is representative of recent investigation reports. The CAM Team will continue to review Incident Analysis Group investigation reports as they become available. The CAM plans to provide a further assessment of the investigation reports in future CAM reports, including any changes after the new investigation procedures, trainings, root cause methodologies, and other related efforts are in place.

### 5.    Ongoing CAM Team Examination

The CAM Team will continue to monitor, assess, and report on the Company's efforts to restructure and enhance its internal investigations function during ECP Year Three. Consistent with the Court's direction, *see* Dkt. No. 157, at 2-3, the CAM Team will examine, among other things: (1) the Company's timetable and plans to meet milestones to enhance investigations; (2) the function and structure of the Incident Analysis Group; (3) the content, implementation, and effectiveness of investigation policies and procedures; (4) the process for identifying and classifying matters for investigation, including the individuals responsible for making such determinations and the timeframes for making them; (5) training for Incident Analysis Group, operating line, and ship investigators; (6) the process and methodologies for root cause analysis that will be used by Incident Analysis Group, operating line, and ship investigators; and (7) the process for disseminating investigation results and lessons learned to corporate leadership, including the Board of Directors, and the fleets more broadly. *See* Third Annual Work Plan at 14.

The investigations function will be an area of focus during the CAM Team's planned visit to the All Brands Group and Carnival Cruise Line shoreside offices in Miami, Florida, in October 2019.  During this visit, the CAM Team plans to meet with the Vice President of the Incident Analysis Group and other personnel whose job functions relate to investigations.

### D.     Food Waste Management

####     1.     Background

Food waste management—in particular, the separation of non-food items, including plastics, from food waste before it is discharged overboard—has become one of the Company's most pressing environmental challenges.  Although incident reports and an internal Company survey identified this problem as early as ECP Year One, *see, e.g.*, *Carnival Corp Engineering Survey Final Comments and Suggestions* (Feb. 2018), PCL_ECP00045496-658, the Company took no significant action until a TPA audit finding in December 2018 that plastic mixed with food waste was discharged by a Carnival Cruise Line ship in Bahamian waters in violation of MARPOL.  On June 3, 2019, the Company pleaded guilty to this violation, along with the failure to accurately record the discharge in the ship's Garbage Record Book.  *See* Dkt. No. 134, at 11.

Further review has shown that food waste management is a widespread challenge across the Company.  The CAM and the TPA each identified food waste management as a critical area of concern in their respective Annual Reports for ECP Year Two.  *See* CAM Second Annual Report at 86-90 (discussing the probation violation and broader food waste management challenges); TPA Second Annual Report at 3, 17-18 (finding issues with garbage management, including garbage segregation and food waste separation).  Since the start of ECP Year Three, the Company has reported hundreds of incidents across all of its operating lines and brands involving the discovery of comingled waste, including plastics, in various parts of the ships' food

September 18, 2019

waste systems that have resulted in actual or potential prohibited discharges.  *See, e.g.*, Carnival

Corp. *HESS Weekly Flash Reports* (Apr. 24, 2019 through Aug. 7, 2019); Carnival Corp. *Food*

*Waste and Galley Grey System Contamination Fleet Dashboards* (July 21, 2019 through Sept.

11, 2019).

As noted above, this problem was previously identified to the Company.  *See* CAM

Second Annual Report at 88 (discussing the identification of concerns related to food waste

management across multiple operating lines and brands in February 2018 in the ECP-required

Fleet Engineering Survey results, as well as more than forty reports of incidents related to food

waste management on Covered Vessels throughout ECP Year Two).  As in other areas where

concerns have been raised by both employees and third parties, the Company's top management

did not focus on these problems until the probation revocation petition was filed.  Given the

global concern about plastic discharges into ocean waters, *see, e.g.*, M. Eriksen, *et. al.*, *Plastic*

*Pollution in the World's Oceans: More than 5 Trillion Plastic Pieces Weighing over 250,000*

*Tons Afloat at Sea* 1-15 (Dec. 10, 2014), *available at*

https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0111913, the Government

stated that "it is disconcerting to learn that [the Company] did not have a better handle on this

problem prior to the ECP."  *Government's Status Report*, Dkt. No. 155, at 3.

2.     Probation Agreement Requirements

In the Probation Agreement, the Company recognized "that there is a need to improve

waste management of non-food waste, including plastic garbage, on Covered Vessels and by

Covered Personnel."  Dkt. No. 134, at 5.  The Company agreed to take various actions to

prioritize this issue, including creating two self-described "food waste Tiger Teams"[50] and

implementing a three-part program to improve its food waste practices.  *See id.* at 5-7.

### i.   *Food Waste Task Force and Tiger Teams*

As required by the Probation Agreement, the Company created two food waste Tiger

Teams that are a subset of a larger Food Waste Task Force.  *See* Dkt. No. 134, at 6-7.  The Task

Force is led by the Corporate Compliance Manager and made up of stakeholders from multiple

departments across the Company, as well as external consultants and experts.  *See Interim*

*Progress Report on Probation Settlement Goals* (July 1, 2019), at 8.  The Tiger Teams are made

up of "internal and external hotel, environmental, and technical subject matter experts."  *Interim*

*Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 4.  From June 3-6, 2019, the

Tiger Teams and members of the Food Waste Task Force held kick-off meetings in Washington,

DC.  Following the kick-off meetings, the Tiger Teams visited approximately thirty ships

between June and August 2019 to:

1. Benchmark process, setup, procedures, design and equipment across ships and brands
2. Review adequacy of manning
3. Review technical aspects including equipment redundancy and adequacy
4. Review food waste volume management
5. Review single-serve/use items
6. Engage crew, solicit good ideas and best practices
7. Provide recommendations to enhance food waste compliance and further standardize on process, procedures, design and equipment.

Dkt. No. 134, at 6.

From July 23-25, 2019, the Tiger Teams met with the Food Waste Task Force in Miami,

Florida.  During this meeting, the parties reviewed observations from the Tiger Team ship visits

---

[50] "Tiger Team" is a term that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions.

September 18, 2019

and developed the recommendations in the Food Waste Management Implementation Plan required under Part One of the three-part program discussed below. *See Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 4. On August 7, 2019, as noted above, the CAM Team and TPA met with members of the Tiger Teams in Houston, Texas, to discuss, among other topics, the Company's process for developing the Food Waste Management Implementation Plan and plans for implementing its recommendations across all operating lines. *See supra*, Parts II.B-C.

> ii.    Three Part Program (including Food Waste Management Implementation Plan)

The Probation Agreement requires the Company to implement a three-part program, and the Company has begun implementing aspects of this program:

- **Part One.** The Company will: "(1) develop and implement clearer and more effective procedures regarding the disposal of food waste; (2) develop new training and signage to ensure that the proper procedures are understood; and (3) use appropriate media, in particular video, to call attention to the new training, procedures, and the renewed commitment to handling of food waste. The Company will also (4) assess the staffing levels for both the operational and compliance aspects of food waste management using a qualified third party to determine appropriate resources to comply with the updated procedures." Dkt. No. 134, at 6. For the first three items, "by August 1, 2019, the Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables. With respect to the fourth item, the Company will retain a qualified third party to assess the necessary staffing[.]" *Id.* at 7.

For the first three items of Part One, on August 1, 2019, the Company provided the Interested Parties, CAM, and TPA with its Food Waste Management Implementation Plan. *See supra*, Part I.B.1. The Plan includes six categories of observations (which mirror the first six categories of Tiger Team tasks set forth in the Probation Agreement listed above) and over forty associated recommendations, including timetables and project owners. *See* Food Waste Management Implementation Plan. The observations note, among other issues, inconsistencies

in "processes, waste management area design and set up, and design of the equipment in use," as well as "in the assignment of manning for food waste management responsibilities"[51] across the Company's ships.  *See id.* at 5, 7.  The recommendations are wide-ranging and include: simplifying, streamlining, and standardizing procedures,[52] signage, training, and equipment across all ships; reviewing new build plans; developing an inventory of food waste processing equipment installed on all ships; designating senior shoreside employees at each brand or operating line to be the "point lead" on food waste compliance; fast-tracking the testing and evaluation of certain food waste processing technologies; establishing a guest-facing food waste minimization program; reviewing and enhancing training, including considering ways to utilize Global Talent Partners; and providing a communications platform to facilitate the sharing of best practices and challenges.  *See* Food Waste Management Implementation Plan at 5-12.  The Corporate Compliance Manager is overseeing the implementation of the recommendations, and has tasked two individuals "to lead the development of new procedures, training, signage and other measures designed to help compliance."  *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5.

---

[51] Some ships "reported they were operating with a lower number of personnel in the food and beverage department than the manning numbers assigned to the ship."  *Id.* at 7.

