## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 16-20897-CR-SEITZ

**UNITED STATES OF AMERICA**

      **v.**

**PRINCESS CRUISE LINES, LTD.,**

      **Defendant.**

_____/

### QUARTERLY REPORT

### OF THE COURT APPOINTED MONITOR (DECEMBER 2019)

I.   **Introduction** ................................................................................................. 1

   A. Executive Summary ...................................................................................... 1
      1.  Roadmap .......................................................................................... 1
      2.  Summary .......................................................................................... 3

   B. Court Oversight ........................................................................................... 11
      1.  Probation Agreement Deadlines ....................................................... 11
      2.  October 2, 2019, Status Conference ................................................. 17
      3.  October 31, 2019, Order re: December 19, 2019, Status Conference ..... 18
      4.  Metrics on Environmental Compliance .............................................. 20

II.  **CAM Methodology and Activities** .............................................................. 22

   A. CAM Team Activities During the Second Quarter of ECP Year Three .......... 22

   B. Oversight of the External Audit Function (TPA) ........................................... 25

   C. Oversight of the Internal Audit Function (RAAS) ......................................... 26

December 18, 2019

**III.** **Updates on ECP Year Three Areas of Focus and Company Capabilities
to Meet ECP Objectives** ...................................................................... 27

   A. Culture Survey and Assessment ........................................................ 27
      1. Background ................................................................................ 27
      2. Company Retention of Outside Consultant .............................. 29
      3. Operating Line Presentations .................................................. 30
      4. Ongoing CAM Team Examination ............................................ 31

   B. Corporate Compliance Structure ...................................................... 31
      1. Background ................................................................................ 31
      2. Updated Final Action Plan and Boards' Statement on Compliance ........................ 33
      3. Financial Plan Supplements ..................................................... 35
      4. Ethics and Compliance Personnel ............................................ 38
      5. Ongoing CAM Team Examination ............................................ 39

   C. Investigations ................................................................................... 40
      1. Background ................................................................................ 40
      2. Updates on Progress Toward Improving the Investigations Program .................... 43
      3. Ongoing CAM Team Examination ............................................ 50

   D. Food Waste Management .................................................................. 51
      1. Background ................................................................................ 51
      2. Updates on Probation Agreement Requirements ...................... 53
      3. Other Initiatives ....................................................................... 60
      4. Ongoing CAM Team Examination ............................................ 61

   E. Training ............................................................................................ 62
      1. General Updates on Company Initiatives ................................. 62
      2. Personnel Updates .................................................................... 63
      3. Environmental Excellence EO3 Course .................................... 64
      4. Ongoing CAM Team Examination ............................................ 68

   F. Implementation of Enumerated ECP Requirements ........................... 69
      1. Background ................................................................................ 69
      2. ECP-Required Trend Analysis .................................................. 70

G. Initiatives Beyond Enumerated ECP Requirements ........................................................ 75
    1.   IT Systems and Tools ............................................................................................ 75
    2.   Fleet Environmental Officer Program .................................................................. 82
    3.   Electronic Key Management System Installations ................................................ 83
    4.   Other Initiatives .................................................................................................... 84

H. Environmental and ECP Violations ............................................................................. 85
    1.   Overview ................................................................................................................ 85
    2.   Advanced Air Quality Systems .............................................................................. 89

I.   Other Ongoing CAM Areas of Focus ........................................................................... 91

**Appendix A**:  Status of Probation Agreement Commitments

December 18, 2019

# I.   INTRODUCTION

Consistent with the Court's Order of April 26, 2018, Dkt. No. 66, the Court Appointed Monitor ("CAM")[1] submits this second Quarterly Report for Year Three of the Environmental Compliance Plan ("ECP") ("CAM December 2019 Quarterly Report" or "Report").[2]  This Report focuses on developments during the second quarter of ECP Year Three:  July 19, 2019 – October 18, 2019.[3]  However, notable developments since the end of this period are included below.[4]

## A.   Executive Summary

### 1.   Roadmap

The Court ordered that the CAM submit Quarterly Reports to provide updates on the monitorship and to address issues identified by the Court and the CAM.  *See* Dkt. No. 62; Status Conf. Tr. at 32-33, 42-45, 93-95 (Apr. 3, 2018).

---

[1] The CAM is Steven P. Solow, a partner at the law firm Baker Botts LLP ("Baker Botts").  The CAM retained, *inter alia*, Baker Botts and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[2] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1, or prior CAM Reports.  The CAM has submitted the following reports:  (1) *First Annual Report of the Court Appointed Monitor (2017-2018)* (June 21, 2018), Dkt. No. 105 ("CAM First Annual Report"); (2) *Quarterly Report of the Court Appointed Monitor (September 2018)* (Sept. 21, 2018), Dkt No. 114 ("CAM September 2018 Quarterly Report");  (3) *Quarterly Report of the Court Appointed Monitor (December 2018)* (Dec. 18, 2018), Dkt No. 115 ("CAM December 2018 Quarterly Report"); (4) *Quarterly Report of the Court Appointed Monitor (April 2019)* (Apr. 2, 2019), Dkt. No. 116 ("CAM April 2019 Quarterly Report"); (5) *Second Annual Report of the Court Appointed Monitor (April 19, 2018-April 18, 2019)* (July 3, 2019), Dkt. No. 150 ("CAM Second Annual Report"); and (6) *Quarterly Report of the Court Appointed Monitor (September 2019)* (Sept. 18, 2019), Dkt No. 166 ("CAM September 2019 Quarterly Report").

[3] ECP Year Three is April 19, 2019, through April 18, 2020.  ECP Year Two was April 19, 2018, through April 18, 2019, and ECP Year One was April 19, 2017, through April 18, 2018.

[4] The CAM provided the Company and the United States Department of Justice ("DOJ") a copy of this Report in advance of its submission.  The CAM took comments from these parties into account; however, the comments did not alter the substance of the Report.

December 18, 2019

Part I.A. of this Report is an Executive Summary, including:  (1) a roadmap of the Report; and (2) a summary of notable developments and CAM observations during this ECP quarter.  Part I.B goes over recent case developments, including updates on:  (1) the Company's performance of commitments under the agreement resolving the probation violations to which it pleaded guilty; (2) the Status Conference held on October 2, 2019; (3) the Court's Order regarding the upcoming meeting scheduled for December 19, 2019; and (4) the metrics and targets on environmental compliance that the Court ordered the Company and DOJ to jointly develop.

Part II of this Report gives an overview of the CAM Team's activities during this ECP quarter, including observations from the oversight of the external audit function performed by the Third Party Auditor ("TPA")[5] and the internal audit function performed by the Company's Risk Advisory and Assurance Services ("RAAS") group.

Finally, Part III of this Report provides updates on the Company's capabilities to meet ECP objectives, *see* ECP § VI.F.3.b,[6] and its performance in other areas of focus identified by the Court and the CAM.  *See* CAM Second Annual Report at 8-11, 110-12.  This Report does not provide the more detailed assessments or findings that the CAM will provide in the Annual Report for ECP Year Three.

---

[5] The TPA is ABSG Consulting Inc. ("ABSG"), an advisory and technical services provider for the marine and other sectors.  The TPA has submitted the following annual reports:  (1) *Third Party Auditor Year One Annual Report* (June 18, 2018) ("TPA First Annual Report"); and (2) *Third Party Auditor Year Two Annual Report* (July 3, 2019), Dkt. No. 153 ("TPA Second Annual Report").

[6] Unless otherwise specified, all citations to the ECP in this Report are to the second amended version that went into effect on June 3, 2019.

December 18, 2019

2.   <u>Summary</u>

The final day of this ECP quarter—October 18, 2019—was a milestone.  It marked the end of the first half of the five-year probationary period.  During this quarter, the Company continued to devote significant efforts toward addressing its ongoing compliance challenges, including in the areas of:  corporate compliance re-structuring; investigations; food waste management; training; and other initiatives.  As discussed in Part III of this Report, updates from this quarter include:

---

**Culture Survey and Assessment**

---

- On August 28, 2019, the CAM's retained maritime culture survey expert, PROPEL SAYFR AS ("Propel"), provided the Company and the CAM with the final report of its Environmental Compliance Culture Assessment.  The assessment was based on a survey of over seventy thousand Company employees carried out from approximately December 2018 through January 2019 to measure the Company's environmental compliance culture.  As discussed in the most recent CAM report, the assessment found that employees identify the Company as a whole, as well as the individual brands/operating lines, as having a compliance culture with a low level of Organizational Culture Maturity (classified as "Apathetic" or "Defeatist") and significant potential for improvement—especially in the Leadership Behavior areas of Trust, Care, and Openness.  These findings are consistent with those of other prior Company surveys and third-party reviews.  *See* CAM September 2019 Quarterly Report at 19-22.

- From September through December 2019, Propel presented the assessment findings to various Company groups, including the Executive Leadership Team and each of the Company's four operating lines.  *See infra*, Part III.A.

- The Company has determined that it needs an action plan developed by an outside consultant to respond to the assessment findings.  More than three-and-a-half months have now passed since the final report was released.  To the best of the CAM's knowledge, the Company has not yet finalized its action plan or announced concrete steps it will take to address the findings.  *See id.*

---

**Corporate Compliance Structure**

---

- In pleading guilty in June 2019 to a violation of probation for failing to provide the Environmental Corporate Compliance Manager with ECP-required authority, the Company committed to restructure its corporate compliance function.  As discussed in prior CAM reports, the Company has since undertaken a number of required

actions, including appointing a Chief Ethics and Compliance Officer, promoting the Environmental Corporate Compliance Manager, and submitting, on September 13, 2019, an action plan for re-structuring its corporate compliance function.  *See* CAM September 2019 Quarterly Report at 30-43.

- During the current ECP quarter, the Company submitted three updates to its September 13, 2019, action plan:

  - (1) a general update, submitted on October 9, 2019, reflecting changes since the September submission, including a curriculum for the annual training program for the Carnival Corporation and Carnival plc ("Carnival Corp.") Boards of Directors (or "Boards") and a statement on compliance from the Boards;

  - (2) a supplement, submitted on November 1, 2019, containing the Company's preliminary financial plan for its Ethics and Compliance Program for fiscal years 2019 and 2020, along with a preliminary roster of Ethics and Compliance Program personnel and list of Ethics and Compliance Program functional leaders; and

  - (3) an additional supplement, submitted on December 10, 2019, containing the Company's final financial plan for its Ethics and Compliance Program for fiscal years 2019 and 2020, along with an updated roster and list of functional leaders.  *See infra*, Part III.B.

- Overall, these action plan submissions describe substantial efforts toward putting in place the people, funding, structures, and systems for the corporate compliance function.  Much remains a work in progress.  As the Environmental Compliance Culture Assessment illuminated, it will be necessary for the Company's top leadership (*i.e.*, the President and Chief Executive Officer ("CEO") and Boards of Directors) to take personal responsibility for promoting a culture of compliance for these efforts to succeed.  *See id.*

- Going forward, increasing areas of focus for the CAM will include the issues highlighted in the Court's Order of October 31, 2019, discussed *infra*, Part I.B.3: leadership communications regarding environmental compliance as a core value; adequacy of staffing on ships; integration of environmental compliance into financial and strategic planning processes; use of data assessment processes to support learning and continuous improvement; and the role of management of change principles in these and other efforts.  *See id.*

---

**Investigations**

---

- In ECP Year One, the CAM made a finding that the Company's internal investigations are "critically flawed."  *See* CAM First Annual Report at 5.  The TPA made a similar finding.  *See* TPA First Annual Report at 3.  As discussed in prior CAM reports, in September 2018, the Company committed to the Court that it would

improve its investigations program through a number of proposed actions and associated timetables, including the revision of relevant procedures, over the remaining quarter of 2018 through the second quarter of 2019. *See* CAM September 2019 Quarterly Report at 44-47. These proposed timetables lapsed while the Company sought to hire someone to lead a new Incident Analysis Group to take over responsibility for what are deemed to be significant Health, Environmental, Safety, & Security ("HESS") investigations. *See id.* at 46. This individual was hired as the Vice President of the Incident Analysis Group in late March 2019. *See id.*

- More than halfway through the probationary period, the Company's efforts to improve its internal investigations function remain a work in progress. For instance, the Company has yet to finalize its revised investigation procedures, which had an initial target date of September 30, 2018 (in the September 2018 proposal submitted to the Court), and a revised target date of September 16, 2019 (in a September 2019 correspondence with the CAM). *See id.* at 51.

- From November 11-14, 2019, an outside consultant retained by the Company held a training on causal analysis for Incident Analysis Group investigators and management at the Company's Miami, Florida offices. Members of the CAM Team attended a short overview of the training, provided by the consultant, after it was completed. Attendee feedback on the course to the CAM Team was largely positive. In addition, around mid-December 2019, the Company rolled out a computer-based root cause analysis training module to be provided to shipboard and shoreside personnel that conduct what are deemed to be less significant HESS investigations. *See infra*, Part III.C.

- Other developments underway include: finalization of revised investigation procedures, which had a target completion date of September 16, 2019; development of new procedures for investigator accreditation and competency development, which had a target completion date of September 16, 2019; efforts to fill a vacant Incident Analysis Group investigator position following the promotion of one investigator; and efforts to address data management and information technology ("IT") challenges. *See id.*

- The CAM Team continues to review HESS incident investigation reports from the Incident Analysis Group, brands/operating lines, and ships. Some of the factual and technical assessments in the Incident Analysis Group reports have improved, but may still fail to address broader, systemic concerns or share lessons learned. The brand/operating line and ship investigation reports continue to vary widely in both substance and format. *See id.*

- Going forward, increasing areas of focus for the CAM will include: the division of authority between key corporate leaders, including the Vice President of the Incident Analysis Group, the Chief Maritime Officer, and the Chief Ethics and Compliance

December 18, 2019

Officer; and the integration of Incident Analysis Group investigations with brand/operating line, ship, and RAAS (non-HESS) investigations. *See id.*

| **Food Waste Management** |
|---|

- In June 2019, the Company pleaded guilty to a probation violation for the illegal discharge of non-food items (including plastic) mixed with food waste into the ocean, along with an associated recordkeeping violation. As discussed in prior CAM reports, in connection with this guilty plea, the Company admitted the need to improve the management of food waste on its ships, and agreed to take various actions to prioritize this issue, including implementing a three-part program to improve its food waste management practices. *See* CAM September 2019 Quarterly Report at 60-67.

- During the current ECP quarter, the Company has continued to implement its food waste management improvement program, including:

  o (1) issuing a new procedure on food waste segregation and disposal that streamlines and standardizes aspects of food waste management;

  o (2) retaining an outside consultant to perform a review of staffing levels to support proper handling of food waste onboard, which is not expected to be complete until April 2020;

  o (3) establishing a baseline (based on 2018 aggregated data for single-use plastics procurement) for measurement against the goal of reducing single-use plastics by 50% by December 31, 2021, with a plan to report on progress semiannually in June and December;

  o (4) adopting a two-pronged approach to reducing single-use plastic items: (i) a first prong focused on removing small items and items with obvious substitutes, which had a goal of October 31, 2019; and (ii) a second prong focused on removing all other single-use plastic items and reducing the use of plastic water bottles;

  o (5) establishing a baseline (based on a food waste weighing project completed on Company ships during the first two weeks of October 2019) for measurement against the goal of reducing food waste by 10% by December 31, 2021, with a plan to report on progress semiannually in April and October;

  o (6) submitting a review and analysis of food waste disposal technologies, systems, and processes, which finds that food waste digesters are likely to be the Company's best option;

December 18, 2019

- o (7) continuing to issue its weekly food waste dashboard; and

- o (8) implementing a "Food Waste Shuffle" music video challenge. Winners are currently being selected. *See infra*, Part III.D.

- Going forward, the CAM will examine the Company's process for selecting and vetting shoreside waste vendors. The Company's 2018 Sustainability Report touts the Company's goal of further developing and implementing waste vendor assurance procedures. However, the Company has conceded that not all operating lines are following Company requirements for the vetting of waste offload vendors. *See id.*

- The CAM will also continue to monitor the Company's testing, procurement, and use of food waste digesters (including its process for selecting and vetting vendors of equipment to be installed onboard), as well as its testing, treatment, and regulation of digester effluent. *See id.*

| **Training** |
| --- |

- The Company continues to invest resources in environmental and ECP training, including conducting environmental and compliance-related trainings at its state-of-the-art CSMART training center, and developing and rolling-out various IT tools. *See infra*, Part III.E.

- During this ECP quarter, in August and November 2019, CSMART held the first two iterations of a new five-day Environmental Excellence hybrid training/conference event for Environmental Officers. The program is designed to be challenge-based, rather than lecture-based, in an effort to make Environmental Officer training interactive and engaging. Overall, both events appeared to result in higher levels of engagement and collaboration by attendees over prior lecture-based trainings. The November course also contained several improvements over the August course, based on feedback from the CAM, TPA, and others. These changes appeared to result in smoother course facilitation, sustained high levels of engagement, and enhanced opportunities for attendees to directly provide feedback to shoreside personnel. *See id.*

- Going forward, an increasing area of focus for the CAM will be the potential role of CSMART in supporting culture change, beyond the boundaries of the facility. *See id.*

| **Implementation of Enumerated ECP Requirements (ECP-Required Trend Analysis)** |
| --- |

- The majority of the Company's enumerated ECP requirements and associated deadlines took effect during ECP Years One and Two. For the current ECP quarter, the Company was required to conduct an incident trend analysis of "all Major Non-Conformities, significant Non-Conformities; recurring minor Non-Conformities and Observations; and identif[cation of] corrective actions taken or recommended," including "an assessment of the contribution, if any, of the following factors to the

identified issues:" (a) human factors; (b) procedural-implementation tools; (c) equipment performance and faults; (d) parts ordering processes; (e) oversight; and (f) adequacy of the current pollution prevention equipment and an assessment of available technology.  ECP § III.F.4

- On October 31, 2019, the Company submitted its ECP-required incident trend analysis and overview of corrective actions.  Overall, the analysis may minimize the Company's compliance challenges, rather than shine light on potential risk areas and areas for improvement.  *See infra*, Part III.F.

### Initiatives Beyond Enumerated ECP Requirements

- The Company continues to develop and implement initiatives that go beyond the enumerated ECP requirements, including initiatives related to:

  o (1) IT systems and tools, with the Company taking steps to address its recognized need for more centralized, modern, and data-driven strategies;

  o (2) the Fleet Environmental Officer Program, which is still in the development phase, with a search for a Director in progress;

  o (3) efforts to improve the implementation of the Environmental Control System (seal/lock/weld) program, including the Company's commitment to install electronic key management systems on ships to reduce the time, labor, and potential for human error associated with certain program requirements. The deadline for installing these systems was postponed from December 31, 2019, to September 1, 2020; and

  o (4) other initiatives related to environmental compliance and sustainability, ranging from policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See infra*, Part III.G.

- Going forward, a continuing area of focus for the CAM will be whether and how management of change principles are considered when new initiatives are launched. *See id.*

### Environmental and ECP Violations

- The Company continues to violate environmental laws and the ECP, even while efforts aimed at compliance are underway.  As the CAM has emphasized, while these incidents are concerning, the Company's deeper and more pressing barriers to

compliance relate not to individual incidents on ships, but to the Company's broader corporate leadership and culture issues.  *See infra*, Part III.H.[7]

- The Company's violations during this ECP quarter included incidents related to:

    o  (1) air emissions;

    o  (2) discharges to the sea, including Advanced Air Quality System washwater, ballast water, black water (sewage), chemicals, food waste, grey water, oil, recreational (*e.g.*, pool/Jacuzzi) water, and solid items/garbage (including plastics);

    o  (3) pollution prevention equipment maintenance and operation; and

    o  (4) recordkeeping, including an alleged training record falsification; an unauthorized modification of a logbook with randomly adjusted numbers; multiple instances of missing or inadvertently destroyed logbooks; and various other errors and discrepancies discovered in log books and records.  In addition, the CAM remains concerned about incidents, discussed in the CAM September 2019 Quarterly Report, which indicate that the Company may have a systemic problem with the completeness and integrity of Planned Maintenance System records across multiple ships.

- Going forward, the CAM will examine issues related to Advanced Air Quality Systems—including emission exceedances, prohibited washwater discharges, and equipment failures or malfunctions—as the new global marine fuel sulfur cap set by the Marine Environment Protection Committee of the International Maritime Organization goes into effect beginning January 1, 2020.  *See id*.

As the CAM has observed, much of the attention and focus on critical compliance matters by top leadership, including the Boards of Directors, did not occur until *after* a probation revocation petition was filed near the end of ECP Year Two.  However, the Company and the Boards were on notice about the Company's challenges in many of these areas as early as the first year of probation, if not earlier.  As the Court observed at the October 2, 2019, Status

---

[7] Although this Report, like prior CAM reports, identifies the ships involved in certain incidents, the Company's compliance challenges are not limited to incidents occurring on the named ships. Rather, such incidents stem from the broader, systemic issues regarding the failure of the Company's leadership to adequately support the ships and take appropriate action on compliance.

December 18, 2019

Conference, "a company of [Carnival Corp.'s] size will not turn on a dime, on October 19th we will be half way through the period of probation and I am concerned about where we are . . . I want to know that we are not going to drag this out until the end of probation."  Status Conf. Tr. at 15 (Oct. 2, 2019).

A culture survey of over seventy thousand Company employees identified the crux of the Company's compliance challenges as an issue of culture and leadership that stems from the very top.  For years, the tone-at-the-top messaging has been centered on the value of delivering "joyful vacation experiences and breakthrough shareholder returns," with comparatively little focus on the value of environmental compliance.  *See* Carnival Corp., *Mission & History*, https://www.carnivalcorp.com/corporate-information/mission-and-history.  These relative priorities were also made clear in practice—as evidenced, for instance, by the Company's lack of a strong, centralized HESS compliance function comparable to its strong, centralized financial function.  *See* CAM Second Annual Report at 71-85.  Leadership and support for the goals of achieving guest satisfaction and strong financial performance are essential to the financial success of this industry-dominating cruise corporation; the Company's challenge is to elevate compliance to the same level of leadership and support.  To do so requires a change from the top that is authentic and credible, backed up by concrete actions to support compliance on the ships.

