**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: <u>16-20897-CR-SEITZ</u>**

**UNITED STATES OF AMERICA**

**v.**

**PRINCESS CRUISE LINES, LTD.,**

**Defendant.**
_____/

<u>QUARTERLY REPORT</u>

<u>OF THE COURT APPOINTED MONITOR (MARCH 2020)</u>

I.  **Introduction** .................................................................................................**1**

A. Preliminary Statement on COVID-19 ............................................................... 1

    1.   Background on COVID-19 .......................................................................... 3

    2.   International and National Response ......................................................... 5

    3.   Cruise Industry Impacts and Response ................................................... 13

    4.   Carnival Corp. Impacts and Response .................................................... 20

    5.   CAM Response ........................................................................................ 34

    6.   Ongoing CAM Team Examination ........................................................... 35

B. Executive Summary .......................................................................................... 36

    1.   Roadmap ................................................................................................. 36

    2.   Summary of CAM Observations .............................................................. 37

    3.   Summary of Updates on ECP Year Three Areas of Focus and Company
        Capabilities to Meet ECP Objectives .................................................... 41

C. Court Oversight ................................................................................................ 50

    1.   Probation Agreement Deadlines ............................................................. 50

    2.   December 19, 2019, Meeting.................................................................... 52

    3.   January 8, 2020, Status Conference ....................................................... 53

    4.   Order on January 8, 2020, Status Conference ....................................... 53

    5.   Company Submissions in Response to Order on January 8, 2020,
        Status Conference .................................................................................. 54

**II.   CAM Methodology and Activities** .................................................................. **56**

A. CAM Team Activities ................................................................................. 56

B. Oversight of the External Audit Function (TPA) ..................................... 59

C. Oversight of the Internal Audit Function (RAAS) ................................... 60

**III.  Updates on ECP Year Three Areas of Focus and Company Capabilities to
Meet ECP Objectives** ........................................................................................ **61**

A. Culture Survey and Assessment .............................................................. 61
   1.   Background ........................................................................................ 61
   2.   Environmental Compliance Culture Assessment ........................... 62
   3.   Culture Action Plan ......................................................................... 64
   4.   Additional Efforts Outside the Culture Action Plan ...................... 64
   5.   Ongoing CAM Team Examination ................................................. 65

B. Corporate Compliance Structure ............................................................ 66
   1.   Background ........................................................................................ 66
   2.   Personnel Updates ............................................................................ 67
   3.   Compliance Training for the Boards of Directors .......................... 69
   4.   Ethics and Compliance Retreat and Ship Visits ............................ 71
   5.   Compliance Risk Assessment .......................................................... 72
   6.   Ongoing CAM Team Examination ................................................. 76

C. Investigations ........................................................................................... 77
   1.   Background ........................................................................................ 77
   2.   Revised Investigation Procedures ................................................... 80
   3.   Other Updates .................................................................................. 85
   4.   Ongoing CAM Team Examination ................................................. 88

D. Food Waste Management .......................................................................... 89
   1.   Background ........................................................................................ 89
   2.   Updates on Probation Agreement Requirements ........................... 92
   3.   Food Waste Digesters ...................................................................... 105
   4.   Other Initiatives .............................................................................. 109
   5.   Ongoing CAM Team Examination ................................................. 110

E. Training .................................................................................................................. 111

   1.   General Updates on Company Initiatives ..................................................... 111

   2.   Personnel Updates .......................................................................................... 113

   3.   Environmental Officer CSMART Training ................................................ 113

   4.   Ongoing CAM Team Examination ............................................................... 116

F. Implementation of Enumerated ECP Requirements ..................................... 117

G. Initiatives Beyond Enumerated ECP Requirements ...................................... 119

   1.   IT Systems and Tools .................................................................................... 120

   2.   Fleet Environmental Officer Program ........................................................ 125

   3.   Holland America Group Workload Study .................................................. 127

   4.   Management of Change Procedure .............................................................. 134

   5.   Other Initiatives ............................................................................................. 136

H. Environmental and ECP Violations ................................................................. 137

   1.   Overview ........................................................................................................ 137

   2.   Planned Maintenance System Recordkeeping .......................................... 144

   3.   Advanced Air Quality Systems ................................................................... 145

I. Other Ongoing CAM Areas of Focus .............................................................. 153

   1.   Diversity and Inclusion ................................................................................ 153

   2.   Other Personnel Issues ................................................................................. 155

   3.   Integration of Compliance Considerations into Ship Design in New Build and Dry/Wet Dock Processes ................................................................. 155

   4.   Waste Offload Practices ................................................................................ 158

   5.   Purchasing and Procurement Processes for Spare Parts ......................... 158

   6.   Other Support for Operations and Compliance ....................................... 159

   7.   Company Response to Internal and External Findings ............................ 159

**Appendix A:  Status of Probation Agreement Commitments**

March 27, 2020

## I.   INTRODUCTION

Consistent with the Court's Order of January 9, 2020, Dkt. No. 174, the Court Appointed Monitor ("CAM")[1] submits this third Quarterly Report for Year Three of the Environmental Compliance Plan ("ECP") ("CAM March 2020 Quarterly Report" or "Report").[2]  This Report focuses on developments during the period from October 19, 2019 – January 18, 2020.[3] However, notable developments since the end of this period are included below.[4]

### A.   Preliminary Statement on COVID-19

Since the CAM December 2019 Quarterly Report, the world has shifted dramatically due to the "coronavirus disease 2019," or "COVID-19."  In the first part of March, it seemed as though cruise ships had become the symbol of the coronavirus.  Day after day, in all forms of media, stories about the coronavirus were attached to pictures of cruise ships, particularly ships

---

[1] The CAM is Steven P. Solow, a partner at the law firm Baker Botts LLP ("Baker Botts").  The CAM retained, *inter alia*, Baker Botts and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[2] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1, or prior CAM Reports.  The CAM has submitted the following reports:  (1) *First Annual Report of the Court Appointed Monitor (2017-2018)* (June 21, 2018), Dkt. No. 105 ("CAM First Annual Report"); (2) *Quarterly Report of the Court Appointed Monitor (September 2018)* (Sept. 21, 2018), Dkt No. 114 ("CAM September 2018 Quarterly Report");  (3) *Quarterly Report of the Court Appointed Monitor (December 2018)* (Dec. 18, 2018), Dkt No. 115 ("CAM December 2018 Quarterly Report"); (4) *Quarterly Report of the Court Appointed Monitor (April 2019)* (Apr. 2, 2019), Dkt No. 116 ("CAM April 2019 Quarterly Report"); (5) *Second Annual Report of the Court Appointed Monitor (April 19, 2018-April 18, 2019)* (July 3, 2019), Dkt. No. 150 ("CAM Second Annual Report"); (6) *Quarterly Report of the Court Appointed Monitor (September 2019)* (Sept. 18, 2019), Dkt. No. 166 ("CAM September 2019 Quarterly Report"); and (7) *Quarterly Report of the Court Appointed Monitor (December 2019)* (Dec. 18, 2019), Dkt. No. 172 ("CAM December 2019 Quarterly Report").

[3] ECP Year Three is April 19, 2019, through April 18, 2020.  ECP Year Two was April 19, 2018, through April 18, 2019, and ECP Year One was April 19, 2017, through April 18, 2018.

[4] The CAM provided the Company and the United States Department of Justice ("DOJ") a copy of this Report in advance of its submission for their review and comment.  The CAM took comments from these parties into account; however, the comments did not alter the substance of the Report.

March 27, 2020

operated by Princess Cruise Lines ("Princess"), the defendant in this case.  The cruise industry has been widely criticized, but the crises faced by these various ships have been compounded by governmental failures to allow cruise ships to berth and to provide or allow immediate and proper screening and medical care for passengers and crews.

For the past three years, the CAM Team, on behalf of the Court, has overseen the efforts of the defendant, and the related Carnival Corporation and plc ("Carnival Corp.") entities (collectively, the "Company"), to meet probation obligations.  These obligations were agreed upon by the Company and DOJ in an effort to move the Company from being a repeat environmental offender to a company with a sustainable culture of compliance.  The CAM reports have chronicled these efforts.  They have also described a range of shortcomings, including the failure of top management to support compliance fully, as well as the discharge of plastic waste and other prohibited discharges.  At the same time, the reports have recognized the extraordinary efforts made by many of the Company's approximately 120,000 employees, and have acknowledged significant investments by the Company, beyond those required by probation, to move towards better compliance performance and a sustainable culture of compliance.  The COVID-19 crisis has resulted in the Company putting its ships on a costly hiatus.  In the coming months, as the Company's ships return to sea, the lessons learned over the past years present the opportunity for the Company to emerge as a stronger organization.

In support of that effort, as part of a March 12, 2020, message to the entire Company, the Carnival Corp. CEO wrote:  "I've directed our brand leaders to reduce or eliminate non-critical cash expenditures, *but of course never cutting anything that would impact compliant, environmentally sound and safe operations*."  *See An Important Message from Arnold Donald* (Mar. 12, 2020) (emphasis added).  He further stated that:  "Our highest responsibility and top

March 27, 2020

priorities are always our commitments to compliance, protecting the environment and the safety of our guests, shipboard crew and staff and shoreside personnel." *Id.*

Those commitments will be put to the test in the weeks and months ahead.  During that time, the CAM Team will continue its work.  At the most recent Status Conference, held as the COVID-19 crisis was only just beginning to unfold, the CEO stated:  "I mean this sincerely: You [the Court] have elevated our focus and the CAM has too."  Status Conf. Tr. at 32 (Jan. 8, 2020).  He further stated that compliance has become "the highest priority," and "that change has been triggered . . . by the actions of the Court—by you and by the CAM, and we thank you for it."  *Id.* at 89.  It remains as critical as ever for the Company to maintain its focus on compliance as it navigates through the unfolding crisis.  The CAM Team will continue to provide information and analysis to support these efforts.

1.  <u>Background on COVID-19</u>

As noted above, during this ECP quarter, beginning around January 2020, the Company has faced an escalating and ongoing crisis presented by COVID-19.  The United States Centers for Disease Control and Prevention ("CDC") describes COVID-19 as "a respiratory disease spreading from person-to-person caused by a novel (new) coronavirus."  *Situation Summary* (Updated Mar. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fsummary.html ("CDC Situation Summary").[5]  The virus that causes COVID-19, known as SARS-CoV-2, "was first identified in Wuhan, China, in December 2019 and has since

---

[5] Coronaviruses "are a large family of viruses that are common in people and many different species of animals, including camels, cattle, cats, and bats.  Rarely, animal coronaviruses can infect people and then spread between people such as with MERS-CoV [the virus that causes Middle East Respiratory Syndrome (MERS)], SARS-CoV [the virus that causes Severe Acute

March 27, 2020

spread worldwide to at least 187 countries and territories." L. Moriarty, *et al.*, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 Morbidity and Mortality Weekly Report 1, 1 (Mar. 23, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf ("Moriarty, *et al.* Report").

As more was learned, the CDC reported that the "situation poses a serious public health risk." *See* CDC Situation Summary. Then, and still, the "complete clinical picture with regard to COVID-19 is not fully known." *See id.* Reported illnesses "have ranged from very mild (including some with no reported symptoms) to severe, including illness resulting in death." *Id.* Those who "seem to be at higher risk of developing serious COVID-19 illness" include "[o]lder people and people of all ages with severe chronic medical conditions — like heart disease, lung disease and diabetes, for example." *Id.* Currently, "there is no vaccine to protect against COVID-19 and no medications approved to treat it." *Id.*

As of March 27, 2020, all fifty states in the United States have reported cases of COVID-19 to the CDC, and most states "are reporting some community spread[6] of COVID-19." *See id*; *see also Cases in U.S.* (Updated Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ("CDC Cases in US Summary"). The CDC reports that, as of March 27, 2020, the total number of "both confirmed and presumptive positive cases" of COVID-19 in the United States is over 85,000. *See id.* The total number of deaths is over 1,200. *See id.*

---

Respiratory Syndrome (SARS)], and now with this new virus (named SARS-CoV-2 [the virus that causes COVID-19])." *Id.*

[6] Community spread "means some people have been infected and it is not known how or where they became exposed." *Id.*

March 27, 2020

The CDC also reports that "[m]ore cases of COVID-19 are likely to be identified in the United States in the coming days, including more instances of community spread."  CDC Situation Summary.  The CDC "expects that widespread transmission of COVID-19 in the United States will occur," and predicts that "[i]n the coming months, most of the U.S. population will be exposed to this virus."  *Id.*

2.    <u>International and National Response</u>

Efforts are underway at international, national, state, and local government levels to respond to the COVID-19 crisis.  At the international level, "[g]lobal efforts at this time are focused concurrently on lessening the spread and impact of this virus."  *Id.*  In the United States, the "federal government is working closely with state, local, tribal, and territorial partners, as well as public health partners, to respond to this public health threat."  *Id.*

i.    *International Declarations*

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the COVID-19 situation a "Public Health Emergency of International Concern."  *Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)* (Jan. 30, 2020), https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-%282005%29-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-%282019-ncov%29.  A Public Health Emergency of International Concern is "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response."  *What are the International Health Regulations and Emergency Committees?* (Dec. 19, 2019), https://www.who.int/news-room/q-a-detail/what-are-

the-international-health-regulations-and-emergency-committees. This definition "implies a situation that is: serious, sudden, unusual or unexpected; carries implications for public health beyond the affected State's national border; and may require immediate international action." *Id.*

On March 11, 2020, the World Health Organization "made the assessment that COVID-19 can be characterized as a pandemic." *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. A pandemic is "a global outbreak of disease. Pandemics happen when a new virus emerges to infect people and can spread between people sustainably. Because there is little to no pre-existing immunity against the new virus, it spreads worldwide." CDC Situation Summary. COVID-19 is "the first pandemic known to be caused by the emergence of a new coronavirus. In the past century, there have been four pandemics caused by the emergence of novel influenza viruses." *Id.*

## ii.   *United States*

### (1)   EMERGENCY AND DISASTER DECLARATIONS

On January 31, 2020, the United States Secretary of Health and Human Services ("HHS") declared a public health emergency[7] for "the entire United States to aid the nation's healthcare community in responding" to COVID-19. *Secretary Azar Declares Public Health*

---

[7] The HHS Secretary issued the declaration pursuant to the Public Health Service Act, which authorizes the Secretary to determine, "after consultation with such public health officials as may be necessary," that "(1) a disease or disorder presents a public health emergency; or (2) a public health emergency, including significant outbreaks of infectious diseases or bioterrorist attacks, otherwise exists." 42 U.S.C. § 247d(a). The Secretary "may take such action as may be appropriate to respond to the public health emergency, including making grants, providing awards for expenses, and entering into contracts and conducting and supporting investigations into the cause, treatment, or prevention of a disease or disorder." *Id.* at § 247d(a)(2).

March 27, 2020

*Emergency for United States for 2019 Novel Coronavirus* (Jan. 31, 2020),

https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.  The emergency declaration "gives state, tribal, and local health departments more flexibility to request that HHS authorize them to temporarily reassign state, local, and tribal personnel to respond to [COVID-19] if their salaries normally are funded in whole or in part by Public Health Service Act programs.  These personnel could assist with public health information campaigns and other response activities."  *Id.*

On March 13, 2020, United States President Trump declared "that the COVID-19 outbreak in the United States constitutes a national emergency,[8] beginning March 1, 2020." *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  The declaration gives the HSS Secretary authority "to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID-19 outbreak."  *Id.* at § 1.

---

[8] President Trump issued the declaration pursuant to the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, which "provides a framework for the President to declare a national emergency, but does not define what may constitute a national emergency."  J. Elsea, Congressional Research Service, *Definition of National Emergency under the National Emergencies Act* (Mar. 1, 2019), https://fas.org/sgp/crs/natsec/LSB10267.pdf.  The Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") defines "emergency" as "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States."  42 U.S.C. § 5122(1).

March 27, 2020

Between March 20 and 27, 2020, President Trump declared that major disasters[9] exist in California, Florida, Illinois, Iowa, Louisiana, Maryland, Missouri, New Jersey, New York, the Commonwealth of Puerto Rico, South Carolina, Texas, and Washington as a result of COVID-19, and ordered federal assistance to supplement state or Commonwealth, tribal, and local recovery efforts in affected areas in these states.[10]

---

[9] President Trump issued the declarations pursuant to the Stafford Act, which defines "major disaster" as "[a]ny natural catastrophe (including any hurricane, tornado, storm, high water, winddriven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, which in the determination of the President causes damage of sufficient severity and magnitude to warrant major disaster assistance under this Act to supplement the efforts and available resources of States, local governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby." 44 C.F.R. § 206.2(17). It is reportedly the first time a United States President has declared a health epidemic to be a "major disaster." *See* T. Frank, *Trump pushes legal limits with virus disaster declaration* (Mar. 23, 2020), https://www.eenews.net/climatewire/2020/03/23/stories/1062676411.

[10] *See President Donald J. Trump Approves New York Disaster Declaration* (Mar. 20, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-new-york-disaster-declaration-5/; *President Donald J. Trump Approves California Disaster Declaration* (Mar. 22, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-california-disaster-declaration-7/; *President Donald J. Trump Approves Washington Disaster Declaration* (Mar. 22, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-washington-disaster-declaration-2/; *President Donald J. Trump Approves Iowa Disaster Declaration* (Mar. 24, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-iowa-disaster-declaration-5/; *President Donald J. Trump Approves Louisiana Disaster Declaration* (Mar. 24, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-louisiana-disaster-declaration-4/; *President Donald J. Trump Approves Texas Disaster Declaration* (Mar. 25, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-texas-disaster-declaration-6/; *President Donald J. Trump Approves Florida Disaster Declaration* (Mar. 25, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-florida-disaster-declaration-4/; *President Donald J. Trump Approves New Jersey Disaster Declaration* (Mar. 26, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-new-jersey-disaster-declaration-2/; *President Donald J. Trump Approves Illinois Disaster Declaration* (Mar. 26, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-illinois-disaster-declaration-2/; *President Donald J. Trump Approves Maryland's Disaster Declaration* (Mar. 26, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-marylands-disaster-declaration/; *President*

March 27, 2020

On March 22, 2020, President Trump also directed[11] the Federal Emergency

Management Agency of the Department of Homeland Security and the Secretary of Defense to

provide federal support to the Governors of California, New York, and Washington for the use of

the National Guard to respond to COVID-19.  *Memorandum on Providing Federal Support for*

*Governors' Use of the National Guard to Respond to COVID-19* (Mar. 22, 2020),

https://www.whitehouse.gov/presidential-actions/memorandum-providing-federal-support-

governors-use-national-guard-respond-covid-19/.

(2)     TRAVEL RESTRICTIONS

Between January 31, 2020, and March 14, 2020, President Trump signed a series of

proclamations that, collectively, restrict entry into the United States by foreign nationals who

have been physically present in China, Iran, Ireland, the United Kingdom, or any of the twenty-

six European countries in the Schengen Area[12] within the fourteen days prior to their entry or

attempted entry.[13]  The travel restrictions "shall remain in effect until terminated by the

---

*Donald J. Trump Approves Missouri Disaster Declaration* (Mar. 26, 2020),
https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-missouri-disaster-declaration-4/; *President Donald J. Trump Approves South Carolina Disaster Declaration* (Mar. 27, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-south-carolina-disaster-declaration-5/; *President Donald J. Trump Approves Puerto Rico Disaster Declaration* (Mar. 27, 2020),
https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-puerto-rico-disaster-declaration-4/.

[11] President Trump issued the directive pursuant to the Stafford Act, which authorizes the President to provide federal emergency assistance to state and local governments "when he determines that an emergency exists for which the primary responsibility for response rests with the United States."  *See* 42 U.S.C. § 5191(b).

[12] These countries are:  Austria, Belgium, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Netherlands, Norway, Poland, Portugal, Slovakia, Slovenia, Spain, Sweden, and Switzerland.

[13] *See Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Risk of Transmitting 2019 Novel Coronavirus* (Jan. 31, 2020),

March 27, 2020

President." *See id.* United States citizens, residents, and their immediate family members "who have been [to] any one of those countries within in [*sic*] the past 14 days can enter the United States, but they are subject to health monitoring and possible quarantine for up to 14 days." CDC Situation Summary.

On March 19, 2020, the United States Department of State issued a Level 4 Global Health Advisory that "advises U.S. citizens to avoid all international travel due to the global impact of COVID-19." *Global Level 4 Health Advisory – Do Not Travel* (Mar. 19, 2020), https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-advisory-alert-global-level-4-health-advisory-issue.html. On March 22, 2020, the Department of State issued a COVID-19 travel update which notes that "[m]any areas throughout the world are now experiencing COVID-19 outbreaks and taking action that may limit traveler mobility, including quarantines and border restrictions. Even countries, jurisdictions, or areas where cases have not been reported may restrict travel without notice." *Current Outbreak of Coronavirus Disease 2019*

---

https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/ (barring entry to the United States of foreign nationals who traveled to China within the past fourteen days, with limited exceptions); *Proclamation on the Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus* (Feb. 29, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-certain-additional-persons-pose-risk-transmitting-coronavirus/ (expanding restrictions to include Iran); *Proclamation—Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus* (Mar. 11, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-certain-additional-persons-pose-risk-transmitting-2019-novel-coronavirus/ (expanding restrictions to include countries in the Schengen Area); *Proclamation on the Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus* (Mar. 14, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-certain-additional-persons-pose-risk-transmitting-coronavirus-2/ (expanding restrictions to include the United Kingdom and Ireland).

(Mar. 22, 2020), https://travel.state.gov/content/travel/en/traveladvisories/ea/covid-19-
information.html.

### (3)   SOCIAL DISTANCING RECOMMENDATIONS

On March 16, 2020, President Trump announced a program called "15 Days to Slow the
Spread," which is "a nationwide effort to slow the spread of COVID-19 through the
implementation of social distancing at all levels of society."  CDC Situation Summary; *15 Days
to Slow the Spread* (Mar. 16, 2020), https://www.whitehouse.gov/wp-
content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.  Among other
measures, it recommends avoiding social gatherings of more than ten people and avoiding
discretionary travel.  *See id.* at 2.

On March 26, 2020, President Trump issued a letter to state Governors stating that his
Administration "is working to publish new guidelines for State and local policymakers to use in
making decisions about maintaining, increasing, or relaxing social distancing and other
mitigation measures they have put in place."  *See* Letter to America's Governors (Mar. 26,
2020), https://assets.documentcloud.org/documents/6819627/letter1.pdf.

### (4)   FINANCIAL ASSISTANCE

On March 6, 2020, President Trump signed into law the Coronavirus Preparedness and
Response Supplemental Appropriations Act.  *See* H.R. 6074.  The law "provides additional fiscal
year 2020 emergency supplemental funding for combatting the spread of the coronavirus at the
local, State, national, and international levels and to prepare for the impacts that it may have on
the Nation."  *Bill Announcement* (Mar. 6, 2020), https://www.whitehouse.gov/briefings-
statements/bill-announcement-84/.

March 27, 2020

On March 18, 2020, President Trump signed into law the Families First Coronavirus Response Act. *See* H.R. 6201. The law "provides for supplemental appropriations related to the COVID-19 public health emergency, as well as waivers and modifications of Federal nutrition programs, employment-related protections and benefits, health programs and insurance coverage requirements, and related tax credits during the COVID-19 public health emergency." *Bill Announcement* (Mar. 19, 2020), https://www.whitehouse.gov/briefings-statements/bill-announcement-88/.

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. *See* H.R. 748. The law "provides emergency assistance and health care response for individuals, families and businesses affected by the COVID-19 pandemic, and provide[s] emergency appropriations to support Executive Branch agency operations during the COVID-19 pandemic." *Bill Announcement* (Mar. 27, 2020), https://www.whitehouse.gov/briefings-statements/bill-announcement-93/. It includes an "unprecedented relief package" totaling more than $2 trillion. *President Donald J. Trump Is Providing Economic Relief to American Workers, Families, and Businesses Impacted by the Coronavirus* (Mar. 27, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-providing-economic-relief-american-workers-families-businesses-impacted-coronavirus/. The legislation includes provisions for "economic stabilization and assistance" to "severely distressed sectors of the United States economy," including airlines and financial institutions. *See* H.R. 748 at tit. IV, subtit. A, §§ 4001-120. Under these provisions, however, cruise lines do not appear to be eligible for direct assistance, primarily because they are not incorporated in the United States. *See* J.E. Moreno, *Cruise lines excluded from Senate's $2*

*trillion stimulus bill* (Mar. 26, 2020), https://thehill.com/homenews/senate/489788-cruise-lines-excluded-from-coronavirus-stimulus-bill.

       3.       <u>Cruise Industry Impacts and Response</u>

The COVID-19 crisis is having substantial impacts on many industries, including the cruise industry.  In addition to the general travel restrictions discussed above, the United States Department of State and the CDC have issued recommendations to avoid cruise travel. Numerous cruise lines, including the Company's brands, have temporarily suspended ship operations in the United States and elsewhere.

On March 7, 2020, the Carnival Corp. President and Chief Executive Officer ("CEO") and other cruise industry leaders met with United States Vice President Pence to discuss COVID-19 and "to learn ways that this industry—the cruise line industry—can work with our health officials at the federal level, here at the state level, with port authorities to keep the passengers, communities, and our country safe and healthy."  *Remarks by Vice President Pence in a Coronavirus Briefing with Cruise Line Executives and Port Directors | Ft. Lauderdale, FL* (Mar 7. 2020),  https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-coronavirus-briefing-cruise-line-executives-port-directors-ft-lauderdale-fl/.

       *i.*    *Cruise Ship Travel Warnings*

On March 8, 2020, the United States Department of State issued an alert that "U.S. citizens, particularly travelers with underlying health conditions, should not travel by cruise ship."  *Cruise Ship Passengers* (Updated Mar. 8, 2020), https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/cruise-ship-passengers.html.  The alert observes that "[i]n order to curb the spread of COVID-19, many countries have implemented strict screening procedures that

March 27, 2020

have denied port entry rights to ships and prevented passengers from disembarking.  In some

cases, local authorities have permitted disembarkation but subjected passengers to local

quarantine procedures."  *Id.*  It also notes that "[w]hile the U.S. government has evacuated some

cruise ship passengers in recent weeks, repatriation flights should not be relied upon as an option

for U.S. citizens under the potential risk of quarantine by local authorities."  *Id.*  The alert

stresses that "[t]his is a fluid situation."  *Id.*

On March 8, 2020, the CDC issued a similar recommendation that "travelers, particularly

those with underlying health issues, defer all cruise ship travel worldwide."  *COVID-19 and

Cruise Ship Travel* (Updated Mar. 8, 2020), https://wwwnc.cdc.gov/travel/page/covid-19-cruise-

ship.  On March 17, 2020, the CDC upgraded the recommendation to a Level 3 travel warning

"that travelers defer all cruise travel worldwide."  *COVID-19 and Cruise Ship Travel* (Updated

Mar. 17, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship  ("CDC

Cruise Ship Travel Notice").  The CDC also recommends that those who do travel on cruise

ships "should stay home for 14 days after returning from travel, monitor their health, and

practice social distancing."  *Id.*  These recommendations are based on the observation that

"[c]ruise passengers are at increased risk of person-to-person spread of infectious diseases,

including COVID-19, and outbreaks of COVID-19 have been reported on several cruise ships."

*Id.*; *see also infra*, Part I.A.4.i (discussing confirmed or suspected COVID-19 cases reported on

the Company's ships).  The CDC further cautions that:  "Recent reports of COVID-19 on cruises

highlight the risk of infections to cruise passengers and crew.  Like many other viruses, COVID-

19 appears to spread more easily between people in close quarters aboard ships and boats.  As

<div align="right">March 27, 2020</div>

the COVID-19 pandemic continues, there remains a risk of infected passengers and crew on board cruise ships."  CDC Cruise Ship Travel Notice.[14]

A recent report on public health responses to COVID-19 cases on cruise ships found that, as of March 17, 2020, confirmed cases of COVID-19 have been associated with over twenty-five cruise ship voyages.  *See* Moriarty, *et al.* Report at 1.  As of March 23, 2020, there were "more than 800 laboratory-confirmed cases among passengers and crew, including 10 deaths" associated with two voyages, both on Princess ships.  *See id.*; *see also infra*, Part I.A.4.i.  The report notes that "[f]actors that facilitate spread on cruise ships might include mingling of travelers from multiple geographic regions and the closed nature of a cruise ship environment. This is particularly concerning for older passengers, who are at increased risk for serious complications of COVID-19."  Moriarty, *et al.* Report at 4.  The report further observes that "responses required the coordination of stakeholders across multiple sectors, including U.S. Government departments and agencies, foreign ministries of health, foreign embassies, state and local public health departments, hospitals, laboratories, and cruise ship companies."  *Id.*

---

[14] Recognizing that "[e]arly detection, prevention, and control of [COVID-19] on ships is important to protect the health of travelers on ships and to avoid transmission of the virus by disembarking passengers and crew members who are suspected of having COVID-19," CDC issued guidance in February 2020 for ships "originating from, or stopping in, the United States to help prevent, detect, and medically manage suspected COVID-19 infections."  *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019* (Updated Feb. 18, 2020), https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.  The guidance covers strategies "for preventing spread of COVID-19 during and after a voyage, including personal protective measures for crew members."  *Id.*

March 27, 2020

ii.    *Suspensions of Cruise Ship Operations*

(1)    UNITED STATES

On March 13, 2020, the Cruise Lines International Association ("CLIA") announced that its members are "voluntarily and temporarily suspending cruise ship operations from U.S. ports of call for 30 days as public health officials and the U.S. Government continue to address COVID-19." *CLIA Announces Voluntary Suspension in U.S. Cruise Operations* (Mar. 13, 2020), https://cruising.org/news-and-research/press-room/2020/march/clia-covid-19-toolkit.  The temporary suspension took effect on March 14, 2020.  *See id.*

CLIA is "the world's largest cruise industry trade association."  *About CLIA*, https://cruising.org/about-the-industry/about-clia.  Its membership includes more than fifty cruise lines, including all of the Company's nine brands:  AIDA, Carnival Cruise Line, Costa Cruises, Cunard, Holland America Line, P&O Cruises Australia, P&O Cruises UK, Princess, and Seabourn.  *See id.*; *see also CLIA Cruise Lines*, https://cruising.org/cruise-vacationer/cruise-lines.

As noted below, on March 12, 2020, one of the Company's brands and CLIA member, Princess, voluntarily suspended ship operations for sixty, rather than thirty, days.  *See infra*, Part I.A.4.ii(1).  On March 23 and March 25, 2020, two of the Company's brands and CLIA members, Costa Cruises and P&O Australia, respectively, announced the extensions of their voluntary thirty-day suspensions:  (1) by approximately two weeks, until the end of April 2020, for Costa Cruises; and (2) by thirty days, until May 15, 2020, for P&O Australia.  *See id.*

On March 24, 2020, two other major cruise companies and CLIA members, Celebrity Cruises and Royal Caribbean International, announced the extension of their voluntary suspensions of ship operations from thirty to approximately sixty days.  *See Celebrity Cruises*

*Announces Global Suspension of Cruising* (Mar. 24, 2020),

https://www.celebritycruises.com/travel-alert/voluntary-suspension-of-cruising; *Health And*

*Travel Alerts* (Updated Mar. 27, 2020), https://www.royalcaribbean.com/cruise-ships/itinerary-

updates.

(2)   CANADA

On March 13, 2020, the Government of Canada announced that it "will defer the start of

the cruise ship season in Canada, from April 2, 2020, to July 1, 2020, at the earliest."

*Government of Canada announces intention to defer the start of cruise ship season in Canada as*

*COVID-19 response measure* (Mar. 13, 2020), https://www.canada.ca/en/transport-

canada/news/2020/03/government-of-canada-announces-intention-to-defer-the-start-of-cruise-

ship-season-in-canada-as-covid-19-response-measure.html.  This deferral "will apply to cruise

ships capable of carrying more than 500 passengers and crew members."  *Id.*  The suspension of

the Canadian cruise season is likely to impact the Company's Alaska, Canada, and New England

cruise schedules.  *See Canada Suspends Cruise Season Until July 1, 2020*,

https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory.html.

iii.   *Financial Assistance for the Cruise Industry*

(1)   PRESIDENTIAL STATEMENTS

In recent weeks, United States President Trump has indicated that "he wants to help

cruise lines with a financial rescue package, along with airlines and hotels."  *See* B. Reinhard, *et*

*al.*, *Experts: Industry's resistance put cruise passengers at risk*, WASHINGTONPOST.COM (Mar.

21, 2020).  For instance, at a press briefing on March 19, 2020, the President stated:  "We will be

helping the airline industry.  We will be helping the cruise ship industry.  We probably will be

helping the hotel industry . . . [W]here jobs are created, you don't want to lose industries like

this.  These are incredible industries.  You can't lose them."  *Remarks by President Trump, Vice*

*President Pence, and Members of the Coronavirus Task Force in Press Briefing* (Mar. 19, 2020),

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-6/.  At a press briefing on March 23, 2020,

the President stated, in response to a question about a proposed economic stimulus package:

"You're going to have to save companies that have been shattered . . . So we have to work with

the airlines.  We have to work with the cruise lines."  *Remarks by President Trump, Vice*

*President Pence, and Members of the Coronavirus Task Force in Press Briefing* (Mar. 23, 2020),

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-9/.  At a press briefing on March 26, 2020,

following the passage of the CARES Act bill in the United States Senate, which, as noted above,

would not include direct financial assistance for the cruise industry, the President stated:

"[W]e're going to work very hard on the cruise line business and we're going to try and work

something out."  *Remarks by President Trump, Vice President Pence, and Members of the*

*Coronavirus Task Force in Press Briefing* (Mar. 26, 2020),

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-12/.

On March 22, 2020, the Carnival Corp. CEO stated in a media interview that:  "We don't

need a bailout in terms of giving us money.  Getting a loan guarantee would be helpful," as

"capital markets are constrained right now."  *See Carnival CEO downplays coronavirus bailout,*

*but worries about job losses* (Mar. 22, 2020), https://www.axios.com/carnival-cruises-coronavirus-bailout-99a765ad-8bd2-4647-9690-94a4dca0a8ce.html.  He also stated that:  "On

the other hand, if for some reason that doesn't happen, we are committed to trying to find a way to support those who are dependent on us for their livelihoods." *Id.*[15]

      (2)    REQUESTS TO CONGRESSIONAL LEADERSHIP FOR ENHANCED CONSUMER, LABOR, AND ENVIRONMENTAL PROTECTIONS

On March 17, 2020, four United States Senators made a formal request to Senate leadership and the Senate Appropriations Committee to "include enhanced consumer and labor protections in any emergency spending package designed to help the airline and cruise industries affected by the coronavirus." Letter from Sen. E. Markey, Sen. R. Blumenthal, Sen. S. Whitehouse, and Sen. T. Baldwin to Sen. M. McConnell, Sen. C. Schumer, Sen. R. Shelby, and Sen. P. Leahy (Mar. 17, 2020), at 1. The letter states that its authors "agree that financial assistance may be necessary for some of our industries most impacted by the ongoing pandemic," but "strongly believe that any such legislation must include conditions that will protect both consumers and workers in the travel industry." *Id.* Regarding the cruise industry, the letter notes "concerns about the inadequate health and safety standards aboard these ships should operations restart." *Id.* at 2. It also notes that the "unique and complex set of international rules" governing ship operations and health and safety "seem to be designed to protect the cruise industry from any kind of liability, rather than to protect the health and safety of passengers." *Id.* The letter urges that "[w]e cannot permit the cruise line industry to obtain federal assistance to overcome the coronavirus until – at the very least – the industry adopts necessary medical and safety safeguards." *Id.*

---

[15] The Miami Herald has observed that a loan guarantee: "would use taxpayer funds to backstop the company's loans, a form of federal assistance. And that could make things tricky for the cruising industry because . . . they're largely tax-exempt." A. Harris and T. Dolven, *'A cruise ship is not a riskier environment' for coronavirus, Carnival CEO tells Axios* (Mar. 22, 2020), https://www.miamiherald.com/news/coronavirus/article241395861.html.

March 27, 2020

On March 18, 2020, eight United States Senators made a formal request to Senate and House of Representatives leadership to pair any financial assistance to the airline or cruise industries with "requirements that the companies act in a more responsible fashion," given "the poor environmental records of some companies in these industries."  Letter from Sen. S. Whitehouse, Sen. M. Heinrich, Sen. J. Merkley, Sen. C. Booker, Sen. E. Markey, Sen. R. Blumenthal, Sen. T. Smith, and Sen. D. Stabenow to Rep. N. Pelosi, Rep. K. McCarthy, Sen. M. Connell, and Sen. C. Schumer (Mar. 18, 2020), at 1.  The letter notes that "[b]usiness leaders are themselves increasingly recognizing that their companies must make positive contributions to society or risk losing their social license.  This is particularly true when companies ask American taxpayers for financial assistance."  *Id.* at 2.

