**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 16-20897-CR-SEITZ**

**UNITED STATES OF AMERICA**
**v.**
**PRINCESS CRUISE LINES, LTD.,**
**Defendant.**
_____/

**THIRD ANNUAL REPORT**

**OF THE COURT APPOINTED MONITOR (APRIL 19, 2019 – APRIL 18, 2020)**

I.   **Introduction**...................................................................................................................1

A. Preliminary Statement ................................................................. 2

B. Background ................................................................................... 8
   1.   Report Overview................................................................... 8
   2.   COVID-19 and Court Oversight ......................................... 11
   3.   Case Background ................................................................. 15
   4.   Other Legal Proceedings Arising Since Start of ECP........... 25

C. COVID-19 Developments............................................................ 27
   1.   Background .......................................................................... 27
   2.   COVID-19 Timeline ........................................................... 30
   3.   CDC No Sail Order .............................................................. 33
   4.   Company Impacts and Response ......................................... 36

D. CAM Methodology and Activities............................................. 64
   1.   CAM Team Visits to Ships and Shoreside Facilities............ 64
   2.   Other CAM Team Activities................................................ 67
   3.   Oversight of the External Audit Function (TPA) ................ 68
   4.   Oversight of the Internal Audit Function (RAAS) .............. 68

II.  **Executive Summary:  CAM ECP Year Three Findings**........................................69

A. CAM Findings:  Progress............................................................ 70

B. CAM Findings:  Unresolved Barriers and Opportunities for Improvement ................... 75

**III. CAM Findings:  Progress** ................................................................................**79**

A. No Repeat of the Underlying Offenses ........................................................... 79

B. General Fulfillment of Enumerated ECP and Probation Revocation Agreement
Requirements; Initiatives Beyond Enumerated Requirements ............................... 80
    1.   Pre-COVID-19 Fulfillment of Enumerated Requirements ..................................... 80
    2.   COVID-19 Impacts on Ability to Fulfill Enumerated Requirements ..................... 81
    3.   Initiatives Beyond Enumerated Requirements ...................................... 82

C. Employee Cooperation and Commitment ...................................................... 84

D. Acceptance of Culture Assessment Findings and Efforts to Address Those Findings .... 85
    1.   Background ............................................................................... 85
    2.   Company Acceptance of Findings and Signs of Progress ....................................... 88
    3.   Culture Action Plans ..................................................................... 92
    4.   Ongoing CAM Team Examination ...................................................... 94

E. Formation of Ethics & Compliance Department and Program ........................... 94
    1.   Background ............................................................................... 94
    2.   Ethics & Compliance Department and Program .................................... 98
    3.   Boards of Directors Updates ........................................................... 102
    4.   Ongoing CAM Team Examination ...................................................... 105

F. Improvements on Food Waste Management ...................................................... 107
    1.   Background ............................................................................... 107
    2.   Single Use Plastics Reduction and Food Waste Reduction .................... 110
    3.   Food Waste Digester Installations ..................................................... 112
    4.   Other Food Waste Management Initiatives ........................................ 116
    5.   Food Waste Workload Assessment and Response Plan ....................... 118
    6.   Ongoing CAM Team Examination ...................................................... 121

G. Development of a Strong Environmental Officer Corps ................................. 123
    1.   Background ............................................................................... 123
    2.   COVID-19 Impacts ...................................................................... 124
    3.   Ongoing CAM Team Examination ...................................................... 127

H. Efforts to Develop IT Systems and Tools in Support of Compliance ......................... 127
    1.    Background ............................................................................................. 127
    2.    Overview of IT Initiatives ...................................................................... 128
    3.    Ongoing CAM Team Examination ......................................................... 136

**IV.  CAM Findings:  Unresolved Barriers and Opportunities for Improvement ..............137**

A. Repeat Failures on Basic Compliance Support for the Ships ........................................ 137
    1.    Overview ................................................................................................ 137
    2.    Pollution Prevention Equipment and Spare Parts .................................. 143
    3.    Crew Staffing and Workload .................................................................. 150
    4.    IT Support, Including Voyage Planning .................................................. 159
    5.    Waste Vendor Assessments .................................................................... 162
    6.    Ongoing CAM Team Examination ......................................................... 162

B. Missed Opportunities in Response to Culture Assessment Findings ............................ 164
    1.    Background ............................................................................................. 164
    2.    Process Concerns:  Delays and the Impact of the Corporate Structure ................ 165
    3.    Substance Concerns:  Draft Culture Action Plan .................................... 167
    4.    COVID-19 Impacts:  Culture Section of the Draft Pause Priorities Plan .............. 170
    5.    Ongoing CAM Team Examination ......................................................... 171

C. Unresolved Weaknesses in Corporate Compliance Function ........................................ 172
    1.    Overview ................................................................................................ 172
    2.    Compliance Function Remains Decentralized in Many Ways ............................. 174
    3.    Ongoing Failure to Provide Required Authority to Chief Ethics & Compliance
          Officer and Environmental Corporate Compliance Manager ................................ 176
    4.    Ongoing CAM Team Examination ......................................................... 179

D. Internal Investigations Remain Flawed ....................................................................... 180
    1.    Overview ................................................................................................ 180
    2.    Background ............................................................................................. 182
    3.    Revised Investigation Procedures .......................................................... 183
    4.    Investigation Reports ............................................................................. 193
    5.    Auditing the Investigation Function ...................................................... 197
    6.    Investigation Training ............................................................................ 198
    7.    COVID-19 Impacts ................................................................................ 199
    8.    Ongoing CAM Team Examination ......................................................... 200

E. Inadequate Waste Vendor Assessment Program ........................................................... 201
   1. Overview .................................................................................................................. 201
   2. Audit Findings ....................................................................................................... 202
   3. Company Sustainability Report Statements ........................................................ 204
   4. Incident Reports ..................................................................................................... 204
   5. Revised Waste Vendor Assessment Procedure .................................................. 206
   6. COVID-19 Impacts ................................................................................................ 210
   7. Ongoing CAM Team Examination ...................................................................... 211

F. Ongoing ECP and Environmental Law Violations ........................................................ 211
   1. Overview .................................................................................................................. 211
   2. Advanced Air Quality Systems ............................................................................ 216

**V. Evaluation of the External Audit Function (TPA)....................................................221**

A. Engagement with the TPA ............................................................................................... 221

B. TPA Audit Process ............................................................................................................ 222

C. TPA Audit Reports ........................................................................................................... 223

D. TPA Independence ............................................................................................................ 223

E. TPA Receptiveness to CAM Feedback .......................................................................... 223

F. COVID-19 Impacts ............................................................................................................ 223

**VI. Evaluation of the Internal Audit Function (RAAS)...................................................224**

A. General RAAS Assessment .............................................................................................. 224
   1. Overview .................................................................................................................. 224
   2. Audit Process (Pre-COVID-19)............................................................................ 226
   3. Auditors ................................................................................................................... 228
   4. Audit Findings ....................................................................................................... 229
   5. COVID-19 Impacts ................................................................................................ 232

B. RAAS ECP Year Three Highlights ................................................................ 234

   1.   August 2019 RAAS Maritime Retreat .......................................... 234

   2.   RAAS Initiatives ............................................................................ 234

C. Ongoing CAM Team Examination ............................................................... 235

**VII. Areas of Focus for ECP Year Four ..............................................................236**

A. Diversity and Inclusion .............................................................................. 236

B. Training ...................................................................................................... 243

C. Other Personnel Issues ............................................................................... 244

D. Integration of Compliance Considerations into Ship Design, including
   New Builds and Dry/Wet Docks ................................................................ 245

E. Other Support for Operations and Compliance .......................................... 247

F. Company Response to Internal and External Findings ................................ 248

G. Post-2022: Compliance Beyond the ECP ................................................... 248

**Appendix A:  Status of Probation Revocation Agreement Commitments**

**Appendix B:  Company Initiatives**

July 13, 2020

## I.   INTRODUCTION

Consistent with the Court's Order of April 24, 2020, Dkt. No. 187, the Court Appointed

Monitor ("CAM")[1] submits this Annual Report for Year Three of the Environmental Compliance

Plan ("ECP") ("CAM Third Annual Report" or "Report").[2]  This Report focuses on

developments during ECP Year Three:  the period from April 19, 2019 – April 18, 2020.[3]

However, notable developments since the end of this period are included below.[4]

---

[1] The CAM is Steven P. Solow, a partner at the law firm Baker Botts LLP ("Baker Botts").  The CAM retained, *inter alia*, Baker Botts and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[2] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1, or prior CAM reports.  The CAM has submitted the following reports:  (1) *First Annual Report of the Court Appointed Monitor (2017-2018)* (June 21, 2018), Dkt. No. 105 ("CAM First Annual Report"); (2) *Quarterly Report of the Court Appointed Monitor (September 2018)* (Sept. 21, 2018), Dkt. No. 114 ("CAM September 2018 Quarterly Report");  (3) *Quarterly Report of the Court Appointed Monitor (December 2018)* (Dec. 18, 2018), Dkt. No. 115 ("CAM December 2018 Quarterly Report"); (4) *Quarterly Report of the Court Appointed Monitor (April 2019)* (Apr. 2, 2019), Dkt No. 116 ("CAM April 2019 Quarterly Report"); (5) *Second Annual Report of the Court Appointed Monitor (April 19, 2018-April 18, 2019)* (July 3, 2019), Dkt. No. 150 ("CAM Second Annual Report"); (6) *Quarterly Report of the Court Appointed Monitor (September 2019)* (Sept. 18, 2019), Dkt No. 166 ("CAM September 2019 Quarterly Report"); (7) *Quarterly Report of the Court Appointed Monitor (December 2019)* (Dec. 18, 2019), Dkt. No. 172 ("CAM December 2019 Quarterly Report"); and (8) *Quarterly Report of the Court Appointed Monitor (March 2020)* (Mar. 27, 2020), Dkt. No. 183 ("CAM March 2020 Quarterly Report").

[3] ECP Year One was April 19, 2017, through April 18, 2018.  ECP Year Two was April 19, 2018, through April 18, 2019.  ECP Year Four is April 19, 2020, through April 18, 2021.

[4] The CAM provided the Company and the United States Department of Justice ("DOJ") a copy of this Report in advance of its submission for their review and comment.  *See 07-10-2020 Carnival Corp. Comments to CAM Third Annual Report* (July 10, 2020) ("Company Comments on Draft Report").  The CAM took the comments received into account; however, the comments did not alter the substance of the Report.

July 13, 2020

### A.    Preliminary Statement

Before the "coronavirus disease 2019" ("COVID-19") pandemic, CAM Annual Reports were structured around reporting on the Company's[5] progress towards compliance, and on obstacles or barriers towards compliance.  This Report continues this structure, but also addresses impacts of the pandemic.

In terms of progress made towards building a sustainable compliance program and culture, there were some important steps in ECP Year Three.[6]  These include:

- For the first time, creating an Ethics & Compliance group, the head of which reports directly to the Company's President and Chief Executive Officer ("CEO");

- Developing and delivering compliance training for the Boards of Directors, and hiring a new independent director with significant compliance experience;

- Establishing a new, permanent Compliance Committee of the Boards of Directors, and hiring independent outside counsel to advise the Committee on compliance issues;

- Making efforts to respond to the results of an environmental compliance culture survey of over 70,000 ship and shore employees across the Company, which illuminated deficits in leadership and management, resulting in "a culture where people who are involved in failures are blamed, and where management does not take required steps to learn from failures."  *See* Propel, *Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019* (Aug. 28, 2019)

---

[5] As noted below, "Company" refers collectively to all corporate entities, including individual brands and operating groups, under the Carnival corporate umbrella.  *See infra*, Part I.B.3.a.

[6] Some of these steps were the result of the June 2019 settlement of the Company's six admitted probation violations.  *See infra*, Part I.B.3.c.  That said, the Company accepted responsibility for these violations, agreed to undertake remedial measures, and committed resources to carry out those measures.  *See id.*  In prior CAM reports and in statements to the Court, the CAM has often observed that the Company has employees with the skill, ability, and dedication to accomplish its compliance goals.  The continuing question has been whether there is lasting resolve from the Company's top leadership to support those efforts, both in words and in deeds.  In the most recent CAM Quarterly Report, the CAM observed that many of the Company's top-level leaders have increased their personal engagement on compliance issues since the probation settlement.  *See* CAM March 2020 Quarterly Report at 39.  The CAM will continue to evaluate the extent to which there is a sustained focus by top leadership on support for compliance, including in the form of concrete commitments and actions.  *See id.*

("Environmental Compliance Culture Assessment Report"), at 3.  Although a coordinated, centralized response has yet to emerge, and the results of the survey have not yet been widely shared within the Company beyond the senior management levels, it is a sign of progress that the Company's CEO and other senior leaders have spoken out about the primacy and importance of safety, environmental protection, and compliance—even as the pandemic suspended the Company's cruise operations;

- Implementing significant measures designed to prevent the illegal discharge of plastics and other non-food items in food waste, including new procedures and equipment installations.  Before the COVID-19 pandemic, the Company reported significant progress toward meeting its commitments to reduce single-use plastics and food waste onboard;

- Continuing to grow a robust Environmental Officer corps, which will be supported by a new group—the Fleet Environmental Officers—as ships prepare for and begin returning to service.  Efforts to develop the Fleet Environmental Officer program were coupled with other improvements in Environmental Officer training and support, under the strong leadership of the Environmental Corporate Compliance Manager and his team;

- Taking steps to develop or improve existing information technology ("IT") systems and tools in support of compliance;

- Making efforts to enhance the Company's internal audit function, which will need to fulfill the "monitor" role once probation is over; and

- Although not directly related to this matter, making significant investments in liquefied natural gas ("LNG") propulsion technology for new ships, which will reduce toxic air pollutants associated with traditional maritime fuel oils.[7]

Yet, barriers and obstacles to compliance remain.  In ECP Year Three, the Company continued to have gaps and missteps in addressing underlying compliance weaknesses.  These include:

- Repeated gaps on basic compliance support for the ships, including issues related to: reliability and availability of pollution prevention equipment;[8] availability of spare

---

[7] Whether a shift to LNG fuel will result in an overall reduction, increase, or no change in greenhouse gas emissions is a matter of debate and beyond the scope of this Report.  *See infra*, Part III.B.3.

[8] Crew members have continued to express to the CAM Team that malfunctions and breakdowns of pollution prevention equipment present a significant workload issue.  This is true even when pollution prevention equipment incidents do not rise to the level of an ECP or regulatory

parts; adequacy of crew staffing; high crew workloads; the generally slow pace of IT improvements needed to support compliance; and the revelation that, despite public statements that the Company was vetting its waste vendors before using them, the general lack of evidence of such vetting, leading to questions about the ultimate fate of wastes offloaded from Company ships;

- Delay in developing a coordinated, centralized response to the findings of the corporate-wide environmental compliance culture survey—a delay which reflects the challenges of the Company's complex and decentralized corporate structure, identified as a barrier to compliance in the CAM First Annual Report;

- Unresolved weaknesses in the corporate compliance function, including that the compliance function remains decentralized in many ways—again, reflecting the CAM's ECP Year One finding that the Company's balkanized corporate structure is a barrier to compliance;

- An apparent failure to provide the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager with the authority required by the ECP and probation settlement, despite pleading guilty in June 2019 to a probation violation for failing to provide the Environmental Corporate Compliance Manager with ECP-required authority, another issue identified by the CAM in ECP Year One;

- Persistent failure to develop an effective, independent internal investigations function—a challenge recognized by the Company, its consultant, the Third Party Auditor ("TPA"),[9] and the CAM as early as ECP Year One;

- A waste vendor assessment program that, despite being an improvement from the previous practices, still appears to be inadequate; and

- A continuing failure to listen to, and respond to, the Company's own employees, auditors, and consultants, who have repeatedly alerted the Company to many of these issues.  For instance, as early as February 2018, Company employees identified the issue of prohibited discharges of non-food items (including plastics) into the ocean due to inadequate onboard food waste management.  But it was not until the issue was

---

violation, as these incidents still require crew members to take time and resources away from other obligations.  As discussed below, the Company's response to these concerns reflects a mindset that is focused on how incidents are classified, rather than on lessons that can be learned from incidents regarding continued obstacles to ship compliance efforts.  *See infra*, Part IV.A.1.

[9] The TPA is ABSG Consulting Inc., an advisory and technical services provider for the marine and other sectors.  The TPA has submitted the following annual reports:  (1) *Third Party Auditor Year One Annual Report* (June 18, 2018) ("TPA First Annual Report"); and (2) *Third Party Auditor Year Two Annual Report* (July 3, 2019), Dkt. No. 153 ("TPA Second Annual Report"); and (3) *Third Party Auditor Year Three Annual Report* (July 13, 2020) ("TPA Third Annual Report").

illuminated by the TPA and the CAM Team in late 2018, and put forward by the Office of Probation in the probation revocation petition filed in March 2019, that the Company began significant work to address this problem.

Indeed, the Company appears to be among the few corporate defendants to have violated the terms of a corporate probation so significantly that it faced probation revocation proceedings. As discussed below and detailed in prior CAM reports, the Office of Probation filed a probation revocation petition in March 2019, near the end of ECP Year Two, alleging six probation violations. The Company admitted guilt to all six violations, and, as part of a June 2019 settlement agreement resolving the violations, agreed to pay an additional $20 million fine and perform a range of remedial actions.

These six probation violations were significant, not only because the underlying behavior was improper, but because they also indicated both: a lack of understanding of the purposes of oversight by the CAM and TPA, as evidenced by the violations related to improperly seeking to prepare ships for TPA audits; and a failure to have been sufficiently engaged with employee concerns to have acted upon internal warnings, as evidenced by the violation related to the illegal discharge of plastic waste into the ocean.

During this past year, the Company has devoted substantial efforts and resources towards implementing the remedial steps agreed to in the probation settlement. It has also pursued other positive avenues to improve compliance, detailed in this Report.

COVID-19 has thrown these efforts into uncertainty. For a period of weeks beginning around February 2020, the cruise industry, and the defendant Princess Cruise Lines in particular, seemed to be the daily face of the pandemic in public news and media reports. Dozens of legal actions and investigations are underway, both private and public, aimed at the Company's response to COVID-19. Whatever their outcome, despite the impression given by early news

coverage, the spread of coronavirus does not appear to have been primarily driven by the cruise industry, but by a combination of factors, including the contagiousness of the virus, governmental failures, and the ease and ubiquity of travel.  While other parts of the travel sector (including air travel, ground transportation, and the hotel industry) have continued or resumed service to some extent, as of this writing, it is unknown to what extent the cruise industry will recover.  The Company has announced that it intends to take a phased approach to the resumption of cruises, and that three of its European ships will be the first to resume service in a limited capacity (with reduced passenger loads, no port stops, and brief three-day cruise durations) from German ports beginning in August 2020.

For cruising to resume, and for the cruise industry to survive, ships must be able to operate safely for all onboard, including the crew.  Over the past three years, the CAM Team and TPA have conducted over 150 ship visits and audits and spent thousands of hours with hundreds of crew members.  The CAM Team and TPA spend little time in the guest spaces on ships, instead focusing on understanding the challenges crew members face in performing the many tasks necessary to operate the ship and support a long-standing core value of the Company: providing a great guest experience.

As a result, the CAM Team and TPA are deeply aware of the dire impacts of the COVID-19 crisis, and the shut-down of the Company's operations, on the livelihoods of the tens of thousands of employees from around the world who work on the Company's ships, and their families.  We are aware of this impact even as it has been observed that crew work conditions may call out for improvements, and that this Company, like the maritime industry it is a part of, reflects longstanding issues of racial and gender discrimination.

July 13, 2020

As of this writing, it is unknown how, as the Company navigates through this pandemic, it will address the safety and other needs of these dedicated employees.  The Company's CEO recently pledged to make real the diversity commitments in the Company's public statements by achieving concrete progress in the diversity of leadership onboard the ships.  In doing so, he recognized that there is a direct connection between a diverse and inclusive workplace and a workplace that is safe and compliant.  It remains to be seen if the Company uses this moment to take concrete steps to create a workforce with diversity at every position, including senior shipboard officers—particularly for crew members from nationalities who have long sought the opportunity to rise to the highest shipboard positions, but found those pathways almost entirely denied to them.

On these and other issues, in this moment of crisis, there is also opportunity.  The Court spoke to the broader opportunity of this moment at the virtual Status Conference held on April 24, 2020, referencing a recent speech by former Deputy Attorney General Sally Yates.[10]  The Court noted:  "[J]ust how important in emergency times, unprecedented emergency times like this, that it's so important to focus on the values that the company has and not just be focused on the bottom line.  You need the bottom line to have an industry, I am not going to minimize that, but it can be a temptation to cut corners."  Status Conf. Tr. at 12 (Apr. 24, 2020).

---

[10] *See,* A. Barbarino, Law360.com, *Ex-DOJ Deputy Warns of Virus' Long-Term Compliance Risks* (Apr. 22, 2020).  Notably, this speech was delivered at the Ethics & Compliance Initiative's ("ECI") IMPACT 2020 Virtual Conference.  ECI describes itself as a "best practice community of organizations that are committed to creating and sustaining high quality ethics & compliance programs."  *About ECI*, https://www.ethics.org/about/.  ECI also serves as a consultant to the Company on its culture survey response efforts, and former Deputy Attorney General Yates serves on the board of ECI.  *Our Boards of Directors*, https://www.ethics.org/about/our-board/.

To the extent that the Company resumes cruise operations, it is expected that it will be in small increments.  Those increments, those "minute particulars,"[11] create an opportunity.  As each ship returns to sea, consideration should be given not only to whether it has been made as safe as reasonably possible from the virus, but also to whether it has been repaired, provisioned, equipped, staffed, and supported to meet the broad and minute particulars of its compliance obligations.  The goal of this probationary period is that the Company learn to operate in a way that supports its top priorities of safety, environmental protection, and compliance—today under probation, and, soon enough, on its own.

**B.      Background**

1.      Report Overview

*a)  Roadmap of Report*

Part I.A of this Report opened with the CAM's preliminary statement on ECP Year Three developments, including observations about the Company's ongoing efforts to respond to the COVID-19 crisis that emerged near the end of ECP Year Three.

Part I.B sets up the background for this Report, including:  (1) a roadmap of the Report, as well as a summary of the role of the CAM and CAM reports as required by the ECP and the Court; (2) a discussion of the Court's oversight role in light of the unfolding COVID-19

---

[11] It is better to prevent error than to forgive the criminal.

Labour well the Minute Particulars: attend to the Little Ones;

And those who are in misery cannot remain so long,

.…

He who would do good to another must do it in Minute Particulars.

General Good is the plea of the scoundrel, hypocrite, and flatterer . . .

"Jerusalem" by William Blake (f. 55, ll. 48–53, 60–6).

pandemic; (3) the background of the current case, including:  the Company and its corporate

structure; the underlying criminal conviction and sentencing; the probation revocation petition

and the agreement resolving that petition; the Status Conferences held with the Court during ECP

Year Three; the first Status Conference of ECP Year Four, held on April 24, 2020; and the

Court's Order issued following the April Status Conference; and (4) other legal proceedings

arising since the start of the ECP, including COVID-19-related proceedings.

   Part I.C. summarizes COVID-19-related developments, with a focus on those affecting

the cruise industry and the Company, including developments since the most recent CAM

Quarterly Report.

   Part I.D. provides an overview of the CAM Team's activities during ECP Year Three,

including visits to ships and shoreside facilities, as well as updates on the CAM Team's efforts to

transition to remote visits while in-person visits remain temporarily suspended due to COVID-

19, as directed by the Court.

   Part II is an Executive Summary of the CAM's ECP Year Three findings regarding the

Company's capabilities to meet ECP objectives.  *See* ECP § VI.F.3.b.[12]  As in prior CAM

Annual Reports, the CAM's findings are divided into two categories:  "Progress" and

"Unresolved Barriers and Opportunities for Improvement."  Part III and Part IV provide more

detailed discussion and analysis of each of the Progress and Barrier findings, respectively.

   Part V provides an assessment of the CAM Team's oversight of the external audit

function performed by the TPA, while Part VI provides an assessment of the CAM Team's

---

[12] Unless otherwise specified, all citations to the ECP in this Report are to the second amended
version that went into effect on June 3, 2019.

oversight of the internal audit function performed by the Company's Risk Advisory and Assurance Services ("RAAS") group.

Finally, Part VI identifies ongoing CAM Team areas of focus for ECP Year Four.

### b)  Role of CAM and CAM Reports

The CAM's mandate under the ECP is to "monitor [the Company's] compliance with this ECP."  ECP § VI.A.  This includes both performing the "tasks and responsibilities" set forth in the ECP, and reporting to the Court, Interested Parties,[13] and Company.  *See id.* at § VI.F. Among other things, the CAM must submit an annual report that shall "include and address" any "information of which the CAM becomes aware pertaining to [the Company's] capabilities to meet the objectives of this ECP, including . . . with respect to [the Company's] performance, whether personnel-based or related to any of its Covered Vessels, systems, equipment, or components."  *Id.* at § VI.F.3.a-b.

The CAM's annual report must also "provide a summary of the CAM's findings with respect to the adequacy of the audits and recommendations for change made by" the TPA.  *Id.* at § VI.F.3.a.  In addition, during ECP Years One through Four, the CAM must perform "a review of [the Company's] internal environmental audits with respect to Covered Vessels and Covered Personnel" and "assess the ability of the Company's internal audit process to accomplish the objectives of this ECP."  ECP § VI.F.4.[14]

The Court has tasked the CAM with serving as its "eyes and ears" within the Company and to provide the "big picture" of the Company's compliance efforts.  Status Conf. Tr. at 16

---

[13] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis."  *Id.* at § I.D.

[14] As noted above, internal environmental audits are performed by the Company's RAAS group.

July 13, 2020

(Oct. 18, 2017); Status Conf. Tr. at 45 (Dec. 4, 2017).  The TPA's reports provide a more granular review of ship and shoreside audit findings related to ECP requirements.

In addition to the CAM Annual Reports required by the ECP, the Company, the Government (together, the "Parties"), the CAM, and the Court agreed that the CAM would prepare CAM Quarterly Reports beginning with the first quarter of ECP Year Two.  *See* Dkt. No. 66.  At the conclusion of each ECP year, the CAM prepares an Annual Report that also serves as the Quarterly Report for the final quarter of the preceding year.  Therefore, this CAM Third Annual Report also serves as the report for the fourth quarter of ECP Year Three.  The Court has ordered that all CAM Annual Reports and Quarterly Reports be filed in the public record.  *See* Dkt. Nos. 104, 113.

### 2.     COVID-19 and Court Oversight

Before COVID-19, this Court had made clear that the Company must improve its compliance performance in the face of continuing ECP violations, including violations of marine environmental protection laws.  *See* CAM Second Annual Report at 1-3.  The Court stressed that this would require not only a focus on meeting specific ECP requirements, but also on improving the way the Company operates, and its culture.  *See* CAM First Annual Report at 24; CAM Second Annual Report at 53; CAM September 2019 Quarterly Report at 15-16.  In ECP Years One and Two, the CAM observed that the Company's balkanized corporate leadership and structure, ineffective internal investigations, pervasiveness of a blame culture, and inconsistent support for compliance (financial, operational, and otherwise) were barriers to developing a sustainable compliance program and culture.  Following its guilty plea to multiple probation violations in June 2019, the Company made significant changes to its corporate compliance structure, including establishing the position of a Chief Ethics & Compliance Officer to lead a

July 13, 2020

new Ethics & Compliance Department.[15]  The Company also began or continued other efforts to improve its investigations function, understand and address the problems in its culture, and increase the consistency of support for the compliance needs of the ships.

COVID-19 now presents a threat to the continued operation of the Company, and those efforts are under the stress of a company without revenue.  But, consistent with the Court's admonition, it is critical that the Company maintain its commitment to and support for compliance (including financial and operational support) as it navigates the crisis.  Recently updated guidance from DOJ affirms the need to evaluate whether a company's compliance program is "adequately resourced and empowered to function effectively," as well as "why the company has chosen to set up the compliance program the way that it has, and why and how the company's compliance program has evolved over time."  DOJ, *Evaluation of Corporate Compliance Programs* (Updated June 2020), *available at* https://www.justice.gov/criminal-fraud/page/file/937501/download ("DOJ Corporate Compliance Program Guidance"), at 2.[16]  It is also important to evaluate whether the steps the Company has and will take "create and foster a culture of ethics and compliance with the law at all levels of the company."  *Id.* at 10.

The COVID-19 crisis also underscores the interrelated nature of the four "HESS" areas of Health, Environment, Safety, and Security.  In examining the Company's compliance performance, the "E" in HESS—Environmental compliance—cannot be separated from the other

---

[15] Recently, the Company also announced the appointment of a Chief Operating Officer at All Brands Group (a position that has not existed for several years).  Both the Chief Ethics & Compliance Officer and the Chief Operating Officer will report directly to the Company's CEO.

[16] The DOJ guidance calls for looking at a range of factors in evaluating a corporate compliance program, including:  the risk assessment function; policies and procedures; corporate culture; training and communications; reporting mechanisms; investigations; third-party management; commitment by senior and middle management; autonomy and resources; incentives and disciplinary measures; and continuous improvement.  *See generally id.*

July 13, 2020

areas of Health, Safety, and Security compliance.  As a threshold matter, an environmentally

compliant ship must have the necessary resources and support for compliance, including:

installed and functioning pollution prevention equipment; a full set of critical (environmental)

spare parts; sufficient staffing with qualified and adequately trained individuals, especially in the

deck, technical, and environmental departments; manageable workloads; adequate shoreside

support, including financial, IT, voyage planning, and waste offload and waste vendor

assessment support; and a culture that supports and incentivizes compliance (including one that

is free from harassment and discrimination).  *See* CAM March 2020 Quarterly Report at 37-41,

61-65.

As COVID-19 has made stark, an environmentally compliant ship also must be a healthy,

safe, and secure ship.  A ship that is struggling with its health, safety, or security compliance

may also struggle with its environmental compliance as a result.  *See id.*  As this Court has

recognized, onboard outbreaks of a potentially disabling disease like COVID-19 among crew

members "could jeopardize a ship's ability to operate safely and in compliance with

environmental protection requirements."  *Id.* at 30.  The International Maritime Organization has

also observed that "[s]eafarers spending extended periods onboard" due to governmental travel

restrictions "are more at risk of adverse health effects, including physical and mental health

issues . . . And a physically and mentally fatigued seafarer has a much higher risk of being

involved in a marine casualty."  *Crew changes and repatriation of seafarers – a key issue

explained* (June 16, 2020), http://www.imo.org/en/MediaCentre/HotTopics/Pages/FAQ-on-crew-

changes-and-repatriation-of-seafarers.aspx.[17]

---

[17] Further, many of the same causes may underlie compliance challenges across HESS areas.
For example, cultural and workplace conditions affecting deck/bridge officers were found to

July 13, 2020

The COVID-19 pandemic is also having direct impacts on the Court's supervision of the Company's compliance with the ECP and the terms and conditions of probation. The CAM and TPA have an obligation under the ECP to visit ships and shoreside facilities as part of their oversight responsibilities. While the Court has granted temporary leave for remote visits and audits, *see infra*, Part I.B.3.f and Part I.D.1, the Court also recognizes "that remote visits and audits are not optimal but are necessary given the unique and unprecedented circumstances of the COVID-19 pandemic." Dkt No. 189 at 6. To determine when it might be safe for the CAM Team and TPA to return to in-person visits and audits, the Court, CAM Team, and TPA must be able to assess the Company's health, safety, and security compliance efforts. This is necessary not only for the health and safety of members of the CAM Team and TPA, but also for ship crews and shoreside staff who would interact with them. While it is important for the CAM Team and TPA to avoid exposing themselves to COVID-19, it is equally important that the CAM Team and TPA avoid introducing or exacerbating the spread of COVID-19 on a ship or at a shoreside facility.

---

have contributed to the 2012 *Costa Concordia* tragedy, a major safety incident, ultimately leading to the development of the concept of Bridge Resource Management. *See* CAM First Annual Report at 30; CAM December 2019 Quarterly Report at n.32 (noting that the Company defines Bridge Resource Management as the "effective management and utilization of all resources, human and technical, available to the bridge team to ensure the safe completion of the ship's voyage from berth to berth"); *see also* A. Di Lieto, BRIDGE RESOURCE MANAGEMENT: FROM THE COSTA CONCORDIA TO NAVIGATION IN THE DIGITAL AGE (1st Ed. 2015). Ineffective Bridge Resource Management (and/or the related concept of Engine Resource Management) continues to be a repeat finding in investigations of the Company's recent environmental and safety incidents. *See* CAM December 2019 Quarterly Report at 49-50; CAM March 2020 Quarterly Report at 141.

July 13, 2020

Therefore, while this Report focuses on the Company's environmental compliance performance, it also discusses relevant aspects of the Company's broader HESS compliance efforts in the areas of health, safety, and security.

3.      Case Background

a)  The Company

The defendant in this case is Princess Cruise Lines, a wholly-owned indirect subsidiary of Carnival Corporation & plc ("Carnival Corp."). Princess Cruise Lines is one of nine brands under the Carnival Corp. corporate umbrella. Each of the nine brands falls within one of Carnival Corp.'s four operating groups.[18] The brands and operating groups are based in various locations around the world:

| Operating Group | Brand(s) | Primary Shoreside Office Location(s) |
|---|---|---|
| **Carnival Cruise Line** | Carnival Cruise Line | Miami, Florida |
| **Carnival UK** | Cunard<br><br>P&O Cruises UK | Southampton, UK |
| **Costa Group** | AIDA Cruises ("AIDA")<br><br>Costa Cruises ("Costa") | Hamburg, Germany (Costa and some AIDA shared services)<br><br>Rostock, Germany (AIDA)<br><br>Genoa, Italy (Costa)<br><br>Shanghai, China (Costa Asia) |
| **Holland America Group** | Holland America Line<br><br>P&O Cruises Australia[19]<br><br>Princess Cruise Lines<br><br>Seabourn | Seattle, Washington (Holland America Line, Seabourn, and some shared services for the other brands)<br><br>Santa Clarita, California (Princess Cruise Lines and some shared services for the other brands)<br><br>Sydney, Australia (P&O Cruises Australia) |

---

[18] Operating groups may also be referred to as "operating lines" or "operating companies." For consistency, this Report generally adopts the term "operating group."

[19] P&O Australia does not operate any Covered Vessels, but the P&O Australia shoreside office provides support to Covered Vessels operating in and around Australia.

July 13, 2020

In addition, Carnival Corp. has a corporate headquarters office in Miami, Florida, that houses the All Brands Group, an entity that oversees all of the Company's operating groups and brands (collectively, the "Company").  *See* CAM First Annual Report at 1; CAM Second Annual Report at n.4.

The Company's complex, multi-national corporate structure is the result of a series of mergers and acquisitions that took place over the course of several decades.  *See* CAM First Annual Report at 25-26.  The Company began in 1972, with the founding of the flagship Carnival Cruise Line and its parent corporation, incorporated in Panama.  *See* Carnival Corp., *Form 10-K for the Fiscal Year Ended November 30, 2019* ("2019 10-K"), *available at* https://www.carnivalcorp.com/static-files/dda3ed91-579c-4930-96bf-55bc4e839497, at 4.  An initial public offering was completed in 1987, which provided an "influx of capital" that "allowed the company to begin expanding through acquisition."  *Corporate Timeline*, https://www.carnivalcorp.com/corporate-information/corporate-timeline?c=200767&p=irol-corporatetimeline ("Corporate Timeline").  Subsequent acquisitions and mergers included:

- 1989:  Acquisition of Holland America Line;

- 1992-1999:  Acquisition of Seabourn;

- 1993:  Name of parent corporation changed to "Carnival Corporation" to distinguish it from Carnival Cruise Line;

- 1997-2000:  Acquisition of Costa;

- 1998-1999:  Acquisition of Cunard;

- 2003:  Merger of Carnival Corporation and P&O Princess Cruises (which includes Princess Cruise Lines, P&O Cruises UK, AIDA, and P&O Cruises Australia); and

July 13, 2020

- 2003:  Carnival Corporation begins trading as "Carnival Corporation & plc," dual-listed on the New York and London stock exchanges.[20]

*See* Corporate Timeline.  As of late 2019, the Company describes itself as the "world's largest leisure travel company" and "the largest cruise company, carrying nearly 45 percent of global cruise guests" on a fleet of over 100 ships.  2019 10-K at 4.

As discussed in the CAM First Annual Report, the Company's brands and operating groups have historically operated with a high degree of independence, making Carnival Corp. "closer to an association of companies rather than a coordinated and integrated corporation." CAM First Annual Report at 25-26.  The Company's website states that its "unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy,[21] with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program." *Vision, Mission & History*, https://www.carnivalcorp.com/corporate-information/mission-and-history?c=200767&p=irol-history.[22]

---

[20] As noted above, Carnival Corporation was incorporated in Panama in 1972.  Carnival plc was incorporated in England and Wales in 2000.  As a dual-listed company, the "two companies operate as if they are a single economic enterprise with a single senior executive management team and identical Boards of Directors, but each has retained its separate legal identity."  2019 10-K at 4.

[21] The assertion that the Company's success is a product of its decision to maintain largely autonomous operations across its brands is often presented as an unqualified truth.  However, individuals from all levels of the Company have expressed concerns that this approach may not be optimal from a compliance perspective.  *See* Employee Interview/Call Notes.  With the recent appointment of a Chief Operating Officer at All Brands Group, it remains to be seen if the Company will continue to operate in this decentralized manner.

[22] As discussed below, *see infra*, Part IV.C, the CAM made a finding in ECP Year One that the Company's "complex corporate structure and lack of centralization impede efforts towards continuous improvement," and that there is "a need for greater clarity as to responsibility, accountability, and authority for environmental compliance."  CAM First Annual Report at 4. The CAM also found that the Company had not given the Environmental Corporate Compliance

July 13, 2020

> ### b) *Criminal Conviction and Probation*

On December 20, 2016, Princess Cruise Lines pleaded guilty to seven criminal felony counts related to knowing illegal discharges of oily waste water, and efforts to conceal those discharges, on the *Caribbean Princess* from 2005-2013: one count of conspiracy; four counts of failure to maintain accurate records; and two counts of obstruction of justice. *See* Dkt. No. 30. This case arose against a backdrop of numerous prior vessel pollution prosecutions and court-imposed compliance programs involving cruise, shipping, and other maritime companies.[23] *See* CAM First Annual Report at 6-8 (discussing history of vessel pollution cases); *id.* at 8-11 (discussing history of the current case); *id.* at 12-13 (providing an overview of the regulatory regime in which cruise ship companies operate). These include at least two cases in which other Carnival Corp. entities have pleaded guilty to felony charges for conduct similar to that in the present case:

- In 1998, a Holland America Line company pleaded guilty to felony charges after illegally discharging oily waste water and failing to properly record such discharges on one of its ships, resulting in $2 million in criminal penalties and a five-year ECP for all Holland America Line ships; and

- In 2002, Carnival Corp. pleaded guilty to six felony charges after falsifying records to conceal oily waste discharges on six ships, resulting in $18 million in criminal penalties and a five-year ECP for its entire fleet (including Princess Cruise Lines ships following the 2003 merger).

---

Manager the ECP-required "authority to ensure full implementation of [the] ECP." *Id.*; *see* ECP § III.A.2. Although the Company has taken steps to address these findings—prompted in large part by the probation revocation petition filed near the end of ECP Year Two—these issues continue to impede the Company's compliance efforts in ECP Year Three. *See infra*, Part IV.C.

[23] These prosecutions have involved violations of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), an international environmental treaty implemented in the United States by the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901-12, and associated criminal offenses, such as obstruction of justice, 18 U.S.C. § 1505, false statements, *id.* § 1001, and conspiracy, *id.* § 371.

*See id.* at 7-8 (discussing the Company's prior environmental criminal convictions and court-mandated compliance programs).  Princess Cruise Lines also had at least two other prior environmental convictions:  the first, in 1993, for knowingly discharging plastic bags of garbage in the ocean off the Florida Keys; and the second, in 2007, for failing to operate safely in the vicinity of humpback whales in waters near Alaska.  *See id.* at 8.

On April 19, 2017, this Court sentenced Princess Cruise Lines to pay a $40 million criminal penalty and community service payment, and to serve a five-year term of probation. *See* Dkt. No. 30.  Among the Special Conditions of Supervision, Princess Cruise Lines and its parent Carnival Corp. must fund, implement, and abide by an ECP for five years.  *See id.*  The terms of the ECP apply to the Company's ships, across all of its brands, that are authorized to operate in United States waters ("Covered Vessels"[24]), *see* ECP §§ I.A, I.D, and XI, and to shoreside and shipboard employees involved with the operation and technical management of those ships ("Covered Personnel").  *See* ECP §§ I.B and I.D.  The Company also must retain an outside independent TPA and fund a CAM to report to the Court and the Interested Parties.  *See* Dkt. No. 30.  The role of the CAM is to "monitor [the Company's] compliance with this ECP." ECP § VI.A.  The ECP also charges the CAM with overseeing both the external TPA audit function, *see* ECP §§ VI.F.1-3, and the Company's internal audit function, *see* ECP § VI.F.4-5, which is housed in Carnival Corp.'s RAAS group.

---

[24] The list of Covered Vessels has changed throughout the ECP period.  As of the date of this Report, there are 74 Covered Vessels spanning eight of the Company's brands:  2 for AIDA; 27 for Carnival Cruise Line; 2 for Costa; 3 for Cunard; 14 for Holland America Line; 3 for P&O Cruises UK; 18 for Princess Cruise Lines; and 5 for Seabourn.  *See* May 2020 Probation Supervision Report, Attachment 4.

July 13, 2020

### c)  *Probation Revocation Petition and Agreement*

In March 2019, the Office of Probation filed a probation revocation petition, subsequently amended, alleging a total of six violations of the terms and conditions of probation. *See* Dkt. Nos. 93, 110.  The alleged violations relate to:  (1) conducting an undisclosed ship visit program to prepare ships shortly in advance of TPA audits; (2) conducting an undisclosed ship visit program after the Court had disapproved of the prior undisclosed ship visit program;[25] (3) a continuing failure to provide the Environmental Corporate Compliance Manager with the requisite authority to implement the ECP; (4) falsifying training records on two ships during ECP Year One; (5) contacting officials of the United States Coast Guard seeking agreement with the Company's position on the definition of a disputed ECP term, outside of the specified protocol for modifying the ECP; and (6) illegally discharging plastic mixed with food waste in Bahamian waters and failing to accurately record the discharge in the ship's records in violation of MARPOL Annex V.  *See* CAM Second Annual Report at 5-6, 86-93 (discussing the probation violations).

On June 3, 2019, the Carnival Corp. CEO pleaded guilty on behalf of the Company to all six violations.  *See* Dkt. No. 137 (Paperless Minute Entry).  The Court accepted an agreement between the Government and the Company to resolve the probation violations and avoid the need for an evidentiary hearing.  *See Proposed Agreement For The Court's Consideration Resolving Superseding Petition For Summons For Offender Under Supervision Dated April 26, 2019*, Dkt. No. 134 at 1-8 (proposed agreement); Dkt. No. 143 (Order accepting agreement)

---

[25] These undisclosed ship visit programs are discussed in detail in prior CAM reports.  *See* CAM First Annual Report at 73-74; CAM September 2018 Quarterly Report at 29-30; CAM December 2018 Quarterly Report at 38; CAM April 2019 Quarterly Report at 41-52 (discussing findings resulting from the CAM Team's review of these ship visit programs).

(collectively, "Probation Revocation Agreement").  Both the Court and the Government have

emphasized that the main impetus for the probation revocation petition was not due to particular

compliance issues on any ship, but due to the failure of the Company's top leadership to take

appropriate action on, and provide needed support for, environmental compliance.  *See* CAM

December 2019 Quarterly Report at 11.

   Under the terms of the Probation Revocation Agreement, the Company agreed to

undertake a range of remedial and other actions, many with associated deadlines.  These include:

the payment of an additional $20 million criminal penalty; the issuance of a statement to

employees by Company leadership personally accepting responsibility for the probation

violations, *see Important Message from Chairman Micky Arison and CEO Arnold Donald* (July

1, 2019) (stating that "Chairman Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full

responsibility for these violations"); enhanced CAM and TPA oversight, including additional

visits and/or audits; restructuring of the Company's corporate compliance function, including

appointing a Chief Ethics & Compliance Officer and promoting the Environmental Corporate

Compliance Manager; enhancements to the Company's policies for reporting regulatory

violations; other enhanced reporting requirements; and improvements to the Company's food

waste management practices.  *See* CAM Second Annual Report at 5-6, 86-93; CAM September

2019 Quarterly Report at 3-6; CAM December 2019 Quarterly Report at 11-17; CAM March

2020 Quarterly Report at 50-52.  Notably, the Company appears to have met its filing and

submission deadlines under the Probation Revocation Agreement to date.  *See infra*, Part III.B

and Appendix A (providing an overview of the status of the Company's fulfillment of its

Probation Revocation Agreement obligations).

July 13, 2020

### d)  ECP Year Three Status Conferences

As part of its oversight of the Company's compliance with the ECP and other terms and conditions of probation, the Court ordered the Company, the Government (together, the "Parties"), as well as the Office of Probation, the CAM, and the TPA, to hold quarterly Status Conferences with the Court.  *See* Dkt. No. 54.  The Court also ordered the Parties to file Status Reports prior to each quarterly Status Conference.  *See id.*  During ECP Year Three, Status Conferences were held on:  July 19, 2019; October 2, 2019; and January 8, 2020.  In addition: on June 3, 2019, a hearing was held on the Parties' proposed Probation Revocation Agreement; and on December 19, 2019, a meeting was held in open court at which the Company presented on "its compliance efforts beyond those that have been conveyed to the Court during the status conferences."  Dkt. No. 167.

### e)  April 24, 2020 Status Conference

The first Status Conference of ECP Year Four was held on April 24, 2020.  Due to the COVID-19 pandemic, the hearing was held virtually.  With the Court's recognition that "[t]hese are unprecedented times for all of us," and that "right now . . . is a critical time" to "not lose focus on the core values of compliance," the focus of the hearing was on "how the defendant is using this pause[26] in operations to take and prepare [it]self for when [it] come[s] out the other side."  Dkt. No. 189 at 1 (citing Status Conf. Tr. (Apr. 24, 2020)).  The Carnival Corp. CEO expressed to the Court:  "[P]lease be assured that we remain committed to compliance . . . nothing is wavering in our commitment to compliance.  Nothing is wavering in our commitment

---

[26] As discussed below, on March 12 and 13, 2020, respectively, the Company announced a voluntary 60-day suspension of its cruise operations at Princess Cruise Lines, and an approximately 30-day suspension at its other brands.  Those initial suspensions have since been extended, with durations varying by brand and geographic location.  *See infra* Part I.C.4.a.

to environmental protection." *Id.* While acknowledging that "it is a very trying time" and that "we are . . . still fighting for survival of the company," the CEO stated that he "made it very clear to my leadership team, to the organization . . . that under no circumstances should we compromise as we seek to keep the company alive, but that we never compromise on compliance or environmental protection or our safety and health and well-being." *Id.* at 1-2. He reiterated: "[W]e are totally focused on compliance still, and we are not going to cut any corners." *Id.* at 2.[27]

Regarding the Company's activities during the pause in cruise operations, the CEO and the Chief Maritime Officer represented that the Company's immediate focus was on "repatriation," or the process of returning "tens of thousands of crew members" to their home countries, including through the use of some of the Company's ships. Dkt. No. 189 at 2.[28] Acknowledging that, even if they are not carrying passengers, "[t]hose ships are still operating," the CEO pledged that "we are still are very much focused on environmental protection and compliance with those ships wherever they happen to be anchored or wherever they happen to be berthed and when they are at sea." Dkt. No. 189 at 2. In addition, the Chief Ethics & Compliance Officer stated that his team "is focusing on how we develop our plan for the relaunch, whenever that will occur . . . We want to keep the CAM updated during the pause in guest operations as we develop a more detailed plan. We are prepared now to really begin looking at prior to re-entry how do we come back stronger, better, smarter . . . [We] remain

---

[27] It remains to be seen if there is a gap between these stated commitments and actions taken by top leadership across the Company, including within the brands/operating groups. *See infra*, Part IV.A.

[28] As of the date of this Report, several thousand crew members have not yet made it home. *See infra*, Part I.C.4.c(ii)-(iii).

wholly committed to figuring what we can advance during this pause so we come back stronger."

*Id.*; *see also infra*, Part I.C.4.g (discussing the Ethics & Compliance Draft Pause Priorities Plan).

### f)   Order Re: COVID-19 Impacts and Probation Obligations

Following the April 24, 2020, Status Conference, on June 2, 2020, the Court issued an

*Order Re: COVID-19 Impacts and Probation Obligations.  See* Dkt. No. 189.  The Order

recognizes both the "significant impact" of COVID-19-related events on the Company

(including suspensions of cruise operations, financing efforts, and staff reductions), and the

"continuing obligation of the Company to meet its compliance obligations in existing law and the

terms and conditions of probation."  *Id.* at 4.  The Order addresses the Court's need for "further

information in order to assess the impact of these events, including the recent staff reductions, on

the Company's ethics and compliance efforts in the interrelated Health, Environment, Safety,

and Security ('HESS') areas."  *Id.*  It also addresses "the CAM and TPA's need for alternative

means of access to Company personnel, physical spaces and equipment, systems, records,

documents, information, and other items to continue to perform their oversight responsibilities

while the ability to perform in-person ship and shoreside facility visits and audits remains

limited."  *Id.* at 5; *see also infra*, Part I.D.1.

Accordingly, the Court ordered that, on or before June 17, 2020, and supplemented or

amended as needed, the Company submit to the Interested Parties, CAM, and TPA:

- **Draft Pause Priorities Plan:**  The current draft of the Company's Pause Priorities Plan that describes "how the Company will address its obligations under the ECP and terms and conditions of probation . . . during the current suspensions of guest operations, as well as in preparation for resumption of guest service 'to ensure that when the ships return to service, they will come back stronger and better equipped.'" Dkt. No. 189 at 5 (quoting April 2020 Probation Supervision Report, Attachment 5, at 2); *see also infra*, Part I.C.4.g (discussing the draft plan);

- **Organizational Charts:**  Organizational charts "reflecting the organizational structure and personnel that will be in place after June 1, 2020, at All Brands Group

and each of the operating groups/lines/brands" for specified organizations within the Company with HESS-related compliance or operational functions.  Dkt. No. 189 at 5; *see also infra*, Part I.C.4.f (discussing personnel impacts, including staff reductions); and

- **Updated Ethics & Compliance Financial Plan:**  An updated *Carnival Corporation Financial Plan (2019 and 2020)*, previously submitted on December 10, 2019, including a revised Ethics & Compliance Department and Program budget for Fiscal Year 2020.  Dkt. No. 189 at 6; *see infra*, Part III.E.1 (noting that the revised plan is still under development, with an expected production date during the week of July 27, 2020).

In addition, the Court "grant[ed] temporary leave for the CAM and TPA to perform ship and shoreside facility visits and audits remotely, recognizing that remote visits and audits are not optimal but are necessary given the unique and unprecedented circumstances of the COVID-19 pandemic."  Dkt. No. 189 at 6.  The Court ordered the Company to "cooperate with the CAM and TPA to facilitate their ability to perform such remote ship and shoreside facility visits, including complying with reasonable requests" for access to:  remote audio and video-conferencing capabilities; records, logbooks, and other documents; electronic databases and systems; video-recordings (e.g., CCTV); and other items or materials as reasonably necessary for performing oversight responsibilities.  *Id.*  The Court also granted temporary leave for the Company, Government, CAM, and TPA to "confer to develop an alternative procedure for conducting remote visits and audits" to the extent it is not feasible to conduct them in an "unannounced" or "short notice" manner as described in Dkt. Nos. 75 and 81.  *Id.*  The Parties, CAM, and TPA are to "report on the status of remote visits and audits at the upcoming Status Conference, currently scheduled for July 29, 2020."  *Id.*

4.     Other Legal Proceedings Arising Since Start of ECP

Other legal proceedings involving the Company have arisen since the start of the ECP, including COVID-19-related actions.

*a) COVID-19-Related Legal Proceedings*

As discussed in detail below, the Company is facing numerous legal proceedings and potential legal proceedings regarding its handling of the COVID-19 crisis, including:  an investigation by the United States Congress; investigations by multiple governmental authorities in Australia and New Zealand regarding the *Ruby Princess*; several putative class action lawsuits by former passengers on different Costa, Holland America Line, and Princess Cruise Lines ships; at least two putative class action securities lawsuits by Carnival Corp. shareholders; over thirty additional individual civil lawsuits from former passengers on different Costa, Holland America Line, and Princess Cruise Lines ships, including wrongful death lawsuits; and other actions or investigations by United States governmental authorities detailed below.  *See infra*, Part I.C.4.h. The Company "does not agree with all of the assertions made in the various media reports and lawsuits described throughout this report."  *See* Company Comments on Draft Report.

*b) Other Legal Proceedings*

Other non-COVID-19-related legal proceedings arising since the start of the ECP involving Carnival Corp. entities include:

- **DOI Administrative Agreement:**  An administrative agreement between Princess Cruise Lines and the United States Department of the Interior ("DOI") that, among other things, requires Princess Cruise Lines to comply with the terms and conditions of probation in this case, and allows DOI to initiate suspension and/or debarment proceedings against Princess Cruise Lines if there is a material breach of the administrative agreement.  *See* CAM Second Annual Report at 14-15;

- **Criminal Conviction for Workplace Fatality:**  A June 2018 criminal guilty plea by Princess Cruise Lines to a violation of the New Zealand Maritime Transport Act "in connection with an incident that led to the death of a crewmember when a high-pressure nitrogen cylinder burst while being re-pressurized."  *See* CAM Second Annual Report at 15 (citation omitted); and

- **Criminal Conviction for Alleged Emissions Violation (Overturned and Currently on Appeal):**  A November 2018 criminal conviction by the Criminal Court of Marseilles, France, resulting in a fine, costs, and damages against Carnival

July 13, 2020

plc and the captain of a Non-Covered P&O Cruises UK ship totaling € 118,000, related to the alleged burning of fuel in the port of Marseilles with a higher sulfur content than allowed under the French Environmental Code.  *See* 2019 10-K at 35.  In November 2019, a court of appeal overturned the original conviction.  *See id.*  The French prosecution has appealed to the French Supreme Court.  *See id.*; and

## C.  COVID-19 Developments

### 1.   Background

As discussed in the most recent CAM Quarterly Report, the Company has faced an overwhelming and ongoing crisis due to COVID-19, beginning around early 2020.  *See* CAM March 2020 Quarterly Report at 1-36 (discussing COVID-19 background; responses by international and national governments; cruise industry impacts and responses; Company impacts and responses; and CAM Team response and ongoing examination).

According to the United States Centers for Disease Control and Prevention ("CDC"), COVID-19 is a respiratory disease that was first detected in Wuhan, China, in late 2019, and since spread worldwide.  *See id.* at 3-4.  The primary cause of its spread appears to be international air and domestic travel.  *See* H. Lau, *et al.*, *The association between international and domestic air traffic and the coronavirus (COVID-19) outbreak*, 53 Journal of Microbiology, Immunology and Infection 467 (June 2020) (concluding that "[t]he number of flight routes as well as total passenger volume are highly relevant risk factors for the spread of current COVID-19"); *Tracking the Spread of COVID-19 with Air Travel Data*, https://www.rand.org/nsrd/projects/cat-v.html (series of reports using data visualization tool to track COVID-19 exportation and importation around the world); *see also* B. Carey and J. Glanz, *Travel From New York City Seeded Wave of U.S. Outbreaks*, NYTIMES.COM (Updated June 27, 2020), https://www.nytimes.com/2020/05/07/us/new-york-city-coronavirus-outbreak.html (attributing primary source of outbreak in the United States to international flights from Europe into New York and subsequent domestic spread).

July 13, 2020

Reported symptoms of COVID-19 range from very mild, including no symptoms, to severe, including death.  Individuals who appear most at risk of developing severe symptoms include "older adults and people of any age who have serious underlying medical conditions," such as heart disease, lung disease, or diabetes.  *Frequently Asked Questions* (Updated June 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html.  The virus "is thought to spread mainly from person to person, mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks."  *Id.*  As of the date of this Report, the complete clinical picture of COVID-19 is still unknown.  *See id.*  There is still no approved vaccine to protect against it.  *See id.*

The COVID-19 situation was declared a global pandemic by the World Health Organization on March 11, 2020; a national public health emergency by the United States on January 31, 2020; and a national emergency by the United States as of March 1, 2020.  *See* CAM March 2020 Quarterly Report at 5-7.  As of July 12, 2020, the World Health Organization reports over 12.5 million cases and over 560,000 deaths worldwide.  *See Situation Report – 174* (July 12, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200712-covid-19-sitrep-174.pdf?sfvrsn=5d1c1b2c_2.  As of the same date, CDC reports over 3.2 million total cases and over 143,000 deaths in the United States.  *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (Updated July 12, 2020).

Governments at all levels around the world have implemented travel restrictions, quarantine requirements, stay at home orders, social gathering restrictions, and other public health and safety measures in an effort to contain the spread of the disease.  *See* CAM March 2020 Quarterly Report at 6-20.  These measures have had significant impacts on many

businesses and individuals, including those in the travel and cruise industries. Travel warnings from the United States government advising against all international travel, as well as all cruise ship travel, remain in effect. *See id.* at 13-15. Based on available information, with the Court's approval, the CAM Team and TPA suspended all in-person ship and shoreside visits and audits under the monitorship in early March 2020. *See infra*, Part I.D.1.

Like other cruise companies, the Company continues to face substantial challenges from the crisis, including impacts to its operations, finances, and personnel. The Company voluntarily suspended cruise operations across its fleet around mid-March 2020. Facing the sudden cessation of revenues as a result, the Company completed financing efforts over the following months to raise over $10 billion in liquidity, *see infra*, Part I.C.4.e(i), and engaged in a range of cost preservation efforts, including significant staff reductions and the sale of some of its ships. *See infra*, Part I.C.4.e-f.

As of the date of this Report, the Company continues to suspend cruise operations across its fleet, although three AIDA ships (all non-Covered Vessels) are expected to resume cruising in a limited, phased capacity from German ports in August 2020. Along with other members of the Cruise Lines International Association ("CLIA"), each of the Company's brands has suspended cruise operations in United States waters until at least September 15, 2020. *See infra*, Part I.C.4.a. Some of the Company's brands have announced additional suspensions, which vary by brand and geographic location. *See id.*

Both the impacts of COVID-19, and the Company's responses, continue to develop as the situation evolves.

July 13, 2020

      2.   <u>COVID-19 Timeline</u>

A timeline of notable developments discussed in the most recent CAM Quarterly Report include:

- <u>January 30, 2020</u>:  World Health Organization declares a **Public Health Emergency of International Concern**;

- <u>January 31, 2020</u>:  United States Secretary of State declares a **national public health emergency**;

- <u>January 31, 2020</u>:  United States **restricts travel into the United States of foreign nationals who traveled to China** within the past 14 days;

- <u>~February 2020 (updated February 18, 2020)</u>:  United States CDC issues ***Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019***, which covers strategies for preventing spread of COVID-19 during and after a voyage, including personal protective measures for crew members;

- <u>February 29, 2020</u>:  United States **restricts travel into the United States of foreign nationals who traveled to Iran** within the past 14 days;

- <u>March 3, 2020</u>:  **CAM Team suspends all in-person ship visits**;

- <u>March 8, 2020</u>:  United States Department of State issues **travel recommendation** that United States citizens, particularly those with underlying health conditions, **should not travel by cruise ship**;

- <u>March 8, 2020</u>:  United States CDC issues **travel recommendation** that travelers, particularly those with underlying health issues, **defer all cruise ship travel** worldwide;

- <u>March 9, 2020</u>:  **CAM Team suspends all in-person shoreside visits**;

- <u>March 10, 2020</u>:  **TPA suspends all in-person ship and shoreside audits**;

- <u>March 11, 2020</u>:  World Health Organization declares a **global pandemic**;

- <u>March 11, 2020</u>:  United States **restricts travel into the United States of foreign nationals who traveled to European countries in the Schengen Area** within the past 14 days;

- <u>March 12, 2020</u>:  Princess Cruise Lines announces that it is **voluntarily suspending global cruise operations for 60 days** (later extended);

- <u>March 13, 2020</u>:  United States President declares a **national emergency**;

July 13, 2020

- <u>March 13, 2020</u>:  CLIA announces that its members, which include all of the Company's brands, are **voluntarily and temporarily suspending cruise ship operations from United States ports for 30 days** (later extended by individual cruise lines for varying time periods);

- <u>March 14, 2020</u>:  United States CDC issues a **No Sail Order** applicable to cruise ships that are not voluntarily suspending operations; therefore, it does not apply to Company (and other CLIA member) ships.  The No Sail Order is renewed, and expanded to include cruise ships not subject to the original order (including Company and other CLIA member ships), on April 15, 2020, as discussed below;

- <u>March 14, 2020</u>:  United States **restricts travel into the United States of foreign nationals who traveled to the United Kingdom and Ireland** within the past 14 days;

- <u>March 16, 2020</u>:  United States President announces a **nationwide program** to slow the spread of COVID-19 through the implementation social distancing measures, including recommendations to avoid social gatherings of more than ten people and avoid discretionary travel;

- <u>March 17, 2020</u>:  United States CDC upgrades its prior recommendation on cruise ship travel to a **Level 3 travel warning** that travelers defer all cruise travel worldwide;

- <u>March 19, 2020</u>:  United States Department of State issues a **Level 4 Global Health Advisory** that advises United States citizens to avoid all international travel; and

- <u>March 27, 2020</u>:  United States President signs into law the **Coronavirus Aid, Relief, and Economic Security ("CARES") Act**, which includes provisions for economic relief to "severely distressed" sectors of the United States economy—including airlines and financial institutions, but not cruise lines.

*See* CAM March 2020 Quarterly Report at 5-32 (citations omitted).

Additional notable developments since the most recent CAM Quarterly Report include:

- <u>March 30, 2020</u>:  United States CDC issues *Public Health Guidance for Potential COVID-19 Exposure Associated with International Travel or Cruise Travel*.  *See* https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html (last updated May 1, 2020);

- <u>April 1, 2020</u>:  United States White House issues **updated guidelines to slow the spread of COVID-19 in the United States**, which continue to recommend avoiding discretionary travel and social gatherings of more than 10 people.  *These 30 Days: How You Can Help* (Apr. 2, 2020), https://www.whitehouse.gov/articles/these-30-days-how-you-can-help/;

July 13, 2020

- <u>April 9, 2020</u>:  United States CDC announces its plan to **renew and extend its prior March 14, 2020, No Sail Order** to include cruise ships not covered by the original order, including Company and other CLIA member ships.  The formal notification is published in the *Federal Register* on April 15, 2020.  *See infra*, Part I.C.3;

- <u>April 10, 2020</u>:  CLIA issues a **statement on the revised United States CDC No Sail Order**, noting "concern[s] about the unintended consequences the No Sail Order . . . has in singling out the cruise industry," including potentially significant economic and job loss impacts to the United States.  *CLIA Statement Regarding No Sail Order Issued by the U.S. Centers for Disease Control and Prevention (CDC) on April 9, 2020* (Apr. 10, 2020), [https://cruising.org/news-and-research/press-room/2020/april/clia-statement-regarding-no-sail-order](https://cruising.org/news-and-research/press-room/2020/april/clia-statement-regarding-no-sail-order);

- <u>April 14, 2020</u>:  United States President announces that various executives, economists, scholars, and industry leaders will form **Great American Economic Revival Industry Groups**, which "will work together with the White House to chart the path forward toward a future of unparalleled American prosperity."  *President Donald J. Trump Announces Great American Economic Revival Industry Groups* (Apr. 14, 2020), [https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-announces-great-american-economic-revival-industry-groups/](https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-announces-great-american-economic-revival-industry-groups/).  The **Hospitality group includes the Carnival Corp. Chairman of the Boards of Directors**, along with executives from other cruise lines, hotels, and resorts.  *See id.*;

- <u>April 15, 2020</u>:  United States **CDC publishes in the *Federal Register*** a formal notice renewing and extending its prior March 14, 2020, **No Sail Order**.  The revised No Sail Order is in effect until July 24, 2020, unless rescinded or modified earlier.  *See infra*, Part I.C.3;

- <u>April 16, 2020</u>:  United States White House issues *Guidelines for Opening Up America Again*, which recommend a three-phased approach to re-opening and empower states to develop their own tailored plans for phased reopening.  *President Donald J. Trump Announces Guidelines for Opening Up America Again* (Apr. 16, 2020), [https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-announces-guidelines-opening-america/](https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-announces-guidelines-opening-america/);

- <u>April 17, 2020</u>:  United States CDC publishes *Interim Guidance for Mitigation of COVID-19 Among Cruise Ship Crew During the Period of the No Sail Order* (subsequently updated several times, most recently on June 1, 2020).  *See infra*, Part I.C.3;

- <u>April 18, 2020</u>:  As of this date, the United States President has **declared that a major disaster exists in all states and territories** of the United States.  *Memorandum on Authorizing the Crisis Counseling Assistance and Training Program for Major Disaster Declarations Related to Coronavirus Disease 2019* (Apr. 28, 2020), [https://www.whitehouse.gov/presidential-actions/memorandum-](https://www.whitehouse.gov/presidential-actions/memorandum-)

July 13, 2020

authorizing-crisis-counseling-assistance-training-program-major-disaster-
declarations-related-coronavirus-disease-2019/;

- <u>May 26, 2020</u>: International Maritime Organization, International Labour
  Organization, and International Civil Aviation Organization issue **joint statement
  seeking support from governments to facilitate crew changes in ports and
  airports**. *See infra*, Part I.C.4.c(iii);

- <u>June 2, 2020</u>: Court issues **Order granting temporary leave for the CAM Team
  and TPA to perform remote visits and audits.** *See supra*, Part I.B.3.f and *infra,*
  Part I.D.1;

- <u>June 8, 2020</u>: International Maritime Organization and United Nations issue **joint
  statement seeking support from governments to facilitate crew repatriation and
  ensure crew wellbeing**, including access to medical care. *See infra*, Part I.C.4.c(iii);

- <u>June 12, 2020</u>: Secretary-General of United Nations issues **statement noting concern
  about the growing humanitarian and safety crisis facing seafarers** around the
  world. *See id.*;

- <u>June 19, 2020</u>: CLIA announces that its members, including all of the Company's
  brands, will voluntarily **extend the suspension of cruise operations from United
  States ports until September 15, 2020**. *See infra*, Part I.C.4.a;

- <u>June 30, 2020</u>: **European Union publishes interim guidelines, called the Healthy
  Gateways Guidance, for restarting cruise ship operations**. *See infra*, Part
  I.C.4.b(i);

- <u>July 6, 2020</u>: Carnival Corp. and the World Travel & Tourism Council announce
  plans to jointly host a virtual **Global Science Summit on COVID-19** on July 23,
  2020. The event will be free and open to the public. *See infra*, Part I.C.4.b(ii); and

- <u>July 7, 2020</u>: Two other major cruise companies, Royal Caribbean Group and
  Norwegian Cruise Line Holdings, announce the creation of the **Healthy Sail Panel**, a
  team of cross-disciplinary experts who will advise on developing a science-backed
  plan for returning cruise ships to service. *See infra*, Part I.C.4.b(iii).

    3.   <u>CDC No Sail Order</u>

On April 14, 2020, the United States CDC renewed and extended its prior March 14,

2020, No Sail Order. *See No Sail Order and Suspension of Further Embarkation; Notice of

Modification and Extension and Other Measures Related to Operations*, 85 Fed. Reg. 21,004

(Apr. 15, 2020) ("No Sail Order Notice"). The prior Order did not apply to cruise ships that had

already voluntarily suspended operations in United States waters, including the Company's ships. However, the renewed Order applies to large cruise ships (with the capacity to carry 250 or more individuals) operating in, or seeking to operate in, United States waters, including "any cruise ship that was previously excluded from the March 14, 2020 Order." *Id.* at 21,005. The No Sail Order generally restricts covered ships from operating in United States waters or disembarking or embarking passengers or crew in United States ports, except under limited circumstances. *See id.* at 21,008; *see also Cruise Ship Crew Member Disembarkations*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/cruise-ship/cruise-ship-member-disembarkations.html. The Order is set to expire on July 24, 2020, although this date may be modified. *See* No Sail Order Notice at 21,004-05.

The No Sail Order is based on findings that "cruise ship travel exacerbates the global spread of COVID-19 and that the scope of this pandemic is inherently and necessarily a problem that is international and interstate in nature and has not been controlled sufficiently by the cruise ship industry or individual State or local health authorities," and that there is "evidence to support a reasonable belief that cruise ships are or may be infected or contaminated with a quarantinable communicable disease." *Id.* at 21,004-06.

If a cruise ship operator wishes to operate any cruise ships in United States waters during the No Sail Order period, it must submit and obtain approval from CDC on an "appropriate, actionable, and robust plan to prevent, mitigate, and respond to the threat of COVID-19 on board cruise ships [("No Sail Order Response Plan")]." *Id.* at 21,007.[29] The Order lays out a minimum

---

[29] There is a limited exception to this requirement: CDC may allow cruise ship operators to disembark asymptomatic crew members in United States ports for repatriation to their home countries, or transfers to another ship, prior to approval of the operator's No Sail Order Response Plan if the operator signs a statement attesting that, after leaving the ship, only private (non-

July 13, 2020

of 14 elements that the plan must address, including:  onboard surveillance of passengers and crew; reporting to CDC; crew training on COVID-19 prevention, mitigation, and response; testing protocols; isolation, quarantine, and social distancing protocols; onboard medical staffing; outbreak management and response plans; evacuation and repatriation plans; and cleaning and disinfection protocols.  *See id.*

As of the date of this Report, the Company has submitted a proposed No Sail Order Response Plan to CDC, but has not received formal approval of its plan.  *See* Employee Interview/Call Notes.  The Company reports that it does not currently have any ships operating in United States waters, and does not plan to operate any of its ships in United States waters before the expected expiration of the No Sail Order period on July 24, 2020.  *See id.*  As noted above, the Company, along with other CLIA members, has voluntarily suspended operations of its cruise ships in United States waters until September 15, 2020, approximately 7 ½ weeks beyond the current expected expiration of the No Sail Order.  *See supra*, Part I.C.1-2.

---

commercial) transport will be used for the crew member(s), along with "with measures in place to ensure those involved in transport are not exposed to the virus that causes COVID-19."  *See* CDC, *Interim Guidance for Mitigation of COVID-19 Among Cruise Ship Crew During the Period of the No Sail Order* (Updated June 1, 2020), https://www.cdc.gov/quarantine/cruise/management/interim-guidance-no-sail-order.html.  The attestation must be signed by the "President and Chief Executive Officer of the operating cruise company, the Chief Ethics and/or Compliance Officer of the operating cruise company and all parent companies, and the highest-ranking Medical Officer of the operating cruise company and all parent companies."  *Attestation for Non-Commercial Travel or Crew Transfers Pre-Approval of NSO Response Plan* (Apr. 23, 2020), *available at* https://www.cdc.gov/quarantine/pdf/Attestation-for-Non-Commercial-Travel-Pre-Approval-of-NSO-Response-Plan_042320_final_fillable-p.pdf.

4.   Company Impacts and Response

a)   *Suspension of Cruise Operations*

As of the date of this Report, the Company continues to voluntarily suspend cruise operations across its fleet, although some AIDA ships are expected to resume cruising in a limited capacity from German ports beginning in August 2020, as discussed below.  The initial suspensions were announced on March 12, 2020, for Princess Cruise Lines (60 days), and on March 13, 2020, for the remaining brands (approximately 30 days).  *See* CAM March 2020 Quarterly Report at 30-32.  Since that time, individual brands/operating groups announced extensions of their respective suspensions, with durations varying by brand and geographic location, as detailed below.  Further, as noted above, on June 19, 2020, CLIA announced that its members, which include all of the Company's brands, are extending their voluntary suspension of cruise operations in United States waters until September 15, 2020.  *CLIA Announces Voluntary Suspension of Cruise Operations from U.S. Ports* (June 19, 2020), https://cruising.org/news-and-research/press-room/2020/june/clia-announces-voluntary-suspension-of-cruise-operations-from-us-ports.

In addition to the CLIA announcement, the Company's brands/operating groups have announced the following brand-specific suspensions:

- **AIDA:**  United States and Canadian cruises cancelled through the end of 2020; European cruises generally cancelled through August 31, 2020, with the exception of cruises from three German ports on three ships (none of which are Covered Vessels), which will resume in August 2020 on three-day cruises "with an adjusted passenger capacity and without calling at another port."  *See Carnival Corporation's AIDA Cruises to Restart Sailing Vacations in August* (July 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporations-aida-cruises-restart-sailing-vacations; *AIDA Cruises suspends cruises with ports in the USA and Canada for 2020* (June 5, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/aida-cruises-suspends-cruises-ports-usa-and-canada-2020; *AIDA Cruises extends pause of its operation until end of August 2020* (July 2, 2020),

July 13, 2020

https://www.carnivalcorp.com/news-releases/news-release-details/aida-cruises-extends-pause-its-operation-until-end-august-2020;

- **Carnival Cruise Line:**  cruises cancelled through at least September 17, 2020, with additional cancellations through different dates between October 2020 and May 2021 for certain ships and itineraries.  *See*  https://www.carnival.com/health-and-sailing-updates.aspx;

- **Costa:**  cruises cancelled through at least August 13, 2020, with additional cancellations through different dates between mid-August and October 2020 for certain ships and itineraries.  *See* https://www.costacruises.com/cruising-soon.html;

- **Cunard:**  cruises cancelled through different dates in November 2020.  *See* https://www.cunard.com/en-us/contact-us/travel-health-advisories; *Cunard Extends Pause in Operations* (June 9, 2020), https://www.carnivalcorp.com/media-center/news-releases;

- **Holland America Line:**  Alaskan, European, and Canadian/New England cruises cancelled through the end of 2020; certain additional Canadian and Hawaiian cruises cancelled through the end of 2020 and early 2021, respectively.  *See Holland America Line Extends The Pause Of Ship Operations For All 2020 Alaska, Europe And Canada/New England Sailings*; *Holland America Line Extends Pause Of Cruise Operations To Fall Vancouver Departures & Early 2021 Hawaii Itineraries*, https://www.hollandamerica.com/en_US/news/coronavirus-travel-advisory.html;

- **P&O Cruises UK:**  cruises cancelled through October 15, 2020.  *See* https://www.pocruises.com/travel-health-advisories;

- **P&O Cruises Australia:**  cruises from Australia cancelled through September 17, 2020; cruises from New Zealand cancelled through August 31, 2020.  *See* https://www.pocruises.com.au/news-centre/notices-advisories;

- **Princess Cruise Lines:**  cruises cancelled through different dates between August and November 2020.  *See Princess Cruises Extends Pause of Global Ship Operations For Remaining 2020 Summer Season* (May 6, 2020), https://www.princess.com/news/notices_and_advisories/notices/global-ship-operations-pause-2020-summer-season.html; *Princess Cruises Extends Pause of Global Ship Operations On Select Sailings in Australia, Canada and Taiwan* (June 3, 2020), https://www.princess.com/news/notices_and_advisories/notices/global-ship-operations-pause-2020-australia-canada-taiwan.html; *see also Princess Cruises Announces Deployment Changes in Alaska and Europe for Summer 2021* (July 8, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/princess-cruises-announces-deployment-changes-alaska-and-europe; and

- **Seabourn:**  cruises cancelled through different dates between October and November 2020.  *See* https://www.seabourn.com/en_US/news/pause-global-cruise-operations.html (May 6, 2020).

July 13, 2020

### b) Resumption of Cruise Operations

The Company reports that it "expects to resume guest operations, after collaboration with both government and health authorities, in a phased manner, with specific ships and brands returning to service over time," with the expectation that "initial sailings will be from a select number of easily accessible homeports."  Form 8-K (June 18, 2020), *available at* https://www.carnivalcorp.com/static-files/067a3942-adca-428a-88ae-2c0270d21177, at § 7.01; *Carnival Corporation & plc Reports Summary Second Quarter Results and Other Matters* (June 18, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-reports-summary-second-quarter-results ("Second Quarter Results Summary"). The Company also states that it will resume cruise operations "in a manner consistent with the company's highest priorities, which are compliance, environmental protection and the health, safety and well-being of its guests, crew and the communities its ships visit."  Form 8-K (July 10, 2020), *available at* https://www.carnivalcorp.com/static-files/b3116f6f-617c-497b-90e8-8f5ebd83c441, at Ex. 99.1; *Carnival Corporation & plc Provides A Business Update And Additional Financial Information For The Second Quarter* (July 10, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-provides-business-update-and-0 ("July 2020 Business Update").

On July 9, 2020, the Company announced that AIDA will be the first of its brands to resume cruises.  *See Carnival Corporation's AIDA Cruises to Restart Sailing Vacations in August* (July 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporations-aida-cruises-restart-sailing-vacations.  Three AIDA ships will sail on three-day cruises from three German ports beginning in August 2020:  (1) *AIDAperla* will sail on August 5, 2020, from Hamburg; (2) *AIDAmar* will sail on August 12, 2020, from Rostock-

Warnemünde; and (3) *AIDAblu* will sail on August 16, 2020, from Kiel.  *See id.*  None of these ships are Covered Vessels.  These "first cruises will take place with an adjusted passenger capacity and without calling at another port."  *Id.*  However, "[d]epending on the opening of further European ports for cruise ships," there could be a second phase in which "the first foreign destinations could be integrated into the itinerary," although the Company has not announced specific plans for a further phase.  *Id.*  As discussed in the following section, the Company reports that AIDA "worked with several global and national health authorities to develop a comprehensive set of health and hygiene protocols to help facilitate a safe, healthy and phased-in return to cruise vacations."  *Id.*

i.   HEALTH/SAFETY/SECURITY RESTART PROTOCOLS

The Company reports that "[i]n preparation for the resumption of its cruises, and consistent with its commitment to provide its guests with a safe and healthy environment," it is "consulting and working in close cooperation with various medical policy experts and public health authorities to develop enhanced procedures and protocols for health and safety onboard its ships."  Second Quarter Results Summary.  A "comprehensive restart protocol may include areas such as medical care, screening, testing, mitigation and sanitization addressing arrival and departure at cruise terminals, the boarding and disembarkation process, onboard experiences and shore excursions."  *Id.*  The Court's interest in any restart protocols, as understood by the CAM, is that onboard health and safety measures are not only directly related to the health and safety needs of crew members, passengers, contractors, and other visitors (including internal and external auditors and members of the CAM Team), but also critical to the ships' ability to manage the ongoing environmental compliance obligations of probation and beyond.  The

CAM's attention to these efforts is a result of the Court's continuing view that these issues are a necessary part of oversight of the Company's probation.  *See supra*, Part I.B.2.

As of the date of this Report, the CAM is not aware of any finalized, comprehensive restart protocols or procedures for Carnival Corp. or its brands.  However, Costa Group—the operating group for the AIDA and Costa brands—has developed a draft high-level health protocol for restarting cruise operations in European waters.  *See [Draft] Restarting Cruise Operations Health Protocol* (June 8, 2020).  According to the Company, this draft protocol is consistent with the European Union's recently published Healthy Gateways Guidance.  *See* EU HEALTHY GATEWAYS Joint Action, *Interim advice for restarting cruise ship operations after lifting restrictive measures in response to the COVID-19 pandemic* (June 30, 2020), *available at* https://www.healthygateways.eu/Portals/0/plcdocs/EU_HEALTHY_GATEWAYS_COVID-19_RESTARTING_CRUISES.pdf; *see also* Employee Interview/Call Notes.

In addition, AIDA has published on its website high-level information "about the enhanced protocols and procedures it will implement against COVID-19" on its ships that will resume cruises in August 2020.  *See Carnival Corporation's AIDA Cruises to Restart Sailing Vacations in August* (July 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporations-aida-cruises-restart-sailing-vacations (providing link to https://www.aida.de/kreuzfahrt/reisen-mit-aida/mit-sicherheit-der-schoenste-urlaub.40409.html). These measures "will include pre-boarding health questionnaires and temperature checks for both guests and crew, physical distancing guidelines, routing systems on arrival, departure and onboard, increased mitigation and sanitation efforts in all cabins and public areas, as well as closely managing capacities at onboard experiences."  *See* July 2020 Business Update.  The Company reports that these measures "have been developed with advice from medical experts

and align with the current guidance from the World Health Organization ('WHO') and the German Robert Koch Institute ('RKI'), as well as other governmental and health authorities." *Id.*

## ii.   GLOBAL SCIENCE SUMMIT ON COVID-19

On July 6, 2020, the Company announced that it is collaborating with the World Travel & Tourism Council to host a virtual "Global Science Summit on COVID-19" on July 23, 2020, which will be free and open to the public. *WTTC and Carnival Corporation Present Unique COVID-19 Scientific Summit* (July 6, 2020), https://www.carnivalcorp.com/media-center/news-releases. The summit is described as an opportunity to "share the latest scientific knowledge and evidence-based best practices related to prevention, detection, treatment and mitigation of COVID-19." *Id.* Speakers and panelists will "represent a diverse range of science, research, clinical, academic, policy and business backgrounds," including medical, epidemiology, and public health experts. *Id.* Panels will focus "on a critical area of science surrounding COVID-19 and will include best practices from different industry sectors and world regions to control and limit the spread of COVID-19" around the topic areas of epidemiology; transmission; screening and testing; therapeutics; and practical risk mitigation. *Id.*

## iii.   HEALTHY SAIL PANEL

On July 7, 2020, two other major cruise companies, Royal Caribbean Group and Norwegian Cruise Line Holdings, announced the creation of the Healthy Sail Panel. *See Healthy Return to Sailing*, *available at*

http://i.email.silversea.com/wpm/1035/ContentUploads/pdf/HEALTHY_SAIL_PANEL.pdf.

The Healthy Sail Panel is described as a "team of cross-disciplinary experts," including specialists in public health, infectious diseases, hospitality, and maritime operations, who have

been "enlisted to guide the cruise industry's way forward in response to COVID-19" and advise

"on a science-backed plan for a healthy return to service," with a focus on United States

operations.  *See id.*  It has been reported that the Healthy Sail Panel intends to provide initial

recommendations to both companies by August 31, 2020, which "will then be vetted by each

company and presented to the CDC."  *Healthy Sail Panel Hopes to Have Plan By August 31 for*

*Royal and Norwegian* (July 7, 2020), https://www.cruiseindustrynews.com/cruise-news/23200-

healthy-sail-panel-hopes-to-have-plan-by-august-31-for-royal-and-norwegian.html.  Although no

Carnival Corp. entities are part of the Healthy Sail Panel, Royal Caribbean Group and

Norwegian Cruise Line Holdings have stated that the recommendations and protocols "will also

be shared with the entire cruise industry," as well as other regulatory bodies.  R. Gibson, *RCL*

*and NCLH develop new Healthy Sail Panel* (July 8, 2020),

https://www.cruiseandferry.net/articles/rcl-and-nclh-develop-new-healthy-sail-panel.

### c)  *Repatriation Efforts*

#### i.  Passenger Repatriation

The Company reports that, during the suspension of cruise operations, it has "[r]eturned

over 260,000 guests to their homes, coordinating with a large number of countries around the

globe," including via chartered aircraft, commercial flights, and use of its own ships for guests

who could not fly.  *See* Second Quarter Results Summary; July 2020 Business Update.  As of the

date of this Report, the Company reports that it has no passengers remaining on its ships in need

of repatriation.  *See* Employee Interview/Call Notes.

#### ii.  Crew Repatriation

The Company has also been returning crew members to their home countries.  Roughly

half of the Company's ships have been involved in these efforts.  As of June 18, 2020,

approximately 60,000 out of 81,000 crew members had been repatriated to over 130 countries.

July 13, 2020

*See* Second Quarter Results Summary.  As of July 10, 2020, approximately 77,000 crew members had been repatriated.  *See* July 2020 Business Update.  According to the Company, its repatriation efforts have faced obstacles and delays due to travel restrictions, testing and quarantine requirements, Visa requirements, and other requirements and restrictions set by governments around the world.  *See* Employee Interview/Call Notes.

### iii.   CREW REPATRIATION CHALLENGES AND HUMANITARIAN CRISIS

The International Maritime Organization has observed that "[t]ravel restrictions imposed by governments around the world have created significant hurdles to crew changes and repatriation of seafarers, which has led to a growing humanitarian crisis as well as significant concerns for the safety of seafarers and shipping." *Coronavirus disease (COVID-19) Pandemic*, http://www.imo.org/en/MediaCentre/HotTopics/Pages/Coronavirus.aspx.  This humanitarian crisis includes not only the risks of onboard exposure to COVID-19 or other workplace hazards, but also the mental health impacts associated with prolonged periods of time stranded at sea.[30] The Secretary-General of the United Nations has also recognized "the growing humanitarian and safety crisis facing seafarers around the world" as a result of COVID-19-related travel restrictions.  *Statement attributable to the Spokesman for the Secretary-General on the*

---

[30] The International Maritime Organization notes that "[t]housands of seafarers stranded on board ships have already expressed their exhaustion, fatigue, anxiety and mental stress." *Crew changes and repatriation of seafarers – a key issue explained* (June 16, 2020), http://www.imo.org/en/MediaCentre/HotTopics/Pages/FAQ-on-crew-changes-and-repatriation-of-seafarers.aspx.  It has been reported in the media that, as of June 19, 2020, there have been between 6-10 cases where "it appears that [cruise ship] crew members may have decided to end their own lives since April 30th, as well as one attempted suicide." *See Crew Member Dies on the Island Princess Awaiting Repatriation* (June 19, 2020), https://www.cruiselawnews.com/2020/06/articles/maritime-death/crew-member-dies-on-the-island-princess-awaiting-repatriation/.  These cases are not limited to Carnival Corp. ships, but include other cruise lines as well.

July 13, 2020

*repatriation of seafarers* (June 12, 2020), https://www.un.org/sg/en/content/sg/statement/2020-06-12/statement-attributable-the-spokesman-for-the-secretary-general-the-repatriation-of-seafarers.

On June 8, 2020, the International Maritime Organization and the United Nations issued a joint statement which "seek[s] the support of Governments to facilitate crew changes and ensure crew wellbeing, by facilitating repatriation and safe return home of seafarers . . . as well as access to medical care for sick or injured crew." *Joint statement IMO-UNCTAD – Call for collaborative action in support of keeping ships moving, ports open and cross-border trade flowing during the COVID-19 pandemic*, Circular Letter No. 4204/Add. 21 (June 8, 2020).  A similar joint statement by the International Maritime Organization, International Labour Organization, and International Civil Aviation Organization was issued on May 26, 2020, "to enlist the support of Governments for the facilitation of crew changes in ports and airports in the context of the COVID-19 pandemic." *Joint Statement IMO-ICAO-ILO on designation of seafarers, marine personnel, fishing vessel personnel, offshore energy sector personnel, aviation personnel, air cargo supply chain personnel and service provider personnel at airports and ports as key workers, and on facilitation of crew changes in ports and airports in the context of the COVID-19 pandemic*, Circular Letter No. 4204/Add. 18 (May 26, 2020).

### d) Ship Layups

Ships not involved in repatriation, and ships that complete repatriation efforts, are being placed in a "layup" status during the suspension in cruise operations.  These ships are "docked or anchored in locations around the world with no guests onboard."  *Quarterly Status Report by Princess Cruise Lines Ltd.,* Dkt. No. 186 at 3.  Ships in layup "will continue to house crew members onboard, either because those crew members are essential to maintain the ship even

during this period of reduced operations, or because international travel restrictions have

prevented Carnival Corp. from repatriating those crew members to their home countries." *Id.*

These ships "will continue to use fuel and generate reduced levels of food waste and other waste

products." *Id.* The Company has represented that it "is committed to handling those continued

operations in a compliant manner." *Id.*

The Company has established three possible levels of layup:

- **"Hot" or "Pause" Layup:** Ship is idle but can return to service within about 24 hours. Ship engines and machinery are kept running;

- **Warm Layup:** Ship can return to service within about a week. Not all machinery is kept running; and

- **Cold Layup:** Ship will take more than a week (potentially many weeks) to return to service. The ship is only supplied with emergency energy for lights, mooring winches, and fire extinguishing.

*See* March 2020 Probation Supervision Report, Attachment 5, at 1-2.

As of July 10, 2020, approximately 52 of the Company's ships are in hot layup, and no

ships are in warm or cold layup. *See* Company Comments on Draft Report. All 52 ships in hot

layup are in their final layup location. *See id.* Layup locations encompass regions in Asia, the

Caribbean, Central America, the Middle East, Northern Europe, and Southern Europe. *See*

PCL_ECP1067055, *(SR 33) Pause July 9.* The Company does not plan to have any ships enter

layup in United States waters. *See id.*

Ships in layup have reduced staffing/manning levels, down to only those crew who are

necessary to maintain safe and compliant ship operations, based on regulatory, flag state, and

other requirements (referred to as "minimum operational manning"). *See* International

Convention for the Safety of Life at Sea (SOLAS), Ch. V, Reg. 14; International Maritime

July 13, 2020

Organization, Res. A.1047(27), *Principles of Minimum Safe Manning*.[31]  Minimum operational

manning levels vary across ships and brands.  In general, the average level for ships in hot or

warm layup is about 100 crew members.  *See* Company Comments on Draft Report.  While none

of the Company's ships are currently in cold layup, minimum operational manning levels for

those ships would be lower and would "depend on factors such as location, service, and

equipment status."  *Id.*  The Company reports that all 52 ships in hot layup are at their minimum

operational manning level.  *Id.*

e)  *Financial Impacts*

i.  FINANCIAL RESULTS AND LIQUIDITY IMPACTS

As discussed in the most recent CAM Quarterly Report, the Company reported on March

16, 2020, that it "believes the ongoing effects of COVID-19 on its operations and global

bookings will have a material negative impact on its financial results and liquidity."  *See Update*

*on Debt Funding and Other Matters* (Mar. 16, 2020),

https://www.carnivalcorp.com/node/60901/pdf; Form 8-K/A (Mar. 16, 2020), *available at*

https://www.carnivalcorp.com/static-files/aed6e4d5-caba-4b84-8ec1-6cad74522e1e, at  § 7.01.

As a result, the Company was "taking additional actions to improve its liquidity, including

capital expenditure and expense reductions, and pursuing additional financing."  *Id.*

On March 31, 2020, the Company reported that it "believe[d] the ongoing effects of

COVID-19 on [its] operations and global bookings have had, and will continue to have, a

material negative impact on [its] financial results and liquidity, and such negative impact may

continue well beyond the containment of such outbreak."  Form 8-K (Mar. 31, 2020), *available*

---

[31] The Company states that it "has implemented manning levels for [its] ships [in layup] that are
much higher than the levels suggested in these regulations."  *See* Company Comments on Draft
Report.

July 13, 2020

*at* https://www.carnivalcorp.com/static-files/3b413b03-e345-4779-9e3f-143a9241eee8, at § 8.01;

*see also* Form 10-Q (Apr. 3, 2020), *available at* https://www.carnivalcorp.com/static-files/8912eb63-49dd-4a1e-856a-8c2e316b3316 ("2020 Q1 Form 10-Q"), at 8.  The Company

further reported that it was "taking further actions to improve our liquidity, including capital

expenditure and operating expense reductions, suspending dividend payments on, and the

repurchase of, the common stock of Carnival Corporation and the ordinary shares of Carnival plc

and pursuing additional financing."  *Id.*

On June 18, 2020, the Company reported that the "pause in guest operations is continuing

to have material negative impacts on all aspects of the company's business."  Form 8-K (June 18,

2020), *available at* https://www.carnivalcorp.com/static-files/067a3942-adca-428a-88ae-2c0270d21177, at § 7.01; Second Quarter Results Summary.  Overall, the Company reported a

net loss of over $4 billion for the second quarter of Fiscal Year 2020, which ended on May 31,

2020.  *Id.*  The Company also reported that the quarter "ended with $7.6 billion of available

liquidity," and that it "expects to further enhance future liquidity, including through refinancing

scheduled debt maturities."  *Id.*[32]  The Company estimated that, during the suspension of guest

operations, the monthly average cash burn rate for the second half of 2020 will be approximately

$650 million/month.  *Id.*  This rate "includes ongoing ship operating and administrative

expenses, committed capital expenditures (net of committed export credit facilities), interest

expense and excludes changes in customer deposits and scheduled debt maturities."  *Id.*

On July 10, 2020, the Company again reported that the "pause in guest operations is

continuing to have material negative impacts on all aspects of the company's business," and that

---

[32] In addition, Company "has $8.8 billion of committed export credit facilities that are available to fund ship deliveries originally planned through 2023."  *Id.*

July 13, 2020

the "longer the full or partial pause in guest operations continues, the greater the impact on the company's liquidity and financial position." *See* July 2020 Business Update. The Company continued to estimate its monthly burn rate at approximately $650 million/month, although it "continues to explore opportunities to further reduce its monthly cash burn rate." *See id.*

The Company also reported that, since March 2020, it has raised over $10 billion in liquidity through a series of financing transactions, including: over $6 billion in bond and stock offerings;[33] approximately $3 billion through existing credit lines;[34] and approximately $2.8 billion in two tranches through an additional loan agreement.[35] *See* July 2020 Business Update. The Company reports that this "over $10 billion of additional liquidity" should "sustain another full year with additional flexibility remaining." *See id.*

ii. SHIP SALES AND NEW SHIP DELIVERY DELAYS

On June 18, 2020, the Company reported that, as a cash preservation measure, it "intends to accelerate the removal of ships in fiscal 2020 which were previously expected to be sold over

---

[33] *See Carnival Corporation & plc Announces Closing of 11.500% First-Priority Senior Secured Notes due 2023 and Exercise of Option for 5.75% Convertible Senior Notes due 2023* (Apr. 8, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-announces-closing-11500-first-priority; *Carnival Corporation & plc Announces Closing of 5.75% Convertible Senior Notes due 2023* (Apr. 6, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-announces-closing-575-convertible; *Carnival Corporation & plc Announces Closing of Offering of 71,875,000 Shares of Common Stock* (Apr. 6, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-announces-closing-offering-71875000.

[34] *See Update on Debt Funding and Other Matters* (Mar. 16, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/update-debt-funding-and-other-matters.

[35] *See Carnival Corporation & Plc Announces Closing Of $1.86 Billion And €800 Million First-Priority Senior Secured Term Loan Facility* (June 30, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-announces-closing-186-billion-and-eu800.

July 13, 2020

the ensuing years," in addition to "working on potential sales of non-ship assets."  *See* Second Quarter Results Summary.  As of July 10, 2020, the Company has "sold one ship during June 2020 and has agreements for the disposal of five ships and preliminary agreements for an additional three ships, all of which are expected to leave the fleet in the next 90 days," in addition to "the sale of four ships, which were announced prior to fiscal 2020."  *See* July 2020 Business Update.  Overall, "the 13 ships expected to leave the fleet represent a nearly nine percent reduction in current capacity."  *Id.*[36]

In addition, the Company "expects only five of the nine ships originally scheduled for delivery in fiscal [year] 2020 and fiscal [year] 2021 will be delivered prior to the end of fiscal year 2021," as well as "later deliveries of ships originally scheduled for fiscal [year] 2022 and 2023."  *See* July 2020 Business Update; *see also infra*, Part VII.D.

### f)   Personnel Impacts

On May 14, 2020, the Company publicly announced "a combination of layoffs, furloughs, reduced work weeks and salary reductions across the company, including senior management" to "further strengthen its liquidity position in the event of an extended pause in guest operations due to COVID-19."  *Carnival Corporation Announces Additional Steps to Further Strengthen Ability to Manage through Extended Pause in Guest Operations* (May 14, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-announces-additional-steps-further.  In addition, the Company has "[i]nstituted a hiring freeze

---

[36] The sales or potential sales of at least two ships, both Non-Covered Vessels, have been publicly reported to date.  The *Costa Victoria* was reportedly sold to an Italian shipyard.  *See* A. Kalosh and L. Peruzzi, *Costa Victoria reported sold to San Giorgio del Porto* (June 19, 2020), https://www.seatrade-cruise.com/news/costa-victoria-reported-sold-san-giorgio-del-porto.  The P&O Cruises UK *Oceana* was reportedly sold to an undisclosed buyer.  *See* M. Bond, P&O *Cruises sells Oceana to 'fit for future growth'* (July 7, 2020), https://www.seatrade-cruise.com/news/po-cruises-sells-oceana-fit-future-growth.

across the organization" and "significantly reduced consultant and contractor roles."  Second

Quarter Results Summary.

The Company has also announced changes among All Brands Group and brand/operating

group top leadership, including:

- **Chief Operating Officer at All Brands Group:**  On June 19, 2020, the Company announced that the President of Carnival UK—the operating group that oversees the Cunard and P&O Cruises UK brands—would become Chief Operations Officer of Carnival Corp. (a position that was eliminated in December 2016 after the individual in that role took another position in the Company).  *See* Internal Communication; *Carnival Corporation & plc Names Josh Weinstein as Chief Operations Officer* (June 19, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-names-josh-weinstein-chief-operations; *see also* Company Comments on Draft Report.  The Chief Operating Officer will report directly to the Carnival Corp. CEO, with responsibilities that "will include oversight of major operational functions, including global maritime, global ports and destinations, global sourcing, global IT and global auditing [RAAS]."  *Id.*  He will also "retain oversight" of Carnival UK, while the current President of Cunard will serve as President of Carnival UK, in addition to continuing to serve as President of Cunard.  *Id.*; *see also Carnival UK Names Simon Palethorpe as President* (June 19, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-uk-names-simon-palethorpe-president;

- **Seabourn and Holland America Line Presidents:**  On or around May 12, 2020, the Presidents of the Seabourn and Holland America Line brands—part of the Holland America Group operating group—announced that they were leaving the Company.  *See* Internal Communication.

  - **Seabourn:**  On June 25, 2020, the Company announced that the Chief Strategy Officer at All Brands Group would become President of Seabourn.  *Seabourn Announces Carnival Corp. Exec Josh Leibowitz As President* (June 25, 2020), https://www.seabourn.com/en_US/news/press-release/2020-press-releases/seabourn-announces-carnival-corp-exec-josh-leibowitz-as-president.html;

  - **Holland America Line:**  On July 9, 2020, the Company announced that the Chief Operations Officer at Carnival Cruise Line would become President of Holland America Line.  *Carnival Corporation Names Antorcha to Lead Holland America Line; Palomba as COO for Carnival Cruise Line* (July 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-names-antorcha-lead-holland-america-line; and

- **Costa President:**  On July 9, 2020, the Company announced that the President of Costa—a brand that, along with AIDA, is part of the Costa Group operating group— would become Executive Vice President and Chief Operations Officer for Carnival Cruise Line.  *See id.*  The CEO of Costa Group will add the role of President of Costa, in addition to continuing to serve as CEO of Costa Group.  *Costa Cruises Announces Organizational Changes* (July 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/costa-cruises-announces-organizational-changes.

On June 17, 2020, the Company provided the Interested Parties, CAM, and TPA with organizational charts reflecting staffing levels, as of June 1, 2020, for various groups across the Company with HESS-related functions, as required by the Court's Order of June 2, 2020.  *See supra*, Part I.B.3.f.[37]  These charts reflect:

- **Ethics & Compliance:**  The structure of the Ethics & Compliance Department and Program is largely consistent with the structure described in prior CAM reports.  *See* CAM March 2020 Quarterly Report at 68.  At the All Brands Group level, it includes a Chief Ethics & Compliance Officer who reports to the Carnival Corp. CEO and Boards of Directors.[38]  Below the Chief Ethics & Compliance Officer, there are: three Corporate Compliance Managers (for Environment, Health/Safety/Security, and General Compliance, respectively); functional leaders for Communications, Compliance Risk, Data Privacy, Investigations/Incident Analysis Group,[39] and Training; and various managers, directors, analysts, and administrative and other staff to support these positions.  At the brand/operating group level, it includes, for each of the four operating groups:  an Operating Line Ethics & Compliance Officer; an Operating Line Compliance Manager; an Operating Line Training Manager; and additional functional leaders for Communications, General Compliance,

---

[37] The Company notes that personnel transitions at Carnival UK will not be complete until July 1, 2020, due to UK employment law.  Letter from Environmental Corporate Compliance Manager to Interested Parties, *Order Re: COVID-19 Impacts and Probation Obligations* (June 17, 2020).  The Company will provide an updated Carnival UK organizational chart once the transitions are complete.  *Id.*

[38] The Deputy Chief Ethics & Compliance Officer is no longer with the Company.

[39] As discussed below, there have been significant personnel changes within the Incident Analysis Group, including the lay-off and/or furlough of five out of eight investigators.  In addition, the Vice President of the Incident Analysis Group, who was hired in March 2019, is no longer with the Company.  The former Senior Director/Deputy has assumed the role of acting Vice President.  *See infra*, Part IV.D.7.

Health/Safety/Security, Risk, and Training.  *See ABG Ethics & Compliance Department Org Chart* (June 2, 2020);

- **Chief Maritime Officer/Marine Operations:**  There have been significant reductions within the Chief Maritime Officer/Marine Operations organization.  These include the elimination of the Fleet Captain and Fleet Chief Engineer programs, *see infra*, Part III.G.2,[40] as well as the elimination of the Maritime Quality Assurance department, which was responsible for monitoring the implementation of HESS policies.  *See* CAM First Annual Report at 29.[41]  At the All Brands Group level, the Chief Maritime Officer continues to oversee the CSMART training center,[42] the Maritime Policy & Analysis department, which develops HESS policies and procedures, and the Shipbuilding department, among other groups.  As noted above, the Chief Maritime Officer will also begin reporting directly to the newly appointed Chief Operations Officer.  At the brand/operating group level, each operating group has an Executive Vice President of Marine Operations (or other equivalent title) that reports to the Chief Maritime Officer.  *See CMO Org Chart* (June 2, 2020); and

- **RAAS:**  RAAS experienced a significant reduction in staff of approximately 60% across the group, including for the internal HESS audit function.  *See* Employee Interview/Call Notes; *RAAS Org Chart* (June 2, 2020); *see also infra*, Part VI.A.5.a (discussing COVID-19 impacts on the RAAS audit function, including staff reductions).

### g)  Draft Pause Priorities Plan

The Company reported to the Office of Probation that, as of April 2020, it was

developing a "Pause Priorities Plan," described as "a list of priorities the Operating Lines want to

focus on during the layup period . . . to ensure that when the ships return to service, they will

---

[40] The Company reports that "resumption of the Fleet Captain and Fleet Chief Engineer programs will be considered once operations are resumed."  *See* Company Comments on Draft Report.

[41] Although the Maritime Quality Assurance department was eliminated, the Company reports that "most of its core functions were assigned to other departments," including oversight over certain training functions and assisting in the development of HESS policies.  *See* Company Comments on Draft Report.

[42] CSMART announced significant staff reductions and other personnel changes affecting approximately 60% of CSMART staff the week of June 15, 2020.  *See* Employee Interview/Call Notes.  The Company reports that updated organizational charts for CSMART will be completed once those personnel changes "have been fully implemented."  *See* Company Comments on Draft Report.

come back *stronger and better equipped*."  April 2020 Probation Supervision Report, Attachment 5, at 2 (emphasis added).

On June 17, 2020, the Company submitted a draft of its Pause Priorities Plan to the Interested Parties, CAM, and TPA, as required by the Court's Order of June 2, 2020.  *See* Letter from Chief Ethics & Compliance Officer to CAM and TPA, *Draft Pause Priorities Plan* (June 5, 2020), PCL_ECP00166531-32 ("Draft Pause Priorities Plan Cover Letter"); *Coming Back Stronger: "Pause Priorities Plan" DRAFT* (June 16, 2020), PCL_ECP00166533-54 ("Draft Pause Priorities Plan" or "Plan").[43]  The draft Plan is described as an "interim strategic plan" that outlines "both programmatic priorities, as well as the timeline for implementation (short, mid and longer terms)."  Draft Pause Priorities Plan Cover Letter at PCL_ECP00166531.  The draft Plan focuses on initiatives under four categories:  (1) Environmental; (2) Investigations; (3) Culture; and (4) Training.  *Id.*[44]  The Company noted that the current draft "was written to be general in nature.  Over the upcoming weeks and months, the various working groups will further refine and provide the specific details for each area."  *Id.*

The Environmental initiatives apply to "ships that are expected to return to service." Draft Pause Priorities Plan at PCL_ECP00166535.  According to the Company, the "goal is to complete the initiatives on all ships that return to guest operations according to the order that they return.  The initiatives will not be implemented on ships that do not return to guest

---

[43] The Company provided the CAM and TPA with a prior draft on June 5, 2020, which was largely consistent with the June 17, 2020, submission.  *See* Letter from Chief Ethics & Compliance Officer to CAM and TPA, *Draft Pause Priorities Plan* (June 5, 2020), PCL_ECP00166531-32; *Coming Back Stronger: "Pause Priorities Plan" DRAFT* (June 5, 2020), PCL_ECP00166533-54.

[44] Notably, the Draft Pause Priorities Plan focuses on ECP-related and environmental initiatives, and does not address the other three pillars of HESS compliance:  Health, Safety, and Security.

operations due to sale, recycling, or donation." *See* Company Comments on Draft Report. However, as the Company has acknowledged, those ships which have not yet returned to guest operations "are still bound by the company's Environmental Management System and applicable regulations." *See id.* The Company has represented that "those ships will continue to comply with those requirements." *See id.*

The Company also cautioned that "all of these initiatives must be subject to best efforts and feasibility challenges," including "the availability of contractors, the supply and delivery of components, the reduced level of shore-side personnel/resources, the restrictions imposed by insurance policies, as well as COVID-19-related issues, protocols, and quarantine rules." Draft Pause Priorities Plan Cover Letter at PCL_ECP00166532. However, the Company reiterated its commitment from the April 20, 2020, Status Conference that "regardless of these challenges, we are maintaining our focus on safety, environmental protection and compliance." *Id.*

In addition to the initiatives outlined in the Draft Pause Priorities Plan, the Ethics & Compliance Program "will be pursuing other initiatives," including: "developing new health protocols and related training programs consistent with new regulatory requirements and procedures, implementing management of change principles, improving data analytics, expanding compliance risk management, and developing better compliance communications." *Id.* at PCL_ECP00166531. In addition, "other corporate functions will also be pursuing various projects," including RAAS's efforts to "use remote HESS auditing, as well as to develop shipboard self-assessments, and oversight of environmental compliance requirements for ships preparing to return to service." *Id.* at n.1; *see also infra*, Part VI.A.5 (discussing RAAS's activities during the suspension of cruise operations, including its transition to a program of remote audits).

Details about specific initiatives in the Draft Pause Priorities Plan are discussed in the relevant sections of this Report.  However, general observations from the CAM Team and TPA include:

- **General lack of concrete commitments to support the Company's claim that it is "maintaining [its] focus on safety, environmental protection and compliance":** *See* Draft Pause Priorities Plan Cover Letter at PCL_ECP00166532.

    o   The Plan states that "[t]o the extent that the commitments in the earliest time frames [*i.e.*, before ships return to service] are not met, this will not preclude a ship's return to operation, but the Company will document and provide an explanation."  Draft Pause Priorities Plan at PCL_ECP001665335.  The Plan does not specify which issues the Company would consider acceptable to leave unaddressed before a ship returns to service, the nature of any explanation to be provided, or who the ultimate decision-maker is;

    o   The Plan states that the Company "*aspire[s] to* achieve compliance" and "will continue to *monitor* [its] compliance with all environmental requirements throughout the pause period and *make best efforts* to find ways to remain in compliance *where operationally feasible*."  Draft Pause Priorities Plan at PCL_ECP00166536 (emphasis added).  Again, without further explanation or definitions, it is unclear what the actual commitment will be, and whether it is consistent with the representations made to the Court by the CEO and Chief Ethics & Compliance Officer;

- **General lack of information about the current status of each initiative:**  Most of the initiatives lack information about their current status—a critical piece of information for measuring and reporting on progress; and

- **General lack of specific timelines or deadlines:**  Most of the initiatives are not assigned specific timelines or deadlines.  Instead, they are classified under nebulous timeline categories such as:  (1) "Do Before Ship Resumes Service"; (2) "Try to Do Before Ship Resumes Service"; (3) "Do When Feasible"; and (4) "[All Brands Group] to decide."  In response to this concern, the Company states that the draft Plan "does not include specific deadlines because no timeline has been established for when ships will return to service."  *See* Company Comments on Draft Report.  The Company also notes that "due to the unprecedented nature of the relaunch and lack of awareness of the status of contractors and third party vendors, there are external factors that the Company does not have control over (which includes quarantining)," which "add to the Company's inability to add timelines to the Pause Priorities Plan at this time."  *Id.*  This suggests that, in the face of continued uncertainty, the Company may never complete the initiatives in the Draft Pause Priorities Plan.  Further, uncertainties as to return to service for ships would not seem to apply to shore-based

initiatives, including certain environmental and culture initiatives.  Yet, many of these also lack specific timelines or deadlines.

In its comments on the draft of the Report, the Company stated that, while it "appreciates this feedback, it is important to note that the draft Pause Priorities Plan was not intended to be final, and the Company conveyed that intent to the CAM Team.  The Company therefore expected that the CAM Team would convey most of these comments prior to the CAM's drafting this annual report, so that the Company could make adjustments before the annual report was due and before the July status conference with the court."  *See id*.  The CAM Team appreciates that the Draft Pause Priorities Plan is a draft, and that it may evolve.  However, the CAM also notes that almost a month has passed since the Company submitted the draft Plan on June 17, 2020.  Since that date, the Company has announced that AIDA intends to resume cruise operations as early as August 5, 2020—less than 3 ½ weeks from the date of this Report.  *See supra*, Part I.C.4.a-b.  Given that the Company began creating the plan as early as April 2020, it is not unreasonable to expect that a more developed and actionable plan would be in place by mid-July 2020, mere weeks before its first ships are set to start sailing again.

Further, the CAM Team provided specific observations on opportunities for compliance efforts during the pause, as well as feedback on the Draft Pause Priorities Plan, in multiple discussions with the Company both before and after receiving the Draft Pause Priorities Plan. Indeed, the CAM Team held two virtual meetings with the Company on June 22, 2020, to walk through the Draft Pause Priorities Plan in detail, during which the CAM expressed concerns noted above and elsewhere in this Report regarding:  vague or non-existent timelines for many of the initiatives; lack of concrete commitments to complete certain initiatives (such as providing a full set of environmental critical spare parts) before ships resume service; absence of health, safety, or security initiatives; and the observation that many of the initiatives relate to issues that

arose long before the COVID-19 pandemic yet remain unresolved.[45]  *See* Employee

Interview/Call Notes.  In addition, the Company received the draft of this Report on June 29,

2020, containing the CAM Team's written feedback on the Draft Pause Priorities Plan.[46]

Continuing to label the Plan as a "draft," especially as some ships are set to imminently

resuming cruising, raises questions about the certainty of the commitments, and accountability if

commitments are not met.

> *h)  Legal Proceedings*[47]

> > i.   INVESTIGATION BY UNITED STATES CONGRESS

On May 4, 2020, the Company notified the Interested Parties, CAM, and TPA that "on or

about May 1, 2020, the Company received a letter from the chairman of the House Committee on

Transportation and Infrastructure, Peter DeFazio, and chairman of the Subcommittee on Coast

Guard and Maritime Transportation, Sean Patrick Maloney, requesting documents relating to the

Company's response to the COVID-19 pandemic."  Letter from Environmental Corporate

Compliance Manager to Interested Parties, *Notice of Congressional Investigation* (May 4, 2020).

The Congressional letter observes that, "[l]ong before the COVID-19 pandemic . . . the

cruise industry had a problem managing, containing, and responding to public health outbreaks,"

---

[45] This observation is a critique of the Company's continuing struggle—after more than three years of probation—to create a sustainable web of compliance support for the ships on issues such as pollution prevention equipment and spare parts; crew staffing and workload; IT support, including voyage planning; waste offload and waste vendor assessment support; effective investigations; and a culture that supports compliance.  *See infra*, Part IV.A-E.

[46] On July 13, 2020, the date of this Report, the CAM Team became aware of a revised version of the Draft Pause Priorities Plan, dated June 25, 2020.  The CAM Team will review and report on these changes, and any other revisions to the Draft Pause Priorities Plan, in the next CAM Quarterly Report.

[47] As noted above, the Company "does not agree with all of the assertions made in the various media reports and lawsuits described throughout this report."  *See* Company Comments on Draft Report.  *See supra*, Part I.B.4.

including outbreaks of infectious diseases such as the norovirus and influenza.  Letter from

House Committee on Transportation and Infrastructure and Subcommittee on Coast Guard and

Maritime Transportation to Carnival Corp. CEO (May 1, 2020), at 1.  The letter further states

that, when cruise ships resume sailing, "more robust health precautions and new social

distancing protocols will be paramount to preventing the re-emergence and spread of new

COVID-19 infections."  *Id.* at 2.  It adds:  "Our Committee, the U.S. Congress, and the American

public need to be assured that the global cruise line industry, and Carnival Corporation & PLC in

particular, are instituting necessary measures to ensure that the safety of the traveling public and

crew members will be your number one priority when your ships set sail again."  *Id.*  The letter

also cites media report allegations that "suggest that officials at Carnival were aware of the

threats to some of its ships and did not take appropriate actions, which may have led to greater

infections and the spread of the disease."  *Id.* at 3.

To "gain a better understanding of how Carnival intends to protect passengers and crew,"

the letter requests that the Company provide the Committee with "the information Carnival

Corporation cruise lines had, and when, regarding potential infections, public health

implications, and possible exposure of its passengers and crew to COVID-19, as well as the

decisions made by Carnival Corporation and its various affiliated lines regarding the health and

safety of their passengers and crew."  *Id.* at 4.  It specifies an extensive list of requested records

from January 1, 2020, to the present, including:  outbreak prevention and/or response plans; and

a wide range of records and correspondence "discussing, referring to, or referencing COVID-

19."  *See id.* at 4-5.  Delivery of the records is requested by May 15, 2020, although a rolling

production of records may be coordinated beyond that date.  *Id.* at 5.  The Company reports that

July 13, 2020

it "continues to work with the Committee on producing responsive information on a rolling basis."  *See* Company Comments on Draft Report.

      ii.   I<small>NVESTIGATIONS BY</small> A<small>USTRALIAN AND</small> N<small>EW</small> Z<small>EALAND</small> G<small>OVERNMENTAL</small> A<small>UTHORITIES</small>

On June 1, 2020, the Company notified the Interested Parties, CAM, and TPA of "certain legal proceedings and potential future proceedings against Princess."  Letter from Company Outside Counsel to Office of Probation, *Notice of Proceedings and Potential Proceedings Involving Defendant Princess Cruise Lines, Ltd.* (June 1, 2020) ("Notice of Proceedings"), at 1. These proceedings include the following investigations by governmental authorities in Australia and New Zealand regarding the *Ruby Princess*:

- **New South Wales Police Department and Coroner:**  investigation "regarding the circumstances of deaths by former guests on the *Ruby Princess*."  *Id.*  According to the Company's notice, "[a]t least some of these guests are believed to have died because of complications due to COVID-19 after the ship disembarked guests in Sydney, Australia on March 19, 2020."  *Id.*  The Company "expect[s] the investigation will take several months to complete."  *Id.*; *see also* Letter from Environmental Corporate Compliance Manager to Interested Parties, *Notice of Port State Action* (Apr. 13, 2020) (providing notice that "a coronial inquest was initiated to investigate the deaths of certain Australian former guests of the *Ruby Princess*").  The Company reports that it "is continuing to disclose records responsive to the coronial orders for production in cooperation with the investigation."  *See* Company Comments on Draft Report;

- **Special Commission of Inquiry on behalf of the Premier of New South Wales:** investigation regarding "the events surrounding the *Ruby Princess*."  Notice of Proceedings at 2.  The appointed commissioner "is in the process of taking testimony from various witnesses and collecting other evidence, and he is scheduled to report back to the government of [New South Wales] by August 14, 2020."  *Id.*  The Company reports that "the Commission has indicated that witness testimony is now likely closed, with one further hearing day of 9 July reserved in case any further witness testimony is required by the Commissioner.  The Company is preparing written submissions which will be due to the Commission by the end the week ending 10 July."  *See* Company Comments on Draft Report;

- **Australian Federal Department of Agriculture, Water and the Environment:** investigation regarding "whether the *Ruby Princess* complied with the pre-arrival reporting requirements of Australia's Biosecurity Act prior to the ship's docking in

July 13, 2020

Sydney on March 19, 2020." Notice of Proceedings at 2. The Company reports that "the Department's investigation is still in progress, and the Company will continue to cooperate with the investigation." *See* Company Comments on Draft Report;

- **New Zealand Customs Service:** investigation regarding "whether the *Ruby Princess* complied with all requirements in New Zealand's Customs and Excise Act of 2018 while the ship was sailing in New Zealand waters between March 11 and 15, 2020." Notice of Proceedings at 2. The Company reports that it "acknowledged the correspondence from the New Zealand Customs Service on 16 April 2020 and provided a point of contact for any further inquiries. As of 2 July 2020, the Company has not received any further communication in respect of this investigation." *See* Company Comments on Draft Report; and

- **Government of Tasmania, Australia:** investigation regarding "a cluster of COVID-19 patients in Northwestern Tasmania, which the government believes may be attributable to two guests who sailed on the *Ruby Princess.*" Notice of Proceedings at 2. The Company reports that "the government of Tasmania has not contacted or requested any information from the Company in relation to this matter." *See* Company Comments on Draft Report.

iii.    Class Action Lawsuits

The CAM is aware of the following COVID-19-related putative class action lawsuits

against Carnival Corp. entities:

- **Former *Costa Luminosa* Passengers:**

  o A putative class action against Costa Crociere S.P.A. and Costa Cruise Lines, Inc., by former passengers on the *Costa Luminosa* cruises departing on February 24, 2020, and/or March 5, 2020, seeking damages based on alleged claims of negligence, negligent inflection of emotional distress, intentional infliction of emotional distress, misleading advertising, and negligent misrepresentation. *See Turner v. Costa Crociere S.P.A.*, No. 1:20-cv-21481 (S.D. Fla.) (Complaint, Apr. 7, 2020).

- **Former *Grand Princess* Passengers:**

  o A putative class action lawsuit against Carnival Corp. and Princess Cruise Lines by former passengers on the *Grand Princess* cruise departing on February 21, 2020, seeking both damages and injunctive relief based on alleged claims of negligence, gross negligence, negligent inflection of emotional distress, and intentional infliction of emotion distress associated with having contracted and/or been exposed or potentially exposed to COVID-19 onboard. *See* Notice of Proceedings at 3; *Archer v. Carnival Corp.*, No. 2:20-cv-04203 (C.D. Cal.) (First Amended Complaint, June 2, 2020);

July 13, 2020

- A putative class action against Carnival Corp. and Princess Cruise Lines from former passengers on the *Grand Princess* cruise departing on February 11, 2020, seeking similar relief and alleging similar claims to those in *Archer*. *See Chung v. Carnival Corp.*, No. 2:20-cv-04954 (C.D. Cal.) (Complaint, June 4, 2020); and

- A putative class action against Princess Cruise Lines from former passengers on the *Grand Princess* cruises departing on February 11, 2020, and/or February 21, 2020, seeking damages based on alleged claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. *Eicher v. Princess Cruise Lines, Ltd.*, No. 2:20-cv-04958 (C.D. Cal.) (Complaint, June 4, 2020).

- **Former *Ruby Princess* Passengers:**

  - A putative class action against Princess Cruise Lines by former passengers on the *Ruby Princess* cruises departing on February 24, 2020, and/or March 8, 2020, seeking damages based on alleged claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. *See Heinzer v. Princess Cruise Lines, Ltd.*, No. 2:20-cv-04959 (C.D. Cal.) (Complaint, June 4, 2020).

- **Former Holland America Line *Zaandam* Passengers:**

  - A putative class action against Carnival Corp. and Holland America Line by former passengers on the Holland America Line *Zaandam* cruise boarding on March 7, 2020, and departing on March 8, 2020, seeking damages and injunctive relief based on alleged claims of negligence, gross negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. *See Lindsay v. Carnival Corp.*, No. 2:20-cv-00982 (W.D. Wash.) (Complaint, June 24, 2020).

- **Shareholders:**

  - A putative securities class action against Carnival Corp., the Carnival Corp. CEO, and the Carnival Corp. Chief Financial Officer by those who acquired Carnival Corp. common stock and securities between January 28, 2020, and May 1, 2020, seeking damages based on alleged violations of the Securities and Exchange Act and Rule 10b-5, including making false or misleading statements that artificially and falsely inflated stock prices. *See Service Lamp Corp. Profit Sharing Plan v. Carnival Corp.*, No. 1:20-cv-22202 (S.D. Fla.) (Complaint, May 27, 2020); and

  - A putative securities class action against Carnival Corp., the Carnival Corp. CEO, the Carnival Corp. Chief Financial Officer, and the Carnival Corp. Chairman of the Boards of Directors by those who acquired Carnival Corp. common stock and/or shares between September 26, 2019, and April 30,

July 13, 2020

2020, seeking damages based on similar allegations. *See Elmensdorp v. Carnival Corp.*, No. 1:20-cv-22319 (S.D. Fla) (Complaint, June 3, 2020).

iv.   INDIVIDUAL CIVIL LAWSUITS

The CAM is aware of over thirty additional COVID-19-related individual civil lawsuits by former passengers that have been filed against Carnival Corp. entities. *See* Notice of Proceedings at 3; *see also*

- *Birkenholz v. Princess Cruise Lines Ltd.*, No. 2:20-cv-03167 (C.D. Cal.) and related cases (individual lawsuits by former *Ruby Princess* passengers);

- *Hook v. Holland America Line N.V. d/b/a Holland America Line N.V. LLC*, 2:20-cv-01009 (W.D. Wash.) (individual lawsuit by former Holland America Line *Zaandam* passengers);

- *Nevis v. Costa Crociere S.P.A.*, No. 0:20-cv-60759 (S.D. Fla.) (individual lawsuit by former *Costa Luminosa* passengers);

- *Toutounchian v. Princess Cruise Lines Ltd.*, No. 2:20-cv-03717 (C.D. Cal.) (individual lawsuit by former *Diamond Princess* passengers); and

- *Weissberger v. Princess Cruise Lines Ltd.*, No. 2:20-cv-02267 (C.D. Cal.) and related cases (individual lawsuits by former *Grand Princess* passengers).

In general, the plaintiffs in these lawsuits seek damages based on alleged claims similar to those in the class action lawsuits discussed above.

These lawsuits also include at least three wrongful death actions. *See Dorety v. Princess Cruise Lines, Ltd.*, No. 20-cv-03507 (C.D. Cal.); (wrongful death lawsuit on behalf of deceased former *Grand Princess* passenger and their estate and lawful survivors); *Weidner v. Carnival Corp.*, No. 2:20-cv-04074 (C.D. Cal.) (same); *Hsu v. Princess Cruise Lines, Ltd.*, No. 20-cv-03488 (C.D. Cal.) (wrongful death lawsuit on behalf of deceased former *Ruby Princess* passenger and their estate and lawful survivors).

July 13, 2020

v.   ALLEGED VIOLATIONS OF CDC NO SAIL ORDER

The CAM is aware of the following alleged violations of the United States CDC No Sail

Order by Carnival Corp. entities:

- An April 29, 2020, Notice of Potential No Sail Order Violation from CDC regarding an alleged attempt to disembark a crew member from the Holland America Line *Oosterdam* in the Port of Los Angeles "even though Holland America and Carnival had not signed an attestation assuring public health authorities that sufficient precautions had been taken." *See* Letter from CDC to Senior Vice President and Chief Medical Officer, *Re: Notice of Potential No Sail Order Violation* (Apr. 29, 2020), at 1; *see also* Letter from Environmental Corporate Compliance Manager to Interested Parties, *Notice of Port State Action* (May 4, 2020). The Company submitted a response on May 6, 2020, which stated that Holland America Line shoreside management "never had any intention or plans to disembark crew," that the situation was the result of "confusion among *Oosterdam*'s administrative personnel and the local port agent," and that the confusion was "corrected immediately" once shoreside management became aware. *See* Letter from Senior Vice President, Fleet Operations, Marine Services to CDC, *Re: Response to Notice of Potential No Sail Order Violation ("Notice")* (May 6, 2020), at 1; and

- An Enforcement Summary notification from the United States Coast Guard against Carnival Cruise Line alleging violations of Coast Guard orders issued pursuant to the CDC No Sail Order by the *Carnival Imagination* and *Carnival Panorama* on April 6-7, 2020, and April 13-14, 2020, respectively, while the ships were in the Port of Long Beach, California. Specifically, the notification alleges that the *Carnival Imagination* did not provide advance notice to the Coast Guard of its decision to medically evacuate a sick crewmember, and that the *Carnival Panorama* did not submit a disembarkation plan, request authorization, or provide advance notice of its decision to disembark a United States crew member, as required by the Order. *See Enforcement Summary*, Enforcement Activity # 5780050.

vi.   OTHER PROCEEDINGS OR POTENTIAL PROCEEDINGS

On April 7, 2020, DOJ notified the Company of allegations from a crew member on the

*Coral Princess* that "on or about March 25 and 26, 2020, while underway, two separate crew

parties were hosted on the vessel which were open to the Deck Department and ultimately the

entire ship's company." Letter from DOJ to Company Outside Counsel, *Re: United States v.*

*Princess Cruise Lines, Ltd. (Case No. 1:16-cr-20897)* (Apr. 7, 2020), at 1. According to DOJ,

"[i]t is apparent from the email that the alleged conduct on board would have maximized rather

than minimized the transmission of the [COVID-19] virus and that senior ship officers and managers had awareness and/or involvement." *Id.*  The information "has been shared with the Center for Disease Control and the U.S. Coast Guard." *Id.*  DOJ issued an information and document request to the Company regarding the allegations. *See id.* at 3.  The Company reports that its "Incident Analysis Group has completed an investigation into the allegations in the DOJ's letter.  The Company will provide a copy of the investigation report to the DOJ." *See* Company Comments on Draft Report.

### D.  CAM Methodology and Activities

#### 1.  CAM Team Visits to Ships and Shoreside Facilities

Consistent with the Third Annual Work Plan, *see* CAM September 2019 Quarterly Report at 10-11 and Attachment 1, and the Probation Revocation Agreement, the CAM Team performed the following ship and shoreside office visits during ECP Year Three:

- 14 ship visits:
    - 10 CAM Team-only;[48]
    - 3 accompanying TPA auditors;[49] and
    - 1 accompanying RAAS auditors.[50]

---

[48] Due to COVID-19, the CAM Team was unable to complete scheduled visits on two additional Covered Vessels.  The CAM Team plans to conduct these visits in ECP Year Four, along with the other missed visits and joint visit/audits of ships and shoreside facilities noted below, in addition to the required ECP Year Four visits.

[49] Due to COVID-19, the CAM Team was unable to complete a scheduled visit to accompany the TPA on one additional Covered Vessel audit.

[50] Due to COVID-19, the CAM Team was unable to complete a scheduled visit to accompany RAAS on one additional Covered Vessel audit.

July 13, 2020

- 7 shoreside office visits:

    o 5 CAM Team-only, including Carnival Corp./All Brands Group, Carnival Cruise Line, Carnival UK, Costa Group, and Holland America Group offices;

    o 2 accompanying TPA auditors, including Holland America Group offices and a joint audit of Carnival Corp./All Brands Group and Carnival Cruise Line offices; and

    o 0 accompanying RAAS auditors.[51]

In addition, the CAM Team attended numerous Company meetings and events during

ECP Year Three at shoreside offices and other sites, including:

- Multiple presentations by PROPEL SAYFR AS ("Propel"), the CAM's retained maritime culture survey expert, to the Company's Executive Leadership Team and to the different operating lines/brands on the results of the Environmental Compliance Culture Assessment.  *See infra*, Part III.D and Part IV.B;

- Multiple meetings with the HESS Committee and the Compliance Committee of the Carnival Corp. Boards of Directors.  *See infra*, Part III.E.3;

- A meeting with members of the Environmental Corporate Compliance Manager's food waste Tiger Teams, held at the TPA's offices in Houston, Texas, in August 2019.  *See infra*, Part III.F and Part V.A;

- Multiple sessions of an Environmental Excellence hybrid training/conference event for Environmental Officers, as well as a session of the Company's redesigned Operational Excellence training course required for deck, technical, and environmental officers, held at the Company's CSMART training facility in Almere, Netherlands.  *See infra*, Part III.G and Part VII.B;

- The Company's Semi-Annual Global Maritime IT Leadership Forum, held in Hamburg, Germany, in October 2019, as well as a Data Management Working Group session of the Company's Corporate Technical Days event, held in Southampton, United Kingdom, in September 2019.  *See infra*, Part III.H;

- One overview meeting and one session of the Company's new causal analysis investigation training provided by an outside consultant, held at the Company's offices in Miami, Florida, in November 2019 and February 2020, respectively.  *See infra*, Part IV.D.6; and

---

[51] Due to COVID-19, the CAM Team was unable to complete scheduled visits to accompany RAAS on two additional shoreside office audits.

July 13, 2020

- The annual 2019 RAAS Maritime Retreat, held at CSMART in August 2019.  *See infra*, Part I.D.4 and Part VI.B.1.

As discussed in the most recent CAM Quarterly Report, in light of the COVID-19 crisis, the CAM, with the Court's approval, suspended all in-person ship visits as of March 3, 2020, and all in-person shoreside office and site visits as of March 9, 2020.  *See* CAM March 2020 Quarterly Report at 34.  The TPA suspended all in-person ship and shoreside office and site audits as of March 10, 2020.  *See* February 2020 Probation Supervision Report, Attachment 8, at 2.  Those suspensions remain in effect.

As noted in the Court's Order of June 2, 2020, the ability of the CAM and TPA to perform in-person visits and audits remains limited due to "challenges presented by the COVID-19 pandemic," including "travel restrictions, quarantine requirements, and other public health and safety measures (such as screening and testing requirements), set by governments, port authorities, the Company, and other bodies, that remain in flux and with uncertain timeframes."  Dkt. No. 189 at 4-5.  Therefore, as discussed above, the Court granted temporary leave for the CAM and TPA to perform ship and shoreside facility visits and audits remotely, and ordered the Company to cooperate to facilitate their ability to do so.  *See id.* at 5; *supra*, Part I.B.3.f.

As of the date of this Report, the CAM and TPA are coordinating with one another and with the Company to develop protocols for remote visits and audits, and will provide a status update to the Court at the July 29, 2020, Status Conference.  The TPA conducted its first remote ship audit of a Princess ship from July 7-9, 2020, joined by the CAM Team.  Overall, the TPA observed that, given the inherent limitations of a remote approach (which does not allow for the kind of informal, organic interactions with crew members that can help build rapport, or the live, in-person inspection or observation of equipment and spaces), the remote audit proceeded smoothly with good cooperation from the crew and no major IT issues.  The TPA was able to

review electronic versions of documents and records, and conduct interviews with crew members via videoconferencing software.  The TPA plans to conduct its first remote shoreside audit of the All Brands Group shoreside offices from July 14-16, 2020, which the CAM Team will also join. In addition to joining these TPA audits, the CAM Team is working to schedule separate CAM Team-only remote visits of ships and shoreside offices.

The CAM Team has continued its other work, as discussed below and described throughout this Report.

>            2.      <u>Other CAM Team Activities</u>

Outside of visits to ships, shoreside offices, and other sites, the CAM Team has continued to perform an ongoing review of documents produced by the Company, and to communicate frequently with the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager and their teams.  The CAM Team also communicates with other personnel, including the Chief Maritime Officer, the Chief Audit Officer, the Chief Financial Officer, the Health/Safety/Security Corporate Compliance Manager, the General Corporate Compliance Manager, executive leadership teams at All Brands Group and the operating line/brands, the HESS and Compliance Committees of the Carnival Corp. Boards of Directors, and the Compliance Committees' independent outside counsel; and with Propel and the Company on the response to the Environmental Compliance Culture Assessment.  The CAM Team conducts additional formal and informal interviews and communications with personnel from all ranks across the Company, including receiving confidential communications from individuals both within and outside of the Company.

July 13, 2020

The CAM Team also remains in regular communication with the TPA and the Interested Parties, including the Office of Probation, and reports to the Interested Parties and the Court as required by the ECP and the Court.

### 3.    Oversight of the External Audit Function (TPA)

During ECP Year Three, the TPA conducted nearly forty audits of Covered Vessels (including three accompanied by the CAM Team)[52] and multiple audits of shoreside offices (including three accompanied by the CAM Team).  *See infra*, Part V.A-B.  In addition to accompanying the TPA on audits, the CAM Team continues to communicate frequently with the TPA, including regular weekly calls and periodic in-person meetings.

The CAM Team has continued to evaluate the adequacy and independence of the TPA, including through:  reviewing TPA audit and annual reports; directly observing TPA audits; and holding formal and informal discussions with Company personnel who have interacted with the TPA.  Part V of this Report provides a more detailed assessment of the CAM's oversight of the TPA during ECP Year Three.

### 4.    Oversight of the Internal Audit Function (RAAS)

During ECP Year Three, RAAS audited over seventy Covered Vessels (including one accompanied by the CAM Team)[53] and multiple shoreside offices.  *See infra*, Part VI.A.1.  In addition to accompanying RAAS on audits, members of the CAM Team and TPA attended a RAAS Maritime Retreat held at the Company's CSMART training facility in Almere,

---

[52] Due to COVID-19, the TPA was unable to complete scheduled audits of four additional Covered Vessels.  The TPA plans to conduct these audits in ECP Year Four, in addition to the required ECP Year Four audits.

[53] Due to COVID-19, RAAS was unable to complete scheduled audits of three additional Covered Vessels.

Netherlands, from August 12-16, 2019.  *See infra*, Part VI.B.1; CAM September 2019 Quarterly Report at 14-15.

The CAM Team has continued to evaluate the effectiveness of the RAAS audit function, including through:  reviewing RAAS audit reports and other materials such as newsletters and reports to the Boards of Directors; directly observing RAAS audits; and holding formal and informal discussions with RAAS personnel (auditors as well as management) and other Company employees, ship and shore, who interact with RAAS personnel.  Part VI of this Report provides a more detailed assessment of the CAM's oversight of RAAS during ECP Year Three.

## II.   EXECUTIVE SUMMARY:  CAM ECP YEAR THREE FINDINGS

For ECP Year Three, the CAM makes the following findings on the Company's capabilities to meet ECP objectives and attain continuous improvement.  *See* ECP § VI.F.3.b. These findings are based on the CAM Team's activities during ECP Year Three, which included: over 30 visits to ships, shoreside offices, and sites; interviews and discussions with hundreds of employees, both ship and shore; and reviews of thousands of documents.  *See supra*, Part I.D (discussing the CAM Team's methodology and activities during ECP Year Three).  These findings also build upon findings and observations from ECP Years One and Two.

As in prior years, the CAM's findings are based on multiple sources of support and corroboration, such as views expressed by a large number of employees across operating groups or brands, or documentation of similar findings in the Company's own studies, surveys, and assessments.  The CAM relies throughout this Report on information gathered from Company employees.  **The CAM is careful to protect the anonymity of communications made in confidence to the CAM or the CAM Team**.  Citations to interviews or discussions with

Company employees do not identify the employee(s) interviewed, and are referred to as "Employee Interview/Call Notes."

The CAM continues to appreciate the opportunity to serve the Court in this matter. As in ECP Years One and Two, the CAM could not have performed his work during ECP Year Three without the extensive support and cooperation of the Company's employees, both ship and shore. These high levels of cooperation and engagement have continued even as the Company faces unprecedented challenges from the COVID-19 pandemic. Now more than ever, the leadership and culture issues identified in this and prior CAM reports will be the most significant drivers for whether the Company emerges from this crisis with a sustainable compliance culture and program.

### A.   CAM Findings: Progress

The CAM's findings related to the Company's progress regarding ECP objectives are:

1) **No Repeat of the Underlying Offenses:** As in ECP Years One and Two, the CAM is not aware of any Covered Vessels that have repeated the misconduct that occurred on the *Caribbean Princess* and gave rise to the Company's conviction. There were no known instances during ECP Year Three where employees on a Covered Vessel intentionally bypassed pollution prevention equipment to discharge oily waste water, coupled with falsification of records and conspiracy to conceal such illegal acts. But, as discussed below under Barrier Finding #6 (Ongoing ECP and Environmental Violations), other violations of the ECP and environmental laws continue to occur, including prohibited discharges and record falsifications.

2) **General Fulfillment of Enumerated ECP and Probation Revocation Agreement Requirements; Initiatives Beyond Enumerated Requirements:** Before the COVID-19 pandemic, the Company had generally appeared to fulfill its enumerated ECP requirements (*i.e.*, requirements with discrete deadlines and/or submission requirements), as well as its enumerated filing and submission deadlines to date under the Probation Revocation Agreement. *See* Appendix A. However, COVID-19 has impacted the Company's ability to comply with certain ECP requirements, including requirements related to: in-person training; testing and calibration of pollution prevention equipment; and performing audits and investigations. The Company has notified the Interested Parties, CAM, and TPA of these impacts, as well as its plans for addressing or mitigating the impacts.

The Company also continues to develop and implement initiatives that go beyond the enumerated ECP and Probation Revocation Agreement requirements, including policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See* Appendix B.

3) **Employee Cooperation and Commitment:**  Overall, the CAM Team's many ship and shoreside visits that took place before COVID-19 proceeded smoothly, with high levels of cooperation and engagement from Company employees, both ship and shore, including a willingness to candidly discuss issues related to ECP implementation and environmental compliance.  After in-person CAM Team visits were suspended in early March 2020, these high levels of cooperation and commitment have continued.  Many Company employees have made themselves available for calls and virtual video interviews with the CAM Team.  The Company also continues to provide the resources and support needed to respond to CAM document and information requests and produce reports and other documents, as required by the ECP and terms and conditions of probation.

The Company's environmental compliance personnel—including the Environmental Corporate Compliance Manager and his team; CSMART staff involved in developing or implementing environmental and compliance training; RAAS personnel who perform or oversee HESS audits; and shipboard Environmental Officers—continue to display a commitment to environmental compliance, and to spearhead efforts to improve the efficiency and effectiveness of the ECP even during this challenging time.  The Environmental Corporate Compliance Manager and his team have led progress on many key issues during ECP Year Three, including developing enhanced Environmental Officer training at CSMART; taking steps to establish a Fleet Environmental Compliance Training Officer Program; and taking steps to improve onboard food waste management.

4) **Acceptance of Culture Assessment Findings and Efforts to Address Those Findings:**  In 2018-2019, the Company, in conjunction with the CAM and the CAM's retained maritime culture survey expert, completed a first-of-its-kind environmental compliance culture survey of more than 70,000 ship and shore employees.  The results of the survey, finalized in August 2019, indicate that the Company's greatest opportunities for improvement are in the areas of Trust, Care, and Openness.  The Company's top leadership accepted these results, and recognized that they are consistent with those of other studies commissioned by the Company.  Following presentations of the results to senior management at All Brands Group and the brands/operating lines from September through December 2019, it seemed that there was support for and momentum towards undertaking a concerted, corporate-wide effort to address the identified opportunities for improvement.  To support this effort, the Company retained an outside consultant in September 2019 to develop a draft action plan.  With support from the consultant, the Company crafted a new Carnival Corp. Vision Statement, presented to the Court at the December 19, 2019, meeting, emphasizing the importance of safety, environmental protection, and compliance.  The Carnival Corp. CEO has made an effort, even during the COVID-19 crisis, to reiterate the Vision Statement's priorities, and the message has also been echoed by other leaders.

In general, however, progress on the action plan, which was still in draft form when COVID-19 hit, has been slow.  In the absence of a final action plan from All Brands Group, most brands/operating groups developed their own culture action plans in collaboration with All Brands Group.  To varying degrees, work has continued on refining and implementing these brand/operating group-level action plans, and elements of these plans are part of the Ethics & Compliance Draft Pause Priorities Plan, which contains a portion devoted to culture.  The CAM Team understands that, in light of the pandemic, All Brands Group has suspended its efforts on the draft action plan and shifted to focusing on the culture portion of the Draft Pause Priorities Plan.

As discussed further below in CAM Barrier Finding #2 (Missed Opportunities in Response to Culture Assessment Findings), despite some significant efforts, the Company's overall response to the findings of the Environmental Compliance Culture Assessment appears to reflect missed opportunities.  It also demonstrates that the Company's complex corporate structure and lack of centralization remain a barrier to compliance.

5) **Formation of Ethics & Compliance Department and Program:**  Since pleading guilty in June 2019 to a probation violation for failing to provide the Environmental Corporate Compliance Manager with the authority required by the ECP, the Company has made significant efforts, many required by the Probation Revocation Agreement, toward standing up a new, centralized compliance organization.  These efforts included elevating the Environmental Corporate Compliance Manager to a Senior Vice President level and creating a new position, the Chief Ethics & Compliance Officer.  The Chief Ethics & Compliance Officer officially began duties in August 2019, and leads a new Ethics & Compliance Department, based at All Brands Group.  From that position, he seeks to implement a broader Ethics & Compliance Program within the brands/operating groups.  Since joining the Company, the Chief Ethics & Compliance Officer has led significant efforts toward putting in place the people, funding, structures, and systems for the corporate compliance organization.

The Company has also taken steps to enhance the compliance expertise of its Boards of Directors, including by developing and implementing an annual training curriculum on corporate compliance topics, and hiring a new Boards member with significant compliance experience.  In addition, the Company created and made permanent a new Compliance Committee of the Boards of Directors, separate from the HESS and Audit Committees.

As the Company has acknowledged, however, much work remains to be done.  Many of the CAM's Barrier findings relate to unresolved weaknesses and areas for improvement in the Company's corporate compliance function.  As described in detail below, these include:  continued decentralization of many HESS compliance functions; failure to give the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager the authority required by the ECP and Probation Revocation Agreement; missed opportunities in responding to the findings of the Environmental

Compliance Culture Assessment; a failure to address long-recognized flaws in the internal investigations program; and an inadequate waste vendor assessment program.

6) **Improvements on Food Waste Management:**  In pleading guilty in June 2019 to a probation violation for illegally discharging non-food items (including plastic) mixed with food waste into the ocean, along with failing to accurately record the discharge, in violation of MARPOL Annex V, the Company admitted the need to improve food waste management on its ships.  Under the Probation Revocation Agreement, the Company agreed to take various actions to prioritize this issue, including establishing a Food Waste Task Force and two Food Waste Tiger Teams, and implementing a three-part program to improve its food waste management practices.  The Company also committed to: (1) reduce the purchase and consumption of single-use plastic items onboard its ships by 50% by December 31, 2021; (2) reduce the total weight of food waste generated onboard its ships by 10% by December 31, 2021; and (3) commit a minimum of $20 million in capital expenditures throughout the remainder of probation to optimize food waste management.  The Company has implemented its food waste management improvement program throughout ECP Year Three, led by the Environmental Corporate Compliance Manager and his team.

   By early 2020, under the leadership of the Environmental Corporate Compliance Manager, the Company was making tangible progress on improving its food waste management.  As of January 2020, the Company's preliminary data indicated that it was on track to meet its Probation Revocation Agreement commitments to reduce single-use plastics and food waste weight onboard.  The Company had also begun a program to install food waste digesters on the majority of its ships, which the Company's prior reviews and assessments had concluded were the best technology option for addressing its food waste management challenges.

   Since January 2020, COVID-19 has had major impacts on nearly all aspects of ship operations, including food waste management.  The full nature and extent of these impacts, including whether they may affect the Company's ability to meet its Probation Revocation Agreement commitments, is not yet known.

   In particular, COVID-19 has affected the Company's plans for food waste digester installations.  In the Draft Pause Priorities Plan, the Company commits to (1) allocate $10 million to purchasing digesters in Fiscal Year 2020; and (2) install those digesters (as well as digesters that have already been purchased and are available for installation) on ships within 60 days of their return to service.  The Company has indicated, however, that it plans to install digesters only on those ships that it plans to return to service—and not, for instance, on ships being sold or going into layup for an extended period of time.

   If digester installations are cancelled or delayed, the Company has not explained what additional measures it would take to prevent prohibited discharges of plastic and other non-food waste.  Unless the Company has ships offload all food waste, or provides them with additional measures or resources to replace the utility of the digesters, then it faces the potential that discharges of non-food waste in violation of MARPOL Annex V could

July 13, 2020

occur that could be said to have happened knowingly due to the actions of Company management.

7) **Development of a Strong Environmental Officer Corps:**  Since ECP Year One, the Environmental Corporate Compliance Manager and his team have led efforts to provide increasing levels of support, resources, and training to onboard Environmental Officers. These efforts, in combination with those of the individuals in these positions, have helped to create a strong corps of Environmental Officers who have consistently impressed the CAM Team with their dedication, knowledge, energy, and commitment to helping the Company improve its environmental compliance performance.  The Company's efforts include:  using the its state-of-the-art CSMART training center to conduct some environmental and compliance-related trainings and events, including the Environmental Commitment and Environmental Excellence hybrid training/conference events; establishing an online forum for Environmental Officers; and taking steps to establish a new Fleet Environmental Compliance Training Officer Program.

As with other areas of the Company's operations, the COVID-19 pandemic has impacted issues related to the Environmental Officer role, many of which are still developing.  These include impacts to CSMART training, onboard training, the Fleet Environmental Compliance Training Officer Program, and Environmental Officer staffing, job duties, and workload.  It is also unclear whether the extended hiatus from cruise operations will cause the Company to lose some of these employees in whom it has invested significant training and other support efforts.

8) **Efforts to Develop IT Systems and Tools in Support of Compliance:**  Prior CAM reports have observed that the Company's IT resources are generally non-centralized, outdated, and unable to support the collection and sophisticated analysis of environmental compliance data.  The Company has recognized its need for more centralized, modern, and data-driven strategies, and taken steps to develop or improve existing IT systems and tools in support of compliance.  These include corporate-wide initiatives related to:  a global system for hosting HESS policies, procedures, reports, and communications; a corporate-wide incident reporting and tracking system; a single, unified spare parts and planned maintenance management system; fleetwide software to support voyage planning on the ships, including environmental planning (*e.g.*, determining when and where on the ship's itinerary discharges and emissions are permitted or restricted); and hiring a consultant to perform analytics on compliance-related data pulled from different brands/operating groups.  Some of the Company's brands/operating groups are also working on initiatives related to:  collecting and analyzing operational and compliance-related data from the ships; improving the delivery and tracking of environmental compliance-related trainings to reduce administrative burdens; optimizing crew staffing and workloads; and managing certain ship visit, survey, and inspection reports.

Overall, however, progress on these initiatives has generally been slow, with delays and limited tangible outcomes to date that directly make compliance easier on the ships. Disruptions from COVID-19 have further delayed many of these efforts.

The Company also has yet to implement a global, corporate-wide IT strategy. Individual brands/operating groups continue to pursue brand-specific strategies and initiatives that may sometimes be at odds or incompatible with other cross-brand efforts.

### B.    CAM Findings:  Unresolved Barriers and Opportunities for Improvement

The CAM's findings of unresolved barriers and opportunities for improvement are:

1)  **Repeat Failures on Basic Compliance Support for Ships:**  A recurring theme of prior CAM reports has been the impact on ship-level compliance of the failure of the Company's top leadership to support compliance fully—not just in words, but in actions that translate to direct support for the ships.  Even before the COVID-19 crisis placed unprecedented strains on the Company's finances and operations, the Company had repeatedly failed to adequately address compliance support for its ships on issues identified by the Company's internal and external studies, and supported by the findings of RAAS, the TPA, and the CAM.  These issues include:  working pollution prevention equipment; spare parts; sufficient staffing levels and manageable workloads; IT support, including voyage planning support; and waste offload and waste vendor assessment support.  That is not to say that no progress was made on these issues, but pre-COVID-19, after almost three years, it was notable that these problems persisted.

The Company's Draft Pause Priorities Plan is a telling case-in-point.  Many, if not most, of the environmental initiatives in the Plan relate to *basic* compliance support for the ships—such as providing a full set of environmental critical spare parts for pollution prevention equipment, or completing repairs to pollution prevention equipment to ensure it is in working order.  These are not newly discovered issues or COVID-19 artifacts.  Many of the items in the Draft Pause Priorities Plan could, and should, have been addressed long before COVID-19, and even as early as ECP Year One.  It is remarkable that, several months into ECP Year Four, such issues are still unresolved.

Some within the Company have observed that the current suspension of cruise operations presents an opportunity to focus on getting the ships staffed and equipped to be in the best position possible to operate compliantly upon return to service.  It remains to be seen if the Company will seize this opportunity.  As discussed below in CAM Barrier Finding #3 (Unresolved Weaknesses in Corporate Compliance Function), it is unclear whether the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager are empowered with the authority to meet the claim made to the Office of Probation that the Company will "ensure that when the ships return to service, they will come back stronger and better equipped."  *See* Dkt. No. 189 at 5 (quoting April 2020 Probation Supervision Report, Attachment 5, at 2).

2)  **Missed Opportunities in Response to Culture Assessment Findings:**  As described above in CAM Progress Finding #4 (Acceptance of Culture Assessment Findings and Efforts to Address Those Findings), a large-scale survey of over 70,000 ship and shore employees was completed in 2018-2019 to assess the Company's environmental compliance culture.  While significant time and resources have been expended since the findings were shared with the Company in August 2019, the Company still has no final,

comprehensive action plan from All Brands Group for addressing the opportunities for improvement identified in the Assessment.  The Company's overall response reflects missed opportunities in terms of both:  (1) process, including delays at the All Brands Group level, which the Company "acknowledges" and attributes to "a variety of reasons but principally because of the COVID-19 crisis," which the CAM notes did not emerge until at least five months after the Company received the survey findings.  *See* Company Comments on Draft Report; and (2) substance, including concerns with the draft All Brands Group action plan that the CAM Team has shared with the Company—most notably, that the plan focuses on pushing responsibility and accountability away from top leadership and towards lower-level supervisors and employees.

The Company's response also demonstrates that the CAM's ECP Year One finding that the Company's complex and decentralized corporate structure is a barrier to compliance remains relevant.

3) **Unresolved Weaknesses in Corporate Compliance Function:**  In ECP Year One, the CAM made a finding that the Company had failed to provide the Environmental Corporate Compliance Manager with ECP-required authority, and that the Company's complex corporate structure, including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance, was an unresolved barrier to compliance.  The Company did not act to remedy these findings until it faced the revocation of its probation near the end of ECP Year Two.

As noted above in Progress Finding #5 (Formation of Ethics & Compliance Department and Program), since pleading guilty in June 2019 to failing to provide the Environmental Corporate Compliance Manager with the required authority, the Company has made significant efforts toward standing up a new compliance function based at All Brands Group.

Despite these efforts, unresolved weaknesses in the corporate compliance function persist.  The CAM's findings from ECP Year One largely still stand:

(1) The compliance function remains decentralized in many ways, a symptom of the Company's generally decentralized operations.  Ownership and accountability over compliance-related initiatives tends to reside in the brands/operating groups, rather than All Brands Group.  Often, the Company seeks to address a compliance problem by setting up a "working group" with individuals from both All Brands Group and the brands/operating groups, with All Brands Group members engaging in a protracted negotiation process to seek "buy-in" from each of the brands/operating groups on any proposed solution.  This approach results in delayed, uncoordinated, and ineffective solutions to some of the Company's most serious and long-standing compliance challenges, including the need to improve its compliance culture and internal investigations program; and

(2) The Company does not yet appear to have provided the Environmental Corporate Compliance Manager with the authority required by the ECP.  In addition, the Company does not yet appear to have provided either the Environmental Corporate

Compliance Manager or the Chief Ethics & Compliance Officer (a position not created until ECP Year Three) with the authority required by the settlement of the Probation Revocation Petition.

In essence, the authority granted to these positions is the authority to *ask*, not the authority to *do*. The Company has described its system of governance as one in which executives are encouraged to engage in collaboration and coordination, with the authority to escalate issues but not to act unilaterally. Regardless of how effective this approach may be for other aspects of the Company's business, this governance-by-consensus approach, without clearly empowered compliance leadership, appears to be an ongoing barrier to obtaining a comprehensive and consistent approach to meeting the compliance needs of the ships.

In particular, the Draft Pause Priorities Plan raises questions as to whether the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager are empowered with the authority to meet the claim that ships will "come back stronger and better equipped." *See* Dkt. No. 189 at 5 (quoting April 2020 Probation Supervision Report, Attachment 5, at 2).

4) **Internal Investigations Remain Flawed:** At the end of ECP Year One, in June 2018, the CAM found that the Company's internal investigations were critically flawed—an observation bolstered by similar findings from the TPA and the Company's external consultant. In September 2018, the Company committed to the Court that it would improve its investigations program through various proposed actions and timetables, in accordance with the findings and recommendations from its consultant, the TPA, and the CAM. The Company also announced its plan to create a new, independent department at All Brands Group, called the Incident Analysis Group, that would be responsible for significant HESS investigations.

The Company missed its initial self-imposed deadlines. It did not launch the Incident Analysis Group until March 2019, hiring a former official from the United States National Transportation Safety Board to lead the new department. Months passed with limited tangible progress, apart from hiring additional Incident Analysis Group investigators. After missing a second set of self-imposed deadlines for developing new investigations procedures and trainings by September 2019, the Company began to report progress on some efforts in late 2019 and early 2020. These included: launching an in-person root cause analysis training course for Incident Analysis Group investigators, developed by an outside consultant, in November 2019; launching a computer-based root cause analysis course for shipboard and shoreside investigators who investigate less significant HESS incidents in December 2019; and publishing a revised set of investigation procedures and associated guidance materials in late February 2020.

Despite some progress, the investigations function remains flawed as the Company moves into ECP Year Four. Ongoing issues include:

o Many aspects of the investigations process under the revised procedures remain unclear, including how investigations are assigned and performed after

being assigned.  Notably, in June 2020, the Company withdrew an investigation manual it published in February 2020, following concerns expressed by the CAM Team;

o   There are concerns as to whether the Incident Analysis Group is set up and resourced to operate with sufficient independence and authority to perform effective and objective investigations;

o   Details about how the Company will perform incident analysis and trending (including of investigation findings) and share lessons learned to support continuous improvement are unclear;

o   In general, investigation reports continue to focus on identifying direct or proximate causes of an incident, without also sufficiently identifying or addressing broader, systemic (root) causes.  Relatedly, investigation reports continue to focus on the identification of individual errors—a sign of a potential blame culture, as opposed to just culture, approach;

o   The Company has not yet implemented a comprehensive process for auditing the effectiveness of its investigations function; and

o   While the new causal analysis training course appears to provide good analytical methods and tools, it does not appear to be sufficient to make investigators proficient at performing effective causal analysis without additional, ongoing coaching and mentoring by experienced professionals with relevant expertise.

The investigations program also faces additional challenges as a result of COVID-19.  Due to staff reductions, five out of eight Incident Analysis Group investigators have been either laid off or furloughed, and the individual hired to lead the Incident Analysis Group in March 2019 is no longer with the Company.  The position has been temporarily filled in an acting capacity by the former Senior Director of the Incident Analysis Group.  It is unclear when this critical position will be permanently filled.  As a result, as of the date of the Report, the department lacks defined leadership and a cohesive vision for moving forward.

5)   **Inadequate Waste Vendor Assessment Program:**  From 2018-2020, RAAS and the TPA issued multiple audit findings that the Company was not following its internal procedures requiring the assessment of third-party waste vendors—contrary to statements in its Sustainability Reports, reflecting a disconnect between public statements and efforts to make those statements reality.  The Company has acknowledged that it was not following these procedures, a critical first step in addressing the issue.  In late March 2020, the Company published an updated waste vendor assessment procedure and associated materials, and has begun to implement these new procedures and processes.  Although an improvement from the previous practices, the Company's current waste vendor assessment program still appears to be inadequate.  The vetting process relies almost exclusively on reviewing vendor self-assessments and performing a form of due

diligence by searching for media reports. This is the type of "check-the-box" approach that DOJ has cautioned can be inefficient and ineffective.

6) **Ongoing ECP and Environmental Law Violations:**  Violations of the ECP and environmental laws persisted during ECP Year Three. As described in this and prior CAM reports, the Company has taken steps to learn from and reduce the frequency of some of these violations. Further, the CAM does not expect that there will ever be zero violations in the course of normal operations. However, these incidents remain concerning, not only because of their impacts or potential impacts on the environment, but because they reflect broader, systemic corporate leadership and culture issues that continue to serve as barriers to compliance. The Company has acknowledged that, despite some progress, it still has much work to do to improve its compliance performance.

The Company's violations on Covered Vessels reported during ECP Year Three include incidents related to:

- o  Air emissions, including leaks of ozone-depleting substances from refrigerant gas systems and emissions associated with the burning of fuel;

- o  Discharges to the sea of various liquid and solid wastes, including:  ballast water, black water/sewage, chemicals, food waste, grey water, oil and oily wastes, permeate (*e.g.*, treated sewage/grey water), recreational (*e.g.*, pool/Jacuzzi) water, solid items/garbage (including plastics), treated bilge water, and other wastes;

- o  Pollution prevention equipment maintenance and operation, including incidents where equipment has been out of service for more than 24 hours (and many more incidents where equipment has been out of service for less than 24 hours), which represent a significant workload concern even when incidents do not rise to the level of a regulatory or ECP violation; and

- o  Recordkeeping, including several incidents of apparent intentional falsifications of ship record books in violation of legal and/or Company requirements, as well as numerous incidents of apparent inadvertent errors in ship record books.

## III.    CAM FINDINGS: PROGRESS

### A.    No Repeat of the Underlying Offenses

The CAM is not aware of any evidence of a recurrence on any of the Company's Covered

Vessels during ECP Years One through Three of the same criminal conduct that occurred on the

*Caribbean Princess*.  Based on the CAM Team's ship and shoreside facility visits and

July 13, 2020

interviews, review of TPA and RAAS audit reports, and assessment of environmental incident reports, there has been no observed evidence of employees on a Covered Vessel intentionally bypassing pollution prevention equipment to discharge oily waste water coupled with falsification of records and conspiracy to conceal such illegal acts.

However, violations of environmental laws and the ECP continue to occur, including numerous instances of prohibited discharges and record falsifications. *See infra*, Part IV.F.

### B. General Fulfillment of Enumerated ECP and Probation Revocation Agreement Requirements; Initiatives Beyond Enumerated Requirements

#### 1. Pre-COVID-19 Fulfillment of Enumerated Requirements

Before the COVID-19 pandemic, the Company had generally appeared to fulfill its enumerated ECP requirements (*i.e.*, requirements with discrete deadlines and/or submission requirements). The majority of these requirements and associated deadlines took effect during ECP Years One and Two. *See* CAM First Annual Report at 13-14 and Appendix D (assessing the Company's efforts to meet enumerated ECP Year One requirements); CAM September 2018 Quarterly Report at 15-16 (same for ECP Year Two and the first quarter of ECP Year Three); CAM December 2019 Quarterly Report at 69-75 (same for the second quarter of ECP Year Three); CAM March 2020 Quarterly Report at 117-119) (same for the third quarter of ECP Year Three). No significant new enumerated ECP requirements took effect during the fourth quarter of ECP Year Three.

In addition, the Company appears to have met its enumerated filing and submission deadline obligations to date under the Probation Revocation Agreement.[54] A chart summarizing

---

[54] Of course, the Probation Revocation Agreement requirements exist because the Company pleaded guilty to multiple violations of the ECP and terms and conditions of probation during ECP Year Three.

the status of the Probation Revocation Agreement requirements is included as Appendix A to this Report.  Additional details about the Company's efforts to perform its obligations under the Probation Revocation Agreement are discussed in the relevant sections throughout this Report.

2.      COVID-19 Impacts on Ability to Fulfill Enumerated Requirements

On April 6, 2020, the Company notified the Interested Parties, CAM, and TPA that "the COVID-19 pandemic is impacting the Company's ability to comply with certain" ECP requirements.  Letter from Environmental Corporate Compliance Manager to Interested Parties, *Notice of COVID-19 Impact*, at 1.  The identified compliance challenges relate to the following ECP requirements:

| ECP Provision | Requirement | COVID-19 Impact | Plan to Address/Mitigate Impact |
|---|---|---|---|
| ECP § IV.A.4(a) | Environmental Officers must attend five days of in-person training and assessments each year | CSMART training facility is closed, with an uncertain re-opening timeline | Evaluating temporary options to provide "micro-distance-learning" to Environmental Officers |
| Attachment 3 | Crew members joining a ship must complete environmental training within seven days of commencing duties | Crew members subject to in-cabin quarantine for 14 days after joining a ship | Interpreting seven-day period to begin after completion of 14-day quarantine<br><br>Exploring ways to conduct onboard training without the need for a classroom, including through crew TV channels and the online Learning Management System |
| ECP § IX.H.3 | Annual third-party testing of Oil Content Monitors | General travel restrictions; restrictions on allowing outside visitors onto Company ships | Assessing options to keep oil monitoring equipment working accurately and reliably during the period in which third-party vendors cannot join ships |
| ECP § IX.H.4 | Monthly operational tests of Oily Water Separators and Oil Content Meters[55] | Ships in or headed toward layup locations at anchor or alongside that limit the ability to perform overboard discharges to test | Making best efforts to, at minimum, perform the test in re-circulation mode; making best efforts to find ways to remain in compliance where operationally feasible |

[55] An Oily Water Separator is a piece of pollution prevention equipment used to separate oil and water mixtures into their separate components. Dkt. No. 58-1, at 9.  The equipment is designed to produce effluent with oil content not exceeding fifteen parts per million, as required by MARPOL Annex I.  *Id.*  An integral part of an Oily Water Separator is an Oil Content Meter, a device that measures and records the oil content in a moving stream of water to determine if it meets regulatory standards prior to discharge.  *Id.* at 8-9.

| | | equipment; some ships may not have sufficient volume of bilge water to perform test in layup | |
|---|---|---|---|
| **ECP § IX.H.5** | Annual operational tests of Oily Water Separators | Same as above; ship visit restrictions for shoreside representatives | Same as above |
| **ECP § IX.H.6** | Clean Oily Water Separator source tanks and remove accumulated oil at least once every six months | Access to ports may be restricted, delaying the ability to timely offload accumulated oil | May need to minimize the volume of waste produced during the layup period |
| **ECP § III.B.1(a)** | RAAS must audit all Covered Vessels | Travel and ship visit restrictions mean in-person audits cannot be conducted | Attempting to continue some aspects of audit functions using telephonic measures and records reviews |
| **ECP § III.C.1** | Incident Analysis Group must investigate Covered Vessel casualties, oil pollution incidents, and hotline reports | Travel and ship visit restrictions mean in-person investigations cannot be conducted | Attempting to continue some aspects of investigations using telephonic measures and records reviews |
| **Non-ECP Related Challenges** | Washwater analysis and calibration of Advanced Air Quality System[56] sensors | Inability to embark third-party vendors; restricted sampling and lab analysis services | Requirements being extended by Flag State Administrations and the United States Environmental Protection Agency |

*See id.* at 1-3.

3.    Initiatives Beyond Enumerated Requirements

The Company continues to develop and implement initiatives that go beyond the enumerated ECP and Probation Revocation Agreement requirements, including policies, programs, surveys, IT projects, studies, trainings, and other efforts.  *See, e.g.*, CAM First Annual Report at 4, 19-21 and Appendix B; CAM Second Annual Report at 31-43 and Appendix A; CAM March 2020 Quarterly Report at 119-137.  An overview of some of these initiatives is provided in Appendix B to this Report.

---

[56] As discussed below, Advanced Air Quality Systems, also called Exhaust Gas Cleaning Systems or "scrubbers," are large (*i.e.*, multi-story towers or "stacks") and complex systems that are designed to remove sulfur oxide compounds from a ship's engine and boiler exhaust gases to meet air emission requirements.  *See infra*, Part IV.F.2.

July 13, 2020

In addition, although not directly related to this matter, the Company has made significant investments in LNG propulsion technology for new ships, which will reduce toxic air pollutants associated with traditional maritime fuel oils.[57]   The Company took delivery of the first LNG-powered cruise ship—the *AIDAnova*—in December 2018, and, as of April 2019, had an additional 10 LNG ships on order for delivery through 2025.  *See AIDAnova Delivered* (Dec. 12, 2018), https://www.cruiseindustrynews.com/cruise-news/20060-aidanova-delivered.html; *Carnival Corporation's AIDAnova First Ship to be Supplied with LNG in Mediterranean* (Apr. 26, 2019), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporations-aidanova-first-ship-be-supplied-lng.  The first LNG-powered cruise ship to operate in the Western Hemisphere, the *Carnival Mardi Gras*, is expected to enter service in February 2021.  *See Carnival Cruise Line Sets Ship Delivery Changes And Related Deployment Plans*

---

[57] There is debate as to whether a shift to LNG from conventional marine fuels will result in an overall reduction, increase, or no change in greenhouse gas emissions.  *See, e.g.*, *Studies on the Feasibility and Use of LNG as a Fuel for Shipping* (2016), *available at* http://www.imo.org/en/OurWork/Environment/PollutionPrevention/AirPollution/Documents/LNG%20Study.pdf (discussing potential for "methane slip" to offset reductions in carbon dioxide production); Thinkstep, *Life Cycle GHG Emission Study on the Use of LNG as Marine Fuel* (Apr. 10, 2019) ("Thinkstep Study") (study commissioned by SEA-LNG, a "multi-sector industry coalition established to demonstrate LNG's benefits as a viable marine fuel," *see* https://sea-lng.org/, and the Society for Gas as a Marine Fuel, concluding that "LNG is a viable solution to reduce GHG emissions from international shipping . . . . However, methane emission from the supply chain and engine slip need to be reduced further to maximise the positive impact on both air quality and GHG emissions"); E. Lindstad, SINTAF Ocean AS, *Increased use of LNG might not reduce maritime GHG emissions at all – June 2019* (June 2019), *available at* https://www.transportenvironment.org/sites/te/files/publications/2019_06_Dr_Elizabeth_Lindstad_commentary_LNG_maritime_GHG_emissions.pdf (challenging Thinkstep Study methodology); *LNG Bunker Lobby Issues Full Response to Criticism of its Benchmark GHG Study* (Sept. 26, 2019), https://shipandbunker.com/news/world/743410-lng-bunker-lobby-issues-full-response-to-criticism-of-its-benchmark-ghg-study (noting that "science alone may not be able to provide a yes/no, right/wrong conclusion to the ongoing debate on LNG's [greenhouse gas] footprint").

(July 6, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-cruise-line-sets-ship-delivery-changes-and-related.

The CAM Team will continue to monitor the Company's initiatives, including examining whether these initiatives are:  well-coordinated; designed to address systemic or root causes; and developed with appropriate assessment of the additional workload or other impacts that may result, including whether the Company utilizes management of change principles.  *See id.*

### C.      Employee Cooperation and Commitment

The CAM's ability to fulfill his broad mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, depends on the Company's cooperation in facilitating the CAM Team's access to the Company's ships, facilities, personnel, and records.  Overall, as in prior ECP years, the CAM Team's many ship and shoreside visits that took place before COVID-19 during ECP Year Three proceeded smoothly with high levels of cooperation and engagement from Company employees, both ship and shore, including a willingness to candidly discuss issues related to ECP implementation and environmental compliance.  *See* CAM First Annual Report at 16-19; CAM Second Annual Report at 21-43.

After in-person CAM Team visits were suspended in early March due to COVID-19, many Company employees have made themselves available for calls and virtual video interviews with the CAM Team.  The CAM Team has also remained in regular contact with the Environmental Corporate Compliance Manager, the Chief Ethics & Compliance Officer, the Chief Maritime Officer, the Chief Audit Officer, and members of their respective teams, among others.  In addition, the Company continues to respond to CAM document and information requests and produce required reports and other documents, as required by the ECP and terms and conditions of probation.  *See* ECP § I.E; Special Condition of Supervision 11.

The Company's environmental compliance personnel—including the Environmental Corporate Compliance Manager and his team; CSMART staff involved in developing or implementing environmental and compliance training; RAAS personnel who perform or oversee HESS audits; and shipboard Environmental Officers—continue to display a commitment to environmental compliance, and to spearhead efforts to improve the efficiency and effectiveness of the ECP.  The Environmental Corporate Compliance Manager and his team have led progress on many key issues during ECP Year Three, including developing enhanced Environmental Officer training at CSMART, *see infra*, Part III.G, taking steps to establish a Fleet Environmental Compliance Training Officer Program, *see id.*, and taking steps to improve onboard food waste management.  *See infra*, Part III.F.

The CAM again expresses thanks for the support, cooperation, and open communication of the Company's employees, ship and shore.  The CAM also recognizes that this is a difficult, and even devasting, time for many of the Company's 120,000+ employees and former employees around the world, as well as their families and loved ones.  As a result of COVID-19, many of the talented and dedicated individuals with whom the CAM Team has interacted over the course of the ECP are no longer with the Company because their positions have been eliminated or furloughed, or their contracts have not been renewed.  The CAM is grateful to have met and learned from so many extraordinary individuals over the past three years.

## D.    Acceptance of Culture Assessment Findings and Efforts to Address Those Findings

### 1.    Background

During ECP Year Two, the CAM, in consultation with the Company, retained Propel, a Norwegian consulting company that specializes in culture assessment in the maritime and energy industries, to conduct an Environmental Compliance Culture Survey and to prepare a first-of-its-

kind Environmental Compliance Culture Assessment to illuminate both the strengths and opportunities for improvement in the Company's environmental compliance culture. *See* CAM First Annual Report at 24-25, 68; CAM September 2018 Quarterly Report at 22-23; CAM December 2018 Quarterly Report at 28-30; CAM April 2019 Quarterly Report at 33-36; CAM Second Annual Report at 53-54.

The Company's compliance culture has been a consistent area of focus for the Court and the CAM, with the Court emphasizing its interest in evaluating the Company's progress and growth in this area. *See* CAM First Annual Report at 24; CAM Second Annual Report at 53. When accepting the Company's guilty plea in December 2016, the Court stated that it wanted to know "what was in the culture" because "there obviously was a culture, at least on [the *Caribbean Princess*], if not on other Princess Cruise Lines ships, that promoted dishonesty and the willingness to help each other out in getting around doing the right thing." *See* Plea Hearing Tr. at 32 (Dec. 20, 2016). At the sentencing hearing in April 2017, the Court observed that "the culture really needs to be changed and [I'm] looking to [the CAM] to assist." Sentencing Hearing Tr. at 13 (Apr. 19, 2017). The Company appeared to agree, stating that "we're committed to working with the court-appointed monitor and the third-party auditor over the next five years to continue to enhance our compliance program even more, and our focus is a culture of compliance." *Id.* at 36. At an April 2019 Status Conference following the filing of the probation revocation petition, the Court stated that "I am interested in . . . evidence of systemic inability to follow through on the commitment that this company made." Status Conference Tr. at 5 (Apr. 10, 2019). This effort also supports the CAM's broad mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, and to assess whether the Company has

adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.  *See* ECP § VI.B.2.

 On August 28, 2019, the CAM's retained maritime culture survey expert, Propel, provided the Company and the CAM with the final report of its assessment of the Company's environmental compliance culture.  *See* Environmental Compliance Culture Assessment Report. The assessment was based on a survey of over 70,000 Company employees and evaluated the Company's environmental compliance culture.

As discussed in prior CAM reports, the assessment found that "employees across all of Carnival, from its [All Brands Group] to the various brands, have identified the Company as having a compliance culture with a low level of maturity and significant potential for improvement."  *Id.* at 3.  In particular:

> Carnival's employees have described a culture where people who are involved in failures are blamed, and where management does not take required steps to learn from failures. They also describe Carnival's culture as one where interpersonal dynamics are ignored, where management is narrowly focused on professional competence, and where management is insensitive as to how culture, attitudes and interpersonal dynamics influence operational performance.  In short, the employees have identified a culture that is neither open to feedback nor one that sees failure as a vital source of learning.

*Id.* at 3-4.  The report indicated that the Company's greatest opportunities for improvement, as evidenced by low scores, are in the areas of Trust, Care, and Openness.  *See id.* at 19-21.

In addition to the written report, on September 3, 2020, Propel presented the findings of its report to the Company's CEO and senior leadership team (including the CEOs of Holland America Group and Costa Group, as well as the Presidents of Carnival Cruise Line and Princess Cruise Lines e, the Chief Maritime Officer, the Chief Ethics & Compliance Officer, and others). After that presentation, Propel was asked to present the findings of its assessment to the senior

July 13, 2020

shoreside management at each of the Company's four operating groups.  Propel completed the last of these presentations on December 9, 2020.

In the Environmental Compliance Culture Assessment Report, Propel noted that "[s]ignificant leadership efforts will be required to create a mature and sustainable compliance culture."  *Id.* at 3.  While prescriptive measures were outside of Propel's scope of work, the report "describes a roadmap approach that has successfully been used in connection with other [Propel] assessments."  *Id.* at 4.  The Assessment also identified "a list of key success factors" that are important for implementing a meaningful culture change program.  *Id.* at 42.  These include:

- "Top Management takes ownership for compliance failures";

- "Top Management accepts that changes are needed";

- "Management dedicates necessary time and resources to implement cultural changes";

- "Top Management takes ownership of strengthening compliance culture";

- "Culture changes are linked to the company strategy"; and

- "Systems and governance are aligned to support the change."

*Id.*

2.     Company Acceptance of Findings and Signs of Progress

In September 2019, after receiving the Environmental Compliance Culture Assessment Report and briefing by Propel, the Company's CEO and senior leadership team distributed an e-mail to all employees conveying that the results of the survey had been received and stating:

> We are very grateful that more than 70,000 of you responded to our request for your input.  We value your feedback to help us understand how we can improve in ways that will help us be a better company and a better place for you to work. The results have showed that we have a lot of work to do in building a culture of trust—not blame.  We as your senior leadership own the responsibility to create a better culture.

> We are taking this very seriously and talking about this at every level of the corporation. Each of us is committed to devoting the time and the resources required to make the changes you have said we need to make and take concrete action steps to make these important changes. . . .
>
> Our efforts will support each of our brands, working on the topics most critical within each of them. We are committed to making our company a place where trust, care and openness are at the center of everything we do.

*Important message from Carnival Corporation leadership* (Sept. 20, 2019),

PCL_ECP00167092-93. In addition, at least one brand President followed this message with an

additional message reinforcing a commitment to improving culture. The President of Carnival

Cruise Line sent a message on September 27, 2019, to all Carnival Cruise Line shipboard and

shoreside employees that included the following:

> As a company and a corporation, nothing is more important than building a culture of trust across the organization. I'm taking responsibility for the areas that the Propel Sayfr results identified for [Carnival Cruise Line] where we clearly have work to do to build a stronger culture of trust and accountability among our leaders and with our team members shipboard and shoreside. . . . While the survey results from Propel are not what we wanted to see, they provide us with critical input that points us to areas of opportunities and a path for continuous improvement. So, the bottom line is I want you to know we are listening to you in multiple ways and are taking action based on your feedback. . . . There is nothing more important to me than for us all to live our Carnival Values and that must start with TRUST in leadership.

*A Message From Christine Duffy* (September 27, 2019), PCL_ECP00167086-87

As noted in the most recent CAM Quarterly Report, the Company has recognized that

Propel's findings are consistent with those of other studies commissioned by the Company, and

has stated that it accepts the findings of the Environmental Compliance Culture Assessment. *See*

CAM March 2020 Quarterly Report at 63. During the January 8, 2020, Status Conference, the

Carnival Corp. CEO stated: "[T]he Propel Study, the reason why we haven't debated it is

because we agree with it. We have other studies that suggested those same things, and we've

had personal experience in talking to our crew and stuff to know that."  Status Conf. Tr. at 87

(Jan. 8, 2020).  Similarly, at the same Status Conference, the Chief Ethics & Compliance Officer

said:  "We are not questioning the Propel conclusions . . . [T]he Propel Survey we believe was

invaluable in understanding the baseline.  It confirmed themes that we understand.  We need to

develop trust, openness, and care.  We understand that."  *Id.* at 11, 15.

In September 2019, the Company retained an outside consultant, ECI, to develop "an

action plan addressing the areas of improvement discussed in Propel Sayfr's culture survey

report."  January 2020 Probation Supervision Report, Attachment 3, at 1.  The Company's

expectation, as expressed by its Chief Ethics & Compliance Officer at the January 2020 Status

Conference, was that "the culture action plan is really going to be 18 to 24 months, at a

minimum."  Status Conf. Tr. at 12 (Jan. 8, 2020).

With the support of ECI, and as an initial step to improve the Company's culture, the

Company crafted the following Carnival Corp. Vision Statement:

> At Carnival Corporation & plc, our top priorities are to operate safely, to protect
> the environment, and to be in compliance everywhere we operate in the world.
> On this foundation, we aspire to deliver unmatched joyful vacations for our
> guests, always exceeding their expectations and in doing so driving outstanding
> shareholder value.  We are committed to a positive and just corporate culture,
> based on inclusion and the power of diversity.  We operate with integrity, trust
> and respect for each other -- seeking collaboration, candor, openness and
> transparency at all times.  And we intend to be an exemplary corporate citizen
> leaving the people and the places we touch even better.

*Vision, Mission & History*, https://www.carnivalcorp.com/corporate-information/mission-and-

history.  The Carnival Corp. CEO has made an effort, even during the COVID-19 crisis, to

reiterate the Vision Statement's priorities.  *See, e.g.*, *An Important Update from Arnold Donald*

(Apr. 3, 2020) (email communication to all Carnival Corp. team members) ("As always, our

highest responsibility and top priorities are compliance, environmental protection and the health,

safety and well-being of our guests, the people in the locations we touch, and you and all the members of our Carnival family.")

This message has been echoed by other leaders.  For example, on April 7, 2020, the President of Princess Cruise Lines and Carnival Australia wrote to all employees:  "We will continue to carry on, and as always, compliance, health, safety and environmental protection remain our top priorities."  *Message from Jan Swartz* (Apr. 7, 2020), PCL_ECP00165458-60, at PCL_ECP00165458.  In an April 2020 video for Carnival Cruise Line crew, the President of Carnival Cruise Line said:  "Minimum staffing, or manning is designed to support the safe operation and maintenance of our vessels, and also will meet all of our regulatory, compliance, environmental, health and safety obligations which we will not compromise."  Video Script (Apr. 7, 2020), PCL_ECP00165361.  Similarly, an April 11, 2020, message from the All Brands Group Ethics & Compliance Department to all ECP Covered Personnel began:  "As our leaders continue to take actions to help safeguard our passengers, crew, and company in the wake of the COVID-19 pandemic, we are reaching out to you with a reminder of our ongoing commitment to ethics and compliance, and why it's especially important during this time of crisis."  *A Message from Your Ethics & Compliance Department* PCL_ECP00165343.  The message went on to instruct:  "[A]nyone directly involved in the cash preservation planning, as well as anyone it impacts, has an obligation and a duty to speak up if you believe that decisions are being made that threaten or jeopardize our safety, environmental and compliance commitments.  For example, this might include our decisions relating to maintenance, waste management or the purchasing of spare parts for pollution prevention or safety equipment."  *Id.*

In addition, on June 3, 2020, the Carnival Corp. CEO sent a message to employees across the Company in the wake of nation-wide protests against racial injustice and police brutality.  In

July 13, 2020

that message, he shared personal experiences and made specific reference to the portion of the

vision statement addressing culture, writing:

> In the hope of catalyzing even the smallest of change, I share with my neighbors and my professional colleagues the incidents of racial profiling and biased accusations that my family members and I have experienced on far too many occasions. And through the greatest platform that I have available to me to effect change, as CEO of this corporation, I want to provide the support and the motivation for us to build on our foundation of being the greatest travel and leisure company in the world, bringing millions of people together every year of all nationalities, ethnicities, backgrounds and experiences so they can joyfully discover what they have in common and learn to celebrate their differences, rather than fear them – while at the same time providing an economic multiplier that contributes to a higher quality of life through the power of inclusion.

> I thank each of you for the part you play in making this possible and I encourage you to honor our core values expressed in our vision statement … "We are committed to a positive and just corporate culture, based on inclusion and the power of diversity. We operate with integrity, trust and respect for each other … an exemplary corporate citizen, leaving the people and the places we touch even better."
> Despite these times, and despite what seems to be far too tedious and far too slow progress, collectively we are capable of powerful change for the better, and I have no doubt that if we double down on our efforts and stay the course, together we will create a brighter future.

*Message to Employees from Arnold Donald, President & CEO Carnival Corporation* (June 3,

2020); *see also* Arnold Donald, *Racism is real. The only way through is … forward*, MIAMI

HERALD.COM (June 9, 2020), https://www.miamiherald.com/news/business/biz-

monday/article243272911.html.

   3. <u>Culture Action Plans</u>

  After the results of the Propel Environmental Compliance Culture Assessment were

provided to the Company's leadership, the decision was made that the findings initially would be

shared only with senior management at each of the brands/operating groups (rather than

distributed more widely among employees),[58] and that the Company would work with ECI to develop an overarching plan to address the findings.  This effort was to result in what the Company calls its Culture Action Plan.  A draft of this plan, dated January 29, 2020, was provided to the CAM Team in February 2020.  *See [Draft] Carnival Corporation Culture Action Plan* (Jan. 29, 2020), PCL_ECP00154952-59 ("Draft Culture Action Plan").  The Draft Culture Action Plan is structured around five categories:

- Leadership Engagement & Accountability at Carnival Corporation Level;

- Prioritize Culture & Compliance at Individual Brand Levels;

- Integration & Ongoing Reinforcement of Core Values;

- Formal & Informal Communications at Corporate and Individual Brand Levels; and

- Assessment & Ongoing Measurement of Progress.

*Id.* at PCL_ECP00154953-54.  In March 2020, the CAM Team was told that the Draft Culture Action Plan had not been finalized because Company leaders "were prioritizing emergencies and issues related to the COVID-19 crisis."  *See* Company Comments on Draft Report; Employee Interview/Call Notes.  The Draft Culture Action Plan is not yet finalized as of the date of this Report, although the June 17, 2020, Draft Pause Priorities Plan contains a segment devoted to culture.  *See supra*, Part I.C.4.g.  As discussed in the separate CAM Barrier finding below, however, the culture portion of the Draft Pause Priorities Plan is not a cohesive and

---

[58] The Company reports that it had planned "to share with lower-level employees a summary of the Propel survey when the Ethics & Compliance Department began distributing to those employees culture pulse surveys, which is a component of the company's Culture Action Plan," discussed below, but "[s]ince the creation and distribution of the pulse surveys was delayed due to COVID-19, the Company also delayed distributing the results of the Propel survey."  *See* Company Comments on Draft Report.

comprehensive attempt to address the Company's culture deficits identified in the Environmental Compliance Culture Assessment.  *See infra*, Part IV.B.3.

In the absence of a finalized overarching Culture Action Plan from All Brands Group, most brands/operating groups developed their own plans to improve their cultures in collaboration with All Brands Group.  By January 2020, Carnival Cruise Line, Carnival UK, and Holland America Group had each independently developed culture action plans and had begun to put those plans into action.  *See* Carnival UK, *Heroes of 'Safe and Well*,' PCL_ECP00164191-97; Carnival Cruise Line, *Culture Action Plan Roadmap*, PCL_ECP00164130-57 ("Carnival Cruise Line Culture Action Plan"); Holland America Group, *Culture Action Plan (HA Group Approach)*, PCL_ECP00166112-20 ("Holland America Group Culture Action Plan").  To varying degrees, work has continued on refining and implementing these brand/operating group-level culture action plans, and elements of these plans are part of the Draft Pause Priorities Plan.

### 4.    Ongoing CAM Team Examination

The CAM will continue to monitor the Company's response to the findings of the Environmental Compliance Culture Assessment.  As discussed below, the Company's overall response to date appears to reflect missed opportunities, and demonstrates that the Company still struggles with its complex and decentralized corporate structure in addressing barriers to compliance.  *See infra*, Part IV.B.

### E.    Formation of Ethics & Compliance Department and Program

### 1.    Background

In June 2019, the Company pleaded guilty to a probation violation for "failing to provide sufficient responsibility and authority to the [Environmental Corporate Compliance Manager] to implement the ECP."  Dkt. No. 134 at 10.  In pleading guilty, the Company "acknowledge[d] that it failed to establish [an Environmental Corporate Compliance Manager] with authority

July 13, 2020

(including resources, budget, and staff) as required to implement the ECP." *Id.* at 2.  This issue was brought to the Company's attention at least as early as the end of ECP Year One, when the CAM made a finding that the Company had failed to provide the Environmental Corporate Compliance Manager with ECP-required authority.  *See* CAM First Annual Report at 4-5, 28. The CAM also found that the Company's complex corporate structure, including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance, was an unresolved barrier to environmental compliance.  *See id.* at 4-5, 25-30.  The CAM continued to report on the Company's failure to remedy these findings throughout ECP Year Two.  *See* CAM Second Annual Report at 46-49, 91-92.

In ECP Year Three, as part of the June 2019 Probation Revocation Agreement, the Company committed "to restructure its existing corporate compliance governing authority." Dkt. No. 134 at 2.  The Probation Revocation Agreement lays out a number of actions the Company is required to take, including appointing a Chief Ethics & Compliance Officer (a position that had not existed at the Company before), promoting the Environmental Corporate Compliance Manager, and providing them "each with: the appropriate budget and staff; a substantive role in financial, strategic, and sustainability planning processes; and compliance authority over regulatory obligations and operations across and within all brands." *Id.*; *see also* CAM September 2019 Quarterly Report at 31-33.

Consistent with its obligations under the Probation Agreement, the Company has submitted to the Court, Interested Parties, CAM, TPA the following action plans and associated materials:

- **Proposed Action Plan (August 2019).**  A proposed action plan for re-structuring its corporate compliance function, submitted on August 14, 2019.  *See Carnival Ethics & Compliance Submission*, PCL_ECP00141514-24; *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities*, PCL_ECP00141389-

99; *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond,"* PCL_ECP00141436-71 (collectively, "Proposed Action Plan");[59]

- **Final Action Plan (September 2019).**  A final action plan for re-structuring its corporate compliance function, submitted on September 13, 2019.  *See Revised EC Submission Cover Letter (for 8 14 Court Filing)*, PCL_ECP00141538-48; *Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities,* PCL_ECP00141372-88; *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond,"* PCL_ECP00141436-71;

- **Updated Final Action Plan (October 2019).**  An updated final action plan for re-structuring its corporate compliance function, submitted on October 9, 2019.  *See Revised EC Submission Cover Letter_Oct 9 2019_FINAL* ("Ethics & Compliance October 2019 Final Action Plan Submission Letter"), PCL_ECP00141549-59 and *Attachments A-D*.  The submission includes:

  o  A charter for the corporate Ethics & Compliance Department.  *See Attachment A – Corporate Ethics & Compliance Department Charter and Responsibilities* ("Ethics & Compliance October 2019 Final Charter"), PCL_ECP00141355-71;

  o  An ethics and compliance strategic plan, titled "Compliance Alliance 2020 and Beyond."  *Attachment B – Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond"* ("Ethics & Compliance October 2019 Final Strategic Plan"), PCL_ECP00141400-35;

  o  An annual training curriculum for the Carnival Corp. Boards of Directors.  *See* Ethics & Compliance October 2019 Final Action Plan Submission Letter at PCL_ECP00141551-52;

  o  An internal Company communication announcing the new Ethics & Compliance team.  *See Attachment C - Important announcement: Carnival Corporation forms new Ethics & Compliance team,* PCL_ECP00141508-11; and

  o  A statement from the Boards reiterating the Company's and the Boards' commitment to compliance.  *Attachment D - Carnival's Commitment to Ethics*

---

[59] The CAM and TPA provided joint comments on the Proposed Action Plan on August 28, 2019.  *See Joint CAM/TPA Comments on August 14, 2019, Proposed Action Plan Submission* (Aug. 28, 2019); CAM December 2019 Quarterly Report at 32-33.

July 13, 2020

> & *Compliance: A Statement from Our Boards of Directors*,
> PCL_ECP00141512-13;

- **Preliminary Financial Plan (November 2019).** A preliminary financial plan for the Ethics & Compliance Program for fiscal years 2019 (historical) and 2020 (proposed), submitted on November 1, 2019, as a supplement to the October 2019 updated final action plan. *See Updated Draft for the Carnival Corporation Compliance Financial Plan (2019 and 2020),* PCL_ECP00141532-37; *Attachment A – Global Roster for Ethics & Compliance*, PCL_ECP00141524-30; *Attachment B – Ethics & Compliance Functional Leaders*, PCL_ECP0014131; and

- **Updated Financial Plan (December 2019).** An updated financial plan for the Ethics & Compliance Program for fiscal years 2019 (historical) and 2020 (proposed), submitted on December 10, 2019, as a supplement to the October 2019 updated final action plan. *See Carnival Corporation Compliance Financial Plan (2019 and 2020)*, PCL_ECP00162713-18 ("Ethics & Compliance December 2019 Financial Plan"). The submission includes:

  - A roster of Ethics & Compliance Program personnel for 2019 and 2020. *See Financial Plan E&C December 10 – Attachment A, 2019 roster for Ethics and Compliance*, PCL_ECP00162719-27; and

  - A list of Ethics & Compliance Program functional leaders for All Brands Group and each of the operating lines. *See Financial Plan E&C December 10 – Attachment B, Ethics & Compliance Functional Leaders*, PCL_ECP00162728.

As noted above, the Court's Order of June 2, 2020, required the Company to submit a revised financial plan for the Ethics & Compliance Program by June 17, 2020. *See supra*, Part I.B.3.f.  On June 17, 2020, the Company notified the Interested Parties, CAM, and TPA that it was "in the process of providing a new Carnival Corporation Financial Plan, including an Ethics and Compliance Department and Program [budget] for the second half of Fiscal Year 2020." Letter from Environmental Corporate Compliance Manager to Interested Parties, *Order Re: COVID-19 Impacts and Probation Obligations* (June 17, 2020), at 2.  According to the Company, it "takes approximately 45-days to collect and evaluate the data commencing following the May month-end close.  Last week, the Company closed the books for May;

therefore, the Company expects to produce the updated plan during the week of July 27, 2020."

*Id.*

2.   Ethics & Compliance Department and Program

a) *Overview*

The Carnival Corp. Chief Ethics & Compliance Officer officially assumed duties on August 12, 2019.  This individual leads the new Ethics & Compliance Department, based at All Brands Group, and seeks to implement a broader Ethics & Compliance Program that extends throughout the brands/operating groups.  Appointing a Chief Ethics & Compliance Officer was a significant achievement, albeit one mandated by the Probation Revocation Agreement, for a company that historically lacked a centralized compliance organization—especially a company of Carnival Corp.'s size and complexity that operates in a highly regulated industry and faces a range of compliance risks, not just environmental.  *See* CAM First Annual Report at 12-13 (discussing the complex regulatory regime in which cruise companies operate); CAM Second Annual Report at 21-24 (same, with a focus on environmental regulations); *id.* at 46-47 (providing overview of the Company's decentralized compliance structure as of ~June 2019). From the beginning, the CAM and the Company recognized that building a new centralized corporate compliance organization would not be simple, easy, or quick.  *See id.* at 48-49.

In standing up the new compliance organization, the Company took steps to empower the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager with the authority required under the ECP and Probation Revocation Agreement, including by having the Chief Ethics & Compliance Officer report directly to the Carnival Corp. CEO, with a dotted reporting line to the HESS and Audit Committees of the Boards of Directors; and promoting the Environmental Corporate Compliance Manager to a Senior Vice President level, with a dotted

July 13, 2020

reporting line to the CEO and the HESS Committee of the Boards of Directors.  These actions were required by the Probation Revocation Agreement.  *See* Dkt. No. 134 at 2.  As discussed below, however, the Company does not appear to have provided the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager with the full required authority. *See infra*, Part IV.C.

The Company has also taken steps, again required by the Probation Revocation Agreement, to enhance the compliance expertise of its Boards of Directors, including by developing and implementing an annual training curriculum on corporate compliance topics, and hiring a new Board member with significant compliance experience.  *See* Dkt. No. 134 at 3; *infra*, Part III.E.3.  In addition, the Company made permanent the new Compliance Committee of the Boards of Directors, separate from the HESS and Audit Committees, an action not required by the Probation Revocation Agreement.  *See id.*

As detailed in prior CAM reports, since joining the Company in August 2019, the Chief Ethics & Compliance Officer has led significant efforts toward putting in place the people, funding, structures, and systems for the corporate compliance organization.  In addition to developing the action plans and associated materials noted above, these efforts (which are in varying stages of completion and implementation) include:

- **Staffing and Organizational Structure:**  Working to staff Ethics & Compliance Department and Program positions at All Brands Group and the brands/operating groups, including:  (1) at All Brands Group, the three Corporate Compliance Managers (for Environment, Health/Safety/Security, and General Compliance, respectively), and the functional leaders for Communications, Compliance Risk, Data Privacy, Investigations/Incident Analysis Group, and Training; and (2) at the brand/operating group level, the Operating Line Ethics & Compliance Officers, Operating Line Compliance Managers, Operating Line Training Managers, and functional leaders for Communications, General Compliance, Health/Safety/Security, Risk, and Training.  As discussed above, there have been some staffing reductions and other personnel changes in the Department and Program due to COVID-19 (most significantly, to the Investigations/Incident Analysis Group function), although the

July 13, 2020

basic structure remains consistent with the pre-COVID-19 structure. *See supra*, Part I.C.4.f;

- **Ethics & Compliance Program Retreat:** Holding an Ethics & Compliance Program Retreat attended by approximately 25 Ethics & Compliance Program personnel from All Brands Group and the brands/operating groups. *See* CAM March 2020 Quarterly Report at 71;

- **Ethics & Compliance Ship Visits:** Conducting a series of half-day ship visits by Ethics & Compliance Program personnel to four ships. The visits included townhall-style sessions, where crew members shared a range of compliance-raised concerns. Plans for additional visits were put on indefinite hold due to COVID-19. *See id.* at 72;

- **Compliance Risk Assessment:** Taking preliminary steps to identify material compliance risks facing the Company, in accordance with its risk assessment strategy and a baseline compliance risk assessment plan for Fiscal Year 2020. *See infra*, Part III.E.2.b; and

- **Management of Change Procedure:** Working to develop a management of change procedure to address concerns about the additional workload and logistical demands associated with new Company procedures and initiatives. *See* CAM March 2020 Quarterly Report at 134-36. The Company's initial deadline of April 20, 2020, for finalizing the procedure was pushed back due to COVID-19. The Company is now aiming to complete the procedure by July 2020. *See* Employee Interview/Call Notes.

*See* CAM March 2020 Quarterly Report at 42-43, 66-77.

However, as the Company has acknowledged, work remains to be done. Many of the CAM's Barrier findings discussed below relate to unresolved weaknesses and areas for improvement in the Company's corporate compliance organization, including: continued decentralization of many HESS compliance functions; failure to give the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager the authority required by the ECP and Probation Revocation Agreement; missed opportunities in responding to the findings of Propel's Environmental Compliance Culture Assessment; a chronic failure to address long-recognized flaws in the internal investigations program; and an inadequate waste vendor assessment program that reflects a disconnect between public statements about compliance and efforts to make those statements reality. *See infra*, Parts IV.C-E.

July 13, 2020

b) *Compliance Risk Assessment*

As noted above, the Company has taken steps to identify material compliance risks that it faces, in accordance with its risk assessment strategy and a baseline compliance risk assessment plan for Fiscal Year 2020. *See* CAM March 2020 Quarterly Report at 72-75. On June 15, 2020, the Company provided the CAM Team with the latest version of the draft risk assessment. *See [Draft] Compliance Risk Assessment for FY 2020* (June 15, 2020).

The CAM Team understands that work on the draft risk assessment is ongoing. However, it is worth noting some high-level preliminary observations at this time. The draft is based primarily on *qualitative* input from interviews with a limited number of stakeholders, mostly at All Brands Group, which was used to identify eight risk categories[60] and create risk profiles for each of these categories.[61] The draft does not explain the methodology used to assign risk profile values, and, except in a few limited circumstances, it is unclear if and how the Company has or will consider *quantitative* factors in finalizing the risk profiles.[62]

Further, the draft does not appear to identify culture as a risk category, despite discussing the results of the Propel Environmental Compliance Culture Assessment as well as the impacts of culture on compliance. Without identifying and assessing cultural risks, it is unclear how the Company will address and monitor those risks in the future.

---

[60] The eight categories are: (1) Health; (2) Environmental; (3) Human Resources; (4) Safety; (5) Security; (6) General Compliance (including data privacy); (7) Financial Controls; and (8) Operations related to Shipbuilding and Ports. *See id.* at 3.

[61] Brand/operating group employees, particularly those who work on ships or directly support ship operations, have not yet been interviewed.

[62] Using quantitative data to assess both risk and controls in place to reduce risk is a recommended best practice when conducting a risk assessment. *See e.g.*, *Committee of Sponsoring Organizations of the Treadway Commission (COSO)*, https://www.coso.org/Documents/COSO-ERM-Risk-Assessment-in-Practice-Thought-Paper-October-2012.pdf, at 8-9.

July 13, 2020

The CAM team plans to continue to examine the Company's efforts to finalize and utilize the risk assessment.  This examination will be guided by the recently revised DOJ guidance, which emphasizes the importance of evaluating "[t]he effectiveness of [a] company's risk assessment and the manner in which the company's compliance program has been tailored based on that risk assessment," including whether the risk assessment criteria are "periodically updated," and whether any such periodic reviews  are "limited to a 'snapshot' in time or based upon continuous access to operational data and information across functions," as well as whether periodic reviews have "led to updates in policies, procedures, and controls."  DOJ Corporate Compliance Program Guidance at 3.

       3.   <u>Boards of Directors Updates</u>

Consistent with its obligations under the Probation Revocation Agreement, the Company has taken steps to enhance the compliance expertise of its Boards of Directors.

       *a)  New Compliance Committee*

In January 2020, the Boards of Directors voted to make the Special Compliance Committee of the Boards of Directors, newly convened as of October 2019, *see* CAM December 2019 Quarterly Report at 34, into a permanent standing Compliance Committee, and the "Special" designation was removed from the name.  *See Compliance Committees Charter* (Jan. 27, 2020), *available at* https://www.carnivalcorp.com/static-files/feeb21d0-8a9e-4477-b34e-588d657851ff.  The Compliance Committee is comprised of independent directors.  It "will oversee the ethics and compliance program, maintain regular communications with the Chief Ethics and Compliance Officer and ensure implementation of the ethics and compliance program's strategic plan."  2019 10-K at 19.  The Compliance Committee has retained a private

July 13, 2020

law firm to provide it with separate legal representation.  *See* CAM December 2019 Quarterly Report at 34.

In addition, the Boards continue to have both a HESS and an Audit Committee, each comprised of independent directors.  The HESS Committee's "principal function" is "to assist the boards in fulfilling their responsibility to supervise and monitor [the Company's] health, environment, safety, security and sustainability related policies, programs and initiatives at sea and ashore and compliance with related legal and regulatory requirements."  2019 10-K at 23. The HESS Committee and the Company's management team "review all significant relevant risks or exposures and associated mitigating actions."  *Id.*  The Audit Committee's purpose includes assisting with the Boards' oversight of the Company's compliance with non-HESS legal and regulatory requirements; performance of the Company's internal audit functions and independent auditors; and "[r]elevant elements of the Companies' risk management programs." *Audit Committees Charter* (Jan. 16, 2019), *available at* https://www.carnivalcorp.com/committee-details/audit-committee.

> b)  *New Director with Significant Compliance Experience*

The June 2019 Probation Revocation Agreement required the Company to "immediately engage a search firm to assist the Board of Directors to recruit a new board member with significant corporate compliance experience."  Dkt. No. 134 at 3.  The Company retained a search firm in July 2019, followed by an approximately nine-month long recruitment process. *See* Appendix A.

That process culminated on April 20, 2020, with the appointment of Jeffrey J. Gearhart to the Carnival Corp. Boards of Directors.  *See* Form 8-K (Apr. 20, 2020), *available at* https://www.carnivalcorp.com/static-files/d76de7d3-0c14-40d1-8d56-d097e133b629, at § 5.02.

July 13, 2020

Mr. Gearhart will be a member of both the Compliance and HESS Committees of the Boards. *Id.* His background includes approximately 15 years at Walmart, Inc., from 2003-2018, where he served in various roles, including as General Counsel and as Executive Vice President, Global Governance and Corporate Secretary, "responsible for oversight of the company's global legal, compliance, ethics and security and investigative functions, among others." *Id.* Before Walmart, Mr. Gearhart was a partner in a private law firm, practicing in the corporate, securities, and mergers and acquisitions areas. *Id.*

### c) *Compliance Training*

The Probation Revocation Agreement requires the Company to "develop an annual training curriculum for members of its Board of Directors that would include corporate compliance topics." Dkt. No. 134 at 3-4. As part of its October 2019 final action plan submission, the Company provided a curriculum for a training program "to help educate the Boards as to the importance of topics in [the area of ethics and compliance], and the Boards' oversight role." Ethics & Compliance October 2019 Final Action Plan Submission Letter at PCL_ECP00141551-52. According to this submission, the initial curriculum would consist of four sessions to be held from October 2019 through July 2020, covering: (1) culture, core values, and response plan; (2) review of the new Ethics & Compliance Department and the new DOJ guidance;[63] (3) the role of Board oversight and fiduciary duties in the environmental and safety context; and (4) tools for measuring compliance program effectiveness. Ethics & Compliance October 2019 Final Action Plan Submission Letter at PCL_ECP00141551-52.

---

[63] *See* DOJ, *Evaluation of Corporate Compliance Programs* (Apr. 2019). As noted above, the guidance was updated in June 2020.

July 13, 2020

As discussed in the most recent CAM report, the first two training sessions were held for the Boards, as well as senior executives, on January 14, 2020.  *See* CAM March 2020 Quarterly Report at 69-71.  One session covered DOJ's guidance on the evaluation of corporate compliance programs, as well as efforts to apply elements of the DOJ guidance to the Company's Ethics & Compliance Program.  *Id.* at 69-70.  The other session covered ethics and compliance culture, including the Propel survey results, the Company's Culture Action Plan, and other culture initiatives by the Ethics & Compliance Department.  *Id.* at 70.

The other two training sessions were originally planned to be held before the end of July 2020, as noted above.  COVID-19 has delayed this timeline.  The Company's current plan is to develop and deliver the next training sessions(s) for the Boards of Directors and "key leaders," which will include a guest speaker and comments from the new member of the Boards of Directors, by the end of September 2020.  *See* Draft Pause Priorities Plan at PCL_ECP00166548.

4.      Ongoing CAM Team Examination

The CAM Team will continue to monitor the Company's efforts to develop and support a centralized, empowered, and effective corporate compliance organization.  While some progress has been made, the Company has not achieved this goal.  Unresolved weaknesses and areas for improvement in the corporate compliance function are discussed further below as CAM Barrier findings.  *See infra*, Part IV.C; *see also infra*, Parts IV.D-E.

A key area of focus will be the existence (or lack) of concrete and observable ways in which the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager are empowered to exercise authority in support of compliance—including through

July 13, 2020

support and backing by the CEO and Boards of Directors.[64]  It is not yet clear that the Company has provided these positions with the authority required by the ECP and Probation Revocation Agreement.  *See infra*, Part IV.C.

Another key area of focus will be support for compliance, including funding, staffing, and other resources in light of COVID-19 impacts.  As the recently revised DOJ Corporate Compliance Program Guidance notes, "[e]ven a well-designed compliance program may be unsuccessful in practice if implementation is lax, under-resourced, or otherwise ineffective." DOJ Corporate Compliance Program Guidance at 9.

The CAM Team will also examine the extent to which the compliance organization is able to address the culture and systemic issues that drive the Company's compliance challenges. DOJ's guidance emphasizes that "[b]eyond compliance structures, policies, and procedures, it is important for a company to create and foster a culture of ethics and compliance with the law at all levels of the company," including "a high-level commitment by company leadership to implement a culture of compliance."  *Id.* at 10.

For the Company's new compliance structures and systems to succeed, it remains crucial that the Company's top leadership (*i.e.*, the CEO and Boards of Directors) take personal responsibility for and lead the promotion of a culture of compliance.  This acceptance of responsibility and commitment to change must be authentic, sustained, and backed up by *concrete actions* by top leadership that value behaviors that support compliance as much as behaviors that support other business imperatives.  *See infra*, Part IV.A.

---

[64] As the CAM has observed, a critical function of a Chief Ethics & Compliance Officer is to both hold management accountable at the highest levels, and to provide the Boards of Directors with clarity as to how and in what ways the most senior and powerful leaders, including the CEO and the Chairman of the Boards, are engaging to support compliance.  *See* CAM March 2020 Quarterly Report at 42.

The CAM has previously observed that the Company's top leadership appears to be hamstrung by a longstanding practice and mindset of minimizing chronic problems, rather than understanding them and addressing their root causes.  *See* CAM March 2020 Quarterly Report at 39-40.  This is not atypical.  When organizations, and in particular their leaders, are faced with issues that are complex, embarrassing or threatening, they may engage in what are known as "organizational defensive routines."  *See* C. Argyris, OVERCOMING ORGANIZATIONAL DEFENSES: FACILITATING ORGANIZATIONAL LEARNING (1990), at 25.  These routines are characterized by "actions . . . that prevent individuals or segments of the organization from experiencing embarrassment or threat.  Simultaneously, they prevent people from identifying and getting rid of the causes of the potential embarrassment or threat.  Organizational defensive routines are antilearning, overprotective, and self-sealing."  *Id.*[65]  As the Environmental Compliance Culture Assessment illuminated, personal responsibility and leadership are necessary for the Company's top leadership to develop a culture of compliance, where information—positive and negative— is heard, valued, and acted upon in a meaningful way.

### F.   Improvements on Food Waste Management

####    1.   Background

In June 2019, the Company pleaded guilty to a probation violation for illegally discharging non-food items (including plastic) mixed with food waste into the ocean, along with failing to accurately record the discharge, in violation of MARPOL Annex V.  *See supra*, Part

---

[65]  Argyris's book is a seminal work in the field of organizational learning.  *See* CAM March 2020 Quarterly Report at n.33.  Argyris was a Professor of Management Science at Yale University and a Professor Emeritus at Harvard Business School.  Yale University has endowed a chair in his honor, and the current President of the University is the "Chris Argyris Professor of Psychology."  *See* https://www.yale.edu/about-yale/leadership-organization/peter-salovey.

I.B.3.c; *see also* CAM Second Annual Report at 86-90 (discussing the probation violation and the Company's broader food waste management challenges).[66]  In pleading guilty, the Company acknowledged the need to improve food waste management on its ships, and agreed to take various actions to prioritize this issue, including establishing a Food Waste Task Force and two Food Waste Tiger Teams,[67] and implementing a three-part program[68] to improve its food waste management practices.  *See* Dkt. No. 134 at 5-7.  The Company also committed to:  (1) reduce the purchase and consumption of single-use plastic items onboard its ships by 50% by December 31, 2021; (2) reduce the total weight of food waste generated onboard its ships by 10% by December 31, 2021; and (3) spend a minimum of $20 million in capital expenditures throughout the remainder of probation "to optimize food waste management, including food waste disposal systems and associated processes."  *Id.* at 7.

As discussed in prior CAM reports, the Company has implemented its food waste management improvement program throughout ECP Year Three, led by the Environmental Corporate Compliance Manager and his team.  *See* CAM September 2019 Quarterly Report at 60-67; CAM December 2019 Quarterly Report at 51-62; CAM March 2020 Quarterly Report at

---

[66] As discussed in prior CAM reports, the problem was identified by the Company's employees in the ECP-required Fleet Engineering Survey results as early as February 2018.  However, the Company's top leadership did not focus on this issue until it faced the revocation of its probation in March 2019.  *See* CAM March 2020 Quarterly Report at 89-90.

[67] Tiger Team" is a term of art that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions.  The term is "generally applied to a high-functioning team of specialists who come together to complete a specific project."  *See What is a Tiger Team Approach?*, https://trextel.com/what-is-a-tiger-team-approach-how-to-successfully-launch-technology-and-save-space-missions-too/.

[68] The three-part program addresses:  (1) training, supervision, staffing, and culture improvements; (2) reducing single-use plastics and food waste onboard; and (3) technology and design improvements.

July 13, 2020

89-111.  To spearhead these efforts, the Environmental Corporate Compliance Manager added

two managers of Hotel Compliance & Sustainability to his team:  one from Princess Cruise Lines

who focuses on the Company's North American brands, and one from Carnival UK who focus

on the European brands.  *Id.* at 93.  These individuals "work[] exclusively on project managing

the adoption of various measures to help ensure food waste compliance," including developing

new procedures, training, signage, and other compliance measures.  *Id.* (citation omitted).

The Company has also completed and submitted to the Interested Parties, CAM, and TPA

the following plans, reviews, and assessments required by the Probation Revocation Agreement:

- **Food Waste Management Implementation Plan.**  An implementation plan for developing improved procedures, training, signage, and media "specifying the project, the project owner, and specific timetables," Dkt. No. 134 at 6-7, submitted on August 1, 2019, with an update submitted on September 4, 2019.  *See Food Waste Task Force: Tiger Team Report, Recommendations, and Implementation Plan* (Aug. 1, 2019); *Tiger Team Implementation Plan Update*, PCL_ECP00134215-19 (together, "Food Waste Management Implementation Plan");

- **Food Waste Technical Review.**  A review and analysis of "(1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes," Dkt. No. 134 at 7, submitted on October 31, 2019.  *Food Waste Equipment Technical Review* (Oct. 31, 2019) ("Food Waste Technical Review");

- **Food Waste Optimization Plan.**  An implementation plan "to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones," Dkt. No. 134 at 7, submitted on January 31, 2020.  Letter from Company Outside Counsel to Interested Parties, CAM, and TPA, *Re: Proposed Improvements to Food Waste Technology and Equipment -- United States v. Princess Cruise Lines, Ltd., No. 16-cr-20897 (S.D. Fla.)* (Jan. 31, 2020) ("Food Waste Optimization Plan");

- **Food Waste Workload Assessment.**  A third-party assessment, performed by Lloyd's Register North America ("Lloyd's Register"), of "the staffing levels for both the operational and compliance aspects of food waste management," Dkt. No. 134 at 6, submitted on April 17, 2020.  Lloyd's Register, *Food Waste Separation – Human Factors Analysis for Carnival Corporation* (Apr. 15, 2020), PCL_ECP00163140-604 ("Food Waste Workload Assessment" or "Assessment"); and

July 13, 2020

- **Food Waste Workload Assessment Response Plan.** The Company's plan in response to the Food Waste Workload Assessment, submitted on June 2, 2020. *See* Letter from Environmental Corporate Compliance Manager to Interested Parties, *Lloyd's Register Food Waste Workload Assessment & Layup Action Commitments* (June 2, 2020) ("Food Waste Workload Assessment Response Plan" or "Response Plan").

In addition, the Company's Draft Pause Priorities Plan, submitted on June 17, 2020, includes several initiatives related to food waste management, discussed in the relevant sections below.

    2.    <u>Single Use Plastics Reduction and Food Waste Reduction</u>

    *a) Pre-COVID-19 Status*

As of January 2020, the Company's preliminary data indicated that it was on track to meet its Probation Revocation Agreement commitments to:  (1) reduce single-use plastics[69] onboard by 50% by December 31, 2021; and (2) reduce the total weight of food waste generated on its ships by 10% by December 31, 2021.  *See* CAM March 2020 Quarterly Report at 98-101.

On single-use plastics, as of the end of November 2019, the Company reported that, compared to a 2018 baseline of aggregated procurement data, it had reduced by 34% its single-use plastics onboard, and had reduced by 29% other single-use, non-food items such as sugar, sweetener, and butter packets.  *See id.* at 98-99.[70]  As observed in the Company's Food Waste

---

[69] The Company describes single-use plastic items as including "straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events."  Dkt. No. 134 at 7.

[70] As of January 2020, single-use items that had been completely removed on ships across all of the Company's brands consisted of:  balloons (deck/external use only), plastic bags in retail stores, plastic cocktail picks, plastic lids, plastic cups, plastic cutlery (except Kosher), plastic stir sticks, plastic straws, plastic garnish picks, plastic tooth picks, and butter foil.  *Id.* at 99.  Single-use items that had a reduction program in place across all of the Company's brands consisted of: chopsticks (reduction program in place, including reusable and disposable options).  *Id.*  Other

July 13, 2020

Technical Review, reducing or eliminating single-use plastics onboard is an "important goal" because "the most effective way to stop plastic from being discharged into the ocean is to avoid using it onboard in the first place.  If plastic ends up in a pulper/vacuum system, it will likely be macerated into smaller pieces that might be indistinguishable from the organic matter it is blended with."  Food Waste Technical Review at 2.

On food waste weight, as of January 2020, the Company reported that, compared to a two-week October 2019 baseline, it had reduced the weight of food waste for the period of January 6-19, 2020, by a fleetwide average of approximately 10%.  *See* CAM March 2020 Quarterly Report at 100-101.[71]

### b)  COVID-19 Impacts

This preliminary data—indicating that the Company was on track to meet its single-use plastics and food waste weight reduction commitments—was provided at the early stages of the COVID-19 crisis.  In the months since, COVID-19 has had major impacts on nearly all aspects of ship operations, including food waste management.  The full nature and extent of these

---

items with a removal or reduction program "in progress" at one or more of the Company's brands consisted of:  individual amenity bottles (*e.g.*, lotion, shampoo, conditioner, and soap bottles), plastic bags (garbage bin liners, laundry, cabin), plastic Q-tips, individual plastic yogurt containers, artificial sweetener packets, plastic cling wrap, individual sauce packets, plastic water bottles, and plastic gloves.  *Id* at 98-99.  In addition, the Company was "reviewing some alternatives to plastic bottles and ha[s] implemented some.  For example, Holland America Line has changed to aluminum cans, and Seabourn is looking into refillable bottles."  *Id.* at n.72.

[71] Company procedures require each ship to measure and report, on a quarterly basis, the weight of food waste generated on board over a consecutive 14-day period.  These quarterly food waste measurements must take place starting the first Monday of January, April, July, and October each year.  *See ENV 1302 Segregation and Disposal of Food Waste* at § 3.  Due to COVID-19, measurements for the second quarter of 2020 (based on April 6-19, 2020, measurements) were not taken.  *See ENV/10/2019 Food Waste Baseline Measurement*.  Measurements for the third quarter of 2020 (based on July 6-19, 2020, measurements) will be based on a "shortened food waste measurement period of seven (7) days."  *ENV/06/2020 Q3 Food Waste Measurement*.

July 13, 2020

impacts on the future of onboard food waste management is not yet known.  Much will depend on a range of factors, including:  whether and when ships resume guest service; crew and passenger (for ships that resume service) loads; ship locations and voyage itineraries (*e.g.*, days at sea versus days in port; available options for discharging and/or offloading food waste); changes to food service and delivery practices for both crew and passengers (*e.g.*, the elimination/modification of buffets or greater use of room service); changes to dining room schedules and layouts for both crew and passengers (*e.g.*, to allow for staggered meal times with fewer individuals); changes to the design and layout of areas where crew prepare food and/or process food waste, including kitchens/galley spaces and Recycling Centers; available onboard food waste management equipment, including digesters, as discussed further below; and any new public health or safety requirements impacting food preparation, service/delivery, and waste management.

The CAM Team will continue to engage with the Company to understand COVID-19's impacts on onboard food waste management practices, including any impacts on the Company's ability to meet its Probation Revocation Commitments to reduce single-use plastics and food waste.

3.     Food Waste Digester Installations

a) *Pre-COVID-19 Status*

As discussed in prior CAM reports, the Company's October 2019 Food Waste Technical Review concluded that the "only viable upgrade options available in the short term to improve [the Company's] current food waste processing equipment capabilities are upgrades to the

July 13, 2020

existing pulper systems[72] (including installing dryers[73]) or the simpler and more

environmentally-friendly option to install multiple food digesters."  Food Waste Technical

Review at 10.  The Review further found that "[f]rom the research conducted to date, digesters[74]

appear to be a good option" and "are a viable and effective means for [the Company] to enhance

its food waste processing capability and related compliance obligations."  *Id.* at 10-11; CAM

December 2019 Quarterly Report at 58-60; CAM March 2020 Quarterly Report at 101-02.

The Company's January 2020 Food Waste Optimization Plan stated that, based on the

Food Waste Technical Review's recommendations, the Company had "decided to optimize its

food waste disposal systems and associated processes by installing food waste digesters on the

vast majority of its ships."  Food Waste Optimization Plan at 2.[75]  The Company estimated that

most ships would have between 7-12 digesters by 2023.  *Id.* at 3.  As of January 31, 2020, the

---

[72] A food waste pulper is akin to a large, industrial-scale version of the garbage disposal in a kitchen sink.  Pulpers use blades to grind food waste into a pulp that can then be directed to other parts of the food waste system, such as a tank or an overboard discharge chute.

[73] A food waste dryer is a large, industrial-scale dehydrator that processes wet food waste into a dried powdered residue that can be offloaded ashore.  Removing the liquid from the food waste can significantly reduce its volume and mass.

[74] A food waste digester is "essentially a mechanized steel version of a human stomach that partially digests food waste and separates the water component."  *Id.* at 11.  There are different designs and models, but digesters typically take the form of a large metal box with an opening on the top or front where food waste can be loaded.  Microbes within the digesters partially digest the food waste and produce a liquid effluent.  Various connections feed the unit with inputs, such as water and enzymes to aid the digestion process, and to carry away outputs, such as effluent.  Once the effluent leaves the digester, it may be routed to different locations based on the ship's design, such as a tank, secondary treatment system, or discharge point.  There is a screen over the digester's effluent outflow point to prevent "undigested" non-food items, such as plastics and metals, from entering the effluent stream.  Such items can be removed by hand when the digester is opened for cleaning or other maintenance.

[75] The Company would not install digesters on some AIDA ships "because those ships will continue their current practice of offloading food waste ashore using a drying process."  *Id.* at 2, n.2.

July 13, 2020

Company had installed 48 digesters across its fleet, and projected that it would install approximately 680 by the end of 2020, and approximately 900 by the end of 2023. *See* CAM March 2020 Quarterly Report at 106. The Company also projected that it would spend more than $27 million on digester installations before the end of the probation period, and that the project would extend beyond the probation period into at least 2023, with an anticipated total cost of more than $29 million. *See id.* at n.78. These expenditures would surpass the Company's obligation in the Probation Agreement to commit at least $20 million in capital expenditures throughout the remainder of probation to optimize food waste management. *See id.*

### b)  COVID-19 Impacts

Since the Food Waste Optimization Plan was submitted in January 2020, the COVID-19 pandemic has affected the Company's plans for digester installations. The Draft Pause Priorities Plan establishes commitments to (1) allocate $10 million to purchasing digesters in Fiscal Year 2020; and (2) install those digesters (as well as digesters that have already been purchased and are available for installation) on ships within 60 days of their return to guest service. *See* Draft Pause Priorities Plan at PCL_ECP00166538. The Company notes that "the ability to complete such installations within this timeframe may be delayed due to circumstances beyond the Company's control." *Id.* The Plan sets an unspecified, long-term goal ("Do When Feasible") of installing additional digesters called for in the January 2020 Food Waste Optimization Plan submission. *See id.* The Company has indicated, however, that it plans to install digesters only on those ships that it plans to return to service—and not, for instance, on ships being sold or going into cold layup for an extended period of time. *See* Employee Interview/Call Notes.

The Company has not explained what additional measures, if digester installations are cancelled or delayed, it will use to prevent prohibited discharges of plastic and other non-food

waste.  Since July 2019, the Company has reported through its weekly food waste dashboards issues with food waste sorting and separation, alone, as a method to prevent the unauthorized discharge of non-food waste into the ocean.  As discussed below, non-food items continue to be found during inspections of food waste and grey water systems, although the dashboards reflect general improvement over time, even before the elimination of passenger food waste due to the suspension of cruise operations.  Unless the Company requires ships to offload all food waste, or provides them with additional measures or resources to replace the utility of the digesters (such as food waste driers), then the Company's management may be reasonably considered to have knowingly put ships to sea that are likely to discharge non-food waste in violation of MARPOL Annex V.

### c)  Regulation of Digester Effluent

The Draft Pause Priorities Plan sets an unspecified, long-term goal ("Do When Feasible") of working with Flag States to "determine the proper waste water classification for digester effluent."  *Id.*  As discussed in the most recent CAM Quarterly Report, there is uncertainty within the industry on the regulatory status of digester effluent—in particular, whether it should be categorized as "food waste," which is regulated as "garbage" under MARPOL Annex V, or as "grey water," which is not regulated under MARPOL.  *See* CAM March 2020 Quarterly Report at 108-09.  In the absence of clear guidance from international regulatory bodies, the Company's brands/operating lines have sought determinations from flag states and/or classification societies on the regulatory status of digester effluent.  *See* Company Comments on Draft Report.  The Company reports that to date "only Italy has a view towards classifying the digester effluent as food waste; all other flag states and classification societies that have responded are inclined to classify the effluent as grey water."  *Id.*  The Company further reports that it "has not made a

July 13, 2020

determination about how to treat the digester effluent" and "is open to either classification depending on the views of flag states." *Id.* The CAM will continue monitoring the Company's treatment of food waste digester effluent, as well as efforts by the Company to seek determinations from flag states or other authorities on how it should be regulated.

### 4.   Other Food Waste Management Initiatives

The Company has also undertaken additional food waste management initiatives—some of which were required by the Probation Revocation Agreement and some of which were not. Other food waste management initiatives required by the Probation Revocation Agreement that the Company has implemented in ECP Year Three include:

- **Revised Food Waste Separation and Disposal Procedure:** Developing and implementing a revised procedure on food waste segregation and disposal that streamlines and standardizes aspects of food waste management across the fleet, based on feedback from Tiger Team ship visits. *See ENV 1302 Segregation and Disposal of Food Waste*; *Environmental Compliance Notice #6-2019*; CAM December 2019 Quarterly Report at 53-55; CAM March 2020 Quarterly Report at 94-96;

- **New Signage:** Developing new standardized signage for food waste pulpers, which, as of May 2020, was in the process of being shipped to individual ships. *See* May 2020 Probation Supervision Report, Attachment 5, at 1. The Company is also working with vendors to develop standardized signage for food waste digesters and food chutes. *See id.* The Draft Pause Priorities Plan sets a short-term goal ("Do Before Ship Resumes Service") of installing the new signage for pulpers, and a mid-term goal ("Try to Do Before Ship Resumes Service") of installing the new signage for digesters and food chutes. Draft Pause Priorities Plan at PCL_ECP00166538; and

- **New "Micro-Procedures" on Food Waste Digesters:** The Company is developing three "micro-procedures" for each of the three different models of digester units on its ships to assist in on-the-job training. *See* May 2020 Probation Supervision Report, Attachment 5, at 1.

The Company has also implemented food waste management initiatives not explicitly required by the Probation Revocation Agreement, including:

- **Weekly Food Waste Dashboards:** Implementing enhanced reporting and tracking of food waste management issues in weekly food waste dashboards, which

summarize data by ship on: (1) the results of daily compliance checks of food waste systems (the components of which may differ by ship); (2) the frequency of particular contaminants found during these daily compliance checks, such as plastics, glass, rubber, hard food items, and paper; (3) the results of food waste tank inspections (the frequency of which may differ by ship), which includes reports of items found in food waste tanks, pulpers, and/or magnetic traps; (4) the results of grey water system inspections, which includes reports of items found in the grey water system (typically in grease traps); and (5) the status of drain bell and scupper cover installation and securing, discussed in the next bullet. Non-food items continue to be found during inspections of food waste and grey water systems (including in the food waste tanks of 14 ships across multiple brands between March-June 2020), although the Company's dashboards reflect that these findings have generally decreased across the fleet over time—even before the elimination of passenger food waste due to the suspension of cruise operations. *See* Carnival Corp. *Fleet Dashboard: Food Waste and Grey Water System Contamination* (July 21, 2019, through July 8, 2020);

- **Drain Bell and Scupper Cover Installations:** Launching an initiative to replace missing drain bells and scupper covers, following a TPA audit finding that missing covers were causing non-food items, including plastics, to drain into a ship's grey water system. *See* CAM March 2020 Quarterly Report at n.89. The Company set an internal deadline of February 29, 2020, for completing certain installations. Recent food waste dashboards indicate that these installations are still "in progress" on numerous ships across the Company's brands. *See* Carnival Corp. *Fleet Dashboard: Food Waste and Grey Water System Contamination* (June 24, 2020, through July 8, 2020), at 6.[76] The Draft Pause Priorities Plan sets a short-term goal ("Do Before Ship Resumes Service") of installing required scupper covers and anti-tamper screws, and a mid-term goal ("Try to Do Before Ship Resumes Service) of installing required down-stream filters. Draft Pause Priorities Plan at PCL_ECP00166538;

- **Data Analytics:** Engaging a data science firm to analyze the Company's existing data sets to identify opportunities to reduce food waste. *See* CAM March 2020 Quarterly Report at 121-22; *see also infra*, Part III.H.2.a(v) (discussing Company IT initiatives in support of compliance, including data analytics to identify opportunities for compliance improvements); and

- **Food Waste Shuffle Challenge:** Hosting a "Food Waste Shuffle" music video competition. Over seventy videos were submitted from ships and shoreside offices across the Company's brands. Winning videos from the top four ships and one shoreside office were announced. *See* CAM March 2020 Quarterly Report at 110.

---

[76] The CAM Team understands that the delays occurred in part because "the Company's understanding of the optimal parts changed based on experience." *See* Company Comments on Draft Report.

July 13, 2020

5.   <u>Food Waste Workload Assessment and Response Plan</u>

a)  *Third-Party Assessment*

On April 17, 2020, the Company provided the Interested Parties, CAM, and TPA with the third-party Food Waste Workload Assessment required by the Probation Revocation Agreement, performed by Lloyd's Register.  The Assessment provides observations and recommendations regarding:  (1) culture, including: workload and staffing; management commitment; leadership and supervision; communications, competence and training; learning; engagement; reporting; procedures and practices; risk management; (2) workplace design; (3) personal protective equipment; and (4) single-use plastics, non-food items, and waste reduction efforts.  *See* Food Waste Workload Assessment at PCL_ECP00163144-45.  Overall, the Assessment identifies 39 global best practices and over 50 global recommendations.  In addition, it identifies "many more" individual ship best practices and ship-specific recommendations, which are included in ship-specific appendices.  *See id.* at PCL_ECP00163153-217.  These findings were based on a review of written documentation (*e.g.*, Company procedures), as well as interviews with over 600 crew members from visits to 12 different ships across the Company's brands between November 2019 and January 2020.  *See id.* at PCL_ECP00163149-52.

Notable observations and recommendations relate to:

- **Staffing and workload**, including the following three "common areas of particular concern":  (1) supervision of food separation and processing; (2) galley steward numbers and shift rotations; and (3) staffing in the recycling center;

- **Management commitment**, including implementing a corporate-wide management of change procedure;

- **Leadership and supervision**, including:  formalizing incentives and recognition for good performance; and reviewing current supervision rotations;

- **Communications**, including:  updating corporate messaging periodically, including providing information on successes and progress; educating and communicating with

July 13, 2020

guests; improving crew messaging, including use of pictorial job aids; and considering a system used by Costa to facilitate measurement of food waste weight;

- **Competence and training**, including providing Environmental Officers (and any other trainers) with "train the trainer" sessions to develop core training competencies;

- **Learning**, including: using graphical messaging and humor to promote learning and comprehension; considering buddy systems pairing new and more seasoned staff; and providing further content via the Company's electronic Learning Management System platform;

- **Engagement**, including continuing to roll out environmental practices and programs to crew members in an effort to integrate environmental culture into their work and home lives;

- **Reporting**, including creating a Just Culture Policy that "clearly outlines a fair and clear approach to investigating near misses, mistakes and interventions," in response to expressed concerns about blame culture, unfair treatment, and a reluctance to report non-compliance due to fear of punishment among some interviewees;

- **Procedures and practices**, including: considering an electronic key locker system to optimize key control; and considering procedures that have a step-by-step set of separation instructions (with photos), as seen on at least one Carnival Cruise Line ship, rather than those that are primarily word-based;

- **Risk Management**, including continuing with the digester installation program;

- **Workplace Design**, including: providing lifting equipment and support to aid crew members when lifting heavy food waste bins; optimizing the space for and design of food waste separation and processing areas; and implementing consistent food waste signage and labelling;

- **Personal Protective Equipment**, including providing physical support for staff lifting heavy equipment and ensuring that personal protective equipment is durable and fit for purpose;

- **Single-Use Plastics**, including reviewing and applying best practices fleetwide for reducing single-use plastics and non-food items onboard; and

- **Food Waste Reduction**, including reviewing and applying best practices fleetwide for food waste reduction and adopting a corporate approach to monitoring and measuring food waste.

*See id.* at PCL_ECP00163153-217.

July 13, 2020

> b) *Company Response Plan*

On June 2, 2020, the Company provided the Interested Parties, CAM, and TPA with its Food Waste Workload Assessment Response Plan required by the Probation Revocation Agreement.  Overall, the Response Plan sets out a "two phase plan that takes into account the pause in operations associated with Covid-19 and the resumption of service thereafter."  Food Waste Workload Assessment Response Plan at 1.

Phase One will occur during the suspension of cruise operations.  During this period, the Company's brands will implement three overarching recommendations from the Assessment, selected by "by eliminating recommendations that had already been achieved or were already in progress prior to Lloyd's Register issuing the Report,[77] recommendations that were out of scope and those recommendations not feasible during the pause in operations."  *Id.* at n.3.  These recommendations are:

- **Management of Change:**  Determine whether a management of change process exists in another department (such as IT or Marine Operations) that "has sufficient guidance to support ECP/[food waste] reduction change efforts to implement change at Corporate, brand and Ship level";

- **Communications (ECP Messages):**  Update onboard ECP messages periodically to keep the culture message alive, including successes and progress; and

- **Communications (Video/Infographics):**  Create videos or infographics on the food waste separation process from the first stage of separation through to discharging/offloading "to illustrate one's influence on others' workload."

---

[77] The Company states that it had already adopted 13 out of the 50+ global recommendations in the Assessment by the time the final report was issued, including several of those highlighted above (*e.g.*, reviewing transportation aids and lifting devices to reduce the amount of manual handling by crew; considering the system used on Costa ships to facilitate measurement of food waste weight; exploring the formalization of informal incentive and recognition programs for good performance).  *See id.* at 2.

July 13, 2020

*See id.* at 2-3.  The Company "decided to pursue the three recommendations listed above because they fell into the category of recommendations expected to have a high impact while requiring a level of effort consistent with the constraints imposed by the pause in guest operations."  *Id.* at 3. The Draft Pause Priorities Plan sets a short-term goal of implementing these three global recommendations on ships before they resume service.  Draft Pause Priorities Plan at PCL_ECP00166538.

Phase Two will occur as ships resume cruise operations.  Once the Company has "clarity, regarding when and which ships resume operations," it will provide "a revised plan to address additional recommendations from the [Assessment]."  Food Waste Workload Assessment Response Plan at 1.

The CAM recognizes that the observations and recommendations in the Lloyd's Register Assessment were based on activities and assessments from the months just prior to the major disruptions to ship operations brought on by the COVID-19 pandemic.  While some specific recommendations might no longer be pertinent or feasible, many of the global recommendations, including those highlighted above (several of which the Company states it has already adopted), would still appear be relevant—even after changes to onboard practices that may occur as a result of COVID-19.  The CAM will continue to examine the Company's plans for continuing to utilize the Food Waste Workload Assessment "both during the pause and when operations resume to further enhance food waste compliance."  *Id.* at 1.

### 6.   Ongoing CAM Team Examination

The CAM Team will continue to monitor the Company's implementation of its food waste management program, including:  the implementation of its Food Waste Workload Assessment Response Plan and food waste management-related aspects of the Draft Pause

Priorities Plan; the implementation of its food waste management procedures and any future revised procedures; the procurement and installation of food waste digesters and/or other equipment or technology designed to improve food waste management onboard; the treatment and regulation of food waste digester effluent; and weekly food waste dashboard performance.

The CAM recognizes that COVID-19 will continue to have substantial impacts on onboard food waste management, the nature and extent of which is not yet known.  Key areas of focus will be COVID-19-related changes to food preparation, service/delivery, and waste management practices onboard, including changes to ship design, staffing, equipment, and procedures and processes.[78]

In addition, the CAM Team is continuing its examination of the Company's processes for selecting and vetting shoreside waste vendors, including food waste vendors.  *See infra*, Part IV.E.

---

[78] An initial investigation of the COVID-19 outbreak on the *Diamond Princess* concluded that "COVID-19 was likely transmitted first from passengers to crew members and subsequently spread among the crew, ***especially among food service workers***."  *See* K. Kakimoto, *et al.*, *Initial Investigation of Transmission of COVID-19 Among Crew Members During Quarantine of a Cruise Ship — Yokohama, Japan, February 2020*, 69 Morbidity and Mortality Weekly Report 312 (Mar. 20, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6911e2-H.pdf, at 312 (emphasis added).  The investigation further found that "infection had apparently spread among ***persons whose cabins were on the same deck*** (deck 3) ***and who worked in the same occupational group (food service)***, probably through contact or droplet spread, which is consistent with current understanding of COVID-19 transmission." *Id.* (emphasis added).  Another report similarly noted that the "***crew dining area was considered the primary area of infection for the crew***, since the food service had the most confirmed cases," and that the "many difficulties in implementing quarantine" included the need for crew to continue performing support for daily life on the ship, including food service.  *See* Y. Yamahata and A. Shibata, *Preparation for Quarantine on the Cruise Ship Diamond Princess in Japan due to COVID-19*, JMIR Public Health & Surveillance (May 2020), *available at* https://pubmed.ncbi.nlm.nih.gov/32365046/ (emphasis added) (citing Kakimoto, *et al.*).

July 13, 2020

### G.    Development of a Strong Environmental Officer Corps

1.    Background

Since ECP Year One, the Environmental Corporate Compliance Manager and his team have led efforts to provide increasing levels of support, resources, and training to onboard Environmental Officers.[79]  These efforts, in combination with those of the individuals in these positions, have helped to create a strong corps of Environmental Officers who have consistently impressed the CAM Team with their dedication, knowledge, energy, and commitment to helping the Company improve its environmental compliance performance.

As discussed in prior CAM reports, the Company's efforts include those related to:

- **CSMART Training and Conferences:**  Using the Company's state-of-the-art CSMART training center to conduct some environmental and compliance-related trainings and events, including the Environmental Commitment and Environmental Excellence hybrid training/conference events discussed in prior CAM reports.  *See* CAM March 2020 Quarterly Report at 112-115.  Feedback on these courses from participants, the CAM, and TPA has been generally positive.  *See id.*  A significant part of the success of these events has been high levels of engagement by the Environmental Officer participants, including a willingness to raise questions, concerns, and other feedback with shoreside personnel.  *See id.*;

- **Online "Environmental Hub" Forum:**  Establishing an online forum called the Environmental Hub for Environmental Officers to "share environmental compliance and stewardship information as well as solicit[] feedback on training, procedures and best practices."  *Id.* at 112 (citation omitted).  Feedback from Environmental Officers to the CAM Team on the Hub has generally been positive.  *See* Employee Interview/Call Notes.  The Company has also established an Environmental Hub Hotel Operations Forum for hotel operations personnel "to discuss environmental compliance topics, including food waste challenges, ideas, potential best practices, etc."  *Id.* (citation omitted).  As of March 2020, the Environmental and Hotel Hubs have the capability to send polls, including free text questions, to users.  *See* March 2020 Probation Supervision Report, Attachment 5, at 1.  According to the Company,

---

[79] The ECP requires each Covered Vessel to have an Environmental Officer onboard.  ECP § IV.A.1.  The ECP also establishes requirements for Environmental Officer background/qualifications; job duties and functions; training and competencies; and access to vessel spaces, equipment, and records.  *See id.* at §§ IV.A.2-5.

July 13, 2020

this tool "will enable the Company to quickly obtain opinions, feedback, and answers specific to environmental compliance issues and questions."  *Id.*; and

- **Fleet Environmental Compliance Training Officer Program:**  Taking steps to establish a new Fleet Environmental Compliance Training Officer Program, described by the Company as a program of Fleet Environmental Officers who will "travel across the fleet to provide guidance, support, mentorship, and training to seagoing Environmental Officers," as well as "collect feedback (including potential best practices) from the fleet in order to improve and enhance the Environmental Officer position onboard."  February 2020 Probation Supervision Report, Attachment 8, at 1. A Director of the program was hired in January 2020.  *Id.*  Notably, this program was based upon the Chief Maritime Officer's Fleet Captain and Fleet Chief Engineer programs, both of which were eliminated as part of the COVID-19-related staff reductions announced in May 2020.  *See supra*, Part I.C.4.f; Employee Interview/Call Notes.

  If successfully implemented and supported, this program could provide the advantage of having a group of Fleet Environmental Officers who could provide support, consistency, and oversight to Environmental Officers across the Company. The program could also provide additional career opportunities for individuals in the unique Environmental Officer role.  *See* CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer position, including lack of a clear career path).

    2.    COVID-19 Impacts

As with other areas of the Company's operations, the COVID-19 pandemic has had

significant and ongoing impacts on issues related to the Environmental Officer role—the full

nature and extent of which is not yet known.  These include:

- **Impacts to CSMART Training:**  As of about March 15, 2020, all in-person CSMART training is suspended, likely until at least April 2021, including Environmental Officer training.  *See* Employee Interview/Call Notes.  As a result, CSMART personnel, in coordination with training personnel within the broader corporation, are developing and implementing new virtual trainings for environmental, deck, and technical officers.  *See id.*  These include the following environmental and compliance-related trainings:

  o  **Environmental Excellence:**  The Company is developing a virtual version of the next iteration of the Environmental Excellence course for 2020/2021, originally planned to launch as a five-day, in-person event in August 2020. *See* CAM March 2020 Quarterly Report at 112-15; Employee Interview/Call Notes.  The course is still planned to launch as a five-day course in August 2020; however, it will now be delivered virtually.  *See id.*  As with prior iterations, the course will be interactive, rather than lecture-based, and will be

structured around a series of case studies. *See id.* However, a new curriculum is being developed that will focus on investigations training for Environmental Officers. *See id.*; Draft Pause Priorities Plan at PCL_ECP00166553-54. The CAM will continue to engage with the Company as it develops and implements this course, including seeking to learn how the course will be aligned with other investigations training provided by the Company, including Incident Analysis Group investigator training, brand/operating investigator training, and computer-based training for both ship and shoreside investigators. *See infra*, Part IV.D.6 (discussing the Company's investigation trainings);

o **Environmental Officer "Learning Nuggets":** The Company has begun rolling out a new, virtual training program for Environmental Officers called "learning nuggets." *See* March 2020 Probation Supervision Report, Attachment 5, at 1. During each session, which is approximately an hour long, "experts on a particular subject share thoughts about best practices and experiences in compliance" using tools such as presentation slides and videos. *Id.* The sessions are interactive, with opportunities to ask questions, share thoughts, participate in activities, and present the results of activities. Participation is voluntary, and Environmental Officers from across all brands are able to join, whether on a ship or ashore. Following the sessions, the instructors prepare written responses to Frequently Asked Questions. Topics to date have included: a new Environmental Officer handover procedure; tying United Nations Global Sustainability Goals with Carnival Corp. Social Responsibility goals; recordkeeping and reporting tasks related to Advanced Air Quality Systems; and food waste separation procedures. *See id.*; April 2020 Probation Supervision Report, Attachment 5, at 1; May 2020 Probation Supervision Report, Attachment 5, at 1; Employee Interview/Call Notes; Draft Pause Priorities Plan at PCL_ECP00166553; and

o **Other Virtual Trainings:** CSMART personnel are also developing and/or implementing other virtual compliance-related trainings for environmental, deck, and technical officers. These include "CSMART Talks," which are TED-talk-styled videos focused on various technical topics, as well as webinars on various marine and technical topics. *See* Employee Interview/Call Notes;

- **Impacts to Onboard Training:** As noted above, the ECP requires Environmental Officers to deliver onboard environmental compliance training, known as "TRG 2302" training, to newly joined crew members within seven days after the crew members begin their duties on the ship. *See supra*, Part III.B.2. Before COVID-19, this training was typically provided in-person in a classroom-like setting on the ship. Attendee numbers could range from 1-2 to dozens of people. As a result of COVID-19, in an effort "to make the content accessible to team members in quarantine and/or isolation as well as to limit any health risks associated with Coronavirus and conducting in-person instructor led training sessions," the Company has developed

and implemented a computer-based training for TRG 2302.  March 2020 Probation Supervision Report, Attachment 5, at 1; Employee Interview/Call Notes.  The Draft Pause Priorities Plan also sets a goal of revising two other onboard trainings, known as "TRG 2308" and "TRG 2309," which focus on workplace-specific environmental training, by February 1, 2021.  Draft Pause Priorities Plan at PCL_ECP00166552.  A pilot project is being planned for the suspension of cruise operations "to receive feedback from shipboard teams" on possible revisions to these procedures and to "ensu[r]e training is effective, relevant, and fit for purpose," including exploring ways to reduce administrative burdens and make trainings "position/department-specific and risk based."  *Id.*;

- **Impacts to Fleet Environmental Compliance Training Officer Program:**  The hiring process for Fleet Environmental Officers, who will be supervised by the recently hired program Director, was delayed as a result of COVID-19.  *See* March 2020 Probation Supervision Report, Attachment 5, at 1.  As of June 29, 2020, eleven individuals for these positions have been hired across the Company's brands/operating groups.  *See* May 2020 Probation Supervision Report, Attachment 5, at 1.  The Draft Pause Priorities Plan sets a mid-term goal ("Try to Do Before Ship Resumes Service") of activating the new program "to support the ship's [Environmental Officer] and ship's team return to service" through "compliance coaching/training, support and verification."  Draft Pause Priorities Plan at PCL_ECP00166542.  The current plan is that by mid-July 2020, "five Fleet Environmental Officers will be ready to assist ships as they come back into service."  May 2020 Probation Supervision Report, Attachment 5, at 1.  These individuals "are currently undertaking online training courses which include mentoring, listening, coaching and investigation skills."  *Id.*  The Company reports that "[a]s and when the number of ships coming back into service increases [it] will add additional Fleet [Environmental Officers] to the program."  *Id.*

  As noted above, this program was based on the Fleet Captain and Fleet Chief Engineer programs, both of which were eliminated during COVID-19-related staff reductions.  *See supra*, Part I.C.4.f; and

- **Impacts to Staffing, Job Duties, and Workload:**  There are likely to be significant impacts to Environmental Officer staffing, job duties, and workload as a result of COVID-19.  However, the full nature and extent of these is not yet clear.  For example, the Draft Pause Priorities Plan states that the Environmental Corporate Compliance Manager is developing a "standard checklist for ships to self-assess prior compliance issues."  Draft Pause Priorities Plan at PCL_ECP00166537.  Environmental Officers will be responsible for completing these checklists prior to sailing, and reporting back to the ship's leadership team and the relevant Operating Line Compliance Manager to highlight any issues found.  *See id.* at 11.

  The Draft Pause Priorities Plan sets a goal of providing additional support to onboard Environmental Officers before and during the resumption of guest service, including with "high training load" and "pre-sail compliance checks."  Draft Pause Priorities Plan at PCL_ECP00166539.  The specific nature of what this additional

support would be is not yet clear.  It is also unclear whether the extended hiatus from cruise operations will cause the Company to lose some of the Environmental Officers in whom it has invested significant training and other support efforts.

In addition, the Company reports that it evaluated the findings of the Lloyd's Register Food Waste Workload Assessment regarding Environmental Officer workloads.  *See supra*, Part III.F.5.  The report, which is based on pre-COVID-19 activities and assessments, "concluded there is a wide variation on the workload experienced by the Environmental Officer across ships and brands."  Food Waste Workload Assessment Response Plan at 3.  After evaluating these findings, the Company "decided to maintain the existing Environmental Officer complement," rather than adding an additional Environmental Officer onboard the ships.  *Id.* However, the Company reports that it "will further examine existing and future developments of the role in the ever-changing operation," and "continues to explore efficient workload management to achieve optimal Environmental Officer performance and productivity levels."  *Id.*

### 3.  Ongoing CAM Team Examination

The CAM remains impressed by the strength of the Company's Environmental Officer corps, including the talent, dedication, and enthusiasm exhibited by individual Environmental Officers.  The CAM Team will continue to examine issues related to the Environmental Officer role, including:  hiring; training; staffing; job duties and workload; support and resources, including the Fleet Environmental Officer Program; and other employment conditions.  The CAM recognizes that the Company's COVID-19 response is likely to continue to significantly impact many of these areas, and a key area of focus will be changes to the Environmental Officer role both during the suspension of cruise operations and as ships begin to resume service.

### H.  Efforts to Develop IT Systems and Tools in Support of Compliance

### 1.  Background

The Company's efforts to develop and implement IT systems and tools in support of compliance was an area of focus in ECP Year Three, based on the CAM's observations that the Company's IT resources were generally:  non-centralized, with different systems—or versions of systems—in use by different brands; outdated; and not able to support the collection and

sophisticated analysis of environmental compliance data across the corporation, in contrast to the way the Company is able to analyze financial information.  *See* CAM Second Annual Report at 36-39, 82-83, 110; CAM September 2019 Quarterly Report at 82-85; CAM December 2019 Quarterly Report at 75-76; CAM March 2020 Quarterly Report at 120-25.

The Company has taken steps to address its recognized need for more centralized, modern, and data-driven strategies.  Some related initiatives are discussed below.  In general, however, the progress on these initiatives has been slow—even before the significant disruptions from COVID-19.  The Company also has yet to implement a global, corporate-wide IT strategy.  As the CAM Team observed following its attendance at the Company's Global Maritime & IT Leadership Forum in Hamburg, Germany, in October 2019, "not every brand favors [the] global approach" proposed by the Company's then-new Chief Information Officer, "preferring brand-specific strategies and initiatives, which are sometimes at odds or incompatible with other cross-brand efforts."  CAM December 2019 Quarterly Report at 81.

2.    <u>Overview of IT Initiatives</u>

a)  *Centralized (Corporate-Wide) Initiatives*

i.   ELECTRONIC HESS MANAGEMENT SYSTEM

- **Global HESS:**  Global HESS is the Company's corporate-wide electronic health, environmental, safety, and security management system.  Global HESS contains, among other things, the Company's HESS policies, procedures, and some related communications (including newsletters, case studies, compliance notices, videos, RAAS and third-party audit reports, and CAM reports).  It also contains modules (*i.e.*, a part of a program that contains one or more individual functions) that allow for managing and tracking audit findings and corrective actions, managing tasks, and viewing a calendar of internal and external ship visits.  *See* May 2020 Probation Supervision Report, Attachment 3, at 2-4.

  The Company reports that it has implemented improvements to Global HESS in 2019 and the first half of 2020, including:

  o  Implementing electronic checklists for Operating Line Compliance Manager monthly reports and Food Waste Segregation Compliance Reports.  *See*

July 13, 2020

> *Health, Environmental, Safety, and Security (HESS), Technical, Regulatory and Sustainability Report Fourth Quarter, FY2019* (Jan. 2020), PCL_ECP00163847-980 ("HESS Q4 FY2019 Report"), at PCL_ECP00163919;[80]

o   Converting the Environmental Officer weekly report to an electronic form. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640;

o   Testing a mobile application for electronic checklists (continued development is on hold at this time).  *See* HESS Q4 FY2019 Report, at PCL_ECP00163919;

o   Improving the process for submitting and tracking suggestions for revisions to Global HESS policies and procedures.  *See id.*;

o   Developing a rank (position)-specific dashboard to enable users to more easily view information in Global HESS relevant to their specific job duties.  *See id.*; and

o   Simplifying procedures to increase readability and usability.  *See id.*

According to the Company, these efforts address recommendations from the Holland America Group Human Factors Study to simplify existing procedures, and to utilize technology like mobile checklists to reduce administrative burdens and the potential for human error during operations.  *See* MTO Safety, *Ship Operations and environmental discharges: An action plan for continuous improvement – final report*, Report MTO-2018-349, PCL_ECP00118647-739 (May 31, 2019) ("Holland America Group Human Factors Study"), at PCL_ECP00118685, 716-18, 727-29.

Before COVID-19, the Company identified the last two items (rank-specific dashboard and simplified procedures) as still in progress, with each considered a "primary deliverable in 2020."  HESS Q4 FY2019 Report at PCL_ECP00163919. For the rank-specific dashboard, the Company reports that it is now "ready for internal demonstration and testing," but will need to be reviewed for management of change issues before implementation because it will be "a significant change to the user experience in Global HESS."  *May 2020 Status Update IT Initiatives*, PCL_ECP00166640.  The Company "will conduct a review of resource constraints in July before deciding launch timing, but the intention is to roll out as soon as practicable."  *Id.*

For the simplification of procedures, the Company has set a goal in the Draft Pause Priorities Plan of completing the project before ships resume operation.  *See* Draft Pause Priorities Plan at PCL_ECP00166542.

---

[80] Similar functionality has been developed within the Company's Neptune software, discussed below.  *See infra*, Part III.H.2.b(i).

    ii.   INCIDENT REPORTING

- **SeaEvent:** SeaEvent is the Company's new centralized, corporate-wide incident and near miss reporting and case management system. *See* CAM Second Annual Report at 36; CAM December 2019 Quarterly Report at 77-78; CAM March 2020 Quarterly Report at 123. Rollout to all ships across the Company's brands was completed in November 2019. *Id.* SeaEvent "allows the data capture, management, analysis and reporting of Health, Environmental, Safety, Security, Technical and other operational events" related to the Company's ships. *See SeaEvent Overview* (Nov. 12, 2019), PCL_ECP00143497-516, at PCL_ECP00143499. SeaEvent has the potential to improve the consistency of the Company's incident and near miss reporting, and enable better fleetwide information-sharing and tracking, trending, and analysis of incident and near miss data. *See also infra*, Part IV.D.4.a(i) (discussing SeaEvent in the context of the Company's new procedure on continuous improvement from lessons learned).

    iii.   PLANNED MAINTENANCE AND SPARE PARTS

- **Marine Asset Strategies Transformation ("MAST") (In Development):** The Company has the spent the last two years planning and designing its MAST initiative, which will be a single, cross-brand planned maintenance and spare parts management (including procurement and logistics) system. The Company believes that the new system will improve its ability to efficiently deliver spare parts to ships, including those that are needed to keep shipboard pollution prevention equipment in working order. *See* CAM Second Annual Report at 83; CAM December 2019 Quarterly Report at 79; CAM March 2020 Quarterly Report at 124. The system's functionality would include allowing the Company to monitor the location and status of its spare parts inventory across the entire fleet. *See id.*; *see also* MAST Update, PCL_ECP00083937-40, (Nov. 13, 2018); October 2019 Probation Supervision Report, Attachment 3, at 11. To support this functionality, the Company is exploring the use of mobile devices by shipboard engineers to assist in identifying issues with the reliability, availability, and maintainability of pollution prevention equipment. *See* Employee Interview/Call Notes.

    According to the Company, the initial version of the MAST software is approximately 50% complete, but completion and subsequent testing on ships has been delayed by about one year (until about December 2021) due to COVID-19. *See MAST Timeline – Revised 2020 (Covid Impact)*, PCL_ECP00165997. Once the MAST system is in place, the next step (estimated for approximately 2025 and beyond) will be the creation and stocking of centralized spare part inventory warehouses to physically store and deploy parts. *See* Employee Interview/Call Notes.

    iv.   VOYAGE PLANNING

- **Voyage Planning Software (In Development):** The Company executed a contract with a vendor to develop voyage and environmental planning software in August 2019. The software would, among other things, integrate and automatically update

information about environmental boundaries and discharge/emission requirements—including Company requirements, which may be more stringent than those set by regulatory bodies—into the electronic navigational charts used by ships, replacing the current analog approach that relies on the use of an Excel spreadsheet referred to as "the Matrix." *See* CAM Second Annual Report at 37; CAM December 2019 Quarterly Report at 79-80; CAM March 2020 Quarterly Report 124-25. The goal is to "provide a real-time, dynamic view of environmental restrictions[,] including a 12-hour look ahead" to "reduce the complexity of environmental regulation interpretation" and "reduce the risk of human errors that could lead to improper discharges." *See Health, Environmental, Safety, and Security (HESS), Technical, Regulatory and Sustainability Report First Quarter, FY2020* (Apr. 2020), PCL_ECP00163655-772, at PCL_ECP00163737. This software would potentially address two recommendations from the Holland America Group Human Factors Study: (1) restructuring the environmental component of voyage planning; and (2) improving situational awareness to reduce non-compliant discharges. *See* Holland America Group Human Factors Study at PCL_ECP00118727-30.

The timeline for developing and implementing the software has been impacted by COVID-19, and the Company hopes to receive the completed software by July 2020 so that testing can occur through October 2020. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640. The Company reports that rollout of the software will be prioritized for the first ships that are planned to come back into service. *Id.*

### v.   DATA ANALYTICS

- **Data Analysis for Compliance Improvement Opportunities (In Development):** The Company has engaged a data science consulting firm to examine the Company's current analytical capabilities and assist in analyzing the Company's existing data sets to identify "opportunities for improvement in processes, systems or training & communication as they relate to compliance." *See* Ethics & Compliance October 2019 Final Strategic Plan at PCL_ECP00141423-24; CAM March 2020 Quarterly Report at 121-22. As part of its initial efforts, the firm analyzed data sets from certain brands to develop prototype models for analyzing three principle areas: (1) food waste management; (2) Oily Water Separator/Oil Content Meter work orders and failures; and (3) unplanned work orders. *Id.* at 121; *Carnival Phase 1 Read Out*, (Dec. 20, 2019), at PCL_ECP00150714-88. Going forward, the firm proposes to rely on a technique called "data virtualization" to integrate the Company's data that is siloed across the different brands (regardless of factors such as format or location), and provide a means for accessing, managing, and delivering the data in real time to applications accessible by end-users. *See id.* at PCL_ECP00150768. This approach, in theory, would enable the Company to analyze its data holistically across the brands, and develop corporate-wide metrics and key performance indicators that would allow for a more targeted, informed, and proactive approach to addressing compliance challenges. According to the Company, this initiative "has good momentum and is moving forward," although the Company has "reduced the arrangement in terms of costs and resources due to COVID-19." *May 2020 Status*

*Update IT Initiatives*, PCL_ECP00166640.  Current areas of focus include "COVID19 focused relaunch brainstorm activities" and "COVID19 focused risk analysis."  *Id.*; and

- **Global Maritime Data Lake (In Development):**  The Company is developing a corporate-wide project to migrate data from various systems (*e.g.*, SeaEvent, Neptune, Mistral) into a "global maritime data lake,"[81] which would enable more advanced analytics, such as correlating incident data with data on weather conditions, training records, or personnel onboard.  *See* Employee Interview/Call Notes.  Each brand would have access to its own data from the data lake for performing analytics in the software of its choice.  *Id.*  Work on this initiative is being coordinated with the outside firm that is performing the data analysis on compliance improvement opportunities discussed in the prior bullet.  *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640.

  b)  *Brand/Operating Group Specific Initiatives*

  i.  DATA COLLECTION & ANALYTICS

- **Neptune:**  Neptune is a proprietary software platform that the Company developed prior to the ECP, which collects raw data from ships in real time and utilizes individual modules for data analytics.  *See* CAM March 2020 Quarterly Report at 122-23.  Some of the key modules that relate to environmental compliance include:

  o  *Neptune Live*:  Tracks ship route and location and Advanced Air Quality System usage, and generates real time alerts under specific circumstances (*e.g.*, ship deviates from planned route; ship approaches Emission Control Area or other regulated area).  Work is in progress to develop an overboard discharge alarm;

  o  *Neptune Checklists and Electronic Forms*:  Digitizes all environmental checklists and forms (with plans to expand to other subject matter areas), generates related alarms, and creates an auditable trail of task completion;

  o  *Neptune Environment*:  Tracks key environmental data (*e.g.*, data on the usage or generation of potable water, bilge water, ballast water, sludge, refrigerants, or other wastewater streams);

  o  *Neptune EEE*:  Manages the collection, transfer, and storage of data related to energy efficiency and Advanced Air Quality Systems;

---

[81] A "data lake" is a system or repository of data stored in its natural or raw format.  It can include structured, semi-structured, unstructured, and binary data.

July 13, 2020

    o   *Neptune LAB*:  Analyzes ship performance using data collected from Advanced Air Quality Systems, engines, propulsion systems, and nautical/navigational systems;

    o   *Neptune Mobile*:  Pushes data to smart devices to provide alerts (including environmental alarms) for shipboard and shoreside employees.  An Apple iOS app was released in November 2019, and an Android app was released in February 2020, although "the applications are currently being beta tested by only a limited number of users."  Company Comments on Draft Report;

    o   *Neptune OnBoard (In Development)*:  Enables ships to view their own Neptune Live data (including environmental alarms) and other data analytics, even if there is no satellite connection.  It has been rolled out to over 90 ships; and

    o   *Neptune Electronic Seal (In Development)*:  Generates real time alerts for shoreside personnel if a re-usable seal with an electronic sensor (including an Environmental Control System seal) is broken on a ship.  Pilot testing of the software by the vendor has been delayed due to COVID-19 until at least September 2020.

*See* Employee Interview/Call Notes.

In 2019, the Company collected about 100 million raw data points per day in Neptune, which can be analyzed in the various Neptune modules.  *See* DMWG General Presentation (Sept. 23, 2019).  As of September 2019:  101 ships can upload engine and automation systems data; 99 ships can upload energy use in port data; 80 ships can upload propulsion data; and 26 ships can upload HVAC and engine room ventilation system data.  *Id.*  Each operating group has different technical systems connected to Neptune, and data is not necessarily comparable across brands/operating groups.  *See* Event Notes.  Corporate-wide analysis of data across the brands will be difficult until the Company selects a standard data approach and implements the Global Maritime Data Lake.  While all Neptune modules are available for use, none are required by the Company except Neptune Live.  As a result, each operating group utilizes Neptune differently.  *See Environmental Working Group/OLTM/OLCM Virtual Conference Minutes 24 – 26 March 2020*, PCL_ECP00162521-38, at PCL_ECP00162536.   For example, while all operating groups use Neptune Live to track the position of their ships, only Costa Group utilizes Neptune Checklists and Neptune Environment to track environmental compliance information.  *See* Employee Interview/Call Notes.

     ii.   T<small>RAINING</small>

- **Global Learning and Development Information System ("GLADIS")**:  GLADIS is a global learning management system that provides computer-based training, including environmental training.  *See* CAM Second Annual Report at 83; CAM December 2019 Quarterly Report at 78-79; CAM March 2020 Quarterly Report at

123-24; *MPD CAM ECP Request Feedback* (July 12, 2019), PCL_ECP00131600. GLADIS was fully deployed to all Carnival ships as of the third quarter of 2019 for use by shipboard crew.  *See* HESS Q4 FY2019 Report at PCL_ECP00163920.  As of April 2020, however, Carnival UK and Costa Group had not completed loading all their crew training content into the system.  *See id.*  Carnival UK and Costa Group also use GLADIS for shoreside personnel training, while Carnival Cruise Line and Holland America Group use a different learning management system for their shoreside employees.  *See id.*; *see also* PCL_ECP00129700.

Although GLADIS is a global platform used by all of the Company's brands, each operating group controls the content on its own GLADIS server in accordance with applicable flag state and other requirements, and cannot access data from other operating groups.  In addition, each brand tracks some of its GLADIS training in other software systems due to integration issues, vendor contracts, and/or brand choice.  *See Maritime Operations Monthly Dashboard* (Mar. 2020), PCL_ECP00163820.

The Company plans to roll out an upgraded version of GLADIS in July 2020 that would allow for:  (1) greater administrative control and management; (2) clearer tracking of training completion dates; (3) communication with electronic applications used to track attendance during instructor-led trainings; and (4) standardized assessments to measure performance during drills.  *See* Employee Interview/Call Notes; January 2020 Probation Supervision Report, Attachment 3, at 9; *May 2020 Status Update IT Initiatives*, PCL_ECP00166640;

- **CrewTube:**  CrewTube is an application for smart phones and tablets that allows crew members to access some types of HESS information and communications before joining a ship.  *See* July 2019 Probation Supervision Report, Attachment 3, at 10; CAM March 2020 Quarterly Report at 112.  Use of CrewTube varies by operating group.  *See* Employee Interview/Call Notes.  A second phase of development, which has been put on hold due to COVID-19, will focus on integration with GLADIS to allow for implementing and documenting certain HESS trainings on mobile devices. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640; *MPD CAM ECP Request Feedback* (July 12, 2019), PCL_ECP00131600;

- **Drill App (In Development):**  The Company has developed an offline, tablet-based application to "assess training and drills, using a competency-based assessment approach for either individuals or teams." *Id.* at 4.  The app has been made available to Apple iOS users, with an Android version planned for release in July 2020.  *See id.* at 13; *May 2020 Status Update IT Initiatives*, PCL_ECP00166640;

- **Onboard Instructor Led Training Attendance App (In Development):**  The Company has developed an offline scanning application to create an electronic record of attendance at onboard trainings by scanning crew member IDs.  *See* July 2019 Probation Supervision Report, Attachment 3, at 13.  The app can interface with GLADIS to automatically update a crew member's training file.  Testing of the software has been delayed due to COVID-19 until ship operations resume.  *See id.*

July 13, 2020

This application could reduce the recordkeeping burden associated with having to manually record and track onboard training attendance, which has been a frequent complaint to the CAM Team—especially from Environmental Officers. *See* Employee Interview/Call Notes; and

- **CADIS (In Development):** This software is a sub-system of GLADIS which would allow job competencies to be created for specific positions, which, in turn, would guide the creation of Professional Development Records so that employees understand the skills necessary for current and future positions. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640.

### iii.   STAFFING/MANNING

- **Costa Group and Carnival UK Mistral Improvements (In Development):** Costa Group and Carnival UK use an internally developed crew personnel management system called Mistral that provides modules to address HR, recruiting, payroll, and crew service needs, such as staffing/manning and training requirements. In particular, Mistral is used to develop crew schedules and track staffing/manning shortages. *See* Employee Interview/Call Notes. According to the Company, development of a new crew planning module utilizing artificial intelligence is approximately 75% complete but has been put on hold due to COVID-19. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640; and

- **Costa Group SCEDAS Module for Optimizing Crew Complements (In Development):** Costa Group has retained a German institute to develop software to help optimize crew staffing levels based on the time associated with completing role-specific work tasks, as well as national laws, regulations, and rules (*e.g.*, rest hour requirements). *See* CAM March 2020 Quarterly Report at 120-21; Employee Interview/Call Notes. The first phase of the project focused on gathering information from two Costa ships and two AIDA ships. Deck and engine crew members on these ships entered information into the software's "task collector" each time they performed a task, including when they started and stopped the task and the nature of the work. Analysis of the data was underway when cruise operations were suspended in mid-March, and work on this project is currently suspended. *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640. When the project restarts, Costa Group plans to work with the institute to develop and deploy an algorithm to assist in understanding crew staffing needs and strategies. While the current phase of the project is limited to deck and engine employees, Costa Group plans to include hotel employees in future phases. *See* Employee Interview/Call Notes; *see also infra*, Part IV.A.3.d (noting that the software was identified as a preventive action in an investigation report into staffing concerns on an AIDA ship).

### iv.   SHIP VISITS

- **Holland America Group iInspector (In Development):** iInspector is a desktop and mobile web application used on Holland America Group ships to create, manage, and store certain ship visit reports, surveys, and inspections. It is integrated with other

systems, including the planned maintenance system used by Holland America Group. *See* TPA Holland America Group Audit Report (Jan. & Feb. 2020), PCL_ECP00164056-82, at PCL_ECP00164069, 74; *Quality Assurance Applications Overview*, PCL_ECP00151290-300, at PCL_ECP00151291-300.  According to the Company, the software has been used for ship superintendent technical reports, and has been trial-tested for dry dock reports.  Further development of the software has been paused due to COVID-19.  However, Holland America Group intends to explore integrating the software with Global HESS in the future.  *See May 2020 Status Update IT Initiatives*, PCL_ECP00166640.

3.    <u>Ongoing CAM Team Examination</u>

The CAM Team will continue to monitor the Company's development and implementation of IT initiatives in support of compliance, including those discussed above as well as any new initiatives.  The CAM Team will also examine the Company's implementation of the IT-related initiatives in the Ethics & Compliance Strategic Plan.  *See* Ethics & Compliance October 2019 Final Strategic Plan at PCL_ECP00141423-24.  The Company reports that, pursuant to the Strategic Plan, it formed a cross-brand and cross-functional IT Compliance Committee in 2019, composed of members of the Maritime, IT, and Ethics & Compliance Departments at both All Brands Group and the operating groups, as well as the Company's data analytics consultant.  *May 2020 Status Update IT Initiatives*, PCL_ECP00166640.  The Committee met several times in early 2020.  *Id.*  However "[d]ue to the COVID-19 impacts, the IT Compliance Committee meetings have been put on pause since March 2020."  *Id.*

Before this suspension, the Committee planned to "[c]onduct a sample of ship visits to identify, catalogue and prioritize current IT problems, limitations or deficiencies that inhibit effective compliance behaviors, practices or functions," and "[r]eview data sources and platforms for analyzing information" to facilitate the "understanding of operational challenges and identify[] opportunities for improvement in processes, systems or training & communication as they relate to compliance."  *See Corporate Compliance Manager Quarterly Environmental*

July 13, 2020

*Compliance Report* Q3 2019, PCL_ECP001447152-273, at PCL_ECP001447167, 71, 74; Ethics

& Compliance October 2019 Final Strategic Plan at PCL_ECP00141423-24.  Currently,

however, the Company reports that "[t]he needs and objectives of this Committee are continuing

to be evaluated." *May 2020 Status Update IT Initiatives*, PCL_ECP00166640.

## IV. CAM FINDINGS: UNRESOLVED BARRIERS AND OPPORTUNITIES FOR IMPROVEMENT

### A. Repeat Failures on Basic Compliance Support for the Ships

#### 1. Overview

A recurring theme of prior CAM reports has been the impact on ship-level compliance of

the failure of the Company's top leadership to support compliance fully—not just in words, but

in actions that translate to direct support for the ships.  Even before the COVID-19 crisis placed

unprecedented strains on the Company's finances and operations, the Company had repeatedly

failed to adequately address compliance support for its ships on issues identified by the

Company's internal and external studies and findings, and supported by the findings of RAAS,

the TPA and the CAM.  As detailed below, these issues include:  working pollution prevention

equipment;[82] spare parts; sufficient staffing levels and manageable workloads; IT support,

---

[82] The Company states that "not every temporary malfunction of a piece of pollution prevention equipment rises to the level of non-compliance with applicable regulations or the ECP.  Many pieces of pollution prevention equipment have redundant counterparts, and many malfunctions are repaired in less than 24 hours." *See* Company Comments on Draft Report.  As detailed below, the CAM Team identified over 200 incidents during ECP Year Three involving pollution prevention equipment that was out of service for more than 24 hours, including approximately 100 incidents related to oily bilge water management equipment.  *See infra*, Part IV.A.2.b.  The number of incidents involving pollution prevention equipment out of service for less than 24 hours is significantly larger.  *See id.*  Regardless of the number of incidents, however, the Company's response is concerning.  It reflects a mindset that is focused on how incidents are classified, rather than on lessons that can be learned from incidents regarding continued obstacles to ship compliance efforts.  Crew members have continued to express to the CAM Team that the (un)reliability of pollution prevention equipment is a significant workload issue.  *See* Employee Interview/Call Notes; *see also infra*, Part IV.A.1-3.  Even if crew members are able to complete

July 13, 2020

including voyage planning support; and waste offload and vendor assessment support.  *See* CAM March 2020 Quarterly Report at 2-3, 37-41, 54-56; CAM December 2019 Quarterly Report at 9-11.

The Draft Pause Priorities Plan is a telling case-in-point.  Many, if not most, of the Environmental initiatives in the Plan relate to *basic* compliance support for ships on issues identified since the beginning of the ECP.  For example, the initiatives include:

| Pollution Prevention Equipment and Spare Parts | |
|---|---|
| Providing ships with a full set of environmental critical spare parts for pollution prevention equipment | Try to Do Before Ship Resumes Service |
| Identifying and assessing repairs needed to improve reliable operation of pollution prevention equipment and proposing a schedule for completion of work | Do Before Ship Resumes Service |
| Completing all significant repairs to pollution prevention equipment | Do When Feasible |
| Completing leak repairs to Advanced Air Quality Systems | Try to Do Before Ship Resumes Service |
| Completing installation, training, and commission of ballast water treatment systems installed but not yet in use | Try to Do Before Ship Resumes Service |
| Repairing and replacing regular leaking piping/components | Try to Do Before Ship Resumes Service |
| Repairing major pipe system changes | Do When Feasible |
| Completing full installation of dry bilge upgrades | Do When Feasible |

---

a repair in less than 24 hours in many instances, it still means that they have taken time and resources away from their other obligations.

Relatedly, the Company's statement about "redundant" equipment is an issue on which DOJ observed over a year ago that the Company's position "appear[s] to reflect an antagonistic corporate culture where management prizes avoiding adverse findings more than achieving actual compliance and progress."  *See* CAM April 2019 Quarterly Report at 12 (citation omitted).  DOJ further noted that "the failure of [redundant] components had systemic consequences and played a significant role in the [conduct on the *Caribbean Princess*] leading to conviction."  *Id.* at 11 (citation omitted).  The CAM has similarly observed that "[g]iven the role that non-working pollution prevention equipment played in the felony convictions in this matter, it would seem more appropriate for the Company to provide ships with the support and resources needed to keep all pollution prevention equipment on board in good operating condition," rather than to dispute whether failures of "redundant" pollution prevention equipment should rise to the level of an ECP violation.  *See id.* at 14.

July 13, 2020

| | |
|---|---|
| Completing Environmental Control System[83] requirements (*e.g.*, color-coded hoses and padlocks) | Before Ship Resumes Service |
| Purchasing and installing electronic key tracking boxes[84] | Within 60 days of return to service |
| **Crew Staffing and Workload** | |
| Ensuring a full complement of deck and technical teams | Before Ship Resumes Service |
| Implementing four-shift watch-keeping rotations for engineers[85] | Within 60 days of return to service |
| Ensuring a dedicated Advanced Air Quality System engineer is onboard equipped ships | Before Ship Resumes Service |
| **IT Support** | |
| Developing and implementing voyage and environmental planning software tool | Do When Feasible |
| **Waste Vendor Assessments** | |
| Assessing each waste vendor, with priorities on early itinerary locations | Try to Do Before Ship Resumes Service |

*See* Draft Pause Priorities Plan at PCL_ECP00166537-43.

---

[83] The Environmental Control System is a program established under the ECP that requires the "control" of certain vulnerable points (e.g., pipes and valves) on ships that could be used to make an unauthorized discharge into the sea, such as by installing seals or padlocks. *See* ECP § IX.B.1 (requiring the Company to implement an Environmental Control System program to "deter and detect unauthorized discharge of vessel waste streams through vulnerable pipework connections").

[84] As discussed in prior CAM reports, the Company committed at least as early as February 2019 to install these systems on ships to help control keys that provide access to portable pumps and hoses. Crew members from across the Company reported to the CAM Team that they were eager for the systems, which could reduce the time, labor, and potential for human error associated with Environmental Control System requirements. However, the Company postponed the deadline for installing these systems from December 31, 2019, to September 1, 2020, "based on competing priorities . . . and the availability of managers and implementers." CAM December 2019 Quarterly Report at 83-84 (citations omitted).

[85] Four-shift watchkeeping means having teams of engineers who staff the engine control room in six-hour shifts throughout the day to ensure 24/7 coverage. This is in contrast to three-shift watchkeeping, historically used on the Company's ships, in which teams of engineers staff the engine control room in eight-hour shifts. Four-shift watchkeeping is generally considered to allow for a more optimal alignment of work schedules with rest and meal times than three-shift watchkeeping. However, it may require additional engineer(s) to be onboard. *See* Employee Interview/Call Notes.

July 13, 2020

It is a remarkable failure that at the time the COVID-19 crisis emerged, well into ECP Year Three, the Company was still struggling to comprehensively address important compliance issues that arose long before the pandemic.  In its comments on the draft of this Report, the Company states it should not be judged critically if ships resume cruise operations without some or all of these commitments implemented, due to the resource and other logistical obstacles it now faces.[86]  This caveat is offered even for measures with a "Do Before Ship Resumes Service" timeline.  As stated in the Draft Pause Priorities Plan:  "The ability to implement the commitments in the earliest time frame – 'before ships resume service' - may be challenging for certain ships which may return to service outside of the United States as early as August 2020 . . . To the extent that the commitments in the earliest time frames are not met, this will not preclude a ship's return to operation, but the Company will document and provide an explanation."  *Id.* at PCL_ECP00166535.

The unprecedented nature of the pandemic, including the existence of factors beyond the Company's control, is without question.  But two critical points remain:  (1) many of the initiatives in the Draft Pause Priorities Plan relate to issues that arose months or years before the COVID-19 pandemic, when the Company did not face current financial or logistical constraints; and (2) the Company's broad statement that "[t]o the extent that the commitments in the earliest time frames are not met, this will not preclude a ship's return to operation," without specifying which issues would be acceptable to leave unaddressed, the nature of any explanation to be provided, or who the ultimate decision-maker would be, does not appear to support its stated

---

[86] According to the Company, it "cannot commit to performing tasks by a specific deadline if it does not have control over all the steps necessary to complete the task.  The Company can only commit to do tasks over which it has full control.  For example, many tasks are constrained by COVID-19 challenges that limit the availability and ability to embark a 3rd party vendor."  *See* Company Comments on Draft Report.

July 13, 2020

representations to the Court that "we are totally focused on compliance . . . and we are not going to cut any corners."  Dkt. No. 189 at 1-2; *see also* Draft Pause Priorities Plan Cover Letter at PCL_ECP00166532 (stating that the Company is "maintaining [its] focus on safety, environmental protection and compliance").

This is not to say that the Company has not made any progress on many of these and other issues.  Notably, as the CAM has observed, many top-level Carnival Corp. leaders have increased their visibility on compliance issues since the Probation Revocation Agreement, including through issuing increased communications on the importance of environmental protection, safety, and compliance.  *See* CAM March 2020 Quarterly Report at 39-40.  But the resolution of the Company's persistent compliance challenges requires concrete commitments and concrete actions that support compliance, and remove obstacles to compliance, for those doing the daily work of operating the ships.  As noted in prior CAM reports, and underlined by the Court and DOJ, those commitments could include the goals that:

- No ship will sail without all pollution prevention equipment installed and in working order;

- No ship will sail without all critical (environmental) spare parts onboard;

- No ship will sail without a full complement of qualified deck and technical officers;

- No ship will sail without all IT systems and tools critical to support compliance, including voyage planning, installed and in working order; and

- No ship will offload waste to an unvetted or unapproved waste vendor.

*See, e.g.*, CAM March 2020 Quarterly Report at 41, 56; Status Conf. Tr. at 10-11, 37 (Apr. 24, 2020).[87]

---

[87] In its comments on the draft of this Report, the Company states that these are Company goals. *See* Company Comments on Draft Report.  The CAM has neither seen these goals unequivocally

July 13, 2020

An essential first step in moving forward is for top leadership to accept responsibility for the Company's historic and ongoing compliance failures.[88]  That acceptance must be followed by specific commitments to address those failures.  Only if top leadership makes clear commitments to undertake concrete steps towards compliance support can they also be held accountable if those steps are delayed or do not occur.  Statements like "our top priorities are to operate safely, to protect the environment, and to be in compliance everywhere we operate in the world" are important, but without a commitment to concrete actions in support of those statements, they are not a basis for sustainable change in both culture and performance.  *See Corporate Vision Statement*, https://www.carnivalcorp.com/corporate-information/mission-and-history.  Worse, for the goal of enhancing corporate culture, if the statements by top leaders are not backed up with visible and measurable actions tied to the real, day-to-day compliance challenges experienced by the ships, then the sincerity of those words, and of compliance as a core corporate value, will be called into question.[89]

Some within the Company have observed that the current suspension of cruise operations presents an opportunity to focus on compliance—including working to ensure that ships are staffed and equipped to operate compliantly upon return to service.  As the Chief Ethics &

---

stated by top leadership to Company employees, nor observed a willingness of those top leaders to be held accountable if the goals are not attained.  Further, the Company states that its ability to meet these goals is now limited due to the COVID-19 crisis.  *See id.*  Again, this response misses the point.  These goals relate to long-standing issues that the Company struggled to adequately address in the months and years preceding the COVID-19 pandemic.

[88] The statement by top leadership accepting personal responsibility for the probation violations was required by the Probation Revocation Agreement.  *See Important Message from Chairman Micky Arison and CEO Arnold Donald* (July 1, 2019) (stating that "Chairman Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these violations").

[89] Relatedly, it remains to be seen if future ship designs will be changed to address environmental compliance challenges identified during the probationary period.  *See infra*, Part VII.D.

July 13, 2020

Compliance Officer stated at the April 24, 2020, Status Conference:  "We are prepared now to really begin looking at prior to re-entry how do we come back stronger, better, smarter . . . [We] remain wholly committed to figuring what we can advance during this pause so we come back stronger."  Status Conf. Tr. at 44-46 (Apr. 24, 2020).  The CAM Team will continue to monitor what specific measures the Chief Ethics & Compliance Officer is able to have implemented on the ships so that they can "come back stronger," including on the issues of pollution prevention equipment, spare parts, crew staffing and workload, IT support, and waste offload and waste vendor assessment support, discussed in the following sections.  In this regard, the CAM Team will also continue to examine whether the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager are empowered with the authority to ensure that ships "come back stronger and better equipped," as well as whether the appointment of a Carnival Corp. Chief Operating Officer facilitates and supports compliance efforts as ships return to service.  *See* Dkt. No. 189 at 5 (quoting April 2020 Probation Supervision Report, Attachment 5, at 2).

## 2.   Pollution Prevention Equipment and Spare Parts

Since the beginning of the ECP, issues related to pollution prevention equipment and spare parts have been a frequent and ongoing source of findings from TPA and RAAS audits, incident reports, and the Company's internal and external studies and assessments.[90]

---

[90] In addition, throughout the ECP, crew members from across the Company have expressed frustration to the CAM Team over difficulties they face in obtaining spare parts, including delivery delays and cancelled purchase orders.  *See* Employee Interview/Call Notes.  At the January 8, 2020, Status Conference, the Carnival Corp. CEO shared an anecdote with the Court about a conversation he had with a Chief Engineer onboard one of the Company's ships.  When the CEO asked him, "What would make your job better? . . . What could we do to help you do your job better?," the Chief Engineer responded:  "[S]ometimes I order parts and it takes a long time to get them . . . Well, I actually often order parts and it takes a long time to get them."

July 13, 2020

### a) Audit Findings

In ECP Year One, the TPA identified "critical spare parts" as one of six key areas of audit findings during ship and shoreside audits.  *See* TPA First Annual Report at 15, 23-24.  In addition, the TPA found that the majority of Major Non-Conformity findings[91] fell under the category of "failure of Pollution Prevention equipment."  *See* TPA First Annual Report at 12-14.[92]  Overall, in ECP Year One, the TPA issued:

- 12 audit findings regarding critical spare parts, including five from ship audits and seven from shoreside audits.  *See* TPA First Annual Report at 11-12.  Examples of findings include that "Critical Spare Parts for Environmental Equipment was not maintained to par levels, orders were found overdue without follow up."  *Id.* at 23; and

- 16 audit findings (including 12 Major Non-Conformities) regarding inoperable pollution prevention equipment, as well as 23 audit findings (including one Major Non-Conformity) regarding piping or valve issues, all from ship audits.  *See id.* at 111.

---

Status Conf. Tr. at 30 (Jan. 8, 2020).  The TPA observed later at that same hearing:  "Spare parts has been a consistent item in our audit reports that there's issues with not getting the parts in time, requisitions being canceled at the shoreside that never got to the ships.  This has been an ongoing issue for two and a half to three years."  *Id.* at 96.

[91] TPA audit findings fall into three categories (from most to least serious):  (1) Major Non-Conformities; (2) Non-Conformities; and (3) Observations.  *See* CAM First Annual Report at 42-43.  A "Major Non-Conformity" is "an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement [collectively, MARPOL, the Act to Prevent Pollution from Ships, the Clean Water Act, and the Oil Pollution Act of 1990] or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water.  It may also include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process."  ECP § I.D.

[92] The TPA notes that many of these findings related to Oily Water Separator equipment, and that, at the time of the report, the Company had plans to upgrade and replace the Oily Water Separators on its ships.  *Id.* at 14.  These upgrades were completed across the fleet by January 31, 2019.  *See* CAM Second Annual Report at Appendix A.  However, as discussed below, ships continue to experience challenges with maintaining the operability of their Oily Water Separator equipment.

TPA audit findings in these areas continued in ECP Year Two, although "[i]mprovements were noted in a reduction of overall findings." *See* TPA Second Annual Report at 24. The TPA identified inoperable pollution prevention equipment as among the top four "Most Common Audit Findings" categories, making up about 8% of total audit findings and, as in ECP Year One, the majority of Major Non-Conformity findings. *See id.* at 2, 13, 19. The TPA also listed "Failure of Pollution Prevention Equipment" as an area of focus for ECP Year Three. *Id.* at 25. Overall, in ECP Year Two, the TPA issued:

- Nine audit findings regarding critical spare parts, including four from ship audits and five from shoreside audits. *See id.* at 14; and

- 22 audit findings (including 10 Major Non-Conformities) regarding inoperable pollution prevention equipment, as well as seven audit findings regarding piping or valve issues, all from ship audits. *See* TPA Year 2 Audit Matrix.

At the end of ECP Year Two, the TPA recommended that the Company "[c]ontinue efforts to minimize risk of 'out of service' pollution prevention equipment." TPA Second Annual Report at 3, 6. Specific recommendations include to: "[b]uild in a reliability, availability, and maintainability (RAM analysis) solution into the design, procurement, installation, and operation of pollution prevention equipment";[93] and to improve management

---

[93] The Company reports that it conferred with the TPA and decided to use an alternative methodology, known as Reliability Centered Maintenance ("RCM"), which the Company believes "will meet the same goal as the RAM methodology." *See* Company Comments on Draft Report. The Company engaged a third party to perform an RCM analysis on the HVAC systems of two of its new ships (one of which was completed and implemented, and one of which is in progress). *See id.* The Company "was planning to perform a study of pollution prevention equipment" using the RCM methodology on one other ship, "but this was delayed due to COVID-19." *See id.* The Company also reports that it has "reorganized the current focus of its MAST program to focus solely on pollution prevention equipment." *See id.*; *see also supra*, Part III.H.2.1(iii) (noting that the Company is exploring the use of mobile devices by shipboard engineers to assist in identifying issues with the reliability, availability, and maintainability of pollution prevention equipment as part of its MAST initiative).

systems that influence "inventory control, spare parts identification, and logistics systems that ensure deliver within appropriate timeframes." *Id.* at 6.[94]

In ECP Year Three, the TPA continued to identify both critical spare parts and pollution prevention equipment as areas of common audit findings. *See* TPA Third Annual Report at 26-27, 30-31. The majority of the Major Non-Conformity findings issued during the year were "associated with inoperable Pollution Prevention Equipment," including "wasted, holed, or cracked" Advanced Air Quality Systems. *See id.* at 13. Overall, in ECP Year Three, the TPA issued:

- Eight audit findings regarding critical spare parts, including seven from ship audits and one from a shoreside audit. *See id.* at 30, 39-40; and

- 24 audit findings (including 10 Major Non-Conformities) regarding inoperable or malfunctioning pollution prevention equipment, all from ship audits. *See id.* at 39.

Among other actions, the TPA recommended that "[n]o vessel leaves port without a full complement of critical spares." *Id.* at 31.

The Company's internal RAAS auditors have also issued findings related to inoperable pollution prevention equipment and spare parts throughout the ECP. *See* CAM First Annual Report at 64-65 (summarizing repeat ECP Year One RAAS audit findings, including "Critical spares not standardized or below minimum levels"); CAM Second Annual Report at 105-07 (summarizing repeat ECP Year Two RAAS audit findings, including "Advanced Air Quality System out of service awaiting spare parts" and "Issues related to critical spare parts for

---

[94] The TPA observed that "[c]onnectivity issues between ships and shoreside" have, in some cases, created delays in critical spare parts ordering and delivery, and that "[m]ultiple non-centralized IT issues used by the different brands have made consolidation of process challenging especially related to critical spare parts." *Id.*; *see also infra*, Part III.H.2.a(iii) (discussing the Company's efforts to develop a single, corporate-wide planned maintenance and spare parts management system under its MAST initiative).

July 13, 2020

Advanced Air Quality Systems"); *RAAS Q4 Report Prepared for the Audit and HESS Committees*, PCL_ECP00152849-855, (Jan. 15, 2020), at PCL_ECP00152852 (identifying "key areas" of environmental audit findings during 2019, including bilge water and oily water management and Advanced Air Quality Systems).

### b) Incident Reports

In addition to audit findings, there have been numerous incident reports related to inoperable pollution prevention equipment and spare parts on Covered Vessels throughout the ECP. These come from a range of formal and informal reporting mechanisms, *see infra*, Part IV.F.1, with the majority coming from the Company's internal weekly Flash Reports.

The ECP requires the CAM to report to the Interested Parties if the CAM "receives information regarding a Major Non-Conformity." *See* ECP § VI.F.6. The ECP's definition of Major Non-Conformity "may . . . include the discovery of pollution prevention equipment determined to be incapable in terms of processing and monitoring capabilities or inadequate with respect to the quantities of wastes such equipment is required to process." *Id.* § I.D. An analysis of the CAM Team's internal records indicates that, pursuant to this provision, the CAM has reported:

- Over 200 incidents during ECP Year Three involving pollution prevention equipment that was out of service for more than 24 hours. Of these incidents, approximately:

    o 70 were related to unavailable spare parts;[95]

---

[95] The CAM Team identified over 30 additional incidents involving unavailable spare parts for pollution prevention equipment that did not rise to the level of a Major Non-Conformity.

July 13, 2020

- o 100 were related to Oily Water Separators[96] or White Boxes;[97] 50 were related to Advanced Air Quality Systems; and 50 were related to incinerators; along with additional incidents related to other systems such as ballast water treatment, garbage/food waste management, and sewage treatment systems; and

- o 18 were related to corroded or deteriorated piping, valves, or other components.[98]

- Over 150 incidents during ECP Year Two involving pollution prevention equipment that was out of service for more than 24 hours.  Of these incidents, approximately:

- o 40 were related to unavailable spare parts;[99] and

- o 80 were related to Oily Water Separators or White Boxes; 30 were related to Advanced Air Quality Systems; and 35 were related to incinerators; along with additional incidents related to other systems such as ballast water treatment, garbage/food waste management, and sewage treatment systems.[100]

---

[96] Within the category of Oily Water Separator incidents, the CAM Team has identified several recurring issues that appear to affect this equipment across the fleet, including:  corroded, blocked, or otherwise damaged sample or supply lines; corroded or blocked heat exchanger elements; Oil Content Meter display errors or other malfunctions; flow switch errors or malfunctions; and three-way valve errors or malfunctions.

[97] The White Box, also known as a Bilge Control Discharge Box, is a locked metal cage.  The White Box contains an Oil Content Meter, which is in addition to the Oil Content Meter on the Oily Water Separator.  The White Box is the final check on the oil content of bilge water before such water can be discharged overboard.  In addition to oil content, the White Box records data such as: discharge volume, valve positions, flow through the Oil Content Meter, overboard flow, door position, vessel position, and time.  *See* Dkt. No. 58-1 at 1-2.

[98] The CAM Team identified over 300 additional incidents across all incident types that were related to corrosion or deterioration issues.  These incidents primarily related to bilge leaks/overflows, air emissions (*e.g.*, refrigerant emissions), and other pollution prevention equipment issues that did not rise to the level of a Major Non-Conformity.  The CAM Team did not systemically track data on incidents related to corrosion/deterioration during ECP Years One or Two.  Therefore, this data is provided for ECP Year Three only.

[99] The CAM Team identified over 15 additional incidents involving unavailable spare parts for pollution prevention equipment that did not rise to the level of a Major Non-Conformity.

[100] The CAM Team did not systematically track data on incidents reported to the Interested Parties during ECP Year One.  Therefore, data for this year is not provided.

July 13, 2020

*See* Internal Incident Log.  The universe of reported incidents involving inoperable pollution prevention equipment and spare parts that did not rise to the level of a Major Non-Conformity is significantly larger.  *See id.*

### c) *Company Studies and Assessments*

The Company's internal and external reports and assessments have also identified issues related to pollution prevention equipment and spare parts throughout the ECP.  For example:

- **Holland America Group Workload Study:**  The November 2019 Holland America Group workload study for onboard technical/engineering and Environmental Officers, performed by DNV-GL AS Maritime ("DNV GL"), found that, across all brands and positions, the "purchasing and procurement process is a recurring point of discussion. Lack of spare parts onboard increases workload as crew must find work-arounds and fabricate items to complete a job related to a breakdown or other unscheduled maintenance."  DNV GL, *Workload analysis of HA Group Technical and Environmental Officers*, Report No. 2019-9346 (Nov. 1, 2019), PCL_ECP00149393-602 ("Holland America Group Workload Study"), at PCL_ECP00149433.  It added that a "complicating factor is when previously ordered spare parts are sometimes ordered at alternative vendors, resulting in the delivery of wrong parts and further prolonging the purchasing process."  *Id.*  The study recommended "[o]ptimiz[ing] the purchasing and procurement process for onboard end-users" as a "prioritized action for reducing workload," noting that the "current procurement process for spare parts makes up a significant proportion of the technical department's workload."  *Id.* at PCL_ECP00149509;

- **Holland America Group Human Factors Study:**  The May 2019 Holland America Group human factors study, performed by MTO Safety, noted concerns that for ship design and refurbishment projects, "it can take a very long time to get refurbishments and new spare parts which makes the operations much more complex and increase[s] the number of work arounds."  Holland America Group Human Factors Study at PCL_ECP00118685.  The study also found that, for older ships:  there were "major problems with technical equipment such as sensors, alarms and equipment being inoperable"; that "much monitoring and cleaning in [the engine room] had to be done dealing with leaks and malfunctions"; that workloads for engineering officers "will increase considerably due to malfunctions of equipment"; and that it "takes long to get spare parts and to get maintenance work done."  *Id.* at PCL_ECP00118687.  The study further noted "several problems related to the supply of spare parts."  *Id.* at PCL_ECP00118705.  These include "not a large enough budget for spare parts, in particular at the end of the financial year," as well as delayed or cancelled spare parts orders which "may lead to systems being inoperable for a long time."  *See id.*; and

July 13, 2020

- **Fleet Engineering Survey:**  The February 2018 ECP-required Fleet Engineering Survey,[101] performed by DuPont Sustainable Solutions, identified "[i]nsufficient spares," "slow delivery of spares," and "delivery of a part that is incorrect for that ship's equipment" as among the reasons that procedures and instructions are not always followed.  DuPont Sustainable Solutions, *Environmental Compliance Survey Final Results*, PCL_ECP00042039-95 (Feb. 2018), at PCL_ECP00042053.  Suggestions from survey respondents for the prevention of future environmental incidents included to "[p]erform adequate maintenance to reduce equipment failures" and "[h]ave better availability of spare parts."  *Id.* at PCL_ECP0042085.  Other compliance concerns from respondents included the reliability of Advanced Air Quality Systems and "the lack of spare parts."  *Id.* at PCL_ECP0042086.

### 3.   Crew Staffing and Workload

The ECP requires the Company "to supplement crews as needed . . . and/or to provide additional shore-side resources" if "inadequacies in the size and capabilities of vessel crews be proven as a contributing factor to their inability to meet the objectives of this ECP."  ECP § I.F.  A key area of focus for the CAM Team throughout the ECP has been whether crew staffing levels and workloads are adequate to achieve compliance.

### a)  *CAM Report Findings*

At the end of ECP Year One, the CAM observed that the Company faces challenges in attracting and retaining sufficient numbers of qualified deck, technical, and environmental officers—especially engineers.  *See* CAM First Annual Report at 72-73.  These challenges continued in ECP Year Two.  *See* CAM Second Annual Report at 56-58.  As the CAM noted, "[t]hese challenges are not unique to the Company.  Finding and retaining qualified personnel, especially deck and engineering officers, is a challenge across the entire maritime industry."  *Id.*

---

[101] The ECP required the Company to "issue a survey to all shipboard engineering officers and all Environmental Officers on its vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures would be beneficial" that included an "assessment requesting the frank opinions of the vessels' engineers as to their ability to adequately maintain the vessels' systems, equipment, and components." ECP § IX.N.1.

at 57.  The CAM also observed that the "industry-wide staffing shortage for officer positions provides the Company with an extraordinary opportunity to be a leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry, and to address compliance challenges related to labor supply."  *Id.* at 61; *see also infra*, Part VII.A (discussing diversity and inclusion issues, including link between global officer shortage and issues of race, gender, and ethnicity).

Throughout ECP Years Two and Three, CAM reports have repeatedly identified crew staffing and workload challenges as one of the Company's top compliance-related concerns. *See, e.g.*, CAM March 2020 Quarterly Report at 41, 56 (listing "[s]hips sailing with a full complement of qualified technical officers" as a specific compliance goal); CAM December 2019 Quarterly Report at 10 (noting that the Company's employees "have repeatedly identified struggles with:  adequate staffing of ships (including in the engine/technical departments); workload . . . diversity and inclusion; workplace harassment and discrimination; and other issues noted in reports from the CAM, TPA, Propel, and the Company's own consultants"); CAM Second Annual Report at 95-96 (noting, as potential systemic causes to a prohibited discharge incident, the Company's possible failures to:  hire sufficient numbers of engineers; establish adequate manning levels for operations in environmentally sensitive areas; or hire sufficiently experienced or trained engineers); *id.* at 97-98 (noting, as factors which may have played a role in a recordkeeping falsification incident, workplace issues that the CAM and the TPA had identified on ships across all operating groups, including:  work-load and time pressure; insufficient shoreside support; insufficient manning/staffing; and inadequate training or qualifications of junior engineers).

July 13, 2020

> ### b) *Company Studies and Assessments*

The Company's internal and external studies and assessments have made similar

findings.  For example:

- **Holland America Group Human Factors Study:**  The May 2019 Holland America Group Human Factors Study identified workload balance in the engine control room as one of the "latent conditions" contributing to compliance issues.  *See* Holland America Group Human Factors Study at PCL_ECP00118656.  The study found that there is a "high workload" in the engine control room with "frequent interruptions" and "low staffing, being on or under [the Table of Personnel, a list of positions allocated to each ship], [] working overtime."  *Id.* at PCL_ECP00118650, 85-91. Further, "the workload and work situation" in the engine control room is "at times unmanageable and measures must be taken to reduce workload" and "improve quality for voyage planning tasks."  *Id.* at PCL_ECP00118685; *see also* CAM Second Annual Report at 49-53 (summarizing the study);

- **Holland America Group Workload Study:**  The November 2019 Holland America Group Workload Study for onboard technical/engineering and Environmental Officers, commissioned to complement the Human Factors Study, also found that engineering and environmental officers face challenges from high administrative workloads; under-staffing (including instances of ships sailing without an officer position staffed because no one was available and/or substituting certain officer positions with lower ranked positions); and competence gaps that relate to some officers lacking sufficient relevant experience.  *See* Holland America Group Workload Study at PCL_ECP00149402-07; *see also* CAM March 2020 Quarterly Report at 127-34 (summarizing the study); and

- **Food Waste Workload Assessment:**  The April 2020 Food Waste Workload Assessment made observations and recommendations regarding food waste staffing and workload, including the following three "common areas of particular concern": (1) supervision of food separation and processing; (2) galley steward numbers and shift rotations; and (3) resourcing in the recycling center.  Food Waste Workload Assessment at PCL_ECP00163154; *see also supra*, Part III.F.5.a (summarizing the study).

The Holland America Group Human Factors Study and Workload Study, which together

include over 100 combined recommendations for improvement, have been shared across the

Company's brands/operating groups.  The Chief Maritime Officer identified 21

recommendations for implementation in whole or part by All Brands Group (*e.g.*, developing

technology solutions like voyage planning software, *see supra*, Part III.H.2.a(iv), fleetwide

July 13, 2020

training on specific issues, and streamlining of procedures).  *See MTO Study – HA Group Priority Actions*, PCL_ECP00149606-16.  Other recommendations were identified for implementation by the operating groups.  *See id.*

In response, Holland America Group developed an action plan that identifies the recommendations it has decided to implement, including over 10 actions that are targeted at reducing workload and improving staffing levels.  *See id.*  Prior to the COVID-19 pandemic, Holland America Group was in various stages of implementing its action plan, while Carnival UK and Carnival Cruise Line had also begun to assess and prioritize implementation of similar recommendations for their ships.  *See MTO Action Plan* (July 25, 2019).  To date, the CAM Team has not received information on Costa Group's response plans.

One recommendation from the Holland America Group Workload Study, which the Company has not yet determined whether it will implement, is to perform a workload study of shoreside staff (including ship superintendents) "to better understand and remedy the workload issues that create conflicts between office and ship."  Holland America Group Workload Study at PCL_ECP00149407.  While RAAS performed a benchmarking study in August 2018 that compared ship superintendent staffing and workloads across the Company's brands/operating groups, it did not issue specific recommendations or required actions, or analyze other shoreside staff positions.  *See Cross-Brand Ship Superintendent* (Aug. 29, 2018), PCL_ECP00124546-88. Each operating group reviewed the RAAS study and implemented different improvements to their ship superintendent programs.  The impact of these changes was scheduled to be analyzed by RAAS in a follow-up study during 2020.  *See* Employee Interview/Call Notes.  However, in light of COVID-19 impacts, the timing of this follow-up study is uncertain.

*c) Audit, Ship Visit, and Self-Reported Non-Conformity Report Findings*

In 2019, at the request of the Chief Maritime Officer, RAAS auditors began preparing a "Manning Shortfall Report," which collects basic data on the deck and technical manning/staffing status of a vessel when it is audited.  *See* Internal Communication.  The CAM team analyzed approximately 80 of these reports available in Global HESS from ships across the Company's brands/operating groups (in roughly equal proportion to each brand/operating group's percentage of the total fleet).  According to the CAM Team's analysis, 74% (59 reports) of these reports identified deck/technical workload issues and/or under-staffing for various time periods ranging from a few days to months.  When drilling down to the operating group level, at least 50% of each operating group's ships reported staffing shortages.[102]

Similar trends can be seen in the CAM Team's analysis of Fleet Chief Engineer ship visit reports performed under the Company's HMP 1503 procedure, since its implementation beginning around December 2018.  Of 71 reports produced to the CAM Team, just over 60% identified issues with engine room workload, engineer qualifications, or general staffing issues, with the single biggest issue (over 40%) being a lack of sufficient experience or training for engineers.

---

[102] However, only about 3% of RAAS audit findings since April 2017 were attributed to staffing issues.  This low figure may be explained by the fact that RAAS audits compliance with the Company's procedures in Global HESS.  As the CAM has previously observed, the Company has not incorporated crew staffing requirements sufficient to support compliance into Global HESS.  *See* CAM September 2019 Quarterly Report at n.35 (noting that "if the Company's leadership recognizes that ships need to be adequately manned in order to meet [compliance] requirements, the Company could incorporate manning requirements sufficient to support compliance into Global HESS.  If shoreside operations do not provide a ship with an appropriate number of qualified crew members to meet these requirements, that performance gap could be reported to senior management through an internal or external audit.  If such an audit finding were made, corrective action would be required and tracked.  The CAM understands that, at present, Global HESS does not obligate action in response to manning shortfalls.").

Since January 2019, ships have been required to self-report instances where they are unable to meet the requirements of Company Global HESS procedures. *See HMP 1106 Self Reported Non-Conformities*. The CAM Team's analysis of over 3,300 of these reports, called Self-Reported Non-Conformities, indicated that approximately 10% of these reports appeared to be tied to staffing-related issues. Of these reports, the single biggest issue (25%) was missing required certifications for engineers. Reports from February to May 2020 also include just over 20 reports identifying impacts to staffing levels or deck/technical operations due COVID-19.

### d)   Investigation Report Findings

The CAM Team's analysis of HESS incident investigation reports since April 2017 (including investigations performed by the Incident Analysis Group, brands/operating groups, and RAAS[103]) indicated that staffing or workload issues contributed to approximately 7% of the incidents. *See also infra*, Part IV.D.4.a(i) (discussing example of investigation into staffing shortage concerns on an AIDA ship).

Notably, one investigation report focused on examining crew staffing level concerns on the *AIDAluna*. The investigation was performed at the request of the Environmental Corporate Compliance Manager and the Chief Maritime Officer in response to comments in a May 2019 Fleet Chief Engineer report that the "Senior Engineer position, as structured, is clearly overloaded," and that the "Technical Department [is] suffering from lack of manpower and continues short manning." *FCE Ships Visit Summary*, PCL_ECP00117788-99, at PCL_ECP00117788. The report further noted that "[a] lot of effort and time is required [for compliance with HESS environmental procedures] with depletion of other duties. Surely the

---

[103] RAAS performed investigations of HESS incidents before the Incident Analysis Group was formed around March 2019.

manning structure requires to be reviewed in order to rebalance the extra workload." *Id.* at

PCL_ECP00117791.

The Incident Analysis Group was assigned to investigate and "report on current manning

level, manning level as planned, the actual workload onboard, management decisions relevant to

the [Fleet Chief Engineer's] observations and to determine any effects the manning level had on

HESS compliance." *Final Report Manning Level Concern*, IAG201917 (Mar. 22, 2020) ("IAG

Report"), at 2.  In addition, a third-party, DNV GL, was asked to "support the investigation by

evaluating the tasks assigned to the AIDAluna engine team and staff levels currently available on

board to manage the environmental operations assigned."  *Id.*  The Incident Analysis Group and

DNV GL conducted a ship visit a few weeks after the Fleet Chief Engineer visit; however, DNV

GL did not issue its report until August 2019, while the Incident Analysis Group did not issue its

final report until March 2020, approximately nine months after the initial Fleet Chief Engineer

visit.

DNV GL found that the general administrative tasks engineers are required to perform

had "gradually risen over the years," making "it very difficult to complete all these requirements

within regular working hours."  DNV GL, *AIDAluna – Accusation of Under-manning Effecting*

*ECP Compliance*, Memo No. 10166208-1 (Aug. 14, 2019) ("DNV GL Report"), at 5.  This

workload burden was exacerbated by the implementation of additional ECP administrative tasks

"without additional manning."  *Id.*  DNV GL also noted that its workload assessment was done

prior to the implementation of the new "yellow manning" requirements, which require additional

engineers to be in the engine control room during higher-risk activities like waste transfers and

discharges.  *Id.* at 6.  DNV GL noted that "significant operational changes that result in

July 13, 2020

additional workload should be subject to an impact assessment. Ever-increasing additional requirements without other changes are unsustainable." *Id.* at 9.[104]

The Incident Analysis Group report noted a lack of "experienced specialists in certain positions." IAG Report at 2. The report further noted that, although Costa Group's shoreside Marine HR group tracks manning shortage and overtime issues, the *AIDAluna*'s concerns about the impact of shortages and high workloads had not been communicated to shoreside personnel. *See id.* at 3. The report did not address why the ship felt unable or unwilling to raise these concerns previously with shoreside management, RAAS, the TPA or the CAM Team.

For corrective and preventive actions, the Incident Analysis Group noted that, at the time of the Fleet Chief Engineer's May 2019 visit, Costa Group's shoreside management was already in the process of getting approval for increasing engine department staffing for all AIDA ships, including adding an engine clerk to assist with administrative duties, and that the *AIDAluna* received its engine clerk in December 2019. *Id.* at 16. The report also noted that Costa Group retained outside consultants from a German institute to develop software to help optimize crew staffing levels, based on data collected from crew members on Costa and AIDA ships, including the *AIDAluna*, about the amount time spent on specific work tasks and in rest hours. *Id.* at 7-8; *see also supra*, Part III.H.b(iii) (discussing the software). In addition, the report assigned some preventive actions to All Brands Group that would apply across the Company's brands/operating

---

[104] The CAM has made a similar observation—using the enhanced yellow manning requirements as a case-in-point—about the need for a management of change process to assess impacts from proposed changes to Company procedures before they are implemented. *See* CAM March 2020 Quarterly Report at 134-35; December 2019 Quarterly Report at 84-85. According to the CAM Team's analysis, in the time period since the new yellow manning requirements were implemented around May 2019, there have been: 13 related RAAS audit findings; 4 Fleet Chief Engineer reports noting challenges with implementing the requirements; and 13 Self-Reported Non-Conformity reports from ships related to their inability to meet the requirements.

July 13, 2020

groups, including the implementation of a management of change procedure. *See id.* at 16-17; *see supra*, Part III.E.2.a (noting that development of the procedure was delayed due to COVID-19, with a current target completion date of July 2020).

### e) COVID-19 Impacts

The COVID-19 pandemic has had major impacts on crew staffing and workload—many of which are developing in real time. As discussed above, the Company's ships are in the process of moving to "minimum operational manning" levels as they enter various stages of layup during the extended pause in cruise operations. *See supra*, Part I.C.4.d.

The Draft Pause Priorities Plan contains several crew staffing and workload-related initiatives. In addition to those noted above, *see supra*, Part IV.A.1, these include:

- Having each brand "develop and implement a methodology and criteria for bringing back the most competent talent before guest operations resume. If shipboard staffing size will be reduced, brands will let go or furlough those personnel who are less qualified or have under-performed"; and

- Developing "common criteria used in re-hiring (ship and shore-side) that emphasizes the priorities within the Corporate Vision statement – including commitment to safety, environmental protection; ethics & compliance; diversity and inclusion," with a goal of having an initial set of criteria by September 2020 and a final set by mid-2021.

*See* Draft Pause Priorities Plan at PCL_ECP00166539, 48.

As noted below, the CAM recognizes that the significant disruptions to the marine and cruise industries from COVID-19 may temporarily ameliorate some of the staffing challenges the Company was facing pre-COVID-19 related to the global shortage of qualified ship officers. *See infra*, Part VII.A (discussing impacts on diversity and inclusion efforts). As cruise ships resume guest service, it is likely that, at least initially, only a small subset of ships (within Carnival Corp. and the cruise industry more broadly) that sailed with passengers before COVID-19 will do so again. This may result in a glut of available officers, including engineering officers, to staff

those ships in the near term.  However, this situation is likely to be temporary.  Over time, either more and more will ships return to service, approaching or even surpassing pre-COVID-19 levels, thereby reducing the pool of available qualified officers; or, if ships never return to pre-COVID-19 levels of service, the surplus of qualified officers who are unable to find open positions on cruise ships will leave the industry to pursue other opportunities.  Under either scenario, the Company and the cruise industry are likely to continue facing the challenge of a long-term shortage of qualified officers.

4.    IT Support, Including Voyage Planning

Inadequate IT support has been a longstanding area of struggle for the Company's ships.  As discussed above, the CAM has observed that the Company's IT resources in support of compliance are, among other critiques, generally outdated and uncoordinated across the Company's brands.  *See supra*, Part III.H.  The Company has recognized the need for more modern and centralized technologies, and is working on various IT initiatives to better support the compliance needs of the ships.  *See id.*  Overall, however, these efforts have proceeded slowly, with frequent delays and limited tangible outcomes.  Many of the IT initiatives underway are designed to address chronic issues discussed in this and prior CAM reports, including:

- **Voyage Planning:**  In ECP Years Two and Three, the CAM Team identified over 50 and over 80 incidents, respectively, on Covered Vessels that appeared to be attributable at least in part to voyage planning errors, such as miscalculations of environmental boundary lines or misunderstandings about applicable environmental requirements.  *See* Internal Incident Log; *see also* CAM First Annual Report at 41, 54-55 (discussing voyage planning-related incidents on Covered Vessels); CAM December 2018 Quarterly Report at 10-11 (same).  The Company's current process for communicating information about environmental boundaries and requirements to the ships relies primarily on a spreadsheet, called "the Matrix," that is periodically updated by shoreside personnel and uploaded in Global HESS.  *See supra*, Part III.H.2.a(iv).  Based on information in this spreadsheet and related online links, deck officers in charge of voyage planning, in consultation with Environmental Officers, are responsible for developing the environmental plan portion of the ship's overall voyage plan, including information about when and where discharges, emissions, and

offloads are permitted or restricted. *See* CAM Second Annual Report at 37-38 (describing the voyage planning process). This time-consuming and labor-intensive approach is rife for potential human error (including, at times, incorrect information within the Matrix itself), and is a frequent source of complaints to the CAM Team by shipboard personnel across the Company's brands. *See id.*; CAM September 2019 Quarterly Report at 79; Employee Interview/Call Notes.

As discussed above, the Company is working with an outside vendor to develop software that would integrate and automatically update information about environmental boundaries and requirements into the electronic navigational charts used by ships, replacing the current analog Matrix approach. *See supra*, Part III.H.2.a(iv). Before COVID-19, this project was subject to delays.[105] COVID-19 has further delayed the timeline, and the current plan is for the Company to receive the completed software by July 2020 so that testing can occur through October 2020. *See supra*, Part III.H.2.a(iv). The Company reports that rollout of the software will be prioritized for the first ships that are planned to come back into service. *Id.*;

- **Spare Parts:** In ECP Years Two and Three, the CAM Team identified over 55 and over 100 incidents, respectively, on Covered Vessels that appeared to be attributable at least in part to unavailable spare parts for pollution prevention equipment. Of these incidents, approximately 40 and 70, respectively, involved pollution prevention equipment that was out of service for more than 24 hours. *See* Internal Data Log; *see also supra*, Part IV.A.2.b. Spare parts issues have also been a frequent source of findings from TPA and RAAS audits, as well as the Company's internal and external studies and assessments, including the Holland America Group Human Factors Study, Holland America Group Workload Study, and Fleet Engineering Survey. *See id.*

As discussed above, the Company has the spent the last two years planning and designing an initiative, called MAST, that would provide a single, cross-brand system for managing spare parts (including procurement and logistics) and planned maintenance tasks. *See supra*, Part III.H.2.a(iii). The Company believes that the new system will improve its ability to efficiently deliver spare parts to ships, including parts for pollution prevention equipment. *See id.* According to the Company, the initial version of the MAST software is approximately 50% complete, but COVID-19 has delayed the timeline for completion and subsequent testing on ships by about one year (until about December 2021). *See id.* Once the MAST system is in place, the

---

[105] In July 2019, the Company reported that full rollout of the software across its fleet was expected by mid- to late 2020. *See* CAM September 2019 Quarterly Report at 84. In November 2019, the Company reported that it did not expect to receive the completed software until February/April 2020, and that the Company would first review the software to determine if it met its needs before deciding whether to adopt and deploy the technology. *See* CAM December 2019 Quarterly Report at 79-80. In March 2020, the Company reported that the software was still under development, "with the vendor contractually obligated to deliver the survey in mid-May. Assuming the software meets all requirements at that time, Carnival will pilot the software on a ship as early as July." CAM March 2020 Quarterly Report at 124-25 (citation omitted).

next step (estimated for approximately 2025 and beyond) will be to create and stock centralized warehouses to physically store and deploy the parts to the Company's ships around the world.  *See id.*; and

- **Crew Staffing and Workload:**  CAM reports have repeatedly identified crew staffing and workload challenges as one of the Company's top compliance concerns, due in part to difficulties (not unique to the Company) in attracting and retaining sufficient numbers of qualified deck, technical, and environmental officers—especially engineering officers.  *See supra*, Part IV.A.3.  The Company's internal and external studies and assessments have made similar findings.  *See id.*  As detailed above, the CAM Team's review of various audit, ship visit, investigation, and other reports indicates that:

  - Approximately 74% of Manning Shortfall Reports from RAAS audits identified deck/technical workload issues and/or under-staffing for various time periods ranging from a few days to months, with at least 50% of each operating group's ships reporting staffing shortages;

  - Just over 60% of Fleet Chief Engineer reports identified issues with engine room workload, engineer qualifications, or general staffing issues, with the single biggest issue (over 40%) being a lack of sufficient experience or training for engineers;

  - Approximately 10% of Self-Reported Non-Conformity Reports appeared to be tied to staffing-related issues, with the single biggest issue (25%) being missing required certifications for engineers; and

  - Approximately 7% of investigation reports indicated that staffing or workload issues contributed the underlying incidents.

*See id.*

As discussed above, some of the Company's operating groups are developing software, or improvements to existing software, to address issues related to crew staffing and workload.  *See supra*, Part III.H.2.b(iii).  These include:  (1) efforts by Costa Group and Carnival UK to develop a new module within an existing crew personnel management system, called Mistral, for planning crew schedules and staffing using artificial intelligence.  Development is approximately 75% complete, but is on hold due to COVID-19; and (2) efforts by Costa Group to develop, with an outside consultant, a software, called SCEDAS, to help optimize crew staffing levels based on obtaining and analyzing data on how long it takes to complete role-specific work tasks.  This project is also on hold due to COVID-19.  *See id.*

July 13, 2020

Despite the promise of these and other efforts to provide ships with better IT systems and tools to support compliance, there have been limited concrete improvements implemented to date.

### 5.    Waste Vendor Assessments

As detailed in the separate CAM Barrier finding below, the TPA and RAAS issued multiple audit findings between 2018 and 2020 regarding the Company's failure to follow its internal procedures requiring the assessment of third-party vendors that receive wastes offloaded from the Company's ships.  *See infra*, Part IV.E.  These findings revealed that the Company was not always evaluating waste vendors before using them, as it had stated in its public Sustainability Reports.  *See infra*, Part IV.E.3.  Although the Company recently published an updated waste vendor assessment procedure, its current program still appears to be inadequate. *See infra*, Part IV.E.5.

In addition, the Company reported over 90 incidents during ECP Year Three involving its waste vendors, including numerous incidents where wastes were inadvertently discharged into the sea due to an error or equipment failure attributable to the waste vendor.  *See infra*, Part IV.E.4.  The Company's current procedures do not appear to establish a formal, standardized mechanism for ships to report issues or concerns about waste vendors, or for shoreside management to follow up on such reports.  *See id.*

### 6.    Ongoing CAM Team Examination

The CAM Team will continue to examine the Company's efforts to provide basic compliance support to the ships.  A key area of focus will be the extent to which the Company uses the current suspension of cruise operations as an opportunity to address compliance failures of the past and provide ships with the staffing and resources they need for compliant operations

July 13, 2020

before returning to service.  This will include examining the Company's implementation of its

Draft Pause Priorities Plan.

It will also include examining issues related to the Company's preservation of support for

compliance (budgets, staffing, and other resources) as it navigates through the crisis, such as:

- Is there internal tension in the Carnival Corp.'s CEO's direction to brand leaders to "reduce or eliminate non-critical cash expenditures, *but of course never cutting anything that would impact compliant, environmentally sound and safe operations*"? *See An Important Message from Arnold Donald* (Mar. 12, 2020), PCL_ECP00165434-35 (emphasis added); *see also infra*, Part IV.B.3;[106]

- Is the Company satisfying Special Condition of Supervision No. 5, to "fully fund and implement the ECP"?  *See* Dkt. No. 30 at 3; and

- Is the Company satisfying the ECP requirement to "supplement crews as needed . . . and/or to provide additional shore-side resources" if "inadequacies in the size and capabilities of vessel crews be proven as a contributing factor to their inability to meet the objectives of this ECP"?  *See* ECP § I.F.

In analyzing the criminal conduct that took place on the *Caribbean Princess*, the

Company's Chief Maritime Office determined that the illegal activity was the result of a culture

---

[106] Similar messaging has been reiterated in subsequent employee communications from the CEO and other members of top leadership.  *See, e.g.*, *Message from Arnold Donald* (Apr. 3, 2020), PCL_ECP00165441-42 ("As always, our highest responsibility and top priorities are compliance, environmental protection and the health, safety and well-being of our guests, the people in the locations we touch and you and all the members of our Carnival family.").  In addition, on April 11, 2020, the Ethics & Compliance Department "sent a message to Covered Personnel as a reminder of the Company's ongoing commitment to ethics and compliance." April 2020 Probation Supervision Report, Attachment 5, at 1.  This message stated that:  "All [Company] leaders are delivering this key message:  these cash preservation efforts are vital, but they must be done in a way that does not jeopardize safety, environmental protection and compliance. Especially in a time of crisis, it's important that we do not waver from our core fundamentals and our top priorities."  *A Message from Your Ethics & Compliance Department* (Apr. 11, 2020), PCL_ECP00165343.  It also emphasized that "anyone directly involved in the cash preservation planning, as well as anyone it impacts, has an obligation and a duty to speak up if you believe that decisions are being made that threaten or jeopardize our safety, environmental and compliance commitments.  For example, this might include our decisions relating to maintenance, waste management or the purchasing of spare parts for pollution prevention or safety equipment."  *Id.*

of "excessive frugality" that "permeated to the lowest levels of our shipboard teams and led to their actions." *See* Chief Maritime Officer Root Cause Analysis.  He cautioned that "[u]nless we change this frugality and establish a stronger environmental culture . . . we could begin this cycle again at the end of the ECP." *Id.*; *see also* CAM First Annual Report at 36-37.

As the Company responds to the COVID-19 crisis, it is critical that its messaging *and actions* on compliance do not reinforce, or support a reversion back, to a culture of "excessive frugality."  As noted above, former DOJ Deputy Attorney Sally Yates has warned that companies face a risk of doing just that:  "Whenever we're in an emergency situation, it's natural for the attention and focus to go to the emergency . . . [T]he real risk is that we let this emergency mentality become more long-term . . . It's not just a budgeting issue, but it's also a messaging and emphasis issue . . . That is where people can start cutting corners because they feel like they need to do that to help the bottom line of the organization."  A. Barbarino, Law360.com, *Ex-DOJ Deputy Warns of Virus' Long-Term Compliance Risks* (Apr. 22, 2020).

### B.     Missed Opportunities in Response to Culture Assessment Findings

#### 1.     Background

As described above, the Company's environmental compliance culture was assessed in connection with a large-scale survey of over 70,000 employees.  *See* supra, Part III.D.1.  The results of that Environmental Compliance Culture Assessment were presented to, and accepted by, the Company's top leadership, and it seemed that there was support for and momentum towards undertaking a concerted, corporate-wide effort to address the opportunities for improvement identified in the Assessment.  *See id.*  While significant time and resources have been expended since the findings were first shared with the Company approximately ten months ago, the Company still has no final, comprehensive Culture Action Plan, and the Company's

overall response reflects missed opportunities in terms of process and substance.  In addition, this effort demonstrates the continued relevance of the CAM's ECP Year One finding that the Company's complex corporate structure—including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance—is a barrier to compliance.

2.     Process Concerns:  Delays and the Impact of the Corporate Structure

A significant issue with respect to the culture change effort has been delay at the All Brands Group level.  The results of the Environmental Compliance Culture Assessment were provided to the Company on August 28, 2019; the Company's most senior leaders stated to the CAM that they accepted the Assessment's findings in early September 2019; and the Company made commitments to the Court that it would address those findings during the October 2, 2019, Status Conference.  Yet, as of March 2020, when COVID-19 forced the suspension of the Company's cruise operations, the Culture Action Plan was still in draft form.  Not even the initial step of "establish[ing] a high-level [Culture Action Plan] Steering Committee and attending Working Group to oversee, coordinate and hold the brands accountable for implementation of this plan" had been accomplished.  *See* Draft Culture Action Plan at PCL_ECP00154953.

While the Company notes that "the Ethics & Compliance Department developed a plan, but the process of finalizing the plan was delayed because the Company's other leaders had to focus on COVID-19 priorities," s*ee* Company Comments on Draft Report, this does not account for the fact that the Environmental Compliance Culture Assessment Report was shared with the Company in late August 2019, and COVID-19 did not emerge as a challenge for the Company until early 2020.  As of the date of this Report, despite what the CAM Team understands to be weekly meetings joined by ECI and members of the All Brands Group Ethics & Compliance

July 13, 2020

Department, there is still no final Culture Action Plan, there is still no operational Steering Committee or Working Group, and the COVID-19 crisis has further stalled implementation.

Faced with delays in the development of a Culture Action Plan by All Brands Group, some, but not all, leaders at the brand/operating group level took action to develop independent culture action plans in collaboration with All Brands Group. *See supra* at Part III.D.3. Several of these plans have been updated to address the COVID-19 crisis. For example: the Carnival Cruise Line plan addresses "Culture During Crisis," *see* Carnival Cruise Line Culture Action Plan at PCL_ECP00164131; and the Holland America Group plan includes evaluations of "COVID-19 Opportunities" and "Learning from the Ships and Experiences During Covid." *See* Holland America Group Culture Action Plan at PCL_ECP00166115-19. The fact that Carnival Cruise Line, Holland America Group, and Carnival UK were able to develop and begin implementing comprehensive culture action plans for their respective organizations, while All Brands Group was not, raises questions about the All Brands Group approach to this issue that have not been satisfactorily explained.

In examining this delay with people who have been directly involved from across the Company, it has become clear that there have been many meetings and discussions, but a lack of focus on generating a clear plan. In the Environmental Compliance Culture Assessment Report, Propel advised that: "Cultural change is most effective when it is closely linked with company strategy and operational goals, and is anchored with a commitment from Top Management." Environmental Compliance Culture Assessment Report at 44. Propel further advised: "To ensure consistency of messaging and implementation, all of the Top Management should agree on a coordinated plan to achieve an effective cultural change in the organization." *Id.* at 42. Based on the CAM Team examination to date, no one at All Brands Group is being held

accountable for promptly developing goals and objectives for the Company-wide Culture Action Plan, and for routinely evaluating the Company's progress towards meeting those goals and objectives. Indeed, the Draft Culture Action Plan states that "[o]versight coordination and accountability will be provided by a central Steering Committee and Working Group," but since neither the Steering Committee nor the Working Group has been activated, it suggests that doing so has not been made a priority. *See* Draft Culture Action Plan at PCL_ECP00154952.

Consistent with this uncoordinated approach, when discussing the lack of a finalized Company-wide Culture Action Plan with those involved at All Brands Group, reference is made to the need to respect the autonomy of the brands as the main impediment. *See* Employee Interview/Call Notes. One senior leader acknowledged that delays in addressing the findings of the Environmental Compliance Culture Assessment could be attributed to the Company's organizational structure, in which the brands/operating groups have a great deal of independence. *See id.* While centralization is not a panacea, in this instance the Company's decentralized operations have resulted in a delayed, fragmented, and ineffective response to findings of serious compliance issues that undercut efforts to develop a sustainable compliance culture. As different Culture Action Plans have been developed by some brands/operating groups, others, like Costa Group and its component brands, are awaiting the comprehensive Culture Action Plan that has yet to be finalized by All Brands Group. This lends support to the CAM's ECP Year One finding that the Company's decentralized corporate structure was a barrier to compliance—a barrier that after more than three years has not been fully addressed.

3.    <u>Substance Concerns: Draft Culture Action Plan</u>

Even if All Brands Group had moved forward with the Draft Culture Action Plan, the CAM has several substantive concerns with the plan itself that have been shared with the

July 13, 2020

Company.  If there was a single take-away from the Environmental Compliance Culture Assessment, it was that the Company's senior-most leaders need to be at the forefront of addressing their failure to foster and develop a sustainable compliance culture.  Yet, in its language and design, the Draft Culture Action Plan seeks to drive the focus away from the role of top leaders both to take responsibility for the Company's compliance failures and to take individual ownership over actions to strengthen the Company's compliance culture.  It does not clearly require, as a starting point, that the highest levels of leadership speak to their support of compliance and be held accountable to act in concrete ways that support actual compliance efforts.

Instead of such an approach, the proposed Draft Culture Action Plan is written in language focused on the perception of tone by employees, and on actions by lower level supervisors, with vague language about "accountability" that is not clearly focused on management and even has the potential to be perceived as threatening.  This last concern is problematic in a Company in which a "blame culture" has been identified as a problem by multiple entities, including Propel, that have looked into the culture of the Company.  *See* CAM September 2019 Quarterly Report at 19-22 (summarizing prior surveys and reports that "have also consistently identified concerns regarding a blame culture and lack of trust between employees, supervisors and managers").  For instance, the Culture Action Plan identifies the following as "critical drivers of culture":

- "One is the ***tone*** that is ***perceived by employees*** as coming from 'the top' (the Board, CEO, brand presidents, division and ship/shore location leaders);

- A second is the ***support of that tone*** (or lack thereof) that is given by each employee's most immediate authority (generally a supervisor);

- A third is the extent to which employees believe they can or cannot ***raise concerns without fear of retaliation***; and

July 13, 2020

- A fourth is the extent to which employees believe there is ***accountability*** for behaviors that step outside those desired values, attitudes and expectations."

Draft Culture Action Plan at PCL_ECP00154952 (emphases in original).  To define the drivers of corporate culture in terms of how leadership communications are "perceived by employees" and "the extent to which employees believe" their company operates justly suggests that the culture change effort is geared towards modifying how employees react to messaging, as opposed to changing the actual messages and behaviors coming from Company leaders and addressing the extent to which the Company actually operates in a just manner.[107]

Relatedly, the Culture Action Plan does not address the need for leaders throughout the Company to be visible in providing concrete support for compliance in the Company's day-to-day operations.  If the Plan has Company leaders reiterate the corporate vision statement that "our top priorities are to operate safely, to protect the environment, and to be in compliance everywhere we operate in the world," but those statements are not paired with concrete actions to address compliance needs, they may have the perverse of effect of sanctioning language that talks the talk of compliance, but does not walk the walk.  This is related to the concern that there could be internal tension in the Carnival Corp. CEO's direction to brand leaders to "reduce or eliminate non-critical cash expenditures, but of course never cutting anything that would impact compliant, environmentally sound and safe operations."  *See supra*, Part IV.A.6 (citing *An Important Message from Arnold Donald* (Mar. 12, 2020), PCL_ECP00165434-35).

---

[107] The Company states that "the Culture Action Plan does prioritize actual leadership commitment in addition to lower-level employees' perception of that commitment.  The surveys distributed to lower-level employees were designed to measure the latter, but that does not mean that the Company was not also working to improve the former."  *See* Company Comments on Draft Report.  However, efforts to prioritize actual leadership commitment and communications are not reflected in the language of the Draft Culture Action Plan.

4.      COVID-19 Impacts:  Culture Section of the Draft Pause Priorities Plan

A section of the Draft Pause Priorities Plan is devoted to culture, but it is not a substitute for developing a comprehensive Culture Action Plan.  In the Draft Pause Priorities Plan, there is no individual or function identified as responsible for developing goals or objectives, or coordinating efforts across the Company.  Rather, "[m]ultiple individuals and working groups from across the company have agreed to participate in implementing different aspects of the Culture Pause Priorities Plan."  Draft Pause Priorities Plan at PCL_ECP00166547.  The culture portion of the Draft Pause Priorities Plan consists of efforts that have already been undertaken by the brands/operating groups, and selected action items from the Draft Culture Action Plan being undertaken primarily by All Brands Group in coordination with its consultant ECI.

The efforts being undertaken primarily by the brands/operating groups are related to addressing the well-being of crew currently on ships and planning for resumption of cruise operations.  The specific topics are:

- **Bring-Back Selection Strategy:**  "Develop common criteria used in re-hiring (ship and shore-side) that emphasizes the priorities within the Corporate Vision statement – including commitment to safety, environmental protection; ethics & compliance; diversity and inclusion; etc;"

- **Team Wellness:**  "Each brand monitors team wellness and develops related materials and responses, the materials are shared across the brands, and [All Brands Group] monitor and report on these efforts";

- **Welcome Back Awareness Launch:**  "Design a collective launch that will highlight and preview these priorities: Employee Reflections and Leadership Listening . . . Values and Vision. . .Organizational Commitment to Ethics & Compliance, and Culture Training"; and

- **HR Lifecycle Enhancements:**  "Each brand develops, exchanges, and reviews inserts of [ethics and compliance] factors into HR Lifecycle, including:

  o   Applications

  o   Job Descriptions

July 13, 2020

     o   Interview Questions

     o   Performance Evaluations

     o   End-of-Contract / Exit Interview Questions"

*Id.* at PCL_ECP00166548-50.

In addition to these brand/operating group-led efforts, the culture portion of the Draft Pause Priorities Plan also includes:  Board and Leadership Trainings (planned for September and December 2020); development of a culture survey "to assess trust, openness, and care"; and an Ethics & Compliance Program Self-Assessment for "E&C team and brand leaders."  *See id.* These efforts will be led by All Brands Group and ECI.  The latter two items do not have deadlines associated with them, and the timing is left to "[All Brands Group] to decide."  In response to CAM Team questions, the Company indicated that these efforts would take place once Company leaders were no longer singularly focused on responding to the COVID-19 crisis.

     5.     <u>Ongoing CAM Team Examination</u>

The CAM Team will continue to monitor the Company's efforts to address the deficits in its compliance culture identified in the Propel Environmental Compliance Culture Assessment, including the development and implementation of the culture section of the Draft Pause Priorities Plan during the current suspension of cruise operations brought on by COVID-19, and, eventually, a comprehensive Culture Action Plan.  The CAM notes the relevance of former Deputy Attorney General Yates's admonition, quoted above, *see supra*, Part IV.A.6, and cited by the Court at the April 24, 2020, Status Conference, "on just how important even in emergency times, unprecedented emergency times like this, that it's so important to focus on the values that the company has and not just be focused on the bottom line.  You need the bottom line to have an industry . . . but it can be a temptation to cut corners."  Status Conf. Tr. at 12 (Apr. 24, 2020). As noted above, to the extent that the Company's need to respond to the existential threat to its

existence posed by COVID-19 causes it to postpone efforts to address the persistent deficits in its

corporate compliance culture, there is a risk that doing so could lead to a return to a "culture of

excess frugality" that the Chief Maritime Officer determined was a root cause of the crimes

committed on the *Caribbean Princess*.  *See supra*, Part IV.A.6.

### C. Unresolved Weaknesses in Corporate Compliance Function

#### 1. Overview

As discussed above, the Company pleaded guilty in June 2019 to a probation violation

for "failing to provide sufficient responsibility and authority to the [Environmental Corporate

Compliance Manager] to implement the ECP," Dkt. No. 134 at 10, and "acknowledge[d] that it

failed to establish [an Environmental Corporate Compliance Manager] with authority (including

resources, budget, and staff) as required to implement the ECP."  *Id.* at 2; *supra*, Part III.E.1.  In

ECP Year One, the CAM made a finding that the Company had failed to provide the

Environmental Corporate Compliance Manager with ECP-required authority, and that the

Company's complex corporate structure, including the lack of centralization and lack of clarity

as to responsibility, accountability, and authority for environmental compliance, was an

unresolved barrier to environmental compliance.  *See* CAM First Annual Report at 4-5, 25-30.

The Company did not act to remedy these findings until it faced the revocation of its probation

near the end of ECP Year Two.  *See* CAM Second Annual Report at 46-49, 91-92.

Since pleading guilty, the Company has made significant efforts—many required by the

Probation Revocation Agreement negotiated by the Company and DOJ—toward standing up a

new, centralized compliance function.  These efforts included appointing a Chief Ethics &

Compliance Officer (a position that did not exist at the Company before), who officially began

duties in August 2019.  The Chief Ethics & Compliance Officer leads the new Ethics &

July 13, 2020

Compliance Department, which is based at All Brands Group, as well as the broader Ethics & Compliance Program, which extends throughout the brands/operating groups.  *See id.*

Building a centralized compliance structure from scratch would be a difficult task for almost any corporation.  This is especially so for a complex, multi-national corporation like Carnival Corp. that has historically operated in a highly decentralized manner, preserving a great deal of management autonomy within the individual brands/operating groups.  *See supra*, Part I.B.3.a.  The COVID-19 pandemic also began to hit approximately 6-9 months after the launch of the Ethics & Compliance Department and Program, testing the Company's new compliance function in unprecedented ways.

The Company's ongoing compliance challenges, discussed throughout this Report, are exacerbated by the fact that it did not attempt a systemic, corporate governance solution to its compliance problems sooner.  As noted above, the CAM made findings in ***ECP Year One*** that the Company's decentralized structure was a barrier to compliance, and that the Environmental Corporate Compliance Manager did not have the authority required by the ECP.  It is now several months into ECP Year Four.  The new Ethics & Compliance Department is less than a year old and struggling to find its footing—a situation exacerbated by the fact that the Company is facing the biggest crisis of its nearly fifty-year history.

Despite many significant efforts to date, unresolved weaknesses in the corporate compliance function persist.  The CAM's findings from ECP Year One largely still stand: (1) the compliance function remains decentralized in many ways, a symptom of the Company's generally decentralized operations; and (2) the Company does not yet appear to have provided the Environmental Corporate Compliance Manager with the authority required by the ECP.  In addition, the Company does not yet appear to have provided either the Environmental Corporate

Compliance Manager or the Chief Ethics & Compliance Officer (a position not created until ECP Year Three) with the authority required by the settlement of the Probation Revocation Petition. These issues remain ongoing barriers to compliance.

2.   <u>Compliance Function Remains Decentralized in Many Ways</u>

The Company's compliance function remains decentralized in many ways.  This is most notable on the Health/Safety/Security side of HESS compliance.  Before COVID-19, the Company decided to allocate "much less" financial and personnel resources at the All Brands Group level to the Health/Safety/Security function "than those allocated for both the Environmental and General Compliance functions."  Ethics & Compliance December 2019 Financial Plan at PCL_ECP00162714.  This was due to the Company's belief that "the overall maturity" of the Health/Safety/Security functions at the brand/operating group levels meant that All Brands Group's "compliance oversight and monitoring role of these functions does not appear to require the financial resources of the other functions."  *Id.*  The Company added that this "conclusion will of course be evaluated as part of the regular risk assessment program that is being developed within the ethics & compliance program."  *Id.*  It remains to be seen if the challenges the Company faces from COVID-19 will affect this conclusion.

Moreover, across all HESS areas, including Environmental, ownership and accountability over compliance-related initiatives and reforms tends to reside in the brands/operating groups. *See* Employee Interview/Call Notes.  This is consistent with the widely reported tendency of brands/operating groups to resist direction or mandates from All Brands Group.  *See id.*  In many instances, the Company seeks to address a compliance problem by setting up a "working group" comprised of individuals from both All Brands Group and the brands/operating groups.  The All Brands Group members often develop a set of approaches, followed by a protracted negotiation

July 13, 2020

process seeking "buy-in" from each of the brands/operating groups on any proposed solution. *See id.*

The Draft Pause Priorities Plan is a prime illustration of this approach.  For example, it lists at least five different groups as being involved in developing the Environmental initiatives: (1) the Environmental Corporate Compliance Manager and Operating Line Compliance Managers; (2) the brand/operating group Executive Vice Presidents of Marine Operations; (3) the Operating Line Ethics & Compliance Officers; (4) the Environmental Working Group; and (5) additional subject matter experts.  Draft Pause Priorities Plan at PCL_ECP00166535. Similarly, at least 14 individuals from across All Brands Group and the brands/operating lines are involved in the Investigations initiatives.  *See id.* at PCL_ECP00166544.  For the Culture initiatives, "[m]ultiple individuals and working groups from across the company have agreed to participate in implementing different aspects of the Culture Pause Priorities Plan."  *Id.* at PCL_ECP00166547.  Likewise, for the Training initiatives, "[m]ultiple individuals and working groups from across the company have agreed to participate in implementing different aspects of the Training Pause Priorities Plan."  *Id.* at PCL_ECP00166551.

The most common internal complaint about this approach is that it results in delayed, uncoordinated, and ineffective solutions to some of the Company's most serious and long-standing compliance challenges, including ineffective internal investigations, *see infra*, Part IV.D, and a corporate culture that does not support compliance.  *See supra*, Part IV.B.  On these and other compliance issues, there remains a need for coordinated, efficient action that is driven from the center, with clear ownership and accountability resting with All Brands Group.

July 13, 2020

### 3.   Ongoing Failure to Provide Required Authority to Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager

In pleading guilty to the probation violation for failing to provide sufficient authority to the Environmental Corporate Compliance Manager, the Company committed to providing both the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager with "the appropriate budget and staff; a substantive role in financial, strategic, and sustainability planning processes; and *compliance authority* over regulatory obligations *and operations across and within all brands*."  Dkt. No. 134 at 2 (emphasis added).

It is not clear that these positions have been given the required compliance authority, especially over "operations" and "across and within all brands."  As discussed in prior CAM reports, the Ethics & Compliance October 2019 Final Charter and Final Strategic Plan include language which states, in a conclusory manner, that the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager have a "substantive role" in financial and strategic planning processes and "authority and [substantial] control" over the operating groups. *See* CAM September 2019 Quarterly Report at 39-41; CAM December 2019 Quarterly Report at 32-33.  Terms like "substantive role" and "substantial control" are not defined.  Nor is it clear how—or if—these concepts are implemented in practice.

This issue is tied to CAM finding, discussed above, that the Company's compliance function remains decentralized in many ways.  The Company's general tendency to operate in a highly decentralized way bleeds into its Ethics & Compliance function, resulting in a persistent reluctance from All Brands Group (bolstered by resistance from the brands/operating groups) to push out compliance-related initiatives and reforms in a centralized and coordinated manner, with ownership and accountability residing with All Brands Group.  *See supra*, Part IV.C.2. Such reluctance indicates that the Chief Ethics & Compliance Officer and the Environmental

July 13, 2020

Corporate Compliance Manager do not, in reality, have compliance authority "across and within all brands."  Indeed, in numerous discussions, their authority is generally described as the "authority to ask" for support.  *See* Employee Interview/Call Notes.

In addition to lacking compliance authority "across and within all brands," these positions do not appear to be empowered to exercise compliance authority over "operations." For example, as discussed above, many of the initiatives in the Draft Pause Priorities Plan relate to basic support for compliant ship operations, such as completing significant repairs to pollution prevention equipment; providing a full set of environmental critical spare parts; repairing and replacing regular leaking piping/components; implementing voyage planning software; and assessing waste vendors.  *See supra*, Part IV.A.1.  However, the draft Plan provides that ships may be able to resume cruise operations without some or all of these commitments implemented, even those with a "Do Before Ship Resumes Service" timeline.  *See id.*  The draft Plan does not specify which issues would be acceptable to leave unaddressed, who the ultimate decision-maker is, the nature of any explanation to be provided, and the recourse (if any) by Ethics & Compliance leadership if the explanation is unacceptable.  *See id.*  Therefore, it is unclear whether the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager are empowered "to ensure that when the ships return to service, they will come back stronger and better equipped."  *See* Dkt. No. 189 at 5 (quoting April 2020 Probation Supervision Report, Attachment 5, at 2).

In essence, the authority granted to Chief Ethics & Compliance Officer and Environmental Corporate Compliance Officer positions is the authority to *ask*, not the authority to *do*.  Indeed, the Company describes its system of governance as one in which executives are encouraged to engage in "collaboration and coordination."  *See* Company Comments on Draft

July 13, 2020

Report.  Under this system, the authority granted to the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager is "not unilateral."  *See id*.  Apart from "collaborating and trying to resolve issues in the ordinary course of operations, both of these individuals, like the other senior executives of the Company, have the ability to escalate issues to the CEO, the Leadership Team, and/or the Board of Directors."  *See id.*  The CAM does not question that this has been the Company's approach, and is unable to opine on the effectiveness of this approach on other aspects of the Company's business.  However, as detailed in prior CAM reports, and as the Company has acknowledged, the Company is not yet where it wants to be on compliance, with "much work to do."  *See* CAM March 2020 Quarterly Report at 53 (quoting Chief Ethics & Compliance Officer).  The governance-by-consensus approach, without clearly empowered compliance leadership, appears to be an ongoing barrier to obtaining a comprehensive and consistent approach to meeting the compliance needs of the ships.

Relatedly, there remain unclear relationships and lines of authority between the Ethics & Compliance Program and the Chief Maritime Officer organization, which oversees marine operations.  *See* CAM September 2019 Quarterly Report at 37 (noting that "the role of the new Chief Ethics & Compliance Officer *vis a vis* the Chief Maritime Officer regarding compliance management and oversight was unclear, including respective authorities and responsibilities").  The Company does not appear to have gone through a change management[108] process to understand how the new compliance function would fit into broader corporate operations.  In

---

[108] "Change management," as distinct from the "management of change" concept discussed elsewhere in this Report and prior CAM reports, refers to changes at an organizational or behavioral level, and can be defined as "the practice of applying a structured approach to transition an organization from a current state to a future state to achieve expected benefits."  *See What is Change Management?*, https://www.acmpglobal.org/page/change_management.

July 13, 2020

particular, the issue of how to reconcile the Chief Ethics & Compliance Officer's required "compliance authority over regulatory obligations and operations across and within all brands," *see* Dkt. No. 134 at 2, with the Chief Maritime Officer's historic authority over "global maritime operations, including maritime quality assurance and policy, maritime affairs, shipbuilding, ship refits and research and development," *see* 2019 10-K at 23-24, is one that the Company does not yet appear to have resolved.[109]  Whether these issues will be considered and addressed with the appointment of a Carnival Corp. Chief Operating Officer remains to be seen.

4.      Ongoing CAM Team Examination

The CAM Team will continue to monitor the Company's efforts to support its corporate compliance function, including the extent to which the Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager are empowered with the authority required by the ECP and Probation Revocation Agreement.  *See supra*, Part III.E.4.

The CAM observes that one possible way to address the continuing weaknesses in the Company's corporate compliance function would be to have a single, centralized entity within All Brands Group that had both the authority and resources (including budgets and staffing) to: develop practices and procedures that it deemed necessary or prudent to compliant ship operations; require implementation of those practices and procedures; and monitor and assess their effectiveness.  It would be staffed with personnel with compliance and operational experience, and would represent a single point of control, responsibility, and accountability.  Key problems such an entity could address include:

---

[109] Likewise, it is not yet clear what the relationship and lines of authority will be between the Ethics & Compliance Program and the new Chief Operating Officer organization, which will oversee "major operational functions, including global maritime, global ports and destinations, global sourcing, global IT and global auditing [RAAS]."  *See supra*, Part I.C.4.f (citation omitted).

July 13, 2020

- Creating a formal process for corporate-wide consideration of learnings from incidents, audits, investigations, government findings, and consultants to obtain the full benefits of that work;

- Creating a single body responsible for staying abreast of regulatory changes, eliminating significant duplication of effort;

- Obviating the need for the cumbersome process of rulemaking by consensus across different brands/operating groups, which may result in delayed responses to incidents and findings, as well as inconsistent performance;

- Obviating the need for the distinction between "doers" (*e.g.*, operational personnel) and "checkers" (*e.g.*, compliance personnel) that creates barriers to effective internal communication and coordination; and

- Creating a process, that would include a robust management of change analysis, by which shoreside personnel have responsibility and accountability for implementing procedures on the ships, rather than simply pushing procedures out to ships without accounting for the impact on ongoing operations, resources, existing obligations, and officer and crew preparedness.

### D.    Internal Investigations Remain Flawed

1.    <u>Overview</u>

In ECP Year One, the CAM made a finding that the "Company's internal investigations are critically flawed."  *See* CAM First Annual Report at 5, 33-40.[110]  The CAM's observation

---

[110] The CAM observed that:  (1) investigations repeatedly failed to identify root cause(s), and the Company lacked a procedure or standard methodology for performing root cause analysis; (2) investigation reports often sought to attribute blame to specific shipboard personnel, rather than evaluate the role of broader, systemic issues that may have contributed to the incident; (3) the investigation program was still largely decentralized, despite being housed in the RAAS function; (4) relevant policies and procedures provided little guidance on how to conduct investigations, including with respect to preservation of evidence; (5) there was inconsistent information sharing regarding brand/operating line investigation findings between brand/operating line investigators and RAAS; (6) there were delays in the conduct of investigations led by brands/operating lines; and (7) the Company failed to follow existing procedures or guidance as part of its internal investigations, or to provide adequate guidance and direction to external investigators in third-party led investigations.

was reflected in similar findings by the TPA and DNV GL, the outside consultant the Company engaged to assess its investigation procedures during the same timeframe.[111]

As the Company moves into ECP Year Four, the investigations function remains flawed. Some progress has been made, including efforts to:  establish a new, independent investigations department at All Brands Group, called the Incident Analysis Group; hire additional investigators; revise investigation procedures; develop investigations training; and improve the consistency and quality of investigation reports, including systemic (root) cause analyses.[112] However, these improvements have proceeded slowly and with limited tangible results.  More than a year after the new Incident Analysis Group department was established, there is a continued lack of strong, centralized leadership at the All Brands Group level to establish both the independence of the investigation function and the method and scope of investigations, including processes for identifying systemic (root) causes, implementing corrective and preventive actions, and sharing lessons learned.  *See also supra*, Part IV.C (discussing unresolved weaknesses in the corporate compliance function, including ongoing decentralization of many HESS compliance functions).

---

[111] The TPA found in ECP Year One that the Company's investigations procedures "are inconsistent, non-conclusive and ineffective."  TPA First Annual Report at 3, 5, 21-23.  At the end of ECP Year Two, the TPA found that there is still "no effective procedure in place to identify or develop preventive actions or Root Cause and Analysis."  TPA Second Annual Report at 22; *see also* DNV GL, *Towards improving Carnival's incident investigation process,* Report No. 2018-0209, Rev. Final (May 8, 2018), PCL_ECP00051998-2050 ("DNV GL Investigations Assessment"), at PCL_ECP00052035-39.

[112] As discussed below, COVID-19 has impacted some of these efforts as a result of staff reductions and restrictions on in-person visits to ships and shoreside facilities (including the CSMART training center).  *See infra*, Part IV.D.6.

July 13, 2020

    2.    <u>Background</u>

In September 2018, about mid-way through ECP Year Two, the Company committed to the Court that it would improve its investigations program through various proposed actions and timetables, in accordance with the findings and recommendations from DNV GL, the TPA, and the CAM. *See Investigations Timeline – U.S. v. Princess Cruise Lines, Ltd.*, 1:16-cr-20897 (S.D. Fla.) (Sept. 21, 2018) ("September 2018 Timeline Submission"). These actions included: improved and more consistent root cause analyses; improved and more consistent investigation reports; improved investigations training; improved and more consistent methodologies for conducting investigations; and improved processes for identifying and sharing lessons learned across the fleet and managing risk areas. *Id.; see also* DNV GL Investigations Assessment at PCL_ECP00052035-39. The Company also announced its plan to create a new, independent department at All Brands Group that would be responsible for significant HESS investigations. *See* Letter from Environmental Corporate Compliance Manager, *Company's Proposed Change to Maritime Investigations & Modification of the ECP* (Sept. 5, 2018), at PCL_ECP00067415.

As described in prior CAM reports, the Company did not meet its initial self-imposed deadlines for improving the investigations function described in the September 2018 Timeline Submission. The Company did not launch the Incident Analysis Group until March 2019, and, at that time, the revised procedures/guidance and trainings to support the new department remained pending. To lead the Incident Analysis Group and implement the recommendations from the September 2018 Timeline Submission, the Company hired a former official from the United States National Transportation Safety Board, who began work in March 2019. Approximately five months later, in August 2019, under the leadership of the new Vice President of the Incident Analysis Group, these recommended actions were still pending. The Company pushed the target

completion dates for the revised investigation procedures, guidance, and training to September 2019.  *See* Court Appointed Monitor Communication – *Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), PCL_ECP00134957-62.  The Company also missed these revised target dates.  As discussed below, however, the Company launched an in-person systemic (root) cause analysis training course for Incident Analysis Group investigators, developed by an outside consultant, in November 2019, and published revised investigation procedures and associated guidance materials in late February 2020 (including a guidance manual that has since been withdrawn).[113]

### 3.    Revised Investigation Procedures

On February 27, 2020, months after the extended target deadline of September 2019, the Company published a set of revised investigation procedures and associated materials, including guidance, report templates, and other appendices.  As discussed in the most recent CAM Quarterly Report, these materials included:

- **Incident Analysis Procedure:**  This procedure outlines processes for investigations, including:  event severity classification; investigation assignment; near miss events; operating group-led incident analyses; Incident Analysis Group-led incident analyses; reporting; corrective and preventive measures; and incident analysis tracking ("Incident Analysis Procedure").  *See HMP 1302 Incident Analysis Procedure* ("HMP 1302");

- **Incident Analysis Risk Matrix:**  This risk matrix appendix provides guidance on classifying events according to three levels of severity:

  - Level 1 (ship-led investigation);
  - Level 2 (brand/operating group-led investigation); or
  - Level 3 (Incident Analysis Group-led investigation)

---

[113] As of the date of this Report, the Company continues to work on finalizing its new procedures for investigator accreditation and competency development.  These had a target completion date of September 16, 2019.  *See* CAM March 2020 Quarterly Report at 88; Court Appointed Monitor Communication – *Twelfth & Thirteenth Requests for Documents and Information* (Sept. 13, 2019), at PCL_ECP00134961; Employee Interview/Call Notes.

July 13, 2020

("Incident Analysis Risk Matrix").  *See HMP 1302-A Internal HESS Incident Analysis Matrix ("HMP 1302-A")*;

- **Investigation Scoping Template:**  This template appendix is a form for determining the scope of an investigation, with questions ranging from basic factual information, such as ship name and time of event, to more substantive information, such as the objective of the investigation and similar prior incidents.  *See HMP 1302-B Scope of Investigation Template*;

- **Near Miss Worksheet:**  This spreadsheet appendix is a screening tool designed to assist in determining whether a near miss event warrants an investigation ("Near Miss Worksheet").  *See HMP 1302-C High Potential Worksheet ("HMP 1302-C")*;

- **Preliminary Report Template:**  This report template appendix provides basic formatting and content instructions for preliminary investigation reports ("Preliminary Report Template").  *See HMP 1302-D Preliminary Report Template*;

- **Final Report Template:**  This report template appendix provides basic formatting and content instructions for final investigation reports.  It is more detailed than the Preliminary Report Template and includes a section for preventive actions.  *See HMP 1302-E Final Report Template*;

- **Report Distribution List:**  This appendix contains distribution lists for the individuals within the Company (both at All Brands Group and within the brands/operating groups) to whom preliminary and final investigation reports should be circulated.  *See HMP 1302-F Report Distribution List*;

- **Investigation Manual:**  This appendix consists of a guidance manual for planning and conducting investigations, including evidence gathering, interviews, and report writing") ("Investigation Manual").  *See HMP 1302-G Investigation Manual ("HMP 1302-G")*;[114] and

- **Continuous Improvement from Lessons Learned Procedure:**  This procedure describes processes for incorporating lessons learned from internal and external audit findings, HESS events, near misses, and incident analyses into Global HESS procedures, as well as processes for communicating lessons learned to management and the ships, as part of continuous improvement efforts ("Continuous Improvement from Lessons Learned Procedure").  *See HMP 1303 HESS Procedure Continuous Improvement from Lessons Learned ("HMP 1303")*.

---

[114] As discussed below, this Investigation Manual was withdrawn in June 2020 for further revision.

July 13, 2020

As the CAM has observed, these procedures are more comprehensive than previous drafts reviewed by the CAM Team, and seek to provide steps for how to proceed through an investigation, as well as processes for continuous improvement.  *See* CAM March 2020 Quarterly Report at 80-84.  However, as discussed below, the Company's approach to investigations, including its procedures, continues to be a work in progress.

In June 2020, the Company revised the Incident Analysis Procedure to emphasize:  the independence and authority of the Incident Analysis Group; the importance of identifying systemic (root) causes that may go beyond ship operations and relate to shoreside management; and the Company's commitment to applying "just culture" principles and avoiding a blame culture approach.[115]  The following language was added near the beginning of the procedure:

> It is emphasized that ***the Incident Analysis Group shall be considered independent and that the Incident Analysis Group and Company investigators hold sufficient authority to follow wherever an incident analysis takes them***.
>
> During an analysis, ***consideration should be given to make further enquiries beyond the shipboard operation***.  Should evidence indicate corrective or preventive actions belong in the company management ashore, then the investigator should follow those indications.  The ***root cause analysis should not be assumed to be concluded onboard but that it may well continue ashore***.
>
> ***Incident analyses will be performed adopting the principles of Just Culture***.  Blame will not be apportioned, rather the aim is to ascertain why an incident occurred and how to prevent its reoccurrence.  However, if the analysis reveals intentional wrongdoing by an individual or individuals either onboard or ashore, this shall be recorded as part of the analysis report.

HMP 1302 at § 1 (emphasis added).

---

[115] As explained in prior CAM reports, a blame culture is defined as the tendency within an organization to look for a person or persons that can be held responsible or blamed for an adverse event; as opposed to a just culture, in which an organization, while appropriately holding individuals accountable, also holds itself accountable for how systems or approaches it designs and implements contribute to unwanted behaviors and adverse events.  *See* CAM First Annual Report at n.26.

July 13, 2020

While laudable, whether and how the concepts in this revised language will be carried out in practice remains to be seen, as discussed below.

### a) Investigation Assignments

The revised Incident Analysis Procedure provides a high-level overview of the process for assigning and initiating investigations. *See* HMP 1302. But many elements of the process remain unclear. For instance, under the plain language of the procedure and its appendices, it is unclear whether or how ship leadership will be trained to classify incident severity per the Incident Analysis Risk Matrix, *see* HMP 1302-A, or to identify near misses that should be investigated per the Company's Near Miss Worksheet. *See* HMP 1302-C.[116]

Further, once incidents are classified under the Incident Analysis Risk Matrix or Near Miss Worksheet, and reported under the Company's reporting procedures (*i.e.*, *COM 1101 Reporting Of Hess And Operational Events, Near Misses And Ship Inspections*, *COM 1102 Marine Casualties*, *COM 1103 United States Environmental Reporting Requirements*, and any applicable operating group-specific procedures), it is not clear how, or which, incidents are routed to the Incident Analysis Group for investigation. As described in the most recent CAM

---

[116] The Near Miss Worksheet does not identify criteria, resources, or other guidance to answer the following types of questions that it presents:

- How far the incident was from being a loss (*i.e.*, remote to more than 2 steps)?
- The learning value of the incident (*i.e.*, useful to the entire Company, department, ship, or no learning value)?
- Whether the near miss is visible before it leads to an accident (*i.e.*, with great difficulty, some insight, obvious, or widely known)?
- The value of the near (*i.e.*, with respect to current, future, or past operations)?
- Was this a repeat or similar event within the same operating company?
- [Potential value of] Property damage/Assets?
- [Effect on] Environmental release/exceeding standards?
- [Impact on] Reputation?

*See* HMP 1302-C.

July 13, 2020

Quarterly Report, under the revised Incident Analysis Procedure, Vice Presidents and Corporate Compliance Managers remain responsible for monitoring "all hotline and Fleet Operations Center reports on a daily basis to maintain awareness of potential incidents that may warrant incident analysis by [the Incident Analysis Group]." HMP 1302 at § 3.2. "Pertinent reports" are then routed to the Chief Ethics & Compliance Officer, Chief Maritime Officer, and relevant Corporate Compliance Managers for "incident analysis decision[s]." *Id.* It is not clear which types of incidents are routed for this shared "incident analysis decision" process, or whether it is performed for every Level 3 (Incident Analysis Group-led) incident, the elevation of significant Level 2 (brand/operating group-led) and near-miss incidents, or both. *See* CAM March 2020 Quarterly Report at 84-85.[117]

b) *Investigation Manual*

Initially, an Investigation Manual accompanied the revised Incident Analysis Procedure that was published in late February 2020. *See* HMP 1302-G. The Investigation Manual was described as guidance on how to perform an investigation once assigned. *See id.* A review of the Investigation Manual by the CAM Team and TPA indicated that a significant portion of its content appeared to be copied (sometimes word-for-word) from external sources, including a manual from the Marine Accident Investigators' International Forum, *see MAIIF Investigation Manual* (2014), as well as copyrighted materials from the TPA's corporate parent, the American Bureau of Shipping.

---

[117] In its comments on the draft March 2020 Quarterly Report, the Company recognized that "Global HESS procedures can more clearly describe the extent of the [Chief Ethics & Compliance Officer's] authority, and Carnival will update those procedures." *See* Company Draft Report Comments. As noted above, the Company has since revised HMP 1302, but the recent revisions do not materially affect the CAM's prior analysis.

July 13, 2020

The CAM Team shared these and other concerns about the Investigation Manual with the Company. Pulling from multiple different source materials resulted in a Manual that was disjointed, often vague, and lacking clear and practical guidance that reflected the Company's unique operations. Further, the source materials primarily relate to safety investigations, and do not address the full breadth of investigations that Company investigators will undertake.

In response to these critiques, in June 2020, the Company withdrew the Investigation Manual from Global HESS and has committed to creating a "bespoke" Investigations Manual for all levels (Levels 1-3) of investigations and for "all areas: [International Safety Management Code], Financial, Legal, HR, etc." *See* Draft Pause Priorities Plan at PCL_ECP00166545.[118]

### c)  *Incident Analysis Group Independence and Authority*

As noted above, the Incident Analysis Procedure was revised in June 2020 to include statements that "the Incident Analysis Group shall be considered independent," and that "the Incident Analysis Group and Company investigators hold sufficient authority to follow wherever an incident analysis takes them." HMP 1302 at § 1. The recently revised DOJ guidance on corporate compliance programs notes the importance of taking steps "to ensure investigations are independent, objective, appropriately conducted, and properly documented." DOJ Corporate Compliance Guidance at 7. However, as of the date of this Report, the Incident Analysis Group's ability to operate as an independent function with sufficient authority remains in question.

---

[118] It is unclear whether the Company intends to create a single unified Investigations Manual or several Manuals specific to individual areas. The CAM Team's concerns about the rescinded Manual, however, were not intended to suggest that multiple Manuals are needed, only that the guidance should be tailored to performing compliance investigations in the context of the Company's maritime operations.

July 13, 2020

For example, Incident Analysis Group investigation reports are subject to review by various members of senior management, as well as subject matter experts, at All Brands Group and the brands/operating groups before finalization.  *See* Employee Interview/Call Notes; HMP 1302 § 3.6.2.  There are, however, no formal criteria or guidance for this review.  The lack of guiding criteria increases the risk that All Brands Group or brand/operating group management may seek to refute or revise damaging or unwanted findings and recommendations.  Experience with the brands pushing back on unwanted investigation and audit findings has been widely reported to the CAM Team.  *See* Employee Interview/Call Notes.  Such pushback—or the fear of encountering such pushback—frustrates investigators and could lead to "negotiated" findings that make it less likely that investigators will identify or address potential systemic causes, including causes that could hold shoreside management accountable.

Further, the fact that this review process is deemed necessary appears to reflect concerns about the quality of Incident Analysis Group investigations, and whether the department is sufficiently resourced with skilled personnel.  As DOJ notes, a "hallmark of a compliance program that is working effectively is the existence of a *well-functioning and appropriately funded* mechanism for the timely and thorough investigations of any allegations or suspicions of misconduct by the company, its employees, or agents."  DOJ Corporate Compliance Guidance at 16 (emphasis added).

In addition, the Company announced that it would establish an Advisory Council, made up primarily of brand/operating group representatives, to "oversee" the Incident Analysis Group.  *See* Draft Pause Priorities Plan at PCL_ECP00166546.  The CAM expressed concerns that placing oversight of investigations under the control of an Advisory Council would be unlikely to produce the independent and effective investigative function the Company asserts that it seeks,

July 13, 2020

along with concerns that there was no guidance or criteria setting forth the Council's mandate or defining the scope of the Council's oversight.  In response to these concerns, the Company has stated that the Advisory Council "will be changed to a Working Group in order to clarify that the purpose[] of the group is to provide guidance on investigative process, not to oversee the work of [the Incident Analysis Group], or to influence any particular investigations."  *See* Company Comments on Draft Report.  The Company also states that it will "issue a revised HESS procedure that clarifies the independence of [the Incident Analysis Group]."  *See id.*  At this time, it is not possible to determine if these changes will address the CAM's concerns.

### d)  *Continuous Improvement from Lessons Learned*

The Company's new Continuous Improvement from Lessons Learned Procedure "describe[s] the processes through which [HESS] management system procedures are continuously improved by incorporating lessons learned from internal and external audit findings, HESS events, near misses and incident analyses, and to describe how lessons learned are to be communicated to management and the fleet."  *See* HMP 1303.[119]  The procedure identifies three components of the "continuous improvement process of HESS management system procedures and communication of associated lessons learned":

- **Incident Analysis and Trending:**  Analyzing "trends from HESS audit findings and incidents to identify and incorporate improvements into HESS procedures";

- **Incorporating Preventive Actions into Procedures:**  Incorporating "preventive actions from HESS incident analysis reports into HESS procedures"; and

- **Sharing Lessons Learned:**  Communicating "lessons learned from HESS events (incidents and near misses), analysis preventive actions and audit findings to management both ashore and onboard, as well as the Board of Directors."

---

[119] The procedure addresses, in part, one of the original May 2018 DNV GL recommendations: to implement methods for tracking and trending information across the fleet to identify and manage key areas of risk.  *See* DNV GL Investigations Assessment, at PCL_ECP00052035-39.

*See* HMP 1303 at § 3.

Overall, the procedure reflects an effort to improve information sharing across the organization to enable continuous improvement.  However, many aspects of its implementation remain vague, including details about how incident analysis and trending (including of investigation findings) will be performed, and how lessons learned will be shared.

### i.   INCIDENT ANALYSIS AND TRENDING

The procedure states that "[a]nalyzing audit findings and trends, as well as HESS incidents, near misses and analysis results is an effective and important means to identify opportunities to improve the HESS management system."  *Id.* at § 3.1.  However, details about how this analysis and trending will be performed, including the extent to which it will encompass investigation findings, is unclear.

The procedure requires three types of analysis and review, none of which specifies how investigation findings will be tracked, analyzed, or trended:

- **Audit Findings:**  RAAS must "conduct an analysis and review of internal and external audit findings" on a quarterly basis, and report its findings to the Chief Ethics & Compliance Officer, Chief Maritime Officer, operating group Executive Vice Presidents, and Operating Company Ethics & Compliance Officers.  *Id.*  Operating Company Ethics & Compliance Officers must "review all analysis reports for their brand/group with a focus on ensuring preventive actions have been implemented."  *Id.*  This quarterly RAAS analysis appears to be limited to audit findings, and does not appear to include investigation findings.  *See id.*;

- **HESS Events:**  The All Brands Group Maritime Policy & Analysis group must "conduct an analysis and review of HESS events" on a quarterly basis, including: trends across incident types; identified causation patterns (*e.g.*, equipment failure, poor communication, lack of training); and common weaknesses in HESS controls (*e.g.*, inadequate maintenance, inadequate procedures, poor risk awareness).  *Id.*  The CAM Team understands that this analysis is based on HESS events that are reported from the ships and stored in the Company's SeaEvent incident reporting database.  *See* Employee Interview/Call Notes; *see also supra*, Part III.H.2.a(ii) (discussing SeaEvent).

July 13, 2020

As of the date of this Report, however, trending of this data has not yet been performed, and the Company continues to refine and tweak the data that SeaEvent tracks. *See id.* In particular, the extent to which SeaEvent allows for the consistent tracking and trending of specific investigation data or findings from Level 1 and 2 investigations remains unclear. *See id.* Notably, there is currently no centralized repository of Level 3 investigation data or findings, and any trending or tracking of such information must be performed manually. The CAM Team understands that no such analysis has yet been performed. *See* Employee Interview/Call Notes. *See id.*; and

- **Level 1 and 2 Incidents:** On a weekly basis, the Health/Safety/Security Corporate Compliance Manager, Vice President of the Incident Analysis Group, and Senior Director of the Incident Analysis Group must "extract a report from SeaEvent of severity level 1 and 2 incidents that were entered into the system during the previous week" to "assess the potential need for analysis of incidents." HMP 1303 at § 3.1. However, the procedure does not provide details on how this review is to be performed, including criteria for determining when a Level 1 or Level 2 incident presents a "potential need for analysis." *See id.* As noted above, the extent to which data or information on investigation findings would be included in the SeaEvent reports that are reviewed is unclear.

### ii.   SHARING OF LESSONS LEARNED

The procedures list a range of "types of communications" that "must be used as appropriate to communicate lessons learned from HESS events and associated analyses." *Id.* at § 3.3. These include:

- **Fleetwide Communications of Preliminary Investigation Findings:** Communications to the ships of preliminary investigation findings when those findings "suggest a need to issue an immediate communication to the fleet regarding preliminary incident lessons learned and/or the need to take any immediate risk-mitigating actions." *Id.* at § 3.3.1;

- **Safety and Environmental Awareness Bulletins:** Quarterly Safety and Environmental Awareness Bulletins "distributed to shoreside and shipboard senior management" which provide "factual information pertaining to recent marine safety, technical safety and environmental incidents and near misses that took place on Company ships" to "raise awareness of the general circumstances, contributing factors and root causes surrounding these incidents and near misses in order to improve operations, reduce risk and prevent future incidents." *Id.* at § 3.3.4. Shipboard management teams must review the bulletins to "determine if similar incidents could occur on board their ships and if so, are to take appropriate preventive actions to reduce recurrence, and to document such actions." *Id.*; and

July 13, 2020

- **Case Studies:**  Short (1-2 page) documents which, as "part of preventive action implementation or at the direction of the [Chief Maritime Officer]," will be incorporated into the CSMART training curriculum.  *Id.* at § 3.3.5.

Overall, however, the procedure does not specify clear, routinized processes for determining when and how such communications are issued.  For example, for fleetwide communications of preliminary investigation findings, the procedure identifies at least four individuals from All Brands Group and the relevant brand/operating group, in addition to relevant subject matter experts, who jointly review preliminary investigation reports and determine whether a communication is needed.  *See id.* at § 3.3.1.  Then, a subset of those individuals determines the "type of communication needed and the appropriate communication distribution type."  *See id.*  This appears to be a largely ad hoc process, with no one individual or department having clear ownership over the critical task of ensuring the consistent, effective sharing of lessons learned.

### 4.   Investigation Reports

The CAM Team has continued to review investigation reports for HESS incidents prepared by the Incident Analysis Group, as well as the brands/operating group and ships.  As with past reports, the factual and technical assessments in these reports vary in rigor and quality. *See* CAM March 2020 Quarterly Report at 88.

#### a)  Systemic (Root) Cause Analysis

DOJ emphasizes that "a hallmark of a compliance program that is working effectively in practice is the extent to which a company is able to conduct a thoughtful root cause analysis of misconduct and timely and appropriately remediate to address the root causes."  DOJ Corporate Compliance Guidance at 17.  Investigations should be "used to identify root causes, system vulnerabilities, and accountability lapses, including among supervisory managers and senior

July 13, 2020

executives." *Id.* at 16.  It is important to evaluate:  "How high up in the company do investigative findings go?"  *Id.*  And:  "Were any systemic issues identified?"  *Id.* at 17.

i.  INVESTIGATION REPORTS

The CAM Team's review of the Company investigation reports indicates that, in general, the reports continue to focus on direct or proximate causes of an incident, without also sufficiently identifying or addressing broader, systemic (root) causes.[120]

For example, a February 2020 Incident Analysis Group investigation report for an incident on a Princess Cruise Lines ship involving the discovery of duplicate, partially completed Oil Record Books identified issues of blame culture (fear of making a mistake) and high workload (distractions in the engine control room) as contributing to the incident, but failed to: assess the impact of these potential systemic issues on the incident; provide corrective or preventive actions designed to address these issues; or undertake a further investigation of All Brands Group or the brand/operating group to examine these issues.  *See* CAM March 2020 Quarterly Report at 139-40 (discussing incident); *Final Report, Partially Filled Oil Record Books*, IAG2019058 (Feb. 5, 2020).  The investigation report found that the duplicate Oil Record Books "were not started to intentionally change entries or to hide illegal transfers/discharges," but were created "due to mistakes that were made in the originals," and "a perceived pressure not to make mistakes."  *Id.* at 1, 4, 6.  The report also noted that "the engineers stated that they were distracted by alarms and phone calls which caused the errors," and that the Chief Engineer believed that distractions in the engine control room were leading to mistakes.  *See id.* at 1.  The report further noted that distractions were a problem in prior similar incidents, but did not make

---

[120] Increasingly, however, the reports do include discussions of similar prior incidents, including incidents on other Company ships, which may be useful in identifying incidents that have potential common systemic cause(s).

July 13, 2020

recommendations or initiate further inquiries related to these observations aimed at discovering why these distractions were occurring elsewhere as well.  Instead, the report recommended only two preventive actions:  (1) to revise the relevant Global HESS procedure to include a process for closing an Oil Record Book should it need to be closed prior to completion; and (2) to issue a case study regarding the incident.  *See id.* at 7.[121]

ii.   INVESTIGATOR NOTES

The CAM Team reviewed investigator notes from seven Incident Analysis Group investigations finalized during the first half of 2020.  These records generally reflect the CAM Team's concerns that the Company's investigations are not performed in a way that would support the identification of systemic (root) causes.

Based on the CAM Team's review, the majority of the notes appear to focus on interviewees' recollections of events leading up to, during, and after the incidents.  It is unclear whether or how the investigators sought to identify or understand potential underlying, systemic causes of the incidents.

A minority of the notes, however, indicate at least some limited follow-up regarding broader issues, such as training and fatigue.  For example, in an investigation regarding an emissions violation, the investigator asked a senior engineer about "any issues that could have affected the [junior] engineer: like stress, fatigue, experience?"  *See* PCL_ECP00166460-64.  However, it appears that even when investigators asked questions about these issues, follow-up opportunities may have been missed.  In that same investigation, the senior engineer responded

---

[121] The report also does not examine other implications of this incident—including the possibility that an Oil Record Book not created in accordance with United States law might have been presented to United States regulatory authorities.  The CAM notes that the Company's underlying criminal convictions in the current case include multiple counts of failure to maintain accurate records.  *See* Dkt. No. 30; *see also* CAM First Annual Report at 8-11.

that the junior engineer "is the only female engineer and may feel excluded." *Id.* Based on the available records, it does not appear that the investigator followed up on this potential issue, and the comment was not included in the final report. *Id.* The root cause in the final report was identified as the junior engineer's "attention slip." *Final Report, [Emission Control Area] Violation,* IAG2019044 (Apr. 2, 2020), at 1. This appears to be a missed opportunity to probe deeper into issues of diversity and inclusion that may be systemic within the Company. *See also infra*, Part VII.A (discussing diversity and inclusion issues).

### b) Just Culture v. Blame Culture

The Company's investigation reports continue to focus on the identification of individual errors and direct or proximate cause—a sign of a potential blame culture, as opposed to just culture, approach. Under a just culture approach, individual accountability is important (especially if there has been intentional wrongdoing), but a focus on individual errors without also identifying or addressing potential systemic causes can foster a culture of blame and fear, attributes of the Company's culture found throughout its brands in the Propel Environmental Compliance Culture Assessment. *See* Environmental Compliance Culture Assessment Report at 3-4; CAM September 2019 Quarterly Report at 19-22. Examples of findings from recent investigation reports reflecting a potential blame culture approach include:

- "The investigation concluded that the root cause of the incident was the staff captain's reliance on his experience with and trust in the bosun and deck crew to manage potential risks." *Final Report, Paint Raft Tilting*, IAG2020010A (Apr. 17, 2020), at 1;

- "The root cause of the incident is the failure of the engine team to identify the planned workload during the pre-cruise technical meeting and the daily meeting." *Final Report, Overflow of Permeate While in Port*, IAG2020006 (Apr. 2, 2020), at 1;

- "The root cause of the wire damage was due to the recovery team starting to heave the tenderboat from the water without checking the davit wire for correct position in

July 13, 2020

the tilting sheave." *Final Report, LSA Failure*, IAG2019048 (Mar. 30, 2020), at 2; and

- "The root cause of the incident was an attention failure of the 2nd engineer to respond to gray water tank 11 port high level alarm." *Final Report, Grey Water Discharge Overboard*, IAG202019042 (Oct. 29, 2019), at 1.

Even a casual reader of investigation methodology literature would read these summaries and observe that they have not fully explored why the failures occurred, as each of these "root cause" findings begs the addition of at least one more "why" question.

Like the investigation reports, the case studies that are sometimes circulated after an investigation is completed also tend to focus on individual errors rather than broader, systemic causes.  For example, the "Why It Happened" section for the case study related to the "Grey Water Discharge Overboard" incident listed above states that the incident was caused by an engineer who acknowledged an alarm indicating that the level of grey water in a tank was getting too high, but "did not take action or share the information" with the rest of the engineering team because he believed the alarm "was inaccurate as he had received false high level alarms from another grey water tank in the past." *Non-Compliant Grey Water Spill,* Case Study #03-2020 at 1.  As with the investigation report, the case study lists the cause as the engineer's error (failure to act on an alarm) without examining or addressing potential systemic causes, such as high workload/distractions, alarm fatigue, and issues of ship system/equipment design resulting in multiple prior false alarms.

### 5.    Auditing the Investigation Function

The Company has not yet implemented a comprehensive process for auditing the effectiveness of its investigations function.  Currently, this is addressed to a limited extent.  For instance, during ship and shoreside audits, RAAS reviews the status of action plans for completed investigations involving the relevant ship or office/facility, including whether action

items have been completed and closed out in a timely manner.  *See HMP 1301-A1 Shipboard HESS Audit Work Steps* at 107-08; *HMP 1301-A2 Office HESS Audit Work Steps* at 24.  RAAS can also issue repeat findings to target recurrent issues.  *See id.*

However, RAAS does not currently audit the effectiveness of the Incident Analysis Group investigation procedures or processes.  The CAM understands that the Company has targeted 2021 for RAAS to begin performing audits of the Incident Analysis Group function.  *See* Employee Interview/Call Notes.

6.   Investigation Training

As discussed in prior CAM reports, the Company took steps to improve its investigation training during ECP Year Three, including for Incident Analysis Group, brand/operating group, and ship investigators.

For Incident Analysis Group investigators and management, the Company held a week-long causal analysis training in its Miami, Florida, offices in November 2019.  *See* CAM March 2020 Quarterly Report at 85-86; CAM December 2019 Quarterly Report at 46-47.  The training was conducted by MTO Safety, an outside consultant retained by the Company.  In February 2020, the Company held an additional, abbreviated version of the course for management in its Miami, Florida, offices, which the CAM Team attended.  Overall, the training appeared to provide good analytical methods and tools, with a skilled and highly experienced instructor.[122] Before COVID-19, the Company intended to provide this training course at its CSMART

---

[122] However, the CAM has continued concerns that attendance at a single training course—even a multi-day course—will not make investigators proficient at performing effective causal analysis without additional, ongoing coaching and mentoring by experienced professionals with expertise in causal analysis.  As discussed above, the CAM Team's ongoing review of Incident Analysis Group investigation reports indicates that these reports still repeatedly fail to sufficiently identify or address potential systemic causes.

facility.  However, these plans are on hold in light of the closure of CSMART to all in-person training courses, likely until at least April 2021.  *See infra*, Part VII.B.

For shipboard and shoreside personnel that conduct "less significant" HESS investigations, the Company rolled out a computer-based training module on root cause analysis in December 2019.  *See* CAM March 2020 Quarterly Report at 87; CAM December 2019 Quarterly Report at 47; *TRG 1101 Root Cause Analysis Training*.  The short course, which can be completed in approximately 30 minutes, focuses on the "5 Why Methodology" for performing root cause analysis.  Overall, the computer-based training appears to offer a good introduction to incident analysis.  However, inexperienced investigators would likely need additional training, and/or a more complete investigations manual, to be able to conduct a thorough investigation.[123]

### 7.    COVID-19 Impacts

As with other areas of the Company's operations, the COVID-19 pandemic has impacted the investigations function.  This includes significant personnel impacts:  five out of eight Incident Analysis Group investigators were either laid off or furloughed as a result of staff reductions.  In addition, the Vice President of the Incident Analysis Group, who was hired in March 2019 to lead the new department, is no longer with the Company.  The former Senior Director of the Incident Analysis Group has assumed the role of acting Vice President, and it is unclear when this critical position will be filled permanently.  *See* Employee Interview/Call Notes.  As a result, as of the date of the Report, the department lacks defined leadership and a cohesive vision for moving forward.

---

[123] "Judgment and experience are required to use the 5-Whys tool effective to reach management system failures.  The level of analysis is up to the group and does not always ensure reaching root causes."  Center for Chemical Process Safety, *Guidelines for Investigating Process Safety Incidents*, (3rd ed. 2019) at 30-31.

July 13, 2020

In addition, investigators have had to shift to performing remote investigations due to general travel restrictions, as well as Company-specific restrictions on visiting ships and shoreside facilities.  Like remote audits, remote investigations are not ideal because they do not enable the same level of access to physical spaces, equipment, and personnel.

As noted above, the Company is also currently unable to provide in-person training to its investigators due to the closure of the CSMART facility.

Despite these challenges, the suspension of cruise operations presents a unique opportunity for the Company to focus improving its investigations function.  The Company's Draft Pause Priorities Plan includes several investigations-related efforts, including:  creating investigative templates/forms; developing investigator competencies; improving investigator training; developing investigative standards; establishing criteria to evaluate investigators and implement performance reviews; and improving the technical accuracy of investigation reports. *See* Draft Pause Priorities Plan at PCL_ECP00166545-46.  Responsibility for these efforts, however, remains unclear given the current state of uncertainty with Incident Analysis Group structure and staffing.

### 8.     Ongoing CAM Team Examination

The CAM Team will continue to examine the Company's efforts to improve its internal investigations function, including its efforts to address findings by DNV GL, the TPA, and the CAM.[124]  Key areas of focus will be:  (1) the function and structure of the Incident Analysis Group, including its independence, authority, and resources; (2) the revision, implementation, and effectiveness of investigation procedures; (3) the process for identifying and classifying

---

[124] To date, DNV GL's recommendations from its May 2018 Investigations Assessment have largely not been implemented.

matters for investigation, including the individuals responsible for making such determinations and the timeframes for making them; (4) training for Incident Analysis Group, brand/operating group, and ship investigators; (5) the methodologies for systemic (root) cause analysis used by Incident Analysis Group, brand/operating group, and ship investigators; (6) the implementation of corrective and preventative actions and how these actions are monitored for effectiveness; and (7) the process for disseminating investigation results and lessons learned to corporate leadership, including the Boards of Directors, and relevant personnel at All Brands Groups, the brands/operating groups, and ships across the fleet.

### E.   Inadequate Waste Vendor Assessment Program

#### 1.   Overview

As noted in prior CAM reports, the Company acknowledged in 2019, following multiple RAAS and TPA audit findings, that it was not following its own internal procedures requiring the assessment of third-party waste vendors.[125]  *See* CAM December 2019 Quarterly Report at 7, 61-62, 91; CAM March 2020 Quarterly Report at 111, 158.  Not only was the Company failing to follow its own procedures, but it was also acting contrary to statements in its public Sustainability Reports from 2013-2017 assuring the public that "shoreside waste facilities are

---

[125] This Report uses the term "waste vendor" to refer generally to entities or facilities that receive or handle wastes offloaded from the Company's ships at the ports it calls upon around the world. Waste streams that may be offloaded include:  black water/sewage; food waste; garbage/solid waste; hazardous waste (including medical waste); grey water; and oily wastes (*e.g.*, sludge, bilge water, and other oily waste or residues).  Waste vendors may be barges that dock alongside the ship, trucks that remain ashore, or other types of reception facilities.  Wastes may be transferred from the ship to the waste vendor manually (for solid waste streams), via a hose connection (for liquid waste streams), or other means depending on the waste stream.  The Company has a current working list of approximately 600 different waste vendors and visits approximately 900 ports around the world.  *See* Employee Interview/Call Notes.

evaluated prior to offloading the waste from the ships where they are reused, recycled, incinerated, or landfilled." *See infra*, Part IV.E.3 (citations omitted).

On March 25, 2020, the Company published an updated waste vendor assessment procedure and associated materials. Although an improvement from the prior process (which, in some instances, was no process at all), the Company's current program still appears to be inadequate. The vetting process relies almost exclusively on reviewing vendor self-assessments and performing a form of due diligence by searching for media reports. This is the type of "check-the-box" approach that DOJ has cautioned can often be inefficient and ineffective. *See infra*, Part IV.E.5.b (citation omitted).

### 2.   Audit Findings

In ECP Year One, both the TPA and RAAS issued audit findings to Holland America Group shoreside offices related to inadequate waste vendor assessments. During a January 2018 audit, the TPA found that Holland America Group had entered into a contract with a waste vendor but could not provide any evidence "that the due diligence audit was conducted before entering into the agreement," as required by then-current Company procedure. TPA Holland America Group Audit Report (Jan. 2018), PCL_ECP00046837-83, at PCL_ECP00046867 (Non-Conformity-08). Shortly thereafter, during a February 2018 audit, RAAS found that Holland America Group had "no waste vendor assessment program in place." RAAS Holland America Group Audit Report (Feb. 2018) (Item 10 – Non-Conformance).

Over a year later, in a May 2019 audit of the Company's All Brands Group offices, the TPA made a finding that the "Company's published Sustainability Report states 'that shore side waste facilities are evaluated prior to offloading the waste from the ships,'" but the Company provided "no evidence . . . to document [that] these evaluations are conducted." TPA Carnival

July 13, 2020

Corp. Audit Report (May 2019), PCL_ECP00123097-118, at PCL_ECP00123108 (Non-Conformity-02).  Months later, in an October 2019 audit of the Carnival Cruise Line offices, the TPA made a similar finding that Carnival Cruise Line had no process for "due diligence checks of waste vendor operations and associated reception facilities."  TPA Carnival Cruise Line Audit Report (Oct. 2019), PCL_ECP00142954-76, at PCL_ECP00142968-69 (Non-Conformity-02).

Two years after its first audit of Holland America Group offices identifying the waste vendor assessment issue, the TPA made yet another finding during a January/February 2020 audit that Holland America Group had not been managing waste vendors "in alignment with the [then-current] procedure" since November 2018.  TPA Holland America Group Audit Report (Jan. & Feb. 2020), PCL_ECP00164056-82, at PCL_ECP00164072 (Non-Conformity-02).

Following these findings, the Company has acknowledged to DOJ and the CAM that "[t]he TPA and the Company's internal [RAAS] audit team have identified that not all Operating Lines" are following "[c]urrent Company procedures [that] require each Operating Line to develop and implement a waste offload vetting program as a Company Policy."  *[Draft] Carnival Corporation's Response to Government's Suggestions Regarding Environmental Performance Metrics* (Oct. 29, 2019), at 3.

The RAAS and TPA audit findings are significant for at least two reasons.  First, they indicate that the Company had not been adhering to its own waste vendor assessment procedures, raising significant concerns about gaps in the Company's compliance management system, as well as providing evidence of the lack of coordination across brands/operating groups and ongoing systemic issues with the Company's waste vendor assessment programs.  Second, they reveal that the Company had been presenting an inaccurate picture of its waste vendor vetting and oversight practices to the public through its annual sustainability reports, despite having

received multiple internal and external audit findings that these practices were not being performed as required.[126]

### 3. Company Sustainability Report Statements

The Company's Sustainability Reports for Fiscal Years 2013 through 2017 state that "shoreside waste facilities are evaluated prior to offloading the waste from the ships where they are reused, recycled, incinerated, or landfilled." *See Sustainability from Ship to Shore: FY2017 Sustainability Report*, at 76; *Sustainability from Ship to Shore: FY2016 Sustainability Report*, at 57; *Sustainability from Ship to Shore: FY2015 Sustainability Report*, at 44; *Sustainability from Ship to Shore: FY2014 Sustainability Report*, at 46; *see also Sustainability Report: FY2013 Sustainability Report*, at 52.[127]

Notably, however, the Company's most recent report for 2018, released in June 2019, uses different language.  It states that the Company aims to "[f]urther develop and implement [waste] vendor assurance procedures," but stops short of saying that waste vendors "*are* evaluated prior to offloading the waste from the ships," as had been stated in prior years.  *See Sustainability from Ship to Shore: FY2018 Sustainability Report*, at 12 (emphasis added).

### 4. Incident Reports

During ECP Year Three, the Company has reported over 90 incidents involving its waste vendors.  These include numerous incidents where black water/sewage, grey water, oily

---

[126] While relevant law does not appear to impose a legal obligation on the Company to perform waste vendor due diligence, the Company has incorporated waste vendor assessment requirements into its Environmental Management System procedures in Global HESS, and compliance with those procedures is audited by international certification bodies.  Further, making inaccurate statements in its sustainability reports may have implications for the Company's Environmental, Social and Governance, or ESG, ratings.

[127] The Fiscal Year 2013 report contains a truncated version of the quoted language, stating that "shoreside waste facilities are evaluated prior to offloading the waste from the ships."  *Id.*

wastes/sludge, or other waste streams have been inadvertently discharged into the sea during waste offload operations due to an error or equipment failure attributable to the waste vendor (such as a leaking hose, a failure to timely notice and respond to an overflowing reception tank/receptacle, or carelessness in handling solid waste items).  *See* Internal Incident Log.

The number of reported incidents, however, likely paints an incomplete picture.  The Company's internal reporting procedure only requires reporting of:  (1) ECP violations; (2) non-compliant environmental discharges; (3) environmental violations; (4) pollution prevention equipment issues; and (5) environmental near-misses.  *See COM 1101-A2 Daily Environmental Events Summary*.  The International Maritime Organization has issued guidance stating that ships should report any inadequacies with waste vendors "to the Administration of the flag State and, if possible, to the competent Authorities in the port State."  *Revised Consolidated Format for Reporting Alleged Inadequacy of Port Reception Facilities*, MEPC.1/Circ.469/Rev.2.  However, the Company's internal reporting procedure, COM 1101, does not require internal reporting of inadequacies with waste vendor facilities unless there is an incident that falls under one of the five categories listed above.  As a result, ships could be observing problems with waste vendors but not reporting them through a formal channel.[128]  Based on the CAM Team's review, there does not appear to be any other procedure that establishes a formal mechanism for such reporting.  In practice, the CAM Team understands that some shipboard personnel may send an informal email to shoreside to report inadequacies with a waste vendor (and, at times, have refused to use a vendor because of concerns about how the vendor would handle the ship's

---

[128] The CAM Team's search of the International Maritime Organization's Port Reception Facilities database reveals no inadequate port reception facility reports filed by Carnival Corp. entities with the International Maritime Organization.  *See IMO GSIS: Port Reception Facilities, Reported Cases of Alleged Inadequacy*.

waste), but there appears to be no standardized process for such reporting or for following up on such reports.  *See* Employee Interview/Call Notes.

5.   Revised Waste Vendor Assessment Procedure

*a) Overview*

On March 25, 2020, following a review of its pre-existing waste vendor assessment procedure and associated processes (or lack thereof) with support from subject matter experts from across the brands, the Company published an updated waste vendor assessment procedure and attachments.  The revised suite of procedures includes:

- **Revised Waste Vendor Assessment Procedure:**  The main procedure for performing waste vendor assessments ("Revised Waste Vendor Assessment Procedure"), which requires ships, "starting 01 July 2020," to "offload only to waste vendors . . . whose waste management practices for that waste stream have been identified as 'preferred' or 'acceptable.'"  *See ENV 1004 Environmental Management of Waste Vendors* ("ENV 1004").  As described below, the "preferred" and "acceptable" categories apply to vendors whose risk profiles indicate minimal risk for the environment.  *See id.*;

- **Approved Waste Vendor List:**  The list of approved "preferred" and "acceptable" vendors, as described by ENV 1004 ("Approved Waste Vendor List").  The Company has not yet published its Approved Waste Vendor List.  *See ENV 1004 A1 List of Vendors* ("ENV 1004 A1");

- **Waste Vendor Self-Assessment Form:**  A questionnaire submitted to potential waste vendors to aid in the assessment of each vendor's risk profile ("Waste Vendor Self-Assessment Form").  *See ENV 1004-A2 Duty of Care – Self Assessment Form*; and

- **Decision Tree Guidance:**  Guidance for the review of a waste vendor's risk profile ("Decision Tree Guidance").  *See ENV 1004 A3 Waste Service Compliance Decision Tree* ("ENV 1004 A3").

The Revised Waste Vendor Assessment Procedure requires the Company to assess all waste vendors by June 30, 2020, and categorize each vendor into one of the following risk profile categories:

- Preferred, meaning that "[v]endor waste handling practices for the applicable waste stream are environmentally sustainable and pose minimal risk for the environment."

July 13, 2020

*See* ENV 1004 .  Offloads to preferred vendors "are encouraged as vendor's waste management practices have been identified by Carnival as the best environmental option."  *Id.*;

- Acceptable, meaning that "[v]endor waste handling practices for the applicable waste stream pose a minimal risk for the environment."  Offloads to "acceptable" waste vendors are "allowed."  *Id.*;

- Contingent, meaning that "[v]endor waste handling practices for the applicable waste stream poses a higher risk for the environment."  *Id.*  Offloads to contingent waste vendors "can occur with agreement from the operating company Shoreside management on a case by case basis" with prior approval.  *Id.*; or

- Unapproved, meaning that "[v]endor waste handling practices are unacceptable from a risk standpoint and the environment."  *Id.*  Offloads to unapproved vendors are prohibited.  *Id.*

The Company has developed a multi-part process for performing the waste vendor assessments.  This process includes: (1) review of vendor responses to the Waste Vendor Self-Assessment Form; (2) due diligence searches for negative media reports pertaining to the vendor; and (3) in limited circumstances, in-person site visits to the vendor.  Relevant factors for consideration during the review of a vendor's risk profile include: past violations; insurance and licensing; facility accessibility and visitation permissibility; waste removal methodologies; and third-party audits.  *See* ENV 1004 A3.

For the first step in the process, the individual brands perform an initial review of the completed Waste Vendor Self-Assessment Forms.  This initial review is done in accordance with the Decision Tree Guidance, and may include additional steps, such as identifying areas that require further review or additional information from the vendor.[129]  *See* ENV 1004 A3.

---

[129] The CAM Team understands that the Company is in the process of screening approximately 600 waste vendors.  The Company developed this initial list by requesting vendor candidates from port agents.  The list includes vendors new to the Company, as well as those the Company has used in the past.  *See* Employee Interview/Call Notes.

July 13, 2020

Separately, but contemporaneously, the All Brands Group Environmental Corporate Compliance and All Brands Group Anti-Bribery and Corruption groups[130] conduct due diligence media reviews of these vendors to identify and evaluate risk factors from external sources.[131]

In general, if the initial brand-level review designates the vendor as "preferred" or "acceptable" (*i.e.*, minimal risk for the environment) and the All Brands Group media review does not identify any external risks, then the vendor is added to the Approved Waste Vendor List. *See* ENV 1004 A1. If, on the other hand, the initial brand-level review designates the vendor as anything other than "preferred" or "acceptable," or the All Brands Group media review identifies external risks, then the brand submits the vendor and relevant information to a Waste Vendor Committee for further consideration. The Waste Vendor Committee is composed of at least one subject matter expert representative from each brand, along with representatives from the Ethics & Compliance Department and the All Brands Group Maritime Policy & Analysis group. The Committee reviews the relevant vendor information and determines if the identified risks are acceptable. *See* Employee Interview/Call Notes. Under the revised procedure, vendors must be re-assessed every three years, or sooner if new information emerges through continuous media review. *See* Employee Interview/Call Notes.

Notably, the only time an in-person site visit is required under the new procedure is if the vendor: (1) has prior violations; (2) has an unacceptable risk profile as determined by the Waste Vendor Committee; and (3) the Company is otherwise required to use the vendor. *See* ENV 1004 A3. The procedure, however, generally contemplates that site visits may be used as a form

---

[130] The CAM Team understands that the Company started assessing shoreside waste vendors for Anti-Bribery and Corruption purposes in May 2020. *See* Employee Interview/Call Notes.

[131] The Company uses Navix and LexisNexis for this negative media screening.

of due diligence to develop a vendor's risk profile, but does not provide instruction as to when such visits are advisable or preferable.  In addition, the procedure is silent on the handling of shipboard or shoreside concerns, complaints, or observations about shoreside waste vendor operations or compliance performance.

### b)  CAM Team Assessment

The Company has admitted that it was not performing the comprehensive waste vendor vetting that it claimed in its public sustainability reports.  That is a critical first step in addressing this issue.  Having developed and begun to implement its new procedures and processes is an improvement from the previous practices.  However, the Company's current waste vendor assessment program still appears to be inadequate when reviewed under relevant standards.

For example, Foreign Corrupt Practices Act ("FCPA") guidance published by the DOJ and the World Economic Forum provides a helpful benchmark for what a company's waste vendor assessment program should address.  *See* DOJ, *A Resource Guide to the U.S. Foreign Corrupt Practices Act, Second Edition* (2020) ("DOJ Guide"); World Economic Forum, *Good Practice Guidelines on Conducting Third-Party Due Diligence* (2013) ("WEF Guidelines").  The DOJ Guide and the WEF Guidelines provide similar frameworks for companies to follow when designing and implementing their own risk-based third-party diligence processes.  Generally, the guidelines suggest that companies implement processes to ensure that they:  (1) understand the qualifications and associations of their third parties; (2) confirm that their third parties are performing the work for which they are being paid; (3) undertake ongoing monitoring of their third-party relationships; and (4) inform their third parties of their compliance programs and commitment to ethical and lawful business practices.  *See DOJ Guide* at 62; *WEF Guidelines* at 7-15.

Confirming that the Company's waste vendors are performing their duties properly and in compliance with Company policies and procedures requires more than reviewing self-assessments and searching for media reports.[132]  Site visits may not be practical or necessary in all instances, but, as the DOJ Guide indicates, companies should avoid "[c]ompliance programs that employ a 'check-the-box' approach" because they "may be inefficient and, more importantly, ineffective." *DOJ Guide* at 58.

### 6.   COVID-19 Impacts

The CAM Team understands that, as a result of COVID-19, the Company has adjusted its timeline to complete the assessment and approval of waste vendors, required by July 1, 2020, under the revised procedure.  *See* Employee Interview/Call Notes.  The Company's current plan is to provide a list of those vendors that have been assessed and approved to date, with a focus on vendors that currently service ships in layup.  *Id.*  The Company published its initial list on July 2, 2020.  *See* ENV1004-A1.[133]  Going forward, the Company will "try" to "[a]ssess each waste vendor in accordance with the new procedure, with priorities on early itinerary locations" and "[w]here required, and if feasible, conduct site visits" for higher risk vendors before the ships resume service.  Draft Pause Priorities Plan at PCL_ECP00166542.

In addition, the Company has stated that it is experiencing delays in receiving responses to the Waste Vendor Self-Assessment Forms, and that some waste vendors may no longer be in operation.  *See* Employee Interview/Call Notes.  If ships return to service and vendors for a

---

[132] Southwest Airlines, for example, states in its 2019 One Report that they "audit[] our environmental vendors to verify their operations are compliant and they demonstrate commitment to environmental stewardship."  Southwest Airlines, *2019 One Report*, http://investors.southwest.com/financials/company-reports/one-reports, at 93.

[133] The initial list includes 36 approved vendors in 36 ports.

July 13, 2020

particular port are not currently on the Approved Waste Vendor List, the vessel is expected to complete and submit a Self-Reported Non-Conformity report, *see supra*, Part IV.A.3.c, prior to offloading waste.  *See* Employee Interview/Call Notes.[134]

### 7.   Ongoing CAM Team Examination

The CAM Team will continue to examine the Company's development and implementation of its revised waste vendor assessment program, including its process for selecting, assessing, and approving waste vendors.  This will include examining the extent to which the Company takes advantage of the current suspension of cruise operations to thoroughly assess waste vendors currently in use or likely to be used in early itineraries when ships resume sailing.  As DOJ noted at the April 24, 2020, Court Status Conference:  "We would certainly hope that when the company does begin cruising again, that there has been meaningful vetting, that the company know where the waste that it discharges ashore is going, and that it's being treated properly and not just going back into the ocean."  Status Conf. Tr. at 11 (Apr. 24, 2020).

## F.   Ongoing ECP and Environmental Law Violations

### 1.   Overview

As in prior years, violations of the ECP and environmental laws persisted during ECP Year Three.  The Company has stated that the "fact that violations have occurred does not convey what the Company has learned from the violations to reduce their frequency since an expectation of no violations would be unreasonable."  *See* Company Comments on Draft Report.  The CAM agrees that it would be unreasonable to expect *no* violations in the course of normal

---

[134] The CAM recognizes that these reports will provide the Company with a method to track the use of waste vendors that have not yet been added to the Approved Waste Vendor List.  The CAM notes, however, that given the limited scope of the current Approved Waste Vendor List, the administrative burden of shipboard employees will likely increase if ships increasingly travel to ports that do not include approved waste vendors.

July 13, 2020

operations.  However, these incidents remain concerning, not only because of their impacts or

potential impacts on the environment, but because they continue to reflect broader, systemic

corporate leadership and culture issues that serve as barriers to compliance.  *See* CAM Second

Annual Report at 94; CAM March 2020 Quarterly Report at 137.  As the Company has

acknowledged, "[p]rogress has been made although the Company has [] much more work still to

do."  *See* Company Comments on Draft Report.

      The Company's violations on Covered Vessels reported during ECP Year Three (April

19, 2019 – April 18, 2020) included incidents related to:[135]

- Air emissions, including leaks of ozone-depleting substances from refrigerant gas systems; and emission violations associated with the use of, or failure to use, Advanced Air Quality Systems (discussed further below);

- Discharges to the sea of various liquid and solid wastes, including:  Advanced Air Quality System washwater (discussed further below), ballast water,

      [*Text continues on following page.*]

---

[135] Although this Report, like prior CAM reports, identifies the ships involved in certain incidents, the Company's compliance challenges are not limited to incidents occurring on the named ships.  Such incidents reflect the broader, systemic issues regarding the need to adequately support the ships and take appropriate action on compliance.

blackwater/sewage,[136] chemicals,[137] food waste,[138] grey water, oil and oily wastes,[139] permeate (*e.g.*, treated sewage/grey water),[140] recreational (*e.g.*, pool/Jacuzzi) water, solid items/garbage (including plastics), and treated bilge water;[141]

---

[136] During the final quarter of ECP Year Three, this includes the discovery in February 2020 of: (1) four separate discharges of sewage and grey water totaling approximately 40 cubic meters in Mexican waters between December 2017 and October 2019 by the *Carnival Fantasy* due to a miscalculation of the relevant environmental boundary line, in violation of Company policy. Carnival Corp. HESS Weekly Flash Report (Feb. 19, 2020), PCL_ECP00156030-49 ("Feb. 19, 2020 Flash Report"); Carnival Corp. Special Condition 13(a) Report (Feb. 11, 2020), PCL_ECP00155215; and (2) an unspecified quantity of apparent discharges of untreated sewage and grey water in the Pacifico Mexicano Profundo "core" special area on approximately four prior voyages by the *Emerald Princess* due to an apparent miscalculation of the relevant environmental boundary line, currently under investigation to determine if there was a violation of anything other than Company policy. Carnival Corp. Special Condition 13(a) Report (Mar. 2, 2020), PCL_ECP00157397; Carnival Corp. HESS Weekly Flash Report (Mar. 25, 2020), PCL_ECP00161737-48 ("Mar. 25, 2020 Flash Report"). The Company reports that "it appears other ships have also conducted improper discharges in the Pacifico Mexican Profundo." Mar. 25, 2020 Flash Report at PCL_ECP00161738.

[137] During the final quarter of ECP Year Three, this includes the discovery in February 2020 of the apparent discharge of an unspecified quantity of spent Barbicide disinfectant used in the Spa Department by the *Carnival Horizon* after a Spa crew member reported that the chemical was "being drained into the sink drains" (which drain to grey water tanks that discharge overboard), rather than collected in drums and offloaded ashore. Carnival Corp. Special Condition 13(a) Report (Feb. 18, 2020), PCL_ECP00155557; Feb. 19, 2020 Flash Report. It was determined that "the proper workplace environmental training was not provided to the crewmember," who was on their first contract. *Id.*

[138] During the final quarter of ECP Year Three, this includes the discharge of approximately three cubic meters of comminuted food waste in Barbados waters by the *AIDAluna* on March 20, 2020, in violation of MARPOL Annex V due to a failure to realize that the ship was in a MARPOL Annex V special area. Carnival Corp. HESS Weekly Flash Report (Apr. 8, 2020), PCL_ECP00162764-73; Carnival Corp. Special Condition 13(a) Report (Mar. 30, 2020), PCL_ECP00162136.

[139] During the final quarter of ECP Year Three, this includes the discharge of approximately 13 liters of biodegradable hydraulic oil in Antarctic waters by the Seabourn *Quest* on December 27, 2019, in violation of MARPOL Annex I due to a seal failure attributed to low sea water temperatures. Feb. 19, 2020 Flash Report; Carnival Corp. Special Condition 13(a) Report (Dec. 30, 2019), PCL_ECP00145409.

[140] During the final quarter of ECP Year Three, this includes the discharge of approximately 37 cubic meters of treated sewage (permeate) in Belizean waters by the *AIDAdiva* on February 13, 2020, in violation of Belizean national requirements due to an internal tank overflow. Carnival Corp. HESS Weekly Flash Report (Feb. 26, 2020), PCL_ECP00157363-79 ("Feb. 26, 2020

- Pollution prevention equipment maintenance and operation, including incidents where equipment related to Advanced Air Quality Systems, ballast water treatment systems, food waste management systems, garbage management systems (including incinerators, crushers, and compactors), Oily Water Separator/White Box systems, and sewage treatment systems have been out of service for more than 24 hours,[142] and many more incidents where equipment has been out of service for less than 24 hours.  These incidents represent a significant workload concern even when they do not rise to the level of a regulatory or ECP violation; and

- Recordkeeping, including several incidents of apparent intentional falsifications of ship record books in violation of legal and/or Company requirements, as well as numerous incidents of apparent inadvertent errors in ship record books.  These include:

  o Multiple findings of apparent falsifications of Planned Maintenance System records on different Company ships, where crew members have indicated that work orders for planned maintenance tasks (such as inspections, cleanings, and alarm tests) have been completed when the work has not actually been done.  *See* CAM March 2020 Quarterly Report at 144-45; CAM September 2019 Quarterly Report at 90;

  o The discovery of "three kinds of irregularities in the training records" on the *Carnival Inspiration*:  (1) inaccurate entries in the ship's computerized database that tracks the completion of training; (2) forged signatures on training attendance sheets; and (3) incorrect dating of training attendance sheets.  *See id.* at 90-92 (citations omitted).  An independent outside investigation determined that the Environmental Officer responsible for the "irregularities" appeared "not to have appreciated how important it is that training sessions be given, that records be accurately kept, and that signatures be authentic."  *Id.* at 92 (citation omitted);

  o The discovery of two partially completed Oil Record Books in the drawer of an Environmental Officer's cabin on the *Sea Princess*, which the Incident

---

Flash Report"); Carnival Corp. Special Condition 13(a) Report (Feb. 17, 2020), PCL_ECP00155545.

[141] During the final quarter of ECP Year Three, this includes the discharge of approximately 23.5 cubic meters of treated bilge water "within the buffer zone of the Pacifico Mexicano Profundo Biosphere Reserve" by the P&O Cruises UK *Arcadia* on January 22, 2020, in violation of Company Policy.  Feb. 26, 2020 Flash Report; Carnival Corp. Special Condition 13(a) Report (Jan. 24, 2020), PCL_ECP00148393.

[142] As noted above, the CAM Team identified over 200 incidents during ECP Year Three involving pollution prevention equipment that was out of service for more than 24 hours, including approximately 100 incidents related to oily bilge water management equipment.  *See supra*, Part I.A and Part IV.A.2.b.

July 13, 2020

> Analysis Group determined were started and later replaced with duplicate Oil Record Books due to mistakes in the originals and "a perceived pressure not to make mistakes." *See* CAM March 2020 Quarterly Report at 139-40 (citation omitted).  These "actions breached maritime and Company policy." *Id.* at 140 (citation omitted); *see also supra*, Part IV.D.4.a(i) (discussing incident and investigation findings);
>
> o   The discovery of modified Daily Sounding Logs entries with "randomly adjusted quantities" on the *Carnival Pride*, in violation of Company policy, which the Incident Analysis Group determined was due to an engineer feeling "prompted" by a more senior engineer to modify the records to correct perceived errors and "to avoid any potential audit findings."  *See* CAM March 2020 Quarterly Report at 140-41 (citation omitted); CAM December 2019 Quarterly Report at n.62 (citation omitted); and
>
> o   The insertion of incorrect training dates (embarkation date instead of the actual date training was conducted) in training records on the Holland America Line *Zaandam* by a crew member who said they were "instructed to do so on the previous ships."  *See* CAM March 2020 Quarterly Report at 141 (citation omitted).

*See* Internal Incident Log; *Quarterly Tracking Spreadsheet – Q1 2020* (Apr. 3, 2020); CAM March 2020 Quarterly Report at 137-152; CAM December 2019 Quarterly Report at 85-91; CAM September 2019 Quarterly Report at 86-96; Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

Other incidents tracked by the CAM Team, which do not typically involve violations of the ECP or environmental laws, include:  bilge leaks/overflows; emissions of non-ozone-depleting refrigerant gases; Environmental Control System program (*i.e.*, the seal/lock/weld program to control vulnerable points on ships that could be used for overboard discharges) issues, such as broken or missing seals with no evidence of intentional tampering; and near misses.

These incidents are reported to the CAM Team through formal and informal reporting mechanisms, including:  audit findings (both internal and external); CAM Team visit findings; weekly internal Flash Reports; Environmental Open (Hotline) Reports; Special Condition 13

July 13, 2020

Reports required under the Probation Agreement;[143] notices to the Office of Probation; and other notifications.  *See* Third Annual Work Plan at 7.  The CAM Team continues to track and assess issues associated with these incidents, including issues related to:  shoreside support, such as concerns related to workload/staffing, IT systems, waste vendors, spare parts, training, or policies and procedures; and workplace/culture, such as concerns related to blame culture, retaliation, discrimination, harassment or bullying, or unsafe working conditions.  The CAM also reports to the Interested Parties as required by the ECP.  *See* ECP §§ III.D.6, VI.F.6.

As discussed in prior CAM reports, the CAM Team tracks and analyzes incident report data, but no longer compiles this data in CAM reports.  As the Company has noted, apparent trends in the data may reflect trends in rates of reporting, which can be a positive development, rather than trends in actual incident occurrences.  *See* CAM September 2019 Quarterly Report at 95-96.  Further, as the Court has observed, focusing on individual incidents on ships can distract from the most pressing barriers to compliance, which are the Company's broader culture issues.  *See, e.g.*, Status Conf. Tr. at 5-6 (Apr. 10, 2019).

    2.    <u>Advanced Air Quality Systems</u>

    *a)  Background*

The CAM Team continues to examine issues related to the Company's use of Advanced Air Quality Systems.  *See* CAM March 2020 Quarterly Report at 145-152.  Advanced Air

---

[143] As part of the Probation Agreement, the Judgment in this matter was amended to include a revised Special Condition of Probation 13 that establishes enhanced reporting requirements for the Company.  Among other things, the Company must, under Special Condition of Probation 13(a), inform the Interested Parties, CAM, and TPA of any:  (i) breach of the ECP; (ii) breach of the plea agreement; (iii) violation of the conditions of probation; (iv) violation of any Marine Environmental Protection Requirement; (v) violation of any applicable United States (federal or state) environmental law; (vi) violation of certain international maritime environmental law conventions; or (vii) credible allegations, including Environmental Open (Hotline) Reports, of violations of the ECP or environmental law.  *See* Dkt. No. 134, at 12-13 (Ex. B).

July 13, 2020

Quality Systems, also called Exhaust Gas Cleaning Systems or "scrubbers," remove sulfur oxide compounds from a ship's engine and boiler exhaust gases. *See* EPA, *Exhaust Gas Scrubber Washwater Effluent* (Nov. 2011),

https://www3.epa.gov/npdes/pubs/vgp_exhaust_gas_scrubber.pdf. ("EPA Exhaust Gas Scrubber Report"). The Company's Advanced Air Quality Systems use an "open loop" design, in which seawater drawn from the ocean is used as washwater that is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulfur oxide compounds from the exhaust. *See id.* The washwater is "filtered and mixed with sea water" before being discharged back to the ocean. *See* CAM March 2020 Quarterly Report at 146.[144]

As discussed in recent CAM Quarterly Reports, a new global marine fuel sulfur cap set by the Marine Environment Protection Committee of the International Maritime Organization went into effect on January 1, 2020. *See* CAM March 2020 Quarterly Report at 147-148; CAM December 2019 Quarterly Report at 89-91; MARPOL Annex VI, Regulation 14.1.3. Under the global marine fuel sulfur cap, ships operating outside of Emission Control Areas must either: (1) use marine fuels with a sulfur content that does not exceed 0.50%, *id.*; or (2) use an approved equivalent method, *id.* at 4.1, which includes the use of an approved Advanced Air Quality System to reduce emissions. *See* MEPC.259(68), 2015 Guidelines for Exhaust Gas Cleaning Systems (May 15, 2015). The global marine fuel sulfur cap does not change marine fuel sulfur content limits for ships operating inside of Emission Control Areas, which must continue to use marine fuels with a sulfur content that does not exceed 0.10% or use an approved equivalent

---

[144] This is in contrast to a "closed loop" design, which uses freshwater injected with caustic soda as the washwater. The washwater in a closed loop system can either be discharged into the ocean or held onboard for disposal ashore. *See* EPA Exhaust Gas Scrubber Report at 1.

July 13, 2020

method to reduce emissions, such as an approved Advanced Air Quality System.  *See* MARPOL Annex VI, Regulations 14.4.3 and 4.1; *see also* Carnival Corp*., Environmental Compliance Notice #5-2019.*  Ships operating without an approved Advanced Air Quality System must not use fuel exceeding applicable sulfur limits.  *See id.*

    As part of its efforts to comply with the new cap, the Company required each ship to develop, implement, and maintain a Ship Implementation Plan ("SIP") that must outline "how the ship will prepare to comply with the new sulphur requirements," and "should address at a minimum, risk assessments of new fuels, fuel oil system modifications and alternative means of compliance."  *See* CAM March 2020 Quarterly Report at 147-148 (citation omitted)*.*

        *[Text continues on following page.]*

July 13, 2020

### b) Incidents

As noted above, the Company experienced multiple incidents related to its Advanced Air Quality Systems during ECP Year Three, including emission exceedances,[145] prohibited washwater discharges,[146] and equipment failures or malfunctions.[147]

---

[145] These included the following incidents during the fourth quarter of ECP Year Three:  burning fuel with a high sulfur content for approximately one hour and 41 minutes while underway towards Napier, New Zealand, in violation of MARPOL Annex VI by the Holland America Line *Maasdam* on February 4, 2020; burning heavy fuel oil for approximately three hours and 54 minutes while in port in Grand Turk, Turks and Caicos, in violation of MARPOL Annex VI by the *Carnival Elation* on February 20, 2020; exceeding emission ratio limits for approximately two hours and six minutes while underway towards Cartagena, Colombia, in violation of MARPOL Annex VI by the *Carnival Miracle* on March 7, 2020; and exceeding emission ratio limits for approximately four hours and 24 minutes while in international waters, in violation of MARPOL Annex VI by the *Carnival Legend* on April 3, 2020.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[146] These included the following incidents during the fourth quarter of ECP Year Three:  the discharge of washwater by the *Costa Luminosa* in Port Everglades, Florida, on January 25, 2020, and February 4, 2020, in violation of local Port Everglades, Florida, requirements; the discharge of washwater by the *Carnival Liberty* in Port Canaveral, Florida, on February 25, 2020, without washwater filters installed in violation of Company policy; the discharge of washwater by the *Carnival Elation* in Port Canaveral, Florida, on April 7, 2020, without washwater filters installed in violation of Company policy; and the discharge of washwater with an overboard pH of less than 6.0 in violation of the United States Environmental Protection Agency Vessel General Permit by the *Carnival Pride* while underway towards Baltimore, Maryland, on March 8, 2020. *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

[147] These included the following incidents during the fourth quarter of ECP Year Three in which Advanced Air Quality Systems were out of service for more than 24 hours:  the Cunard *Queen Victoria* on January 20, 2020, due to compliance computer issues; the Holland America Line *Veendam* on February 1, 2020, due to gas analyzer issues; the *Carnival Elation* on February 24, 2020, due to an exhaust gas leak; the *Carnival Fantasy* on February 27, 2020, due to an automation system malfunction; and the P&O Cruises UK *Aurora* on March 10, 2020, due to a turbidity probe malfunction.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.

July 13, 2020

### c)  *Ongoing CAM Team Examination*

The CAM Team will continue its examination of Advanced Air Quality System issues during ECP Year Four.  This will include monitoring the Company's compliance with the new global marine fuel sulfur cap, as well as with local restrictions on the use of Advanced Air Quality Systems in port.  *See* CAM March 2020 Quarterly Report at 148-51 (discussing how an increasing number of coastal states and ports around the world have enacted local regulations that restrict or prohibit the use of open loop Advanced Air Quality Systems in port due to concerns about potential harm to the marine environment from washwater discharges).[148]  The CAM Team also plans to continue exploring workload and staffing issues related to Advanced Air Quality Systems,[149] and intends to attend the CSMART training course on Advanced Air Quality Systems (either virtually or when the facility reopens for in-person courses).

---

[148] As discussed in the most recent CAM Quarterly Report, the Company issued an instructional notice to its ships on January 11, 2020, in an effort to minimize the chance of "discoloration and other surface effects" from Advanced Air Quality System washwater discharges in port.  *See id.* at 151; *IN ENV 02-2020 Advanced Air Quality System (AAQS) / Exhaust Gas Cleaning System (EGCS) Washwater Filter Requirement in Port* ("IN ENV 02-2020").  The instructional notice required ships with Advanced Air Quality Systems to "have operating washwater filters installed and in use in order to be run in port."  *Id.*  On June 11 and 30, 2020, the Company revised the instructional notice to permit ships, in certain situations, to use Advanced Air Quality Systems without washwater filters installed or in use as long as the Advanced Air Quality System discharge point is visually checked "to verify that there are no significant and unusual visual effects in the water like oil sheen, soot or significant discoloration."  *See* IN ENV 02-2020 (Rev. June 30, 2020).

[149] Most of the Company's brands require equipped ships to have a dedicated Advanced Air Quality Systems engineer onboard, and the Holland America Group Workload Study recommended a possible study to determine whether one engineer is sufficient.  *See* CAM March 2020 Quarterly Report at 152. The Draft Pause Priorities Plan sets a short-term goal of ensuring there is a designated Advanced Air Quality System engineer onboard equipped ships before they resume service.  Draft Pause Priorities Plan at PCL_ECP00166539.

July 13, 2020

## V.  EVALUATION OF THE EXTERNAL AUDIT FUNCTION (TPA)

### A.  Engagement with the TPA

The ECP requires the CAM to oversee the TPA to confirm that the TPA acts with independence and performs adequate ECP-required audits.  *See* ECP §§ VI.F.1-3.  During ECP Year Three, the TPA performed 38 Covered Vessel audits (including three accompanied by the CAM Team)[150] and multiple shoreside office audits (including three accompanied by the CAM Team).[151]  The TPA performed two additional Covered Vessel visits and two additional shoreside visits to follow-up on the Company's response to prior TPA audit findings.  The TPA also audited the Environmental Excellence training course for Environmental Officers at the CSMART training facility.  *See supra*, Part III.G (discussing the training course).

The CAM Team has continued to be in regular contact with the TPA through both weekly calls and periodic in-person meetings.  For example, on August 7, 2019, the TPA hosted the CAM Team and the Company at its Houston, Texas offices, with 13 members of the TPA present.  The meeting included presentations from the Company regarding revisions to it Environmental Control System methodology, as well as a report on the findings and recommendations from the Company's Food Waste Tiger Teams.  The CAM Team and TPA team had a meeting after these presentations to discuss observations from the first two years of the probationary period and areas of focus areas for ECP Year Three.

---

[150] As noted above, due to COVID-19, the TPA was unable to complete scheduled audits of four additional Covered Vessels.  The TPA plans to conduct these make-up audits in ECP Year Four, in addition to the required ECP Year Four audits.  *See supra*, Part I.D.3.

[151] The shoreside audits included the main office of each operating group, as well as a visit to the offices of P&O Australia (which does not operate any Covered Vessels, but provides support to Covered Vessels operating in and around Australia).

July 13, 2020

On January 24, 2020, the CAM Team hosted a meeting at its Washington, DC offices, with nine members of the TPA, to share feedback, discuss lessons learned, and address areas of focus from the first three quarters of ECP Year Three.  The CAM Team plans to continue to hold these periodic meetings with the TPA during ECP Year Four, although some meetings may be held virtually in light of COVID-19.

The CAM Team has also continued to oversee the TPA's work by attending TPA ship and shoreside facility audits, speaking with Company personnel who have experienced a TPA audit, and reviewing TPA audit and annual reports.

### B.    TPA Audit Process

As noted above, during ECP Year Three, the CAM Team attended three Covered Vessel[152] and three shoreside[153] TPA audits.  Consistent with prior observations, the CAM Team did not identify significant shortcomings with the TPA's audit process.  *See* CAM First Annual Report at 59-60 (assessing TPA audit process); CAM Second Annual Report at 101.  Based on the CAM Team's observations during ship and shoreside TPA audits, follow-up visits after TPA audits, and discussions with Company personnel, the TPA teams are qualified, well-organized, methodical, and knowledgeable.  The TPA auditors continue to demonstrate the technical ability and maritime experience necessary to identify a wide range of issues.  During ECP Year Three, the TPA also made extra efforts to conduct follow-up visits for certain Covered Vessels and shoreside offices to assess the Company's response to TPA audit findings.  For example, after

---

[152] This included two full audits, as well as a follow-up visit on a previously audited ship.

[153] This included two full audits, as well as a virtual follow-up visit of previously audited shoreside offices.

discovering co-mingled food waste issues on a Holland America Line ship in September 2019, the TPA returned to the ship in March 2020 to evaluate the status of corrective actions.

### C.    TPA Audit Reports

As in prior years, the CAM Team has found that TPA audit reports are clear, cover the necessary areas, and sufficiently document the TPA's findings.

### D.    TPA Independence

As in prior years, the CAM Team has seen no indication that the TPA's independence is compromised, even when audit findings are met with disagreement.

### E.    TPA Receptiveness to CAM Feedback

As noted above, the CAM Team has provided ongoing feedback to the TPA via regular phone calls and periodic in-person meetings.  TPA representatives have been receptive to the CAM Team's feedback.

### F.    COVID-19 Impacts

Following the Court's Order of June 2, 2020, granting temporary leave for the TPA and CAM Team to perform remote audits and visits in light of COVID-19, *see supra*, Part I.B.3.f, the TPA has been coordinating with the Company and the CAM Team on protocols for remote audits of both ships and shoreside facilities.[154]  This process is ongoing.  As discussed above, the TPA conducted its first remote ship audit, joined by the CAM Team, from July 7-9, 2020, and plans to conduct its first remote shoreside audit of the All Brands Group offices, which will also be joined by the CAM Team, from July 14-16, 2020.  *See id.*

---

[154] As noted above, the TPA, with the Court's approval, suspended all in-person ship and shoreside office and site audits as of March 10, 2020.  *See supra*, Part I.D.1.

July 13, 2020

## VI.   EVALUATION OF THE INTERNAL AUDIT FUNCTION (RAAS)

### A.   General RAAS Assessment

The ECP requires the CAM to "conduct a review of [the Company's] internal environmental audits with respect to Covered Vessels and Covered Personnel."  ECP § VI.F.4. This review "shall assess the ability of [the Company's] internal audit process to accomplish the objectives of the ECP, including any inadequacies with respect to [the Company's] performance, whether personnel-based or related to any of its Covered Vessels, systems, equipment, or components."  *Id.*

#### 1.   Overview

During ECP Year Three, RAAS audited 71 Covered Vessels[155] and multiple shoreside offices, including Carnival Cruise Line, Carnival UK, Costa Group, and P&O Australia (which does not operate any Covered Vessels) offices.  The CAM Team accompanied RAAS on one of the Covered Vessel audits to assess the overall RAAS audit process.  During this visit, the CAM Team spent most of its time accompanying the auditor(s) covering the environmental compliance components of the audit.  The CAM Team also spent time observing the auditors' overall process, including their approach to finalizing audit findings.

As in ECP Year Two, the RAAS auditors appeared knowledgeable about HESS systems, conducted themselves professionally, and had the technical expertise required for the audit.  The auditors also appeared to be provided with access to relevant documents, personnel, and physical spaces.  However, at times, auditors appeared to be constrained by the ship and shore work-steps, which, as discussed in previous CAM reports, are frameworks that generally focus on assessing

---

[155] As noted above, due to COVID-19, RAAS was unable to complete scheduled audits of three additional Covered Vessels.  *See supra*, Part I.D.4

July 13, 2020

compliance with discrete Global HESS procedural requirements (consistent with applicable codes and standards).  *See* CAM Second Annual Report at 102-03.  Because these work-steps focus on identifying compliance with specific procedural requirements, they may not promote the identification of issues outside of the work-steps, the assessment of which could provide additional opportunities for continuous improvement through the existing RAAS quality-assurance process.[156]

A common observation throughout the ECP has been that both ship and shoreside management will dispute RAAS audit findings as to both ship and shoreside operations.  There have been reports that findings are removed or reclassified by shoreside leadership.  *See* Employee Interview/Call Notes.  These challenges to audit findings appear to be related to the view that RAAS audit findings are used unfairly or punitively by management, resulting in efforts to contest audit findings rather than to identify, understand, correct, and prevent them. *See id.*; *see also* HESS Maritime Survey Response.  This attitude towards audit findings, which flows from the general blame culture identified in the Propel Environmental Compliance Culture Assessment and other consultants, *see supra*, Part III.D and Part IV.B, is viewed as undermining the value of the internal audit function, including impeding RAAS's ability to report on the Company's compliance performance and risk areas to the Boards of Directors.  *See* Employee Interview/Call Notes.

---

[156] RAAS has a quality-assurance process for reviewing and analyzing audit findings across all brands, which generally includes:  (1) identifying repeat findings; (2) detecting trends; (3) identifying cross-brand issues; and (4) providing guidance on corrective and preventative measures.

2.      Audit Process (Pre-COVID-19)

As described in the CAM First Annual Report, the Company's internal HESS audits are conducted by RAAS, an independent department that reports directly to Carnival Corp.'s Boards of Directors.  *See* CAM First Annual Report at 61-63 (providing an overview of the RAAS audit process).[157]  RAAS audits assess compliance with applicable codes (*e.g.*, the International Safety Management Code), regulations, and internal policies and procedures.  *See HMP 1301 - Internal Audits*.[158]

Each ship and operating group shoreside office is audited by RAAS once per year.[159] Unlike TPA ship audits, RAAS audits are "announced"—*i.e.*, ships and shoreside offices know in advance when an audit will occur.  The annual audit schedule is set approximately six months in advance of each year's audits.  Draft audit schedules are shared with the ship or shoreside office at least 15 days prior to the audit.  Audits typically last for one week.

For ship audits, RAAS audit teams generally consist of three auditors, one of whom is dedicated to focusing on environmental compliance issues, while the other auditors focus on the remaining HESS factors of health, safety, and security.  For shoreside audits, the audit teams

---

[157] The RAAS audit function is distinct from its investigatory function.  Prior to the restructuring of the Company's internal investigation function, *see supra*, Part IV.D, RAAS was also responsible for HESS investigations.  RAAS remains responsible for certain non-HESS investigations (*e.g.*, financial, fraud).

[158] This section discusses the RAAS audit process prior to COVID-19.  As discussed further below, RAAS has experienced significant staff reductions and transitioned to a program of remote audits as a result of COVID-19.  During ECP Year Four, the CAM Team will continue to monitor the impacts of these and other changes on the RAAS audit process.

[159] The CAM understands that it has been regular Company practice, at least among some brands, for ships to prepare in advance of RAAS audits.  *See* PCL_DOJ_ESAVP_00043885.

July 13, 2020

vary depending on the facility being audited.  They generally consist of five to six auditors and do not include a dedicated environmental auditor.

Each audit team is required to hold certain auditor qualifications/certifications (either individually with each auditor or across the audit team).  The auditors' activities during each audit are guided by work-steps, which are tied to Company policies and procedures.  *See HMP 1301-A1 Shipboard HESS Audit Work Steps*; *HMP 1301-A2 Office HESS Audit Work Steps*. These work steps assign risk-based weights to various compliance areas on a scale from one through five, with five being the highest risk (*e.g.*, fire prevention).

RAAS audits typically follow the following format: an opening meeting with relevant personnel on the first day of the audit; interviews, physical inspections, and document review throughout the course of the audit; and a closing meeting at the completion of the audit where findings and recommendations are discussed.  *See* CAM First Annual Report at 62 (describing typical audit process for a shipboard audit).  For a 10-day period following the audit, the ship or shoreside office may review the audit findings and raise any disagreements with the Audit Review Committee of the relevant operating group.  *See id.*  Within three weeks of completing the audit, the relevant Audit Review Committee holds a meeting where final corrective action plans, including deadlines, for each finding are agreed upon.  *See id.* at 63.

Each audit finding is associated with a category (*e.g.*, environmental) and severity (*e.g.*, Major Non-Conformity, Non-Conformity (High, Medium, or Low), or Observation).  After the audit is complete, RAAS generates a score for each finding based on its severity and risk, following the Company's internal risk matrix.  *See HMP 1301-A3 Finding Risk Assessment Matrix*.  Repeat findings are graded at one and half times the numerical score.  The individual finding scores are then deducted from a total score of 1000 (the starting baseline score) to

generate the overall audit grade.  The spectrum of audit grades ranges from "excellent" (900 – 1000) to "follow-up required" (below 549).  *See id.*  Finally, audit findings are entered into the Company's Global HESS's audit tracking system, which also tracks the status of the implementation of corrective actions.

### 3. Auditors

During the CAM Team's ECP Year Three ship and shoreside office visits (including, but not limited to, those accompanying RAAS auditors), the CAM Team has asked Company personnel about their experiences and perspectives on the Company's internal audit process and auditors.  As in prior years, responses have been mixed and are dependent on a variety of factors, such as the audit team composition, the areas of inquiry identified by RAAS, the operating group or brand, and the individual office or ship, as well as the limits on the number of such visits that the CAM Team can undertake.  However, as discussed below, RAAS generally agrees with these observations and is taking steps to address them.  The feedback generally falls into three categories:

- **Auditor Attitude:**  Some Company personnel report that some RAAS auditors can take a superior and sometimes condescending attitude towards crew members.  *See* Employee Interview/Call Notes.  This perception may be a mix of personal experiences, personality differences, or perceptions of the audit team's purpose and value more generally.  RAAS has recognized that this is a genuine issue and has launched initiatives to address communication and perception issues associated with the group's role within the Company, as discussed below;

- **Audit Consistency:**  Some Company personnel report that RAAS audits occasionally lack consistency.  For instance, Company personnel have reported that RAAS auditors review, identify, and interpret non-conformities differently, which can lead to lack of uniformity in audit results and expectations.  *See id.*  The CAM Team understands that RAAS plans to address this issue through a series of initiatives designed to enhance audit consistency and streamline the overall audit process, as discussed below; and

- **Auditor Competency:**  Some Company personnel report that varying levels of auditor competency in discrete areas can present challenges to achieving the goal of

consistent and meaningful audits.  *See* Employee Interview/Call Notes.  This feedback principally focuses on competency in technology and IT-related areas.  *See id.*  The CAM Team understands that RAAS plans to address issues like competency and training in its "HESS 3.0" initiative, as discussed below.

4.   Audit Findings

*a)  RAAS 2019 Year End Report*

On January 15, 2020, RAAS issued a report synthesizing audit results and key trends

from 2019 audit findings.  *See RAAS Q4 Report Prepared for the Audit and HESS Committees*

(Jan. 15, 2020), PCL_ECP00152849-855.  Overall, RAAS found that audit scores for 58% of the

fleet were higher in 2019 than 2018.  *Id.* at PCL_ECP00152850.  No Major Non-Conformities[160]

were issued.  *Id.*  Repeat findings decreased from 74 to 56 total findings.  *Id.*  RAAS also

reported that during "92 follow up visits, 1,764 action plans were reviewed and 183 (10%) were

reported to management as potential for repeat."  *Id.*

For environmental findings, there was an overall decrease of approximately 6% in the

number of findings from 2018 to 2019.  *Id.* at PCL_ECP00152852.  RAAS attributed the

majority of findings to "lack of oversight."  *Id.*  The key areas RAAS identified were:  refrigerant

gases; bilge water and oily water management; garbage management; Environmental Control

Systems; and Advanced Air Quality Systems.  *Id.*

*b)  CAM Team Analysis*

The CAM Team analyzed audit report findings from RAAS audits of Covered Vessels

that occurred within 60 days prior to a TPA audit.  Between the start of the ECP in April 2017

---

[160] The Company's definition of Major Non-Conformity for RAAS audits is different from the ECP definition used for TPA audits.  For RAAS audits, a Major Non-Conformity is an "identifiable deviation that poses a serious threat to the safety of personnel or the ship or a serious risk to the environment that requires immediate corrective action or the lack of effective and systematic implementation of a requirement."  *INT-1007 Glossary of Terms and Acronyms.*

July 13, 2020

and June 2020, there were 13 such audits.  The CAM Team reviewed the respective RAAS and TPA audit reports for those ships to see how often:  (1) RAAS reports included findings the TPA reports did not, indicating that the findings were resolved before the TPA audit or that the TPA may have missed those findings;  (2) the TPA reports included findings the RAAS reports did not, indicating that the findings arose after the RAAS audit or that RAAS may have missed those findings; and (3) both reports contained the same findings, indicating that the findings had not been resolved between the RAAS audit and the TPA audit.

In large part, the findings RAAS identified were different from the findings the TPA identified.  There are a few examples, however, of the findings overlapping.  For example, both RAAS and the TPA identified food waste separation issues in their June and July 2019 audits of the Holland America Line *Westerdam*, respectively.  During the RAAS audit, "items of non food material (paper, plastic, metal) were found inside of food waste bins brought from the point of generation to the recycling center, where the only operable food waste pulper unit is located," and a piece of plastic was found in the aft grease trap strainer.  *See* RAAS Audit Report, *Westerdam* (June 2019).  During the TPA audit, a wooden skewer was observed in the food waste tank, and plastic was found in the grease traps.  *See* TPA Audit Report, *Westerdam* (July 2019), PCL_ECP 135821-55.  Although the findings identify different specific issues, both reports reveal an ongoing struggle with food waste separation.[161]

The RAAS and TPA reports for audits of the *AIDAmar* in July and September 2018, respectively, provide another example of overlapping findings.  Both audit teams identified errors in the Oil Record Book.  RAAS identified missing entries for "a number of occasions

---

[161] As discussed above, food waste management has been revealed to be a struggle on ships across the Company's entire fleet.  *See supra*, Part III.F.

July 13, 2020

when utilizing portable pumps" and "when transferring lifeboats bilge to sludge tanks."  RAAS Audit Report, *AIDAmar* (July 2018).  The TPA found that a March 2018 "annual servicing to verifying calibration of the [Oil Content Meter] was not logged."  TPA Audit Report, *AIDAmar* (Sept. 2018), PCL_ECP00081891-2010, at PCL_ECP00081985.  This example is notable for at least two reasons:  first, the audit reports reveal an ongoing issue with Oil Record Book recordkeeping; and second, the TPA identified an Oil Record Book error that RAAS could have observed, but did not.

The CAM Team also identified one example of RAAS and TPA making the same finding, though as to an obvious issue regarding significant pollution prevention equipment.  Both RAAS and the TPA audited the *Carnival Dream* in August 2018, and each found that the Advanced Air Quality System had been out of service since March 2018.  RAAS Audit Report, *Carnival Dream* (Aug. 2018); TPA Audit Report, *Carnival Dream* (Aug. 2018), PCL_ECP00083586-615.

Overall, the CAM Team's analysis of the audit reports for these 13 ships indicates that most RAAS findings were addressed before subsequent TPA visits.  There was also at least one instance (the *AIDAmar* Oil Record Book recordkeeping issue noted above) where the TPA identified a finding that RAAS may have missed.

A few common themes from across the RAAS and TPA audit reports emerged.  These included:  recordkeeping errors and omissions; issues with seals and locks for the Environmental Control System; challenges with food waste separation and garbage disposal; and missing or incomplete procedures in Global HESS (an issue that can be attributed to shoreside rather than the ship).  Given that these are recurring issues identified across multiple ships by both sets of auditors, they may be ripe for further analysis as to potential systemic (root) causes.

July 13, 2020

### 5.   COVID-19 Impacts

#### a)   *Personnel*

As a result of COVID-19-related layoffs and furloughs, RAAS experienced a reduction in staff of approximately 60% across the group as of June 2020.  *See* Employee Interview/Call Notes.  Staffing for the internal HESS audit function went down from approximately 32 to 14 employees, an approximately 56% staff reduction.  *See id.*  The CAM Team will continue to examine the impacts of these staffing reductions.

#### b)   *Remote Audits*

RAAS has shifted to conducting remote ship and shoreside audits.  *See id*.  As of June 23, 2020, RAAS had completed approximately 11 remote audits of ships and two remote audits of shoreside offices, with roughly two dozen additional remote ship and shoreside audits scheduled through early September 2020.  *See* RAAS Audit Schedule (June 23, 2020).[162]  The overall process for remote audits is similar to the in-person audit process:  an opening meeting with relevant personnel on the first day of the audit; interviews, inspections, and document review throughout the course of the audit; and a closing meeting at the completion of the audit where findings and recommendations are discussed.  *See* Employee Interview/Call Notes; *see also infra*, Part VI.A.2 (discussing the internal audit process).  However, meetings, interviews, and inspections of physical spaces are performed virtually using various forms of audiovisual technology.  In addition, a significant portion of the review of records and documents now occurs prior to the audit.  For instance, RAAS will provide the ship with a list of requested materials (such as record books, certificates, and other documents that auditors would typically

---

[162] RAAS also plans to conduct approximately five in-person ship audits in mid- to late July 2020 on ships that will be docked within driving distance of Hamburg, Germany, or Genova, Italy, in light of easing travel restrictions in Europe.  *See id.*; Internal Communication.

review onboard) that the auditors will review in advance of the audit.  The results of this review may be the basis for follow-up interview questions or potential audit findings.  *See* Employee Interview/Call Notes.

The CAM Team will continue to engage with RAAS as it transitions to performing remote audits, including evaluating the challenges, and any possible advantages, of this new approach to auditing.

c)      <em>Self-Assessment Program</em>

RAAS is working on a "Self-Assessment Program" to enable ship crew to conduct "self-audits" of HESS policies and procedures that were associated with recurrent or significant audit findings in 2019.  *See id.*  Under the program, RAAS would notify the ship about the relevant HESS policy or procedure to be audited; instruct the ship on how to audit the procedure; and provide the ship with one week to perform the self-audit.  *See id.*  The CAM Team understands that RAAS has experienced delays in launching this program due to COVID-19 impacts, including staff reductions.  *See id.*  The CAM Team will continue monitor the development and implementation of this program.

d)      <em>Oversight of Return to Cruise Operations</em>

RAAS intends to audit ships prior to their return to guest services for compliance with HESS policies and procedures, including COVID-19-related requirements.  *See id.*  The CAM Team understands that RAAS plans to provide this oversight as ships are designated to return to service.  *See id.*  The CAM Team will continue to engage with RAAS on this effort.

July 13, 2020

### B. RAAS ECP Year Three Highlights

#### 1. August 2019 RAAS Maritime Retreat

In August 2019, RAAS held its annual week-long RAAS Maritime Retreat at the CSMART training center in Almere, Netherlands.  Approximately 30 RAAS auditors attended.  Members of the CAM Team and TPA also observed.  The retreat was designed to provide auditors with an opportunity to "share best practices, enhance professional development, and build stronger professional relationships throughout the team."  2019 Q3 RAAS Cruise Control Newsletter, at PCL_ECP00166720.  The agenda included presentations from RAAS Maritime leaders, which highlighted several challenge areas, including:  the group's quality assurance process; perceptions by others within the Company of RAAS and its auditors; and consistency of audit protocols and audit findings.  The CAM Team observed that attendees were highly engaged, willing to ask RAAS leadership thoughtful and challenging questions, and in general expressed a desire to enhance their role and performance within the Company.  RAAS leadership was similarly engaged and thoughtful in responding to auditor questions, considering issues facing the internal audit function, and developing strategies to enhance the group's value as a tool for continuous improvement.

#### 2. RAAS Initiatives

Following the RAAS Maritime Retreat, RAAS began working on initiatives to address some of the identified areas for improvement.  These include:

- **HESS 3.0:**  An initiative designed to address several areas for improvement that the CAM Team, TPA, RAAS, and Company personnel have identified, including: (1) audit planning; (2) field work and follow-up work; (3) auditor training and competency; (4) group communication and culture; and (5) root cause and data analytical enhancements.  A central goal of HESS 3.0 is to improve the consistency of RAAS audits and how findings are communicated.  In that vein, RAAS plans to focus on several projects aimed to improve its overall consistency, such as streamlining the ship and shore work-steps; enhancing its opening and closing meeting procedures;

July 13, 2020

and standardizing its follow-up audits.  Likewise, RAAS plans to enhance its training and cross-brand collaboration efforts, along with emphasizing a more analytical causal analysis approach in conjunction with enhancements to the use of metrics and data analysis;

- **Hackathon:**  A workshop (originally planned for March 25-26, 2020, but whose date has been indefinitely postponed due to COVID-19) developed in collaboration with an outside consultant designed to engage Company personnel across different departments in brainstorming ways to improve RAAS audits and the audit function;

- **Rebranding—Tone from the Top:**  An initiative in collaboration with the All Brands Group Communications and Marketing group designed to improve the overall perception of RAAS's relationship within the Company.  A principal takeaway from the RAAS Maritime Retreat was that, "[w]hile there are many strong advocates across the organization, the current state of trust, cooperation[,] and transparency between the business units, ships, brands" presents an opportunity for improvement.  Project Roadmap: RAAS Branding Initiative 01.10.2020 (DRAFT), at 1.  The Rebranding initiative aims "to build a stronger and more authentic partnership, trust, and commitment between the ship and shore side teams and experts in the RAAS organization."  2019 Q3 RAAS Cruise Control Newsletter at PCL_ECP00166720.

    RAAS plans to tackle this rebranding initiative in three phases:  (1) Phase One includes outreach and interviews with shoreside and shipboard stakeholders to assess perception and opinions of RAAS; a review of RAAS communications (*e.g.*, RAAS newsletters, audit reports, and leadership presentations); and a workshop with RAAS leadership to assess "truths" about the organization (*i.e.*, understanding perceptions about the RAAS culture, processes, and deliverables); (2) Phase Two will entail developing an action plan based on findings from Phase One; and (3) Phase Three will consist of carrying out this action plan.  While final deliverables are not finalized, RAAS anticipates developing RAAS-specific "marketing" material (*i.e.*, a "simple, benefit-oriented overview of the organization"; messaging for shipboard and shore side leadership; and a presentation for senior leadership.  *Id.*; and

- **Project Management Software:**  To support and manage the HESS 3.0 and Rebranding initiatives—as well as support forward-future projects—RAAS has engaged a collaboration and project management software, Monday.com.  Company employees have reported to the CAM Team that the software has enhanced communication and efficiency, and has been widely used within the group since acquisition.  *See* Employee Interview/Call Notes.

## C.    Ongoing CAM Team Examination

The CAM Team will continue to evaluate the Company's internal audit function.  This will include examining the impacts of COVID-19 on RAAS's audit process, staffing, and other initiatives and activities.  It will also include examining RAAS's role within the broader

July 13, 2020

corporation, including perceptions of RAAS from Company employees and support for RAAS from senior management.  A large part of RAAS's success depends "on support from the Board and [Senior] Executive Management."  2019 Q3 RAAS Cruise Control Newsletter, at PCL_ECP001667203.  Messaging from senior management has a direct "impact on the effectiveness of support RAAS receives in carrying out its responsibilities."  *Id.*  For RAAS to reach its full potential, it must be viewed as a set of in-house experts and partners who can work with ships and shoreside personnel alike to identify areas of risk and opportunities for improvement at all levels and across multiple departments within the Company.

## VII.   AREAS OF FOCUS FOR ECP YEAR FOUR

In addition to the areas of ongoing CAM Team examination described in connection with the findings above, the CAM Team continues to examine the following areas of interest and intends to report further on these issues in future reports.  These examinations will occur in the context of the Company's ongoing response to the COVID-19 pandemic.  The CAM recognizes that the Company's ships may be operating in a very different reality, if at all, in ECP Year Four.

### A.   Diversity and Inclusion

This includes examining the Company's stated intent to "strive to increase the diversity of its shipboard workforce across certain positions."  *See Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148, at 6.  Currently, it continues to appear that any such efforts are being led by the brands/operating groups, without a centralized, coordinated plan led by All Brands Group— despite public statements from the Carnival Corp. CEO and other members of top leadership on the importance of a diverse and inclusive workforce.  *See CAM March 2020 Quarterly Report at*

153-54.  The opportunity to widen the range of countries and nationalities from which the

Company recruits and develops future ship officers remains a largely untapped one.[163]

The CAM Second Annual Report identified the opportunity to enhance diversity and

inclusion among the Company's ship officers as a way to strengthen and support its compliance

efforts.  *See* CAM Second Annual Report at 54-63.  The Company, like others in the cruise

industry and the maritime industry more broadly, faces challenges to recruit and retain

individuals for these positions due to a global shortage of qualified officers, especially

engineering officers.  It has been observed that this shortage is connected to issues of ethnicity,

race, and gender.  Historically, officer positions on cruise ships have been filled predominantly

by men from European countries, while non-officer positions have been filled predominantly by

men from Asian or other non-European countries:

> While cruise ship personnel are ethnically diverse, they are not apportioned randomly.
> Even a rudimentary analysis of crew composition reveals that they are highly stratified
> based on ethnicity, race and gender.  Certain ethnic groups tend to work in specific roles.
> Workers from developed countries tend to occupy higher positions within a ship's
> organizational hierarchy.  These tend to be well remunerated and have either greater
> responsibility, better working conditions, or some combination of the two.  The rest of
> the workers, especially those in positions involving more menial tasks, almost universally
> come from the developing world.

W. C. Terry, *Geographic limits to global labor market flexibility: The human resources paradox*

*of the cruise industry*, 42 Geoforum 660, 662 (2011).  Other studies have similarly found "that

employees in the lowest status roles were mainly from the underdeveloped parts of Eastern

Europe, Central America and Southeast Asia.  Middle ranked employees were mainly from

---

[163] While the CAM Team's focus is primarily on diversity and inclusion issues impacting
shipboard crew, the CAM Team will seek to learn more about the Company's shoreside diversity
and inclusion efforts during ECP Year Four, including the extent to which diversity and
inclusion considerations were factored into the shoreside staff reductions that occurred as a result
of COVID-19.  *See id.*

July 13, 2020

developing Western or Eastern Europe countries and crew members in the higher status positions

employees were from the more developed countries, the United Kingdom and Australia." E. E.

T. Bolt and C. Lashley, *All at sea: Insights into crew work experiences on a*

*cruise liner*, 5:2 Research in Hospitality Management 199, 200 (2015) (citations omitted). In

addition, "[g]ender segmentation is also a feature of cruise ship employment," with 80% of the

workforce being male, and females primarily "represented in service-oriented positions." *Id.* It

has further been observed that, while "typical" in the industry, such conditions "are not an

inevitable feature of cruise ship working life" but are "by-products of company recruitment

policies and procedures at a corporate level; and of shipboard management sensitivity to crew

stresses and strains." *Id.* at 206.

The CAM Second Annual Report found that the Company's strong, long-standing

relationships with many of its Global Talent Partners,[164] including with agencies located in the

Philippines, Indonesia, and India, provided a unique opportunity to develop a more diverse

officer corps. *See* CAM Second Annual Report at 54-63. As the CAM observed, the "industry-

wide staffing shortage for officer positions provides the Company with an extraordinary

opportunity to be a leader in addressing historic ethnic, racial, and gender employment

---

[164] Global Talent Partners are agencies, generally referred to as "manning agencies" in the maritime industry, located around the world that cruise lines and other companies use to recruit and train many of the (typically non-officer) crew members on their ships. Holland America Group has moved from calling these businesses "manning agencies" to "Global Talent Partners," to shift from an overtly gendered nomenclature to one that focuses on the notion that the individuals hired from these agencies provide needed skills or talent, and that the agencies are partners in the Company's efforts. In support of that effort, CAM reports have adopted that term.

July 13, 2020

disparities in the maritime industry, and to address compliance challenges related to labor supply." *Id.* at 61.

Research indicates that diversity and inclusion promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law. *See e.g.*, ECI, *How to Leverage Workplace Diversity to Increase Regulatory Compliance* (June 22, 2018), https://www.ethics.org/how-to-leverage-workplace-diversity-to-increase-regulatory-compliance/.[165] As diversity and inclusion become standardized throughout an organization, workplace adaptability increases, resulting in employees who feel more comfortable at work and who more readily adopt new policies and behaviors that support compliance programs. *See id.* Research also indicates that diversity and inclusion increases an organization's profitability, innovation, and problem-solving abilities. *See e.g.*, World Economic Forum, *The Business Case for Diversity in the Workplace is Now Overwhelming* (Apr. 29, 2019), https://www.weforum.org/agenda/2019/04/business-case-for-diversity-in-the-workplace/.

The Company has publicly recognized the benefits of diversity and inclusion. For example, the Carnival Corp. CEO has stated that:

> Diversity is a business imperative. The key to innovation is diversity of thinking . . . having people from different backgrounds and different cultural experiences who are organized around a common objective are far more likely to create breakthrough innovation than a homogenous group. That same diversity of thinking is a powerful advantage.

---

[165] As noted above, the Company has hired ECI as a consultant on its culture survey response efforts.

July 13, 2020

*Carnival Corp., Diversity & Inclusion*, https://www.carnivalcorp.com/corporate-information/diversity-inclusion.[166]  In a recent media article on the response of the travel industry to the Black Lives Matter movement, the Carnival Corp. CEO is described as "one of the few black executives in the [travel] industry," and is quoted as writing:

> It is not about marketing slogans or campaigns in my view, but about the proactive actions each of us personally take and hold ourselves accountable for . . . There is an opportunity here for all of us to do more—and do much better—looking closely at our diversity and inclusion results across the board and challenging ourselves as individuals to take actions that can make a difference.

J.D. Shadel, *Travel brands rushed to post #BlackLivesMatter but are slow to share how they're taking action*, WASHINGTONPOST.COM (June 26, 2020), https://www.washingtonpost.com/travel/2020/06/26/travel-brands-rushed-post-blacklivesmatter-are-slow-share-how-theyre-taking-action/.  The President of Princess Cruise Lines also recently sent an internal communication to Holland America Group employees stating that:

> We are committed to creating a workplace where everyone feels comfortable bringing their whole, true self to work every day and has equal opportunity to develop and succeed.  Front and center in our core values is Respect.  Within that, we each commit to being open and honest, building trust, celebrating differences, including everyone, and supporting change.

*Message from Jan Swartz* (June 19, 2020).  In addition, the Company's Corporate Vision Statement states:

> We are committed to a positive and just corporate culture, *based on inclusion and the power of diversity*.  We operate with integrity, trust and respect for each other—seeking

---

[166] The President of Princess Cruise Lines has similarly stated that: "[Carnival Corp.'s CEO] has made diversity and inclusion a real focus of our corporation.  We believe, and I think our results have proven this to be true, that diverse teams are not just the right thing to do, but they're really good for business because everybody brings their own lens to a problem or an opportunity and you get to more effective solutions faster with competitive advantage and I absolutely see that happen every day here at Princess Cruises."  Interview with President, Princess Cruise Lines, *Skift Global Forum Preview: Princess Cruises is Evolving with History in Mind* (Sept. 21, 2018), https://skift.com/2018/09/21/skift-global-forum-preview-princess-cruises-is-evolving-with-history-in-mind/.

July 13, 2020

collaboration, candor, openness and transparency at all times.  And we intend to be an exemplary corporate citizen leaving the people and the places we touch even better.

*Corporate Vision Statement*, https://www.carnivalcorp.com/leading-responsibly/corporate-vision-statement (emphasis added).

However, the efforts of the Company do not yet match these words.  Pre- or post-COVID-19, the CAM is not aware of any significant, coordinated, centralized effort to launch a long-term program that would lead to the development of a diverse officer corps across the Company's ships.[167]  At the All Brands Group level, diversity and inclusion efforts remain unclear, and efforts across the brands/operating lines do not appear consistent or coordinated.

As noted above, some of the Company's brands/operating groups have made efforts to increase diversity and inclusion among shipboard officers in recent years.  For example, Costa Group and Carnival Cruise Line have implemented programs to source new officers from non-traditional areas, including regions outside of Europe.  *See* Employee Interview/Call Notes.  Both Costa Group and Carnival Cruise Line currently have several cadets in these programs.[168]  *See id*.  In addition, the June 19, 2020, internal communication from the President of Princess Cruise Lines, quoted above, notes that Holland America Group "encourage[s] the recognition of important cultural observances shipboard" and "provid[es] floating holidays that shoreside

---

[167] As of 2019, the Company reported that it continued to source its shipboard officers primarily from European countries (Italy, the UK, the Netherlands, Germany and Norway), while the remaining (non-officer) crew positions "are sourced from around the world, with the largest contingent from the Philippines, Indonesia and India."  2019 Form 10-K at 20.  The Company has not set numeric diversity and inclusion targets or goals for its shipboard officers.  *See* Employee Interview/Call Notes.

[168] In May 2020, Carnival Cruise Line hired a Manager of Marine Talent Attraction to support its cadet programs and other recruiting initiatives.  *See id*.  However, the individual was furloughed as a result of COVID-19.  *See id*.

July 13, 2020

employees use for everything from Passover and Eid ul-Fitr, to Día de Muertos and Juneteenth." *See Message from Jan Swartz* (June 19, 2020).

Employees from various positions across the Company continue to express frustration and disappointment over the longstanding and continuing lack of ethnic, racial, and gender diversity and inclusion within the officer ranks.  *See id.*  These frustrations include allegations of racism and retaliation.  *See id.*; *see also*, *e.g.*, Environmental Compliance Culture Assessment at 28 (noting, as a common theme among free text responses to the Propel survey, the "need to eliminate harassment or discrimination" in the workplace, including preferential treatment by supervisors for those who share the same nationality or those with whom supervisors have romantic relationships); *Internal Key Workplace Own-Will Exit Employees Interview Survey* (Feb. 2018), PCL_ECP00047298 (a survey of approximately 100 former Holland America Group employees where "discrimination and favoritism," "a lot of favoritism when the Supervisor is same nationality as the crew," and "not treating me fairly because of my nationality" were among the reasons cited for leaving the Company).

As discussed above, the significant disruptions to the marine and cruise industries from COVID-19 may temporarily ameliorate the global shortage of available qualified ship officers that has affected the industry for years.  *See infra*, Part IV.A.3.e (discussing reduced crew staffing demands during the suspension of cruise operations, as well as during any restart period in which ships are slowly ramping up passenger service).  But, as emphasized above, any sudden glut of available qualified officers is not likely to last.  The Company and the industry continue to face the likelihood of a long-term global officer shortage.  *See id.*  Therefore, as part of any long-term plan to achieve the Company's stated goals, the need to prioritize diversity and

inclusion efforts to expand the pool from which the Company recruits and trains officers remains as critical as ever.

## B.    Training

This includes examining the Company's environmental and other compliance-related trainings, including:

- CSMART course development and delivery, including virtual courses while the facility remains closed for in-person courses due to COVID-19, as well as in-person courses once the facility re-opens. *See supra*, Part III.G.2 (discussing COVID-19 impacts on CSMART environmental and compliance-related trainings);

- The impact of COVID-19-related staff reductions on CSMART operations. *See supra*, Part I.C.4.f;

- The potential role of CSMART in supporting culture change within the broader organization. *See* CAM March 2020 Quarterly Report at 116-17 (observing that "[w]hile it appears that great strides have been made to create a culture of trust, care, openness, and speaking up during CSMART trainings, the Company's challenge is to carry and sustain that culture aboard the Company's ships and in its shoreside offices");

- Onboard trainings, including whether a more sustainable and effective onboard environmental training program can be developed. *See supra*, Part III.G.2 (discussing ongoing efforts to improve onboard environmental compliance trainings during the suspension of cruise operations);

- Training for the Company's Global Talent Partner recruits. *See supra*, Part VII.A (discussing the Company's relationships with its Global Talent Partner recruitment and training agencies); *see also* CAM Second Annual Report at 61-62 (discussing opportunities to use Global Talent Partner agencies to enhance pre-boarding HESS trainings, as well as potential training on overcoming cultural barriers to "speaking up" to report compliance concerns);

- Investigations and systemic (root) cause analysis training, including the next iteration of the Environmental Excellence CSMART course (which will focus on investigations training for Environmental Officers) and other investigations trainings for Incident Analysis Group, brand/operating group, and shipboard investigators. *See supra*, Part III.G.2 and Part IV.D;

- Compliance training for corporate leadership, including the Boards of Directors. *See supra*, Part III.E.3.c (discussing annual compliance training curriculum for the Boards developed in response to the Probation Revocation Agreement);

July 13, 2020

- IT tools and systems in support of training.  *See supra*, Part III.H.2.b(ii); and

- The respective roles of All Brands Group training and HR personnel, CSMART personnel, Operating Line Training Managers, and other relevant Company personnel in these and other training-related efforts, including development of competency frameworks.

*See* CAM First Annual Report at 21-23, 69-70; CAM Second Annual Report at 31-35; CAM March 2020 Quarterly Report at 111-17.

The CAM Team's examination will be guided by the recently revised DOJ Corporate Compliance Program Guidance, which emphasizes that a "hallmark of a well-designed compliance program is appropriately tailored training and communications."  DOJ Corporate Compliance Program Guidance at 5.  It is critical to assess "the steps taken by the company to ensure that policies and procedures have been integrated into the organization, including through periodic training and certification for all directors, officers, relevant employees, and, where appropriate, agents and business partners."  *Id.*  It is also important to assess "whether the company has relayed information in a manner tailored to the audience's size, sophistication, or subject matter expertise," as well as whether the company has "evaluated the extent to which the training has an impact on employee behavior or operations."  *Id.* at 5-6.

## C.     Other Personnel Issues

This includes examining other personnel issues, such as the hiring, staffing, workload, and employment conditions of officer and non-officer crew, including Environmental Officers, engineering officers and ratings, bridge/deck personnel, hotel personnel, and food and beverage personnel—including challenges and recommendations identified in the Holland America Group Human Factors Study and Workload Study (such as "indications that crew are working overtime without registering all their hours" and "have been compelled to work but discouraged to write overtime . . . by senior officers to avoid questions from the office and additional paperwork").

July 13, 2020

*See* Holland America Group Workload Study at PCL_ECP00149438; *see also supra*, Part IV.A.3 (discussing crew staffing and workload concerns).

This examination will include exploring the relationship between technical, deck, environmental, hotel, and food and beverage personnel, both shipboard and shoreside, on compliance issues.  In particular, environmental and technical personnel have expressed concerns to the CAM Team about a lack of ownership and support for compliance by hotel and food and beverage departments—although this is reported to be improving as a result of the heightened focus on food and other garbage/waste management.  *See* Employee Interview/Call Notes.

### D.      Integration of Compliance Considerations into Ship Design, including New Builds and Dry/Wet Docks

This includes examining the Company's efforts regarding the integration of compliance considerations into the design or re-design of ships during new build[169] and dry/wet dock processes.  *See* CAM March 2020 Quarterly Report at 155-157.  The Court has expressed particular interest in how the Carnival Corp. Chairman of the Boards, who is recognized for his leadership role in new ship design, is "making concrete design changes to make sure that the new ships that are coming online are able to address some of the failures in the past."  Status Conf. Tr. at 69-70 (Jan. 8, 2020).  The CAM Team also plans to examine other issues regarding dry/wet dock project planning and management, including issues related to the timing and length

---

[169] On June 18, 2020, the Company reported that it "believes COVID-19 has impacted shipyard operations and will result in delivery delays" of new ships.  *Id.*  As noted above, on July 10, 2020, the Company reported that it "expects only five of the nine ships originally scheduled for delivery in fiscal [year] 2020 and fiscal [year] 2021 will be delivered prior to the end of fiscal year 2021," as well as "later deliveries of ships originally scheduled for fiscal [year] 2022 and 2023."  *See* July 2020 Business Update. *See supra*, Part I.C.4.e(ii).

July 13, 2020

of wet/dry periods, scope of work, and cost/budget considerations.  The CAM Team's examination will include the integration of design changes that would address environmental compliance concerns (*e.g.*, food waste management, Engine Control Room design, piping arrangements to avoid cross-contamination of waste streams, and quality of piping materials to mitigate deterioration/corrosion), as well as other health,[170] safety, and security compliance concerns (*e.g.*, measures for the prevention and control of infectious disease spread on ships in light of COVID-19).

The Company has recognized the role that ship system design can play in promoting or forming a barrier to compliance, including the impact that ship design has on the ease with which compliant operations can be carried out in an efficient manner.  *See* Employee Interview/Call Notes.  While the CAM understands that many of the ways that ship system designs get updated, including through the new build and dry/wet dock processes, are on hold during the suspension of the Company's cruise operations, the CAM Team will seek to understand in ECP Year Four how the Company is integrating compliance concerns into ship design.  In particular, the CAM Team understands that, prior to the onset of COVID-19, design changes were either being considered, or in process of being implemented, to:  (1) improve food waste separation; (2) redesign piping to avoid cross-contamination between waste streams; (3) eliminate leaks and redesign piping to minimize bilge water accumulation; and (4) reconfigure piping arrangements to allow for more efficient bilge water offloads on select ships.  *See* Employee Interview/Call Notes.

---

[170] The CAM Team's review of public health inspection results from the United States CDC's Vessel Sanitation Program indicates that out of 284 inspections between January 2017 to March 2020 of ships across all Carnival Corp. brands, slightly over 3% (9 inspections) resulted in failing scores.  *See* https://wwwn.cdc.gov/InspectionQueryTool/InspectionSearch.aspx.

July 13, 2020

The COVID-19 pandemic has only increased the importance of this area of focus.  Not only will the Company need to address the backlog of projects resulting from postponed drydocks and delayed new build progress, but the Company will also need to consider the impact of ship design on the potential spread of a new, highly infectious disease.  A report by a team of medical professionals involved in implementing the *Diamond Princess* quarantine details some of the ship design features that made an onboard quarantine difficult, including:  limited points of ingress and egress; small crew living quarters; and limited crew dining area spaces making social distancing and isolation difficult.  *See* Y. Yamahata and A. Shibata, *Preparation for Quarantine on the Cruise Ship Diamond Princess in Japan due to COVID-19*, JMIR Public Health & Surveillance (May 2020), *available at* https://pubmed.ncbi.nlm.nih.gov/32365046/.  Similarly, architects working on ship design in the wake of COVID-19 have emphasized the need to eliminate areas of crowding, including at embarkation/disembarkation points, theaters, and in crew quarters.  *See* M. Hines, *'Hygiene is the new luxury': How cruise ship design could evolve to ward against outbreaks*, USA TODAY (May 20, 2020), https://www.yahoo.com/news/hygiene-luxury-cruise-ship-design-170620642.html.

The CAM Team will seek to better understand how the Company addresses these ship design issues to promote compliance in all HESS areas in ECP Year Four.  In particular, the CAM Team will evaluate the Company's decisions regarding guest-facing design issues, which may be crucial to regaining customers, as well as decisions regarding behind-the-scenes design issues, which are critical to compliance.

### E.    Other Support for Operations and Compliance

This includes examining the Company's efforts regarding:

- Financial resources for HESS compliance, including:  the revised Ethics & Compliance Department and Program budget for Fiscal Year 2020; the revised 2020

July 13, 2020

Operating Line Compliance Manager Annual Plan (Budget) Certifications; and the integration of HESS compliance into the annual financial and strategic planning processes. *See supra*, Part III.E;

- Purchasing and procurement processes for spare parts. *See supra*, Part IV.A.2 (discussing repeat findings on Company ships regarding pollution prevention equipment and spare parts);

- Shoreside support for ships, including the extent to which shoreside has adequate resources to provide the support needed by the ships (*e.g.*, superintendent workloads), including in light of COVID-19-releated staff reductions. *See supra*, Part I.C.4.f (discussing staff reductions); Part IV.A.3 (discussing crew staffing and workload concerns and a prior RAAS study of superintendent workloads); and

- Efforts to improve the clarity and understandability of HESS policies and procedures, including the goal to implement "new shorter and clearer" environmental procedures before ships resume service. *See* Draft Pause Priorities Plan at PCL_ECP00166542. The recently revised DOJ Corporate Compliance Program Guidance emphasizes the importance of evaluating whether "policies and procedures been published in a searchable format for easy reference," as well as whether a company "track[s] access to various policies and procedures to understand what policies are attracting more attention from relevant employees." DOJ Corporate Compliance Program Guidance at 4.

## F.    Company Response to Internal and External Findings

This includes examining the Company's response to findings from the CAM, TPA, RAAS, outside consultants, and other internal and external studies and assessments, such as: the DNV GL Investigations Assessment; the Propel Environmental Compliance Culture Assessment; the ECP-mandated Fleet Engineering Survey; the Holland America Group Human Factors Study; the Holland America Group Workload Study; the participant feedback surveys and reports from the Operational Excellence and Environmental Excellence CSMART training courses, *see* CAM March 2020 Quarterly Report at 116-17; and the Food Waste Workload Assessment.

## G.    Post-2022: Compliance Beyond the ECP

From the beginning of the ECP, the CAM has expressed the view that, when the ECP comes to an end in 2022, the best scenario for the long-term sustainability of the Company's compliance program would be that no changes to the program are needed or desired because the

July 13, 2020

ECP requirements have become fully integrated into the Company's operations as the new normal.  *See* Employee Interview/Call Notes.  With that goal in mind, the CAM Team has supported the Company's efforts to revise provisions of the ECP that have proven to be inefficient or ineffective in practice and has actively sought input from Company personnel about additional ECP provisions that may not be practical long-term.  *See* CAM Second Annual Report at 27-31 (discussing joint efforts by the Company, CAM, and TPA to revise ECP provisions, including provisions related to Environmental Officer workload).

During ECP Year Four, the CAM Team will continue to engage the Company on this issue, including seeking additional input in light of operational and other changes resulting from COVID-19.  Through this process, the CAM Team will also seek to evaluate the Company's capacity for continuous improvement in 2022 and beyond, particularly in light of the significant staffing reductions and other impacts from COVID-19.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor
July 13, 2020

July 13, 2020

**APPENDIX A:  STATUS OF PROBATION REVOCATION AGREEMENT COMMITMENTS**

| Deadline | Obligation | Status |
|---|---|---|
| **Immediately** | **Search Firm for New Board Member.** The Company will immediately engage a search firm to assist the Boards of Directors to recruit a new board member with significant corporate compliance experience. | Search firm retained in July 2019; appointment of new Board member announced April 21, 2020 |
| **06/01/2019** | **Consultant Recommendations.** The Company shall provide the Court, CAM, TPA and Interested Parties with the consultant's further recommendations. | Submitted June 1, 2019 |
| **06/2019-08/2019** | **Tiger Teams.** The Company's tiger teams intend to meet in Washington D.C. on June 3-7, 2019 for planning workshops in which most of the inner workings and plans will be finalized. The tiger teams will be dedicated to visiting at least 30 ships between June and August. | Met June 3-6, 2019; visited 30 ships between June-August 2019 |
| **06/10/2019** | **Financial Penalty.** The Company agrees to pay an additional financial penalty of $20 million. | The Company reports that this was paid on schedule. *See* Status Conf. Tr. at 16 (July 19, 2019). |
| **06/30/2019** | **Special Condition 13(a) Reporting Process.** The Company shall submit for approval to the Interested Parties a proposed process, including the criteria for determining which incidents to report and how they will be reported in compliance with Special Condition of Probation 13(a). | Submitted June 28, 2019 |
| **07/01/2019** | **Interim Progress Report.** The Company will provide an interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted July 1, 2019 |

July 13, 2020

| Deadline | Obligation | Status |
|---|---|---|
| **07/03/2019** | **Management Acceptance of Responsibility Statement.** The Company will issue a statement to all employees in which the CEO of Carnival Corporation & plc (and other senior management if they so choose) personally accepts management responsibility for the probation violations. | Issued July 1, 2019 |
| **08/01/2019** | **Interim Progress Report.** The Company shall provide a second interim report on its progress toward completing a proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 1, 2019 |
| **08/01/2019** | **Food Waste Management Implementation Plan (Part One)**. The Company will provide to the Interested Parties, TPA, and CAM an implementation plan specifying the project, the project owner, and specific timetables for Part one – improved training, supervision, staffing, and culture – of its Three Part Program addressing food waste. | Submitted August 1, 2019; update submitted September 4, 2019 |
| **08/02/2019** | **Draft Unified Regulatory Reporting Policy.** The Company will submit for review and comment to the Interested Parties, CAM and TPA a draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Submitted July 31, 2019 |
| **08/14/2019** | **Proposed Action Plan on Corporate Re-Structuring.** The Company shall provide the Court, CAM, TPA and Interested Parties with the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Submitted August 14, 2019 |
| **08/23/2019** | **Comments on Draft Unified Regulatory Reporting Policy.** The Interested Parties, CAM, and TPA will provide comments to the Company, if any, on the Company's draft new policy in the | Joint CAM/TPA comments submitted August 23, 2019 |

July 13, 2020

| Deadline | Obligation | Status |
|---|---|---|
| | Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | |
| 08/28/2019 | **Comments on Proposed Action Plan on Corporate Re-Structuring.** The Interested Parties, CAM and TPA will provide any comments or suggestions to the Company about the Company's proposed action plan to restructure its existing corporate compliance governing authority. | Joint CAM/TPA comments submitted August 28, 2019 |
| 09/13/2019 | **Final Action Plan on Corporate Re-Structuring.** The Company will provide a final version of its action plan to restructure its existing corporate compliance governing authority to the Court. | Submitted September 13, 2019; update submitted October 9, 2019; supplements submitted November 1, 2019 (preliminary financial plan) and December 10, 2019 (final financial plan)<br><br><span style="color:red">Additional supplement (updated final financial plan) expected week of July 27, 2020</span> |
| 09/13/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 13, 2019, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the court. | -- |
| 09/22/2019 | **Final Unified Regulatory Reporting Policy.** The Company will adopt and implement a final new policy that addresses the comments it received from the Interested Parties, the CAM, and the TPA on the draft new policy in the Company's Environmental Management System that will govern the reporting requirements for discharges according to United States federal and state laws. | Policy implemented in Global HESS September 19, 2019 |

July 13, 2020

| Deadline | Obligation | Status |
|---|---|---|
| 09/23/2019 | **[Sanctions.]** If the Company fails to submit an action plan to restructure compliance by September 23, 2019, the Court may impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the court. | -- |
| 10/09/2019 | **[Sanctions.]** If, by October 9, 2019, the Company fails to complete implementation of certain tasks enumerated in September 13, 2019 compliance action plan, the Court may impose sanctions of up to $1,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 10/09/2019 | **Environmental Corporate Compliance Manager Promotion.** The Company will elevate the Environmental Corporate Compliance Manager. | Environmental Corporate Compliance Manager promoted from Vice President to Senior Vice President on May 17, 2019 |
| 10/09/2019 | **Chief Ethics & Compliance Officer Charter and Job Description.** The Company will create the Chief Ethics & Compliance Officer charter and job description. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Chief Ethics & Compliance Officer Appointment.** The Company will appoint the Chief Ethics & Compliance Officer. | Chief Ethics & Compliance Officer officially assumed duties August 12, 2019 |
| 10/09/2019 | **Executive Compliance Committee.** The Company will create the Executive Compliance Committee. | Submitted September 13, 2019; update submitted October 9, 2019 |
| 10/09/2019 | **Annual Training Curriculum for Boards of Directors.** The Company will create an annual training curriculum for members of its Boards of Directors that would include corporate compliance topics. | Submitted October 9, 2019 |
| 10/09/2019 | **Boards' Statement on Commitment to Compliance.** The Company's Boards of Directors will adopt a new written statement | Submitted October 9, 2019 |

July 13, 2020

| Deadline | Obligation | Status |
|---|---|---|
|  | that reiterates the Company's and the Boards' commitment to compliance. |  |
| 10/31/2019 | **Food Waste Disposal Technologies Analysis.** The Company shall review and provide an analysis of: (1) new food waste disposal technologies; (2) options for redesign of existing food waste disposal systems and associated processes; and (3) the optimization of food waste disposal systems and associated processes. | Submitted October 31, 2019 |
| 11/01/2019 | **[Sanctions.]** If the Company fails to complete implementation of certain tasks to restructure compliance by November 1, 2019, the Court may impose sanctions of up to $10,000,000.00 per day, until the date of compliance, as determined by the Court. | -- |
| 01/31/2020 | **Food Waste Management Implementation Plan (Part 3).** The Company shall provide to the Interested Parties, TPA, and CAM an implementation plan to optimize food waste management, including food waste disposal systems and associated processes, specifying projects, the project owners, and specific timetables for milestones. | Submitted January 31, 2020 |
| No deadline set | **Third-Party Food Waste Staffing Assessment.** The Company will retain a qualified third-party to assess the necessary staffing levels for both the operational and compliance aspects of food waste management to determine appropriate resources to comply with the updated procedures. | Third-party assessment submitted to Interested Parties, CAM, and TPA on April 17, 2020 |
| May 29, 2020 | **Company Plan in Response to Third-Party Food Waste Staffing Assessment.** Within forty-five days of receiving the third-party food waste staffing assessment, the Company will provide the Interested Parties, CAM, and TPA with its plan in response to the assessment. | Submitted June 2, 2020 (*extension agreed upon with Interested Parties, CAM, and TPA*) |

July 13, 2020

| Deadline | Obligation | Status |
|---|---|---|
| **12/31/2021** | **Single-Use Plastic Reduction.** The Company shall reduce the purchase and consumption of single-use plastic items across the corporate fleet by 50 percent. | TBD |
| **12/31/2021** | **Food Waste Weight Reduction.** The Company shall reduce the total weight of food waste that the Company creates by 10 percent. | TBD |
| **04/18/2022** | **Commitment of $20 Million in Capital Expenditures to Optimize Food Waste Management.** The Company has committed a minimum of $20 million in capital expenditures throughout the remainder of probation to optimize food waste management, including food waste disposal systems and associated processes. | TBD |

July 13, 2020

**APPENDIX B:  COMPANY INITIATIVES**

| Category | Initiative | Description |
|---|---|---|
| Communications & Awareness | **Case Studies** | An initiative to share lessons learned from incidents.  Case studies typically take the form of a short document summarizing a notable environmental incident that occurred on a Company ship, along with lessons learned and reminders to avoid similar incidents in the future. |
| Communications & Awareness | **ECP Newsletter** | A monthly newsletter from the Chief Maritime Officer covering issues and developments related to environmental compliance. |
| Communications & Awareness | **Electronic HESS Notice Boards** | A program to replace paper-based HESS notice boards on ships with flat screen televisions. |
| Communications & Awareness | **Environmental Compliance Notices** | Fleetwide communications from the Environmental Corporate Compliance Manager's team that raise awareness about environmental compliance-related matters and typically require shipboard personnel to take certain actions to promote compliance. |
| Communications & Awareness | **Ethics & Compliance Week** | A weeklong event held in November 2019 at all Holland America Group offices to highlight the importance of ethics and compliance.  Some ships also held events onboard.  The theme was "Awareness, Recognition, Reinforcement." |
| Communications & Awareness | **HESS Feedback Stations** | A program to install HESS feedback stations on ships to allow to crew members to submit written feedback, concerns, and suggestions on HESS-related issues. |
| Communications & Awareness | **Operation Oceans Alive** | A trademarked brand name for the Company's environmental compliance and stewardship program.  It includes a communications program consisting of compliance notices, newsletters, case studies, info-graphics and video messages.  It also includes the Top 5 Program, the Environmental Excellence Awards, and the Environmental Hub online chat forum. |

July 13, 2020

| Category | Initiative | Description |
|---|---|---|
| Communications & Awareness | **Safety and Environmental Awareness Bulletin** | A quarterly bulletin providing information related to marine safety, technical safety, and environmental incidents and near misses that took place on Company ships. |
| Communications & Awareness | **Soundwaves Podcast** | A podcast hosted by the Carnival Corp. CEO that includes interviews with people throughout the Company.  It has covered various compliance-related topics, including reducing single-use plastics. |
| Communications & Awareness | **Speak Up Posters** | A program to install info-graphic posters encouraging employees to "speak up" and report compliance concerns.  The posters are refreshed each year. |
| Communications & Awareness | **Stand in Compliance Program** | A program to install signage on and around Oily Water Separator and White Box equipment to make the equipment stand out and remind crew members to follow procedures when operating it. |
| Communications & Awareness | **The Environmental Hub and Hotel Operations Forum** | An online chat forum for Environmental Officers and other compliance personnel that is designed as a platform to share environmental compliance information, as well as solicit feedback on training, procedures, and best practices.  The Company has also established an Environmental Hub Hotel Operations Forum for hotel personnel. |
| Diversity and Inclusion | **IDEA Conference** | An inaugural forum on Inclusion, Diversity, Equity, and Aspiration hosted by Carnival Cruise Line in Miami, Florida, from January 22-24, 2020. |
| Employee Incentive Programs | **Environmental Challenge Coins and Certificates** | A program to give away collectible environmental "challenge coins" to employees who go above and beyond environmental compliance and stewardship expectations. |

July 13, 2020

| Category | Initiative | Description |
|---|---|---|
| Employee Incentive Programs | **Environmental Excellence Awards** | A reward and recognition program for employees who exceed environmental compliance expectations.  Awards are given to ships achieving the highest levels of compliance, based on a standard scoring criteria. |
| Employee Incentive Programs | **HESS Employee of the Month Program** | A program to reward employees for their HESS-related compliance performance or leadership.  The criteria and rewards differ by brand. |
| Incident Data Tracking and Analysis | **HESS Monthly Dashboard** | The Chief Maritime Officer's monthly dashboard analyzing HESS compliance-related key performance indicators. |
| Other | **Environmental Control System "Get Well" Program** | A program to address concerns with the Environmental Control System (seal/lock/weld) program.  The first phase focused on reducing the number of seals on ships to a manageable level that still acts to deter and detect improper discharges.  The Environmental Corporate Compliance Manager and his team also collaborated with the CAM Team and TPA on ECP revisions to improve the effectiveness of the Environmental Control System program. |
| Training | **Tool Box Talks** | A series of supervisor-led training sessions held onboard ships that cover various environmental and technical requirements, including the Environmental Control System program, bilge water procedures, portable pump procedures, and food waste management. |
| Waste Management and Reduction | **Bilge Water Minimization Initiative** | An initiative to reduce the volume of bilge water that accumulates in ships across the fleet.  It includes a focus on the need to promptly report and repair leaks to the bilge. |
| Waste Management and Reduction | **Oily Water Separator and** | A fleetwide initiative to install updated Oily Water Separator and White Box equipment on ships.  The updated equipment is designed to be more effective at |

July 13, 2020

| Category | Initiative | Description |
|---|---|---|
| | **White Box Upgrades** | separating oil from water and more resistant to tampering.  The Company reported that these installations were completed by January 31, 2019. |
| Waste Management and Reduction | **Top 5 Program** | An initiative to address five key areas of environmental concern/risk related to:  (1) waste stream and ballast water discharges; (2) tampering or unauthorized modifications to pollution prevention equipment; (3) identification and control of vulnerable vales, fittings and portable pumps; (4) use of compliant fuels and Advanced Air Quality System operation; and (5) reporting leaks to the bilge and making timely repairs. |