**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 16-20897-CR-SEITZ**

**UNITED STATES OF AMERICA**

      **v.**

**PRINCESS CRUISE LINES, LTD.,**

      **Defendant.**

_____/

**QUARTERLY STATUS REPORT BY PRINCESS CRUISE LINES, LTD.**

Markus/Moss PLLC          DECHERT LLP
40 N.W. Third Street         1095 Avenue of the Americas
Penthouse One            New York, NY 10036
Miami, FL 33128

*Attorneys for Defendant Princess Cruise Lines, Ltd.*

Defendant, Princess Cruise Lines, Ltd. ("Princess"), the wholly owned subsidiary of Carnival Corporation & plc ("Carnival Corp." or the "Company"), respectfully submits this status report in advance of the status conference scheduled for July 29, 2020.  In addition to the information provided in this report, attached as **Exhibit A** is the Company's quarterly tracking chart summarizing the status of corrective and preventive actions taken in response to final audit findings by the TPA and various other incidents.

## I.        The Current Status of Carnival Corp.'s Operations

As the Court is aware, due to the extreme circumstances arising from the global pandemic, Carnival Corp. paused its guest operations worldwide prior to the most recent status conference in April.  That pause has continued throughout this quarter.  Pausing guest operations means that Carnival Corp. has not earned any revenue for several months, which is a situation that has literally no precedent in the Company's nearly 50-year history.  Companies in the travel and leisure industry throughout the world have been forced to lay off or furlough massive numbers of employees, and some have been driven to bankruptcy.

Carnival Corp. has not been immune from these challenges; in fact, it is taking drastic actions to help ensure its survival.  The Company has been forced to lay off or furlough thousands of shore-side employees, reduce its shipboard team by approximately 80,000, drastically decrease its expenses, and even go so far as to sell a portion of its fleet and delay the delivery dates of other new ships on order.  Carnival Corp. has also raised billions of dollars through a combination of very costly new debt and diluted equity to mitigate its lack of revenue, including an additional round of financing obtained since the last status conference.  Despite an explosive increase in their workload, the Company has significantly reduced compensation for nearly all remaining employees, as well as for the Boards of Directors.  The Chief Executive Officer has taken a 50%

1

reduction in his base compensation, and the other members of the Leadership Team and the Boards of Directors have taken a 25% reduction.

Despite all of these challenges, and consistent with the Company's Corporate Vision, Carnival Corp. has channeled its resources towards promoting the safety and health of its guests, crew, and the communities the Company touches, while maintaining its focus on compliance and environmental protection.  All of Carnival Corp.'s 260,000 guests who were sailing at the beginning of the Company's pause have been returned to their home countries through the Company's sustained and arduous efforts.  For example, the Company had to navigate travel restrictions, closed borders, and medical restrictions and needed to coordinate with dozens of foreign governments in order to get all of its guests home by early June.

Carnival Corp.'s efforts to repatriate its crew members have accounted for the majority of the Company's work at sea during the past quarter.  Many of these employees live in countries that impose onerous restrictions on people (including citizens) entering the country, which has made transporting all of them home extremely challenging.  Despite these barriers, as of July 20, Carnival Corp. has transported home approximately 79,500 of the 82,500 crew members who have been identified for repatriation.  The Company has repatriated employees to more than 130 countries, sailing its own ships more than 400,000 nautical miles and chartering more than 225 flights in the face of constantly changing and evolving restrictions.  Carnival Corp. has devoted more than 50 of its ships to the repatriation efforts during the past several months, and 12 ships are continuing to sail employees home.  The Company is committed to returning home all of its remaining crew members who are not needed to operate the Company's ships while guest operations are paused.

The entire cruise and shipping industries have faced immense, if not often insurmountable, challenges in bringing home their crews. The International Chamber of Shipping recently reported that 200,000 seafarers across the world remain stranded at sea, largely due to government restrictions that prevent the embarkation and disembarkation of people in port.[1] Carnival Corp. has only approximately 3,000 such employees still at sea. During Carnival Corp.'s repatriation, the Company has kept the health and well-being of its crew members as a paramount concern. The Company has balanced its employees' physical and mental health by implementing responsible COVID-19 response measures that nonetheless enable as much freedom of crew movement as possible, making counseling services available, and working to make shore leave possible. The Company joins the maritime industry in imploring governments worldwide to relax their restrictions in order to allow crew members to return home safely.

