January 20, 2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 16-20897-CR-SEITZ**

**UNITED STATES OF AMERICA**

**v.**

**PRINCESS CRUISE LINES, LTD.,**

**Defendant.**

_____/

**QUARTERLY REPORT**

**OF THE COURT APPOINTED MONITOR (JANUARY 2021)**

I.   Preliminary Statement .................................................................................................. 1

II.  Introduction ................................................................................................................... 5

   A.   Overview of Report ................................................................................................ 5

   B.   CAM Team Methodology ...................................................................................... 6

     1.   CAM Reporting and CAM/Company Communications ................................. 6

     2.   CAM and TPA Visits and Audits .................................................................. 7

     3.   Other CAM Team Activities .......................................................................... 8

III. Updates on ECP Year Four Areas of Focus and Company Capabilities to Meet ECP
    Objectives ..................................................................................................................... 9

   A.   COVID-19 Developments ...................................................................................... 9

     1.   Background ...................................................................................................... 9

     2.   CDC Conditional Sailing Order ..................................................................... 9

     3.   Status of Company Passenger Cruise Operations ......................................... 11

     4.   Covered Vessel List Updates ........................................................................ 13

     5.   Financial Updates .......................................................................................... 13

     6.   COVID-19 Impacts on ECP Compliance ...................................................... 14

January 20, 2021

B.    **Efforts in Support of Continued Compliance During the Pause** ............................ 14

    1.    Pause Priorities Plan ................................................................................................ 14

    2.    Court Order of October 21, 2020 ............................................................................. 15

    3.    Certifications Pursuant to the Court Order of October 21, 2020 .............................. 16

    4.    Outstanding Planned Maintenance Items ................................................................. 17

C.    **Corporate Compliance Organization** ........................................................................ 22

    1.    Background ............................................................................................................... 22

    2.    Personnel Changes ................................................................................................... 24

    3.    Notable Initiatives ................................................................................................... 25

    4.    Risk Assessment Function ....................................................................................... 28

    5.    Ongoing CAM Team Examination ........................................................................... 30

D.    **Culture** ........................................................................................................................ 31

    1.    Background ............................................................................................................... 31

    2.    Culture Action Plan ................................................................................................. 32

    3.    Ongoing CAM Team Examination ........................................................................... 37

E.    **Diversity, Equity, and Inclusion** ............................................................................... 37

    1.    Background ............................................................................................................... 37

    2.    Link to Compliance and Business Performance ....................................................... 38

    3.    Maritime Industry Context ....................................................................................... 39

    4.    COVID-19 Impacts .................................................................................................. 41

    5.    New Centralized C.A.R.E. Framework .................................................................... 41

    6.    Ongoing CAM Team Examination ........................................................................... 43

F.    **Investigations** ............................................................................................................. 43

    1.    Background ............................................................................................................... 43

    2.    Personnel Updates ................................................................................................... 45

    3.    CAM and TPA Concerns Regarding Response to Hotline Complaints ..................... 46

    4.    Outside Counsel Report on Incident Analysis Group Issues ..................................... 48

    5.    Other Initiatives ...................................................................................................... 50

    6.    Ongoing CAM Team Examination ........................................................................... 54

G.    **Food Waste Management (Prohibiting Plastic and Non-Food Item Discharges)** .. 55

    1.    Background ............................................................................................................... 55

    2.    Progress Toward Single-Use Plastic Reduction Goal ............................................... 57

    3.    Progress Toward Food Waste Weight Reduction Goal ............................................. 58

    4.    Food Waste Digester Installations ........................................................................... 60

5. Implementation of Recommendations from Food Waste Workload Assessment ...... 64
6. Other Food Waste Management Initiatives ................................................. 65
7. Ongoing CAM Team Examination .......................................................... 66

H. **Waste Vendor Assessments** ..................................................................... 67
1. Background ........................................................................................ 67
2. Recent Program Updates ...................................................................... 68
3. CAM Team Observations on Current Program .......................................... 68
4. Ongoing CAM Team Examination .......................................................... 71

I. **Training** ................................................................................................ 71
1. Background ........................................................................................ 71
2. CSMART Trainings .............................................................................. 73
3. Fleet Environmental Officer Program ..................................................... 75
4. Shipboard Trainings ............................................................................ 77
5. Shoreside Trainings ............................................................................. 78
6. IT Systems and Tools to Support Training ............................................... 79
7. Training Governance Framework ........................................................... 79
8. Ongoing CAM Team Examination .......................................................... 80

J. **IT and Data Management** ....................................................................... 81
1. Background ........................................................................................ 81
2. Global IT Strategy .............................................................................. 81
3. Updates on IT Initiatives ...................................................................... 82
4. Updates on Data Management Initiatives ................................................ 85
5. Ongoing CAM Team Examination .......................................................... 87

K. **Environmental and ECP Violations** ........................................................ 87
1. Overview ............................................................................................ 87
2. Voyage Planning Incidents ................................................................... 89
3. Advanced Air Quality System Incidents .................................................. 93
4. Ongoing CAM Team Examination .......................................................... 95

L. **Other Ongoing Areas of Focus** ............................................................... 96
1. Staffing and Other Personnel Issues ...................................................... 96
2. Integration of Compliance Considerations into Ship Design, including New Builds and Dry/Wet Docks ............................................................................... 97
3. Other Support for Operations and Compliance ........................................ 98
4. Company Response to Internal and External Findings .............................. 98
5. Post-2022:  Compliance Beyond the ECP ................................................ 99

January 20, 2021

**Appendix A:**  **Operating Company Ethics & Compliance Officer and Operating Line Compliance Manager Bios**

**Appendix B:**  **CAM/Company Communication Recap (August 6, 2020, Bi-Weekly CAM/CECO Call) (Aug. 19, 2020) (Redacted)**

**Appendix C:**  **CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call – Virtual Environmental Excellence CSMART Course Feedback) (Sept. 2, 2020) (Redacted)**

**Appendix D:**  **CAM/Company Communication Recap (August 26, 2020, Global HESS Updates Demonstration) (Sept. 4, 2020) (Redacted)**

**Appendix E:**  **Letter from CAM to Environmental Corporate Compliance Manager Regarding ECP Critical Spare Parts Management (Sept. 15, 2020) (Redacted)**

**Appendix F:**  **Letter from CAM to Chief Ethics & Compliance Officer Regarding Incident Analysis Group (IAG) and Recent Hotline Complaints Assessment (Oct. 8, 2020) (Redacted)**

**Appendix G:**  **CAM/Company Communication Recap (October 1, 2020, RAAS Dashboards Walkthrough) (Nov. 11, 2020) (Redacted)**

January 20, 2021

Consistent with the Court's Order of November 20, 2020, Dkt. No. 210, the Court Appointed Monitor ("CAM")[1] submits this Quarterly Report for the first two quarters of Year Four of the Environmental Compliance Plan ("ECP") ("CAM January 2021 Quarterly Report" or "Report").[2]  This Report focuses on developments since the CAM Third Annual Report.[3]

## I.    PRELIMINARY STATEMENT

The CAM Third Annual Report of this monitorship was issued on July 13, 2020.  At that point, the Company had already suspended all passenger cruises as of mid-March 2020, and was in the midst of seeking to return guests and crew to their home countries.

That process of repatriation entailed moving over 300,000 people to more than 130 countries.  It took months to complete, and involved chartered aircraft, commercial flights, ground transportation, and the use of the Company's own ships, as well as coordination with authorities around the globe.  This was a prodigious effort, made more difficult by travel restrictions, and by the resistance of many countries to welcome home returning seafarers.  Over the same time period, the Company reduced the size of its shoreside workforce by upwards of 45%, and sold or arranged to sell several of its ships.  Under these circumstances, the repatriation effort occupied a significant number of the Company's available managers and employees.

---

[1] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms, Dkt. No. 58-1 (Mar. 30, 2018) ("Joint Glossary"), or prior CAM Reports.

[2]  ECP Year Four is April 19, 2020, through April 18, 2021.

[3] The CAM provided the Company and the United States ("U.S.") Department of Justice ("DOJ") a copy of this Report in advance of its submission for their review and comment.  *See FINAL Carnival Corp. Response CAM Quarterly Report (January 2021)* and proposed supplemental edits (collectively, "Company Comments on Draft Report").  The CAM took the comments received into account; however, the comments did not alter the substance of the Report.

Perhaps as early as the spring of 2021, the Company intends to reverse that process.  It will attempt to return crew members to ships, and passengers to cruising.  As of this writing, it is not known exactly when the Company can resume even limited passenger cruises in the U.S. The majority of its ships are in "layup" status, operating with reduced crew levels, down to only those individuals who are necessary to maintain safe and compliant ship operations, referred to as "minimum (non-)operational manning."  As a result, ships designed for between approximately 500 and 4200 guests, which normally would require between approximately 300 and 1400 crew members, are seeking to maintain their safety, compliance, and readiness with roughly 100 or so crew members per ship.

At virtual status conferences held in April, July, and October 2020, the Company reiterated to the Court its "unwavering" commitment to compliance and environmental protection, despite its current challenges.  *See* Status Conf. Tr. at 26-27 (Oct. 16, 2020); Status Conf. Tr. at 7 (July 29, 2020); Status Conf. Tr. at 14-15 (Apr. 24, 2020).  It also stated its intent to use what it has called a "pause" in passenger cruises as an opportunity to "come back stronger, better, smarter."  Status Conf. Tr.. at 45 (Apr. 24, 2020).

The impacts of COVID-19 occurred at what might have been a major inflection point for the Company's compliance efforts, some three years into the term of probation.  Before the pandemic, despite some ongoing challenges, the Company had made, or was on track to make, substantial progress in a number of areas, including:  corporate governance, including at the Boards of Directors and top leadership levels; increased engagement and communications on compliance issues by the Boards and top leadership; training; food waste management; and continued development of the Environmental Officer program, including the newly launched Fleet Environmental Officer program and Environmental Officer training, knowledge, and

support.  In certain critical areas—most notably, internal investigations and corporate compliance culture—the Company had accepted that these were issues that required greater attention and reform.

The Company has continued to make efforts in these and other areas.  Some have been more effective than others.  The general status of these efforts is discussed in this Report. In the final year and a half of the ECP, the CAM, at the direction of the Court, will continue to examine the areas highlighted in this and prior CAM and Third Party Auditor ("TPA") Reports—with an increasing focus on the Company's capabilities for developing and maintaining, through continuous improvement, a sustainable compliance program and culture after probation ends.

Crucial to this examination will be the capacity of the Company's internal audit, investigation, and Ethics & Compliance programs to work in a unified way to provide meaningful information and analysis to both senior management and the Boards of Directors.  A related factor will be the engagement of the Boards of Directors to hold the Company's leadership accountable for compliance shortcomings.  The *Caremark* court was careful to note that Boards of Directors are appropriately limited in their function—they do not manage the corporation.[4]  But Boards' duties are informed by the nature of the compliance issues the corporation faces.  Since the Company's guilty plea in December 2016 and sentencing in April 2017, the Company's Boards of Directors are aware that repeated instances of compliance failures have persisted.  The more than 1,000 pages of CAM and TPA reports make clear that

---

[4] "Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.  Legally, the board itself will be required only to authorize the most significant corporate acts or transactions:  mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996).

these compliance issues have occurred notwithstanding the good faith efforts of thousands of employees to seek to comply. The central underlying cause identified in these reports was the need for top leadership to more fully support and promote compliance efforts, both in word and deed. Particularly where the Company's leadership has agreed to its shortcomings, as it did in pleading guilty to six probation violations in June 2019, the Boards are on notice that greater engagement, scrutiny, and accountability is needed.

And the Boards have responded. They have taken steps to enhance their compliance expertise, including: establishing a new, permanent Compliance Committee, comprised of independent directors, to oversee the Ethics & Compliance Program; retaining a private law firm to provide the Compliance Committee with separate legal representation; hiring a new member of the Boards with significant corporate compliance expertise; and developing an annual training curriculum for members of the Boards and other senior management on corporate compliance topics. In addition, the Compliance Committee recently hired outside counsel to perform a review of issues related to the Company's internal investigations function.

However, the persistence of management and culture issues heightens the risk of future non-compliance. Ultimately, the leadership of the Company will determine whether that risk ripens into a liability. As has often been expressed by the Court, the hope is that the Company's leadership emerges from the present crisis having propelled a culture of compliance throughout the Company's operations.

Some members of senior Company management have expressed concern to the CAM about the critiques of top leadership contained in CAM reports. They express the worry that such critical assessments may make it more difficult for them to earn the trust of employees. This concern misunderstands the origin of these observations. As the CAM has emphasized,

"the critical observations in CAM reports [as to top leadership] are rooted in the observations of the Company's employees.  Failing to raise these observations would not make them go away, and would undercut our ability to receive candid reports, as individuals would come to see that their concerns did not find expression in the CAM reports.  Moreover, the CAM has an obligation to the Court to accurately report on information and observations of the Company's employees."  *CAM/Company Communication Recap (August 6, 2020, Bi-Weekly CAM/CECO Call)* (Aug. 19, 2020), attached as Appendix B, at 2.

The CAM recognizes that rebuilding corporate culture is difficult in any circumstances— particularly here, where the Company first saw its problem as an operational one (*e.g.*, a need to "stop people from making mistakes" or to eliminate "bad apples"), and not as an organizational culture problem.  It took over two years of probation and the findings of the Environmental Corporate Compliance Assessment for top leadership at the All Brands Group level to accept the scope of the Company's culture problem and start taking steps to address it.  Since then, the Company has made significant efforts toward standing up a centralized compliance organization designed to, among other things, drive a consistent culture of compliance.  As Company leadership has stated, work on these efforts remains to be done.  Now, these efforts are complicated by the existential crisis brought on by the pandemic.  COVID-19 presents unprecedented challenges, but it is also an opportunity for leadership to undertake a transformational reset to support a culture of compliance mindset in the daily work of every employee.

## II.  INTRODUCTION

### A.  Overview of Report

This Report has a different format and structure than prior CAM reports, designed to deliver a more streamlined overview of core areas of focus.  Part I provided the CAM's

preliminary statement.  Part II gives an overview of this Report, as well as the CAM Team's

methodology during ECP Year Four.  Finally, Part III provides updates on the Company's

capabilities to meet ECP objectives, *see* ECP § VI.F.3.b, and its performance in other areas of

focus identified by the Court and the CAM.  The CAM Annual Report for ECP Year Four will

provide a more detailed set of findings and assessments.

## B.  CAM Team Methodology

1.  <u>CAM Reporting and CAM/Company Communications</u>

In light of the extraordinary circumstances brought on by the global COVID-19

pandemic, described in prior CAM reports, the CAM and the Company, with the Court's

approval, agreed to modify the process for CAM reporting and for CAM and TPA visits and

audits.  This included foregoing the CAM report for the first quarter of ECP Year Four, which

would have been submitted in September 2020.  *See Order Amending Prior Court Orders [DE

174 & DE 143]*, Dkt. No. 199 (Aug. 10, 2020).  In lieu of that report, the CAM and the Company

were directed to "engage in communications sufficient to allow the CAM to inform the Court of

the Company's compliance with the Terms and Conditions of Probation."  *Id.*  These

communications, which have continued to the present, include more frequent calls, interviews,

workshops, presentations, and other discussions and exchanges, both formal and informal.  In the

CAM's view, this has been a mutually productive process of increased interaction and

engagement that is expected to continue.

As part of this process, the CAM has provided several letters to the Company to provide

prompt feedback, observations, or questions on notable developments and Company efforts.

These "CAM Recap" letters are attached as Appendices to this Report, as well as being

summarized in the relevant portions of Part III below.

As noted above, current circumstances made impossible the usual program of CAM and TPA visits and audits. The CAM and TPA Teams instead conducted a program of remote ship and shoreside visits, as discussed in Part II.B.2 below. The CAM Team continues to receive high levels of cooperation and engagement from Company employees, both ship and shore, during these difficult times. The CAM appreciates the efforts of the many dedicated individuals involved in supporting CAM Team visits, workshops, document requests, and other activities—with special thanks to the Environmental Corporate Compliance Manager and his talented team, as well as the impressive corps of shipboard Environmental Officers.

   2.   <u>CAM and TPA Visits and Audits</u>

In light of the COVID-19 crisis, both the CAM and TPA, with the Court's approval, suspended all in-person ship and shoreside visits and audits in March 2020. *See* CAM March 2020 Quarterly Report at 34. In accord with the Court's Order of June 2, 2020, the CAM and the TPA have conducted an ongoing program of remote visits and audits, relying primarily on electronic document review and videoconferencing. *See ORDER RE: COVID-19 Impacts and Probation Obligations*, Dkt. No. 189 (June 2, 2020) ("Dkt. No. 189"). Between June and December 2020, the CAM Team performed:

   o   10 virtual ship visits (including one accompanying the TPA and one accompanying the Company's internal Risk Advisory and Assurance Services ("RAAS") auditors); and

   o   3 virtual shoreside office visits (including one accompanying the TPA and one accompanying RAAS).

Overall, the CAM Team's visits have run smoothly, with good cooperation from both ship crews and shoreside personnel, including information technology ("IT") and administrative support staff. Remote visits carry some inherent limitations compared to in-person visits, however. Remote ship visits do not provide the same opportunity for in-person inspections or

observations of equipment, spaces, and processes (such as food waste separation).  Remote ship

and shore visits alike also must proceed in a more formal fashion because interactions are

scheduled in advance.  As a result, there are no informal, organic interactions.[5]  Notwithstanding

these limitations, the virtual visits have continued to provide the CAM Team with valuable

insights into CAM areas of focus, including support for, and barriers to, a sustainable compliance

culture.

The CAM Team will continue to conduct virtual visits for the foreseeable future, with the

intent of resuming in-person ship and shoreside visits at an appropriate time, when it is safe to do

so.

### 3.   Other CAM Team Activities

In addition to the activities discussed above, the CAM Team has continued both to

perform an ongoing review of documents produced by the Company and to receive confidential

communications from individuals both within and outside of the Company.  The CAM Team

also remains in regular communication with the TPA and the Interested Parties,[6] including DOJ

and the Office of Probation, and reports to the Interested Parties and the Court as required by the

Court and the ECP.

---

[5] The nature of videoconferencing software can also increase the difficulty associated with interviewing individuals who do not speak English as their first language.  The CAM Team has experimented with using a remote interpreter service for certain interviews (in particular, with non-officer crew members known as "ratings"), with generally positive results.  This is one area where virtual visits provide an opportunity not available during in-person visits.

[6] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis."  ECP at § I.D.

### III.    UPDATES ON ECP YEAR FOUR AREAS OF FOCUS AND COMPANY CAPABILITIES TO MEET ECP OBJECTIVES

#### A.    COVID-19 Developments

1. <u>Background</u>

- The COVID-19 pandemic continues to present the Company with extraordinary and unprecedented challenges.  *See* CAM Third Annual Report at 27-64.  Despite these impacts, the Company has a continuing obligation to comply with the terms and conditions of probation.  The Company has expressed to the Court its commitment to compliance and environmental protection despite its present challenges.  *See Agreed Order on October 16, 2020 Status Conference*, Dkt. No. 207 (Oct. 21, 2020) ("Dkt. No. 207") at 1; Status Conf. Tr. at 26-27, 35 (Oct. 16, 2020).  The Court has expressed its interest and parallel obligation to monitor how the Company demonstrates this commitment in practice, including the concrete actions it takes to support its statements.

- The Court also has an interest in monitoring how COVID-19 response efforts affect both: (1) the safety and welfare of crew members who are responsible for operating ships compliantly; and (2) the ability of the CAM and TPA teams to safely visit ships and shoreside facilities in-person as part of their oversight responsibilities— not only with respect to their own health and safety, but also with respect to the health and safety of the ship crews and shoreside staff who would interact with them.  *See* CAM Third Annual Report at 11-15.

- As discussed in Part III.B.2-3 below, in furtherance of its oversight and monitoring obligations, and given the limits on ship visits by the CAM, the TPA, and the Company's internal auditors due to the pandemic, this Court issued an Order on October 21, 2020, requiring the Company to submit, for each Covered Vessel returning to the territorial waters of the U.S. ("U.S. Waters"), a certification signed by the Carnival Corp. Chief Executive Officer ("CEO") as to the status of compliance-related items the Company had identified as priorities.  *See* Dkt. No. 207 at 2.

2. <u>CDC Conditional Sailing Order</u>

- Between March 14 and September 30, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") issued a series of No Sail Orders that, cumulatively, banned passenger cruises on large cruise ships in the U.S. through October 31, 2020.  *See Cruise Ship Guidance*, https://www.cdc.gov/quarantine/cruise/index.html (Rev. Nov. 3, 2020).  Both CDC and the U.S. Department of State have issued a Level 4 ("Very High"—the highest level) travel advisory recommending "that all people avoid travel on cruise ships."  *See COVID-19 and Cruise Ship Travel*, https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-cruise-ship (Rev. Dec. 2, 2020).

- On October 30, 2020, CDC issued a Framework for Conditional Sailing Order for cruise ships operating or seeking to operate in U.S. Waters that introduces a phased approach for resuming passenger cruises.  *See Framework for Conditional Sailing and Initial Phase*

*COVID-19 Testing Requirements for Protection of Crew*, 85 Fed. Reg. 70,153 (Nov. 4, 2020) ("Conditional Sailing Order").

- The Conditional Sailing Order establishes several initial phases that must occur before passenger cruises may resume. These include:

  o A 28-day period of reporting COVID-19 surveillance data to CDC before a ship may enter U.S. Waters;

  o A 60-day period of crew testing (which may overlap with the 28-day reporting period);

  o A period of simulated voyages, with details regarding the timing and requirements for these voyages yet to be determined; and

  o An application to CDC for a Conditional Sailing Certification, which must be obtained before a ship may sail with passengers. *See id.*

- After these initial phases, restricted passenger cruises may begin, subject to a number of health and safety protocol requirements, such as passenger and crew testing—many details of which are still to be determined. *See id.*

- The CAM Team understands that questions remain regarding the timelines and requirements laid out in the Conditional Sailing Order, including the requirements for cruise company public health and safety protocols, and that the industry is awaiting further guidance from the CDC. *See id.*; *see also* Employee Interview/Call Notes. The CAM also understands that the Cruise Lines International Association ("CLIA"), an industry trade group that includes the Company's brands as members, has established a working group with representatives from several major cruise companies, including Carnival Corp., to engage with CDC on these issues. Apart from CLIA, representatives from Carnival Corp. have separate regular calls with CDC. *See* Employee Interview/Call Notes.

- To date, the Company has developed and regularly revised on an ongoing basis two corporate-wide sets of public health and safety instructions for mitigating COVID-19 risk to crew members. The Company reports that it has aligned these to relevant CDC guidance. *See id.*:

  o In April 2020, the Company issued protocols for mitigating COVID-19 risk to crew members remaining onboard (regardless of the ship's geographic location) during the pause. *See IN HEA/04/2020 Prevention, Control and Surveillance of Acute Respiratory Diseases (ARDs) including COVID-19 during the Pause in Guest Operations* (Rev. Oct. 14, 2020). The protocols "do[] not apply to ships conducting guest operations." *Id.* They include, among other items, instructions and guidance for: pre-embarkation screening of crew, contractors, and shoreside employees; onboard public health measures, such as face masks; onboard health surveillance, health checks, and reporting; precautions for quarantine and isolation, including cabin

ventilation, room service, laundry, and cleaning; and training on COVID-19 prevention, mitigation, and response.  *See id.*; and

o   In October 2020, the Company issued protocols for mitigating COVID-19 risk to crew members operating ships in U.S. Waters.  *See IN HEA/07/2020 Mitigation of COVID-19 among Cruise Ship Crew operating in or under the jurisdiction of the United States* (Rev. Dec. 30, 2020).  The protocols require, among other measures, that the "completed and updated CDC Technical Instructions must be followed."  *See id.*  It also sets out CDC status criteria and thresholds for "Green" ships (*e.g.*, no confirmed COVID-19 or COVID-19-like case for 28 days), "Yellow," ships (*e.g.*, one or more COVID-19 or COVID-19 cases, pending test results), and "Red" ships (*e.g.*, one or more confirmed COVID-19 or COVID-19 cases), along with the public health and safety measures required at each of these levels.  *See id.*

   The protocols also include measures for contractors and other visitors who will be onboard for seven nights or less.  Although such individuals are not required to complete a 14-day onboard quarantine upon embarkation, they must follow a set of precautions, including:  testing on the day of embarkation; taking all meals in their cabin; having no interaction with crew except to perform duties; maintaining physical distancing with crew as far as possible at all times; and returning to their cabin when not working.  Any crew members who have to work with the contractor/visitor for a cumulative total of more than 15 minutes in a 24-hour period must quarantine for 14 days after the work is completed.  *See id.* at § 1.6.

•   The Company has not issued corporate-wide public health and safety protocols for ships resuming passenger cruises.[7]  The CAM Team understands that the Company has established a working group that is engaging with CDC, CLIA, and other internal and external stakeholders to develop such protocols for ships returning to service in the U.S.  *See* Employee Interview/Call Notes.

3.   Status of Company Passenger Cruise Operations

•   In September and October 2020, two of the Company's brands, Costa and AIDA, respectively, resumed limited passenger cruises in European waters on a small number of ships (none of which are Covered Vessels).  Both brands subsequently announced additional suspensions of, and/or alterations to, planned itineraries due to COVID-19 resurgences in

---

[7] Two of the Company's brands, Costa and AIDA, developed brand-specific public health and safety protocols in connection with the resumption of limited passenger cruises in European waters in the fall of 2020.  The Company reports that these protocols were based on the European Union's "Healthy Gateways" guidance, and were audited and confirmed by third-parties.  *See* November 2020 Probation Supervision Report, Attachment 5, PCL_ECP00177593-94 at PCL_ECP00177593; *see also* EU HEALTHY GATEWAYS Joint Action, *Interim advice for restarting cruise ship operations after lifting restrictive measures in response to the COVID-19 pandemic* (June 30, 2020), *available at* https://www.healthygateways.eu/Portals/0/plcdocs/EU_HEALTHY_GATEWAYS_COVID-19_RESTARTING_CRUISES.pdf.

January 20, 2021

Europe and corresponding governmental travel restrictions.  *See, e.g.*, October 2020 Probation Supervision Report, Attachment 5, PCL_ECP00175649-52 at PCL_ECP00175649; *see also* https://www.costacruises.com/cruising-soon.html.  As noted below, all Costa and AIDA cruises are suspended through February 2021.

- Along with other CLIA members, the Company voluntarily suspended passenger cruises in the U.S. through December 31, 2020.  *See CLIA Ocean-Going Cruise Line Members - Reaffirming Commitment to Stringent Protocols - Voluntarily Extend Suspension of U.S. Operations* (Nov. 3, 2020), https://cruising.org/en/news-and-research/press-room/2020/november/clia-cruise-line-members-voluntarily-extend-suspension-of-us-operations.

- The Company's individual brands have announced additional suspensions, including:

  o **AIDA:**  all cruises cancelled through February 2021, with additional cancellations on a ship-specific basis.  *See Current Information from AIDA Cruises*, https://www.aida.de/kreuzfahrt/angebote-buchen/wichtiger-reisehinweis.40233.html (Rev. Jan. 8, 2021); *AIDA Cruises extends pause of its cruise season until end of February 2021* (Jan. 8, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/aida-cruises-extends-pause-its-cruise-season-until-end-february;

  o **Carnival Cruise Line:**  all cruises cancelled through at least March 31, 2021, with additional cancellations on a ship-specific basis.  *See Carnival Cruise Line Notifies Guests of Cruise Cancellations* (Jan. 6, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-cruise-line-notifies-guests-cruise-cancellations;

  o **Costa:**  all cruises cancelled through February 2021, with additional cancellations on a ship-specific basis.  *See* https://www.costacruises.com/cruising-soon.html;

  o **Cunard:**  cruises cancelled through various dates in May and June 2021 on a ship-specific basis.  *See Cunard Extends Pause in Operations* (Dec. 9, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/cunard-extends-pause-operations-0;

  o **Holland America Line:**  all cruises cancelled through at least April 30, 2021, with additional cancellations on a ship-specific basis; all cruises of eight days or longer to U.S. ports cancelled through November 1, 2021.  *See Holland America Line Extends Cruise Pause to Include All Departures Through March 31, 2021, as it Prepares for CDC Requirements to Resume Cruising* (Nov. 20, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/holland-america-line-extends-cruise-pause-include-all-departures;  *Holland America Line Extends Pause in Cruise Operations* (Jan. 6, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/holland-america-line-extends-pause-cruise-operations;

  o **P&O Cruises UK:**  cruises cancelled through various dates in April and May 2021 on a ship-specific basis.  *See Find a Cruise*, https://www.pocruises.com/find-a-cruise;

January 20, 2021

- o **Princess:** all cruises cancelled through at least May 14, 2021; all cruises of eight days or longer to U.S. ports cancelled through November 1, 2021; all cruises to Japanese ports cancelled through June 25, 2021. *See Princess Cruises Extends Pause of Global Ship Operations into 2021* (Nov. 20, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/princess-cruises-extends-pause-global-ship-operations-2021; *Princess Cruises Extends Pause of Guest Cruise Vacations Through May 14, 2021* (Jan. 6, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/princess-cruises-extends-pause-guest-cruise-vacations-through; and

- o **Seabourn:** cruises cancelled through various dates in 2021 on a ship-specific basis. *See Seabourn Announces Additional 2021 Voyage Cancellations* (Nov. 20, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/seabourn-announces-additional-2021-voyage-cancellations.

4. Covered Vessel List Updates

- Between March and December 2020, approximately 19 ships were removed from the Covered Vessel list, either because they were sold (10 ships) or because they no longer have plans to sail to the U.S. before the end of probation (nine ships). Over the same time period, two new Covered Vessels were added to the Company's fleet. As of the date of the Report, there are 57 Covered Vessels, compared to 74 at the time of the CAM March 2020 Quarterly Report.[8]

5. Financial Updates

- As of November 30, 2020, the Company has around $9.5 billion in liquidity, having raised about $19 billion since March 2020 through a series of financial transactions. The Company reports that this liquidity can "sustain [it] throughout 2021, even in a zero-revenue environment." *Carnival Corporation & plc Provides Preliminary Financial Information For The Fourth Quarter* (Jan. 11, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-plc-provides-preliminary-financial. The monthly average cash burn rate for the fourth quarter of Fiscal Year 2020[9] was around $500 million, which the Company expects to increase to about $600 million for the first quarter of Fiscal Year 2021, due in part to costs associated with preparing ships to resume passenger cruises. *See id.*

- The Company also announced that it plans to dispose of 19 ships (representing about 13% of its fleet capacity before the pause), 15 of which have already left the fleet. The Company expects to add only one more new ship to its fleet in Fiscal Year 2021, compared to five ships that were originally scheduled for delivery this year. *Id.*

---

[8] There are no longer any Covered Vessels operated by Costa Group, which manages the AIDA and Costa brands.

[9] The Company's fiscal year begins on December 1 and ends on November 30.

January 20, 2021

6. COVID-19 Impacts on ECP Compliance

- In April 2020, the Company notified the Interested Parties, CAM, and TPA that "the COVID-19 pandemic is impacting the Company's ability to comply with certain" ECP requirements.  *See* CAM Third Annual Report at 81-82 (quoting Letter from Environmental Corporate Compliance Manager to Interested Parties).

- On December 23, 2020, the Company provided an update on these impacts, along with "a proposed set of alternative requirements" designed to "achiev[e] a similar outcome of what the original ECP requirement was designed to achieve . . . until such time upon which the original ECP requirements can be re-implemented based upon easing of the COVID-19 pandemic."  Letter from Environmental Corporate Compliance Manager to Interested Parties, *Notice of COVID-19 Impact Update* (Dec. 23, 2020) at 1.

- The identified compliance challenges and proposed solutions in the December 2020 update relate to ECP requirements for:

  o Annual in-person training of Environmental Officers, with the Company proposing to conduct this training, previously provided in-person at CSMART, "remotely using online tools," as well as requesting a "one-time three month extension" of the time for Environmental Officers to complete the training.  *Id.* at 1-2;

  o Onboard in-person environmental trainings of crew members who join a ship on a new contract, with the Company proposing to provide this training remotely via a computer-based training module, as well as requesting a 14-day extension of the time period for this training (which currently must be provided within seven days of the crew member commencing their duties), to account for 14-day onboard quarantine periods.  *Id.* at 2-3;

  o Internal audits of Covered Vessels performed by RAAS and internal investigations of incidents on Covered Vessels performed by the Incident Analysis Group, with the Company proposing to perform the majority of these audits and investigations remotely.  *Id.* at 4; and

  o Annual testing of oily bilge water management equipment, with the Company proposing to allow certain testing, previously performed by third-party vendors, to be performed by onboard engineers, as well as to allow certain other testing, which is required to be witnessed in-person by a shoreside representative, to be witnessed remotely.  *Id.* at 3-4; *see also IN ENV/05/2020 Management of Environmental Requirements for Ships during the Pause in Guest Operations* (Rev. Dec. 17, 2020).

**B. Efforts in Support of Continued Compliance During the Pause**

1. Pause Priorities Plan

- In April 2020, the Company reported that it was developing a Pause Priorities Plan, described as "a list of priorities the Operating Lines want to focus on during the layup period . . . to ensure that when the ships return to service, they will come back *stronger and better*

*equipped*."  CAM Third Annual Report at 52 (quoting April 2020 Probation Supervision Report, Attachment 5) (emphasis added).

- On June 17, 2020, the Company submitted a draft of its Pause Priorities Plan to the Interested Parties, CAM, and TPA, as required by the Court's Order of June 2, 2020.  *See* CAM Third Annual Report at 53; *see also* Dkt. No. 189.  The plan has since been revised several times, most recently on November 30, 2020.  *See, e.g.*, *Coming Back Stronger "Pause Priorities Plan"* (Nov. 30, 2020), PCL_ECP00177469 ("Pause Priorities Plan").[10]  The draft plan, as well as its subsequent revisions, sets forth "programmatic priorities, as well as the timeline for implementation (short, mid and longer terms)" under four categories:  (1) Environmental; (2) Investigations; (3) Culture; and (4) Training.  CAM Third Annual Report at 53 (quoting Draft Pause Priorities Plan Cover Letter).[11]

- The environmental initiatives in the Pause Priorities Plan are designed to apply to "ships that are expected to return to [passenger] service."  Pause Priorities Plan, PCL_ECP00177469 at 3.  However, the Company acknowledges that ships not expected to return to passenger service "are still bound by the company's Environmental Management System and applicable regulations," and represents that "those ships will continue to comply with those requirements."  CAM Third Annual Report at 53 (quoting Company Comments on Draft Report).

- The Company has provided the CAM Team with regular updates on the general status of the Pause Priorities Plan actions at a summary (non-ship specific) level.  *See, e.g.*, *Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339.

  2.  Court Order of October 21, 2020

- On October 21, 2020, following review of the Company's most recent Pause Priorities Plan status update submission, and in consideration of the Company's stated "commitment to compliance and environmental protection despite its present challenges," the Court issued an Order requiring the Company to submit a certification signed by the Carnival Corp. CEO, based on a reasonable inquiry, as to the status of 12 specific items from the Pause Priorities Plan in advance of, or shortly after, a Covered Vessel's planned entry to U.S. Waters.[12]  Dkt.

---

[10] Citations in this Report are to the November 30, 2020, version of the Pause Priorities Plan, unless otherwise noted.

[11] As the CAM has observed, many of the environmental initiatives in the Pause Priorities Plan relate to basic compliance support for ships on issues identified since the beginning of the ECP, indicating that at the time the COVID-19 crisis emerged, well into ECP Year Three, the Company was still struggling to comprehensively address important compliance issues that arose long before the pandemic.  *See* CAM Third Annual Report at 138-41.

[12] Following the Company's passenger and crew repatriation efforts, most of its ships have been docked or anchored outside U.S. Waters in layup status.  *See* CAM Third Annual Report at 44-46.  Ships in layup are at "minimum (non-)operational manning levels," down to only those crew who are necessary to maintain safe and compliant ship operations, based on regulatory, flag state, and other requirements.  *Id.* at 44-45 (citations omitted).

No. 207 at 1-2; *see also Agreed Order Extending Deadline for Certifications*, Dkt. No. 211 (Dec. 22, 2020); *Order Amending Agreed Order Extending Deadline for Certifications*, Dkt. No. 212 (Dec. 26, 2020).