[52] On May 1, 2019, the Company issued a five-page Instructional Notice setting forth a range of food waste management requirements, including requirements for waste segregation, supervision, equipment and tank inspections, reporting, and recordkeeping.  *See* ENV-07-2019 *Additional Measures to Ensure Compliant Segregation of Food Waste*.  The Food Waste Management Implementation Plan recommends that the Company replace the Instructional Notice "with a clear and concise HESS procedure that incorporates the feedback gained from the Tiger Team visits," including feedback that certain requirements have "increased the workload on many ships."  *See* Food Waste Management Implementation Plan at 6-7.  The Company reports that a procedure is "on track for issue."  Update at ECP_ECP00134215.

September 18, 2019

On September 4, 2019, the Company provided the Interested Parties, CAM, and TPA with an update to the Food Waste Management Implementation Plan providing "a more detailed implementation plan to mitigate food waste management issues based on the Tiger Teams' recent recommendations and observations."  Cover Letter at ECP_ECP00134212.  The Update lists approximately thirty-five action items under categories such as:  Communications, Guidance, Procedure (including HESS, Hotel, and Technical), Manning, New Ship Design, Procurement, Technical, Training, and Volume Management.  *See* Update at ECP_ECP00134212-19.  The action items appear to be tied to recommendations from the Food Waste Management Implementation Plan, and each is assigned a point of contact (typically one or two individuals), due date, and current status.  *See id.*  The CAM Team is reviewing the Food Waste Management Implementation Plan and the Update and will provide feedback and comment to the Company as appropriate.

For the fourth item of Part One, the Corporate Compliance Manager has hired a third-party "Human Factors expert" to perform the review of staffing levels.  This review is in the planning stages.  *See Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5; July 2019 Probation Supervision Report, Attachment 3, at 15.  The Food Waste Management Implementation Plan makes five specific recommendations for what the third-party performing the review should assess, including certain inconsistencies in manning and workload.  *See* Food Waste Management Implementation Plan at 7-8.  In addition, the Update provides for the Head of Global Human Resources to "[d]evelop a clear and concise dashboard to provide an overview of the adequacy of manning levels on all ships" by November 1, 2019.  Update at ECP_ECP00134217.

September 18, 2019

- **Part Two.**  The Company will "design and implement procedures to reduce the purchase and consumption of single-use plastic items[53] across the corporate fleet by 50 percent by December 31, 2021.  It will also design strategies to reduce the total weight of food waste that the Company creates by 10 percent by December 31, 2021."  Dkt. No. 134, at 7.

For Part Two, the CAM understands that the Company is working to develop metrics and baselines by which it can measure its production and consumption of single-use plastics and generation of food waste by weight.  *See* Employee Interview Notes.  On single-use plastics, the Food Waste Management Implementation Plan recommends that the Company develop a full list of single-use items that is "prioritized to eliminate or reduce the items based upon the risk of them entering the food waste stream."  Food Waste Management Implementation Plan at 10.  It further recommends, among other measures, that the Company "[d]evelop and implement a procedure establishing a tiered approach to reducing the consumption of single use items" that "include[s] prioritizing items that are frequently found in food waste."  *Id.* at 6, 10.  The Company reports that a procedure is "nearing final stages of development."  Update at ECP_ECP00134215.  The Government has also stated that it "seeks to confirm that [the Company] knows the universe of single use plastic products it utilizes, the volumes purchased per ship/fleet, the volume of plastic disposed ashore, and that shore side disposal and recycling are being handled in a legal and responsible manner."  *Government Status Report*, Dkt. No. 155, at 16.

On food waste generation, the Food Waste Management Implementation Plan recommends that the Company provide ships with weighing equipment and implement a

---

[53] The Company describes single-use plastic items as including "among others, the following: straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events."  *Id.*

recordkeeping regime to allow for establishing an accurate baseline. *See* Food Waste Management Implementation Plan at 10. The Company reports that a baseline will be established by the first two weeks of October 2019. Update at ECP_ECP00134217. The Food Waste Management Implementation Plan further recommends, among other measures, that the Company evaluate two specific food waste reduction and volume management systems, which "provide an accurate record of the items wasted as well as the weight." Food Waste Management Implementation Plan at 10. The Company reports that this review is being led by Holland America Group and Costa Group and will be completed by November 1, 2019. Update at ECP_ECP00134217.

- **Part Three.** By October 31, 2019, the Company "will review and provide an analysis of: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes." Dkt. No. 134, at 7. Further, by January 31, 2020, the Company "shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones." *Id.*

For Part Three, the Corporate Compliance Manager has hired an independent marine engineer to review food waste processing technologies. As of August 2019, this individual "has performed a number of site visits, including visits to shore-side facilities using food waste digesters and a large recycling center in South Florida." *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5; July 2019 Probation Supervision Report, Attachment 3, at 15. The Corporate Compliance Manager is also "leading a project to evaluate the benefits of green technology food waste digesters." *Id.* Three different types of digesters are being tested on various Company ships. *See id.* In addition, the Company plans to test a new device in the coming months that is "designed to further improve the quality of disaster effluent through a secondary means of filtering and sterilizing." *Id.*

September 18, 2019

3.     Other Food Waste Initiatives

The Company is developing and implementing various other food waste initiatives not

discussed above, including:

- A weekly food waste dashboard "to measure fleetwide food waste compliance and to identify ships most in need of assistance." *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5. The CAM Team reviews this dashboard on a weekly basis and will seek to learn more about the Company's development and use of the dashboard;

- A fleetwide review of missing drain bell/scupper covers. This was prompted by TPA audit findings related to the discovery of missing drain covers on a Carnival Cruise Line ship. *See* ABSG, *Carnival Cruise Line Environmental Compliance Audit Report* (June 4, 2019), at 4 (Major Non-Conformity-02 and 03). The TPA auditors found non-food items, including plastics, in the ship's galley grey water drain tank, and concluded that these items were being washed down the deck drains of the galleys because the covers had been removed from the drains. *See id.* at 4, 19; *Government Status Report*, Dkt. No. 155, at 11-12. In response to these findings, the Company "conducted a full fleetwide review and found that other ships similarly had missing drain bells/scupper covers due to a lack of procedures." *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5; July 2019 Probation Supervision Report, Attachment 3, at 15. The Company reports that its procurement teams are in the process of purchasing replacements. *See id.*; *see also* Environmental Compliance Notice #03-2019. The Food Waste Management Implementation Plan recommended that the Company "[d]evelop and implement a procedure to require the installation (where missing) and securing of drain bells / scupper covers with unique fasteners in all food preparation spaces including a requirement for periodic checks." Food Waste Management Implementation Plan at 6. The Company reports that a procedure is "on track for issue." Update at ECP_ECP00134215; and

- A compliance awareness challenge, initiated by the Corporate Compliance Manager, involving a competition for each ship to create a "Food Waste Shuffle" music video." *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5; July 2019 Probation Supervision Report, Attachment 3, at 16; Food Waste Management Implementation Plan at 12.

*See Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 5.

4.     Ongoing CAM Team Examination

The CAM Team will continue to monitor and assess issues associated with food waste

management. This will include the review, assessment, and tracking of the Tiger Team

program and food waste initiatives, including the Food Waste Management Implementation Plan recommendations and other components and deadlines of the three-part program set forth in the Probation Agreement.  *See* Third Annual Work Plan at 7.  The CAM Team also intends to evaluate the Company's process for selecting and vetting shoreside waste vendors who handle the disposal of wastes, including plastics, offloaded from ships, and vendors of equipment to be installed onboard.

## E.    Training

The CAM Team continues to monitor the Company's training in support of environmental compliance.  This includes its ECP-related curriculum and the integration of environmental compliance into trainings for deck and technical personnel.  *See* CAM First Annual Report at 21-23, 69-70; CAM September 2018 Quarterly Report at 25-27; CAM December 2018 Quarterly Report at 31-36; CAM April 2019 Quarterly Report at 38-40; CAM Second Annual Report at 31-35.