The areas of need are not a mystery.  The Company's employees have repeatedly identified struggles with:  adequate staffing of ships (including in the engine/technical departments); workload; training; IT support; equipment and other resources; financial pressures to avoid expenditures; diversity and inclusion; workplace harassment and discrimination; and other issues noted in reports from the CAM, TPA, Propel, and the Company's own consultants.  Without acceptance by top leadership of the need to change their understanding of, and approach

December 18, 2019

to, compliance, the Company appears unlikely to succeed in establishing a sustainable

compliance culture—despite the sincere efforts underway by the Company's many dedicated and

talented employees both ship and shore.

**B.      Court Oversight**

1.      Probation Agreement Deadlines

As discussed in prior CAM reports, on June 3, 2019, the CEO of Carnival Corp. pleaded

guilty on behalf of the Company to six violations of the terms and conditions of probation.  *See*

Dkt. No. 137 (Paperless Minute Entry); CAM Second Annual Report at 5-6, 86-94 (discussing

the probation violations); CAM September 2019 Quarterly Report at 3-6.  In doing so, and in a

subsequent message to employees, the CEO, along with the members of the Executive

Committee of the Carnival Corp. Boards of Directors, "t[ook] full responsibility for these

violations."  *See Important Message from Chairman Micky Arison and CEO Arnold Donald*

(July 1, 2019).

The Court accepted an agreement between the Government and the Company to resolve

the probation violations and avoid the need for an evidentiary hearing.  *See Proposed Agreement*

*For The Court's Consideration Resolving Superseding Petition For Summons For Offender*

*Under Supervision Dated April 26, 2019*, Dkt. No. 134 (proposed agreement); Dkt. No. 143

(Order accepting agreement) (collectively, "Probation Agreement").  Both the Court and the

Government have emphasized that the main impetus for the probation revocation petition was

the failure of the Company's top leadership to take appropriate action on environmental

compliance.  *See* CAM September 2019 Quarterly Report at 3.

Under the terms of the Probation Agreement, the Company is required to undertake a

range of remedial and other actions, including the following actions with deadlines falling within

December 18, 2019

the first two quarters of ECP Year Three and up until the date of this Report.  Many of the

actions listed below were described in the most recent CAM report.  *See id.* at 4-6.  **Updates**

**since the CAM September 2019 Quarterly Report are emphasized below in**

**bold/underlined text**:

- **Corporate Compliance Consultant Recommendations (June 1, 2019):**  By June 1, 2019, provide the Court, Interested Parties,[8] CAM, and TPA with its outside corporate compliance consultant's recommendations to improve its corporate compliance program.  The Company provided these recommendations on June 1, 2019.  *See Summary and Recommendations from Compliance Program Assessment* (May 31, 2019); CAM Second Annual Report at 47-48 (discussing recommendations); *see also infra,* Part III.B (discussing the Company's corporate compliance function re-structuring efforts);

- **$20 Million Penalty (June 10, 2019):**  By June 10, 2019, pay an additional financial penalty of $20 million.  The Company reports that this was paid on schedule.  *See* Status Conf. Tr. at 16 (July 19, 2019);

- **Special Condition of Probation 13(a) Reporting Process (June 30, 2019):**  By June 30, 2019, submit for approval to the Interested Parties a proposed process for meeting the enhanced reporting requirements of the revised Special Condition of Probation 13(a).[9]  The Company submitted its proposed process on June 28, 2019.  *See Proposed Process for Compliance with Special Condition of Supervision No. 13(a)* (June 28, 2019).  **The Company has since made changes to its process, including: (1) discontinuing its practice of including near miss and passenger incident reports, in response to concerns expressed by DOJ; and (2) re-formatting the reports so that incidents of potentially higher significance (such as pollution prevention equipment issues, recordkeeping issues, prohibited liquid discharges, and prohibited air emissions) are listed first, and other incidents such as**

---

[8] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida [("Probation Office")], the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis."  ECP § I.D.

[9] As part of the Probation Agreement, the Judgment in this matter was amended to include a revised Special Condition of Probation 13 that establishes enhanced reporting requirements for the Company.  Among other things, the Company must, under Special Condition of Probation 13(a), inform the Interested Parties, CAM, and TPA of any:  (i) breach of the ECP; (ii) breach of the plea agreement; (iii) violation of the conditions of probation; (iv) violation of any Marine Environmental Protection Requirement; (v) violation of any applicable United States (federal or state) environmental law; (vi) violation of certain international maritime environmental law conventions; or (vii) credible allegations, including Environmental Open (Hotline) Reports, of violations of the ECP or environmental law.  *See* Dkt. No. 134, at 12-13 (Ex. B).

December 18, 2019

**"incidents caused by contractors/third parties, non-[ozone depleting substance] refrigerant leaks, crewmember unintentional MARPOL Annex V incidents, and unintentional Environmental Control System seal breaks were listed on the second page of the excel sheet."** *See RE: U.S. v. Princess Cruise Lines Ltd. - Special Condition No. 13 (13 DEC 19)* **(Dec, 13, 2019).** The CAM understands that the Company is continuing to evaluate and may modify, as necessary and in consultation with the Interested Parties, its approach to reporting under Special Condition of Probation 13(a);

- **Interim Progress Reports (July 1, 2019 and August 1, 2019).** By July 1, 2019, and August 1, 2019, respectively, file monthly interim reports on the Company's progress toward completing a proposed action plan to restructure its existing corporate compliance function. The Company filed these reports on July 1, 2019, and August 1, 2019. *See Interim Progress Report on Probation Settlement Goals* (July 1, 2019), Dkt. No. 149; *Interim Progress Report on Probation Settlement Goals* (Aug. 1, 2019);

- **Management Acceptance of Responsibility Statement (July 3, 2019):** By July 3, 2019, issue a statement to all Company employees in which the CEO of Carnival Corp. (and other senior management if they so choose) accepts management responsibility for the probation violations. The Company issued this statement on July 1, 2019. *See Important Message from Chairman Micky Arison and CEO Arnold Donald* (July 1, 2019) (stating that "Chairman [Micky] Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these violations");

- **Food Waste Management Implementation Plan (August 1, 2019):** By August 1, 2019, provide the Interested Parties, CAM, and TPA with an implementation plan specifying the project, project owner, and timetables for Part One of its three-part program addressing food waste management issues. The Company provided this plan on August 1, 2019. *See Food Waste Task Force: Tiger Team Report, Recommendations, and Implementation Plan* (Aug. 1, 2019) ("Food Waste Management Implementation Plan"). On September 4, 2019, the Company provided the Interested Parties, CAM, and TPA with an update to the Food Waste Management Implementation Plan. *See* Cover Letter, *Tiger Team Implementation Plan* (Sept. 4, 2019), PCL_ECP00134212-14 ("Cover Letter"); *Tiger Team Implementation Plan Update*, PCL_ECP00134215-19 ("Update"); *see also infra*, Part III.D (discussing the Company's food waste management efforts);

December 18, 2019

- **Unified Regulatory Reporting Policy (draft by August 2, 2019; final by September 22, 2019):**  By August 2, 2019, submit for review to the Interested Parties, CAM, and TPA a new draft internal policy in the Company's Environmental Management System governing the reporting requirements for discharges according to United States federal and state laws; and by September 22, 2019, issue the final policy.  The Company provided the draft policy on July 31, 2019.  *See Submission of new Environmental Management System policy governing reporting requirements for discharges according to United States federal and state laws per Section VI. Unified Regulatory Reporting Policy* (July 31, 2019), PCL_ECP00124954-56; *[Draft] COM-1103 United States Environmental Reporting Requirements*, PCL_ECP00124889-90; *[Draft] COM-1103-A1 United States Environmental Regulatory Requirements Details*, PCL_ECP00124891-928; *[Draft] Flag State Reporting Requirements*, PCL_ECP00124881-88; *Draft Vessel External Reporting Policy Sources*, PCL_ECP00124929-53 (collectively, "Proposed Unified Regulatory Reporting Policy").  The CAM and TPA provided joint comments on the Proposed Unified Regulatory Reporting Policy on August 23, 2019.  *See RE: U.S. v. Princess Cruise Lines, Ltd. – 1:16-cr-20897 - Unified Regulatory Reporting Policy* (Aug. 23, 2019); *see also* CAM September 2019 Quarterly Report at 93-95 (discussing the proposed policy and joint comments).  <u>**The final policy was published on the Company's internal Global HESS system on September 19, 2019.  See COM-1103 United States Environmental Reporting Requirements; COM-1103-A1 United States Environmental Regulatory Requirement Details; COM-1102-A1 Flag State Reporting Requirements (collectively, "Unified Regulatory Reporting Policy")**</u>;

- **Proposed Action Plan for Corporate Compliance Re-Structuring (August 14, 2019):**  By August 14, 2019, submit for review to the Court, Interested Parties, CAM, and TPA a proposed action plan to restructure its existing corporate compliance function.  The Company provided this proposed plan on August 14, 2019.  *See Carnival Ethics and Compliance Submission* ("Proposed Submission Letter"); *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("Proposed Charter"); *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("Proposed Strategic Plan") (collectively, "Proposed Action Plan").  The CAM and TPA provided joint comments on the Proposed Action Plan on August 28, 2019.  *See Joint CAM/TPA Comments on August 14, 2019, Proposed Action Plan Submission* (Aug. 28, 2019) ("Joint CAM/TPA Proposed Action Plan Comments"); *see also infra*, Part III.B (discussing the Company's corporate compliance re-structuring efforts);

December 18, 2019

- **Final Action Plan for Corporate Compliance Re-Structuring (September 13, 2019):** By September 13, 2019, provide the Court with a final version of its action plan to restructure its existing corporate compliance function. The Company provided this final plan on September 13, 2019. *See Revised EC Submission Cover Letter (for 8 14 Court Filing)* ("September 2019 Final Submission Letter"); *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("September 2019 Final Charter"); *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("September 2019 Final Strategic Plan") (collectively, "September 2019 Final Action Plan").

  - On October 9, 2019, the Company provided the Interested Parties, CAM, and TPA with an updated version of the action plan to "reflect[] updates to the restructuring process that have occurred since September 13." *See Updated Compliance Restructuring Plan -- United States v. Princess Cruise Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* (Oct. 9, 2019); *Revised EC Submission Cover Letter_Oct 9 2019_FINAL* ("October 2019 Final Submission Letter"); *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("October 2019 Final Charter"); *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("October 2019 Final Strategic Plan"); *Attachment C - Important announcement: Carnival Corporation forms new Ethics & Compliance team* ("Compliance Structure Announcement"); *Attachment D - Carnival's Commitment to Ethics & Compliance: A Statement from Our Boards of Directors* ("Boards' Statement on Compliance") (collectively, "October 2019 Final Action Plan").

  - On November 1, 2019, the Company provided the Interested Parties, CAM, and TPA with a supplement to the action plan to reflect "a preliminary financial plan for its restructured Ethics & Compliance Program." *See Supplement to Compliance Restructuring Plan -- United States v. Princess Cruise Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* (Nov. 1, 2019); *Updated Draft for the Carnival Corporation Compliance Financial Plan (2019 and 2020)* ("Preliminary Financial Plan"); *Attachment A – Global Roster for Ethics & Compliance* ("Preliminary Roster"); *Attachment B – Ethics & Compliance Functional Leaders* ("Preliminary Functional Leaders List").

December 18, 2019

- o **On December 10, 2019, the Company provided the Interested Parties, CAM, and TPA with an additional supplement to reflect a final financial plan for the Ethics and Compliance Program.** *See RE: Supplement to Compliance Restructuring Plan -- United States v. Princess Cruise Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* **(Dec. 10, 2019);** *Carnival Corporation Compliance Financial Plan (2019 and 2020)* **("Final Financial Plan");** *Financial Plan E&C December 10 – Attachment A, 2019 roster for Ethics and Compliance* **("Final Roster")**; *Financial Plan E&C December 10 – Attachment B, Ethics & Compliance Functional Leaders* **("Final Functional Leaders List");** *see also infra*, **Part III.B (discussing the Company's corporate compliance re-structuring efforts)**.

- **Various Actions Related to Corporate Compliance Re-Structuring.**  By October 9, 2019, complete a number of actions related to the re-structuring of the Company's corporate compliance function, including:

  - o **Promoting the Environmental Corporate Compliance Manager, which occurred in May 2019;**

  - o **Appointing the Chief Ethics and Compliance Officer, which occurred in August 2019;**

  - o **Creating the Chief Ethics and Compliance Officer charter and job description, which were included in the September 2019 Final Action Plan (and October update);**

  - o **Creating an Executive Compliance Committee, which was established in the September 2019 Final Action Plan (and October update);**

  - o **Creating an annual training curriculum for the Carnival Corp. Boards of Directors that includes corporate compliance topics, which was included in the October 2019 Final Action Plan; and**

  - o **Issuing a written statement by the Boards of Directors that reiterates the Company's and the Boards' commitment to compliance, which was included in the October 2019 Final Action Plan and emailed to Company personnel on October 9, 2019.**

- **Food Waste Technical Review.**  By October 31, 2019, review and analyze: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes.  **The Company submitted its review and analysis of food waste technologies, systems, and processes on October 31, 2019.** *See U.S. v. Princess Cruise Lines Ltd. - Food Waste Equipment Technical Review* **(Oct. 31, 2019);** *Food Waste Equipment Technical Review* **(Oct. 31, 2019) ("Food**

**Waste Technical Review"); *see also infra*, Part III.D (discussing the Company's food waste management efforts)**.

*See* Dkt. No. 134 at 1-8; Dkt. No. 154-1 at 1-3.

The Company appears to have met all of its filing and submission deadline obligations to date under the Probation Agreement.  A chart summarizing the status of the Probation Agreement requirements is included as Appendix A to this Report.  Additional details about the Company's efforts to perform its obligations under the Probation Agreement are discussed in the relevant sections of Part III below.

2.      October 2, 2019, Status Conference

Following the submission of the CAM September 2019 Quarterly Report, the Court held a quarterly Status Conference on October 2, 2019.  Representatives from the Company, DOJ, CAM Team, and TPA were present.  Among other items, the parties discussed the Company's efforts to:  respond to the Environmental Compliance Culture Assessment, *see infra*, Part III.A, which "focuses on the deficit; specifically of leadership behavior," *see* Status Conf. Tr. at 8 (Oct. 2, 2019); improve its internal investigations function; re-structure its corporate compliance function, including compliance risk assessment and training functions; and address its ongoing food waste management challenges.  *See generally id.*  As described further below, *see infra,* Part I.B.4, the parties also discussed the status of the jointly agreed-upon metrics and targets on environmental compliance that the Court ordered the Company and DOJ to develop at the July 19, 2019, Status Conference.  *See* Status Conf. Tr. at 60-61 (July 19, 2019); Dkt. No. 157 at 3.

At the outset of the hearing, the Court spoke with the Carnival Corp. CEO and the Chairman of the Boards of Directors to reiterate the Court's interest in "the affirmative steps that show that leadership is changing."  *Id.* at 8.  The Court added that "[y]ou are extremely blessed – based on what the CAM has reported to me and the TPA – with having a work force that is

December 18, 2019

highly committed to doing an excellent and safe job in order to deliver on the product that makes the cash return for your shareholders." *Id.* But "what I need to know is what the two of you are doing and taking personal ownership of." *Id.* at 14. And "I need to know the concrete things that we can use to say we are making progress." *Id.* at 16. Similarly, the Court expressed to the Chief Ethics and Compliance Officer that, "as you can imagine at this point I have heard wonderful talk for the past almost two and half years . . . Give me specifics as to how it is going to change so I know when these ships go out they have everything they need not just in the hospitality area so the customer has a wonderful experience." *Id.* at 64-65. As discussed below, *see infra*, Part I.B.3, the Court issued an Order following the hearing that lists specific areas of interest for the Court.

        3.     <u>October 31, 2019, Order re: December 19, 2019, Status Conference</u>

Following the October 2, 2019, Status Conference, the Court issued an Order on October 31, 2019, setting a meeting for December 19, 2019, at which the Company "may make a presentation to the Court regarding its compliance efforts." Dkt. No. 167 at 1. Representatives from the DOJ, CAM Team, and TPA will also attend. *See id.* The Order states that the meeting is a response to the Company's request for "an opportunity to address the Court regarding its compliance efforts beyond those that have been conveyed to the Court during the status conferences." *Id.* The Order also "notes that it would be beneficial" for the Company's presentation to address the following items:

    1.   The Defendant's leadership's communications to ship-board and shoreside employees regarding environmental compliance as a core value of the Company.

    2.   Actions the Company has taken in the past three months, and actions the Company plans to take at three month intervals, from the date of this Order to achieve:

        a.   A sufficient number of qualified deck, engine, and hotel crew members on its ships who have the training, resources, time, and support to execute their job responsibilities and meet compliance obligations;

b.   Financial and strategic planning processes designed to provide adequate resources and attention toward environmental compliance, including processes to allocate resources outside of the formal planning processes as needed to support compliance efforts;

c.   Processes designed to enable learning and continuous improvement through the assessment of data (including incident and near miss reports), internal and external findings (including audits, surveys, studies, and other assessments), investigations findings, and corrective and preventive actions, including processes for developing and implementing responsive action plans, and sharing lessons-learned and best practices; and

d.   Processes designed to implement management of change principles when new actions are taken.[10]

3.   The Company shall describe the actions, including reference to those steps identified in section 2c above, to address the following compliance challenges, with reference to specific incidents noted in the Company's Quarterly Tracking Chart filings, including:

a.   Discharge of non-food items, including plastics, in food waste;

b.   Discharge of other prohibited waste streams, including air emissions, ballast water, black water (sewage), garbage, grey water, oil and oily wastes, and recreational water; and

c.   Inaccurate completion and maintenance of training records, Planned Maintenance System records, and other logs and records required by law or the ECP.

4.   Other efforts at environmental compliance the Company wishes to highlight that have not otherwise been described in the reports of the Court Appointed Monitor.

Dkt. No. 167 at 1-2.

---

[10] Under management of change principles, "[w]henever a change is made, the potential consequences of that change should be assessed before implementation."  American Bureau of Shipping, *Guidance Notes on Management of Change for the Marine and Offshore Industries* (Feb. 2013), at ii.  A management of change system "is a combination of policies and procedures used to evaluate the potential impacts of a proposed change so that it does not result in unacceptable risks.  Developing an effective [Management of Change] strategy requires establishing, documenting, and successfully implementing formal policies to evaluate and manage both temporary and permanent modifications in the facility or ship including equipment, materials, operating procedures and conditions, and personnel."  *Id.* at 1.

December 18, 2019

The Order directs the Company to submit an agenda and outline of topics for the meeting to the CAM, TPA, and Interested Parties by December 2, 2019. *Id.* at 2. The Company provided an agenda and outline on that date. *See Agenda & Outline for December 19, 2019 Court Workshop* (Dec. 2, 2019) ("Agenda"). Topics included:

- An overview of the purpose of the workshop, by the Carnival Corp. CEO;

- An overview of the Company, including corporate organization and evolution and areas of progress and gaps, by the Carnival Corp. CEO;

- Leadership engagement in compliance as the top priority, by the Carnival Corp. CEO and the Environmental Corporate Compliance Manager;

- Environmental compliance progress, by the Environmental Corporate Compliance Manager;

- Environmental metrics and trend analysis, by the Chief Maritime Officer. *See infra*, Part I.B.4 and Part III.F.2; and

- Ethics and Compliance Program progress, including enhancing the HESS investigative function and addressing and strengthening corporate culture, by the Chief Ethics and Compliance Officer and others.

*See* Agenda at 1-2. The Order also directs the Company to meet with the CAM and TPA "to preview and take comments on the presentation that will be made to the Court on December 19, 2019." Dkt. No. 167 at 2-3. The Company held this meeting with the CAM Team and TPA on December 4, 2019, at the offices of the Company's outside counsel in Washington, DC.

    4. <u>Metrics on Environmental Compliance</u>

The Company and DOJ continue to work to develop the metrics and targets on environmental compliance ordered by the Court. *See* Status Conf. Tr. at 60-61 (July 19, 2019); Dkt. No. 157 at 3. Nearly five months have passed since the Court ordered the metrics to be developed:

December 18, 2019

- On July 19, 2019, the Court directed DOJ and the Company to develop the metrics. *See* Status Conf. Tr. at 60-61 (July 19, 2019); Dkt. No. 157 at 3;

- On July 24, 2019, DOJ provided the Company with "proposed areas where it was believed that newly established or additional metrics would be helpful," as well as "subject areas in which additional information was needed in order to establish a benchmark."  Dkt. No. 163 at 2; *see also Re: Metrics* (July 24, 2019) and attachment;

- On September 25, 2019, the Company responded with "proposed methods to provide metrics about some of these topics, and explained challenges in providing metrics about other topics."  Dkt. No. 164 at 2; *see also Carnival Corporation's Response to the Government's Suggestions Regarding Environmental Performance Metrics* (Sept. 25, 2019);

- On October 1, 2019, in its Status Report filed prior to the October 2, 2019, hearing, DOJ noted that "some of [the Company's] responses are incomplete or unacceptable."  Dkt. No. 163 at 2;

- On October 1, 2019, in its response to DOJ's Status Report, the Company stated that "conferral with the Government will be the most useful way of making progress on metrics.  The goal will be for the Company to propose a method for providing metrics to the Interested Parties, CAM, and TPA on or before November 1, 2019," with a final report on metrics provided to the Court "shortly thereafter."  Dkt. No. 164 at 2;

- At the October 2, 2019, Status Conference, DOJ noted that, as of that date, "we don't have a proposal; we have a discussion."  Status Conf. Tr. at 11 (Oct. 2, 2019).  The Court instructed the parties "to come up with what is realistic and practical so that all of us can measure and ultimately reduce the number of incidents that are reported." *Id.* at 32; and

- On November 2, 2019, the Company submitted a draft proposal to DOJ.  *See RE: Carnival metrics* (Nov. 2, 2019) and attachments.