<div align="center">(3)     CARES ACT</div>

As discussed above, on March 27, 2020, President Trump signed into law the CARES Act, which includes an approximately $2 trillion economic stimulus package in response to COVID-19.  *See supra*, Part I.A.2.ii(4).  The legislation does not include direct financial assistance for the cruise industry.  *See id.*

<div align="center">4.    <u>Carnival Corp. Impacts and Response</u></div>

Like other cruise companies, Carnival Corp. is facing substantial challenges as a result of the COVID-19 crisis, including impacts to its passengers and crew, operations, and finances.  Notably, and as described further below, in March 2020, the Company "implemented a temporary pause of its global fleet cruise operations across all brands."  Form 8-K/A (Mar. 16, 2020), https://www.carnivalcorp.com/static-files/aed6e4d5-caba-4b84-8ec1-6cad74522e1e., at § 7.01.  As the situation evolves, the impacts of COVID-19, and the Company's responses, are developing.

March 27, 2020

i.   *Passenger and Crew Impacts*

As of the date of this Report, several of the Company's ships were confirmed to be carrying passengers and/or crew who tested positive for the virus which causes COVID-19.

(1)   *DIAMOND PRINCESS*

In February 2020, approximately 2,630 passengers and 1,070 crew on the *Diamond Princess* were subject to quarantine upon arrival at the Port of Yokohama, Japan, after a passenger who had previously disembarked was confirmed to have COVID-19.  *See* K. Kakimoto, *et al.*, *Initial Investigation of Transmission of COVID-19 Among Crew Members During Quarantine of a Cruise Ship — Yokohama, Japan, February 2020*, 69 Morbidity and Mortality Weekly Report 312 (Mar. 20, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6911e2-H.pdf  ("Kakimoto, *et al.* Report").

The ship departed Yokohama on January 20, 2020, on a two-week round-trip itinerary scheduled to end on February 3, 2020.  *See* Moriarty, *et al.* Report at 1.  On January 25, 2020, a symptomatic passenger disembarked in Hong Kong, where he later tested positive for the virus which causes COVID-19.  *Id.*  After making six stops in three countries, the ship returned to Yokohama as scheduled on February 3, 2020.  *Id.*

The quarantine began when the ship arrived in Yokohama on February 3, 2020, and lasted for nearly four weeks.  Kakimoto, *et al.* Report at 312.  Symptomatic passengers were tested upon arrival, and those with positive results were disembarked and hospitalized on February 4-5, 2020.  *Id.*  Testing was later "expanded to support a phased disembarkation of passengers, prioritizing testing of older persons, those with underlying medical conditions, and those in internal cabins with no access to the outdoors."  Moriarty, *et al.* Report at 2.  From February 16-23, 2020, "nearly 1,000 persons were repatriated by air to their home countries,

including 329 persons who returned to the United States and entered quarantine or isolation." *Id.*[16]

The remaining passengers who had negative test results, no respiratory symptoms, and no close contact with a person with a confirmed COVID-19 case were not taken off the ship, but instead were required to complete a fourteen-day ship-based quarantine before disembarkation. Moriarty, *et al.* Report at 2. Those passengers who had close contact with a person with a confirmed COVID-19 case "completed land-based quarantine, with duration determined by date of last contact." *Id.* After all passengers were disembarked, "crew members either completed a 14-day ship-based quarantine, were repatriated to and managed in their home country, or completed a 14-day land-based quarantine in Japan." *Id.*[17]

For those undergoing the onboard quarantine, passengers were requested to remain in their cabins, while crew members "continued to perform their regular duties, delivered meals to passengers, and remained in their cabins when they were not working; symptomatic crew members were required to remain in their cabins." Kakimoto, *et al.* Report at 312. By the end of the quarantine, approximately seven hundred and twelve cases of COVID-19 were confirmed among passengers and crew, including approximately twenty cases among crew (fifteen of whom were food service workers). *See id.* This is reported to have been, at the time, "the largest cluster of COVID-19 cases outside mainland China." Moriarty, *et al.* Report at 1.

---

[16] As of March 19, 2020, the CDC reported that there were forty-six confirmed positive cases of COVID-19 in the United States among persons repatriated to the United States from the *Diamond Princess. See* CDC Cases in US Summary (Updated Mar. 19, 2020).

[17] The Company has reported paying for charter flights and costs related to quarantine and containment for many of its crew members. *See* Employee Interview/Call Notes.

March 27, 2020

An initial investigation by researchers at Japan's National Institute of Infectious Diseases concluded that "COVID-19 was likely transmitted first from passengers to crew members and subsequently spread among the crew, especially among food service workers." *See* Kakimoto, *et al.* Report at 312.[18]  The investigation further found that "infection had apparently spread among persons whose cabins were on the same deck (deck 3) and who worked in the same occupational group (food service), probably through contact or droplet spread, which is consistent with current understanding of COVID-19 transmission."  Kakimoto, *et al.* Report at 312.  The study "underscores the need for swift epidemiologic investigation as soon as a COVID-19 case is detected in an area or group where a large number of persons gather in a closed or crowded setting," such as a cruise ship.  *Id.* at 312-13.  Another report found that RNA from the virus which causes COVID-19 "was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess but before disinfection procedures had been conducted."  Moriarty, *et al.* Report at 4. The report concluded that "[a]lthough these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite [*i.e.*, surface] transmission of SARS-CoV-2 aboard cruise ships is warranted."  *Id.*

(2)   *GRAND PRINCESS*

Beginning in early March 2020, approximately 2,420 passengers and 1,110 crew on the *Grand Princess* were subject to quarantine upon arrival in Oakland, California, after a passenger from the ship's prior voyage was confirmed to have COVID-19.  The quarantine and

---

[18] Consistent with this conclusion, another report found that "[o]n the *Diamond Princess*, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine."  Moriarty, *et al.* Report at 4.

March 27, 2020

disembarkation processes have raised both humanitarian and compliance-related concerns that attracted the attention of the Court, as discussed below.

The ship departed San Francisco, California, on February 21, 2020, on a round-trip itinerary to Hawaii and Mexico.  *See* Moriarty, *et al.* Report at 3.  The ship had sailed a prior round-trip itinerary from San Francisco to Mexico from February 11-21, 2020.  *Id.*  Most of the approximately 1,110 crew and sixty-eight passengers from that prior voyage remained onboard for the subsequent voyage beginning on February 21, 2020.  *Id.*  On March 4, 2020, California public health officials reported the COVID-19-related death of a passenger from the prior voyage.  *See id.*[19]

On March 5, 2020, in a collaborative effort between the CDC, local authorities, and Princess, "a response team was transported by helicopter to the ship to collect specimens from 45 passengers and crew with respiratory symptoms," with the samples transferred to the California Department of Public Health for COVID-19 testing.  *Id.*; *see also Grand Princess Updates* (Updated Mar. 16, 2020), https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html ("Grand Princess Updates").  Passengers and "symptomatic crew members were asked to self-quarantine in their cabins, and room service replaced public dining until disembarkation."  Moriarty, *et al.* Report at 3.  On March 6, 2020, it was confirmed that twenty-one individuals—two passengers and nineteen crew—had tested positive.  *See id.*[20]  All

---

[19] As of March 23, 2020, more than twenty additional cases of COVID-19 have been identified among individuals who sailed on this prior February 11-21, 2020 voyage and did not remain onboard for the second voyage that departed on February 21, 2020.  *See id.*

[20] A recent report found that "crew members were likely infected on voyage A and then transmitted [the virus] to passengers on voyage B," and that the ship "was an example of perpetuation of transmission from crew members across multiple consecutive voyages and the potential introduction of the virus to passengers and crew on other ships."  *Id.* at 5.

passengers "and affected crew" were instructed to "remain isolated in their rooms" while Princess "await[ed] official specific plans for future positioning of the ship from relevant authorities." *See* Grand Princess Updates. The ship, which was returning from Hawaii, cancelled a planned port call in Mexico to return to San Francisco.

The ship was held off the Californian coast for days. It was finally permitted to dock in the Port of Oakland on March 9, 2020. On that date, despite the need for the ship's passengers and crew to receive medical screening and, in some cases, care, the CDC issued a No Sail Order[21] requiring that the *Grand Princess* "shall not disembark or reembark any crew members except as instructed by U.S. Coast Guard or HHS/CDC personnel until further notice," "shall only be permitted to disembark or reembark international passengers in a manner designed to minimize the risk of disease transmission per the instructions of HHS/CDC personnel," and "shall not embark any new passengers or embark new crew, except as instructed by U.S. Coast Guard or HHS/CDC personnel, or otherwise commence or continue operations until further notice." CDC, *No Sail Order* (Mar. 9, 2020).

Under orders from the CDC and other federal, state and local authorities, the ship was allowed to begin disembarking passengers on March 9, 2020. *See* Grand Princess Updates. The two passengers who tested positive, along with their travel companions, were transferred to local hospitals. *Id.* But the nineteen crew members who tested positive were "deemed asymptomatic and were not disembarked from the ship," and instead were ordered to be placed "in isolation in their individual cabins." *Id.*

---

[21] The CDC has "authority to institute a no-sail order to prevent ships from sailing when it is reasonably believed that continuing normal operations might subject newly arriving passengers to disease." Moriarty, *et al.* Report at 3.

Disembarkation for the remaining passengers began on March 9, 2020, and continued until March 16, 2020. *See id.* United States passengers were transferred to military bases in the United States for quarantine, while most non-United States passengers[22] were repatriated to their home countries via charter flights for quarantine. *See* Grand Princess Updates. All passengers who underwent land-based quarantine in the United States were offered COVID-19 testing. *See* Moriarty, *et al.* Report at 3. As of March 21, 2020, seventy-eight out of approximately four hundred and seventy individuals with available test results had tested positive. *See id.*

During this time period, crew members (and non-United States passengers who could not be repatriated) remained onboard while government plans for a crew quarantine were "being determined." *See* Grand Princess Updates. The initial plan was that "[o]nce disembarkation of the guests is completed, remaining crew members will remain onboard and [the] Grand Princess will depart from San Francisco Bay." *See id.* This scenario raised humanitarian concerns— shared by the Company, the CAM, and the Court—regarding the safety and welfare of the remaining crew and passengers onboard. *See infra*, Part I.A.4.i(4). The Company sought additional time to provide chartered flights, at the Company's expense, to fly the majority of the crew back to their home countries. *See* Employee Interview/Call Notes. In support of this effort, and aware of the potential for the virus to impact the crew's health in such a way as to create a risk to safety and environmental compliance, this Court began to examine whether it should issue an Order, based in part on its continuing supervision of the *Grand Princess*, that would require the relevant governmental bodies to show cause why they should not be enjoined from forcing the ship out to anchorage without giving the Company a short additional period of time to

---

[22] A small number of passengers remained onboard who could not be repatriated to their home countries due to travel restrictions or other logistical challenges. *See* Employee Interview/Call Notes.

complete arrangements for non-essential crew to disembark and return to their homes. *See infra*, Part I.A.4.i(4).

On March 15, 2020, Princess announced that the United States Department of State, HHS, the CDC, the State of California, the City of Oakland, and the Port of San Francisco had "coordinated on a plan to disembark and repatriate Grand Princess crew members via charter flights." *See* Grand Princess Updates. Under this plan, disembarking crew members would "undergo the same health screenings as guests from the ship, which continues to be managed by HHS and CDC health authorities." *Id.*[23] This "humanitarian effort [was] applauded by Princess for its intent to assist crew members, not required for the safe operation of the ship, allowing them to return to their home countries." *Id.* Princess "committed to pay for the ground transportation and charter flight costs." *Id.* According to Princess, the "repatriation process has been extremely challenging due to the dynamic nature of the expanding and evolving air travel restrictions throughout the world." *Id.* By March 16, 2020, more than half of the crew members had been disembarked, and the ship (with a complement of mostly essential crew members) had left the Port of Oakland to anchor in San Francisco Bay. *Id.*

(3)   *OTHER SHIPS*

Additional cases of confirmed or suspected COVID-19 have been reported among passengers and/or crew members on:

- The *Costa Luminosa*, which departed Fort Lauderdale, Florida, on February 24, 2020, with approximately 1,400 passengers on an itinerary through the Caribbean and Europe. *See* B. Reinhard, *et al.*, *Experts: Industry's resistance put cruise passengers*

---

[23] The plan also includes the following conditions: "Crew members who are ill (for any reason) or symptomatic will not be allowed to fly via charter aircraft. Crew members who are not symptomatic but for whom no charter flight is currently available will stay under quarantine on the ship. Those requiring elevated care will be moved to land-based medical facilities or HHS alternate care sites, depending upon their condition." *Id.*

*at risk*, WASHINGTONPOST.COM (Mar. 21, 2020).  On March 8, 2020, a passenger who reported breathing difficulties disembarked in Puerto Rico, and both the passenger and a travel companion later tested positive for the virus.  *See id.*[24]  The ship continued on its voyage across the Atlantic and docked in Marseilles, France, on March 19, 2020.  *See id.*  At that time, five passengers and two crew members reported flu-like symptoms.  *See id.*  On March 20, 2020, a plane with over three hundred Americans and Canadians from the ship landed in Atlanta, Georgia.  *See id.*  According to the CDC, as of March 21, 2020, three individuals from this flight have tested positive for the virus, with a fourth to be evaluated at a local hospital.  *See id.*

- The *Ruby Princess*, which departed Sydney, Australia, on March 8, 2020, on a round-trip itinerary to New Zealand.  The ship returned to Sydney on March 19, 2020, disembarking approximately 2,700 passengers and one hundred crew members (with remaining crew members staying onboard).  On March 20, 2020, Princess confirmed that three passengers and one crew member who were on the ship tested positive for the virus.  *See Ruby Princess Advisory* (Updated Mar. 20, 2020), https://www.princess.com/news/notices_and_advisories/notices/ruby-princess-advisory.html.  On March 24, 2020, it was reported in the media that "[m]ore than 130 people from the cruise have now tested positive, making it the biggest single source of infections in Australia."  *See* F. Mao, *Coronavirus: How did Australia's Ruby Princess cruise debacle happen?* (Updated Mar. 24, 2020), https://www.bbc.com/news/world-australia-51999845.

- The *Zaandam*, which departed Buenos Aires, Argentina, on March 7, 2020, with approximately 1,240 passengers and 590 crew members on a South American itinerary that was originally scheduled to end in San Antonio, Chile, on March 21, 2020.  This itinerary was altered after Holland America Line decided to suspend its global ship operations on March 13, 2020.  All ports along the *Zaandam*'s originally planned route were closed to cruise ships, and the Company worked to find a port where the ship could disembark passengers.  *See Statement Regarding Zaandam* (Updated Mar. 27, 2020), https://www.hollandamerica.com/blog/ships/ms-zaandam/statement-regarding-zaandam/.  On March 22, 2020, Holland America Line announced that "13 guests and 29 crew reported to the ship's medical center with influenza-like symptoms.  Out of an abundance of caution, we have now asked all guests to remain in their staterooms until we have more information."  *Id.*  On March 27, 2020, Holland America Line announced that on March 26, 2020, the *Rotterdam*, carrying approximately six hundred crew members and no passengers, "rendezvoused" with the *Zaandam* off the coast of Panama to provide medical supplies, test kits, and additional medical staff.  *See id.*  On March 27, 2020, Holland America Line also announced that "[y]esterday a number of patients with respiratory symptoms were tested for COVID-19 and two individuals tested positive . . . Currently, 53 guests (4%) and 85 crew (14%) have reported to Zaandam's medical center with influenza-like illness symptoms."  *Id.*  As of the date of this Report, "the

---

[24] During a prior voyage, a passenger who complained of heart trouble disembarked in the Cayman Islands on February 29, 2020.  He later died after testing positive for the virus.  *See id.*

onward plan for both ships is still being finalized" as Holland America Line "continue[s] to work with the Panamanian authorities on approval to transit the Panama Canal for sailing to Fort Lauderdale, Florida." *Id.*

- The *Costa Favolosa* and *Costa Magica*, which, as of the date of this Report, are reported to be anchored approximately three miles off the coast of Florida with approximately one thousand crew members each on board. *See* T. Dolven, *Thirteen sick crew with COVID-19 symptoms evacuated from cruise ships to Miami hospitals* (Mar. 26, 2020), https://www.miamiherald.com/news/business/tourism-cruises/article241523751.html. In mid-March, "all passengers and a few crew disembarked from the ships in the Caribbean islands of Martinique and Guadeloupe after the cruise industry halted operations in response to the COVID-19 pandemic." *Id.* Among those who disembarked, it is reported that "eight people on the ships tested positive for COVID-19, including four crew members." *Id.* On March 25, 2020, it was reported that "[t]hirty people between the two ships had flu-like symptoms." *See id.* On March 26, 2020, it was reported that thirteen crew members (seven from the *Costa Favolosa* and six from the *Costa Magica*) were evacuated from the ships via lifeboats and transported to hospitals in Miami "with COVID-19 symptoms." *Id.* It was also reported that the Company "is working to organize flights home for the crew members still on board." *Id.*[25]

- The *Carnival Freedom*, which departed Galveston, Texas, on March 8, 2020, on a round-trip itinerary, and returned on March 14, 2020, disembarking all passengers. On March 26, 2020, it was reported that passengers from the voyage were notified by the Company that "they were potentially exposed to the virus" and "were asked to quarantine for two weeks after a crew member tested positive for COVID-19." *See* A. Harris and T. Dolven, *Carnival Freedom passengers told to isolate after crew member's positive COVID-19 test* (Mar. 26, 2020), https://www.miamiherald.com/news/coronavirus/article241540271.html. As of the date of this Report, the ship is reportedly docked in Gulfport, Mississippi, with crew members onboard. According to a Company statement: "[G]iven the community spread of COVID-19 and the fact that most of our homeports are in various stages of lockdown, we have kept all crew on board and not allowed shore privileges." *See id.*

These situations continue to develop; some ships remain at sea with passengers and/or

crew seeking ports willing to accept them and provide them with humanitarian relief.

---

[25] The *Costa Favolosa* and *Costa Magica* were previously Non-Covered Vessels. On March 25, 2020, the Company provided notice that, due to the need for the ships to sail in United States waters because of COVID-19, both ships "will obtain Certificates of Financial Responsibility ('COFR') and become Covered Vessels." Letter from Environmental Corporate Compliance Manager, *Notice of Change Under Environmental Compliance Plan* (Mar. 25, 2020).

March 27, 2020

(4)     IMPACT OF COVID-19 ON COMPLIANT OPERATIONS

The situations on ships forced to remain at sea, or quarantined in port, illuminate the risks

that passengers and crew members face onboard as a result of a novel, highly contagious

virus.  The most significant risks are to the health, safety, and welfare of the individuals

onboard.  However, as ships are continually denied entry or support, there is also concern that

the spread of a potentially disabling disease among crew members could jeopardize a ship's

ability to operate safely and in compliance with environmental protection requirements,

especially if a ship is at sea or anchored away from port.  Being away from port places enhanced

operational demands on a ship, and makes it more difficult to access medical personnel,

treatment, and supplies (including medication, test kits, cleaning/sanitizing supplies, and

personal protective equipment); food; fuel; waste vendors for the offload of wastes generated

onboard, including medical and hazardous wastes; and other provisions necessary for the safe

and compliant operation of the ship.  Accordingly, in communications with the Office of

Probation and the CAM (and, through them, with DOJ), the Court sought to support the

Company's humanitarian efforts to address the plight of the crew on the *Grand Princess*,

discussed above, as also consistent with the probation obligations to maintain safe and compliant

operations of Company ships subject to the Court's oversight.

*ii.     Operational Impacts*

Throughout the COVID-19 crisis, Company ships have had to alter, cut short, or cancel

planned itineraries and implement enhanced public health and safety measures.  As of the date of

this Report, the Company has temporarily suspended ship operations across its brands.

(1)     SUSPENSION OF SHIP OPERATIONS AT PRINCESS

On March 12, 2020, Princess "announced that it will voluntarily pause global operations

of its 18 cruise ships for two months (60 days), impacting voyages departing March 12 to May

March 27, 2020

10.”  *Princess Cruises Announces a Voluntary and Temporary Pause of its Global Ship*

*Operations for 60 Days* (Mar. 12, 2020),

https://carnival.us.newsweaver.com/icfiles/200/1000534/1012624/875231/4ac4b2229a42d3adf0f

3f171/princess%20cruises%20announces%20a%20voluntary%20and%20temporary%20pause.p

df; *see also Princess Cruises | Jan Swartz Announces Pause of Ship Operations* (Mar. 12, 2020);

https://www.youtube.com/watch?v=ZC1jVkY9hqE (video by the President of Princess

announcing that:  "In the interest of doing what's right and upholding our core values, I

regretfully am announcing a 60 day pause of our Princess global ship operations").

(2)    S<small>USPENSION OF</small> S<small>HIP</small> O<small>PERATIONS AT</small> O<small>THER</small> B<small>RANDS</small>

On March 13, 2020, four of the Company's other brands—Carnival Cruise Line, Cunard,

Holland America Line, and Seabourn—announced temporary month-long voluntary suspensions

of ship operations.  *See Four Additional Carnival Corporation North American Brands*

*Announce Month-Long Temporary Pause in Fleet Cruise Operations* (Mar. 13, 2020),

https://www.carnivalcorp.com/news-releases/news-release-details/four-additional-carnival-

corporation-north-american-brands.  The Company's other brands—AIDA, Costa Cruises, P&O

Cruises Australia, P&O Cruises UK—announced similar temporary month-long voluntary

suspensions around the same time, with the exact dates of the suspensions differing by brand but

generally ending around mid-April 2020.  On March 23 and March 25, 2020, Costa Cruises and

P&O Australia announced, respectively, the extensions of their voluntary suspensions by

approximately two weeks, for Costa Cruises, and by thirty days, for P&O Australia:

- AIDA is reportedly "halting operations at least through early April."  *See* R. Wile, *Three more cruise lines suspend operations amid coronavirus fears* (Mar. 13, 2020), https://www.miamiherald.com/news/business/tourism-cruises/article241168306.html;

- Carnival Cruise Line "is pausing operations immediately across its fleet of ships based in North America and will resume them on Friday, April 10."  *Carnival Cruise*

March 27, 2020

*Line Announces Pause In Service* (Mar. 13, 2020),
https://www.carnivalcorp.com/news-releases/news-release-details/carnival-cruise-line-announces-pause-service;

- Costa Cruises "decided to suspend the activities of our ships until the end of April." *Updates on Cancellations and Fleet activities*, https://www.costacruises.com/cruising-soon.html;

- Cunard "is suspending any new cruises until April 11, 2020." *Cunard voluntarily suspends operations until April 11*, https://www.cunard.com/en-us/contact-us/travel-health-advisories;

- Holland America Line "has made the decision to voluntarily pause global cruise operations of its 14 ships for 30 days, impacting sailings scheduled to depart through April 14, 2020." *Holland America Line Announces A Voluntary And Temporary Pause Of Its Global Ship Operations For 30 Days* (Mar. 17, 2020), https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory.html;

- P&O Cruises UK "is suspending any new cruises until April 11, 2020." *P&O Cruises voluntarily suspends all sailings until 11 April*, https://www.pocruises.com/travel-health-advisories;

- P&O Cruises Australia, which does not operate any Covered Vessels, "will resume its operations on 15 May 2020 – an extra 30 days to what had previously been announced." *P&O Extends its Temporary Pause in Operations in Australia and New Zealand* (Mar. 25, 2020), https://www.pocruises.com.au/news-centre/2020/2020-march-25; and

- Seabourn "will voluntarily pause global operations of its five cruise ships for 30 days, starting March 14, 2020." *Seabourn To Pause Global Cruise Operations For 30 Days* (Mar. 13, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/seabourn-pause-global-cruise-operations-30-days-0.

(3)    OFFER TO USE CRUISE SHIPS AS TEMPORARY HOSPITALS

On March 19, 2020, Carnival Corp. announced "that select cruise ships from the company's global cruise line brands, including Carnival Cruise Line, Holland America Line, Princess Cruises and P&O Cruises Australia, will be made available to communities for use as temporary hospitals to help address the escalating impacts of the COVID-19 pandemic on healthcare systems around the world." *Carnival Corporation Extends Offer to Governments and Health Authorities to Consider Cruise Ships as Temporary Hospitals* (Mar. 19, 2020),

https://www.carnivalcorp.com/node/60911/pdf.  The initiative "would utilize converted cruise ships for non-COVID-19 patients to help relieve pressure on land-based hospitals and free up capacity to care for cases of COVID-19 [at land-based hospitals]."  *Id.*  As part of the offer, "interested parties will be asked to cover only the essential costs of the ship's operations while in port."  *Id.*

### iii.    Financial Impacts

In a Form 8-K/A report (as amended), filed with the United States Securities and Exchange Commission on March 16, 2020, Carnival Corp. disclosed that it "believes the ongoing effects of COVID-19 on its operations and global bookings will have a material negative impact on its financial results and liquidity."  *See Update on Debt Funding and Other Matters* (Mar. 16, 2020), https://www.carnivalcorp.com/node/60901/pdf; Form 8-K/A (Mar. 16, 2020), https://www.carnivalcorp.com/static-files/aed6e4d5-caba-4b84-8ec1-6cad74522e1e., at § 7.01.  As a result, the Company "is taking additional actions to improve its liquidity, including capital expenditure and expense reductions, and pursuing additional financing."  *Id.*  Due to "the uncertain[t]y of the situation," the Company "is currently unable to provide an earnings forecast."  *Id.*  However, it expects "results of operations for the fiscal year ending November 30, 2020 to result in a net loss."  *Id.*

Carnival Corp. also disclosed that it has fully drawn down on an approximately $3 billion multi-currency revolving credit agreement.  *See* Form 8-K (Mar. 19, 2020), https://www.carnivalcorp.com/node/60916/html, at § 7.01; Form 8-K (Mar. 16, 2020), https://www.carnivalcorp.com/node/60896/html, at § 2.03.  Carnival Corp. is borrowing under the agreement "to increase its cash position and preserve financial flexibility in light of current

uncertainty in the global markets resulting from the COVID-19 outbreak." *Id.* The proceeds "will be available to be used for working capital, general corporate or other purposes." *Id.*

     5.    <u>CAM Response</u>

          *i.*    *CAM Team Visits*

As the CAM recognized that the COVID-19 crisis began to present an unprecedented set of challenges for the Company's crew, and as the threat of the spread of the virus became clear, on March 3, 2020, with the Court's approval, CAM Team visits and TPA ship audits were suspended for an initial period of thirty days.[26]  By March 9, 2020, again with the Court's approval, the CAM Team and the TPA began conducting all meetings and interviews with shoreside personnel via telephone and videoconference.  These decisions were based on a belief—shared by the CAM, the Court, and the Company—that safety and health are the most important priorities ahead of all others.  The CAM Team and the TPA will confer with the Company at least weekly, and will resume ship and in-person shoreside office visits and audits when it is appropriate to do so.

          *ii.*    *CAM Team Work*

The CAM Team's work to monitor the Company's compliance with its probation obligations continues.  There is an opportunity to examine the information collected by the CAM Team and the TPA over the first three years of probation, and to seek to analyze this information for insights that could enhance the Company's future compliance efforts.  As described throughout this Report, these efforts by the CAM Team and TPA, along with continued

---

[26] These decisions were made moot by the Company's decision to temporarily suspended ship operations on March 12, 2020, for Princess, and shortly thereafter for its other brands.  Many of the Company's shoreside operations are now being conducted remotely.

engagement with the Company on its compliance efforts, should provide crucial information in this challenging time.

### 6.     Ongoing CAM Team Examination

The rapidly evolving COVID-19 situation is having a global impact.  As recognized above, it will undoubtedly impact the cruise industry, as well as the Company's efforts discussed in this Report.

While the crisis presents challenges that are unprecedented and unpredictable, it also presents opportunities for the Company to emerge with an enhanced focus on and commitment to compliance.  As the Carnival Corp. CEO has recognized, throughout the Company's history, it has "gotten through global challenges—and indeed come out stronger—with the unity, wisdom and sheer grit of our entire team, ship and shore."  *See An Important Message from Arnold Donald* (Mar. 12, 2020).  The CEO's direction, quoted above, bears repetition.  In it, he directs "brand leaders to reduce or eliminate non-critical cash expenditures, *but of course never cutting anything that would impact compliant, environmentally sound and safe operations*."  *Id.* (emphasis added).  He has also emphasized that:  "Our highest responsibility and top priorities are always our commitments to compliance, protecting the environment and the safety of our guests, shipboard crew and staff and shoreside personnel."  *Id.*

The current situation has required this Company, like others, to manage a global crisis that changes by the hour.  As the CAM's retained maritime culture survey expert, PROPEL SAYFR AS ("Propel"), has observed, the maritime industry may be "amongst the best when it comes to handling crisis situations."  *See* Propel, *Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019* (Aug. 28, 2019) ("Environmental Compliance Culture Assessment Report"), at 7.  However, the ability to handle crises is distinct from the ability to

"manage failures"—*i.e.*, to learn from failures and "have an environment where the sharing of mistakes or concerns is seen as a strength, rather than as a weakness." *See id.* at 7-8. This ability to manage failures "is often overlooked and explains much of the variances in [compliance] performance from one company to another." *Id.* at 8. Propel's assessment identified significant opportunities for improvement in the Company's ability to manage failures.

### B. Executive Summary

#### 1. Roadmap

The Court ordered that the CAM submit Quarterly Reports to provide updates on the monitorship and to address issues identified by the Court and the CAM. *See* Dkt. No. 62; Status Conf. Tr. at 32-33, 42-45, 93-95 (Apr. 3, 2018).

Part I.A of this Report provided a preliminary statement on the COVID-19 crisis. Part I.B is an Executive Summary, including: (1) a roadmap of the Report; (2) a summary of CAM observations for this ECP quarter; and (3) a summary of updates on ECP Year Three areas of focus and Company capabilities to meet ECP objectives during this ECP quarter, which are discussed in detail in Part III. Part I.C goes over recent case developments, including updates on: (1) the Company's performance of commitments under the agreement resolving the probation violations to which it pleaded guilty; (2) the meeting held with the Court on December 19, 2019; (3) the Status Conference held on January 8, 2020; (4) the Court's Order on the January 8, 2020, Status Conference; and (5) the Company's submissions in response to the Order on the January 8, 2020, Status Conference, which take the place of the metrics and targets on environmental compliance that the Court previously ordered the Company and DOJ to jointly develop.

Part II of this Report gives an overview of the CAM Team's activities during this ECP quarter, including observations from the oversight of the external audit function performed by the Third Party Auditor ("TPA")[27] and the internal audit function performed by the Company's Risk Advisory and Assurance Services ("RAAS") group.

Finally, Part III of this Report provides updates on the Company's capabilities to meet ECP objectives, *see* ECP § VI.F.3.b,[28] and its performance in other areas of focus identified by the Court and the CAM.  *See* CAM Second Annual Report at 8-11, 110-12.  This Report does not provide the more detailed assessments or findings that the CAM will provide in the Annual Report for ECP Year Three.

2.    Summary of CAM Observations

This ECP quarter marked the start of the second half of the five-year probationary period. The date of this Report also falls approximately one year since the Office of Probation filed a petition to revoke the Company's probation, alleging six counts to which the Company pleaded guilty.  A consistent theme of CAM reports has been that, despite progress and many sincere efforts underway,[29] significant work remains to achieve a sustainable and effective compliance program, including changing the culture to one that supports compliance.  The Carnival Corp. CEO has expressed a similar view, stating to the Court:  "[W]e've identified some gaps and—a

---

[27] The TPA is ABSG Consulting Inc. ("ABSG"), an advisory and technical services provider for the marine and other sectors.  The TPA has submitted the following annual reports:  (1) *Third Party Auditor Year One Annual Report* (June 18, 2018) ("TPA First Annual Report"); and (2) *Third Party Auditor Year Two Annual Report* (July 3, 2019), Dkt. No. 153 ("TPA Second Annual Report").

[28] Unless otherwise specified, all citations to the ECP in this Report are to the second amended version that went into effect on June 3, 2019.

[29] Notably, the Company appears to have met all of its filing and submission deadline obligations to date under the agreement resolving the probation violations.

lot of them—and we still have progress that we need to make to ultimately realize this in our aspirations of excellence in safety, environmental protection and compliance."  Meeting Tr. at 7-8 (Dec. 19, 2019).  In particular, the CEO observed that "we have a lot of work to do on our culture."  *Id.* at 18.

Separate from the response to the COVID-19 crisis, the Company continued to devote significant efforts toward improving its compliance performance during this reporting period, including in the areas of:  corporate compliance re-structuring; investigations; food waste management; training; and other initiatives.  As valuable as this work has been, and recognizing the energy and focus that the Company has brought to these efforts, much of this work began—or gained additional resources and focus—only after the filing of the probation revocation petition near the end of ECP Year Two, and the Court's requirement that the members of the Executive Committee of the Carnival Corp. Boards of Directors (including the CEO and Chairman) be present at the revocation hearing.[30]  These events appeared to substantially increase attention to and action on these compliance issues from top leadership, including the Boards of Directors.[31]  The Court, DOJ, and CAM have recognized the value of these recent

---

[30] The Court has since required the Chairman and CEO to attend all future Court conferences and hearings.  *See* Dkt. No. 157 at 3.

[31] In its comments on the draft of this Report, the Company requested that the CAM include "some acknowledgment that the Board did receive updates on environmental and ECP-specific topics and exercised oversight prior to the probation revocation."  *Draft CAM Quarterly Report Carnival Comments* (Mar. 23, 2020) ("Company Draft Report Comments").  The CAM understands that, prior to the resolution of the probation revocation petition, the Carnival Corp. Boards of Directors had a Health, Environmental, Safety, & Security ("HESS") Committee that met quarterly and received environmental and ECP-related updates, as well as an Audit Committee that received updates from RAAS on HESS-related audit findings; the CAM is unable to comment on the extent to which the Boards "exercised oversight" over environmental compliance.  Since the resolution of the probation revocation petition, the Boards of Directors have:  (1)  established permanent standing Compliance Committees with independent outside compliance counsel, *see infra*, Part I.B.3; (2) received compliance-related training, with

efforts.  However, as the Court stated at the most recent Status Conference:  "As much as the company is doing," there continue to be "violations of [the] ECP [that] would be grounds to revoke [probation]."  Status Conf. Tr. at 74 (Jan. 8, 2020).  The Court also expressed a desire to see "something that between now and our next session that I can begin to say:  Yes, I do see concrete progress in achieving what you've told me you're going to do."  *Id.* at 107.

The CAM has observed that many top-level Carnival Corp. leaders have increased their personal engagement on compliance issues, and that some brand/operating line CEOs and Presidents and other senior leaders have taken initiative to drive forward certain issues, including culture action plans and diversity and inclusion efforts.  The CAM will continue to evaluate the extent to which there is a sustained focus by top Carnival Corp. leadership on *concrete* steps that would support compliance, and remove obstacles to compliance, for those doing the daily work of operating the ships—such as specific actions that relate to critical issues the Court, CAM, TPA, and others have identified, including:  ship design (including new build and dry dock processes), staffing, reliability and performance of pollution prevention equipment, spare parts, waste offloads, and diversity and inclusion.

The CAM has also observed, however, that the Company's top leadership appears to be hamstrung by a longstanding practice and mindset of minimizing chronic problems, rather than understanding them and addressing their root causes.  In the CAM's view, this is the mindset that led to the undisclosed ship visit programs earlier in the ECP, which were an effort to ensure good outcomes in compliance audits, as opposed to a long-term effort to provide support for the

---

additional sessions planned, as required by the revocation settlement; and (3) begun a search for a new member of the Boards with corporate compliance experience, as required by the revocation settlement. *See infra*, Part III.B.

ships.[32]  This same way of thinking is reflected in the Company's initial proposal, filed with the

Court, on compliance metrics, which was described directly to the CAM Team by some of those

involved in its development as an attempt to counter negative publicity about the Company.[33]  As

discussed below, the Company is working on a revised version of the proposal in response to

critiques from the DOJ, CAM, and TPA.  *See infra*, Part I.C.5.

If top leadership were to set *specific* compliance-related goals, the Company's many

talented employees would doubtless devote themselves to meeting those goals.  Clear and

---

[32] As the CAM has observed, "[b]y carrying out these [ship visit] programs with the express or perceived purpose of avoiding TPA audit findings, leadership communicated to its employees that the Company valued the *perception* of compliance more than the need to actually address compliance issues openly and directly.  Indeed, the stated purpose of these visits was to 'avoid this type of poor audit,' and shipboard employees whose ships were visited as part of these programs understood that to be the purpose."  CAM Second Annual Report at 67-68.