Carnival Corp. has redirected all ships not part of the repatriation efforts to their "pause locations," which are the ports in which they will remain during the pause. A total of 59 ships have transited to their pause locations, and the Company has reduced their level of operations to their "final pause status," *i.e.*, the safe staffing levels necessary to maintain the ships in their reduced operational state. Another five ships have reached their pause location but are still undergoing reductions in operation to reach their pause status. The Company expects substantially all of its ships to reach their full pause status during the third quarter of 2020.

Even with Carnival Corp.'s focus on cash preservation during the pause in guest operations, the Company's shore-side personnel are paying close attention to make sure that its ships are

---

[1]  *See* INT'L CHAMBER OF SHIPPING, *Global Shipping Fleet to Sound Horns on 8 July to Remind Governments Over Need for Urgent Crew Change* (June 30, 2020), https://www.ics-shipping.org/news/press-releases/view-article/2020/06/30/global-shipping-fleet-to-sound-horns-on-8-july-to-remind-governments-over-need-for-urgent-crew-change.

adequately staffed, particularly with sufficient crew members in the technical and deck departments. Carnival Corp. has set the staffing levels for its ships that have reached their pause status at levels above the requirements mandated by the International Convention for the Safety of Life at Sea, and the Company has coordinated with each ship's flag state when setting its staffing levels. The Company is committed to ensuring staffing levels that are sufficient to meet all of its environmental standards and its legal obligations.

## II.   <u>Carnival Corp.'s Pause Priorities Plan and Resumption of Guest Operations</u>

One of Carnival Corp.'s Brands, AIDA Cruises, expects to recommence cruises on three ships in August.[2] These cruises will each depart from Germany and last approximately three days without calling on ports other than the ships' home ports. Carnival Corp. will evaluate these cruises and determine when it is appropriate to expand and add visits to other ports.

Carnival Corp. is assessing when and how its remaining Brands may resume guest operations. In preparation for the resumption of operations, the Chief Ethics & Compliance Officer ("CECO") and Environmental Corporate Compliance Manager ("CCM") created a draft of the Company's Pause Priorities Plan ("PPP"), outlining the environmental and other compliance-related tasks that Carnival Corp. will aim to complete by the time that its ships resume operations or soon thereafter. In particular, the CCM performed a feasibility assessment together with the Operating Line Compliance Managers who report to him, the Chief Maritime

---

[2]   AIDA Cruises' 14-ship fleet currently includes only two Covered Vessels that are governed by Carnival Corp.'s Environmental Compliance Plan ("ECP"), and the three ships on which AIDA will resume guest operations are not Covered Vessels. Carnival Corp. expects in the near future to remove the Certificates of Financial Responsibility ("COFRs") from more ships, which will cause them no longer to be Covered Vessels, because they will be sold or recycled or are ships based in Europe or Australia that simply will not, for various commercial reasons, maintain itineraries that visit the United States for the foreseeable future. Carnival Corp. anticipates removing COFRs from a total of 18 ships, which will cause the percentage of Covered Vessels in its fleet to decrease from 70% to 62%, after accounting for the anticipated departure of certain ships from the fleet altogether.

Officer, and other key stakeholders before deciding upon the current PPP.  This assessment included considering a number of factors such as the availability of parts, materials, and third party contractors.  In addition to many other topics, the plan addresses issues that the CAM has cited as needing improvement: keeping ships adequately staffed with qualified crew members, maintaining the availability of critical environmental spare parts, and making outstanding repairs to pollution prevention equipment.