- The 12 items required in each ship-specific certification relate to pollution prevention equipment, spare parts, staffing, IT support/voyage planning, and waste offload support. *See* Dkt. No. 207 at 2. To the extent "the status of any item is incomplete, the certification must include a detailed explanation, including a specific plan . . . and timeframe for addressing the item." *Id.*

- Along with the certification, the Company must submit "a list of all outstanding or postponed" planned maintenance items for the Covered Vessel. *Id.* at n.8.[13]

   3. Certifications Pursuant to the Court Order of October 21, 2020

      a. OVERVIEW

- By December 31, 2020, the Company had provided Notices of Intent to Enter U.S. Waters for 30 Covered Vessels that planned to enter U.S. Waters on or before December 31, 2020. On January 7, 2021, the Company provided a Notice of Intent to Enter U.S. Waters for one Covered Vessel that plans to enter U.S. Waters on or before February 16, 2021. These Notices have been followed by certifications for all 31 Covered Vessels. *See* Certifications Pursuant to the Oct. 21, 2020 Order.[14]

      b. CAM AND TPA REVIEW

- The CAM Team and the TPA are reviewing the certifications received to date. Based on the face of those certifications, including the definitions provided by the Company which set the scope of the certifications, the Company appears to have largely achieved, or provided a plan and timeframe for achieving, the 12 compliance actions for each ship.[15]

---

[13] "Planned maintenance" refers to routine, preventive maintenance tasks performed to keep systems and equipment in working order (such as inspections, cleanings, alarm testing, or filter replacements), as opposed to maintenance tasks performed in response to an unexpected equipment breakdown, accident, emergency, or other incident. Planned maintenance tasks are entered into a ship's planned maintenance management system software, which generates automatic work orders when a task becomes due. The work orders include deadlines by which the task must be completed, unless postponed or suspended.

[14] The 31 Covered Vessels include 17 Carnival Cruise Line ships and 14 Holland America Group ships. *See id.*

[15] However, on spare parts, while most of the certifications indicate that the ship has a full set of environmental critical spare parts, several ships are missing one or more of these parts. For such ships, the certifications do not provide a specific plan and timeframe for achieving the full inventory. Holland America Group reports that purchase orders are in place, or are being worked out with vendors, for the outstanding environmental critical spare parts on its ships.

- However, the CAM has expressed to the Company that:  (1) some of the definitions provided by the Company may require additional clarification; and (2) many of the statements regarding the compliance status of certain actions require additional supporting information for the CAM Team and TPA to properly assess the compliance status of the ship.  *See* Email from CAM to Environmental Corporate Compliance Manager and Deputy, *Follow-up Re: Certification/Disclosures Pursuant to the Oct. 21, 2020 Order* (Jan. 5, 2021).  The CAM Team is continuing to engage with the Company to clarify these items.  *See* Email from Deputy Environmental Corporate Compliance Manager to CAM, *Follow-up Re: Certification/Disclosures Pursuant to the Oct. 21, 2020 Order* (Jan. 14, 2021) and attachments.

   *c. ONGOING CAM TEAM EXAMINATION*

- The CAM Team will continue to monitor the Company's efforts to meet its stated commitment to compliance and environmental protection during the pause, and to ensuring ships "come back stronger and better equipped."  *See supra*, Part III.B.1.  As part of this review, the CAM Team will continue to work with the TPA to assess and, as necessary, vet the certifications for ships entering U.S. Waters, though both teams are operating within the limits imposed by COVID-19.

- As discussed in the following section, a major focus of the CAM Team and TPA will be the Company's evolving approach to managing planned maintenance items onboard its ships, both during the pause and as ships resume passenger cruises.

  4. <u>Outstanding Planned Maintenance Items</u>

   *a. OVERVIEW*

- On any given day, a ship may have from 75 to 200 planned maintenance tasks, which, as noted above, can range from inspections to filter changes.  *See* Company Comments on Draft Report.  During the pause, however, ships are operating with reduced crew levels, down to about 100 crew members per ship.  While the ships do not have thousands of guests to provide for, and not all equipment needs to be operated during the pause,[16] certain maintenance remains necessary for the ship to operate and to maintain compliance.

- The ability to complete planned maintenance items during the pause has been hampered by a number of factors, including:  certain equipment not being in use during the pause; reduced crew size; travel and quarantine restrictions that constrain the ability of third-party contractors or vendors to come onboard to perform work; and logistical challenges in

---

Carnival Cruise Line reports that it monitors on a weekly basis the status of requisitions and purchase orders of environmental critical spare parts below the minimum required stock level, and that it keeps "a long term storage of ECP spares in Miami" which "greatly reduces the lead time" on delivering the parts to ships.  *See* Company Comments on Draft Report.

[16] For example, some sewage treatment systems may be taken out of operation if there is not the usual volume of sewage to process.  *See* Company Comments on Draft Report.

sourcing and transporting necessary equipment and parts to the ships.  *See* Employee/Interview Call Notes.

- These impacts have resulted in backlogs of overdue, postponed, and/or suspended planned maintenance items (collectively, "outstanding planned maintenance items").  Importantly, these categories do not all carry the same risk level.  For example, a postponed or suspended item may carry less risk than an overdue item if it has been determined that the postponed or suspended item does not need to be performed while the ship is in layup.  *See id.*

- As discussed in the following sections, the TPA and RAAS have made audit findings related to planned maintenance backlogs, and the Company is taking various actions in response. The Company reports that it is prioritizing planned maintenance tasks during the pause based on risk level, giving priority to tasks required by regulation, Company policy, or to maintain classification society certification.  *See id.*

   *b. TPA AND RAAS FINDINGS*

- The TPA and RAAS have made audit findings regarding planned maintenance backlogs during the pause.  For example:

   o From July through December 2020, the TPA issued audit findings for at least 15 Princess ships because of the existence of outstanding planned maintenance items. *See* TPA Audit Reports.  The TPA observed that the Company will need to have "a plan in place to address the significant number of maintenance backlog items before resuming sailing."  *See id.*; and

   o On August 17, 2020, RAAS issued an audit finding for Carnival Cruise Line regarding its implementation of the process for postponing planned maintenance items required by Company procedure, including that the process lacked evidence of formal risk assessment or a formal approach to applying postponement criteria, and that the approach to postponements for the same type of maintenance was inconsistent across the fleet.  *See 2020 Carnival Cruise Line Office ISM/ISPS/ISO 14001/OHSAS 18001 Internal Audit* (Aug. 2020) at 10.

- Notably, the CAM Team understands that outstanding items related to the ECP or pollution prevention equipment have generally remained lower than other (non-ECP/environmental) items.  *See, e.g.*, *Global Planned Maintenance Dashboards*, PCL_ECP00177686-715, PCL_ECP00177725-34 (indicating percentages of environmental overdue items out of total overdue items ranging from approximately 3% to 14%, varying by brand, as of December 20, 2020); *see also PMS Process During Pause in Operations, CAM and TPA Workshop* (Dec. 17, 2020), PCL_ECP00177434-67  ("Workshop Presentation"); *see also* Employee Interview/Call Notes.

- Though the number of outstanding ECP/environmental work orders has remained comparatively low, the TPA and RAAS audit findings raise concerns about the Company's overall management of planned maintenance items during the pause, including:  (1) the build-up of a backlog of work orders that ships must complete before resuming passenger

cruises; (2) the incomplete implementation of the postponement process, including gaps in the documentation of risk assessments and approvals for modifying work order due dates; and (3) the inconsistent implementation of the postponement process, both within and between brands.

### c. RAAS OPERATIONAL PAUSE RISK ASSESSMENT

- Apart from its audit function, RAAS recently completed a risk assessment to evaluate risks associated with the pause. *See Emerging Stronger: Advisory Services to Support Success During the Operational Pause* (Nov. 5, 2020), PCL_ECP000174904 ("Operational Pause Risk Assessment Presentation"). Among other findings, the assessment identified risks associated with the inconsistent approaches taken by the brands to postponing planned maintenance items. *See id.* at 6. Notably, RAAS observed that recent audits have identified "key" environmental maintenance requirements "that have not been performed." *Id.* Echoing the concerns of the CAM Team and TPA, RAAS also observed that "[n]on-key postponed maintenance will create a large maintenance backlog resulting in increased cost, complexity and/or out-of-service equipment." *Id.*

- RAAS has coordinated with All Brands Group management on certain actions designed to mitigate these issues. For example, the Chief Maritime Officer requested that RAAS develop a status report to identify maintenance "that should have been carried out but has not." *Id.* RAAS completed this report in December 2020 and will provide it on a monthly basis to the Chief Maritime Officer. *See* Employee Interview/Call Notes; *see also Emerging Stronger: Advisory Services to Support Success During the Operational Pause 1Follow-Up Status as of January 5, 2021*, PCL_ECP00177716-24 ("Operational Pause Risk Assessment Updates Presentation") at PCL_ECP00177719; *Global Planned Maintenance Dashboards*, PCL_ECP00177686-715, PCL_ECP00177725-34; *see also infra*, Part III.C.4.b.

### d. COMPANY WORKSHOPS

- In two workshops held in October and December 2020, representatives from the Company's brands/operating groups presented to the CAM Team on their strategies for addressing the issues raised by the TPA and RAAS. The workshops reinforced that each brand/operating group is seeking to prioritize the continued completion of "essential maintenance" during the pause, which the Company defines as maintenance related to regulatory, Company, and/or classification society requirements.[17] Other maintenance not deemed essential (such as maintenance on equipment that is not currently being operated) may be postponed or suspended.

- The workshops also illuminated, perhaps unintentionally, the decentralized nature of the Company's approach to operations, as illustrated through the differing methods that the

---

[17] Where certain regulatory or classification society requirements cannot be met, the brands seek to coordinate with flag states or classification societies to obtain regulatory extensions or other accommodations. *See IN HMP/02/2020 General Global HESS Procedure Amendments for Ships during the Pause in Guest Operations* (Rev. Oct. 6, 2020).

brands/operating groups are taking to manage outstanding planned maintenance items.  For example:

- o Carnival Cruise Line is implementing corrective and preventive actions in response to the RAAS audit finding noted above, including requiring a formal risk assessment for each planned maintenance task to be postponed, which will be documented and reflected in its planned maintenance system software.  *See* Workshop Presentation at PCL_ECP00177448-52; and

- o Holland America Group is implementing a different review process for postponing or suspending what is deemed to be non-essential maintenance.  Under this process, a crew member who seeks to have a planned maintenance item postponed must seek approval from designated ship and shoreside personnel.  The CAM Team understands, however, that a formal risk assessment is not performed or documented for each postponement or suspension.  *See Planned Maintenance Strategy Explanation HA-Group* (Sept. 2020), PCL_ECP00173768.

- The varying approaches taken by the brands/operating groups also raises the issue of whether the Company is consistently defining and identifying the same types of maintenance tasks as "essential" for completion during the pause.  As noted above, RAAS audits have identified key environmental maintenance items that were not completed during the pause.  This includes items that were not captured in the brand/operating group designations of "essential" maintenance.  *See* Operational Pause Risk Assessment Presentation, PCL_ECP000174904 at 6.

- The workshops also highlighted a potential area for improvement in managing the designated "essential" maintenance during the pause.  While the brands/operating groups appear to be considering and prioritizing risk in making decisions about postponing or suspending planned maintenance items, there does not appear to be a systematic way in which the Company is tracking and prioritizing the age and risk of *overdue* items.[18]  That said, the Company explained during the workshops that ship superintendents are in regular communication with the ships on the status of planned maintenance items, including overdue items.  *See* Employee Interview/Call Notes.

- As noted above, these issues will be a continuing subject of CAM and TPA review, particularly as the Company approaches the time when it will resume passenger-carrying operations.

---

[18] As stated during the workshops, the brands/operating groups strive for zero overdue planned maintenance items.  However, the CAM Team and TPA are aware that overdue items are an operational reality.  It is also true that some overdue items might be completed only hours or a day after the due date.  There can be a significant difference, in terms of compliance risks, between a maintenance item that has been overdue for one day, versus an item that has been overdue for 30 days, for instance.

### e. PLANNING FOR RESUMPTION OF GUEST OPERATIONS

• The brands/operating groups have begun to consider a coordinated approach to managing the potential surge of work that will be required to address planned maintenance backlogs as ships resume passenger service.  Crew members from various ranks and departments have indicated to the CAM Team that they believe it will take no less than 60 days, once full deck and technical crews are onboard, to complete backlogged maintenance.  They have further indicated that the ability to complete much of this work may depend on the availability of third-party contractors and parts and equipment, and that many contractors are shared across the brands.  *See* Employee Interview/Call Notes.

• To address these issues, and following a recommendation by RAAS, the brands/operating groups initiated brand-level resource planning meetings in November 2020 to review maintenance plans, determine what goods or services will be needed and when, and plan to ensure resources are available.  *See* Operational Pause Risk Assessment Presentation, PCL_ECP000174904 at 7.  The results of these meetings will be shared cross-brand to identify global opportunities and best practices for resource sharing.  *Id.*; *see also* Operational Pause Risk Assessment Updates Presentation at PCL_ECP00177720-21.

### f. REVISION TO PAUSE PRIORITIES PLAN

• On December 28, 2020, the Company, "[b]ased upon concerns raised by the TPA and the CAM," added a new action to the Pause Priorities Plan that requires Operating Line Compliance Managers to review planned maintenance items for each ship before it resumes service "for level of completion of essential, regulatory, company and ECP-required environmental work orders."  *Coming Back Stronger "Pause Priorities Plan"* [Redline] (Nov. 30, 2020), PCL_ECP00177470 at 5; *see also Pause Priorities Plan November 30*th *Updates*, PCL_ECP00178297-339 at PCL_ECP00178309.

### g. ONGOING CAM TEAM EXAMINATION

• The CAM Team understands that the Company's existing planned maintenance systems were not designed with a pause scenario in mind, and that the brands/operating groups have articulated their efforts to address outstanding planned maintenance issues.  Many of the challenges that have arisen appear to be attributed, at least in part, to the lack of a corporate-wide management of change process.  *See infra*, Part III.C.3.b.  As the Company moved into the pause, there does not appear to have been a systematic, coordinated process for re-evaluating how planned maintenance tasks would be managed.

• The CAM Team will continue to monitor the Company's approaches to managing planned maintenance items, including backlogs of outstanding items, both during and after the pause, and the degree to which the ships are receiving the necessary support for these efforts.

January 20, 2021

### C. Corporate Compliance Organization

1. Background

- In ECP Year One, the CAM found that the Company had failed to provide the Environmental Corporate Compliance Manager with ECP-required authority, and that the Company's complex corporate structure, including the lack of centralization and lack of clarity as to responsibility, accountability, and authority for environmental compliance, was an unresolved barrier to environmental compliance. *See* CAM First Annual Report at 4-5, 25-30. The Company did not act to remedy these findings until it faced the revocation of its probation near the end of ECP Year Two. *See* CAM Second Annual Report at 46-49, 91-92.

- In pleading guilty in June 2019 to a violation of probation for "failing to provide sufficient responsibility and authority to the [Environmental Corporate Compliance Manager] to implement the ECP," the Company "acknowledge[d] that it failed to establish [an Environmental Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP," and committed to build up and restructure its corporate compliance function. *See Proposed Agreement for the Court's Consideration Resolving Superseding Petition for Summons for Offender Under Supervision Dated April, 26, 2019*, Dkt. No. 134 (June 3, 2019) ("Dkt. No. 134" or "Probation Revocation Agreement") at 2, 10.

- Since the Probation Revocation Agreement, the Company has made substantial efforts toward putting in place people, funding, structures, and systems for the corporate compliance function. Notable achievements discussed in prior CAM reports include:

  o Appointing a Chief Ethics & Compliance Officer (a newly created position) who reports directly to the Carnival Corp. CEO and to the Health, Environment, Safety & Security ("HESS"), Audit, and Compliance Committees of the Boards of Directors. This individual officially began duties in August 2019;

  o Promoting the Environmental Corporate Compliance Manager to a more senior position within the Company;

  o Developing an action plan for re-structuring its corporate compliance function, which included creating a new Ethics & Compliance Department at All Brands Group that is part of a broader Ethics & Compliance Program extending throughout the brands/operating groups;

  o Establishing a charter, strategic plan, and financial plan (for Fiscal Years 2019 and 2020) for the Ethics & Compliance Department and Program;

  o Appointing or hiring people to fill leadership positions in the Ethics & Compliance Department, including an: Incident Analysis Group (Investigations) Leader; Compliance Training Leader; Compliance Risk Management Leader; Compliance Communications Leader; and Data Privacy Leader;

- Conducting, in January 2020, a series of ship visits by Ethics & Compliance Program personnel that included townhall-style sessions where crew members could discuss compliance issues and concerns.  Plans for additional visits were indefinitely postponed due to the pandemic;

- Taking steps to bolster its compliance risk management function, including developing a risk assessment strategy and a draft baseline compliance risk assessment, as discussed in Part III.C.4.a below;

- Hiring a new member of the Boards of Directors with significant corporate compliance experience;

- Establishing a new, permanent Compliance Committee of the Boards of Directors;

- Hiring outside counsel to advise the Compliance Committee of the Boards of Directors; and

- Developing and delivering corporate compliance training sessions for the Boards of Directors and senior executives.  *See* CAM Third Annual Report at 94-107.

- While recognizing these accomplishments, the CAM made a finding at the end of ECP Year Three that "unresolved weaknesses in the corporate compliance function persist."  CAM Third Annual Report at 76.  The CAM observed that the following findings from ECP Year One "largely still stand":

  - (1) The compliance function remains decentralized in many ways, a symptom of the Company's generally decentralized operations, with ownership and accountability over compliance-related initiatives tending to reside in the brands/operating groups, rather than All Brands Group—an approach that "results in delayed, uncoordinated, and ineffective solutions to some of the Company's most serious and long-standing compliance challenges, including the need to improve its compliance culture and internal investigations program." *Id.* at 76, 174-75; and

  - (2) The Company does not yet appear to have provided the Environmental Corporate Compliance Manager with the authority required by the ECP, or to have provided either the Environmental Corporate Compliance Manager or the Chief Ethics & Compliance Officer (a position not created until ECP Year Three) with the authority required by the settlement of the Probation Revocation Petition. *Id.* at 76-77, 176-79.

    Relatedly, there remain unclear relationships and lines of authority between the Ethics & Compliance Program (established in ECP Year Three) and the Chief Maritime Officer organization, which oversees marine operations. *Id.* at 178-79.

- The CAM has observed some progress on these issues, including significantly higher levels of involvement from All Brands Group in affirming support for compliance, engaging on culture change efforts, and taking steps to begin to rebuild the internal investigations program.  Despite progress, work remains to be done to enhance the Company's compliance performance, and to develop and support a centralized, empowered, and effective corporate

compliance organization.  As the Carnival Corp. CEO has recognized:  "[W]e know we have a ways to go . . . I know we have room for improvement, and I'm reminded of that by our flash reports and our conversations here [in court]."  Status Conf. Tr. at 35-37 (Oct. 16, 2020).

- In particular, until the draft baseline risk assessment, discussed in Part III.C.4.a below, is finalized and the Company determines lines of accountability for compliance risks, the CAM Team (and the Company) is unable to fully evaluate the efficacy of the Company's corporate compliance program.[19]  The CAM Team notes that the ability to systematically and holistically identify and prioritize the highest risks across the Company is even more important during economically challenging times when resources are limited.  Without such an ability, the Company lacks critical information to determine which of the many serious risks it faces is in greatest need of additional resources.

2. Personnel Changes

- Several changes in key leadership and compliance-related positions in the Company occurred during ECP Year Four.  These include:

  o **Carnival Corp. Chief Operations Officer:**  In June 2020, the Company appointed a new Chief Operations Officer of Carnival Corp. (a position that had not existed at the Company since December 2016), who reports directly to the Carnival Corp. CEO and has "oversight of major operational functions, including global maritime, global ports and destinations, global sourcing, global IT and global auditing [RAAS]."  CAM Third Annual Report at 50 (quoting Carnival Corp. press release).  The individual in this position previously served as President of Carnival UK, the operating group that oversees the Cunard and P&O Cruises UK brands.  *See id.*;

  o **Carnival Corp. Senior Advisor to the CEO and to the Chairman:**  On December 1, 2020, the former CEO of Holland America Group was named to a new role as senior advisor to the Carnival Corp. CEO and to the Carnival Corp. Chairman of the Boards of Directors.  *See Carnival Corporation Announces Stein Kruse in New Role as Senior Advisor to the Chairman and to the CEO* (Dec. 1, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-announces-stein-kruse-new-role-senior;

  o **Holland America Group President:**  With the move of the former CEO of Holland America Group, the former President of Princess Cruises was named Group President of Holland America Group, with responsibility for Princess Cruises, Holland America Line, Seabourn, and P&O Australia, as well as for Holland America Princess Alaska Tours and inter-group operations.  *See Carnival Corporation Announces Jan Swartz*

---

[19] DOJ's guidance on evaluating corporate compliance programs recommends that companies tailor their compliance programs to their individual risk profile, as identified through a risk assessment, and allocate resources based on risk level.  *See* DOJ, *Evaluation of Corporate Compliance Programs* (Updated June 2020), *available at* https://www.justice.gov/criminal-fraud/page/file/937501/download ("DOJ Corporate Compliance Program Guidance") at 1-3.

*as Group President, Holland America Group* (Dec. 1, 2020),
https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-announces-jan-swartz-group-president;

- o **Holland America Line and Seabourn Brand Presidents:**  In May 2020, the former Presidents of the Holland America Line and Seabourn brands (part of the Holland America Group operating group) left the Company.  The current Holland America Line President is the former Chief Operations Officer at Carnival Cruise Line, while the current Seabourn President is the former Chief Strategy Officer at All Brands Group.  *See* CAM Third Annual Report at 50 (citing Carnival Corp. press releases);

- o **Deputy Chief Ethics & Compliance Officer and Head of Incident Analysis Group:**  On September 25, 2020, the former Operating Line Compliance Manager for Carnival UK was named as the Deputy Chief Ethics & Compliance Officer and the Head of the Incident Analysis Group.  In addition to overseeing the internal investigations function, this individual will "play an integral role in supporting the overall implementation of the ethics and compliance program," including overseeing compliance risk activities.  *See Carnival Corporation Appoints Peter Hutchison as Senior Vice President, Deputy Chief Ethics and Compliance Officer* (Sept. 16, 2020), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-appoints-peter-hutchison-senior-vice; *see also infra*, Part III.F.2.a; and

- o **Operating Company Ethics & Compliance Officers and Operating Line Compliance Managers:**  Since the formation of the Ethics & Compliance Program, three out of the four Operating Line Compliance Managers have moved to other positions in the Company (two to become Operating Company Ethics & Compliance Officers, and one to become the Deputy Chief Ethics & Compliance Officer/Head of the Incident Analysis Group, as noted above), with new individuals appointed to these positions.  In addition, four new Operating Company Ethics & Compliance Officer positions were established.  The individuals currently serving in these positions continue to have significant maritime and/or compliance experience and display a commitment to environmental compliance.  *See* CAM First Annual Report at 14.  Brief bios for these individuals are attached as Appendix A.

3. Notable Initiatives

    a. MANAGEMENT ACCOUNTABILITY

- In ECP Year One, the CAM found that, among other factors, the lack of clarity as to responsibility, accountability, and authority for environmental compliance was an unresolved barrier to compliance.  *See* CAM Third Annual Report at 76.  As discussed in prior CAM reports, management accountability at the highest levels is critical to an effective ethics and compliance function, including one that can provide the Boards of Directors with clarity as to how and in what ways the most senior and powerful leaders are performing on compliance management.  *See* CAM March 2020 Quarterly Report at 42; CAM Third Annual Report at 105-06, n.64.  As the Environmental Compliance Culture Assessment illuminated, personal responsibility and leadership from the Company's top leadership are necessary to develop a

culture of compliance, where information and feedback—positive and negative—are heard, valued, and acted upon in a meaningful way.  *Id.* at 107.

- The CAM Team understands that the recently appointed Carnival Corp. Chief Operations Officer is leading an "accountability exercise" to establish senior management accountability at the All Brands Group level.  The CAM has observed that "a management of change process could help with the effort to enhance accountability, as it requires an assessment of how changes in processes, materials, budgets, and staffing impact a range of pre-existing obligations."  *CAM/Company Communication Recap (August 6, 2020, Bi-Weekly CAM/CECO Call)* (Aug. 19, 2020), attached as Appendix B, at 2.  The Company reports that, as of January 2021, "[p]rogress is being made amongst the Ethics & Compliance, RAAS, Maritime and the Legal department in more clearly delineating accountabilities amongst these functions, to help ensure that appropriate leadership is identified across [the Company's] actions and activities."  Company Comments on Draft Report.

  b. MANAGEMENT OF CHANGE

- Throughout the ECP period, crew members from across the Company's brands/operating groups have reported concerns to the CAM Team about the additional workload and demands associated with new Company procedures and initiatives.  *See, e.g.*, CAM March 2020 Quarterly Report at 134-36.  The CAM has observed that, though initiatives may be well-intentioned, the Company's senior management does not apply a management of change process to "evaluate[] at the outset what new challenges or trade-offs might result, in light of existing staffing levels and workloads on the ships."  *Id.* at 135 (citing Holland America Group Workload Study).

- As described by the American Bureau of Shipping, a management of change system:

  is a combination of policies and procedures used to evaluate the potential impacts of a proposed change so that it does not result in unacceptable risks.  Developing an effective [Management of Change] strategy requires establishing, documenting, and successfully implementing formal policies to evaluate and manage both temporary and permanent modifications in the facility or ship including equipment, materials, operating procedures and conditions, and personnel.

  American Bureau of Shipping, *Guidance Notes on Management of Change for the Marine and Offshore Industries* (Feb. 2013) at 1.

- By early 2020, the Company had recognized this shortcoming, and had begun an effort to develop a corporate-wide management of change procedure.  *See* CAM March 2020 Quarterly Report at 135-36; CAM Third Annual Report at 100.  The Company's initial internal deadline of April 20, 2020, for finalizing the procedure was pushed back due to the pandemic.  *See* CAM Third Annual Report at 100.

- As of January 2021, the Company reports that an initial procedure will be published at the end of the month.  This initial procedure will include "material to introduce the concept and principles of Management of Change," and will focus on "technical installations on board the

ships as it is recognized as the highest area of risk."  Company Comments on Draft Report. Further expansion and supplementation of the initial procedure is expected.  *Id.*

### c.   STREAMLINING SHORE/SHIP COMMUNICATIONS

- Since the start of probation, officers and other crew members have shared their frustration with the massive volume of communication that flows largely uncontrolled from shoreside offices to the ships.  They have described  "a tidal wave of communication from shore, including uncoordinated and unprioritized email inquiries."  CAM First Annual Report at 72. These communications come through a variety of channels, such as emails, newsletters, bulletins, case studies, surveys, reports, and notices, including Instructional Notices announcing procedure changes.[20]  The flow of these communications, which may be well-intentioned, contributes to a sense that rules and expectations are in flux in a manner that is unnerving at times to those onboard.  Further, these communication channels may differ by brand/operating group and, as a whole, are not governed in a systematic way.  This lack of coordination and prioritization of shoreside communications has led to concerns from shipboard officers about their ability to know the demands being made of themselves and of other officers and crew.  *See* Employee Interview/Call Notes.

- The CAM Team understands that there is a recognition of this communication flow problem at the upper levels of the Company, and the Health, Safety, & Security Corporate Compliance Manager has begun an effort to review ways to streamline and govern the various pathways of shore/ship communication that exist.  *See id.*  The Company reports that a cross-brand Working Group was established in November 2020 that has been meeting on a weekly basis.  The Working Group expects to generate a recommended action plan "to reduce, simplify and adjust reporting requirements" by the end of March 2021.  Company Comments on Draft Report.

### d.   OTHER INITIATIVES

- Other Ethics & Compliance Program initiatives planned or underway include:

  o **Virtual Ethics & Compliance Ship Visits:**  As noted above, Ethics & Compliance Program personnel conducted a series of in-person ship visits in January 2020 that included townhall-style sessions with crew members.  Plans for additional visits were indefinitely postponed due to the pandemic.  The Company reports that, as of January 2021, the Ethics & Compliance team is coordinating with human resources ("HR") leads to "develop a comprehensive agenda" for virtual ship visits, and is also exploring the possibility of holding virtual "office hours" where crew members could ask questions, raise concerns, or seek advice from shoreside ethics and compliance

---

[20] Instructional Notices are notifications that are sent to the ships containing new or revised procedural requirements that require "immediate" implementation "before these changes are reflected in Global HESS."  *INT 1005 Development, Approval, Release, and Implementation of Documents.*

personnel.  *Id.*  The current plan is to move forward with the virtual ship visits in February 2021.  *Id.*;

o **HESS Ship Surveys:**  The Environmental Corporate Compliance Manager and his team are developing a new survey tool to solicit "input, guidance and perspective on HESS challenges" from the ships.  Pause Priorities Plan, PCL_ECP00177469 at 10. Implementation of this initiative was delayed, in part due to feedback, noted above, from operating group personnel that a number of channels for ship/shore communication (including a variety of surveys) already exist.  *See* Employee Interview/Call Notes.  As of January 2021, the Company reports that it has "pilot tested the survey tool and will be developing a project to conduct surveys in 2021." Company Comments on Draft Report; and

o **"Stop Work" Authority for HESS Compliance:**  The Chief Ethics & Compliance Officer and his team are evaluating possible mechanisms for empowering crew members (from officers to ratings) with "stop work" authority, typically seen in safety programs, in the HESS compliance context—*i.e.*, empowering crew members to intervene to stop an operation they know or suspect is not compliant.  *See* Employee Interview/Call Notes.  The Company has acknowledged that such authority is not currently explicit in its internal procedures.  *See* CAM December 2019 Quarterly Report at 67, n.48; *Cf. OHS-1001 Job Safety Review* (stating that "[e]very crew member has the authority and duty to stop work that they deem to be unsafe"). The Company reports that introducing this concept into its internal procedures "is on the agenda" for an Operational Health & Safety Working Group meeting scheduled for later in January 2021.  Company Comments on Draft Report.

4. Risk Assessment Function

   a. ETHICS & COMPLIANCE BASELINE RISK ASSESSMENT

- Pursuant to the commitment in its Ethics & Compliance Strategic Plan, the Company began developing a baseline risk assessment in the fall of 2019 to "include information regarding the Company's risk profile, existing controls designed to mitigate risks, and recommendations for enhancements to controls."  *See* CAM March 2020 Quarterly Report at 72-75 (quoting Baseline Compliance Risk Assessment Plan).  In June 2020, the Company provided the CAM Team with the first draft of the baseline risk assessment.  *See [Draft] Compliance Risk Assessment for FY 2020* (June 15, 2020).  The CAM previously provided high level observations on the draft assessment, including that it relied primarily on qualitative factors over quantitative data, and did not include risks associated with corporate culture or the impacts of COVID-19 on operations.  *See* CAM Third Annual Report at 101-02.

- Further work on the draft risk assessment was put on hold during the pause.  The Company has acknowledged that the first draft was incomplete, and recently informed the CAM Team that it plans to supplement the draft assessment as it relates to environmental risk by January 2021, with other areas to follow thereafter.  With respect to cultural risks, which were not identified in the June 2020 draft, the Company indicated that it is relying on the Culture

Action Plan to address those risks.  *See* Employee Interview/Call Notes; *see also infra*, Part III.D.2.

- As noted above, until the baseline risk assessment is finalized, it is not possible to fully evaluate the Company's compliance program.

       *b.   RAAS OPERATIONAL PAUSE RISK ASSESSMENT*

- Recognizing that it faced new and different risks during the pause compared to normal operations, the Company directed RAAS to prepare an assessment of the risks created by moving its ships into a pause status.  *See* Employee Interview/Call Notes.  RAAS, through discussions with senior management at All Brands Group and the brands/operating groups, identified five areas for analysis that are believed to be most impacted by the change in operations:  (1) Human Capital (Ship/Shore); (2) IT Security; (3) Ship Security/Terrorism; (4) Repair & Maintenance; and (5) Health/Pandemic.  *See* Operational Pause Risk Assessment Presentation, PCL_ECP000174904 at 2.  The purpose of the risk assessment was to:  inventory risks related to these selected key areas; identify ways to mitigate those risks; and highlight opportunities to improve tracking and reporting of mitigation efforts.  *See Emerging Stronger: Risk Assessment as a Tool to Support Lay-Up and Re-Entry Success* (Apr. 21, 2020), PCL_ECP00166222-24 at PCL_ECP00166223.

- In its assessment, RAAS found that, while "[m]anagement's overall identification of pause-related risk has been thorough," there were opportunities "[w]ith intense crisis management behind us" to "revisit decisions with enhanced analysis and planning."  *See* Operational Pause Risk Assessment Presentation, PCL_ECP000174904 at 3.  RAAS also identified recommended actions to senior management at All Brands Group and the brands/operating groups to mitigate risk for each of the five key areas analyzed.

- Of particular relevance to the ECP, RAAS identified risks associated with the inability to perform all critical maintenance onboard the ships during the pause, as discussed in Part III.B.4.c above.  *See id.* at 3, 6.  According to the Company, this is the most significant new environmental risk to emerge due to the pause.  *See* Employee Interview/Call Notes.[21] RAAS provided recommended action items to the Company to mitigate the new risks identified during the pause, some of which have been completed and others that are in progress.  RAAS is tracking implementation of those recommendations.  *See* Operational Pause Risk Assessment Updates Presentation at PCL_ECP00177716-24.

       *c.   INTEGRATION OF RISK ASSESSMENT APPROACHES*

- The Company acknowledges that it does not have a formal Enterprise Risk Management program to integrate the multiple risk management approaches across the Company, some of which are described above.  *See* Employee Interview/Call Notes.  Without a holistic framework to assess and manage risk, the Company's current siloed approach may result in unintended consequences, such as increased costs due to duplication of efforts by different

---

[21] The Company reports that monitoring existing (pre-pause) environmental risks continues to be done through operations reporting, such as weekly flash reports.  *See id.*

departments or a greater likelihood of overlooking certain risks if one business area believes another business area is addressing those risks.  *See e.g.*, J. Deloach, *Think Holistically When Managing Risk* (Mar. 27, 2015), https://www.corporatecomplianceinsights.com/think-holistically-when-managing-risk; K. Jones and L. Jarvis, *Breaking Down Silos to Improve Risk Assessments in Foreign Jurisdictions* (Sept. 3, 2020), https://www.corporatecomplianceinsights.com/silos-risk-assessments-foreign-jurisdictions/. Further, risk management is done separately from the Company's strategic planning processes, which could leave leaders with incomplete information when making strategic business decisions.

- The Company reports that it is in the early stages of considering how to formally assess and manage risks holistically across the corporation, going beyond just compliance and HESS risks, as well as how to establish clear accountability for risk mitigation, particularly in areas such as environmental risk where compliance and operational responsibilities overlap.  *See* Employee Interview/Call Notes.  This is an area the CAM Team will continue to monitor closely.

5.  Ongoing CAM Team Examination

- The CAM Team will continue to monitor the Company's efforts to develop and support its corporate compliance organization.

- Areas of focus will include:

  o  The existence (or lack) of concrete and observable ways in which:

      ▪  Top leadership takes personal responsibility for and leads the promotion of a culture of compliance, including concrete actions that value behaviors that support compliance as much as behaviors that support other business imperatives; and

      ▪  The Chief Ethics & Compliance Officer and Environmental Corporate Compliance Manager are empowered to exercise authority in support of compliance—including through support and backing by the Carnival Corp. CEO and Boards of Directors;

  o  Support for compliance, including funding, staffing, and other resources in light of COVID-19 impacts;

  o  The extent to which the compliance organization is able to address the culture and other systemic issues (including lack of a comprehensive and actionable risk assessment) that drive the Company's compliance challenges; and

  o  Relationships and lines of authority between the Ethics & Compliance Program and the new Chief Operations Officer organization, which will oversee major operational functions, including the Chief Maritime Officer organization and the internal audit function performed by RAAS.

January 20, 2021

### D. Culture

1. Background

- When accepting the Company's guilty plea in December 2016, the Court stated that it wanted to know "what was in the culture" because "there obviously was a culture, at least on [the *Caribbean Princess*], if not on other Princess Cruise Lines ships, that promoted dishonesty and the willingness to help each other out in getting around doing the right thing." *See* Plea Hearing Tr. at 32 (Dec. 20, 2016). At the sentencing hearing in April 2017, the Court observed that "the culture really needs to be changed and [I'm] looking to [the CAM] to assist." Sentencing Hearing Tr. at 13 (Apr. 19, 2017). The Company appeared to agree, stating that "we're committed to working with the court-appointed monitor and the third-party auditor over the next five years to continue to enhance our compliance program even more, and our focus is a culture of compliance." *Id.* at 36. This effort also supports the CAM's broad mandate to monitor the Company's compliance with the ECP, *see* ECP § VI.A, and to assess whether the Company has adequate systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance. *See* ECP § VI.B.2; *see also* CAM First Annual Report at 24; CAM Second Annual Report at 53; CAM Third Annual Report at 86.