### 1.    General Updates on Company Initiatives

The Company continues to invest resources in environmental and ECP-related training. Notable recent updates include:

- **CSMART Training Courses.**  As of July 2019, the Company has conducted over thirty "Environmental Officer 1," or "EO1," training courses (required for those in their first year as an Environmental Officer under the ECP) and over twenty "Environment Officer 2," or "EO2," training courses (required for those in their second year as an Environmental Officer under the ECP).  July 2019 Probation Supervision Report, Attachment 3, at 8.  As discussed further below, CSMART also held the first "Environmental Officer 3," or "EO3," hybrid training/conference event (required for those in their third year as an Environmental Officer under the ECP) in August 2019;

- **Tool Box Talks.**  In January 2019, the Company began implementing a series of supervisor-led training sessions, called Tool Box Talks, held onboard ships that cover various environmental and technical requirements.  The first set, implemented on January 18, 2019, address:  (1) bilge water management; (2) the Environmental

Control System program (*i.e.*, the use of seals, locks, and welds to control vulnerable points on ships that could lead to prohibited discharges); and (3) portable pumps.  *See* CAM Second Annual Report at 32; TRG-2308-A4-A7; June 2019 Probation Supervision Report, Attachment 3, at 8.  On June 26, 2019, the Company implemented a fourth Tool Box Talk addressing food waste management.  *See* TRG-2308-A7; *see also supra*, Part III.D (discussing food waste management issues);

- **Augmented Reality Oily Water Separator Training.**  Following pilot testing, the Company has completed amendments to its augmented (virtual) reality Oily Water Separator CSMART training developed by a third-party vendor.  *See* CAM Second Annual Report at 32 (discussing the technology); July 2019 Probation Supervision Report, Attachment 3, at 8-9.  According to the Company, "[a]t a later date, depending on the success and value of this new approach to training, the Company will be considering its application for other training needs."  *Id.* at 9;

- **Oily Water Separator/Oil Content Meter Onboard Equipment and Culture of Compliance Training.**  The Company has finalized a single Oily Water Separator/Oil Content Meter service and maintenance contract for its entire corporate fleet with a third-party vendor.  According to the Company, the objective "is to harmonize brand individual contracts into one corporate contract."  June 2019 Probation Supervision Report, Attachment 3, at 14.  The scope of the contract includes various preventive maintenance and operations services, as well as two types of training that will be delivered by the third-party vendor during ship visits: (1) equipment training of systems operators; and (2) "culture of compliance dedicated training."  July 2019 Probation Supervision Report, Attachment 3, at 13; and

- **IT Tools.**  The Company continues to develop and roll-out various tools related to training, including:  (1) the Global Learning and Development Information System ("GLADIS"), a learning management system designed to deploy and track training; (2) CrewTube, an application for smart phones and tablets that allows crew members to access HESS information and complete some HESS trainings before joining a ship; (3) a new offline, tablet-based drill application to "assess training and drills;" and (4) a new Instructor Led Training Attendance App that will be able to scan crew member IDs to assist in recording attendance at onboard trainings.  *See infra*, Part III.G.1.

2. <u>Personnel Changes</u>

The Director of Environmental Training at CSMART is retiring in September 2019.  The Company is currently searching for a replacement.  *See* July 2019 Probation Supervision Report, Attachment 3, at 9.

In addition, two Operating Line Training Managers recently left the Company:  one from Holland America Group and one from Carnival CUK.  The Company has appointed a new

Operating Line Training Manager for Carnival UK and is searching for someone to fill this position at Holland America Group (an environmental manager has assumed these responsibilities on an interim basis).  *See id.* at 9; June 2019 Probation Supervision Report, Attachment 3, at 10.  The Company also recently promoted the Operating Line Training Manager for Carnival Cruise Line to Senior Manager of Environmental Compliance Training and Communications for All Brands Group.  *See* July 2019 Probation Supervision Report, Attachment 3, at 10.  Carnival Cruise Line is searching for a replacement Operating Line Training Manager.  *Id.*

3.   CAM Team Attendance at Environmental Excellence EO3 Course

As discussed in prior CAM reports, the Company worked with the University of West Florida to develop a new Environmental Officer training course given at CSMART.  This course, called Environmental Excellence or EO3, is the third annual training provided to Environmental Officers.  It is delivered as part of a five-day program in the form of a hybrid training/conference event.  *See* CAM Second Annual Report at 32, 35-36.[54]  Recognizing the need to make Environmental Officer training more interactive and innovative, the program is designed to be challenge-based, rather than lecture-based.  *See id.* at 32.[55]  Environmental Officers attending these Environmental Excellence trainings are also required to attend the six-hour Operational Excellence course, held on the day following the Environmental Excellence course, discussed below.

---

[54] As discussed in prior CAM reports, going forward, these hybrid training/conference events will replace the Environmental Commitment Conferences, which were held in September 2018 and April 2019.  *See id.* at 35-36.

[55] New Environmental Officers will still be required to take the lecture-based EO1 and EO2 training courses before moving on to the Environmental Excellence EO3 course.

From August 12-16, 2019, the CAM Team and the TPA attended the first iteration of the Environmental Excellence training/conference event at CSMART.  There were approximately forty Environmental Officers in attendance from across the Company's brands, along with various training and compliance shoreside personnel.  External training consultants, including representatives from the University of West Florida, also attended.  The Environmental Officers were divided into five groups of 7-8 people who remained together throughout the week.  *See* Event Notes.

The five-day course consisted of twelve different "episode" exercises, each of which presented a mini-case study of a hypothetical environmental incident scenario using a variety of media tools, including videos and electronic reference materials designed to reflect the types of materials that an Environmental Officer would have access to on a ship.  In addition to the episodes, a limited number of more traditional lectures and presentations were given throughout the week on topics such as pollution prevention equipment and the new SeaEvent incident and near miss reporting system.  On the final day of the course, participants were required to take and pass a written assessment.  *See id.*

Each episode had its own theme, such as ballast water management or recordkeeping, and was typically divided into multiple phases.  Learning objectives were stated at the beginning and end of each episode.  For each phase, the instructors provided a discrete list of questions and gave the groups anywhere from 5-30 minutes to work on the answers.  During this time, the facilitators walked around the room to guide discussions and answer questions, often while role-playing as ship personnel.  At the conclusion of each phase, the groups presented their conclusions, and the instructors provided feedback.  Each episode wrapped up with a series of approximately 3-4 multiple-choice questions, referred to as "clicker test" questions, designed to

assess individual participants' knowledge of relevant topics.  Each participant was assigned an electronic "clicker" device that allowed them to submit their responses.  Each device was tied to a participant, such that their individual performance could be tracked throughout the week (although this performance did not factor into the final assessments).  *See id.*

Overall, participants expressed to the CAM Team that the interactive, challenge-based approach to the course was an improvement over the lecture-based EO1 and EO2 courses.  The CAM Team observed that this approach appeared to result in higher levels of engagement and created opportunities for participants to collaborate with and learn directly from one another. Many participants also expressed that the course helped to remind them that they are part of a larger team and support network, which was useful because the Environmental Officer position can feel isolated on the ships.  *See id.*  In that regard, the course was successful in bringing Environmental Officers together in a format in which they could interact, problem-solve, share best practices and experiences, and simply meet and hang out with one another.[56]

A number of areas for improvement in the course were evident, however.  These include issues related to:

- **Course Content:**

    o Some of the episodes appeared to risk creating confusion about the role of the Environmental Officer.  These episodes emphasized the need for an Environmental Officer to "take ownership" and go beyond his or her explicit duties, including taking the initiative to conduct onboard investigations in response to incidents.  Participants expressed confusion around this

---

[56] The CAM notes, however, that the hybrid training/conference format does not appear to deliver all of the value of the prior Environmental Commitment conferences.  One of the most impactful aspects of the Environmental Commitment conferences was the opportunity for Environmental Officers to directly provide feedback to shoreside personnel.  Such opportunities were more limited at the Environmental Excellence course.

messaging.[57]  Relatedly, many of the episodes and presentation materials used terms like "investigation" and "root cause" in ways that were not well defined. The CAM notes that these issues are further complicated by the fact that the Company has yet to develop clear or effective training or guidance for onboard investigations and root cause analysis.  *See supra* Part III.C;[58]

o   Some of the clicker test questions at the end of each episode prompted push-back from participants, who raised concerns that the questions:  (1) did not follow the goals or learning objectives of the episode, by asking about tangential topics that had not been covered;  (2) had confusing wording that was open to multiple interpretations;  (3) had potentially inaccurate answers (*e.g.*, incorrect information about certain ballast water discharge requirements); or (4) tested knowledge of obscure details, such as specific policy numbers, rather than assessing practical knowledge.  As noted above, the instructors did confirm that, while the clickers were linked to individual participants such that their performance on the questions could be tracked throughout the week, scores on these questions did not factor into the attendees' final assessments.

o   On the positive side, the discussions that resulted from challenges by participants to confusing or potentially inaccurate course content were received openly by the course leaders and highlighted areas for potential improvements to the program, as well as areas where the Company's existing

---

[57] For instance, some participants expressed that they did not think it was the role of an Environmental Officer to start an investigation as soon as they come across an incident, but rather to help make sure people are dealing with situations compliantly.  Some participants also expressed concern that taking on such a role could distract from their other duties or interfere with ship operations.  *See id.*

[58] At least one operating line lists Environmental Officer trainings, including Environmental Excellence, as the only currently available CSMART courses on investigations for seaboard personnel.  *See* Carnival Maritime Group, *Tracker: CSmart / external courses on investigation*, PCL_ECP000134650.  It is of some concern that Environmental Excellence is viewed as an "investigation" training course, at least in part, when the course does not appear to have been developed in consultation with the Incident Analysis Group or the external consultant, MTO Safety, that is developing the new Maritime Accident and Incident Investigation Course.  *See id.*

policies and procedures (*e.g.*, certain ballast water discharge requirements) might be unclear.