In developing the November 2, 2019, draft proposal, the Company engaged with the CAM Team, including soliciting feedback on prior drafts.  During this process, the CAM emphasized to the Company "that the value proposition of metrics is that the time and effort expended in this area is worthwhile to the extent doing so provides support for the Company's compliance efforts – and importantly, support for efforts that will continue beyond the end of the period of probation."  Email from S. Solow to B. Burke, *Fw: DoJ Metrics* (Oct. 31, 2019).  The CAM also acknowledged the Company's observation that, at least currently, it "does not have

December 18, 2019

the processes to automate the collection of certain data" (*e.g.*, pollution prevention equipment malfunctions), and expressed hope "that these goals and data collection challenges will be a subject of conversation with the government, and will prompt internal discussions as to whether there are ways to enhance the collection of data that would be optimal for enhancing compliance management and risk management." *Id.*

The CAM has also urged the Company not to view the development of metrics as an exercise to appease the Court, DOJ, or CAM, nor commit to metrics it does not find useful. The metrics agreed upon should be ones that bring value and insight to the Company, "ones that generate information that can be pushed up through and across management, and provide managers with information that can inform actions to enhance the Company's ability to manage risk and support compliance." *Id.*

## II.   CAM METHODOLOGY AND ACTIVITIES

### A.   CAM Team Activities During the Second Quarter of ECP Year Three

Consistent with the Third Annual Work Plan, *see* CAM September 2019 Quarterly Report at 10-11 and Attachment 1, and the Probation Agreement, the CAM Team performed the following ship and shoreside office visits during the second quarter of ECP Year Three (July 19, 2019 – October 18, 2019):

- Four ship visits:
    - Three CAM Team-only visits;[11] and
    - One RAAS ride along visit.[12]

---

[11] These visits were to a Carnival Cruise Line ship from September 12-16, 2019; a Carnival UK ship from September 13-17, 2019; and a Costa Group ship from October 8-13, 2019.

[12] This visit was to a Carnival Cruise Line ship from August 24-31, 2019.

December 18, 2019

- Three shoreside office visits:

  - One CAM Team-only visit to All Brands Group offices in Miami, Florida, from July 23-26, 2019;

  - One CAM Team-only visit to Holland America Group offices in Seattle, Washington, from August 19-21, 2019; and

  - One CAM Team-only visit to Carnival UK offices in Southampton, United Kingdom, from September 18-20, 2019.[13]

In addition, the CAM Team attended various Company meetings and events during the second quarter of ECP Year Three and up until the date of this Report (from July 19, 2019 – December 18, 2019), including:

- Multiple presentations by Propel, the CAM's retained maritime culture survey expert, on the results of the Environmental Compliance Culture Assessment.  The first presentation was held in person with the Company's Executive Leadership Team in New York City, New York, on September 3, 2019.  A second presentation was held via WebEx with approximately fifty senior-level shoreside employees from the All Brands Group, operating lines, and brands on September 5, 2019.  Additional presentations at operating line offices were held on:  (1) November 21, 2019, for Carnival Cruise Line personnel in Orlando, Florida; (2) December 3, 2019, for Carnival UK personnel in Southampton, United Kingdom; (3) December 9, 2019, for Holland America Group personnel in Seattle, Washington; and (4) December 12, 2019, for Costa Group personnel in Hamburg, Germany.  *See infra*, Part III.A.1, 3;

- A meeting with the Company and the TPA to preview the presentation that the Company will make to the Court on December 19, 2019, held at the offices of the Company's outside counsel in Washington, DC, on December 4, 2019.  *See supra*, Part I.B.3;

- An overview of the new causal analysis investigation training provided by the Company's outside consultant, held at the Company's offices in Miami, Florida, on November 15, 2019.  *See infra*, Part III.C.2.iv(1);

- Two sessions of an Environmental Excellence hybrid training/conference event with third-year Environmental Officers and shoreside training, compliance, and operations

---

[13] Between the end of the second quarter of ECP Year Three and the date of this Report, the CAM Team also performed the following CAM Team-only shoreside office visits:  (1) All Brands Group and Carnival Cruise Line offices in Miami, Florida, from October 22-24, 2019; and (2) Costa Group offices in Hamburg, Germany, from November 10-12, 2019.

December 18, 2019

personnel, held at the Company's CSMART training facility in Almere, Netherlands, from August 12-16, 2019, and from November 11-15, 2019. *See infra*, Part III.E.3;

- A meeting with the Special Compliance Committee of the Carnival Corp. Boards of Directors, held on a Princess ship in the Gulf of Trieste, Italy, on October 14, 2019. *See infra*, Part III.B.2;

- The Company's Semi-Annual Global Maritime IT Leadership Forum, held in Hamburg, Germany, from October 7-11, 2019. *See infra*, Part III.G.1;

- A Data Management Working Group session of the Company's Corporate Technical Days event, held in Southampton, United Kingdom, on September 23, 2019. *See infra*, Part III.G.1;

- A session of the Company's redesigned Operational Excellence training course required for all deck, technical, and environmental officers attending CSMART, held at the Company's CSMART training facility in Almere, Netherlands, on August 17, 2019. *See infra*, Part III.E.4;

- An annual RAAS auditor workshop, called the RAAS Maritime Retreat, held at the Company's CSMART training facility in Almere, Netherlands, from August 12-16, 2019. *See infra*, Part II.C; and

- A meeting with members of the Environmental Corporate Compliance Manager's food waste Tiger Teams, held at the TPA's offices in Houston, Texas, on August 7, 2019. *See infra*, Part II.B and Part III.D.1-2.

Outside of visits to ships, shoreside offices, and other sites, the CAM Team has continued to communicate frequently with the Environmental Corporate Compliance Manager and his team. The CAM Team also communicates with other personnel, including the Chief Ethics and Compliance Officer, the Chief Maritime Officer, the Chief Audit Officer, the Chief Financial Officer, the Vice President of the Incident Analysis Group, the Special Compliance Committee of the Carnival Corp. Boards of Directors, and the Special Compliance Committee's independent outside counsel; and with Propel and the Company on the response to the Environmental Compliance Culture Assessment. The CAM Team performs an ongoing review of documents produced by the Company, and conducts additional formal and informal interviews and communications with personnel from all ranks across the Company, including receiving

December 18, 2019

confidential communications.  The CAM Team also remains in regular communication with the TPA and the Interested Parties, and reports to the Interested Parties and the Court as required by the ECP and the Court.

### B.    Oversight of the External Audit Function (TPA)

During the second quarter of ECP Year Three (July 19, 2019 – October 18, 2019), the TPA conducted eleven ship audits, two shoreside office audits,[14] and one audit of the Environmental Excellence training course for third-year Environmental Officers held at the Company's CSMART facility in Almere, Netherlands.[15]  In addition, as discussed in the most recent CAM report, on August 7, 2019, the TPA hosted a presentation by the Company to the TPA and the CAM Team on developments related to the updated Environmental Control System methodology and ongoing food waste management initiatives.  *See* CAM September 2019 Quarterly Report at 13-14.  Following the Company's presentation, the TPA hosted a meeting with the CAM Team to discuss, among other items, goals and areas of focus for ECP Year Three.  *See id.*

The CAM Team continues to communicate regularly with the TPA (including phone conferences and in-person meetings), review TPA reports, and evaluate the adequacy and independence of the TPA through both observations during ride-along ship and shoreside visits and interviews with Company employees who have interacted with TPA auditors.  The CAM will provide an assessment of the TPA's activities during ECP Year Three in the next annual report.

---

[14] These TPA shoreside office audits were of Carnival UK offices in Southampton, United Kingdom, from August 19-22, 2019, and Carnival Cruise Line offices in Miami, Florida, from September 30 – October 4, 2019.

[15] This TPA audit was of the session held from August 12-16, 2019.  *See infra*, Part III.E.3.

### C.    Oversight of the Internal Audit Function (RAAS)

During the second quarter of ECP Year Three (July 19, 2019 – October 18, 2019), RAAS conducted twenty-three audits of Covered Vessels (including one with the CAM Team in attendance, as noted above) and no audits of shoreside offices.  In addition, as discussed in the most recent CAM report, from August 12-16, 2019, the Company held a RAAS Maritime Retreat at its CSMART training facility in Almere, Netherlands.  The CAM Team and TPA attended.  *See id.* at 14-15.

As discussed in the Third Annual Work Plan, the CAM Team intends to build upon its observations of RAAS during ECP Years One and Two to further explore the role of RAAS in supporting a sustainable compliance culture during ECP Year Three.  To do so, among other activities, the CAM Team expects to review and assess:  (1) training, support, and resources provided to RAAS auditors; (2) training, support, and resources provided to ship and shoreside employees to address and track RAAS findings; and (3) the role of top leadership, including the Boards of Directors, in supporting and promoting the RAAS function.  *See* Third Annual Work Plan at 12.  The CAM Team also intends to monitor RAAS's efforts to develop and implement an action plan for addressing the areas for improvement identified at the RAAS Maritime Retreat, *see* CAM September 2019 Quarterly Report at 15, as well as efforts at coordination and collaboration between RAAS and the new Ethics and Compliance Department and Program, including in the functional areas of environmental compliance, training, risk assessment, communications, and incident analysis.  The CAM will provide an assessment of its oversight of the RAAS function in the next annual report.

December 18, 2019

III.    **UPDATES ON ECP YEAR THREE AREAS OF FOCUS AND COMPANY CAPABILITIES TO MEET ECP OBJECTIVES**

    A.    **Culture Survey and Assessment**

        1.    Background

The Company's compliance culture has been a consistent area of focus, with the Court emphasizing its interest in evaluating the Company's progress and growth in this area.  *See, e.g.*, CAM First Annual Report at 24; CAM Second Annual Report at 53.  At the most recent status conference, the Court stated:  "I also want to address the culture survey which focuses on the deficit; specifically of leadership behavior."  Status Conf. Tr. at 8 (Oct. 2, 2019).

As discussed in prior CAM reports, the CAM, in consultation with the Company, retained Propel, a Norwegian consulting company that specializes in culture assessment in the maritime and energy industries, to conduct an Environmental Compliance Culture Survey and to prepare an Environmental Compliance Culture Assessment to illuminate both the strengths and opportunities for improvement in the Company's environmental compliance culture.  *See* CAM First Annual Report at 24-25, 68; CAM Second Annual Report at 53-54; CAM September 2019 Quarterly Report at 15-30.

 On August 28, 2019, Propel provided the Company and the CAM with the final report of its Environmental Compliance Culture Assessment.  *See* Propel, *Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019* (Aug. 28, 2019) ("Environmental Compliance Culture Assessment Report").  The report indicates that "employees across all of Carnival, from its All Brands Group ('ABG') to the various brands, have identified the Company

December 18, 2019

as having a compliance culture with a low level of maturity and significant potential for

improvement." *Id.* at 3.[16]  In particular:

> Carnival's employees have described a culture where people who are involved in failures
> are blamed, and where management does not take required steps to learn from failures.
> They also describe Carnival's culture as one where interpersonal dynamics are ignored,
> where management is narrowly focused on professional competence, and where
> management is insensitive as to how culture, attitudes and interpersonal dynamics
> influence operational performance.  In short, the employees have identified a culture that
> is neither open to feedback nor one that sees failure as a vital source of learning.

Environmental Compliance Culture Assessment Report at 3-4.  The Company's greatest

opportunities for improvement, as evidenced by low scores, are in the Leadership Behavior areas

of Trust, Care, and Openness.  *See id.* at 19-21.  The low Trust score, notably, indicates a "lack

of confidence between employees, supervisors and managers."  *Id.* at 19.

The Environmental Compliance Culture Assessment Report advises that "[s]ignificant

leadership efforts will be required to create a mature and sustainable compliance culture."  *Id.* at

3.  Accordingly, the report identifies "a list of key success factors" that are important for

implementing a meaningful culture change program.  *Id.* at 42.  These include:

- "Top Management takes ownership for compliance failures;"

- "Top Management accepts that changes are needed;"

---

[16] The Company as a whole had an Organizational Culture Maturity score at the 27th percentile
(meaning it scored higher than approximately 27% of other companies in the comparison
database; or, conversely, that approximately 73% of other companies scored higher).  That score
places the Company in the "Apathetic" category, the second lowest of the five-level scale used in
Propel's methodology.  *See* CAM September 2019 Quarterly Report at 22-24 (providing
overview of Propel's methodology).  When the brands/operating lines were assessed
individually, the Organizational Culture Maturity scores varied, but all of the brands/operating
lines fell into either the "Apathetic" (second-lowest) or "Defeatist" (lowest) categories.  *See id.* at
24.

- "Management dedicates necessary time and resources to implement cultural changes;"

- "Top Management takes ownership of strengthening compliance culture;"

- "Culture changes are linked to the company strategy;" and

- "Systems and governance are aligned to support the change."

*Id.* During presentations made by Propel to the Company's Executive Leadership Team and senior shoreside management on September 3 and 5, 2019, Propel reiterated these "key success factors" and highlighted that the involvement of "Top Management"[17] is critical to a successful culture change program, and that a change in culture cannot be effected without the active and sustained engagement of leadership.

At the October 2, 2019, Status Conference, the Carnival Corp. CEO referenced the Environmental Compliance Culture Assessment Report and stated:  "[W]e have to make certain that the culture we want is established.  Having said that, Your Honor, I think that the Propel Study highlighted, again, some of those things we know we have to do better on."  Status Conf. Tr. at 19 (Oct. 2, 2019).

2.      <u>Company Retention of Outside Consultant</u>

The Company has retained an outside consultant, the Ethics & Compliance Initiative ("ECI"), to "develop an action plan addressing the areas of improvement discussed in [Propel's] culture survey report."  October 2019 Probation Supervision Report, Attachment 3, at 1.  ECI indicated that it would "assist the company in further reviewing, analyzing and interpreting the results" and "lead action planning sessions with the [Company] leadership to discuss the results, define short- and long-term priorities and next steps."  Letter from ECI to Propel (Sept. 16,

---

[17] Propel defines "Top Management" as the "Board of Directors and the executive management teams of [All Brands Group], Groups and [Operating Lines]."  *Id.* at 2.

December 18, 2019

2019), at 1.  To the best of the CAM's knowledge, the Company has not yet finalized this action

plan.

In connection with its work, ECI made several requests for additional information from

Propel.  *See id.* at 1-2.  On October 18, 2019, the CAM Team transmitted to ECI, via the

Company, the following additional information from Propel in response to ECI's requests:

- A document describing the structure, validity, and reliability of the survey instrument, as well as the survey items and the Leadership Behaviors to which each item related;

- The scores for each brand, shoreside group, and ship;

- A cruise industry benchmark showing the average scores by Leadership Behavior available for non-Carnival Corp. cruise companies in the Propel database;

- An analysis comparing the current AIDA and Costa results to the results of a previous assessment conducted by Propel of AIDA and Costa in 2014; and

- The text of the over twenty-one thousand free text comments made by survey participants.  These comments were translated into English and anonymized.

*See Supplemental Information Prepared by Propel in Response to ECI's Requests* (Oct. 18,

2019).

On October 28, 2019, ECI made an additional request for raw scores for each survey

item.  *See* Email from ECI to Propel (Oct. 28, 2019).  Propel expressed concern to ECI that the

request for raw scores for individual survey items could distract the Company from

understanding "the underlying cultural dimension" of the survey results.  *See* Email from Propel

to ECI (Oct. 30, 2019).  ECI reiterated its request for the raw scores for individual survey items.

*See* Email from ECI to Propel (Nov. 1, 2019).  Propel provided raw data scores for the individual

brands on November 15, 2019.  *See* Email from Propel to ECI (Nov. 15, 2019).

3.  Operating Line Presentations

Following the presentation to the Executive Leadership Team on the results of the

Environmental Compliance Culture Assessment on September 3, 2019, the Company requested

December 18, 2019

that Propel give additional presentations to each of the operating lines.  The operating line presentations were held on:  November 21, 2019 (Carnival Cruise Line); December 3, 2019 (Carnival UK); December 9, 2019 (Holland America Group); and December 12, 2019 (Costa Group).

4.    <u>Ongoing CAM Team Examination</u>

The Company has stated that "[a]lthough the efforts to improve the culture of a company with more than 120,000 employees will inevitably extend beyond the term of the ECP, [the Company] hopes appreciably to improve its culture by the time Propel conducts the second stage of its survey at the end of the ECP."  *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on October 2, 2019*, Dkt. No.162 (Sept. 25, 2019), at 2. To date, the Company has yet to finalize its action plan or announce concrete steps it will take to address the findings of the Environmental Compliance Culture Assessment.  The CAM will report on the Company's response to the assessment findings, including the extent to which top leadership utilizes the "key success factors" referenced above.

**B.  Corporate Compliance Structure**

1.    <u>Background</u>

The Company continues its efforts to restructure its corporate compliance function.  As discussed in prior CAM reports, the Company pleaded guilty on June 3, 2019, to a violation of probation for "failing to provide sufficient responsibility and authority to the [Environmental Corporate Compliance Manager] to implement the ECP," Dkt. No. 134 at 10, and "acknowledge[d] that it failed to establish [an Environmental Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP."  *Id.* at 2.  This issue was brought to the Company's attention at least as early as the end of ECP Year One, when the CAM made a finding that the Company had failed to provide the Environmental

Corporate Compliance Manager with ECP-required authority.  *See* CAM First Annual Report at 4-5, 28.  The CAM also found that the Company's complex corporate structure, including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance, was an unresolved barrier to environmental compliance.  *See id.* at 4-5, 25-30.  The CAM continued to report on the Company's failure to remedy these findings throughout ECP Year Two.  *See* CAM Second Annual Report at 46-49, 91-92.  However, the Company took only limited actions in response, until it faced the probation revocation petition filed by the Office of Probation near the end of ECP Year Two.  *See* Dkt. Nos. 93, 110, 134, 143.

As part of the Probation Agreement, the Company committed "to restructure its existing corporate compliance governing authority."  Dkt. No. 134 at 10.  The Probation Agreement requires the Company to undertake a number of actions, including appointing a Chief Ethics and Compliance Officer, promoting the Environmental Corporate Compliance Manager, and providing them "***each*** with: the appropriate budget and staff; a substantive role in financial, strategic, and sustainability planning processes; and compliance authority over regulatory obligations and operations across and within all brands."  *Id.* at 2 (emphasis added); *see also* CAM September 2019 Quarterly Report at 31-33.

Consistent with its obligations under the Probation Agreement, the Company submitted to the Court, CAM, TPA, and Interested Parties its proposed action plan for re-structuring its corporate compliance function on August 14, 2019.  *See* Proposed Action Plan.  After receiving joint comments from the CAM and TPA, the Company submitted to the Court its final action plan on September 13, 2019.  *See* September 2019 Final Action Plan.  The September 2019 Final Action Plan incorporated changes in response to concerns expressed by the CAM and TPA on the Proposed Action Plan, including concerns relating to:  (1) the role and authority of the

Environmental Corporate Compliance Manager and Chief Ethics and Compliance Officer; and (2) budgetary resources for compliance.  *See* Joint CAM/TPA Proposed Action Plan Comments at 1.  Many of these changes consisted of additions to descriptions of the Environmental Corporate Compliance Manager and Chief Ethics and Compliance Officer positions, stating in a conclusory manner, for instance, that these individuals have a "substantive role"[18] in financial and strategic planning processes and "authority and [substantial] control"[19] over the operating lines.  *See* CAM September 2019 Quarterly Report at 39-41.  For the most part, these changes mirror language from the Probation Agreement and Joint CAM/TPA Proposed Action Plan Comments.  What remains unclear is how these concepts and terms such as "substantive role" will be implemented in practice.  The CAM Team will continue to focus on understanding whether there are concrete and observable ways in which the Environmental Corporate Compliance Officer and Chief Ethics and Compliance Officer will exercise authority in support of compliance efforts.

2.     Updated Final Action Plan and Boards' Statement on Compliance

On October 9, 2019, the Company submitted to the Court, CAM, TPA, and Interested Parties an update to its September 13, 2019, action plan for re-structuring its corporate compliance function, to reflect changes since the September submission.  *See* October 2019 Final

---

[18] For example, the Chief Ethics and Compliance Officer will "participat[e] in the financial planning processes, and play[] a substantive role in the full plan cycle[.]"  September 2019 Final Submission Letter at 8.  The Environmental Corporate Compliance Manager will "participate in and perform [a] substantive role in financial, strategic, and sustainability planning processes." September 2019 Final Strategic Plan at 29.

[19] For example, the Chief Ethics and Compliance Officer will "[a]ssume compliance authority and substantial control to oversee and implement the Company's overall ethics and compliance functions – including the ability to direct change and actions across and within all brands (if, and when, necessary ) . . . The Environmental [Corporate Compliance Manager] will maintain authority and control over [Operating Line Compliance Managers]."  *Id.* at 27.