[33] When organizations, and in particular their leaders, are faced with issues that are complex, embarrassing or threatening, they may engage in what are known as "organizational defensive routines."  *See* C. Argyris, OVERCOMING ORGANIZATIONAL DEFENSES: FACILITATING ORGANIZATIONAL LEARNING (1990), at 25.  These routines are characterized by "actions . . . that prevent individuals or segments of the organization from experiencing embarrassment or threat.  Simultaneously, they prevent people from identifying and getting rid of the causes of the potential embarrassment or threat.  Organizational defensive routines are antilearning, overprotective, and self-sealing."  *Id.*  In its comments on the draft of this Report, the Company requested that the CAM remove this reference to Argyris's book because it is thirty years old. *See* Company Draft Report Comments.  Argyris's book is a seminal work in the field of organizational learning that continues to be cited in academic publications.  *See, e.g.*, L. Argote, and J.M. Levine (eds.), THE OXFORD HANDBOOK OF GROUP AND ORGANIZATIONAL LEARNING (Jan. 2020); D. Carless, *Feedback loops and the longer-term: towards feedback spirals*, 44 Assessment & Evaluation in Higher Education 705 (2019); F. Artinger, *et al.*, *C. Y. A.: frequency and causes of defensive decisions in public administration*, Business Research (2019); *see also Argyris, Chris(Topher) (1923--2013)*, THE HUTCHINSON UNABRIDGED ENCYCLOPEDIA WITH ATLAS AND WEATHER GUIDE (2018), https://search.credoreference.com/content/entry/heliconhe/argyris_chris_topher_1923_2013/0 (describing the book as a "prominent" work); M. Smith, *Chris Argyris: theories of action, double-loop learning and organizational learning* (Updated Oct. 18, 2019), https://infed.org/mobi/chris-argyris-theories-of-action-double-loop-learning-and-organizational-learning/ (noting that Argyris "has influenced thinking about the relationship of people and organizations, organizational learning and action research" and "made a significant contribution to the development of our appreciation of organizational learning").

March 27, 2020

meaningful metrics would follow.  Examples of specific compliance goals, which would naturally lend themselves to straightforward metrics, include achieving, in a specific time period, the following:

- Ships sailing with a full complement of qualified technical officers;

- Ships sailing with all pollution equipment prevention equipment in working order;

- Ships sailing with all critical (environmental) spare parts aboard;

- No waste offloads to unvetted or unapproved waste vendors; and

- A diverse engine, deck, and hotel officer corps.

     3.     <u>Summary of Updates on ECP Year Three Areas of Focus and Company Capabilities to Meet ECP Objectives</u>

As discussed in Part III of this Report, updates from this quarter include:

| **Culture Survey and Assessment** |
|---|

- On August 28, 2019, the CAM's retained maritime culture survey expert, Propel, provided the Company and the CAM with the final report of its assessment of the Company's environmental compliance culture.  *See* Environmental Compliance Culture Assessment Report.  The assessment was based on a survey of over seventy thousand Company employees and evaluated the Company's environmental compliance culture.  As discussed in prior CAM reports, the assessment found that employees identify the Company as a whole, as well as the individual brands/operating lines, as having a compliance culture with a low level of Organizational Culture Maturity and significant potential for improvement— especially in the Leadership Behavior areas of Trust, Care, and Openness.  These findings are consistent with those of other Company surveys and third-party reviews. *See* CAM September 2019 Quarterly Report at 19-22; CAM December 2019 Quarterly Report at 27-31.  In addition to the written report, and the provision of additional data requested by the Company, from September through December 2019, Propel presented the findings of its assessment to various Company groups, including the Executive Leadership Team and senior shoreside management at each of the Company's four operating lines.  *See id.* at 30-31.  The Company has stated that it accepts the findings of the Environmental Compliance Culture Assessment, and is seeking to take steps to remedy the identified obstacles to a robust compliance culture.  *See infra*, Part III.A.

- In September 2019, the Company retained an outside consultant, the Ethics & Compliance Initiative ("ECI"), to develop a plan to respond to the assessment findings.  The Company has provided the CAM with a draft Culture Action Plan,

dated January 29, 2020.  The CAM understands that, while there are efforts underway to finalize the Culture Action Plan and prepare for its implementation, these efforts have been delayed due, in large part, to the focus on the COVID-19 crisis.  *See id*.

- Going forward, the CAM Team will continue to monitor the Company's response to the findings of the assessment, including specific actions taken by top leadership to improve support of compliance shoreside and on the ships.  *See id.*

## Corporate Compliance Structure

- In pleading guilty in June 2019 to a violation of probation for failing to provide the Environmental Corporate Compliance Manager with ECP-required authority, the Company committed to restructure its corporate compliance function.  As discussed in prior CAM reports, the Company has since undertaken a number of required actions, including:  appointing a Chief Ethics and Compliance Officer; promoting the Environmental Corporate Compliance Manager; submitting an action plan for re-structuring its corporate compliance function, which includes creating a new Ethics and Compliance Department at All Brands Group that is part of a broader Ethics and Compliance Program that extends throughout the brands/operating lines; and submitting a financial plan for its Ethics and Compliance Program for fiscal years 2019 and 2020, along with a roster of Ethics and Compliance Program personnel and list of Ethics and Compliance Program functional leaders.  *See* CAM September 2019 Quarterly Report at 30-43; CAM December 2019 Quarterly Report at 31-40.

- As the CAM has observed, these submissions and related actions reflect substantial efforts toward putting in place the people, funding, structures, and systems for the corporate compliance function.  However, as the CEO has noted, work remains to be done.  A critical function of an effective Chief Ethics and Compliance Officer is to both hold management accountable at the highest levels, and to provide the Boards of Directors with clarity as to how and in what ways the most senior and powerful leaders, including the Chairman and the CEO, are engaging to support compliance.  As the Environmental Compliance Culture Assessment illuminated, personal responsibility and leadership are necessary for the Company's top leadership to develop a culture of compliance, where information—positive and negative— is heard, valued, and acted upon in a meaningful way.  *See id.* at 39-40.

- Since the most recent CAM Quarterly report, the Company has:

  o Continued to work on staffing Ethics and Compliance Program positions at All Brands Group and the brands/operating lines, including hiring a

March 27, 2020

Compliance Communications Leader at All Brands Group. *See infra*, Part III.B;

o   Delivered the first corporate compliance training sessions for its Boards of Directors and senior executives, as required by the probation revocation settlement. *See id.*;

o   Determined to make the Special Compliance Committees of the Boards of Directors, *see* CAM December 2019 Quarterly Report at 34, into permanent standing Compliance Committees;[34]

o   Held an Ethics and Compliance Program Retreat attended by approximately twenty-five Ethics and Compliance Program personnel from All Brands Group and the brands/operating lines. *See infra*, Part III.B;

o   Conducted a series of half-day ship visits by Ethics and Compliance Program personnel to four ships. The visits included townhall-style sessions, where crew members shared a range of compliance-raised concerns. Additional visits are planned, but their timing has been impacted by the COVID-19 crisis. *See id.*; and

o   Taken steps to bolster its compliance risk management function, including developing a risk assessment strategy and a baseline compliance risk assessment plan. *See id.*

- Going forward, the CAM Team will continue to monitor the restructuring of the compliance function at both the All Brands Group and brand/operating line levels, including the funding and resources for the Ethics and Compliance Department and Program. The issues highlighted in the Court's Order of October 31, 2019, will remain key areas of focus: leadership communications regarding environmental compliance as a core value; adequacy of staffing on ships; integration of environmental compliance into financial and strategic planning processes; use of data assessment processes to support learning and continuous improvement; and the role of management of change principles in these and other efforts. *See id.*

## Investigations

- One of the CAM's earliest findings was that the Company's internal investigations are "critically flawed." *See* CAM First Annual Report at 5. The TPA made a similar finding. *See* TPA First Annual Report at 3. As discussed in prior CAM reports, in September 2018, the Company recognized this shortfall and committed to the Court that it would improve its investigations program through a number of proposed

---

[34] The Boards made this determination at the January 2020 Boards meeting, and the "Special" designation was removed from the name. *See Compliance Committees Charter* (Jan. 27, 2020), https://www.carnivalcorp.com/static-files/feeb21d0-8a9e-4477-b34e-588d657851ff.

March 27, 2020

actions and associated timetables, including the revision of relevant procedures, over the remaining quarter of 2018 through the second quarter of 2019. *See* CAM September 2019 Quarterly Report at 44-47. These proposed timetables were delayed while the Company searched for someone to lead the new Incident Analysis Group. *See id.* at 46. This individual was hired in late March 2019. *See id.*

- It has now been one year since the new Incident Analysis Group was stood up. In that time, some significant progress has been made, including: hiring additional investigators, with recruitment of additional investigators underway; developing a causal analysis in-person training course; developing a computer-based root cause analysis training course; finalizing revised investigation procedures (discussed below); and taking steps to increase the accessibility and fleet-wide sharing of investigation reports through Global HESS. *See* CAM December 2019 Quarterly Report at 43-49. Efforts to improve the investigation function are still underway.

- On February 27, 2020, the Company finalized its revised investigation procedures. Overall, the set of revised procedures is more comprehensive than previous drafts reviewed by the CAM Team. For example, the revised procedures address root cause analysis, and include a new procedure that aims to provide processes for continuous improvement from lessons learned and contains provisions on trend analysis. The CAM Team is reviewing the procedures, and plans to provide a more detailed assessment in the next CAM Annual Report. *See infra*, Part III.C.

- The Company continues to work on developing new procedures for investigator accreditation and competency development, and reports that "the current investigation procedures include a basic description of the competencies that an investigator must have. The specific competencies will be expanded upon in the more detailed procedures to follow." *See* Company Draft Report Comments.

- The CAM Team continues to review HESS incident investigation reports from the Incident Analysis Group, brands/operating lines, and ships. As with past reports, the factual and technical assessments in these reports vary in rigor and quality. The CAM plans to report on its review in the next CAM Annual Report. *See infra*, Part III.C.

- Going forward, the CAM Team will continue to monitor the Company's efforts to restructure and enhance its internal investigations function. Continued areas of focus will include: the division of authority between key corporate leaders, including the Vice President of the Incident Analysis Group, the Chief Maritime Officer, the Chief Ethics and Compliance Officer, and the Corporate Compliance Managers; the integration of Incident Analysis Group investigations with brand/operating line, ship, and RAAS (non-HESS) investigations; efforts to achieve continuous improvement from lessons learned; and the management, tracking, and analysis of data and information related to investigations. *See id.*

March 27, 2020

| **Food Waste Management** |

- In June 2019, the Company pleaded guilty to a probation violation for the illegal discharge of non-food items (including plastic) mixed with food waste into the ocean, along with an associated recordkeeping violation.  As discussed in prior CAM reports, in connection with this guilty plea, the Company admitted the need to improve the management of food waste on its ships, and agreed to take various actions to prioritize this issue, including implementing a three-part program to improve its food waste management practices.  *See* CAM September 2019 Quarterly Report at 60-67; CAM December 2019 Quarterly Report at 51-62.

- During the current ECP quarter, the Company has continued to implement its food waste management improvement program, including:

   o  Implementing its new procedure on food waste segregation and disposal that streamlines and standardizes aspects of food waste management.  *See id.*;

   o  Working with its outside consultant to perform a review of staffing levels for onboard food waste management, with eleven ship visits conducted between November 2019 and January 2020.  These visits "included the distribution of extensive questionnaires to crew members in order to collect data."  *See* Company Draft Report Comments.  The final report from this review, which "requires converting those hard-copy questionnaires into a format in which the data can be analyzed, which is a time-intensive process," is not expected to be complete until April 2020.  *See id.*;

   o  Implementing its two-tiered approach to reducing single-use plastic items onboard its ships (with a first tier focused on removing small items and items with obvious substitutes, which had a goal of October 31, 2019, and a second tier focused on removing all other single-use plastic items and reducing the use of plastic water bottles), and reporting on its progress toward the goal of reducing its single-use plastics onboard by 50% by December 31, 2021.  As of the end of November 2019, the Company reports that it has reduced its single-use plastics onboard by 34% as compared to a 2018 baseline, and has reduced by 29% other single-use, non-food items such as sugar, sweetener, and butter packets.  *See infra*, Part III.D;

   o  Tracking and reporting on its progress toward the goal of reducing the total weight of food waste generated on its ships by 10% by December 31, 2021. As of January 2020, the Company reports that it has reduced the weight of food waste for the period of January 6-19, 2020, by a fleetwide average of approximately 10%, as compared to a two-week October 2019 baseline.  *See id.*;

   o  Submitting its implementation plan to optimize food waste management, which states that the Company has decided to install food waste digesters on the majority of its ships, based on recommendations from its prior review and

analysis of food waste disposal technologies, systems, and processes.  *See*
CAM December Quarterly Report at 58-60;

- o   Continuing to issue its weekly food waste dashboard.  *See infra*, Part III.D;
  and

- o   Announcing the ship and shoreside office winners of its "Food Waste Shuffle"
  music video challenge.  *See id.*

- Going forward, the CAM Team will continue to monitor the Company's
  implementation of its food waste management program, including the implementation
  of recommendations set forth in the Food Waste Management Implementation Plan
  and Update, Food Waste Technical Review, and Food Waste Optimization Plan, as
  well as the feasibility, clarity, and effectiveness of its food waste management
  procedures.  The CAM Team will also continue to monitor the Company's testing,
  procurement, and use of food waste digesters (including its process for selecting and
  vetting vendors of equipment to be installed onboard), as well as its testing, treatment,
  and regulation of digester effluent.  *See id.*

- In addition, the CAM Team is continuing its examination of the Company's processes
  for selecting and vetting shoreside waste vendors.  *See id.*; *see also infra*, Part III.I.4.

| **Training** |
| --- |

- The Company continues to invest resources in environmental and ECP training,
  including conducting environmental and compliance-related trainings at its state-of-
  the-art CSMART training center, and developing and rolling-out various IT tools.
  *See infra*, Part III.E.

- Due to the COVID-19 crisis, as of the end of the week of March 9-15, 2020, all
  CSMART training has been suspended until at least April 12, 2020.  During this time,
  the Company reports that "CSMART will continue to progress internal operations
  including course development, staff training, planned maintenance, etc. to the
  maximum degree possible."  *See id.* (citing email from Chief Maritime Officer).

- To date, CSMART has held four sessions of the new five-day Environmental
  Excellence, or "EO3," hybrid training/conference event for those in their third year as
  an Environmental Officer under the ECP.  The program is designed to be challenge-
  based, rather than lecture-based, in an effort to make Environmental Officer training
  interactive and engaging.  Feedback from attendees to the CAM Team on this course
  has been consistently and overwhelmingly positive.  The Company is in the process
  of developing "a more advanced and re-focused version" of the course, which is
  expected to be launched during the summer of 2020.  *See id.*  The CAM remains
  impressed by the strength of the Company's Environmental Officer corps—including
  the talent, dedication, and enthusiasm exhibited by individual Environmental

Officers—and is grateful for the continued opportunity to witness the nurturing and display of this talent at Environmental Excellence courses.  *See id.*

- The new Director of Environmental Training at CSMART, a former Operating Line Training Manager for Costa Group, began in February 2020, following the retirement of the former Director.  In addition, the Company has filled the Operating Line Training Manager positions at all four operating lines.  *See id.*

- Going forward, the CAM Team will continue to monitor and assess the Company's environmental compliance training, including CSMART courses, onboard trainings (including whether a more sustainable onboard training program can be developed that is more specific to the work of those receiving the training), and computer-based trainings.  In addition, the CAM will examine the potential role of CSMART in supporting culture change, beyond the boundaries of the training center, as well as the response of the Company's top leadership to the feedback on compliance issues and challenges provided by CSMART course participants.  *See id.*

## Implementation of Enumerated ECP Requirements

- The CAM Team continues to monitor the Company's implementation of enumerated ECP requirements with discrete deadlines.  The majority of these requirements and associated deadlines took effect during ECP Years One and Two.  In addition, the Company was required to conduct an incident trend analysis during the second quarter of ECP Year Three.  *See* CAM December 2019 Quarterly Report at 69-75 (assessing the Company's ECP-required trend analysis).

- For the current ECP quarter, the Company was required to implement revisions to the Environmental Control System (*i.e.*, the seal/lock program to control vulnerable points on ships that could be used for overboard discharges) on Covered Vessels by December 31, 2019.  *See infra*, Part III.F.  These revisions were the outcome of an extensive effort led by the Environmental Corporate Compliance Manager to review and revise the vulnerability assessments underlying the Environmental Control System program to "reduc[e] the number of seals onboard to a manageable level that still acts as an effective means to deter and detect improper discharges."  *See* CAM Second Annual Report at 29-31.  This effort resulted in revisions to both the ECP and the Company's internal procedures, requiring certain actions to be completed by December 31, 2019.  *See infra*, Part III.F.  The Company reports that implementation of these requirements was completed on all Covered Vessels by the December 31, 2019 deadline, with one exception (one requirement was met approximately one month late on one Covered Vessel due to a delay in delivering certain required parts to the ship).  *See id.*

<div style="border: 1px solid black; text-align: center;">

**Initiatives Beyond Enumerated ECP Requirements**

</div>

- The Company continues to develop and implement initiatives that go beyond the enumerated ECP requirements, including initiatives related to:

   o Information technology ("IT") systems and tools, with the Company recognizing and taking steps to address its need for more centralized, modern, and data-driven strategies.  *See infra*, Part III.G.1;

   o The Fleet Environmental Officer Program, with the Company recently completing the hiring process for a Director of the program.  *See infra*, Part III.G.1;

   o Efforts by Holland America Group to better understand the causes of some of its compliance challenges, including the completion a workload study for onboard technical/engineering and Environmental Officers.  The findings of this study, discussed in detail below, are consistent with findings and other observations by the CAM, TPA, RAAS, outside consultants, and other internal and external studies and assessments.  *See infra*, Part III.G.3;

   o Efforts to develop a procedure on management of change.  *See infra*, Part III.G.4; and

   o Other initiatives related to environmental compliance and sustainability, ranging from policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See infra*, Part III.G.5.

- Going forward, the CAM Team will continue to monitor the Company's initiatives, including examining whether these initiatives are:  well-coordinated; designed to address systemic or root causes; and developed with appropriate assessment of the additional workload or other impacts that may result, including whether the Company utilizes management of change principles.  *See id.*

<div style="border: 1px solid black; text-align: center;">

**Environmental and ECP Violations**

</div>

- Although efforts aimed at compliance are underway, violations of environmental laws and the ECP persist.  As the CAM has emphasized, these incidents are concerning, but should not distract from the Company's broader corporate leadership and culture issues.

- The Company's violations reported during this ECP quarter included incidents related to:  air emissions; discharges to the sea, including Advanced Air Quality System washwater, ballast water, black water/sewage, chemicals, food waste, grey water (including recent incidents where grey water has been inadvertently discharged during ballast water discharge operations into United States waters), oil, recreational (*e.g.*, pool/Jacuzzi) water, and solid items/garbage (including plastics); pollution

prevention equipment maintenance and operation; and recordkeeping. *See infra*, Part III.H.

- Going forward, key areas of focus for the CAM Team will include: Planned Maintenance System and other recordkeeping issues; issues related to ship system design; issues related to shoreside support for ships (such as staffing, workload, IT tools and support, voyage planning, spare parts, training, waste vendor vetting and oversight, and policies and procedures); issues related to workplace and culture (such as blame culture, retaliation, discrimination, harassment, bullying, and unsafe working conditions); and issues related to Advanced Air Quality Systems and compliance with the new global marine fuel sulfur cap that went into effect on January 1, 2020, including emission exceedances, prohibited washwater discharges, and equipment failures or malfunctions. *See id.*

| **Other Ongoing CAM Areas of Focus** |
|---|

- The CAM Team continues to examine the following areas of interest and intends to report further on these issues in future reports:

  o Diversity and inclusion efforts, including the Company's assertion that "there are limitations created by labor laws, union agreements, and various flag state requirements that constrain the company's ability rapidly to make major changes to the composition of its workforce." *See* Company Draft Report Comments;

  o Other personnel issues, including the hiring, training (including development of competency frameworks), workload, and employment conditions of officer and non-officer crew, as well as the relationships and coordination between technical, deck, environmental, hotel, and food and beverage personnel on compliance issues;

  o Integration of compliance considerations into ship design in new build and wet/dry dock processes, as well as other issues regarding dry/wet dock project planning and management, including issues related to the timing and length of wet/dry periods, scope of work, and cost/budget considerations. In light of recent cases of COVID-19 on several of the Company's ships, the CAM Team's examination will include any design changes during dry dock or new build processes designed to help prevent disease spread on ships;

  o Waste offload practices, including the Company's process for selecting and vetting shoreside waste vendors who handle the disposal of wastes offloaded from ships;

March 27, 2020

    o   Purchasing and procurement processes for spare parts, including the Company's efforts to address the ongoing challenge of timely provision of spare parts for pollution prevention equipment to ships;

    o   Other support for operations and compliance, including:  shoreside support for ships, including the extent to which shoreside has adequate resources to provide the support needed by the ships (*e.g.*, superintendent workloads); environmental support and special project ship visits; the integration of HESS compliance into the annual financial and strategic planning processes; improvements to HESS policies and procedures; and implementation of the new Unified Regulatory Reporting Policy, including any associated training; and

    o   Company response to internal and external findings from the CAM, TPA, RAAS, outside consultants, and other internal and external studies and assessments, such as the DNV GL investigations review; the Environmental Compliance Culture Assessment; the ECP-mandated Fleet Engineering Survey; the human factors study and workload analysis commissioned by Holland America Group; and the participant feedback surveys and reports from the Operational Excellence CSMART training course.  *See infra*, Part III.I.

## C.    Court Oversight

### 1.    Probation Agreement Deadlines

As discussed in prior CAM reports, on June 3, 2019, the Carnival Corp. CEO pleaded guilty on behalf of the Company to six violations of the terms and conditions of probation.  *See* Dkt. No. 137 (Paperless Minute Entry); CAM Second Annual Report at 5-6, 86-94 (discussing the probation violations); CAM September 2019 Quarterly Report at 3-6.  In doing so, and in a subsequent message to employees, the CEO, along with the members of the Executive Committee of the Carnival Corp. Boards of Directors, "t[ook] full responsibility for these violations."  *See Important Message from Chairman Micky Arison and CEO Arnold Donald* (July 1, 2019).

The Court accepted an agreement between the Government and the Company to resolve the probation violations and avoid the need for an evidentiary hearing.  *See Proposed Agreement For The Court's Consideration Resolving Superseding Petition For Summons For Offender*

March 27, 2020

*Under Supervision Dated April 26, 2019*, Dkt. No. 134 (proposed agreement); Dkt. No. 143

(Order accepting agreement) (collectively, "Probation Agreement").  Both the Court and the

Government have emphasized that the main impetus for the probation revocation petition was

the failure of the Company's top leadership to take appropriate action on environmental

compliance.  *See* CAM December 2019 Quarterly Report at 11.

Under the terms of the Probation Agreement, the Company is required to undertake a

range of remedial and other actions, many with associated deadlines.  Most of these deadlines

fell during prior ECP quarters, as discussed in recent CAM Quarterly Reports.  *See, e.g.*, *id.* at

11-17 (summarizing the Company's performance of required actions with deadlines falling on or

before December 18, 2019).  Since the date of the most recent CAM Quarterly Report, the

Company was required, by January 31, 2020, to provide the Interested Parties,[35] TPA, and CAM

"an implementation plan to optimize food waste management, including food waste disposal

systems and associated processes, specifying projects, the project owners, and specific timetables

for milestones."  Dkt. No. 134 at 7.  The Company provided this implementation plan on January

31, 2020.  *See Submission Regarding Food Waste Disposal -- United States v. Princess Cruise*

*Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* (Jan. 31, 2020); Letter from Company Outside Counsel

to Interested Parties, CAM, and TPA, *Re: Proposed Improvements to Food Waste Technology*

*and Equipment -- United States v. Princess Cruise Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* (Jan.

31, 2020) ("Food Waste Optimization Plan"); *2019-2021 Food Digester Installation Plan –*

*Consolidated – Jan 29th Update* ("Digester Installation Plan"); *see also infra*, Part III.D

(discussing the Company's food waste management efforts).

---

[35] The Interested Parties are "[t]he Government, the United States Probation Office for the
Southern District of Florida [("Probation Office")], the Seventh Coast Guard District (dp), and
the U.S. Coast Guard Office of Investigations & Analysis."  ECP § I.D.

March 27, 2020

The Company appears to have met all of its filing and submission deadline obligations to date under the Probation Agreement.  A chart summarizing the status of the Probation Agreement requirements is included as Appendix A to this Report.  Additional details about the Company's efforts to perform its obligations under the Probation Agreement are discussed in the relevant sections of Part III below.

2.    December 19, 2019, Meeting

As discussed in the most recent CAM Quarterly Report, the Court issued an Order on October 31, 2019, granting the Company's request for "an opportunity to address the Court regarding its compliance efforts beyond those that have been conveyed to the Court during the status conferences."  Dkt. No. 167 at 1; CAM December 2019 Quarterly Report at 18-20.  This meeting was held with the Court on December 19, 2019.[36]  Representatives from the Company (including the Carnival Corp. CEO, Chief Ethics and Compliance Officer, and Chief Maritime Officer), DOJ, CAM Team, and TPA were present.  The Company made two presentations in open court:  (1) a presentation led by the CEO on the Company's compliance efforts related to issues identified in the Court's Order of October 31, 2019, *see id.* at 18-20 (summarizing the Order), PCL_ECP00147493-524; and (2) a presentation led by the Chief Maritime Officer on the Company's environmental compliance and sustainability performance, including reported environmental events.  *See* PCL_ECP00147394-441.  Due to time constraints, a third presentation by the Chief Ethics and Compliance Officer was re-scheduled for the January 8, 2020, Status Conference.

_____

[36] As directed by the Court, the Company held a preview meeting with the CAM Team and TPA on December 4, 2019, at the offices of the Company's outside counsel in Washington, DC.  *Id.* at 20.

March 27, 2020

      3.    <u>January 8, 2020, Status Conference</u>

Following the submission of the CAM December 2019 Quarterly Report, the Court held a

quarterly Status Conference with representatives from the Company, DOJ, CAM Team, and TPA

on January 8, 2020.  The hearing began with a presentation (a continuation of the December 19

meeting) led by the Chief Ethics and Compliance Officer on the Company's efforts related to

culture, investigations, and the Ethics and Compliance Program.  *See* PCL_ECP00147442-492.

The remainder of the hearing focused on the status and pace of the Company's efforts to make

progress on compliance—including its ongoing challenges with corporate culture/tone from the

top, food waste management, and continued occurrence of prohibited discharges and other

incidents.  *See* generally Status Conf. Tr. (Jan. 8, 2020).  The Carnival Corp. CEO told the Court:

"You have elevated our focus . . . [W]e can see progress.  We have a ways to go."  *Id.* at 32.

Likewise, the Chief Ethics and Compliance Officer stated:  "We know that we have much work

to do . . . [W]e've made efforts, but we need to do even more."  *Id.* at 6.

      4.    <u>Order on January 8, 2020, Status Conference</u>

Following the January 8, 2020, Status Conference, the Court issued an Order requiring

the Company to file a "proposal for measuring its progress towards achieving a sustainable

culture of environmental compliance during the probation term and thereafter."  *Order on

January 8, 2020 Status Conference*, Dkt. No. 175 (Jan. 14, 2020), at 1.  The Order notes that, at

the hearing, the Court asked the Company "to identify its *concrete, measurable goals* to track the

progress of its efforts to achieve a sustainable culture of environmental compliance long-term."

*Id.* (emphasis added).  At the Company's (unopposed) request, the Court extended the filing

deadline from January 22 to January 29, 2020.  *See Order*, Dkt. No. 179 (Jan. 22, 2019).

March 27, 2020

>    5.    Company Submissions in Response to Order on January 8, 2020, Status
>           Conference

On January 29, 2020, the Company filed with the Court a proposal consisting of a "scorecard and accompanying addenda" in response to the Court's Order.  *See Notice of Princess's Response to Court Orders [DE 175, 179]*, Dkt. No. 180, (Jan. 29, 2020); *Carnival Corporation Performance Scorecard*, Dkt. No. 180-1 (Jan. 29, 2020) ("Proposed Scorecard").[37] The Company described the filed Proposed Scorecard as "designed to address three main questions:"  (1) Are we making progress in fostering a culture that inspires excellence in compliance?; (2) Are we making progress in protecting the environment?; and (3) Are we demonstrating environmental leadership?  *See* Proposed Scorecard at 1.  Twenty-two "key indicators" and "associated metrics" were linked to these questions, with each key indicator having a "high-level visual indicator of our performance."  *See id.*  These "visual indicators" were colored dots reminiscent of a stoplight:  green for "improving;" blue for "no change or stable;" and red for "declining."  *See id.*  The Proposed Scorecard also had two supporting attachments:  one with an explanation for how the Company arrived at the visual indicator for each item, and one with a list of "other activities for the next quarter to drive further progress."  *Id.*

After reviewing the publicly filed Proposed Scorecard, DOJ notified the Company that "[w]e do not think that this responds to the concerns the Court has expressed during several of the recent hearings.  Moreover, we do not think that it will be helpful in achieving the goals of

---

[37] The CAM understands that this submission takes the place of the prior submissions regarding metrics and targets on environmental compliance that the Court ordered the Company and DOJ to jointly develop.  *See* Status Conf. Tr. at 60-61 (July 19, 2019); Dkt. No. 157 at 3; *see also* CAM December 2019 Quarterly Report at 20-22 (discussing the status of efforts to develop the metrics and targets).

March 27, 2020

compliance and continuous improvement."  Email from DOJ to Company Outside Counsel, *Scorecard* (Feb. 6, 2020).  DOJ further observed that the "problems and defects are numerous," including that the proposal:  (1) is "superficial and overly simplistic," especially the color-coding; (2) "fails to adequately focus on and address issues related to management engagement as the Court has repeatedly instructed;" (3) is "likely to mislead, appears intended to mislead, is open to abuse, and appears likely to lead to complacency;" and (4) that some "proposed categories and metrics appear deliberately oriented toward minimizing criminal conduct."  *Id.*[38] The CAM expressed similar concerns about the filed Proposed Scorecard on behalf of the CAM Team and TPA during conversations with the Chief Ethics and Compliance Officer and other Company personnel.  *See* Employee Interview/Call Notes.

On February 24, 2020, the Company submitted to the Interested Parties, CAM, and TPA an updated draft of the Proposed Scorecard.  *See* Email from Director of Corporate Environmental Compliance, *Carnival Scorecard – Updated Draft* (Feb. 24, 2020); *[Updated] Carnival Corporation Performance Scorecard* (Feb. 24, 2020) ("Updated Proposed Scorecard"). Despite some revisions to certain key indicators and metrics, the basic design and approach of the Updated Proposed Scorecard remain unchanged.  The CAM has previously emphasized to the Company that metrics should be "ones that generate information that can be pushed up through and across management, and provide managers with information that can inform actions

---

[38] For example, the Proposed Scorecard proposed to present data on discharge and emission violations in terms of "volume of water violations vs. total volume of discharge" or "[c]umulative time of [emission] violations/running hour."  *See* Proposed Scorecard at 3.  This approach focuses on how violations are a tiny percentage of a larger pie.  It is likely true that the illegal discharges on the *Caribbean Princess*—the criminal violations underlying the Company's criminal conviction in the current case—were a small percentage of the ship's total volume of discharges.  The Court has expressed her concern about presenting data in this manner.  *See* Status Conf. Tr. at 117 (Jan. 8, 2020) ("I just ask that [the Chief Maritime Officer] not say: It's only 0.00 because it comes across as you're looking at it in a minimizing way.").

March 27, 2020

to enhance the Company's ability to manage risk and support compliance," and that "that the value proposition of metrics is that the time and effort expended in [developing, reporting, and reviewing metrics] is worthwhile to the extent doing so provides support for the Company's compliance efforts – and importantly, support for efforts that will continue beyond the end of the period of probation."  Email from CAM to Chief Maritime Officer, *Fw: DoJ Metrics* (Oct. 31, 2019).

A set of metrics focused on achieving operational improvements in support of compliance long-term does not need to be complex.  As noted above, *see supra*, Part I.B.2, it could be as simple as metrics related to:

- Ships sailing without a full complement of qualified technical officers;

- Ships sailing without all pollution equipment prevention equipment in working order;

- Ships sailing without all critical (environmental) spare parts aboard;

- Waste offloads to unvetted or unapproved waste vendors; and

- Diversity of engine, deck, and hotel officer corps.

The CAM understands that the Company is continuing to evaluate its metrics proposal prior to filing any updates with the Court.  The CAM will continue to monitor and engage as appropriate on this effort.

## II.  CAM METHODOLOGY AND ACTIVITIES

### A.  CAM Team Activities

Consistent with the Third Annual Work Plan, *see* CAM September 2019 Quarterly Report at 10-11 and Attachment 1, and the Probation Agreement, the CAM Team performed the following ship and shoreside office visits during the period covered by this Report (October 19, 2019 – January 18, 2020):

- Three ship visits (all CAM Team-only);[39] and

- Two shoreside office visits:

    o One CAM Team-only visit to Carnival Cruise Line and All Brands Group offices in Miami, Florida, from October 22-24, 2019; and

    o One CAM Team-only visit to Costa Group offices in Hamburg, Germany, from December 10-13, 2019.[40]

In addition, the CAM Team attended various Company meetings and events during the period covered by this Report, and up until the date of this Report (from October 19, 2019 – present), including:

- Multiple sessions of an Environmental Excellence hybrid training/conference event with third-year Environmental Officers and shoreside training, compliance, and operations personnel, held at the Company's CSMART training facility in Almere, Netherlands.  The CAM Team attended one session in person from November 11-15, 2019, and the CAM addressed two sessions via video conference on January 7, 2020, and February 27, 2020.  *See infra*, Part III.E.3;

- One overview meeting and one session of the Company's new causal analysis investigation training provided by an outside consultant, held at the Company's offices in Miami, Florida, on November 15, 2019, and from February 10-12, 2020, respectively.  *See infra*, Part III.C;

- A meeting with the Compliance Committees of the Carnival Corp. Boards of Directors, held in Miami, Florida, on January 14, 2020.  *See supra*, Part I.B.2-3 and *infra*, Part III.B;

- Multiple presentations by Propel, the CAM's retained maritime culture survey expert, to operating lines on the results of the Environmental Compliance Culture Assessment.  These were held on:  (1) November 21, 2019, for Carnival Cruise Line personnel in Orlando, Florida; (2) December 3, 2019, for Carnival UK personnel in

---

[39] These visits were to a Princess ship from November 14-17, 2019; a Carnival Cruise Line ship from December 7-11, 2019; and a Carnival Cruise Line ship from December 14-18, 2019.

[40] Between the end of the period covered by this Report and the date of this Report, the CAM Team also performed the following shoreside office visits:  (1) a TPA shoreside audit observation of Holland America Group offices in Seattle, Washington, and Santa Clarita, California, from January 28-31, 2020, and February 3-5, 2020, respectively; (2) a TPA shoreside audit observation of P&O Australia offices in Sydney, Australia, from February 17-19, 2020; and (3) a TPA shoreside audit observation of All Brands Group and Carnival Cruise Line offices, which was conducted virtually by videoconference and phone from March 10-13, 2020.

March 27, 2020

Southampton, United Kingdom; (3) December 9, 2019, for Holland America Group personnel in Seattle, Washington; and (4) December 12, 2019, for Costa Group personnel in Hamburg, Germany.  The CAM Team also attended presentations by Propel to the Company's Executive Leadership Team in New York City, New York, on September 3, 2019, and to senior-level shoreside employees from All Brands Group, operating lines, and brands via videoconference on September 5, 2019.  *See infra*, Part III.A; and

- A meeting with the Company and the TPA to preview the presentation that the Company planned to make to the Court on December 19, 2019, held at the offices of the Company's outside counsel in Washington, DC, on December 4, 2019.  *See supra*, Part I.C.2.

As noted above, *see supra*, Part I.A.5.i, the CAM, with the Court's approval, suspended all CAM Team ship visits as of March 3, 2020, for a minimum of thirty days in light of the additional demands being placed on the Company as a whole, and in particular the ships, as a result of the ongoing COVID-19 crisis.  As of March 9, 2020, the CAM Team is also performing shoreside office visits virtually, via phone or videoconference.  The CAM will confer with the Company at least weekly, and intends to resume ship and in-person shoreside visits at an appropriate time.[41]  The CAM Team is continuing its other work, as discussed below and described throughout this Report.  *See, e.g., infra*, Part III.I.

Outside of visits to ships, shoreside offices, and other sites, the CAM Team has continued to communicate frequently with the Environmental Corporate Compliance Manager and his team.  The CAM Team also communicates with other personnel, including the Chief Ethics and Compliance Officer, the Chief Maritime Officer, the Chief Audit Officer, the Chief Financial Officer, the Vice President of the Incident Analysis Group, the Compliance Committees of the Carnival Corp. Boards of Directors, and the Compliance Committees' independent outside counsel; and with Propel and the Company on the response to the Environmental Compliance

---

[41] The CAM understands that the TPA has similarly suspended all ship audits and is conducting shoreside audits virtually until it is appropriate to resume in-person audits.