Carnival Corp. provided a draft of the PPP to the CAM, and the CAM has responded with two principal criticisms surrounding the environmental sections of the PPP:  (1) The plan lacks set dates by which tasks will be completed, and (2) the plan does not include a guarantee that no ship will sail before all of the tasks in the plan that pertain to the ship have been completed.  We address these points here:

1.  *Deadlines* – The environmental section of the PPP does not assign specific deadlines by which many of its tasks must be completed.  Instead, it categorizes tasks into those which: (1) are a priority to complete before a ship returns to service, or within at least 60 days after returning to service; (2) would be helpful to complete before a ship returns to service but are complicated by various external factors beyond the Company's control; and (3) cannot realistically be completed before a ship returns to service but will be completed at a feasible time thereafter.  Setting specific deadlines for these tasks is impossible because many of the tasks that are in the PPP rely on parties beyond the control of Carnival Corp., and the Company has not developed a full schedule of when the fleet will resume cruising.  The Company's need to rely on third parties is always a hindrance to scheduling, but this is especially so given the uncertainty and likely ongoing disruptions to business, manufacturing, supply chains, and transportation caused by COVID-19.

However, the Company has set specific deadlines for the tasks in the PPP that lie substantially within its control—for example, tasks related to improving the Company's investigations and culture.  Tasks that rely on third parties or other outside factors for completion, on the other hand, do not have specific deadlines.  For example, tasks such as installing ballast water treatment systems and gray water filters require third-party contractors to complete.  Other tasks such as replenishing a ship's critical spare parts require third parties to manufacture and deliver new products, including to parts of the world where the ships do not normally operate but have been relocated during the pause.  Still other tasks such as installing new signage about food waste handling require Company personnel to travel among various ships, and such travel is, as the Court is aware, extremely difficult under present circumstances.  Setting realistic deadlines for tasks such as these is impossible to do in these unprecedented and unpredictable times.  Nonetheless, the Company is confident that it has the capability to be in compliance and is committed to protecting the environment both during the pause and upon resumption of guest operations.

Despite these challenges, Carnival Corp. remains committed to making all the changes that it can control.  The CCM in particular is supervising on a daily basis the implementation of all PPP commitments to identify any potential delays or issues and to solve them expeditiously so that Carnival Corp. can bring each ship back better able to sustain compliance in the long term.  Carnival Corp.'s goal of making the ships stronger than they were before the pause may not happen immediately upon a given ship's re-entry, but the Company is committed to achieving this goal.

2.  *Guarantees* – The environmental section of the PPP provides that if a task for a particular ship is not completed before the ship is scheduled to resume guest operations, the ship

6

may return to service, and Carnival Corp. will document the tasks remaining, and explain why they were not completed before the ship resumed guest operations. The CAM contends that the failure to guarantee that tasks will be completed before a ship resumes guest operations demonstrates a lack of commitment and that the Ethics & Compliance Department lacks sufficient authority.

Carnival Corp., the CECO, and the CCM respectfully disagree. While the extensive authorities of the CECO and the CCM are described more fully in the next section, what is important to emphasize here is that the authorities who decide when ships may sail, including Carnival Corp.'s Chief Executive Officer, must consider and weigh numerous factors— operational, environmental, contractual, reputational, and fiduciary. No Carnival Corp. ship will resume guest operations until the Company is confident that it is able to meet the Company's obligations under law, regulations, and the ECP.

The compliance tasks identified in the PPP exceed what is required by law and even the ECP. The CAM has suggested that the Company should make additional guarantees in the PPP, *see* CAM Third Annual Report at 141, but these also are not legally required and exceed the ECP:

- *Pollution Prevention Equipment* – The temporary malfunction of a piece of pollution prevention equipment does not violate the ECP unless it independently violates some other environmental law. The Company is required only to develop adequate budgets to maintain and repair pollution prevention equipment, develop best practices for such equipment's maintenance and repair, timely fix any malfunctioning pollution prevention equipment, and report any malfunction to the ship's applicable Operating Line. ECP §§ III.A.10, III.A.17, IV.B.1.d, IV.B.1.i, IV.B.2.d.

- *Spare Parts* – A ship's temporary lack of one or even many critical environmental spare parts does not violate the ECP. The Company is required to maintain a system to identify critical environmental spare parts, identify when those parts are missing, and timely order replacements. ECP §§ V.B.2, V.B.3.