- On August 28, 2019, the CAM's retained maritime culture survey expert, Propel Sayfr ("Propel"), provided the Company and the CAM with a final report of its assessment of the Company's environmental compliance culture. *See* Propel, *Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019* (Aug. 28, 2019) ("Environmental Compliance Culture Assessment"). The assessment was based on a survey of over 70,000 Company employees and evaluated the Company's environmental compliance culture. A first-of-its-kind effort, it was designed to illuminate both the strengths and opportunities for improvement in the Company's environmental compliance culture.

- As discussed in prior CAM reports, the assessment found that "employees across all of Carnival, from its [All Brands Group] to the various brands, have identified the Company as having a compliance culture with a low level of maturity and significant potential for improvement." *Id.* at 3. In particular, the report indicated that the Company's greatest opportunities for improvement, as evidenced by low scores, are in the areas of Trust, Care, and Openness. *See id.* at 19-21. The assessment also noted that "[s]ignificant leadership efforts will be required to create a mature and sustainable compliance culture." *Id.* at 3. While prescriptive measures were outside the scope of work, the report described "a roadmap approach that has successfully been used in connection with other [Propel] assessments." *Id.* at 4. The assessment also identified "a list of key success factors" that are important for implementing a meaningful culture change program. *Id.* at 42. These include:

  o "Top Management takes ownership for compliance failures;"

  o "Top Management accepts that changes are needed;"

  o "Management dedicates necessary time and resources to implement cultural changes;"

- o "Top Management takes ownership of strengthening compliance culture;"

- o "Culture changes are linked to the company strategy"; and

- o "Systems and governance are aligned to support the change." *Id.*

- The Company has recognized that the findings of the Environmental Compliance Culture Assessment are consistent with those of other studies commissioned by the Company, and has stated that it accepts these findings. *See* CAM Third Annual Report at 88-90.  For instance, during the January 8, 2020, Status Conference, the Carnival Corp. CEO stated: "[T]he Propel Study, the reason why we haven't debated it is because we agree with it.  We have other studies that suggested those same things, and we've had personal experience in talking to our crew and stuff to know that."  Status Conf. Tr. at 87 (Jan. 8, 2020).

- In September 2019, the Company retained an outside consultant, the Ethics & Compliance Initiative ("ECI"), to support its efforts to address the Environmental Compliance Culture Assessment findings, including to develop "an action plan addressing the areas of improvement discussed in [Propel's] culture survey report."  *See* January 2020 Probation Supervision Report, Attachment 3,  PCL_ECP00157092-103 at PCL_ECP00157092.

- With the support of ECI, and as an initial step to improve the Company's culture, the Company crafted a new Carnival Corp. Vision Statement, which currently reads:

  > At Carnival Corporation & plc, our highest responsibility and top priorities are to be in compliance everywhere we operate in the world, to protect the environment and the health, safety and well-being of our guests, the people in the communities we touch and our shipboard and shoreside employees.  On this foundation, we aspire to deliver unmatched joyful vacations for our guests, always exceeding their expectations and in doing so driving outstanding shareholder value.  We are committed to a positive and just corporate culture, based on inclusion and the power of diversity.  We operate with integrity, trust and respect for each other—communicating, coordinating and collaborating while seeking candor, openness and transparency at all times.  And we aspire to be an exemplary corporate citizen leaving the people and the places we touch even better. *Vision, Mission & History*, https://www.carnivalcorp.com/corporate-information/mission-and-history.

2. Culture Action Plan

   a. OVERVIEW

- In February 2020, the Company provided the CAM Team an initial draft of the action plan, developed in consultation with ECI, for improving the Company's culture. *See [Draft] Carnival Corporation Culture Action Plan* (Jan. 29, 2020), PCL_ECP00154952-59.  A revised draft was provided in August 2020. *See Carnival Corporation Culture Action Plan for 2020-2021* (Aug. 2020), PCL_ECP00168638 ("Culture Action Plan"); *see also Appendix – Work Plan for Culture Action Plan* (Aug. 2020), PCL_ECP00168629.

January 20, 2021

- The Culture Action Plan identifies four "drivers of culture":

  o "One is the *tone* that is perceived by employees as coming from 'the top' (the Board, CEO, brand presidents, division and ship/shore location leaders);

  o A second is the *support of that tone* (or lack thereof) that is given by each employee's most immediate authority (generally a supervisor);

  o A third is the extent to which employees believe they can or cannot *raise concerns without fear of retaliation*; and

  o A fourth is the extent to which employees believe there is *accountability* for behaviors that step outside those desired values, attitudes, and expectations." Culture Action Plan at 1-2 (emphasis in original).

- The Culture Action Plan also states that the Company "has committed to using the 'pause period' to develop plans and take preliminary actions to enable the brands to implement the Culture Action Plan when they resume guest operations." *Id.* at 3. It specifies 12 activities, split into two phases: activities during the pause and activities after the pause.

  o Activities during the pause are: (1) a Bring Back selection strategy to incorporate ethics and compliance considerations into re-hiring decisions; (2) measures to promote team wellness for shipboard crews; and (3) a Culture Essentials framework of "key actions and behaviors" to strengthen corporate culture. *See id.* at 3-6; and

  o Activities after the pause are: (4) welcome back sessions for all employees; (5) Boards of Directors and executive leadership training and oversight; (6) self-assessments for leadership and Ethics & Compliance Program personnel (using ECI's High-Quality Program assessment tool, *see* https://www.ethics.org/hqp/); (7) performance evaluations for leadership "to ensure their adoption and promotion of key actions and behaviors;" (8) leadership training for brand leaders and managers "on their role in the culture change effort;"(9) manager-led training that emphasizes the Corporate Vision Statement, Brand Core Values, and Culture Essentials; (10) developing a peer-to-peer "ambassador program" to "support employee engagement and issue spotting;" (11) improving communication methods and messages; and (12) sharing feedback from the Environmental Compliance Culture Assessment and developing/implementing a Culture Survey Plan to include monthly "pulse" surveys, quarterly "panel" surveys, and an annual "all-employee culture survey." *See* Culture Action Plan at 6-10.

  *b. GOVERNANCE*

- The Company recently provided the CAM Team with a document that lays out: the new Carnival Corp. Vision Statement; the Culture Action Plan initiatives; and an "outline [of] the governance surrounding these efforts," including "roles, responsibilities and accountabilities" of the Boards of Directors, Executive Leadership and Brand Leaders, HR Leadership Teams, Ethics & Compliance Teams, and Brand Functional Leaders (*e.g.*, heads of Communications,

Learning & Development, and HR).  *See Coordinating our Efforts to Further Strengthen our Culture Across Carnival Corporation* (Jan. 7, 2021), PCL_ECP00178127-48 ("Culture Summary Governance Document") at PCL_ECP00178127-33.

- At its outset, the Culture Summary Governance Document observes that, historically, many brands "have done good work to undertake various initiatives and implement certain actions to strengthen culture," but "these efforts were often done independently or unilaterally, with no (or limited) coordination across the Corporation."  *Id.* at PCL_ECP00178127.  It notes that, in recent months, the "Executive Leadership Team has conveyed the need for more consistency for more progress" by adopting the Vision Statement and endorsing the Culture Action Plan efforts.  *Id.*

- The Culture Summary Governance Document establishes the following "roles, responsibilities and accountabilities":

  o The Boards of Directors are responsible "to oversee and safeguard culture" and "to set clear expectations for what it expects [the Company's] senior leaders to achieve, and what concrete goals will be accomplished."  *Id.* at PCL_ECP00178132;

  o The Executive Leadership Team and Executive Leaders in the brands/operating groups "are ultimately accountable for setting the strategy and delivering the results." *Id.*;

  o The HR Leadership Team will "oversee[] the execution with the brands," with responsibility for "developing clear expectations and implementation steps that include key performance indicators ('KPIs') for each Culture Essential behavior," including "ensuring that all on-going culture efforts prioritize and foster improvements in [diversity, equity, and inclusion ('DEI')]."  *Id.*;

  o The Ethics & Compliance Team will "monitor the implementation and execution efforts to ensure timely progress, general consistency between brands, the sharing of information and best practices, as well as to assess overall effectiveness."  *Id.* at PCL_ECP00178133; and

  o Brand Functional Leaders will be responsible for "implementation and execution." *Id.*

- The Culture Summary Governance Document also states that "the principles of [DEI] will be a central pillar of our broader culture improvement efforts."  *Id.* at PCL_ECP00178128; *see also infra*, Part III.E.

  c.  UPDATES

- The Company presented to the CAM Team on the status its Culture Action Plan activities in a series of workshops in September and November 2020.

- Updates on activities during the pause include:

- **Bring Back Selection Strategy:**  The Culture Action Plan defines this as a "common set of criteria to be used in re-hiring (ship and shore-side) employees that reflect the priorities within the Corporate Vision Statement and the Culture Essentials 'including commitment to safety, environmental protection; ethics & compliance.'"  Culture Action Plan at 3.  Much of this work was completed by the brands before the Culture Action Plan was launched.  For example, Holland America Group created a competency matrix, which includes the Culture Essentials attributes discussed below, for shoreside employees to use to score shipboard officers to determine who should be brought back during restart.  The CAM Team understands that some other brands/operating groups have adopted this competency matrix (or a similar evaluation tool) as well, while other brands "already had similar evaluation processes in place that included similar behaviors that matched the Culture Essentials that were used to evaluate employees who would be separated."  *See* Culture Summary Governance Document at PCL_ECP0178129.  Holland America Group also created an interview tool tied to the Culture Essentials attributes to be used by the Company's Global Talent Partners[22] when re-staffing non-officer shipboard positions.  *See* Employee Interview/Call Notes;

- **Promoting Team Wellness:**  Each brand/operating group was tasked with developing activities to promote team wellness onboard the ships during the pause, and reporting back on those activities to All Brands Group.  Activities that have been put in place include:  free internet to communicate with friends and family; free mental health counseling resources; training for shipboard leadership on warning signs for mental health issues; moving crew to guest cabins to be more comfortable; and outdoor activities for crew, such as games and movie screenings.  *See id.*; and

- **Culture Essentials:**  The Culture Essentials are "key actions and behaviors" that "everyone across all brands needs to remember to help [the Company] live out the top priorities from [its] Vision Statement, as well as [its] shared core values."  Culture Action Plan at 4.  Key actions and behaviors for everyone (including leaders) are:  Speak Up; Respect and Protect; and Improve.  *Id.*  Additional key actions and behaviors for leaders are:  Communicate; Listen & Learn; and Empower.  *Id.* at 5.  The Company rolled out these Culture Essentials the week of October 26, 2020, with messages from the Carnival Corp. CEO, Chief Ethics & Compliance Officer, and brand/operating group leaders.  *See Culture Communications*, PCL_ECP00175606 at 4.  Parallel efforts are ongoing at the brands/operating groups to incorporate the

---

[22] Global Talent Partners are agencies, generally referred to as "manning agencies" in the maritime industry, located around the world that cruise lines and other companies use to recruit and train many of the (typically non-officer) crew members on their ships.  Holland America Group has moved from calling these businesses "manning agencies" to "Global Talent Partners," to shift from an overtly gendered nomenclature to one that focuses on the notion that the individuals hired from these agencies provide needed skills or talent, and that the agencies are partners in the Company's efforts.  In support of that effort, CAM reports adopt that term.

Culture Essentials attributes into their respective materials and initiatives.  *See* Employee Interview/Call Notes.

- Updates on activities for after the pause include:

  o **Training:**  At the All Brands Group level, the Company is working on a revamped Code of Conduct training, and is coordinating with relevant personnel across the brands/operating groups to integrate their feedback.  *See id.*  The Company is also revamping certain shipboard compliance trainings, as discussed in Part III.I.4 below.  *See* Culture Summary Governance Document at PCL_ECP00178130.

     Brands/operating groups have also been developing or updating leadership trainings to integrate the Culture Essentials attributes.  For example, before the pandemic, Holland America Group developed a Management Essentials training, which has been updated to include a module on the Culture Essentials.  *See* Employee Interview/Call Notes;

  o **Performance Evaluations:**  Each brand/operating group is expected to integrate Culture Essentials attributes into the HR lifecycle, including performance evaluations for both ship and shoreside employees.  *See* Culture Action Plan at 8.  The CAM Team understands that Carnival Cruise Line will be the first brand to implement these new performance evaluations, using them for 2020 end of year reviews.  *See* Employee Interview/Call Notes; and

  o **Ambassador Program:**  Holland America Group started developing a peer-to-peer ambassador program in 2019 for shoreside employees.  Under this program, Holland America Group Ethics & Compliance Program personnel identify employees who are interested in receiving additional training on the Code of Conduct, and who are willing to serve as resources for other employees.  These ambassadors receive initial training and are sent "awareness builder" slide decks on a monthly basis.  Right now, the program is active only at Holland America Group for shoreside employees, but the CAM Team understands that it will be expanded across brands/operating groups and to the ships.  *See id.*; and

  o **Self-Assessments and Surveys:**  ECI is administering, or planning to administer, various self-assessments and surveys, including a High-Quality Program self-assessment of the Ethics & Compliance Program and a series of monthly "pulse" surveys to small, random groups of ship and shoreside employees "to measure the progress of [the Company's] culture change efforts" in response to the findings of the Environmental Compliance Culture Assessment.  *See* Culture Action Plan at 10.  The CAM Team has raised questions regarding these efforts and is engaging with ECI and the Company on these questions.[23]

---

[23] The CAM Team has also requested information about the validity and reliability of the relevant survey and assessment instruments.

- From these workshops, it is clear that the brands/operating groups have been actively leading efforts to improve culture and implement the Culture Action Plan, and have been increasingly working in tandem with All Brands Group personnel over the past 6-8 months. The CAM Team recognizes the hard work and dedication of the involved personnel during these challenging times, and will continue to monitor these initiatives with interest.

3. Ongoing CAM Team Examination

- The CAM Team will continue to monitor how the Company uses its resources to build a stronger, sustainable compliance culture, including efforts to respond to the findings of the Environmental Compliance Culture Assessment. The Company's response to date indicates a wide range of activity, including promising, significant initiatives that are largely driven by the brands/operating groups. At the same time, it reflects the Company's historically decentralized, uncoordinated approach to addressing barriers to compliance. The Company's recent Culture Summary Governance Document recognizes the need for increased coordination of culture change efforts, and establishes roles, responsibilities, and accountabilities for top leadership, including at the All Brands Group and Boards of Directors levels. The CAM Team looks forward to observing how this governance framework will function in practice.

**E. Diversity, Equity, and Inclusion**

1. Background

- By the end of ECP Year Two, the CAM Team's interviews with Company employees and business partners around world identified the signal opportunity to support compliance efforts through enhancing diversity and inclusion[24] among the Company's ship officers, particularly in the engine and deck departments. *See* CAM Second Annual Report at 54-63. At the end of ECP Year Three, the CAM again observed the largely untapped opportunity to widen the range of countries and nationalities from which the Company recruits and develops future ship officers. *See* CAM Third Annual Report at 236-43.[25]

- The Company, including the Carnival Corp. CEO, has acknowledged that there is a meaningful connection between creating a diverse, equitable, and inclusive work force and building a sustainable culture of compliance. The Company has also stated its intent to "strive to increase the diversity of its shipboard workforce across certain positions." *See*

---

[24] The Company recently expanded its diversity and inclusion efforts to also focus on equity. According to the Company's definitions:  diversity is "the representation of a range of backgrounds, traits, and experiences in a company's workforce;" equity is "the fair treatment, access, opportunity, and advancement for all people;" and inclusion is "creating an environment of involvement, respect, participation and connection." *See Carnival Corporation Diversity, Equity, and Inclusion – Scope and Strategy* (Jan. 7, 2021) ("DEI Presentation") at 4. As noted above, diversity, equity, and inclusion are collectively referred to as DEI.

[25] The CAM Team's focus is primarily on DEI issues impacting shipboard crew, rather than shoreside personnel.

*Status Report by Princess Cruise Lines, Ltd.*, Dkt. No. 148 (July 12, 2019) at 6; *see also* Employee Interview/Call Notes.  Joining the CEO, members of top leadership have made public statements about the importance of a diverse and inclusive workforce, including the value of diversity as a business imperative.  *See* CAM Third Annual Report at 239-40.  The Company has also revised its Corporate Vision Statement to include a commitment to "a positive and just corporate culture*, based on inclusion and the power of diversity*."  *See Corporate Vision Statement*, https://www.carnivalcorp.com/leading-responsibly/corporate-vision-statement (emphasis added).

- In the past, there had not been a significant, coordinated, centralized effort by All Brands Group to launch a long-term program to build a diverse officer corps across the Company's ships.  *See* CAM Third Annual Report at 236.

- Recently, the Company took steps toward greater centralization of its DEI approach.  HR leaders from across the Company's brands/operating groups, in coordination with the All Brands Group Ethics & Compliance Department and other All Brands Group leaders, have developed a proposal for a centralized framework to incorporate DEI into the broader corporate culture framework.  *See supra*, Part III.C.2 (discussing the broader Culture Action Plan).  As discussed in Part III.E.5 below, the framework is a laudable achievement, and the individuals involved in its development have expressed passion and commitment to DEI goals.  The CAM Team looks forward to monitoring whether and how it will be backed up by specific timeframes, concrete actions, clear accountabilities, and measurable goals and milestones.

2.  Link to Compliance and Business Performance

- The role of DEI in supporting compliance is recognized by the Company's culture consultant, ECI.  *See e.g.*, ECI, *How to Leverage Workplace Diversity to Increase Regulatory Compliance* (June 22, 2018), https://www.ethics.org/how-to-leverage-workplace-diversity-to-increase-regulatory-compliance/.  As DEI becomes the norm throughout an organization, it helps to "minimize[] [the organization's] risk for compliance failure," while allowing individual employees to "improve their immediate, everyday workplace experience."  *Id.*

  o   The findings of the Environmental Compliance Culture Assessment, discussed in Part III.D.1 above, indicate that DEI values are not the norm across the Company, as in many companies and industries.  One theme among free text responses to the culture survey was the "need to eliminate harassment or discrimination" onboard, including preferential treatment by supervisors for those who share the same nationality or those with whom supervisors have romantic relationships.  CAM Third Annual Report at 241-42 (quoting Environmental Compliance Culture Assessment).

  o   These findings are backed up by comments made to the CAM Team throughout the ECP by crew members from various positions across the Company, who have expressed frustration and disappointment over the longstanding and continuing lack of ethnic, racial, and gender DEI within the shipboard officer ranks—including allegations of racism and retaliation.  *See id.* at 241.

January 20, 2021

- Separate from the moral and compliance imperatives, research indicates that DEI norms support a pathway to increase an organization's profitability, innovativeness, and problem-solving abilities.  *See e.g.*, World Economic Forum, *The Business Case for Diversity in the Workplace is Now Overwhelming* (Apr. 29, 2019), https://www.weforum.org/agenda/2019/04/business-case-for-diversity-in-the-workplace/.

  - The Carnival Corp. CEO has recognized these links, stating that "diversity of thinking is a business imperative and competitive advantage . . . In my experience, that diverse group will out-solution a homogenous group of people every time, which enables us to continually improve in everything we do to provide our guests extraordinary vacations at a great value."  M. Juliano, *Carnival's Arnold Donald: 'Always more to do' on diversity; Coronavirus disruption provides perfect opportunity for cruise sector to do better, according to the Society for Diversity*, (Oct. 30, 2020), https://www.tradewindsnews.com/cruise-and-ferry/carnivals-arnold-donald-always-more-to-do-on-diversity/2-1-895969.

3. Maritime Industry Context

- As described in prior CAM reports, the Company, like others in the cruise industry and the maritime industry more broadly, had faced challenges in recent years to recruit and retain individuals for shipboard officer positions due to a global shortage of qualified individuals, especially engineering officers.  *See* CAM Third Annual Report at 237-38.

- It has been observed that this shortage is connected to issues of ethnicity, race, and gender:

  - Historically, officer positions on cruise ships have been filled predominantly by men from Western European countries, while non-officer positions have been filled predominantly by men from Asian, South American, or other non-Western European countries.  *See id.* at 237 (citing W. C. Terry, *Geographic limits to global labor market flexibility: The human resources paradox of the cruise industry*, 42 Geoforum 660, 62 (2011)).

  - In addition, the number of women seafarers in the maritime industry across all positions has historically been low.  According to the International Transport Workers' Foundation, women comprise just 1% of "the global supply of seafarers available for service on internationally trading ships."  International Chamber of Shipping, *ICS Diversity Tracker* (Nov. 2020) at 12.  On cruise ships, females make up on average approximately 20% of the workforce, primarily "represented in service-oriented positions."  E. E. T. Bolt and C. Lashley, *All at sea: Insights into crew work experiences on a cruise liner*, 5:2 Research in Hospitality Management 199, 200 (2015) (citations omitted).  It has further been observed that, while "typical" in the industry, such conditions "are not an inevitable feature of cruise ship working life," but are "by-products of company recruitment policies and procedures at a corporate level; and of shipboard management sensitivity to crew stresses and strains."  *Id.* at 206.

January 20, 2021

- o It has been recognized that the current shortage of qualified officers is really a shortage of qualified European male officers. At a cruise industry conference held in the Philippines in late 2018 and attended by Company personnel, attendees raised concerns about "the availability of skilled deck officers and engineers, most of who[m] until now were sourced in Europe." J. Boonzaier, *Cruise industry concerned about skills shortage* (Nov. 5, 2018), https://www.tradewindsnews.com/passengerships/1624041/cruise-industry-concerned-about-skills-shortage. Attendees further noted that "it is becoming increasingly challenging to recruit younger generations of Europeans as seafarers as there are good job opportunities ashore that fit in with their lifestyle expectations." *Id.* Panel experts "stressed the need to widen the source base for officers and engineers, and to begin investing in training *right now*." *Id.* (emphasis added).

- The CAM has observed that the Company has "an extraordinary opportunity to be a leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry, and to address compliance challenges related to labor supply," through its strong, long-standing relationships with many of its Global Talent Partners, including agencies in the Philippines, Indonesia, and India. *See* CAM Second Annual Report at 61; CAM Third Annual Report at 238.

- As of 2019, the Company reported that it continued to source its shipboard officers primarily from European countries (Italy, the UK, the Netherlands, Germany, and Norway), while the remaining (non-officer) crew positions "are sourced from around the world, with the largest contingent from the Philippines, Indonesia and India." Carnival Corp. Securities and Exchange Commission Form 10-K (2019) at 20. The Company has asserted "that there are limitations created by labor laws, union agreements, and various flag state requirements that constrain the company's ability rapidly to make major changes to the composition of its workforce." CAM March 2020 Quarterly Report at 153 (quoting Company Draft Report Comments).[26] Overcoming historic barriers and entrenched traditions to achieve diversity among its shipboard officer ranks will require a long-term, sustained endeavor at every level of leadership.

- Although recent disruptions to the maritime and cruise industries from COVID-19 may temporarily ameliorate the global shortage of available qualified ship officers, any sudden

---

[26] As of the date of this Report, the Company's Covered Vessels are registered in five different flag states: Bahamas, Bermuda, Netherlands, Panama, and United Kingdom. *See* November 2020 Probation Supervision Report, Attachment 4, PCL_ECP00177586-92. The CAM Team's prior review indicated that none of these flag states restrict officer nationality (with the limited exception of the Netherlands, which generally requires that ship Captains be either Dutch or European Union citizens, but does not appear to restrict the nationalities of other officers). *See* CAM March 2020 Quarterly Report at 153-54. However, these flag states may only accept certain Standards of Training, Certification, and Watchkeeping ("STCW") officer endorsements from specified countries. Notably, countries from which STCW officer endorsements are accepted generally appear to include countries from which many of the Company's non-officer personnel are recruited, such as the Philippines, Indonesia, and India. *See id.*

glut of available qualified officers due to ships being taken out of service (or to reduced staffing levels) is not likely to last. The Company and the industry continue to face the likelihood of a long-term (European) officer shortage. Therefore, if there is a true commitment to fostering DEI in the officer corps, the need to create a pipeline of talent from which the Company can recruit and train officers remains as critical as ever. *See* CAM Third Annual Report at 242.

### 4. COVID-19 Impacts

- As a result of COVID-19, the Company has made significant staff reductions, both shipboard and shoreside. The CAM Team will continue to seek to learn more about how DEI considerations were factored into decisions about who to retain, let go, or furlough, as well as how DEI is being considered in decisions about which crew members to bring back to the ships. *See supra*, Part III.D.2.c (discussing the Company's Bring Back initiative as part of the Culture Action Plan).

- The CAM Team will also seek to understand any impacts to employee diversity as a result of these staffing decisions, including the extent to which there is a structured, coordinated rehiring process that values the rehiring of diverse personnel.

### 5. New Centralized C.A.R.E. Framework

- As noted above, the Company's DEI efforts have historically been led by the brands/operating groups, without a centralized, coordinated plan led by All Brands Group. Throughout the first three years of the ECP, DEI efforts at the All Brands Group level remained unclear, and efforts across the brands/operating groups did not appear consistent or coordinated—despite examples of laudable efforts spearheaded by individual brands. *See* CAM Third Annual Report at 240-41.[27]

- It was not until ECP Year Four that the Company took concrete steps toward centralizing its DEI approach. In recent months, HR leaders from across the Company's brands/operating groups were directed to develop a centralized framework for incorporating DEI into the broader corporate Culture Action Plan framework, discussed in Part III.D.2 above.

- In December 2020, the Company provided the CAM Team with a presentation on the HR leaders' coordinated proposal for a DEI framework, called the C.A.R.E. framework. The framework is designed to require the systematic consideration of DEI or culture impacts when making business decisions, and for those decisions to be re-evaluated if there are unintended DEI or culture impacts. C.A.R.E means: **C**onsider intended goal to achieve; **A**sk

---

[27] For example, before COVID-19, Costa and Carnival Cruise Line implemented programs to source new officers from non-traditional areas, including regions outside of Europe. *See id.* at 241; *see also* Carnival Cruise Line, *Diversity & Inclusion*, PCL_ECP00173770-810; Costa, *Costa D&I*; Holland America Group, *Diversity & Inclusion* (Oct. 2020); Carnival UK, *Carnival UK Diversity and Inclusion initiatives 2017 – 2020*.

January 20, 2021

if there is any unintended culture/DEI impact; **R**ethink actions to mitigate DEI impact; and **E**valuate how to proceed if mitigation does not fully address.  DEI Presentation at 8.[28]

- The CAM Team understands that this is the first substantial effort to create a coordinated approach to DEI across the brands/operating groups, and recognizes the significant efforts undertaken to create a collective framework for integrating DEI into decision making processes—as well as the passion and commitment to DEI demonstrated by the individuals involved in its development.  As noted above, the framework itself is a laudable achievement, though questions remain about how it will be implemented, including details about timeframes, concrete actions,[29] accountabilities, and goals and milestones.  For instance, the CAM Team understands that, in accordance with the Culture Summary Governance Document, brand/operating group leaders will oversee "implementation and execution" of the framework in each brand, while the All Brands Group Ethics & Compliance Department will "monitor the implementation and execution efforts," including for "overall effectiveness" and "to ensure timely progress, general consistency between brands," and "the sharing of information and best practices."  *See* Culture Summary Governance Document at PCL_ECP00178132-33; *see also supra*, Part III.D.2.b.  Until the goals of the framework and everyone's roles within it are better defined, the framework runs the risk of not being concrete enough to be impactful.

- It will, of course, take more than a framework to make change—change requires action.  Examples of corporate best practices for actions to support DEI include:  ensuring the representation of diverse talent; strengthening leadership accountability and capabilities for DEI; enabling equality of opportunity through fairness and transparency; promoting openness and upholding a zero-tolerance policy for discriminatory behavior, including through effective internal investigations;[30] and fostering belonging through unequivocal support for

---

[28] To illustrate the C.A.R.E. framework, the Company used the following example of onboard firefighters:  The Company's goal is for every firefighter to be able to carry required equipment.  It proposes a new rule that every firefighter onboard must be able to carry a 50-pound load.  An examination of the goal indicates an unintended DEI impact:  it will likely disproportionately affect women.  The Company then looks for ways to mitigate the DEI impact.  It evaluates the weight firefighters need to carry when firefighting, and determines the average is no more than 25 pounds.  Therefore, the Company alters the proposed rule to require every firefighter to be able to carry 25 pounds individually, or 50 pounds between two people.  *See* Employee Interview/Call Notes.

[29] "Operational actions" identified in the proposal include:  establishing gender-neutral job titles and criteria; ensuring DEI is reflected in all training materials; and establishing transparent job and promotion criteria.  *See* DEI Presentation at 13.  Other, more nebulous, actions include developing a communication plan to "raise conscious awareness," "set expectations," "trigger engagement," "established DEI as a priority," and "share best practices across brands."  *See id.*

[30] As the CAM has observed, even when the Company's internal investigators learn of possible discrimination or harassment issues, follow-up opportunities may be missed.  In one investigation, a senior engineer told the investigator that a junior engineer involved in the incident "is the only female engineer and may feel excluded."  CAM Third Annual Report at 195-96 (quoting Incident Analysis Group investigation report).  Based on the available records, it

multivariate diversity (going beyond gender and ethnicity).  *See* S. Dixon-Fyle, *et al.*, McKinsey & Company, *Diversity Wins: How Inclusion Matters* (May 19, 2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters#.

6.  Ongoing CAM Team Examination

- The CAM Team will continue to examine the Company's efforts to create and implement a centralized DEI framework across the Company's brands.  The CAM Team will also continue to monitor individual brand/operating group DEI efforts (including programs to recruit, train, retain, and promote non-traditional officer candidates), as well as DEI impacts resulting from COVID-19-related personnel changes.

**F. Investigations**

1.  Background

- In ECP Year One, the CAM made a finding that the "Company's internal investigations are critically flawed."  *See* CAM First Annual Report at 5, 33-40.  The CAM made similar findings in ECP Years Two and Three.  *See* Second Annual Report at 43-46; CAM Third Annual Report at 180-201.  The TPA has made analogous findings.  *See* TPA First Annual Report at 3; TPA Second Annual Report at 21-22; TPA Third Annual Report at 5.  These CAM and TPA findings generally focused on:  (1) the lack of (adequate) procedures, guidance, or training on causal analysis and basic investigative techniques for All Brands Group and brand/operating group-level investigations; (2) the tendency of investigation reports to focus on identifying human error rather than also identifying broader systemic, organizational causes; (3) the limited independence and authority of the Company's investigative unit to direct and determine investigation assignments and scope, including the continued dominant role played by the Chief Maritime Officer (an operations, not compliance, function); and (4) the lack of (adequate) procedures, processes, and tools for fostering continuous improvement, such as through the tracking and trending of investigation findings and the auditing of the internal investigations function.  *See e.g.*, CAM First Annual Report at 5, 33-40; CAM Second Annual Report at 43-46; CAM Third Annual Report at 180-201; Employee Interview/Call Notes.

- These persistent problems have also more broadly impacted the Company's compliance efforts.  Without effective analysis of compliance failures, the Company has lacked clarity about the nature and scope of the compliance problems it has faced and sought to remedy.  A remedy must be driven by understanding the many and often varied causes of a problem.  For instance, was a voyage planning error that led to an improper discharge a training issue, a workload issue, an issue arising from unclear procedures, and/or a management of change issue in which shoreside personnel did not fully consider the impact of their actions on

---

does not appear that the investigator followed up on this potential issue, and the comment was not included in the final report.  The root cause in the final report was identified as the junior engineer's "attention slip."  *Id.*

ships?[31]  Under a just culture approach, an organization, while appropriately holding individuals accountable, also holds itself accountable for how systems or approaches it designs and implements contribute to unwanted behaviors and adverse events.  *See* CAM First Annual Report at 30, n.26.[32]  Without an effective and independent investigations function capable of facilitating such an approach, the Company has been impeding its compliance efforts.

- As detailed in prior CAM reports, the Company's efforts to revamp its internal investigation program have been subject to repeated delays and detours.  *See, e.g.*, *id.* at 182-83.  Since the CAM's Third Annual Report was released in July 2020, however, the Company has made progress under the leadership of the newly-appointed head for the corporate-level investigations unit, called the Incident Analysis Group.  Many initiatives to address the CAM and TPA's concerns are planned or underway, including several that implement recommendations recently proposed by an outside law firm engaged to investigate concerns, internally reported by Company personnel, about the Incident Analysis Group's structure and independence, discussed in Part III.F.4 below.

- The Company also recently provided the CAM Team with a revised plan for improving its internal investigations function.  *See* Carnival Corp., *A Revised Plan ("Roadmap") for Improving HESS Investigations at Carnival Corporation & Plc and its Brands* (Jan. 7, 2021) ("Roadmap").  The Roadmap establishes that the "primary mandates" for the Incident Analysis Group are "to conduct high-quality and rigorous investigations (through a 'just and fair' methodology) that will deliver timely reports that avoid the rush to blame and achieve the dual goals of 'learning' and 'accountability."  *Id.* at 1.  It also sets out "specific changes" that have been implemented and timeframes "for other improvements that are underway."  *Id.*  Relevant aspects of the Roadmap are discussed in the following sections.  The CAM Team looks forward to continuing to monitor its implementation.  It will be crucial to see how these efforts are carried out in the coming weeks and months.

---

[31] For example, one internal investigation report attributed the cause of an illegal sewage discharge to an oversight failure by a bridge officer who was distracted, in part, by "an IT project team visit to the Bridge."  *See* CAM December 2019 Quarterly Report at 50, n.34 (quoting HESS Report to the Boards of Directors).  The report identifies several corrective actions, including re-briefing of relevant personnel on "maintaining situational awareness and avoiding distractions," but fails to include any causal findings or corrective actions related to the deployment and scheduling of project teams by shoreside personnel.  *See id.*

[32] As the CAM has observed, "individual accountability is important (especially if there has been intentional wrongdoing), but a focus on individual errors without also identifying or addressing potential systemic causes can foster a culture of blame and fear, attributes of the Company's culture found throughout its brands in the Propel Environmental Compliance Culture Assessment."  CAM Third Annual Report at 196.

January 20, 2021

2. Personnel Updates

    *a.* NEW INCIDENT ANALYSIS GROUP HEAD

- In September 2020, the Company appointed a new individual to lead the Incident Analysis Group, whose formal job title is Senior Vice President, Deputy Chief Ethics & Compliance Officer and Head of the Incident Analysis Group ("Incident Analysis Group Head" or "Head"). *See* Job Description. The individual appointed to this position previously served as the Operating Line Compliance Manager for Carnival UK and has a background in "maritime, investigations and governance." Roadmap at 1.

- The new Incident Analysis Group Head has "a clear mandate to carefully examine the past challenges, to review the current capabilities and processes, and to develop a plan to further strengthen" the Incident Analysis Group function. *Id.* The job description states that the position will have "full authority to carry out independent investigations throughout the corporation that involve the maritime Health, Environmental, Safety and Security areas." Job Description at 1. The Roadmap further specifies that the Head "has the authority to identify investigation teams and assign investigation responsibilities based on the incident severity level, arrange for any additional expertise needed to assist with the Investigation such as subject matter experts or externally sourced consultants, oversee the development of recommendations from investigations and, importantly, to ensure that the investigation work performed is independent." Roadmap at 1-2. At the October 16, 2020, Status Conference, the Incident Analysis Group Head informed the Court that he "own[s] [the Incident Analysis Group] in terms of the . . . product . . . in terms of assigning, investigators, in terms of deciding what's going to be investigated, at what level, that will be my decision." Status Conf. Tr. at 45 (Oct. 16, 2020).

- In addition to leading the Incident Analysis Group, the Head will oversee the compliance risk function, and assist the Chief Ethics & Compliance Officer as Deputy "by supporting the open communications with operating companies, as well as helping to implement the overall [Ethics & Compliance] Program." Job Description at 1.

- The CAM Team has heard positive reports from Company personnel regarding the leadership and engagement of the new Incident Analysis Group Head. *See* Employee Interview/Call Notes.

    *b.* INCIDENT ANALYSIS GROUP STRUCTURE

- As discussed in Parts III.F.3-4 below, in response to concerns about Incident Analysis Group structure and independence, the group is now positioned directly under the Chief Ethics & Compliance Officer, who has direct communication and a reporting line to the Compliance Committee of the Boards of Directors.

    *c.* OTHER PERSONNEL UPDATES

- The Incident Analysis Group currently has seven investigators. *See* Employee Interview/Call Notes. Three former investigators were let go during pandemic-related cutbacks, and one

new investigator was recently hired.  *Id.*  In addition, in August 2020, the Incident Analysis Group seconded a RAAS manager to assist with investigations.  *Id.*  The Company plans to hire at least two more investigators in the coming months.  *See* Roadmap at 2.