- **Course Development:**

  o The CAM Team was informed of challenges in the course development process and plans to seek to learn more about these challenges.

- **Course Facilitation:**

  o The CSMART personnel leading the episode sessions indicated that they received only minimal training in course facilitation (as opposed to course instruction), which is a critical skill given the challenge-based nature of the course and the unique demands on instructors to not only deliver course content but to also guide problem-solving discussions and role-play.

  o During the earlier episodes, there was some confusion among participants about how the episodes were supposed to run, including about individual roles and task assignments within the groups (such as scribe, presenter, researcher, etc.).

- **Course Assessment:**

  o There did not appear to be a clear plan in place for how to address a situation in which a participant did not pass the final assessment.

- **Course Logistics:**

  o The classroom appeared to be too small for the number of participants. This created a cramped, noisy, and often distracting atmosphere.

  o The individual group sizes (of approximately 7-8 people) also appeared to be too large given the nature of the exercises.

  o There were various IT issues that presented challenges (*e.g.*, bandwidth and Internet connectivity). The Company did have an IT support person on-site all week and was generally able to resolve IT issues quickly.

*See* Event Notes.

During a meeting with the TPA on the final day of the course, in which a number of the course's shortcomings were discussed, the Company indicated that it plans to make changes to the course for the next session scheduled for November 2019. *See id.* The CAM recognizes that the August 2019 course was the first run of a new (and ambitious) course and looks forward to

seeing how the Company addresses feedback from the CAM, TPA, instructors, and participants for future iterations of Environmental Excellence.

4.    CAM Team Attendance at Operational Excellence Course

As discussed in prior CAM Reports, the Company worked with the University of West Florida to redesign its Compliance to Commitment environmental training program, a six-hour course required for deck, technical, and environmental officers attending CSMART.  The revamped program was launched in January 2019 under the new title of Operational Excellence.  *See* CAM April 2019 Quarterly Report at 38 (discussing criticisms of and efforts to revamp the former Compliance to Commitment course); CAM Second Annual Report at 33-35.  The course consists of four moderator-led modules through which participants rotate, entitled: (1) Ownership; (2) Environment; (3) Ethics; and (4) Technology.  In general, the modules (with the exception of Technology, which is a more traditional lecture format) consist of brief videos dramatizing an environmental incident scenario, followed by question prompts, small group discussions, and the sharing of responses, best practices, challenges, questions, and other feedback.  *See id.*  Participants also have the opportunity to provide feedback via an online survey at the end of the course.

On August 17, 2019, the CAM Team attended the Operational Excellence course, following its attendance the preceding week at both the Environmental Excellence course and RAAS Maritime Retreat at CSMART.  The CAM Team had previously attended the Operational Excellence course on April 27, 2019.  *See* CAM Second Annual Report at 33-35 (discussing the CAM Team's observations from the April session).  The August course was substantially unchanged from the April course, and the CAM Team's observations are consistent with those previously made.  *See id.*  The course appears to be responsive to criticisms of the former

Compliance to Commitment course, to engage participants, and to prompt substantive discussions about compliance challenges and best practices. *See id.*

The CAM understands that the Company "intend[s] to modify some elements of [its] approach to training for the next iteration of the event" in response to participant feedback, including possible changes to course schedule, structure, content, and facilitation. *See* Operational Excellence Participant Survey Results Report 2019 Q2, at PCL_ECP00132962-63. The CAM Team plans to continue attending sessions of the Operational Excellence course and to report on any changes.

5.    <u>Operational Excellence Course Participant Feedback</u>

The Company continues to evaluate the Operational Excellence program and issue quarterly reports based on participant feedback (including both oral in-session feedback and written post-course survey feedback). Much of this feedback is not directed at the course itself, but at broader issues and challenges within the Company that participants identified in the course modules. *See* CAM Second Annual Report at 34-35 (discussing feedback from the first Operational Excellence quarterly report issued on April 11, 2019, based on over one-hundred-seventy sessions of the course held from January through March 2019). A key theme from the first quarterly report is "[p]erceptions of a blame culture and concerns about speaking up or challenging supervisors or other authorities combin[ing] to create an environment where errors or mistakes grow until there is a big issue/problem." *Id.* at 35 (quoting report). The report also identifies "[u]nderlying factors of budget/cost, staffing, workload, meeting structure, knowledge/skills, communication, rewards/bonus system, and transparency [which] influence a complex work environment and subsequent ability of staff to respond to emergencies and abnormal events." *Id.* (quoting report).

September 18, 2019

On July 21, 2019, the Company issued a second quarterly report, based on feedback from over two hundred sessions of the course held from April through July 2019.  *See* Operational Excellence Participant Feedback Report 2019 Q2; *see also* Operational Excellence Participant Survey Results Report 2019 Q2.  The observations in the second report are largely consistent with those in the first.  Again, the report notes that "blame culture, and in particular [the Company's] approach to mistakes (as opposed to violations) seems to be uppermost" in discussions about decision-making processes that lead to violations.  Operational Excellence Participant Feedback Report 2019 Q2 at PCL_ECP00132926.  The report further notes that participants "accept that there is a difference between no blame and no responsibility - there is a general consensus that deliberate violations should not be consequence free.  However, mistakes[] are not deliberate, and they feel there needs to be a substantive shift in [the Company's] approach - actively encouraging mistake reporting by ensuring people feel safe to admit making them."  *Id.*  Responses to certain clicker test questions asking how participants would respond to an incident also "implie[d] an urge to avoid blame above all other concerns."  *Id.* at PCL_ECP00132928.

In addition to blame culture, other common themes relate to financial pressure, support for the ships, and workload.  For example:

- **Financial Pressure.**  Participants made "remarks about budgets, financial pressure, and a prevailing perception of inappropriate bonuses based on cost savings - particularly for those in positions to affect decision making.  On the flipside, the perceived lack of appropriate, highly visible bonuses and rewards for choosing to do the right thing was considered a barrier to making positive choices."  *Id.* at PCL_ECP00132926;

- **Support for the Ships.**  Participants "regularly stated that pressure upon ship teams to find solutions within the constraints of poor logistic support, particularly spare parts, is likely to increase the likelihood of similar incidents reoccurring."  *Id.* at PCL_ECP00132926.  Participants also indicated that the "dominant perception of 'shore' attitude is that the information has been provided and therefore the support

September 18, 2019

requirement has been met, but there is little consideration given to how ships are to use the information, nor advice on the implications of new procedures and processes." *Id.* at PCL_ECP00132929.[59]  Regarding voyage planning in particular, "[t]he perceived lack of consistent support carries through into discussions about how [the Company] can ensure voyage briefings include the relevant information, along with the need for improved (yet simplified) checklists and a means of ensuring certainty prior to commencing a voyage that the ship has all the relevant, up to date environmental restrictions.  [Participants] also identif[ied] the need for better teamwork during the planning process, particularly information sharing and the encouragement of challenges."  Operational Excellence Participant Feedback Report 2019 Q2 at PCL_ECP00132929.  The report also notes that "[f]requent mentions of the need for better support by shore staff is somewhat offset by what [participants] see as an evident need for individuals to take more responsibility for their jobs, and to set a suitable example for others."  *Id.* at PCL_ECP00132931; and

- **Workload.**  Participants made "frequent mention of people being too busy with their own responsibilities to maintain awareness of the activities of others."  *Id.* at PCL_ECP00132929.  In addition, issues of "workload and fatigue management" were brought up in many sessions.  *See id.* at PCL_ECP00132930.

It appears that the Operational Excellence course has been successful in soliciting thoughtful participant feedback on compliance issues and challenges.  Much of this feedback is consistent with observations made by the CAM, TPA, and the Company's own assessments and reports.  *See, e.g.*, CAM Second Annual Report at 8, 51, 111-12.