December 18, 2019

Action Plan.  As with the prior submissions, it consists of three primary documents:  a

submission letter, a charter, and a strategic plan.  Among other changes, the October submission

includes the following updates:

- **Independent Legal Representation for the Special Compliance Committee of the Boards of Directors.**  A newly convened Special Compliance Committee of the Carnival Corp. Boards of Directors has retained a private law firm to provide it with separate legal representation.  *See* October 2019 Final Submission Letter at 3.  The Special Compliance Committee is compromised entirely of independent directors.  *See* Boards' Statement on Compliance at 2.  It "will be the Board Committee primarily responsible for overseeing the [Ethics and Compliance] Program, and the [Chief Ethics and Compliance Officer] will report to this Committee, as well as the Audit Committee and HESS Committee (as requested or as the Chief Ethics and Compliance Officer deems necessary)."  October 2019 Final Charter at 4 (footnote omitted); and

- **Annual Training Curriculum for the Boards of Directors.**  The Special Compliance Committee has reviewed and approved an annual training program for the Boards of Directors "to help educate the Boards as to the importance of topics in [the area of ethics and compliance], and the Boards' oversight role."  October 2019 Final Submission Letter at 3-4.  The initial curriculum will consist of four sessions to be held from October 2019 through July 2020, covering:  (1) culture, core values, and response plan; (2) review of the new Ethics and Compliance Department and the new DOJ guidance; (3) the role of Board oversight and fiduciary duties in the environmental and safety context; and (4) tools for measuring compliance program effectiveness.  *Id.*[20]

The October 2019 Final Action Plan includes two additional attachments:  (1) an email

sent to Company personnel announcing the Ethics and Compliance team, including brief job

descriptions and individual bios for the Deputy Chief Ethics and Compliance Officer;

Environmental Corporate Compliance Manager; Health/Safety/Security Corporate Compliance

Manager; General Corporate Compliance Manager; Incident Analysis Group Investigations

Leader (*i.e.*, the Vice President of the Incident Analysis Group); Compliance Risk Management

---

[20] The October 2019 Final Charter also clarifies that the Environmental Corporate Compliance Manager is a member of the newly established Executive Compliance Committee.  The September 2019 Final Action Plan did not list this position as a member of the Committee, as required by the Probation Agreement.  *See* CAM September 2019 Quarterly Report at 38.

December 18, 2019

Leader; and Compliance Training Leader, *see* Compliance Structure Announcement; and (2) an email sent to Company personnel with the statement, required under the Probation Agreement, from the Carnival Corp. Boards of Directors reiterating the Company's and the Boards' commitment to compliance.  *See* Boards' Statement on Compliance.

The Boards' Statement on Compliance states that "[p]rotecting the environment and ensuring the health and safety of our customers and employees are core values of our Company." *Id.*  This message is long overdue:  at the end of ECP Year Two, the CAM found that "[t]he Company does not express protection of the environment as a core value, or one that takes precedence over revenue generation, in its communications of corporate values."  CAM Second Annual Report at 65.  Observable behavior by top leadership consistent with this statement is necessary if the message is to resonate with employees across the Company to the same degree as the long-standing messages on the value to leadership of delivering a great guest experience and breakthrough shareholder returns.  *See id.*

3.   Financial Plan Supplements

On December 10, 2019, the Company provided the Interested Parties, CAM, and TPA with a supplement to the October 2019 Final Action Plan to reflect "the final version of the Company's financial plan for the broader ethics and compliance program" for fiscal years 2019 (historical) and 2020 (proposed).  Final Financial Plan at 1.[21]  The Company had provided a preliminary version of the financial plan on November 1, 2019.  *See* Preliminary Financial Plan.

---

[21] The Probation Agreement requires the Company's action plan to include "a preliminary annual compliance budget for the various compliance responsibilities," as well as "a summary and description of the changes in budget/resources —(actual for 2019; and proposed for 2020)."  Dkt. No. 134 at 3.  The Company notes that it "uses the term 'plan' versus 'budget' due to the operationally-driven process it follows, which allows it to make the necessary adjustments based upon a variety of circumstances that can arise throughout the year."  Final Financial Plan at 1.

December 18, 2019

As the CAM has noted, the Company's action plan submissions in September and October 2019 were "not . . . able to provide a detailed forecast for the overall [Ethics and Compliance] Program for 2020" because the "annual plan process [was] still underway for 2020" at the time of those submissions.  *See* CAM September 2019 Quarterly Report at 41; October 2019 Final Submission Letter at 7.

The Final Financial Plan includes a "final revised summary of 'compliance' spend for both 2019 and 2020" for All Brands Group and each of the Company's four operating lines, arranged by three substantive categories:  (1) Health, Safety, and Security; (2) Environmental; and (3) General Corporate Compliance.  *See* Final Financial Plan at 1-2.  Overall, it estimates an increase in total compliance spend of approximately $18.8 million from 2019 to 2020 (approximately $2.4 million of which is Environmental),[22] along with the addition of forty full time equivalent ("FTE") compliance staff across the Company from 2019 to 2020 (thirteen of whom are Environmental).[23]  Final Financial Plan at 2.[24]

The Final Financial Plan also sets forth a list of outside consultant projects for the fourth quarter of 2019 and into 2020, including:

---

[22] This figure was approximately $21.6 million (approximately $1.2 million of which was Environmental) in the Preliminary Financial Plan.  *See* Preliminary Financial Plan at 2.

[23] This figure was 65 FTEs (eighteen of whom were Environmental) in the Preliminary Financial Plan.  *See id.*

[24] The plan notes that "the financial resources and FTEs associated with the [Health, Safety, and Security] functions at [All Brands Group] are much less than those allocated for both the Environmental and General Compliance functions.  These differences are due to the higher levels of resources and the overall maturity of the health, safety and security functions that are currently in place within the Operating Companies."  *Id.*

December 18, 2019

- Change management;[25]

- A new IT compliance data science project;

- Enhancements to IT systems to improve compliance;

- Compliance risk assessments;

- An environmental recordkeeping review;

- A Reliability, Availability, and Maintainability study of all shipboard pollution prevention equipment; and

- Revised and enhanced environmental and general training.

Final Financial Plan at 5-6.  An identical list of projects was provided in the Preliminary

Financial Plan.

The CAM Team is reviewing the Final Financial Plan.  The CAM Team also intends to

seek further information on the source of the funding and resources for the Ethics and

Compliance Department and Program at the All Brands Group and brand/operating line levels—

for instance, is the ethics and compliance function being funded by offsets or resource-shifting

---

[25] It is unclear what "change management" refers to.  Similar terminology can describe related, but distinct, concepts.  For instance, "change management" typically refers to changes at an organizational or behavioral level, and can be defined as "the practice of applying a structured approach to transition an organization from a current state to a future state to achieve expected benefits."  *See What is Change Management?*, https://www.acmpglobal.org/page/change_management.  "Management of change," on the other hand, typically refers to the technical side of change and "is a structured process that is used to review all proposed changes to equipment, raw materials, processes, and procedures before the changes are implemented to evaluate the impact and risks associated with the change."  *See Management of change vs. change management*, https://www.plantservices.com/articles/2012/10-management-of-change-vs-change-management/.  It is this latter concept—management of change—in which the Court has expressed an interest.  As noted above, the Court requested more information on the Company's "[p]rocesses designed to implement management of change principles when new actions are taken" in the Order of October 31, 2019.  *See* Dkt. No. 167 at 2.

December 18, 2019

from other areas?  If so, were any associated risks and impacts evaluated using management of change principles?

        4.     <u>Ethics and Compliance Personnel</u>

The December 10, 2019, Final Financial Plan supplement includes two attachments: (1) a roster of Ethics and Compliance Program personnel for 2019 and 2020, including for All Brands Group and each of the Company's four operating lines, *see* Final Roster; and (2) a list of Ethics and Compliance Program functional leaders for All Brands Group and each of the operating lines, including Operating Company Chief Ethics and Compliance Officers, Deputy Chief Ethics and Compliance Officers, Operating Line Compliance Managers, Operating Line Training Managers, Compliance Risk Leaders, Compliance Communications Leaders, and Incident Analysis Leaders.  *See* Final Functional Leaders List.  The Company previously provided preliminary versions of these documents on November 1, 2019.  *See* Preliminary Roster; Preliminary Functional Leaders List.  Overall, these documents reflect that the staffing of the Ethics and Compliance Program positions is an ongoing effort, with many key positions "to be determined."

The Chief Ethics and Compliance Officer has stated that many decisions about structuring the compliance function at the operating line level are being left up to the individual companies.  *See* Employee Interview Notes.  This is likely to include, for instance, the relationships and reporting lines between the Operating Company Chief Ethics and Compliance Officers, Operating Line Compliance Managers, and other functional leaders and compliance managers.  *See id.*; *see also* Final Functional Leaders List at 1 (indicating, for example, that only two out of the four operating lines will have a Deputy Chief Ethics and Compliance Officer position, and that the Health/Safety/Security Compliance Leader position will be filled by

"various" unspecified individuals at each of the operating lines).  As a result, different structures may emerge at each of the operating lines.  The CAM takes no position on this approach, but is interested to see how it will address Company-wide compliance support needs (such as the implementation of corporate-wide IT initiatives under the global strategy of the Company's new Chief Information Officer.  *See infra*, Part III.G.1).  The CAM Team will continue to seek to understand the structure and implementation of the ethics and compliance function at both All Brands Group and the operating lines.

> 5.    Ongoing CAM Team Examination

As discussed in prior CAM reports, a tremendous amount of effort has gone into developing the Ethics and Compliance Department and Program.  *See* CAM September 2019 Quarterly Report at 41-43.  New compliance structures and systems alone cannot succeed in addressing the Company's current compliance challenges and building a sustainable compliance culture.  A primary function of a compliance program is to address systemic and cultural issues that drive a company's compliance challenges.  It remains crucial that the Company's top leadership (*i.e.*, the CEO and Boards of Directors) take personal responsibility for and lead the promotion of a culture of compliance.  *Id.*  For the compliance structures and systems to be effective, top leadership's acceptance of responsibility and commitment to change must be authentic.  Messaging alone is not enough; words must be backed up by concrete actions by top leadership that make behaviors that support compliance as valued as behaviors that support other business imperatives.

The CAM Team will continue to monitor the implementation of the October 2019 Final Action Plan and overall restructuring of the compliance function, including the projects and initiatives listed in the Final Financial Plan and October 2019 Final Action Plan, as well as the

Company's ongoing efforts to hire a new member of the Boards of Directors with corporate compliance experience.  The CAM Team will focus on the issues highlighted in the Court's Order of October 31, 2019:  leadership communications regarding environmental compliance as a core value; actions to ensure a sufficient number of qualified deck, engine, and hotel crew members on Company ships; the integration of environmental compliance into financial and strategic planning processes; the adoption and implementation of processes designed to enable learning and continuous improvement through the assessment of data and findings; and the adoption and implementation of processes designed to implement management of change principles when new actions are taken.  *See* Dkt. No. 167 at 1-2.

Consistent with the Court's direction, *see* Dkt. No. 157 at 1, the CAM Team will also continue to track the Company's efforts to create benchmarks and use empirical measures to assess its stated aim of establishing a "world class compliance and ethics program."  *See* Third Annual Work Plan at 12; Status Conf. Tr. at 33 (July 19, 2019).

Further, the CAM Team will examine whether top leadership accepts the findings of the Environmental Compliance Culture Assessment, and what steps they take to address their role in fostering a culture that is marred by a "lack of confidence between employees, supervisors and managers."  Environmental Compliance Culture Assessment Report at 19.

    **C.**    **Investigations**

        1.    <u>Background</u>

During the first year of the ECP, one of the CAM's most significant findings identified that the "Company's internal investigations are critically flawed."  *See* CAM First Annual Report at 5, 33-40.  Specifically, the CAM observed that:  (1) investigations repeatedly failed to identify root cause(s), and the Company lacked a procedure or standard methodology for performing root

December 18, 2019

cause analysis;[26] (2) investigation reports often sought to attribute blame to specific shipboard personnel, rather than evaluate the role of broader, systemic issues that may have contributed to the incident; (3) the investigation program was still largely decentralized, despite being housed in the RAAS function; (4) relevant policies and procedures provided little guidance on how to conduct investigations, including with respect to preservation of evidence; (5) there was inconsistent information sharing regarding brand/operating line investigation findings between brand/operating line investigators and RAAS; (6) there were delays in the conduct of investigations led by brands/operating lines; and (7) the Company failed to follow existing procedures or guidance as part of its internal investigations, or to provide adequate guidance and direction to external investigators in third-party led investigations.  *See* CAM First Annual Report at 33-40.

In September 2018, the Company committed to the Court that it would improve its investigations program through a number of proposed actions and associated timetables.  *See Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21, 2018) ("Proposed Investigations Timeline").  The actions in the Company's Proposed Investigations Timeline were based on recommendations from an outside consultant, DNV GL AS Maritime ("DNV GL"), that the Company engaged to assess its internal investigations process and make recommendations for improving and standardizing the program.  *See* DNV GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev.

---

[26] The TPA made a similar finding in ECP Year One that the Company's investigations procedures "are inconsistent, non-conclusive and ineffective.  There is no formal 'Root Cause Analysis' process for investigation[s]."  TPA First Annual Report at 3, 5, 21-23.  At the end of ECP Year Two, the TPA found that there is still "no effective procedure in place to identify or develop preventive actions or Root Cause and Analysis."  TPA Second Annual Report at 3.

December 18, 2019

Final (May 8, 2018), PCL_ECP00051998-52050.[27]  As discussed below, the initial Company

deadlines have passed or been revised, and many proposed actions remain incomplete, including

the revision of relevant procedures and guidance.[28]

      Around the same time as its September 2018 submission to the Court, in a separate

correspondence with the CAM, the Company announced its plan to create a new, independent

department that would be responsible for what are deemed to be significant HESS investigations.

*Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5,

2018), at 1.  The Company missed its proposed deadlines in the September 2018 Court

submission while it conducted an extensive search for an individual to lead this new

investigations department, which has been named the Incident Analysis Group.  In late March

2019, the Company hired a former official from the United States National Transportation Safety

Board to lead the new department as the Vice President of the Incident Analysis Group.  *See*

CAM September 2019 Quarterly Report at 46.

      On August 30, 2019, the CAM Team requested an updated timeline for implementation

of the efforts to address the CAM and DNV GL findings.  *See Court Appointed Monitor*

*Communication Thirteenth Request for Documents and Information* (Aug. 30, 2019).  The

---

[27] DNV GL's recommendations included the need for:  (1) a more clearly defined and consistent
incident investigation process, with clear lines of authority across the brands; (2) a more
structured approach to root cause analysis and reporting; (3) improved training on investigations;
(4) consistent investigation and reporting methodology; and (5) methods for tracking and
trending this information across the fleet to identify and manage key areas of risk.  *See id.* at
PCL_ECP00052035-39.

[28] The proposed deadline for finalizing these procedures was September 30, 2018.  *See* Proposed
Investigations Timeline.  Shortly before that deadline, the Company provided the CAM with
draft revised procedures, prepared by DNV GL.  *See Carnival - Investigation Policies and
Procedures* (Sept. 25, 2018).  However, as noted below, the review and finalization of these
procedures was suspended pending the hire of the new investigations group lead, and is still
incomplete.

December 18, 2019

Company provided a list of actions and anticipated completion dates, including the following actions which had target completion dates of September 16, 2019, but remain incomplete:

- By September 16, 2019, finalizing revised investigation procedures, report templates, and relevant appendices;

- By September 16, 2019, developing a procedure for accreditation of incident investigators; and

- By September 16, 2019, implementing a competency development process.

*See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019).

2.   Updates on Progress Toward Improving the Investigations Program

i.   *Incident Analysis Group Structure*

The Incident Analysis Group is part of the All Brands Group Ethics and Compliance Department.  The Vice President of the Incident Analysis Group currently reports to the General Corporate Compliance Manager.  *See* October 2019 Final Charter at 16.  However, the CAM understands that the Company recently decided to transfer oversight of the Incident Analysis Group to the Health/Safety/Security Corporate Compliance Manager, a position that will be filled by the current All Brands Group Vice President of Corporate Compliance for Safety, Security & Health.  *See* Employee Interview Notes.

Under the current structure, the Incident Analysis Group handles investigations of what are deemed to be significant HESS investigations, while the brands/operating lines and ships continue to perform what are deemed to be less significant HESS investigations.[29]  RAAS continues to perform certain non-HESS (*e.g.*, financial/fraud) investigations.

---

[29] The CAM understands that the revised investigation procedures will include a risk assessment matrix that will provide guidance on classifying the significance/severity of HESS incidents and

The Company's revised investigation procedures remain incomplete.  As a result, the delineation of matters which will be investigated by the Incident Analysis Group, the brands/operating lines, and/or the ships remains unclear.  Further, the division of authority between key corporate leaders—including the Vice President of the Incident Analysis Group, the Chief Maritime Officer, and the Chief Ethics and Compliance Officer—also remains unclear with respect to:  the decision whether to investigate an incident; the review, assessment, and possible revision of investigation reports; and the communication of findings and lessons learned more broadly across the Company.  Even with the efforts to centralize the investigations structure and process, the CAM understands that brand/operating line, ship, and RAAS investigations continue to operate subject to separate oversight.  In addition, the CAM understands that there may be some limitations in the ability of personnel to access and review incident-specific information from different brands in the new SeaEvent platform.  *See* Employee Interview Notes.  It remains to be seen whether these separate groups will effectively coordinate and share incident information, best practices, and lessons learned in order to support Company-wide continuous improvement efforts and implement the recommendations laid out by DNV GL eighteen months ago.

### ii.    *Incident Analysis Group Staffing*

The Incident Analysis Group has eight investigator positions (seven of which are filled as of the date of this Report).  The investigators are divided across the Company, each based out of one of the Company's brand/operating line or All Brands Group offices.  Three of the current investigators are former RAAS investigators, hired prior to the formation of the Incident

---

near misses for investigation by the Incident Analysis Group, brands/operating lines, and/or ships.  As noted below, however, the current classification of matters for investigation is unclear.

December 18, 2019

Analysis Group.  The other four investigators are new hires hailing from a varied background. They include a senior class surveyor, a Carnival Corp. RAAS auditor, a Carnival Australia Maritime Compliance Officer, and an investigator from the United Kingdom Marine Accident Investigation Branch.  *See* Incident Analysis Group Investigator Resumes, PCL_ECP00124811-23.  The Company is recruiting for the vacant eighth investigator position, following the recent promotion of one investigator to the position of Deputy Vice President of the Incident Analysis Group.  *See* October 2019 Probation Supervision Report, Attachment 3, at 4-5.  The CAM understands that the new Deputy will, among other duties, oversee the onboarding and accreditation process for new investigators, as discussed further below.  *See* Employee Interview Notes.

iii.     *Revised Investigation Procedures*

As of the date of this Report, the Company has not finalized its revised investigation procedures, guidance, report templates, and relevant appendices.  These had an initial proposed deadline of September 30, 2018, *see* Proposed Investigations Timeline, and a revised target deadline of September 16, 2019.  *See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019); *see also* Employee Interview Notes.  The CAM Team initially reviewed a draft set of procedures prepared by DNV GL in September 2018, and then a draft set prepared under the Vice President of the Incident Analysis Group in July 2019.  *See* CAM September 2019 Quarterly Report at 51-52.  Each draft provided guidance regarding the process for conducting an investigation.  However, each draft also lacked certain elements, including guidance for root cause analysis, as well as processes for the dissemination of lessons learned, data sharing, and trend analysis.  The CAM Team will review the latest revised procedures when they are available, including the roles and

responsibilities of key decision makers, Incident Analysis Group investigators, and brand/operating line- and ship-specific personnel.

iv. *Training and Certification*

(1)   CAUSAL ANALYSIS TRAINING

From November 11-14, 2019, the Company held a training on causal analysis for Incident Analysis Group investigators and management in its Miami, Florida offices.  The training was conducted by MTO Safety, an outside consultant retained by the Company.  *See* October 2019 Probation Supervision Report, Attachment 3, at 4-5.  Members of the CAM Team attended a short overview of the training, provided by MTO Safety, on November 15, 2019.

Based on the limited course summary, the CAM understands that the MTO Safety course covered:  an overview of incident investigations generally; the role investigations play in the broader loop of continuous improvement for an organization; and a simple technique to systematically assess the causal chain (or roots) of an incident.  The training overview provided to the CAM Team emphasized the importance of identifying and reviewing all underlying causes, or "pre-incidents," leading to the final incident.  This approach helps to identify any underlying or systemic causes of an incident, rather than just the proximate (*i.e.*, direct or immediate) causes of an incident, which are often symptoms of the underlying or systemic causes.  This causal assessment is aided through a proprietary MTO Safety software that structures the chain of events, causes, risk barriers, and deviations in simple diagrams.[30] Attendee feedback on the training to the CAM Team was largely positive.  The CAM

---

[30] The CAM understands that the Company has a license to use this software for a limited period. The process set forth in the software, however, while useful, can also be replicated manually.

December 18, 2019

understands that participants also recommended the incorporation of additional role play exercises and guidance on report generation.  *See* Employee Interview Notes.

The Company plans to offer the causal analysis training at CSMART in February, April, and July 2020 for shoreside staff that conduct investigations on behalf of the Incident Analysis Group or at a brand/operating line; and, in 2021, will require the training for shipboard Second or First Officers, Safety Officers, Second or First Engineers, and Senior First Engineers before any of these positions can be promoted to Staff Captain or Staff Chief Engineer.  *See* October 2019 Probation Supervision Report, Attachment 3, at 4.  This language indicates that the training will only be required for shipboard personnel that will be promoted to Staff Captain or Staff Chief Engineer, and will otherwise remain optional for shipboard personnel.

In addition to the in-person training course, the Company retained an outside consultant, the University of West Florida, to develop a computer-based training module on root cause analysis to be provided to shipboard and shoreside personnel that conduct what are deemed to be less significant HESS investigations.  *Id.*  The Company reports that this training was rolled out around mid-December 2019.  *See* Employee Interview Notes.  However, pending final revised procedures on the investigation process, it is not clear which ship or shoreside personnel will be investigating such incidents, whether this training will be required for such personnel, or what the process will be for brand/operating line- and ship-led investigations.

(2)    INCIDENT ANALYSIS GROUP INVESTIGATOR ACCREDITATION

As of the date of this Report, the Company continues to work on finalizing its new procedures for incident investigator accreditation and competency development.  These had a target completion date of September 16, 2019.  *See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at 5.  The CAM

understands, however, that new Incident Analysis Group investigators are subject to an internal review process prior to leading investigations—a process which each of the new hires mentioned above has completed or is currently undergoing.  As part of this process, a new investigator partners with an existing investigator to assist the existing investigator in one or more investigations.  Following the completion of that initial investigation or investigations, the roles will swap, and the new investigator will lead an investigation with assistance from the existing investigator.  Upon recommendation by the existing investigator, the Deputy Vice President of the Incident Analysis Group will conduct an observation-based assessment of the new investigator and determine whether they are ready to lead an investigation independently.  Separately, as part of onboarding, the CAM understands that investigators attend various technical training courses at CSMART, including Bridge Resource Management and Engine Resource Management.  *See id.* at 3; Employee Interview Notes.