March 27, 2020

Culture Assessment. The CAM Team performs an ongoing review of documents produced by the Company, and conducts additional formal and informal interviews and communications with personnel from all ranks across the Company, including receiving confidential communications from individuals both within and outside of the Company. The CAM Team also remains in regular communication with the TPA and the Interested Parties, including the Office of Probation, and reports to the Interested Parties and the Court as required by the ECP and the Court.

**B.    Oversight of the External Audit Function (TPA)**

During the period covered by this Report (October 19, 2019 – January 18, 2020), the TPA conducted fourteen ship audits of Covered Vessels and no audits of shoreside offices.[42]  In addition, on January 24, 2020, the CAM Team hosted a day-long meeting with the TPA at the CAM's offices in Washington, DC.  Among other items, the parties discussed:  an overview of ECP Year Three court proceedings; findings from the Environmental Compliance Culture Assessment and the Company's response; notable issues, findings, and other observations from ECP Year Three audits and visits; and areas of focus for ECP Year Four.

The CAM Team continues to communicate regularly with the TPA (including phone conferences and in-person meetings), review TPA reports, and evaluate the adequacy and

---

[42] Between the end of the period covered by this Report and the date of this Report, the TPA conducted three shoreside office audits:  (1) an audit of Holland America Group offices in Seattle, Washington, and Santa Clarita, California, from January 28-31, 2020, and February 3-5, 2020, respectively (also attended by the CAM Team); (2) an audit of P&O Australia offices in Sydney, Australia, from February 17-18, 2020 (also attended by the CAM Team); and (3) an audit of All Brands Group and Carnival Cruise Line offices, conducted virtually by videoconference and phone from March 10-13, 2020 (also attended by the CAM Team).  In addition, the TPA audited a session of the Company's Environmental Excellence/EO3 course, held at the Company's CSMART training facility in Almere, Netherlands from February 24-28, 2020.

independence of the TPA through both observations during ride-along ship and shoreside visits and interviews with Company employees who have interacted with TPA auditors. The CAM will provide an assessment of the TPA's activities during ECP Year Three in the next annual report.

### C.      Oversight of the Internal Audit Function (RAAS)

During the period covered by this Report (October 19, 2019 – January 18, 2020), RAAS conducted sixteen audits of Covered Vessels and no audits of shoreside offices. In addition, RAAS worked with an outside consultant to develop a "hackathon" event, which was to be held from March 25-26, 2020, but has been postponed due to COVID-19 for a date to be determined. *See* Company Draft Report Comments. The goal of the hackathon will be to bring together people from across the Company to generate a "set of ideas and solutions that would help identify/utilize analysis beyond inspection/inquiry/interviews to provide a higher level of assurance, better understand causal factors by correlating non-conformities with other data points, and identify systemic issues that plague the entire system." Letter from The Strategy Lab, Inc., to RAAS (Jan. 1, 2020), at 2. A secondary goal of the event will be "enhancing relationships and communication around [RAAS's] work and possibilities." *Id.*

The CAM Team intends to continue building upon its observations of RAAS during ECP Years One and Two to further explore the role of RAAS in supporting a sustainable compliance culture during ECP Year Three. To do so, among other activities, the CAM Team expects to review and assess: (1) training, support, and resources provided to RAAS auditors; (2) training, support, and resources provided to ship and shoreside employees to address and track RAAS findings; and (3) the role of top leadership, including the Boards of Directors, in supporting and promoting the RAAS function. *See* Third Annual Work Plan at 12. The CAM Team also

intends to monitor RAAS's efforts to develop and implement an action plan for addressing the areas for improvement identified at the RAAS Maritime Retreat, *see* CAM September 2019 Quarterly Report at 15, as well as efforts at coordination and collaboration between RAAS and the new Ethics and Compliance Department and Program, including in the functional areas of environmental compliance, training, risk assessment, communications, and incident analysis. The CAM will provide an assessment of its oversight of the RAAS function in the next annual report.

**III.    UPDATES ON ECP YEAR THREE AREAS OF FOCUS AND COMPANY CAPABILITIES TO MEET ECP OBJECTIVES**

**A.    Culture Survey and Assessment**

1.    Background

Since the Company's guilty plea, the Court has been focused on the Company's compliance culture. *See, e.g.*, CAM First Annual Report at 24; CAM Second Annual Report at 53.  At the most recent Status Conference, the Court asked:  "What is the leadership doing, particularly, beyond what is required with the modification and the settlement of the revocation proceeding, to show that we're starting the foundation for the change of the culture?"  Status Conf. Tr. at 9 (Jan. 8, 2020).  The CAM has sought to examine these issues on behalf of the Court, and to help illuminate for the Company the connection between culture and compliance.

As part of these efforts, and as discussed in prior CAM reports, the CAM, in consultation with the Company, retained Propel, a Norwegian consulting company that specializes in culture assessment in the maritime and energy industries, to conduct an Environmental Compliance Culture Survey and to prepare an Environmental Compliance Culture Assessment to identify both the strengths and opportunities for improvement in the Company's environmental

compliance culture.  *See* CAM First Annual Report at 24-25, 68; CAM Second Annual Report at

53-54; CAM December 2019 Quarterly Report at 27-40.

<div align="center">2.   <u>Environmental Compliance Culture Assessment</u></div>

After surveying more than seventy thousand Company employees, on August 28, 2019,

Propel provided the Company and the CAM with the final report of its Environmental

Compliance Culture Assessment.  The report indicates that the Company's greatest opportunities

for improvement, as evidenced by low scores, are in the Leadership Behavior areas of Trust,

Care, and Openness.  *See* Environmental Compliance Culture Assessment Report at 19-21.  In

order to improve in those areas, the Environmental Compliance Culture Assessment Report

observes that "[s]ignificant leadership efforts will be required to create a mature and sustainable

compliance culture."  *Id.* at 3.

The report also identifies "a list of key success factors" that are important for

implementing a meaningful culture change program.  *Id.* at 42.  These include:

- "Top Management takes ownership for compliance failures;"

- "Top Management accepts that changes are needed;"

- "Management dedicates necessary time and resources to implement cultural changes;"

- "Top Management takes ownership of strengthening compliance culture;"

- "Culture changes are linked to the company strategy;" and

- "Systems and governance are aligned to support the change."

*Id.*  During presentations made by Propel to the Company's Executive Leadership Team and

senior shoreside management at All Brands Groups and the operating lines, Propel reiterated

these "key success factors" and highlighted that the involvement of "Top Management"[43] is critical to a successful culture change program, and that a change in culture cannot be effected without the active and sustained engagement of leadership.

The Company's top leadership has recognized that Propel's findings are consistent with other studies commissioned by the Company, and has stated that they accept the findings of the Environmental Compliance Culture Assessment. For instance, at the January 8, 2020, hearing, the CEO stated: "the Propel Study, the reason why we haven't debated it is because we agree with it. We have other studies that suggested those same things, and we've had personal experience in talking to our crew and stuff to know that." Status Conf. Tr. at 87 (Jan. 8, 2020). Likewise, the Chief Ethics and Compliance Officer said: "We are not questioning the Propel conclusions . . . [T]he Propel Survey we believe was invaluable in understanding the baseline. It confirmed themes that we understand. We need to develop trust, openness, and care. We understand that." *Id.* at 11, 15.

This is a significant indicator of progress. As the Government observed: "At the time of sentencing in this case, the company disagreed that corporate culture was, at root, its problem. That was something that was contested very strongly by the company. So for this company to now embrace that corporate culture is actually a problem—its problem, that's a change." *Id.* at 108. The recognition that the Company's culture must be improved to support compliance, however, is only the first step in a process that will require a concerted and sustained plan that is "closely linked with company strategy and operational goals, and is anchored with a commitment from Top Management." Environmental Compliance Culture Assessment Report at 44.

---

[43] Propel defines "Top Management" as the "Board of Directors and the executive management teams of [All Brands Group], Groups and [Operating Lines]." *Id.* at 2.

March 27, 2020

3.     Culture Action Plan

In September 2019, the Company retained an outside consultant, ECI, "who is developing an action plan addressing the areas of improvement discussed in Propel Sayfr's culture survey report."  January 2020 Probation Supervision Report, Attachment 3, at 1.  The Company's expectation, as expressed by its Chief Ethics and Compliance Officer during the January 2020 Status Conference, is that "the culture action plan is really going to be 18 to 24 months, at a minimum."  Status Conf. Tr. at 12 (Jan. 8, 2020).

The Company has been working with ECI to finalize its Culture Action Plan, and provided the CAM with a draft plan, dated January 29, 2020.  *See [Draft] Carnival Corporation Culture Action Plan* (Jan. 29, 2020), PCL_ECP00154952-59.  The draft Culture Action Plan is structured around five categories:

- Leadership Engagement & Accountability at Carnival Corporation Level;

- Prioritize Culture & Compliance at Individual Brand Levels;

- Integration & Ongoing Reinforcement of Core Values;

- Formal & Informal Communications at Corporate and Individual Brand Levels; and

- Assessment & Ongoing Measurement of Progress.

*Id.*, at PCL_ECP00154953-54.  The CAM understands that, while there are efforts underway to finalize the Culture Action Plan and prepare for its implementation, these efforts have been delayed due, in large part, to the focus on addressing the ongoing COVID-19 crisis.  *See* Employee Interview/Call Notes.

4.     Additional Efforts Outside the Culture Action Plan

The top leadership of the Company has shown increased engagement on compliance culture issues.  This includes efforts to address the Company's culture by the Carnival Corp.

CEO, as well as by brand/operating line CEOs and Presidents, and other senior leaders, before the finalization of a coordinated and centralized Culture Action Plan.

One new vehicle for top leadership's support of a culture of compliance is the newly launched Soundwaves podcast hosted by the Carnival Corp. CEO.  The Company describes this podcast as "contain[ing] interesting stories and interviews of people from throughout the Company and all over the world."  *See* January 2020 Probation Supervision Report, Attachment 3, at 7.  Each episode is about ten minutes long, with new episodes posted about every two weeks.  *Id.*  The first episode included an interview between the CEO and the Chief Ethics and Compliance Officer.  *See* Event Notes.  The Company reports that, as of March 23, 2020, the CEO has "done a total of six podcasts about various topics, including reducing single-use plastics."  *See* Company Draft Report Comments.  This undertaking by the Company's top executive is notable as an effort to communicate on a personal level about the Company's priorities outside the requirements of probation, with tens of thousands of employees spread across the globe.

   5. <u>Ongoing CAM Team Examination</u>

The CAM will continue to monitor the Company's response to the findings of the Environmental Compliance Culture Assessment.  In speaking about the Company's efforts to address the findings, the Carnival Corp. CEO expressed:  "I couldn't agree more that it starts at the top."  Status Conf. Tr. at 94 (Jan. 8, 2020).  Accordingly, an area of focus will be the extent to which top leadership utilizes the "key success factors" referenced above, including actions taken by top leadership.

March 27, 2020

### B.      Corporate Compliance Structure

1.      Background

The Company continues its efforts to restructure its corporate compliance function.  As

discussed in prior CAM reports, the Company pleaded guilty on June 3, 2019, to a violation of

probation for "failing to provide sufficient responsibility and authority to the [Environmental

Corporate Compliance Manager] to implement the ECP," Dkt. No. 134 at 10, and

"acknowledge[d] that it failed to establish [an Environmental Corporate Compliance Manager]

with authority (including resources, budget, and staff) as required to implement the ECP."  *Id.* at

2.  This issue was brought to the Company's attention at least as early as the end of ECP Year

One, when the CAM made a finding that the Company had failed to provide the Environmental

Corporate Compliance Manager with ECP-required authority.  *See* CAM First Annual Report at

4-5, 28.  The CAM also found that the Company's complex corporate structure, including the

lack of centralization and lack of clarity as to responsibility, accountability, and authority for

environmental compliance, was an unresolved barrier to environmental compliance.  *See id.* at 4-

5, 25-30.  The CAM continued to report on the Company's failure to remedy these findings

throughout ECP Year Two.  *See* CAM Second Annual Report at 46-49, 91-92.

In ECP Year Three, as part of the Probation Agreement, the Company committed "to

restructure its existing corporate compliance governing authority."  Dkt. No. 134 at 10.  The

Probation Agreement requires the Company to undertake a number of actions, including

appointing a Chief Ethics and Compliance Officer, promoting the Environmental Corporate

Compliance Manager, and providing them "***each*** with: the appropriate budget and staff; a

substantive role in financial, strategic, and sustainability planning processes; and compliance

March 27, 2020

authority over regulatory obligations and operations across and within all brands." *Id.* at 2 (emphasis added); *see also* CAM September 2019 Quarterly Report at 31-33.

Consistent with its obligations under the Probation Agreement, the Company submitted to the Court, CAM, TPA, and Interested Parties:  a proposed action plan for re-structuring its corporate compliance function on August 14, 2019; a final action plan on September 13, 2019; an update to the final action plan on October 9, 2019, including an annual training program curriculum for the Carnival Corp. Boards of Directors and a statement from the Boards reiterating the Company's and the Boards' commitment to compliance; and a supplement to the updated final action plan on December 10, 2019, containing a financial plan for the Ethics and Compliance Program for fiscal years 2019 (historical) and 2020 (proposed), as well as a roster of Ethics and Compliance Program personnel for 2019 and 2020 and a list of Ethics and Compliance Program functional leaders for All Brands Group and each of the operating lines. *See* CAM December 2019 Quarterly Report at 32-39.

2.   Personnel Updates

The Company continues to work on staffing Ethics and Compliance Program positions at All Brands Group and the operating lines.  *See id.* at 38-39 (noting that, as of December 2019, the staffing of the Ethics and Compliance Program positions was an ongoing effort, with many key positions "to be determined," and that many decisions about structuring the compliance function at the operating line level were being left up to the individual companies).  Since the most recent CAM Quarterly Report, the Company has filled the final "Leader" position, the Compliance Communications Leader, within the All Brands Group Ethics and Compliance

March 27, 2020

Department.[44]  This individual began on March 3, 2020, and will be in charge of managing both internal and external corporate compliance communications.  *See* Employee Interview/Call Notes.

In addition, the Company has announced the appointment of the following operating line personnel since the most recent CAM Quarterly Report:

- The Operating Company Chief Ethics and Compliance Officer for Holland America Group, which will be filled by the line's former Operating Line Compliance Manager, effective December 1, 2019; and

- The replacement Operating Line Compliance Manager for Holland America Group, which will be filled by the former All Brands Group Deputy Environmental Corporate Compliance Manager, effective December 19, 2019.

*See* Letter from Environmental Corporate Compliance Manager, *Q4 2019 Summary of Notification of Changes* (Jan. 27, 2020).  The Company also recently appointed a Deputy Operating Line Compliance Manager for Holland America Group.  This individual is a former Technical Superintendent for Holland America Line who will assist the new Operating Line Compliance Manager with the Holland America Line and Seabourn brands.  *See* Employee Interview/Call Notes.  For the three other operating lines (Carnival Cruise Line, Carnival UK, and Costa Group), the individuals in the Operating Company Chief Ethics and Compliance Officer and Operating Line Compliance Manager positions remain unchanged from the December 2019 Final Functional Leaders List.

---

[44] The "Leader" positions are:  the Incident Analysis Group Investigations Leader (reporting to the Health/Safety/Security Corporate Compliance Manager); Compliance Training Leader (reporting to the Environmental Corporate Compliance Manager); Compliance Risk Management Leader (reporting to the Deputy Chief Ethics and Compliance Officer); Compliance Communications Leader (reporting to the Deputy Chief Ethics and Compliance Officer); and Data Privacy Leader.  *See* October 2019 Final Charter at 16; Final Functional Leaders List at 1; Compliance Structure Announcement at 2-3; CAM December 2019 Quarterly Report at 43.  As of the CAM December 2019 Quarterly Report, all positions were filled except for the Compliance Communications Leader.

March 27, 2020

The Company has also appointed a replacement Operating Line Training Manager at Carnival UK, after the former Operating Line Training Manager transitioned to another position within the Company.  *See* January 2020 Probation Supervision Report, Attachment 3, at 8; Employee Interview/Call Notes.  The Operating Line Training Manager positions at the other lines remain unchanged from the December 2019 Final Functional Leaders List.

### 3.      Compliance Training for the Boards of Directors

The Probation Agreement requires the Company to "develop an annual training curriculum for members of its Board of Directors that would include corporate compliance topics."  Dkt. No. 134 at 3-4.  As part of its October 2019 Final Action Plan, the Company submitted a curriculum for a training program "to help educate the Boards as to the importance of topics in [the area of ethics and compliance], and the Boards' oversight role."  October 2019 Final Submission Letter at 3-4.  According to this submission, the initial curriculum would consist of four sessions to be held from October 2019 through July 2020, covering:  (1) culture, core values, and response plan; (2) review of the new Ethics and Compliance Department and the new DOJ guidance;[45] (3) the role of Board oversight and fiduciary duties in the environmental and safety context; and (4) tools for measuring compliance program effectiveness.  October 2019 Final Submission Letter at 3-4.

The first training sessions were held for the Boards, as well as senior executives, on January 14, 2020.[46]  One session covered DOJ's guidance on the evaluation of corporate compliance programs.  The first part of this session was led by an external expert in the area of

---

[45] *See* DOJ, *Evaluation of Corporate Compliance Programs* (Apr. 2019), https://www.justice.gov/criminal-fraud/page/file/937501/download.

[46] The CAM Team did not attend these sessions but was provided with copies of the presentation materials.

corporate compliance.  Topics addressed included the benefits and importance of ethics and compliance (*e.g.*, reducing rate of misconduct and risk of enforcement, increasing employee morale and productivity, reducing employee turnover, improving financial performance), as well as an overview of the DOJ guidance.  *See Director Training Program on Ethics & Compliance*, PCL_ECP00148020-109, at PCL_ECP00148022-62.  The second part of this session was led by the CEO of ECI, the Company's retained culture expert, and included a discussion of efforts to apply elements of the DOJ guidance to the Company's Ethics and Compliance Program.  *See id.* at PCL_ECP00148063-84.

A second session held at the January 2020 retreat covered ethics and compliance culture, and was led by the CEO of ECI.  *See id.* at PCL_ECP00148085-109.  It began with a general overview of the importance of culture, drivers of culture, and effective efforts to strengthen culture.  *See id.* at PCL_ECP00148086-97.  The final portion focused on the Propel survey results, the Company's Culture Action Plan, and other culture initiatives by the Ethics and Compliance Department.  *See id.* at PCL_ECP00148098-109.  The Boards "also reviewed and discussed the emerging industry-driven standard for High Quality Ethics & Compliance Programs (HQPs), as driven by ethics & compliance professionals worldwide."  *[Draft] Carnival Corporation Culture Action Plan*, PCL_ECP00154952-59, at PCL_ECP00154955.[47]

Another training session is planned for 2020 for the Boards and senior executives that "will focus on the following:

---

[47] The Company plans to design its Ethics and Compliance Program around the High Quality Ethics & Compliance Program standard.  *See id.* PCL_ECP00154956.  Elements of the High Quality Ethics & Compliance Program standard include:  integrating ethics and compliance into corporate strategy; identifying and mitigating compliance risks; leaders' role in building and sustaining a strong ethical culture; encouraging and protecting employee reporting of wrongdoing; and accountability when wrongdoing occurs.  *Id.*

- Key results from employee surveys regarding the ethics-related actions of leadership and findings from the [High Quality Ethics & Compliance Programs] assessment; and

- Ongoing implementation of the [Culture Action Plan] and the role of the board in oversight."

*Id.* In addition, the Culture Action Plan Steering Committee & Working Group "will keep the board of directors regularly updated on [Culture Action Plan] actions, progress, and other key culture & compliance metrics." *Id.*

### 4.   Ethics and Compliance Retreat and Ship Visits

From January 22-26, 2020, the Chief Ethics and Compliance Officer held an Ethics and Compliance Program Retreat in Miami, Florida, and Nassau, Bahamas. *See Ethics & Compliance Program Retreat: "Compliance Alliance: 2020 and Beyond – 2.0,"* PCL_ECP00154914-16 ("Retreat Agenda").[48] The retreat was attended by approximately twenty-five Ethics and Compliance Program personnel from All Brands Group and the operating lines, including the Chief Ethics and Compliance Officer and his Deputy, the three Corporate Compliance Managers, Operating Company Ethics and Compliance Officers and their Deputies, and various corporate compliance leaders and team members (including for training, investigations, communications, and risk assessment). *See id.* at PCL_ECP00154916. Agenda items included:  brainstorming sessions on current, short-term, and long-term goals for the Ethics and Compliance Program Strategic Plan; and presentations on the structure, current priorities, and other updates regarding the Operating Company Ethics and Compliance Programs. *See Ethics & Compliance Program Retreat: "Compliance Alliance: 2020 and Beyond – 2.0,"* PCL_ECP00154917-20.

---

[48] The CAM Team did not attend this retreat, but was provided with copies of the agenda and presentation materials.

March 27, 2020

Following the retreat, from January 25-26, 2020, a team of approximately eight Ethics and Compliance Program personnel from All Brands Group and the operating lines—including the Chief Ethics and Compliance Officer, Operating Company Ethics and Compliance Officers, and their respective Deputies—performed a series of half-day ship visits to four different ships. *See* Retreat Agenda at PCL_ECP00154915.  Additional ship visits are planned, which will be led by Operating Company Ethics and Compliance Officers (or their designees) and include one or more representatives from All Brands Group; however the timing of this additional visits has been impacted by the COVID-19 crisis.  *See* Employee Interview/Call Notes.  According to the Chief Ethics and Compliance Officer, the goal of the ship visits is to:  "Go onto a ship, not with any agenda of an audit or an inspection or any type of investigation.  It really is to sit and listen and to figure out:  What can we do better?  What are your concerns?  And what do we do with that information?"  Status Conf. Tr. at 28-29 (Jan. 8, 2020).  The visits have included townhall-style sessions, attended by approximately 60-200 crew members from multiple departments on each ship.  The Chief Ethics and Compliance Officer reports that crew members have been forthcoming and engaged during these townhalls, raising a range of concerns, both ECP-related (*e.g.*, spare parts, staffing, and HESS policies and procedures) and HR-related (*e.g.*, internet access, travel schedules, contract length, uniforms, and nutrition onboard).  *See* Employee Interview/Call Notes.  Going forward, it will be important to assess what the Ethics and Compliance team will do with the information that crew members have provided.

5.     Compliance Risk Assessment

The Ethics and Compliance Strategic Plan calls for hiring a Compliance Risk Management Leader "who will oversee the compliance risk management function and develop a practical strategy and system to identify, assess, and prioritize top compliance risks within the

scope of the [Ethics and Compliance] Program."  October 2019 Final Strategic Plan at 9.  The Company filled this position around September 2019, with an individual who previously worked as a RAAS Director at Carnival Corp., as well as the Senior Director for Compliance Risk Monitoring and Analysis at Holland America Group, and who has "more than 20 years' experience (17 in the cruise industry) in all aspects of risk management including processes, risks, controls, audits, investigations, digital forensics and proactive analytics."  Compliance Structure Announcement at 3.

The Strategic Plan tasks the Compliance Risk Management Leader with developing a risk assessment strategy by December 1, 2019, and an initial compliance risk ranking report by March 31, 2020.  October 2019 Final Strategic Plan at 9.  The CAM received a copy of the risk assessment strategy in February 2020, which the CAM understands was completed around October 2019 and subsequently revised.  *See* Employee Interview/Call Notes.  It is a high-level document that sets out a strategy for developing, implementing, and executing "a compliance risk program that will proactively identify, assess, and monitor a compliance risk in order to evaluate the overall risk profile of the company on an ongoing basis."  *Carnival Corporation's Ethics & Compliance Risk Management Strategy* ("Risk Management Strategy"), at 1.  The Risk Management Strategy notes that it "is critical that there is buy-in" from others in the Company, including RAAS, the Carnival Corp. Maritime Policy and Analysis Group, and management-level risk owners, for the program to be successful.  *Id.*  Among other actions, the Strategy calls for:

- Identifying and cataloging "all significant areas of compliance risks based on the Company's activities and business plans;"

March 27, 2020

- Conducting a baseline compliance risk assessment "to develop a detailed risk-profile, primarily related to environmental, health, safety, security risks, and general compliance risks that are deemed to be sufficiently 'material;'"

- Assessing "the completeness and adequacy of any existing compliance program activities (e.g., policies, procedures, and training) reasonably necessary to prevent and detect any noncompliant behavior with respect to 'material' risks;"

- Developing and tailoring "appropriate mitigation and remediation plans to respond to identified but inadequately addressed risk areas;" and

- Developing and monitoring "compliance risk metrics in order to evaluate and monitor compliance program effectiveness."

*Id.* Current priorities include:

- Building and managing a team capable of executing compliance risk assessment;

- Conducting a baseline risk assessment;

- Presenting the results of the baseline risk assessment to senior leadership, along with a proposal for "deep dive" evaluations into prioritized risk areas using techniques such as interviews, focus groups, process walkthroughs, control evaluations, surveys, and root cause analysis;

- Beginning to execute the "deep dive" assessments;

- Working with the Chief Information Officer and other executives "to plot a course towards enhanced compliance metrics and analyses;" and

- Working with other Ethics and Compliance Program leaders "to support their metrics and analysis requirements."

*Id.* at 3.

The Company is currently working on the second item (conducting a baseline risk assessment), in conjunction with an outside consultant.  *See Baseline Compliance Risk Assessment Plan for FY 2020* (Jan. 21, 2020) ("Baseline Compliance Risk Assessment Plan"). The methodology being used is "to review relevant Company documents and to conduct individual interviews of employees," while future assessments may include other methods such as focus groups or employee surveys.  *Id.* at 3.  The interviews will focus on "certain Company

March 27, 2020

managers who have direct oversight and/or substantial knowledge of compliance risk areas,"
including:  health, environmental, safety, security, general compliance (including Code of
Conduct, antitrust, anti-corruption and bribery, anti-money laundering, data privacy, and non-
retaliation), and other areas where the Ethics and Compliance Program has indirect "line of
sight" responsibility (including RAAS, finance/controls, legal, IT, and human resources).  *Id.* at
4.  The basic aim of the assessment is to identify risk areas and, for each risk area, identify
qualitative and quantitative information that can be helpful in mitigating risk.  *See id.* at 5.[49]  A
report will be produced by March 31, 2020, that will "include information regarding the
Company's [Ethics and Compliance] risk profile, existing [Ethics and Compliance] controls
designed to mitigate risks, and recommendations for enhancements to [Ethics and Compliance]
controls."  *Id.* at 7.  The CAM understands that this report will include the initial compliance risk
ranking report required by the Strategic Plan.  *See* Employee Interview/Call Notes; October 2019
Final Strategic Plan at 9.  As of March 23, 2020, the report is reportedly on track to be finalized
by the March 31, 2020, deadline; however, this timing may be impacted by the COVID-19
situation.  *See* Employee Interview/Call Notes; Company Draft Report Comments.

The CAM Team will continue to monitor and report on the Company's efforts to launch a
compliance risk program and improve its compliance risk management, including efforts at
coordination and collaboration between the Compliance Risk Management team and others
within the Company, including RAAS, the Maritime Policy and Analysis group, the Incident
Analysis Group, and other functional areas in the Ethics and Compliance Program.

---

[49] Relevant interview questions include:  the most likely scenarios in which a violation could
occur; the types of individuals likely to be involved in creating the risk; the locations where
misconduct is most likely to occur; and the most likely causes of the risk.  *Id.* at 6.

March 27, 2020

6.     Ongoing CAM Team Examination

The CAM Team will continue to monitor the restructuring of the compliance function at both the All Brands Group and operating line levels, including:  the development and implementation of the projects and initiatives listed in the October 2019 Final Action Plan, Final Financial Plan, Risk Management Strategy, and Baseline Compliance Risk Assessment Plan; the existence of concrete and observable ways in which the Environmental Corporate Compliance Officer and Chief Ethics and Compliance Officer exercise authority in support of compliance efforts; the emergence of ethics and compliance structures at the operating line levels, including how the emergence of different structures will address Company-wide compliance support needs (such as the implementation of corporate-wide IT initiatives under the global strategy of the Company's new Chief Information Officer); and the status of ongoing efforts to hire a new member of the Boards of Directors with corporate compliance experience.

In addition, the CAM Team intends to seek further information on funding and resources for the Ethics and Compliance Department and Program at the All Brands Group and operating line levels, as reflected in the Final Financial Plan.

The CAM Team will also continue to focus on the issues highlighted in the Court's Order of October 31, 2019:  leadership communications regarding environmental compliance as a core value; actions to ensure a sufficient number of qualified deck, engine, and hotel crew members on Company ships; the integration of environmental compliance into financial and strategic planning processes; the adoption and implementation of processes designed to enable learning and continuous improvement through the assessment of data and findings; and the adoption and implementation of processes designed to implement management of change principles when new actions are taken.  *See* Dkt. No. 167 at 1-2.  Consistent with the Court's direction, *see* Dkt. No.

157 at 1, the CAM Team will also continue to track the Company's efforts to create benchmarks and use empirical measures to assess its stated aim of establishing a "world class compliance and ethics program." *See* Third Annual Work Plan at 12; Status Conf. Tr. at 33 (July 19, 2019); *Overview & Goals*, PCL_ECP00154921-51, at PCL_ECP00154945.

As the CAM has emphasized, a primary function of the Ethics and Compliance Program is to address cultural and systemic issues that drive the Company's compliance challenges. For the new compliance structures and systems to succeed, it remains crucial that the Company's top leadership (*i.e.*, the CEO and Boards of Directors) take personal responsibility for and lead the promotion of a culture of compliance. This acceptance of responsibility and commitment to change must be authentic, sustained, and backed up by concrete actions by top leadership that make behaviors that support compliance as valued as behaviors that support other business imperatives.

## C.    Investigations

### 1.    Background

One of the CAM's earliest findings was that the "Company's internal investigations are critically flawed." *See* CAM First Annual Report at 5, 33-40. In ECP Year One, the CAM observed that: (1) investigations repeatedly failed to identify root cause(s), and the Company lacked a procedure or standard methodology for performing root cause analysis;[50] (2) investigation reports often sought to attribute blame to specific shipboard personnel, rather than evaluate the role of broader, systemic issues that may have contributed to the incident;

---

[50] The TPA made a similar finding in ECP Year One that the Company's investigations procedures "are inconsistent, non-conclusive and ineffective. There is no formal 'Root Cause Analysis' process for investigation[s]." TPA First Annual Report at 3, 5, 21-23. At the end of ECP Year Two, the TPA found that there is still "no effective procedure in place to identify or develop preventive actions or Root Cause and Analysis." TPA Second Annual Report at 3.

(3) the investigation program was still largely decentralized, despite being housed in the RAAS

function; (4) relevant policies and procedures provided little guidance on how to conduct

investigations, including with respect to preservation of evidence; (5) there was inconsistent

information sharing regarding brand/operating line investigation findings between

brand/operating line investigators and RAAS; (6) there were delays in the conduct of

investigations led by brands/operating lines; and (7) the Company failed to follow existing

procedures or guidance as part of its internal investigations, or to provide adequate guidance and

direction to external investigators in third-party led investigations.  *See* CAM First Annual

Report at 33-40.

      In September 2018, the Company committed to the Court that it would improve its

investigations program through a number of proposed actions and associated timetables.  *See*

*Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd. 1:16-cr-20897 (S.D. Fla.)* (Sept. 21,

2018) ("Proposed Investigations Timeline").  The actions in the Company's Proposed

Investigations Timeline were based on recommendations from an outside consultant, DNV GL

AS Maritime ("DNV GL"), that the Company engaged to assess its internal investigations

process and make recommendations for improving and standardizing the program.  *See* DNV

GL, *Towards improving Carnival's incident investigation process*, Report No. 2018-0209, Rev.

Final (May 8, 2018), PCL_ECP00051998-52050.[51]  As discussed below and in prior CAM

---

[51] DNV GL's recommendations included the need for:  (1) a more clearly defined and consistent
incident investigation process, with clear lines of authority across the brands; (2) a more
structured approach to root cause analysis and reporting; (3) improved training on investigations;
(4) consistent investigation and reporting methodology; and (5) methods for tracking and
trending this information across the fleet to identify and manage key areas of risk.  *See id.* at
PCL_ECP00052035-39.

March 27, 2020

reports, the Company did not proceed in accordance with the initial timetable and is still in the process of improving its investigative function.

Around the same time as its September 2018 submission to the Court, in a separate correspondence with the CAM, the Company announced its plan to create a new, independent department that would be responsible for what are deemed to be significant HESS investigations. *See* Letter from Environmental Corporate Compliance Manager, *Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at 1. The Company's launch of this new investigations department, which has been named the Incident Analysis Group, did not occur until around late March 2019, when the Company hired a former official from the United States National Transportation Safety Board to lead the new department. *See* CAM September 2019 Quarterly Report at 46. The Incident Analysis Group is part of the All Brands Group Ethics and Compliance Department, with the Vice President of the Incident Analysis Group currently reporting to the Health/Safety/Security Corporate Compliance Manager following a re-structuring. *See* CAM December 2019 Quarterly Report at 43-44.

On August 30, 2019, the CAM Team requested an updated timeline for implementation of the efforts to address the CAM, TPA, and DNV GL findings. *See Court Appointed Monitor Communication Thirteenth Request for Documents and Information* (Aug. 30, 2019). The Company provided a list of actions and anticipated completion dates, including the following actions which had target completion dates of September 16, 2019:

- By September 16, 2019, finalizing revised investigation procedures, report templates, and relevant appendices;

- By September 16, 2019, developing a procedure for accreditation of incident investigators; and

- By September 16, 2019, implementing a competency development process.

*See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019).  The Company missed these proposed completion dates, but published revised investigation procedures and associated materials in late February 2020, as discussed further below.  The procedure for accreditation of incident investigators and the implementation of a competency development process remain in progress.  *See* Employee Interview/Call Notes; Company Draft Report Comments.

        2.        Revised Investigation Procedures

                i.        *Overview*

The Company finalized its revised set of investigation procedures, including guidance, report templates, and appendices, on February 27, 2020—more than five months after the revised target deadline.  As discussed in prior CAM reports, the CAM Team initially reviewed a draft set of procedures prepared by DNV GL in September 2018, and then a draft set prepared under the Vice President of the Incident Analysis Group in July 2019.  *See* CAM September 2019 Quarterly Report at 51-52; CAM December 2019 Quarterly Report at 45-46.  Each draft provided guidance regarding the process for conducting an investigation.  However, each draft also lacked certain critical elements, including guidance for root cause analysis, as well as processes for the dissemination of lessons learned, data sharing, and trend analysis.  *See id.*

The suite of documents published in February 2020 consists of:

- ***HMP-1302 Incident Analysis Procedure.***  This procedure outlines processes for investigations, including:  event severity classification; investigation assignment; near miss events; operating line-led incident analyses; Incident Analysis Group-led

incident analyses; reporting; corrective and preventive measures; and incident analysis tracking;

- ***HMP-1302-A Internal HESS Incident Analysis Matrix.*** This risk matrix appendix provides guidance on classifying events according to three levels of severity:  Level 1 (ship-led analysis); Level 2 (operating line-led analysis); or Level 3 (Incident Analysis Group-led analysis);

- ***HMP-1302-B Scope of Investigation Template.*** This template appendix is a form for determining the scope of an investigation, with questions ranging from basic factual information, such as ship name and time of event, to more substantive information, such as the objective of the investigation and similar prior incidents;

- ***HMP-1302-C High Potential Worksheet.*** This spreadsheet appendix is a screening tool to assist in determining whether a near miss event warrants an investigation;

- ***HMP-1302-D Preliminary Report Template.*** This report template appendix provides basic formatting and content instructions for preliminary investigation reports;

- ***HMP-1302-E Final Report Template.*** This report template appendix provides basic formatting and content instructions for final investigation reports. It is more detailed than the preliminary report template and includes a section for preventive actions;

- ***HMP-1302-F Report Distribution List.*** This appendix contains distribution lists for the individuals within the Company (both at All Brands Group and within the brands/operating lines) to whom preliminary and final investigation reports should be circulated;

- ***HMP-1302-G Investigation Manual.*** This appendix consists of a guidance manual for planning and conducting investigations, including evidence gathering, interviews, and report writing; and

- ***HMP-1303 HESS Procedure Continuous Improvement from Lessons Learned.*** This procedure describes processes for incorporating lessons learned from internal and external audit findings, HESS events, near misses, and incident analyses into Global HESS procedures, as well as processes for communicating lessons learned to management and the ships, as part of continuous improvement efforts.

Overall, the set of revised procedures is more comprehensive than previous drafts reviewed by the CAM Team.  For example, the revised procedures address root cause analysis, and include a new procedure, HMP-1303, that aims to provide processes for continuous

improvement from lessons learned and includes provisions on trend analysis.[52]  The CAM Team

is in the process of reviewing the procedures and plans to provide a more detailed assessment in

the next CAM Annual Report.