- *Full Complements of Deck and Technical Officers* – The ECP does not mandate specific staffing levels. The Company is required to remedy any "inadequacies in the size and

capabilities of vessel crews" if the existing crew sizes are "proven as a contributing factor to their inability to meet the objectives of this ECP."  ECP § I.F.

- *Information Technology Systems* – There is no requirement in the ECP that the Company install specific information technology systems; such systems are voluntary measures by which the Company increases the ease of complying with ECP requirements.

- *Vetting of Shore-side Waste Vendors* – There is no requirement in the ECP that the Company vet the vendors that it uses to dispose of shore-side waste, and many of those vendors are vetted by local port authorities, which sometimes require that the Company use a specific vendor.

Carnival Corp. selected the tasks in the PPP to go further than the ECP requirements listed above in order to achieve the Company's goal of sustaining the ECP standards and more for many years to come.  Some efforts to make the ships stronger are currently underway and will be completed by the time the ships return to sailing.  However, other efforts may not be accomplished within that timeframe.  Although Carnival Corp. cannot definitively declare that all improvements will be made by the time of re-entry, this does not undermine the Company's commitment to making these improvements.

## III.    Creation of the Ethics & Compliance Department

In the past year, Carnival Corp. has created a company-wide Ethics & Compliance Department, as required by the agreement that the Court adopted to resolve Princess's probation violations.  The CAM contends that the top officers in the Ethics & Compliance Department, the CECO and CCM, do not have the level of authority required by that agreement and the ECP.

Carnival Corp. believes that the CECO and the CCM are vested with sufficient authority and that their authority meets not only the requirements of the ECP and the probation violation agreement, but standards of good corporate governance as well.  Their authority was described in detail in the Ethics & Compliance Charter that the Company developed in August 2019 and revised in response to the CAM's and the TPA's comments, as required by the probation

violation agreement.  In addition, the CAM has not identified a specific obligation in the ECP or the probation violation agreement that they lack the authority to implement.

The CECO's and the CCM's authority compares favorably to the Department of Justice's guidance for compliance programs and other "best practices" in the compliance field.  Both the CECO and the CCM report to Carnival Corp.'s Chief Executive Officer and Boards of Directors.[3]  Each of them meets with the respective committees of the Boards to which they report on at least a quarterly basis, and some of the CECO's meetings occur during sessions in which the Chief Executive Officer is not present.  During the Company's response to the COVID-19 pandemic, the CCM has been meeting with the Boards' HESS Committees even more frequently than before—on almost a monthly basis.  One of the committees to which the CECO reports is a permanent committee specifically dedicated to compliance, and it includes a new member who has a long career of compliance experience.  The CECO communicates regularly with the members of this committee between formal meetings.  All members of the Boards of Directors receive training about compliance issues on a regular basis.

The CECO is a member of Carnival Corp.'s Leadership Team, which consists of nine executives from throughout the Company and currently meets five times or more each week to address the most important issues related to the Company's governance.  The CECO's compensation is on par with the other members of the Leadership Team, and his employment is subject to contractual protections that prevent his removal without approval from members of the Boards of Directors.  The Ethics & Compliance Program that the CECO oversees includes direct

---

[3]     The CECO reports directly to the Chief Executive Officer and has a dotted-line reporting relationship with the Compliance, HESS, and Audit Committees of the Boards of Directors.  The CCM reports directly to the CECO, and he has a dotted-line reporting relationship with the Chief Executive Officer and the Boards' HESS Committees.

reports within each of Carnival Corp.'s different Operating Lines and has been allocated sufficient resources in the Company's financial plans.

The CAM's concern that the CECO and the CCM lack authority appears to arise from his opinion that certain initiatives for which the CECO and CCM are responsible have been inappropriately delayed or are inadequate. One such initiative is the PPP, which is discussed above. Another is Carnival Corp.'s response to the culture survey published last year. In response to that survey, the Ethics & Compliance Department designed a Culture Action Plan, which was being finalized in the weeks before COVID-19 became a global pandemic. A revised Culture Action Plan will be finalized by the end of this month to incorporate priorities and changes reflected within the PPP and other recent developments.