- Other positions that have been added, or approved in the 2021 financial plan, are:  Director of Incident Analysis Group Training (added in October 2020, to be converted to a 12-month contract in February 2021); Director of Program Implementation and Quality Assurance (to be advertised); Superintendent, Technical Editor (advertised); and Administration Support (to be advertised).  *See id.*  The Company is also evaluating whether a new position "is needed to help investigators to strengthen the investigative techniques that are provided through more traditional law enforcement training."  *Id.*

3.  CAM and TPA Concerns Regarding Response to Hotline Complaints

a.  *CAM CONCERNS ABOUT COMPANY RESPONSE TO HOTLINE COMPLAINTS REGARDING INCIDENT ANALYSIS GROUP STRUCTURE AND INDEPENDENCE*

- In July 2020, the Company received hotline complaints which alleged concerns about the structure and independence of the Incident Analysis Group function ("Incident Analysis Group Hotline Complaints").  *See, e.g.*, Environmental Open Report #41-2020, PCL_ECP00167625021-28.[33]

- The Company hired an outside law firm to investigate these complaints.  The law firm prepared a final investigation report that was directed to the Carnival Corp. General Counsel and the Carnival Corp. Vice President, Global Ethics & Compliance.  It was submitted to the Interested Parties, CAM, and TPA on September 25, 2020.  *See* Outside Counsel, *Hotline Complaints: Report and Recommendations* (Sept. 24, 2020).

- The CAM Team found this initial report to be deficient in numerous respects, including that it appeared to be narrowly scoped, internally inconsistent, and to contain unsupported opinion-based assertions.[34]  On October 8, 2020, the CAM sent a letter to the Company outlining these concerns, and requesting documents and information related to the complaints and the Company's investigation process.  *See* Letter from CAM to Chief Ethics & Compliance Officer Regarding Incident Analysis Group (IAG) and Recent Hotline Complaints Assessment (Oct. 8, 2020), attached as Appendix F.[35]

- On October 15, 2020, the Company informed the CAM that the Compliance Committee of the Boards of Directors had engaged a new outside law firm to "conduct a fresh review of the

---

[33] Another related complaint was received in October 2020.  *See* Environmental Open Report #44-2020.

[34] The CAM notes that the initial investigation occurred before the new Incident Analysis Head was appointed.

[35] On December 16 and 22, 2020, the CAM Team received numerous emails and records in response to the October 8, 2020, document and investigation request.  The CAM Team is reviewing these materials.

work that had been done by the [prior] firm, to supplement the initial investigation as necessary, and to prepare a report that, among other things, addresses the concerns raised" by the CAM. *See* Letter from Outside Counsel to CAM, *United States v. Princess Cruise Lines, Ltd., No. 1:16-cr-20897 (S.D. Fla.)* (Oct. 15, 2020). At the October 16, 2020, Status Conference, the Court sought a "postmortem on how that first decision was made, as to who was selected to do the investigation and what were the lessons learned from that." Status Conf. Tr. at 51 (Oct. 16, 2020).

- On December 14, 2020, the CAM Team received the final investigation report prepared by the second law firm, which includes a series of findings and recommendations, as discussed in Part III.F.4 below. *See* Outside Counsel, *Internal Investigation Report: Issues Related to the Incident Analysis Group, Prepared for the Compliance Committee of Carnival Corporation's Board of Directors* (Dec. 15, 2020) ("Outside Counsel Report on Incident Analysis Group Issues").

- The scope of the Outside Counsel Report on Incident Analysis Group Issues does not include "a post-mortem on the [initial] report." *Id.* at n.1. The analysis sought by the Court is being conducted by outside counsel for the Compliance Committee of the Boards of Directors. Results are pending. *See* Company Comments on Draft Report.

  *b.* TPA CONCERNS ABOUT COMPANY RESPONSE TO OTHER RECENT HOTLINE COMPLAINTS

- The TPA has expressed concerns to the Company regarding its response to other recent hotline complaints, including concerns that:

  o While the ECP requires the Incident Analysis Group to investigate environmental hotline complaints, *see* ECP § III.C.1.b, the Incident Analysis Group appeared to "stand down" from investigating a hotline complaint alleging an oil leak from a Company ship after communications from senior operations personnel that the substance was soot, not oil. *See* Letter from TPA to Chief Ethics & Compliance Officer, #ABSG/CC-062 (Oct. 18, 2020) at 1;

  o Investigations, in particular hotline investigations, "may be too narrowly scoped"— for instance, by primarily focusing on substantiating if allegations were correct— which "ultimately limits the ability to review issue[s] that may be raised by the complaint." *Id.*; and

  o Investigations did not appear to examine all issues raised by the complaints. *See id.* at 1-3; *see also* Letter from TPA to Chief Ethics & Compliance Officer, #ABSG/CC-058 (Aug. 21, 2020); Letter from TPA to Incident Analysis Group Head, #ABSG/CC-035 (Dec. 9, 2020).[36]

---

[36] The CAM notes that the investigations at issue in the TPA's letters occurred before the new Incident Analysis Head was appointed.

January 20, 2021

- The Incident Analysis Group Head has responded to the TPA that:

  o Outside counsel would undertake a new investigation of the alleged oil leak, which would address a number of the TPA's inquiries.  *See* Letter from Incident Analysis Group Head to TPA, *Response to Request for Additional Information* (Oct. 28, 2020);[37]

  o Going forward, the Incident Analysis Group will be assigned to investigate all environmental hotline complaints, pending further review and clarification of differing interpretations within the Company of the relevant ECP provision.  *Id.* at 2; and

  o Efforts are being made to reinforce a message that the primary focus of investigations is not to "to substantiate if the allegations were correct."  Letter from Incident Analysis Group Head to TPA, *Investigation Reports* (Jan. 18, 2021) at 2.  For example, in October 2020, a three-day continuous improvement workshop was held with the Incident Analysis Group, and Continuous Improvement workshops are scheduled to take place every two months beginning in February 2021 where "this critical point will continue to be reinforced."  *Id.*; *see also* Roadmap at 6.

  4. <u>Outside Counsel Report on Incident Analysis Group Issues</u>

       a. OVERVIEW

- The Outside Counsel Report on Incident Analysis Group Issues reviews the Incident Analysis Group Hotline Complaints and addresses certain of the CAM and TPA concerns discussed above.  Ultimately, the report recommends that the Company provide the Incident Analysis Group with independence from the corporate operations function, while still allowing designated operational personnel to provide technical expertise in a consultant-like manner.  *See* Outside Counsel Report on Incident Analysis Group Issues at 3.

- In addition, the report recommends a structure in which the Incident Analysis Group falls directly under the leadership of the Incident Analysis Group Head, the Chief Ethics & Compliance Officer, and, importantly, the Compliance Committee of the Boards of Directors.  *See id.* at 3, 23.  The CAM Team understands that this recommended structure is in place.  The CAM Team will continue to monitor how this structure, along with other changes in response to the report's findings and recommendations, impacts the independence and effectiveness of the internal investigations function.

       b. FINDINGS AND RECOMMENDATIONS

- The report's other findings and recommendations can be categorized under the following topics:  (1) Incident Analysis Group independence; (2) blame culture; (3) root cause analysis; (4) overall quality of investigations and reports; (5) hotline complaint investigations, and

---

[37] The outside counsel for this investigation is the same outside counsel that conducted the second investigation into the Incident Analysis Group Hotline Complaints.

(6) brand/operating group-level investigator training and independence.  They include the following recommendations:

o  ***Limit and Define Distribution of Draft Reports and Comments.***  The distribution of draft investigation reports should be limited to a defined set of stakeholders.  *See id.* at 3-4;

o  ***Conduct a Bi-annual Review of Global Issues.***  Every six months, designated personnel, including representatives from the Boards of Directors, should meet to review "global" issues identified in investigation reports from the prior two years, including similar incidents, preventive actions, and opportunities for modifications to training and procedures.  *See id.* at 4;

o  ***Designate Subject Matter Experts to Review Investigation Reports.***  A list of internal subject matter experts should be formalized that investigators can contact for appropriate input and advice.  *See id.*;

o  ***Reinforce a Constructive Tone at the Top.***  Those in senior management must take care not to foster a blame culture in any way, including in the wording of constructive criticism.  *See id.* at 8, 10;

o  ***Clarify the Definition of Root Cause.***  The term should be defined to mean:  "All contributing factors to an incident in order of priority, if priority can be established."  *See id.* at 7, 21, 29;

o  ***Expand the Incident Analysis Group Investigator Ranks with Former Federal Agents and a Mix of Investigative Backgrounds.***  The Incident Analysis Group should hire classically trained investigators, such as former federal agents, to supplement the existing Incident Analysis Group investigators, who have primarily maritime backgrounds.  *See id.* at 5;

o  ***Provide Classic Investigative Training for Incident Analysis Group Investigators.***  Investigators should receive classic investigative training, such as that received by former FBI agents.  *See id.* at 5-6;

o  ***Create a Single Investigative Guidelines Manual.***  The Incident Analysis Group should create one investigative guidelines manual which should address, among other areas:  basic investigative techniques; identification and prioritization of contributing factors, including systemic causes; and implementation and verification of corrective action plans.  *See id.* at 29-30;

o  ***Address Broader Systemic or Fleetwide Issues in Separate Incident Analysis Group Reviews.***  The Incident Analysis Group should identify issues with fleet-wide implications that may not be appropriate for a single report, and separately address them or bring them to the attention of management and/or the Boards of Directors.  *See id.* at 6;

January 20, 2021

    o **_Designate Brand/Operating Group and Ship Personnel to Assist in Investigations._** Brand/operating group and ship personnel should receive basic investigative training, be assigned to appropriate Incident Analysis Group investigations, and report directly to the Incident Analysis Group for such investigations.  *See id.* at 8;

    o **_Place Oversight Over Corrective Actions with the Ethics & Compliance Program._** The Ethics & Compliance Program should oversee and monitor corrective action plans and due dates.  *See id.* at 25; and

    o **_Designate the Incident Analysis Group as the Default Investigative Body for All Environmental Issues_**.  For any incident involving environmental issues, whether a hotline complaint or otherwise, the default investigators should be the Incident Analysis Group.  *Id.* at 8.  If an incident is reassigned, the newly assigned investigator(s) must affirm in writing that they have accepted the matter.  *See id.*[38]

5.  Other Initiatives

    a.  INVESTIGATION MANUAL AND PROCEDURES

- The Company is in the process of crafting an investigations manual, for use by all HESS investigators who conduct Level 3 and Level 2 investigations,[39] that will include basic investigative techniques and guidance, as recommended in the Outside Counsel Report on Incident Analysis Group Issues.  *See* Employee Interview/Call Notes; Roadmap at 5.  The Company expects to complete the manual by March 2021.  *See* Company Comments on Draft Report.  An abbreviated version of the manual will be created for shipboard use.  Roadmap at 5.

- In response to additional recommendations from the Outside Counsel Report on Incident Analysis Group Issues, the Company plans the following revisions to its internal investigation procedures:

    o Specifying "a documented stakeholder review process for individual investigation reports" by the end of February 2021.  *Id.* at 4;

---

[38] This recommendation is reiterated in the supplemental review performed by outside counsel in response to the TPA's concerns, noted above, about the Company's handling of a hotline complaint alleging an oil leak.  *See* Outside Counsel, *Supplemental Report* (Dec. 31, 2020) at 5.

[39] The Company's internal procedures establish three levels of incident/event severity.  Level 3 incidents are the highest level and are assigned to the Incident Analysis Group.  Level 2 incidents are typically assigned to brand/operating group investigators (although, as discussed below, the Company is providing Level 2 investigations training to Environmental Officers).  Level 1 incidents are typically assigned to shipboard investigators.  *See* CAM Third Annual Report at 183-84.

- o   Establishing a roster of subject matter experts by the end of January 2021 that will be "kept up to date within Global HESS," with any input from these experts "limited to correcting any factual errors or omissions."  *Id.*;

- o   Formalizing the Incident Analysis Group's role in maintaining "line of sight" over brand/operating group investigations by requiring that the Incident Analysis Group "sign off" on draft reports for Level 2 investigations.  *Id.* at 6.  Relatedly, the Incident Analysis Group will begin holding monthly meetings with investigation leads within the brands/operating groups in January 2021.  *Id.*;

- o   Reviewing, and, if necessary, revising existing procedures "to ensure that global issues such as proposed significant policy changes may be discussed and agreed" by the end of March 2021.  *Id.* at 5.  The review will include consultation with ships "to solicit input on methods of disseminating lessons learned."  *Id.*  In addition, the Incident Analysis Group plans to "establish a regular program to engage with selected ships to ensure open communications and direct feedback from the fleet about how to improve ship-board HESS investigations."  *Id.* at 6; and

- o   Reviewing existing procedures and collaborating with RAAS on agreed protocols to "ensure that [corrective] action plan completion is monitored and verified" by the end of February 2021.  *Id.* at 5.

- As noted above, following concerns raised by the TPA, the Company revised its internal investigation procedures in November 2020 to assign all environmental hotline complaints to the Incident Analysis Group.  *See id.*; Letter from Incident Analysis Group Head to TPA, *Response to Request for Additional Information* (Oct. 28, 2020) (noting that, pending further review, the Incident Analysis Group will investigate all environmental hotline complaints); *see also* Letter from Incident Analysis Group Head to TPA, *Investigation Reports* (Jan. 18, 2021) (noting that "a draft set of Hotline procedures" is expected to be finalized by the end of January 2021).  This partially implements the recommendation from the Outside Counsel Report on Incident Analysis Group Issues to assign *any* incident involving environmental issues, whether a hotline complaint or otherwise, to the Incident Analysis Group by default.  *See* Outside Counsel Report on Incident Analysis Group Issues at 8.

- The CAM Team understands that the Company continues to revise and refine its investigation procedures.  *See* Roadmap at 4-5.  In future reports, the CAM plans to assess how the Company incorporates recommendations from the Outside Counsel Report on Incident Analysis Group Issues into these revisions.

   b.   *TRAINING AND COMPETENCIES*

- The Company continues to conduct its Environmental Excellence training for Environmental Officers.  The most recent iteration of this course, which is being delivered virtually during the pause, provides Level 2 investigations training to Environmental Officers.  The CAM Team's observations on this course are detailed in Part III.I.2.b below and in Appendix C. The Company reports that it is "also exploring possible ways to improve investigative training for other nominated ranks onboard and personnel ashore who are responsible for

conducting Level 1 & Level 2 investigations." Roadmap at 6. This review is expected to be completed by the end of January 2021. *Id.*

- The Company has hired, on a contract basis, a Director of Training to develop competency frameworks for Incident Analysis Group investigators. The competency frameworks will define requirements for new investigators (such as particular skills or training), as well as outline requirements for the continued professional development of existing investigators. *See* Employee Interview/Call Notes; Roadmap at 3.

- The new Director of Training is also working with third-party vendors on a report writing training that is expected to begin in February 2021. *See* Employee Interview/Call Notes; Roadmap at 3. This training will be accompanied by "a standard investigation report template and report writing procedures which will be published by January 31, 2021." Roadmap at 3.

- In response to a recommendation from the Outside Counsel Report on Incident Analysis Group Issues, the Company is also "planning to develop a training course that will strengthen the investigation techniques that are often provided in more traditional law enforcement training programs." *Id.*

- The Company reports that "[a]dditional courses and training will be continuously developed," including in response to feedback from the bi-monthly Incident Analysis Group Continuous Improvement workshops that will begin in February 2021. *See id.* at 3, 6.

- In future reports, the CAM plans to assess how the Company incorporates recommendations from the Outside Counsel Report on Incident Analysis Group Issues into its competency models and training.

       *c.   DATA MANAGEMENT AND TRACKING*

- The Company launched a new software database platform in December 2020 to assign and track Incident Analysis Group investigations, including investigation descriptions, root cause analysis findings, and corrective and preventive actions. The CAM Team understands that the Incident Analysis Group has begun to populate the database with data from recent investigations, and is working to identify resources to backfill data from older investigations. The database will link to other software designed to enable the creation of unique dashboards to track, trend, and communicate data. While the database has the functionality to track and trend data from brand/operating group and ship investigations (*i.e.*, Level 1 and Level 2 investigations), the Company has not yet decided whether the platform will be used for this purpose. *See* Employee Interview/Call Notes. The database is expected to go live by the end of February 2021. Roadmap at 5. If successfully implemented, the database could help the Company trend data to better identify, manage, and prevent repeat incidents.

- The CAM Team understands that Level 1 and Level 2 investigations will continue to be tracked in SeaEvent. SeaEvent includes a tool, known as the Root Cause Analysis Map, designed to facilitate causal analysis of these lower-level incidents. During ship and shoreside visits, however, personnel have reported to the CAM Team that SeaEvent, and the

Root Cause Analysis Map, is difficult to navigate, time-consuming, and does not provide the appropriate depth of analysis.  *See* Employee Interview/Call Notes.  In response to these concerns, the Company is working to develop a streamlined version of the Root Cause Analysis Map, which would simplify the terms used and make it easier to navigate the platform.  The Company reports that the revised module is being rolled out on a staggered basis across the brands/operating groups and All Brands Group, with full roll-out expected to be complete by early February 2021.  *See* Pause Priorities Plan, PCL_ECP00177469 at 15; Company Comments on Draft Report; *see also infra*, Part III.J.3.e.

> ### d.   INVESTIGATIONS WORKING GROUP

- The Company announced in an early version of the Pause Priorities Plan that it would establish an Advisory Council, made up primarily of brand/operating group representatives, to "oversee" the Incident Analysis Group.  *See* CAM Third Annual Report at 189 (quoting Draft Pause Priorities Plan).  The CAM expressed concerns that placing *oversight* of investigations under the control of an Advisory Council would be unlikely to produce an independent and effective investigative function, along with concerns that there was no guidance or criteria setting forth the Council's mandate or defining the scope of the Council's oversight.  *See id.* at 189-90.[40]  In response to these concerns, the Company changed the name of the Advisory Council to a Working Group to "clarify that the purpose[] of the group is to provide guidance on investigative process, not to oversee the work of [the Incident Analysis Group], or to influence any particular investigations."  CAM Third Annual Report at 190 (quoting Company Comments on Draft Report).

- The Working Group continues to meet quarterly.  It is chaired by the new Incident Analysis Group Head, and its members are comprised of brand/operating group investigation coordinators.  The CAM Team understands that the Working Group's main goals are to facilitate the sharing of best practices among the brands/operating groups and to promote consistency in brand/operating group support of Incident Analysis Group investigations.  *See* Employee Interview/Call Notes.

> ### e.   CONTINUOUS IMPROVEMENT

- As noted above, a program of bi-monthly Incident Analysis Group Continuous Improvement workshops will begin in February 2021.  *See* Roadmap at 6.

- The Company "will also explore the option" of having the Incident Analysis Group investigation process externally certified to an international standard (known as the "ISO-

---

[40] These concerns are reflected in the recommendation from the Outside Counsel Report on Incident Analysis Group Issues to provide the Incident Analysis Group with independence from the corporate operations function.  *See, e.g.*, Outside Counsel Report on Incident Analysis Group Issues at 3, 10.

January 20, 2021

9001 Quality Management System" standard).  *Id.*[41]  This review is expected to be completed by the end of the second quarter of Fiscal Year 2021.  Roadmap at 6.

       *f.* AUDITING THE INTERNAL INVESTIGATIONS FUNCTION

- As the CAM has observed, it is critical that the Company implement a comprehensive process for evaluating the effectiveness of its investigations function.  *See* CAM Third Annual Report at 197-98.  The Company has targeted the third quarter of Fiscal Year 2021 for RAAS to begin auditing the Incident Analysis Group.  Roadmap at 6.  The CAM Team will continue to monitor this effort.

    6.  <u>Ongoing CAM Team Examination</u>

- The CAM Team will continue to monitor the Company's efforts to improve its internal investigations function.  A key area of focus will be the Company's efforts to review and implement recommendations from the Outside Counsel Report on Incident Analysis Group Issues.  The CAM Team's examination will include:  (1) the function and structure of the Incident Analysis Group, including its independence, authority, and resources; (2) the revision, implementation, and effectiveness of investigation procedures; (3) the process for identifying and classifying matters for investigation, including individuals responsible for making such determinations and the timeframes for making them; (4) training for the Incident Analysis Group, brand/operating group, and ship investigators; (5) the guidance and training for causal analysis used by the Incident Analysis Group, brand/operating group, and ship investigators; (6) the implementation of corrective and preventative actions and how these actions are monitored for effectiveness; and (7) the process for disseminating investigation results and lessons learned to corporate leadership, including the Boards of Directors, and relevant All Brands Group, brand/operating group, and ship personnel across the fleet.

- The CAM Team acknowledges that reviewing and implementing the recommendations in the Outside Counsel Report on Incident Analysis Group Issues will require the investment of funds, resources, and time.  The CAM will look to the Company to provide firm timelines, action plans, and accountabilities for implementing applicable recommendations.

---

[41] The ISO-9001 standard "sets out the criteria for a quality management system" and is "based on a number of quality management principles," including "the motivation and implication of top management, the process approach and continual improvement."  *See ISO 9000 Family Quality Management*, https://www.iso.org/iso-9001-quality-management.html.

### G. Food Waste Management (Prohibiting Plastic and Non-Food Item Discharges)

1. Background

- In June 2019, the Company pleaded guilty to a probation violation for an illegal discharge into the ocean of non-food items—including plastic—mixed with food waste,[42] along with a failure to accurately record this discharge.  Dkt. No. 134 at 11.  These actions violated the International Convention for the Prevention of Pollution from Ships ("MARPOL"), which generally prohibits the discharge of all garbage,[43] including all plastics, into the sea.  *See* MARPOL Annex V, Reg. 3.1-3.2.[44]  Further review confirmed that the discharge of food waste comingled with non-food items was a Company-wide issue.  *See* CAM March 2020 Quarterly Report at 90-91.  Further review also revealed that the food waste stream is not the only mechanism through which plastics and other non-food items are discharged to the sea.  Such items may also be discharged via grey water systems, as discussed in Part III.G.4.e below.[45]

- As discussed in prior CAM reports, as early as February 2018, in responses to the ECP-required Fleet Engineering Survey, the Company's employees identified the problem of ongoing discharges of plastics and other non-food items commingled with food waste, due to inadequate onboard waste sorting and disposal processes.  *See* CAM March 2020 Quarterly Report at 89-90.  However, the Company's top leadership did not focus on this issue until it faced probation revocation in March 2019.  *See id.*; CAM Third Annual Report at 108, n.66.

- Failing to recognize and address this problem sooner reflects a tendency by the Company's top leadership to view incidents as discrete acts by individual actors, and not as the result of inadequate systems and processes.  Such a view is compounded by the Company's

---

[42] References to food waste in this section generally refer to "soft" food waste (such as wet food scraps and other digestible items), and not to "hard" food waste (such as bones, shells, and tough fruit/vegetable skins).

[43] Garbage is broadly defined under MARPOL to include, among other things, "domestic wastes and operational wastes" and "all plastics," with certain exceptions that do not apply here.  *See* MARPOL Annex V, Reg. 1.9.

[44] Although MARPOL permits the discharge of food waste under specified conditions, *see*, *e.g.*, MARPOL Annex V, Reg. 4.1.1-4.1.2, whenever food waste or other garbage is "mixed with or contaminated by other substances prohibited from discharge [*e.g.*, plastics] or having different discharge requirements, the more stringent requirements shall apply."  MARPOL Annex V, Reg. 4.4.  Therefore, a food waste discharge that would otherwise be permitted under MARPOL is not permitted if the food waste is contaminated with plastics or other non-food items that cannot be legally discharged.

[45] Plastics and other solid items may also be dropped, thrown, blown, or otherwise lost overboard, whether intentionally or accidentally—a separate issue beyond the scope of this section.

longstanding lack of robust systems for internal investigations (including root cause analysis), risk assessment, data management and analysis, and management accountability.

- In connection with its guilty plea, the Company admitted the need to improve the management of food waste on its ships to prevent discharges of plastics and other non-food items, and agreed to take actions to prioritize this issue, including:

  o Establishing a Food Waste Task Force and two Food Waste Tiger Teams;[46]

  o Implementing a three-part program to improve its food waste management practices, which addresses:  (1) training, supervision, staffing, and culture improvements; (2) reducing single-use plastics and food waste onboard; and (3) technology and design improvements;

  o Committing to:  (1) reduce the purchase and consumption of single-use plastic items onboard its ships by 50% by December 31, 2021; and (2) reduce the total weight of food waste generated onboard its ships by 10% by December 31, 2021;

  o Committing a minimum of $20 million in capital expenditures throughout the remainder of probation to optimize food waste management; and

  o Submitting a range of plans, reviews, and assessments, including:  (1) a Food Waste Management Implementation Plan for developing improved procedures, training, signage, and media; (2) a Food Waste Technical Review of food waste disposal technologies; (3) a Food Waste Optimization Plan for optimizing food waste management, including food waste disposal systems and processes; (4) a third-party Food Waste Workload Assessment of the staffing levels for both the operational and compliance aspects of food waste management; and (5) a Food Waste Workload Assessment Response Plan in response to the third-party assessment.  *See* CAM Third Annual Report at 73-74, 107-22.

- At the end of ECP Year Three, the CAM made a finding that, by early 2020, "under the leadership of the Environmental Corporate Compliance Manager, the Company was making tangible progress on improving its food waste management." *Id.* at 73.  Before the onset of the pandemic, the Company's preliminary data from January 2020 indicated that it was on track to meet its Probation Revocation Agreement commitments to reduce single-use plastics and food waste weight onboard.  The Company had also begun a program to install food waste digesters on the majority of its ships, which the Company's prior reviews and

---

[46] Tiger Team" is a term of art that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions.  The term is "generally applied to a high-functioning team of specialists who come together to complete a specific project."  *See What is a Tiger Team Approach?*, https://trextel.com/what-is-a-tiger-team-approach-how-to-successfully-launch-technology-and-save-space-missions-too/.

assessments had concluded were the best technology option for addressing its food waste management challenges.  *See id.*

- Other notable accomplishments discussed in prior CAM reports include:

  o Developing and implementing a revised procedure on food waste segregation and disposal that streamlines and standardizes aspects of food waste management across the Company's brands/operating groups, based on feedback from Food Waste Tiger Team ship visits;

  o Implementing enhanced reporting and tracking of food waste management performance through food waste dashboards; and

  o Hosting a "Food Waste Shuffle" music video competition, with over 70 videos submitted from ships and shoreside offices across the Company's brands/operating groups.  *See id.* at 116-17.

- The pandemic continues to have major impacts on nearly all aspects of ship operations, including food waste management, which is likely to result in significant changes in the processes for preparing, serving, and disposing of food and associated wastes.  *See id.* at 111-12.  The full nature and extent of these impacts, including whether they may affect the Company's ability to meet its Probation Revocation Agreement commitments, is still evolving, as discussed in the following sections.

2. Progress Toward Single-Use Plastic Reduction Goal

   a. BACKGROUND

- Before the pandemic, the Company's preliminary data from January 2020 indicated that it was on track to meet its Probation Revocation Agreement commitment to reduce single-use plastics onboard by 50% by December 31, 2021.  *See id.* at 110.

- The Company describes single-use plastic items as including "straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events."  Dkt. No. 134 at 7.

- The Company is taking a two-tiered approach to reducing single-use items onboard its ships:

  o A first tier, which is complete, focused on removing small items and items with obvious substitutes, such as:  plastic cutlery/cups/straws/stirrers/lids; plastic bags in retail stores; and balloons; and

  o A second tier, which is not yet complete, focused on removing all other single-use plastic items, such as:  individual amenity bottles (*e.g.*, lotion, shampoo); plastic garbage bin liners and laundry bags; individual sauce/condiment packets; individual

plastic yogurt containers; and plastic cling wrap. *See* CAM March 2020 Quarterly Report at 45, 98-100.

The Company reports that, due to the pandemic, its internal deadline for completing the second tier has been pushed back from October 2020 to October 2021. *See Sustainability Single Use Items Global Meeting* (Oct. 5, 2020), PCL_ECP00174038-50 at PCL_ECP00174039.

- As observed in the Company's Food Waste Technical Review, reducing or eliminating single-use plastics onboard is an "important goal" because "the most effective way to stop plastic from being discharged into the ocean is to avoid using it onboard in the first place. If plastic ends up in a pulper/vacuum system, it will likely be macerated into smaller pieces that might be indistinguishable from the organic matter it is blended with." Food Waste Technical Review at 2.

  b. UPDATES

- As of October 2020, the Company reported that, based on comparing aggregated procurement data from a 12-month baseline period in 2018 to the 12-month period of June 2019 through May 2020, both plastic and non-plastic single use items have been reduced onboard by a fleetwide average of **approximately 63%**. *See Sustainability Single Use Items Global Meeting* (Oct. 5, 2020), PCL_ECP00174038-50 at PCL_ECP00174042. As of December 2020, this figure for the 12-month period of December 2019 through November 2020 was **approximately 88% (plastic items) and approximately 89% (non-plastic items)**. *See Sustainability Single Use Items Global Meeting* (Dec. 14, 2020), PCL_ECP00177292-305 at PCL_ECP00177294-95.

- This data indicates that the Company continues to be on track to meet its Probation Revocation Agreement goal of achieving a 50% reduction by the end of 2021.

- The Company reports that, although new COVID-19 public health and safety protocols may require the re-introduction of some single-use items (such as plastic bags for garbage bins or laundry, plastic cling wrap, individual sauce/condiment/sugar/butter packets, or individual yogurt containers), it expects "[m]inimal changes" to its current approach as a result. *See id.* at PCL_ECP00177302; Employee Interview/Call Notes. The Company expects that any increases in onboard single-use items as a result of health and safety protocols will be offset by reductions of other items, without compromising the Company's ability to meet its Probation Revocation Agreement commitment. *See id.*

  3. Progress Toward Food Waste Weight Reduction Goal

  a. BACKGROUND

- Before the pandemic, the Company's preliminary data from January 2020 indicated that it was on track to meet its Probation Revocation Agreement commitment to reduce the total weight of food waste generated on its ships by 10% by December 31, 2021. *See* CAM Third Annual Report at 110. The Company has set an internal goal of achieving a 20% reduction,

going beyond the Probation Revocation Agreement commitment.  *See ECP-MSM-A26: Food Waste Reduction Performance Update* (Sept. 15, 2020).

- Company procedures require each ship to measure and report, on a quarterly basis, the weight of food waste generated on board over a consecutive 14-day period, to take place in January, April, July, and October each year.  *See ENV 1302 Segregation and Disposal of Food Waste* at § 3.

  - o   Due to workload concerns and reduced staffing as a result of COVID-19, measurements for the second quarter of 2020 (based on April 2020 measurements) were not taken, while measurements for the third and fourth quarters of 2020 (based on July 2020 and October 2020 measurements, respectively) were based on a shortened period of seven days.  *See* CAM Third Annual Report at 111, n.71; Employee Interview/Call Notes.

  - o   The Company expects to be able to return to a two-week measurement period in 2021.  *See* Employee Interview/Call Notes.

    *b.  UPDATES*

- The Company reports that, based on the seven-day October 2020 measurement period, average fleetwide onboard food waste weight generation (per capita) **decreased over 30%** relative to the two-week October 2019 baseline.  *See Food Waste Reduction Performance Update* (Nov. 6, 2020).

- This data indicates that the Company continues to be on track to meet its Probation Revocation Agreement goal of achieving a 10% reduction by the end of 2021, as well as its internal goal of achieving a 20% reduction.

- Based on the data, the Company also observed that the "best ships in a class have less than half the food waste of the ships with the greatest amount of food waste *indicating continued opportunity to improve*."  *See ECP-MSM-A32: Food Waste Reduction Performance Update* (Nov. 9, 2020) (emphasis added).

- As the Company acknowledges, due to the significant disruptions from COVID-19 (with the vast majority of ships sailing without passengers and with drastically reduced crew), the measurements from July 2020 and October 2020 "are not directly comparable" to the baseline figures from October 2019.  *Id.* at 1; *see also* Carnival Corp., *Health, Environmental, Safety and Security (HESS), Technical Regulatory and Sustainability Report*, Fourth Quarter, FY2020 (Jan. 2021), PCL_ECP00178205-292 at PCL_ECP0178229.  This is partly addressed by presenting the data on a per capita (rather than overall) basis.  *See* Employee Interview/Call Notes.  The data could become more directly comparable if passenger operations resume in 2021.  *See id.*

January 20, 2021

4. <u>Food Waste Digester Installations</u>

      a. BACKGROUND

- The Company's October 2019 Food Waste Technical Review concluded that the "only viable upgrade options available in the short term to improve [the Company's] current food waste processing equipment capabilities are upgrades to the existing pulper systems[47] (including installing dryers[48]) or the simpler and more environmentally-friendly option to install multiple food digesters." Food Waste Technical Review at PCL_ECP00141157. The Review further found that "[f]rom the research conducted to date, digesters appear to be a good option" and "are a viable and effective means for [the Company] to enhance its food waste processing capability and related compliance obligations." *Id.* at PCL_ECP00141157-58; CAM Third Annual Report at 112-13.

- A food waste digester is "essentially a mechanized steel version of a human stomach that partially digests food waste and separates the water component." Food Waste Technical Review at PCL_ECP0014158. There are different designs and models, but digesters typically take the form of a large metal box with an opening on the top or front where food waste can be loaded. Microbes within the digesters partially digest the food waste and produce a liquid effluent. Once the effluent leaves the digester, it may be routed to different locations based on a ship's design, such as a storage tank that discharges overboard. There is a screen over the digester's effluent outflow point to prevent "undigested" non-food items, such as plastics and metals, from entering the effluent stream. Such items can be removed by hand when the digester is opened for cleaning or other maintenance. Therefore, if operated properly, digesters are designed to prevent plastics and other non-food items from being discharged to the sea as part of the food waste stream.

      b. JANUARY 2020 DIGESTER INSTALLATION PLAN

- Based on the Food Waste Technical Review recommendations, the Company "decided to optimize its food waste disposal systems and associated processes by installing food waste digesters on the vast majority of its ships." Food Waste Optimization Plan at 2.

- In its January 2020 Food Waste Optimization Plan, the Company estimated:

      o Most ships would have between 7-12 digesters by 2023;[49]

---

[47] A food waste pulper is akin to a large, industrial-scale version of the garbage disposal in a kitchen sink. Pulpers use blades to grind food waste into a pulp that can then be directed to other parts of the food waste system, such as a tank or an overboard discharge chute.

[48] A food waste dryer is a large, industrial-scale dehydrator that processes wet food waste into a dried powdered residue that can be offloaded ashore. Removing the liquid from the food waste can significantly reduce its volume and mass.

[49] The Company would not install digesters on some AIDA ships that use a combination of food waste dryers and offloads to handle food waste.

- o Approximately 680 digesters would be installed on ships by the end of 2020, and approximately 900 would be installed by the end of 2023; and

- o It would spend more than $27 million on digester installations before the end of probation, which would surpass the Company's obligation to commit at least $20 million in capital expenditures to optimize food waste management. *See* CAM Third Annual Report at 113-14.

- The Company reported that the installations called for in the January 2020 plan "should result in ships processing 100% of their [soft] food waste via digesters," excluding the AIDA ships that use food waste dryers. *See* CAM March 2020 Quarterly Report at 108 (quoting Company Draft Report Comments).

    *c. CURRENT DIGESTER INSTALLATION PLAN*

- The Company's Pause Priorities Plan establishes a commitment to allocate $10 million to purchasing digesters in Fiscal Year 2020, and to install those digesters (as well as digesters that have already been purchased and are available for installation) on ships within 60 days of their return to guest service. *See* Pause Priorities Plan, PCL_ECP00177469 at 6. The Company still intends to meet its Probation Revocation Agreement obligation to commit at least $20 million in capital expenditures to optimize food waste management before the end of the ECP period. *See id.*

- The most recent version of the Pause Priorities Plan removes the long-term goal of installing the full set of additional digesters called for in the January 2020 plan, due to "COVID-19 impacts." *See id.*; *Coming Back Stronger "Pause Priorities Plan"* [Redline] (Nov. 30, 2020), PCL_ECP00177470 at 3. The CAM Team understands that these impacts include the limited availability of equipment, parts, and personnel (including third-party vendors and contractors) needed to install, commission, and/or operate the systems. In addition, the CAM Team understands that, even before the pause, the Company was achieving reductions in the amount of food waste generated onboard, indicating that fewer digesters may be needed than originally anticipated. *See* Employee Interview/Call Notes; *see also* Certifications Pursuant to the Oct. 21, 2020 Order.