As the CAM has observed, it remains to be seen how effectively the Company will respond to this feedback, or whether the new course will be successful in the goal of demonstrating that the Company is "ready to move past blame culture and autocracy towards a co-operative approach to change."  *See Operational Excellence: The Evolution of C2C* (Jan. 14, 2019), PCL_ECP00088071-76, at PCL_ECP00088073.  According to the most recent participant

---

[59] One example given is the ENV-1001-F1 spreadsheet, or "the Matrix," which lists environmental requirements.  The Matrix "is described as unclear and not necessarily complete . . . and information can be missed if the user is unfamiliar with it."  *Id.*  This spreadsheet approach "exemplifies the participants' perception of the nature of support provided to seagoers.  A spreadsheet is easy to enter data into, but it's really not the best way to present information to a user."  *Id.*; *see also* CAM Second Annual Report at 37-39 (discussing the Matrix, including criticisms).

feedback report, "[w]hat is very clear from discussions with participants, course feedback and observation is that there is a genuine hope for measurable change based on what they have provided, but concern is slowly growing that the time they have been required to spend at the event is having no effect."  Operational Excellence Participant Feedback Report 2019 Q2 at PCL_ECP00132925.  Indeed, "[t]o date, the participants have not seen any acknowledgement of specific feedback items, and there are no publicized current or intended actions that are based on, or following consideration of, what they have provided.  As the year progresses this may have an increasingly negative impact on the perception of the event, particularly its overall worth."  Operational Excellence Participant Survey Results Report 2019 Q2 at PCL_ ECP00132959.  These observations indicate that, until the Company addresses its broader corporate leadership and culture issues, the course may be limited in its ability to achieve its objectives.

### 6.   Ongoing CAM Team Examination

The CAM Team will continue to monitor and assess the Company's environmental compliance training, including the Environmental Excellence and Operational Excellence CSMART courses.  The CAM Team also plans to examine additional training correlated to ECP Year Three areas of focus, including:  (1) IT resources training; (2) investigations and root cause analysis training; (3) training for specific jobs or personnel (both officers and ratings); (4) training for the Company's Global Talent Partner recruits; and (5) compliance training for corporate leadership, including the Board of Directors.  *See* CAM Third Annual Work Plan at 14.

### F.   Implementation of Enumerated ECP Requirements

The CAM Team continues to monitor the Company's implementation of enumerated ECP requirements.  The majority of these requirements and associated deadlines took effect during ECP Years One and Two.  *See* CAM First Annual Report at 13-14 and Appendix D

(assessing the Company's efforts to meet enumerated ECP Year One requirements); CAM September 2018 Quarterly Report at 15-16 (assessing the Company's efforts to meet enumerated ECP Year Two requirements).

Two additional requirements apply to the period covered by this Report.  The Company was required to develop and submit to the CAM and the Interested Parties a response to the TPA Second Annual Report within sixty days of the report's filing, by September 1, 2019.  *See* ECP § VIII.E.3.  The Company filed this document on July 16, 2019, ahead of the required deadline, in order to provide the Interested Parties, CAM, and the Court with its response for the July 19, 2019, Status Conference.  *See Response by Princess Cruise Lines, Ltd. To Third Party Auditor Year Two Annual Report* (July 16, 2019), Dkt. No. 151.

The Company is also required to complete, by October 18, 2019, a trend analysis of "all Major Non-Conformities, significant Non-Conformities; recurring minor Non-Conformities and Observations," as well as to "identify corrective actions taken or recommended."  ECP § III.F.4.  The Company must submit this trend analysis to the Interested Parties and the CAM by November 1, 2019.  *Id.*  The CAM Team will review and assess this analysis as required by the ECP.  *See* ECP § VI.F.4.  As part of this work, the CAM Team intends to, among other things: (1) assess the Company's trend analysis and consider the need to conduct its own trend analysis and benchmarking; (2) consider whether that analysis reveals issues with respect to personnel, policies, corporate governance, training, systems, or equipment; (3) assess whether a continual improvement process is in place to address audit findings and trend analyses; and (4) determine whether the Company's internal audit process is sufficient to accomplish ECP objectives.  *See* Third Annual Work Plan at 8.

September 18, 2019

### G.      Initiatives Beyond Enumerated ECP Requirements

The Company continues to develop and implement initiatives that go beyond the enumerated ECP requirements.  Many of these initiatives have been discussed in prior CAM reports.  *See* CAM First Annual Report at 4, 19-21 and Appendix B; CAM September 2018 Quarterly Report at 16-17; CAM December 2018 Quarterly Report at 16-18; CAM April 2019 Quarterly Report at 26-29; CAM Second Annual Report at 31-43.  Notable recent developments are summarized below.

####   1.      IT Initiatives

The Company's efforts to develop and implement IT tools in support of compliance is an ongoing area of focus for the CAM Team.  *See* CAM Second Annual Report at 36-39, 110. Throughout the probationary period, the CAM has observed that the Company's IT resources are inefficient, non-centralized (with different systems in use by different brands), and often described by Company personnel as "antiquated," creating compliance challenges for the Company that include:  (1) connectivity issues between ships and shoreside, including bandwidth issues on the ships making it difficult to access and use the Global HESS system and other IT systems and tools; and (2) difficulty integrating and standardizing processes, including reporting, tracking, and data analysis of incidents; reporting and tracking of shipboard trainings; and ordering and delivery of spare parts.  *See* TPA Second Annual Report at 22; *see also* Employee Interview Notes.  The Company has recognized the need for more centralized, up-to-date, and harmonized technological capabilities and more data-driven strategies.  It has launched a number of IT initiatives, including:

- **SeaEvent.**  SeaEvent is the Company's new centralized, corporate-wide incident and near miss reporting and case management system.  *See* CAM Second Annual Report at 36.  As of July 2019, approximately seventy ships across the Company's brands have SeaEvent onboard.  *See* July 2019 Probation Supervision Report, Attachment 3,

at 11.  The Company expects for the system to be rolled out to all ships by the end of 2019.  *Id.*  SeaEvent is designed to improve the consistency of the Company's incident reporting, and enable better fleetwide information-sharing and tracking, trending, and analysis of incident data.[60]  With SeaEvent, shipboard personnel with authority to make incident reports (*e.g.*, Environmental and Security Officers) can report an incident electronically, which is then sent to senior shipboard leadership (*e.g.*, the Captain) for review, feedback, and approval.  Once approved, the incident is sent to a shoreside office for review, feedback, and approval.  *See* Demonstration Notes.  The SeaEvent user interface is template-driven, with a series of required inputs and fields (usually with a discrete menu of options, known as "libraries," for the user to select from) that vary based on the incident type.  *See id.*  There are limited options for narrative or free text responses, in order to promote consistency across reports and enable better data analysis.  *Id.*  The platform includes inputs for root cause analysis, corrective actions, and preventive actions.  *Id.*  Critically, these functions will need to be aligned with the procedures and processes, including root cause analysis methodology, that are finalized and adopted by the Incident Analysis Group;

- **GLADIS.**  GLADIS is a single learning management system to deploy and track training, including environmental training.  *See* CAM Second Annual Report at 83.  As of July 2019, all Company ships have GLADIS onboard, and the operating lines are in various stages of making it available to all crew members.  *See* Carnival Corp., *MPD CAM ECP Request Feedback* (July 12, 2019), at 3.  Related IT training tools include:

  o **CrewTube.**  CrewTube is an application for smart phones and tablets that allows crew members to access HESS information and complete some HESS trainings before joining a ship.  *See* July 2019 Probation Supervision Report, Attachment 3, at 10.  According to the Company, its Global Talent Partners "promote and encourage use of CrewTube."  *Id.*[61]

  o **Drill App.**  The Company is developing an offline, tablet-based application to "assess training and drills, using a competency based assessment approach for either individuals or teams."  *Id.* at 13; Carnival Corp., *MPD CAM ECP Request Feedback* (July 12, 2019), at 4; and

  o **Instructor Led Training Attendance App.**  The Company is in the "final stages" of developing an offline scanning application that will be able to scan

---

[60] On July 2, 2019 and August 22, 2019, the CAM Team received instructional demonstrations from the Company via WebEx of the SeaEvent software.  The CAM Team has been granted access to the system and plans to monitor and report on the system's functionality and effectiveness during its roll-out and implementation.

[61] The CAM has learned of concerns related to whether the use of CrewTube for required training may conflict with obligations to compensate employees for time spent on such training.  This issue will be examined further.

crew member IDs to assist in recording attendance at onboard trainings. July 2019 Probation Supervision Report, Attachment 3, at 13. The app "will be interfaced with GLADIS to automatically update a crew member's training file." *Id.* The recordkeeping burden associated with having to manually record and track onboard training attendance has been a frequent complaint to the CAM Team—especially from Environmental Officers. *See* Employee Interview Notes. If successfully implemented, this app could reduce the administrative workload of Environmental Officers and other officers who deliver onboard trainings.