> v.  *IT Challenges*

Management of data and information needed for compliance continues to be a challenge for the Company, including as it relates to investigations.  For example, the CAM understands that the Incident Analysis Group was only recently able to provide:  (1) access to investigation "reports, recommendations, action owners, and due dates" on Global HESS, *see* October 2019 Probation Supervision Report, Attachment 3, at 4; (2) centralized investigation data and records on a shared drive; and (3) ready access to records for various brands/operating lines in the SeaEvent tracking and reporting system.  *See* Employee Interview Notes.  The CAM understands that the Company does not currently have a systematic method to track and analyze investigation

root causes and findings, which may present an obstacle to the identification of investigation trends for assessment and follow-up.  *See id.*

       *vi.*   *Investigation Reports*

The CAM Team continues to review investigation reports for HESS incidents prepared by the Incident Analysis Group, as well as the brands/operating lines and ships.  The factual and technical assessments in the Incident Analysis Group reports vary in quality.  Some appear to be both factually and technically thorough with an assessment of direct, contributing, and potentially systemic causes.  *See, e.g.*, *Final Report, Costa Deliziosa, Near Miss Allision in Venice*, IAG2019030 (Oct. 14, 2019), PCL_ECP00142870-886 (a safety, rather than an environmental, incident).  Even these, however, may fail to identify or address broader, systemic concerns or share lessons learned to the broader corporate audience, both shipboard and shoreside.  For example, a recent report regarding a near miss allision[31] identifies the ineffective implementation of Bridge Resource Management[32] techniques as a contributing factor to the near miss.  *See id.* at PCL_ECP00142884 ("The principles of good [Bridge Resource Management] were not always evident and they were a contributive factor.").  The report recommends that data on the incident be sent to CSMART for "review and making of a case study."  *Id.*  The report, however, does not identify or address that the failure of Bridge Resource Management, Engine Resource Management (a similar concept, applied to the engineering team), or related

---

[31] An allision occurs when a ship strikes a stationary object.

[32] The Company defines Bridge Resource Management as the "effective management and utilization of all resources, human and technical, available to the bridge team to ensure the safe completion of the ship's voyage from berth to berth."  *Id.* at PCL_ECP00142879.

December 18, 2019

communications is found to be a contributing cause or factor in numerous investigation reports.[33] The review and recommendations in the near miss allision report, as in others, appear to have been developed in isolation, and highlight the Company's apparent resistance to identifying, assessing, and addressing what may be systematic trends.  This challenge is heightened by the differing approaches to investigations taken within the brands/operating lines and on ships, where investigation reports continue to vary widely in both substance and format.[34]

### 3.   Ongoing CAM Team Examination

The CAM Team will continue to monitor, assess, and report on the Company's efforts to restructure and enhance its internal investigations function during ECP Year Three, including:

---

[33] *See, e.g.*, *Investigation Report Caribbean Princess Black Water Discharge* (Feb. 12, 2019), PCL_ECP00139484-500; *Crown Princess*, KP20180048 (Aug. 16, 2018), PCL_ECP00136843-49; *Investigation Memo No. 54/2018 Zuiderdam – Emissions in Icelandic Exclusive Economic Zone* (Aug. 10, 2018), PCL_ECP00138243-62; *Investigation Memo No. 56/2018, Grand Princess – Washwater Discharge* (June 13, 2018), PCL_ECP00137879-903; *Investigation Memo No. 59/2018 Carnival Dream – Sewage Discharge* (June 3, 2018), PCL_ECP00137638-52; *Investigation Memo No. 42/2017 Oosterdam – Untreated Ballast Discharge* (Aug. 2, 2017), PCL_ECP00138016-24.  More recently, though shortly after the release of the *Costa Deliziosa* report discussed above, the National Transportation Safety Board released a Marine Accident Brief regarding a *Carnival Horizon* allision at New York's Manhattan Cruise Terminal, which identified the ineffective implementation of Bridge Resource Management techniques, as well as "ineffective interaction and communication," as a probable cause of the incident.  *See Marine Accident Brief: Contact of Cruise Ship Carnival Horizon with Manhattan Cruise Terminal Pier 90* (Oct. 22, 2019), *available at* https://www.ntsb.gov/investigations/AccidentReports/Pages/MAB1929.aspx.

[34] For example, a recent HESS Report to the Company's Boards of Directors includes an overview of a ship-led investigation that may have failed to review a key contributing factor and generate recommendations regarding a potentially significant issue.  *See Health, Environmental, Safety and Security, Technical, Regulatory, and Sustainability Report* (July 2019), PCL_ECP00137197-325, at PCL_ECP00137229.  The investigation attributed the cause of an illegal sewage discharge on the *Queen Victoria* to an oversight failure by a bridge officer who was distracted, in part, by "an IT project team visit to the Bridge."  *Id.*  The report identifies several corrective actions, including re-briefing of relevant personnel on "maintaining situational awareness and avoiding distractions," but fails to include any causal findings or corrective actions related to the deployment and scheduling of project teams by shoreside personnel.  *See id.*

December 18, 2019

(1) the Company's timetable and plans to meet milestones to enhance investigations; (2) the

function and structure of the Incident Analysis Group; (3) the development, implementation, and

effectiveness of investigation policies and procedures; (4) the process for identifying and

classifying matters for investigation, including the individuals responsible for making such

determinations and the timeframes for making them; (5) training for Incident Analysis Group,

brand/operating line, and ship investigators; (6) the process and methodologies for root cause

analysis that will be used by Incident Analysis Group, brand/operating line, and ship

investigators; and (7) the process for disseminating investigation results and lessons learned to

corporate leadership, including the Boards of Directors, and the fleets more broadly.  *See* Third

Annual Work Plan at 14.

### D.   Food Waste Management

#### 1.   Background

Food waste management—specifically, the risk that non-food items, including plastics,

are discharged into the ocean with food waste—remains a widespread and pressing challenge.

*See* CAM September 2019 Quarterly Report at 60-69; CAM Second Annual Report at 86-90;

TPA Second Annual Report at 3, 17-18.  As discussed in prior CAM reports, the problem was

identified by the Company's own employees as early as February 2018,[35] and was the basis for a

TPA audit finding in December 2018.  However, the Company's top leadership did not focus on

this issue until it faced the revocation of its probation in March 2019.  On June 3, 2019, the

Company pleaded guilty to a probation violation for the illegal discharge of non-food items,

---

[35] *See* CAM Second Annual Report at 88 (discussing the identification of concerns related to
food waste management across multiple operating lines and brands in February 2018 in the ECP-
required Fleet Engineering Survey results, as well as more than forty reports of incidents related
to food waste management on Covered Vessels throughout ECP Year Two); CAM September
2019 Quarterly Report at 61.

including plastics, in food waste by a Carnival Cruise Line ship in Bahamian waters in December 2018, along with the failure to accurately record the discharge in the ship's Garbage Record Book. *See* Dkt. No. 134 at 11.

Further review has confirmed that this issue is Company-wide. Since the start of ECP Year Three and as a result of increased checks of food waste systems, the Company's employees have detected and reported hundreds of events across all its operating lines and brands involving the discovery of comingled waste, including plastics, in various parts of the ships' food waste systems that have resulted in actual or potential prohibited discharges. *See, e.g.*, Carnival Corp. *HESS Weekly Flash Reports* (Apr. 24, 2019 through Aug. 7, 2019); Carnival Corp. *Food Waste and Galley Grey System Contamination Fleet Dashboards* (July 21, 2019 through Dec. 11, 2019). The TPA also continues to find issues related to food waste management in its ship audits. *See, e.g.*, ABSG, *Holland America Line Environmental Compliance Audit Report – Veendam* (Oct. 10, 2019) (issuing four Major Non-Conformity findings related to food waste management on the Holland America Line *Veendam*: (1) discovery of non-food items on the overboard food chute metal grill while observing an overboard discharge operation; (2) discovery of non-food items during an inspection of galley grease traps; (3) discovery of a non-food item floating on the tank surface during an inspection of galley grey water drain tanks; and (4) discovery of four missing galley drain scupper covers in the galleys and food preparation areas).

In the Probation Agreement, the Company admitted "that there is a need to improve waste management of non-food waste, including plastic garbage, on Covered Vessels and by Covered Personnel." Dkt. No. 134 at 5. The Company agreed to take various actions to

prioritize this issue, including creating two self-described "food waste Tiger Teams" [36] that are a subset of a larger Food Waste Task Force, and implementing a three-part program to improve its food waste management practices. *See* Dkt. No. 134 at 5-7; CAM September 2019 Quarterly Report at 62-67 (describing activities of the Tiger Teams and Food Waste Task Force, and efforts to implement the three-part program, during the first quarter of ECP Year Three).

2.    Updates on Probation Agreement Requirements

The Company continues to implement the three-part program required by the Probation Agreement:

i.    *Part One of Three Part Program*

- **Part One** requires the Company to "(1) develop and implement clearer and more effective procedures regarding the disposal of food waste; (2) develop new training and signage to ensure that the proper procedures are understood; and (3) use appropriate media, in particular video, to call attention to the new training, procedures, and the renewed commitment to handling of food waste. The Company will also (4) assess the staffing levels for both the operational and compliance aspects of food waste management using a qualified third party to determine appropriate resources to comply with the updated procedures." Dkt. No. 134 at 6. For the first three items, "by August 1, 2019, the Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables. With respect to the fourth item, the Company will retain a qualified third party to assess the necessary staffing. The Company will provide a copy of the third party assessment to the Interested Parties, CAM and TPA within seven days of receipt. Within 45 days after receiving that third party's assessment, the Company will provide the Interested Parties, TPA, and the CAM with its plan in

---

[36] "Tiger Team" is a term of art that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions. The term is "generally applied to a high-functioning team of specialists who come together to complete a specific project." *See What is a Tiger Team Approach?*, https://trextel.com/what-is-a-tiger-team-approach-how-to-successfully-launch-technology-and-save-space-missions-too/.

December 18, 2019

response to the assessment.  This plan will address the workload of the Environmental Officer."  *Id.* at 7.

For the first three items of Part One, the Company provided the Interested Parties, CAM, and TPA with its Food Waste Management Implementation Plan on August 1, 2019, and with an Update containing a more detailed implementation plan on September 4, 2019.  *See* CAM September 2019 Quarterly Report at 63-65 (discussing Food Waste Management Implementation Plan and Update).  The Environmental Corporate Compliance Manager has hired two individuals (one from Princess and one from Carnival UK) to "work[] exclusively on project managing the adoption of various measures to help ensure food waste compliance."  October 2019 Probation Supervision Report, Attachment 3, at 12.  These individuals "are currently focused on developing new procedures, training, signage, and other measures designed to help compliance."  *Id.*

Among other initiatives, the Food Waste Management Implementation Plan and Update call for "[r]eplacing the existing food waste Instructional Notice[37] with a clear and concise HESS procedure that incorporates the feedback gained from the Tiger Team visits."  Update at PCL_ECP00134215.  On October 24, 2019, the Company published this procedure in its Global HESS system.  *See ENV-1302 Segregation and Disposal of Food Waste* ("ENV-1302"); *see also Environmental Compliance Notice #6-2019*.  Notable changes from the prior Instructional Notice include:  (1) establishing a standardized "two-step process" for food waste segregation to be used

---

[37] On May 1, 2019, the Company issued a five-page Instructional Notice setting forth a range of food waste management requirements, including requirements for waste segregation, supervision, equipment and tank inspections, reporting, and recordkeeping.  *See IN ENV-07-2019 Additional Measures to Ensure Compliant Segregation of Food Waste*.

across all Company ships;[38] (2) establishing a requirement for color-coded waste bin/container systems to be implemented on ships "at all locations where food waste is initially segregated" by January 31, 2020;[39] and (3) reducing the requirement for inspecting the bottoms of food waste holding tanks for non-food waste items from weekly to "at least once per month."[40]  *Id.*  The CAM Team will monitor the implementation of this procedure, including soliciting feedback on the feasibility, clarity, and effectiveness of its requirements.

For the fourth item of Part One, the Environmental Corporate Compliance Manager retained an outside consultant, Lloyd's Register, to perform the review of staffing levels.  This review will consist of "a manning assessment of [the Company's] waste management processes, including an on-board assessment for eleven vessels" across multiple Company brands.  *Request for Consultancy Services* (Sept. 17, 2019), PCL_ECP00139907-10, at PCL_ECP00139907.  The work program contains three phases:  (1) "Review the documentation associated with current processes;" (2) "Review current processes – on board manning assessment;" and (3) "Release of manning assessment report and presentation."  *Id.*  The overall aim of the work is to "[a]ssess the staffing levels for both the operational and compliance aspects of food waste management (to include supervisory positions and the Environmental Officer)," and to support the Company "by making recommendations on current signage and/or training as relevant to staffing levels."

---

[38] For Step One, non-food waste items are to be segregated from food waste "starting as close to the source (where generated) as possible."  *See* ENV-1302.  For Step Two, all food waste bins/containers must be checked using a sorting table to identify and remove any additional non-food waste items.  *Id.*

[39] The waste bin/containers must identify the type of waste they are designed for using the following color codes:  red = food waste; blue = aluminum; yellow = glass; white = broken china/crockery; grey = paper and plastic.  *Id.*

[40] The tops of food waste holding tanks still must be inspected for non-food waste items prior to discharge, "[w]here feasible."  *Id.*

*Waste Management Improvements Program [Proposal]* (July 10, 2019), PCL_ECP00139870-906, at PCL_ECP00139872.  According to the Company, the consultant "will need until the end of January [2020] to conduct shipboard assessments" and "then will require another two months until the end of March [2020] to conduct analysis and provide a report of its findings."  *[Draft] Carnival Corporation's Response to Government's Suggestions Regarding Environmental Performance Metrics* (Oct. 29, 2019), at 1.  "To allow for unforeseen delays, the Company has set April 30, 2020 as the deadline" for completion of the assessment.  *Id.* at 2.  This timeline means that the assessment will not be completed until the beginning of ECP Year Four.

ii.     *Part Two of Three Part Program*

- **Part Two** requires the Company to "design and implement procedures to reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent by December 31, 2021.  It will also design strategies to reduce the total weight of food waste that the Company creates by 10 percent by December 31, 2021." Dkt. No. 134 at 7.[41]

For Part Two, the Company has developed baselines to measure its production and consumption of single-use plastics and generation of food waste by weight.  On single-use plastics, the Company intends to use 2018 aggregated procurement data for numerous single-use plastic items as its baseline for measurement against the goal of reducing its single-use plastics by 50% by December 31, 2021.  *See [Draft] Carnival Corporation's Response to Government's Suggestions Regarding Environmental Performance Metrics* (Oct. 29, 2019), at 2, Appendix B.  The Company reports that it "is taking a two pronged approach to reducing single use plastics."  *Id.* at 2.  The first prong will focus "on small items such as plastic straws, plastic stir sticks,

---

[41] The Company describes single-use plastic items as including "straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events."  *Id.*

December 18, 2019

plastic cocktail sticks and plastic toothpicks that are challenging to segregate from food waste. Items with obvious substitutes such as plastic cups, plastic cup lids, plastic cutlery and plastic shopping bags are also included in the Company's first tier of eliminated items." *Id.* The goal for this first prong "was October 31, 2019 and removal of those items is nearly complete." *Id.* The second prong "has kicked off and will focus on all other single use plastic items including individual amenity bottles, plastic Q tips, plastic garnish picks and individual sauce packages." *Id.* In addition, "there are ongoing efforts to reduce the use of plastic water bottles as part of the second phase of our plastics reduction efforts." *Id.* The Company "intends to track its reduction of single use plastics and will provide updates semiannually in June and December." *Id.*

On food waste generation, the Company "measured the weight of all food waste generated [on its ships] during the first two weeks of October 2019 (using scales and/or previously determined average bin weights), and will use that measurement as a baseline from which to measure progress" against the goal of reducing the total weight of food waste by 10% by December 31, 2021. *Id.* at 1. The Company "intends to track its generation of food waste per person on board per day (to normalize for variances in occupancy levels throughout the year) and will provide updates semiannually in April and October." *Id.*

The Company is also in the process of reviewing "food waste management and minimization systems" that can "provide an accurate record of the items wasted as well as the weight." Food Waste Management Implementation Plan at 10. One of these systems is currently installed on some Costa Group ships. *Id.* The Company is also reviewing the feasibility of global adoption of the Costa Group "4GoodFood" program, a food waste reduction program that aims to cut food waste in half by 2020. *See id.*

December 18, 2019

### iii.     Part Three of Three Part Program

- **Part Three** requires the Company, by October 31, 2019, to "review and provide an analysis of:  (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes."  Dkt. No. 134 at 7.  Further, by January 31, 2020, the Company "shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones."  *Id.*

For Part Three, on October 31, 2019, the Company submitted its review and analysis of food waste disposal technologies, systems, and processes.  *See* Food Waste Technical Review.  The review was performed by an independent marine engineer retained by the Environmental Corporate Compliance Manager, in conjunction with a marine consultant and the Tiger Teams.  The report contains "the joint considerations, recommendations, and views" of these individuals.  *Id.* at 1.  Observations and considerations from the report include:

- A "one size fits all" or "off the shelf" technical solution "is not readily apparent and custom solutions will need to be developed."  *Id.*;

- Change management "is an important factor to consider when developing the future plan.  Technical change decisions need to be reviewed by designated individuals or their delegates (stakeholders) to determine the impact to certain key areas, including manning and workload, before approval . . . Risk-based decision-making strategies coupled with a change management process have been well proven in the Oil and Gas industry for several decades and will go a long way towards helping to harmonize equipment installed across [the Company's] fleet and reducing the risk of unplanned operational impacts, including costs."  *Id.* at 1-2; and

- An "important goal should be to reduce/eliminate single-use plastics onboard" because "the most effective way to stop plastic from being discharged into the ocean is to avoid using it onboard in the first place.  If plastic ends up in a pulper/vacuum system, it will likely be macerated into smaller pieces that might be indistinguishable from the organic matter it is blended with."  *Id.* at 2.  The Company should also "capitalize on the existing motivation and desire of its crew members to play their part in sorting food waste at the source and provide the necessary resources (people), training and means (equipment) to achieve compliance."  *Id.*

December 18, 2019

Recommendations from the Report include:

- Developing and implementing a technical management of change procedure, which "should give the individual/team reviewing the specific technical/system change the authority to stop work/deny progress on the requested change until they are satisfied it addresses their relevant safety, public health, environmental, operational and functional concern."  *Id.* at 2-3;

- Adopting one of two possible solutions to address "increased hotel crew workload" resulting from the shutdown of food transfer/pulper stations:[42]  (1) return a minimum of three pulper stations to service; or (2) install food waste digesters[43] that can process all food waste generated onboard.  *Id.* at 3-4.  The report notes that "[i]t is unreasonable to expect crew members to effectively separate all non-food items from food waste on a ship that generates several tons of food waste each day[.]"  *Id.* at 3;

- Installing magnetic traps in food waste disposal systems to capture metallic items, such as cutlery, that inadvertently enter the system.  *Id.* at 6-7;

- Installing filters on washing machines because multiple ships "identified laundry as a potential source of plastic pollution."  *Id.* at 7; and

- Conducting engineering studies of food waste and grey water systems for each ship before upgrades.  *Id.* at 9-10.

Finally, the report evaluates a range of food waste technologies, and concludes that there

are only two "viable upgrade options available in the short term to improve [the Company's]

current food waste processing equipment capabilities:"  (1) upgrades to the existing pulper

systems, including installing food waste dryers; or (2) installing food waste digesters.  *See id.* at

---

[42] The report notes that these stations were shut down on many ships "to help ensure food waste management is compliant through increased supervision and the use of fewer stations, and also due to increased maintenance and workload resulting from breakdowns caused by non-food items like cutlery entering the pulper system."  *Id.* at 3.  However, this was done "with little to no apparent consideration for the long term occupational health and safety implications of manually handling and moving heavy buckets of food waste around the ship," which has "resulted in crew members resorting to whatever means are available to make their jobs easier.  On one ship, crew members resorted to using forklifts to create a temporary work platform to aid in the transfer of food waste into a food chute in the recycling center, which increases the risk of injury."  *Id.*

[43] A digester is "essentially a mechanized steel version of a human stomach that partially digests food waste and separates the water component."  *Id.* at 11.  They reportedly "cannot digest plastic and other non-food items like metals."  *Id.*  Such non-food items are removed on a periodic or as-needed basis.  *Id.*

December 18, 2019

10.  Of these options, the report finds that research conducted to date indicates that digesters

bring more benefits and "are a viable and effective means for [the Company] to enhance its food

waste processing capability and related compliance obligations."  *Id.* at 11.

As noted in the most recent CAM report, the Environmental Corporate Compliance

Manager is "leading a project to evaluate the benefits of green technology food waste digesters."

CAM September 2019 Quarterly Report at 67; October 2019 Probation Supervision Report,

Attachment 3, at 12-13.  Three different types of digesters are being tested on Company ships,

with over fifty units purchased to date.  *See id.*  The Environmental Corporate Compliance

Manager is also "leading an effort to evaluate galley grey water filtration equipment and the

development of a new standard for grey water filtration across the Company's fleet."  *Id.*  The

CAM Team will continue to monitor the Company's testing, procurement, and use of food waste

digesters, as well as its testing, treatment, and regulation of digester effluent.

3.    Other Initiatives

The Company continues to implement other food waste initiatives not discussed above,

including:

- The weekly food waste dashboard, which summarizes data by ship for both Covered and non-Covered Vessels on:  (1) the results of daily compliance checks of food waste systems;[44] (2) the results of food waste tank inspections, which includes reports of items found in food waste tanks, pulpers, and/or magnetic traps; (3) the results of grey water system inspections, which includes reports of items found in the grey water system (typically in grease traps); and (4) the status of drain bell/scupper cover installation and securing;[45] and

- The "Food Waste Shuffle" music video competition initiated by the Environmental Corporate Compliance Manager and his team.  Each ship and shoreside office had the

---

[44] The CAM understands that the components of the food waste system covered by these checks differ by ship.