*ii.    Notable Elements*

(1)    EVENT SEVERITY CLASSIFICATION

Under the revised procedures, there are three levels of classification for HESS events,

with Level 3 events being the most serious, and Level 1 events being the least serious:

- Level 3 event investigations are Incident Analysis Group-led, and include:  any "environmental related ship detention, fines/penalties or litigation and claim" greater than or equal to $100,000; oil discharge incidents "related to misuse of the bilge system or oil disposal via other waste streams;" regulatory violations "due to solid/liquid/air emission discharges apparently resulting from intentional crew action and/or a failure to follow company procedures;" Environmental Control System violations involving unauthorized use of portable pumps; and allegations of falsified records;

- Level 2 event investigations are operating line-led, and include:  any "environmental related ship claim" less than $100,000; all ozone-depleting substance refrigerant emissions; non-refrigerant regulatory violations; oil discharges greater than five liters, including oil-to-sea interface seal failures; Company policy violations "due to solid/liquid discharges apparently resulting from intentional crew action and/or a failure to follow company procedures;" and Environmental Control System violations "involving missing, broken or unexpectedly open padlocks and/or missing keys;" and

- Level 1 event investigations are ship-led, and include:  "[u]nintended Environmental Control System violations (missing or broken seals);" "minor solid item discharges;" and oil leaks into the water less than one liter.

*See HMP-1302-A Internal HESS Incident Analysis Matrix.*

---

[52] For instance, it provides that:  "On a quarterly basis, [the Maritime Policy & Analysis group at All Brands Group] will conduct an analysis and review of HESS events including:  trends across incident types, identified causation patterns (e.g., equipment failure, poor communication, lack of training, etc.), [and] common weaknesses in HESS controls (e.g., inadequate maintenance, inadequate procedures, poor risk awareness)."  *HMP-1303 HESS Procedure Continuous Improvement from Lessons Learned*, at § 3.1.  It is unclear how, in practice, that review and analysis will occur, or how identified trends will be communicated in a systematic way.

These classifications are guidelines only.  Incidents "may be upgraded or downgraded" by the Chief Maritime Officer or relevant Corporate Compliance Manager "based on a potential severity assessment."  *Id.*  In addition, the "Captain and/or company shore management may decide to investigate events not listed in this document at their discretion."  *Id.*  Further, the Chief Maritime Officer "may appoint [the Incident Analysis Group] to investigate any event (listed or not listed in this document) at his/her discretion."  *Id.*

<div align="center">(2)   INVESTIGATION ASSIGNMENT</div>

The revised investigation procedures attempt to outline how investigations are assigned. But overall, the process, as described in the investigation procedures, remains unclear, with multiple decision-makers and uncertain lines of authority, especially regarding Incident Analysis Group assignments.[53]  For example, as noted above, the Incident Analysis Matrix authorizes the Chief Maritime Officer to appoint the Incident Analysis Group to investigate any event at his or her discretion, but it does not explicitly give the Chief Ethics and Compliance Officer similar authority.  *See HMP-1302-A Internal HESS Incident Analysis Matrix.*[54]  Further, based on the

---

[53] In its comments on the draft of this Report, the Company provided clarification about how some of these processes work in practice.  These clarifications are noted throughout this section. The Company also stated that it "recognizes the Global HESS procedures can more clearly describe the extent of the [Chief Ethics and Compliance Officers'] authority, and Carnival will update those procedures."  *See* Company Draft Report Comments.

[54] According to the Company's comments on the draft of this Report, the Chief Ethics and Compliance Officer "has the authority to upgrade or downgrade the classification of investigations and the authority to appoint the Incident Analysis Group to investigate."  *See* Company Draft Report Comments.  The Chief Ethics and Compliance Officer has delegated that authority to the Environmental and Health/Safety/Security Corporate Compliance Managers, and "maintains oversight for the most serious incidents.  The [Chief Maritime Officer] maintains input in the assignment process because of his significant operational experience."  *See id.*  If the Chief Ethics and Compliance Officer and Chief Maritime Officer "were to disagree about appointing the [Incident Analysis Group] to investigate an incident, then the matter would be elevated to the [Carnival Corp.] CEO for a decision."  *See id.*

text of the procedures, it appears that either the Chief Maritime Officer or relevant Corporate Compliance Manager can upgrade or downgrade an event classification, but only the Chief Maritime Officer has explicit authority to appoint the Incident Analysis Group.  *See HMP-1302-A Internal HESS Incident Analysis Matrix.*  Therefore, it is unclear if a Corporate Compliance Manager could upgrade a Level 1 or Level 2 event to a Level 3 event (which would, in effect, be an assignment to the Incident Analysis Group) on his or her own authority.[55]

In addition, under the revised HMP-1302 Incident Analysis Procedure, the Vice Presidents of Environmental Compliance and Health/Safety/Security Compliance, or Vice President of Global Ethics and Compliance, will monitor all hotline and Fleet Operations Center reports daily "to maintain awareness of potential incidents that may warrant incident analysis by [the Incident Analysis Group]."  *See HMP-1302 Procedure for HESS Incident Analysis*, at § 3.2. They are to share "[p]ertinent reports" with "key stakeholders," including the Chief Maritime Officer and Operating Line Executive Vice Presidents.  *Id.*  The Chief Maritime Officer, "in consultation with the above," will decide if the Incident Analysis Group will be assigned to investigate.  *Id.*  If the Incident Analysis Group is assigned, then the Vice President of the Incident Analysis Group will assign an investigator "as soon as practical."  *Id.*

The language of this procedure leaves some open questions.  For instance, it is unclear whether all the named Vice Presidents monitor all the hotline and Fleet Operations Center reports each day, or whether they will be assigned certain types of reports and/or days to

---

[55] According to the Company's comments on the draft of this Report, the Environmental and Health/Safety/Security Corporate Compliance Managers "have the authority to assign the Incident Analysis Group to investigate an incident without the express permission of the [Chief Maritime Officer]."  *See* Company Draft Report Comments.  The Chief Maritime Officer and the Environmental and Health/Safety/Security Corporate Compliance Managers "discuss each incident report prior to deciding whether the [Incident Analysis Group] will investigate."  *See id.*

March 27, 2020

monitor.[56]  It is also unclear whether the Chief Maritime Officer must consult with all or certain of these Vice Presidents when deciding to assign an investigation to the Incident Analysis Group, or whether the Chief Maritime Officer may assign a report without consultation.[57]  It also remains unclear why the Chief Maritime Officer has such a dominant role in investigation assignments when the Incident Analysis Group is part of the compliance, not operations, function.

### 3.   Other Updates

#### i.   *Staffing*

The Incident Analysis Group currently has seven investigators and is recruiting three more.  *See* January 2020 Probation Supervision Report, Attachment 3, at 4.  The Company plans to locate the three additional investigators either in Miami, Florida, Santa Clarita, California, or Seattle, Washington to "allow for quicker response to reported incidents."  *Id.*

#### ii.   *Training*

As discussed in the most recent CAM report, the Company held a training on causal analysis for Incident Analysis Group investigators and management in its Miami, Florida, offices from November 11-14, 2019.  *See* CAM December 2019 Quarterly Report at 46-47.  The

---

[56] According to the Company's comments on the draft of this Report, "[Incident Analysis Group] investigators monitor each day the reports received by the [Fleet Operations Center] in their geographic area.  The reports for the most serious incidents are forwarded to the [Corporate Compliance Manager] for [Health/Safety/Security] and the [Vice President of the Incident Analysis Group]."  *See* Company Draft Report Comments.  Additionally, the Environmental and Health/Safety/Security Corporate Compliance Managers, the Vice President of the Incident Analysis Group, and the Chief Maritime Officer "receive the weekly flash reports to review incidents for potential investigation."  *See id.*  Further, all of the Corporate Compliance Managers (Environmental, Health/Safety/Security, and General) "review each hotline report received."  *Id.*

[57] According to the Company's comments on the draft of this Report, the Chief Maritime Officer "consults with the pertinent [Corporate Compliance Manager] prior to making each decision about whether to appoint the [Incident Analysis Group]."  *See id.*

March 27, 2020

training was conducted by MTO Safety, an outside consultant retained by the Company.  *Id.* at 46.  Members of the CAM Team attended a short overview of the training, provided by MTO Safety, on November 15, 2019.  *Id.*  Attendee feedback to the CAM Team on the course was generally positive.  *See id.* at 46-47.

From February 10-12, 2020, the Company held an additional, abbreviated version of the course for management in its Miami, Florida, offices.  Members of the CAM Team attended this training.  Overall, the training appears to provide good analytical methods and tools, with a skilled and highly experienced instructor.  However, the CAM has concerns that attendance at a single training course—even a multi-day course—will not make investigators proficient at performing effective causal analysis without additional, ongoing coaching and mentoring by experienced professionals with expertise in causal analysis.

The Company plans to continue offering the causal analysis training at CSMART in 2020 for shoreside staff that conduct investigations either on behalf of the Incident Analysis Group or for a brand/operating line; and, in 2021, will require the training for shipboard Second or First Officers, Safety Officers, Second or First Engineers, and Senior First Engineers before any individuals in these positions can be promoted to Staff Captain or Staff Chief Engineer.  *See* January 2020 Probation Supervision Report, Attachment 3, at 4.  The Company's description seems to indicate that the training will only be required for shipboard personnel that will be promoted to Staff Captain or Staff Chief Engineer, and will otherwise remain optional for shipboard personnel.[58]

---

[58] As well as the training efforts discussed above, the Company reports that Incident Analysis Group investigators "receive ongoing mentorship because new investigators work as [a] pair with a more experienced investigator until the new investigator is determined to be competent." *See* Company Draft Report Comments.  The Incident Analysis Group "is also working with the

March 27, 2020

       In addition to the in-person training course, in December 2019 the Company rolled out a

computer-based training module on root cause analysis to be provided to shipboard and

shoreside personnel that conduct what are deemed to be less significant HESS investigations.

*See* CAM December 2019 Quarterly Report at 47; *TRG-1101 Root Cause Analysis Training*.

The course is designed to provide a foundation on root cause analysis and the "5 Why

Methodology." *Id.*  The stated learning objectives are to:  create a problem statement; use root

cause analysis to identify root causes and causal factors; use the 5 Why Methodology; and

determine corrective and preventive actions.  *Id.*

       For shipboard personnel, the computer-based training is required for "anyone who

conducts a [HESS] investigation or audit follow-up," including Captains, Staff Captains, Chief

Engineers, Environmental Officers, Safety Officers, Security Officers, Hotel Directors, and

Department heads and subheads.  *See id.*  For shoreside personnel, the training is required for

"identified subject matter experts and anyone who conducts a follow-up of a HESS incident or

audit finding on board or ashore."  *Id.*  This includes Ship Managers, Environmental Managers,

Safety Managers, Compliance Team Members, and Hotel Managers.  *Id.*  Shipboard employees

will have forty-five days from joining the ship to take the course, while shore side employees

will have forty-five days from the start of employment.  The course must be retaken every two

years.  *Id.*

---

Director of Compliance Training to develop a competency model for those who conduct level 1,
2, and 3 incident analysis to determine when additional training is necessary.  Throughout the
year, the investigators will attend technical and investigative training to maintain their
credentials and technical expertise."  *See id.*

   iii.   *Incident Analysis Group Investigator Accreditation and Competency Development*

As of the date of this Report, the Company continues to work on finalizing its new procedures for incident investigator accreditation and competency development. These had a target completion date of September 16, 2019. *See Court Appointed Monitor Communication – Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at 5. The CAM understands, however, that new Incident Analysis Group investigators are subject to an internal review process prior to leading investigations that includes partnering with an existing investigator to assist the existing investigator in one or more investigations before leading an investigation independently. *See* CAM December 2019 Quarterly Report at 47-48. The Company also reports that "the current investigation procedures include a basic description of the competencies that an investigator must have. The specific competencies will be expanded upon in the more detailed procedures to follow." *See* Company Draft Report Comments.

   iv.   *Investigation Reports*

The CAM Team continues to review investigation reports for HESS incidents prepared by the Incident Analysis Group, as well as the brands/operating lines and ships. As with past reports, the factual and technical assessments in these reports vary in rigor and quality. The CAM Team will continue to review reports and will provide a more detailed analysis in the next CAM Annual Report.

   4.   Ongoing CAM Team Examination

The CAM Team will continue to monitor the Company's efforts to restructure and enhance its internal investigations function during ECP Year Three, including: (1) the Company's timetable and plans to meet milestones to enhance investigations; (2) the function and structure of the Incident Analysis Group; (3) the implementation, and effectiveness of

investigation procedures; (4) the process for identifying and classifying matters for investigation, including the individuals responsible for making such determinations and the timeframes for making them; (5) training for Incident Analysis Group, brand/operating line, and ship investigators; (6) the process and methodologies for root cause analysis used by Incident Analysis Group, brand/operating line, and ship investigators; and (7) the process for disseminating investigation results and lessons learned to corporate leadership, including the Boards of Directors, and the fleets more broadly. *See* Third Annual Work Plan at 14. Continued areas of focus will include: the division of authority between key corporate leaders, including the Vice President of the Incident Analysis Group, the Chief Maritime Officer, and the Chief Ethics and Compliance Officer; the integration of Incident Analysis Group investigations with brand/operating line, ship, and RAAS (non-HESS) investigations; and efforts to achieve continuous improvement from lessons learned. In addition, the CAM Team will examine the management, tracking, and analysis of data and information related to investigations.

### D.   Food Waste Management

#### 1.   Background

Food waste management—specifically, the risk that non-food items, including plastics, are discharged into the ocean with food waste—remains a challenge. *See* CAM December 2019 Quarterly Report at 51-62; CAM Second Annual Report at 86-90; TPA Second Annual Report at 3, 17-18. As discussed in prior CAM reports, the problem was identified by the Company's own employees as early as February 2018,[59] and was the basis for a TPA audit finding in December

---

[59] *See* CAM Second Annual Report at 88 (discussing the identification of concerns related to food waste management across multiple operating lines and brands in February 2018 in the ECP-required Fleet Engineering Survey results, as well as more than forty reports of incidents related to food waste management on Covered Vessels throughout ECP Year Two); CAM September 2019 Quarterly Report at 61.

2018.  However, the Company's top leadership did not focus on this issue until it faced the

revocation of its probation in March 2019.  On June 3, 2019, the Company pleaded guilty to a

probation violation for the illegal discharge of non-food items, including plastics, in food waste

by a Carnival Cruise Line ship in Bahamian waters in December 2018, along with the failure to

accurately record the discharge in the ship's Garbage Record Book.  *See* Dkt. No. 134 at 11.

Further review has confirmed that this issue is Company-wide.  Since the start of ECP

Year Three and as a result of increased checks of food waste systems, the Company's employees

have detected and reported hundreds of events across all of its operating lines and brands

involving the discovery of comingled waste, including plastics, in various parts of the ships' food

waste systems that have resulted in actual or potential prohibited discharges.  *See, e.g.*, Carnival

Corp. *HESS Weekly Flash Reports* (Apr. 24, 2019, through Aug. 7, 2019); Carnival Corp. *Food

Waste and Galley Grey System Contamination Fleet Dashboards* (July 21, 2019, through Mar.

18, 2020).[60]  The TPA also continues to find issues related to food waste management in its ship

audits.  *See, e.g.*, ABSG, *Holland America Line Environmental Compliance Audit Report –

Veendam* (Oct. 10, 2019) (issuing four Major Non-Conformities related to food waste

management during an audit from September 7-11, 2019, including the discovery of plastics and

other non-food items in the overboard discharge food chute metal grill);[61] ABSG, *Carnival

Cruise Line Environmental Compliance Audit Report – Carnival Conquest* (Dec. 2, 2019)

---

[60] Although the Company characterizes most of these incidents as near misses, the CAM notes that it is generally not possible to confirm whether or not there were prior prohibited discharges from the food waste systems found to be contaminated during a routine check.

[61] A follow-up audit conducted from February 5-7, 2020, "observed some improvement in handling the segregation of food waste," but found that "[t]he segregation problem has yet to be fully corrected."  ABSG, *Holland America Line Environmental Compliance Supplemental Audit Report – Veendam* (Mar. 11, 2020).

March 27, 2020

(issuing a Non-Conformity related to the discovery of approximately twenty-six non-food items in the magnetic trap of the food waste system during an audit from November 16-20, 2019); ABSG, *Holland America Line Environmental Compliance Audit Report – Nieuw Amsterdam* (Jan. 31, 2020) (issuing a Non-Conformity related to the discovery of approximately thirty-four non-food items in the magnetic trap, an Observation for the discovery of a non-food item in the food waste tank, and an Observation for "limited and constricted food waste segregation areas," during an audit from January 4-7, 2020); ABSG, *Princess Cruise Lines Environmental Compliance Audit Report – Diamond Princess* (Jan. 31, 2020) (issuing two Observations related to the discovery of non-food items in the food waste system during an audit from January 15-20, 2020); ABSG, *Princess Cruise Lines Environmental Compliance Audit Report – Sea Princess* (Mar. 10, 2020) (issuing an Observation related to the discovery of non-food items (including a plastic sticker) in grease traps during an audit from February 19-23, 2020); ABSG, *Holland America Line Environmental Compliance Audit Report – Nieuw Statendam* (Mar. 18, 2020) (issuing two Non-Conformities related to food waste tanks and grease traps not being inspected in accordance with Global HESS requirements, and one Non-Conformity related to the discovery of non-food items (including plastic material) in grease traps, during an audit from March 1-5, 2020).[62]

In the Probation Agreement, the Company admitted "that there is a need to improve waste management of non-food waste, including plastic garbage, on Covered Vessels and by

---

[62] The TPA has observed to the CAM Team that food waste-related audit findings have improved since the Company began implementing changes to its food waste management practices, but that onboard food waste management remains "a tedious and cumbersome operation," and that current processes may not be sustainable long-term. *See* Internal Correspondence.

Covered Personnel." Dkt. No. 134 at 5. The Company agreed to take various actions to prioritize this issue, including creating two self-described "food waste Tiger Teams" [63] that are a subset of a larger Food Waste Task Force, and implementing a three-part program to improve its food waste management practices. *See* Dkt. No. 134 at 5-7; CAM September 2019 Quarterly Report at 62-67 (describing activities of the Tiger Teams and Food Waste Task Force, and efforts to implement the three-part program, during the first quarter of ECP Year Three); CAM September 2019 Quarterly Report at 53-60 (same for second quarter of ECP Year Three).

2.   Updates on Probation Agreement Requirements

The Company continues to implement the three-part program required by the Probation Agreement:

i.   *Part One of Three Part Program*

- **Part One** requires the Company to "(1) develop and implement clearer and more effective procedures regarding the disposal of food waste; (2) develop new training and signage to ensure that the proper procedures are understood; and (3) use appropriate media, in particular video, to call attention to the new training, procedures, and the renewed commitment to handling of food waste. The Company will also (4) assess the staffing levels for both the operational and compliance aspects of food waste management using a qualified third party to determine appropriate resources to comply with the updated procedures." Dkt. No. 134 at 6. For the first three items, "by August 1, 2019, the Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables. With respect to the fourth item, the Company will retain a qualified third party to assess the necessary staffing. The Company will provide a copy of the third party assessment to the Interested Parties, CAM and TPA within seven days of receipt. Within 45 days after receiving that third party's assessment, the Company will provide the Interested Parties, TPA, and the CAM with its plan in

---

[63] "Tiger Team" is a term of art that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions. The term is "generally applied to a high-functioning team of specialists who come together to complete a specific project." *See What is a Tiger Team Approach?*, https://trextel.com/what-is-a-tiger-team-approach-how-to-successfully-launch-technology-and-save-space-missions-too/.

response to the assessment.  This plan will address the workload of the Environmental Officer."  *Id.* at 7.

(1)   PROCEDURES, TRAINING, AND OTHER MEASURES

For the first three items of Part One, the Company provided the Interested Parties, CAM, and TPA with its Food Waste Management Implementation Plan on August 1, 2019, and with an Update containing a more detailed implementation plan on September 4, 2019.  *See* CAM September 2019 Quarterly Report at 63-65 (discussing Food Waste Management Implementation Plan and Update).  The Environmental Corporate Compliance Manager has hired two individuals (one from Princess to focus on United States operations and one from Carnival UK to focus on European operations) to "work[] exclusively on project managing the adoption of various measures to help ensure food waste compliance."  January 2020 Probation Supervision Report, Attachment 3, at 11.  These individuals "are currently focused on developing new procedures, training, signage, and other measures designed to help compliance."  *Id.*  In addition to developing procedures and other measures, these individuals "also visit ships to quality check the efficacy of the new procedures and to gather information to assist with designing further new procedures."  *See* Company Draft Report Comments.  These visits are described by the Company as "quality assurance checks," where the individuals working for the Environmental Corporate Compliance Manager visit ships to:  (1) both determine if food waste management procedures are being implemented correctly, and to provide additional training, coaching, or mentoring as needed; and (2) both ascertain if aspects of the procedures are impractical or unclear, and to bring back suggestions for improvement or other feedback to the shoreside office.  *See* Employee Interview/Call Notes.

As discussed in the most recent CAM Quarterly Report, the Company issued a new procedure on food waste management in October 2019 to replace a prior Instructional Notice,[64] based on feedback from the Tiger Team visits.  *See* CAM December 2019 Quarterly Report at 53-55; *ENV-1302 Segregation and Disposal of Food Waste* ("ENV-1302"); *Environmental Compliance Notice #6-2019*.  Changes include:  (1) establishing a standardized "two-step process" for food waste segregation to be used across all Company ships;[65] and (2) establishing a requirement for color-coded waste bin/container systems to be implemented on ships "at all locations where food waste is initially segregated" by January 31, 2020.[66]  Preliminary feedback to the CAM Team from crew members indicates that the simplified, streamlined guidance in ENV-1302, including the two-step sorting/color-coded bin system, is both easier to implement and more effective than the requirements of the prior Instructional Notice.  *See* Employee Interview/Call Notes.  However, crew members also report that proper food waste segregation and disposal remains a challenging and labor-intensive task.  *See id.*  Non-food items continue to be found during checks and inspections of food waste and grey water systems, although the Company's dashboards reflect that these findings have generally decreased across the fleet over

---

[64] On May 1, 2019, the Company issued a five-page Instructional Notice setting forth a range of food waste management requirements, including requirements for waste segregation, supervision, equipment and tank inspections, reporting, and recordkeeping.  *See IN ENV-07-2019 Additional Measures to Ensure Compliant Segregation of Food Waste*.

[65] For Step One, non-food waste items are to be segregated from food waste "starting as close to the source (where generated) as possible."  *See* ENV-1302, § 2.2.  For Step Two, all food waste bins/containers must be checked using a sorting table to identify and remove any additional non-food waste items.  *Id.*

[66] The waste bin/containers must identify the type of waste they are designed for using the following color codes:  red = food waste; blue = aluminum; yellow = glass; white = broken china/crockery; grey = paper and plastic.  *Id.* at § 2.3.

time.  *See* Carnival Corp. *Fleet Dashboard: Food Waste and Grey Water System Contamination*
(July 21, 2019, through Mar. 18, 2020).[67]

The new ENV-1302 procedure also generally reduces the frequency of the requirement to
inspect the bottoms of food waste tanks for non-food items, from weekly (under the prior
Instructional Notice) to "at least once per month."  *Id.* at § 2.7.[68]  In addition, the tops (but not
the bottoms or middles) of food waste tanks must be inspected for non-food waste items prior to
discharge, "[w]here feasible."  *Id.*  It is not clear that these inspection requirements are sufficient
to guard against the potential discharge of non-food items from food waste tanks.  For instance,
any non-food items that enter a food waste tank *after* a monthly tank bottom inspection and sink
beneath the surface/tank top could be discharged if the tank is emptied at any point before the
next monthly tank bottom inspection.  Under this scenario, the only other inspection that would
occur prior to discharge is a tank *top* inspection that would not be likely to catch items that have

---

[67] The CAM notes that the findings reflected in the Company's dashboards are based on self-reports of the results of inspections carried out by shipboard crew, and that the frequency, manner, and scope (*i.e.*, the parts of the food waste system that are inspected) of these inspections may differ by ship or brand, as well as over time for the same ship(s).  *See infra*, Part III.D.4.

[68] Under a recent amendment to the procedure, "if non-food waste items are found during a food waste tank bottom inspection, weekly inspections are required until four consecutive inspections result in no non-food waste items found.  At that time, the inspection frequency may be returned to monthly."  *Id.* (amendment published Jan. 23, 2020).

sunk below the surface.[69]  It remains a possibility that non-food items continue to be discharged by Company ships that discharge food waste from tanks to the sea.[70]

(2)     FOOD WASTE STAFFING REVIEW

For the fourth item of Part One, the Environmental Corporate Compliance Manager retained an outside consultant, Lloyd's Register, to perform the review of staffing levels and identify "potential staffing improvements."  *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 4. The consultant's plan calls for visiting eleven ships across the Company's brands between November 2019 and January 2020.  *See Request for Consultancy Services* (Sept. 17, 2019), PCL_ECP00139907-10, at PCL_ECP00139907.  These visits include "the distribution of extensive questionnaires to crew members in order to collect data."  *See* Company Draft Report Comments.  The overall aim of the work is to "[a]ssess the staffing levels for both the operational and compliance aspects of food waste management (to include supervisory positions and the Environmental Officer)," and to support the Company "by making recommendations on current signage and/or training as relevant to staffing levels."  *Waste Management Improvements Program [Proposal]* (July 10, 2019), PCL_ECP00139870-906, at PCL_ECP00139872.  The

---

[69] In its comments on the draft of this Report, the Company noted that "[t]his risk-based version of the checking process was implemented to help improve employee morale, which can be damaged by requiring frequent checks of the food waste tank," and that "daily checks in the food preparation spaces [*i.e.*, the "two-step process" described above] continue, which the company considers to be more effective."  *See* Company Draft Report Comments.

[70] Not all of the Company's ships discharge food waste from tanks to the sea.  For instance, some AIDA ships use food waste dryers to process food waste into a dried powdered residue that is then offloaded ashore.  *See* Food Waste Optimization Plan at 2, n.2.  Other food waste disposal options include burning the waste in an incinerator, packaging and offloading the waste ashore, or processing the waste into effluent using a food waste digester (the Company's use of food waste digesters is discussed further below, *see infra*, Part III.D.2-3).  These disposal options are not necessarily mutually exclusive, and many Company ships use one or more methods.

March 27, 2020

Company has set April 30, 2020, as the deadline for the consultant to provide a final report with recommendations.  This timeline means that the assessment will not be completed until the beginning of ECP Year Four.  According to the Company, and as noted above, "[m]uch of the ongoing work required to create" the final report requires converting "hard-copy questionnaires into a format in which the data can be analyzed, which is a time-intensive process."  *See* Company Draft Report Comments.

To date, the CAM Team has received reports for ship visits performed on two AIDA ships.  *See* PCL_ECP00149843-49; PCL_ECP00149850-54.  These reports make a number of positive observations, including:  good training by the Environmental Officers; high levels of environmental awareness and knowledge by crew members; progress in reducing single-use plastics; good cross-communication between ship and shore; and positive views of onboard leadership, management, and supervision.  *See id.*  However, the reports also raise concerns, including:

- "[W]idespread shortages of Utilities and Stewards, so workload is increased for the restaurants, bars and in the galley."  PCL_ECP00149843-49, at PCL_ECP00149845;

- "Extra crew are provided for the USA season due to high workload.  Although it was identified that more support and awareness of this higher workload need[s] to be raised within the company."  *Id.*;

- "There is a need for supervision cover in the Recycling Center at night as lack of supervision limits operations which can take place."  *Id.*;

- "Non-compliance / mistakes are attributed by crew to fatigue and potential poor time management, during breaks, where personnel are rushing mealtimes."  *Id.* at PCL_ECP00149844;

- "There is reportedly a shortage of supervisors which impacts on the amount of pressure on existing supervisors.  Additionally, there is a requirement for lower ranks to take on higher responsibilities to fill the gap (e.g. act up as supervisors)."  PCL_ECP00149850-54, at PCL_ECP00149852; and

March 27, 2020

- "30%-40% of all crew are first contractors on the ship, which leads to higher workload.  There is no limit for the number of first contracts in any single turnover.  Supervision of first contractors can be challenging as it increases workload." *Id.*

The CAM Team will continue to review further ship visit reports, as well as the final staffing review report, and will monitor the Company's response to findings and recommendations.  As the Company's own consultants and Tiger Teams have observed, it is critical for the Company to "capitalize on the existing motivation and desire of its crew members to play their part in sorting food waste at the source *and provide the necessary resources (people), training and means (equipment) to achieve compliance*."  *Food Waste Equipment Technical Review* (Oct. 31, 2019) ("Food Waste Technical Review"), at 2 (emphasis added).

### ii.    *Part Two of Three Part Program*

- **Part Two** requires the Company to "design and implement procedures to reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent by December 31, 2021.  It will also design strategies to reduce the total weight of food waste that the Company creates by 10 percent by December 31, 2021."  Dkt. No. 134 at 7.[71]

For Part Two, the Company has developed baselines to measure its production and consumption of single-use plastics and generation of food waste by weight.

### (1)    SINGLE-USE PLASTICS

The Company is using 2018 aggregated procurement data for numerous single-use plastic items as its baseline for measurement against the goal of reducing its single-use plastics by 50% by December 31, 2021.  *See* CAM December 2019 Quarterly Report at 56.  The Company has implemented a two-tiered approach to reducing single-use plastics:

---

[71] The Company describes single-use plastic items as including "straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events."  *Id.*

- A first tier focused on small items (such as plastic straws and stir sticks) and items with obvious non-plastic substitutes (such as plastic cups, lids, cutlery, and shopping bags). The goal for this first prong was October 31, 2019. The Company reports that it "removed the vast majority of these items from its ships by the end of October." *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 4; and

- A second tier focused on all other single-use plastic items (including individual amenity bottles, plastic Q tips, plastic garnish picks and individual sauce packages) and reducing the use of plastic water bottles. *See* CAM December 2019 Quarterly Report at 56.

The Company intends to track its reduction of single-use plastics and provide updates semiannually in June and December. *See* CAM December 2019 Quarterly Report at 57. As of the end of November 2019, the Company reports that it "has reduced its single-use plastics by 34% as compared to 2018, and it has reduced by 29% other single-use, non-food items such as sugar, sweetener, and butter packets." *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 4-5.

As of January 2020, Tier 1 single-use items that have been completely removed on ships across all of the Company's brands consist of: balloons (deck/external use only), plastic bags in retail stores, plastic cocktail picks, plastic lids, plastic cups, plastic cutlery (except Kosher), plastic stir sticks, plastic straws, plastic tooth picks, and butter foil. *See Sustainability Single Use Items Global Meeting* (Jan. 2020) ("Single Use Items Presentation"), at 2. Tier 2 single-use items that have been completely removed, or that have a reduction program in place, on ships across all of the Company's brands consist of: plastic garnish picks (removed) and chopsticks (reduction program in place, including reusable (melamine/steel) and disposable (wood) options). *See id.* at 3. Other Tier 2 items whose removal or reduction program is "in progress" in one or more of the Company's brands consist of: individual amenity bottles (*e.g.*, lotion, shampoo, conditioner, and soap bottles), plastic bags (garbage bin liners, laundry, cabin), plastic

March 27, 2020

Q-tips, individual plastic yogurt containers, artificial sweetener packets, plastic cling wrap, individual sauce packets (*e.g.*, salt, pepper, Nutella, honey, ketchup, jams, vinegar sachets, peanut butter, mayonnaise, mustard, and salad dressing), plastic water bottles,[72] and plastic gloves.  *See* Single Use Items Presentation at 3.

As observed in the Company's Food Waste Technical Review, reducing or eliminating single-use plastics onboard is an "important goal" because "the most effective way to stop plastic from being discharged into the ocean is to avoid using it onboard in the first place.  If plastic ends up in a pulper/vacuum system, it will likely be macerated into smaller pieces that might be indistinguishable from the organic matter it is blended with."  Food Waste Technical Review at 2.

### (2)    FOOD WASTE GENERATION

The Company completed a project to weigh all food waste generated on its ships during the first two weeks of October 2019 (using scales and/or previously determined average bin weights).  That measurement will serve as a baseline from which to measure progress against the goal of reducing the total weight of food waste by 10% by December 31, 2021.  *See* CAM December 2019 Quarterly Report at 57.  The Company intends to track its generation of food waste per person on board per day and provide updates semiannually in April and October.  *See id.*

In January 2020, the Company reported that its food waste reduction performance against the October 2019 baseline for the period of January 6-19, 2020, "reflects a fleet wide average

---

[72] In its comments on the draft of this Report, the Company noted that it "is not actively working to reduce the number of plastic bottles in tier 2 because they are not single use.  However . . . the company is reviewing some alternatives to plastic bottles and ha[s] implemented some.  For example, Holland America Line has changed to aluminum cans, and Seabourn is looking into refillable bottles."  *See* Company Draft Report Comments.

March 27, 2020

improvement of approximately 10% – 0.83KG/Person/Day in comparison to the baseline of

0.92KG/Person/Day." *Food Waste Reduction Performance Update*, PCL_ECP00155487, at 1.

This preliminary data indicates that the Company is on track to meet the goal set in the Probation

Agreement.

The amount of food waste generated onboard varies by brand, which could be a result of

differing passenger and crew behaviors, food service practices (*e.g.*, portion/plate sizes, buffet

availability, room service availability and pricing), ship design and operations, and/or voyage

itineraries (*e.g.*, number of days in port versus at sea).  The highest average levels of food waste

are reported on Carnival Cruise Line (1.03KG/Person/Day) and Holland America Line

(1.03KG/Person/Day) ships, while the lowest levels were reported on Costa EU

(0.50KG/Person/Day), P&O Australia (0.51KG/Person/Day),[73] and Princess

(0.63KG/Person/Day).  *Id.* at 2; *see also* Valkyrie, *Carnival Phase 1 Read Out* (Dec. 20, 2019),

PCL_ECP00150714-88, at PCL_ECP00150719-38.

><center>iii.    *Part Three of Three Part Program*</center>

- **Part Three** requires the Company, by October 31, 2019, to "review and provide an analysis of:  (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes."  Dkt. No. 134 at 7.  Further, by January 31, 2020, the Company "shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones.  The Company has committed a minimum of $20 million in capital expenditures throughout the remainder of Princess's probation to optimize food waste management, including food waste disposal systems and associated processes."  *Id.*

For the first part of Part Three, the Company submitted its review and analysis of food

waste disposal technologies, systems, and processes, on October 31, 2019, as discussed in the

---

[73] P&O Australia does not operate any Covered Vessels.

March 27, 2020

most recent CAM Quarterly Report.  *See* Food Waste Technical Review; CAM December 2019 Quarterly Report at 58-60 (summarizing the report).  The report evaluates a range of food waste technologies, and finds that the "only viable upgrade options available in the short term to improve [the Company's] current food waste processing equipment capabilities are upgrades to the existing pulper systems[74] (including installing dryers[75]) or the simpler and more environmentally-friendly option to install multiple food digesters."  Food Waste Technical Review at 10.  It further finds that "[f]rom the research conducted to date, digesters appear to be a good option" and "are a viable and effective means for [the Company] to enhance its food waste processing capability and related compliance obligations."  *Id.* at 10-11.  A food waste digester is "essentially a mechanized steel version of a human stomach that partially digests food waste and separates the water component."  *Id.* at 11.  These machines reportedly "cannot digest plastic and other non-food items like metals."  *Id.*  Such non-food items are removed by hand on a periodic or as-needed basis.  *Id.*[76]

---

[74] A food waste pulper is akin to a large, industrial-scale version of the garbage disposal in a kitchen sink.  Pulpers use blades to grind food waste into a pulp that can then be directed to other parts of the food waste system, such as a tank or an overboard discharge chute.

[75] A food waste dryer is a large, industrial-scale dehydrator that processes wet food waste into a dried powdered residue that can be offloaded ashore.  Removing the liquid from the food waste can significantly reduce its volume and mass.

[76] There are different designs and models of food waste digesters, but they typically take the form of a large metal box with an opening on the top or front where food waste can be loaded.  Microbes within the digesters partially digest the food waste and produce a liquid effluent.  Various connections feed the unit with inputs, such as water and enzymes to aid the digestion process, or carry away outputs, such as effluent.  Once the effluent leaves the digester, it may be routed to different locations based on the ship's design, such as a tank, secondary treatment system, or discharge point.  There is a screen over the digester's effluent outflow point to prevent "undigested" non-food items from entering the effluent stream.  Such items can be removed by hand when the digester is opened for cleaning or other maintenance.

March 27, 2020

For the second part of Part Three, the Company submitted its implementation plan to optimize food waste management on January 31, 2020.  *See* Food Waste Optimization Plan.  The plan states that, based on the recommendations in the Food Waste Technical Review, the Company "has decided to optimize its food waste disposal systems and associated processes by installing food waste digesters on the vast majority of its ships."  *Id.* at 2.  The Company plans to "install several digesters on the majority of its ships in key food waste production areas."  *Id.* at 3.[77]  The Company estimates that most ships will have between seven and twelve digesters by 2023, "but the exact number will vary depending on the size and configuration of each ship."  *Id.*  Purchasing decisions for each brand will be made by the Executive Vice President responsible for marine operations within that brand, with oversight from the Chief Maritime Officer and Environmental Corporate Compliance Manager.  *Id.* at 4.[78]  The Environmental Corporate Compliance Manager is also "overseeing a team that is developing standard operating procedures and training materials to educate crew members about how to use the digesters."  *Id.* at 5.