Carnival Corp. appreciates the CAM's frustration with how long it has taken to publish a company-wide response to the culture survey. However, as the CAM recognizes, fostering a proper compliance culture requires participation from Carnival Corp.'s most senior leadership. *See* CAM Third Annual Report at 88. It is also a time-consuming endeavor. Instead of focusing on the culture survey at this particular juncture, the Company's senior management has spent considerable time and effort—not to mention hundreds of millions of dollars—in getting almost 80,000 crew members home despite daunting challenges and barriers posed by their home countries and striving to ensure their good health and wellbeing. Although the CAM has often commented that the Company's leadership says the right things but does not take actions that match its words, the Company believes the actions of senior management, particularly during this crisis, dispels that notion, and also speaks volumes about the caring culture they are trying to build and sustain.

The CAM submits that the delays in Carnival Corp.'s finalizing its response to the culture survey and its PPP illustrate that the CECO and the CCM lack authority to implement initiatives across the Company's Brands.  But the CECO and the CCM have moved at the steady pace that they have because they believe that the projects the Company should undertake are better when they draw upon the subject matter expertise of employees across the Company, including the Brands, and coordinate with those experts, rather than unilaterally develop and implement new policies.  Carnival Corp. recognizes that the CAM may disagree with the CECO's and the CCM's management style, critique the characteristics of specific projects they pursue, and offer his opinions about the weaknesses or delays of those projects.  Carnival Corp. will continue to consider the CAM's views concerning this matter and is committed to keep improving.  The CECO and CCM have found many of the CAM's opinions about specific projects to be helpful. However, the CAM's criticisms about the processes and outcomes of certain projects for which the CECO and CCM are responsible are not evidence that the CECO and CCM lack the requisite authority.

## IV.   Restructuring of the HESS Investigations Department

Carnival Corp. acknowledges that it needs to continue strengthening the Incident Analysis Group ("IAG"), which is the department responsible for investigating HESS incidents. Accordingly, the Company has implemented a number of recent improvements and is prioritizing others in the upcoming weeks.

Carnival Corp. is currently searching for a new Vice President to lead the IAG.  The department is currently being overseen by the Ethics & Compliance Department's Corporate Compliance Manager responsible for Health, Safety, and Security, who has substantial experience dealing with investigations during his 42 years working in the maritime industry. The day-to-day responsibilities of the IAG are being handled by the previous leader's deputy,

who has worked for Carnival Corp. for more than 16 years.  The Company anticipates appointing a permanent leader of the IAG before most guest operations resume.

Carnival Corp.'s efforts over the past year to improve the IAG have borne some fruit, even though there is still much more progress that the Company recognizes it needs and would like to make.  The Company revised and improved its investigative procedures to make them more understandable, and also included a new procedure specifically designed to prioritize the need to share "lessons learned" from the investigations.  The Company reduced the number of investigations that had been pending for several months without any reports being issued, and it intends to use the pause in guest operations to further reduce this backlog.

The Company also retained a reputable third-party consultant to conduct root cause analysis training for the department's investigators, which the CAM said "appeared to provide good analytical methods and tools, with a skilled and highly experienced instructor."  CAM Third Annual Report at 198.  The Company also administered new computer-based training in root cause analysis to employees from the Brands who investigate less serious incidents.  Although Carnival Corp. agrees with the CAM that the root cause analysis set forth in investigative reports must be improved, the Company believes that this training and its new investigative procedures and report templates have laid the foundation for this improvement.

The CAM is concerned that the IAG is not independent from the personnel responsible for maritime operations, whose incidents the IAG is responsible for investigating.  The CAM's concern is based in part on the Ethics & Compliance Department's recent decision to create an Advisory Council of subject matter experts from throughout the Company, which will be responsible for providing guidance to the IAG on various issues designed to help improve the overall investigative program.  The CAM's comments suggested to the Company that he

understood that the Advisory Council would have substantive input into, or make decisions about, the scope or outcome of any investigations.  This was a misunderstanding, perhaps induced by the name "Advisory Council."  To be clear:  The body will have no role in investigations, and it will not limit in any way the independence of the IAG.  It is intended solely as a resource to the IAG, not a limit or authority over it.  To avoid confusion on this point, the Company revised the PPP to rename the Advisory Council to the Investigations Working Group.