- As of December 2020, the Company reports that:

- o Digester installations are being prioritized for those ships that are expected to resume passenger cruises in the next four to six months, while installations on other ships are on hold until there is greater clarity about their restart dates. *See* Employee Interview/Call Notes;

- o At least 10 ships have a full set of digesters installed onboard as of November 30, 2020. *See Maritime Operations Monthly Dashboard November 2020* (Dec. 17, 2020), PCL_ECP00177552 at 22; and

- o As with the January 2020 plan, the Company intends for each ship to eventually have enough digesters to process 100% of its food waste (excluding those that rely on food

waste dryers).  Some pre-existing food waste processing equipment, including pulpers, will be maintained on the ships for redundancy purposes, to be utilized only when necessary due to failure of a digester system.  *See* Employee Interview/Call Notes.

### d. REGULATION OF FOOD WASTE DIGESTER EFFLUENT

- There is uncertainty within the maritime industry on the regulatory status of digester effluent—in particular, whether it should be categorized as "food waste," which is regulated as "garbage" under MARPOL Annex V, or as "grey water," which is not regulated under MARPOL.  *See* CAM Third Annual Report at 115-16.  In the absence of clear guidance from international regulatory bodies, the Company has sought determinations from flag states and/or classification societies on the regulatory status of digester effluent.  *See id.*

- The Pause Priorities Plan sets a goal of working with flag states to "determine the proper waste water classification for digester effluent."  *See* Pause Priorities Plan, PCL_ECP00177469 at 7.  The Company reports that this effort has been completed.  The Company consulted with several flag states, who differed on whether to classify digester effluent as food waste or grey water.  *See* Employee Interview/Call Notes.

- In the absence of a consensus from flag states, the Company has decided to classify digester effluent as food waste across its fleet.  *See id.*  Accordingly, in October 2020, the Company published a new procedure requiring that "[f]ood waste biodigester effluent must be classified as food waste and disposed of in compliance with food waste discharge requirements at sea or ashore."  *See ENV 1304 – Food Waste Biodigester Effluent Requirements* ("ENV 1304") (internal citation omitted).

- The ENV 1304 procedure creates an exception for certain ships that are currently configured to treat their digester effluent as grey water.  These ships have until June 30, 2023, to come into compliance with the new procedure.  *See id.*  The Company reports that only a small number of ships fall under this exception.  *See* Employee Interview/Call Notes.

### e. DISCHARGES THROUGH GREY WATER SYSTEMS

- Even if ships have enough digesters to process all of their food waste, plastics and other non-food items may still be discharged overboard through the grey water system.  The grey water system processes waste water coming from various sources on the ships, including galleys, laundries, and showers.  If those sources do not have adequate filtration devices (such as drain and/or scupper covers), plastics and other non-food items may end up entering the grey water system and getting discharged overboard.  *See* CAM Third Annual Report at 117.  As noted above, the Company has reported in its food waste dashboards that non-food items continue to be found during inspections of grey water systems.  *See, e.g.*, *Fleet Dashboard: Food Waste and Grey Water System Contamination* (Jan. 6, 2021), PCL_ECP00178359 at 4.

- Following a June 2019 TPA audit finding that missing drain/scupper covers were causing non-food items, including plastics, to drain into a ship's grey water system and potentially

overboard, the Company performed a fleetwide review which found that a similar issue existed on other ships.  *See* CAM March 2020 Quarterly Report at n.89.

- In December 2019, the Company issued an internal procedure to "reduce the risk of plastic or other foreign material from entering the ship's grey water and overboard drainage systems by ensuring appropriate scupper covers are secured in place and that there are methods in place to capture any debris."  *DER 2005 Grey Water and Downstream Filtration* (Rev. Aug. 2020) ("DER 2005") at § 1.  Among other things, DER 2005 sets time frames for installing drain/scupper covers on various systems that drain into the grey water system and for performing assessments of additional levels of filtration at certain grey water system pre-discharge locations.  *See id.* at §§ 2.1-2.4.

- As of January 1, 2021, the DER 2005 requirements are not complete on all ships.  Approximately 31 ships are reported to be "fully compliant" with DER 2005, while the remaining 61 ships are reported to have one or more items outstanding, with completion deadlines ranging from January 2021 to February 2021, where provided (several ships have no completion deadline provided for one or more requirements).  *See Fleet Dashboard: Food Waste and Grey Water System Contamination* (Jan. 6, 2021), PCL_ECP00178359 at 5.

- The Pause Priorities Plan sets a goal of completing the pending drain/scupper cover installations required by DER 2005 before ships return to guest service, as well as a goal to "try to" complete installations of additional down-stream filters required by DER 2005 before ships return to guest service.  *See* Pause Priorities Plan, PCL_ECP00177469 at 7.

*f.  PREVENTING PROHIBITED DISCHARGES IN THE ABSENCE OF A FULL SET OF DIGESTERS*

- If ships do not have enough digesters to handle all (soft) food waste generated onboard, other measures must be in place to prevent the prohibited discharge of plastic and other non-food items.  The CAM Team understands that the Company will continue to rely primarily on its food waste sorting and pulper systems for these ships, to the extent digesters are not installed or not capable of processing all (soft) food waste.  *See* Employee Interview/Call Notes.

- However, the Company's food waste dashboards indicate that food waste sorting and pulpers alone may not be fully effective at preventing prohibited discharges.  Despite significant improvement over time since the dashboards began in July 2019 (including improvement that was underway before the pause), non-food items continue to be found during inspections of food waste and grey water systems.  *See, e.g.*, *Fleet Dashboard:  Food Waste and Grey Water System Contamination* (Jan. 6, 2021), PCL_ECP00178359 at 2-4.  Although overboard discharges are stopped upon discovery of such items, it remains a possibility that undetected items are going overboard in-between inspections, or because they may be missed during inspections.  To the extent ships must rely on food waste sorting and pulpers to handle their food waste, should there be evidence that these methods did not prevent the discharge of non-food waste in violation of MARPOL Annex V or U.S. law, there is a risk of both

corporate and individual liability, including for corporate managers with knowledge of these efforts.[50]

5.  Implementation of Recommendations from Food Waste Workload Assessment

    *a.* BACKGROUND

- As required by the Probation Revocation Agreement, the Company retained a third-party to perform a Food Waste Workload Assessment, which was completed in April 2020.  The assessment provided observations and recommendations on a range of issues, including: culture; workload and staffing; workplace design; and waste reduction efforts.  Overall, it identified over 35 global best practices and over 50 global recommendations.  *See* CAM Third Annual Report at 118-19.

- In response to these findings, the Company submitted its Food Waste Workload Assessment Response Plan in June 2020.  Overall, the response plan sets out a "two phase plan that takes into account the pause in operations associated with Covid-19 and the resumption of service thereafter."  Food Waste Workload Assessment Response Plan at PCL_ECP00165685.

- Phase One of the response plan is to occur during the pause, and calls for implementing three overarching recommendations from the assessment:

    o  **Management of Change:**  Determine whether a management of change process exists in another department (such as IT or Marine Operations) that has sufficient guidance to support food waste reduction efforts;

    o  **Communications (ECP Messages):**  Update onboard ECP messages periodically to keep the culture message alive, including successes and progress; and

    o  **Communications (Videos/Infographics):**  Create videos or infographics on the food waste separation process from the first stage of separation through to discharging/offloading "to illustrate one's influence on others' workload."  CAM Third Annual Report at 120-21 (quoting Food Waste Workload Assessment Response Plan).

- Phase Two of the response plan is to occur as ships resume passenger cruises.  The Company plans to provide "a revised plan to address additional recommendations from the [assessment]" once it has "clarity, regarding when and which ships resume operations."  Food Waste Workload Assessment Response Plan at PCL_ECP00165685.

---

[50] *See, e.g.*, *United States v. Hong*, 242 F. 3d 528, 531 (4th Cir. 2001) ("The gravamen of liability as a responsible corporate officer is not one's corporate title or lack thereof; rather, the pertinent question is whether the defendant bore such a relationship to the corporation that it is appropriate to hold him criminally liable for failing to prevent the charged violations of the [Clean Water Act].").

January 20, 2021

      b. *UPDATES*

- For Phase One, the Company reports that all three recommendations noted above were implemented by September 2020. *See Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178302.

  - On management of change, the Company's review identified some potentially useful processes in other departments at the brand level (*e.g.*, Carnival Cruise Line procedures for dry/wet dock planning). These findings have been shared with the Health/Safety/Security Corporate Compliance Manager, who is leading the Company's broader effort to develop a corporate-wide management of change procedure, as discussed above in Part III.C.3.b. *See* Employee Interview/Call Notes.

  - On ECP messaging, the Company's efforts have included updating existing policies and procedures to ensure consistent messaging, as well as providing regular updates on food waste management practices and achievements in the Chief Maritime Officer's monthly Environmental Excellence Newsletter. *See, e.g.*, *Environmental Excellence Newsletter #4-2020* at 3, 5-7 (highlighting, among other items, examples of individual crew members demonstrating leadership and creativity in approaching food waste management challenges, such as coming up with innovative ways to record daily food waste data).

  - On videos/infographics, the Company engaged a third-party vendor to produce a video that shows the flow of food waste onboard, from generation to sorting to disposal, while highlighting the impacts that failing to follow procedures can have on fellow crew members' workloads. The video will be incorporated into the shipboard environmental compliance training, known as "TRG 2302" training, discussed in Part III.I.4 below. *See* Employee Interview/Call Notes.

- For Phase Two, the Company is currently reviewing the additional recommendations from the Food Waste Workload Assessment to identify further measures that may be achievable during the pause. *See* Employee Interview/Call Notes.

6. Other Food Waste Management Initiatives

- The Company has undertaken additional food waste management initiatives not discussed above, including:

  - Developing new, standardized signage to be installed onboard ships for operating food waste pulpers, digesters, and chutes. *See* October 2020 Probation Supervision Report, Attachment 5, PCL_ECP00175649-52 at PCL_ECP00175650; Pause Priorities Plan, PCL_ECP00177469 at 7;

  - Equipping ships with color-coded and plastic liner-free waste bins and associated signage to facilitate waste sorting. Pause Priorities Plan, PCL_ECP00177469 at 7;

- o Developing a new Hotel Food Waste Compliance Self-Assessment form to be completed by ships before resuming passenger cruises "to make sure food waste procedures are properly implemented at restart." *Id.*;

- o Developing both computer based and "on-the-job" training materials for food waste digesters. *See* November 2020 Probation Supervision Report, Attachment 5, PCL_ECP00177593-94 at PCL_ECP00177594; and

- o In coordination with the European Food Banks Federation, donating over 7,300 kg of food and 60,000 liters of mineral water from two AIDA ships to food banks in Europe. *See Environmental Excellence Newsletter #4-2020* at 6.

- In addition, the Company has updated its Top 5 campaign[51] to include "ensur[ing] food waste is properly separated" as a critical environmental focus area. Carnival Corp., *Health, Environmental, Safety and Security (HESS), Technical Regulatory and Sustainability Report*, Third Quarter, FY2020 (Oct. 2020), PCL_ECP00176441-535 at PCL_ECP00176512.

7. Ongoing CAM Team Examination

- The CAM Team will continue to monitor the Company's implementation of its food waste management program, including: the Food Waste Workload Assessment Response Plan and food waste management-related aspects of the Pause Priorities Plan; food waste management procedures; the procurement and installation of food waste digesters and/or other equipment or technology designed to improve food waste management onboard, including the treatment and regulation of food waste digester effluent; and weekly food waste dashboard performance.

- The CAM Team recognizes that COVID-19 will continue to have substantial impacts on onboard food waste management, the nature and extent of which is not yet known. Key areas of focus will be COVID-19-related changes to food preparation, service/delivery, and waste management practices onboard, including changes to ship design, staffing, equipment, and procedures and processes.

- In addition, the CAM Team is continuing its examination of the Company's processes for selecting and vetting shoreside waste vendors, including food waste vendors, as discussed in Part III.H below.

---

[51] The Top 5 program is an initiative, begun in ECP Year One, through which the Company "identified 5 key areas of environmental concern/risk" and "commenced an initiative to reduce the number of issues and further alleviate those risks." *See* CAM First Annual Report at 20 (quoting April 2018 Probation Supervision Report, Attachment 3); CAM Third Annual Report at Appendix B.

January 20, 2021

### H. Waste Vendor Assessments

1. <u>Background</u>

- The Company acknowledged in 2019, following multiple RAAS and TPA audit findings, that it was not following its internal procedures requiring it to assess third-party waste vendors.[52] *See* CAM Third Annual Report at 201-11.  Not only was the Company failing to follow its own procedures, but it was also acting contrary to statements in its public Sustainability Reports assuring the public that "shoreside waste facilities are evaluated prior to offloading the waste from the ships where they are reused, recycled, incinerated, or landfilled."[53]  CAM Third Annual Report at 204 (quoting Sustainability Reports for Fiscal Years 2013 through 2017).

- Although the Company's 2018 and 2019 Sustainability Reports "tout[] the Company's goal to '[f]urther develop and implement [waste] vendor assurance procedures,'" *see* CAM December 2019 Quarterly Report at 61 (discussing revisions to the Company's 2018 Sustainability Report), these reports do not correct the inaccurate assurances of waste vendor vetting from prior years.

- In March 2020, the Company launched a revised waste vendor assessment program, publishing an updated procedure and associated materials.  *See* CAM Third Annual Report at 202, 06-10; *ENV 1004 Environmental Management of Waste Vendors* ("ENV 1004").  The Company describes its current program as a "three-step process" relying on:

---

[52] This Report uses the term "waste vendor" to refer generally to entities or facilities that receive or handle wastes offloaded from the Company's ships at the ports it calls upon around the world.  Waste streams that may be offloaded include:  black water/sewage; food waste; garbage/solid waste; hazardous waste (including medical waste); grey water; and oily wastes (*e.g.*, sludge, bilge water, and other oily waste or residues).  Waste vendors may include barges that dock alongside the ship, trucks that remain ashore, or other types of reception facilities.  Waste may be transferred from the ship to the waste vendor manually (such as by hand or via a forklift or other machinery, for solid waste streams), via a hose connection (for liquid waste streams), or other means depending on the waste stream.  Before the pandemic, the Company had a working list of approximately 600 different waste vendors and visited approximately 900 ports around the world, although it did not offload waste in every port.  *See* Employee Interview/Call Notes.

[53] Companies across industries routinely make similar public assurances about waste vendor vetting.  *See, e.g.*, CenterPoint Energy, Inc., *2020 Corporate Responsibility Report*, https://www.centerpointenergy.com/en-us/Documents/CNP_CRR_report_18_%20full.pdf at 75 (stating that "we maintain a robust environmental audit program on all solid waste disposal vendors"); Marathon Petroleum Corp., *2019 Sustainability Report*, https://sustainability.marathonpetroleum.com/Reader/page/28 at 28 (stating that "[w]e carefully screen our vendors to ensure they meet our rigorous standards for recycled and disposed waste"); Southwest Airlines, *2019 One Report*, http://investors.southwest.com/financials/company-reports/one-reports at 93 (stating that "we . . . audit[] our environmental vendors to verify their operations are compliant and they demonstrate commitment to environmental stewardship").

January 20, 2021

    o  (1) Waste vendor self-assessments, in which the Company sends forms to each vendor requesting basic (but unverified) information that the vendor fills out and returns to the Company;

    o  (2) Searches of commercial databases for public negative media reports involving the vendor; and

    o  (3) Internal "red-flag" reviews of information collected during the first two steps. *See* Status Conf. Tr. at 30 (Oct. 16, 2020). Relevant factors considered during internal reviews include: past violations; insurance and licensing; facility accessibility and visitation permissibility; waste removal methodologies; and third-party audits. *See ENV 1004 A3 Waste Service Compliance Decision Tree*.

- At the end of ECP Year Three, the CAM observed that the Company's updated program improves upon its previous practice (which, in some instances, was nonexistent), but still appears to be inadequate. *See* CAM Third Annual Report at 201-11. The vetting process relies almost exclusively on reviewing self-reported (but unverified) information from the vendor and performing searches for negative media reports. *See id.* at 202, 09-10. This is the type of "check-the-box" approach that DOJ has cautioned is often inefficient and ineffective. *Id.*

2. <u>Recent Program Updates</u>

- In October 2020, the Company revised its ENV 1004 waste vendor assessment procedure and associated materials. Among other changes, the revisions remove the requirement to assess Port Authority Mandated Waste Vendors. *See* ENV 1004 § 2.1. A Port Authority Mandated Waste Vendor is one the Company is required to use by a Port Authority, as opposed to one chosen by the Company. Under the prior version of the ENV 1004 procedure, the Company was required to assess both Port-Mandated and Company-selected vendors. Under the revised procedure, only Company-selected vendors must be assessed. *See id.*

- Additionally, as part of its Pause Priorities Plan, the Company committed to assess each waste vendor on a ship's itinerary (including non-U.S. ports) before the ship resumes guest service, with priorities on locations where ships are in layup or have planned early itineraries. *See* Pause Priorities Plan, PCL_ECP00177469 at 11; *see also* Employee Interview/Call Notes. The Company reports that, due to the pandemic, it has experienced some delays in receiving responses to the waste vendor self-assessment forms, and that some waste vendors may no longer be in operation. *See* Employee Interview/Call Notes.

- The Company has been reporting on the status of its waste vendor assessments for Covered Vessels returning to U.S. Waters in its disclosure certifications submitted pursuant to the Court's Order of October 21, 2020, discussed in Part III.B.2-3 above.

3. <u>CAM Team Observations on Current Program</u>

- Throughout ECP Year Four, the CAM Team has continued to share with the Company observations on its third-party waste vendor assessment program. These include:

### a. LIMITED VETTING DUE DILIGENCE

- As DOJ notes in its guidance on evaluating corporate compliance programs, a well-designed program should apply risk-based due diligence to its third-party relationships. *See* DOJ Corporate Compliance Program Guidance at 7-8.

- The Company's waste vendor assessment program, however, consists of a limited form of due diligence that relies almost exclusively on reviewing basic information from waste vendor self-assessment forms and conducting negative media reviews. It does not appear that the Company verifies the accuracy of the information on the self-assessment forms unless a "red flag" is identified, such as a lack of liability insurance or government enforcement actions. *See* Employee Interview/Call Notes.

- The Company's procedure generally contemplates that site visits may be used as a form of due diligence to develop a vendor's risk profile, but does not provide instruction as to when such visits are advisable or how to conduct them.[54]

- In addition, as noted above, the Company's revised ENV 1004 procedure exempts Port Authority Mandated Waste Vendors from the waste vendor assessment process. According to the Company, "[t]he port authority selects and assesses these vendors based on their local/national regulatory requirements. Therefore, [the] Company cannot select/modify/influence which port authority mandated vendor the ship must use." *ENVC 1004 Company - Environmental Management of Waste Vendors* at § 2. While it may be true that the Company "cannot select/modify/influence which port authority mandated vendor the ship must use," the Company *can* select the ports where it visits and can choose not to visit a port where a Port Authority Mandated Waste Vendor is inadequate in the Company's view. The CAM Team will seek to learn more about the Company's use of Port Authority Mandated Waste Vendors and reliance on the vetting performed by port or other third-party authorities. *See* Company Comments on Draft Report.

### b. ONGOING ASSESSMENT AND ACCOUNTABILITY

- The Company's revised ENV 1004 procedure requires waste vendors to be assessed "before signing or renewing a contract, or every three years from the date the vendor is approved . . . , or [w]here there are reports of consistent poor service or known reported incidents." ENV 1004 at § 2.1. However, the procedure does not establish a process for tracking reports of "consistent poor service," a category that includes incidents which may not be reportable under the Company's internal HESS event reporting procedure,[55] or otherwise establish a

---

[54] The CAM Team recognizes that site visits may not be practical or necessary in all instances.

[55] That procedure generally only requires the reporting of waste vendor incidents or near misses involving discharges or potential discharges during offload operations. *See COM 1101-A1 HESS and Operational Events and Near Misses to be Reported from Ship to Shore* ("COM 1101"). It does not, for instance, explicitly require the reporting of issues or concerns related to the vendor's management, treatment, or transportation of wastes after offload operations are complete.

process for conducting ongoing waste vendor assessments based on newly-acquired information from the ships.[56]

- The ENV 1004 procedure also does not appear to establish any formal, standardized mechanisms for: shipboard personnel to receive training on how to investigate waste vendor issues or concerns; shipboard personnel to report issues or concerns about waste vendors; or shoreside personnel to track or follow-up on such reports.[57]

### c. ANTI-BRIBERY & CORRUPTION ASSESSMENTS

- The CAM Team understands that the Company began assessing its third-party waste vendors for anti-bribery and corruption purposes in May 2020. *See id.* However, aspects of the relationship between the Company's third-party waste vendor assessment process and its third-party anti-bribery and corruption review process are unclear. For example, there is no clear process or requirement addressing what to do if issues with an approved waste vendor are identified during an anti-bribery and corruption review of the same vendor. *See* ENV 1004; Employee Interview/Call Notes.

### d. OFFLOADS TO UNASSESSED WASTE VENDORS

- In recent audit reports, the TPA has identified incidents where ships in layup locations have appeared to offload wastes to unassessed waste vendors. *See* TPA Audit Reports. The CAM Team notes that the Company's current ENV 1004 procedure appears to create a loophole that allows for such offloads to occur. While a ship must issue a Self-Reported Non-Conformity[58] if it uses an *unapproved* waste vendor,[59] it is not required to do so if it uses an *unassessed* waste vendor. Instead, if using an unassessed waste vendor, the ship must notify shoreside personnel, who then send the vendor a self-assessment form and begin the assessment process only *after* the offload has occurred. *See id.* at § 2.3; Employee Interview/Call Notes.

---

[56] When evaluating a company's compliance program, DOJ considers whether a "company track[s] red flags that are identified from due diligence of third parties." *See* DOJ Corporate Compliance Program Guidance at 8.

[57] In practice, the CAM Team understands that some shipboard personnel may send an informal email to shoreside to report inadequacies with a waste vendor (and, at times, have refused to use a vendor because of concerns about how the vendor would handle the ship's waste), but there appears to be no standardized process for such reporting or for following up on such reports. *See* Employee Interview/Call Notes.

[58] Since January 2019, ships have been required to self-report instances where they are unable to meet the requirements of Company procedures. *See HMP 1106 Self Reported Non-Conformities*.

[59] An unapproved waste vendor is one whose "waste handling practices are unacceptable from a risk standpoint and the environment." ENV 1004 at § 2.2.

e. *WASTE VENDOR INCIDENTS*

- During ECP Year Four, the Company has continued to report incidents or near misses involving its waste vendors, including discharges or potential discharges of wastes, including sludge and other oily wastes, into the sea during waste offload operations due to an error or equipment failure attributable to the vendor.  *See* Internal Incident Log.

- As discussed in the CAM Third Annual Report, the number of reported incidents "likely paints an incomplete picture" because "the Company's internal reporting procedure, COM 1101, does not require internal reporting of [all] inadequacies with waste vendor facilities," such as those that do not result in a discharge or potential discharge during offload operations.  *See* CAM Third Annual Report at 204-06.  Further, as noted above, the Company's current ENV 1004 procedure for waste vendor assessments does not establish a mechanism for shipboard personnel to report issues or concerns about waste vendors that may exist outside of COM 1101 requirements, such as suspected or observed improper handling of waste at the port or the reception facility.  As a result, ships could be observing problems with waste vendors but not reporting them through a formal channel.  *See id.*

4. Ongoing CAM Team Examination

- The CAM Team will continue to examine the Company's development and implementation of its revised waste vendor assessment program, including its process for selecting, assessing, and approving waste vendors.  This will include examining the extent to which the Company takes advantage of the pause to assess waste vendors currently in use, or likely to be used in early itineraries when ships resume passenger cruises.

**I.  Training**

1. Background

- The Company has invested resources in environmental and compliance training throughout the period of probation, and has gone beyond that required by the ECP.  This includes developing, conducting, and continuously revising:  (1) training courses at its state-of-the-art CSMART facility in The Netherlands; and (2) instructor-led and computer-based training courses for shipboard and shoreside personnel.  *See id.* at 123-27.

- A consistent highlight of these efforts has been the week-long Environmental Commitment and Environmental Excellence hybrid training/conference events for Environmental Officers held at CSMART.  Feedback on these courses from participants, the CAM, and thevTPA has, in general, been overwhelmingly positive.  *See id.* at 123-25.

- Other notable accomplishments, led by the Environmental Corporate Compliance Manager and his team, discussed in prior CAM reports include:

    o Launching a new Fleet Environmental Compliance Training Officer Program ("Fleet Environmental Officer Program"), as discussed in Part III.I.3 below.  *See id.* at 123-27; and

January 20, 2021

    o  Establishing online forums—one for Environmental Officers (called "The Environmental Hub") and one for hotel operations personnel—to interact, ask questions, and share best practices with one another, as well as shoreside compliance personnel.  *See id.* at 123-24.[60]

- At the end of ECP Year Three, the CAM made a finding that "[s]ince ECP Year One, the Environmental Corporate Compliance Manager and his team have led efforts to provide increasing levels of support, resources, and training to onboard Environmental Officers . . . help[ing] to create a strong corps of Environmental Officers who have consistently impressed the CAM Team with their dedication, knowledge, energy, and commitment to helping the Company improve its environmental compliance performance."  *Id.* at 123.

- As the CAM has since observed, "the development of a strong, cross-brand [Environmental Officer] corps has been one of the Company's most significant achievements over the course of the monitorship—supported by efforts from the Environmental Corporate Compliance Manager ('CCM') and his team, CSMART staff, the Corporate Training Manager, the Operating Line Training Managers ('OLTMs'), and the Operating Line Compliance Managers ('OLCMs')."  *CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call – Virtual Environmental Excellence CSMART Course Feedback)* (Sept. 2, 2020), attached as Appendix C, at 4.  The success of the Environmental Officer program is an example of how strong, centralized management and support (through innovative training and communication tools, among other efforts) can create a high-functioning and integrated cross-brand group.

- An increasing CAM area of focus in ECP Years Four and Five will be the future of training after the ECP ends.  This will include exploring the potential role of CSMART in supporting culture change within the broader organization.  *See* CAM March 2020 Quarterly Report at 116-17 (observing that "[w]hile it appears that great strides have been made to create a culture of trust, care, openness, and speaking up during CSMART trainings, the Company's challenge is to carry and sustain that culture aboard the Company's ships and in its shoreside offices").[61]  As discussed below in Part III.I.7, the CAM Team understands that the Company is in the early stages of exploring the development of a corporate-wide training governance systems framework that would, among other goals, aim to bridge silos that currently exist between different training areas (*e.g.*, compliance, operational, HR, and executive/management).  Such an approach could also help support the use of training as a tool to transform corporate culture—including to carry lessons beyond the boundaries of CSMART.

---

[60] At least one brand, Carnival Cruise Line, has been hosting weekly or bi-weekly Environmental Officer coffee chats during the pause, designed to give Environmental Officers the chance to talk freely and express concerns to shoreside personnel.  Carnival Cruise Line also has a dedicated WhatsApp group for Environmental Officers to discuss different topics and concerns.  *See* Employee Interview/Call Notes.

[61] The Company states that "CSMART can help in culture," but "its primary mission is focused on deck, tech, and environmental officer training."  Company Comments on Draft Report.

- While this section of the Report focuses on environmental training, the Company has training efforts underway in other areas, including culture and investigations, as discussed above in Part III.D and Part III.F, respectively.

2. <u>CSMART Trainings</u>

     *a.* OVERVIEW

- Around March 15, 2020, the Company suspended in-person trainings at CSMART until at least April 2021 due to the pandemic. During this period, CSMART staff, in coordination with the Environmental Corporate Compliance Manager team and training personnel across the broader corporation, have made significant efforts to transition training courses to a virtual format. *See* CAM Third Annual Report at 124-25.

- In mid-June 2020, CSMART announced significant staff reductions and other personnel changes as a result of the pandemic, affecting approximately 60% of CSMART staff. *Id.* at 52, n.42. This included the departure of the recently appointed CSMART Director of Environmental Training.[62] However, responsibility for environmental compliance trainings has been transitioned to a new CSMART team. *See CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call – Virtual Environmental Excellence CSMART Course Feedback)* (Sept. 2, 2020), attached as Appendix C, at 5.

- Courses now being delivered virtually include:

     o Environmental Excellence and Environmental Officer 2 training for Environmental Officers;

     o New "Team Up" webinars that present an incident case study from three different perspectives, jointly presented by an environmental, a nautical, and an engineering trainer;

     o Advanced Air Quality System training for engineers; and

     o Other compliance-related trainings for environmental, deck, and technical officers, including "CSMART Talks," which are TED-talk-styled videos focused on technical topics, as well as webinars on various marine and technical topics. *See* CAM Third Annual Report at 124-25; Employee Interview/Call Notes.

     *b.* ENVIRONMENTAL EXCELLENCE COURSE

- In August 2020, the CAM Team, as well as the TPA, attended the first virtual session of the week-long CSMART Environmental Excellence course for Environmental Officers. According to the Company, the course is designed to "enhance the [Environmental Officers']

---

[62] The CAM Team understands that staff reduction decisions were driven by Dutch law (which sets strict requirements regarding seniority/tenure) and are not a reflection of the capabilities of the affected individuals. *See* Employee Interview/Call Notes.

investigation skills and help them evolve their analytical and critical thinking skills." *See* October 2020 Probation Supervision Report, Attachment 5, PCL_ECP00175649-52 at PCL_ECP00175649.  Approximately 16 Environmental Officers from across the Company's brands attended.  The curriculum centered on investigations (including root cause analysis), with some sessions focused on culture.  The lead instructor was an Incident Analysis Group investigator.

- Like prior in-person Environmental Excellence trainings, the course was designed to be challenge-based and interactive.  The sessions typically consisted of lectures to introduce core concepts (often interspersed with brief discussions, brainstorming exercises, and/or polling questions to gauge participant engagement and comprehension), followed by break-out sessions in which groups of 3-4 participants worked together to complete exercise prompts based on case studies.

- The CAM provided the Company with feedback and observations on the course.  *See CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call – Virtual Environmental Excellence CSMART Course Feedback)* (Sept. 2, 2020), attached as Appendix C.  Overall:

  o The CAM's positives observations included:  strong presenter skills by the lead instructor; a general tone of openness, collaboration, and support; presentation materials that generally contained good, clear content; positive messaging that emphasized the importance of a no-blame culture and a fair and just culture; and an important discussion around the tendency for investigations to superficially conclude that the root cause is lack of (effective) training, without performing a robust causal analysis to identify potential deeper or systemic causes.  *See id.* at 2-3; and

  o The CAM's observations about potential areas for improvement included:  some ambiguous and inconsistent messaging around critical issues such as blame culture and root cause analysis, especially during group discussions; and insufficient opportunities for Environmental Officers to practice implementing new skills using specific examples, or to receive feedback from facilitators.  *See id.* at 2-4.

- The CAM also observed that while, from a pedagogical standpoint, "the virtual environment appeared to allow for delivering course content and meeting learning objectives," a significant part of the value of prior Environmental Officer CSMART courses and conferences "has been a social aspect that cannot be replicated in a virtual setting."  *Id.* at 5.  This includes the opportunity for Environmental Officers "to get to know one another and exchange stories, ideas, and best practices in informal settings over coffee, meals, drinks, and other activities," as well as the opportunity "to meet and share feedback, questions, or concerns directly with shoreside personnel."  *Id.*  Such interactions are especially valuable for Environmental Officers, "who (unlike engineering and deck officers) are alone without a natural peer group on the ships."  *Id.*  The CAM expressed hope that, "once the global pandemic situation allows for in-person travel to CSMART, the Company will provide the resources and support to resume in-person [Environmental Officer] courses and conferences."  *Id.*

January 20, 2021

- At least four additional virtual sessions of Environmental Excellence have been held to date. The CAM Team has not attended these additional sessions, but plans to attend one or more course sessions in the coming year to assess changes and continuous improvement since the August 2020 session.

    c. *LEARNING NUGGETS*

- In addition to the formal CSMART courses, a new virtual training program for Environmental Officers, called "Learning Nuggets," was launched around March 2020. The program consists of a series of short (approximately one hour) sessions rolled out on a roughly bi-weekly basis. During each interactive session, one or more subject matter experts leads a discussion on a compliance-related topic, using tools such as presentation slides, videos, quizzes, and other activities. Participation is voluntary, and Environmental Officers from across all of the Company's brands are able to join, whether on a ship or ashore. *See* Employee Interview/Call Notes.

- At least 17 sessions have been held to date. Recent topics have included: the international regulatory regime for maritime investigations; recordkeeping and performing checks of technical records; waste vendor assessments; waste management and waste offloads; and best practices for performing Environmental Officer handovers. *See* October 2020 Probation Supervision Report, Attachment 5, PCL_ECP00175649-52 at PCL_ECP00175649; September 2020 Probation Supervision Report, Attachment 5, PCL_ECP00174216-18 at PCL_ECP00174216-17.

    d. *CAM FEEDBACK SESSIONS WITH ENVIRONMENTAL OFFICERS*

- At each session of the Environmental Excellence course held to date (in-person and virtual), the CAM has been invited to host an interactive, question-and-answer session with the Environmental Officer attendees. The CAM has been consistently impressed by the thoughtfulness and engagement of the Environmental Officers during these sessions, as demonstrated by their many insightful questions, concerns, and observations.

- Some recurring themes from these discussions have included: the role of an investigations program as a learning tool, including the importance of identifying root causes; concerns about a continuing blame culture; the importance of a strong compliance culture to support continuous improvement; concerns about staffing and workload, including the administrative burdens associated with onboard trainings; concerns about the lack of management of change processes; and reflections on the Company's capacity for continuous improvement after the ECP ends. *See* Event Notes.

3. Fleet Environmental Officer Program

    a. *BACKGROUND*

- In January 2020, the Company hired a Director of its new Fleet Environmental Officer Program, who reports to the Environmental Corporate Compliance Manager. Under this program, a group of Fleet Environmental Officers from across the Company's brands "travel

across the fleet to provide guidance, support, mentorship, and training to seagoing Environmental Officers," as well as to "collect feedback (including potential best practices) from the fleet in order to improve and enhance the Environmental Officer position onboard." CAM Third Annual Report at 124 (quoting February 2020 Probation Supervision Report, Attachment 8).

- The Fleet Environmental Officer program was launched around August 2020, during the pause.  Currently, there are seven fleet officers, who report to the Director.  Their primary role is "to provide assistance and mentoring" to shipboard Environmental Officers, as well as to assist and support other shipboard officers and crew "in implementing and complying with all environmental procedures."  *ECP-MSM-A30 Fleet EO Program Announcement.* According to the Company, the fleet officers "have undergone many hours of specialized training, including classes to hone their leadership, mentoring, and listening skills."  *Id.*

- Notably, this program is based on the Chief Maritime Officer's Fleet Captain and Fleet Chief Engineer programs, both of which were eliminated as part of the COVID-19-related staff reductions announced in May 2020.  *See* CAM Third Annual Report at 52, 124-26.

    b.  *SHIP VISITS*

- Under the program, all ships returning to guest service are to receive a visit from a Fleet Environmental Officer who will provide support, including assisting the shipboard Environmental Officer and other crew "in completing all environmental training and the environmental compliance self-assessments designed to help ensure the ship is fully compliant with all environmental regulations upon returning to service."  *Environmental Excellence Newsletter #4-2020* at 4.  In addition, some ships are to receive visits (regardless of return to service status) if the shipboard Environmental Officer needs extra assistance.  *See* Employee Interview/Call Notes.

- According to the Company, the fleet officer visits "have been well received by the ships' crew, and the [Environmental Officers] and [Captains] have provided positive feedback on the benefits of the program."  September 2020 Probation Supervision Report, Attachment 5, PCL_ECP00174216-18 at PCL_ECP00174217; *see also* Carnival Corp., *Health, Environmental, Safety and Security (HESS), Technical Regulatory and Sustainability Report*, Fourth Quarter, FY2020 (Jan. 2021), PCL_ECP00178205-292 at PCL_ECP00178268. Feedback to the CAM Team from shipboard officers, including Environmental Officers, Captains, and Chief Engineers, has been similarly positive.  *See* Employee Interview/Call Notes.

- The Company recently reported that "it has become increasingly difficult to conduct in person" Fleet Environmental Officer ship visits due to the pandemic.  November 2020 Probation Supervision Report, Attachment 5, PCL_ECP00177593-94 at PCL_ECP00177593. However, the fleet officers "remain committed to providing each ship with an in person visit guidance as and when they are in preparation to return to operations."  *Id.* at PCL_ECP00177594.