- **Marine Asset Strategies Transformation ("MAST").** Under the MAST initiative, the Company expects to develop a new, single planned maintenance and spare parts management system during the fourth quarter of 2019. *See* July 2019 Probation Supervision Report, Attachment 3, at 11. The new system will be designed, among other things, to improve the Company's ability to efficiently deliver spare parts to ships that are needed to keep onboard pollution prevention equipment in working order. *See* CAM Second Annual Report at 83. Its functionality would include allowing the Company to monitor the location and status of its spare parts inventory across the entire fleet. *See id.*; MAST Update (Nov. 13, 2018), PCL_ECP00083937-40; July 2019 Probation Supervision Report, Attachment 3, at 11; and

- **Voyage Planning Software.** The Company has executed a contract with a vendor to develop new software that could help address voyage planning challenges, which often relate to misunderstandings or miscommunications as to the location of environmental boundary lines and/or the applicable requirements within a set of environmental boundary lines. *See* CAM Second Annual Report at 37-39; July 2019 Probation Supervision Report, Attachment 3, at 11. The new software would, among other things, aim to integrate information about environmental boundaries and standards—including the Company's own requirements, which may be more stringent than those set by regulatory bodies—into the electronic navigational charts used by ships. *See* CAM Second Annual Report at 37. This would replace "the WorldWide Cruising Standards spreadsheet [*i.e.*, the Matrix] approach with a chart-based solution." July 2019 Probation Supervision Report, Attachment 3, at 11. Now that a contract has been executed, the Company reports that, as of July 2019, "it is expected that up to six months of software development time and 2-3 months of testing time will be needed before a decision to adopt and deploy the solution will be taken." *Id.* Full fleet rollout and transition is expected by mid- to late 2020. *See id.* The CAM Team will continue to monitor the development and implementation of this software, as well as the Company's general efforts to improve its voyage planning process and address workplace and staffing issues that may contribute to voyage planning-related incidents.

As part of its monitoring efforts, the CAM Team plans to attend the Semi-Annual

Company's Global Maritime IT Leadership Forum to be held from October 7-11, 2019, in

Hamburg, Germany.  The forum brings together IT and business leaders from across the Company to discuss various IT-related topics, including project updates and roadmaps, IT needs, and opportunities for collaboration and synergy.  The CAM Team also plans to attend the Data Management Working Group session of the Company's Corporate Technical Days event to be held from September 23-27, 2019 in Southampton, UK.  This event consists of a series of meetings and workshops for the Company's technical working groups, with sessions covering topics such as data management, waste management, and emerging technologies.  *See Carnival Technical Days Overview*.

2.   Fleet Environmental Officer Program

The Company continues to work on developing a "fleet environmental compliance trainer officer program."  *See* CAM Second Annual Report at 39-40; July 2019 Probation Supervision Report, Attachment 3, at 5.  This program "will provide training, coaching, and mentoring to environmental officers as well as environmental training to employees of the Deck, Technical, and Hotel departments."  *Id.*  The Company reports that recruitment of a Director-level employee to run the program will begin in September 2019.  *Id.*

If successfully implemented and supported, a Fleet Environmental Officer program could help address the ECP obligation to have a sufficient number of Environmental Officers to meet fleet needs, *see* ECP § IV.A.1, and provide the advantage of having a group of Fleet Environmental Officers who could provide support, consistency, and oversight to the more than two hundred Environmental Officers across the Company.  The program could also provide broader career opportunities for individuals in the unique Environmental Officer role.  *See* CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer

position, including lack of a clear career path).  The CAM Team will continue to monitor and report on the development and implementation of this program.

### 3. Other Initiatives

The Company has instituted a number of other initiatives related to environmental compliance and sustainability, ranging from policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See* CAM Second Annual Report at 31-43 and Appendix A.  The CAM Team will continue to monitor the Company's initiatives, including examining whether the number of disparate initiatives are:  well-coordinated; developed with sufficient consideration of the additional strain or workload they put on the ships; and based on accurate understandings of the root causes of the issue(s) they are designed to address.

### H. Environmental and ECP Violations

As in ECP Years One and Two, the Company continues to violate environmental laws and the ECP, even while efforts aimed at compliance are underway.  As emphasized in prior CAM reports, while these incidents are concerning, the Company's deeper and more pressing barriers to compliance relate not to individual incidents on ships, but to the Company's broader corporate leadership and culture issues.  *See* CAM Second Annual Report at 94.

### 1. Significant Incidents

#### i. *Update on* Westerdam *Grey Water Discharge in Glacier Bay, Alaska*

As described in prior CAM reports, on September 11, 2018, the Holland America Line *Westerdam* discharged approximately eighty-five cubic meters of grey water inside of Glacier Bay National Park and Preserve, Alaska, in violation of federal and state law.  *See* CAM December 2018 Quarterly Report at 9-10 (discussing the incident); CAM Second Annual Report at 95-96 (same).  On August 12, 2019, the Company notified the Interested Parties, CAM, and TPA that it signed a settlement agreement with the Alaska Department of Law to resolve the

September 18, 2019

matter for a penalty of $17,653.  *See U.S. v. Princess Cruise Lines Ltd. - Special Condition No. 13 (12 AUG 2019)* (Aug. 12, 2019); *In the Matter of: State of Alaska v. Holland America Line*, Settlement Agreement, ADEC Enforcement Tracking No. 18-R1057-40-0001 (Aug. 8. 2019), PCL_ECP00129986-93; *see also Notice Pursuant to Special Condition No. 13(e) -- U.S. v. Princess Cruise Lines, Ltd. No. 16-cr-20897 (S.D. Fla.)* (July 18, 2019) (providing notification to the Interested Parties under Special Condition of Probation 13(e)[62] of intent to sign the proposed settlement agreement); Letter from Attorney General, State of Alaska, to Senior Director for Environmental Operations, Holland America Line, *Re: Proposed Settlement of 2018 Unauthorized Graywater Discharge by* M/S *Westerdam, CATS Enforcement No. 18-R1057-40-0001* (July 2, 2019), PCL_ECP00122493-98; Letter from Holland America Line to Assistant Attorney General, State of Alaska, *Re: Notice of Environmental Compliance Plan* (July 16, 2019).  Previously, the Company paid a fine of $280 to the United States Department of Interior National Park Service to resolve an alleged federal violation arising out of the same incident. *See* Letter from Law Enforcement Officer, Glacier Bay National Park, to Holland America Group, *Re: Federal Violation Notice #6003836* (Sept. 28, 2018), PCL_ECP00082657-58; *03-20-201[9] Quarterly Tracking Chart (2019 Q1)* (Mar. 20, 2019), Dkt. No. 99-1, at 53.

In addition to the illegal discharge, the Company appears to have committed an additional violation by failing to initially report the incident to the United States Coast Guard.  *See* CAM Second Annual Report at 96.  Federal regulations require that "[i]n the event of an emergency,

---

[62] The revised Special Condition of Probation 13(e) provides that the Company may not resolve any enforcement action with a United States federal or state regulatory authority related to an incident covered by Special Condition of Probation 13 until the Company:  (i) informs the Interested Parties; and (ii) informs the regulatory authority that Carnival Corp. and its related entities are operating under a Court Supervised ECP in this case in the Southern District of Florida, including a reference to the case number.  *See* Dkt. No. 134, at 13 (Ex. B).

accidental or other exceptional discharge of sewage or graywater . . . an immediate notification of the discharge shall be made to the [United States Coast Guard Captain of the Port]." 33 C.F.R. § 159.315(d). As part of the Probation Agreement, the Company agreed to "reorganize and enhance existing policies in the Company's Environmental Management System regarding how violations of Marine Environmental Protection Requirements, and United States federal and state laws, including the Certain Alaska Cruise Ship Operations statute, are reported to external regulators in the United States and to each vessel's flag state and recognized organization." Dkt. No. 134, at 5; *see also Interim Progress Report on Probation Settlement Goals* (July 1, 2019), at 10; *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019), at 6. As discussed below, on July 31, 2019, the Company submitted its new Proposed Unified Regulatory Reporting Policy for review to the Interested Parties, CAM, and TPA. *See infra*, Part H.2.