[45] As discussed in the most recent CAM report, the Company launched an initiative to replace missing drain bells and scupper covers following a TPA audit finding that missing covers were

December 18, 2019

opportunity to enter, but was not required to do so.  Over seventy-five videos were submitted.  Three winning ships will receive prizes.  *See* October 2019 Probation Supervision Report, Attachment 3, at 13; Employee Interview Notes.

### 4.   Ongoing CAM Team Examination

The CAM Team will continue to monitor and assess issues associated with food waste management.  This will include the review, assessment, and tracking of the Tiger Team program and food waste initiatives, including the Food Waste Management Implementation Plan and Update, Food Waste Technical Review, and other components and deadlines of the three-part program set forth in the Probation Agreement.  *See* Third Annual Work Plan at 7.  As noted above, this will include examining the Company's testing, procurement, and use of food waste digesters, as well as its testing, treatment, and regulation of digester effluent.  The CAM Team also continues to review the Company's weekly food waste dashboard.

In addition, the CAM Team will evaluate the Company's process for selecting and vetting:  (1) shoreside waste vendors who handle the disposal of wastes offloaded from ships, including plastics, food waste, and other waste streams; and (2) vendors of equipment to be installed onboard, including food waste digesters.  The Company's 2018 Sustainability Report touts the Company's goal to "[f]urther develop and implement [waste] vendor assurance procedures[.]"  *See Sustainability from Ship to Shore: FY2018 Sustainability Report*, at 12,

---

causing non-food items, including plastics, to drain into a ship's grey water system.  *See* CAM September 2019 Quarterly Report at 68.  For a two-week period in November 2019, data on drain bell/scupper cover installations was missing from the food waste dashboard after the Company became aware of inconsistent interpretations by ships as to what was required due to ambiguity in the related Environmental Compliance Notice.  *See Drainbell Dashboard Clarification* (Nov. 1, 2019); *Environmental Compliance Notice #3-2019*; Employee Interview Notes.

December 18, 2019

*available at* https://carnivalsustainability.com/.  However, the Company has conceded that not all operating lines are following Company requirements for the vetting of waste offload vendors.[46]

### E.    Training

The CAM Team continues to monitor the Company's training in support of environmental compliance.  This includes its ECP-related curriculum and the integration of environmental compliance into trainings for deck and technical personnel.  *See* CAM First Annual Report at 21-23, 69-70; CAM Second Annual Report at 31-35; CAM September 2019 Quarterly Report at 69-80.

### 1.    General Updates on Company Initiatives

The Company continues to invest resources in environmental and ECP-related training.  Notable recent updates include:

- **CSMART Training Courses.**  The Company continues to conduct environmental and compliance-related trainings at its CSMART training center, including Environmental Officer training, Operational Excellence training for deck, technical, and environmental officers, and leadership training for deck, technical, and hotel employees.  *See* October 2019 Probation Supervision Report, Attachment 3, at 7-8.  As discussed below, *see infra*, Part III.E.3, CSMART held the first two iterations of the new Environmental Excellence, or Environmental Officer 3 ("EO3"), hybrid training/conference event (required for those in their third year as an Environmental Officer under the ECP) in August and November 2019; and

---

[46] The Company reports that "[c]urrent Company procedures require each Operating Line to develop and implement a waste offload vetting program as a Company Policy.  The TPA and the Company's internal audit team have identified that not all Operating Lines are following the procedure.  The Company has revised its procedure to require a standard vetting process for each waste vendor and is developing an implementation plan and timeline.  Operating Lines will continue to be held responsible for vetting their waste vendors.  It is expected this will take at least a year to vet all waste vendors."  *[Draft] Carnival Corporation's Response to Government's Suggestions Regarding Environmental Performance Metrics* (Oct. 29, 2019), at 3.

December 18, 2019

- **IT Tools.**  The Company continues to develop and roll-out various IT tools related to training, including:  (1) the Global Learning and Development Information System ("GLADIS"), a learning management system designed to deploy and track training; (2) CrewTube, an application for smart phones and tablets that allows crew members to access HESS information and complete some HESS trainings before joining a ship; (3) a new offline, tablet-based drill application to "assess training and drills;" (4) a new Instructor Led Training Attendance App that will be able to scan crew member IDs to assist in recording attendance at shipboard trainings; and (5) an online chat forum called The Environmental Hub for Environmental Officers to "share environmental compliance and stewardship information as well as solicit[] feedback on training, procedures and best practices;" and (6) an Environmental Hub Hotel Operations Forum for hotel operations personnel "to discuss environmental compliance topics, including food waste challenges, ideas, potential best practices, etc."  *Corporate Compliance Manager's Quarterly Environmental Compliance Report Q3 2019*, PCL_ECP001447152-273, at PCL_ECP001447162; *see also* CAM September 2019 Quarterly Report at 70, 82-84 (discussing training-related IT initiatives); *infra*, Part III.G.1 (same).

      2.   <u>Personnel Updates</u>

Following the retirement of the Director of Environmental Training at CSMART on September 6, 2019, the Company has appointed the former Operating Line Training Manager for Costa Group to serve in this role beginning in February 2020.  *See* October 2019 Probation Supervision Report, Attachment 3, at 9.  In the meantime, the current acting Director will continue to serve.  *Id.*

In addition, the Company recently hired replacement Operating Line Training Managers for Carnival Cruise Line, Holland America Group, and Costa Group.  *See id.* at 10; Final Functional Leaders List at 1.  All Brands Group also hired a new Manager, Ethics and Compliance Training.  *See* October 2019 Probation Supervision Report, Attachment 3, at 9.

3.    Environmental Excellence EO3 Course

As discussed in prior CAM reports, the Company has been working with outside consultants to develop and launch a new Environmental Officer CSMART training course, called Environmental Excellence or EO3.  This course is the third annual training provided to Environmental Officers, and is delivered as part of a five-day program in the form of a hybrid training/conference event.  *See* CAM Second Annual Report at 32, 35-36.  Recognizing the need to make Environmental Officer training more interactive and innovative, the program is designed to be challenge-based, rather than lecture-based.  *See id.* at 32.

The CAM Team has attended both iterations of the course held to date:  from August 12-16, 2019 (also attended by the TPA), and from November 11-15, 2019.  The most recent CAM report summarizes the August event, including feedback and impressions from the CAM Team.  *See* CAM September 2019 Quarterly Report at 71-76.  Among other observations, the CAM noted that the interactive, challenge-based approach to the course appeared to result in higher levels of engagement and collaboration by attendees over the lecture-based EO1 and EO2 courses.  *See id.* at 73.  The CAM also highlighted potential areas for improvement, including areas related to course content, course facilitation, and course logistics.  *See id.* at 73-75.  On October 25, 2019, the TPA issued its report for the audit of the August course.  *See* ABSG, *Carnival Corporation Environmental Compliance Audit Report – CSMART Environmental Officer Course II (EO3)* (Sept. 18, 2019).  The TPA made similar observations, including:

- "The course format (case studies and discussions with limited lectures/power point instruction) tested the overall knowledge of the EO's while stimulating debate and problem solving;"

- "Room where course was held was not conducive to learning;"

- "Lack of IT planning/support: WIFI reception for the room was weak;"

- "[I]nstructors used the words investigation/inquiry/root cause analysis in the same context, not explaining the different levels of effort and training required for each;"

- "Quiz questions asked after completed course sections did not follow the goals and objectives of the section" and "were site specific rather than asking students what reference(s) the student utilize to find the answers;"

- "Instructors need facilitator training;" and

- "Responsibilities/expectations of individual group member's positions were not explained prior to starting activities."

*Id.* at 5. The Company indicated that it was making changes to the course for the forthcoming November session, in response to feedback from the TPA, CAM, participants, instructors, and others. *See* Event Notes; Employee Interview Notes.

The November iteration of Environmental Excellence appeared to take much of this feedback to heart. Similar to the August event, there were approximately forty-five Environmental Officer attendees from across the Company's brands, along with various training, compliance, and operations shoreside personnel and outside training consultants. The basic structure of the course was largely the same, consisting primarily of thirteen "episode" exercises based on hypothetical environmental incident scenarios. These episodes were interspersed with a limited number of presentations on topics such as pollution prevention equipment, voyage planning, and the new SeaEvent incident and near miss reporting system. *See* Event Notes.

Many aspects of the course, however, were altered to address feedback from the August session, including:

- A larger classroom and smaller group sizes;

- Improved IT planning and support;

- Reduced references in the course materials to terms like "investigations" or "root cause," which are concepts to be covered in trainings being developed by the Incident Analysis Group. Attendees did not express the same concerns about potential role

December 18, 2019

confusion that were raised in the August course.  *See* CAM September 2019 Quarterly Report at 73;

- Revisions to "clicker test" questions given at the end of each episode to address concerns about the relevance, accuracy, and fairness of some of the questions;[47]

- Bringing in outside consultants to provide the CSMART course facilitators with an additional two-day training in course facilitation (as opposed to course instruction) prior to the course; and

- Greater instruction and clarity at the outset of the course about how the episodes were supposed to run.  For instance, explicit instruction was given about individual participant roles and task assignments within the groups (such as recorder, presenter, and researcher).

*See* Event Notes; Employee Interview Notes.

These changes appeared to result in smoother course facilitation and sustained high levels of engagement from attendees.  In addition, the November course provided enhanced opportunities for attendees to directly provide feedback to shoreside personnel.  A range of shoreside compliance, training, and operations personnel were present, including the Environmental Corporate Compliance Manager, the Compliance Training Manager, multiple Operating Line Training Managers, and, for part of the week, the Chief Ethics and Compliance Officer and the Chief Maritime Officer.  Throughout the week, issues and questions that arose during exercises and discussions were collected for follow-up and clarification by shoreside personnel.  Many of these items were addressed, at least in part, before the week's end.  For instance, several impromptu question-and-answer sessions were held during the final two days of the course to cover topics that had been flagged, including:  how to determine coastal state

---

[47] Attendees did, however, raise concerns about the wording of particular questions that posed difficulties for non-native English speakers.  In addition, the CAM Team observed at least one instance where, after it was revealed that a majority of attendees had selected an incorrect answer to one question, no effort was made to explore why this had occurred before moving on to the next question—*i.e.*, was there a widespread misunderstanding about the issue?  A poorly worded question?  Or something else?  This appeared to represent a missed learning opportunity.

baselines for voyage planning purposes, *see A Review of coastal State Baselines* (Nov. 14, 2019), PCL_ECP00143425-41; the exercise of "stop work" authority by Environmental Officers if they witness an activity that is non-compliant or potentially non-compliant, *see Environmental Excellence, Some of the parked items . . .*, PCL_ECP001447437-44 ("Parked Items Presentation"), at PCL_ECP00144742;[48] reporting requirements for Advanced Air Quality System emissions exceedances;[49] and technical points regarding the operation of pollution prevention equipment. *See* Event Notes; Parked Items Presentation at PCL_ECP001447440-41.

Overall, attendees expressed to the CAM Team that the event was a meaningful and instructive opportunity to engage with colleagues and supervisors on issues relevant to their day-to-day activities on the ships. The CAM Team's own observations indicated that the Environmental Officer attendees were energized and engaged, actively sharing questions, concerns, best practices, and ideas for improvement. The course facilitators and shoreside

---

[48] Stop work authority "in safety programs is intended to empower employees to intervene if and when they see situations that are unsafe or they see others engaged in unsafe behaviors." *See Stop Work Authority and the Bystander Effect*, https://www.irmi.com/articles/expert-commentary/stop-work-authority-and-the-bystander-effect. The Company clarified at the November course that Environmental Officers have the authority to stop an operation that they know or suspect is non-compliant (however, they may not physically stop the operation themselves, but instead must immediately find somebody to stop it). The Company acknowledged that this authority is not currently explicit in its Global HESS procedures and pledged to work on incorporating it. *See* Event Notes; *Cf. OHS-1001 Job Safety Review* (Company procedure providing that, in the safety context, "[e]very crew member has the authority and duty to stop work that they deem to be unsafe").

[49] Also referred to as Exhaust Gas Cleaning Systems, these systems remove sulphur oxide compounds from a ship's engine and boiler exhaust gases. *See* EPA, *Exhaust Gas Scrubber Washwater Effluent* (Nov. 2011), *available at* https://www3.epa.gov/npdes/pubs/vgp_exhaust_gas_scrubber.pdf. The Company's Advanced Air Quality Systems use an open loop design, in which seawater drawn from the ocean is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulphur oxide compounds from the exhaust. The seawater is then treated and discharged back to the ocean as washwater. *See* Event Notes; *see also infra*, Part III.H.2 (discussing issues related to the use of Advanced Air Quality Systems).

attendees were also engaged and responsive, convening multiple times each day to go over

feedback and make real-time adjustments to the course.  As a result, compared to the August

course, the November iteration appeared to deliver more of the benefits of the prior

Environmental Commitment Conferences.  *See* CAM September 2019 Quarterly Report at 73

(noting that "the hybrid training/conference format does not appear to deliver all of the value of

the prior Environmental Commitment conferences" due to "limited" opportunities for

Environmental Officers to directly provide feedback to shoreside personnel).  The CAM

commends the Environmental Corporate Compliance Manager team, CSMART faculty and

leadership team, and other involved individuals for their significant, ongoing efforts to develop,

deliver, and improve this course.

4.    <u>Ongoing CAM Team Examination</u>

The CAM Team will continue to monitor and assess the Company's environmental

compliance training, including the Environmental Excellence and Operational Excellence

CSMART courses.  As part of this effort, the CAM Team plans to explore the potential role of

CSMART in supporting culture change.  One of the CAM's findings of "progress regarding ECP

objectives" in the first Annual Report was the Company's use of its state-of-the-art CSMART

facility to implement some environmental trainings.  *See* CAM First Annual Report at 3-4, 21-

23, Appendix B.  The CAM has continued to report on how the Environmental Excellence and

Operational Excellence courses have solicited thoughtful feedback on compliance issues and

challenges from participants, including issues related to culture, financial pressure, support for

the ships, and workload.  *See, e.g.*, CAM September 2019 Quarterly Report at 78-79.  It still

remains to be seen how effectively the Company, including its top leadership, will respond to

this feedback.  According to a participant feedback report from the Operational Excellence

course, "[w]hat is very clear from discussions with participants, course feedback and observation is that there is a genuine hope for measurable change based on what they have provided, but concern is slowly growing that the time they have been required to spend at the event is having no effect." *Operational Excellence: Participant Feedback Q2 2019* (July 31, 2019), PCL_ECP00132923-56, at PCL_ECP00132925.  It is one thing for a culture of openness, trust, and speaking up to exist within the safe space of a training facility where employees may spend only a few days or weeks each year; it is another for such a culture to translate over to the Company's ships and shoreside offices where employees spend the vast majority of their working time.

The CAM Team also plans to examine additional training correlated to ECP Year Three areas of focus, including:  (1) IT resources training; (2) investigations and root cause analysis training; (3) training for specific jobs or personnel (both officers and ratings); (4) training for the Company's Global Talent Partner recruits; and (5) compliance training for corporate leadership, including the Boards of Directors.  *See* CAM Third Annual Work Plan at 14.

### F.   Implementation of Enumerated ECP Requirements

#### 1.   Background

The CAM Team continues to monitor the Company's implementation of enumerated ECP requirements.  The majority of these requirements and associated deadlines took effect during ECP Years One and Two.  *See* CAM First Annual Report at 13-14 and Appendix D (assessing the Company's efforts to meet enumerated ECP Year One requirements); CAM September 2018 Quarterly Report at 15-16 (assessing the Company's efforts to meet enumerated ECP Year Two requirements).  For the current ECP quarter, the Company was required to conduct an incident trend analysis, as discussed in the following section.

December 18, 2019

2.    <u>ECP-Required Trend Analysis</u>

    i.   *ECP Requirement*

The ECP requires the Company to complete and submit to the Interested Parties and the

CAM by November 1, 2019:

> [A] trend analysis . . . of all Major Non-Conformities, significant Non-Conformities;
> recurring minor Non-Conformities and Observations; and identif[cation of] corrective
> actions taken or recommended . . . The analysis shall include an assessment of the
> contribution, if any, of the following factors to the identified issues:
>
> > a. Human factors
> > b. Procedural-implementation tools
> > c. Equipment performance and faults
> > d. Parts ordering processes
> > e. Oversight
> > f. Adequacy of the current pollution prevention equipment and an assessment of
> >    available technology.

ECP § III.F.4.

On October 31, 2019, the Company submitted its ECP-required trend analysis.  *See*

*Carnival Corporation & plc: Environmental Compliance Plan Trend Analysis and Corrective*

*Actions Overview* (Oct. 31, 2019) ("ECP Trend Analysis").

    ii.   *DOJ Guidance*

The CAM Team's review of the Company's ECP Trend Analysis is guided by DOJ

guidance on the evaluation of corporate compliance programs.  According to DOJ, "[o]ne

hallmark of an effective compliance program is its capacity to improve and evolve."  DOJ,

*Evaluation of Corporate Compliance Programs* (Apr. 2019), *available at*

https://www.justice.gov/criminal-fraud/page/file/937501/download ("DOJ Corporate

Compliance Program Guidance"), at 14.  Aspects of such a program may include "revisions to

corporate compliance programs in light of lessons learned," as well as "reasonable steps" to

"ensure that the organization's compliance and ethics program is followed, including monitoring

and auditing to detect criminal conduct" and "evaluate periodically the effectiveness of the organization's program." *Id.* (internal citations and quotations omitted). DOJ's guidance highlights the importance of cultivating a "culture of compliance." *Id.* at 15.

Another hallmark of an effective compliance program identified by DOJ is "the extent to which a company is able to conduct a thoughtful root cause analysis of misconduct and timely and appropriately remediate to address the root causes." *Id.* at 16. DOJ highlights the importance of several factors, including: root cause analysis (were any systemic issues identified?); prior weaknesses (what controls failed?); payment systems (how was the misconduct funded?); vendor management (if vendors were involved in the misconduct, what was the process for vendor selection, and did the vendor undergo that process?); prior indications (were there prior opportunities to detect this misconduct, such as audit reports?); remediation (what specific changes has the company made to reduce the risk that the same or similar issues will not occur in the future?); and accountability. *See id.* at 16-17.

Viewed in light of this guidance, the value of a trend analysis is its potential to serve as a mechanism for reviewing historical data to identify potential risk areas, patterns of behavior or results (including possible systemic issues), and opportunities to continuously "improve and evolve" a compliance program.

### iii.   *CAM Team Review*

The Company's ECP Trend Analysis contains four sections:

- **Section 1 (Executive Summary)**: An Executive Summary that includes self-identified "highlights" from the first thirty months of the ECP; areas "highlighted for additional improvement;" and an overview of the findings discussed in Sections 2-4. *See* ECP Trend Analysis at 1-6;

- **Section 2 (TPA Audit Findings)**: An analysis of findings from TPA audits of both ships and shoreside offices, "including patterns of findings by year, actions taken to

December 18, 2019

correct, and overall performance assessment and a discussion of areas requiring additional actions." *Id.*;

- **Section 3 (RAAS Audit Findings)**:  An analysis of environmental findings from RAAS audits of ships *but not* shoreside offices, "including patterns of findings by year and an overall performance assessment." *Id.*  This section does not analyze corrective actions for RAAS audit findings; and

- **Section 4 (Reported Environmental Non-Compliant Events)**:  An analysis of "environmental non-compliant events reported by the fleet, including patterns of events by year, causation, corrective actions taken and open areas for improvement." *Id.*  "Environmental non-compliant events" are defined as "environmental regulatory violations as well as violations of Company policy, non-violation leading indicator event types and environmental near misses." *Id.* at 5.  "Leading indicator" event types are defined as "leaks and overflows into the ship's bilges, pollution prevention equipment issues and Environmental Officer coverage gaps on board." *Id.* at 30.[50] The report does not expressly state the source of the data for Section 4; however, the CAM understands that it is limited to Flash Report incidents, and does not include CAM-reported Major Non-Conformities or Environmental Open (Hotline) Reports. *See* Employee Interview Notes.

As noted above, the report opens with an Executive Summary that offers "highlights" from the first thirty months of the ECP.  *See* ECP Trend Analysis at 1-2.  However, it is not clear if, or how many of, these reported achievements are tied to the trend analysis (*e.g.*, those related to training, corporate ISO-14001 Environmental Management System certification, SeaEvent

---

[50] The Company does not appear to classify pollution prevention equipment issues (not associated with an illegal discharge or emission) as regulatory violations.  However, as discussed in prior CAM reports, DOJ has taken the position that inoperability of pollution prevention equipment listed on a ship's certificates (*e.g.*, International Oil Pollution Prevention certificate, International Air Pollution Prevention certificate, International Sewage Pollution Prevention certificate) may violate U.S. regulations and/or MARPOL.  In March 2018 correspondence to the Company, DOJ observed that ships are required to carry certificates which "identify the equipment and procedures used to handle pollutants and their waste streams" and that the "inoperability of this equipment is unquestionably a very significant event" which "generally results in the detention of a ship.  *See* 33 U.S.C. § 1904(e)(2) (stating the Secretary of Homeland Security '*shall*' detain ships 'whose condition or whose equipment's condition does not substantially agree with the particulars of the certificate aboard.'); and MARPOL, Art. 5."  CAM April 2019 Quarterly Report at 11 (quoting Letter from DOJ, *United States v. Princess* (Case 1:16-cr-20897) (Mar. 27, 2018), at 3) (emphasis is DOJ's).

reporting system, risk mitigation, and corporate compliance culture).  Likewise, the areas

"highlighted for additional improvement" are not clearly tied to the trend analysis.  *See id.* at 2.