Importantly, the Company notes that "[c]hange management during the installation process is essential to maximize the digesters' labor-saving potential."  Food Waste Optimization Plan at 5.[79]  This appears to be based on a recommendation from the Food Waste Technical Review, which observed that management of change:

---

[77] The Company will not install digesters on some AIDA ships "because those ships will continue their current practice of offloading food waste ashore using a drying process."  *Id.* at 2, n.2.

[78] The Company projects that it will spend more than $27 million on the digesters before the end of the probation period, and that the project will extend beyond the probation period into at least 2023, with an anticipated total cost of more than $29 million.  *See id.* at 5.  These expenditures would fulfill the Company's obligation in the Probation Agreement to commit "a minimum of $20 million in capital expenditures throughout the remainder of Princess's probation to optimize food waste management."  Dkt. No. 134 at 7.

[79] The CAM Team believes that "change management" refers to "management of change."

is an important factor to consider when developing the future plan.  Technical change decisions need to be reviewed by designated individuals or their delegates (stakeholders) to determine the impact to certain key areas, including manning and workload, before approval . . . Risk-based decision-making strategies coupled with a change management process have been well proven in the Oil and Gas industry for several decades and will go a long way towards helping to harmonize equipment installed across [the Company's] fleet and reducing the risk of unplanned operational impacts, including costs.

Food Waste Technical Review at 1-2.  The Food Waste Technical Review recommends developing and implementing a technical management of change procedure, which "should give the individual/team reviewing the specific technical/system change the authority to stop work/deny progress on the requested change until they are satisfied it addresses their relevant safety, public health, environmental, operational and functional concern."  *Id.* at 2-3; *see also infra*, Part III.G.4 (discussing the Company's recent effort to draft a management of change procedure).

However, it is not clear that a full management of change assessment for the food waste digesters has been followed to date, or will be going forward.  The Food Waste Optimization Plan states that management of change will be applied "*during* the installation process."  Food Waste Optimization Plan at 5 (emphasis added).  However, a key aspect of management of change is the review of "proposed changes to equipment, raw materials, processes, and procedures *before the changes are implemented* to evaluate the impact and risks associated with the change."  *Management of change vs. change managemen*t,

https://www.plantservices.com/articles/2012/10-management-of-change-vs-change-management/

(emphasis added); *see also* American Bureau of Shipping, *Guidance Notes on Management of Change for the Marine and Offshore Industries* (Feb. 2013), at ii (noting that, under management of change principles, "[w]henever a change is made, the potential consequences of that change should be assessed *before implementation*") (emphasis added).  A management of change

March 27, 2020

process starts from a position of assuming the status quo, and then evaluating the impacts of the proposed change.  Such an inquiry would go beyond the immediate issue (*i.e.*, impact on food waste management) to broader potential impacts (*e.g.*, impact on labor/workload, including whether any new labor/workload demands would outweigh any labor/workload savings; impact on other equipment or processes, especially given space limitations in galley and Recycling Center areas;  regulatory/legal compliance risks; safety risks; and time and costs associated with training and maintenance, including space parts availability).  The Company's approach, instead, appears to assume that digesters will be installed, and then addresses the more limited inquiry of, where is the best place to install them on the ships "to maximize [their] labor-saving potential"?  *See* Food Waste Optimization Plan at 5.

The Company's testing, procurement, and use of food waste digesters is discussed further below.

### 3.   Food Waste Digesters

As discussed in prior CAM reports, and in accord with the Food Waste Technical Review and Food Waste Optimization Plan, the Environmental Corporate Compliance Manager "has been overseeing the testing of various different models of food waste digesters to replace the pulper systems that most ships currently use to dispose of food waste."  *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 4; *see also* CAM December 2019 Quarterly Report at 60.  This testing began around August 2019, and included both operational testing of the digester units and third-party testing of the digester effluent.[80]  In January 2020, the Company reported that it "has

---

[80] According to the Company, this testing "confirmed that the digesters' effluent results in reduction in biological load compared to pulped or macerated food waste.  The testing also

March 27, 2020

determined to use a combination of three different digester models across its fleet, each of which is manufactured by a company that [the Company] considers to be reputable." *Id.*[81]  The Company has installed forty-eight digesters across its fleet as of January 31, 2020, and projects that it will install approximately six hundred and eighty by the end of 2020, and approximately nine hundred by the end of 2023.  *See* Digester Installation Plan.

To date, crew members have provided the CAM Team with the feedback that, while the units are generally reliable and help to reduce workload, challenges remain.  *See* Employee Interview/Call Notes.[82]  These challenges include issues with performance of the units,[83] as well as allegations of workload pressures and potential safety hazards.  *See* Employee Interview/Call Notes; *see also, e.g.*, *Environmental Open Report #30-2020 (CVL-2020-1-4257)* (Jan. 14, 2020) (anonymous hotline report alleging "[t]errible issues and pressure to keep [food waste digester]

---

yielded no evidence of plastic contamination associated with co-mingling of food and non-food waste."  Food Waste Optimization Plan at 3.

[81] The Company "determined not to purchase all of its future models from one manufacturer in large part because no single manufacturer is currently producing enough digesters to meet [the Company's] demand.  Furthermore, each model has its own strengths relative to the other models, and [the Company] decided that it would be better to allow each Brand to determine which relative strengths best suited the Brand's ships."  *Id.*  However, the Company has "limited future procurement to only two of the three models currently in use in order to simplify employee training and the procurement of spare parts."  *Id.*

[82] Most of these challenges appear to pertain to a single digester model, which the Company has decided not to purchase going forward.  *See* Company Draft Report Comments.

[83] These include multiple incidents where digesters have been placed out of service for more than a day due to technical or other issues.  *See, e.g.*, Carnival Corp. HESS Weekly Flash Report (Jan. 15, 2020) (digester placed out of service for at least twelve days on the *Carnival Victory* "due to a technical failure . . . caused by a sensor fault"); Carnival Corp. HESS Weekly Flash Report (Dec. 4, 2019) (digester placed out of service "while waiting to receive a spare part on board" on the *Carnival Paradise* due to a missing component); Carnival Corp. HESS Weekly Flash Report (Sept. 18, 2019) (digester placed out of service for approximately two weeks on the *Carnival Inspiration* due to "improper commissioning and an insufficient instruction manual for the system").

machines running," and that "[w]e now have crew member getting electric shock from [food waste digester] machine[s]" [*sic*] and "[t]hese machines are dangerous").[84]  An investigation into Environmental Open Report #30-2020 by members of the Environmental Corporate Compliance Manager's team, with oversight from the Incident Analysis Group, found that "[w]hile the majority of allegations were not substantiated during the review, interviews indicated that shore-side personnel put pressure on ship's staff to install and commission the [digesters].  Adding to the pressure was the [ship's] team members' lack of experience and lack of adequate training in [digester] operation, prior to commissioning.  In addition to the lack of support from the [Carnival Cruise Line] office team and equipment supplier, there was a lack of clear and effective project management and change management principles."  *Review of Carnival Panorama (Carnival Vista Class) [Food Waste] Digester Hotline Allegations* (Mar. 12, 2020), at 2.  The preventive actions include that, by June 30, 2020, Carnival Cruise Line will "ensure all future food waste digester installations are conducted using effective project and change management principles, including training of team members before commissioning."  *Id.* at 6.[85]

While the digesters overall are reportedly helping to relieve workload, they will not eliminate the need for at least some manual separation of non-food items from food waste prior to loading the machines.  The Company has expressed the belief that the digesters "will not decrease the effort required for initially segregating food waste at its source in the dining rooms

---

[84] The allegations in Environmental Open Report #30-2020 pertain to the digester model that the Company has decided not to purchase going forward.

[85] The investigation found "no evidence to substantiate the statement that employees received either electric or static electric charge shocks."  *Id.* at 2.  This conclusion was based on findings of "no onboard accident reports, no mention during interviews and no problems from the [food waste] digester unit electrical inspection and tests, conducted by the review team in conjunction with the Chief Electrical Engineer and Facility Maintenance Manager."  *Id.*

and other dining areas," but that they "will eliminate significant workload associated with second-stage segregation efforts."  Food Waste Optimization Plan at 5.  The Company has also estimated "that the digesters should decrease by half the number of segregation checks required, which will reduce workload."  *See* Company Draft Report Comments.

Currently, the Company's ships are not equipped with sufficient numbers of digester units to handle all of the food waste that is generated onboard.  Therefore, even on ships with multiple units, some food waste continues to be disposed of in other ways, such as by offloading it ashore, storing it in food waste tanks that discharge overboard, or feeding it into pulper units that discharge overboard via food waste chutes.  *See* Employee Interview/Call Notes.  The Company reports, however, that "installations of additional digesters over the next two years should result in ships processing 100% of their food waste via digesters.  (This excludes the AIDA ships that use drying and offloading procedures.)."  *See* Company Draft Report Comments.

A key issue related to the Company's use of food waste digesters is the uncertain regulatory status of digester effluent.  In general, food waste is regulated as a form of "garbage" under Annex V of the International Convention for the Prevention of Pollution from Ships ("MARPOL").  *See, e.g.*, MARPOL Annex V, Reg. 1.8 (defining food waste as "any spoiled or unspoiled food substances and includes fruits, vegetables, dairy products, poultry, meat products and food scraps generated aboard ship"); *id.* at 1.9 (defining garbage as including "all kinds of food wastes"); *id.* at 4.1.1-4.1.2 (setting restrictions for the discharge of food waste); *id.* at 6.1.1 (same).  However, it is unclear whether food waste digester effluent falls within the scope of "food waste" regulated under MARPOL Annex V.  To date, the International Maritime Organization, the international body that establishes regulations under MARPOL, has not

provided guidance on this issue.  In the absence of such guidance, at least one of the Company's brands/operating lines has sought determinations from flag states that digester effluent is categorized as grey water, which is not regulated under MARPOL, rather than as food waste that is regulated under MARPOL Annex V.  *See*, *e.g.*, Email from Carnival Cruise Line Vice President of Environmental Operations, *FW: Water effluent from Food Digester technologies* (Apr. 15, 2019) (seeking concurrence from the Bahamas Maritime Authority "on the effluent being galley grey water").[86]  The CAM intends to further examine the Company's treatment of food waste digester effluent, including any sampling/testing of digester effluent produced on its ships, as well as efforts by the Company to seek determinations from flag states or other authorities.

### 4.   Other Initiatives

The Company continues to implement other food waste initiatives, including:

- The weekly food waste dashboard, which summarizes data by ship for both Covered and non-Covered Vessels on:  (1) the results of daily compliance checks of food waste systems;[87] (2) as of March 4, 2020, a breakdown of the frequency of particular contaminants found during these daily compliance checks, such as plastics, glass, rubber, hard food items, and paper; (3) the results of food waste tank inspections,[88] which includes reports of items found in food waste tanks, pulpers, and/or magnetic traps; (4) the results of grey water system inspections, which includes reports of items

---

[86] The Company has since reported that it "is in the process of considering its approach to classifying the digester effluent and anticipates classifying the effluent as food waste going forward."  *See* Company Draft Report Comments.

[87] The CAM understands that the components of the food waste system covered by these checks differ by ship.

[88] The CAM understands that the frequency of these inspections may vary under the new ENV-1302 procedure, as discussed above.

found in the grey water system (typically in grease traps); and (5) the status of drain bell/scupper cover installation and securing.[89]

- The "Food Waste Shuffle" music video competition initiated by the Environmental Corporate Compliance Manager and his team "to heighten awareness among crew members of the Company's increased attention to properly sorting and disposing of food waste." *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 3. Each ship and shoreside office had the opportunity to enter, but was not required to do so. Over seventy videos were submitted. Winning videos from the top four ships and one shoreside office have been selected. *See* November 2019 Probation Supervision Report, Attachment 3, at 12-13 (announcing the winning ships as: *P&O Britannia* (first place); *Carnival Inspiration* (second place); and *P&O Arcadia* and *Regal Princess* (tied for third place), with honorable mentions to *Golden Princess* and the Holland America Line *Zaandam*); December 2019 Probation Supervision Report, Attachment 3, at 12 (announcing the winning shoreside office as Carnival UK). The Company reports that it "is working to translate the heightened awareness and positive sentiment created by the video competition into meaningful change for how food waste is handled." *Status Report by Princess Cruise Lines, Ltd. to be Considered during Status Conference on January 8, 2020* (Dec. 31, 2019), Dkt. No. 170, at 3.

  5.   Ongoing CAM Team Examination

The CAM Team will continue to monitor issues associated with food waste management.

This will include the review the Company's weekly food waste dashboard and the review,

assessment, and tracking of the Tiger Team program and food waste initiatives, including the

Food Waste Management Implementation Plan and Update, Food Waste Technical Review,

---

[89] As discussed in prior CAM reports, the Company launched an initiative to replace missing drain bells and scupper covers following a TPA audit finding that missing covers were causing non-food items, including plastics, to drain into a ship's grey water system. *See* CAM September 2019 Quarterly Report at 68; CAM December 2019 Quarterly Report at n.45. On December 19, 2019, the Company issued a new procedure to "mitigate the risk of plastic and other foreign materials from entering into and progressing through the ship's grey water systems." *See DER-2005 Grey Water System Inlet and Downstream Filtration* ("DER-2005"). Among other things, DER-2005 sets time frames for the installation of scupper covers on various systems that drain into the grey water system. *See id.* The March 18, 2020, dashboard indicates that a number of installations with a completion deadline of February 29, 2020, were still "in progress" on multiple ships across all of the Company's brands. *See* Carnival Corp. *Fleet Dashboard: Food Waste and Grey Water System Contamination* (Mar. 18, 2019), at 6.

March 27, 2020

Food Waste Optimization Plan, and other components and deadlines of the three-part program set forth in the Probation Agreement. *See* Third Annual Work Plan at 7. The CAM Team will also continue to monitor the implementation of the Company's food waste management procedures (including ENV-1302 and DER-2005) and solicit feedback on the feasibility, clarity, and effectiveness of their requirements.

As noted above, the CAM Team also intends to examine the Company's testing, procurement, and use of food waste digesters (including the vetting and selection of vendors of equipment to be installed onboard), as well as its testing, treatment, and regulation of digester effluent. In addition, as discussed below, the CAM Team will evaluate the Company's process for selecting and vetting shoreside waste vendors who handle the disposal of wastes offloaded from ships, including food waste and plastics. *See infra*, Part III.I.4.

### E.     Training

The CAM Team continues to monitor the Company's training in support of environmental compliance. This includes its ECP-related curriculum and the integration of environmental compliance into trainings for deck and technical personnel. *See* CAM First Annual Report at 21-23, 69-70; CAM Second Annual Report at 31-35; CAM December 2019 Quarterly Report at 62-69.

1.     General Updates on Company Initiatives

The Company continues to invest resources in environmental and ECP-related training. Notable recent updates include:

March 27, 2020

- **CSMART Training Courses.**  The Company continues to conduct environmental and compliance-related trainings at its CSMART training center, including Environmental Officer training, Operational Excellence training for deck, technical, and environmental officers, and leadership training for deck, technical, and hotel employees.  *See* January 2020 Probation Supervision Report, Attachment 3, at 7-8.  During ECP Year Three to date, CSMART has held four iterations of the new five-day Environmental Excellence, or Environmental Officer 3 ("EO3"), hybrid training/conference event (required for those in their third year as an Environmental Officer under the ECP), as discussed further below.  The Company is also in the process of developing "a more advanced and re-focused version of the current Environmental Excellence course that will be required for all [Environmental Officers] in their third or fourth years (or above)."  *See* Company Draft Report Comments.

  As a result of COVID-19, all CSMART training was suspended "effective end of training [for the week of March 9-15, 2020] until 12 April 2020.  The decision will be reviewed at the end of March."  *See* Email from Chief Maritime Officer (Mar. 12, 2020).  During this time, "CSMART will continue to progress internal operations including course development, staff training, planned maintenance, etc. to the maximum degree possible."  *Id.*

- **IT Tools.**  The Company continues to develop and roll-out various IT tools related to training, including:  (1) the Global Learning and Development Information System ("GLADIS"), a learning management system designed to deploy and track training; (2) CrewTube, an application for smart phones and tablets that allows crew members to access HESS information and complete some HESS trainings before joining a ship; (3) a new offline, tablet-based drill application to "assess training and drills;" (4) a new Instructor Led Training Attendance App that will be able to scan crew member IDs to assist in recording attendance at shipboard trainings; and (5) an online chat forum called The Environmental Hub for Environmental Officers to "share environmental compliance and stewardship information as well as solicit[] feedback on training, procedures and best practices;" and (6) an Environmental Hub Hotel Operations Forum for hotel operations personnel "to discuss environmental compliance topics, including food waste challenges, ideas, potential best practices, etc."  *Corporate Compliance Manager's Quarterly Environmental Compliance Report Q3 2019*, PCL_ECP001447152-273, at PCL_ECP001447162; *see also* CAM December 2019 Quarterly Report at 63, 75-81 (discussing training-related IT initiatives); *infra*, Part III.G.1 (same).

March 27, 2020

### 2.  Personnel Updates

The new Director of Environmental Training at CSMART, a former Operating Line Training Manager for Costa Group, began in February 2020, following the retirement of the former Director.  *See* January 2020 Probation Supervision Report, Attachment 3, at 8.  In addition, the Company has filled the Operating Line Training Manager positions at all four operating lines.  *See id.*; *see also supra*, Part III.B.2.

### 3.  Environmental Officer CSMART Training

As discussed in prior CAM reports, the Company worked with outside consultants to develop and launch a new Environmental Officer CSMART training course, called Environmental Excellence or EO3.  This course is the third annual training provided to Environmental Officers, and is delivered as part of a five-day program in the form of a hybrid training/conference event.  *See* CAM Second Annual Report at 32, 35-36.  Recognizing the need to make Environmental Officer training more interactive and innovative, the program is designed to be challenge-based, rather than lecture-based.  *See id.* at 32.  To date, four sessions of EO3 have been held in:  August 2019, November 2019, January 2020, and February 2020.  The CAM Team attended the August 2019 and November 2019 sessions in-person,[90] while the CAM made remarks via videoconference, followed by an interactive open forum discussion, at the January 2020 and February 2020 sessions.  Feedback from attendees to the CAM Team on this course has been overwhelmingly positive.  *See* CAM December 2019 Quarterly Report at 64-68.  In particular, attendees report that they value the opportunity to engage, collaborate, and share lessons and best practices with colleagues, as well as to directly provide feedback on current challenges, areas of confusion, and suggestions for improvement to shoreside personnel.  *See id.*

March 27, 2020

Environmental Excellence course attendees also have the opportunity to engage with the CAM Team, both formally during the open forum discussions, and informally during side or follow-up conversations. From the CAM's perspective, these conversations have been valuable and productive, with attendees raising everything from general questions about Court proceedings and the role of the monitorship, to specific issues related to their jobs and ECP compliance. Recent topics have included:

- A desire for additional officers (beyond deck, technical/engineering, and environmental) to be required to attend compliance-related trainings at CSMART, including hotel, food and beverage, and housekeeping officers and managers. This is related to a perception by some Environmental Officers of a general lack of buy-in and support for culture change, as well as a lack of ownership over compliance issues, from these departments;

- A desire for a more formalized and consistent process for shoreside to seek input from the ships, including Environmental Officers, on new or revised policies and procedures. This suggestion is intended to minimize the imposition on the ships of unclear or impractical requirements. In addition, a potential consequence of not soliciting input from the ships is that some Environmental Officers who feel their voices are not being heard may leave the Company, creating retention challenges;

- A general sense that Environmental Officer voices are not always heard, and that it takes findings from the TPA or CAM to get action from the Company (such as on the food waste management issue);

---

[90] The TPA also attended in person and audited the August 2019 and February 2020 sessions. *See* ABSG, *Carnival Corporation Environmental Compliance Audit Report – CSMART Environmental Officer Course (EO3)* (Sept. 18, 2019); ABSG, *Carnival Corporation Environmental Compliance Supplemental Audit Report – CSMART Environmental Officer Course (EO3)* (Mar. 13, 2020) ("EO3 Supplemental Audit Report"). The TPA issued ten Observations for the August 2019 course audit. *See* CAM December 2019 Quarterly Report at 64-65 (discussing TPA audit findings). The TPA conducted a follow-up audit of the February 2020 course "to ensure that the Observations had been addressed." EO3 Supplemental Audit Report at 3. The TPA found that the Observations had been addressed, and issued no new findings. *See generally id.*

March 27, 2020

- A potential need for additional onboard support for Environmental Officers, such as an additional clerk, assistant, or the creation of a "junior" Environmental Officer position;[91] and

- A general sense of excitement and support for the Fleet Environmental Officer program that is being developed.  *See infra*, Part III.G.2.

*See* Event Notes.

As noted above, the Company is developing "a more advanced and re-focused version" of the Environmental Excellence course that will be required for all Environmental Officers in their third year and above.  *See* Company Draft Report Comments; *see also Survey: Collecting feedback of our EOs* (Jan. 16, 2020); Employee Interview/Call Notes.  The first session of the re-vamped course is expected to be held during the summer of 2020.  *See id.*  The Company will continue to deliver EO1 and EO2 courses at CSMART on as as-needed basis.  *See* Company Draft Report Comments.

The CAM remains impressed by the strength of the Company's Environmental Officer corps—including the talent, dedication, and enthusiasm exhibited by individual Environmental Officers—and is grateful for the continued opportunity to witness the nurturing and display of this talent at Environmental Excellence courses.

---

[91] At least two of the Company's new liquid natural gas ("LNG") ships at Costa Group—one AIDA ship and one Costa ship—have both a Senior and Junior Environmental Officer onboard. The Company has stated that "the size of these ship models made it advisable to add a junior [Environmental Officer], and that size concern does not apply equally to all other ships."  *See* Company Draft Report Comments.  Environmental Officers from across the Company's brands, including on non-LNG ships, have expressed that this set-up would benefit their ships as well. *See* Employee Interview/Call Notes; Event Notes.  Many Environmental Officers at the EO3 course were also previously unaware of this practice on the new LNG Costa Group ships, an indication of the Company's ongoing challenges with cross-brand sharing of best practices.

### 4.   Ongoing CAM Team Examination

The CAM Team will continue to monitor the Company's environmental compliance training, including the Environmental Excellence and Operational Excellence CSMART courses. As part of this effort, the CAM Team plans to explore the potential role of CSMART in supporting culture change within the broader organization.

As discussed in prior CAM reports, the Environmental Excellence and Operational Excellence courses at CSMART have consistently solicited thoughtful feedback on compliance issues and challenges from participants, including issues related to culture (and blame culture), financial pressure, support for the ships, and workload.  *See, e.g.*, CAM September 2019 Quarterly Report at 78-79 (discussing concerns raised by Operational Excellence course participants[92]); CAM December 2019 Quarterly Report at 64-69 (discussing concerns raised by Environmental Excellence course participants[93]); *supra*, Part III.E.3 (same).  It remains to be seen how effectively the Company, including its top leadership, will respond to feedback from

---

[92] For example, participants during course sessions held from April-July 2019 noted concerns about "blame culture, and in particular [the Company's] approach to mistakes (as opposed to violations);" "budgets, financial pressure, and a prevailing perception of inappropriate bonuses based on cost savings - particularly for those in positions to affect decision making;" "pressure upon ship teams to find solutions within the constraints of poor logistic support, particularly spare parts;" and "issues of "workload and fatigue management."  *See id.*

[93] For example, Environmental Excellence course participants have raised concerns about the lack of clarity regarding whether Environmental Officers have "Stop Work Authority" if they come across an operation that they know or suspect is non-compliant.  Shoreside personnel have clarified that Environmental Officers do have such authority, but acknowledged that it is not explicit in Global HESS procedures.  *See* Event Notes; *Environmental Excellence, Some of the parked items . . .*, PCL_ECP001447437-44, at PCL_ECP00144742; *Cf. OHS-1001 Job Safety Review* (Company procedure providing that, in the *safety* context, "[e]very crew member has the authority and duty to stop work that they deem to be unsafe").  As of the date of this Report, the CAM understands that the Company is working to get this authority incorporated into the ENV-1008 procedure, which sets forth Environmental Officer roles and responsibilities.  *See* Employee Interview/Call Notes.

course participants.  According to a feedback report from the Operational Excellence course, "[w]hat is very clear from discussions with participants, course feedback and observation is that there is a genuine hope for measurable change based on what they have provided, but concern is slowly growing that the time they have been required to spend at the event is having no effect." *Operational Excellence: Participant Feedback Q2 2019* (July 31, 2019), PCL_ECP00132923-56, at PCL_ECP00132925.  More recent CAM Team discussions and interviews with crew members from across brands, departments, and positions indicate that such concerns persist.  *See* Employee Interview/Call Notes.  While it appears that great strides have been made to create a culture of trust, care, openness, and speaking up during CSMART trainings, the Company's challenge is to carry and sustain that culture aboard the Company's ships and in its shoreside offices.

In addition to the CSMART courses, the CAM Team plans to examine other training correlated to ECP Year Three areas of focus, including:  (1) IT resources training; (2) investigations and root cause analysis training; (3) training for specific jobs or personnel (both officers and ratings); (4) training for the Company's Global Talent Partner recruits; (5) compliance training for corporate leadership, including the Boards of Directors; and (6) other compliance-related trainings, including computer-based trainings and shipboard trainings, which are an area of frequent complaints regarding timing requirements, recordkeeping requirements, and content (including that onboard environmental trainings are not sufficiently tailored to the work of those receiving the training).  *See* CAM Third Annual Work Plan at 14.

### F.    Implementation of Enumerated ECP Requirements

The CAM Team continues to monitor the Company's implementation of enumerated ECP requirements with discrete deadlines.  The majority of these requirements and associated

deadlines took effect during ECP Years One and Two.  *See* CAM First Annual Report at 13-14 and Appendix D (assessing the Company's efforts to meet enumerated ECP Year One requirements); CAM September 2018 Quarterly Report at 15-16 (assessing the Company's efforts to meet enumerated ECP Year Two requirements).  In addition, the Company was required to conduct an incident trend analysis during the second quarter of ECP Year Three.  *See* CAM December 2019 Quarterly Report at 69-75 (assessing the Company's ECP-required trend analysis).

For the current ECP quarter, the Company was required to implement revisions to the Environmental Control System on Covered Vessels by December 31, 2019.  *See* ECP § IX.B. The Environmental Control System is a program established under the ECP that requires the "control" of certain vulnerable points (*e.g.*, pipes and valves) on ships that could be used to make an unauthorized discharge into the sea, such as by installing seals or padlocks.  *See* ECP § IX.B.1 (requiring the Company to implement an Environmental Control System program to "deter and detect unauthorized discharge of vessel waste streams through vulnerable pipework connections").  During ECP Year One, the Company developed and implemented a methodology, referred to as a "vulnerability assessment," to identify vulnerable points on ships required to be controlled under the program.  CAM Second Annual Report at 29 (citation omitted).  However, the original vulnerability assessments were not performed consistently, leading some ships to install more seals than required and "making onboard management of the program quite challenging."  *Id.* at 30.  During ECP Year Two, the Environmental Corporate Compliance Manager led an extensive effort to review and revise the vulnerability assessments to "reduc[e] the number of seals onboard to a manageable level that still acts as an effective means to deter and detect improper discharges."  *Id.* at 29-31.  This effort resulted in revisions to

March 27, 2020

both the ECP and the Company's internal procedures.  Among other items, the revised Company procedures required the following actions to be completed by December 31, 2019:  (1) reducing the number of portable pumps onboard to below certain threshold numbers; designating each portable pump with a hose; and identifying/marking, designating/color-coding, and storing the designated portable pumps and hoses as specified in the procedure; (2) reducing the number of seals to a maximum of one hundred per ship; and (3) grouping padlocks into six categories (with a single key to provide access to each category) and color-coding the padlocks by category.  *See ENV-1203 Minimization and Control of the Use of Portable Pumps and Their Designated Hoses*; *ENV-1204 Environmental Control System.*

The Company reports that implementation of these requirements was completed on all Covered Vessels by the December 31, 2019 deadline, with one exception.  *See Maritime Operations Monthly Dashboard January 2020* (Feb. 10, 2020), at 8.[94]  Beyond these requirements, the Environmental Corporate Compliance Manager's ECP Technical Consultant Engineer put together several short "micro-learning" videos, each of which is based on a system in the engine room (such as sewage treatment or Advanced Air Quality Systems) and describes the methodologies and points to be controlled in those systems.  *See id*.

### G.    Initiatives Beyond Enumerated ECP Requirements

The Company continues to develop and implement initiatives that go beyond the enumerated ECP requirements.  *See* CAM First Annual Report at 4, 19-21 and Appendix B; CAM Second Annual Report at 31-43; CAM December 2019 Quarterly Report at 75-85.  Notable recent developments are summarized below.

---

[94] On one AIDA ship, the third requirement (color-coded padlocks) was completed in late February 2020 due to a delay in delivering the color-coded padlocks to the ship.  *See id.*; *see also* Employee Interview/Call Notes.

March 27, 2020

1.    IT Systems and Tools

The Company continues its efforts to leverage IT systems and tools in support of compliance.  As previously reported, the CAM has observed that the Company's maritime IT resources are non-centralized (with different systems—or versions of systems—in use by different brands) and described by numerous Company personnel as outdated.  *See* CAM December 2019 Quarterly Report at 75-76.  The Company has recognized and taken steps to address its need for more centralized, modern, and data-driven strategies.

*i.    Updates on New Initiatives*

During shoreside visits this ECP quarter, the CAM Team has learned about new initiatives to leverage technology to improve the Company's overall visibility into data and information, including:

- **Global Maritime Data Lake.**  A corporate-wide project is underway to migrate data from various systems (*e.g.*, SeaEvent, Neptune) into a "global maritime data lake,"[95] which would enable more advanced analytics, such as correlating incident data with data on weather conditions, training records, or personnel onboard.  Each brand would have access to its own data from the data lake for performing analytics; and

- **SCADIS Module for Optimizing Crew Complements.**  One of the Company's operating lines, Costa Group, has retained a German institute to develop an algorithmic software to support optimum crew complement levels based on role-specific work tasks and national laws, regulations, and rules (*e.g.*, rest hour requirements).  The software is still in the development stage while Costa Group collects the necessary information on its crew (*e.g.*, assigned work tasks).  During this information-gathering phase, crew members enter information into the software's "task collector" every time they perform a task, including when they started and stopped the task, the nature of the work involved, and any other pertinent variables.  This information is received shoreside, where it can be reviewed and analyzed, akin to a time-motion study.  Once the information-gathering phase is complete, Costa Group plans to work with the institute to develop and deploy an algorithm to assist in understanding crew complement needs and strategies.  As of December 2019, the software was being piloted on two ships (one AIDA and one Costa), with plans to

---

[95] A "data lake" is a system or repository of data stored in its natural or raw format.  It can include structured, semi-structured, unstructured, and binary data.

deploy it on at least two other ships thereafter.  Currently, the initiative covers the deck and engine departments.

*See* Employee Interview/Call Notes.

In addition, the Company has engaged a data science consulting firm, Valkyrie, to examine the Company's current analytical capabilities and assist in analyzing the Company's existing data sets to identify "opportunities for improvement in processes, systems or training & communication as they relate to compliance."  *See* October 2019 Final Strategic Plan at 24-25. The Company's existing data sets are uncorrelated (*i.e.*, decentralized and siloed across brands), which has created historic barriers to the ability to perform holistic, corporate-wide data analysis or to develop meaningful corporate-wide metrics and key performance indicators.  *See* Employee Interview/Call Notes.

As part of its initial efforts, Valkyrie is providing the Company with prototype models that analyze three principal areas:

- **Food Waste**:  The purpose of this prototype model is to identify opportunities to reduce food waste by analyzing data collected from over one hundred ships over a two-week period;

- **Oily Water Separator/Oil Content Meter Work Orders & Failures**:  The purpose of this prototype model is to quantify the reliability of Oily Water Separators and Oil Content Meters and identify the causes of failures by assessing Planned Maintenance System records from Princess ships; and

- **Unplanned Work Orders**:  The purpose of this prototype model is to identify broad correlations between nautical conditions and unplanned work orders by reviewing Planned Maintenance System records from Princess ships and Neptune data, such as temperature, depth of sea bed, and speed.

*See* Valkyrie, *Carnival Phase 1 Read Out* (Dec. 20, 2019), PCL_ECP00150714-88.  In most instances, the prototype models rely on information from limited data sets (such as Planned Maintenance System records only for Princess ships), and preliminary conclusions are not extrapolated across all of the Company's brands.  Rather, the purpose of the prototype models is

to develop and test a base model using test data to ensure that the parameters are successful and defensible. *See id.*

Going forward, Valkyrie proposes to rely on a technique called "data virtualization" to correlate otherwise siloed data across all of the Company's brands. Data virtualization allows for the integration of siloed data (regardless of factors such as format or location), and provides a means for accessing, managing, and delivering the data in real time to applications accessible by end-users. *See id.* at PCL_ECP00150768. This approach, in theory, would enable the Company to take a more holistic view of its data, and to develop corporate-wide metrics and key performance indicators that allow for a more targeted, informed, and proactive approach to addressing compliance challenges.

The CAM understands that this project is in its early stages and looks forward to monitoring its progress.

> ii.   *Updates on Previously Reported Initiatives*

Updates on other IT initiatives on which the CAM has previously reported include:

- **Neptune**. The Company continues to develop and deploy modules of its Neptune platform across the brands, which should enhance its fleetwide data collection and analysis efforts.[96] Neptune is an internally-developed platform that utilizes individual modules (*i.e.*, a part of a program that contains one or more individual functions), which are focused on onboard, real-time data analytics. New modules that the Company is developing and deploying include Neptune LAB and Neptune Electronic Seal. Neptune LAB provides for access to raw data collected from Neptune sensors on ship equipment, including data relating to Advanced Air Quality Systems, engines, propulsion, and nautical/navigational status. The primary goal of Neptune LAB is to leverage raw data to analyze engine performance around various targets. This module went live at the end of 2019. Neptune Electronic Seal provides for the functionality to send immediate alerts shoreside if a seal (including an Environmental Control System seal) is broken on a ship. It requires the Company to replace plastic seals with re-usable electronic seals that have sensors. This module is currently in the

---

[96] The Company requested that the CAM clarify that Neptune "was developed prior to the ECP and was not created in response to an ECP requirement." *See* Company Draft Report Comments.

testing phase and is not yet live corporate-wide.  *See* Employee Interview/Call Notes; Event Notes;

- **Global HESS**.  The Company reports that it now has Global HESS "modules for audit tracking, managing tasks and a calendar showing ship visits."  January 2020 Probation Supervision Report, Attachment 3, at 9.  In addition, the Company has upgraded the system to include implementation of a "Root Cause Analysis tool for ECP TPA audits."  *Id.*  It has also implemented electronic checklists for monthly Operating Line Compliance Manager reports, and plans to expand this functionality to other electronic forms and checklists to "reduce paper and e-mail traffic."  *Id.*  The Company has developed and is currently testing a Global HESS mobile application to enhance the application and utility of the electronic forms and checklists.