Carnival Corp. recognizes the importance of establishing and maintaining an independent investigative function, free from improper influence of those impacted by its investigative work, conclusions, and recommendations.  The Company is committed to this goal and will continue to evaluate the investigative function and take the necessary steps to ensure its effectiveness, professionalism, and independence.

## V.   **Improved Handling of Food Waste**

Carnival Corp. has made significant progress within the past year in its handling of food waste, particularly the separation of non-food from food waste, and the Company appreciates the CAM's recognition of this improvement in his annual report.  The pause in guest operations, however, has slowed further progress in certain initiatives in this area during the past quarter, such as the installation of food waste digesters and the elimination of certain types of single-use plastics.  We wish to mention, however, two points related to the Company's handling of food waste.

*First*, prior to the pause, Carnival Corp. had made substantial progress in reducing the ships' food waste and single-use plastics.  In fact, the Company was proceeding ahead of the schedules established by the agreement that resolved Princess's probation violations, and the target reduction in food waste had nearly been met.  In light of public health and hygiene concerns raised by the COVID-19 pandemic, however, Carnival Corp. expects that it may need

to scale back its planned decrease of certain single-use plastic items once guest operations resume.  Certain items like communal sugar shakers and ketchup bottles can increase the spread of disease onboard a ship because many guests will touch them.  The Company may decide that it is better to protect public health by replacing these items with single-use sugar or ketchup packets and to account for the environmental risk posed by such items through its recently enhanced food waste separation practices.  Despite these potential future changes, Carnival Corp. is confident that it can make corresponding decreases to the procurement of other single-use items to stay on track with its overall 50% reduction target.

*Second*, Carnival Corp. has delayed its plan to install food waste bio-digesters on many of its ships because of the Company's need to preserve financial resources due to the absence of revenue during the pause in guest operations.  However, the Company has recently ordered a few dozen new digesters and intends to prioritize their installation on ships that will start cruising first.  The CAM submits that, unless Carnival Corp. installs the digesters as planned, compensates for the absence of digesters by installing alternative food disposal equipment, or disposes of all its ships' food waste ashore, the Company's senior management will have "knowingly" allowed "discharges of non-food waste in violation of MARPOL Annex V."  CAM Third Annual Report at 73-74, 115.

The planned installation of digesters was not the Company's only means of improving its separation of food and non-food waste.  Within the past year, the Company put into place a multi-layered system of checks of various stages of the food waste stream at the recommendation of its food waste tiger teams.  Carnival Corp. will continue to rely on these checks to prevent improper discharges when its ships resume guest operations and will increase the frequency of or otherwise enhance the checks if necessary.

VI.   **Environmental Incidents**

Carnival Corp. recognizes that environmental incidents continue to occur and is continuously working to reduce their frequency, notwithstanding the challenges of achieving a complete elimination of all incidents in any maritime organization, let alone a company of its size.

The CAM's annual report, like many of his earlier reports, addresses instances of malfunctioning pollution prevention equipment and ships lacking spare parts.  The Company is working hard to improve the functioning and reliability of all of its pollution prevention equipment and to improve the availability of spare parts for such equipment.  Its efforts have paid off:  During each of the most recent three quarters for which data is available, for all instances of malfunctioning pollution prevention equipment, the malfunction was corrected within 24 hours more than 50% of the time.[4]  For the most recent two quarters, that frequency either approached or exceeded 60% of incidents in which pollution prevention equipment malfunctioned.  Additionally, for more than a year, the average percentage of critical environmental spare parts onboard the Company's ships has exceeded 99%.[5]  The Company notes that breakdowns in pollution prevention equipment and delays in replacing parts for such equipment rarely lead to violations of environmental law, regulations, or the ECP due to purposefully engineered redundancy in systems to provide for compliance in the event of equipment failures.[6]  Nevertheless, Carnival Corp. remains committed to further decreasing the

---

[4]    This data applies to the third quarter of 2019 through the first quarter of 2020.

[5]    This data is based on the time period between April 2019 and May 2020.