January 20, 2021

### c. MENTOR PROGRAM

- Fleet Environmental Officers also act as mentors to shipboard Environmental Officers, who can reach out to them for advice and moral support. *See id.*; August 2020 Probation Supervision Report, Attachment 5, PCL_ECP00172980-81. For instance, as part of a trial project, each shipboard Environmental Officer with less than two years' experience is assigned a fleet officer "buddy" from whom they are encouraged to ask questions and seek advice. *See ECP-MSM-A30 Fleet EO Program Announcement.* Mentees are "provided with guidance such as, which subject matter expert to contact for procedural matters or how to work out a situation with colleagues on-board," as well as general moral support. November 2020 Probation Supervision Report, Attachment 5, PCL_ECP00177593-94 at PCL_ECP00177593-94. The Company reports that "this support has been very appreciated by the mentees and brands." *Id.* at PCL_ECP00177593.

### d. OTHER ACTIVITIES

- On top of ship visits and mentoring, Fleet Environmental Officers "are involved in assessing and developing environmental training," including shipboard trainings discussed below. *Id.* at PCL_ECP00177594. Fleet officers also support CSMART in developing the Learning Nuggets program, as well as by serving as subject matter experts for program sessions. *See* September 2020 Probation Supervision Report, Attachment 5, PCL_ECP00174216-18 at PCL_ECP00174217.

- The Director of the Fleet Environmental Officer program is also leading efforts to revise the professional development framework for Environmental Officers to expand the focus beyond the development of technical competencies. One goal is to create a career map for shipboard Environmental Officers, including a pathway for becoming a Fleet Environmental Officer. *See* Employee Interview/Call Notes; *see also* CAM December 2018 Quarterly Report at 19-21 (discussing concerns about the Environmental Officer position, including the lack of a clear career path).

- In addition, Fleet Environmental Officers are "consulted for procedural changes to environmental Global HESS procedures," where, the Company reports, "their in depth knowledge of the practical side of the procedures has proven to be invaluable." November 2020 Probation Supervision Report, Attachment 5, PCL_ECP00177593-94 at PCL_ECP00177594.

### 4. Shipboard Trainings

- Throughout the ECP, crew members have shared concerns with the CAM Team about onboard environmental compliance trainings, including: high administrative workloads for tracking and reporting training completion; short time frames in which to deliver ECP-required training; and a need for content that is better tailored to the work of those receiving the training. *See* CAM March 2020 Quarterly Report at 117, 32; CAM Third Annual Report at 243.

- The Environmental Corporate Compliance Manager's team has led efforts to utilize the pause to revise environmental compliance onboard trainings, including:

  o **TRG 2302 (Shipboard Environmental Awareness Training):**  The ECP requires Environmental Officers to deliver onboard environmental awareness training, known as "TRG 2302" training, to newly joined crew members within seven days after the crew members begin their duties on the ship.  Before the pandemic, this training was provided in-person in a classroom-like setting on the ship.  In response to COVID-19, the Company developed a computer-based version of TRG 2302 training that allows crew members to complete it while in quarantine or isolation in their cabins.  *See* CAM Third Annual Report at 125-26.  The Company reports that this training was rolled out by July 2020, with "very positive feedback."  *Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178321; and

  o **TRG 2308 and TRG 2309 (Shipboard Environmental Workplace Training):**  Environmental Officers, as well as managers from other shipboard departments with environmental compliance-related responsibilities, also deliver and/or receive workplace-specific environmental trainings, known as "TRG 2308" and "TRG 2309" training.  The Pause Priorities Plan sets a goal of revising these trainings by February 1, 2021.  *See* Pause Priorities Plan, PCL_ECP00177469 at 23.  The revisions are driven by feedback from crew members that the trainings could be made more "effective, relevant, and fit for purpose," including by reducing administrative burdens and making trainings "position/department-specific and risk based."  CAM Third Annual Report at 126 (quoting Draft Pause Priorities Plan).

     To date, a series of virtual workshops have been held with both shipboard and shoreside stakeholders to solicit feedback on proposed revisions.  *See* Employee Interview/Call Notes.  The revised procedures will be piloted on a sample of ships before being finalized.  *See Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178322.

5. Shoreside Trainings

- During the pause, the Company also revised the annual refresher training for shoreside Covered Personnel, known as "TRG 2307" training.  The revisions, which were completed in July 2020, simplify the training, reducing it from three modules to a single module.  Changes to the content include:  a new Power Point presentation; a new video providing a recap of the ECP; and "more opportunity for employee engagement/discussion, and better flow of information."  *Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178321.  The revised content also includes:  a summary of ECP Year Three TPA audit findings; an overview of the importance of conducting root cause analyses to prevent future incidents; information on environmental compliance priorities during the pause; and an overview of channels to report any environmental incident or concern.  *See* October 2020 Probation Supervision Report, Attachment 5, PCL_ECP00175649-52 at PCL_ECP00175649-50.

January 20, 2021

6.   <u>IT Systems and Tools to Support Training</u>

- As noted above, and as discussed in prior CAM reports, Environmental Officers and other crew members have consistently expressed frustration to the CAM Team over the high administrative workloads associated with tracking and reporting on the completion of shipboard trainings.  *See* CAM March 2020 Quarterly Report at 117, 32; CAM Third Annual Report at 243.

- Before the pandemic, the Company had rolled out, or begun efforts to develop and roll-out, various IT tools to address some of these concerns, including:

  o  The Global Learning and Development Information System ("GLADIS"), a learning management system designed to deploy and track computer-based training, including environmental training, which has been rolled out for over a year;

  o  CrewTube, an application for smart phones and tablets that allows crew members to access some types of HESS information and communications before joining a ship, which has been rolled out for over two years;

  o  Drill App, an offline, tablet-based application to assess training and drills using a competency-based assessment approach; and

  o  An onboard instructor-led training attendance app that can create an electronic record of attendance at onboard trainings by scanning crew member IDs, as well as interface with GLADIS to automatically update a crew member's training profile.  *See* CAM Third Annual Report at 133-35; Company Comments on Draft Report.

- Development and implementation timelines for some IT initiatives, including the Drill App and the training attendance app, have been delayed due to the pandemic, as discussed in Part III.J below.  Even before COVID-19, the Company had lagged on many IT efforts in support of compliance.  *See* CAM Third Annual Report at 128.

7.   <u>Training Governance Framework</u>

- The CAM Team understands that the Company is in the early stages of exploring the development of a corporate-wide training governance framework that would approach training from a systems perspective.  Such a framework would entail a more holistic and strategic approach to training—one that would aim to bridge silos that currently exist between different areas, such as compliance, operational, HR, and executive/management training.  It would also aim to achieve a lifecycle approach to training to support the continual professional development of employees from cradle-to-grave.  *See* Employee Interview/Call Notes.

- The CAM notes that many organizations have a C-Suite level Chief Learning Officer (or equivalent title).  The role of a Chief Learning Officer can extend beyond "making skills-based and compliance-oriented courses available to employees and perhaps running leadership-development programs," to "a more powerful role in which they reshape

capabilities and organizational culture."  *See* A. Lundberg and G. Westerman, *The Transformer CLO*, Harvard Business Review (Jan./Feb. 2020), *available at* https://hbr.org/2020/01/the-transformer-clo.  These "transformer" Chief Learning Officers can drive changes in an organization's:

- o Learning goals, "shifting the focus from the development of skills to the development of mindsets and capabilities that will help workers perform well now and adapt smoothly in the future."  *Id.*;

- o Learning methods, "making them more experiential and immediate, and atomizing content for delivery when and where it's needed."  *Id.*; and

- o Learning departments, "making them leaner, more agile, and more strategic."  *Id.*

8. Ongoing CAM Team Examination

- The CAM Team will continue to monitor the Company's environmental and other compliance-related trainings, including:

- o Efforts to develop a corporate-wide training governance framework;

- o Compliance training for corporate leadership, including the Boards of Directors;

- o CSMART course development and delivery, both virtual and (eventually) in-person;

- o The potential role of CSMART in supporting culture change within the broader organization, including the "evolution of CSMART toward a hybrid training model" that provides training "onsite, online and onboard" as part of the larger initiative "to design and implement a Corporate-wide training strategy and organization in the years ahead." *Q4 2020 Safety, Environmental & Security Awareness Bulletin* at 6;

- o Onboard trainings, including efforts to revise existing training to support a more sustainable and effective onboard environmental training program;

- o Training for the Company's Global Talent Partner recruits;

- o Investigations and systemic (root) cause analysis training, including the investigations training provided to Environmental Officers in the Environmental Excellence CSMART course, as well as other investigations trainings for Incident Analysis Group, brand/operating group, and shipboard investigators;

- o Development of competency frameworks;

- o IT tools and systems in support of training; and

- o The respective roles of All Brands Group and brand/operating group training, operational, and HR personnel, CSMART personnel, and other relevant Company personnel in these and other training-related efforts.

- The CAM Team's examination will be guided by DOJ's Corporate Compliance Program Guidance, which emphasizes that a "hallmark of a well-designed compliance program is appropriately tailored training and communications."  DOJ Corporate Compliance Program Guidance at 5.  It is critical to assess "the steps taken by the company to ensure that policies and procedures have been integrated into the organization, including through periodic training and certification for all directors, officers, relevant employees, and, where appropriate, agents and business partners."  *Id.*  It is also important to assess "whether the company has relayed information in a manner tailored to the audience's size, sophistication, or subject matter expertise," as well as whether the company has "evaluated the extent to which the training has an impact on employee behavior or operations."  *Id.* at 5-6.

**J.  IT and Data Management**

1.  Background

- The CAM has previously observed that the Company's IT resources were generally:  non-centralized, with different systems (or versions of systems) in use by different brands; outdated; and not able to support the collection and sophisticated analysis of environmental compliance data across the corporation, in contrast to the way the Company is able to analyze financial information.  *See* CAM Third Annual Report at 127-37.

- The Company has recognized its need for more centralized, modern, and data-driven strategies.  Throughout the ECP, the Company has made efforts to develop and implement IT systems and tools in support of compliance, and to enhance its data management and analysis capabilities.  However, progress on these efforts has generally been slow, both before and after the pandemic.  *See id.* at 128; Employee Interview/Call Notes.

- Now, following COVID-19-related disruptions, the Company's IT resources (including staffing, budgets, software licenses, and contracts with outside service providers) have been, on average, halved, and several initiatives that were underway before the pandemic have been suspended.  *See* Employee Interview/Call Notes.

- Notwithstanding these challenges, the Company continues to confirm its commitment to developing a "global, corporate-wide IT strategy," which currently "remains under development."  *Corporate Compliance Manager Quarterly Environmental Compliance Report* (Q3 2020), PCL_ECP00176537-665 at PCL_ECP00176559.  The Company has also continued to make progress on certain corporate-wide IT and data management initiatives designed to help improve both operations and compliance, as discussed in the following sections.

2.  Global IT Strategy

- Historically, the Company's individual brands/operating groups have pursued brand-specific IT strategies and initiatives, which, as the CAM has observed, are "sometimes at odds or incompatible with other cross-brand efforts."  *See* CAM Third Annual Report at 128; CAM December 2019 Quarterly Report at 81.  The Company's Chief Information Officer, who was

appointed in December 2018, has proposed a global, corporate-wide approach to IT strategy. *See* CAM December 2019 Quarterly Report at 81.

- As noted above, the Company remains committed to developing a global IT strategy, and has taken steps to facilitate such an approach, including restructuring certain positions and reporting lines within All Brands Group. For instance, the All Brands Group Chief Information Officer has created a new All Brands Group Maritime IT Liaison position, reporting directly to him, to provide technical expertise on the development and implementation of corporate-wide maritime IT initiatives. This position works closely with the position (created in 2019) of Senior Director of Maritime IT, who provides substantive expertise on maritime operational data needs and reports directly to the Chief Maritime Officer. *See* Employee Interview/Call Notes.

- In addition, the operating group Chief Information Officers now report directly to the All Brands Group Chief Information Officer, which should enable better alignment and standardization of IT systems across the company. *See id.*

   3.   Updates on IT Initiatives

         a.   *EMAIL AND VIDEO COMMUNICATIONS BETWEEN SHIP AND SHORE*

- The pause in guest operations—and the resulting repatriation efforts and ship layups—created a need for new, enhanced methods of communication between shoreside and ships. In response, the Company accelerated its roll out of a single, global email and video collaboration system. *See id.*

- The Company reports that this tool has enabled shoreside management to maintain close contact with shipboard personnel, and to more easily share information with the ships. Ship and shore employees from across the Company's brands/operating groups and departments have commented to the CAM Team that the ability to engage in more real-time and frequent communications, including the ability to video conference, during the pause has been one area of improvement during the pandemic. *See id.*

         b.   *VOYAGE PLANNING SOFTWARE (IN DEVELOPMENT)*

- In response to voyage planning challenges, discussed in Part III.K.2 below and in CAM reports since ECP Year One, the Company executed a contract in late 2019 with a vendor to develop voyage and environmental planning software. The software would, among other things, integrate information about environmental boundaries and requirements into the electronic navigational charts used by ships, replacing the current analog approach that relies on the use of an Excel spreadsheet referred to as "the Matrix." The project has been subject to delays, both pre- and post-pandemic. *See* CAM Third Annual Report at 130-31, 59-60; *see also infra*, Part III.K.2.c.

- In July 2020, the vendor delivered a beta version of the software to the Company for testing. According to the Company, its "testing team was unable to accept the software due to significant shortcomings related to both voyage planning and environmental content

requirements." *Court Appointed Monitor Communication – Requests for Documents and Information* (Oct. 9, 2020), PCL_ECP00173536-40 at PCL_ECP00173537-38. The vendor is working on revisions to the software. The Company expects to continue to test additional versions, and reports that the "latest estimate for delivering software with the basic requirements is the spring of 2021, with full delivery of requirements later in 2021." *See, e.g.*, Certification Pursuant to the Oct. 21, 2020 Order (Jan. 4, 2021), PCL_ECP00177657-65 at PCL_ECP00177662.

     *c.   MARINE ASSET STRATEGIES TRANSFORMATION ("MAST") (IN DEVELOPMENT)*

- The Company's MAST initiative is an effort to develop a single, corporate-wide planned maintenance and spare parts management system. The Company believes that the new system will improve its ability to efficiently deliver spare parts to ships, including those that are needed to keep shipboard pollution prevention equipment in working order. The system's functionality would, among other things, allow the Company to monitor the location and status of its spare parts inventory across the entire fleet. *See* CAM Third Annual Report at 130.

- The Company reports that the initial version of the MAST software is approximately 50% complete. However, completion and subsequent testing on ships has been delayed by approximately one year (until about December 2021) due to the pandemic. *See id.*[63]

- In the meantime, the Company is moving forward on efforts to develop standard nomenclature for pollution prevention equipment and related spare parts, as well as common maintenance plans, across the entire fleet—a process referred to as "data globalization" or "data normalization." The data can be imported into each brand's existing planned maintenance database, which should ease the eventual transition to MAST, when the data will be exported into a single, corporate-wide database. *See ECP Critical Spare Parts Management CAM and TPA Workshop* (Aug. 25, 2020), PCL_ECP00168725 at 44. The Company expects to complete this data globalization process for approximately 30 ships a year, with completion across the fleet to occur by the end of 2025. *See Revised MAST Timeline*, PCL_ECP00173011. This plan is based on a fleet size of 104 ships and "will be modified based on the size of the fleet post-COVID-19." *Court Appointed Monitor Communication – Requests for Documents and Information* (Oct. 2, 2020), PCL_ECP00173251-54 at PCL_ECP00173252.

- Once the MAST system is in place, the next step (estimated for approximately 2025 and beyond) will be the creation and stocking of centralized spare part inventory warehouses to

---

[63] RAAS's recent Operational Pause Risk Assessment, discussed in Part III.C.4.b above, identified risk associated with the "[i]nability to timely source/deliver spares" due to "markets closed due to COVID, vendor viability, limited supply, [and/or] inability to meet payment terms." Operational Pause Risk Assessment Presentation, PCL_ECP000174904 at 7. RAAS further observed that cross-brand communications on resource planning (*i.e.*, sourcing and delivering good and services, including spare parts) is "somewhat limited." *Id.* These observations underscore the critical need to complete the MAST project.

physically store and deploy parts.  *See* CAM Third Annual Report at 130; *see also* Letter from CAM to Environmental Corporate Compliance Manager Regarding ECP Critical Spare Parts Management (Sept. 15, 2020), attached as Appendix E, at 4-5.

### d. GLOBAL HESS

- Global HESS is the Company's corporate-wide electronic health, environmental, safety, and security management system.  Global HESS contains, among other things, the Company's HESS policies, procedures, and related communications, including newsletters, case studies, compliance notices, videos, RAAS and third-party audit reports, and CAM reports.  It also contains modules (*i.e.*, a part of a program that contains one or more individual functions) that allow for managing and tracking audit findings and corrective actions, managing tasks, and viewing a calendar of internal and external ship visits.  *See* CAM Third Annual Report at 128.

- The Company has continued to move forward on certain improvements to Global HESS.  *See id.* at 128-29.  Two notable initiatives to be rolled out during the pause are interrelated efforts to:  (1) develop a rank (position)-specific dashboard to enable users to more easily view information in Global HESS relevant to their specific job duties, which has been rolled out; and (2) simplify environmental procedures to increase readability and usability, which "continue[s] to be rolled out in batches and will be complete by end of February 2021." *Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178306; *see also CAM/Company Communication Recap (August 26, 2020, Global HESS Updates Demonstration)* (Sept. 4, 2020), attached as Appendix D.  Feedback from crew members to the CAM Team on these initiatives so far has been mixed.  *See* Employee Interview/Call Notes.

- Other efforts continue to be on hold as a result of the pandemic, such as developing a mobile application for completing Global HESS electronic checklists and moving the weekly Environmental Officer checklist report into Global HESS as an electronic report.  *See* CAM Third Annual Report at 129; *Pause Priorities Plan November 30th Updates*, PCL_ECP00178297-339 at PCL_ECP00178309.

### e. SEAEVENT

- SeaEvent is the Company's new centralized, corporate-wide incident and near miss reporting and case management system.  Rollout to all ships across the Company's brands was completed in November 2019.  SeaEvent has the potential to improve the consistency of the Company's incident and near miss reporting, and enable better fleetwide information-sharing and tracking, trending, and analysis of incident and near miss data.  *See* CAM Third Annual Report at 130.

- Efforts are underway to improve the Root Cause Analysis Map tool within SeaEvent to "better lead input through drop down menus," as discussed in Part III.F.5.c above.  *See* Pause Priorities Plan, PCL_ECP00177469 at 15.  As also discussed in Part III.F.5.c above, the Incident Analysis Group implemented new software in December 2020 to track information

related to investigations reported via SeaEvent and other avenues, including root cause analysis findings, associated risks, and corrective and preventive actions.

4.   Updates on Data Management Initiatives

      *a.   DATA ANALYSIS FOR COMPLIANCE IMPROVEMENT OPPORTUNITIES (SUSPENDED)*

- In ECP Year Three, the Company engaged a data science consulting firm to examine the Company's analytical capabilities and assist in analyzing the Company's existing data sets to identify "opportunities for improvement in processes, systems or training & communication as they relate to compliance." *See Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond,* (Oct.9, 2019), PCL_ECP00141400-35 at PCL_ECP00141423-24; CAM Third Annual Report at 131-32. As part of its efforts, the firm analyzed data sets from some of the Company's brands to develop prototype models for analyzing three principal areas:  (1) food waste management; (2) Oily Water Separator/Oil Content Meter work orders and failures; and (3) unplanned work orders.  CAM Third Annual Report at 131.

- As a next step, the firm had proposed to rely on a technique called "data virtualization" to integrate the Company's data that is siloed across the different brands (regardless of factors such as format or location), and provide a means for accessing, managing, and delivering the data in real time to end-use applications.  This approach, in theory, would enable the Company to analyze its data holistically across the brands, and develop corporate-wide metrics and key performance indicators that would allow for a more targeted, informed, and proactive approach to addressing compliance challenges.  *Id.*

- Since the onset of the pandemic, the Company has suspended its relationship with the consulting firm.  However, the Company reports that it is implementing some of the learnings from the preliminary modeling—most importantly, the need to normalize its data across brands/operating groups, and to verify data accuracy so that it can reliably be used to identify trends.  *See* Employee Interview/Call Notes.

      *b.   GLOBAL MARITIME DATA LAKE (IN DEVELOPMENT)*

- The Company continues to work on a corporate-wide project to migrate data from various systems, including SeaEvent, into a "global maritime data lake,"[64] which would enable more advanced analytics, such as correlating incident data with data on weather conditions, training records, or personnel onboard.  Each brand would have access to its own data from the data lake for performing analytics in the software of its choice.  Certain All Brands Group departments (*e.g.*, Ethics & Compliance, Maritime Operations) and RAAS would have access to data across the entire fleet.  *See* CAM Third Annual Report at 132; Employee Interview/Call Notes.

---

[64] A "data lake" is a system or repository of data stored in its natural or raw format.  It can include structured, semi-structured, unstructured, and binary data.

January 20, 2021

### c. HOLLAND AMERICA GROUP DATA WAREHOUSE AND DASHBOARDS (IN DEVELOPMENT)

- One of the Company's operating groups, Holland America Group, is developing a group-specific data warehouse, with the intent to expand the warehouse across the Company. The data warehouse would be comprised of multiple data streams, including SeaEvent incident and near miss data, as well as legacy data (such as pre-SeaEvent data stored in older systems). The Company's goals for the warehouse include enabling enhanced automation of incident and near miss reporting, as well as more sophisticated data analysis, such as tracking of leading indicators that could help predict (and prevent) future incidents. *See* Employee Interview/Call Notes.

- In addition to the data warehouse, Holland America Group is developing automated analytical dashboards that would cover a range of areas, including planned maintenance, spare parts, layup and restart planning, and new build assessments. Currently, some of this reporting is being managed manually using Excel spreadsheets, while other reporting is being managed in native applications. With this new tool, Holland America Group would be able to analyze real-time information and assess trends across the fleet from multiple data sources together. *See id.*

### d. RAAS DASHBOARDS (IN DEVELOPMENT)

- RAAS is spearheading efforts to analyze and trend certain HESS metrics—including RAAS HESS audit findings, planned maintenance status, and crew experience and training—and develop dashboards to assist RAAS auditors in focusing their vessel audits on key issues. *CAM/Company Communication Recap (October 1, 2020, RAAS Dashboards Walkthrough)* (Nov. 11, 2020), attached as Appendix G. The CAM has expressed appreciation for "the efforts that RAAS has undertaken to use existing technology to leverage the deep bench of data the Company generates and maintains," noting "the importance of developing strategies to collect, analyze, and use data to support the Company's environmental compliance efforts." *Id.* at 1.

- As part of these efforts, RAAS is developing three principal interactive dashboards: (1) a RAAS HESS audit findings dashboard, designed to track all RAAS HESS audit findings across the Company's brands to, among other goals, enable auditors to identify problematic procedures to focus on before arriving on a ship; (2) a planned maintenance status dashboard, designed to track planned maintenance items, which can be grouped and analyzed in several ways, including by ship, by maintenance activity, by department, or by length of delay for overdue items; and (3) a crew experience and training dashboard, designed to track information about crew member experience and competencies, which can be overlaid with data on RAAS HESS audit findings to identify potential correlations. The CAM Team understands that RAAS expects to finalize these dashboards and roll them out for use by RAAS auditors in the first and second quarters of Fiscal Year 2021. *See id.* at 1-2; *see also* Letter from RAAS to CAM (Nov. 20, 2020) at 1-2.

5. <u>Ongoing CAM Team Examination</u>

- The CAM Team will continue to monitor the Company's development and implementation of IT initiatives in support of compliance, as well as its efforts to enhance its data management and analysis capabilities.  As the CAM has observed, "there are several disparate efforts underway across the Company to collect, analyze, and report on various HESS metrics that could benefit from enhanced cooperation."  *CAM/Company Communication Recap (October 1, 2020, RAAS Dashboards Walkthrough)* (Nov. 11, 2020), attached as Appendix G, at 3.  The CAM Team will seek to learn more about individual initiatives, as well as efforts at cross-brand and cross-department collaboration and coordination to support the Company's stated goal of achieving a global, corporate-wide IT strategy.

**K. Environmental and ECP Violations**

1. <u>Overview</u>

- Violations of the ECP and environmental laws persist, including recent upticks in incidents related to voyage planning and Advanced Air Quality System soot discharges, discussed in Parts III.K.2-3 below.  *See, e.g.*, *January 6, 2021 Quarterly Issue Tracker* (Jan. 6, 2021); Internal Incident Log.  From the beginning of the ECP, the CAM has emphasized, both in conversations with Company personnel and in prior CAM reports, that it would be unreasonable to ever expect zero violations in the course of normal operations.  *See id.*; Employee Interview/Call Notes.  Mistakes and mishaps will occur.  The central question is: how does the Company learn from them?

- The Company's approach to learning from incidents still appears to be hamstrung by a longstanding practice and mindset of minimizing or deflecting chronic problems, rather than understanding them and addressing their root causes.  *See* CAM Third Annual Report at 107.  As an illustration of this mindset, the Company's internal HESS reporting reflects a focus on:

  o Driving down incident numbers and rates, rather than on *also* understanding the underlying, systemic factors that may be driving incident trends.  For example, the Company's HESS Quarterly Reports for the Boards of Directors and Executive Management ("HESS Quarterly Reports") present data on reported violations in a series of graphs showing trends across prior quarters, with limited if any analysis of potential underlying, systemic factors driving these trends.  *See, e.g.*, Carnival Corp., *Health, Environmental, Safety and Security (HESS), Technical Regulatory and Sustainability Report*, Fourth Quarter, FY2020 (Jan. 2021), PCL_ECP00178205-292 at PCL_ECP00178221-31.  The reports do highlight and provide incident descriptions for significant individual incidents.  However, these descriptions typically consist only of basic factual (and often dense, highly technical) accounts of the incident, without higher-level analysis of such things as:  systemic (root) causes, lessons

learned, similar or repeat incidents, or—critically—associated risk factors. *See, e.g.*, *id.* at PCL_ECP00178222-33;[65] and

o Presenting data in a manner that appears designed to minimize prohibited activity by showing it as a tiny percentage of a larger universe of activity. For example, the HESS Quarterly Reports now include an Environmental Compliance Scorecard component[66] that presents data on discharge violations in the form of a per-ship average (*e.g.*, 0.3 violations per ship). *See, e.g.*, *id.* at PCL_ECP00178220. Other metrics measure discharge and emission violations in terms of a small numerator on top of a large denominator, such as: "the volume of bilge, sewage and grey water violations *as a percentage of total discharge volume to sea*," or the amount of time an Advanced Air Quality System is run non-compliantly *as a percentage of total running hours*. *See id.* at PCL_ECP00178221-22, 27 (emphasis added).

As discussed in prior CAM reports, and in conversations with the Company, a focus on how violations may be a small percentage of a larger pie is potentially misleading. *See* CAM March 2020 Quarterly Report at 55-56, n.38. For example, despite the fact that the illegal discharges on the *Caribbean Princess* were the basis for the Company's criminal conviction in the current case, those discharges were likely a small percentage of the ship's total volume of discharges. Merely reporting the small error rate of those illegal discharges would fail to capture the large consequences of those discharges. The Court has expressed its concern about presenting data in this manner. *See* Status Conf. Tr. at 117 (Jan. 8, 2020) ("I just ask that [the Chief Maritime Officer] not say: It's only 0.00 because it comes across as you're looking at it in a minimizing way.").

• The CAM recognizes that there is value in identifying and tracking trends in incident numbers and rates over time as a potential marker of continuous improvement. The CAM also recognizes that there may be value in framing incidents (the things that go wrong) in the context of the many things that the Company does right.

---

[65] While incident descriptions may reference such things as investigation findings (including causal factors), similar incidents, or corrective and preventive actions, this information tends to be buried within the text of the incident descriptions without being systematically presented or analyzed.

[66] DOJ, the CAM, and the TPA critiqued an earlier version of the Scorecard. DOJ observed that "we do not think that it will be helpful in achieving the goals of compliance and continuous improvement," in part because it is "superficial and overly simplistic," "fails to adequately focus on and address issues related to management engagement as the Court has repeatedly instructed," and some "proposed categories and metrics appear deliberately oriented toward minimizing criminal conduct." *See* CAM March 2020 Quarterly Report at 55-56, n.38 (citations omitted). The CAM expressed similar concerns on behalf of the CAM Team and TPA during conversations with the Chief Ethics & Compliance Officer and other Company personnel. *Id.* at 55. The basic design and approach of the Scorecard elements that have been incorporated into the HESS Reports appear to remain largely the same.

- However, these approaches, alone, do not effectively manage risk.  In particular, they may not effectively highlight the risks associated with low probability, high consequence events. The Company's current approach to HESS data analysis and reporting does not appear designed to provide the following type of analysis:  For the (significant) incidents that occurred, what are the underlying systemic (root) causes?  What are the potential consequences?  What are the associated risk factors?  How should those risks be managed and addressed?

- As discussed in this Report and in prior CAM reports, the Company appears to be hampered in its ability to take a such a risk-based, learning approach by its longstanding lack of a mature compliance culture and robust systems for internal investigations (including root cause analysis), risk assessment, data management and analysis, and management accountability.  Efforts are underway to enhance the Company's capabilities in these areas.

2.  Voyage Planning Incidents

   a.  OVERVIEW

- Before sailing on an itinerary, a ship must prepare a voyage plan that lays out the ship's intended route, along with relevant conditions (*e.g.*, weather, current, tides), restrictions, and potential problems or hazards.  Each voyage plan includes an environmental plan, which identifies, among other things, when and where certain environmental operations can occur (such as discharging various waste streams or operating equipment that generates emissions or smoke), based on the ship's location and applicable international, national, local, or Company restrictions, such as the special requirements that apply in U.S. marine sanctuary waters.  *See* CAM First Annual Report at 41; Joint Glossary at 10.

- During ECP Year Four, the CAM Team identified at least 10 incidents on Covered or previously Covered Vessels occurring between April 19, 2020, and December 9, 2020, that appeared to be attributable at least in part to voyage planning and execution errors, such as miscalculations of environmental boundary lines, misunderstandings about applicable environmental requirements, or failures to configure back-up engine equipment to run on compliant fuel in the event of an engine shutdown or malfunction in areas where emissions are regulated.  *See* Internal Incident Log; *see also infra*, Part III.K.2.c (providing examples of incidents throughout the ECP period).

   b.  CASE STUDY TRAINING PROGRAM

- The Company has recognized that recent voyage planning and execution incidents are concerning.  Around August 2020, after observing that "voyage planning and voyage execution errors have resulted in several Marpol and company environmental violations," the Chief Maritime Officer and his team launched a case study training program.  *See* Incident Analysis Group, Final Report IAG2020034 (Sept. 28, 2020) at 14.

- Under this program, all ship Captains were instructed "to implement a special voyage planning training session" that included a review of:  (1) voyage planning requirements; (2) the broad range of voyage planning errors being made; and (3) lessons learned from

January 20, 2021

several case studies.  *Id.*  Following the training session, each Captain was required to send written feedback to the Chief Maritime Officer, relevant Maritime Executive Vice President, and the Environmental Corporate Compliance Manager on the training, as well as on the voyage planning process on the ship more generally.  The All Brands Group Maritime Policy & Analysis/Marine Working Group is reviewing the responses received from the ships to "capture both the challenges and best practices for inclusion in future passage planning procedures."  *Id.*

- The CAM Team understands that the purpose of this training was to facilitate a thoughtful review of the voyage planning process by shipboard teams in a novel and collaborative way. The CAM Team further understands that it was an effort to take prompt action in response to a noted uptick in incidents, while longer-term solutions (such as the voyage planning software discussed in the following section) remain under development.  *See* Employee Interview/Call Notes.  The CAM does not doubt that this training exercise was well-intentioned, or that it may result in useful learnings for shipboard and shoreside staff alike.

- At the same time, the approach reflects a tendency—not unique to the Company—to attribute incidents to a lack of (effective) training, and to prescribe more training as the preventive action, without the type of robust causal analysis that could reveal potential deeper, systemic causes.  As observed at the virtual CSMART Environmental Excellence course, incident and investigation reports often identify training as a root cause, but, in reality, training is rarely a root cause.  *See CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call – Virtual Environmental Excellence CSMART Course Feedback)* (Sept. 2, 2020), attached as Appendix C, at 3.  The Company acknowledges that "most of the [voyage planning and execution] incidents have not been fully investigated so the root cause remains unknown." Company Comments on Draft Report.  Without an understanding of root cause, it may not be possible to know if the chosen corrective and preventive actions are the most impactful ones. For instance, is a training program a temporary band-aid (one that will need to be applied again and again) over deeper issues, such as ineffective processes or procedures?

    c.   *"THE MATRIX" AND VOYAGE PLANNING SOFTWARE*

- As described in Part III.J.3.b above, and in prior CAM reports, the Company's current process for communicating information for environmental voyage planning to the ships relies primarily on a large and complex spreadsheet, called "the Matrix," that is periodically updated by shoreside personnel and uploaded in Global HESS.  Based on information in this spreadsheet and related online links, deck officers in charge of voyage planning, in consultation with Environmental Officers, are responsible for developing the environmental plan portion of the ship's overall voyage plan, including information about when and where discharges and emissions are permitted or restricted.  The CAM has observed that this "time-consuming and labor-intensive approach is rife for potential human error (including, at times, incorrect information within the Matrix itself), and is a frequent source of complaints to the CAM Team by shipboard personnel across the Company's brands."  CAM Third Annual Report at 130-31, 159-60.

- Incidents involving inaccurate, incomplete, or confusing information in the Matrix have occurred since the beginning of the ECP (and before).  *See, e.g.*, CAM First Annual Report at

January 20, 2021

41, 54-55 (discussing voyage planning-related incidents on Covered Vessels); CAM December 2018 Quarterly Report at 10-11 (same); CAM March 2020 Quarterly Report at 141-42 (same).  For example:

o   Between 2015-2017, multiple ships discharged various waste streams in the Greater Farallones and Cordell Bank National Marine Sanctuaries, in violation of U.S. federal regulations, as a result of voyage planning errors and inadequate shoreside support— including the failure to notify ships that the marine sanctuary boundaries had expanded, or to timely incorporate information about the expanded boundaries into the Matrix.  *See* CAM March 2020 Quarterly Report at 141-42;

o   In September 2018, a ship used its incinerator for approximately 3.5 hours inside Swedish Territorial Waters, where the use of incinerators is prohibited, because this restriction "had not been correctly copied across into the appropriate decision support tools."  *See* CAM December 2018 Quarterly Report at 10-11 (quoting Carnival Corporation & plc HESS Weekly Flash Report (Sept. 12, 2018));

o   Between May and August 2019, two ships discharged biomass in Canadian waters, in violation of Company requirements, due to "confusion and ambiguity" regarding Global HESS requirements, including a diagram of the baselines of the relevant area in an appendix to the Matrix that had "no legend or text guidance to describe the various lines illustrated" and "did not effectively communicate" the relevant baseline. *See* Incident Analysis Group, Final Report IAG2019043 (Jan. 27, 2020) at 4, 13;

o   In November 2019, a ship discharged Advanced Air Quality System washwater in the Florida Keys National Marine Sanctuary, in violation of U.S. federal regulations, due to "a misunderstanding of what the sanctuary limits were."  Investigation Report HAGNSDMENV201900019S at 2.  The Company's brand/operating group-led internal investigation concluded that the root cause "was complexity of [the Matrix], *which is not designed in a way to mitigate human error and contains information in multiple locations, which can be missed by users*."  *Id.* (emphasis added).  The investigation also found that:  "*Misunderstanding of [the Matrix] is a repeat cause for environmental incidents in the fleet*."  *Id.* (emphasis added);

o   In December 2019, a ship discharged approximately 150 cubic meters of untreated ballast water while underway from Key West to Port Everglades, Florida, in violation of U.S. federal regulations, due in part to a misinterpretation of requirements in the Matrix.  Incident Analysis Group, Final Report IAG2020008 (Aug. 6, 2020) at 1. The Company's Incident Analysis Group-led internal investigation noted that the Matrix "required users to check multiple places to get all of the information required for ballast operations for Florida," and that the Matrix "*contains a large volume of information that is frequently amended* and, *if the instructions are not followed, is open to misinterpretation and facilitates human error*."  *Id.* at 12 (emphasis added). In addition, "officers interviewed stated that the environmental restrictions matrix was difficult to use," including that it "*contained too much information and required too much scaling and manipulation*."  *Id.* at 1, 7 (emphasis added);

January 20, 2021

- o In May 2020, a ship discharged treated bilge water, grey water, and treated sewage in Panamanian waters in violation of Company requirements, in part because the Matrix "was misread" after the Voyage Planning Officer "missed an asterisk, which instructed the reader to review a second document."  Incident Analysis Group, Final Report IAG2020034 (Sept. 28, 2020) at 2-3; and

- o Between approximately July/August and September 2020, a ship operated its incinerator in the Italy Ecological Protection Zone, where the use of incinerators is prohibited, on multiple voyages over a two-month period because relevant coordinates and boundaries had not been properly carried over from the Matrix to the ship's electronic navigation charts.  *See* Carnival Corporation & plc HESS Weekly Flash Report (Oct. 7, 2020), PCL_ECP00173285-95.