On August 5, 2019, the Company made a presentation to the United States Attorney's Office for the District of Alaska regarding the *Westerdam* incident. *See Holland America Line | MS Westerdam September 2018 Graywater Discharge, Presentation to USAO* (Aug. 5, 2019), PCL_ECP00131264-81. The CAM Team will continue to monitor and report on any further action by the federal government.[63]

---

[63] On August 13, 2019, DOJ sent a letter to the Company regarding "an apparent non-compliance with federal law" concerning the electronic Sewage and Graywater Record Book in use on the *Westerdam* at the time of the incident, as well as on other "Holland America cruise ships, and perhaps other cruise lines owned and operated by Carnival." *See Re: United States v. Princess (Case No. 1:16-cr-20897)* (Aug. 13, 2019), at 1. According to the letter, a hard-copy, not electronic, log is required under the Certain Alaskan Cruise Ships Operation Act ("CACSO"), 33 U.S.C. 1901. *See id.* On August 27, 2019, the Company responded, noting that it is "currently compiling a list" of when its ships operating in Alaska started using electronic recordkeeping systems. *See RE: United States v. Princess (Case No. 1:16-cr-20897)* (Aug. 27, 2019), at 1. The Company also stated that around August 8, 2019, it "issued a directive for all ships covered by

The CAM notes that the Company has reported other prohibited discharges in Alaskan waters on Covered Vessels during ECP Years Two and Three, including:

- A discharge of approximately 2.3 cubic meters of recreational (Jacuzzi) water in Glacier Bay, Alaska, by the *Ruby Princess* in violation of the United States Environmental Protection Agency ("EPA") Vessel General Permit;

- A discharge of less than one quart of lubricating grease into Taiya Inlet near Skagway, Alaska, by the *Royal Princess* in violation of federal regulations.  The Company was issued a letter of warning in lieu of a civil penalty from the United States Coast Guard.  *See* Letter to Princess Cruises from United States Coast Guard, Chief, Incident Management, *Warning in Lieu of Civil Penalty* (June 17, 2019), PCL_ECP00124094;

- A discharge of approximately nine cubic meters of recreational (Jacuzzi) water in Alaskan waters by the *Coral Princess* in violation of the EPA VGP.  The Incident Analysis Group is investigating the incident; and

- A discharge of approximately nine liters of hydraulic oil while underway to Juneau, Alaska, by the *Westerdam* in apparent violation of federal regulations.  The United States Coast Guard issued a Notification of Federal Interest.

*See* Carnival Corp. HESS Weekly Flash Reports and Flash Report Follow-Up Productions;

*2019.09.11 Quarterly Tracking Chart – Q3 2019* (Sept. 11, 2019).

---

CACSO to print and sign the electronic [logbook] entries each day in order to create a hard copy Sewage and Graywater Record Book that will be maintained on the vessel and available for inspection, along with the electronic entries that will continue to be stored and available in the [electronic] record keeping system."  *Id.*; *see also Re: Sewage and Graywater Record Books for Alaska* (Sept. 4, 2019) (providing copies of and additional details about the relevant directives). DOJ noted "concern[s] that such an approach will not comply with the letter or intent of the law."  *See Re: United States v. Princess (Case No. 1:16-cr-20897)* (Sept. 3, 2019), at 2.  DOJ and the Company have also exchanged correspondence regarding a September 4, 2019, meeting between Holland America Group and United States Coast Guard Sector Juneau for which a proposed agenda item was "implementation of paper sewage and gray water logs . . . [and] reluctance to develop totally paper-based log."  *See id.*; *Re: Meeting Between Holland America Group and U.S. Coast Guard Sector Juneau — United States v. Princess Cruise Lines, Ltd., No. 1:16-cr-20897 (S.D. Fla.)* (Sept. 17, 2019).  The CAM Team will continue to monitor this issue.

September 18, 2019

ii.     *Falsification of Planned Maintenance System Records*

As discussed above, an investigation conducted by Holland America Group and approved by the Incident Analysis Group revealed apparent falsifications of Planned Maintenance System records over a period of several years on two Covered Vessels:  the *Coral Princess* and the *Crown Princess*.  *See supra*, Part III.C.4.  These issues are similar to the recordkeeping falsification incident on the *Westerdam* that occurred in ECP Year Two and that attracted significant attention from the CAM, TPA, and Government.  *See id.*  These incidents indicate that the Company may have a systemic problem with the completeness and integrity of Planned Maintenance System records across multiple ships.  *See id.*  However, the investigation report does not explore this possibility, or the potential role of broader concerns that may play a role, including:  workload and time pressure; insufficient shoreside support; insufficient staffing; inadequate training; and lack of a "speak up" culture.  *See id.*

iii.     *Falsification of Training Records*

On June 14, 2019, the Company reported the potential falsification of training records by an Environmental Officer on the *Carnival Inspiration*.  *See Notification of Allegations* (June 14, 2019).[64]  The Company initially investigated this incident through the Incident Analysis Group, with assistance from Carnival Cruise Line's Operating Line Training Manager.  *See U.S. v. Princess Cruise Lines. Ltd. — 1:16-cr-20897: Production of Documents Related to Recordkeeping Allegation* (Aug. 30, 2019).  Based on those preliminary results, the Company requested that its outside counsel conduct a second, independent investigation.  *Id.*

---

[64] The same notification also included a report of the potential falsification of training records on the *Carnival Imagination*.  *See id.*  The CAM understands that this incident is still under investigation.

September 18, 2019

On August 30, 2019, the Company provided DOJ and the CAM with the investigation

memorandum prepared by its outside counsel.  *See Investigation into Potential Falsification of*

*Training Records Aboard the* Carnival Inspiration (Aug. 21, 2019), PCL_DOJ_00005946-52

("Investigation Memo").  The Investigation Memo identifies "three kinds of irregularities in the

training records":

- **Inaccurate entries in the ship's computerized database, known as the Crew Personnel System, that tracks the completion of trainings**.  Five crew members were entered into the system as having received certain training "even though they had not received those trainings and even though the signature blocks on the paper records for those trainings were blank."  *Id.* at PCL_DOJ_00005947.  The Environmental Officer acknowledged making the entries but explained them as "innocent mistakes for which he took full responsibility."  *Id.* at PCL_DOJ_00005948 (citations omitted).

- **Forged signatures on training attendance sheets**.  Five signatures of crew members on paper training attendance sheets were identified where the crew member "who purportedly attended the training session and whose purported signature appears on the record *denies* having taken the training, and *denies* that the signature is his."  *Id.* (emphasis in original).  The Environmental Officer "stated that he had no idea how the signatures came to appear on the training records."  *Id.* at PCL_DOJ_00005949 (citations omitted).[65]  The Investigation Memo states that "[o]n consideration of all the evidence, we believe that [the Environmental Officer] signed the crew members' names to the training records.  He had a motive to do so – he wanted to appear to be a competent Environmental Officer who gave trainings to the crew members."  *Id.* However, the Investigation Memo does not cite any specific support, such as interview memoranda, for this motive.  *See id.*

- **Incorrect dating of training attendance sheets.**  One crew member signed an attendance sheet, presented to her by the Environmental Officer, that was back-dated to indicate that the training took place within a required seven-day timed period, when in fact the training took place outside of this period.  *Id.* at 5.  The Investigation

---

[65] Further, the investigation found that the Facilities Maintenance Manager, who delivers a certain training in conjunction with the Environmental Officer, claimed that his signature on one attendance sheet was "not authentic."  *Id.* (citations omitted).  The Investigation Memo does not specifically address whether the Environmental Officer acknowledged or denied falsifying this signature.  *See id.*

September 18, 2019

Memo does not specifically address whether the Environmental Officer acknowledged or denied this allegation.  *See id.*

The Investigation Memo states that the investigators "considered the reasons that may have led to [the Environmental Officer's] behavior," in particular "whether he may have been overworking during his time on the *Carnival Inspiration*, or under great pressure to do the trainings."  *Id.* at PCL_DOJ_00005950.  It concludes that "[n]either possibility accounts for [the Environmental Officer's] behavior,"  for the following reasons:  (1) the Environmental Officer "den[ied] being overworked or feeling great pressure;" (2) many of the trainings at issue had no imminent deadline by which they needed to be delivered; (3) the Environmental Officer, who was on his first contract, never reached out to the ship's regular Environmental Officer to ask questions about training or recordkeeping responsibilities; (4) the regular Environmental Officer reported that the new Environmental Officer had a "relaxed" demeanor when she returned from vacation and had a week-long overlapping handover period with him onboard.  *See id.* (citations omitted).  According to the investigators, the Environmental Officer "appears not to have appreciated how important it is that training sessions be given, that records be accurately kept, and that signatures be authentic.  Because he has denied the activity that the evidence shows he engaged in, forgery, it will be difficult, in our opinion, to impress upon him the seriousness of his misbehavior such that the Company can be confident that it will not recur."  *Id.* at PCL_DOJ_00005951.

The CAM Team will continue to follow this matter and the Company's response to the investigation's findings.

### iv.    *Other Environmental Violations*

The Company had numerous other violations of environmental laws and/or the ECP during the first quarter of ECP Year Three, including violations related to air emissions,

discharges to the sea,[66] Environmental Control System program requirements, pollution

prevention equipment maintenance and operation, and recordkeeping.[67]  The CAM Team

continues to track and assess issues associated with these violations and report to the Interested

Parties as required by the ECP.

2.      Unified Regulatory Reporting Policy

Part VI of the Probation Agreement requires the Company to:

[R]eorganize and enhance existing policies in the Company's Environmental
Management System regarding how violations of Marine Environmental Protection
Requirements, and United States federal and state laws, including the Certain Alaska
Cruise Ship Operations statute, are reported to external regulators in the United States
and to each vessel's flag state and recognized organization.  The new policy will govern
the reporting requirements for discharges according to United States federal and state
laws[.]