The Executive Summary also lists a number of points as evidence that "[t]he Company is

moving in a positive direction."  *Id.* at 2.  This approach may minimize the Company's ongoing

compliance challenges, rather than shine light on potential risk areas and areas for improvement.

For instance, data points are presented in terms of relative percentages that may obscure issues

that would be revealed by looking at raw totals or unpacking the data in a different way.[51]  In

addition, the Executive Summary presents the TPA and RAAS audit finding data in terms of

average findings per audit, rather than total findings.[52]  The report's overall focus on average

findings per audit could distract from lessons to be learned from examining trends in total

findings.[53]

---

[51] For example, the report notes that "today, 40% of all environmental reports received are not reports of noncompliance; rather, they are near miss reports."  *Id.*  This data point reveals that the relative percentage of near miss reports, compared to incident reports, has increased.  However, it does not reveal anything about actual trends in the incident or near miss report data.  It also does not reveal anything about the size of the larger pie: while the relative percentage of incident reports may have shrunk compared to near miss reports, the number of incident reports may still have increased.  Similarly, the report notes that "[e]rror rates are low relative to the scale of operations, and declining, e.g., the Company's sewage compliance rate has improved from 99.97% in year 1 to 99.99% in year 2."  *Id.*  Presenting the data in terms of error rates may distract from pursuing the lessons that can be learned from examining the data on the incidents that *did* occur (which, given the scale of the Company's operations, could still be a significant number of incidents), including understanding any trends that may be driving those non-compliant events.

[52] The CAM recognizes that the "average findings per audit" metric was used for year-over-year comparisons due to the different numbers of audits that occurred in ECP Years One and Two, and that data on total TPA audit findings are included in charts in Section 2.  *See id.* at 11-24.  Limited data on total RAAS audit findings (overall year totals only, not broken down by category) are included in a chart in Section 3.  *See id.* at 25.

[53] For example, there appear to be increases in total findings from ECP Year One to Two in several categories, including:  portable pump "virtual lock" findings (actual 350% increase); unclear contractor environmental training requirements (actual 300% increase); waste

In Sections 2-4, it is evident that the Company used different methodologies and approaches for performing the trend analyses. In other words, the Company appears to have performed separate reviews of various data populations, rather than a holistic trend analysis across all data. The report does not describe many aspects of the Company's overall methodology for performing these analyses. For instance, there are limited to no details on: the trend analysis personnel/team (including qualifications and experience); whether or how the trend analysis is being integrated into the Company's compliance program; sources of certain data (*e.g.*, reported environmental non-compliance events); methodologies and approaches to data analysis, including identification of reasons for variations in methodologies and approaches (such as why the RAAS audit finding analysis does not include findings from shoreside audits,[54] or why the TPA audit findings are mapped against the six factors identified in the ECP requirement, but the RAAS audit findings and reported non-compliant events are not); identification and treatment of outlier data; identification of root causes and corrective actions for negative trends, including evaluation of the effectiveness or practicality of corrective actions;[55] or identification of how findings from the trend analysis will inform "efforts toward

---

offload/bunkering documents not correct or complete (actual 500% increase); and error in system documentation (actual 400% increase). *See id.*

[54] The language of the ECP requirement is not limited to ship findings, but instead refers to "*all* Major Non-Conformities, significant Non-Conformities; recurring minor Non-Conformities and Observations." ECP § III.F.4 (emphasis added). Further, the RAAS audit finding analysis does not distinguish ship audit findings that are attributed to the ship from those that are attributed to shore. *See* CAM Second Annual Report at 108 (discussing concerns raised by shipboard employees that some RAAS ship audit findings are the result of action (or inaction) by a shoreside office beyond the ship's control).

[55] The identified root causes in the report largely appear to be proximate (*i.e.*, direct or immediate) causes, rather than root causes. *See, e.g.*, ECP Trend Analysis at 12-24 (identifying as root causes things such as: lack of attention to detail; ineffective policies and procedures; document control issues; lack of oversight; lack of knowledge/training; and multiple IT systems

embedding within the Company culture an inherent focus on compliance."  ECP Trend Analysis

at 2; *see also* DOJ Corporate Compliance Program Guidance at 15.

Overall, the Company's approach to this trend analysis appears to have been aimed

mostly at fulfilling ECP requirements.  These requirements, including the six factors listed

above, were established before the challenges facing the Company were made as clear as they

are today.  What remains to be seen is the Company's ability to develop a robust trend analysis

approach of its own, one that can support (but not replace) its efforts to address the culture

deficiencies identified in the Environmental Compliance Culture Assessment.

### G.      Initiatives Beyond Enumerated ECP Requirements

The Company continues to develop and implement initiatives that go beyond the

enumerated ECP requirements.  *See* CAM First Annual Report at 4, 19-21 and Appendix B;

CAM Second Annual Report at 31-43; CAM September 2019 Quarterly Report at 82-86.

Notable recent developments are summarized below.

### 1.      IT Systems and Tools

The Company continues its efforts to leverage IT systems and tools in support of

compliance.  Throughout the period of probation, the CAM Team has observed that the

Company's maritime IT resources are inefficient, non-centralized (with different systems—or

---

in use).  This ties into the Company's broader challenges with identifying true root causes, which
the CAM, TPA, and the Company's own consultants have repeatedly highlighted.  *See* CAM
September 2019 Quarterly Report at 52-53.  In other areas, the report appears to side-step the
identification of root causes by attributing incident trends to "increased [reporting]
transparency."  *See, e.g.*, ECP Trend Analysis at 31.  For example, in discussing "Oil Regulatory
Violations" in Section 4, the report states that the Company "believes that this increase in
reported events is indicative of improved reporting transparency rather than an actual increase in
the number of events."  *Id.* at 35.  While this may be true, and while increased reporting
transparency is a good thing, the report fails to attempt to identify the root causes of events such
as "leaking hydraulic units," "errors in properly preparing to paint the exterior of the ship," and
"equipment failures."  *See id.*

December 18, 2019

versions of systems—in use by different brands), and described by Company personnel as "antiquated." *See id.* at 82.

This lack of a modern, global vision for technology presents compliance challenges for the Company. Some of these challenges include: (1) fleetwide collection and assessment of critical environmental and compliance data; (2) reliability and quality of connectivity and bandwidth on the ships; (3) speed and ease of use of IT programs on the ships; and (4) integration and standardization of processes, including reporting, tracking, and analysis of incidents; reporting and tracking of shipboard trainings; and ordering and delivery of spare parts. *See id.*; TPA Second Annual Report at 22; Employee Interview Notes.

The Company has recognized the need for more centralized, modern, and data-driven strategies. As a result, it has launched a number of initiatives, including:

- **Connectivity Upgrades.** Within the past year, the Company has consolidated its efforts to upgrade and increase its fleetwide bandwidth. *See id.* With these upgrades, the Company aims to increase its shipboard technological capacities and improve the reliability of its ship-to-shore communications, including data collection and transfer from shipboard sensors to shoreside personnel for analytics;

- **Neptune.** The Company is in the process of deploying modules of its Neptune platform across the brands, which should enhance its fleetwide data collection and analysis efforts. *See* Event Notes. Neptune is an internally-developed platform that utilizes individual modules (*i.e.*, a part of a program that contains one or more individual functions) which are focused on onboard, real-time data analytics. Some of these modules can play a role in supporting environmental compliance. For example, Neptune Live provides a tool for enhanced situational awareness related to environmental requirements, such as generating real-time Advanced Air Quality System alerts when a ship is approaching an Emission Control Area or other regulated area. *See id.* In addition, the Company is deploying mobile instances of Neptune Live (*i.e.*, Neptune that works in collaboration with a mobile device, like a phone or smart watch) so that shoreside management will be alerted via Neptune when, for example, a ship is approaching an Emission Control Area or when a ship runs an Advanced Air Quality System in a prohibited zone. *See id.*;

- **Global HESS.** The Company reports that it has "enhanced its audit management and tracking system within [Global HESS] to achieve improved and consistent identification of root cause." October 2019 Probation Supervision Report,

December 18, 2019

Attachment 3, at 3.  The includes implementing a new process "where root cause analysis of audit findings is directly supervised by the [Environmental Corporate Compliance Manager] and his team."  *Id.*  In addition, developments are underway to introduce electronic forms and task checklists in Global HESS.  *See id.* at 10-11.  The CAM understands that these are intended to increase accountability and efficiency among shipboard personnel responsible for the tasks, as well as to make it easier to audit related requirements.  *See* Employee Interview Notes.  Although efforts to improve Global HESS are underway, the CAM Team has learned that there are concerns about the sufficiency of the resources dedicated to the maintenance and development of Global HESS.  *See id.*  For instance, there are only two technology professionals familiar with the Global HESS database architecture, and these two individuals support the database for the entire Company.  *See id.*;

- **SeaEvent.**  SeaEvent is the Company's new centralized, corporate-wide incident and near miss reporting and case management system.  *See* CAM Second Annual Report at 36.  It "allows the data capture, management, analysis and reporting of Health, Environmental, Safety, Security, Technical and other operational events" related to the Company's ships.  *See SeaEvent Overview* (Nov. 12, 2019), PCL_ECP00143497-516 ("SeaEvent Overview Presentation"), at PCL_ECP00143499.  The Company reports that rollout of SeaEvent to all ships across the its brands was completed in November 2019.  *See* Company Comments on Draft CAM December 2019 Quarterly Report.

  The Company believes that SeaEvent will improve the consistency of its incident and near miss reporting, and enable better fleetwide information-sharing and tracking, trending, and analysis of incident and near miss data.[56]  With SeaEvent, shipboard personnel with responsibility to author incident reports (*e.g.*, Environmental and Security Officers) can report an incident electronically, rather than manually entering information in a spreadsheet or report, which was the Company's previous process.  Once an author submits a report in SeaEvent, the platform sends a notification to shipboard leadership (*e.g.*, the Staff Captain) who is then prompted to review the report and either send it back to the author for revision or approve the report as authored.  Once shipboard leadership approves the report, it is then sent via SeaEvent to shoreside management, where it is similarly reviewed.  Once shoreside management approves the report, it is registered in the SeaEvent system.  *See* Demonstration Notes; SeaEvent Overview Presentation at PCL_ECP00143503-04.

  The SeaEvent user interface is template-driven, with a series of required inputs and fields (usually with a discrete menu of options, known as "libraries," from which the user can select) that vary based on the event or incident type.  There are limited options for narrative or free-text responses, which is intended to promote consistency

---

[56] On July 2, 2019, and August 22, 2019, the CAM Team received instructional demonstrations from the Company via WebEx of the SeaEvent software.  The CAM Team has been granted access to the system and plans to monitor and report on the system's functionality and effectiveness during its implementation.

across reports and enable better data analysis.  The platform includes inputs for root cause analysis, corrective actions, and preventive actions.  *See* Demonstration Notes. Critically, these functions will need to be aligned with the investigation procedures and processes, including root cause analysis methodology, that are being developed by the Incident Analysis Group.  Feedback to the CAM Team from shipboard personnel responsible for entering incident reports has been generally positive, with individuals stating that the system is user-friendly and makes incident reporting easier.  *See* Employee Interview Notes;

- **GLADIS.**  GLADIS is a single learning management system to deploy and track training, including environmental training.  *See* CAM Second Annual Report at 83. The system harmonizes the Company's computer-based training across all brands. All vessels have GLADIS onboard, and the operating lines are in various stages of deploying it to crew members.  *See* Carnival Corp., *MPD CAM ECP Request Feedback* (July 12, 2019), at 3.

  In addition, the Company has created related IT training tools that connect with GLADIS to make the onboarding experience more universal, training more accessible, and instructor-led course training easier to track.  These include:

  o **CrewTube.**  CrewTube is an application for smart phones and tablets that allows crew members to access HESS information and complete some HESS trainings before joining a ship.  *See* July 2019 Probation Supervision Report, Attachment 3, at 10.  According to the Company, its Global Talent Partners "promote and encourage use of CrewTube."  *Id.*[57]

  o **Drill App.**  The Company is developing an offline, tablet-based application to "assess training and drills, using a competency based assessment approach for either individuals or teams."  July 2019 Probation Supervision Report, Attachment 3, at 10, at 13; Carnival Corp., *MPD CAM ECP Request Feedback* (July 12, 2019), at 4; and

  o **Instructor Led Training Attendance App.**  The Company is developing an offline scanning application that will be able to scan crew member IDs to assist in recording attendance at shipboard trainings.  *See* July 2019 Probation Supervision Report, Attachment 3, at 13.  The app "will be interfaced with

---

[57] The CAM Team has learned of concerns related to whether the use of CrewTube for required training may conflict with obligations to compensate employees for time spent on such training. For instance, the Maritime Labour Convention 2006, known as the "seafarers' bill of rights," sets standards for, among other things, wages and overtime payments.  *See* Maritime Labour Convention, 2006, *as amended*, Tit. 2, Reg. 2.2 (2019), *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---normes/documents/normativeinstrument/wcms_554767.pdf.  Specific requirements are governed by national laws or union agreements.  *See id.*

December 18, 2019

GLADIS to automatically update a crew member's training file." *Id.* The recordkeeping burden associated with having to manually record and track shipboard training attendance has been a frequent complaint to the CAM Team—especially from Environmental Officers. *See* Employee Interview Notes. If successfully implemented, this app could reduce the administrative workload of Environmental Officers and other officers who deliver shipboard trainings;[58]

- **Marine Asset Strategies Transformation ("MAST").** Under the MAST initiative, the Company expects to develop a single planned maintenance and spare parts management system (with consolidated cross-brand inventory indices). The Company believes that the new system will improve its ability to efficiently deliver spare parts to ships, including those that are needed to keep shipboard pollution prevention equipment in working order. *See* CAM Second Annual Report at 83. Its functionality would include allowing the Company to monitor the location and status of its spare parts inventory across the entire fleet. *See id.*; MAST Update (Nov. 13, 2018), PCL_ECP00083937-40; October 2019 Probation Supervision Report, Attachment 3, at 11. To support this function, the Company is exploring the deployment of mobile devices to assist shipboard engineers in addressing the availability, reliability, and maintainability of pollution prevention equipment. *See* Employee Interview Notes; and

- **Voyage Planning Software.** The Company has executed a contract with a vendor to develop new software that could help address voyage planning challenges, which often are described as resulting from misunderstandings or miscommunications as to the location of environmental boundary lines and/or the applicable requirements within a set of environmental boundary lines. *See* CAM Second Annual Report at 37-39; July 2019 Probation Supervision Report, Attachment 3, at 11. The new software would, among other things, aim to integrate information about environmental boundaries and standards—including the Company's own requirements, which may be more stringent than those set by regulatory bodies—into the electronic navigational charts used by ships. *See* CAM Second Annual Report at 37. This would replace the otherwise cumbersome "WorldWide Cruising Standards spreadsheet [*i.e.*, the Matrix] approach with a chart-based solution." July 2019 Probation Supervision Report, Attachment 3, at 11. In July 2019, the Company reported that "it is expected that up to six months of software development time and 2-3 months of testing time will be needed before a decision to adopt and deploy the solution will be taken." *Id.* More recently, in November 2019, it was stated that a software solution is expected to be developed by February/April 2020. If the

---

[58] As discussed in the CAM First Annual Report, two Environmental Officers were found to have falsified training records in ECP Year One. *See* CAM First Annual Report at 40-41, 47-48. Both individuals were terminated. *See id.* Although the Company does not appear to have investigated the role that workload may have played in these incidents, it has been reported to the CAM Team by crew members across the Company that high workloads, along with fear of speaking up, likely contributed to both incidents. *See* Employee Interview Notes.

December 18, 2019

Company determines that this software meets its needs, the technology will be adopted and deployed.  *See* Event Notes.

The CAM Team will continue to monitor the development and implementation of these initiatives, as well as the Company's general efforts to improve its overall IT architecture.  This will include monitoring the status of IT-related initiatives in the Company's Ethics and Compliance Program Strategic Plan, including efforts to:  "[f]orm a cross-brand and cross-functional 'IT Compliance Committee' and 'tech teams' (similar to the 'tiger teams' on the food waste initiative);" "[c]onduct a sample of ship visits to identify, catalogue and prioritize current IT problems, limitations or deficiencies that inhibit effective compliance behaviors, practices or functions;" and "[r]eview data sources and platforms for analyzing information, including both structured and unstructured sources, with the objective of facilitating three dimensional understanding of operational challenges and identifying opportunities for improvement in processes, systems or training & communication as they relate to compliance."  *See Corporate Compliance Manager's Quarterly Environmental Compliance Report Q3 2019*, PCL_ECP001447152-273, at PCL_ECP001447167, 71, 74; October 2019 Final Strategic Plan at 24-25.  The CAM Team also intends to explore the incorporation of IT-related expenditures into the Company's financial and strategic planning processes.

As part of its ongoing monitoring efforts, during ECP Year Three the CAM Team has visited shoreside offices for the All Brands Group and each of the Company's four operating lines (Carnival Cruise Line, Carnival UK, Costa Group, and Holland America Group) to interview key personnel and learn more about overall brand IT strategies, the roll out of corporate initiatives, and areas that may require improvements.  In addition, the CAM Team attended the Data Management Working Group session of the Company's Corporate Technical Days event held in Southampton, UK, from September 23-27, 2019.  The event consisted of a

December 18, 2019

series of meetings and workshops for the Company's technical working groups, with sessions covering topics such as data management, waste management, and emerging technologies.  *See Carnival Technical Days Overview*.

Finally, the CAM Team attended the Company's Global Maritime & IT Leadership Forum (the "Forum") in Hamburg, Germany, from October 7-11, 2019.  The Forum brought together IT and business leaders from across the Company to discuss various IT-related topics, including the Company's global IT strategy, current initiatives and updated roadmaps, opportunities for collaboration and synergy, and innovation.  A central topic throughout the Forum was the need for the Company to move beyond brand-specific strategies—*i.e.*, the current siloed process—in favor of more global or cross-brand alignment.  *See* Event Notes.

The Forum provided an opportunity for the Company's new Chief Information Officer to frame his global strategy and solicit input from cross-brand team members.  The CAM Team observed, however, that not every brand favors this global approach, preferring brand-specific strategies and initiatives, which are sometimes at odds or incompatible with other cross-brand efforts.  *See id.*  Another topic of discussion was strategic budgeting and operational needs related to both:  (1) existing maritime initiatives, such as MAST; and (2) the development or deployment of new, innovative technologies to support compliance, such as technologies (like edge computing[59] and data virtualization[60]) designed to make data more widely available to ships, as well as to make it easier to analyze data across brands.  *See* Event Notes.

---

[59] Edge computing is the practice of processing data where it is generated (*e.g.*, by the device itself or a local computer or server), rather than transmitting it to a data center (*e.g.*, a cloud-based program) to be processed.  *See What is Edge Computing?*, https://www.hpe.com/us/en/what-is-edge-computing.html.

[60] Data virtualization is "an approach to data management that allows an application to retrieve and manipulate data without requiring technical details about the data, such as how the data is

December 18, 2019

2. <u>Fleet Environmental Officer Program</u>

The Company continues to work on developing a "fleet environmental compliance trainer officer program" designed to "provide training, coaching, and mentoring to environmental officers as well as environmental training to employees of the Deck, Technical, and Hotel departments." *See* CAM Second Annual Report at 39-40; October 2019 Probation Supervision Report, Attachment 3, at 6. The Company reports that recruitment of a Director-level employee for this program has commenced. *See id.*; *Job Description – DIRECTOR, Fleet Environmental Compliance Training Program* (Sept. 12, 2019). The Director will be tasked to "develop, implement and manage an Environmental Compliance training program that is designed to promote a culture of compliance and learning." *Id.* The position's functions will include "[e]stablish[ing] and direct[ing] a team of approximately ten Fleet Environmental Compliance Officers who perform training that includes:

- Environmental compliance training for Environmental Officers onboard their assigned ships.

- Special environmental compliance training for Deck, Technical and Hotel employees onboard their assigned ships.

- Special environmental compliance training and/or facilitation of training at the company's CSMART training academy and shore-side centers of excellence."

*Id.*

If successfully implemented and supported, a Fleet Environmental Officer program could help address the ECP obligation to have a sufficient number of Environmental Officers to meet fleet needs, *see* ECP § IV.A.1, and provide the advantage of having a group of Fleet

---

formatted or where it is physically located. The goal of data virtualization is to create a single representation of data from multiple, disparate sources without having to copy or move the data." *See* https://searchdatamanagement.techtarget.com/definition/data-virtualization.

December 18, 2019

Environmental Officers who could provide support, consistency, and oversight to the more than two hundred Environmental Officers across the Company.  The program could also provide additional career opportunities for individuals in the unique Environmental Officer role.  *See* CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer position, including lack of a clear career path).  The CAM Team will continue to monitor the development and implementation of this program.

3.    Electronic Key Management System Installations

As part of its efforts to improve the implementation of the Environmental Control System program (*i.e.*, the use of seals, locks, and welds to control vulnerable points on ships that could lead to prohibited discharges, as required under ECP § IX.B), the Company committed at least as early as February 2019 to install electronic key management systems on its ships to "control keys that provide access to portable pumps and their designated hoses."  *See ENV-1203 Minimization and Control of the Use of Portable Pumps and Their Designated Hoses* ("ENV-1203"); *see also Maritime Operations Monthly Dashboard February 2019* (Mar. 6, 2019), PCL_ECP00117220-62, at PCL_ECP00117234 (noting a December 31, 2019, deadline for the installations).  These systems "automatically send an e-mail to the [Environmental Officer], Chief Engineer, and Staff Chief Engineer every time a key that provides access to a portable pump and its designated hoses is taken or returned."  ENV-1203.  Crew members from across the Company have reported to the CAM Team that they are eager for the installation these systems, which could reduce the time, labor, and potential for human error associated with Environmental Control System requirements.  *See* Employee Interview Notes.