  Further, the Company reports that it has improved the procedure revision suggestion system within Global HESS.  For instance, one operating line, Costa Group, has developed a new system in which suggestions submitted from ships are immediately assigned to a shoreside subject matter expert.  The assigned individual reviews the suggestion and either accepts or rejects the proposed changes.  If the changes are accepted, the proposed revision is forwarded to the Marine Policy & Analysis group at All Brands Group for final review, approval, and incorporation into the procedure.  *See* Employee Interview/Call Notes;

- **SeaEvent.**  SeaEvent is the Company's new centralized, corporate-wide incident and near miss reporting and case management system.  *See* CAM Second Annual Report at 36; CAM December 2019 Quarterly Report at 77-78.  Rollout to all ships across the Company's brands was completed in November 2019.  *Id.* at 77.  SeaEvent "allows the data capture, management, analysis and reporting of Health, Environmental, Safety, Security, Technical and other operational events" related to the Company's ships.  *See SeaEvent Overview* (Nov. 12, 2019), PCL_ECP00143497-516, at PCL_ECP00143499.  SeaEvent has the potential to improve the consistency of the Company's incident and near miss reporting, and enable better fleetwide information-sharing and tracking, trending, and analysis of incident and near miss data;

- **GLADIS.**  GLADIS is a single learning management system that deploys and tracks training, including environmental training.  *See* CAM Second Annual Report at 83; CAM December 2019 Quarterly Report at 78-79.  The system harmonizes the Company's computer-based training across all brands.  The Company is currently testing an upgraded version of GLADIS that would allow for:  (1) greater administrative control and management; (2) defined information about training completion dates; (3) communication with attendance applications during instructor-

led trainings;[97] and (4) standardized assessments to measure performance during drills.[98]  *See* Employee Interview/Call Notes; and

- **Marine Asset Strategies Transformation ("MAST").**  Under the MAST initiative, the Company expects to develop a single planned maintenance and spare parts management system (with consolidated cross-brand inventory indices).  The Company believes that the new system will improve its ability to efficiently deliver spare parts to ships, including those that are needed to keep shipboard pollution prevention equipment in working order.  *See* CAM Second Annual Report at 83; CAM December 2019 Quarterly Report at 79.  The system's functionality would include allowing the Company to monitor the location and status of its spare parts inventory across the entire fleet.  *See id.*; *see also* MAST Update (Nov. 13, 2018), PCL_ECP00083937-40; October 2019 Probation Supervision Report, Attachment 3, at 11.  To support this functionality, the Company is exploring the deployment of mobile devices to shipboard engineers to assist in addressing the availability, reliability, and maintainability of pollution prevention equipment.  *See* Employee Interview/Call Notes.  Once the single planned maintenance and spare parts management system is in place, the Company reports that its next step (estimated for approximately 2025 and beyond) will be the creation and stocking of centralized spare part inventory warehouses to physically store and deploy the parts.  *See id.*

- **"OneOcean" Voyage Planning Software.**  The Company has executed a contract with a vendor to develop software that could help address voyage planning challenges, which often are described as resulting from misunderstandings or miscommunications as to the location of environmental boundary lines and/or the applicable requirements within a set of environmental boundary lines.  *See* CAM Second Annual Report at 37-39; July 2019 Probation Supervision Report, Attachment 3, at 11.  The software would, among other things, aim to integrate information about environmental boundaries and standards—including the Company's own requirements, which may be more stringent than those set by regulatory bodies—into the electronic navigational charts used by ships, replacing the current "WorldWide Cruising Standards spreadsheet [*i.e.*, the Matrix] approach."  *See* CAM Second Annual Report at 37; CAM December 2019 Quarterly Report at 79-80.  As of March 23, 2020, the Company reports that the software, called OneOcean, is "still under development," with the vendor "contractually obligated to deliver the survey in mid-

---

[97] The Company is developing an offline scanning application to scan crew member IDs to assist in recording attendance at shipboard trainings.  *See* July 2019 Probation Supervision Report, Attachment 3, at 13.  The application "will be interfaced with GLADIS to automatically update a crew member's training file."  *See id.*; *see also* Carnival Corp., *MPD CAM ECP Request Feedback* (July 12, 2019), at 4.

[98] The Company is developing an offline, tablet-based application to "assess training and drills, using a competency based assessment approach for either individuals or teams."  July 2019 Probation Supervision Report, Attachment 3, at 13.

March 27, 2020

May.  Assuming the software meets all requirements at that time, Carnival will pilot the software on a ship as early as July." *See* Company Draft Report Comments.

### iii.    Ongoing CAM Team Examination

The CAM Team will continue to monitor the development and implementation of these initiatives, and to learn more about overall corporate and brand/operating line IT strategies and areas of potential improvement.  This will include monitoring the status of IT-related initiatives in the Company's Ethics and Compliance Program Strategic Plan, including efforts to: (1) "[f]orm a cross-brand and cross-functional 'IT Compliance Committee' and 'tech teams' (similar to the 'tiger teams' on the food waste initiative);" (2) "[c]onduct a sample of ship visits to identify, catalogue and prioritize current IT problems, limitations or deficiencies that inhibit effective compliance behaviors, practices or functions;" and (3) "[r]eview data sources and platforms for analyzing information, including both structured and unstructured sources, with the objective of facilitating three dimensional understanding of operational challenges and identifying opportunities for improvement in processes, systems or training & communication as they relate to compliance."[99]  *See Corporate Compliance Manager's Quarterly Environmental Compliance Report Q3 2019*, PCL_ECP001447152-273, at PCL_ECP001447167, 71, 74; October 2019 Final Strategic Plan at 24-25.  The CAM Team also intends to explore the incorporation of IT-related expenditures into the Company's financial and strategic planning processes.

### 2.    Fleet Environmental Officer Program

The Company continues to work on developing a Fleet Environmental Officer Program, described by the Company as a "fleet environmental compliance trainer officer program"

---

[99] The CAM understands that the Valkyrie initiative, discussed above, is part of this effort.

March 27, 2020

designed to "provide training, coaching, and mentoring to environmental officers as well as environmental training to employees of the Deck, Technical, and Hotel departments." *See* CAM Second Annual Report at 39-40; January 2020 Probation Supervision Report, Attachment 3, at 6. In January 2020, the Company completed the hiring process for the Director of the Fleet Environmental Officer Program, appointing an individual whose background includes over fifteen years with Holland America Line as a Safety, Environmental, and Health Officer, as well as more than twenty years with the United Kingdom Royal Navy. *See* Employee Interview/Call Notes. The Director will be tasked to "develop, implement and manage an Environmental Compliance training program that is designed to promote a culture of compliance and learning." *Job Description – DIRECTOR, Fleet Environmental Compliance Training Program* (Sept. 12, 2019). The position's functions will include "[e]stablish[ing] and direct[ing] a team of approximately ten Fleet Environmental Compliance Officers who perform training that includes:

- Environmental compliance training for Environmental Officers onboard their assigned ships.

- Special environmental compliance training for Deck, Technical and Hotel employees onboard their assigned ships.

- Special environmental compliance training and/or facilitation of training at the company's CSMART training academy and shore-side centers of excellence."

*Id.*

If successfully implemented and supported, a Fleet Environmental Officer program could help address the ECP obligation to have a sufficient number of Environmental Officers to meet fleet needs, *see* ECP § IV.A.1, and provide the advantage of having a group of Fleet Environmental Officers who could provide support, consistency, and oversight to the more than two hundred Environmental Officers across the Company. The program could also provide additional career opportunities for individuals in the unique Environmental Officer role. *See*

March 27, 2020

CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer position, including lack of a clear career path).  The CAM Team will continue to monitor the development and implementation of this program.

3.      Holland America Group Workload Study

As discussed in prior CAM reports, one of the Company's operating lines, Holland America Group,[100] retained third-party consultants to conduct two complementary studies:  (1) a human factors study, performed by MTO Safety, of the human factors related to prohibited discharges, which was finalized in May 2019 and summarized in the CAM Second Annual Report;[101] and (2) a workload study for onboard technical/engineering and Environmental Officers, performed by DNV GL, to "complement the human factors review to determine whether the work load expectations are reasonable or whether staffing changes need to be made to allow crewmembers to complete required tasks in compliance with work and rest requirements," which was finalized in November 2019 and summarized below.  *See id.* at 49-53

---

[100] The Holland America Group operating line includes the Princess, Holland America Line, and Seaborn brands.  It also includes the P&O Australia brand, which does not operate any Covered Vessels.

[101] The human factors study identified "latent conditions contributing to non-compliant discharges" related to seven themes:  (1) regulations and procedures; (2) culture and attitudes; (3) workload balance; (4) competence, training, and qualifications; (5) communication, teamwork, and distribution of accountabilities; (6) work tasks and support systems; and (7) technical status of the ships.  *See* CAM Second Annual Report at 49-50 (citations omitted). For each latent condition, the final report provided "suggestions [for] how to improve performance and prioritiz[e] improvement opportunities."  *Id.* at 51 (citations omitted).  It also identified "nine different areas where identified problems could be reduced by implementation of suggested actions."  *Id.* at 51-52 (citations omitted).  The final report also made three recommendations to the Company "for sustainable, long term improvement:"  (1) consider "new concepts for ship design and retrofitting old ships to proactively manage stricter environmental regulations;" (2) build "a sustainable environmental awareness and commitment culture and move away from a culture based only on compliance and procedures;" and (3) make use of "new technology to facilitate management of discharge operations."  *Id.* at 52 (citations omitted).

March 27, 2020

(citations omitted).  The studies were commissioned in response to prohibited discharge incidents on Holland America Group ships during 2018.  *See* CAM December 2018 Quarterly Report at 9-10 (discussing the incidents which prompted the studies).

The final report for the DNV GL workload study was issued on November 1, 2019.  *See* DNV GL, *Workload analysis of HA Group Technical and Environmental Officers*, Report No. 2019-9346 (Nov. 1, 2019), PCL_ECP00149393-602 ("Holland America Group Workload Study"), at PCL_ECP00149394.[102]  The objective of the study is "to establish an impartial evaluation of the workload assigned to technical and environmental officers, the adequacy of current manning levels and organizational structures, and to identify areas where the productivity and efficiency of [Holland America Group's] onboard technical and environmental organization can be improved."  *Id.*[103]

The report makes some positive observations, including that technical/engineering and Environmental Officers "are motivated and committed to work to the best of their ability;" that management "recognizes that there are issues with too high workload in the technical department;" and that numerous initiatives "are already ongoing to improve the effectiveness of work processes on board,"[104] with "many good practices to share across ships and brands."

---

[102] The CAM Team received a copy of the final report on January 30, 2020.

[103] The study's methodology included:  a psychometric survey sent to all onboard technical/engineering and Environmental Officers on Holland America Group ships, as well as some officers on leave (415 responses were received out of a total survey population of approximately 650 officers); interviews with onboard officers during ship visits that lasted up to six days (average of fifteen officers per ship on seven ships); validation workshops held with representatives from each brand for each officer position during a five-day period at CSMART; three additional review workshops; one additional ship visit (focused on Alaska-related findings, Environmental Officer-related findings, and Princess-related findings); and periodic conference calls and email discussions.  *See id.* at PCL_ECP00149421.

[104] One listed example is the MAST initiative, discussed above.  *See infra*, Part III.G.1(ii).

March 27, 2020

Holland America Group Workload Study at PCL_ECP00149398. Identified good practices include: two-hour lunch breaks on Princess ships; a Technical Clerk position on Princess ships, who "[s]upports and relieves the Chief [Engineer] with administrative work;" a formal mentoring program for engineers on Princess ships; and senior positions for certain ratings (*i.e.*, machinists, wipers, and repairmen) on Holland America Line ships, an organizational structure that helps to both relieve senior technical/engineering officers from daily tasks and "empower the ratings, increas[ing] their ownership of task duties." *See id.* at PCL_ECP00149427-28, 520-21. Such practices "are important to highlight and share across ships and brands to help in the process of improving the working environment onboard." *Id.* at PCL_ECP00149427.

Overall, the final report identifies: a range of workload challenges facing technical/engineering and Environmental Officers; ten prioritized actions for reducing workload; an additional sixty-one recommendations for reducing workload, grouped into "four primary improvement areas;"[105] and five recommendations for the rest of the Holland America Group organization to consider as a "way forward to gathering broader and deeper insight into workload experienced" in the organization. *See id.* at PCL_ECP00149402-07.

Workload challenges identified in the report include those related to:

- **Administrative Workload.** High administrative workload is "a major challenge for the technical and environmental officers," including reporting, managing spare parts, and email correspondence. *Id.* at PCL_ECP00149402. Challenges include: a significant amount of manual and paper-based processes; frequent changes to Global HESS and environmental compliance requirements; duplicate administrative work; lack of automated logging; and software that is not user-friendly. *See id.* These tasks "reduce time for onboard leadership and maintenance jobs." *Id.* As a result, Holland

---

[105] The four primary improvement areas are: (1) *Task Requirements*: standardize and digitalize routine and administrative tasks and reporting; (2) *Physical Conditions*: improve working environments through user-centered design; (3) *Social and Organizational Factors*: make changes to organization and process to better distribute workload; and (4) *Individual Factors*: offer tailored support to cater to individual's developmental needs. *See id.* at PCL_ECP00149404-05, 29.

America Group "may not be using its key personnel in key positions as efficiently or effectively as they could be." *Id.* Related prioritized actions and/or recommendations for reducing workload include:

- o Implement automated logging and recordkeeping;

- o Remove duplicate recordkeeping;

- o Simplify the use and accessibility of Global HESS;

- o Optimize the spare part purchasing and procurement process for onboard end-users; and

- o Perform a rationalization of the administrative tasks directed to certain senior technical/engineering officers "to determine which tasks can be delegated to other functions so that the Officers can return to their core business." *Id.* at PCL_ECP00149404; *see also id.* at PCL_ECP00149513-15.

- **Under-Manning.** It is "a challenge to man the ships with enough qualified officers for all positions." *Id.* at PCL_ECP00149402. As a result, numerous Holland America Line and Seabourn ships "have had to substitute, for at least the duration of a contract, certain officer positions with lower ranked positions in order to stay on complement (e.g. First Electrical Officer covered by a Second or Third Electrical Officer)." *Id.* Further, there are "cases where the ship had to sail under complement because no substitution was available." *Id.* Officers at Holland America Line and Seabourn have expressed a particular concern that "experienced officers leave their ship to join another company, ship and/or group for more attractive total rewards, and a better working environment with less perceived pressure." *Id.* at PCL_ECP00149430. Related prioritized actions and/or recommendations for reducing workload include:

  - o Make the "Total Rewards" system (*i.e.*, salary and benefits) more competitive—that is, "in line with the benefits of the deck officers, in proportion to the increasing size of ships that add work to regular maintenance, in proportion to the fewer benefits but higher perceived workload for [Seabourn] officers." *Id.* at PCL_ECP00149436.

- **Competence.** Officers "express concerns that some officers have competence gaps." *Id.* at PCL_ECP00149402. These may relate to a lack of experience in the cruise industry, Holland America Group, and/or on the ship. *Id.* As a result, "the qualified personnel have to monitor and sometimes compensate for the lesser qualified personnel and thus struggle with higher workload from pressure to fulfill their own duties and monitor the duties of others as well." *Id.* From the ship's perspective, therefore, "being on complement is not a goal in itself, because in practice, officers who join a ship without the necessary competence (skill/experience) tend to add to workload due to the need for mentoring and follow-up." *Id.* at PCL_ECP00149436. One reason for the lack of competent (*i.e.*, qualified but inexperienced) personnel

onboard "is that the cruise industry is booming, which makes it difficult for the company to access sufficiently competent personnel from outside. High workload with insufficient merit for one's accomplishments (e.g. positive acknowledgement) is a motivation for crew to leave a ship, and it is a great challenge for HR to replace these competent (skill and experienced) crew members." *Id.* at PCL_ECP00149439. Related prioritized actions and/or recommendations for reducing workload include:

- o   Implement a training program for new technical department members "which covers particulars about the relevant brand, the cruise industry, and the ship they will join, including the [Global HESS], environmental compliance, ship layout and position-specific requirements;"

- o   Implement a formal onboard mentoring program; and

- o   Share good practices on informal and formal recognition and appreciation of crewmembers to raise morale onboard and team cohesion. *Id.* at PCL_ECP00149518, 26-27.

- **Blame Culture.** There are indications of "an overarching perception of a blame culture where anyone can be held accountable for anything," especially regarding audits and inspections, where officers report "the perceived pressure to perform well." *Id.* PCL_ECP00149437. Many officers "feel that they are liable to be held directly responsible for audit findings, although full compliance with all requirements may be unrealistic considering how much time and resources [are] available." *Id.* This perceived blame culture results in "a reduction in proactiveness and ownership" and "a sense of helplessness," with some officers reporting "that they are starting to give up on being innovative and dedicated to improving their ship." *Id.* The "overarching perception of a blame culture in the company appears to be stronger on ships that are sailing under complement or on complement with insufficiently qualified personnel." *Id.* at PCL_ECP00149402. Related prioritized actions and/or recommendations for reducing workload include:

  - o   Implement "awareness and promotion campaigns and changes to audit and inspection practices to reverse the perception of a blame culture and instead develop a learning culture." *Id.* at PCL_ECP00149404.

- **Changes to Policies and Procedures.** Changes to policies and procedures "contribute a very high workload related to re-doing already completed work, as well as changing existing practices. There are reports of many changes to policies and procedures which are later undone, resulting in even more workload (and frustration onboard)." *Id.* at PCL_ECP00149522. Related prioritized actions and/or recommendations for reducing workload include:

March 27, 2020

- Send proposals for new and revised procedures to ships and invite input from onboard personnel; and

- Roll out changes to policies and procedures consistently across all systems. *Id.* at PCL_ECP00149522-23.

- **Training.** Feedback on the classroom training delivered onboard "is that the courses are very time consuming, often irrelevant to officers and planned without consideration of the Technical Department's maintenance schedule." *Id.* at PCL_ECP0014940. Feedback on computer-based training is that the quality is "good but does not properly target relevant courses to positions." *Id.* Officers "expressed the need for more tailor-made training that covers ship-specific issues and that answers to evolving competence requirements related to modernized systems and equipment." *Id.* Related prioritized actions and/or recommendations for reducing workload include:

  - Review onboard and computer-based training courses and modules for each position "to ensure maximum relevance and benefit in return for the time spent on training." *Id.* at PCL_ECP00149528.

- **Environmental Officers.** The workload of many Environmental Officers "appears to generally be manageable, provided that they get the support they need from the office and technical department onboard." *Id.* at PCL_ECP00149482. Related prioritized actions and/or recommendations for reducing workload include:

  - Providing Environmental Officers without a technical background with competence development opportunities that can increase their confidence in their role;

  - Determining how the Environmental Officer role can be seen as advocating environmental leadership rather than policing the crew onboard; and

  - Streamlining administration related to logging training needs. *Id.*

The report finds that "most challenges are shared across positions and across brands and that relatively few challenges are brand or position-specific." *Id.* at PCL_ECP00149402. In other words, "the challenges that the brands are facing appear to be more similar than different from each other." *Id.* at PCL_ECP00149425.

These workload challenges have consequences for individuals (*e.g.*, "feelings of insecurity, stress and fatigue"), as well as for the organization (*e.g.*, higher turnover rates "due to pressure from perceived workload"). *Id.* at PCL_ECP00149430. Some officers "have said that

they are currently looking to other employers because they are seriously concerned about the future.  They stated that they are no longer willing/able to endure the pressure." *Id.*  Other consequences to the organization "are lost time, errors, violations, incomplete tasks, and reduced vigilance for safety-critical tasks." *Id.*  The report finds that over ninety percent of survey respondents "agree or strongly agree with the statement that they know of people who have made mistakes because of their high workload." *Id.*  Feedback from DNV GL's assessment "includes reports about near misses where individuals missed alarms in the [Engine Control Room], have made wrong entries in their records, have made mistakes due to stress to get a task done (e.g. caused a black-out), have experienced miscommunication that could lead to environmental non-compliance, have taken short-cuts and shorter watch rounds, and have made mistakes in following procedures." *Id.*  These "are leading indicators of an increasing level of systemic risk, and the lessons from these near misses, incidents and accidents need to be learned to improve company practice and support safe operation of the fleet." *Id.*

The report's broader recommendations for the way forward for the Holland America Group organization as a whole include:  performing a similar workload study for shoreside personnel (including superintendents) "to better understand and remedy the workload issues that create conflicts between office and ship;" performing a similar workload study for the deck department "to better understand and remedy the workload issues that clash in the interface between the technical and deck departments;" and studying "how competence development of all ratings could alleviate high workload in the rest of the technical department." *Id.* at PCL_ECP00149407.

Overall, the findings of the Holland America Group Workload Study are in accord with findings and other observations by the CAM, TPA, RAAS, outside consultants, and other

March 27, 2020

internal and external studies and assessments.  The CAM commends the steps Holland America

Group has taken to better understand the causes of some of its continuing compliance challenges

through both the human factors study and the workload study.  What is most important is what

happens next—*i.e.*, the Company's response to these and other findings.  Holland America

Group reports that it has begun to take steps in response to the studies,[106] and that in 2020,

"teams will begin regular communications about the studies, our progress and action plans" and

solicit feedback from Company personnel.  *Id.*  These efforts, as well as any efforts to share

findings, lessons learned, and best practices with other operating lines, will be an ongoing area of

focus for the CAM.  *See infra*, Part III.I.7.

> ### 4.   Management of Change Procedure

Throughout the ECP period, crew members from across the Company have reported

concerns to the CAM Team regarding the additional workload and logistical demands associated

with new Company procedures and initiatives.  *See, e.g.*, CAM December 2019 Quarterly Report

at 84-85 (discussing concerns related to:  (1) the "Yellow Plus" and "Yellow with Operations

Director" procedures, which require additional senior-level engineering officers to be present in

---

[106] For example, Holland America Group has identified six key areas of focus in response to the MTO Safety human factors study:  (1) work task restructuring and workload reduction; (2) alarms and sensors; (3) simplification of environmental voyage planning; (4) integrated Bridge and Engine Room training and competence development; (5) information display and work stream improvements; and (6) culture.  Holland America Group, *HESS & Sustainability Newsletter*, Vol. 17, Issue 1 (Jan. 2020), at 3.  Specific actions where teams "have already begun work while keeping the DNV Workload study and Propel Culture Survey in mind" include: (1) adding Technical Clerks onboard Holland America Line ships in Fiscal Year 2020 and Seabourn in Fiscal Year 2021; (2) transiting to a new watch shift rotation schedule for engineers on Princess ships that includes adding engineers to each ship; and (3) moving First Engineers out of the watch to serve as mentors to junior engineers.  *Id.*

the Engine Control Room for certain operations that carry a risk of non-compliant discharges;[107]

and (2) a prohibition on discharges of a range of liquid waste streams inside twelve nautical

miles "where operationally feasible").

The CAM has observed that, though initiatives are well-intentioned, the Company's

senior management does not appear to apply management of change principles to "evaluate[] at

the outset what new challenges or trade-offs might result, in light of existing staffing levels and

workloads on the ships." *Id.* at 85. As described by the American Bureau of Shipping, a

management of change system:

> is a combination of policies and procedures used to evaluate the potential impacts of a
> proposed change so that it does not result in unacceptable risks. Developing an effective
> [Management of Change] strategy requires establishing, documenting, and successfully
> implementing formal policies to evaluate and manage both temporary and permanent
> modifications in the facility or ship including equipment, materials, operating procedures
> and conditions, and personnel.

American Bureau of Shipping, *Guidance Notes on Management of Change for the Marine and*

*Offshore Industries* (Feb. 2013), at 1.

The Company has recognized this shortcoming and reports that it is working to develop a

procedure for management of change. *See* January 2020 Probation Supervision Report,

Attachment 3, at 3; Employee Interview/Call Notes. The Company has set a completion date of

---

[107] The Holland America Group Workload Study, discussed above, observes that the
"increasingly stringent requirements regarding red and yellow manning are a significant demand
on the time for Chief [Engineers] (and other Operations Directors) and remove hours of a day
that they otherwise would spend on other duties." Holland America Group Workload Study at
PCL_ECP00149443. In particular, the "[r]ecent changes to yellow manning" are "adding
considerable workload to Operations Directors," who are now "required to be present during fuel
changeovers, overboard discharges and food waste discharges," which could add another
approximately two hours per week to their workload and impact their quality of sleep when these
tasks happen at night. *Id.* at PCL_ECP00149444. The study recommends ensuring "that red and
yellow manning procedures are standardized practice across the fleet so that senior technical
officers do not need to spend a disproportionate amount of time in the [Engine Control Room]."
*Id.* at PCL_ECP00149403.

April 30, 2020, for completing and publishing the procedures. *See Carnival Panorama* Digester

Allegations Investigation Report at 6. The CAM Team will continue to monitor and report on

this effort, including any draft or final procedures, as part of its broader review of whether and

how the Company implements management of change principles when new actions are taken.

> 5. <u>Other Initiatives</u>

The Company has instituted a number of other initiatives related to environmental

compliance and sustainability, ranging from policies, programs, surveys, IT projects, studies,

trainings, and other efforts. *See* CAM Second Annual Report at 31-43 and Appendix A. The

CAM Team will continue to monitor the Company's initiatives, including examining whether

these initiatives are: well-coordinated; designed to address systemic or root causes; and

developed with appropriate assessment of the additional workload or other impacts that may

result, including whether the Company utilizes management of change principles. *See* Dkt. No.

167.

Examples of recent initiatives include:

- An inaugural IDEA Conference hosted by Carnival Cruise Line in Miami, Florida, from January 22-24, 2020. The event is described by the Company as a forum on Inclusion, Diversity, Equity, and Aspiration. Attendees included approximately sixty Carnival Cruise Line shipboard officer or other management-level employees (mostly female). Agenda items included remarks, followed by an interactive "fireside chat," by a female Carnival UK ship captain and the female President of Carnival Cruise Line, along with workshops on topics such as unconscious bias, building and leveraging business relationships, defining equity, and the impacts of performance, image, and exposure over the course of a career. *See* PCL_ECP00147442-492, at PCL_ECP00147463; PCL_ECP00156301-498; Employee Interview/Call Notes. Feedback from attendees to the CAM Team has been positive. *See id.*;

- An Ethics & Compliance Week held in November 2019 at all Holland America Group offices "to highlight the importance of ethics and compliance at Holland America Group." Holland America Group, *HESS & Sustainability Newsletter*, Vol. 17, Issue 1 (Jan. 2020), at 7. Some ships also held events onboard. The theme was "Awareness, Recognition, Reinforcement," highlighting "the importance of being aware of our company's policies and procedures and reporting resources to ensure

March 27, 2020

that we are both ethical and compliant, recognizing employees who do the right thing by speaking up, and reinforcing such behavior by creating a positive work environment." *Id.* Events included the release of Holland America Group's new Code of Business Conduct and Ethics Users Guide for Employees, daily articles posted on internal intranets, videos, employee get-togethers with "sweet treats," and quizzes. *Id.* One ship per brand received a reward ($500 for its crew fund) for the most creative event onboard with the highest participation. *Id.*;

- Replacing paper environmental notice boards with digital signs across all Carnival Corp. ships, "after observing successful use of these notice boards aboard some Carnival Cruise Line and Holland America Group ships." *Id.* at 4. These signs are mounted in the main crew corridor and "display relevant environmental information such as Environmental Compliance Notices, Objectives and Targets updates and important contact information." *Id.*; and

- The launch of the Soundwaves podcast by the Carnival Corp. CEO, discussed above. *See supra*, Part III.A.4.

### H.    Environmental and ECP Violations

#### 1.    Overview

Although efforts aimed at compliance are underway, violations of environmental laws and the ECP persist. As the CAM has emphasized, these incidents are concerning, but should not distract from the Company's broader corporate leadership and culture issues. *See* CAM Second Annual Report at 94.[108]

The Company's violations on Covered Vessels reported during the period covered by this Report (October 19, 2019 – January 18, 2020) included incidents related to:

---

[108] Although this Report, like prior CAM reports, identifies the ships involved in certain incidents, the Company's compliance challenges are not limited to incidents occurring on the named ships. Rather, such incidents reflect the broader, systemic issues regarding the need to adequately support the ships and take appropriate action on compliance.

March 27, 2020

- Air emissions, including leaks of ozone-depleting substances from refrigerant gas systems; and emission violations associated with the use of, or failure to use, Advanced Air Quality Systems (discussed further below);

- Discharges to the sea, including discharges of:  Advanced Air Quality System washwater (discussed further below), ballast water,[109] black water/sewage,

  [*Text continues on following page.*]

---

[109] This includes:  the discovery of the discharge of approximately one hundred and fifty cubic meters of ballast water by the Holland America Line *Veendam* on December 27, 2019, inside United States territorial waters.  *See* Carnival Corp. Special Condition 13(a) Report (Jan. 16, 2020); Carnival Corp. HESS Weekly Flash Report (Jan. 22, 2020); and the discovery on the *Carnival Ecstasy* in November 2019 that the physical layout of ballast system pipes and valves "makes ship ballasting and de-ballasting operations noncompliant with the [International Maritime Organization] Ballast Water Management Convention" and United States Coast Guard regulations.  *See* Carnival Corp. Special Condition 13(a) Report (Nov. 22, 2019); Carnival Corp. HESS Weekly Flash Report (Nov. 27, 2019).  An Incident Analysis Group investigation of the *Carnival Ecstasy* incident found that the ship discharged a cumulative total of approximately five hundred cubic meters of untreated ballast water in Jacksonville, Florida, and approximately one hundred cubic meters of untreated ballast water in the Bahamas, in October and November 2019 before the issue was discovered.  *See Final Report Carnival Ecstasy (Carnival Fantasy Class) Discharge of ballast water not in compliance with USCG requirements*, IAG2019056 (Mar., 2020), at 1.  A similar ballast system piping issue was discovered on the *Carnival Imagination* and *Carnival Sensation*, but the Ballast Water Treatment System on the *Carnival Imagination* was not yet in operation and reportedly was corrected before the system was put into use, while the system on the *Carnival Sensation* was not yet installed and reportedly will be modified during installation to address the issue.  *See id.* at 5; Carnival Corp. HESS Weekly Flash Report (Dec. 4, 2019).

chemicals,[110] food waste, grey water,[111] oil and oily wastes,[112] recreational (*e.g.*, pool/Jacuzzi) water,[113] and solid items/garbage (including plastics);

- Pollution prevention equipment maintenance and operation, including incidents where Advanced Air Quality System components, ballast water treatment system components, food waste system components, incinerators, Oily Water Separators, and White Boxes have been out of service for more than a day; and

- Recordkeeping, including:

  o Allegations of potential falsifications of Planned Maintenance System records, discussed further below. *See infra*, Part III.H.2;

  o The discovery of two partially completed Oil Record Books in the drawer of an Environmental Officer's cabin on the *Sea Princess*, which the Incident

---

[110] This includes the discharge of approximately sixty-five liters of photo chemical waste by the *Majestic Princess* on October 25, 2019, in Fijian waters. Carnival Corp. Special Condition 13(a) Report (Nov. 22, 2019); Carnival Corp. HESS Weekly Flash Report (Nov. 27, 2019).

[111] This includes the discharge of approximately eighty cubic meters of ballast water contaminated with grey water by the *Carnival Conquest* on December 14, 2019, in Miami, Florida, due to a leak in a grey water pipeline passing through a ballast water tank. Carnival Corp. Special Condition 13(a) Report (Dec. 16, 2019); Carnival Corp. HESS Weekly Flash Report (Dec. 23, 2019). It also includes the discharge of approximately twenty-two metric tons of grey water during de-ballasting operations by the *Carnival Elation* on January 2, 2020, in Port Canaveral, Florida, due to a "disturbance" of an automatic valve "allowing grey water to enter the ballast line and therefore discharge overboard." Carnival Corp. Special Condition 13(a) Report (Jan. 3, 2020); Carnival Corp. HESS Weekly Flash Report (Jan. 8, 2020).

   In response to these and other incidents, the Company issued an Instructional Notice on January 8, 2020, implementing "additional precautionary steps that must be taken" prior to or during these operations, including requirements for monitoring and system checks. *See ENV/01/2020 Preventing Improper Discharges during Grey Water Transfer and Ballast Water Discharge Operations* (Jan. 8, 2020).

[112] This includes the leak of over one hundred and forty liters of oil from an azipod shaft seal on the Holland America Line *Nieuw Amsterdam* between December 2018 and January 2019. *See* ABSG, *Holland America Line Environmental Compliance Audit Report – Nieuw Amsterdam* (Jan. 31, 2020), at 4, 20-21 (Major Non-Conformity-1).

[113] This includes the discharge of approximately sixty cubic meters of pool water by the *Carnival Glory* on December 5, 2019, in Nassau, Bahamas. Carnival Corp. Special Condition 13(a) Report (Dec. 9, 2019); Carnival Corp. HESS Weekly Flash Report (Dec. 11, 2019). It also includes the discharge of approximately fifty-five cubic meters of pool water by the *P&O UK Aurora* on December 11, 2019, in Hamburg, Germany. Carnival Corp. Special Condition 13(a) Report (Dec. 12, 2019); Carnival Corp. HESS Weekly Flash Report (Dec. 18, 2019).

March 27, 2020

Analysis Group determined were started and later replaced with duplicate Oil Record Books "due to mistakes that were made in the originals" and "a perceived pressure not to make mistakes." *See* Incident Analysis Group, *Final Report Sea Princess (Sun Class) Partially Filled Oil Record Books*, IAG2019058 (Feb. 5, 2020), at 4, 6.  These "actions breached maritime and Company policy." *Id.* at 6.[114]  Although the investigation report found that the replacement Oil Record Books "were not started to intentionally change entries or to hide illegal transfers/discharges," *id.* at 1, the report does not examine other implications of this incident—including the possibility that an Oil Record Book not created in accordance with United States law might have been presented to United States regulatory authorities.[115]  Nor does the report include preventive actions aimed at addressing the underlying issues of blame culture (fear of making mistakes) and workload/staffing[116] that are identified as contributing to the incident.  Instead, the only two preventive actions relate to revising a Company procedure[117] and including the case in an upcoming bulletin.  *See id.* at 7;

o  The discovery that an engineer on the *Carnival Pride* had modified Daily Sounding Logs[118] entries for a one-week period during September 2019, in

---

[114] The investigation report also notes similar prior incidents on:  the *Carnival Miracle* on February 27, 2019 (use of erasable ink in the Oil Record Book); and the *Crown Princess* on November 15, 2018 (use of erasable ink in the Oil Record Book due in part to "[i]nsufficient communication regarding a similar incident onboard another corporate ship," "a perceived pressure not to make mistakes," and "distractions" such as "the number of alarms, the number of telephone calls that are not related to their watch, and contractors looking to sign" a log).  *See id.* at 5-6.

[115] The CAM notes that the Company's underlying criminal convictions in the current case include multiple counts of failure to maintain accurate records.  *See* Dkt. No. 30; *see also* CAM First Annual Report at 8-11.

[116] According to the investigation report, it was "believed that the engineers were making several mistakes due to distractions in the [engine] control room, such as answering alarms and taking phone calls." *Id.* at 4.  Crewmembers "highlighted distractions while on watch as the main issue." *Id.* at 6.

[117] The report notes that "Holland America Group shoreside management expressed concerns that the procedure for [Oil Record Book recordkeeping] was too complicated.  However, none of the crewmembers interviewed made any comments on this and highlighted distractions while on watch as the main issue." *Id.*

[118] "Sounding" is a term for taking a measurement of the amount of fluids in the tanks of a ship. *See* https://www.marineinsight.com/guidelines/how-and-why-to-take-manual-sounding-on-a-ship/.  A Daily Sounding Log is a paper log used to record tank quantities/volumes, including for "[a]ll sludge and bilge tanks associated with bilge water and/or oil residues (sludges)." *ENV-1201-A1 Daily Sounding Log*; *see also* CAM December 2019 Quarterly Report at 86 (discussing initial incident report).

March 27, 2020

violation of Company policy.  The Incident Analysis Group determined that the engineer felt "prompted" by a more senior engineer to modify the records to correct perceived errors "to avoid any potential audit findings."  *See* Incident Analysis Group, *Final Report Carnival Pride Falsification of the Daily Sounding Logs*, IAG2019051 (Dec. 9, 2019), at 3.  Among other factors, the incident was attributed to a lack of knowledge of the relevant procedure by both engineers; an ineffective handover period; the exercise of "a subtle pressure" by the more senior engineer on the more junior engineer; a failure to practice the "open communication" principle of Engine Resource Management; and a failure by either engineer to "speak up."  *See id.* at 9.  As with the *Sea Princess* incident, this incident raises concerns about the how the Company is addressing issues regarding blame culture, including fear of making mistakes and reluctance to speak up.  The report's preventive actions include reminding Carnival Cruise Line engineers through trainings and meetings that "they are empowered and required by the company to speak up and promptly report anything that is not environmentally compliant" and having a Fleet Chief Engineer "assess technical team communication skills at earliest opportunity" and "share observations and lessons learned" with the team.  *See id.* at 9-10;

o   The insertion of incorrect training dates (embarkation date instead of the actual date training was conducted) in training records on the Holland America Line *Zaandam* by a crew member who said they were "instructed to do so on the previous ships."  Carnival Corp. Special Condition 13(a) Report (Dec. 2, 2019); Carnival Corp. HESS Weekly Flash Report (Dec. 11, 2019); and

o   Various other errors and discrepancies in log books and records, including Oil Record Books, Oil to Sea Interface Logs, Advanced Air Quality System Record Books and computer data monitoring systems, fuel bunkering records (including missing fuel samples), and training records.[119]

*See Monthly Issue Tracker as of January 31, 2020 – Q1 2020* (Feb. 28, 2020); Carnival Corp.

Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

In addition, on February 10, 2020, the Company notified the Interested Parties, CAM,

and TPA of an administrative proceeding commenced by the NOAA related to discharges by

---

[119] The Company reports that it is retaining a third party "to undertake a review of the company's recordkeeping practices that will hopefully address certain root causes that create instances of improper recordkeeping."  *See* Company Draft Report Comments.