[6]    *Cf.* CAM Third Annual Report at 214 (noting that the CAM's concerns about malfunctioning pollution prevention equipment are partially driven by the "significant workload concern" that these incidents pose for crew members "even when they do not rise to the level of a regulatory or ECP violation").  Section II of this status report explains in greater detail the Company's ECP obligations related to pollution prevention equipment and critical environmental spare parts.

rate at which pollution prevention equipment malfunctions and critical environmental spare parts are unavailable, as the Company will always strive for sustained compliance with all environmental laws, regulations, and the ECP.

## VII.    Carnival Corp.'s Commitment to Diversity and Inclusion

Carnival Corp. continues to address the need for greater diversity and inclusion in its workforce.  The CAM states in his annual report that he intends to focus on assessing Carnival Corp.'s efforts to increase diversity in its workforce during the upcoming year.  *See* CAM Third Annual Report at 236.  Carnival Corp. is committed to creating a diverse and inclusive workplace but strongly disagrees with the CAM's assessment that "the efforts of the Company do not yet match these words."  *See id.* at 241.  Moreover, the Company's efforts to improve diversity and inclusion are not required by the ECP and are insufficiently related to the Company's environmental obligations to place them within the CAM's authority to monitor.  Nevertheless, ensuring a diverse and inclusive workplace is vitally important, as noted in the Company's Corporate Vision Statement.

Carnival Corp.'s leadership has recently spoken about the importance of ensuring that the Company's workforce is diverse and that its workplace is inclusive.  For example, Carnival Corp.'s Chief Executive Officer and Princess's President have recently made published statements emphasizing this importance in order to add to the international dialogue fostered by the Black Lives Matter movement.[7]  Carnival Corp. was also recently informed by Forbes

---

[7]    Specifically, Carnival Corp.'s Chief Executive Officer said, "It is not about marketing slogans or campaigns in my view, but about the proactive actions each of us personally take and hold ourselves accountable for . . . There is an opportunity here for all of us to do more—and do much better—looking closely at our diversity and inclusion results across the board and challenging ourselves as individuals to take actions that can make a difference."

Princess's President told all Holland America Group employees worldwide, "We are committed to creating a workplace where everyone feels comfortable bringing their whole, true self to work every day and has

magazine that it will be included in the magazine's 2020 list of America's Best Employers for Women.  The Company's leadership will continue to strive for a diverse and inclusive workforce as operations resume and the workforce once again grows commensurably.

## VIII.   Concerns with the Scope of the CAM's Review[8]

The CAM's annual report, similar to his most recent quarterly report submitted in March, includes an extensive discussion of the impact of COVID-19 on Carnival Corp.'s efforts to comply with public health obligations.[9]  *See* CAM Third Annual Report at 27-64.  Carnival Corp. does not dispute that its efforts to meet its legal and regulatory obligations in the spheres of health, safety, and security have some impact on its compliance with the Company's environmental obligations.  The CAM's authority to oversee Carnival Corp.'s operations in spheres not directly related to the environment must be limited, however.  The CAM should not have unbridled authority to oversee areas that have only an indirect—and often attenuated— relationship to the Company's compliance with environmental laws and regulations.  *Cf. United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring) ("The inferences must

---

[8]     Because this section addresses concerns that Carnival Corp. has with the scope of the CAM's review, the Company respectfully requests that the CAM and the Court not discuss these concerns while a representative from Carnival Corp. is not present and that the Company be permitted to participate in any discussion of these issues.

equal opportunity to develop and succeed.  Front and center in our core values is Respect.  Within that, we each commit to being open and honest, building trust, celebrating differences, including everyone, and supporting change."

[9]     Portions of the CAM's report describe the COVID-19 pandemic and Carnival Corp.'s response to the pandemic by relaying information from media reports and, in some instances, describing allegations made in lawsuits filed against Carnival Corp. or its affiliates.  Carnival Corp. does not believe it would be helpful to the Court to address all of these descriptions in detail, but the Company's silence should not be interpreted as an indication that it agrees with the statements made in these media reports and lawsuits. Notably, the U.S. District Court for the Central District of California on July 14, 2020, dismissed with prejudice claims brought in several lawsuits by former passengers on the *Grand Princess* based on their alleged exposure to COVID-19 but not having ever tested positive for or displayed symptoms of the disease.

be controlled by some limitations lest, as Thomas Jefferson warned, congressional powers become completely unbounded by linking one power to another *ad infinitum* in a veritable game of ''this is the house that Jack built.''  Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), 31 The Papers of Thomas Jefferson 547 (B. Oberg ed. 2004).'').