- As discussed above, and in prior CAM reports, the Company has long promised a software solution designed to automate aspects of the voyage planning process and address challenges presented by the Matrix.  *See supra*, Part III.J.3.b.  However, this project has been subject to numerous delays.  Before COVID-19, the Company had reported that full roll-out was expected by mid- to late 2020.  *See* CAM Third Annual Report at 160, n.105.  After a series of delays, both before and after the pandemic, *see id.*, the Company now reports that the "latest estimate for delivering software with the basic requirements is the spring of 2021, with full delivery of requirements later in 2021."  *See, e.g.*, Certification Pursuant to the Oct. 21, 2020 Order (Jan. 4, 2021), PCL_ECP00177657-65 at PCL_ECP00177662.

- In the absence of a software solution, an alternative means of preventing the voyage planning incidents that continue to occur is required.  The questions that should be asked in response to incidents are not (only):  Why do ship officers continue to make mistakes when using the Matrix?  Do they need further training?  Rather, the necessary questions include:

  - o Why is information in the Matrix sometimes inaccurate or difficult to find (*e.g.*, the Matrix is designed and updated by individuals who are different than those responsible for using it; the Matrix exists in a cumbersome Excel spreadsheet)?

  - o Why aren't onboard cross-checks and/or shoreside checks effective at catching all errors (*e.g.*, lack of familiarity with relevant procedures; insufficient time and/or resources)?

  - o For each answer to the first "why" question, another "why" question should be asked until root cause is ascertained.

- Such questions are designed to lead to an understanding of root causes at a systems or process level that might reveal more efficient—and more permanent—solutions than approaching every incident as a training issue.

3.   Advanced Air Quality System Incidents

    a.   OVERVIEW

- The Company experienced multiple incidents related to its Advanced Air Quality Systems during ECP Year Three, including emission exceedances, prohibited washwater discharges, and equipment failures or malfunctions.  *See January 6, 2021 Quarterly Issue Tracker* (Jan. 6, 2021); Internal Incident Log.

- Advanced Air Quality Systems, also called Exhaust Gas Cleaning Systems or "scrubbers," are a type of pollution prevention equipment that removes sulfur oxide compounds from a ship's engine and boiler exhaust gases.  *See* CAM Third Annual Report at 216-17 (citations omitted).  The Company's Advanced Air Quality Systems use an open loop design, in which seawater drawn from the ocean is used as washwater that is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulfur oxide compounds from the exhaust. The washwater is filtered and mixed with sea water before being discharged back into the sea.  *Id.* at 217.

    b.   SOOT DISCHARGES AND WASHWATER FILTERS

- The Company's reported incidents include several discharges of soot particles from Advanced Air Quality Systems into the sea.  The CAM Team identified approximately 10 such incidents on Covered or previously Covered Vessels occurring between August 18, 2020, and November 18, 2020.  *See* Internal Incident Log.  The Company has also noted "an increase in reports regarding soot, discoloration and other surface effect events throughout the pause in guest operations."  *Q4 2020 Safety, Environmental & Security Awareness Bulletin* at 12.

- Discharges of soot particles into the sea from Advanced Air Quality Systems occur when "accumulated soot is dislodged into the exhaust stream and washed out when the [Advanced Air Quality System] is running."  *IN ENV/02/2020 Advanced Air Quality System (AAQS) / Exhaust Gas Cleaning System (EGCS) Washwater Filter Requirement in Port* ("ENV/02/2020").  Extended low engine load operations during the pause have resulted in increased soot build-up in Advanced Air Quality System components, such as economizers and exhaust gas piping.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.  During maneuvering, this soot can become "dislodged into the exhaust stream" and discharged into the sea when "no washwater filter is installed," or if the installed washwater filter is in bypass mode, non-operational, or "not able to capture the full volume of soot."  *Q4 2020 Safety, Environmental & Security Awareness Bulletin* at 12; *see also* ENV/02/2020; Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.  These discharges can result in surface effects, such as discoloration of the water, which "can occur even when operating parameters are within compliant limits." ENV/02/2020 at 1.

- Although Advanced Air Quality System soot discharges are not regulated by MARPOL, an increasing number of coastal states and ports around the world (including in Asia, Europe, the Middle East, and the U.S.) have enacted local regulations that restrict or prohibit the use

January 20, 2021

of open loop Advanced Air Quality Systems in port due to concerns about potential harm to the marine environment from washwater discharges.  *See* Gard, *Beware of local restrictions before discharging washwater from exhaust gas scrubbing* (Updated Nov. 24, 2020), http://www.gard.no/web/updates/content/26939066/beware-of-local-restrictions-before-discharging-washwater-from-exhaust-gas-scrubbing.

- In an effort to minimize the chance of "discoloration and other surface effects" from Advanced Air Quality System washwater discharges, including those attributable to soot, the Company issued an Instructional Notice to its ships on January 11, 2020, that required ships to "have operating washwater filters installed and in use in order to be run in port."  *See* CAM Third Annual Report at n.148; ENV/02/2020.  Since the issuance of ENV/02/2020, the Company has continued to report incidents involving surface water effects and/or discoloration near Advanced Air Quality System washwater discharge points as a result of inoperable or ineffective washwater filtration systems.  *See* Carnival Corp. Special Condition 13(a) Reports; Carnival Corp. HESS Weekly Flash Reports.  As noted above, approximately 10 such incidents occurred on Covered or previously Covered Vessels between August 18, 2020, and November 18, 2020.  *See* Internal Incident Log.

- The Company has revised the Instructional Notice several times since it was issued in January 2020, including as follows:

  o On June 11 and 30, 2020, the notice was revised to permit ships, in certain situations, to use Advanced Air Quality Systems *without* washwater filters as long as the discharge point is visually checked "to verify that there are no significant and unusual visual effects in the water like oil sheen, soot or significant discoloration."  *See* ENV/02/2020 (Rev. June 30, 2020);

  o On November 20, 2020, and December 9, 2020, the notice was revised to require "inspections of washwater filter(s) every two hours when in use," and for ship personnel "to complete training on surface effect events, water and fuel emulsification and low load engine operations" by December 31, 2020.  *See* ENV/02/2020 (Rev. Dec. 9, 2020).  "Until training is completed, ships that have reported recent soot incidents while docked alongside or anchored . . . must use [low sulfur marine gas oil] when docked alongside or anchored."  *Id.* (emphasis in original).

- On January 13, 2021, the TPA issued an observation "regarding systemic issues related to the operations" of Advanced Air Quality Systems, which "remains a recurring issue on [Company] vessels with the result being the repeated discharge of soot into oceans and navigable waterways."  Letter from TPA to Environmental Corporate Compliance Manager, *Systemic Exhaust Gas Cleaning Systems Soot Discharges* (Jan. 13, 2021) at 1.  The TPA identified over 60 such incidents on both Covered and Non-Covered Vessels between June 2017 and October 2020.  While recognizing "that the Company has acknowledged that soot discharges are an issue," the TPA recommended that the Company "more fully investigate and evaluate the reliability, availability, and maintainability" of Advanced Air Quality Systems "from design through operations," including equipment design and "the efficacy of

any mitigation measures (*e.g.*, washwater filters) to determine the underlying causes of the recurring soot discharges and gain some measure of control over their occurrence."  *Id.* at 2.

The TPA also expressed concern that the "frequent changes" to ENV/02/2020 since it was issued in January 2020 "may have impacted the ability of crews onboard to implement these instructions effectively."  *Id.*

  *c.  TRAINING WEBINAR*

- As with voyage planning incidents, the Company has recognized that recent soot discharge incidents are concerning.  In response to the noted uptick in incidents during the pause, the Chief Maritime Officer and his team developed and presented a virtual training webinar in August 2020 on Advanced Air Quality System surface effects.  The webinar provided training on recently updated procedures, and "used recent events as case studies and discussed causes, remedial actions and lessons learnt, with a series of polling questions."  *See* August 2020 Probation Supervision Report, Attachment 5, PCL_ECP00172980-81 at PCL_ECP00172980.  Three sessions were held, with several hundred overall attendees, ship and shore.  *See id.*; Employee Interview/Call Notes.

- Similar to the response to voyage planning and execution incidents, this approach was an attempt to respond quickly to an issue.  It was undoubtedly well-intentioned and may well prove beneficial.  But, again, any training solution is likely to provide only a temporary fix at best until the Company has mature investigations/root cause analysis and risk assessment processes in place.

4.  Ongoing CAM Team Examination

- The CAM Team will continue to monitor and track the Company's violations of the ECP and environmental laws, and to report to the Interested Parties as required by the ECP.  *See* ECP §§ III.D.6, VI.F.6.

   o  These include incidents related to:  air emissions, such as leaks of ozone-depleting substances from refrigerant gas systems or exceedances of sulfur cap limits for Advanced Air Quality Systems; discharges to the sea of various liquid and solid wastes, including oily wastes; pollution prevention equipment maintenance and operation, including incidents where equipment has been out of service for more than 24 hours; and recordkeeping, including incidents of apparent intentional falsifications of ship records in violation of legal and/or Company requirements.

   o  Other events tracked by the CAM Team, which do not typically involve violations of the ECP or environmental laws, include:  bilge leaks/overflows; emissions of non-ozone-depleting refrigerant gases; Environmental Control System program (*i.e.*, the seal/lock/weld program to control vulnerable points on ships that could be used for overboard discharges) issues, such as broken or missing seals with no evidence of intentional tampering; and near misses.

- o These incidents and events are identified to the CAM Team through formal and informal mechanisms, including: audit findings (both internal and external); CAM Team visit findings; weekly internal Flash Reports; Environmental Open (Hotline) Reports; Special Condition 13 Reports required under the Probation Agreement; notices to the Office of Probation; and other notifications.

- The CAM Team will also continue to track and assess issues associated with these incidents and events, such as issues related to: shoreside support, such as concerns related to workload/staffing, IT systems, waste vendors, spare parts, training, or policies and procedures; and workplace/culture, such as concerns related to blame culture, retaliation, discrimination, harassment or bullying, or unsafe working conditions.

- In particular, the CAM Team will continue to focus on Advanced Air Quality System issues during ECP Years Four and Five. This will include monitoring the Company's compliance with the new global marine fuel sulfur cap, as well as with local and Company restrictions on the use of Advanced Air Quality Systems in port. The CAM Team also plans to continue exploring workload and staffing issues related to Advanced Air Quality Systems, and intends to attend the CSMART training course on Advanced Air Quality Systems (either virtually or when the facility reopens for in-person courses).

- In addition, the CAM Team will continue to monitor impacts from COVID-19 on the Company's ability to comply with certain ECP requirements, as discussed in Part III.A.5 above.

### L. Other Ongoing Areas of Focus

- The CAM Team continues to monitor the following areas of interest and intends to report further on these issues in future reports. These examinations will occur in the context of the Company's ongoing response to the COVID-19 pandemic.

1. Staffing and Other Personnel Issues

- The CAM Team will continue to examine the hiring, staffing, workload, and employment conditions of officer and non-officer crew. This will include not only technical, deck, and environmental personnel, who have been the greatest focus of the CAM Team to date, but also hotel and food and beverage personnel. *See* CAM Third Annual Report at 244-45.

- One area of focus will be employee perceptions about how compliance is supported by their management (both ship and shoreside), including comments the CAM Team has received regarding a lack of ownership and support for compliance by hotel and food and beverage departments, although there have been indications of improvements in connection with the heightened focus on food waste management. *See* Employee Interview/Call Notes.

2. Integration of Compliance Considerations into Ship Design, including New Builds and Dry/Wet Docks

- From the beginning of probation, the CAM Team has inquired of Company personnel about whether or how compliance concerns were reflected the design or re-design of the Company's ships, and how and in what ways compliance demands were impacting dry/wet dock processes. As to ship design, it was noted that the multi-year process of getting a ship built means that the design of ships being built, or about to be built, had long ago largely been set. *See* Employee Interview/Call Notes.

- Now, more than three years of probation have illuminated a range of compliance challenges related at least in part to ship design, including: food waste management; other (non-food) waste management; human error in monitoring and/or inputting commands and settings in Engine Control Room displays; alarm fatigue/flooding; cross-contamination of waste streams from piping and tank arrangements; design of piping (*e.g.*, piping being routed behind other piping or machinery) that inhibits the ability to perform repair and maintenance outside of dry/wet docks; and leaks from deteriorated or corroded piping and other equipment or components.

- The Company has, at times, recognized the role that ship design can play in promoting or forming a barrier to compliance, including the impact that ship design has on the ease with which compliant operations can be carried out in an efficient manner. *See* Employee Interview/Call Notes; Holland America Group Workload Study, PCL_ECP00149393-602. The CAM Team understands that, prior to the onset of COVID-19, design changes were either being considered, or in the process of being implemented, to: (1) improve food waste separation; (2) redesign piping to avoid cross-contamination between waste streams; (3) eliminate leaks and redesign piping to minimize bilge water accumulation; and (4) reconfigure piping arrangements to allow for more routine maintenance and more efficient bilge water offloads on select ships. *See* Employee Interview/Call Notes.[67]

- The CAM Team intends to learn more about the Company's efforts to integrate compliance considerations into re-design of ships during new build and dry/wet dock processes. The Court has expressed particular interest in how the Carnival Corp. Chairman of the Boards, who is recognized for his leadership role in new ship design, is "making concrete design changes to make sure that the new ships that are coming online are able to address some of the failures in the past." Status Conf. Tr. at 69-70 (Jan. 8, 2020).

- As discussed in the CAM Third Annual Report, the pandemic has only increased the importance of this area of focus. Not only will the Company need to address any backlog of projects resulting from postponed drydocks and delayed new build progress, but the Company will also need to consider the impact of ship design on the management of a new, highly infectious disease. The CAM Team intends to evaluate the Company's decisions

---

[67] The Company has also made significant investments in liquefied natural gas propulsion technology for new ships, which can reduce toxic air pollutants associated with traditional maritime fuel oils. *See* CAM Third Annual Report at 83-84.

regarding both: (1) guest-facing design issues, which may be crucial to regaining customers; and (2) behind-the-scenes design issues, which are critical to compliance. *See* CAM Third Annual Report at 245-47.

3. <u>Other Support for Operations and Compliance</u>

- The CAM Team will continue to assess the Company's efforts regarding:

  o Review and improved management of the various pathways of shore/ship communication that exist across the organization, as discussed in Part III.C.3.c above;

  o Financial resources for HESS compliance, including: Ethics & Compliance Department and Program budgets; Operating Line Compliance Manager Annual Plan (Budget) Certifications; and the integration of HESS compliance into annual financial and strategic planning processes;

  o Purchasing and procurement processes for spare parts; and

  o Shoreside support for ships, including the extent to which shoreside has adequate resources to provide the support needed by the ships (*e.g.*, superintendent workloads), including in light of COVID-19-related staff reductions. *See id.* at 247-48.

4. <u>Company Response to Internal and External Findings</u>

- The CAM Team will continue to monitor the Company's response to findings from CAM, TPA, RAAS, and other internal and external studies, assessments, and reports, such as:

  o The recent Outside Counsel Report on Incident Analysis Group Issues, as well as its supplemental report;

  o The Environmental Compliance Culture Assessment;

  o The Food Waste Workload Assessment;

  o The RAAS Operational Pause Risk Assessment;

  o RAAS focus reviews, including the cross-brand ship superintendent review;

  o The ECP-mandated Fleet Engineering Survey;

  o The Holland America Group Human Factors Study and the Holland America Group Workload Study; and

  o The participant feedback surveys and reports from Operational Excellence, Environmental Excellence, and other CSMART compliance training courses (including virtual courses). *See* CAM March 2020 Quarterly Report at 116-17; CAM Third Annual Report at 248.

January 20, 2021

    5.  <u>Post-2022:  Compliance Beyond the ECP</u>

- During the remainder of ECP Year Fours and Five, the CAM Team will continue to engage with the Company on efforts to revise provisions of the ECP that have proven to be inefficient or ineffective in practice, and that may not be practical in the long-term.  *See* CAM Third Annual Report at 248-49; CAM Second Annual Report at 27-31 (discussing joint efforts by the Company, CAM Team, and TPA to revise ECP provisions, including provisions related to Environmental Officer workload).  The CAM's goal is that, when the ECP comes to an end in 2022, no changes to the Company's compliance program are needed or desired because the ECP requirements have become fully internalized and integrated into the Company's operations, and have become just how work is done.

- In addition, during ECP Year Five, the CAM will perform the review of the Company's capacity for continuous improvement required under the ECP.  *See* ECP § VI.F.5 (requiring the CAM to "conduct a review . . . to assess the implementation of [the Company's] internal audit process and determine if a continual improvement process is in place to establish Best Practices and assess potential technological improvements").

                                      Respectfully Submitted,

                                       STEVEN P. SOLOW
                                       Court Appointed Monitor

                                       January 20, 2021

# APPENDIX A

**Appendix A:  Operating Company Ethics & Compliance Officer and Operating Line Compliance Manager Bios**

<u>CARNIVAL CRUISE LINE</u>

- **Operating Company Ethics & Compliance Officer (*Senior Vice President, Ethics & Compliance Officer and Company Designated Person Ashore*):**  The individual in this position has spent more than 40 years in the maritime industry, most of it with the Company, holding various positions both shipboard and shoreside, including as a ship Captain, Vice President Maritime Compliance for Carnival Cruise Line, Vice President Safety and Environmental Operations for Carnival Cruise Line, and Vice President and Chief Compliance Officer for Carnival Cruise Line.  He was the Operating Line Compliance Manager for Carnival Cruise Line from the beginning of the ECP until his appointment as Senior Vice President, Ethics & Compliance Officer in mid-2020.  In addition to that role, he is the Designated Person Ashore for Carnival Cruise Line.  Outside of the Company, he serves as Vice Chairman of the Bahamas Ship-owners Association Board and is a member of the CLIA Technical and Environmental Committee.  *See Ethics and Compliance Officers and Deputies BIOs*, PCL_ECP00178149-53 at PCL_ECP00178149.

- **Deputy Operating Company Ethics & Compliance Officer (*Senior Vice President, Chief HR Officer & Deputy, Ethics & Compliance Officer*):**  The individual in this position has a 20+ year career in management and HR in a diverse array of industries, including prior positions as the chief HR executive with the Society for Human Resource Management ("SHRM"), the City of Alexandria, VA, the Washington Nationals Baseball Club, and the National Association of Social Workers.  She is an SHRM Senior Certified Professional and a certified Senior Professional in Human Resources and DEI.  As Carnival Cruise Line's Deputy Ethics & Compliance Officer, she is "mostly focused on Culture and DEI." *Id.*  In addition to her Deputy role, she is the Senior Vice President, Chief Human Resources Officer for Carnival Cruise Line, responsible for both shipboard and shoreside HR functions.  Outside of the Company, she serves as a member of SHRM and as an active, voting member of a United States delegation to an international body that develops international HR Standards.  In addition, she is a frequent speaker and presenter, and "has been heavily quoted on various media outlets," including the Wall Street Journal, Bloomberg BNA, and Diversity Women Magazine. *Id.*  She is also a published novelist. *See id.* at PCL_ECP00178149-50.

- **Operating Line Compliance Manager (*Senior Director, Environmental Compliance and ECP Operating Line Compliance Manager*):**  The individual in this position has been with Carnival Cruise Line since 2006, holding various shipboard and shoreside positions, including as an onboard Engine Environmental Supervisor, onboard Assistant Housekeeping Manager, onboard Environmental and Occupational Safety Officer, Traveling Environmental Superintendent, shoreside Environmental Manager, and shoreside Director, Environmental Compliance.  He began his current role as Senior Director, Environmental Compliance and Operating Line Compliance Manager for Carnival Cruise Line in September 2020. *See* Bio, PCL_ECP00178400-04.

### CARNIVAL UK

- **Operating Company Ethics & Compliance Officer (*Vice President, Ethics & Compliance Officer*):**  The individual in this position has been with Carnival UK for 13 years.  She has a legal background, having qualified as an English Solicitor at a commercial law firm in the United Kingdom before joining Carnival UK as Legal Counsel in 2007.  She has since moved up the ranks, including serving as Senior Legal Counsel and Director Ethics & Compliance for Carnival UK.  She assumed her current position as Vice President Ethics & Compliance Officer for Carnival UK in December 2019.  *See Ethics and Compliance Officers and Deputies BIOs*, PCL_ECP00178149-53 at PCL_ECP00178150.

- **Deputy Operating Company Ethics & Compliance Officer:**  The individual in this position joined P&O/Princess in 1994, serving as an Electrical Technical Officer on a number of ships, before moving to a shoreside position for the Corporate Newbuild Department in 2002.  In 2004, he transitioned to a Maritime Policy and Compliance role "supporting EU funded projects which the Corporation had agreed to participate in, risk assessment decision support, policy evolvement and event trending."  *Id.*  He then spent 12 years in the Carnival UK Safety & Environmental Department, where his responsibilities included reviewing HESS procedures, risk assessment administration, and acting as a subject matter expert for various Safety/Technical Working Groups.  He joined the Carnival UK Ethics & Compliance team in January 2020.  *See id.* at PCL_ECP00178150-51.

- **Operating Line Compliance Manager (*Vice President Governance Carnival UK Maritime/ISM Code Designated Person Ashore/ECP Operating Line Compliance Manager*):**  The individual in this position spent over 24 years in the Royal Navy before joining the Company in 2015, where he "has been employed in a variety of maritime roles within Carnival UK (Southampton) and Carnival Maritime (Hamburg) focusing on investigations, operational safety, governance, crisis management, nautical operations, operational quality assurance, operational support, and risk management."  Bio, PCL_ECP00177362.  He assumed his current role in September 2020.  Outside of the Company, he serves as a Fellow of the Royal Geographical Society and an Associated Fellow of the Nautical Institute.  He is also pursuing a part-time PhD in crisis management.  *See id.*

### COSTA GROUP

- **Operating Company Ethics & Compliance Officer (*Senior Vice President, Chief Financial Officer and Ethics & Compliance Officer*):**  The individual in this position has a financial and accounting background and has been with the Company since 2001, holding various shoreside positions, including as Senior Vice President and Chief Financial Officer of AIDA, Senior Vice President Shared Services of Costa Group, and Senior Vice President and Chief Financial Officer of Carnival Maritime Group.  He currently serves as Senior Vice President, Chief Financial Officer and Ethics & Compliance Officer for Costa Group.  *See Ethics and Compliance Officers and Deputies BIOs*, PCL_ECP00178149-53 at PCL_ECP00178151.

- **Deputy Operating Company Ethics & Compliance Officer (*General Counsel and Deputy Ethics & Compliance Officer*):**  The individual in this position has a legal background and was admitted to the Italian Lawyer Bar.  She has been with the Company since 1991, beginning as a Corporate Matters Manager, with a focus on mergers, acquisitions, acquisition financing, and corporate law.  In 2005, she became the Head of Legal Matters for the Costa Crociere Legal Department, where her duties included managing "all the legal matters regarding the Costa fleet," including litigation and the purchase and sale of vessels.  *Id.* at PCL_ECP00178151-52.  She took over responsibility of the newly created Compliance Department for Costa Group in 2013, as Costa Group Corporate Ethics & Compliance Director.  In this role, she was tasked with "disseminating a culture of rigorous Ethics & Compliance in all business areas."  *Id.* at PCL_ECP00178152.  In 2015, she also took over responsibility for the Carnival Maritime Legal Department.  *Id.*

- **Operating Line Compliance Manager (*Director Environmental*):**  The individual in this position began his maritime career in 1999 as a Project Manager of the Marine Pollution Prevention Service for the Italian Ministry of the Environment.  He has worked for the Company since 2001 in various shipboard and shoreside positions, including as an onboard inventory officer (*i.e.*, hotel controller), onboard Environmental Officer, shoreside environmental superintendent and quality standards compliance auditor, shoreside environmental management system coordinator, and shoreside environmental management director.  He assumed his current role as Director Environmental in January 2017 and has served as the Operating Line Compliance Manager for Costa Group since the beginning of the ECP.  *See* Bio, PCL_ECP00177530-33.

## HOLLAND AMERICA GROUP

- **Operating Company Ethics & Compliance Officer (*Vice President, Ethics & Compliance Officer*):**  The individual in this position is a Chartered Engineer (UK), specializing in Marine Engineering.  He began his career as a Merchant Naval Engineer Cadet sailing onboard Naval Auxiliary vessels.  His early career also included eight years sailing as an Engineer with P&O Cruises and Princess Cruises, during which time he obtained a Chief Engineer's Certificate for both steam and motor vessels.  He then left sea for further studies, obtaining an Engineering Council Part II/BSc Hons eq. degree.  Next, he worked in various positions at Lloyd's Register, a classification society, for approximately 20 years.  He joined Holland America Group in February 2017 as Vice President, Environment.  In that role, he served as the Operating Line Compliance Manager for Holland America Group from the beginning of the ECP until he assumed his current position as Vice President, Ethics & Compliance Officer in December 2019.  *See Ethics and Compliance Officers and Deputies BIOs*, PCL_ECP00178149-53 at PCL_ECP00178152-53.

- **Deputy Operating Company Ethics & Compliance Officer (*Director, Ethics & Compliance, Deputy Ethics & Compliance Officer*):**  The individual in this position has been with the Company since April 2005, spending seven years onboard Holland America Line vessels as a Deck Officer.  She joined the shoreside Ethics & Compliance team at Holland America Group in 2013.  In her current role, she oversees Holland America Group's Ethics & Compliance program, including the Economic Sanctions Program and

Sustainability Reporting Program.  She also manages the Anti-Corruption Program, Hotline Program, and Anti-Money Laundering Program.  She has a Master of Business Administration with a focus in Sustainability, in addition to certifications as a Certified Compliance & Ethics Professional and Certified Compliance & Ethics Professional – International.  *See id.*

- **Operating Line Compliance Manager:**  The individual in this position joined Holland America Line in 2007.  He started as a shipboard Nautical Officer and rose through the ranks to Staff Captain before transferring to a shoreside position with RAAS.  From 2013-2017, he worked in the RAAS Maritime Department.  He then joined the Environmental Compliance team at All Brands Group in 2017 as Senior Manager, and, later, Director.  He assumed his current position as Operating Line Compliance Manager for Holland America Group in December 2019.  *See Bio* at PCL_ECP00178154.

# APPENDIX B

**BAKER BOTTS** LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL  +1 202.639.7700
FAX  +1 202.639.7890
BakerBotts.com

AUSTIN
BEIJING
BRUSSELS
DALLAS
DUBAI
HONG KONG
HOUSTON

LONDON
MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

August 19, 2020

**Via Email**

Re:     **CAM/Company Communication Recap (August 6, 2020 Bi-Weekly CAM/CECO Call)**

Given the Company's request to have more frequent substantive communications about issues related to compliance, we thought it would be helpful to provide a recap of our discussions from the last time we spoke before our call tomorrow.

Our August 6, 2020, call included a discussion of the following substantive items:

- **Exit Interviews by the Ethics & Compliance Team**:  During a discussion about the CAM's confidential discussions with departing or former Company employees,         stated that         had not conducted exit interviews of employees who recently departed the Company during the COVID-19-related staffing changes, including members of senior shoreside management                                                                                 .         also stated that currently there is no formal role for the Ethics & Compliance team in exit interview processes, but that establishing such a role is (or should be) part of the culture change efforts underway.  We suggested that departing employees are valuable sources of information and that         should try to speak with departing employees who might be able to identify opportunities for improvement at the Company.         indicated that         agreed that  exit interviews could be valuable, and that         thought         would proceed by contacting certain former employees for interviews.  These interviews would likely be conducted by         and 1-2 others from         team with familiarity of the specific issues that may be discussed.  We will be interested to learn about         progress on this effort since we spoke.

- **Communication Streams with Current Employees**:  In addition to exit interviews,         expressed a desire to enhance ongoing communication streams with current employees on compliance issues and concerns, including developing new HESS surveys for the ships.         expressed the concern that the critique of senior management in various reports (including CAM reports) made it harder         to earn the trust of employees and obtain their candid

**BAKER BOTTS** LLP

- 2 -                                                          August 19, 2020

assessments.        suggested that        chances of doing so would be improved if CAM reports, in particular, did not include critical observations about senior management.  As we discussed, the critical observations in CAM reports are rooted in the observations of the Company's employees.  Failing to raise these observations would not make them go away, and would undercut our ability to receive candid reports, as individuals would come to see that their concerns did not find expression in the CAM reports.  Moreover, the CAM has an obligation to the Court to accurately report on information and observations of the Company's employees.  Finally, we agreed that it is crucial for        to find a means to learn about the concerns of the Company's employees.  Some of that information is contained in the CAM, TPA and RAAS reports, as well as in the            culture survey report, and in the reports of other third parties (such as                        ) that the Company has hired during this period of probation.  As we've discussed on numerous occasions,        also surrounded by talented and knowledgeable colleagues, who have significant insights.  We cannot reduce the difficulties        have by changing our reports because the underlying issues would remain unresolved.  We also recognize that the current pandemic creates extraordinary barriers to communication as well.  However, we are confident that        can find a methodology to establish                as someone within the Company with whom people can and will speak candidly, and look forward to further conversations on this important issue.

- **Accountability Exercise**:        stated that                involved in the All Brands Group "accountability exercise" being led by the new Chief Operating Officer.        also stated that in the next couple of weeks, there would be an effort to look at All Brands Group versus Operating Company Ethics & Compliance Officer accountabilities.  We suggested that a management of change process could help with the effort to enhance accountability, as it requires an assessment of how changes in processes, materials, budgets, and staffing impact a range of pre-existing obligations.  Again, we will be interested to know about the status of the management of change process when we speak again.

- **Voyage Planning Software**:  We discussed the August 5, 2020, Special Condition 13 report, which included two voyage planning incidents.  I shared that a recent update we received from the Company (on July 15, 2020, during the TPA audit of All Brands Group) on the status of the new voyage planning software indicated that the software could be piloted on the ships by October 2020.  I observed that having the software on ships by the October 16, 2020, Status Conference would be a very positive development to be able to report for an issue that has been an ongoing struggle throughout the probationary period.  Please provide an update on the status of this effort when we next speak.

Regards,

Steven P. Solow

# APPENDIX C

**BAKER BOTTS** LLP

| | | |
|---|---|---|
| 700 K STREET, N.W.<br>WASHINGTON, D.C.<br>20001 | AUSTIN<br>BEIJING<br>BRUSSELS<br>DALLAS | LONDON<br>MOSCOW<br>NEW YORK<br>PALO ALTO |
| TEL +1 202.639.7700<br>FAX +1 202.639.7890<br>BakerBotts.com | DUBAI<br>HONG KONG<br>HOUSTON | RIYADH<br>SAN FRANCISCO<br>**WASHINGTON** |

September 2, 2020

**Via Email**

Re:  **CAM/Company Communication Recap (August 21, 2020, CAM/CCM Call - Virtual Environmental Excellence CSMART Course Feedback)**

This letter provides a recap of the CAM Team's feedback on the virtual Environmental Excellence CSMART training course for Environmental Officers ("EOs") held from August 10-14, 2020. This feedback was provided orally to the Company on the weekly CAM/CCM call held on August 21, 2020.

**Background**

This course was the first session of the new EO3/EO4 Environmental Excellence training course. Due to the temporary closure of the CSMART facility to in-person trainings as a result of COVID-19, the five-day training was delivered virtually via the _____ platform. We understand that the Company plans to continue delivering the course virtually while the CSMART facility remains closed.

Approximately 16 EOs attended from across the Company's operating groups. Members of the CAM Team also attended, splitting the sessions among them so that 1-2 CAM Team members covered each session. In addition, I provided CAM remarks and held a question-and-answer session with the EOs on Day 3 of the course. A final assessment was administered on Day 5; the CAM Team did not participate in this portion of the course.

The lead instructor for the course was _____. The course curriculum was designed to provide investigations training to EOs (including training in root cause analysis and the 5 Why methodology), with some sessions focused on culture. Like prior EO3 CSMART trainings, the course was designed to be primarily challenge-based and interactive, rather than lecture-based. The sessions typically consisted of introductory lectures to introduce core concepts (often interspersed with brief discussions, brainstorming exercises, and/or polling questions to gauge participant engagement and comprehension), followed by break-out sessions in which groups of 3-4 participants worked together to complete exercise prompts based

**BAKER BOTTS** LLP

- 2 -                                                                    September 2, 2020

on case studies.  On Day 3 of the course, the CAM Team requested access to the break-out sessions (as silent observers) because a significant part of the learning appeared to occur in these sessions—from formal mock exercises to informal brainstorming discussions among the EOs.  The Company declined to provide the CAM Team with access to these sessions out of a pedagogical concern that the CAM's Team's presence would interfere with the desired learning atmosphere.  I hope that we can re-visit this issue before the CAM Team's next observation of the course.  When the CAM Team has attended prior Environmental Excellence courses in-person at CSMART, we have remained physically present in the room during break-out sessions, observing from a distance without participating in the exercises.  I am not aware of any feedback from EOs or course facilitators that our presence has had a dampening effect or otherwise interfered with the learning atmosphere.

In addition to the CAM Team, a representative from the TPA attended and performed a "pre-audit" of the course.  We understand that the TPA has separately provided its feedback and preliminary findings to the Company.

## <u>CAM Team Feedback and Observations</u>

The CAM Team's feedback and observations on the course include:

- **Course Facilitation:**  Overall,            appeared to be a strong presenter in terms of maintaining participant engagement and keeping energy levels high.  Along with the CSMART staff course facilitators,       established a general tone of openness and support in which EOs appeared to be engaged and comfortable sharing candid thoughts and questions, including pushing back when they disagreed with or had questions about a conclusion.  However, there was room for improvement, particularly in the leading of group discussions.  Notably, there was a tendency for discussions to be cut short without resolving key areas of confusion or concern.  In some instances, this led to ambiguous and inconsistent messaging around critical issues such as blame culture and root cause analysis, as discussed further below.  This may have been an artifact of the nature of the remote learning structure, and the natural tendency to want to move a class along to keep within a desired time frame.  As we are learning in other circumstances, expectations for the required time to complete various efforts may need to be revised when interacting in these remote settings.

  Separately, during discussions,            tended to respond to incorrect responses with a variation of "yes, but . . ."  There is a risk that a person providing an incorrect response will come away thinking they were correct when they first word they hear back is "yes," without fully appreciating the corrections or clarifications that follow.

- **Course Content:**  The slides generally appeared to provide good, clear content that introduced core concepts related to investigations and culture.  At times, however, contradictory or muddying information was given during discussions—particularly around issues of blame culture and root cause analysis:

**BAKER BOTTS** LLP

- 3 -                                                                    September 2, 2020

- o **Blame Culture:**  Many sessions included positive messaging that emphasized the importance of a no-blame culture and a fair and just culture, in which the goal of an investigation is not to identify individuals to blame but to identify root causes to prevent recurrence.  Despite this messaging, in some group discussions,              would ask participants who was to blame or who was at fault for an incident.  In addition, one of the slides in a session on "just and fair" culture used an example involving a waitress who was found not to be sorting food waste properly because she was new and had not received proper training.  The discussion of the slide focused on the individual waitress, rather than potential systemic or root causes, making the choice between whether the waitress should be disciplined or retrained without also asking broader questions to explore potential systemic issues (*e.g.*, Were there others who also were not trained?  Why was the training not conducted?  Was high workload a factor?  Scheduling challenges?).  Furthermore, the range of potential actions to be taken for "behavior that falls below expectations" on the slide consist of:  "investigation," "possible disciplinary hearing-gross misconduct," "possible disciplinary hearing-misconduct," "consider informal action," and "coaching/training."  No actions are listed that might address systemic issues identified when assessing the situation; this also was not part of the discussion during the course.

- o **Root Cause Analysis:**  Similarly, there was inconsistent and confusing messaging on the 5 Why methodology.              walked the EOs through at least two hypothetical examples to show how the methodology is applied.  In both examples, the analysis appeared to stop short of getting to the final "why" and identifying root cause.  For example, one hypothetical involved a prohibited AAQS washwater discharge.  Participants were asked to identify the root cause between two options:  failure of an AAQS system, or failure of an engineer to act on an AAQS alarm.  In the CAM Team's view of this hypothetical, neither of these is a root cause.  Nonetheless,              stated that the root cause was the AAQS system failure, and a contributing cause was the failure to act on the alarm.              made the point that neither option appeared to be a root cause because you could keep asking "why."  Based on the CAM Team's observations, there was no clear resolution to this discussion.  It did not appear that participants would come away with a firm grasp of root cause or the 5 Why method.