Dkt No. 134, at 5.  As discussed above, this requirement of the Probation Agreement was

prompted in part by the Company's failure to immediately notify the United States Coast Guard

of the illegal discharge of grey water in Alaskan waters by the Holland America Line *Westerdam*

in September 2018.  *See supra*, Part III.H.1.i.

Consistent with the Probation Agreement, on July 31, 2019, the Company submitted its

Proposed Unified Regulatory Reporting Policy for review to the Interested Parties, CAM, and

TPA.  *See supra*, Part I.B.1.  The Company's submission included four documents:

- **[Proposed] COM-1103 ("United States Environmental Reporting
  Requirements")**:  an overarching policy with the stated objective of "instruct[ing]

---

[66] These include a discharge of approximately one hundred cubic meters of ballast water from
the *Carnival Dream* in Mexican waters without completing a proper ballast exchange, in
violation of international law.  *See* Carnival Corp. HESS Weekly Flash Report (July 30, 2019).
The Incident Analysis Group is investigating the incident.  *See 2019.09.11 Quarterly Tracking
Chart – Q3 2019* (Sept. 11, 2019).

[67] These include a potential falsification of signatures in the Hazardous Waste Log on the
*Caribbean Princess*.  The investigation report is under review by the Incident Analysis Group
and Holland America Group.  *See id*.

September 18, 2019

how environmental incidents that occur within United States (U.S.) waters must be reported to U.S. federal authorities, state authorities, and/or flag state authorities per regulatory requirements and the conditions of probation."  PCL_ECP00124889;

- **[Proposed] COM-1103-A1 ("United States Environmental Reporting Requirements Details"):**  a chart exhibit to the COM-1103 policy providing United States environmental reporting requirements guidance to ships by type of incident and location, including information about:  (1) who an incident must be reported to (*e.g.*, U.S. Coast Guard Sector Office, EPA Regional Office); (2) what type of information must be reported; and (3) additional comments, such as the timeframe and required manner of reporting.  *See* PCL_ECP00124891-928;

- **Regulatory Reporting Requirements Matrix ("Vessel External Reporting Policy Sources"):**  a chart with information that significantly overlaps with the information in the COM-1103-A1 chart, but that includes additional information about:  (1) the source of the reporting requirement (*e.g.*, citations to statutes and regulations); and (2) who should report (*e.g.*, master/Captain, owner or operator, person in charge).  *See* PCL_ECP00124929-53.  This document is not intended to be incorporated into the final policy, but is underlying work product that served as the basis for the draft policy documents.  *See* PCL_ECP00124954; and

- **[Proposed] Flag State Reporting Requirements Matrix:**  a chart to be incorporated into the Company's separate marine casualty reporting procedure (COM-1102 *Flag and Port State Marine Casualty Reporting Requirements*) that includes environmental and other marine casualty flag state reporting requirements.  *See* PCL_ECP00124881-88.  This document is intended to be incorporated into COM-1103 by reference only "because flag state reporting requirements for environmental and other marine casualty [events] are generally applicable worldwide (not limited to United States waters).  Therefore, flag state reporting requirements will remain in a separate, dedicated reporting procedure [*i.e.*, COM-1102]."  PCL_ECP00124955.

*See* Proposed Unified Regulatory Reporting Policy.

On August 23, 2019, the CAM and TPA provided joint comments on the Proposed Unified Regulatory Reporting Policy submission.  *See RE: U.S. v. Princess Cruise Lines, Ltd. – 1:16-cr-20897 - Unified Regulatory Reporting Policy* (Aug. 23, 2019).  Overall, the joint comments reflected a concern that the Company's approach of creating a new, additive policy and appendices instead of creating a "unified" policy may create confusion in the practical implementation of the policies.  The joint comments provided suggestions and considerations for incorporating the information in the Proposed Unified Regulatory Reporting Policy into the

September 18, 2019

Company's existing reporting policies and procedures, as well as integrating this information with the Company's incident reporting and tracking IT tools. *See id.* The comments also identified gaps in the existing and proposed reporting procedures, such as steps for internal shipboard reporting or external shoreside reporting, as well as certain ambiguous terms that might not provide sufficiently clear guidance to the ships. *See id.*

On September 10, 2019, the CAM Team and the Company, at the Company's request, held a call to discuss the Company's response to joint CAM/TPA comments. The Company indicated that in some areas, it was making changes in response to the comments, such as clarifying certain ambiguous terms; however, in other areas, it was declining to do so, such as deciding to remain with a stand-alone policy rather a single unified policy. The Company explained the rationale behind its chosen approaches. *See* Call Notes.

The final policy is required to go into effect by September 22, 2019. *See* Dkt No. 134, at 5. The CAM Team will continue to monitor the development, finalization, and implementation of the new policy, including any associated training.

### 3. Environmental Incident Data Collection

The CAM Team continues to collect and track incidents reported through formal and informal reporting mechanisms, including audit findings, Flash Reports, Environmental Open (Hotline) Reports, Special Condition 13 Reports required under the Probation Agreement, notices to the Office of Probation, and other notifications. *See* Third Annual Work Plan at 7.

As part of this effort, the CAM Team continues to identify and track numerous incidents on Covered Vessels falling under the general categories of recurrent incidents identified by the CAM Team. The recurrent incident categories for ECP Year Three include: air emissions, bilge leaks and overflows; discharges (including oil, grey water, black water (sewage), ballast water,

recreational (*e.g.*, pool/Jacuzzi) water, food waste, chemicals, and garbage); Environmental

Control System issues, such as missing or broken seals; pollution prevention equipment issues;

recordkeeping issues; shoreside support issues, such as concerns related to workload/staffing, IT

systems, waste vendors, spare parts, or policies and procedures; training; voyage planning; and

workplace/culture issues, such as concerns related to blame culture, retaliation, discrimination,

harassment or bullying, or unsafe working conditions.

While the CAM Team continues to track and analyze incident report data, this data is of

inherently limited value and is not presented in this Report.  For instance, apparent trends in the

data may reflect trends in rates of reporting rather than trends in actual incident occurrences.

Further, as the Court has observed, focusing on individual incidents on ships can distract from

the most pressing barriers to compliance, which are the Company's broader corporate leadership

and culture issues.  *See, e.g.*, Status Conference Tr. at 5-6 (Apr. 10, 2019).

## I.      Other Ongoing CAM Areas of Focus

In addition to the issues discussed in this Report, the CAM continues to examine the

following areas of interest and intends to report on these issues in future reports:

- **Personnel**.  This includes issues related to the Company's efforts regarding:
  (1) relationships with its Global Talent Partners, including specific Global Talent
  Partner operations and the Company's stated intent to engage in efforts at diversity
  and inclusion, *see Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 6-7;
  (2) development and implementation of the Fleet Environmental Officer program;
  and (3) hiring, training (including development of competency frameworks),
  workload, and employment conditions of officer and non-officer crew, including
  Environmental Officers, engineering officers, and ratings.  *See* Third Annual Work
  Plan at 15;

- **Support for Operations and Compliance**.  This includes issues related to the
  Company's support for:  (1) the internal RAAS audit function; (2) IT platforms; and
  (3) shoreside support for ships, including the extent to which shoreside has adequate
  resources to provide the support needed by the ships.  *See id.* at 11-12.  It also
  includes issues related to the Company's efforts to:  (1) perform environmental
  support and special project ship visits under the HMP-1503 procedure implemented

September 18, 2019

in January 2019, *see* July 2019 Probation Supervision Report, Attachment 3, at 5; (2) "address HESS operational expenditures" in its annual planning processes, *see Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 5-6; (3) improve its HESS policies and procedures, including its efforts to hire a professional policy writer, *see Response by Princess Cruise Lines, Ltd. To Third Party Auditor Year Two Annual Report* (July 16, 2019), Dkt. No. 151, at 1-3; (4) work with vendors to "explore the development of a review of recordkeeping practices" and pursue opportunities "to streamline the recordkeeping process onboard and introduce efficiencies that will make compliance easier to achieve and reduce crew members' workload," *id.* at 4; and (5) conduct a "full review analysis of the Reliability, Availability and Maintainability of all shipboard pollution prevention equipment using a qualified third party vendor." *Id.* at 5; and

- **Company Response to Internal and External Findings**.  This includes the Company's response to findings from the CAM, TPA, RAAS, third party consultants, and other internal and external studies and assessments, such as the DNV GL investigations review; the Propel Environmental Compliance Culture Survey and Assessment; the ECP-mandated Fleet Engineering Survey; the human factors study and workload analysis commissioned by Holland America Group; and the participant feedback surveys and reports from the Operational Excellence CSMART training course.  *See* CAM Second Annual Report at 111-12; July 2019 Probation Supervision Report, Attachment 3, at 11, 14.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor

September 18, 2019