Around April 2019, the Company postponed the deadline for installing these systems on the ships from December 31, 2019, to September 1, 2020.  *See* ENV-1203, April amendment

December 18, 2019

(Apr. 25, 2019).  The CAM asked the Company for "[i]nformation related to the change in date for completion" of the installations.  *Court Appointed Monitor Communication – Thirteenth Request for Documents and Information* (Aug. 30, 2019), at 3.  On September 20, 2019, the Company responded that "[t]he decision to phase in [the electronic key management systems] over a longer period of time was based on competing priorities (i.e. focusing on completing the Vulnerability Assessment) and the availability of managers and implementers within the brands given the project requires IT support to hook the boxes up to the Wi-Fi, servers, e-mails, etc." *See U.S. v. Princess Cruise Lines. Ltd. — 1:16-cr-20897: Production of Information Related to [Electronic Key Management] System Installation* (Sept. 20, 2019).  The CAM Team will continue to monitor the implementation of this initiative.

### 4.    Other Initiatives

The Company has instituted a number of other initiatives related to environmental compliance and sustainability, ranging from policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See* CAM Second Annual Report at 31-43 and Appendix A.  The CAM Team will continue to monitor the Company's initiatives, including examining whether the number of disparate initiatives are:  well-coordinated; based on accurate understandings of the root causes of the issue(s) they are designed to address; and developed with sufficient consideration of the additional strain or workload they may put on the ships, including whether and how management of change principles are implemented when new actions are taken, as flagged in the Court's Order of October 31, 2019.  *See* Dkt. No. 167.

For example, shipboard employees from across the Company have reported concerns to the CAM Team regarding the additional workload and logistical demands associated with two recent initiatives:  (1) the "Yellow Plus" and "Yellow with Operations Director" procedures,

which require additional senior-level engineering officers to be present in the Engine Control Room for certain operations that carry a risk of non-compliant discharges; and (2) a prohibition on discharges of a range of liquid waste streams (*i.e.*, processed bilge water, treated sewage, grey water, food waste, recreational water facility water, and super-chlorinated water from the potable water tank disinfection) inside twelve nautical miles "where operationally feasible."  *See* October 2019 Probation Supervision Report, Attachment 3, at 3; *see also* Employee Interview Notes. These initiatives are well-intentioned, with the stated aim of reducing the risk of non-compliant discharges.  *See* October 2019 Probation Supervision Report, Attachment 3, at 3.  However, it does not appear that the Company's senior management evaluated at the outset what new challenges or trade-offs might result, in light of existing staffing levels and workloads on the ships.  Instead, the approach appears at odds with management of change principles:  first, issue the directives; then, wait for the ships to struggle and ask for help, such as additional crew members or an exception from the requirement; and, finally, only at that point, considering taking steps to provide ships with the additional resources necessary to carry out the directives.

### H.   Environmental and ECP Violations

#### 1.   Overview

As in ECP Years One and Two, the Company continues to violate environmental laws and the ECP, even while efforts aimed at compliance are underway.  As emphasized in prior CAM reports, while these incidents are concerning, the Company's deeper and more pressing barriers to compliance relate not to individual incidents on ships, but to the Company's broader corporate leadership and culture issues.  *See* CAM Second Annual Report at 94.

The Company's violations of environmental laws and/or the ECP during the second quarter of ECP Year Three (July 19, 2019 – October 18, 2019) included incidents related to:

December 18, 2019

- Air emissions, including leaks of ozone-depleting substances from refrigerant gas systems; and emission violations associated with the use of (or failure to use) Advanced Air Quality Systems;

- Discharges to the sea, including discharges of:  Advanced Air Quality System washwater, ballast water, black water (sewage), chemicals, food waste, grey water, oil, recreational (*e.g.*, pool/Jacuzzi) water, and solid items/garbage (including plastics);

- Pollution prevention equipment maintenance and operation, including incidents where Advanced Air Quality System components, ballast water treatment system components, food waste system components, incinerators, Oily Water Separators, sewage treatment system components, and White Boxes have been out of service for more than a day; and

- Recordkeeping, including at least one new incident of alleged training record falsification,[61] in addition to the training record falsification incidents discussed in the most recent CAM report.  *See* CAM September 2019 Quarterly Report at 90-92. Other recordkeeping incidents include:  the modification of Daily Sounding Logs with "randomly adjusted quantities;"[62] missing Daily Sounding Logs;[63] missing Hazardous Waste Generation/Transfer Logs;[64] and various errors and discrepancies in

---

[61] A shipboard manager on the *Seabourn Odyssey* is alleged to have asked a newly joined crew member to sign a training sheet for Workplace Specific Environmental Training before the training was conducted.  The Incident Analysis Group is investigating.  *See* Carnival Corp. Special Condition 13(a) Report (Sept. 26, 2019); Carnival Corp. HESS Weekly Flash Report (Oct. 2, 2019).

[62] A Daily Sounding Log is a paper log used to record tank quantities/volumes, including for "all sludge and bilge tanks associated with bilge water and/or oil residues (sludges)."  *ENV-1201-A1 Daily Sounding Log.*  In response to being told of apparent errors in his Daily Sounding Logs, an engineer on the *Carnival Pride* is reported to have "(without asking/discussing with anyone) created new logs for eight days with randomly adjusted quantities, placed them in the binder and removed the original logs."  Carnival Corp. HESS Weekly Flash Report (Oct. 7, 2019); Carnival Corp. Special Condition 13(a) Report (Oct. 16, 2019).  The Incident Analysis Group is investigating.

[63] The Daily Sounding Log and the Draft Daily Sounding Log were found to be missing from the Engine Control Room on the *Carnival Sunshine* on October 14, 2019, which "allegedly occurred during a mix up" while shelves were being cleaned.  Carnival Corp. HESS Weekly Flash Report (Oct. 23, 2019); Carnival Corp. Special Condition 13(a) Report (Oct. 16, 2019).

[64] A range of Hazardous Waste Generation/Transfer Logs were found to be missing on the *Carnival Sunrise* on August 24, 2019, and "it was concluded that the completed logs . . . were not submitted to the Staff Captain or deck office for filing and were disposed of during painting of the Recycling Center by contractors during dry dock in April 2019."  Carnival Corp. HESS

---

December 18, 2019

> log books and records, including Oil Record Books, Oil to Sea Interface Logs,
> Garbage Record Books, and Biofouling Record Books.  Further, the CAM remains
> concerned about the findings, discussed in the most recent CAM report, of apparent
> falsifications of Planned Maintenance System records over a period of several years
> on at least two Princess ships.  *See* CAM September 2019 Quarterly Report at 90.  In
> conjunction with a similar incident on a Holland America Line ship in ECP Year
> Two, these incidents indicate that the Company may have a systemic problem with
> the completeness and integrity of Planned Maintenance System records across
> multiple ships.  *See id.*[65]

*See September 25, 2019 Quarterly Issue Tracker* (Sept. 25, 2019), Dkt. No. 162-1; Carnival

Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.  Other

incidents tracked by the CAM Team, which do not typically involve violations of environmental

laws or the ECP, include bilge leaks/overflows; emissions of non-ozone-depleting refrigerant

gases; Environmental Control System program issues, such as broken or missing seals with no

evidence of intentional tampering; and near misses.

     These incidents are reported to the CAM Team through formal and informal reporting

mechanisms, including:  audit findings (both internal and external); CAM Team visit findings;

Flash Reports; Environmental Open (Hotline) Reports; Special Condition 13 Reports required

under the Probation Agreement; notices to the Office of Probation; and other notifications.  *See*

Third Annual Work Plan at 7.  The CAM Team continues to track and assess issues associated

with these violations, including issues related to:  shoreside support, such as concerns related to

workload/staffing, IT systems, waste vendors, spare parts, training, or policies and procedures;

---

Weekly Flash Report (Sept. 4, 2019); Carnival Corp. Special Condition 13(a) Report (Aug. 26, 2019).

[65] This issue may not be limited to Holland America Group ships.  A recent internal audit of the *Carnival Pride* found that two monthly bilge water tank inspections "could not be performed because the tanks were full but the [Planned Maintenance System] job was closed without being postponed."  Carnival Corp. HESS Weekly Flash Report (Nov. 20, 2019).  The Company reported that "Company procedure was not followed for [Planned Maintenance System] job closing/postponing[.]"  *Id.*

December 18, 2019

and workplace/culture, such as concerns related to blame culture, retaliation, discrimination, harassment or bullying, or unsafe working conditions.  The CAM also reports to the Interested Parties as required by the ECP.  *See* ECP §§ III.D.6, VI.F.6.

As discussed in prior CAM reports, the CAM Team tracks and analyzes incident report data, but no longer compiles this data in CAM reports.  As the Company itself has noted, apparent trends in the data may reflect trends in rates of reporting, which can be a positive development, rather than trends in actual incident occurrences.  *See* CAM September 2019 Quarterly Report at 95-96.  Further, as the Court has observed, focusing on individual incidents on ships can distract from the most pressing barriers to compliance, which are the Company's broader corporate leadership and culture issues.  *See, e.g.*, Status Conference Tr. at 5-6 (Apr. 10, 2019).

[*Text continues on following page.*]

December 18, 2019

2.    Advanced Air Quality Systems

As noted above, the Company experienced multiple incidents related to its Advanced Air

Quality Systems during the second quarter of ECP Year Three, including emission

exceedances,[66] prohibited washwater discharges,[67] and equipment failures or malfunctions.

The CAM intends to further examine issues related to Advanced Air Quality Systems

throughout the remainder of ECP Year Three and beyond.  This will become an increasingly

---

[66] These included:  burning heavy fuel oil for one hour and forty-two minutes in Spanish waters in violation of a European Union Directive by the *P&O UK Arcadia* on August 22, 2019; burning heavy fuel oil for approximately three hours in the North American Emission Control Area in violation of MARPOL Annex VI by the *Carnival Dream* on August 23, 2019; exceedance of emission ratio limits due to a drop in seawater flow in the Advanced Air Quality System for approximately 3.5 hours while underway toward Seattle, Washington, in violation of MARPOL Annex VI by the *Star Princess* on August 25, 2019; burning heavy fuel oil for thirty-three minutes while underway toward Glacier Bay, Alaska, in violation of MARPOL Annex VI by the Holland America Line *Noordam* on August 26, 2019; exceedance of emission ratio limits for one hour and forty-eight minutes due to a reduced flow rate in the Advanced Air Quality System while underway toward New York in violation of MARPOL Annex VI by the *Caribbean Princess* on September 3, 2019; burning approximately 2.8 metric tonnes of heavy fuel oil in the North American Emission Control Area by the *Carnival Freedom* on September 13, 2019; burning heavy fuel oil for one hour and two minutes following a blackout in Vancouver, Canada, in violation of MARPOL Annex VI by the Holland America Line *Westerdam* on September 22, 2019; exceedance of emission ratio limits for one hour and forty minutes due to high load in Galveston, Texas, in violation of MARPOL Annex VI by the *Carnival Freedom* on September 29, 2019; burning heavy fuel oil for approximately one hour and forty-five minutes in route to Stockholm, Sweden, in violation of MARPOL Annex VI by the *Pacific Princess* on October 1, 2019; burning heavy fuel oil for approximately two hours in the North American Emission Control Area in violation of MARPOL Annex VI by the *Carnival Fantasy* on October 5, 2019; and burning heavy fuel oil for approximately five hours and fifteen minutes in the North American Emission Control Area in violation of MARPOL Annex VI by the *Carnival Freedom* on October 6, 2019.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[67] These included the discharge of washwater with an overboard pH of less than six in violation of the U.S. Environmental Protection Agency Vessel General Permit by:  the *Caribbean Princess* for approximately seven hours in Charleston, South Carolina, on July 29, 2019; and the Holland America Line *Zuiderdam* for approximately two hours and twenty minutes in Newport, Rhode Island, on September 28, 2019.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

December 18, 2019

important area of focus as the global marine fuel sulfur cap set by the Marine Environment

Protection Committee of the International Maritime Organization goes into effect beginning

January 1, 2020.  Under this new limit, ships outside of Emission Control Areas "will have to use

marine fuels with a sulfur content of no more than 0.50% (the current limit is 3.5%) unless using

approved equivalent methods under regulation 4.1 of MARPOL Annex VI," which include the

use of an approved Advanced Air Quality System.  American Bureau of Shipping, *Marine Fuel*

*Advisory 2018* (2018), at 3.  Ships inside of Emission Control Areas must continue to use marine

fuels with a sulfur content of no more than 0.1% or approved equivalent methods such as an

approved Advanced Air Quality System.  *See Environmental Compliance Notice #5-2019.*  Ships

without an approved Advanced Air Quality System must not use fuel exceeding the applicable

sulfur limit.  *See id.*

To "help ships prepare for the 2020 Sulphur Cap," the Company issued an Instructional

Notice in late August 2019 requiring each ship to develop, implement, and maintain, by

November 30, 2019, a Ship Implementation Plan ("SIP").  *Id.*  The SIP must outline "how the

ship will prepare to comply with the new sulphur requirements," and "should address at a

minimum, risk assessments of new fuels, fuel oil system modifications and alternative means of

compliance.  Each ship will work with their shoreside technical department to develop a ship-

specific SIP."  *Id.*; *IN ENV-09-2019 Ship Implementation Plan (SIP) Requirement to Prepare for*

*the 2020 0.50% Global Sulphur Cap* ("IN ENV-09-2019").  According to the Company, Port

State Control[68] "will review the preparatory actions described in the ship-specific SIP when

---

[68] Port State Control is "the inspection of foreign ships in national ports to verify that the
condition of the ship and its equipment comply with the requirements of international regulations
and that the ship is manned and operated in compliance with these rules."  International Maritime
Organization, *Port State Control*,
http://www.imo.org/en/OurWork/MSAS/Pages/PortStateControl.aspx.

verifying compliance with sulphur limit requirements."  IN ENV-09-2019.  As part of its

ongoing examination of issues related to Advanced Air Quality Systems, the CAM Team plans

to review the development, implementation, and maintenance of SIPs.

### I.    Other Ongoing CAM Areas of Focus

In addition to the issues discussed in this Report, the CAM continues to examine the

following areas of interest and intends to report on these issues in future reports:

- **Personnel**.  This includes issues related to the Company's efforts regarding:

  - Relationships with its Global Talent Partners, including specific Global Talent Partner operations and the Company's stated intent to "seize on" the "unique opportunities that the Company has to leverage its strong relationship with its Global Talent Partners," including "the opportunity to develop a more diverse corps of shipboard officers who would help to promote and enhance environmental compliance," *see Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 6-7, as well as other efforts to support the Company's stated priority of "[b]uilding a diverse and inclusive workforce."  *See Sustainability from Ship to Shore: FY2018 Sustainability Report*, at 7, *available at* https://carnivalsustainability.com/; and

  - Hiring, training (including development of competency frameworks), workload, and employment conditions of officer and non-officer crew, including Environmental Officers, engineering officers, and ratings.  *See Third Annual Work Plan at 15.*

- **Support for Operations and Compliance**.  This includes issues related to the Company's efforts regarding:

  - Shoreside support for ships, including the extent to which shoreside has adequate resources to provide the support needed by the ships;

  - Processes for selecting and vetting shoreside waste vendors;

  - Environmental support and special project ship visits under the HMP-1503 procedure implemented in January 2019 and amended in June 2019;

  - The integration of HESS compliance into the annual financial and strategic planning processes;

December 18, 2019

- o Improvements to HESS policies and procedures, including the "internal effort to improve upon the clarity and understandability of current [Environmental Management System] related procedures."  October 2019 Probation Supervision Report, Attachment 3, at 4; and

- o Implementation of the new Unified Regulatory Reporting Policy required under the Probation Agreement, which went into effect on September 19, 2019, including any associated training.

- **Company Response to Internal and External Findings**.  This includes the Company's response to findings from the CAM, TPA, RAAS, outside consultants, and other internal and external studies and assessments, such as the DNV GL investigations review; the Environmental Compliance Culture Assessment; the ECP-mandated Fleet Engineering Survey; the human factors study and workload analysis commissioned by Holland America Group; and the participant feedback surveys and reports from the Operational Excellence CSMART training course.  *See* CAM Second Annual Report at 111-12; CAM September 2019 Quarterly Report at 15-30, 97; October 2019 Probation Supervision Report, Attachment 3, at 11-12.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor

December 18, 2019

December 18, 2019

### APPENDIX A:  STATUS OF PROBATION AGREEMENT COMMITMENTS

| Deadline | Obligation | Status |
|---|---|---|
| Immediately | **Search Firm for New Board Member.** The Company will immediately engage a search firm to assist the Boards of Directors to recruit a new board member with significant corporate compliance experience. | Search firm retained in July 2019; recruitment process ongoing |
| 06/01/2019 | **Consultant Recommendations.** The Company shall provide the Court, CAM, TPA and Interested Parties with the consultant's further recommendations. | Submitted June 1, 2019 |
| 06/2019-08/2019 | **Tiger Teams.** The Company's tiger teams intend to meet in Washington D.C. on June 3-7, 2019 for planning workshops in which most of the inner workings and plans will be finalized. The tiger teams will be dedicated to visiting at least 30 ships between June and August. | Met June 3-6, 2019; visited 30 ships between June-August 2019 |
| 06/10/2019 | **Financial Penalty.** The Company agrees to pay an additional financial penalty of $20 million. | The Company reports that this was paid on schedule. *See* Status Conf. Tr. at 16 (July 19, 2019). |
| 06/30/2019 | **Special Condition 13(a) Reporting Process.** The Company shall submit for approval to the Interested Parties a proposed process, including the criteria for determining which incidents to report and how they will be reported in compliance with Special Condition of Probation 13(a). | Submitted June 28, 2019 |
| 07/01/2019 | **Interim Progress Report.** The Company will provide an interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted July 1, 2019 |

December 18, 2019

| Deadline | Obligation | Status |
|---|---|---|
| 07/03/2019 | **Management Acceptance of Responsibility Statement.** The Company will issue a statement to all employees in which the CEO of Carnival Corporation & plc (and other senior management if they so choose) personally accepts management responsibility for the probation violations. | Issued July 1, 2019 |
| 08/01/2019 | **Interim Progress Report.** The Company shall provide a second interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 1, 2019 |
| 08/01/2019 | **Food Waste Management Implementation Plan (Part One)**. The Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables for Part one – improved training, supervision, staffing, and culture – of its Three Part Program addressing food waste. | Submitted August 1, 2019; Update submitted September 4, 2019 |
| 08/02/2019 | **Draft Unified Regulatory Reporting Policy.** The Company will submit for review and comment to the Interested Parties, CAM and TPA a draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Submitted July 31, 2019 |
| 08/14/2019 | **Proposed Action Plan on Corporate Re-Structuring.** The Company shall provide the Court, CAM, TPA and Interested Parties with the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 14, 2019 |
| 08/23/2019 | **Comments on Draft Unified Regulatory Reporting Policy.** The Interested Parties, CAM, and TPA will provide comments to the Company, if any, on the Company's draft new policy in the | Joint CAM/TPA comments submitted August 23, 2019 |

December 18, 2019

| Deadline | Obligation | Status |
|---|---|---|
| | Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | |
| 08/28/2019 | **Comments on Proposed Action Plan on Corporate Re-Structuring.** The Interested Parties, CAM and TPA will provide any comments or suggestions to the Company about the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Joint CAM/TPA comments submitted August 28, 2019 |
| 09/13/2019 | **Final Action Plan on Corporate Re-Structuring.** The Company will provide a final version of its action plan to restructure its existing corporate compliance governing authority to the Court. | Submitted September 13, 2019; update submitted October 9, 2019; supplements submitted November 1, 2019 (preliminary financial plan) and December 10, 2019 (final financial plan) |
| 09/13/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 13, 2019, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the court. | -- |
| 09/22/2019 | **Final Unified Regulatory Reporting Policy.** The Company will adopt and implement a final new policy that addresses the comments it received from the Interested Parties, the CAM, and the TPA on the draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Policy implemented in Global HESS September 19, 2019 |
| 09/23/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 23, 2019, the Court may | -- |

December 18, 2019

| Deadline | Obligation | Status |
|---|---|---|
|  | impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the court. |  |
| 10/09/2019 | **[Sanctions.]** If, by October 9, 2019, the Company fails to complete implementation of certain tasks enumerated in September 13, 2019 compliance action plan, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 10/09/2019 | **Environmental Corporate Compliance Manager Promotion.** The Company will elevate the Environmental Corporate Compliance Manager. | Environmental Corporate Compliance Manager promoted from Vice President to Senior Vice President on May 17, 2019 |
| 10/09/2019 | **Chief Ethics and Compliance Officer Charter and Job Description.** The Company will create the Chief Ethics and Compliance Officer charter and job description. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Chief Ethics and Compliance Officer Appointment.** The Company will appoint the Chief Ethics and Compliance Officer. | Chief Ethics and Compliance Officer officially assumed duties August 12, 2019 |
| 10/09/2019 | **Executive Compliance Committee.** The Company will create the Executive Compliance Committee. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Annual Training Curriculum for Boards of Directors.** The Company will create an annual training curriculum for members of its Boards of Directors that would include corporate compliance topics. | Submitted October 9, 2019 |
| 10/09/2019 | **Boards' Statement on Commitment to Compliance.** The Company's Boards of Directors will adopt a new written statement | Submitted October 9, 2019 |

December 18, 2019

| Deadline | Obligation | Status |
|---|---|---|
| | that reiterates the Company's and the Boards' commitment to compliance. | |
| 10/31/2019 | **Food Waste Disposal Technologies Analysis.** The Company shall review and provide an analysis of: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes. | Submitted October 31, 2019 |
| 11/01/2019 | **[Sanctions.]** If the Company fails to complete implementation of certain tasks to restructure compliance by November 1, 2019, the Court may impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 01/31/2020 | **Food Waste Management Implementation Plan (Part 3).** The Company shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones. | TBD |
| 12/31/2021 | **Single-Use Plastic Reduction.** The Company shall reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent. | TBD |
| 12/31/2021 | **Food Waste Weight Reduction.** The Company shall reduce the total weight of food waste that the Company creates by 10 percent. | TBD |