March 27, 2020

multiple Princess and Holland America Line ships in the Greater Farallones and Cordell Bank

National Marine Sanctuaries between 2015-2017.  *See* Email from Director of Corporate

Environmental Compliance, *U.S. v. Princess Cruise Lines Ltd. – Notice of Administrative*

*Proceeding* (Feb. 10, 2020).[120]  NOAA is assessing an approximately $1.4 million civil monetary

penalty for violations of the National Marine Sanctuaries Act.  *See* Letter from NOAA Office of

General Counsel to Carnival Corp., *Re: NOAA Case No. NW1703667 (Carnival*

*Corporation/Holland America Group).*  The Company's internal investigation determined that

the discharges were the result of voyage planning errors and inadequate shoreside support—

including the failure to notify ships that the marine sanctuary boundaries had expanded, or to

timely incorporate information about the expanded boundaries into the electronic "Matrix"

voyage planning tool used by ship officers.  *See Investigation Report M/V Grand Princess*,

PCL_ECP00042760-84, at PCL_ECP00042761.  The Company has continued to report

prohibited discharges and emissions related to voyage planning issues,[121] including at least one

NOAA marine sanctuary violation in ECP Year Three.[122]

---

[120] The NOAA investigation was previously reported to the Interested Parties, TPA, and CAM in June 2017.  *See id.*; *Notice of Violation #03-2017.*

[121] These include the discovery that the *Carnival Fantasy* made at least four non-compliant discharges of grey water and black water/sewage while sailing into and out of Progreso, Mexico due to a mis-calculation of the boundary where discharges are prohibited or restricted.  *See* Carnival Corp. Special Condition 13(a) Report (Feb. 11, 2020); Carnival Corp. HESS Weekly Flash Report (Feb. 19, 2020).  On March 2, 2020, the Company reported the further discovery that the *Emerald Princess* "identified that they sailed through a Pacifico Mexicano Profundo 'core' special area, where discharges are prohibited or restricted, on approximately 4 prior voyages and conducted discharge operations."  Carnival Corp. Special Condition 13(a) Report (Mar. 2, 2019).  Further, it appears that "other ships have also conducted improper discharges in Mexican Profundo core areas."  *Id.*  The Company is "reviewing records & identifying what improper discharges may have been made."  *Id.*

[122] These involved the prohibited use of the Advanced Air Quality System by the Holland America Line *Nieuw Statendam* in the Florida Keys National Marine Sanctuary, on November

March 27, 2020

Other incidents tracked by the CAM Team, which do not typically involve violations of environmental laws or the ECP, include bilge leaks/overflows; emissions of non-ozone-depleting refrigerant gases; Environmental Control System program issues, such as broken or missing seals with no evidence of intentional tampering; and near misses.

These incidents are reported to the CAM Team through formal and informal reporting mechanisms, including:  audit findings (both internal and external); CAM Team visit findings; Flash Reports; Environmental Open (Hotline) Reports; Special Condition 13 Reports required under the Probation Agreement;[123] notices to the Office of Probation; and other notifications. *See* Third Annual Work Plan at 7.  The CAM Team continues to track and assess issues associated with these incidents, including issues related to:  shoreside support, such as concerns related to workload/staffing, IT systems, waste vendors, spare parts, training, or policies and procedures; and workplace/culture, such as concerns related to blame culture, retaliation, discrimination, harassment or bullying, or unsafe working conditions.  The CAM also reports to the Interested Parties as required by the ECP.  *See* ECP §§ III.D.6, VI.F.6.

As discussed in prior CAM reports, the CAM Team tracks and analyzes incident report data, but no longer compiles this data in CAM reports.  As the Company has noted, apparent

---

30, 2019, due to "a misunderstanding of what the sanctuary limits were."  *See* Carnival Corp. Special Condition 13(a) Report (Dec. 23, 2020); Carnival Corp. HESS Weekly Flash Report (Dec. 30, 2020).

[123] As part of the Probation Agreement, the Judgment in this matter was amended to include a revised Special Condition of Probation 13 that establishes enhanced reporting requirements for the Company.  Among other things, the Company must, under Special Condition of Probation 13(a), inform the Interested Parties, CAM, and TPA of any:  (i) breach of the ECP; (ii) breach of the plea agreement; (iii) violation of the conditions of probation; (iv) violation of any Marine Environmental Protection Requirement; (v) violation of any applicable United States (federal or state) environmental law; (vi) violation of certain international maritime environmental law conventions; or (vii) credible allegations, including Environmental Open (Hotline) Reports, of violations of the ECP or environmental law.  *See* Dkt. No. 134, at 12-13 (Ex. B).

March 27, 2020

trends in the data may reflect trends in rates of reporting, which can be a positive development, rather than trends in actual incident occurrences.  *See* CAM September 2019 Quarterly Report at 95-96.  Further, as the Court has observed, focusing on individual incidents on ships can distract from the most pressing barriers to compliance, which are the Company's broader culture issues. *See, e.g.*, Status Conference Tr. at 5-6 (Apr. 10, 2019).

2.    Planned Maintenance System Recordkeeping

The CAM has previously reported on concerns about findings of apparent falsifications of Planned Maintenance System records on multiple Company ships, where crew members have indicated that work orders for planned maintenance tasks (such as inspections, cleanings, and alarm testing) have been completed when the work has not actually been done.  *See* CAM December 2018 Quarterly Report at 6-8 (discussing incident involving inaccurate entries for three Planned Maintenance System tasks related to oily bilge water management); CAM September 2019 Quarterly Report at 55-59, 90 (discussing apparent inaccuracies of Planned Maintenance System entries related to inspections of oily bilge water processing equipment); CAM December 2019 Quarterly Report at 87, n.65 (discussing internal audit finding involving inaccurate entries for a Planned Maintenance System task related to oily bilge water tank inspections).

On February 17, 2019, the Company notified the Interested Parties, CAM, and TPA of new allegations regarding Planned Maintenance System inaccuracies and other related issues in an Environmental Open (Hotline) Report by a Carnival Cruise Line employee.  According to the notification, the employee "put in his employment resignation via an email alleging possible inaccuracies in the Planned Maintenance System and closeout of work orders prior to completing the work."  Letter from Environmental Corporate Compliance Manager, *Environmental Open*

March 27, 2020

*Report #31-2020* (Feb. 17, 2020).  The Incident Analysis Group is investigating the complaint.  The CAM Team will continue to monitor and report on these allegations, including the Company's investigation and response.

The Holland America Group Workload Study discussed above, *see supra*, Part III.G.3, also notes workload concerns associated with planned maintenance tasks, including that the tasks contained in a ship's Planned Maintenance System may not accurately reflect the tasks required for that ship.  *See, e.g.*, Holland America Group Workload Study at PCL_ECP00149513.  The study recommends efforts to "[v]alidate the accuracy and completeness of [the Planned Maintenance System] so that it correctly covers the required planned maintenance for the ship."  *See id.* at PCL_ECP00149404.

### 3.    Advanced Air Quality Systems

The CAM Team is continuing to examine issues related to the Company's use of Advanced Air Quality Systems throughout ECP Year Three and beyond.  *See* CAM December 2019 Quarterly Report at 89-91.  Also referred to as Exhaust Gas Cleaning Systems, these systems remove sulfur oxide compounds from a ship's engine and boiler exhaust gases.  *See* EPA, *Exhaust Gas Scrubber Washwater Effluent* (Nov. 2011), https://www3.epa.gov/npdes/pubs/vgp_exhaust_gas_scrubber.pdf.  ("EPA Exhaust Gas Scrubber Report").  The Company's Advanced Air Quality Systems use an "open loop" design, in which seawater drawn from the ocean is used as washwater that is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulfur oxide compounds from the exhaust.  *See id.*; *see*

*also* Event Notes.  The washwater is "filtered and mixed with sea water" before being discharged

back to the ocean.  *See* Company Draft Report Comments.[124]

>    i.   *Incidents*

As noted above, the Company experienced multiple incidents related to its Advanced Air

Quality Systems during the period covered by this Report, including emission exceedances,[125]

prohibited washwater discharges,[126] and equipment failures or malfunctions.[127]

---

[124] This is in contrast to a "closed loop" design, which uses freshwater injected with caustic soda as the washwater.  The washwater in a closed loop system can either be discharged into the ocean or held onboard for disposal shoreside.  *See* EPA Exhaust Gas Scrubber Report at 1.

[125] These included:  burning heavy fuel oil for approximately seven minutes while underway towards Puerto Vallarta, Mexico, in violation of MARPOL Annex VI by the *Emerald Princess* on October 27, 2019; burning heavy fuel oil for approximately four minutes in the North American Emission Control Area in violation of MARPOL Annex VI by the *Carnival Valor* on November 27, 2019; burning heavy fuel oil for approximately twenty-four minutes while in the North American Emission Control Area in violation of MARPOL Annex VI by the *Star Princess* on December 12, 2019; burning fuel with a sulfur content of 3.16% instead of 0.5% for approximately three hours and eighteen minutes while in port in Grand Turk Island, in violation of MARPOL Annex VI by the *Costa Luminosa* on January 1, 2020; and burning heavy fuel oil for approximately six hours and twelve minutes while underway towards Cartagena, Colombia, in violation of MARPOL Annex VI by the *Island Princess* on January 2, 2020.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[126] These included:  the discharge of Advanced Air Quality System washwater for several days with an overboard pH below the ship's specific limit of 4.9 in violation of  MEPC.259(68) by the *AIDAdiva* between June and late October of 2019 in various locations; the discharge of Advanced Air Quality System washwater for sixty-nine minutes with an overboard pH of less than 6.0 in violation of the United States Environmental Protection Agency Vessel General Permit by the Holland American Line *Nieuw Amsterdam* on November 20, 2019, in Charlotte Amalie, St. Thomas; and the discharge of Advanced Air Quality System washwater in violation of NOAA marine sanctuary regulations by the Holland America Line *Nieuw Statendam* on November 30, 2019, in Key West, Florida.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[127] These included Advanced Air Quality Systems being placed out of service for more than twenty-four hours by:  the *Carnival Fantasy* on October 24, 2019, due to variable frequency drive issues; the Holland America Line *Zaandam* on November 12, 2019, due to a leak in the gas trap; the *Carnival Elation* on November 15, 2019, due to faulty $CO_2$ and $SO_2$ sensor readings; the *Carnival Conquest* on November 16, 2019, due to extensive exhaust gas pipe leak repairs; the *Carnival Fantasy* on December 22, 2019, due to variable frequency drive issues; the Holland

March 27, 2020

ii.     *Global Marine Fuel Sulfur Cap*

As discussed in the most recent CAM Quarterly Report, a new global marine fuel sulfur cap set by the Marine Environment Protection Committee of the International Maritime Organization went into effect on January 1, 2020.  *See* CAM December 2019 Quarterly Report at 89-91; MARPOL Annex VI, Regulation 14.1.3.  Under the global marine fuel sulfur cap, ships operating outside of Emission Control Areas must either:  (1) use marine fuels with a sulfur content that does not exceed a percent concentration of 0.50%, *id.*; or (2) use an approved equivalent method, *id.* at 4.1, which includes the use of an approved Advanced Air Quality System to reduce emissions.  *See* MEPC.259(68), 2015 Guidelines for Exhaust Gas Cleaning Systems (May 15, 2015).  The global marine fuel sulfur cap does not change marine fuel sulfur content limits for ships operating inside of Emission Control Areas, which must continue to use marine fuels with a sulfur content that does not exceed 0.10% or use an approved equivalent method to reduce emissions, such as an approved Advanced Air Quality System.  *See* MARPOL Annex VI, Regulations 14.4.3 and 4.1; *see also* Carnival Corp., *Environmental Compliance Notice #5-2019.*  Ships operating without an approved Advanced Air Quality System must not use fuel exceeding applicable sulfur limits.  *See id.*

As part of its efforts to comply with the new cap, the Company has required each ship to develop, implement, and maintain a Ship Implementation Plans ("SIP").  *See* CAM December 2019 Quarterly Report at 90-91; Carnival Corp., *IN ENV-09-2019, Ship Implementation Plan (SIP) Requirement to Prepare for the 2020 0.50% Global Sulphur Cap* ("*IN ENV-09-2019*").

---

America Line *Nieuw Amsterdam* on December 22, 2019, due to gas analyzer issues; the *Carnival Dream* on December 27, 2019, due to a monitoring system malfunction; and the *Seabourn Ovation* on January 8, 2020, due to gas analyzer issues.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

March 27, 2020

The SIPs must outline "how the ship will prepare to comply with the new sulphur requirements," and "should address at a minimum, risk assessments of new fuels, fuel oil system modifications and alternative means of compliance." *IN ENV-09-2019.* According to the Company, Port State Control[128] "will review the preparatory actions described in the ship-specific SIP when verifying compliance with sulphur limit requirements." *Id.*

### iii. Washwater Discharges

The CAM Team is monitoring developments regarding the use of Advanced Air Quality Systems in port. An increasing number of coastal states and ports around the world (including in Asia, Europe, the Middle East, and the United States) have enacted local regulations that restrict or prohibit the use of open loop Advanced Air Quality Systems in port due to concerns about potential harm to the marine environment from washwater discharges. *See Beware of local restrictions before discharging washwater from exhaust gas scrubbing* (Updated Feb. 17, 2020), http://www.gard.no/web/updates/content/26939066/beware-of-local-restrictions-before-discharging-washwater-from-exhaust-gas-scrubbing. A recent meeting of the International Maritime Organization's Sub-Committee on Pollution Prevention and Response, held in London, United Kingdom, from February 17-21, 2020, had as an agenda item: the "[e]valuation and harmonization of rules and guidance on the discharge of liquid effluents from [Advanced Air

---

[128] Port State Control is "the inspection of foreign ships in national ports to verify that the condition of the ship and its equipment comply with the requirements of international regulations and that the ship is manned and operated in compliance with these rules." International Maritime Organization, *Port State Control*, http://www.imo.org/en/OurWork/MSAS/Pages/PortStateControl.aspx.

Quality Systems] into waters, including conditions and areas." *See* IMO Provisional Agenda for Seventh Session of the Sub-Committee.[129]

The Company has taken the position that there is little or no risk of harm to the marine environment from washwater discharges.  For example, the Company points to an industry-commissioned study which found that "the impacts of using open-loop [Advanced Air Quality Systems] are small in relation to the agreed [European Union] water quality standards for 2021." CE Delft, *The impacts of EGCS washwater discharges on port water and sediment* (Dec. 2019), at 53.[130]  The Company also points to the results of a two-year study that analyzed washwater samples from fifty-three of the Company's ships, and found that all samples "remain comfortably within the minimum [International Maritime Organization] criteria for [polycyclic aromatic hydrocarbon] and nitrate concentrations" and that "the concentrations of all tested parameters . . . are below the criteria for relevant land-based point source waste water standards." DNV GL, *Compilation and Assessment of Lab Samples from EGCS Washwater Discharge on Carnival ships* (Feb. 2019), at 8.  The DNV GL study notes that it "presents a snapshot of average washwater concentrations" and does not "[a]ttempt to assess the cumulative effect of washwater parameters entering seawater or the potential environmental impact" or "[m]ake any

---

[129] The CAM understands that the Company met with the United States delegation (including a representative from the United States Coast Guard) at this meeting.  *See* Email from Company Outside Counsel to DOJ, *Carnival contact with USCG* (Feb. 7, 2020).

[130] The CE Delft study was commissioned by CLIA, "the world's largest cruise industry trade association, providing a unified voice and leading authority of the global cruise community." *See* CLIA, https://cruising.org/.  As noted above, CLIA's membership includes all of the Company's nine brands.  *See supra*, Part I.A.3.ii.

March 27, 2020

conclusions regarding washwater parameter concentrations and fuel types, engine and flow conditions." *Id.*

Among the studies pointed to by critics of the Company's position are a German washwater study, with preliminary results which found that "a significant quantity of chemical substances will be emitted to the marine environment by the use of open-loop [Advanced Air Quality Systems]," and that the increasing use of these systems on ships "may improve the air quality in harbor cities and at sea, but will be a new direct pollution source to the marine environment, in particular of fossil fuel combustion residuals like [polycyclic aromatic hydrocarbons]." *Results from a German project on washwater from exhaust gas cleaning systems*, Submission to Sub-Committee on Pollution Prevention and Response (6th session), Agenda Item 11, PPR 6/INF.20 (Dec. 14, 2018), at 2.

A report by the Joint Group of Experts on the Scientific Aspects of Marine Environmental Protection ("GESAMP") Task Team[131] concluded that further information is needed on the issue of potential harm to the marine environment from washwater discharges, identifying "data gaps in mainly basic (eco-) toxicological information of [Advanced Air Quality System] contaminants" and recognizing "that current available evidence on chemicals in [Advanced Air Quality System] washwater effluents and its importance for the environment,

---

[131] The GESAMP Task Team was convened on a request of the Marine Environmental Protection Committee of the International Maritime Organization to "give an opinion on the potential environmental and public health effects of [Advanced Air Quality System] effluents." *Report of the GESAMP Task Team on exhaust gas cleaning systems*, Submission to Sub-Committee on Pollution Prevention and Response (7th session), Agenda Item 12, PPR 7/INF.23 (Dec. 13, 2019), at 11.

should call for an increased and broad focus on this topic from both the science community and from policymakers."  *Id.* at 13.

In January 2020, the Company issued an instructional notice to its ships in an effort to minimize the chance of "discoloration and other surface effects" from Advanced Air Quality System washwater discharges in port.  *See IN ENV-02-2020 Advanced Air Quality System (AAQS) / Exhaust Gas Cleaning System (EGCS) Washwater Filter Requirement in Port* ("IN ENV-02-2020").  According to the Company, such effects can occur "even when operating parameters are within compliant limits."  *Id.*[132]  The directive requires ships with Advanced Air Quality Systems to "have operating washwater filters installed and in use in order to be run in port."  *Id.*  Ships without an installed and in-use washwater filter on an Advanced Air Quality System "must use an engine with compliant fuel oil and not operate the [Advanced Air Quality System] after safely mooring."  *Id.*  The CAM Team plans to review the implementation of the instructional notice and the effectiveness of the Advanced Air Quality System washwater filters.[133]  The CAM Team will also continue to examine the Company's efforts to monitor and comply with local restrictions on the use of Advanced Air Quality Systems in port.

---

[132] Before the issuance of IN ENV-02-2020, the Company reported numerous incidents involving the observation of surface water effects and/or discoloration near Advanced Air Quality System washwater discharge points.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[133] Since the issuance of IN ENV-02-2020, the Company has reported several incidents involving the observation of surface water effects and/or discoloration near Advanced Air Quality System washwater discharge points as a result of inoperable or ineffective washwater filtration systems. *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

March 27, 2020

### iv.   Workload and Staffing

The CAM Team plans to explore workload and staffing issues related to Advanced Air Quality Systems.  Most of the Company's brands require ships with Advanced Air Quality Systems to have a dedicated Advanced Air Quality Engineer onboard.[134]  The Holland America Group workload study recommends performing "a more thorough study to determine whether one [Advanced Air Quality System] engineer will be enough to cover the workload when regulations require the [Advanced Air Quality Systems] to be operated at all times."  Holland America Group Workload Study at PCL_ECP00149522.  If there appears to be a need for more Advanced Air Quality System engineers as a result of the new regulations, "then the company should be proactive in making the position attractive."  *Id.*

### v.   Training

The CAM Team plans to attend the training course on Advanced Air Quality Systems offered at the Company's CSMART facility.  According to the course description, it is designed "for Technical and Environmental Officers that are involved with the operation, maintenance and monitoring of exhaust gas cleaning (EGCS)/advanced air quality (AAQ) systems that are provided to comply with emission regulations."  https://www.csmartalmere.com/courses/.

---

[134] According to the Company, all brands except for AIDA "have a formal policy that requires ships with an [Advanced Air Quality System] to have an [Advanced Air Quality System]-dedicated engineer onboard, and minor deviations from the policy occur only when temporary gaps arise because of staffing issues.  AIDA assigns dedicated AAQS engineers to ships that are equipped with washwater filters pursuant to an informal policy, but AIDA does not presently have sufficient engineers to assign dedicated AAQS engineers to all ships without washwater filters."  *See* Company Draft Report Comments.

March 27, 2020

I.      **Other Ongoing CAM Areas of Focus**

In addition to the issues discussed in this Report, the CAM Team continues to examine

the following areas of interest and intends to report further on these issues in future reports.

1.      Diversity and Inclusion

This includes examining the Company's stated intent to "strive to increase the diversity

of its shipboard workforce across certain positions."  *See Status Report by Princess Cruise Lines,*

*Ltd.*, Dkt. No. 148, at 6.  Currently, it appears that any such efforts are being led by the

brands/operating lines,[135] without a centralized, coordinated plan led by All Brands Group.

In particular, the CAM Team plans to examine the Company's assertion that there are

barriers to increasing the diversity of its officer corps "that ha[ve] to do with flag states and

nationalities"—for instance, that "[c]ertain flag states will not allow officers from another

country to be on board some of the ships."  Meeting Tr. at 14, 83 (Dec. 19, 2019); *see also*

Company Draft Report Comments (noting "that there are limitations created by labor laws, union

agreements, and various flag state requirements that constrain the company's ability rapidly to

make major changes to the composition of its workforce").

The CAM understands that, as of the date of this Report, the Company has seventy-four

Covered Vessels (with two soon to be added as a result of COVID-19[136]), registered in seven

---

[135] One example is the IDEA Conference hosted by Carnival Cruise Line in January 2020.  *See supra*, Part III.G.5.

[136] As noted above, on March 25, 2020, the Company provided notice that two Non-Covered Vessels from Costa, both flagged in Italy, will be sailing in United States waters due to COVID-19 and will become Covered Vessels.  *See supra* Part I.A.4.i(3); Letter from Environmental Corporate Compliance Manager, *Notice of Change Under Environmental Compliance Plan* (Mar. 25, 2020).

March 27, 2020

different flag states.[137]  The CAM Team's preliminary review indicates that only one of these flag states (Italy, where four—soon to be six—Covered Vessels are flagged) restricts the nationality of all officers.  *See* Italian Navigation Code, Art. 318 – 319 (requiring all ship officers and crew to be either Italian or European Union citizens, with certain limited exceptions).  The other six flag states (where approximately seventy Covered Vessels are flagged) do not appear to restrict officer nationality,[138] although they may only accept Standards of Training, Certification, and Watchkeeping ("STCW") officer endorsements from specified countries.  Notably, countries from which STCW officer endorsements are accepted generally appear to include countries from which many of the Company's non-officer personnel are recruited, such as the Philippines, India, and Indonesia.

At least one of the Company's operating lines, Costa Group, has started a cadet program to train and hire diverse officers, including forming a partnership with one of the Company's Global Talent Partners in the Philippines.  *See* CAM Second Annual Report at 58.  Another operating line, Carnival Cruise Line, reports that it is "currently exploring relationships" with Global Talent Partners in China and the Philippines to potentially start sponsoring officer cadetships with these agencies later this year.  *See* Email from Manager of Legal Affairs and Reporting – Corporate Environmental Compliance, *Follow-up from 02.27.20 CAM Call* (Mar. 2, 2020).

---

[137] The seven flag states are:  the Bahamas (eleven ships); Bermuda (twenty ships); Italy (four ships); Malta (one ship); the Netherlands (fourteen ships); Panama (twenty ships); and the United Kingdom (four ships).  *See COFR/ECP Covered Vessels*, PCL_ECP00157101-06.

[138] The Netherlands requires that all ship Captains be either Dutch or European Union citizens, with limited exceptions.  *See* Article 29 - 30, Netherlands Regulatory Framework, Manning Act (Apr. 3, 2008).  However, the Netherlands does not appear to restrict the nationalities of other officers on board.  *Id.*

March 27, 2020

2.      Other Personnel Issues

This includes examining the hiring, training (including development of competency frameworks), workload, and employment conditions of officer and non-officer crew, including Environmental Officers, engineering officers and ratings, bridge/deck personnel, hotel personnel, and food and beverage personnel—including challenges and recommendations identified in the Holland America Group Workload Study (such as "indications that crew are working overtime without registering all their hours" and "have been compelled to work but discouraged to write overtime . . . by senior officers to avoid questions from the office and additional paperwork"). *See* Holland America Group Workload Study at PCL_ECP00149438.

It also includes examining the relationships and coordination between technical, deck, environmental, hotel, and food and beverage personnel, both shipboard and shoreside, on compliance issues.  In particular, environmental and technical personnel have expressed concerns to the CAM Team about a lack of ownership and support for compliance by hotel and food and beverage departments—although this is reported to be improving as a result of the heightened focus on food and other garbage/waste management.  *See* Employee Interview/Call Notes.

3.      Integration of Compliance Considerations into Ship Design in New Build and Dry/Wet Dock Processes

This includes examining the Company's efforts regarding the integration of compliance considerations into the design or re-design of ships during new build and dry/wet dock processes. The Court has expressed particular interest in how the Carnival Corp. Chairman, who is recognized for his leadership role in new ship design, is "making concrete design changes to make sure that the new ships that are coming online are able to address some of the failures in the past."  Status Conf. Tr. at 69-70 (Jan. 8, 2020).

March 27, 2020

A recent workload study confirms the role that ship design can have on workload and the ability of crews to meet compliance obligations, noting, for example, that "inconsistencies in layout and accessibility of the engine room and plumbing and electrical work" mean that, in many cases, "more time and effort are required to perform a job than is usually anticipated." Holland America Group Workload Study at PCL_ECP00149434. The same study also finds that the layout of the Engine Control Room on older ships "does not optimally support operator performance." *Id.* at PCL_ECP00149435. Among other things, the study recommends increasing oversight in the design phase of newbuild ships by including project team members with recent operational experience and implementing user-centered design principles and processes. *See id.* at PCL_ECP00149515-16.

The CAM Team also plans to examine other issues regarding dry/wet dock project planning and management, including issues related to the timing and length of wet/dry periods, scope of work, and cost/budget considerations. The workload study generally observes that "preparations for drydocking/wetdocking, the short drydock/wetdock period itself and the clean-up and return-to-service work after a drydock/wetdock are experienced as extremely stressful," and makes recommendations for improving these processes. *See id.* at PCL_ECP00149437, 524-25. Further, a number of specific, significant concerns regarding the Company's dry/wet dock processes have been raised across multiple brands during ECP Year Three. For example, the TPA issued a Major Non-Conformity finding on the *Carnival Sensation* during an audit from January 27 – February 1, 2020, regarding a grease tank/trap that was out of service because a project to replace the tank/trap was not completed during a recent ten-day dry-dock period. *See*

March 27, 2020

ABSG, *Major Nonconformity Finding on the Carnival Sensation* (Feb. 1, 2020).[139]  The TPA recommended that the "worklist for the shipyard period should be reviewed and investigated to determine if all worklist items could reasonably fit into a 10-day schedule." *Id.*  In addition, the Company received several Environmental Open (Hotline) Reports in November/December 2019 alleging a range of safety, environmental, and other compliance issues arising out of a dry dock on the *AIDAmira* (a Non-Covered Vessel).[140]  The CAM understands that the Incident Analysis Group is investigating the *Carnival Sensation* finding and the *AIDAmira* allegations.  The CAM also understands that the Company is working to hire someone into a new position within the All Brands Group Ethics and Compliance Department to focus on dry/wet dock management oversight.  *See* Employee Interview/Call Notes.

In light of recent cases of COVID-19 on several of the Company's ships, *see supra*, Part I.A.4.i, the CAM Team's examination will include any design changes during dry dock or new build processes that would help prevent disease spread on ships, including among crew members.

---

[139] This issue created a number of workload and compliance challenges for the ship.  As a result of the tank/trap being out of service, the grey water drains feeding this tank/trap were being re-routed via a portable pump and hoses to the ship's second grease tank/trap, which was still in service.  The volume of grey water being re-routed to the second tank/trap was causing grey water overflows from that tank/trap into the bilges.  In addition, the portable pump/hose system required continuous (24/7) monitoring.  Therefore, an engineer had to be stationed at the pump all times.

[140] The CAM also intends to examine issues regarding support for compliance on Non-Covered versus Covered Vessels, which will give insight into the Company's commitment to developing a corporate-wide, integrated, and sustainable compliance program that will extend beyond the ECP.

March 27, 2020

### 4.   Waste Offload Practices

This includes examining the Company's process for selecting and vetting shoreside waste vendors who handle the disposal of wastes offloaded from ships, including oily wastes, garbage (including plastics and food waste), and other waste streams.  *See* CAM December 2019 Quarterly Report at 61-62 and n.46.  As discussed in the most recent CAM report, "the Company's 2018 Sustainability Report touts the Company's goal of further developing and implementing waste vendor assurance procedures.  However, the Company has conceded that not all operating lines are following Company requirements for the vetting of waste offload vendors."  *See* CAM December 2019 Quarterly Report at 7, 61-62, 91.

On January 10, 2020, the CAM issued an extensive request to the Company for documents and information relating to its program for assessing and/or vetting waste vendors, including ongoing efforts to revise and streamline waste vendor due diligence requirements across the brands/operating lines.  *See Court Appointed Monitor Communication – Fourteenth Request for Documents and Information* (Jan. 10, 2020).  The Company has been producing responsive documents on a rolling basis, and has reported that it "is developing a three-part, risk-based assessment for shore-side waste vendors that includes:  (1) vendor responses to questionnaires, (2) company-specific searches for media reports and (where available) searches for incorporation documents and registration with local regulators, and (3) third-party visits to vendors that raise red flags."  *See* Company Draft Report Comments.  The CAM Team will continue to monitor this effort.

### 5.   Purchasing and Procurement Processes for Spare Parts

This includes examining the Company's efforts to address the ongoing challenge of timely provision of spare parts for pollution prevention equipment to ships, which has been a

recurring issue throughout the ECP.  The Company recently reported that it plans to retain a third party "to undertake a review of the company's practices related to spare parts."  *See* Company Draft Report Comments.  As noted in the recent workload study, the "[l]ack of spare parts onboard increases workload as crew must find work-arounds and fabricate items to complete a job related to a breakdown or other unscheduled maintenance."  Holland America Group Workload Study at PCL_ECP00149433.  As part of this examination, the CAM Team will continue to monitor the development and implementation of the MAST initiative.  *See supra*, Part III.G.1.

### 6.  Other Support for Operations and Compliance

This includes examining the Company's efforts regarding:

- Shoreside support for ships, including the extent to which shoreside has adequate resources to provide the support needed by the ships (*e.g.*, superintendent workloads);

- Environmental support and special project ship visits under the HMP-1503 procedure implemented in January 2019 and amended in June 2019;

- The integration of HESS compliance into the annual financial and strategic planning processes;

- Improvements to HESS policies and procedures, including the "internal effort to improve upon the clarity and understandability of current [Environmental Management System] related procedures."  January 2020 Probation Supervision Report, Attachment 3, at 3; and

- Implementation of the new Unified Regulatory Reporting Policy required under the Probation Agreement, which went into effect on September 19, 2019, including any associated training.

### 7.  Company Response to Internal and External Findings

This includes examining the Company's response to findings from the CAM, TPA, RAAS, outside consultants, and other internal and external studies and assessments, such as the DNV GL investigations review; the Environmental Compliance Culture Assessment; the ECP-mandated Fleet Engineering Survey; the human factors study and workload analysis

March 27, 2020

commissioned by Holland America Group; and the participant feedback surveys and reports

from the Operational Excellence CSMART training course.  *See* CAM Second Annual Report at

111-12; CAM September 2019 Quarterly Report at 15-30, 97; CAM December 2019 Quarterly

Report at 27-31, 92; January 2020 Probation Supervision Report, Attachment 3, at 11.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor

March 27, 2020

March 27, 2020

**APPENDIX A:  STATUS OF PROBATION AGREEMENT COMMITMENTS**

| Deadline | Obligation | Status |
|---|---|---|
| Immediately | **Search Firm for New Board Member.** The Company will immediately engage a search firm to assist the Boards of Directors to recruit a new board member with significant corporate compliance experience. | Search firm retained in July 2019; recruitment process ongoing |
| 06/01/2019 | **Consultant Recommendations.** The Company shall provide the Court, CAM, TPA and Interested Parties with the consultant's further recommendations. | Submitted June 1, 2019 |
| 06/2019-08/2019 | **Tiger Teams.** The Company's tiger teams intend to meet in Washington D.C. on June 3-7, 2019 for planning workshops in which most of the inner workings and plans will be finalized. The tiger teams will be dedicated to visiting at least 30 ships between June and August. | Met June 3-6, 2019; visited 30 ships between June-August 2019 |
| 06/10/2019 | **Financial Penalty.** The Company agrees to pay an additional financial penalty of $20 million. | The Company reports that this was paid on schedule. *See* Status Conf. Tr. at 16 (July 19, 2019). |
| 06/30/2019 | **Special Condition 13(a) Reporting Process.** The Company shall submit for approval to the Interested Parties a proposed process, including the criteria for determining which incidents to report and how they will be reported in compliance with Special Condition of Probation 13(a). | Submitted June 28, 2019 |
| 07/01/2019 | **Interim Progress Report.** The Company will provide an interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted July 1, 2019 |

March 27, 2020

| Deadline | Obligation | Status |
|---|---|---|
| 07/03/2019 | **Management Acceptance of Responsibility Statement.** The Company will issue a statement to all employees in which the CEO of Carnival Corporation & plc (and other senior management if they so choose) personally accepts management responsibility for the probation violations. | Issued July 1, 2019 |
| 08/01/2019 | **Interim Progress Report.** The Company shall provide a second interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 1, 2019 |
| 08/01/2019 | **Food Waste Management Implementation Plan (Part One)**. The Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables for Part one – improved training, supervision, staffing, and culture – of its Three Part Program addressing food waste. | Submitted August 1, 2019; Update submitted September 4, 2019 |
| 08/02/2019 | **Draft Unified Regulatory Reporting Policy.** The Company will submit for review and comment to the Interested Parties, CAM and TPA a draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Submitted July 31, 2019 |
| 08/14/2019 | **Proposed Action Plan on Corporate Re-Structuring.** The Company shall provide the Court, CAM, TPA and Interested Parties with the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 14, 2019 |
| 08/23/2019 | **Comments on Draft Unified Regulatory Reporting Policy.** The Interested Parties, CAM, and TPA will provide comments to the Company, if any, on the Company's draft new policy in the | Joint CAM/TPA comments submitted August 23, 2019 |

March 27, 2020

| Deadline | Obligation | Status |
|---|---|---|
| | Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | |
| 08/28/2019 | **Comments on Proposed Action Plan on Corporate Re-Structuring.** The Interested Parties, CAM and TPA will provide any comments or suggestions to the Company about the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Joint CAM/TPA comments submitted August 28, 2019 |
| 09/13/2019 | **Final Action Plan on Corporate Re-Structuring.** The Company will provide a final version of its action plan to restructure its existing corporate compliance governing authority to the Court. | Submitted September 13, 2019; update submitted October 9, 2019; supplements submitted November 1, 2019 (preliminary financial plan) and December 10, 2019 (final financial plan) |
| 09/13/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 13, 2019, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the court. | -- |
| 09/22/2019 | **Final Unified Regulatory Reporting Policy.** The Company will adopt and implement a final new policy that addresses the comments it received from the Interested Parties, the CAM, and the TPA on the draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Policy implemented in Global HESS September 19, 2019 |
| 09/23/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 23, 2019, the Court may | -- |

March 27, 2020

| Deadline | Obligation | Status |
|---|---|---|
| | impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the court. | |
| 10/09/2019 | **[Sanctions.]** If, by October 9, 2019, the Company fails to complete implementation of certain tasks enumerated in September 13, 2019 compliance action plan, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 10/09/2019 | **Environmental Corporate Compliance Manager Promotion.** The Company will elevate the Environmental Corporate Compliance Manager. | Environmental Corporate Compliance Manager promoted from Vice President to Senior Vice President on May 17, 2019 |
| 10/09/2019 | **Chief Ethics and Compliance Officer Charter and Job Description.** The Company will create the Chief Ethics and Compliance Officer charter and job description. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Chief Ethics and Compliance Officer Appointment.** The Company will appoint the Chief Ethics and Compliance Officer. | Chief Ethics and Compliance Officer officially assumed duties August 12, 2019 |
| 10/09/2019 | **Executive Compliance Committee.** The Company will create the Executive Compliance Committee. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Annual Training Curriculum for Boards of Directors.** The Company will create an annual training curriculum for members of its Boards of Directors that would include corporate compliance topics. | Submitted October 9, 2019 |
| 10/09/2019 | **Boards' Statement on Commitment to Compliance.** The Company's Boards of Directors will adopt a new written statement | Submitted October 9, 2019 |

March 27, 2020

| Deadline | Obligation | Status |
|---|---|---|
| | that reiterates the Company's and the Boards' commitment to compliance. | |
| 10/31/2019 | **Food Waste Disposal Technologies Analysis.** The Company shall review and provide an analysis of: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes. | Submitted October 31, 2019 |
| 11/01/2019 | **[Sanctions.]** If the Company fails to complete implementation of certain tasks to restructure compliance by November 1, 2019, the Court may impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 01/31/2020 | **Food Waste Management Implementation Plan (Part 3).** The Company shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones. | Submitted January 31, 2020 |
| 12/31/2021 | **Single-Use Plastic Reduction.** The Company shall reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent. | TBD |
| 12/31/2021 | **Food Waste Weight Reduction.** The Company shall reduce the total weight of food waste that the Company creates by 10 percent. | TBD |