The authority of the CAM and the TPA is rooted in Carnival Corp.'s obligations to comply with the environmental requirements of the ECP and certain environmental laws identified in the ECP.[10]  The parties proposed the appointment of the CAM and the TPA based on their competence to assess the Company's compliance with environmental obligations, not based on any qualifications—or lack thereof—to assess compliance with public health regulations or any other type of obligation.  The judgment entered in this case authorizes the Court and the Office of Probation to assess Princess's compliance more broadly, but that oversight extends only to Princess—the only criminal defendant in this case—and not to Carnival Corp. and its other entities.

The scope of the CAM's review is not purely a legal issue; it has significant practical implications for the Company's work on environmental compliance, which is the purpose of these proceedings.  Expanding the scope of the CAM's review too broadly diverts the attention and resources of the Company to non-core environmental issues and makes it difficult for Carnival Corp. to focus and execute on core environmental compliance issues which merit the

---

[10]     Carnival Corp. understands that the CAM believes the scope of his authority was increased by the agreement adopted by the Court in June 2019 that resolved Princess's probation violations.  *See* ECF No. 134.  That agreement did authorize the CAM to assess whether Carnival Corp. satisfied its commitments to create an Ethics & Compliance Department that would be responsible for all HESS areas and not just the environment.  *See id.* § IV.  However, the agreement authorized the CAM to monitor whether Carnival Corp. completed specific actions related to the creation of the Ethics & Compliance Department.  *Id.*  The agreement did not authorize the CAM to engage in an open-ended inquiry for the remainder of Princess's probation into whether Carnival Corp. complies with all non-environmental laws or whether the Ethics & Compliance Department effectively performs its responsibilities not directly related to the environment.

Company's highest priority in the remaining time of the ECP.  Demonstrating progress on environmental compliance becomes all the more difficult if the CAM continues to expand upon his inquiries about topics such as public health, safety, and diversity—all of which Carnival Corp. is already addressing independent of his observations.

In the spirit of cooperation and compromise, the Company has complied in many instances in which the CAM has requested information that the Company believes is not directly related to the environment or the obligations imposed by the ECP.[11]  Similarly, and for the same reasons, the Company has not objected to those portions of the CAM's quarterly and annual reports that address topics unrelated to the environment.  As time goes on, Carnival Corp. may, however, object to such requests that are unreasonably burdensome or that impose significant costs.  To that end, the Company intends to review carefully the CAM's Annual Plan for the upcoming year and raise with him any concerns that some of the work identified therein is outside the scope of his authority established by the ECP.

> Dated: July 22, 2020
> Miami, Florida

> Respectfully submitted,

> MARKUS/MOSS PLLC
> By: */s/ David Oscar Markus*
> David Oscar Markus (FBN 119318)
> dmarkus@markuslaw.com
> 40 N.W. Third Street
> Penthouse One

---

[11]     As one example, Carnival Corp. circulates throughout the Company weekly reports summarizing HESS incidents.  During the first year of the ECP, the CAM requested that the Company provide the full version of this report, which would include incidents related to health and safety topics, rather than providing only the environmental portion.  Carnival Corp. decided voluntarily to provide the CAM with the full version of these reports, rather than ask the Court to adjudicate the dispute.  However, Carnival Corp. told the CAM when it made that decision that it was not conceding that he had the authority to monitor issues related to health and safety and that the Company's voluntary production of the full versions of its HESS reports should not be interpreted as such.

Miami, FL 33128
Tel: (305) 379-6667

and

David N. Kelley (pro hac vice)
Benjamin E. Rosenberg (pro hac vice)
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
Tel.: (212) 698-3500

*Attorneys for Defendant*