     At one point,          stated that he was not a big fan of the 5 Why method.  This is a risky and perplexing message to send to EOs, who may reasonably question why the Company is training them in a method that its                        investigators do not believe in.

     On a positive note,          emphasized that there is a tendency for investigations to conclude the root cause was lack of (effective) training, and that the preventive action should be more training.              explained that training is rarely the root cause.              remarked that      often made this conclusion in his own investigations, and that      now appreciated the need to go deeper in future investigations.

**BAKER BOTTS** LLP

- 4 -                                    September 2, 2020

- **Practical Skills Development:** Both the slide content and most of the group exercises focused on high-level concepts. We understand that this was an introductory course designed to be more basic than the training provided to Incident Analysis Group investigators. Even for an introductory course, however, there did not appear to be sufficient opportunities for EOs to practice implementing new skills using specific examples, or to receive feedback from facilitators. Only one break-out session (Case Study 3 – Planning an Interview) appeared to give EOs the chance to practice investigation skills in a mock exercise while receiving real-time trainer feedback.

  As noted above, the CAM Team was denied access to the break-out sessions. To the extent that additional opportunities for real-time practice and feedback were provided in those sessions, the CAM Team was not able to observe it.

  The general lack of practical skills development opportunities—combined with the inconsistent messaging on blame culture and root cause analysis discussed above—raises concerns that EOs will not leave the course with the tools and understandings necessary to perform effective investigations

- **CAM Remarks:** As always, I valued the opportunity to speak directly with the EOs and hear their feedback, questions, concerns, and other observations. In my remarks, I shared my team's observation that the development of a strong, cross-brand EO corps has been one of the Company's most significant achievements over the course of the monitorship—supported by efforts from the Environmental Corporate Compliance Manager ("CCM") and his team, CSMART staff, the Corporate Training Manager, the Operating Line Training Managers ("OLTMs"), and the Operating Line Compliance Managers ("OLCMs"). I also recognized the individual efforts of many EOs to improve culture and compliance through their role onboard the ships. In addition, I discussed my team's observations since the beginning of the ECP about the weaknesses in the Company's internal investigations program, citing the *Diamond Princess* EO training record falsification incident from ECP Year One as an example of an investigation in which blame was placed on an individual without an attempt to conduct a root cause analysis, an approach that was apparently accepted by the Company's leadership as sufficient. During the question-and-answer session that followed, a number of issues were discussed, including: areas of improvement and areas of in need of ongoing focus; the importance of a strong compliance culture to support continuous improvement; the importance of a learning organization approach to incidents and findings; EO concerns about shoreside delays in actioning on                incident reports; and the CAM's focus on how the Company incorporates management of change principles into both (i) corrective and preventive actions from investigations; and (ii) balancing the enhanced role of EOs in investigations against their other duties.

- **Technology:** The course appeared to run smoothly from a technological standpoint, apart from occasional minor connection issues. The video and audio files were of a high production quality and were a useful complement to the slides. The CAM Team appreciates the significant

**BAKER BOTTS** LLP

                                        - 5 -                          September 2, 2020

efforts by those involved in course development and delivery, including IT personnel, behind the scenes to make this so.

Although adequate for content delivery, the            platform did not appear to be optimal for a course designed to be interactive and challenge-based, compared to other available platforms like            and            that allow for more dynamic group views and interactions.  However, we understand that other considerations, including IT and licensing considerations, may have been involved in selecting the platform.

- **Limitations of the Virtual Environment:**  From a pedagogical standpoint, the virtual environment appeared to allow for delivering course content and meeting learning objectives. However, as I emphasized on the call, a significant part of the value of prior EO courses and conferences at CSMART has been a social aspect that cannot be replicated in a virtual setting. This includes the opportunity for EOs to get to know one another and exchange stories, ideas, and best practices in informal settings over coffee, meals, drinks, and other activities.  It also includes the opportunity for EOs to meet and share feedback, questions, or concerns directly with shoreside personnel, including the CCM, Corporate Training Manager, OLTMs, and OLCMs.  Such interactions are especially valuable for EOs, who (unlike engineering and deck officers) are alone without a natural peer group on the ships.  I expressed on the call my hope that, once the global pandemic situation allows for in-person travel to CSMART, the Company will provide the resources and support to resume in-person EO courses and conferences.

We understand that this was the first iteration of a first-of-its-kind EO training course, in terms of both content (investigations) and delivery (all-virtual).  We also recognize the tremendous efforts of CSMART staff, course facilitators, IT personnel, and others within All Brands Group and the operating lines to develop and deliver the course in the midst of unprecedented challenges from COVID-19.  We look forward to observing the evolution of Environmental Excellence in future sessions—virtually for now, and, hopefully one day, in-person once again.  As I've shared with you and others, I was saddened to learn of the recent departure of the CSMART Director of Environmental Training and CSMART EO Trainers due to COVID-19-related staffing changes. We understand that responsibility for the Environmental Excellence course has transitioned to a new CSMART team, and we look forward to engaging with these individuals and learning more about their vision and plans for the course and other environmental and compliance trainings.

We also understand that the Company may adapt the course to provide similar investigations training to other onboard ranks/positions who conduct investigations (such as Staff Captains, Security Officers, and Safety Officers).  During the question-and-answer session with the CCM held near the end of the course,

                              The CCM stated that there would be no expectation for EOs to begin conducting all Level 1 or Level 2 investigations.  He also stated that there are plans to provide investigations training to other shipboard officers.  However, there is no clear timeframe for when this might occur.  We look forward to learning more about the Company's efforts to develop and provide investigations training to EOs, as well as other shipboard officers, that builds

**BAKER BOTTS** LLP

                                    - 6 -                              September 2, 2020


upon the computer-based root cause analysis training rolled out in December 2019.  As discussed
at length in CAM Quarterly and Annual Reports, and in numerous formal and informal
communications with the Company, the weaknesses in the Company's internal investigations
program has been a critical area of concern for the CAM, TPA, and the Court throughout the
monitorship.  Effective training of shipboard and shoreside investigators, including in root cause
analysis, will be an essential component of any improved investigations program.

Regards,

Steven P. Solow

# APPENDIX D

**BAKER BOTTS** LLP

| | | |
|---|---|---|
| 700 K STREET, N.W. | AUSTIN | LONDON |
| WASHINGTON, D.C. | BEIJING | MOSCOW |
| 20001 | BRUSSELS | NEW YORK |
| | DALLAS | PALO ALTO |
| TEL +1 202.639.7700 | DUBAI | RIYADH |
| FAX +1 202.639.7890 | HONG KONG | SAN FRANCISCO |
| BakerBotts.com | HOUSTON | **WASHINGTON** |

September 4, 2020

**Via Email**

Re:    **CAM/Company Communication Recap (August 26, 2020, Global HESS Updates Demonstration)**

This letter provides a recap of the virtual meeting held on August 26, 2020, in which the Company provided a demonstration and overview to the CAM and TPA of two forthcoming changes to Global HESS: (1) simplified and streamlined environmental (ENV) procedures; and (2) updated rank-specific Global HESS dashboards to provide users with more tailored position-specific information.  The Company described these as separate, but complementary and interrelated, initiatives.

- **Simplification and Streamlining of Environmental Procedures:**  The Company (led by _____) provided members of the CAM and TPA teams with a status update on the Company's efforts designed to simplify and streamline ENV procedures, a process that began in late 2019.[1]  The Company explained that one goal was to simplify language and increase readability, without altering substantive requirements, including efforts to: (1) replace the passive voice with the active voice; (2) increase readability, as measured by the Flesch-Kincaid Readability Score; (3) lower the reading grade level; and (4) reduce word count.  Another goal was to make it easier for end-users (*e.g.*, shipboard

---

[1]  Prior CAM reports have noted concerns from crewmembers about "unclear or unworkable policies and procedures."  *See* CAM September 2018 Quarterly Report at 18; *see also* CAM Second Annual Report at 50 (citing Holland America Group Human Factors Study finding that "complex and ambiguous" Company procedures are a latent condition contributing to non-compliant discharges).  The TPA has also identified issues related to policies and procedures as a common source of audit finding in each of its annual reports to date.  *See* TPA First Annual Report at 15-17; TPA Second Annual Report at 15; TPA Third Annual Report at 21-25.  In ECP Years One and Two, the TPA recommended that the Company "[r]eview all Policies and Procedures" and "update incomplete or vague policies and procedures."  TPA First Annual Report at 5; TPA Second Annual Report at 5.  In ECP Year Three, the TPA recommended that the Company "[p]rovide a more robust QA/QC system which assures that the procedures are clear, complete, measurable, and easily understood by shipboard, with better implementation oversight/management to ensure effectiveness."  TPA Third Annual Report at 25.

**BAKER BOTTS** LLP

- 2 -                                                                        September 4, 2020

officers and crew) to identify the procedural requirements that apply to them by creating discrete procedural sections that consolidate the requirements applicable to each relevant rank/position.

The Company stated that it has shared the draft revised ENV procedures with several working groups, including a working group composed of Chief Engineers, Environmental Officers, and Captains that convened in early 2020. The shoreside Environmental Working Group has also finalized its review of the procedures, which are now undergoing a process of fine-tuning and incorporation of any recent updates.

- **Global HESS Rank-Specific Dashboards:** The Company provided a demonstration of the rank-specific dashboards that will be introduced to Global HESS. Once the simplified ENV procedures are finalized for roll-out, each ENV procedure will be tagged with rank-specific designations. When a specific user (*e.g.*, an Environmental Officer) signs into Global HESS, the new rank-specific dashboard will prominently display the primary procedures designated to their rank/position, as well as recent procedure updates (*i.e.*, those within the last four months). The dashboard will also display additional rank/position-specific information, including: assigned tasks for the position (*e.g.*, regular weekly/monthly checks); assigned tasks for the position's direct reports, if any; assigned HESS Action Items for the position from investigations, inspections, and audits; self-reported non-conformities submitted by the position or with action items assigned to the position; and HESS procedure suggestions submitted by the position.

  Other current Global HESS features and functionalities will be retained, including the ability to search for and access: policies and procedures; Instructional Notices; Global HESS tutorial videos; and other ECP and compliance-related information, including audit, investigation, and inspection reports, Must See Messages, Environmental Compliance Notices, Chief Maritime Officer Newsletters, ECP case studies, Safety & Environmental Awareness Bulletins, SoundWaves podcasts, and CAM and TPA reports.

- **Timeline for Implementation:** The Company plans to roll out both Global HESS updates concurrently, starting around late September/early October 2020. The roll-out will be staggered by brand, beginning with Carnival UK, followed by Carnival Cruise Line, Costa Group, and Holland America Group. Fleetwide roll-out is expected to be complete by October 7, 2020. The Company also plans to distribute training material to accompany the roll-out, which will be accessible in Global HESS, although the format of the training material (*e.g.*, Environmental Compliance Notice) has not yet been determined.

  The Company offered to hold a follow-up meeting approximately 30-45 days after the roll-out is complete to provide the CAM and TPA teams with updates and to share feedback from the ships. The Company also stated its interest in hearing any feedback provided by the ships to the CAM or TPA teams during virtual visits and/or audits.

**BAKER BOTTS** LLP

- 3 -                                                          September 4, 2020

- **HESS Owners:**  We inquired about the Company's process for updating ENV procedures in Global HESS, including the designation of rank/position-specific requirements.  The Company explained that there are several layers of review and approval, and that each operating line has a HESS Owner                                                                                                who is responsible for approving the ENV procedure designations in Global HESS.

    In response to a request from the TPA, the Company agreed to provide a list of the HESS Owners at each operating line.

As noted above, and as we have discussed, the complexity of some Global HESS procedures is an issue the CAM and TPA teams have routinely heard identified as a concern of shipboard personnel, throughout the period of the monitorship.  We agree that these Global HESS updates are an important effort and look forward to engaging in further discussions with both shipboard and shoreside personnel during and after the roll-out.

Regards,



Steven P. Solow

# APPENDIX E

**BAKER BOTTS** LLP

700 K STREET, N.W.          AUSTIN          LONDON
WASHINGTON, D.C.            BEIJING         MOSCOW
20001                      BRUSSELS        NEW YORK
                           DALLAS          PALO ALTO
TEL  +1 202.639.7700       DUBAI           RIYADH
FAX  +1 202.639.7890       HONG KONG       SAN FRANCISCO
BakerBotts.com             HOUSTON         **WASHINGTON**

September 15, 2020

**Via Email**

**Re:**

We are writing to relate some observations and questions after attending the presentation set up by the Company to provide an overview of ECP critical spare parts management. Representatives from the Company and its external consultant,           , gave a presentation to the CAM and TPA teams via video conference on August 25, 2020.  The slide deck was provided shortly after the presentation concluded.

**Background**

As detailed in the CAM Third Annual Report, "[s]ince the beginning of the ECP, issues related to pollution prevention equipment and spare parts have been a frequent and ongoing source of findings from TPA and RAAS audits, incident reports, and the Company's internal and external studies and assessments."  CAM Third Annual Report at 143.  In addition, "throughout the ECP, crew members from across the Company have expressed frustration to the CAM Team over difficulties they face in obtaining spare parts, including delivery delays and cancelled purchase orders."  *Id.* at 90.  The TPA has also identified spare parts as a critical area of audit finding in all three of the TPA Annual Reports to date.  *See id.* at 144-46.

On July 30, 2020,        sent an email to the CAM and TPA stating that      had "spent a lot of time over the last few weeks assessing and evaluating the spare parts process across the groups in response to [CAM and TPA] feedback in the annual reports."  Email                                , *Proposed Workshop on Carnivals Spare Parts Process, Journey and Next Steps* (July 30, 2020).        observed that "[a] lot has been accomplished in this area, driven mostly by the ECP and the story over the last 3 years is quite interesting . . . The story going forward with MAST is also an interesting one."  *Id.*        proposed "a 2 hour virtual workshop towards the end of August for us to walk through the journey and evolution of spares parts from the last 3 years and what the future will look like."  *Id.*  The CAM and TPA agreed that this could be a valuable exercise, and the presentation was held on August 25, 2020.

**BAKER BOTTS** LLP

- 2 -                                                                                      September 15, 2020

<u>**CAM Team Observations and Follow-Up Questions**</u>

While the CAM Team appreciates the time and effort of the many individuals involved in preparing and presenting the material, we note at the outset that much of the information presented was not new, particularly with respect to the management of spare parts at each of the operating lines and the plans for MAST.  We thank you for organizing the presentation as it provided a useful starting place for further discussion and inquiry.  Specific observations and follow-up questions are detailed below.

- **Section 1 (Slides 2 to 17) – Identification of ECP Critical Spare Parts:**  The first section of the presentation, led by                                                    recapped the work the Company undertook in the first year of the ECP to identify ECP critical spare parts.  The information was consistent with what the CAM Team understood was the Company's approach, based on our previous vessel and shoreside visits and other interactions with the Company.

  The CAM Team has the following questions and requests for additional information:

  o  Slide 3:  Please provide a spreadsheet listing the critical spare parts and minimum restock levels for each critical spare part across the entire fleet.

  o  Slides 6-12:  To what extent did the Company analyze legal risk as part of the analysis in making its criticality determinations for ECP critical spare parts?  Was any attempt made to adapt the                            analysis to the heightened compliance requirements imposed on the Company as a part of its criminal probation and/or to the goal of ensuring that the Company operates legally in the future?  For example, was there an analysis on whether failure of a part (including a part required for "redundant" equipment) could result in (1) an increased risk of non-compliance with the ECP or environmental laws; or (2) other compliance risks (such as risks related to increased workloads and time/attention/resource demands associated with frequent equipment breakdowns, even if the breakdowns would not themselves constitute a violation)?  If so, how did this affect the criticality determination and the minimum restock levels?

We appreciate that the                                standard the Company used considers system/equipment redundancy as part of the criticality determination.  Nonetheless, the CAM Team views this as an example of the Company's approach to redundant systems that weakens foundational support for compliance.

As the Government and the CAM have emphasized, "the failure of such ['redundant'] components had systemic consequences and played a significant role in the [conduct on the *Caribbean Princess*] leading to conviction."  CAM April 2019 Quarterly Report at 11 (citing Letter from              to Company Outside Counsel, *United States v. Princess* (Case 1:16-cr-20897) (Mar. 27, 2018) ("DOJ Letter")).  The Government has also noted that ships are required to carry certificates which "identify the equipment and procedures used to handle

**BAKER BOTTS** LLP

- 3 -                                                                September 15, 2020

pollutants and their waste streams" and that the "inoperability of this equipment is unquestionably a very significant event" which "generally results in the detention of a ship. 33 U.S.C. § 1904(e)(2) (stating the Secretary of Homeland Security '*shall*' detain ships 'whose condition or whose equipment's condition does not substantially agree with the particulars of the certificate aboard.'); and MARPOL, Art. 5." *Id.* (citing DOJ Letter) (emphasis in original).  The Government further observed that the Company's position "appear[s] to reflect an antagonistic corporate culture where management prizes avoiding adverse findings more than achieving actual compliance and progress." *Id.* at 12 (citing DOJ Letter).  The CAM has similarly observed that "[g]iven the role that non-working pollution prevention equipment played in the felony convictions in this matter, it would seem more appropriate for the Company to provide ships with the support and resources needed to keep all pollution prevention equipment on board in good operating condition," rather than to dispute whether failures of "redundant" pollution prevention equipment should rise to the level of an ECP or regulatory violation.  *See id.* at 14.

Defining critical spare parts using a standard that deems spares not critical if a redundant system is onboard makes compliance harder for those onboard the ships for at least three important reasons:  (1) crew may have to improvise and deviate from established procedures to compensate for the lack of a spare part, making mistakes or errors in judgment more likely; (2) crew who already face heavy workloads may have to spend additional time addressing an equipment failure in the absence of a spare part, adding to their workloads and limiting the time available for their many operational and maintenance requirements (and again, fatigue and excessive workload increase the likelihood of mistakes or errors in judgement); and (3) there is a heightened potential consequence of any subsequent failure of a second (or third) "redundant" pollution prevention equipment system—*i.e.*, that there would be no onboard means of processing the relevant waste stream, as was the case on the *Caribbean Princess*.

- **Section 2 (Slides 18 to 34) – Overview of Operating Line Activities:**  The second section of the presentation, led by operating line representatives, focused on summarizing what each operating line has done since the beginning of the ECP to address ECP critical spare parts issues.  Much of this information was again consistent with what the CAM Team had learned through prior visits and interactions with Company personnel.

The CAM Team has the following questions and requests for additional information:

  o  Have there been any analyses of the trends shown in Slides 19, 25, 26, 27, and 32 that provides actionable lessons learned (regarding "Improved Stock Out Performance," "Critical Spare Growth," "PPE Incident Impact," and "% Env Critical Spares Below Min")?  By Year Four of the ECP, we would expect there to be a meaningful analysis of the data now that there is preliminary alignment between operating lines on the designation of ECP critical spare parts.  For example, what is the significance of the increase of ECP critical spare parts?  Is the rate increasing solely based on the MAST globalization review, or are there other contributing factors?  Are the factors

**BAKER BOTTS** LLP

- 4 -                                                        September 15, 2020

contributing to increased ECP critical spare parts the same or different for each operating line?  What is driving the improvements in stockout performance for each operating line?  What are the remaining barriers to achieving a 100% compliance with min stock levels for ECP critical spare parts for each operating lines?  Have any root cause analyses been done for components or parts that have a high failure rates?  If not, why not?

o  It appears that each operating line implemented a different set of initiatives to address critical spare parts issues.  *See, e.g.*, Slides 20, 23, and 29.  To the extent the operating line initiatives differ, why?  Were efforts made to coordinate approaches?  Have the operating lines been sharing best practices throughout this process, as well as key trends or findings?  If so, how have those learnings been incorporated by each operating line?

- **Section 3 (Slides 35 to 46) – MAST Initiative Update:**  The final section of the presentation, led by representatives of the MAST team from All Brands Group and the operating lines, focused on the MAST program's scope and history, revised project plan due to COVID-19 impacts, next steps, and timelines.  From this presentation, as well as prior visits and interactions with Company personnel, we understand that a primary goal of MAST is to harmonize the different approaches the operating lines have historically taken to the management of spare parts and planned maintenance activities.  The CAM agrees that this is a vitally important project.

The CAM Team has the following questions and requests for additional information:

o  We understand the Company has delayed certain aspects of MAST due to the pause in operations caused by COVID-19.  As a result, full implementation with fleetwide rollout is now targeted for the fourth quarter of 2024.  *See* Slide 45.  The only remaining parts of the initiative scheduled for completion before the end of the ECP in April 2022 are:  system build/execution, data globalization, and initial pilot testing of the MAST software.  Since full implementation of MAST appears to be at least four years away, well beyond the end of the ECP, what strategies does the Company intend to implement to meet its compliance obligations prior to MAST's full implementation?  This question relates to the questions regarding analyses of critical spare parts trends discussed in the comments on Section 2 above.

o  We understand that MAST will not only help achieve environmental compliance but would also allow the Company to negotiate more economically favorable sourcing agreements.  Given the importance of the MAST initiative, have there been any discussions about the feasibility of moving up the schedule for completing MAST development and pilot testing?  If it has been determined that implementation of

**BAKER BOTTS** LLP

- 5 -                                                    September 15, 2020

MAST cannot be moved up, why is that?  If no such discussions have taken place, are those discussions planned in the future, and if so, when?

o   Slide 44:  Does the Maintenance Review Acceptance Board (MRAB) have a charter or other document laying out the scope of its duties and the criteria it applies during its review process?  If so, please provide a copy.

o   Slide 44:  What are the barriers to the use of              to accelerate implementation of data virtualization?

o   Slide 45:  What is the timeline for globalization of non-environmental parts?

Again, thank you for organizing the presentation.  Please let me know in what manner, and in what time frame, can we expect to receive responses to the questions above.  We look forward to continued engagement with the Company on the issue of critical spare parts management.

Regards,

Steven P. Solow

# APPENDIX F

**BAKER BOTTS** LLP

| | |
|---|---|
| 700 K STREET, N.W.<br>WASHINGTON, D.C.<br>20001 | AUSTIN        LONDON<br>BEIJING       MOSCOW<br>BRUSSELS     NEW YORK |
| TEL  +1 202.639.7700<br>FAX  +1 202.639.7890<br>BakerBotts.com | DALLAS        PALO ALTO<br>DUBAI          RIYADH<br>HONG KONG  SAN FRANCISCO<br>HOUSTON      **WASHINGTON** |

October 8, 2020

**Via Email**

**Re:     Incident Analysis Group (IAG) and Recent Hotline Complaints Assessment**

I am writing to provide observations and relay questions regarding the assessment conducted by the Company's outside counsel with respect to Environmental Open Reports                     These two hotline complaints alleged undue influence on the investigations function

On September, 25, 2020, the Court Appointed Monitor ("CAM") received the final investigation report, prepared by the                     law firm and provided to                     and                     , regarding the            hotline complaints. *See Hotline Complaints: Report and Recommendations* (Sept. 24, 2020) ("                Report" or "Report"). As detailed below, the CAM Team found the                     Report deficient in numerous respects, including that it appears narrowly scoped, internally inconsistent, and to contain unsupported assertions.

**Narrow Scope of Review**

First, the Report's conclusions appear to be based on a narrow scope of review, focused primarily on interviews with management or executive-level personnel and limited documents. This limited review seems inadequate to address the allegations in the hotline complaints, and insufficient to support the Report's broad conclusions.

Concerningly, the Report does not directly or meaningfully address serious questions about the structure of the IAG, which were raised by the            hotline complaints. Instead, it reads as a recitation of the views                     in part by casting aspersions on the Incident Analysis Group ("IAG") investigators, without fully supporting these conclusions with evidence gathered during the investigation. For example:

- Both            hotline complaints allege                                                      . The                     Report does not investigate this allegation in any meaningful way.

**BAKER BOTTS** LLP

- 2 -                                                                October 8, 2020

- Open Report #41-2020 states that: "Investigations are not independent
                                                                                                In response, the
  Report concludes that no IAG reports were "improperly changed." Report at 3. However,
  whether an IAG report was "improperly changed" does not address the structural question
  as to whether the IAG is operating independently.

- In addition, we note that the former head of IAG was selected, in part, by          . Based
  on the Report, the investigation by                        does not appear to have meaningfully
  analyzed the IAG supervisory structure,

**Internal Inconsistencies**

Second, the                        Report is internally inconsistent. It is unclear whether the Report's
inconsistencies are attributable to                              or to revisions by subsequent reviewers. For
example, the Report states: "Noteworthy is that *only one* of the individuals interviewed (
       ) asserted that IAG is entirely independent." *Id.* at 4 (emphasis added). Yet, the Report also
asserts that the interviews "confirmed that no one outside of the IAG has had a role shaping or
influencing the contents of any reports." *Id.* at 3. How can the latter statement be true if *only one*
interviewee asserted that IAG is fully independent?

**Unsupported Assertions**

Third, the Report makes unsupported assertions. For example, the Report states that: "Some of the
perceived loss of independence is a direct result of some investigations not being the quality and
caliber expected of IAG, *thus necessitating oversight and input from individuals outside of IAG,*
                         ." *Id.* at 6 (emphasis added). The Report does not explain or support the
basis for this conclusion. Even if the first conclusion was true (*i.e.,* assuming that investigations
are not "the quality and caliber expected of IAG"), it does not support the second conclusion that
"oversight and input" is necessary from                        other individuals outside the Ethics &
Compliance Department structure that includes IAG. The Report does not directly address or
acknowledge that IAG leadership, including the IAG head or the Chief Ethics & Compliance
Officer (to whom the IAG head continues to report), is, or should be, primarily responsible for
oversight and input into the quality and caliber of investigations.

As noted above, the Report also makes opinion-based statements about the competency of IAG
investigators that do not appear to be the result of a rigorous or comprehensive analysis of IAG's
work product. Even if IAG work product could be improved, the Report's repeated focus on IAG
investigator competency evades the question of
Instead of investigating this structural concern, the Report makes a personalized finding regarding
IAG investigators, stating that: "Frankly, IAG needs to earn                        respect and gain        full
confidence." *Id.* at 8. Such statements do not further the goals of an independent investigations
function and only serve to undercut investigators' efforts.

**BAKER BOTTS** LLP

- 3 -                                                              October 8, 2020

### New IAG Head

As you know, the Company's investigations function has been an area of concern since before the end of the first year of the ECP.[1] The Company recently selected                          as the newest person to head IAG. The CAM Team is looking forward to seeing                          plans for IAG, including how he plans to support and improve the function's efficacy and independence.

job title, however, is the SVP, Deputy Chief Ethics and Compliance Officer, and he does not hold a formal title as the head of IAG.[2]                          official role also includes responsibility for assisting the Chief Ethics and Compliance Officer in the implementation of the overall E&C Program and direct oversight for the compliance risk function. It remains to be seen whether                          other responsibilities will impact his ability to fully focus on and lead IAG's operations, and to promote IAG's independence.

Moreover,                          assumed his new position on September 25, 2020—the day after the                          Report was officially issued. Based on that timeframe, it appears that                          did not have a meaningful opportunity, before stepping into his new role as head of IAG, to consider the Report's conclusions, including its judgements about the IAG investigators and the appropriate role of                          in the investigation process. The CAM Team welcomes                          feedback regarding the Report and its conclusions.

### CAM Information and Document Requests

To better understand the scope of the                          review, the CAM Team makes the following information and document requests:

- How many individuals were interviewed?

    - IAG investigators?

    - Investigators at operating lines?

    - Management- or executive-level personnel?

_____

[1] *See* CAM First Annual Report at 5, 33-40; CAM Second Annual Report at 43-46; CAM Third Annual Report at 180-201.
[2] The CAM Team has reviewed his job description, which lists his title as SVP, Deputy Chief Ethics and Compliance Officer. While the job description states that he has "full authority to carry out independent investigations throughout the corporation that involve the maritime Health, Environmental, Safety and Security areas," as well as authority and responsibility for "overseeing the planning and progress of independent HESS investigations that are conducted or overseen by the Incident Analysis Group," it does not appear to officially designate him as the head of IAG.

**BAKER BOTTS** LLP

                                          - 4 -                                    October 8, 2020

- Did the law firm review any investigation reports other than                    ? For instance, were all IAG reports involving the Worldwide Cruising Environmental Standards Matrix reviewed to determine whether the persistence of discharge incidents across brands, despite training, suggests that the Matrix is flawed?

- What other evidence was reviewed?

- Did individuals outside of                    edit or revise the Report?

Finally, the CAM Team requests the following records:

- All emails related to the            investigation, including:

- All preliminary IAG reports since April 2019.

**<u>Conclusion</u>**

The CAM Team continues to have concerns and questions regarding the Company's willingness to build and support an investigations function that can independently conduct investigations, provide recommendations for corrective and preventive actions, and effectively inform the Company's continuous improvement process.

Over the past few weeks, before the                    Report was released, the CAM Team engaged in extensive conversations with members of the investigation teams at both the operating lines and IAG. These professionals demonstrated a great deal of engagement with, and enthusiasm for, their work.

Importantly, however, the Company does not appear committed to adequately supporting the independence of the investigations conducted by these teams. The Company's approach to the           hotline complaints, evidenced in the                    Report, leaves unaddressed the concerns raised in the           hotline complaints. This implicates the CAM Team's continuing concern that the Company is not taking the steps needed to protect the independence and completeness of internal investigations, which are so necessary to promote continuous improvement.

We look forward to hearing back in response to the concerns and requests raised above. Please let me know if you have any questions or would like to discuss further.

# APPENDIX G

**BAKER BOTTS** LLP

700 K STREET, N.W.
WASHINGTON, D.C.
20001

TEL +1 202.639.7700
FAX +1 202.639.7890
BakerBotts.com

AUSTIN
BEIJING
BRUSSELS
DALLAS
DUBAI
HONG KONG
HOUSTON

LONDON
MOSCOW
NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
**WASHINGTON**

November 11, 2020

<u>Via Email</u>

Re:   **CAM/Company Communication Recap (October 1, 2020, RAAS Dashboards Walkthrough)**

This letter provides a recap of the virtual meeting held on October 1, 2020, in which the Company provided a demonstration and overview to CAM and TPA team members of RAAS' efforts (led by             ) to analyze and trend certain HESS metrics—including RAAS HESS audit findings, planned maintenance status, and crew experience and training—and develop dashboards to assist RAAS auditors in focusing their vessel audits on key issues. Over the course of the Monitorship, we have noted the importance of developing strategies to collect, analyze, and use data to support the Company's environmental compliance efforts, and we appreciate the efforts that RAAS has undertaken to use existing technology to leverage the deep bench of data the Company generates and maintains.[1]

As we understand it, RAAS is currently developing three principal interactive dashboards: RAAS HESS Audit Findings Dashboard; Planned Maintenance Dashboard; and Crew Experience & Training Dashboard.

- **RAAS HESS Audit Findings Dashboard:** RAAS has developed a dashboard that tracks all RAAS HESS audit findings fleetwide, which builds upon the basic statistics that RAAS previously managed manually. This dashboard provides greater insight into the different HESS procedure groupings (*e.g.*, ENV, TRG, EMR); audit finding trends year-over-year within each

---

[1] The CAM has previously reported that the Company's non-centralized and differing technological resources has hindered its ability to collect and analyze environmental compliance data across the Company. *See* CAM Third Annual Report at 127-28; *see also* CAM Second Annual Report at 36-39, 82-83, 110; CAM September 2019 Quarterly Report at 82-85; CAM December 2019 Quarterly Report at 75-76; CAM March 2020 Quarterly Report at 120-25.

**BAKER BOTTS** LLP

- 2 -

brand and across brands; and audit finding trends related to every HESS procedure audited (*e.g.*, year-over-year or repeat findings relating to ENV-1204: Environmental Control Systems). As a result, comparisons are limited to those within the same HESS procedure group or category. Within the dashboard itself, RAAS is capable of reviewing severity of findings or even improvements related to the finding over time. The intended benefits of these enhanced reports are: (1) quick identification of problematic procedures before RAAS auditors arrive onboard a vessel; and (2) identification of potential root causes that may be contributing to HESS RAAS audit findings.

- **Planned Maintenance Dashboard:** RAAS has also developed a dashboard that tracks and highlights planned maintenance items, which can be group and analyzed in several ways including by vessel, by department or area, or by length of delay. This dashboard interfaces directly with the brands' and/or operating lines' planned maintenance systems (*i.e.*, or          ), so the updates are real-time and capture planned maintenance jobs that were either postponed or suspended. The goal of this dashboard is to provide RAAS auditors with a focused approach while onboard and assist with the identification of risk areas or potential causes for non-compliance. In addition, the dashboard has a built-in Gantt chart that visually displays planned maintenance items, along with any delay cycles.

  We understand that RAAS is unable to compare trends across certain brands and/or operating lines at this time because there is no globalization of parts and maintenance fleetwide yet. To date, we understand the globalization process has been completed with respect to ECP critical spare parts only. Further, we understand that the globalization process is still underway as part of the Company's ongoing MAST efforts, but other portions of this project have been stayed during the pause in operations resulting in an estimated delay in full implementation of MAST until the Q4 of 2024. Thus, the Company will not be able to fully analyze data across its entire fleet using this dashboard until the MAST globalization process is complete. Had more rapid progress been made on this effort, it appears that it would have been helpful in managing the accumulation of planned maintenance items as the a result of the pause in passenger-carrying activity.

- **Crew Experience & Training Dashboard**: Finally, we understand that RAAS is developing a dashboard that tracks crew experience and competencies. In particular, the dashboard highlights a vessel's manning complement and identifies the relevant department, functional position, class of vessel, crew experience, and crew training. This information is pulled directly from the brands' and/or operating lines' relevant HR systems (*e.g.*,          ). The goal of this dashboard is to overlay the manning complements with RAAS HESS audit findings to identify potential root causes or correlations related to crew experience or competencies. We understand that RAAS is looking to include more details about crew experiences over time, including length of time at a brand; length of time on a given vessel class; and length of time in a particular position. Currently, the dashboard is only able to compare positions within a single brand due to inconsistent HR-related nomenclatures across the brands.

**BAKER BOTTS** LLP

- 3 -

We understand that RAAS is expecting to finalize these dashboards over the next few months with an expectation to deploying them for use with RAAS auditors in Q1 2021. In addition, we understand that RAAS is planning to leverage additional analytical technology to assess free-form text associated with responses to RAAS HESS audit findings, such as root causes and corrective or preventative action plans. The CAM looks forward receiving updates on additional efforts to expand and improve RAAS' dashboards and its overall analytical capabilities.

We remained concerned, however, that there are several disparate efforts underway across the Company to collect, analyze, and report on various HESS metrics that could benefit from enhanced cooperation. In light of this concern, and in an effort to better understand the Company's efforts to leverage RAAS' great work, we would appreciate responses to the following questions:

- How and to what extent does RAAS share its analysis efforts throughout the Company, including within Maritime Operations? Are there any future plans to expand the sharing of these analyses?

- RAAS' dashboards appear to pull information from many of the same databases that we understand are manually accessed to develop          Maritime Operations Monthly Dashboard. Has there been any collaboration efforts between Maritime Operations at ABG or at the operating line level and RAAS to streamline or automate analysis of the same type of data?

- Is RAAS planning to incorporate other metrics into the dashboards, including TPA (during the remainder of probation) or other third-party audit findings, SeaEvent incidents, or IAG investigation findings and/or action items?

- How does the Company envision using these analytical efforts to identify "best practice" that will more "consistently and reliably prevent"[2] HESS audit findings and incidents in the future, such as identifying trends to prevent predicted occurrences of non-compliance? What types of trend analysis of data across brands would help achieve this goal?

- What technologies or other advanced analytics is RAAS considering to better analyze metrics within these current and future dashboards, such as data virtualization to harmonize otherwise non-validated data elements? For example, we currently understand that RAAS is utilizing          to develop the dashboards and envisions using          to deploy the dashboards for use.

As noted above, and as we have previously discussed, the Company's ability to transform its data into actionable information to predict and prevent potential future non-compliance is critical to achieving and maintaining compliance, and consistent with the overriding purpose of the Environmental Compliance Plan. We commend RAAS for their initiative and look forward to

---

[2] *See,* ECP § I.C. & D (" "Purpose" and "Definitions," "Best Practices") (June 3, 2019)

**BAKER BOTTS** LLP

- 4 -

engaging in further discussions with the Company about the further development and implementation of this effort.

Regards,

Steven P. Solow