July 19, 2021

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 16-20897-CR-SEITZ

**UNITED STATES OF AMERICA**

     **v.**

**PRINCESS CRUISE LINES, LTD.,**

       **Defendant.**

_____/

### FOURTH ANNUAL REPORT

### OF THE COURT APPOINTED MONITOR (APRIL 19, 2020 - APRIL 18, 2021)

I.     **PRELIMINARY STATEMENT** .................................................................. 1

II.    **INTRODUCTION** .......................................................................................... 9

  A.    Report Overview ........................................................................................ 9

  B.    CAM Team Methodology and Activities ................................................. 11

  C.    Executive Summary .................................................................................. 13
      1.   CAM Findings:  Progress ................................................................... 13
      2.   CAM Findings:  Remaining Barriers and Opportunities for Improvement ............... 21

III.   **CORPORATE GOVERNANCE AND LEADERSHIP** ............................................. 27

  A.    Potential Post-ECP Goals ........................................................................ 27

  B.    Progress .................................................................................................... 30
      1.   Enhanced Compliance Expertise and Engagement by the Board of Directors .......... 30
      2.   Increased Visibility and Engagement on Compliance Issues by Top Executive Leadership .................................................................... 33
      3.   New General Counsel and Realigned Global Legal Services Group ........................ 35
      4.   Establishment and Continued Support of the Ethics & Compliance Group .............. 36

July 19, 2021

C. Remaining Barriers and Opportunities for Improvement ............................................ 40
    1. Taking Concrete Action to "Walk the Walk" of Compliance .................................... 40
    2. Overcoming Historic Anti-Learning Mindset ........................................................... 42
    3. Improving Coordination and Unification of Compliance Efforts ............................. 44
    4. Empowering Compliance Leaders with Authority to Carry Out Responsibilities ..... 49

IV. **CULTURE** ............................................................................................................................ 51

    A. Potential Post-ECP Goals ............................................................................................. 51

    B. Progress ........................................................................................................................ 53
    1. Commitment to Measuring and Enhancing Compliance Culture .............................. 53
    2. Efforts to Improve and Clarify Culture Change Governance .................................... 54
    3. Culture Action Plan Implementation ........................................................................ 55

    C. Remaining Barriers and Opportunities for Improvement ............................................ 55
    1. Missed Opportunities and Delays ............................................................................. 55
    2. Unresolved Culture Change Governance Concerns ................................................... 56
    3. Establishing Accountability for Top Leadership ....................................................... 58
    4. Self-Assessment and Survey Concerns ..................................................................... 58
    5. Achieving a Just Culture ........................................................................................... 63
    6. Maintaining Support for Crew Welfare, Including Mental Health and Wellbeing .... 64

V. **DIVERSITY, EQUITY, AND INCLUSION** ................................................................. 66

    A. Potential Post-ECP Goals ............................................................................................. 66

    B. Progress ........................................................................................................................ 67
    1. Commitment to Enhancing Shipboard DEI .............................................................. 67
    2. Integrating DEI into the Culture Action Plan and C.A.R.E. Framework ................. 74

    C. Remaining Barriers and Opportunities for Improvement ............................................ 76
    1. Developing a Centralized, Coordinated DEI Strategy ............................................... 76
    2. Establishing Programs to Enhance DEI Among Shipboard Officers ........................ 76

VI. **SUPPORT FOR SHIP OPERATIONS** ........................................................................ 78

    A. Potential Post-ECP Goals ............................................................................................. 78

    B. Progress ........................................................................................................................ 79
    1. Pause Priorities Plan Implementation and Fleet Readiness ...................................... 79
    2. Continued Food Waste Management Progress .......................................................... 82
    3. IT and Data Improvements ....................................................................................... 90
    4. Waste Vendor Assessment Program Improvements ................................................. 93
    5. Establishing a (Limited) Management of Change Procedure ..................................... 99
    6. Efforts to Improve Shore/Ship Communications Governance .................................. 101

July 19, 2021

C.    Remaining Barriers and Opportunities for Improvement .......................................... 102
   1.    Prioritizing Ship Operational and Compliance Needs.............................................. 102
   2.    Exhaust Gas Cleaning System Concerns.................................................................. 105
   3.    Emergent Food Waste Management Issues............................................................... 109
   4.    Slow Progress on IT and Data Projects Critical for Compliance ............................ 111
   5.    Integrating Compliance Considerations into Ship Design ....................................... 115

VII.    **CONTINUOUS IMPROVEMENT (ECP § VI.F.5 Review)** ....................................... 121

A.    Potential Post-ECP Goals.......................................................................................... 121

B.    Progress ...................................................................................................................... 122
   1.    No Repeat of the Underlying Offenses..................................................................... 122
   2.    Commitment to Preserve Compliance Positions and Programs ............................... 123
   3.    Continued Strength of Shipboard and Fleet Environmental Officer Programs........ 124
   4.    Mature Internal Audit Function (ECP § VI.F.4 Review) ......................................... 129
   5.    Internal Investigation Program Improvements ......................................................... 134
   6.    Continued High Levels of Employee Cooperation and Engagement........................ 137

C.    Remaining Barriers and Opportunities for Improvement .......................................... 138
   1.    Achieving a Learning Culture .................................................................................. 138
   2.    Establishing a Fully Independent and Empowered Internal Investigation Program  138
   3.    Developing a Holistic Risk Governance Framework ................................................ 144
   4.    Developing a Holistic Training Governance Framework.......................................... 152
   5.    Achieving a Continuous Learning Feedback Loop .................................................. 157

VIII.    **EVALUATION OF THE EXTERNAL AUDIT FUNCTION (TPA)**..................... 159

A.    Engagement with TPA ............................................................................................... 159

B.    ECP Year Four Audit Activities................................................................................. 159

C.    General Auditor and Audit Report Assessment .......................................................... 160

D.    Support for Continuous Improvement........................................................................ 161

**Appendix A**:  Ethics & Compliance Initiative Highlights
**Appendix B**:  Culture Action Plan Initiative Highlights
**Appendix C**:  Brand and DEI Initiative Highlights
**Appendix D**:  IT and Data Initiative Highlights
**Appendix E**:  Implementation of Investigation Review Recommendations

July 19, 2021

Consistent with the Court's Order of January 29, 2021, the Court Appointed Monitor ("CAM")[1] submits this Annual Report for Year Four of the Environmental Compliance Plan ("ECP")[2] ("CAM Fourth Annual Report" or "Report").  *See* Order Setting Status Conference Dates and CAM and TPA Report Deadlines (Jan. 29, 2021), Dkt. No. 217 ("Scheduling Order of January 29, 2021").  This Report focuses on developments during ECP Year Four:  the period from April 19, 2020 – April 18, 2021.  However, notable developments between April 18 and the date of this Report are included.[3]

## I.  **PRELIMINARY STATEMENT**

For well over a year, Carnival Corporation & plc ("Carnival Corp.") has been a cruise company largely without customers.[4]  During this period, the Company[5] has operated massive

---

[1] The CAM is Steven P. Solow, a partner at the law firm Baker Botts LLP ("Baker Botts").  The CAM retained, among others, Baker Botts and the marine consulting firm Martin & Ottaway as advisors to the CAM (collectively, the "CAM Team").

[2] Any terms not defined in this Report take the definitions provided in the ECP, the Joint Glossary of Terms (Mar. 30, 2018), Dkt. No. 58-1, or past CAM reports.

[3] The CAM provided the Company and the United States ("U.S.") Department of Justice ("DOJ") a copy of this Report in advance of its submission for their review and comment.  *See* Company Response to DRAFT CAM Fourth Annual Report (July 15, 2021) ("Company Draft Report Comments").  The CAM took the comments received into account; however, the comments did not alter the substance of the Report.

[4] Limited passenger cruises in Europe began in late 2020 (before being temporarily suspended by early 2021), and again in March 2021.  *See* CAM January 2021 Quarterly Report at 11-12.  As noted below, the Company is in the process of resuming cruising on a wider scale in the U.S., Caribbean, and Europe.

[5] References to "the Company" refer collectively to all corporate entities under the Carnival Corp. corporate umbrella.  These include **All Brands Group**, the Carnival Corp.-level entity that oversees the Company's Operating Groups and Brands.  **Operating Groups** (sometimes called "Operating Lines" or "Operating Companies") are the four divisions of the Company, each of which operates one or more of the Company's nine **Brands**:  (1) **Carnival Cruise Line**, which operates the Carnival Cruise Line Brand; (2) **Carnival UK**, which operates the Cunard and P&O Cruises UK Brands; (3) **Costa Group**, which operates the AIDA and Costa Crociere ("Costa") Brands; and (4) **Holland America Group**, which operates the Holland America Line, Princess

ships with skeleton crews.  Ships built to hold thousands of guests and crew members have been waiting out the pandemic with crews of a little over one hundred.

At the most recent Status Conference in April, the Court heard from the Third Party Auditor ("TPA")[6] about the efforts of these shipboard crews, supported by shoreside personnel, to maintain ships in a state of readiness to resume guest operations.  The Court sought assurance that, as ships return to U.S. waters, they be capable of operating in compliance with the ECP and terms and conditions of probation.  In a series of Orders, the Court required that the Company certify the status of each ship in the following areas, among others:

o   Operability and condition of pollution prevention equipment.

o   Condition of piping and other ship components.

o   Availability of critical environmental spare parts for pollution prevention equipment.

o   Sufficiency of staffing in the deck (navigational) and technical (engineering) teams.

o   Adequacy of voyage planning support.

o   Adequacy of waste offload support.

o   Status of planned (preventive) maintenance tasks.

*See, e.g.*, Agreed Order on October 16, 2020 Status Conference (Oct. 21, 2021), Dkt. No. 207 ("Compliance Certification Disclosure Order").

The Company provided voluminous information in response to the certification requirements.  The TPA reviewed this information, and, within the limits of remote interviews and document reviews, reported that, on many of the items, the crews "are doing an unbelievable job in the pandemic era, finding ways to fix things and doing it quite well."  Status Conf. Tr. at

---

Cruises, P&O Cruises Australia, and Seabourn Brands.  **This Report generally refers to Operating Groups and Brands collectively as "Brands."**

[6] The TPA is ABSG Consulting Inc., an advisory and technical services provider for the marine and other sectors.

27 (Apr. 30, 2021).  The TPA concluded that "in general" the dozens of ships returning to U.S. waters were "in good working order" and "probably ready to go back into service," provided the ships are adequately staffed and nonconformities identified by the TPA are addressed, including repairs to Exhaust Gas Cleaning Systems.  *Id.* at 31; *see also infra*, Part VI.C.2.  This is a notable achievement given the economic reality of having to reduce crew and shoreside support staff. [7]

As of the date of this Report, in addition to its limited cruise operations in Europe, the Company has announced plans to resume cruising on a broader scale in the U.S., Caribbean, and Europe, "using a gradual, phased-in approach, with sailings announced on 42 ships to date through the end of fiscal year 2021."  *See Carnival Corporation Brands Resume Cruising in US, Caribbean and Europe* (June 23, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-brands-resume-cruising-us-caribbean-and.  On July 5, 2021, the first Carnival Cruise Line ship in almost 16 months sailed from the Port of Miami, Florida, on a cruise including stops in the Caribbean.  Two other Carnival Cruise Line ships have started cruising from the Port of Galveston, Texas.  *See Carnival Breeze Returns To Service From Galveston Today; Third Carnival Cruise Line Ship To Resume Guest Operations* (July 15, 2021), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-breeze-returns-service-galveston-today-third-carnival.  By the end of this month, at least five Carnival Cruise Line ships are expected to resume cruising from ports in Florida, Texas, and Washington.  *See Carnival Cruise Line Returns To Guest Operations From PortMiami, Bolstering Local Economic Impact* (July 4, 2021), https://www.carnivalcorp.com/news-releases/news-release-

---

[7] At the outset of the pandemic, the Company pledged to use the pause period "to ensure that when the ships return to service, they will come back stronger and better equipped" and "stronger, better, smarter."  Given the challenges presented by the pandemic, that was an overly optimistic promise that may never have reflected reality.  *See infra*, Part VI.B.1(b).

July 19, 2021

details/carnival-cruise-line-returns-guest-operations-portmiami.  By October, Carnival Cruise

Line expects to have a total of 15 ships sailing from various U.S. ports.  *See Carnival Cruise*

*Line Makes Plans For Additional Ship Restarts In September And October* (July 19, 2021),

https://www.carnivalcorp.com/news-releases/news-release-details/carnival-cruise-line-makes-
plans-additional-ship-restarts.

As more of the Company's ships resume guest service, a new set of challenges begins.

Even with ships in "good working order," bringing on thousands of passengers and crew

members while maintaining safe and compliant operations will be a complex and multi-layered

endeavor.  As the Company recognizes, "many crew members will be rejoining ships after a

significant time away from the operation.  New medical and public health protocols need to be

learned and mastered, shipboard equipment and systems need to be tested and made ready, and

refresher training for core operations must be completed."  *HMP/01/2021 Guest Operations*

*Return to Service Requirements*.  During this time, the CAM and TPA teams have resumed in-

person ship visits and audits.

Relief at the return to work for many crew members will be overlaid with the recognition

that the past 16-18 months have bought significant loss and lasting trauma.  The cruise industry

was the seeming face of the pandemic in the early part of 2020, and the impacts of COVID-19

persist.  In addition to the sickness and fatalities suffered in those early days, as recently as June

28, 2021, the CAM Team learned of the COVID-19-related death of an engineer who was known

to our team.  As crew members return to ships, the Company will need to be prepared to address

the potential impacts of trauma on individuals, as well as on ship culture and operations.

When this Report is provided to the Court, fewer than nine months will remain in the

term of probation.  The Company today is, in many respects, a different company than the one

July 19, 2021

sentenced by the Court in April 2017.  It is different in ways that had not been required or

contemplated by the ECP or by the original terms and conditions of probation.[8]  These changes,

detailed throughout this Report, include:

- o  Developing a new Corporate Vision Statement and a set of coordinated Brand core values that, for the first time, articulated a corporate-wide emphasis on "compliance, environmental protection," and "health, safety and well-being" as being as important as, and the "foundation" for, the well-established goals of delivering "unmatched joyful vacations for our guests" and "outstanding shareholder value."[9]

- o  Increasing the level of visibility and engagement on compliance issues by the Board of Directors[10] and top executive leadership.[11]

- o  Hiring a new member of the Carnival Corp. Board of Directors with significant compliance experience.

- o  Establishing a Compliance Committee of the Board of Directors, in addition to the existing Audit Committee, Health, Environment, Safety & Security ("HESS") Committee, Compensation Committee, and Nominating & Governance Committee, as well as retaining independent outside counsel to advise the Compliance Committee, independent of management.

---

[8] Some of the changes noted below were required by the agreement resolving the probation revocation petition.  *See Proposed Agreement for the Court's Consideration Resolving Superseding Petition for Summons for Offender Under Supervision Dated April, 26, 2019* (June 3, 2019), Dkt. No. 134  ("Probation Revocation Agreement").

[9] *See, e.g.*, *Carnival Corporation – Vision Statement* ("Corporate Vision Statement"), https://www.carnivalcorp.com/corporate-information/mission-and-history.

[10] Carnival Corp. is a dual-listed entity on the New York and London stock exchanges.  It consists of Carnival Corporation, incorporated in Panama in 1972, and Carnival plc, incorporated in England and Wales in 2000.  The two companies operate as a single economic enterprise with a single executive management team and identical Boards of Directors.  *See* CAM Third Annual Report at 17, n.20.  This Report refers to the Boards of Directors in the singular as the "Board of Directors."

[11] "Top executive leadership" in this Report generally refers to the Carnival Corp. President and Chief Executive Officer ("CEO"), Brand Presidents/CEOs, and other C-Suite level executives at All Brands Group and the individual Brands.  "Top leadership" generally refers to top executive leadership as well as the Board of Directors.  "Senior management" generally refers to personnel at the Director level and above.

July 19, 2021

o   Ongoing efforts by the Board to establish a means for holding senior executives accountable for meeting compliance goals, including through potential use of performance-based compensation.

o   Ongoing efforts by the Board to set clear expectations and concrete goals for culture change efforts, aimed at addressing the shortcomings identified in the environmental compliance culture assessment, based on a survey of more than 70,000 Company employees (a response rate of approximately 75%).  *See* Environmental Compliance Culture Assessment of Carnival Corporation 2018/2019 (Aug. 28, 2019) ("Environmental Compliance Culture Assessment").

o   Creating the Chief Ethics & Compliance Officer position, reporting directly to the Carnival Corp. CEO and to the Audit, HESS, and Compliance Committees of the Board of Directors.

o   Growing the Ethics & Compliance organization under the Chief Ethics & Compliance Officer to over 60 positions across All Brands Group and the individual Brands, and largely preserving staffing and resources for the organization throughout the pandemic, despite major cutbacks across the corporation.

o   Appointing a new Chief Operations Officer (a position that was previously eliminated in December 2016 after the individual in that role took another position in the Company), who reports directly to the Carnival Corp. CEO and has "oversight of major operational functions, including global maritime, global ports and destinations, global sourcing, global [information technology ('IT')] and global auditing."  CAM Third Annual Report at 50 (quoting Company press release).

o   Appointing a new General Counsel who has stated a commitment:  to "act as the conscience to our business leaders;" to help "lead in our efforts to continuously improve on compliance and environmental protection;" and to reshape the legal function into one capable of providing legal counsel in support of these goals for a global organization.  *See* Status Conf. Tr. at 14-16 (Apr. 30, 2021).

o   Recognizing the role that a diverse, equitable, and inclusive workforce plays in creating a sustainable culture of compliance and in effectively managing risk.  Should the Company follow up on this recognition with meaningful concrete actions, it would represent historic changes for the cruise and broader maritime industry.[12]

o   Ongoing progress toward meeting food waste and single-use plastic reduction goals.

---

[12] According to the Company's definitions:  diversity includes "the representation of a range of backgrounds, traits, and experiences in a company's workforce;" equity includes "the fair treatment, access, opportunity, and advancement for all people;" and inclusion includes "creating an environment of involvement, respect, participation and connection."  *See* Carnival Corporation Diversity, Equity, and Inclusion – Scope and Strategy (Jan. 7, 2021), PCL_ECP00178135-47 ("DEI Presentation") at PCL_ECP0017838.

July 19, 2021

o   Ongoing progress toward equipping ships with technologies designed to eliminate or minimize the risk of discharging plastics and other contaminants in food waste.

o   Ongoing efforts to develop IT and data tools to support compliance efforts.

o   Ongoing efforts to support the continued development of the already impressive, cross-brand corps of Environmental Officers beyond ECP requirements.  This includes:

   ▪   Creating a Fleet Environmental Officer program, modeled on the Company's various "Fleet" programs in which experienced Captains, Chief Engineers, and Human Resources ("HR") Managers travel among the ships to provide advice, counsel, and support to their shipboard counterparts.

   ▪   Given that the Environmental Officer role does not fit neatly within any of the traditional "deck," "engine," or "hotel" divisions on cruise ships, the Fleet Environmental Officer program provides both support and mentorship to shipboard officers, as well as a potential career path option for Environmental Officers.

o   Creating a new internal investigation group, called the Incident Analysis Group, reporting directly to the Chief Ethics & Compliance Officer, in response to what the Company acknowledges are longstanding shortcomings in its internal investigation program.

o   Recognizing the need for more holistic approaches in certain critical compliance areas, including risk management and training, and beginning to explore possible governance frameworks in these areas.

At the same time, the Company, as it readily admits, still has a long way to go.  *See, e.g.,* Status Conf. Tr. at 11 (Apr. 30, 2021) (statement by Carnival Corp. CEO to Court that "we have worked really hard, but . . . we have a ways to go").  In this context, since the start of probation, Company employees, ship and shore, have expressed their needs, concerns, and frustrations to the CAM and TPA teams, as well as through the more than 70,000 responses to the environmental compliance culture survey.  They have described concerns about whether there will be continuing support and resources for compliance efforts and programs, such as Environmental Officers; they have spoken about the challenge of facing issues of race and gender discrimination which have a long history in the maritime world, exacerbated by being

within the confines of a ship at sea; they have expressed frustrations about the lack of modern IT and data tools, and the costs imposed on even the lowest-paid crew members to access the internet in order to stay in touch with families over the course of months at sea; they have raised concerns about the durability of the Company's commitment to long-term culture change; and they have shared their sense that the Company does not prioritize meeting the operational and compliance needs of the ships to the same extent as achieving other business goals (such as delivering a great guest experience and outstanding shareholder returns). The CAM and the TPA have synthesized those observations into more than 1,000 pages of prior CAM and TPA reports. More than any other input, these reports reflect the extraordinarily open approach of the Company's employees to the monitorship, and both the CAM and TPA teams are deeply appreciative of the trust in our efforts shown by these individuals.

As the CAM and TPA reports make clear, the Company's top leadership began the period of probation with a marked and unhelpful tendency to take a defensive stance, seeking to minimize or deflect such issues—prompting the Court to remind the Company at one point that it "is a criminal . . . a recidivist criminal." Status Conf. Tr. at 4 (Apr. 10, 2019). These behaviors reflect the types of "organizational defensive routines" that are not uncommon when leaders are faced with issues that are complex, embarrassing, or threatening. *See* C. Argyris, OVERCOMING ORGANIZATIONAL DEFENSES: FACILITATING ORGANIZATIONAL LEARNING (1990) at 25. Unfortunately, these attitudes hindered the Company's progress in the early years of probation. Much of the progress described above occurred only after the Company faced the revocation of its probation in March 2019.

Now, with increasing frequency across the Company, many top leaders have indicated that they hear what employees have been saying, and are willing to recognize and confront their

own past shortfalls and missteps in providing compliance support to the ships.  In moving away from earlier misguided efforts to try to hide or minimize flaws (such as attempts to "ace" TPA audits through undisclosed ship visit programs that resulted in two probation violations), many top leaders have come to accept that these issues present an opportunity for them to lead the Company towards a culture of trust, care, and openness—an essential foundation for a sustainable compliance culture.[13]

During these final months of probation, the CAM, at the Court's direction and consistent with the ECP, will focus on the Company's capabilities for developing and maintaining a sustainable compliance program and culture.  *See* ECP § VI.F.5.  The restart of guest operations, and the impending end of probation, provides an opportunity for the Company's top leadership to pivot from a focus on the ECP and external oversight to a focus on leading change in both corporate governance and corporate culture to support compliance—and, consequently, the freedom to operate—far beyond the probationary period.

## II.    INTRODUCTION

### A.    Report Overview

Part I of this Report opened with the CAM's preliminary statement.  Part II includes an overview of the CAM Team's methodology and activities during ECP Year Four, as well as an Executive Summary of the CAM's ECP Year Four findings, both as to progress and as to barriers and opportunities for improvement.  Parts III-VII assess the Company's "capabilities to meet the objectives of [the] ECP" in areas of focus identified by the Court and the CAM.  *See*

---

[13] Despite these positive steps, employees across the Company still report in confidence that they are at times criticized or questioned for being "too open with the CAM team."  *See* Employee Interview/Call Notes.  These reports, though few in number, continue to raise concerns about the long-term commitment of top leadership.

ECP § VI.F.3(b).[14]  Finally, Part VIII assesses the external audit function performed by the TPA, as required by the ECP.  *See* ECP §§ VI.F.1-3.

The format and structure of this Report differ from earlier CAM reports, in an effort to provide more holistic assessments of the Company's compliance efforts.  As directed by the ECP, the CAM's focus during ECP Years Four and Five is increasingly forward-looking, analyzing not only the Company's past and current compliance performance, but also its capabilities for "a continual improvement process" after probation ends.  *See* ECP § VI.F.5.  To that end, Parts III-VII below have the following three-part structure:

o   Part A:  Summarizes the CAM's understanding of the Company's post-ECP ***goals for itself*** in the relevant area.

> The goals detailed in this Report were compiled by the CAM as of result of its communications with top leaders and senior management.  However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization."  *See* Company Draft Report Comments.  The Company further stated that it "has not yet[] issued a 'Post ECP-Vision statement,' that has been reviewed or subjected to commentary from employees, management or the board or formally adopted."  *Id.*  That said, the Company is taking steps toward realizing many of the goals—some of which involve considerable expenditures of time and resources.

o   Part B:  Summarizes the CAM's findings of the Company's ***progress*** toward achieving these goals.

o   Part C:  Summarizes the CAM's findings of ***remaining barriers and opportunities for improvement*** toward achieving these goals.

This Report assumes familiarity with the background of this matter, as well as the developments discussed in earlier CAM reports, the most recent of which was submitted on January 20, 2021.  For a detailed overview of the case background, including the Company's

---

[14] ECP citations in this Report are to the second amended version that went into effect on June 3, 2019, unless otherwise noted.

corporate history and organization, refer to the CAM Third Annual Report.  *See* CAM Third

Annual Report at 15-25.

B.     **CAM Team Methodology and Activities**

As described in the most recent CAM report, in light of the extraordinary circumstances

brought on by the COVID-19 pandemic, the CAM and the Company, with the Court's approval,

agreed to modify the process for CAM reporting and for CAM and TPA visits and audits.  These

changes included shifting to a program of remote visits and audits beginning in March 2020, as

well as foregoing two CAM Quarterly Reports (for September 2020 and April 2021) and instead

engaging in more frequent calls, interviews, workshops, presentations, and other discussions and

exchanges, both formal and informal.  *See* CAM January 2021 Quarterly Report at 6-8;

Scheduling Order of January 29, 2021.  In the CAM's view, this has continued to be a mutually

productive process, despite the challenging conditions, with high levels of cooperation and

engagement from Company employees, ship and shore.  The CAM remains deeply appreciative

of the efforts of the many dedicated individuals involved in supporting CAM Team visits,

workshops, document requests, and other activities—with special thanks to the Environmental

Corporate Compliance Manager and the rest of the Ethics & Compliance team, as well as the

Environmental Officers.

In accord with the Court's Order of June 2, 2020, the CAM Team conducted the

following remote ship and shoreside visits during ECP Year Four, relying primarily on electronic

document review and videoconferencing.  *See* ORDER RE:  COVID-19 Impacts and Probation

Obligations (June 2, 2020), Dkt. No. 189:

July 19, 2021

o   15 virtual ship visits, including one accompanying the TPA and one accompanying the Company's internal Risk Advisory and Assurance Services ("RAAS") auditors.[15]

o   5 virtual shoreside office visits, including one accompanying the TPA and one accompanying RAAS.

Overall, as in prior years, these visits ran smoothly, with good cooperation from both ship crews and shoreside personnel, including IT and administrative support staff.  As discussed in the last CAM report, remote visits carry inherent limitations compared to in-person visits. Remote ship visits do not provide the same opportunity for in-person inspections or observations of equipment, spaces, and processes (such as food waste separation or the operation of pollution prevention equipment).  Remote ship and shore visits alike also must proceed in a more formal fashion because interactions are scheduled in advance.  As a result, there are no informal, organic interactions.[16]  Notwithstanding these limitations, the virtual visits provided the CAM Team with valuable insights into ECP areas of focus, including support for, and barriers to, a sustainable compliance culture.  *See* CAM January 2021 Quarterly Report at 7-8.

In June 2021, the CAM and TPA, with the Court's approval and working in close coordination with the Company, resumed in-person visits and audits.  From June 13-16, 2021, the TPA, accompanied by the CAM Team, performed its first in-person audit of a Covered Vessel since the start of the pandemic.  From June 28-30, 2021, the CAM Team performed its

---

[15] A detailed overview of the RAAS function is provided in Part VII below.  *See infra*, Part VII.B.4.

[16] The nature of videoconferencing software can also increase the difficulty associated with interviewing individuals who do not speak English as their first language.  The CAM Team has experimented with using a remote interpreter service for certain interviews (in particular, with non-officer crew members known as "ratings"), with generally positive results.  This is one area where virtual visits provide an opportunity not available during in-person visits.

July 19, 2021

first in-person visit of a Covered Vessel.  The CAM and TPA will work with the Company to schedule additional in-person visits and audits.[17]

In addition to the activities discussed above, the CAM Team has continued both to perform an ongoing review of documents produced by the Company and to receive confidential communications.  The CAM Team also remains in regular communication with the TPA and the Interested Parties,[18] including DOJ and the Office of Probation, and reports to the Interested Parties and the Court as required by the Court and the ECP.

In ECP Year Five, the CAM will issue the following reports:  (1) the CAM Fifth Annual Report, to be submitted to the Court by January 19, 2022; and (2) a final CAM Closing Letter, to be submitted to the Court by April 11, 2022.  The term of probation will end on April 18, 2022.[19] *See* Scheduling Order of January 29, 2021.

### C.      Executive Summary

#### 1.      *CAM FINDINGS:  PROGRESS*

The CAM's findings related to the Company's progress are:

- **Corporate Governance and Leadership**

    1) **Enhanced Compliance Expertise and Engagement by the Board of Directors:**
       Since the resolution of the probation revocation proceedings in June 2019, the
       Board of Directors has taken significant steps to enhance its knowledge and

---

[17] In accord with Court's Order of June 8, 2021, to "assist in this return to in-person visits and audits," the CAM and TPA teams have discretion to schedule some or all in-person visits and audits as "announced," with advanced notice to the Company, in lieu of the "unannounced" visits and audits previously ordered by the Court.  *See* Order on July 28, 2021 Status Conference (June 8, 2021), Dkt. No. 223 at 2-3.

[18] The Interested Parties are "[t]he Government, the United States Probation Office for the Southern District of Florida, the Seventh Coast Guard District (dp), and the U.S. Coast Guard Office of Investigations & Analysis."  ECP at § I.D.

[19] Under Title 18 of the U.S. Code, the term of probation cannot be extended beyond the five-year period that will end on April 18, 2022.  *See* 18 U.S.C. § 3564(d) (probation term may not be extended beyond maximum authorized term); *see also id.* at § 3561(c)(1) (maximum authorized term of probation for a felony conviction is five years).

engagement on issues related to its compliance oversight duties. These steps included: hiring a new Board member with significant compliance experience; forming a new Compliance Committee of the Board with its own outside counsel; and participating in a series of compliance training sessions. The Board has also agreed to take on responsibility for setting clear expectations and concrete goals for senior executives on culture change, which remain in progress. Perhaps most importantly, the Board has announced that it will establish a means to set concrete compliance goals for senior executives, and to hold them accountable for meeting those goals, including through performance-based compensation.

2) **Increased Visibility and Engagement on Compliance Issues by Top Executive Leadership:** Similarly, the Company's top executive leadership at both the All Brands Group and individual Brand levels has significantly increased its visibility and engagement on compliance issues since the resolution of the probation revocation proceedings. This includes frequent and consistent messaging, both within and outside the Company, on the importance of compliance, environmental protection, and health, safety, and well-being as the Company's highest responsibilities and top priorities. Observable behavior and concrete actions by top leadership in support of this new messaging is necessary if compliance and environmental protection are to join the long-standing priorities of great guest experience and breakthrough shareholder returns.

In addition, throughout the pause, many senior leaders, including Brand Presidents and top Carnival Corp. executives, have made unprecedented efforts to engage directly with crew members on the ships, including through virtual town hall-style sessions, video updates, and in-person ship visits. Across the Brands, these contacts have been seen as welcome engagement, especially from deck and technical personnel, who have often complained that the focus of management is too often skewed towards the guest-facing side of the business. The Company's top executive leadership has also agreed to take on responsibility for leading culture change efforts, setting culture strategy, and being held accountable for delivering results. These efforts remain in progress.

3) **New General Counsel and Realigned Global Legal Services Group:** In March 2021, the Company appointed a new General Counsel of Carnival Corp. The individual assuming this position has stated a commitment to act as the "conscience" to senior management, and to work with Ethics & Compliance, RAAS, and other departments to improve the Company's compliance and continuous improvement efforts. The new General Counsel has also committed to revamping the legal function so that it has the structures and resources needed to provide legal counsel in support of these goals. As the Company's employees have observed, the legal organization has historically been both under-staffed and insufficiently integrated with other departments and across the Brands. Realignment efforts are underway. For example, each Brand's general counsel or legal lead now reports directly to the Carnival Corp. General Counsel, in addition to their current Brand business leaders. New in-house positions have also been

created for a Global Maritime Counsel (filled) and Global Compliance Counsel (recruitment underway).

4) **Establishment and Continued Support of the Ethics & Compliance Group:** In the Probation Revocation Agreement accepted by the Court, the Company agreed to create the new position of Chief Ethics & Compliance Officer, reporting directly to the Carnival Corp. CEO and the Board of Directors.  The individual serving in this role took office in August 2019.  In establishing this C-Suite level position, the Company placed compliance on equal footing as operations, at least structurally, for the first time.  The Company has since grown the Ethics & Compliance group to over 60 positions across All Brands Group and the individual Brands.  Throughout the pandemic, the Company has continued to provide support and resources for the Ethics & Compliance group, despite massive reductions in personnel and resources across the corporation.  In the less than two years since the Ethics & Compliance group was established—most of it over the most challenging period in the Company's history—substantial progress has been made in many areas, as highlighted throughout this Report.

- **Culture**

5) **Commitment to Measuring and Enhancing Compliance Culture:**  As detailed in earlier CAM reports, the Company supported the efforts of the CAM and the CAM's maritime culture expert to conduct a first-of-its-kind environmental compliance culture assessment based on a survey of more than 70,000 ship and shoreside Company employees.  The results, finalized in August 2019, revealed opportunities for improving the Company's compliance culture, especially in the areas of trust, care, and openness.  To its credit, the Company's top leadership accepted these results, and directed the Ethics & Compliance team to prepare a plan to address the findings.  The Chief Ethics & Compliance Officer retained an outside consultant to support this effort.  As an initial step, the consultant worked with the Company to craft a new Corporate Vision Statement.  The consultant also worked with the Company on developing a Culture Action Plan.  Despite missed opportunities and delays, the plan has been finalized and is now being implemented.

As planned, the CAM's retained culture expert will administer a second survey before the end of the period of probation in order to assess the Company's progress in supporting a sustainable compliance culture.

6) **Efforts to Improve and Clarify Culture Change Governance:**  Recognizing the need for better coordination and consistency over its culture change efforts, the Company finalized a culture governance framework in January 2021.  Under this framework, the Company's top executive leadership has agreed to take on ownership and accountability over culture change efforts.  Importantly, the framework also recognizes diversity, equity, and inclusion ("DEI") as central to broader culture improvement efforts.  The framework has not yet been fully

implemented, as efforts by the Board to set clear expectations and concrete goals, and by top executive leadership to set culture strategy, remain in progress.

7) **Culture Action Plan Implementation:**  In August 2020, the Company produced a final Culture Action Plan in response to the findings of the Environmental Compliance Culture Assessment.  The plan identifies a range of activities, from awareness campaigns to training programs to crew wellness initiatives, many of which are underway.  The CAM continues to recognize the hard work and dedication of the personnel working to improve culture and implement the Culture Action Plan.  These efforts continue to be led primarily by the Brands, working in coordination with All Brands Group.

- **Diversity, Equity, and Inclusion**

8) **Commitment to Enhancing Shipboard DEI:**  The Company has acknowledged that it has an opportunity to become an industry leader in addressing the historic racial, ethnic, and gender disparities in shipboard officer positions which characterize the maritime industry as a whole.  The Company's top leaders, including the Carnival Corp. CEO, have repeatedly stated a commitment to DEI in both internal and external communications.  However, clear expectations and accountabilities have yet to be established by top leadership.  As the Company returns to service, it has an opportunity to focus on DEI as a meaningful way to better manage risk and compliance—in addition to being a moral, legal, and business imperative.

9) **Integrating DEI into the Culture Action Plan and C.A.R.E. Framework:**  As noted above, the Company has incorporated DEI as a central pillar of its culture governance framework.  DEI activities that have been carried out or are underway under the Culture Action Plan include:  integrating DEI factors into the selection criteria developed by the Brands for making re-hire decisions for ship and shore employees as operations resume; integrating DEI factors into other aspects of the HR lifecycle, such as job applications and performance evaluations; and launching a program of Brand-led "Courageous Conversations" about culture and DEI issues.  In addition, the Company has developed a "C.A.R.E. Framework," which is designed to require the systematic consideration of DEI or culture impacts when making business decisions, and for those decisions to be re-evaluated if there are unintended DEI or culture impacts.  It remains unclear, however, what impact the C.A.R.E. Framework is having in practice.  While the CAM has heard the strongly stated commitment to DEI expressed by many Brand leaders involved in developing and implementing the Culture Action Plan and C.A.R.E. Framework, these individuals appear to operate in the absence of clear vision or direction from the All Brands Group.

- **Support for Ship Operations**

10) **Pause Priorities Plan Implementation and Fleet Readiness:**  After the onset of the pandemic, the Company developed a "Pause Priorities Plan," described as "a

list of priorities" during the pause period "to ensure that when the ships return to service, they will come back stronger and better equipped" and "stronger, better, smarter." *See infra*, Part VI.B.1.  The Pause Priorities Plan sets forth a range of initiatives under four categories:  (1) Environmental; (2) Investigations; (3) Culture; and (4) Training.  Numerous actions have been implemented, or are underway, under this plan that are designed to help support ship operations, including equipment installations and repairs.  As directed by the Court, the Company submitted to the Interested Parties a series of certifications for ships returning to U.S. waters summarizing the status of 12 specific items from the Pause Priorities Plan.  The TPA's review of these certifications indicated that the ships returning to U.S. waters are generally capable of operating in compliance with the ECP and environmental laws, provided the ships are adequately staffed and nonconformities identified by the TPA are addressed, including repairs to Exhaust Gas Cleaning Systems.  Meeting its obligations under the Court Orders was a significant achievement—especially for the shipboard crews, who the TPA found were doing "an unbelievable" and "amazing" job.  *See id.*  Whether the ships are coming back "stronger, better, smarter" as originally promised by the Company's top leadership, however, is difficult to assess.

11) **Continued Food Waste Management Progress:**  The Company continues to make tangible progress on improving its shipboard food waste management.  This includes remaining on track to meet or exceed its Probation Revocation Agreement commitments to:  (1) reduce the purchase and consumption of single-use plastic items on its ships by 50% by December 31, 2021; (2) reduce the total weight of food waste generated on its ships by 10% by December 31, 2021; and (3) commit a minimum of $20 million in capital expenditures throughout the remainder of probation to optimize food waste management, which the Company has elected to do primarily through purchasing and installing food waste digesters on the majority of its ships.  As discussed below, however, recent concerns have emerged related to certain aspects of food waste management processes, including food waste weighing practices and digester operations.  Active investigations and reviews into these issues are underway.

12) **IT and Data Improvements:**  Recognizing its need for more centralized, modern, and data-driven strategies, the Company is continuing to move towards implementing a global, corporate-wide IT strategy.  The Company also continues to make efforts to develop and implement IT and data tools designed to help improve both operations and compliance.  Although progress on these efforts has generally been slow, some significant progress on certain efforts was made during ECP Year Four, including the development of dashboards that can provide analytics related to various operational and compliance issues.  The Company also recently approved additional resources to complete the development of its Marine Assets Strategy Transformation ("MAST") initiative a year ahead of the original pre-pandemic schedule.  This project is designed to result in a single corporate-wide system for managing planned maintenance tasks and spare parts.

13) **Waste Vendor Assessment Program Improvements:**  In March 2020, the Company launched a revised, corporate-wide waste vendor assessment program, prompted by multiple RAAS and TPA audit findings that the Company was not assessing third-party waste vendors as required by its internal procedures—and contrary to assurances in its public Sustainability Reports.  In ECP Year Three, the CAM observed that the Company's updated program improved upon its previous practice, but that it may be akin to the "check-the-box" approach that DOJ has cautioned against.  In ECP Year Four, the Company made some meaningful strides with its waste vendor assessment program.  These include revising its internal procedures to clarify, among other changes, the criteria for determining if a vendor should be suggested for a site visit, as well as the criteria for prioritizing site visits to the highest-risk vendors.  Ongoing opportunities for improvement include:  developing procedures for conducting, assessing, and documenting site visits; establishing protocols for performing negative media review searches of vendors that are designed to capture a wider range of potential hits; establishing a formal process for shipboard personnel to identify and report issues or concerns with waste vendors; and establishing a formal process for shoreside personnel to track or follow-up on such reports.

14) **Establishing a (Limited) Management of Change Procedure:**  Throughout the period of probation, crew members from across the Company have reported concerns to the CAM Team about the additional workload and demands associated with new Company procedures and initiatives.  Unlike many other large organizations, Carnival Corp. has historically lacked a formal "Management of Change" process to evaluate and manage the potential impacts of such changes.  The Company has recognized this shortcoming, and, in January 2021, published a corporate-wide Management of Change procedure, which became effective on April 30, 2021.  The current procedure, however, is narrowly scoped, limited to "technical installation projects" on ships that result in "permanent system changes."  *See infra*, Part VI.B.5.  Employees have raised concerns to the CAM Team about the program's limited scope, as well as the lack of coordination and guidance from All Brands Group on implementing the program.  The Company reports that it "intends to expand the scope over time," but the Company has not provided a timetable for doing so.  Company Draft Report Comments.  A fully integrated Management of Change process—one that permeates all aspects of the Company's actions and is applied consistently throughout the organization— would help address concerns about workloads and competing priorities, and also help with efforts to enhance management accountability, as it would require an assessment of how changes in processes, materials, budgets, and staffing impact a range of pre-existing obligations.

15) **Efforts to Improve Shore/Ship Communications Governance:**  Since the start of probation, officers and other crew members have shared frustration to the CAM Team over the massive volume of communication that flows largely uncontrolled from shoreside offices to the ships.  At the same time, shipboard personnel report that their communications to shoreside often go unacknowledged and unaddressed.  The Company's internal RAAS auditors have identified similar

July 19, 2021

issues.  The Company has recognized the need to address these communication flow problems, which are not unique to the Company or the cruise industry.  A working group has been established to develop a strategy for improving shore-to-ship communications, building upon the prior work by RAAS.  This effort remains in progress.

- **Continuous Improvement**

16) **No Repeat of the Underlying Offenses:**  As in prior years, the CAM is not aware of any evidence of a recurrence on any of the Company's Covered Vessels of the same criminal conduct that occurred on the *Caribbean Princess*.  However, violations of environmental laws and the ECP persist.  These include:  prohibited discharges and emissions; inoperable pollution prevention equipment; and recordkeeping errors, including potential intentional falsifications.  ECP Year Four also saw notable upticks in incidents related to voyage planning and execution and Exhaust Gas Cleaning System discharges.  The CAM has always emphasized, both in conversations with Company personnel and in earlier CAM reports, that it would be unreasonable to ever expect zero violations in the course of normal operations.  Mistakes and mishaps will occur.  The central question is: how does the Company learn from them to minimize their future occurrence and continuously improve compliance efforts?

17) **Commitment to Preserve Compliance Positions and Programs:**  The Company's top leadership has publicly pledged to preserve resources and support for positions and programs set up during the probationary period to support environmental compliance, such as the Chief Ethics & Compliance Officer, Environmental Corporate Compliance Manager, shipboard and Fleet Environmental Officers, Incident Analysis Group, and broader Ethics & Compliance organization.  Over the course of probation, Company employees at various levels (primarily at senior management and top leadership levels) have increasingly expressed to the CAM Team that they do not view April 18, 2022, as an end date to the Company's compliance and continuous improvement efforts.  At the same time, employees (at middle and lower management levels and among shipboard officers and crew) continue to express concerns to the CAM Team about management backsliding after probation ends.  Such concerns are more pronounced among employees who were present for the conclusion of the Company's prior ECP in August 2006—when the criminal activity underlying the current conviction had begun, even before the prior ECP had ended.  There is no question that the Company has a far more robust compliance program in place now than it did at the end of the prior ECP.  Upholding the commitment to preserve resources and support for this program will be critical for guarding against the backsliding that could result in future threats to the Company's freedom to operate.

18) **Continued Strength of Shipboard and Fleet Environmental Officer Program:**  The development and continued support of a strong, cross-brand Environmental Officer program continues to be one of the Company's most significant

achievements over the course of the monitorship.  Notable developments in ECP Year Four include the formal launch of the Fleet Environmental Officer program, as well as ongoing efforts to establish a more defined and formalized career path for Environmental Officers.  The CAM Team continues to be impressed by the talent and dedication of the Environmental Officers met through ship and shoreside visits (virtual and in-person).  As noted above, continued support and resources for the shipboard and Fleet Environmental Officer programs, and for the Environmental Corporate Compliance Manager who oversees these programs, will be critical for the Company's continuous improvement efforts after probation ends.

Despite the many bright spots in the program, shipboard Environmental Officers have increasingly expressed concerns to the CAM Team about the potential expansion of their role to include acting as part-time investigators on the ships, which may cause them to be viewed as "police officers" by other crew members, rather than as trusted compliance counselors.  The Company has responded that these concerns are "a misunderstanding from [its] [Environmental Officers] attending the investigation training course."  Company Draft Report Comments.  The Company further reports that, since becoming aware of these concerns, the Environmental Corporate Compliance Manager "has personally assured" Environmental Officers "that they will not become the [ships'] HESS investigators."  *Id*.  The Company is also revising its internal procedures "to make it clear that [Environmental Officers] can support Environmental investigations" as needed, but "they won't be in charge to lead them."  *Id.*

19) **Mature Internal Audit Function:**  As in prior years, the CAM continues to find that the Company has a mature internal audit function, housed within the independent RAAS department.  The internal audit program is generally strong, with clear audit protocols and auditors who generally appear knowledgeable, professional, and qualified.  In ECP Year Five, the CAM's primary focus will be on RAAS's capabilities to further integrate with the investigation, operations, risk, training, and broader Ethics & Compliance functions to support continuous improvement beyond the ECP.  This function will be critically important to continuous improvement after the Company exits probation, and the support of the Company's top leadership for this function is essential to compliance.

20) **Internal Investigation Improvements:**  The Company accepts that it historically has had a weak internal HESS investigation program.  As detailed in earlier CAM reports, the Company's efforts to revamp the program were subject to repeated delays and detours.  In March 2019, the Company launched a new group, called the Incident Analysis Group, to lead the Company's internal HESS investigations.  In September 2020, the Company appointed a new Head of the Incident Analysis Group after the group was failing to make expected progress, including meeting stated expectations and commitments.  Under the leadership of the new Head, the Incident Analysis Group has made some important progress in ECP Year Four, including:  hiring additional investigators and support staff; delivering new trainings on investigation techniques and report-writing; working to create a more

diverse corps of investigators; finalizing a new investigation manual; and ongoing efforts to revise internal procedures on conducting investigations and continuous improvement and lessons learned processes. The CAM recognizes the hard work, dedication, and commitment of the Incident Analysis Group team. These efforts are essential for establishing the basic building blocks of an effective internal investigation program. However, these efforts will fall short without express commitment and support from the Company's top leadership for the independence and authority of the Incident Analysis Group.

21) **Continued High Levels of Employee Cooperation and Engagement:** As in prior years, the CAM Team has continued to encounter impressive levels of cooperation, engagement, and support from Company employees, ship and shore, in both formal and informal interactions. One of the most important things the Company can do to guard against risks of future noncompliance is to ensure employees at all levels have the support they need to both succeed in their jobs and to be unafraid to speak up when something does not seem right or could be improved. This support is not limited to training and equipment, but also includes compensation, mental and physical well-being and safety, and access to mentorship and career growth opportunities. The Company's pool of dedicated and talented employees stand ready to help it succeed—and lead—in the area of compliance the same way it has in other business areas.

   2. *CAM FINDINGS:  REMAINING BARRIERS AND OPPORTUNITIES FOR IMPROVEMENT*

The CAM's findings related to the Company's remaining barriers and opportunities for improvement are:

- **Corporate Governance and Leadership**

   1) **Taking Concrete Action to "Walk the Walk" of Compliance:** The Company's employees continue to express concerns to the CAM Team that top leadership has sent mixed messages by "talking the talk" of compliance, without taking sufficient concrete steps to "walk the walk"—*i.e.*, taking meaningful actions that translate to direct support for the ships even when expenditure of resources is required. Effective compliance leadership requires that rhetoric on compliance be matched with taking on ownership and accountability for compliance efforts. As the Company emerges from the pandemic, and as the period of probation draws to an end, there is an opportunity for top leadership to continue to move beyond messaging, and to shift from a focus on external oversight to a focus on asking: How can I make compliance easier? What do people on ships need to support compliance in a direct way? What concrete actions did I take today, and what will I do tomorrow and each day after to own and be accountable for meeting those needs?

   2) **Overcoming Historic Anti-Learning Mindset:** The CAM has observed that the Company's top leadership had a longstanding tendency to resort to techniques

July 19, 2021

that deflect or minimize negative or uncomfortable information, rather than embrace a learning culture approach to such information.  Increasingly, however, there are signs that this mindset has shifted.  As noted above, leaders at the Board and top executive leadership levels have significantly increased their visibility and engagement on compliance issues during ECP Year Four.  The new Board member appears to be driving more sophisticated awareness of and approaches to compliance issues at the highest levels.  Other leaders in new or newly filled positions at All Brands Group, including the Chief Ethics & Compliance Officer, Chief Operations Officer, and new General Counsel, also demonstrate what appears to be a genuine commitment to helping lead a mindset shift that starts at the very top.

3) **Improving Coordination and Unification of Compliance Efforts:**  Past CAM reports have found that the Company's generally decentralized operations are a barrier to compliance.  Despite the creation of an All Brands Group-based Ethics & Compliance group, there remains an engrained view in favor of decentralized approaches, which has resulted in delayed, uncoordinated, and ineffective solutions to some of the Company's most serious and long-standing compliance challenges.  This balkanized approach has also led to a lack of clarity among employees as to authority, responsibility, and accountability for compliance support and leadership between and across both:  (1) All Brands Group and the individual Brands; and (2) Ethics & Compliance and other departments, including HR, RAAS, Legal, and Maritime Operations.  Progress toward greater coordination and unification of compliance-related efforts in many areas has been made or is underway, both before and during the period of probation.  Company employees have identified additional critical compliance areas in need of greater clarity and harmonization of approaches—most significantly:  culture, DEI, IT and data, risk management, and training.  As detailed in this Report, the Company is taking steps toward establishing more centralized governance approaches in each of these areas.

4) **Empowering Compliance Leaders with Authority to Carry Out Responsibilities:**  It is not clear that longstanding concerns about the authority provided to compliance leaders, including the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager, have been fully resolved in ECP Year Four.  In general, there is a lack of clarity within the Company about how authority is delegated across departments and positions.  Further, it is not clear that the delegations of authority in the Ethics & Compliance program charter and strategic plan extend beyond the Ethics & Compliance program to empower its leaders:  to direct changes impacting other business areas, such as operations, finance, IT, or procurement; to verify and validate whether such changes have occurred; and to assess the effectiveness of such efforts as part of a process of continuous improvement.  The individuals in Ethics & Compliance leadership positions are not set up for success so long as the Company does not establish clarity as to responsibility, authority, and accountability for compliance efforts.

- **Culture**

5) **Missed Opportunities and Delays:**  As noted above, the Company's response to the Environmental Compliance Culture Assessment reflects missed opportunities, including delays at the All Brands Group level in finalizing both the Culture Action Plan and a culture governance framework.  These delays appear to be attributable to a lack of focused, coordinated leadership at the All Brands Group level.  Employees who took the survey have expressed frustration to the CAM Team that, despite their time, effort, and openness in completing the survey, the Company did not find a timely way to provide them with information about the assessment's findings and the steps that the Company would take in response.

6) **Unresolved Culture Change Governance Concerns:**  It remains to be seen if the culture governance framework will resolve the concerns about a lack of coordinated, centralized strategy or leadership on culture change efforts.  The framework continues to be viewed by employees as a somewhat confused set of oversight and implementation responsibilities across a range of departments and personnel at All Brands Group and the individual Brands.

7) **Establishing Accountability for Top Leadership:**  If there were a single take-away for success in the way forward from the Environmental Compliance Culture Assessment, it is that the Company's top leaders need to be forthright in addressing their own past failures to foster and develop a culture of compliance.  Any culture governance framework or culture action plan should require, as a starting point, that the highest levels of leadership not only speak to their support of compliance, but are held accountable to act in concrete ways that support compliance.  It is not yet clear that this has occurred.  The return to service presents an opportunity for Company leaders to explicitly introduce any new strategy and vision for Company culture, as well as to set clear expectations for culture going forward, and to commit to being held accountable for supporting employees in meeting those expectations.

8) **Self-Assessment and Survey Concerns:**  Employees have raised concerns, shared by the CAM, about the various self-assessments and surveys that the Company's consultant is administering or plans to administer as part of the Culture Action Plan.  These include concerns about the structure and content of the question sets and survey instruments, as well as some potentially concerning and misleading findings from a self-assessment of the Ethics & Compliance program that was recently administered.

9) **Achieving a Just Culture:**  The Company has stated a commitment to move away from an acknowledged historic blame culture and toward a just and fair culture.  The Company is to be credited for recognizing and taking steps to address this barrier to compliance.  While some progress has been made, further efforts will be required.  The perception of a blame culture continues to be felt aboard the ships and in shoreside offices.

10) **Maintaining Support for Crew Welfare, Including Mental Health and Wellbeing:** As part of the Culture Action Plan, each Brand developed strategies to promote crew wellness aboard the ships during the pause.  These efforts have been well-received, and the CAM and TPA teams have observed high levels of crew morale, despite their challenging circumstances, during virtual ship visits conducted during the pause.  At the same time, crew members expressed concerns that, as passenger cruises resume, this level of attention may disappear as management's focus shifts away from support for ship operations, crew needs, and welfare, to guest experience and revenue generation.  As more ships prepare for restart, the Company will also need to consider that many crew members returning to work aboard may suffer from trauma or other mental health conditions related to the effects of the pandemic, which may affect ship culture and operations.

- **Diversity, Equity, and Inclusion**

11) **Developing a Centralized, Coordinated DEI Strategy:** CAM Team discussions with Company employees continue to reveal a vacuum of clear leadership at the All Brands Group level on setting DEI strategy and goals, with most efforts left to the Brands.  This stands in stark contrast to the Company's well-understood and well-structured approach to setting expectations for achieving guest satisfaction and financial goals.  Despite the lack of overarching coordination on the Company's DEI strategy, several notable Brand efforts are in progress, as noted above.

12) **Establishing Programs to Enhance DEI Among Shipboard Officers:** There does not yet appear to be a significant, coordinated effort led by All Brands Group to launch a program (long term or immediate) with the aim of building a diverse officer corps across the Company's ships—including one with clear expectations, accountabilities, and concrete goals.  Again, any such efforts have been led by the Brands.  For example, Costa Group has launched cadet programs in the Philippines, India, Ethiopia, and China, and recently reached an agreement with Chinese and Italian authorities to recognize Chinese officer certifications on its Italian-flagged ships.  Carnival Cruise Line has partnered with schools in the Bahamas, Panama, Philippines, and China to hire diverse engineers into its cadet program.  The CAM recognizes the commitment to DEI expressed by many of the Brand leaders involved in efforts to help the Company seize the opportunity to become a leader—and make history—in this space.  However, progress requires strong, centralized leadership on DEI, which remains lacking.

- **Support for Ship Operations**

13) **Prioritizing Ship Operational and Compliance Needs:** Past CAM reports have observed a general failure of the Company's top leadership to understand what it takes to fully support compliance, as well as repeated failures by top leadership to listen and learn from its own employees about compliance challenges.  Even before the pandemic, the Company had repeatedly failed to adequately address

compliance support for its ships on issues identified by the Company's internal and external studies and surveys, and supported by the findings of RAAS, the TPA, and the CAM.  Crew members from across the Company, particularly deck and technical officers, have expressed to the CAM Team their sense that this compliance shortcoming may stem from a lack of appreciation for the maritime operations side of the Company's business, in comparison to the value placed on the (revenue-generating) hotel and entertainment side.  The notion of primacy (or at least parity) between meeting the operational and compliance needs of the ships and achieving other business goals is not yet part of the lived experience of the ships.  As noted above, crew members have expressed appreciation for the increased levels of focus and attention to ship and crew needs during the pause, but they have also expressed concerns about the extent to which Company will prioritize ship and crew member needs as passenger operations resume.

14) **Exhaust Gas Cleaning System Concerns:**  Throughout the period of probation, operational issues with the reliability and maintainability of the Company's Exhaust Gas Cleaning Systems have been one of the most common concerns raised by engineering crews to the CAM and TPA teams, including frustrations about the extra training and workload demands associated with the units, as well as voyage planning and execution challenges.  The TPA issued two systemic findings related to Exhaust Gas Cleaning Systems in ECP Year Four:  (1) one related to soot discharges and other surface effects from washwater discharges; and (2) one related to equipment condition and reliability.  Despite ongoing efforts to respond to these findings, to the best of the CAM's knowledge, the Company has not performed a systemic root cause analysis that looks beyond current technical issues to also examine the entire design, procurement, and installation processes that led to the current situation.  Such an effort could yield lessons about project scoping, procurement, and Management of Change processes that would apply to other major shipboard technical installation projects the Company performs in the future.

15) **Emergent Food Waste Management Issues:**  Several food waste management concerns have recently emerged, including issues related to:  (1) improper removal or disposal of food waste liquids in an apparent effort to reduce reported food waste numbers; (2) the breakdown of plastic components inside food waste digesters and potential discharge of plastic to the sea as a result; (3) food waste digester installation project management practices; and (4) improperly installed or fitted drain/scupper covers that may not fulfill their intended function to prevent non-food items from entering a ship's grey water and overboard drainage systems.  It is notable that the Company's internal reporting and review mechanisms revealed these issues and concerns.  The Company has several active investigations and reviews underway.

16) **Slow Progress on IT and Data Projects Critical for Compliance:**  Progress on IT and data efforts in support of compliance has generally been slow, both before and during the pandemic, including on projects designed to address persistent critical compliance risks.  Some of the Company's most important initiatives in

this space have been subject to repeated or significant delays, including:  the development of voyage planning software, which is being done by an external party who has yet to deliver a product that meets the Company's expectations; the MAST initiative to move to a single, corporate-wide planned maintenance and spare parts management system, some aspects of which were paused due to COVID-19; and the development of an app to automatically record attendance at shipboard trainings.  In particular, the prolonged delay in developing software to support voyage planning appears to present a significant compliance risk in the face of continued voyage planning and execution-related incidents, which demonstrate that the Company's current processes and tools are not fully effective.

17) **Integrating Compliance Considerations into Ship Design:**  The Court has urged the CAM Team to inquire of Company personnel about whether or how compliance concerns and best practices are reflected in the design or re-design of the Company's ships, and how and in what ways compliance demands are impacting dry/wet dock processes.  More than four years of probation have illuminated a range of compliance challenges related, at least in part, to ship design.  During ECP Year Four, the CAM Team has sought to learn more about the Company's new build and dry/wet dock planning and execution processes, including efforts to integrate compliance considerations into the design or re-design of ships.  This review is ongoing and will be a core focus area for ECP Year Five.

- **Continuous Improvement**

18) **Achieving a Learning Culture:**  As noted above, the approach by the Company's top leadership to incidents (including near misses), findings, and negative or uncomfortable information has historically been characterized by a tendency to minimize or avoid chronic problems, rather than to seek to understand them and address their root causes and risk factors.  This defend-and-deflect approach has been an obstacle to the learning culture that the Company seeks to achieve.  There are promising indications that this mindset is starting to shift.

19) **Establishing a Fully Independent and Empowered Internal Investigation Program:**  The Incident Analysis Group cannot fulfill its purpose without clear and unequivocal statements of support by top leadership, including the Board of Directors, that investigators are empowered to act with independence and authority, including to set the scope of investigations and to initiate independent reviews of potential systemic issues as they arise.  Importantly, the Company's new Investigations Manual sets forth principles that appear designed to empower the Incident Analysis Group with the necessary independence and authority.  However, it is not yet clear that they do so fully, or that the Incident Analysis Group has the resources and structures in place to exercise its independence and authority in practice.  The CAM and TPA teams also have ongoing concerns about:  investigation and report quality; investigation report timing; alignment between Incident Analysis Group, Brand, and ship-led HESS investigations; and

alignment between HESS and non-HESS (*e.g.*, HR, financial, anti-bribery/anti-corruption) investigations.

20) **Developing a Holistic Risk Governance Framework:**  The Company has acknowledged that it continues to lack a coordinated, holistic approach to risk management—including one with clear accountabilities for managing and dealing with risk.  Progress toward a holistic approach has been hampered by a lack of clarity at the highest leadership levels about lines of responsibility and accountability between the various entities with a claim to risk management, including RAAS, Maritime Operations, Ethics & Compliance, and Legal, as well as the Brands.  Defining a process of cross-departmental, cross-brand coordination will be critical to the Company's ability to identify, mitigate, and manage risks to support continuous improvement.

21) **Achieving a Continuous Learning Feedback Loop:**  The Company has acknowledged that it does not yet have a clear continuous learning feedback loop between its audit, investigation, operations, risk, training, and broader Ethics & Compliance functions.  Such a mechanism is critical for the Company's compliance efforts, including its capability to effectively:  operationalize lessons learned and best practices; identify and address systemic causes; and systematically and holistically identify, prioritize, and communicate risks across the Company to the Board of Directors and top executive leadership to enable risk-based decision-making.  While various efforts to enhance continuous improvement and lessons learned processes are underway, there does not yet appear to be an established mechanism for integrating these various efforts, which may involve different (but overlapping) sets of stakeholders, timing cadences, and subject matter focus areas.

## III.   <u>CORPORATE GOVERNANCE AND LEADERSHIP</u>

### A.   Potential Post-ECP Goals

As described in Part II.A above, the goals detailed below were compiled by the CAM as of result of its communications with top leaders and senior management.  However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization."  *See* Company Draft Report Comments.

- *Board of Directors***:  A Board of Directors with:

  o   Significant compliance expertise, including:

    ▪   A permanent Compliance Committee.

    ▪   Regular compliance trainings for all Board members.

    ▪   Consideration of compliance expertise in recruiting new Board members.

- o Active oversight and engagement on compliance issues, including:

  - Culture.

  - DEI.

  - Investigations.

  - Risk management.

  - Broader Environmental, Social, and Governance ("ESG") efforts, including corporate sustainability goals[20] and sustainability accounting.[21]

- o Responsibility in these areas for:

  - Setting clear expectations and concrete goals for executive leadership.

  - Holding executive leadership accountable for meeting these expectations and goals, including through performance-based compensation.

- o A reporting relationship with executive management that embraces the improvement opportunities that come with acknowledging failures, and pushes management to effectively identify and prioritize risks (including systemic issues) facing the Company.

- o A diverse membership that reflects the diversity of the Company's workforce.

---

[20] On June 22, 2021, the Company announced its initial 2030 sustainability goals and 2050 aspirations.  The initial goals, discussed throughout this Report, focus on climate action and waste reduction (including food waste).  *See infra*, Part VI.B.2(b)-(c) (food waste reduction goals) and Part VI.C.5 (emission reduction goals).  Additional goals and aspirations will be announced in Carnival Corp.'s forthcoming 2020 Sustainability Report, expected to be issued this summer.  *See Carnival Corporation Announces Initial 2030 Sustainability Goals* (June 22, 2021) ("Initial 2030 Sustainability Goals Announcement"), https://www.carnivalcorp.com/news-releases/news-release-details/carnival-corporation-announces-initial-2030-sustainability-goals.

[21] The Sustainability Accounting Standards Board ("SASB") sets industry-specific standards "that assist companies in disclosing financially material, decision-useful sustainability information to investors."  SASB, *Cruise Lines Sustainability Accounting Standard* (Oct. 2018) ("Cruise Lines SASB") at 2.  Sustainability accounting "reflects the governance and management of a company's environmental and social impacts arising from production of goods and services, as well as its governance and management of the environmental and social capitals necessary to create long-term value."  *Id.* at 4.  SASB issued standards for cruise lines in 2018, which address:  greenhouse gas emissions; air quality; discharge management and ecological impacts; customer health and safety; labor practices; employee health and safety; and accident management.  *See id.* at 3.

July 19, 2021

- ***Top Executive Leadership***:  Executive leaders at All Brands Group and the individual Brands who:

    o   Exhibit consistent, high levels of visibility and engagement on compliance issues, including DEI and broader ESG efforts, through both:

        ▪   Communications and messaging.

        ▪   Concrete actions and commitments to support and carry out the messaging.

    o   Take responsibility and hold themselves accountable for setting strategy and delivering results on compliance issues, including culture, DEI, risk management, training, and support for ship operations.

    o   Establish clear lines of responsibility, authority, and accountability over compliance issues, including lines of accountability that are not driven by shame-and-blame strategies but by effective root cause analyses and corrective and preventive actions.

    o   Take a learning culture approach to information about compliance shortfalls, rather than a defensive, minimizing, or deflective approach.

    o   Composed of a diverse membership that reflects the diversity of the Company's workforce.

- ***Legal Group***:  An in-house legal group with:

    o   A General Counsel who embodies the role of "counselor" to senior management— that is, someone who, supported by an appropriately sized and resourced legal team, is a legal watchdog, with the will and authority to stop actions that could undermine compliance efforts.

    o   A global legal organization that is:

        ▪   Well-resourced, with staffing and resources comparable to or exceeding those in similarly-situated corporations.

        ▪   Well-coordinated across and between All Brands Group and the individual Brands.

        ▪   Well-integrated with other departments—including the audit, investigation, operations, risk, training, and broader Ethics & Compliance functions—to support the Company's risk management and continuous improvement efforts.

        ▪   Composed of a diverse membership that reflects the diversity of the Company's workforce.

- ***Ethics & Compliance Group***: An Ethics & Compliance group with:

  o Support from the Board and top executive management, through words as well as actions that make clear that compliance is valued as much as other business imperatives.

  o Sufficient resources and staffing, including continued support for positions and programs established during the probationary period, such as the Chief Ethics & Compliance Officer, Environmental Corporate Compliance Manager (and team), Brand equivalents to these positions, and shipboard and Fleet Environmental Officers.

  o Ethics & Compliance leaders (across all compliance areas, not just environmental) who are empowered with the necessary authority to carry out their responsibilities, not just on paper but also in practice.

  o Clear lines of responsibility, authority, and accountability across and between All Brands Group and the individual Brands.

  o Effective integration with other departments—including the audit, legal, operations, risk, and training functions—to support the Company's risk management and continuous improvement efforts.

  o A diverse membership that reflects the diversity of the Company's workforce.

**B.    Progress**

*1.    ENHANCED COMPLIANCE EXPERTISE AND ENGAGEMENT BY THE BOARD OF DIRECTORS*

- In line with DOJ guidance, a key aspect of the CAM Team's focus is what "compliance expertise has been available on the board of directors," as well as what "types of information have the board of directors and senior management examined in their exercise of oversight in the area in which the misconduct occurred." *See* DOJ, *Evaluation of Corporate Compliance Programs* (Updated June 2020), *available at* https://www.justice.gov/criminal-fraud/page/file/937501/download ("DOJ Corporate Compliance Guidance") at 11. This includes examining the capacity of the Company's audit, investigation, operations, risk, training, and broader Ethics & Compliance programs to work in a unified way to provide meaningful information and analysis to both senior management and the Board of Directors, as well as the capacity of the Board of Directors to engage in compliance oversight and hold the Company's executive leadership accountable for compliance shortcomings.

- The CAM recognizes that over the past year-and-a-half, like countless other businesses, the Company has faced unprecedented challenges, including the potential that the business would not be able to continue. After the onset of the pandemic, the Board of Directors and various of its Committees, including the Compliance and HESS Committees, began to meet more frequently, as often as weekly or more, to chart a path through the crisis. Though financial survival was paramount, the Board also used this time to further enhance its

knowledge and engagement on compliance issues. Members of the Compliance and HESS Committees have also remained in regular contact with the CAM.

> a)      *Actions in Response to Probation Revocation Agreement*

- Following the Company's guilty plea to six probation violations in June 2019, in which the Company's top leadership acknowledged that it had failed in its probation obligations to fully support and promote compliance efforts, the Board of Directors was on notice that greater engagement, scrutiny, and accountability on their part was needed.

- As part of the resolution of the probation revocation proceedings, the Company agreed to some overdue steps to increase the Board's knowledge and sophistication with regards to overseeing management compliance efforts. These actions include:

  o   **Compliance Committee:** The Company established a new Compliance Committee of the Board of Directors, comprised of independent directors, to oversee the Ethics & Compliance program. Initially, the Compliance Committee was announced as a temporary measure, but the Board soon determined to make it a permanent committee. Separately, in response to CAM observations, the Board retained a private law firm with significant Board-level representation experience to provide the Compliance Committee with legal counsel, independent of management. *See* CAM Third Annual Report at 102-03.[22]

  o   **New Board Member with Significant Compliance Experience:** The Company hired a new Board member with significant compliance experience. The new member's experience includes approximately 15 years at a global corporation in various roles, including as General Counsel and as an Executive Vice President with oversight of global legal, compliance, ethics, security, and investigative functions. *See* CAM Third Annual Report at 103-04. This individual serves on both the Compliance and HESS Committees, and regularly engages with other Board members, the Chief Ethics & Compliance Officer, the new General Counsel, and the CAM, among others.

  o   **Compliance Training Program:** Led by the Chief Ethics & Compliance Officer, the Company developed an annual compliance training program for the Board, which has also been attended by many senior executives. *See id.* at 104-05. Eight hours of training over four sessions were delivered in 2020, including sessions with: (1) a

---

[22] In addition, the Board continues to have both a HESS and an Audit Committee, each comprised of independent directors. The HESS Committee assists the Board "in fulfilling [its] responsibility to supervise and monitor [the Company's] health, environment, safety, security and sustainability related policies, programs and initiatives . . . and compliance with related legal and regulatory requirements." *See* Carnival Corp. 2020 Form 10-K at 19. The Audit Committee assists the Board with oversight of the Company's financial statement integrity, compliance with non-HESS legal and regulatory requirements, internal audit function, and "[r]elevant elements" of risk management programs. *See* Audit Committees Charter (Rev. Apr. 16, 2021), *available at* https://www.carnivalcorp.com/committee-details/audit-committee.

Former U.S. Deputy Attorney General, with experience as General Counsel of a global corporation and service as a corporate monitor over the world's largest auto maker.  This session focused on strategies for integrating culture into business practices, as well as educating the Board on recent updates to the DOJ Corporate Compliance Guidance; and (2) a bestselling author, whose session focused on the importance of Board and executive leaders "asking the right, innovative questions and of creating a culture of inquiry."  Letter from Chief Ethics & Compliance Officer to CAM, *Re: Carnival Corp. Positive Developments in ECP Year Four* (June 18, 2021), PCL_ECP00225061-68 ("Company Updates Letter") at PCL_ECP00225063.  At least two additional sessions are being planned for 2021.  *See* Employee Interview/Call Notes.

o **Written Commitment to Compliance:**  Adopting a written statement reiterating the Company's and the Board's commitment to compliance.  *See* CAM December 2019 Quarterly Report at 35.

*b)*    *Additional Actions*

- The Board has taken further actions, above and beyond prior efforts, designed to increase its oversight of and engagement on compliance issues, including:

  o **Culture Governance Oversight:**  The Board has agreed to take on responsibility "to oversee and safeguard culture" and "to set clear expectations" and "concrete goals" for senior executives on culture change efforts, including DEI.  *See Coordinating our Efforts to Further Strengthen our Culture Across Carnival Corporation* (Jan. 7, 2021), PCL_ECP00178127-48 ("Culture Governance Framework Document") at PCL_ECP00178132.  As noted in Part IV.B below, the CAM is aware that the Board plans to set clear expectations and concrete goals with respect to culture and DEI, but has not yet done so.  *See infra*, Part IV.B.2.

  o **Internal Investigations Oversight:**  The Board hired outside counsel to perform reviews of issues related to the Company's internal investigations function, which resulted in recommendations to develop and implement new procedures for: (1) scoping investigations; (2) determining when to retain outside counsel to conduct investigations; and (3) escalating significant compliance allegations to the Compliance Committee.  *See* CAM January 2021 Quarterly Report at 48-50; *see also infra*, Part VII.B.5(b).  Drafts of the procedures are under review.  *See* Employee Interview/Call Notes.

  o **Accountability Mechanism for Senior Executives:**  Perhaps most importantly, the Board has announced that, with the assistance of an outside consultant, it will establish a means to set concrete compliance goals for senior executives, and to hold them accountable for meeting those goals, including through potential performance-based compensation.  This effort is expected to be completed in September 2021.  *See* Employee Interview/Call Notes; *see also* Email from Chief Ethics & Compliance Officer to CAM (June 25, 2021).  As discussed in earlier CAM reports, management accountability at the highest levels is critical to an effective Ethics & Compliance

function, including one that can provide the Board with clarity as to how and in what ways the most senior and powerful executives are providing leadership in support of compliance. *See* CAM January 2021 Quarterly Report at 25.

o **Ethics & Compliance Retreat:** Members of the Board participated in the opening session of the 2021 Ethics & Compliance retreat, as discussed below. *See infra*, Part III.B.4.

> 2. *INCREASED VISIBILITY AND ENGAGEMENT ON COMPLIANCE ISSUES BY TOP EXECUTIVE LEADERSHIP*

- DOJ recognizes that a "company's top leaders – the board of directors and executives – set the tone for the rest of the company." DOJ Corporate Compliance Guidance at 10. In evaluating a company's compliance program, it is therefore critical to examine "the extent to which senior management have clearly articulated the company's ethical standards, conveyed and disseminated them in clear and unambiguous terms, ***and demonstrated rigorous adherence by example***." *Id.* (emphasis added).

- Since the resolution of the probation revocation proceedings in June 2019, the Company's top executive leadership at both the All Brands Group and individual Brand levels has significantly increased its visibility and engagement on compliance issues.[23] Examples include:

  o **Communications:** In internal and external communications, top executives consistently emphasize the importance of "compliance, environmental protection," and "health, safety and well-being" as the Company's "highest responsibilities" and "top priorities."[24] Company leaders also emphasize the importance of DEI as both a moral and business imperative, as discussed in Part V.B below. *See infra*, Part V.B.1. In addition, Company leaders report that executive leadership team meetings at both the All Brands Group and individual Brand levels regularly include topics such as compliance, culture, DEI, and crew welfare and wellbeing. *See* Leadership Updates Feedback at 1-9.

    ▪ This is a notable change. At the end of ECP Year Two, the CAM found that "[t]he Company does not express protection of the environment as a core value, or one that takes precedence over revenue generation, in its communications of corporate values." CAM Second Annual Report at 65.

---

[23] In general, the CAM Team has had less visibility into efforts by Costa Group, which operates the Costa and AIDA brands, because that operating group no longer has any Covered Vessels. While some communication continues with Costa Group, it is at a reduced level.

[24] *See, e.g.*, Corporate Vision Statement; *see also* Summary Response to CAM Request for Arnold Donald and Brand OpCo Leaders (June 25, 2021) ("Leadership Updates Feedback"); Arnold Donald Media Interviews & Speaking Engagements (June 7, 2021).

▪ Employees at many levels throughout the Company welcome these statements by executive leadership, but remain concerned and sometimes skeptical that these statements, and related concrete actions, will continue after the end of probation. As discussed in Part III.C below, observable behavior by top leadership, by taking concrete actions in support of this new messaging, is necessary if compliance and environmental protection are to join the long-standing messages by leadership on the expectation that employees deliver a great guest experience and breakthrough shareholder returns. *See id.*; Employee Interview/Call Notes; *see also infra*, Part III.C.1.

o **Direct Engagement with Ships:** Throughout the pause, many senior leaders, including Brand Presidents and top Carnival Corp. executives, have made unprecedented efforts to engage directly with crew members on the ships. As one Captain remarked, he had more conversations in the past 15 months with senior leadership than in the past 15 years. Across the Brands, these contacts have been seen as welcome engagement, especially from deck and technical personnel, who have often complained that the focus of management is too often skewed towards the guest-facing side of the business. *See* Employee Interview/Call Notes.

▪ These efforts have included live town hall-style virtual sessions led by Brand Presidents, as well as email updates, video updates, blogs, calls, PA system broadcasts, and in-person visits to ships. Topics are reported to have included compliance, health and safety, culture, crew wellbeing, feedback on shoreside support, vaccinations, and business updates. *See* Leadership Feedback Updates at 2-9.

▪ Some of this engagement occurred as a result of the Court's requirement for returning ships to certify their state of repair and capacity for operating in compliance with ECP and environmental requirements. Numerous high-level executives took direct roles in talking with the ships about their preparedness, and this attention was largely welcomed. *See* Employee Interview/Call Notes. For example, the Carnival Corp. CEO spoke with over 50 shipboard personnel regarding the Court attestations. *See* Leadership Updates Feedback at 1.

o **Culture Governance:** Top executive leadership has stated that it will take on "responsibility for leading the culture improvement efforts and monitoring progress" and for being "ultimately accountable for setting [culture] strategy and delivering the results." *See* Coming Back Stronger "Pause Priorities Plan," Revised DRAFT (July 8, 2021) ("Pause Priorities Plan"); Culture Governance Framework Document at PCL_ECP00178132; *see also infra*, Part IV.B.2. As noted in Part IV.C below, the CAM is aware that top executive leaders plan to articulate a strategy for establishing a culture of compliance and determining how they will measure progress, but have not yet done so. *See infra*, Part IV.C.2.

o **Compliance Training:** Many senior executives, including the Carnival Corp. CEO, participated in the Board of Directors compliance training sessions discussed above. *See* Leadership Updates Feedback at 1.

o **CEO/Environmental Officer Coffee Chats:** The Carnival Corp. CEO, in coordination with the Environmental Corporate Compliance Manager team, held virtual "coffee chats" with Environmental Officers from each Brand in 2021. Each call included more than 25 Environmental Officers, as well as the Environmental Corporate Compliance Manager and relevant Operating Line Compliance Manager. *See id.* Among other topics, Environmental Officers asked the CEO about his commitment to environmental compliance and the Environmental Officer program beyond the ECP. The CAM understands that the CEO committed to maintain resources and support for the program after probation ends. *See* Employee Interview/Call Notes. The CEO also stated this commitment to the Court at the April 2021 Status Conference. *See infra*, Part VI.B.2.

o **Ethics & Compliance Retreat:** The Carnival Corp. CEO participated in the opening session of the 2021 Ethics & Compliance Retreat, as discussed below. *See infra*, Part III.B.4.

- Some employees, including some senior managers and leaders, have expressed concerns to the CAM Team that, as management focuses attention and resources towards environmental compliance, less attention and resources will be devoted to safety, security, or public health compliance. The CAM has made clear from the start of probation that safety is *the* top priority, ahead of all others. *See* Employee Interview/Call Notes. For any organization undergoing improvements in a critical compliance area, such as environmental, there is the risk that the organization will engage in trade-offs in other compliance areas, even safety. This should not be the case, but the employees' concerns reflect a serious potential risk. One function of management leadership on compliance is to provide a centralized, holistic, risk-based approach designed to avoid inappropriate trade-offs between compliance areas—an approach that is supported by a robust Management of Change program. *See infra*, Part VI.B.5 and Part VII.C.4. This is a critical consideration for the Company as it seeks to resume passenger-carrying operations after such a long pause, and as it continues to build its Ethics & Compliance program. *See* CAM Second Annual Report at 48-49.

### 3.   NEW GENERAL COUNSEL AND REALIGNED GLOBAL LEGAL SERVICES GROUP

- In March 2021, the Company appointed a new General Counsel of Carnival Corp. The individual assuming this position is not new to the Company. He has been with the Company for nearly 25 years, including over 18 years as Deputy General Counsel. The new General Counsel states that his mandate "is to act as the ***conscience to our business leaders*** providing proper guidance and judgment while ensuring legal compliance." Status Conf. Tr. at 14 (Apr. 30, 2021) (emphasis added). He has also stated a desire to help "lead in our efforts to continuously improve on compliance and environmental protection," including on risk management efforts. *See id.* This includes both: (1) reviewing the structure, organization, and resources of the legal teams at All Brands Group and the individual Brands; and (2) identifying areas where the Legal, Ethics & Compliance, and RAAS departments can "link to improve our compliance, culture, and investigations." *See id.* at 16; Employee Interview/Call Notes.

July 19, 2021

- The Company has implemented structural and organizational changes designed to enhance the General Counsel's role in supporting compliance efforts.  For example:

    o  **General Counsel Attendance at Board Meetings:**  The General Counsel will attend all future meetings of the Compliance Committee of the Board of Directors.  He is also invited to attend regular Board meetings.  *See* Employee Interview/Call Notes.

    o  **Global Legal Services Group Realignment:**  The legal function has been realigned into a Global Legal Services Group, in which each Brand's general counsel or legal lead reports directly to the All Brands Group General Counsel, in addition to their current Brand business leaders.  The realignment is designed, in part, to "improve[] focus and integration of the global legal services group with compliance and risk management" and to develop "common practices to lower risk throughout [the] organization."  *See* Global Legal Services Group Realignment (May 11, 2020) at 1.

    o  **New In-House Global Maritime Counsel Position:**  A new Global Maritime Counsel position has been created, to serve as "an internal, North America-based legal resource to advise on maritime laws and regulations impacting fleet operations (marine, technical, environmental) anywhere around the globe."  *Id.* at 2.  This position has been filled.

    o  **New In-House Global Compliance Counsel Position (Hiring Underway):**  Hiring is underway for a new Global Compliance Counsel position, which the Company aims to fill by the end of this summer.  *See* Employee Interview/Call Notes.

- The new General Counsel, in coordination with the Board's Compliance Committee, is also undertaking a benchmarking exercise to compare the structure, organization, practices, and resources of the Company's legal organization with those of similarly situated corporations, including in the areas of claims and risk management.  Company employees have reported to the CAM Team that, historically, the Company's legal organization has been both under-staffed and insufficiently integrated with other departments and across the Brands.  *See id.*

- The Court expressed to the new General Counsel at the April 2021 Status Conference that "this is now going to be your general counsel office and an opportunity to make your mark as truly the conscience of leadership."  Status Conf. Tr. at 19 (Apr. 30, 2021).  As the Court observed, the former General Counsel, who was appointed in 1995, served in that role at the time of several of the Company's prior environmental criminal convictions, including two that resulted in court-supervised ECPs before the current monitorship.  *See id.*; CAM First Annual Report at 6-11 (discussing the Company's history of environmental violations); CAM Second Annual Report at 12 (same).

    4.  *ESTABLISHMENT AND CONTINUED SUPPORT OF THE ETHICS & COMPLIANCE GROUP*

- DOJ highlights a range of factors for assessing the strength of a compliance program, including "[t]he resources the company has dedicated to compliance," "[t]he authority and independence of the compliance function," and actions by senior leaders and managers "to

demonstrate their commitment to compliance or compliance personnel . . . in the face of competing interests or business objectives." *See* DOJ Corporate Compliance Guidance at 10-11.

- Under the Probation Revocation Agreement, the Company agreed to establish a new Ethics & Compliance group, based at All Brands Group and designed to provide centralized oversight and management of the Company's compliance program. The Company has had a long-standing approach to compliance that was highly decentralized and lacked a C-Suite level compliance officer. *See* CAM Second Annual Report at 46-47. The Company has since made substantial efforts toward putting in place people, funding, structures, and systems for the revamped compliance function. These include:

  o **New Chief Ethics & Compliance Officer Position:** As noted above, the Company created the new position of Chief Ethics & Compliance Officer, and in August 2019 the individual serving in that position took office. This individual reports directly to the Carnival Corp. CEO and to the HESS, Compliance, and Audit Committees of the Board of Directors. In establishing this C-Suite level position, the Company placed compliance on equal footing as operations, at least structurally, for the first time.

    As of July 2021, the Chief Ethics & Compliance Officer is supported by a Deputy Chief Ethics & Compliance Officer (who also serves as Head of the Incident Analysis Group), as well as a part-time Chief of Staff (who also serves as Deputy Environmental Corporate Compliance Manager).

    The Company also promoted the Environmental Corporate Compliance Manager to a more senior position within the Company (from Vice President to Senior Vice President).[25]

  o **Ethics & Compliance Program Staffing:** The Company has grown the Ethics & Compliance program to over 60 positions across All Brands Group and the individual Brands, comprised of:

    ▪ An All Brands Group-based team that includes:

      • Three Corporate Compliance Managers for: (1) Environmental compliance; (2) Health/Safety/Security compliance; and (3) General compliance (*e.g.*, antitrust, anti-corruption and bribery, anti-money laundering, and privacy).[26] The Environmental Corporate Compliance Manager oversees programs for ECP reporting, Environmental Officer training, Fleet Environmental Officers, food waste, and waste vendor assessments, among others.

---

[25] The other two Corporate Compliance Manager positions (for Health/Safety/Security and General compliance, as noted below) are Vice President-level positions.

[26] The General Corporate Compliance Manager also serves as the Company's Chief Privacy Officer.

July 19, 2021

- Heads of the following groups (which the Company refers to as "functional areas"):  Investigations, Training, Risk, and Data Privacy.

- Directors, managers, analysts, assistants, and other support staff for the above.

▪ Brand-based teams that include:

- Operating Company Ethics & Compliance Officers, who report directly to the Chief Ethics & Compliance Officer.[27]

- Operating Line Compliance Managers, who report directly to the Environmental Corporate Compliance Manager.

- Operating Line Training Managers, who report directly to the Operating Line Compliance Managers, with a dotted line to the Ethics & Compliance Corporate Training Director.

- Other functional area heads and support stuff, which correspond in varying degrees to those at All Brands Group.

  *See* Ethics & Compliance Department and Program Organizational Charts, PCL_ECP00225053-60 (provided to the Court and Interested Parties under separate cover due to Confidential Business Information concerns).

o **Approval for New Hires:**  In recent months, the Company has added at least nine new Ethics & Compliance positions.  Additional positions "will be evaluated for next fiscal year (later in the fall)," including potential additional investigators, data analysts, and support staff for the Health/Safety/Security Corporate Compliance Manager.  *See* Company Draft Report Comments; Employee Interview/Call Notes.

o **Ethics & Compliance Charter, Strategic Plan, and Financial Plan:**  Before the pandemic, the Company developed a charter, strategic plan, and financial plan for the Ethics & Compliance group.  As noted below, in conjunction with the 2021 Ethics & Compliance retreat, the strategic plan is currently being revised.  The CAM understands that the financial plan will also be revised once regular operations resume on a wider scale.  *See* Employee Interview/Call Notes.

On paper, these documents appear to give the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager "authority" and "control" to carry out their responsibilities.  *See* CAM Third Annual Report at 176-79 (quoting Ethics &

---

[27] The structure of the Ethics & Compliance teams differs at each Brand.  For example, some Operating Company Ethics & Compliance Officers and their Deputies wear multiple hats, such as Chief Financial Officer, Chief Human Resources Officer, or General Counsel of their respective Brand.

Compliance charter and strategic plan). However, as detailed below, it remains unclear how—or if—these concepts are implemented in practice. It is also unclear whether these grants of authority extend beyond the Ethics & Compliance program to other business areas, such as operations, finance, IT, or procurement. The documents are also silent as to the authority of the Corporate Compliance Managers for Health/Safety/Security compliance and General compliance. *See infra*, Part III.C.4.

o **Ethics & Compliance Retreats:** Led by the Chief Ethics & Compliance Officer, the Company began a program of annual Ethics & Compliance program retreats in 2020. Due to the pandemic, the 2021 retreat was held through a series of targeted (1-3 hour) virtual sessions, staggered between March and June 2021. The sessions focused on setting priorities and identifying improvement opportunities in a range of areas, including: communications; compliance risk management; culture; internal investigations; lessons learned processes; and training. *See* 2021 Ethics and Compliance Program Retreat Agenda (May 19, 2021), PCL_ECP00217765-66.

The kick-off session included remarks from the Carnival Corp. CEO and two members of the Board's Compliance Committee. The final sessions focused on developing a set of concrete action items as follow-up from the retreat, many of which will be incorporated into the next iteration of the Ethics & Compliance strategic plan. *See id.* This action plan is currently being finalized. *See* Employee Interview/Call Notes.

- Throughout the pandemic, the Company has continued to provide support and resources for the Ethics & Compliance group, despite massive reductions in personnel and resources across the corporation.[28] The Company's top leadership has also issued directives that the Company's cash preservation efforts should not "impact compliant, environmentally sound and safe operations." *See* CAM Third Annual Report at 163, n.106 (quoting communication from Carnival Corp. CEO). The CAM has noted the relevance of former Deputy Attorney General Sally Yates's admonition,[29] cited by the Court at the April 24, 2020, Status Conference, "on just how important even in emergency times, unprecedented emergency times like this, that it's so important to focus on the values that the company has and not just

---

[28] While some positions were cut or furloughed, including investigators and CSMART environmental training staff, the Ethics & Compliance organization was largely preserved during the pandemic-related cut-backs. Even during the pandemic, the Company hired additional Ethics & Compliance personnel, including Fleet Environmental Officers, Incident Analysis Group investigators, and support staff for the Incident Analysis Group.

[29] *See* A. Barbarino, *Ex-DOJ Deputy Warns of Virus' Long-Term Compliance Risks* (Apr. 22, 2020). Notably, this speech was delivered at a virtual conference hosted by the Ethics & Compliance Initiative ("ECI"). ECI describes itself as a "best practice community of organizations that are committed to creating and sustaining high quality ethics & compliance programs." *About ECI*, https://www.ethics.org/about/. ECI also serves as a consultant to the Company on its culture survey response efforts, and former Deputy Attorney General Yates serves on the board of ECI. *Our Boards of Directors*, https://www.ethics.org/about/our-board/.

be focused on the bottom line.  You need the bottom line to have an industry . . . but it can be a temptation to cut corners."  Status Conf. Tr. at 12 (Apr. 24, 2020).

- Overall, in the less than two years since the Ethics & Compliance group was established— most of it over the most challenging period in the Company's history—substantial progress has been made in many areas.  Since it was formed around the fall of 2019, the Ethics & Compliance group has spearheaded numerous environmental compliance-related initiatives, many of which go beyond the requirements of the ECP or Probation Revocation Agreement. Highlights are summarized in Appendix A.

- The CAM recognizes the hard work by the many talented and dedicated individuals, ship and shore, who have pushed these efforts forward under difficult circumstances, and amidst competing priorities.  As the Company acknowledges, this work is not done.  *See, e.g.*, Status Conf. Tr. at 11 (Apr. 30, 2021) (statement by Carnival Corp. CEO to Court that "we have worked really hard, but believe me, we know, as you pointed out, we have a ways to go").  Many critical remaining barriers and opportunities for improvement are at the top leadership levels, as discussed in the next section.

### C.    Remaining Barriers and Opportunities for Improvement

### 1.    *Taking Concrete Action to "Walk the Walk" of Compliance*

- DOJ recognizes that "[e]ven a well-designed compliance program may be unsuccessful in practice if implementation is lax, under-resourced, or otherwise ineffective."  DOJ Corporate Compliance Guidance at 9.  It is important to consider "whether the corporation's employees are adequately informed about the compliance program ***and are convinced of the corporation's commitment to it***."  *Id.* at 9-10 (emphasis added).  This includes looking at how "senior leaders, through their words ***and actions***, [have] encouraged or discouraged compliance," and asking:  "What ***concrete actions*** have they taken to demonstrate leadership in the company's compliance and remediation efforts?  How have they modelled proper behavior to subordinates?"  *Id.* at 10 (emphasis added).

- The Company's employees continue to express concerns to the CAM Team that top leadership has sent mixed messages by "talking the talk" of compliance, without taking sufficient concrete steps to "walk the walk" in actions that translate to direct support for the ships.  *See* Employee Interview/Call Notes.  Examples discussed in this Report and earlier CAM reports include:

  o  **Support for Ship Operations:**  The CAM found at the end of ECP Year Three that there had been a history of inadequate compliance support to the ships pre-pandemic on basic issues such as:  working and reliable pollution prevention equipment; spare parts; sufficient crew staffing levels; manageable workloads; IT and data tools; food waste management; voyage planning; and waste offloads and waste vendor assessments.  *See* CAM Third Annual Report at 137-64.  As discussed in Part VI.B and Part VI.C below, the Company has initiatives underway in these areas, including the Pause Priorities Plan initiatives.  *See infra*, Part VI.B.1.  However, concerns remain about whether leadership is taking sufficient action to prioritize ship

operational and compliance needs—both now as the Company exits the pause, and in the future beyond the ECP.  *See infra*, Part VI.C.1.

o **DEI:**  There is a continued lack of leadership, coordination, and concrete action at the All Brands Group level to enhance DEI among deck and engine officers.  As in other compliance areas, the lack of concrete action, in the face of a claimed commitment to DEI, is problematic for several reasons, including that it sends mixed signals which undercut employee confidence in the sincerity of the messaging.  Further, as discussed in Part V.B below, a lack of DEI among shipboard and shoreside leadership teams works against effective risk management and the development of a sustainable compliance culture.  *See infra*, Part V.B.1.

o **Waste Vendor Assessments:**  From 2018-2020, RAAS and the TPA issued a series of remarkable audit findings that—in violation of internal procedures and contrary to statements in its public Sustainability Reports—the Company was not vetting the third-party waste vendors who receive wastes from its ships all around the world.  Such a disconnect between public statements and reality not only created the risk of improper waste handling ashore, it sent employees the message that the Company was willing to make statements in its sustainability report that were not based in reality.  Even viewed as an unfortunate oversight of the past, this kind of lapse makes senior management's job of convincing employees of its sincerity more difficult.  As discussed in Part VI.B below, in early 2020, the Company launched a new waste vendor assessment program.  It has also changed the language in its Sustainability Reports, although it has not corrected the inaccurate statements from past reports.  *See infra*, Part VI.B.4(a).

o **Benchmarking and Metrics:**  The CAM observed at the end of ECP Year Two that the Company lacked benchmarks to measure the extent to which the Company is achieving its aspiration of "leaving the people and the places we touch even better."  *See* CAM Second Annual Report at 66-67; *see also, e.g.*, Corporate Vision Statement.  To the best of the CAM's knowledge, the Company has continued to use the phrase, including in its public Sustainability Reports, without putting forth concrete metrics to measure, for instance, baseline environmental conditions and the impact of the Company's activities on those conditions.  *See* Employee Interview/Call Notes.[30]

• Effective compliance leadership requires that rhetoric on compliance be matched with taking on ownership and accountability for compliance efforts.  A constant theme of conversations

---

[30] As SASB observes:  "Cruise vacations offer unique access to pristine ocean waters and destinations with delicate ecosystems.  These sensitive ecosystems can be threatened by the size of the ships, the influx of tourists, and the scale of the resources consumed and waste generated onboard.  Cruise ships discharge many types of treated and untreated wastewater at sea and non-degradable solid wastes on land.  Careful management of ship discharge and mitigation of the ecological impacts of cruise line operations will ensure continued access to key ports and will help preserve the natural beauty that guests with to experience, both of which are key for companies to maintain market share as well as attract new customers."  Cruise Lines SASB at 14.

between the CAM Team and the Company's senior management is the fact that the Company's employees are perceptive, and they pay attention to what management says and does. *See* Employee Interview/Call Notes. As a result, the Company is constantly teaching by example—by what it says and does, as well as by what it says and doesn't do. If Company leaders reiterate statements like those in the Corporate Vision Statement, but do not pair those statements with concrete actions to address compliance needs, the messaging may have the perverse effect of sanctioning behavior that talks the talk of compliance, but does not walk the walk. This undercuts the espoused message, and teaches that it is better to *appear* committed than to *be* committed.

- As the Company emerges from the pandemic, and as the period of probation draws to an end, there is an opportunity for top leadership to continue to move beyond messaging, and to shift from a focus on external oversight to a focus on asking: How can I make compliance easier? What do people on ships need to support compliance in a direct way? What concrete actions did I take today, and what will I do tomorrow and each day after to own and be accountable for meeting those needs?

2.   *OVERCOMING HISTORIC ANTI-LEARNING MINDSET*

- The CAM has observed that the Company's top leadership had a longstanding tendency to resort to techniques that deflect or minimize negative or uncomfortable information, rather than embrace a learning culture approach to such information. *See* CAM Third Annual Report at 107. This is not atypical. When organizations, and in particular their leaders, are faced with issues that are complex, embarrassing, or threatening, they may engage in what are known as "organizational defensive routines." *See* C. Argyris, OVERCOMING ORGANIZATIONAL DEFENSES: FACILITATING ORGANIZATIONAL LEARNING (1990) at 25. These routines are characterized by actions "that prevent individuals or segments of the organization from experiencing embarrassment or threat. Simultaneously, they prevent people from identifying and getting rid of the causes of the potential embarrassment or threat." *Id.* Such defensive behaviors "are antilearning, overprotective, and self-sealing." *Id.*[31]

- As the environmental compliance culture survey of more than 70,000 Company employees illuminated, information—positive and negative—must be heard, valued and acted upon in a meaningful way to develop a culture of compliance. *See infra*, Part IV.B.1. Top leadership must "acknowledge and communicate that the unwanted environmental performance in the past is a result of how the organization works and not due to a handful of individuals alone." Environmental Compliance Culture Assessment at 41-42. Top leadership must also "take[] ownership for compliance failures" and "acknowledge that change involves everyone, including them." *Id.* at 42.

---

[31]  Argyris's book is a seminal work in the field of organizational learning. *See* CAM March 2020 Quarterly Report at n.33. Argyris was a Professor of Management Science at Yale University and a Professor Emeritus at Harvard Business School. Yale University has endowed a chair in his honor, and the current President of the University is the "Chris Argyris Professor of Psychology." *See* https://www.yale.edu/about-yale/leadership-organization/peter-salovey.

- Examples of the defend-and-deflect mindset, discussed in this Report and earlier CAM reports, include:

  o **Blaming "A Few Bad Apples:"** Ascribing the crimes on the *Caribbean Princess* to "a few bad apples" and expressing views blaming employees, rather than taking broad corporate responsibility, for the years of violations. *See* CAM First Annual Report at 31.[32]

  o **Undisclosed Ship Visit Program:** Sanctioning a "pre-TPA audit" ship visit program that was not disclosed to the TPA, CAM, or Interested Parties, the purpose of which appeared to be to avoid TPA audit findings, rather than to understand and address specific ship needs or uncover systemic or ongoing compliance challenges affecting ships on a fleetwide basis. *See* CAM April 2019 Quarterly Report at 47-52.

  o **Litigious Approach to Audit Findings on "Redundant" Pollution Prevention Equipment:** Debating DOJ and the TPA over the definition of the ECP term "Major Non-Conformity"—in particular, as to whether the discovery of inoperable pollution prevention equipment should qualify as a Major Non-Conformity if "redundant" equipment performing the same function remains operable. As DOJ observed, the Company's attitude "appear[s] to reflect an antagonistic corporate culture where management prizes avoiding adverse findings more than achieving actual compliance and progress." *Id.* at 13-14 (quoting DOJ correspondence to Company). There may be significant compliance risks associated with the failure of "redundant" pollution prevention equipment, as evidenced by the role that successive breakdowns of "redundant" equipment played in the felony convictions in this matter. Rather than expending time, resources, and leadership attention to fighting such findings, it would seem more appropriate for the Company to prioritize providing ships with the support and resources needed to keep *all* pollution prevention equipment in good operating condition, and to embrace audit findings that elevate any issues with doing so to management's attention. *See id.* at 10-14.

  o **Failing to Listen and Learn from Employee Concerns:** Failing to effectively listen and learn from employees on a range of compliance-related concerns, including those related to: Exhaust Gas Cleaning Systems; DEI; food waste management; IT tools,

---

[32] As required by the Probation Revocation Agreement, the Company's top leadership issued a statement personally accepting responsibility for the probation violations. *See Important Message from Chairman Micky Arison and CEO Arnold Donald* (July 1, 2019) (stating that "Chairman Arison, Mr. [Stuart] Subotnick and I [Arnold Donald] take full responsibility for these violations"). The CAM is unaware of any such statement or apology issued with regard to the original criminal conviction. Instead, the Company issued a statement blaming employees, which read: "We are extremely disappointed about the ***inexcusable actions of our employees*** who violated our policies and environmental law . . ." *See* CAM First Annual Report at 31 (quoting Statement from Princess Cruises (Dec. 1, 2016)) (emphasis added). As noted above, it is critical for top leadership to "take[] ownership for compliance failures" of the past in order for an organization to move forward. *See* Environmental Compliance Culture Assessment at 42.

including the automation of training recordkeeping; spare parts; and voyage planning. *See infra*, Part V and Part VI.C.1-4.

o **Unsophisticated Approach to HESS Incident Reporting:** Reporting on HESS events to the Board of Directors in a manner that appears designed to minimize incidents (including near misses) and risk factors, rather than to elevate them. In particular, such approaches may not effectively highlight the risks associated with low probability, high consequence events. *See* CAM January 2021 Quarterly Report at 87-89.

- An antilearning mindset can also be seen in the seeming inability for the Company to move effectively and with clarity on establishing robust programs for both internal investigations and risk management. *See infra*, Part VII.B.5, Part VII.C.2-3. This reflects a management culture that historically has not prioritized wanting to know everything, the bad along with the good, about the risks it faces and the systemic and cultural issues that may contribute to those risks. A mature organization understands that learning and acting upon hard truths through probing investigations and risk assessments will enhance its compliance, operational, *and* business performance, all of which are critical to helping ensure its continued freedom to operate.

- As discussed above, there are signs that this mindset has moved. Leaders at the Board and top executive leadership levels, including the Carnival Corp. CEO and Brand Presidents, have increased their visibility and engagement on compliance issues during ECP Year Four. *See supra*, Part III.B.1-2. The new Board member appears to be driving more sophisticated awareness of and approaches to compliance issues at the highest levels. Other leaders in new or newly filled positions at All Brands Group, including the Chief Ethics & Compliance Officer, Chief Operations Officer, and new General Counsel, also demonstrate what appears to be a genuine commitment to helping lead a mindset shift that starts at the very top.

  3. *IMPROVING COORDINATION AND UNIFICATION OF COMPLIANCE EFFORTS*

     a) *Background*

- Past CAM reports have found that the Company's generally decentralized operations—a product of its remarkable growth through a series of mergers and acquisitions over several decades—are a barrier to compliance. Despite the creation of an All Brands Group-based Chief Ethics & Compliance Officer and Ethics & Compliance Department, there remains an engrained view in favor of decentralized approaches, which has resulted in "delayed, uncoordinated, and ineffective solutions to some of the Company's most serious and long-standing compliance challenges." *See* CAM Third Annual Report at 76, 174-75. This balkanized approach has also led to a lack of clarity among employees as to authority, responsibility, and accountability for compliance support and leadership between and across both: (1) All Brands Group and the individual Brands; and (2) Ethics & Compliance and

other departments, including HR, RAAS, Legal, and Maritime Operations—especially in critical areas like culture, DEI, risk, and training.[33]

- The CAM recognizes that centralization is not a panacea, and has consistently emphasized in conversations with Company personnel that centralization should not be pursued for its own sake. *See* Employee Interview/Call Notes. The CAM also recognizes that the Company attributes its historic business success in significant part to "its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices." *See Vision, Mission & History*, https://www.carnivalcorp.com/corporate-information/mission-and-history?c=200767&p=irol-history; Employee Interview/Call Notes; CAM Third Annual Report at 17, n.21. The assertion that the Company's business success is a product of its decision to maintain largely autonomous operations across its Brands is often presented as an unqualified truth. However, individuals from all levels of the Company have expressed concerns that this approach may not be optimal from a compliance or maritime operations perspective. *See* Employee Interview/Call Notes.

> *b)*     *Positive Examples*

- Progress toward greater coordination and unification of compliance-related efforts has been made or is underway, both before and during the period of probation. Examples include:

  o Establishing the state-of-the-art Center for Simulator Maritime Training ("CSMART") training center in The Netherlands to provide training to deck, technical, and Environmental Officers from across the Company's Brands. CSMART opened in 2009 for two of the Company's Brands, and significantly expanded in 2012 to provide training to officers from all of the Company's Brands. *See* CAM First Annual Report at 21-23;[34]

---

[33] The Ethics & Compliance charter states: "Due to the variety of environmental legal and regulatory issues and the maritime operations and compliance issues that frequently arise, [the Ethics & Compliance, Legal, and Maritime Operations] departments plan to develop more detailed protocols to provide clarity and guidance to various Company leaders and employees on where to direct certain questions or problems that may arise in addressing how such over-lapping issues should be addressed." Corporate Ethics & Compliance Department Charter (Oct, 9, 2019) at 14. To the best of the CAM's knowledge, no such protocols have been developed. The Company has confirmed that a "specific protocol was not developed," but the Company "believe[s] [it has] addressed the concept through the following programs:" (1) a "Listen and Learn" campaign through which Ethics & Compliance personnel solicit feedback from employees through a range of mechanisms; (2) the risk registry currently underway, *see infra*, Part VII.C.3(b)(iv); (3) the accountabilities initiative currently underway, *see supra*, Part III.B.1(b); and (4) compliance reporting posters. *See* Company Draft Report Comments. These measures do not appear to directly address the barrier to compliance described above.

[34] Due to the pandemic, the CSMART facility has been closed to in-person trainings since mid-March 2020. During this period, CSMART staff, in coordination with training, compliance, and operations personnel across the Company, have made significant efforts to transition training courses to a virtual format. *See* CAM January 2021 Quarterly Report at 73-75. The Company is

July 19, 2021

o  Unifying and standardizing policies and procedures from across the Brands into a single corporate-wide HESS management system, known as Global HESS.  *See* CAM First Annual Report at App. B.

o  Transitioning to a single, corporate-wide ISO 14001 certification for the Company's Environmental Management System,[35] instead of each Brand individually holding its own separate certification.  *See* CAM December 2018 Quarterly Report at 25.[36]

o  Developing a corporate-wide incident and near miss reporting system, known as SeaEvent.  *See* CAM January 2021 Quarterly Report at 84-85; *see also infra*, Part VI.B.3 and Part VI.C.4.

o  Ongoing development of the MAST initiative, which is designed to result in a single corporate-wide management system for planned maintenance[37] and spare parts, including procurement and logistics.  *See* CAM January 2021 Quarterly Report at 83-84; *see also infra*, Part VI.B.3 and Part VI.C.4.

o  Consolidating the Company's two North American Fleet Operations Centers (one based in Seattle and one based in Miami) into a single Miami-based center.  *See* HESS Technical, Regulatory and Sustainability Report Q1 FY2021 (Apr. 2021), PCL_ECP00190483-574 ("HESS Board Report Q1 FY2021") at PCL_ECP00190542.[38]  This project was completed in May 2021.  *See* Company Draft

---

targeting a potential October 2021 date for re-opening CSMART to in-person trainings.  *See* Employee Interview/Call Notes.

[35] The Environmental Management System is the Company's set of "policies, procedures, and other documentation . . . that supports environmental operations."  ECP § I.D.  The Company's Environmental Management System is housed within its Global HESS system.

[36] Developed and published by the International Organization for Standardization ("ISO"), ISO-14001 is an international standard that "sets out the criteria for an environmental management system and can be certified to."  *ISO 14000 family – Environmental Management*, https://www.iso.org/iso-14001-environmentalmanagement.html.  To receive an ISO-14001 certification, a company's environmental management system must be audited by an accredited third-party body.

[37] "Planned maintenance" refers to routine, preventive maintenance tasks performed to keep systems and equipment in working order (such as inspections, cleanings, alarm testing, or filter replacements), as opposed to maintenance tasks performed in response to an unexpected equipment breakdown, accident, emergency, or other incident.  Planned maintenance tasks are entered into a ship's planned maintenance system software, which generates automatic work orders when a task becomes due.  The work orders include deadlines by which the task must be completed, unless postponed or suspended.  Currently, the Company's ships use one of two different planned maintenance systems.  The Company is transitioning to a single system under the MAST initiative, discussed further in Part VI.B.3 below.

[38] Fleet Operations Centers are staffed 24/7 and provide real time tracking, monitoring, and emergency response services to the ships, among other services.  The Company also operates a

Report Comments.  The CAM notes that this presents an opportunity for the Company to consider enhancing the level and breadth of services its Fleet Operations Centers provide to ships, including enhanced voyage planning and execution support, which could help address recurrent issues with prohibited discharges and emissions by Company ships into protected or restricted areas.

o   Ongoing corporate reorganization to establish a global Health Services group under an All Brands Group Chief Health Officer.  This includes establishing a central Miami-based Health Operations Center, which is connected to Regional Health Operations Centers based in:  Hamburg, Germany; Southampton, United Kingdom; and Sydney, Australia.  *See* HESS Board Report Q1 FY2021 at PCL_ECP00190546-47.

o   Ongoing implementation of Ethics & Compliance-led programs on food waste management, waste vendor assessments, and shipboard and Fleet Environmental Officers.  *See infra*, Part VI.B.2, Part VI.B.4, and Part VII.B.3.

> ### c)   *Areas of Opportunity*

- The positive examples discussed above show that the Company is capable of achieving more unified approaches to historically decentralized aspects of its business.  Company employees have identified additional areas of opportunity where there is a need for greater clarity and harmonization of approaches—most significantly, in the critical compliance areas of culture, DEI, IT and data, risk management, and training.  As detailed in this Report, the Company is taking steps toward establishing more centralized governance approaches in each of these areas.  *See infra*, Part IV.B.2 (culture), Part V.B.2-3 (DEI), Part VI.B.3 (IT and data), Part VII.C.3 (risk), and Part VII.C.4 (training).

- Continuing weaknesses in the Company's corporate compliance function include:

  o   Lack of a formal process for corporate-wide consideration of learnings from incidents (including near misses), audits, investigations, government findings, consultants, and other sources to obtain the full benefits of that work.

  o   Lack of coordination on assessing regulatory requirements and the impact of changes of operations.

  o   Decision-making by consensus across different Brands, which may result in delayed responses to incidents (including near misses), findings, and other information, as well as inconsistent performance.

  o   Lack of a robust Management of Change process.

---

Fleet Operations Center based in Hamburg, Germany, for its European brands.  *See About Us*, https://www.carnival-maritime.com/about-us.31182.html.

July 19, 2021

- Addressing these weaknesses through enhanced coordination and unification of efforts would allow the Company to better develop practices and procedures in support of compliant ship operations and to better monitor and assess their effectiveness.

- Some individuals within the Company have asserted that the International Safety Management ("ISM") Code[39] limits the Company's ability to take a centralized approach to ship operations and compliance issues.

  o  Under the ISM Code, maritime companies are required to have a Safety Management System[40] and must designate a person ashore responsible for "monitoring the safety and pollution-prevention aspects of the operation of each ship and ensuring that adequate resources and shore-based support are applied."  ISM Code (2018 ed.) ("ISM Code") at §§ 1.4 and 4.

  o  To certify compliance with the ISM Code, a Document of Compliance is issued to a company.[41]  *See id.* at §§ 1.1.5, 13.1-2 (each "ship should be operated by a company which has been issued with a Document of Compliance…").  At Carnival Corp., Documents of Compliance are issued to entities at the Brand level, rather than to an entity at the All Brands Group level.

  o  Some employees have stated that the fact that the Documents of Compliance are issued to the Brands means that the Brands must maintain control over the content of the Safety Management System.  *See* Employee Interview/Call Notes.  It is not clear that this is intended to be a limitation of the ISM Code.  In particular, the Preamble to the ISM Code states:  "Recognizing that no two shipping companies or shipowners are the same, and that ships operate under a wide range of different conditions, the Code is based on general principles and objectives."  *See* ISM Code at Preamble.

---

[39] The ISM Code is "an international standard for the safe management and operation of ships and for pollution prevention . . .  based on general principles and objectives, which include assessment of all identified risks to one Company's ships, personnel and the environment and establishment of appropriate safeguards."  *See ISM Code*, https://www.imo.org/en/OurWork/HumanElement/Pages/ISMCode.aspx.

[40]  A Safety Management System is "a structured and documented system enabling company personnel to implement effectively the company safety and environmental protection policy." *Id.* at § 1.1.4.  The Company's Safety Management System is contained within its Global HESS management system, which is an electronic platform that includes the Company's HESS policies, procedures, and related guidance, notices, and other documents.  The Company's Environmental Management System is a component of the broader Safety Management System within Global HESS.

[41] The ISM Code defines "company" as "the owner of the ship or any other organization or person such as the manager, or the bareboat charterer, who has assumed the responsibility for operation of the ship from the shipowner and who, on assuming such responsibility, has agreed to take over all duties and responsibility imposed by the Code."  *Id.* at § 1.1.2.

o   Even if it is a limitation of the ISM Code, as noted above, some employees have suggested that the Company could elect to have its Documents of Compliance issued to a single entity at the All Brands Group level that would then have ultimate decision-making authority for the content of the Safety Management System.  *See* Employee Interview/Call Notes.  The Company has responded by expressing concern that having Documents of Compliance issued to a single entity "is not an option without necessity for considerable change," including revising "the entire structure of reporting and responsibilities."  Company Draft Report Comments.  The Company also notes that an argument could be made "that having the [Documents of Compliance] embedded within each Brand brings the [Documents of Compliance] closer to operations and hence enhances compliance rather than distancing the [Documents of Compliance] from the operational unit."  *Id.*  For the purposes of this Report, there does not appear to be consensus within the Company on the best path forward.

4.   *EMPOWERING COMPLIANCE LEADERS WITH AUTHORITY TO CARRY OUT RESPONSIBILITIES*

a)   *Background*

- One of the "fundamental questions" DOJ asks in evaluating corporate compliance programs is whether a program is "adequately resourced *and empowered* to function effectively."  DOJ Corporate Compliance Guidance at 1-2 (emphasis added).  Effective implementation "requires those charged with a compliance program's day-to-day oversight to act with *adequate authority and stature*."  *Id.* at 11 (emphasis added).  These individuals "*must be empowered* within the company."  *Id.* (emphasis added).

- In ECP Year One, the CAM found that the Company had failed to provide the Environmental Corporate Compliance Manager with ECP-required authority.  *See* CAM First Annual Report at 4-5, 25-30.  The Company did not act to remedy this finding until it faced the revocation of its probation near the end of ECP Year Two.  *See* CAM Second Annual Report at 46-49, 91-92.  In June 2019, the Company pleaded guilty to a probation violation for "failing to provide sufficient responsibility and authority to the [Environmental Corporate Compliance Manager] to implement the ECP."  Probation Revocation Agreement at 2.  In doing so, the Company "acknowledge[d] that it failed to establish [an Environmental Corporate Compliance Manager] with authority (including resources, budget, and staff) as required to implement the ECP."  *Id.* at 10.

- At the end of ECP Year Three, while recognizing significant efforts to elevate and provide additional resources to the Environmental Corporate Compliance Manager position, the CAM found that the Company "does not yet appear to have provided the Environmental Corporate Compliance Manager with the authority required by the ECP," or "to have provided either the Environmental Corporate Compliance Manager or the Chief Ethics & Compliance Officer (a position not created until ECP Year Three) with the authority required by the settlement of the Probation Revocation Petition."  CAM Third Annual Report at 76-77, 176-79.  As detailed below, it is not clear that these concerns have been fully resolved in ECP Year Four.

> b)      *Written Delegations of Authority*

- In general, there is a lack of clarity within the Company about how authority is delegated across departments and positions.  The CAM understands that there are no central corporate governing documents which enumerate such delegations.  Instead, authorities are laid out in varying degrees of specificity across a range of documents, such as department charters, job descriptions, financial plans, and policies and procedures, including financial approval threshold policies.  *See, e.g.*, Approval Thresholds (Rev. Feb. 3, 2021) (setting financial approval thresholds for the Board of Directors and certain C-Suite executives, including the Carnival Corp. CEO, Chief Financial Officer, Chief Operations Officer, and Chief Maritime Officer, but not the Chief Ethics & Compliance Officer); *see also* Employee Interview/Call Notes.  In practice, actual authority appears to be tied as much or more to an individual's force of personality and perceived stature within the Company than to powers inherent in the position itself.

> c)      *Authority for Ethics & Compliance Leaders*

- As noted above, the Ethics & Compliance charter and strategic plan state that the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager have "authority" and "control" to carry out their responsibilities.  This includes the "authority and substantial control" of the Chief Ethics & Compliance Officer "to oversee and implement the Company's overall ethics and compliance functions."  Carnival Corporation & plc's Ethics & Compliance Strategic Plan: "Compliance Alliance 2020 and Beyond" (Oct. 9, 2019) ("Ethics & Compliance Strategic Plan") at 27; *see also* Corporate Ethics & Compliance Department Charter (Oct. 9, 2019) ("Ethics & Compliance Charter") at 2, 15.[42]

- Despite having such authority on paper,[43] it is not clear how concepts such as "authority" and "control" are implemented in practice.  Further, these grants of authority appear to be limited to authority and control over the Ethics & Compliance program itself, a grant of authority that states the obvious.  For example:

---

[42] The Ethics & Compliance governing documents do not appear to specify the authority of the other Corporate Compliance Managers (*i.e.*, for Health/Safety/Security and General compliance) or functional leaders, including the heads of investigations and training.  *See, e.g.*, Ethics & Compliance Charter at 15.  This indicates that these documents may have been drafted with the primary intent of appeasing the Court and DOJ, rather than ensuring that (all) compliance leaders are sufficiently empowered to carry out their duties.

[43] The authority of the Environmental Corporate Compliance Manager is not always made explicit in written documents.  For example, the Annual Environmental Compliance Report states that the Environmental Corporate Compliance Manager has "[o]verall responsibility" for ECP implementation, with no reference to "authority."  *See* Corporate Compliance Manager Annual Environmental Compliance Report 2020-2021, PCL_ECP00211308-614 ("Environmental Corporate Compliance Manager Annual Report") at PCL_ECP00211312.

o   The charter delegates to the Chief Ethics & Compliance Officer "full authority ***over the Company's Ethics & Compliance Program***."  Ethics & Compliance Charter at 2 (emphasis added).

o   Likewise, the strategic plan states that the Chief Ethics & Compliance Officer has "authority and substantial control to oversee and implement the Company's ***overall ethics and compliance functions*** - including the ability to direct change and actions across and within all brands (***if, and when, necessary***)."  Ethics & Compliance Strategic Plan at 27 (emphasis added).

o   The Strategic Plan also states that the Environmental Corporate Compliance Manager has "authority and control ***over Operating Line Compliance Managers***."  *Id.* (emphasis added).

- In that sense, these grants of authority appear to be redundant—*i.e.*, the head of the Ethics & Compliance program is granted authority over the Ethics & Compliance program.  It is unclear to what extent this authority extends ***beyond*** the Ethics & Compliance program to empower Ethics & Compliance leaders:  to direct changes impacting other business areas, such as operations, finance, IT, or procurement; to verify and validate whether such changes have occurred; and to assess the effectiveness of such efforts as part of a process of continuous improvement.

- It is not uncommon for there be conflict between compliance and operational groups within an organization.  The CAM Team has received numerous comments regarding continuing internal conflicts between Ethics & Compliance leaders and others within the company, including Maritime Operations leaders, that undercut the ability of the Chief Ethics & Compliance Officer and the Environmental Corporate Compliance Manager to exercise authority.  The Company's response was that:  "The [Chief Maritime Officer] and [Chief Ethics & Compliance Officer] believe this is a mischaracterization."  Company Draft Report Comments.  No matter how dedicated and talented the individuals in Ethics & Compliance leadership positions may be, they are not set up for success so long as the Company does not address even perceived uncertainty as to responsibility, authority, and accountability for compliance efforts.

## IV.   CULTURE

### A.   Potential Post-ECP Goals

As described in Part II.A above, the goals detailed below were compiled by the CAM as of result of its communications with top leaders and senior management.  However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization."  *See* Company Draft Report Comments.

July 19, 2021

- ***Culture Maturity***: A corporate compliance culture characterized by:

  o  The highest level of cultural maturity—in particular, in the areas of trust, care, and openness—as assessed through tools that have been vetted for validity and reliability.

  o  A culture of continuous improvement where learnings from successes *and* failures are identified and incorporated into operations.

  o  A diverse, equitable, and inclusive workplace environment, shipboard and shoreside.

- ***Culture Governance***: Corporate governance and leadership on culture characterized by:

  o  A Board of Directors that has set clear expectations and concrete goals on culture, including DEI, and holds top executive leadership accountable for delivering results.

  o  Top executive leadership that has set a clear strategy on culture, including DEI, and is responsible and accountable for achieving results.

  o  Oversight and monitoring of culture change efforts that is effectively coordinated between All Brands Group and the individual Brands.

  o  Commitment to culture change by leadership that is authentic and sincere (and believed by employees as such) and is purposefully, mindfully, and continuously reinforced.

- ***Just Culture***: Moving beyond an admitted historic blame culture to a just culture approach, including one characterized by:

  o  The ability to effectively identify and analyze compliance shortcomings so that the Company holds not only individuals, but also itself, accountable for how systems or approaches it designs and implements contribute to unwanted behaviors and adverse events.

  o  Employees who are empowered, willing, and unafraid to report incidents, near misses, or other issues or concerns.

- ***Crew Welfare, including Mental Health and Wellbeing***: Being a company that values and treats its crew members (of all ranks) as well as it treats its guests—including on issues of crew welfare (both physical and mental health and wellbeing), crew conditions, and compensation—and a company that is able to attract and retain top talent as a result.[44]

---

[44] As SASB observes: "Cruise lines employ thousands of workers onboard each large vessel. Most ships are registered in countries where labor laws allow flexibility in many dimensions including pay, hours, fair treatment, and termination. Ship crews are multinational, and many are hired on a contract basis . . . Language barriers and the complexity of flag-state laws and the laws in workers' home countries can make it difficult for workers to file charges in the case of labor law violations. Low morale among workers can impact their ability to meet customer

July 19, 2021

### B.   Progress

#### 1.   COMMITMENT TO MEASURING AND ENHANCING COMPLIANCE CULTURE

##### a)   Background

- In accepting the Company's guilty plea in December 2016, the Court stated that it wanted to know "what was in the culture" because "there obviously was a culture, at least on [the *Caribbean Princess*], if not on other Princess Cruise Lines ships, that promoted dishonesty and the willingness to help each other out in getting around doing the right thing." *See* Plea Hearing Tr. at 32 (Dec. 20, 2016). At the sentencing hearing in April 2017, the Court observed that "the culture really needs to be changed and [I'm] looking to [the CAM] to assist." Sentencing Hearing Tr. at 13 (Apr. 19, 2017). The Company appeared to agree, stating: "[W]e're committed to working with the court-appointed monitor and the third-party auditor over the next five years to continue to enhance our compliance program even more, and our focus is a culture of compliance." *Id.* at 36.

- This recognition of the importance of culture is echoed in DOJ's Corporate Compliance Guidance that states: "Beyond compliance structures, policies, and procedures, it is important for a company to create and foster a culture of ethics and compliance with the law at all levels of the company." DOJ Corporate Compliance Guidance at 10. Accordingly, in evaluating compliance program effectiveness, DOJ considers the steps a company has "taken in response to its measurement of the compliance culture." *Id.* at 16.

##### b)   Environmental Compliance Culture Assessment (Round One)

- As detailed in earlier CAM reports, the Company, in conjunction with the CAM and Propel Sayfr (now known as "SAYFR"), the CAM's retained maritime culture expert, completed a first-of-its-kind environmental compliance culture survey of more than 70,000 ship and shoreside employees from late 2018 to early 2019. The survey results were finalized in August 2019. The results revealed a low level of compliance culture maturity throughout the Company, with the lowest scores—and greatest opportunities for improvement—in the areas of trust, care, and openness.[45] *See, e.g.*, CAM Third Annual Report at 71-72, 85-94. The final assessment noted that "[s]ignificant leadership efforts will be required to create a mature and sustainable compliance culture." Environmental Compliance Culture Assessment at 3.

- To its credit, the Company's top leadership accepted these results, and recognized that they are consistent with those of other studies commissioned by the Company. The Carnival Corp. CEO directed the Ethics & Compliance team to prepare a plan to address the findings

---

service expectations, reducing a company's revenues and market share." Cruise Lines SASB at 21.

[45] Hundreds of comments also revealed widespread concerns about harassment and discrimination. As discussed in Part V.B below, such concerns relate directly to the Company's compliance and risk management efforts. *See infra*, Part V.B.1(b).

before the assessment results were rolled out widely throughout the corporation. To support this effort, the Chief Ethics & Compliance Officer retained an outside consultant, ECI, in September 2019. As an initial step, ECI worked with the Company to craft a new Corporate Vision Statement. ECI also began working with the Company on developing a Culture Action Plan. *See* CAM January 2021 Quarterly Report at 32-33.

- Despite early support for and momentum towards a concerted, corporate-wide effort to address the assessment's findings, initial progress on the action plan was slow. Much to the frustration of employees who had made significant efforts to answer the survey, details of the results, along with a plan to address the findings, were not timely or uniformly shared throughout the corporation, as the CEO had planned. *See infra*, Part IV.C.1.

- Although the survey results were provided to the Company in August 2019, the plan was still in draft form six months later when COVID-19 emerged as a concern in February 2020. The Company did not produce a revised Culture Action Plan until August 2020, approximately one year after the results were released, and that plan deferred many actions until after the pause. In the face of the pandemic, these delays might seem understandable.[46] But there were months before the pandemic emerged when this critical effort was neither moved forward by top executive leadership, nor demanded by the Board of Directors. The failures of top executives to seize the moment, and of the Board to demand action, functioned as barriers to the Company's stated aim of enhancing its compliance culture. *See* CAM Third Annual Report at 71-72, 164-72.

### c) Environmental Compliance Culture Assessment (Round Two)

- As planned, SAYFR will administer a second survey before the end of the five-year period of probation in order to assess the Company's progress in supporting a sustainable compliance culture. The CAM Team and SAYFR are discussing the timing and further details of the survey administration.

- The CAM Team and SAYFR are also evaluating how the survey instrument should reckon with the effects of the COVID-19 pandemic and the profound impacts it has had on shipboard crew and shoreside employees.

### 2.   *EFFORTS TO IMPROVE AND CLARIFY CULTURE CHANGE GOVERNANCE*

- The Company has recognized the need for better coordination and "more consistency" over its culture change efforts, which "were often done independently or unilaterally, with no (or limited) coordination across the Corporation." *See* Culture Governance Framework Document at PCL_ECP00178127; CAM January 2021 Quarterly Report at 33-34.

---

[46] However, as noted above, the Court, quoting a former Deputy Attorney General, has admonished "just how important even in emergency times, unprecedented emergency times like this, that it's so important to focus on the values that the company has and not just be focused on the bottom line." Status Conf. Tr. at 12 (Apr. 24, 2020).

- In January 2021, the Company finalized a culture governance framework setting out "roles, responsibilities and accountabilities" of various leaders, from Board Members to Brand personnel.  *See* Culture Governance Framework Document at PCL_ECP00178127-33.[47] Under this framework, the Company's executive leadership at All Brands Group and the individual Brands have agreed to take on ownership and accountability over culture change efforts.  Further details on the framework are discussed in Part IV.C below.  *See infra*, Part IV.C.2.

- Importantly, the framework establishes DEI as a "central pillar of our broader culture improvement efforts."  Culture Governance Framework Document at PCL_ECP00178128.

### 3.     *CULTURE ACTION PLAN IMPLEMENTATION*

- The Company produced a final Culture Action Plan in August 2020.  The plan identifies a range of activities, some to be implemented during the pause and some to implemented after.  *See* CAM January 2021 Quarterly Report at 32-37; Carnival Corporation Culture Action Plan for 2020-2021 (Aug. 2020), PCL_ECP00168638 ("Culture Action Plan"); Appendix – Work Plan for Culture Action Plan (Aug. 2020), PCL_ECP00168629.

- Highlights of Culture Action Plan activities are summarized in Appendix B.

- The CAM continues to recognize the hard work and dedication of the personnel working to improve culture and implement the Culture Action Plan.  These efforts continue to be led primarily by the Brands, working in coordination with All Brands Group.

## C.     Remaining Barriers and Opportunities for Improvement

### 1.     *MISSED OPPORTUNITIES AND DELAYS*

- As noted above, the Company's response to the Environmental Compliance Culture Assessment reflects missed opportunities,[48] including delays at the All Brands Group level in finalizing both:  (1) the Culture Action Plan—finalized ***one year*** after the assessment's results were shared; and (2) a culture governance framework—established ***nearly a year and a half*** after the assessment's results were shared.  Based on the CAM Team's discussions at all levels of leadership, these delays appear to be attributable to a lack of focused, coordinated leadership at the All Brands Group level.  *See* CAM Third Annual Report at 166-67.

- Groups of senior shoreside and shipboard leaders were briefed (either by SAYFR or internally) on the results of the assessment, and there have been some Brand- and/or

---

[47] The CAM understands that this framework replaces the "high-level" Steering Committee and Working Group anticipated under the Draft Culture Action Plan.  *See* [Draft] Carnival Corporation Culture Action Plan (Jan. 29, 2020), PCL_ECP00154952-59 at PCL_ECP00154953.

[48] This includes the failure to act promptly to address reports of harassment and discrimination, a key compliance risk factor.  *See infra*, Part V.B.1(b).

Company-wide communications, training materials, and presentations which describe the results and follow-up actions at a high level.  For example, in September 2019, an email was sent to Company employees stating that:  "The [culture survey] results have showed that we have a lot of work to do in building a culture of trust - not blame.  As your senior leadership we own the responsibility to create a better culture . . . One of the ways we have begun to take steps in the right direction is the creation of a Carnival Corporation Ethics & Compliance Department . . ."  *See* Internal Communication (Sept. 20, 2019), PCL_ECP00167092-93.

- While it is important for top leadership to accept responsibility for leading culture change efforts, it is not sufficient to say "we own the responsibility to create a better culture."  It is critical that top leadership also "take[] ownership for compliance failures" of the past, and fully and openly "acknowledge and communicate that the unwanted environmental performance in the past is a result of how the organization works."  Environmental Compliance Culture Assessment at 41-42.  As noted above, an overt acknowledgement by top leadership of its own role and accountability in past compliance failures is a critical missing element of Company communications.  *See supra*, Part III.C.2.

- Crew members and shoreside employees who took the survey have expressed frustration to the CAM Team that, despite their time, effort, and openness in completing the survey, the Company did not find a timely way to provide them with information about the assessment's findings and the steps that the Company would take in response.  The unintended consequence is, ironically, to further undercut their confidence in management's commitment to trust, care, and openness—the very areas in which the Company scored the lowest in the assessment.  This is a self-inflicted wound.  *See* Employee Interview/Call Notes.

### 2. *Unresolved Culture Change Governance Concerns*

- It remains to be seen if the culture governance framework will resolve the concerns about a lack of coordinated, centralized strategy or leadership.  The framework continues to be viewed by employees as a somewhat confused set of oversight and implementation responsibilities across a range of departments and personnel at All Brands Group and the individual Brands.  *See id.*

- Under the framework:

  o The Board of Directors will "oversee and safeguard culture" and "***set clear expectations*** for what it expects [the Company's] senior leaders to achieve, and what ***concrete goals*** will be accomplished."  Culture Governance Framework Document at PCL_ECP00178132 (emphasis added).

    ▪ The CAM is aware that the Board plans to set clear expectations and concrete goals with respect to culture.  *See supra*, Part III.B.1(b).

  o Top executive leaders at All Brands Group and the individual Brands "are ***ultimately accountable for setting the strategy and delivering the results***."  Culture Governance Framework Document at PCL_ECP00178132 (emphasis added).

July 19, 2021

▪ The CAM is aware that top executive leaders plan to articulate a strategy for establishing a culture of compliance and determining how they will measure progress.  *See* Company Draft Report Comments.

o The "HR Leadership Team"[49] will "***oversee[] the execution*** with the brands" and develop "***clear expectations and implementation steps that include key performance indicators ('KPIs')***," including "ensuring that all on-going culture efforts prioritize and foster improvements" in DEI.  Culture Governance Framework Document at PCL_ECP00178132 (emphasis added).

▪ While it does appear that Brand HR leaders are undertaking efforts with respect to establishing a culture of compliance, the CAM is not aware that any "HR Leadership Team" has set clear expectations and implementation steps consistently with a strategy set by top executive leadership, or in an effort to meet concrete goals articulated by the Board.  Nor could HR leaders be expected to do so given that the Board and top executive leaders have yet to provide the strategy and concrete goals described in the culture governance framework.  The CAM is also not aware of any corporate-wide KPIs for culture.

o The Ethics & Compliance team will "***monitor the implementation and execution*** efforts ***to ensure*** timely progress, general consistency between brands, the sharing of information and best practices, as well as to ***assess overall effectiveness***."  *Id.* at PCL_ECP00178133 (emphasis added).

▪ The CAM notes that there seems to be significant overlap between the role of the "HR Leadership Team" and the Ethics & Compliance team.  In addition, the CAM is not aware of any concrete goals set by the Board, any desired results identified by top executive leadership, or any KPIs set by the "HR Leadership Team" to guide the Ethics & Compliance team in assessing overall effectiveness.

▪ Moreover, it is unclear what actual authority the Ethics & Compliance team has "to ensure" timely progress.  For instance, it does not appear that Ethics & Compliance leaders have authority or responsibility to take action to address implementation and execution efforts that are inadequate or inconsistent.

---

[49] To the best of the CAM's knowledge, the Company has no centralized "HR Leadership Team."  Instead, each Brand has its own HR department.  HR leaders from across the Brands may coordinate via formal working groups or informal interactions, but the separate Brand HR departments largely operate independently from one another, as well as from other functions such as Maritime Operations and Ethics & Compliance.  Although there is an All Brands Group Chief HR Officer, the CAM has been told unequivocally that the function of this position is limited to "executive compensation."  *See* Employee Interview/Call Notes.  The Chief HR Officer appears to play an administrative and facilitating role for the Brand HR leaders, but does not, and is not apparently authorized to, lead culture change or DEI efforts.  *See id.*

July 19, 2021

o Brand HR, Learning & Development, and Communications Leaders will be responsible for "***implementation and execution***." *Id.* (emphasis added); *see also* Carnival Corporation & plc Ethics & Compliance Q1 2021 Report to the Compliance Committees ("Compliance Committee Q1 2021 Report").

▪ It does appear that the Brand HR, Learning & Development, and Communications Leaders are taking steps to establish a culture of compliance, and the CAM Team will continue to monitor whether these efforts are being undertaken with clear direction and support from the Board and top executive leadership. The CAM Team will also monitor whether there is effective coordination and oversight by the "HR Leadership Team" and the Ethics & Compliance team.

### 3.   ESTABLISHING ACCOUNTABILITY FOR TOP LEADERSHIP

• Culture change in any organization is a difficult, often long-term effort, especially for an organization of the size and complexity of Carnival Corp. The Environmental Compliance Culture Assessment makes clear that the challenge is increased when an organization's leaders are reluctant to recognize their own role in creating or maintaining a culture which enabled the organization's past violations. *See* Environmental Compliance Culture Assessment at 41-42.

• If there were a single take-away for success in the way forward from the Environmental Compliance Culture Assessment, it is that the Company's top leaders need to be forthright in addressing their own past failures to foster and develop a culture of compliance. *See id.* Any culture governance framework or culture action plan should require, as a starting point, that the highest levels of leadership not only speak to their support of compliance, but are held accountable to act in concrete ways that support compliance. If words are not backed up with concrete commitments to which leaders are held accountable, the culture change efforts will likely be viewed by employees as a hollow PR campaign or, for the next several months, an effort to placate the Court or DOJ. Leaders could be perceived as continuing a message that it is more important to ***say*** the right thing than to ***do*** the right thing. This is especially so if the messaging comes out without effective leadership accountability mechanisms in place. *See* CAM Third Annual Report at 168; *see also supra*, Part III.C.1.

• The return to service presents an opportunity for Company leaders to explicitly introduce any new strategy and vision for Company culture, as well as to set clear expectations for culture going forward, and to commit to being held accountable for supporting employees in meeting those expectations.

### 4.   SELF-ASSESSMENT AND SURVEY CONCERNS

• As part of the Culture Action Plan, ECI, in coordination with the Ethics & Compliance team and others, has administered, or is planning to administer, various self-assessments and surveys, including a High-Quality Program Self-Assessment and a series of monthly

July 19, 2021

("pulse"), quarterly, and annual employee surveys.  Company employees have raised concerns about these efforts, and the CAM shares those concerns, as summarized below.[50]

*a)      High-Quality Program Self-Assessment*

- The High-Quality Program Self-Assessment is a self-assessment of the Ethics & Compliance program, using ECI's High-Quality Program self-assessment tool.[51]  As noted below, in ECI's own words in its transmittal letter to the CAM, the self-assessment "is ***not intended to be a third-party verification of actual program implementation, nor is it a scientific testing of program effectiveness***."  Letter from ECI to Chief Ethics & Compliance Officer (May 26, 2021), PCL_ECP00217884-86 ("HQP Self-Assessment Transmittal Letter") at PCL_ECP00217884 (emphasis added).  Rather, it is a *self*-assessment designed to prompt "robust conversations" about what those within the Company perceive as the strengths and weaknesses in the program.  *Id.*

- The High-Quality Program Self-Assessment focuses on five principles ECI has determined are critical for an effective Ethics & Compliance program:  (1) Strategy; (2) Risk Management; (3) Culture; (4) Speaking Up; and (5) Accountability.  The self-assessment administered to Carnival Corp. consisted of question sets provided to three small groups within the Company (41 members of the Ethics & Compliance team, 129 senior executives, and the 12 members of the Board of Directors), and the results were compared to similar self-assessments conducted at approximately 70 other organizations.  *See* HQP Self-Assessment, Carnival Corporation & plc Report, Comparison of E&C, Senior Leaders and Board of Directors (June 10, 2021), PCL_ECP00223913 ("HQP Self-Assessment Report") at 4-9.

  o  The first question set was administered to 41 members of the Ethics & Compliance team in August 2020 "to gather input on the extent to which Carnival has implemented the elements of an [Ethics & Compliance] program that are generally accepted by the [Ethics & Compliance] industry as critical to a [High-Quality Program]."  HQP Self-Assessment Transmittal Letter at PCL_ECP00217885.  This first question set had a 98% response rate, indicating that 40 people responded.

  o  The second question set was administered to 129 senior executives in December 2020 and January 2021 to "gauge the extent to which leaders: a) were aware of the presence of key [Ethics & Compliance] program practices, b) understood and accepted their role in leading [Ethics & Compliance] in their portion of the business, and c) actively engaged in the behaviors that are essential to the growth of a strong ethical culture in the organization."  *Id.*  This question set had a 76% response rate, indicating that 98 people responded.

---

[50] ECI, through its general counsel, requested that the assessment and survey instruments and materials not be shared with SAYFR, the CAM's maritime culture expert, despite the fact that confidentiality agreements were in place.  Accordingly, the CAM does not have the benefit of SAYFR's review of these materials.

[51] *See* https://www.ethics.org/hqp/.

**Page 59** of **161**

o   The third and final question set was administered to the 12 members of the Board of
    Directors to "ascertain the extent to which they were: a) aware of the priorities and
    key activities of the [Ethics & Compliance] program, b) understood their role in
    prioritizing [Ethics & Compliance], and c) actively engaged in the activities that are
    essential for proper oversight of the [Ethics & Compliance] effort." *Id.* This question
    set had a response rate of 75%, indicating that 9 people responded.

- The High-Quality Program Self-Assessment presents the following as key findings, among
  others:

  o   The Ethics & Compliance team's ratings of its program were generally consistent
      with those of other companies' Ethics & Compliance departments.

  o   The more senior the leader, the more positive the perception of the Company's Ethics
      & Compliance efforts. Board members rated the Company's Ethics & Compliance
      efforts most favorably out of the three groups of survey respondents.

  o   All three groups rated themselves in the top two tiers of maturity for all five
      assessment principles (*i.e.*, Strategy, Risk Management, Culture, Speaking Up, and
      Accountability). Despite high ratings across the board, all three groups rated Risk
      Management as the area needing most improvement. The Ethics & Compliance
      Department rated itself highest in Culture. The senior executives and the Board rated
      themselves highest in Strategy.

      *See* HQP Self-Assessment Report at 11-33.

- The High-Quality Program Self-Assessment also presents the following recommendations:

  o   The Board should "[d]evelop incentives and ***accountability systems for leaders' roles***
      in identifying risks, strengthening culture and ensuring consistent
      ***accountability***/disciplinary action across all employee levels." *Id.* at 36 (emphasis
      original).

  o   Senior executives should "[i]mplement systems to ***help leaders identify and mitigate***
      key compliance risks;" "[p]rioritize ***communication*** with employees ***about [senior***
      ***leaders'] commitment to integrity*** and steps [senior leaders] are taking to promote
      [Ethics & Compliance];" and "[f]ocus on the implementation of ***systems of***
      ***accountability across all employee levels***." *Id.* (emphasis original).

  o   The Ethics & Compliance team should "***[d]evelop strategies*** for . . . ***[r]isk assessment***
      through ***issue spotting*** and early remediation of compliance gaps using ***root cause***
      ***analysis***," and "***[f]ollow-up/response to employees*** who report suspected
      wrongdoing." *Id.* (emphasis original).

- Importantly, the transmittal letter accompanying the final High-Quality Program Self-
  Assessment report states that the self-assessment "is ***not intended to be a third-party***
  ***verification of actual program implementation***, ***nor is it a scientific testing of program***
  ***effectiveness***." HQP Self-Assessment Transmittal Letter at PCL_ECP00217884 (emphasis

added).  Rather, it "contains a set of metrics developed by practitioners in the [Ethics & Compliance] industry to provide *a way to help organizations consider their program activities* relative to what the industry considers to be best practice."  *Id.* (emphasis added).  The self-assessment "fulfills its intended purpose if an organization completes the assessment, *holds robust internal conversations* with leadership about their level of satisfaction with their results and the current state of their efforts, and then adjusts its [Ethics & Compliance] program objectives based on identified gaps, new goals for the program, or heightened priorities."  *Id.* (emphasis added).

- The statements that the High-Quality Program Self-Assessment is neither "a third-party verification of actual program implementation," nor "a scientific testing of program effectiveness" is consistent with views of employees and the CAM.  It is not an objective survey or assessment of the Company's compliance program or culture.  Rather, the self-assessment is a tool to prompt conversations about the Ethics & Compliance program.  The fact that it does not measure actual program effectiveness also explains the discrepancy between what might appear to be high scores and the Company's acknowledged deficits in the areas being measured.  For example, the self-assessment results rated Risk Management highly (either the highest ("optimizing") or second-highest ("managing") maturity level), despite the fact that the Company has acknowledged, including to the Court, that it does not have either a coordinated, holistic approach to risk management or clear accountabilities for managing and dealing with risk.  *See, e.g.*, Status Conf. Tr. at 55-56 (Apr. 30, 2021); *see also infra*, Part VII.C.3.  The Company states that it recognizes that, despite the high ratings, "risk management was rated the lowest out of the five principles by each group surveyed indicating it as an area of opportunity."  Company Draft Report Comments.  The Company further states that the "results of the self-assessment will not hamper the Company's commitment to continue  focusing on improving risk."  *Id.*

### b) Pulse, Quarterly, and Annual Surveys

- ECI also plans to administer a series of monthly "pulse" surveys, quarterly "panel" surveys, and annual "all-employee" surveys, designed to "measure the progress of [the Company's] culture change efforts" in response to the findings of the Environmental Compliance Culture Assessment.  *See* Culture Action Plan at 10.  As noted below, because the survey instruments have not yet been tested for validity and reliability, it has not been established that they will provide, or be intended to provide, valid measurements of progress.

- The first pulse survey was launched on June 7, 2021, to all ship and shoreside employees.  It was open for a two-week period.  Results are not yet available.  Plans for future pulse surveys (which might proceed on a bi-monthly, rather than monthly, basis initially), as well as quarterly and annual surveys, are still being developed.  *See* Employee Interview/Call Notes.

### c) Areas of Concern

- The CAM Team has heard multiple concerns about these self-assessment and survey efforts from Company personnel, and they seem well-founded.  Although not always expressed in these terms, the employee concerns primarily relate to:

o   **Validity and Reliability Testing:**  The CAM Team is aware of a reliability analysis as to the High-Quality Program Self-Assessment administered to the Ethics & Compliance department.  The CAM Team is not aware of any validity and reliability analysis of the High-Quality Program Self-Assessment question sets administered to the Board of Directors or to senior leaders, or for the pulse, quarterly, or annual survey instruments.

ECI has reported that it will assess the validity and reliability of the pulse survey instrument ***after*** the initial round of survey administration, and that it could not do so earlier because the questions were developed specifically for Carnival Corp.  *See id*.  The CAM Team will review any such assessments.

**Survey Instrument Question Sets:**  Because ECI requested that the CAM's maritime culture expert, SAYFR, not have access to the assessment and survey instrument materials, the CAM Team's ability to assess the survey instruments is limited.  Nonetheless, it is apparent that the pulse survey contains repeated compound questions.  For example, several questions ask the respondent to rate the behaviors of "Ship Leadership," defined as "ship captain, hotel general manager and chief engineer."  A respondent may wonder how they should answer if, for example, the respondent would rate the captain highly and the hotel general manager poorly.  This type of question asks employees to rate the behaviors of multiple specific individuals with a single rating.  This is a classic compound question.  Rather than recognizing it as problematic, the Company's response attempts to equate this question with a question from the SAYFR assessment which asks respondents for their perception of whether "[m]anagement pressure causes us to break company policies."  *See* Company Draft Report Comments.  Asking employees to rate the behavior of multiple specific leaders with a single rating differs from asking employees to rate how management pressures collectively influence the employees' own behaviors.

There are multiple other examples of compound questions in the pulse survey question sets.

**High-Quality Program Self-Assessment Conclusions:**  Some of the conclusions from the High-Quality Program Self-Assessment are concerning.  For example, the assessment observes that "[s]ome of the differences in perspective at lower levels of the organization may be the result of a lack of visibility into leadership activity (e.g., leaders' integrity & accountability, owning risks)."  HQP Self-Assessment Report at 35.  However, it does not go on to explicitly observe the other side of the coin:  that the higher ratings of Board members and senior executives may be due to the fact that they have a "lack of visibility" into the challenges faced by those carrying out the day-to-day functioning of the organization.[52]

---

[52] The Company notes that, 24 pages earlier, the report says that:  "The higher the level of leader, the more positive the perspective of the [Ethics & Compliance] effort.  This finding is consistent with ECI's research that 'the view is rosier at the top.'"  Company Draft Report Comments.  This

Further, ECI's transmittal letter makes clear that the High-Quality Program Self-Assessment does not purport to measure "actual program implementation" or "program effectiveness," but rather assesses "how company leaders **self-measure** the maturity of the various elements of the [Ethics & Compliance] program." *See* HQP Self-Assessment Transmittal Letter at PCL_ECP00217884 (emphasis added). These qualifications are not included in the final assessment report. Moreover, the question sets to the Board of Directors and to senior leaders state that the "report will indicate, by principle, the maturity level of the [Ethics & Compliance] program." *See* ECI HQP Assessment Board Question Set; ECI HQP Assessment Senior Leaders Question Set.

Because vital information about the assessment's limitations is not included in the report (and indeed, the question sets to the Board and senior leaders have seemingly contradictory information), there is a risk that the Company will interpret the high scores as indicators that its program is both mature and effective, even in the face of significant and acknowledged deficits in the areas measured in the assessment. The exclusion of this information also seems counter to the stated purpose of the self-assessment to engender "robust internal conversations" to address "identified gaps." *See* HQP Self-Assessment Transmittal Letter at PCL_ECP00217884.[53]

### 5. *ACHIEVING A JUST CULTURE*

- The SAYFR Environmental Compliance Culture Assessment identified concerns about a blame culture. These findings are consistent with the findings of other assessments of the Company's culture, including those by the Company's own consultants. *See* CAM September 2019 Quarterly Report at 19-22 (summarizing surveys and reports that have "consistently identified concerns regarding a blame culture and lack of trust between employees, supervisors and managers").

- The Company has stated a commitment to move away from a blame culture and toward a just and fair culture. *See, e.g.*, Culture Governance Framework Document at PCL_ECP00178127 (noting that the Corporate Vision Statement includes a commitment to a "positive and just corporate culture"). Under a just and fair culture approach, an organization, while appropriately holding individuals accountable, also holds itself accountable for how systems or approaches it designs and implements contribute to unwanted behaviors and adverse events. *See* CAM First Annual Report at 30, n.26. As the CAM has observed, "individual

---

is not the same as a statement that the "rosier" views held by leadership may be due to leadership not having visibility into the challenges faced by those carrying out day-to-day operations.

[53] The Company states that "[p]rior to the survey and during [its] briefings on findings, ECI conveyed to the company that the purpose of the [High-Quality Program Self-Assessment] was to enable [the Company] to gauge internal perceptions of its progress in order to initiate an internal dialogue about priorities going forward," and that the "absence of such a disclaimer has not precluded the 'robust internal conversations' that were initially intended." Company Draft Report Comments. The Company also states that "regardless of whether the self-assessments are positive, it will not hamper our efforts as a company to make improvements." *Id.*

accountability is important (especially if there has been intentional wrongdoing), but a focus on individual errors without also identifying or addressing potential systemic causes can foster a culture of blame and fear, attributes of the Company's culture found throughout its brands in the [SAYFR] Environmental Compliance Culture Assessment."  CAM Third Annual Report at 196.

- Reversing a longstanding blame culture is not a short-term effort.  Employees have expressed concerns to the CAM Team that some members of top leadership think this problem has been addressed (as exhibited through statements from leaders like "we used to have a blame culture but don't anymore").  *See* Employee Interview/Call notes.

- While the Company is to be credited for recognizing and taking steps to address this barrier to compliance, further efforts will be required.  The perception of a blame culture continues to be felt aboard the ships and in shoreside offices.  *See* Employee Interview/Call Notes. That is not to say no progress has been made.  Many employees report that they would feel more comfortable reporting a compliance concern without fear of retaliation now than in the past, and the increase in Environmental Open ("Hotline") Reports from Year 1 – Year 4 indicates improvement in Speak Up culture.  But it is difficult to know if a widespread change has occurred.  The Company's own internal investigations reveal some views to the contrary.  For example, one investigation found:  "Most of the interviewees stated they felt empowered to use Hotline Reporting System; however several interviewees were not confident that the reporter's anonymity would be protected . . . ***Although onboard senior management perceived a healthy speaking up culture, there were several statements made by crew members that indicated speaking up was not always easy***."  Final Report, IAG2021006 (June 14, 2021), PCL_ECP00223914-22 at PCL_ECP00223919 (emphasis added).

> 6.   *MAINTAINING SUPPORT FOR CREW WELFARE, INCLUDING MENTAL HEALTH AND WELLBEING*
>
>     a)   *Pause Initiatives*

- As part of the Culture Action Plan "Promoting Team Wellness" initiative, described in Appendix B of this Report, each Brand developed strategies to promote crew wellness aboard the ships during the pause.  These activities have included:  free internet to communicate with friends and family; free mental health counseling resources; training for shipboard leadership on warning signs for mental health issues; moving crew to guest cabins to be more comfortable; and outdoor activities for crew, such as games and movie screenings.  *See* Employee Interview/Call Notes; Leadership Updates Feedback at 2-9.  The extent to which each of these strategies will continue once passenger operations resume remains to be seen, but, as noted below, the needs of the crew will continue.

- In virtual ship visits conducted during the pause, the CAM and TPA teams observed high levels of crew morale, despite their challenging circumstances.  Notably, many crew members have expressed deep appreciation for the increased attention from shoreside personnel (from managers up to Brand Presidents and top Carnival Corp. executives), enabled in part by enhanced IT support for videos and call conferencing.  *See* Employee

Interview/Call Notes.  As discussed in Part III.B above, some of that engagement occurred as a result of the Court's requirement for returning ships to certify their compliance readiness.  *See supra*, Part III.B.2.

- At the same time, crew members expressed concerns that, as passenger cruises resume, this level of attention may disappear.  There is a general apprehension that management's focus will shift away from support for ship operations, crew needs, and welfare, to guest experience and revenue generation.  *See* Employee Interview/Call Notes; *see also infra*, Part VI.C.1.[54]

    *b)      Restart Initiatives*

- As more ships prepare for restart, the Company will need to consider that many crew members returning to work aboard may suffer from trauma or other mental health conditions related to the effects of the pandemic.  As one study observed:

    Cruise ship employees who are stuck at sea have found themselves in a peculiar situation that they cannot change because they depend on multilateral dialog and agreements between cruise line companies, the CDC, airlines, and various governments.  As uncertainty crawls in every pore of cruise ships, causing waves of stress, depression, anxiety, and panic, cruise ship employees are in need to create a common sense from what appears to be a hopeless situation.  ***The COVID-19 pandemic is having an overwhelming effect on all life aspects of cruise ship employees, including mental and physical health***.

    A. Radic, et al., *Fear and Trembling of Cruise Ship Employees: Psychological Effects of the COVID-19 Pandemic*, Int'l Journal of Envt'l Rsch. and Pub. Health (Sept. 16, 2020) (emphasis added).[55]

---

[54] Throughout the period of probation, crew members have expressed to the CAM Team a sense that the Company values guest experience over crew experience.  *See* Employee Interview/Call Notes.  The Company has long conveyed that its mission, in addition to delivering breakthrough shareholder returns, is to "deliver joyful vacation experiences . . . by exceeding guest expectations."  *See Carnival Corporation – Our Mission*, https://www.carnivalcorp.com/corporate-information/mission-and-history.  Corporate philosophies emphasizing *employee* experience, rather than guest experience, have been embraced by other leaders in the transportation and travel industries.  For example, a co-founder of Virgin Group Ltd., is quoted as saying:  "Clients do not come first.  Employees come first.  If you take care of your employees, they will take care of the clients."  *See, e.g.*, *Why you should put employees, not customers, first* (Nov. 2, 2016), https://nzbusiness.co.nz/article/why-you-should-put-employees-not-customers-first.

[55] SASB observes that even under normal working conditions, "[w]orkers often put in long hours for months at a stretch and stay in shared quarters, which can make it difficult to recuperate."  Cruise Lines SASB at 21.

- The Company's Brands report that they plan to provide a range of mental health and wellbeing services to crew members on ships returning to service, ranging from support hotlines to mental health awareness trainings, with offerings differing by Brand. *See* Leadership Updates Feedback at 3-9. It will be critical for the Company to maintain focus, support, and resources for crew mental health and wellbeing as ships return to service, including sharing best practices between Brands and establishing mechanisms for soliciting feedback directly from crew members about their needs and concerns.

- The CAM Team intends to further explore the steps the Company is taking to plan for and address the potential impacts of trauma on individuals, as well as how those impacts may affect ship culture and operations. This will include the extent to which the Company is incorporating trauma-informed techniques in its many auditing, inspection, interviewing, and training processes, an approach the CAM Team is seeking to undertake as well.

## V.   DIVERSITY, EQUITY, AND INCLUSION

### A.   Potential Post-ECP Goals

As described in Part II.A above, the goals detailed below were compiled by the CAM as of result of its communications with top leaders and senior management. However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization." *See* Company Draft Report Comments.

- ***Culture***: A corporate culture that employees experience as supporting a diverse, equitable, and inclusive workplace, shipboard and shoreside.

- ***DEI Governance***: Corporate governance and leadership on DEI characterized by:

  o  A Board of Directors that has set clear expectations and concrete goals on DEI, and holds top executive leadership accountable for delivering results.

  o  Top executive leadership that has set a clear strategy on DEI, and is responsible and accountable for achieving results.

  o  Oversight and monitoring of DEI efforts that is effectively coordinated between All Brands Group and the individual Brands.

  o  Commitment to DEI by top leadership that is authentic and sincere (and believed by employees as such) and is purposefully, mindfully, and continuously reinforced.

  o  Diversity at the top leadership and senior management levels that reflects the diversity of the Company's workforce.

- ***DEI Achievements***: Becoming an industry leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry, while at the same time enhancing the Company's ability to address some of the compliance challenges tied to a lack of DEI, such as the ability to spot and manage risks. At minimum, this will entail having:

- o Individuals in shipboard and shoreside leadership and senior management positions who reflect the diversity of the Company's workforce, including:

    - Shipboard officers, especially in the deck and technical departments.

    - Internal investigators and auditors.

    - Board of Directors.

    - Top executive leadership.

    - Senior shoreside management.

- o Coordinated strategies for establishing pipelines of diverse candidates for these positions, such as through cadet programs and enhanced collaboration with Global Talent Partners for shipboard officers.

**B.    Progress**

*1.    COMMITMENT TO ENHANCING SHIPBOARD DEI*

*a)    Background*

- Past CAM reports have observed the interrelationship between DEI and compliance and noted that that there is an opportunity for the Company to promote compliance and support risk management by enhancing DEI among its ship officers, particularly in the engine and deck departments. Past CAM reports have also reflected on the Company's strong relationships with its Global Talent Partners[56] around the world and the largely untapped opportunity to widen the range of countries and nationalities from which it recruits and develops future engine and deck officers. *See, e.g.*, CAM Second Annual Report at 54-63; CAM Third Annual Report at 236-43; CAM January 2021 Quarterly Report at 37-43.[57]

- In addition, CAM reports have discussed the frustration and disappointment expressed by crew members and shoreside employees in various positions across the Company over the longstanding and continuing lack of ethnic, racial, and gender DEI within the shipboard officer ranks—including allegations of racism, sexual harassment, and retaliation. *See, e.g.*, CAM Third Annual Report at 241. As noted in Part IV above, the Environmental

---

[56] Global Talent Partners are agencies, generally referred to as "manning agencies" in the maritime industry, located around the world that cruise lines and other companies use to recruit and train many of the (typically non-officer) crew members on their ships. Holland America Group has moved from calling these businesses "manning agencies" to "Global Talent Partners," to shift from an overtly gendered nomenclature to one that focuses on the notion that the individuals hired from these agencies provide needed skills or talent, and that the agencies are partners in the Company's efforts. In support of that effort, CAM reports adopt that term.

[57] The CAM Team's main focus is on DEI issues impacting shipboard crew, rather than shoreside personnel.

Compliance Culture Assessment results included hundreds of comments revealing concerns about harassment and discrimination. *See supra*, Part IV.B.1 and Part IV.C.1. One theme among these responses is the "need to eliminate harassment or discrimination" aboard, including preferential treatment by supervisors for those who share the same nationality, or who share the same gender (especially among deck and technical officers), or those with whom supervisors have romantic relationships. *See* CAM Third Annual Report at 241-42 (quoting Environmental Compliance Culture Assessment); Employee Interview/Call Notes.

- DEI challenges are not unique to the Company. They are worldwide. However, it is widely recognized that the cruise industry and the maritime industry as a whole lag significantly behind other industries.[58] For instance:

  - Officer positions on cruise ships are filled predominantly by men from Western European countries, while non-officer positions are filled predominantly by men from Asian, South American, or other non-Western European countries. *See* CAM January 2021 Quarterly Report at 39 (citing study).

    - As of 2019, the Company reported that it sourced its shipboard officers primarily from European countries (Italy, the United Kingdom, the Netherlands, Germany, and Norway), while the remaining (non-officer) crew positions "are sourced from around the world, with the largest contingent from the Philippines, Indonesia and India." Carnival Corp. 2019 Form 10-K at 20. The Company's 2020 report is less detailed, providing only that its "shipboard and shoreside employees are sourced from over 100 countries." Carnival Corp. 2020 Form 10-K at 17.

    - As discussed in earlier CAM reports, the Company has asserted "that there are limitations created by labor laws, union agreements, and various flag state requirements that constrain the company's ability rapidly to make major changes to the composition of its workforce." CAM March 2020 Quarterly Report at 153 (quoting Company statements to Court and Company Draft Report Comments). The CAM Team's review indicated that none of the Flag States to which its Covered Vessels are registered (*i.e.*, the Bahamas, Bermuda, the Netherlands, Panama, and the United Kingdom) restrict officer nationality, with the limited exception of the Netherlands, which generally requires that ship Captains be either Dutch or European Union citizens, but does not appear to restrict the nationalities of other officers.[59]

---

[58] The commercial airline industry has a relatively long history of employing women as pilots. However, women still make up only around 5-7% of the pilots on major carriers United, Delta and American. *See* J. Wells, *Top US airlines want to hire women pilots. So where are the applicants?* (Aug. 2, 2019), https://www.cnbc.com/2019/08/02/top-us-airlines-want-to-hire-women-pilotswhere-are-the-applicants.html.

[59] However, these Flag States may only accept certain Standards of Training, Certification, and Watchkeeping ("STCW") officer endorsements from specified countries. Notably, countries from which STCW officer endorsements are accepted generally appear to include countries from

All Costa Non-Covered Vessels are registered in Italy, which historically has required all officers and crew to be either Italian or European Union citizens, with some limited exceptions.  *See id.* at 154.  However, Costa Group reports that it "worked with Chinese and Italian Authorities to obtain in February 2021 a bi-lateral agreement recognizing Chinese Officer certification on board Italian flag ships."  Leadership Updates Feedback at 4.

o   In addition, the number of women seafarers in the maritime industry across all positions has historically been low.  A 2015 study found that women make up on average approximately 20% of the workforce on cruise ships, and are primarily "represented in service-oriented positions."  CAM January 2021 Quarterly Report at 39 (quoting study).  The study further observed that, while "typical" in the industry, such gender imbalances are "***not an inevitable feature of cruise ship working life***," but are "***by-products of company recruitment policies and procedures*** at a corporate level; and of shipboard management sensitivity to crew stresses and strains."  *Id.* (quoting study) (emphasis added).[60]

- As the CAM has observed, the Company has "an extraordinary opportunity to be a leader in addressing historic ethnic, racial, and gender employment disparities in the maritime industry, and to address compliance challenges related to labor supply," including difficulties in recruiting and retaining shipboard officers, especially engineering officers, due to a global shortage of qualified individuals from the European countries from which these officers have traditionally been sourced.  *See* CAM January 2021 Quarterly Report at 39-40.  It remains to be seen whether the disruptions to the cruise industry from COVID-19 temporarily ameliorates the global shortage of available qualified ship officers.  Regardless, the Company and the industry face a long-term officer shortage if they continue to rely on recruiting primarily from the traditional European countries.  There is a critical need for the Company to create a broader pipeline of talent from which it can recruit and train officers.  *See* CAM Third Annual Report at 242.

- The Company, including the Carnival Corp. CEO, has acknowledged this opportunity, and has stated a commitment to "strive to increase the diversity of its shipboard workforce across certain positions."  *See Status Report by Princess Cruise Lines, Ltd.* (July 12, 2019), Dkt. No. 148  at 6; Employee Interview/Call Notes.  Making progress on DEI could also help the

---

which many of the Company's non-officer personnel are recruited, such as the Philippines, Indonesia, and India.  *See* CAM March 2020 Quarterly Report at 153-54.

[60] In March 2020, Celebrity Cruises, a competing cruise line, announced the first cruise ship to sail with "an entirely female bridge and hotel officer team, led by the first American female cruise ship captain."  S. Grogan, *The first ever all-female cruise ship crew sets sail* (Mar. 9, 2020).  The team included women from 16 countries, including Greece, New Zealand, South Africa, and the Philippines.  According to media reports, the "sailing is part of Celebrity Cruises' Bridge the Gap campaign, which aims to inspire a new generation of women to pursue maritime careers.  Currently, just 2 per cent of the world's mariners are female, but women make up 22 per cent of the bridge teams on Celebrity Cruises."  *Id.*  The initiative was "introduced by the company's president and CEO . . . who was the first woman to run a major cruise line."  *Id.*

Company to overcome the gaps in trust, care, and openness that were identified by the environmental compliance culture survey of over 70,000 of its employees.

> b) *Link Between DEI, Compliance, and Risk Management*

- The Company, including its CEO and other top leaders, have publicly stated that DEI is not just a moral and legal issue, but also a business imperative. *See* CAM Third Annual Report at 239-40; CAM January 2021 Quarterly Report at 38-39. A growing body of research illuminates a fourth justification for DEI: that of building a sustainable compliance culture. As the Company returns to service, it has an opportunity to focus on DEI as a meaningful way to better manage risk and compliance. Likewise, a continuing lack of DEI among shipboard officers will exacerbate existing compliance and risk management problems.

- The role of DEI in supporting compliance is cited by the Company's culture consultant, ECI. *See e.g.*, ECI, *How to Leverage Workplace Diversity to Increase Regulatory Compliance* (June 22, 2018), https://www.ethics.org/how-to-leverage-workplace-diversity-to-increase-regulatory-compliance/. As DEI becomes the norm throughout an organization, it helps to "minimize[] [the organization's] risk for compliance failure," while allowing individual employees to "improve their immediate, everyday workplace experience." *Id.*

- Additional studies, summarized below, reveal a meaningful link between creating a diverse, equitable, and inclusive work force and building a sustainable culture of compliance, including one that is able to effectively identify and manage risks.

> i. <u>General Research</u>

- A diverse workforce has been linked to:

  o **Better Performance Across Multiple Industries:** A meta-analysis of 140 studies found that Boards of Directors with more gender diversity fulfilled monitoring and strategy involvement responsibilities more often, and that this increased oversight was associated with higher accounting returns. *See* C. Post and K. Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis*, 58:5 Acad. Mgmt. Journal 1546, 1546-71 (2015). Additionally, a 2014 meta-analysis of 25 studies found that increased diversity in healthcare settings helps reduce or eliminate racial health disparities while increasing patient compliance and satisfaction scores. *See* T. A. LaVeist and G. Pierre, *Integrating the 3Ds – Social Determinants, Health Disparities, and Health-Care Workforce Diversity*, 129 Pub. Health Reports 2 (2014). Given the extensive former military experience of many of the Company's personnel, it is notable that one study of nearly 850 armies in 250 wars fought since 1800 found that the most inclusive armies have usually prevailed on the battlefield, rather than the largest or best-equipped ones. *See* J. Lyall, *The military is making changes in response to Black Lives Matter protests. That's good for fighting wars.* (July 28, 2020), https://www.washingtonpost.com/politics/2020/07/28/military-is-making-changes-response-black-lives-matter-protests-thats-good-fighting-wars/.

o **Better Risk Perception:** Increased diversity helps eliminate the groupthink and affinity bias that homogenous groups of employees tend to exhibit, and which can cause compliance risks to be overlooked. Research demonstrates that white men tend to have the lowest risk perceptions, which could make homogenous groups of white men prone to underestimate the risks of compliance failures. *See, e.g.*, D. M. Kahan et al., *Culture and Identity-Protective Cognition: Explaining the White Male Effect in Risk Perception*, 4:3 Journal of Empirical Legal Studies 465, 465-66 (2007). Another study found that women had stricter ethical stances than men, concluding that having more women in the workplace may improve ethical decision-making. *See* W. A. Weeks et al., *The Effects of Gender and Career Stage on Ethical Judgment*, 20 Journal of Bus. Ethics 301, 301 (1999).

o **Better Creativity and Workplace Adaptability:** The occasional friction that may result from more diverse teams can actually help them perform better, as "the debate and unfamiliarity that come with diversity is an important catalyst for creativity and deep thinking." D. Rock et al., *Diverse Teams Feel Less Comfortable – and That's Why They Perform Better*, Harvard Bus. Review (Sept. 22, 2016), https://hbr.org/2016/09/diverse-teams-feel-less-comfortable-and-thats-why-they-perform-better. The expectation is that, as diversity increases, so does workplace adaptability. *See* ECI, *How to Leverage Workplace Diversity to Increase Regulatory Compliance* (June 22, 2018), https://www.ethics.org/how-to-leverage-workplace-diversity-to-increase-regulatory-compliance/. This flows from the notion that "[e]mployee readiness to adopt new points of view and new policy directly affects compliance programs" because "[a]n open and willing organization more readily accepts policy requirements," minimizing the risk of compliance failure. *Id.* This same reasoning presumably holds true for the safety context as well.

• Diversity alone is not enough. To leverage the full compliance benefits of diversity, the workplace must also have an inclusive culture. The business community at large acknowledges the importance of inclusivity. *See, e.g.*, Deloitte Insights, *Diversity and inclusion: The reality gap* (Feb. 28, 2017) (observing that "research comparing high-performing teams against lower-performing teams supports the view that people must feel included in order to speak up and fully contribute."); McKinsey & Co., *Diversity wins: How inclusion matters*, Preface (May 2020) (recognizing the "dynamics around inclusion" as "a critical differentiator for companies"). A key risk of a non-inclusive culture is:

o **Less Willingness to Speak Up ("Spirals of Silence"):** Employees' sense of psychological safety and perception of levels of trust, care, and openness within an organization can determine whether those employees stay silent when compliance failures occur. *See, e.g.*, J. R. Detert and E. R. Burris, *Leadership Behavior and Employee Voice: Is the Door Really Open?*, 50:4 Acad. of Mgmt. Journal 869 (2007); M. Vakola and D. Bouradas, *Antecedents and consequences of organisational silence: an empirical investigation*, 27:5 Employee Relations 441 (Oct. 2005); S. F. Premeaux and A. G. Bedeian, *Breaking the Silence: The Moderating Effects of Self-Monitoring in Predicting Speaking Up in the Workplace*, 40:6 Journal of Mgmt. Studies 1537 (Sept. 2003). The threat and fear of isolation can prevent employees from raising compliance issues. *See* F. Bowen and K. Blackmon, *Spirals of Silence:*

July 19, 2021

*The Dynamic Effects of Diversity on Organizational Voice*, 40:6 Journal of Mgmt. Studies 1393, 1393 (Sept. 2003).  The decision to remain silent may then create "spirals of silence" that echo throughout the organization, resulting in instances where important information does not reach senior management.  *Id.*

Predictably, companies that allow racist, sexist, or otherwise discriminatory behavior to go unchecked create a lack of psychological safety for their employees.  *See* A. Bagalini, *5 ways racism is bad for business – and what we can do about it* (Jul. 14, 2020), https://www.weforum.org/agenda/2020/07/racism-bad-for-business-equality-diversity/.  This, in turn, could contribute to spirals of silence.  It bears repeating that silence in the face of improper or questionable conduct figured in both the tragedy of the *Costa Concordia*,[61] as well as the criminal activity aboard the *Caribbean Princess*.

## ii.   *Cruise Industry Context*

- If diversity were measured by the number of nationalities working aboard, the cruise industry would be a DEI leader.  The cruise industry is anything but.  What belies the diversity in numbers is the fact that, as noted above, ships typically operate with various national groups that are almost entirely stratified and separated into relatively homogenous and non-inclusive groups, with non-Europeans concentrated in service-oriented positions or low-ranking engineering and deck positions.  Likewise, most women on cruise ships are concentrated in service-oriented positions.  This stratification—in particular, the lack of senior officer diversity—poses a threat to compliance for the reasons described above.

- A growing body of research further supports the notion that ships face enhanced compliance risks when they are diverse within the crew population as a whole, but stratified and non-inclusive across the hierarchy of shipboard position ranks.

    o   As one study observes, "categorization into cultural subgroups lies at the heart of many of the negative outcomes of diversity in organizations, including reduced social cohesion, lower organizational commitment, and an increased chance of miscommunication and conflict."  J. Hofhuis et al., *Diversity climate enhances work outcomes through trust and openness in workgroup communication*, 5 SpringerPlus 714 (2016), https://springerplus.springeropen.com/articles/10.1186/s40064-016-2499-4; *see also* F.J. Milliken, *Diversity and Corporate Social Responsibility:  Exploring the Potential Connections between Top Management Team/Board Diversity, CSR,*

---

[61] Cultural and workplace conditions affecting the willingness of bridge officers to challenge the Captain were found to have contributed to the 2012 *Costa Concordia* tragedy, in which more than 30 people lost their lives when the ship sailed too close to shore and partially sank.  *See* CAM First Annual Report at 30; CAM December 2019 Quarterly Report at n.32; *see also* A. Di Lieto, BRIDGE RESOURCE MANAGEMENT: FROM THE COSTA CONCORDIA TO NAVIGATION IN THE DIGITAL AGE (1st Ed. 2015).  The CAM has observed that the *Costa Concordia* incident "galvanized efforts within the Company and in the broader cruise industry to drive systemic change, including changing shipboard [safety] culture [in the bridge] . . . Many in the Company view the *Caribbean Princess* prosecution as an analogous opportunity to change culture with regards to environmental compliance."  CAM First Annual Report at 30.

*and Workforce Diversity*, THE OXFORD HANDBOOK OF CORPORATE SOCIAL RESPONSIBILITY: PSYCHOLOGICAL AND ORGANIZATIONAL PERSPECTIVES (Oct. 2019).

- o   As noted in a recent Human Rights at Sea report:  "If an individual does not feel comfortable in their working environment, they are less likely to draw attention to a problem or to ask for help—this increases the risk of accidents and injuries."  J. Rawley, *We are ALL someone's Daughter. We chose to be Seafarers:  A reality check on Diversity and Hope in 2021,* Human Rights at Sea, 4 (Feb. 2021).

- Strong leadership towards achieving a robust DEI culture is becoming recognized as an essential component of a robust compliance program for any organization—including a cruise company.  The ISM Code requires that "[e]very Company should develop, implement and maintain a [Safety Management System] which includes . . . defined levels of authority and lines of communication between, and amongst, shore and shipboard personnel."  ISM Code, Part A, § 1.4.  As the above research demonstrates, a deficient DEI culture could result in crew members who do not feel they can speak up about compliance issues, jeopardizing the communication that is essential for an effective compliance program and preventing ships from implementing an effective Safety Management System.  As Carnival Corp.'s history of noncompliance issues shows, some of its biggest compliance risks can be traced to continuing patterns of stratification and exclusion.  Research indicates that if employees at every rank of the ship hierarchy feel supported by a diverse, equitable, *and* inclusive culture, they are far more likely to identify and raise compliance issues.

### c)   Stated Commitment to DEI

- The Company has stated a commitment to DEI.  For instance, the Corporate Vision Statement reads, in part: "We are committed to a positive and just corporate culture, ***based on inclusion and the power of diversity***."  Corporate Vision Statement (emphasis added)*.*  As noted in Part III.B above, members of top leadership, including the Carnival Corp. CEO, have communicated the importance of DEI as a moral and business imperative, in both internal and external communications.  *See supra*, Part III.B.2; *see also* CAM Third Annual Report at 239-40 (providing examples).  For example, the President of Holland America Group reports that they have addressed DEI topics at "regular all hands/town hall meetings and in other leadership messaging," including in response "to feedback from teammates about recognizing and engaging on current topics facing society—such as the recent increase in Asian hate crime, and the sentencing in the George Floyd trial—as well as recognizing milestones such as Pride, the formalization of Juneteenth as a federally recognized commemoration, and more."  *See* Leadership Updates Feedback at 9.

- In addition, at the April 30, 2021, Status Conference, the Carnival Corp. CEO expressed to the Court that the Company is "committed to . . . enhancing diversity, equity, and inclusion throughout all aspects of [the] company."  Status Conf. Tr. at 6 (Apr. 30, 2021).  The CEO emphasized that DEI "***particularly in the deck and technical departments . . . is a key factor for our longterm success . . .* [T]**here is *no doubt in my mind that to be our best, we must have a diverse and inclusive work force in all areas*."  *Id.* at 11 (emphasis added).  The CEO also stated, "a commitment and an expectation of inclusion and diversity in the [internal

investigator] team." *Id.* at 48; *see also infra*, Part VII.C.2(c) (discussing efforts to enhance diversity among Incident Analysis Group investigators).

- While these statements are important, words and intentions are insufficient absent a commitment and dedication of resources. Clear expectations and accountabilities must also be established at the top leadership levels. As discussed in Part V.C below, employees do not see these words matched with leadership action. They continue to express concerns about the long-term impacts on the viability of the Company from a lack of concrete actions and improvements in the DEI space, as well as short-term concerns that this inaction will result in increased acts of harassment and discrimination. *See infra*, Part V.C.1-2.

### *d)   Awards and Recognition*

- The Company has received various awards and recognition related to corporate culture and DEI. These include: Forbes' list of America's Best Large Employers of 2021 (ranked #179); Forbes' list of Best Employers for Diversity for 2021 (ranked #383); Newsweek's list of America's Most Responsible Companies for 2021 (ranked #196); Glassdoor's Employees' Choice Awards for the Best Places to Work for 2021 (ranked #58); and a 2021 recognition by the Human Rights Campaign as a Best Place to Work for LGBTQ Equality.[62]

- Based on the CAM Team's review, these awards appear to be largely based on surveys of (mostly U.S.-based) shoreside employees,[63] and therefore it is likely the survey populations are a small percentage of the Company's overall employee base. They do not specifically focus, as the Environmental Compliance Culture Assessment did, on the tens of thousands of shipboard maritime employees and the shoreside staff who support them.

### 2.   INTEGRATING DEI INTO THE CULTURE ACTION PLAN AND C.A.R.E. FRAMEWORK

### *a)   Culture Action Plan*

- As discussed in Part IV.B above, the Company has incorporated DEI as a "central pillar" of its culture governance framework and made it a component of the Culture Essentials program under the Culture Action Plan. *See supra*, Part IV.B.2; *infra*, App. B. According to the Company, this was prompted by the recognition that "DEI efforts needed to be prioritized, better coordinated, and fully incorporated as a central pillar of our culture improvements." Compliance Committee Q1 2021 Report at PCL_ECP00190577.

- DEI activities that have been carried out or are underway under the Culture Action Plan, largely led by the Brands, include:

---

[62] This recognition focuses largely on corporate policies and is not based on employee survey data.

[63] Not all of the awards make their methodology publicly available.

- o  Integrating DEI factors into the Bring Back selection criteria developed by the Brands for making re-hire decisions for ship and shore employees as operations resume.[64]

- o  Integrating DEI factors into other aspects of the HR lifecycle, such as job applications and performance evaluations.

- o  Brand-led "Courageous Conversations" about culture and DEI issues.

  *See infra*, App. B.

- A range of additional initiatives, which differ by Brand, are underway in areas including: DEI goals and targets; employee surveys; Global Talent Partner outreach; recruitment; and training.  Highlights of these efforts are summarized in Appendix C.

  *b)    C.A.R.E. Framework*

- As discussed in the last CAM report, in ECP Year Four, Brand HR leaders, in coordination with the Ethics & Compliance team and other All Brands Group leaders, developed what the Company calls the "C.A.R.E. Framework."  The CAM has observed that the C.A.R.E. Framework was a laudable step toward greater centralization of the Company's DEI approach.  *See* CAM January 2021 Quarterly Report at 40.[65]

- The C.A.R.E. Framework is designed to require the systematic consideration of DEI or culture impacts when making business decisions, and for those decisions to be re-evaluated if there are unintended DEI or culture impacts.  C.A.R.E. means:  **C**onsider intended goal to achieve; **A**sk if there is any unintended culture/DEI impact; **R**ethink actions to mitigate the impact; and **E**valuate how to proceed if mitigation does not fully address the impact.  DEI Presentation at PCL_ECP00178142.

- Since the initial presentation to the CAM Team on the C.A.R.E. Framework in December 2020, the CAM Team has met with each of the Brands to learn how the framework is being implemented in practice.  At least one Brand, Carnival Cruise Line, has created resources for the C.A.R.E. Framework and plans to use the entertainment department as a pilot group.  *See* CCL May 2021 Culture Updates – Preparing for Restart with the Expected Behaviors (June 7, 2021), PCL_ECP00219315.  Other Brands appeared to view the framework as largely a "branding" effort that has not had discernable impacts on how they do things.  *See* Employee

---

[64] The CAM Team will continue to seek to learn more about how DEI considerations were factored into decisions about which employees (ship and shoreside) to retain, let go, or furlough. The CAM Team will also seek to understand any impacts to employee diversity as a result of these staffing decisions.

[65] As noted in Part IV.C above, there does not appear to be a centralized HR leadership team driving these efforts.  The All Brands Group Chief HR Officer has not played a visible role in leading or coordinating culture change efforts, including in the DEI space.  *See supra*, Part IV.C.2.

Interview/Call Notes.  At present, based on the Brand presentations, it is difficult to evaluate what, if any, concrete impacts the framework is having.

- The CAM has heard the strongly stated commitment to DEI expressed by many of the Brand leaders involved in developing and implementing the Culture Action Plan and C.A.R.E. Framework.  However, as discussed in the following section, these individuals appear to operate in the absence of clear vision or direction as to what is expected from them, or what defines success, from the All Brands Group.

## C.    Remaining Barriers and Opportunities for Improvement

### 1.    *DEVELOPING A CENTRALIZED, COORDINATED DEI STRATEGY*

- The Company's DEI efforts have historically been decentralized, without coordinated leadership or strategy at the All Brands Group level.  Throughout the first three years of the probationary period, DEI efforts at the All Brands Group level remained unfocused, and efforts across the Brands did not appear consistent or coordinated—despite examples of laudable efforts spearheaded by individuals within the various Brands.  As noted above, it was not until ECP Year Four that the Company took steps (at least in writing) toward centralizing its DEI approach through the Culture Action Plan and C.A.R.E. Framework. Despite the lack of overarching coordination on the Company's DEI strategy, several notable Brand efforts are in progress, as discussed above and in Appendix C.  *See supra*, Part V.B.2; *infra*, App. C.

- Employees continue to report a vacuum of leadership at All Brands Group, with most efforts left to the Brands.  For example, the CAM Team has received conflicting responses from employees when they are asked who at All Brands Group is setting DEI strategy or coordinating DEI efforts.  Despite what the Culture Governance Framework Document may say, it appears that ownership and responsibility for DEI largely relies upon individuals at the Brand level, primarily within each Brand's HR department.  There is widespread confusion and frustration over the lack of overarching strategy throughout the corporation in this area. *See* Employee Interview/Call Notes.  This stands in stark contrast to the Company's well-understood and well-structured approach to setting expectations for achieving guest satisfaction and financial goals.  *See* CAM Second Annual Report at 63-64, 71-85.

### 2.    *ESTABLISHING PROGRAMS TO ENHANCE DEI AMONG SHIPBOARD OFFICERS*

- There does not yet appear to be a significant, coordinated effort led by All Brands Group to launch a program (long term or immediate) with the aim of building a diverse officer corps across the Company's ships—including one with clear expectations, accountabilities, and concrete goals.  Again, any such efforts have been led by the Brands.  *See supra*, Part V.B.2; *infra*, App. C.

- On issues of racial and ethnic diversity, Brands are still in the early stages of developing or implementing plans to increase DEI among shipboard officer ranks, such as programs to source new officers from non-traditional areas, including regions outside of Europe.  While Costa Group and Carnival Cruise Line began such programs before the pandemic, most

Brands are still in the scoping phase of considering possible approaches.  As of the date of this Report:

- o Carnival Cruise Line has partnered with schools in the Bahamas, Panama, Philippines, and China "to hire diverse technical candidates into [its] cadet program." *See* Leadership Updates Feedback at 2.

- o Costa Group has launched cadet programs in the Philippines, India, Ethiopia, and China.  As noted above, Costa Group recently lobbied for and facilitated a bi-lateral agreement between Chinese and Italian Authorities to recognize Chinese officer certifications on its Italian-flagged ships.  *See id.* at 4; Company Draft Report Comments.

- o Other Brands have not yet launched formal programs.  *See* Employee Interview/Call Notes.

- On issues of gender diversity, Company employees observe that actions appear reactive, rather than proactive, despite a stated goal of having more female deck and technical officers.  To the best of the CAM's knowledge, there is no comprehensive strategy for recruiting or retaining female officers.[66]  This includes a lack of consistent policies for maternity leave and return to work, or for accommodating child-care responsibilities in setting schedules.  Brands appear to address such issues on a case-by-case basis.  Such a strategy has, at times, enabled the Company to accommodate an individual woman's specific situation, but such an approach is far from comprehensive, and is likely to hinder the ability to recruit and retain more women.  Indeed, many employees from various ranks and departments, ship and shore, have suggested to the CAM Team that existing recruitment and retention processes for female officers are inadequate, which has contributed to other cruise companies poaching female officers.  *See* Employee Interview/Call Notes.

  - o Senior shoreside managers have told the CAM Team that it is inconvenient and expensive to accommodate women officers.  *See id.*[67]  However, given the research summarized above on the links between DEI and compliance, up-front investments in accommodating more women could instead be viewed as supporting the Company's long-term compliance (and business performance) goals.

- As noted above, the CAM recognizes the commitment to DEI expressed by many of the Brand leaders involved in efforts to help the Company seize the opportunity to become a

---

[66] The CAM Team is gathering further information about the Company's policy (or policies) and practices for investigating and addressing instances of sexual harassment or the creation of a hostile workplace.

[67] For example, one Brand has struggled to accommodate female deck officers who complained about the requirement that they remain on deck for long hours while wearing white pants (given their monthly cycles).  The Company has now committed to provide the women with darker colored pants.  However, there was reportedly resistance to making this minor accommodation in the Company's uniform policy.  *See id.*

leader—and make history—in this space.  However, progress requires strong, centralized leadership on DEI, and not the efforts of a few committed employees.

## VI.    SUPPORT FOR SHIP OPERATIONS

### A.    Potential Post-ECP Goals

As described in Part II.A above, the goals detailed below were compiled by the CAM as of result of its communications with top leaders and senior management.  However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization."  *See* Company Draft Report Comments.

- *Safe, Compliant, and Environmentally Conscious Ships***:**  Ships that are known for, and promoted as, being safe, compliant, and environmentally conscious, as much as for being "fun," "ultra-luxury," or otherwise guest-experience focused.

- *Prioritized Ship Operational and Compliance Need***s:**  Ship operational and compliance needs that are prioritized as much as (or more than) the revenue-generating aspects of the Company's business, including:

    o   Ships with:

        ▪   All pollution prevention equipment in working order.

        ▪   All necessary spare parts (including but not limited to critical environmental spare parts) and related equipment and tools aboard, with the ability to acquire additional materials efficiently and without undue budget pressures.

        ▪   Adequate crew complements, especially in the deck and technical departments, in terms of both numbers of crew members and adequacy of their skills and qualifications.

        ▪   Ready access to sufficient shoreside and monetary resources to repair, maintain, and replace equipment, piping, and other ship components.

    o   Diverse, equitable, and inclusive shipboard workforces, including among deck and technical officers.

    o   Manageable workloads for both crew members and shoreside support staff, supported by:

        ▪   A robust Management of Change program that governs all aspects of operations and business decision-making, including changes to equipment, processes, budgets/plans, policies and procedures, work assignments, and employment conditions.

- ▪ A manageable and well-governed stream of communications between shoreside offices and the ships.

- ▪ Ready access to sufficient shoreside and monetary resources to address ongoing and unplanned needs.

- o A successfully executed global IT strategy that provides:

  - ▪ Modern and effective IT and data systems and tools in support of compliance, including:  voyage planning software; planned maintenance and spare parts management systems; training attendance tracking and reporting tools; incident and near miss reporting, tracking, and analysis tools; reliable shipboard Wifi connectivity and bandwidth; and a modernized Global HESS platform.

  - ▪ Data management and analysis tools that allow for sophisticated analysis of compliance data across the corporation.

- o Robust and effective programs for:

  - ▪ Minimizing shipboard food waste and single-use items.

  - ▪ Assessing waste vendors and managing waste offloads.

  - ▪ Integrating compliance considerations into ship design, including during new build and dry/wet dock processes.

  - ▪ Identifying lessons learned from successes and failures (including near misses) and incorporating those learnings into operations as part of a continuous improvement process.

- Procurement practices that leverage the size of the organization for both:  (1) purchases of provisions, equipment, and spare parts; and (2) large capital projects, such as major pollution prevention equipment installations (*e.g.*, Exhaust Gas Cleaning Systems), as well as a process for assessing the success of, and lessons learned from, past procurement efforts (including the adequacy of Management of Change processes).

- Clear goals, expectations, ownership, and accountabilities in each of these areas.

  **B.    Progress**

  *1.    PAUSE PRIORITIES PLAN IMPLEMENTATION AND FLEET READINESS*

  *a)    Background*

- After the onset of the pandemic, in April 2020, the Company reported that it was developing a Pause Priorities Plan, described as "a list of priorities" during the pause period "to ensure that when the ships return to service, they will come back ***stronger and better equipped***" and

July 19, 2021

"***stronger, better, smarter***."  CAM Third Annual Report at 52-53 (quoting April 2020 Probation Supervision Report, Attachment 5) (emphasis added); Status Conf. Tr. at 45 (Apr. 24, 2020) (emphasis added); Environmental Excellence Newsletter Issue 03-2021 at 4.  A draft Pause Priorities Plan was submitted in June 2020.  *See* CAM January 2021 Quarterly Report at 15.  The plan has since been revised several times, most recently on July 8, 2021. The Company has provided the CAM Team with regular updates on the general status of its implementation.

- The Pause Priorities Plan sets forth a range of initiatives, with corresponding approximate timelines, under four categories:  (1) Environmental; (2) Investigations; (3) Culture; and (4) Training.  Numerous actions have been implemented, or are underway, under this plan that are designed to help support ship operations, including:

  o  Installing food waste digesters.

  o  Providing full sets of critical environmental spare parts for pollution prevention equipment.

  o  Changing shift rotations for engineers in the Engine Control Room (from six four-hour watches per day to four six-hour watches per day, and expanding from three to four shifts) to allow for more optimal alignment of work schedules with rest and meal times.

  o  Implementing dry bilge upgrades to minimize the amount of liquid that enters the bilges, which are the lowest portion of a ship inside the hull where liquids accumulate.[68]

  o  Repairing pollution prevention equipment and leaking piping and other ship components.

  o  Reviewing the completion status of planned maintenance items related to environmental compliance.

  *See* Pause Priorities Plan at 9-17.

- As the CAM has observed, many of the environmental initiatives relate to basic compliance support for ships, and cover issues identified since the beginning of probation.  At the time the COVID-19 crisis emerged, well into ECP Year Three, the Company had still not comprehensively addressed previously identified ship needs related to compliance.  *See* CAM Third Annual Report at 138-41.  The Company's ongoing struggles to effectively prioritize the operational and compliance needs of ships, above or on par with other business interests, is discussed in Part VI.C below.  *See infra*, Part VI.C.1.

---

[68] Excess bilge water accumulation was a significant contributing factor to the illegal activity that occurred on the *Caribbean Princess* and other Company ships.  *See* Joint Factual Statement (Dec. 1, 2016), Dkt. No. 2-1 at 8-11.

July 19, 2021

### b)   *Fleet Readiness for Ships Returning to U.S. Waters*

- Since October 2020, the Court has issued two Orders regarding the readiness of Company ships returning to operations.  The Court's goal in issuing these Orders was to learn about the condition of ships that would be returning to U.S. waters.  In the Court's view, these Orders were a prudent precaution given that the pandemic had restricted in-person ship visits or audits by the CAM or TPA, as well as by the Company's own internal auditors and external certification and regulatory bodies.

  - **Compliance Disclosure Certifications:**  The first Order requires the Company to submit Compliance Disclosure Certifications for ships returning to U.S. waters, summarizing the status of 12 specific items related to ship maintenance and repair (such as repairs to pollution prevention equipment and leaking piping).  The items come directly from the Pause Priorities Plan.  *See* Compliance Certification Disclosure Order.

  - **Planned Maintenance Task Updates:**  The second Order was issued in response to challenges the ships were reported to be facing in completing certain planned maintenance tasks due to pandemic-related issues, such as reduced crew levels, difficulties in bringing third-party contractors or vendors aboard, difficulties in obtaining needed materials like spare parts, and certain equipment being taken out of service.  The Order requires the Company to submit information on planned maintenance activities on a monthly basis, including:  (1) identification of outstanding planned maintenance tasks on a ship-specific basis; and (2) plans for addressing these tasks.  *See* Order on January 27, 2021 Status Conference (Feb. 22, 2021), Dkt. No. 218.

- The Company has timely complied with both Orders, submitting a total of 33 certifications for ships returning to U.S. waters as of the date of this Report, as well as monthly planned maintenance task updates for all Covered Vessels.  As discussed in Part VIII below, the TPA has reviewed these submissions on an ongoing basis.  *See infra*, Part VIII.B.  To help verify the information in the submissions, the TPA also conducted virtual audits of 31 out of the 33 ships that have submitted Compliance Disclosure Certifications so far.[69]  The TPA's review to date indicates that the ships returning to U.S. waters are generally capable of operating in compliance with the ECP and environmental laws, provided the ships are adequately staffed and nonconformities identified by the TPA are addressed, including repairs to Exhaust Gas Cleaning Systems.  The TPA's review also indicates that the Company has facially adequate plans for addressing outstanding planned maintenance items, provided the ships are supplied with adequate staffing and resources.  *See* Status Conf. Tr. at 31 (Apr. 30, 2021).

- In general, crew members and other Company employees have expressed to the CAM and TPA teams that the Court-required submissions were a substantial, but worthwhile, undertaking.  One benefit reported by many crew members was the opportunity to directly share information and insight about ship needs with members of the most senior shoreside

---

[69] The TPA plans to perform verification audits of the additional ships.

leadership, including the Carnival Corp. CEO and Chief Operations Officer.  *See* Employee Interview/Call Notes.

- Meeting its obligations under the Court Orders was a significant achievement—especially for the shipboard crews, who the TPA found were doing "an unbelievable job in the pandemic era, finding ways to fix things and doing it quite well," including "an amazing job" in repairing leaking components and reducing bilge water.  Status Conf. Tr. at 26-27 (Apr. 30, 2021).  Whether the ships are coming back "stronger, better, smarter" as originally promised by the Company's top leadership, however, is difficult to assess.

*c)*    *Integration into Ethics & Compliance Strategic Plan*

- Now that the Company is exiting the pause, it plans to "close out" the Pause Priorities Plan.  *See* Company Draft Report Comments.  The Ethics & Compliance team plans to issue a final report on the implementation status of the Pause Priorities Plan initiatives.  Any non-environmental initiatives still in progress will be monitored and tracked through the forthcoming revised Ethics & Compliance Strategic Plan.  Any environmental initiatives still in progress will be tracked independently until complete.  *See id.*; Employee Interview/Call Notes.

2.    *CONTINUED FOOD WASTE MANAGEMENT PROGRESS*

*a)*    *Background*

- During ECP Years Two and Three, the discharge of non-food items, including plastics, in food waste[70] and grey water[71] waste streams from the Company's ships came to light as a systemic, corporate-wide issue.  Such discharges may violate the International Convention for the Prevention of Pollution from Ships ("MARPOL"), which generally prohibits the discharge of all garbage,[72] including all plastics, into the sea.  *See* MARPOL Annex V, Reg. 3.1-3.2.[73]  In June 2019, the Company pleaded guilty to a probation violation for a

---

[70] "Food waste" in this Report generally refers to "soft" food waste (such as wet food scraps and other digestible items), and not to "hard" food waste (such as bones, shells, tough skins, and other nondigestible items).

[71] The grey water system processes wastewater coming from various sources on the ships, including kitchen galley drains.  If those sources do not have adequate filtration devices (such as drain/scupper covers), plastics and other non-food items may enter grey water pipework, which may ultimately go to tanks that are discharged overboard.  *See* CAM January 2021 Quarterly Report at 62-63.

[72] Garbage is broadly defined under MARPOL to include, among other things, "domestic wastes and operational wastes" and "all plastics," with certain exceptions that do not apply here.  *See* MARPOL Annex V, Reg. 1.9.

[73] Although MARPOL permits the discharge of food waste under specified conditions, *see, e.g.*, MARPOL Annex V, Reg. 4.1.1-2, whenever food waste or other garbage is "mixed with or contaminated by other substances prohibited from discharge [*e.g.*, plastics] or having different discharge requirements, the more stringent requirements shall apply."  MARPOL Annex V, Reg.

commingled food waste discharge, along with a failure to accurately record this discharge. *See* CAM January 2021 Quarterly Report at 55 (citing Probation Revocation Agreement at 11).

- As discussed in earlier CAM reports, as early as February 2018, in responses to the ECP-required Fleet Engineering Survey, the Company's employees identified the problem of ongoing discharges of plastics and other non-food items commingled with food waste due to inadequate shipboard waste sorting and disposal processes.  However, the Company's top leadership did not respond to the employees' concerns about possible plastic discharges into the ocean until it faced probation revocation in March 2019.  For employees, the failure of management to act on a self-reported problem (until confronted by the Office of Probation) reflects a larger failing by the Company's top executive leadership and Board of Directors. Employees believe that these leaders viewed such incidents as missteps by individual actors, without also considering whether they may be the result of inadequate systems and processes. Their concerns are compounded by the Company's longstanding lack of focus on compliance culture, as well as its lack of robust systems for internal investigations (including root cause analysis), risk governance, data management and analysis, and management accountability. *See* CAM January 2021 Quarterly Report at 55-56.

- In connection with its guilty plea, the Company acknowledged the need to improve the management of food waste on its ships to prevent discharges of plastics and other non-food items, and agreed to take actions to prioritize this issue, including:

    o Establishing a Food Waste Task Force and two Food Waste Tiger Teams.[74]

    o Implementing a three-part program to improve its food waste management practices, which addresses:  (1) training, supervision, staffing, and culture improvements; (2) reducing single-use plastics and food waste; and (3) technology and design improvements.

    o Committing to:  (1) reduce the purchase and consumption of single-use plastic items[75] on its ships by 50% by December 31, 2021; and (2) reduce the total weight of food waste generated on its ships by 10% by December 31, 2021.

---

4.4.  Therefore, a food waste discharge that would otherwise be permitted under MARPOL is not permitted if the food waste is contaminated with plastics or other non-food items that cannot be legally discharged.

[74] "Tiger Team" is a term of art that arose from aeronautics in the 1960s to describe a team of technical experts who are given unrestricted freedom to track down and assess all possible sources of failure in a system, and to develop solutions.  The term is "generally applied to a high-functioning team of specialists who come together to complete a specific project."  *See What is a Tiger Team Approach?*, https://trextel.com/what-is-a-tiger-team-approach-how-to-successfully-launch-technology-and-save-space-missions-too/.

[75] The Company describes single-use plastic items as including "straws, cups, lids, stir sticks, cutlery, cocktail picks, tooth picks, butter packets, serving sauce packets, honey packets, sugar

July 19, 2021

- o Committing a minimum of $20 million in capital expenditures throughout the remainder of probation to optimize food waste management.

- o Submitting a range of plans, reviews, and assessments, as discussed in earlier CAM reports. *See*, *e.g.*, CAM Third Annual Report at 73-74, 107-22; CAM January 2021 Quarterly Report at 56.

- At the end of ECP Year Three, the CAM made a finding that "under the leadership of the Environmental Corporate Compliance Manager, the Company was making tangible progress on improving its food waste management." CAM Third Annual Report at 73. The Company reported that it was on track to meet its Probation Revocation Agreement commitments to reduce single-use plastics and food waste weight. The Company had also begun a program to install food waste digesters on the majority of its ships (which remains in progress, as detailed below), which the Company's prior reviews and assessments had concluded were the best technology option for addressing its food waste management challenges. *See id.* This progress continued through the beginning of ECP Year Four. *See* CAM January 2021 Quarterly Report at 57-64.

- As of the date of this Report, the Company continues to make tangible progress on improving its shipboard food waste management. This includes remaining on track to meet or exceed its various Probation Revocation Agreement commitments. However, as discussed in Part VI.C below, recent concerns have emerged related to various aspects of food waste management processes, including food waste weighing practices and digester operations. Active investigations and reviews are underway. *See infra*, Part VI.C.3.

*b)*     *Single-Use Plastics Reduction*

- The Company's self-reported data indicates that it is on track to meet or exceed its Probation Revocation Agreement commitment to reduce single-use plastics on ships by 50% by December 31, 2021. The Company has incorporated this commitment into its recently announced 2030 sustainability goals. *See* Initial 2030 Sustainability Goals Announcement.

- As of July 2021, the Company reports that single-use plastics have been reduced by a fleetwide average of ***approximately 98%***, based on comparing the 12-month period from June 2020 – May 2021 to the Fiscal Year 2018 baseline. Non-plastic single-use items over the same time period have been reduced by ***approximately 99%***. *See Sustainability Single Use Items Global Meeting* (July 2021), PCL_ECP00226766-77 ("Single Use Items Update")

---

packets, sweetener packets, plastic bags in retail stores, Company provided Q-tips, Company-provided individual shampoo bottles, plastic garbage bags in cabins, and balloons used during outdoor events." Probation Revocation Agreement at 7. The Company excludes water bottles "because they are recycled" and plastic gloves "because they are critical to food safety and medical hygiene." Environmental Compliance Scorecard Q1 FY2021 (Apr. 2021), PCL_ECP00190448-82 ("Environmental Compliance Scorecard Q1 FY2021") at PCL_ECP00190466.

July 19, 2021

at PCL_ECP00226767-69.  Items that have been eliminated from ships include Q-tips, garnish picks, and chop sticks.  *See* Company Updates Letter at PCL_ECP00225067.

> o   These significant reductions are likely attributable in part to the drastically reduced number of crew members and passengers aboard ships during 2020, compared to the 2018 baseline year of normal operations.  The Company likely will need to reintroduce some items as guest operations resume on a wider scale.  In addition, new public health and safety protocols may require the re-introduction of certain items, such as plastic bags for garbage bins or individual condiment packets.  *See* Single Use Items Update at PCL_ECP00225073.

> o   The Company reports that it does not expect any increases from the restart of guest operations or the implementation of new public health and safety protocols to compromise its ability to meet its Probation Revocation Agreement commitment.  *See id.*; Employee Interview/Call Notes.  The Company has also voluntarily set the 50% reduction goal again for December 2022 (beyond the December 2021 goal set in the Probation Revocation Agreement) "to prove to [itself]" that it can achieve the goal when it is "no longer getting an assist from the pandemic."  Company Draft Report Comments.

- As discussed in earlier CAM reports, the Company is taking a two-tiered approach to reducing single-use items.  The first tier, which is complete, focused on eliminating or reducing small items and items with obvious substitutes (like plastic cutlery, cups, and straws).  A second tier is focused on eliminating or reducing other single-use items (including amenity bottles, plastic bags, yogurt containers, and cling wrap).  This tier is approximately 79% complete as of July 2021.  *See* Single Use Items Update at PCL_ECP00226767.  In addition, the Company is exploring approaches for addressing other single-use plastics, beyond those in tiers 1 and 2, such as coffee pods and face masks.  *Id.* at PCL_ECP00226774.

- As the Company's outside consultant has observed, reducing or eliminating single-use plastics is an "important goal" because "the most effective way to stop plastic from being discharged into the ocean is to avoid using it onboard in the first place.  If plastic ends up in a pulper/vacuum system, it will likely be macerated into smaller pieces that might be indistinguishable from the organic matter it is blended with."  Food Waste Equipment Technical Review (Oct. 31, 2019) at 2.  According to the International Union for Conservation of Nature, "[p]lastic pollution is the most widespread problem affecting the marine environment."  *Issues Brief: Marine Plastics* (May 2018) at 1, *available at* https://www.iucn.org/sites/dev/files/marine_plastics_issues_brief_final_0.pdf.  Marine species "ingest or are entangled by plastic debris, which causes severe injuries and deaths."  *Id.*  In addition, plastic pollution "threatens food safety and quality, human health, coastal tourism, and contributes to climate change."  *Id.*  It is estimated that as much as 90% of the plastic in the ocean comes from land-based sources, including plastic flushed out to sea due to "inadequate waste disposal and management" practices ashore.  *See id.*; *see also Our planet is drowning in plastic pollution—it's time for change!*, https://www.unep.org/interactive/beat-plastic-pollution/.  Even if the percentage of plastic waste coming directly from cruise ships is relatively small, it nonetheless constitutes an

July 19, 2021

addition to the sea of a waste that the U.S. National Oceanic and Atmospheric Administration reports "can stick around indefinitely, wreaking havoc on marine ecosystems." *See A Guide to Plastic in the Ocean*, https://oceanservice.noaa.gov/hazards/marinedebris/plastics-in-the-ocean.html. The threat of plastic pollution from land-based sources also underscores how critical it is for the Company to thoroughly vet the shoreside vendors it relies on to receive and properly dispose of wastes from its ships.

### c) Food Waste Weight Reduction

- The Company's self-reported data indicates that it is on track to meet or exceed its Probation Revocation Agreement commitment to reduce the total weight of food waste (per capita) generated on its ships by 10% by December 31, 2021. The Company also appears to be on track to meet or exceed its recently announced sustainability goals and aspirations to reduce food waste by 30% by 2022, and by 50% by 2030. *See* Initial 2030 Sustainability Goals Announcement.

- As of April 2021, the Company reports that the weight of food waste generated on its ships (per capita) was reduced by a fleetwide average of ***approximately 40%***, based on comparing a two-week measurement period in April 2021 to the two-week October 2019 baseline. *See* Food Waste Reduction Performance Update (Apr. 2021), PCL_ECP00221559 at 1.

  o The Company acknowledges that the April 2021 and October 2019 figures "are not directly comparable," given that the 2021 measurements took place with a limited number of guests and crew aboard ships across the Company's fleet. *Id*. However, the data is calculated on a per capita basis, which helps to control for the discrepancy in the size of the comparison populations. *See id.*; Employee Interview/Call Notes.

  o The Company reports that, although "there is an expectation that food waste will likely increase" as guest operations resume, it does not expect any such increases to compromise its ability to meet its Probation Revocation Agreement commitment. *See* Cross-Brand Food Waste Measurement, Report 2021-03 (Mar. 3, 2021) ("Cross-Brand Food Waste Measurement Report") at 6; Employee Interview/Call Notes; Company Updates Letter at PCL_ECP00225067-8.

- Notably, as discussed in Part VI.C below, concerns have recently emerged regarding shipboard food waste measurement practices. *See infra*, Part VI.C.3. In March 2021, RAAS completed a Focus Review[76] into food waste measurement and reporting processes. The final report found that different Brands, and even some ships within the same Brand, were taking inconsistent approaches to food waste calculations—in particular, in how they treat food waste liquids (such as soup, beverages, or thawing liquids). For example, out of 19 ships sampled, four ships reported removing liquids from food waste (through straining or other

---

[76] As discussed in Part VII.B below, RAAS Focus Reviews are cross-brand analyses of business issues that may cover a range of topic areas, from spare parts to superintendent workloads. *See infra*, Part VII.B.4.

means) before the waste was measured.  *See* Cross-Brand Food Waste Measurement Report at 10.

- o   The RAAS report does not analyze the extent to which these inconsistencies may impact the accuracy or reliability of the Company's self-reported food waste weight reduction data.  The RAAS report also does not analyze the potential root cause(s) underlying the inconsistent liquid removal practices (such as whether some ships may have been driven by a desire to drive down reported food waste numbers).

- o   Relatedly, an internal investigation is ongoing into allegations of improper food waste measurement and liquid disposal practices on several Company ships, as discussed in Part VI.C below.  *See infra*, Part VI.C.3.  These allegations were reported around the same time the RAAS review was finalized.  It is unclear if the reports were prompted by, or otherwise tied to, the RAAS review.

- •   The RAAS review also identified several opportunities for clarifying food waste measurement, reporting, and recordkeeping requirements.  *See* Cross-Brand Food Waste Measurement Report at 10-15, 17.  Following the review, the Company published a new procedure in May 2021 which clarifies, among other things, the types of liquids that can be removed from food waste.  It expressly prohibits other liquids from being "strained, filtered or otherwise extracted" from food waste.  *ENV 1304 Measuring, Recording, and Reporting of Food Waste* at § 3.  The new procedure also requires ships to weigh and record food waste continuously (*e.g.*, daily or more).  Previously, ships were required to weigh and record food waste only during a two-week period each quarter.  *See id.* at § 2.

### d)   *Food Waste Digester Installations*

- •   The Company has committed in its Pause Priorities Plan to allocate $10 million to purchasing food waste digesters in Fiscal Year 2021, with the goal of installing those digesters on ships within 60 days of their return to service.  *See* Pause Priorities Plan at 10.  The Company reports that it has met its Probation Revocation Agreement obligation to commit at least $20 million in capital expenditures on food waste technologies before the end of probation.  *See* Company Draft Report Comments.

- •   As of the date of this Report, the Company continues to move forward with its digester installation plan.[77]  However, as detailed below, recent concerns have emerged regarding aspects of digester installations and operations, including allegations of the breakdown of plastic digester components and associated potential discharge of plastic into the ocean.  *See infra*, Part VI.C.3.  The Company is actively examining these issues, as well as potential corrective and preventive actions.  The CAM understands that the Company may re-evaluate

---

[77] As discussed in the last CAM report, the current plan differs from the plan submitted in January 2020.  Due to food waste reductions that were underway before the pandemic, the Company determined that fewer digesters than originally anticipated are needed.  Installation timelines have also been adjusted in light of COVID-19 impacts.  *See* CAM January 2021 Quarterly Report at 61.

its digester installation plan depending on the outcome of its investigations and reviews into these concerns.  *See* Employee Interview/Call Notes.

- Under the current plan, the Company expects to complete all digester installations before the end of 2021.  Installations continue to be prioritized for those ships resuming guest operations the earliest.  As of June 2, 2021, the Company reports that, out of 93 ships in its fleet:  (1) ***33 ships (or approximately 35%)*** have either a full set of digesters (21 ships) or a food waste drying system (12 ships) installed; (2) ***31 ships (or approximately 33%)*** have a partial set of digesters installed; (3) ***21 ships (or approximately 23%)*** have no digesters installed but have digesters on order; and (4) ***8 ships (or approximately 9%)*** have no digesters installed or on order.  *See* Maritime Operations Monthly Dashboard (May 2021), PCL_ECP00224689 at 21.  All digesters are projected to be installed before December 2021.

- To further support its digester installation plan, the Company has taken additional actions, including:

  o Establishing, in February 2021, a Food Waste Digester Working Group, led by All Brands Group, with approximately 30 members from across Brands and departments. The working group's purpose is to share knowledge, best practices, and lessons learned on everything from technical installations to operational processes to training. *See* Employee Interview/Call Notes.

  o Developing a list of critical spare parts for digesters, which was completed in February 2021.  *See* Company Updates Letter at PCL_ECP00225068; Company Draft Report Comments.

  o Beginning to develop digester-related trainings for crew members, including a computer-based training.  *See* Company Updates Letter at PCL_ECP00225068.

  o Beginning to develop "micro-procedures" on how to operate digesters, to supplement existing procedures and manuals.  *See id.*

  o Revising its procedure on food waste segregation and disposal to include simplified and less labor-intensive processes for ships that rely exclusively on digesters to process their food waste.  *See ENV 1302 Segregation and Disposal of Food Waste*; Environmental Corporate Compliance Manager Annual Report at PCL_ECP00211335.

- Notably, the Company issued a new procedure in May 2021 requiring each ship (including new builds) to install digesters "with sufficient capacity to meet the daily expected food waste production plus spare capacity."  *DER 2006 Food Waste Processing Equipment* at § 2. Food waste dryers or dehydrators are allowed as an alternative, or in addition, to digesters. *Id.*  This policy effectively requires all food waste to be processed either by digesters or by drying systems, or, if it cannot be processed, to be offloaded ashore.  It also effectively prohibits all food waste discharges to sea (except for digester effluent, which the Company has decided to classify as food waste, rather than grey water, going forward, as discussed in prior CAM reports).  *See id.* at § 1; CAM January 2021 Quarterly Report at 62; Company

July 19, 2021

Draft Report Comments; HESS Committee Meeting Minutes (Apr. 14, 2021), PCL_ECP00217910-14 at PCL_ECP00217911.[78]

> e)   *Other Food Waste Management Initiatives*

- The Company has undertaken additional food waste management initiatives not discussed above, including:

  o   Holding a webinar, in conjunction with CSMART, in early June 2021 with hotel, technical, and environmental personnel, ship and shore, on recent changes to food waste procedures.  *See* May 2021 Probation Supervision Report, Attachment 5, PCL_ECP00225117-20 ("May 2021 Probation Supervision Report Attachment 5") at PCL_ECP00225117.

  o   Providing ships with new, standardized signage for operating shipboard food waste processing equipment, including digesters.  *See* Pause Priorities Plan at 11; Environmental Corporate Compliance Manager Annual Report at PCL_ECP00211335.

  o   Developing a Hotel Food Waste Compliance Self-Assessment form to be completed by ships before resuming passenger cruises, designed "to make sure food waste procedures are properly implemented at restart."  *See* Pause Priorities Plan at 11.

  o   Continuing to report and track food waste management performance in its food waste dashboards, which track data on "the number of instances in which shipboard employees found non-food waste at any point in the food waste disposal system" or grey water system.  Company Updates Letter at PCL_ECP00225068.  The Company reports that the dashboards indicate "significant reduction of contaminants found in food waste," based on comparing data from Q4 Fiscal Year 2020 to Q2 Fiscal Year 2019 (the first quarter in which the Company tracked the dashboard data).  *See* Environmental Corporate Compliance Manager Annual Report at PCL_ECP00211336-37; *see also* Company Updates Letter at PCL_ECP00225068.

---

[78] The Company reports that this policy was introduced before issues came to light regarding the potential breakdown and discharge to the sea of plastic digester components, as discussed in Part VI.C.3 below.  As a result of "the current [plastic] media challenge," the Company is "allowing lawful discharges to sea" of food waste that has not been processed by a digester (*e.g.*, through historic practices such as the use of food waste pulpers or chutes), until there is "a workable solution" to the digester issues.  Company Draft Report Comments.  As the CAM has observed, to the extent ships must rely on historic (pre-digester) food waste management practices, should there be evidence that these methods fail to prevent the discharge of non-food waste in violation of MARPOL Annex V or U.S. law, there is a risk of both corporate and individual liability.  *See* CAM January 2021 Quarterly Report at 63-64.

### 3. IT AND DATA IMPROVEMENTS

#### a) Background

- The CAM has observed that the Company's IT and data resources in support of compliance historically have been: non-centralized, with different systems (or versions of systems) in use by different brands; outdated; and not able to support the collection and sophisticated analysis of environmental compliance data across the corporation, in contrast to the way the Company is able to analyze financial information. *See* CAM Third Annual Report at 127-37.

- The Company has recognized its need for more centralized, modern, and data-driven strategies. Throughout the period of probation, the Company has made efforts to develop and implement IT systems and tools designed to help improve both operations and compliance, and to enhance its data management and analysis capabilities. As discussed in Part VI.C below, progress on these efforts has generally been slow over the course of probation, notwithstanding the pandemic. *See infra*, Part VI.C.4. That said, some significant progress on certain efforts has been made during ECP Year Four, and the Company is continuing to move towards implementing a global, corporate-wide IT strategy. *See* CAM January 2021 Quarterly Report at 81.

- Effective IT and data tools are critical to any organization's compliance and risk management efforts. DOJ recognizes that it is critical for compliance personnel to have access to "relevant sources of data to allow for timely and effective monitoring and/or testing of policies, controls, and transactions." *See* DOJ Corporate Compliance Guidance at 12.

- Company compliance activities supported by IT and data tools include:

  o Hosting internal policies and procedures.

  o Managing internal and external communications, including between ship and shore.

  o Enabling incident and near miss reporting, tracking, and analysis, including data visualization to help identify and manage risks.

  o Managing and tracking findings and corrective/preventive actions from audits and investigations.

  o Managing spare parts, including logistics and procurement.

  o Managing, reporting, and analyzing planned (and unplanned) maintenance activities.

  o Supporting voyage planning, including environmental planning.

    o   Improving the delivery and tracking of trainings.

    o   Optimizing crew staffing and workloads.[79]

    *b)*    *Global IT Strategy*

- Historically, the Company's individual Brands have pursued their own, brand-specific IT and data strategies and initiatives. As the CAM has observed, such efforts are "sometimes at odds or incompatible with other cross-brand efforts." *See* CAM January 2021 Quarterly Report at 81-82 (citations omitted). In recent years, beginning in late 2018, the Company committed to pursuing a global, corporate-wide approach to IT and data. While this effort remains under development, progress has been made. *See id.*

- To support a global approach, the Company has made some organizational changes. For instance, in December 2018, the Company appointed an All Brands Group Chief Information Officer. Each Brand Chief Information Officer now reports directly to this individual. New positions were also created within All Brands Group to provide technical expertise on developing and implementing corporate-wide maritime IT and data initiatives. For example, the Company appointed: a Senior Director of Maritime Innovation that reports to the Chief Maritime Officer; a Maritime IT Director that reports to the All Brands Group Chief Information Officer; and an IT liaison from the Ethics & Compliance department. Together, these three positions comprise the Maritime & Environmental IT group, which is designed to promote continuous improvement in the IT space, with a maritime and environmental focus. *See* Employee Interview/Call Notes.

- Among other initiatives, the Maritime & Environmental IT group has instituted a cross-brand Maritime IT Working Group. According to the Company, this working group "has the specific function to support implementation of the holistic maritime IT strategy led by [Maritime & Environmental IT]." Company Draft Report Comments. Its membership includes leaders from the IT, Maritime Operations, and Ethics & Compliance departments. *Id.*

---

[79] IT and data systems can also expose organizations to cybersecurity threats. The International Maritime Organization has recognized "the urgent need to raise awareness on cyber risk threats and vulnerabilities to support safe and secure shipping," and issued a regulation, which went into effect on January 1, 2021, that requires maritime companies to include cybersecurity risk assessments in their internal HESS policies and procedures. *See* IMO Resolution MSC.428(98) (June 16, 2017). In response, the Company has published in Global HESS both: (1) a cybersecurity framework designed to "implement a risk-based approach that identifies, protects, detects, responds and recovers from any cybersecurity event," *see CYB 1000 Maritime Operational Technology Cybersecurity Framework* at § 1; and (2) incident response plan requirements designed to "[d]efine the response plan for cyber incidents impacting [operational technology] systems or operations." *See CYB 1005 Incident Response Plan Requirements for Critical Ship Systems* at § 1. The Company is also developing cyber security standards for new builds. *See* HESS Board Report Q1 FY2021 at PCL_ECP00190561.

- These changes are designed to support better alignment and standardization of IT and data across the corporation. For example, one focus of the maritime IT strategy is to reduce the number of incompatible "legacy" systems in use throughout the Brands. Another is to enhance the compatibility of various data sources to enable better cross-brand data sharing and analysis. The MAST program, discussed in detail in Part VI.C.4 below, is a specific example of an effort to align the entire corporation on a single software management system. Notably, the Company recently approved additional resources to complete the development of the MAST initiative a year ahead of the original pre-pandemic schedule. *See* Employee Interview/Call Notes.

- Highlights of additional IT initiatives are summarized in Appendix D.

      c)      *Data Visualization Efforts*

- During ECP Year Four, the Company has taken steps to enhance its data visualization capabilities. The goal of data visualization is to represent information in a form that makes it easier to understand and process, such as a chart, graph, diagram, map, or picture. This "visualized" data can then be shared in dashboards, which may be static or interactive (allowing viewers to "drill down" into different data points, or see updates in real time). Notable efforts underway include:

    o **Compliance Risk Intelligence Group Dashboards:** In 2021, the Company reorganized its Ethics & Compliance Risk function to create a four person team known as the Compliance Risk Intelligence Group, led by the Senior Director of Compliance Risk and Analytics and reporting directly to the Deputy Chief Ethics & Compliance Officer. One of its primary responsibilities is to provide data analysis support to stakeholders across the Company. Since its formation, the Compliance Risk Intelligence Group has created over 20 different data visualization dashboards, in response to requests from stakeholders in the Maritime Operations, Ethics & Compliance, and Legal groups. Several of these dashboards provide analytics related to various operational and compliance issues, such as: Global HESS procedure suggestions; critical spare parts for pollution prevention equipment; compliance training; Hotline Reports; investigations; audit findings; Self-Reported Non-Conformities;[80] and HESS incidents and near misses. *See* CRIG Data Intelligence Dashboards Correspondence and Attachments (Apr. 6, 2021); Company Updates Letter at PCL_ECP00225065.

    o **Holland America Group Pollution Prevention Equipment Event Dashboards:** At least one Operating Group, Holland America Group, has started to use data visualization to track and trend pollution prevention equipment events in a more sophisticated manner than has traditionally been done within the Company. *See, e.g.*, Pollution Prevention Equipment Event Review Dashboards, PCL_ECP00221561-88. For instance, these dashboards can provide information about equipment failures on a granular level (*e.g.*, based on the specific component of the equipment that failed), as

---

[80] Since January 2019, ships have been required to self-report instances where they are unable to meet the requirements of Company procedures. *See HMP 1106 Self Reported Non-Conformities*.

well as track and trend repeat issues over time. *See id.* The CAM understands that this effort began in July 2020. Other Operating Groups have recognized a similar need to track, trend, and visualize equipment failures in a more detailed and holistic way (including specific component failures, time out of service, and repair times). Such methods could provide better insights into predicting and preventing pollution prevention equipment events. *See* Employee Interview/Call Notes.

o **RAAS Dashboards:** RAAS continues to develop dashboards that analyze and trend certain HESS metrics central to its audit function, including HESS audit findings, planned maintenance status, and crew experience and training. *See* CAM January 2021 Quarterly Report at 86. RAAS has made improvements to the dashboards since the last CAM report, including: expanding the HESS audit findings dashboard to include TPA audit findings; revising the planned maintenance status dashboard to use the same data and definitions as the monthly Court-ordered planned maintenance submissions; and completing beta testing of the crew experience and training dashboard at three Operating Groups. These dashboards currently do not provide real time access to data and must be manually updated. *See* Employee Interview/Call Notes.

   *d)*  *Return to Service IT Efforts*

- Employees report that the Company is prioritizing IT projects critical to the return to service. For example, current IT priorities include contact tracing and vaccination and consent form tracking systems. The Company is also working on improving existing crew personnel management systems to enable better management of crew immigration status, vaccination status, credentials, travel logistics, and ship assignments. *See* Employee Interview/Call Notes.

   *4.*  *W̲A̲S̲T̲E̲ ̲V̲E̲N̲D̲O̲R̲ ̲A̲S̲S̲E̲S̲S̲M̲E̲N̲T̲ ̲P̲R̲O̲G̲R̲A̲M̲ ̲I̲M̲P̲R̲O̲V̲E̲M̲E̲N̲T̲S̲*

   *a)*  *Background*

- In March 2020, the Company launched a revised, corporate-wide waste vendor assessment program.[81] The redesigned program was prompted by multiple RAAS and TPA audit findings that the Company was not assessing third-party waste vendors as required by its

---

[81] This Report uses the term "waste vendor" to refer generally to entities or facilities that receive or handle wastes offloaded from the Company's ships at the ports it calls upon around the world. Waste streams that may be offloaded include: black water/sewage; food waste; garbage/solid waste; hazardous waste (including medical waste); grey water; and oily wastes (*e.g.*, sludge, bilge water, and other oily waste or residues). Waste vendors may include barges that dock alongside the ship, trucks that remain ashore, or other types of reception facilities. Waste may be transferred from the ship to the waste vendor manually (such as by hand or via a forklift or other machinery, for solid waste streams), via a hose connection (for liquid waste streams), or other means depending on the waste stream. Before the pandemic, the Company had a working list of approximately 600 different waste vendors and visited approximately 900 ports around the world, although it did not offload waste in every port. *See* Employee Interview/Call Notes.

internal procedures—and contrary to assurances in its public Sustainability Reports that "shoreside waste facilities are evaluated prior to offloading the waste from the ships." *See* CAM Third Annual Report at 204 (quoting Sustainability Reports for Fiscal Years 2013 through 2017).[82]

- While relevant law does not appear to impose a legal obligation on the Company to assess waste vendors, assessing third-party risk is integral to compliance. DOJ recognizes that a well-designed corporate compliance program should apply risk-based due diligence to third-party relationships and "incentivize compliance and ethical behavior by third parties." DOJ Corporate Compliance Guidance at 7-8.[83] As DOJ expressed to the Court in this case: "We would certainly hope that when the company does begin cruising again, that there has been meaningful vetting, that the company know where the waste that it discharges ashore is going, and that it's being treated properly and not just going back into the ocean." Status Conf. Tr. at 11 (Apr. 24, 2020).

- In ECP Year Three, the CAM observed that the Company's updated program improves upon its previous practice. However, the CAM raised concerns about the program, including the risk that the limited review process may be akin to the "check-the-box" approach that DOJ has cautioned is often inefficient and ineffective. *See* CAM January 2021 Quarterly Report at 68 (citing DOJ guidance).

- During ECP Year Four, the CAM Team has continued to engage with All Brands Group and individual Brand personnel responsible for implementing the program. These individuals have expressed passion and dedication to implementing and continuously improving the program. Highlights of these efforts, along with some of the CAM Team's ongoing concerns, are discussed in the following sections.

### b) Redesigned Program

- The Company describes the redesigned waste vendor assessment program, launched in March 2020, as a three-step process, relying on:

  o (1) **Self-Assessment "Duty of Care" Forms:** The Company sends Duty of Care self-assessment forms to each vendor requesting basic (but unverified) information that the vendor fills out and returns to the Company.

---

[82] The Company's 2018 and 2019 Sustainability Reports were revised to "tout[] the Company's goal to '[f]urther develop and implement [waste] vendor assurance procedures.'" CAM December 2019 Quarterly Report at 61 (discussing revisions to the Company's 2018 Sustainability Report). However, these reports do not correct the inaccurate assurances of waste vendor vetting from prior years.

[83] Making inaccurate statements in its sustainability reports may also have implications for the Company's ESG ratings. Moreover, the Company has incorporated waste vendor assessment requirements into its Environmental Management System procedures in Global HESS, and compliance with those procedures is audited by international certification bodies.

July 19, 2021

o   (2) **Negative Media Reviews:**  The Company performs searches of commercial databases for public negative media reports involving the vendor, a process referred to as a "negative media review."

o   (3) **"Red Flag" Reviews:**  The Company performs internal "red flag" reviews of information collected during the first two steps.  Relevant factors considered during these reviews include:  past violations; insurance and licensing; facility accessibility and visitation permissibility; waste removal methodologies; and third-party audits.

See CAM January 2021 Quarterly Report at 67-68; *ENV 1004 Environmental Management of Waste Vendors* ("ENV 1004"); *ENVC 1004 Company Environmental Management of Waste Vendors* ("ENVC 1004").

- In late 2019, the Company established a Waste Vendor Working Group with representatives from All Brands Group and each of the Brands.  The working group is tasked with overseeing the development, implementation, and continual improvement of the program. *See* Employee Interview/Call Notes.

- The program is centrally coordinated at the All Brands Group level, with responsibility for the three steps described above split between All Brands Group and the individual Brands. The Brands primarily oversee the self-assessment process, while All Brands Group performs the negative media reviews, and the Waste Vendor Working Group performs the internal "red flag" reviews.  *See id.*

c)   *Program Updates*

- The Company has made some meaningful strides with its waste vendor assessment program in ECP Year Four.  As of the date of this Report, the Company has implemented its assessment process for all waste vendors located in potential layup and restart locations, and nearly all other waste vendors that are not mandated by the ports.[84]  *See* Maritime Operations Monthly Dashboard (May 2021), PCL_ECP00224689 at 34.  According to the Company, "only 35 vendors (out of 597) are pending final vetting completion."  Company Draft Report Comments.

- In addition, in May 2021, the Company revised its internal procedures for the waste vendor assessment program.  Among other changes, the revisions clarify:

o   That all waste vendors, including port-mandated vendors, must undergo negative media reviews.

---

[84] As discussed in the last CAM report, the Company revised its internal procedures in October 2020 to exempt port-mandated vendors (*i.e.*, vendors the Company is required to use by a Port Authority, as opposed to vendors chosen by the Company) from the waste vendor assessment process.  *See* CAM January 2021 Quarterly Report at 68-69.

- o   The process for ships to issue a Self-Reported Non-Conformity if they learn they will have to use an unapproved vendor.

- o   The criteria for determining if a vendor should be suggested for a site visit.  The CAM has observed that the prior procedures did not provide instruction on when site visits were advisable or how to conduct them.  The revised procedures now detail the criteria used to determine whether to conduct a site visit, as well as the criteria for prioritizing site visits to the highest-risk vendors.  *See* ENVC 1004 § 2.3.  The procedures do not yet provide instruction on how to conduct, assess, or document such visits.  The Company reports that "[c]urrent procedures do not yet document how to perform a site visit as site visits are not currently feasible due to the pandemic."  Company Draft Report Comments.  Once site visits become feasible, "the procedures will be developed jointly with a 3rd party vendor who [the Company] will work with to develop the site visit program."  *Id.*  This "is the next phase of the project" and a "work in progress."  *Id.*  The Company did not provide an expected date of completion.

    *See* ENV 1004 §§ 2.1-2.3; ENVC 1004 §§ 2.1-2.3, 2.5.

- The Company describes its approach as "risk based due to the volume of vendors and different regulatory bodies/requirements at all levels including international, national, local, port specific, etc."  Company Draft Report Comments.  In addition to the three steps outlined above, "[i]n the future, site visits will include additional document review and onsite checks."  *Id.*

- The Waste Vendor Working Group is also now coordinating with the Company's Anti-bribery and Corruption team "to conduct negative media anti-bribery and corruption screenings on identified waste vendors."  Compliance Committee Q1 2021 Report at PCL_ECP00190616.  The screening process "is ongoing."  *Id.*

- In addition, the Company is considering possible software solutions to automate the management of Duty of Care vendor self-assessment forms.  *See* Employee Interview/Call Notes; Company Draft Report Comments.  Similarly, the Company has proposed enhancements to SeaEvent (the Company's incident and near miss reporting and case management system) that would allow it to better track and trend reportable waste vendor issues.  *See* SeaEvent v1.10 Enhancements.

### d)   CAM Team Review

- The CAM Team reviewed more than 500 waste vendor due diligence documents provided by the Company, including Duty of Care self-assessment forms, negative media review reports, and Waste Vendor Working Group notes.  The CAM Team also conducted additional spot-checks on specific waste vendors.

- The CAM Team's review revealed that the Company has identified and elevated issues with some waste vendors to the Waste Vendor Working Group, and engaged directly with vendors

to seek assurances about the sufficiency of remedial measures to address "red flags."  For example:

o   A negative media search for one waste vendor identified that the vendor had received fines related to environmental violations.  The Company reports that it "follow[ed] up with [the] waste vendor to understand corrective and preventive actions put in place in response to fines identified via negative media."  Environmental Management of Waste Vendors Call (Apr. 7, 2021),  PCL_ECP00189446-54 at PCL_ECP00189449.  Based on the vendor's response, it was deemed a "high risk" and was categorized as "unapproved."  *See id.*; *see also ENV 1004-A1 List of Approved Vendors*.

o   Another vendor's self-assessment form revealed potential issues with its bilge and sludge hose testing.  The Company reached out to the vendor and learned that it did not test its hoses annually.  Accordingly, the vendor was categorized as "approved but contingent" for liquid waste streams, meaning that offloads can only occur with approval from shoreside management prior to the offload.  Approval is granted "on a case by case basis."  *See* Waste Vendor Committee Call Minutes (Apr. 21, 2021), PCL_ECP00211188-89; *see also* ENV 1004 at § 2.2.  According to the Company, the shoreside contact "confirms there is no other option available for that particular offload before approving using the contingent vendor.  If an approved vendor is available, the shoreside contact will reject the request."  Company Draft Report Comments.

- The Company has also begun to categorize waste vendors with prior reported environmental incidents as subject to what employees describe as "probationary approval," under which the vendor must provide quarterly updates to the Company as a condition of approval.  *See* Employee Interview/Call Notes.  To date, however, the Company has not formalized this probationary approval process in its procedures.  The Company reports that the types of information requested "vary based on the prior incident."  Company Draft Report Comments.  The types of information that can be requested in the quarterly updates include:

   "1) Details of any environmental or pollution related violations and incidents with corrective actions where appropriate and any resolution or strategy implemented to prevent the violation from reoccurring.

    2) Documents (updates to policy or procedures) or training materials disseminated to employees regarding a culture of compliance and ethical behavior."  *Id.*

- The CAM Team's review also revealed opportunities for improving the Company's vetting process, including:

o   Establishing consistent protocols for performing searches on all names or variations that may be associated with a waste vendor, such as acronyms, aliases, alternate spellings (or misspellings), or parent/subsidiary corporate entities.  Based on the CAM Team's review, the Company's negative media review process has not captured all relevant negative media reports.  Spot checks resulted in negative media hits that did not appear in the Company's commercial database reports.  For example, one

CAM Team search of an approved waste vendor found that the owner had been convicted of federal weapons charges and sentenced to prison during the relevant search period. The owner's name is part of the name of the waste vendor company. It is possible that the Company's search was limited to the exact waste vendor entity name and, as a result, missed the negative media that would have been identified by searching for variations or components of the name.

o   Establishing consistent protocols for vetting related corporate entities for vendors that have been part of a merger, acquisition, or other corporate re-structuring. The Company has acknowledged that its negative media reviews do not include search terms designed to capture these corporate changes. *See* Employee Interview/Call Notes.

### e)   *Waste Vendor Incidents*

- The Company has continued to report incidents and near misses involving its waste vendors, including discharges or potential discharges of wastes (such as sludge and other oily wastes) into the sea during waste offload operations due to an error or equipment failure attributable at least in part to the vendor. *See* Internal Incident Log.

- One recent incident involving a vendor (a fuel supplier rather than a waste vendor) has led to local prosecutors filing charges against the vendor, as well as the Captain and Chief Engineer of a Company ship, as a result of a discharge that occurred during fuel bunkering operations. *See* Carnival Corp. Special Condition No. 13 Report (May 28, 2021). According to the Company, "[p]roceedings against the Captain and Chief Engineer are pending and no resolution date is currently known. The local coastguard has yet to issue an administrative fine associated with the incident but required the Company to post security of EUR37,000 plus stamp duty (which likely represents the estimated value of the eventual fine)." Company Draft Report Comments.

### f)   *Continuous Improvement Efforts*

- The Company has stated a goal to "lead the cruise industry in this area [of waste vendor vetting]." Environmental Compliance Scorecard Q1 FY2021 at PCL_ECP00190467. Benchmarking efforts to track this goal, though, are in their infancy, and so it is unclear how the Company intends to "lead the industry," since it has not identified the standard against which it is to be measured. According to the Company, certain continuous improvement initiatives, such as the software intended to automate portions of the vetting process, may support benchmarking efforts. *See* Employee Interview/Call Notes.

- Now that the Company is nearing the completion of its initial vetting process for its (non-port-mandated) vendors,[85] the CAM understands that the Waste Vendor Working Group is

---

[85] Each vendor must be vetted again within three years of the date it was approved or before renewing a contract, whichever is soonest, or if there are "reports of consistent poor service or known reported incidents." ENV 1004 at § 2.1.

shifting its focus toward continuous improvement efforts to strengthen the program.  *See* Employee Interview/Call Notes.

- Ongoing opportunities for improvement identified by the CAM Team, in addition to those noted in the preceding sections, include addressing the following:

  o   Clarifying what is meant by "reports of consistent poor service" or "known reported incidents," both of which are listed in the Company's procedure as events that can trigger the vetting of a previously approved waste vendor.  *See* ENV 1004 at § 2.1.

  o   Relatedly, establishing a formal process for:  (1) shipboard personnel to identify and report issues or concerns with waste vendors, including clarifying what constitutes "consistent poor service;" and (2) shoreside personnel to track or follow-up on such reports.  The CAM understands that, currently, these processes happen in an informal, ad hoc way.  Ship may contact shoreside (typically via email) if there is a concern with a waste vendor, but there is no requirement to do so, no procedure detailing how the ships should communicate this information, no designated point of contact shoreside to receive these communications, and no consistent way of assessing and managing this information.  *See* Employee Interview/Call Notes.

- The CAM Team will continue to examine the Company's efforts to develop and implement its revised waste vendor assessment program, including processes for:  performing site visits; performing negative media reviews; continuously monitoring vendors; and reporting, investigating, tracking, and following up on incidents (including near misses) and concerns.

    5.   *ESTABLISHING A (LIMITED) MANAGEMENT OF CHANGE PROCEDURE*

        a)   *Background*

- Throughout the period of probation, crew members from across the Company have reported concerns to the CAM Team about the additional workload and demands associated with new Company procedures and initiatives.  *See* Employee Interview/Call Notes.  Many organizations have a formal process, known as "Management of Change," to evaluate and manage the potential impacts of such changes.  As described by the American Bureau of Shipping, a Management of Change process:

  "is a combination of policies and procedures used to evaluate the potential impacts of a proposed change so that it does not result in unacceptable risks.  Developing an effective [Management of Change] strategy requires establishing, documenting, and successfully implementing formal policies to evaluate and manage both temporary and permanent modifications in the facility or ship ***including equipment, materials, operating procedures and conditions, and personnel***."

  American Bureau of Shipping, *Guidance Notes on Management of Change for the Marine and Offshore Industries* (Feb. 2013) at 1 (emphasis added).

- The CAM has observed that implementing (well-intentioned) initiatives without an effective a Management of Change process "at the outset" blinds management to "what new

challenges or trade-offs might result, in light of existing staffing levels and workloads on the ships."  CAM January 2021 Quarterly Report at 26.

- By early 2020, the Company recognized this shortcoming, and announced it would develop a corporate-wide Management of Change procedure.  The effort was delayed several times during the pandemic.  *See id.* at 26-27.

<em>b)      New Procedure</em>

- In January 2021, the Company published a narrowly scoped Management of Change procedure, which became effective on April 30, 2021.  Its objective is to "establish a consistent process to control and reduce risks when changes are made that ***significantly impact*** ship operations."  *HMP 1600 Management of Change* ("HMP 1600") at § 1 (emphasis added).  The procedure establishes a formal process, with template checklists and forms, for identifying changes to be managed, as well as for developing, approving, implementing, reviewing, and completing Management of Change plans for those changes. *See id.* at § 2.1.

- The HMP 1600 Management of Change process is limited to "technical installation projects"[86] on ships that result in "permanent system changes."[87]  *See id.*; *HMP 1600-A1 Introduction to Management of Change* ("HMP 1600-A1").  It does not apply to the activities and business decisions typically covered by Management of Change procedures, such as changes to:  policies and procedures; trainings; IT tools and systems (including projects like MAST); job positions, job duties, or job shifts/rotations; compensation and employment conditions; shoreside equipment or resources; vendor or service provider contracts; organizational structure; or financial plans/budgets.  Further, Management of Change programs typically are not limited to only those changes which "significantly impact" operations.

- The Company states that it "intends to expand the scope over time."  Company Draft Report Comments.  The Company appears to be taking a piecemeal approach to doing so.  For instance, the Company reports that "[o]ther areas outside of technical installations are being considered for inclusion in further, targeted, Management of Change procedures." Compliance Committee Q1 2021 Report at PCL_ECP00190596.  The Company has not provided a timetable for building out its program.

- An appendix to the HMP 1600 procedure states that Management of Change "principles," but not the formal HMP 1600 process, "must be adopted for ***any*** operational or organizational change."  HMP 1600-A1 (emphasis added).  However, there is no protocol for applying or assessing adherence to these principles for changes outside the scope of the HMP 1600

---

[86] "Technical installation projects" is not defined.

[87] "Permanent system changes" is defined as "[s]ignificant changes to or new installation of major equipment or systems that require at least one of the following:  Creation of new training; Amendment to PMS; Change to operational processes; Additional Resources (human or financial); Changes in Job Responsibilities."  *Id.* at § 2.1.1.

process.  In the absence of such a protocol, some departments are determining their own approaches.  For instance, the Ethics & Compliance group reports that it is "developing specific procedures to be used in assuring that management of change principles are being followed in the various activities [the Ethics & Compliance] Department is undertaking." Compliance Committee Q1 2021 Report at PCL_ECP00190596.  Again, this indicates a piecemeal—and balkanized—approach to building out the program, and an absence of clear leadership and accountability for making progress on this effort.

### c)  Areas of Concern

- Employees have raised concerns to the CAM Team about the program's limited scope, as well as the lack of coordination and guidance from All Brands Group on implementing the program, including on training employees on how to use the checklists and forms.  The CAM understands that the Brands are developing their own approaches to these issues.  For example, Carnival UK has revised the template forms, and has also decided to go beyond the procedure's current limited scope to apply the Management of Change process to any change that impacts maritime operations.  Carnival UK has developed its own trainings specific to its revised forms and protocols.  *See* Employee Interview/Call Notes.  While these appear to be laudable efforts by an individual Brand, they illuminate the Company's balkanized approach to rolling out its Management of Change program.

- A fully integrated Management of Change process—one that permeates all aspects of the Company's actions and is applied consistently throughout the organization—would help address concerns about workloads and competing priorities, and also help with the effort to enhance management accountability, as it would require an assessment of how changes in processes, materials, budgets, and staffing impact a range of pre-existing obligations.  *See* CAM January 2021 Quarterly Report at 26.

### 6.  EFFORTS TO IMPROVE SHORE/SHIP COMMUNICATIONS GOVERNANCE

### a)  Background

- Since the start of probation, officers and other crew members have shared with the CAM Team their frustration with the massive volume of communication that flows largely uncontrolled *from shoreside* offices *to the ships*.  They have described "a tidal wave of communication from shore, including uncoordinated and unprioritized email inquiries."  CAM First Annual Report at 72.  These communications come through a variety of channels, such as emails, newsletters, bulletins, case studies, surveys, reports, and notices, including Instructional Notices announcing procedure changes.[88]  The flow of these (well-intentioned) communications contributes to a sense by those shipboard that their time and responsibilities are not fully understood or valued by those ashore.  Others report that constant changes in rules and expectations are unnerving at times.  Further, these ungoverned

---

[88] Instructional Notices are notifications that are sent to the ships containing new or revised procedural requirements that require "immediate" implementation "before these changes are reflected in Global HESS."  *INT 1005 Development, Approval, Release, and Implementation of Documents.*

communication channels have led to concerns from shipboard officers about their ability to be appropriately informed about demands being made of officers and crew. *See* Employee Interview/Call Notes.

- At the same time, shipboard personnel report that their communications to shoreside often go unacknowledged and unaddressed. *See id*.

> b)   *Ongoing Efforts to Address Concerns*

- The Company's internal auditors have identified similar issues. In July 2020, RAAS completed a Focus Review of the various reports that shipboard deck and engine departments are required to create and send shoreside. That review found that shipboard officers "are overwhelmed by administrative tasks," and that "nearly 60K (24%) of shipboard reporting hours" could be saved through "automation, streamlining, and eliminating key reports." Cross-Brand Deck and Engine Reporting, PCL_ECP00166236-64 at PCL_ECP00166241-43. The review also found that, for 17-46% of reports, "shoreside feedback is 'never' or 'almost never' provided." *Id.* at PCL_ECP00166241.

- The Company has recognized the need to address these communication flow problems, which are not unique to the Company or the cruise industry. In November 2020, a working group was established to "[d]evelop a ***communications strategy*** and approach" for shore-to-ship communications, including to "***[c]oordinate and harmonize communications*** going out as well as the ***communications and feedback*** asked of the ships." HESS Committee Meeting Presentation (Apr. 14, 2021), PCL_ECP00217915-61 at PCL_ECP00217924 (emphasis original).

  - o   The working group is building upon the RAAS Focus Review discussed above. In its final report, RAAS issued detailed recommendations for streamlining reporting processes and reducing burdens on shipboard crew. The working group reviewed and updated those recommendations. *See* Employee Interview/Call Notes. The Company reports that the working group has finished its analysis, "and is putting the output into a presentation format." Company Draft Report Comments.

- In addition, a May 2021 session of the Ethics & Compliance retreat, discussed in Part III.B.4 above, was dedicated to "Improving Fleet Engagement & Compliance Communications," including "potential steps to take and opportunities for improvement" in addressing "ship-shore communication challenges." *See* Meeting Agenda (May 21, 2021), PCL_ECP00221856-57 at PCL_ECP00221857; Meeting Presentation (May 21, 2021), PCL_ECP00218429-40 at PCL_ECP00218438. Action items from the retreat session are being developed. *See* Employee Interview/Call Notes.

## C.   Remaining Barriers and Opportunities for Improvement

> 1.   PRIORITIZING SHIP OPERATIONAL AND COMPLIANCE NEEDS

- Past CAM reports have observed a general failure of the Company's top leadership to understand what it takes to fully support compliance—that doing so requires not just words,

not just a slogan, but also actions that translate to direct support for ship operations.  The CAM has also observed repeated failures by top leadership to listen and learn from its own employees about compliance challenges.  Even before the pandemic, the Company had repeatedly failed to adequately address compliance support for its ships on issues identified by the Company's internal and external studies and surveys, and supported by the findings of RAAS, the TPA, and the CAM.  These issues include:

- o   Working and reliable pollution prevention equipment,[89] including repeated issues with Oily Water Separator and Exhaust Gas Cleaning System equipment.[90]

- o   Spare parts, including critical environmental (ECP) spare parts,[91] as well as non-ECP spare parts.[92]

- o   Sufficient crew levels, including adequate numbers of crew with the requisite competency levels.

- o   IT support.

- o   Data management and analysis capabilities.

---

[89] Since ECP Year Two, the TPA has recommended that the Company "[b]uild in a reliability, availability, and maintainability (RAM analysis) solution into the design, procurement, installation, and operation of pollution prevention equipment" to "address the complete lifecycle of equipment and systems being installed on their assets."  *See* TPA Second Annual Report at 6; TPA Third Annual Report at 37; TPA Fourth Annual Report at 8.  The Company has yet to fully implement this recommendation.  At the end of ECP Year Three, the Company reported that it "was planning to perform a study of pollution prevention equipment" using an alternative methodology, known as Reliability Centered Maintenance, that the Company believes "will meet the same goal as the RAM methodology," but this effort "was delayed due to COVID-19."  CAM Third Annual Report at 145, n.93.  As of the date of this Report, the Company reports that it has "engaged third parties to assist [it] with the MAST initiative which will embrace the [Reliability Centered Maintenance] methodology."  Company Draft Report Comments.

[90] To the best of the CAM's knowledge, the Company historically has not tracked and trended pollution prevention equipment failures on a granular level (*e.g.*, based on the specific component of the equipment that failed).  As noted in Part VI.B above, it was only recently (July 2020) that one Operating Group, Holland America Group, started to do so.  *See supra*, Part VI.B.3(b).

[91] A RAAS Focus Review into "drivers for inconsistent critical spare part identification across the brands and non-compliance with spare minimums" found that "Brands are not consistently assessing similar equipment and parts as environmentally critical."  *RAAS Q1 Report* (Apr. 16, 2021), PCL_ECP00190754-72 at PCL_ECP00190761.

[92] Crew members continue to report difficulties to the CAM and TPA teams in getting non-ECP spare parts, as well as other materials (*e.g.*, for onboard pipe replacements), which they attribute to cost saving measures.  These challenges have been exacerbated by the pandemic but were experienced before the pandemic as well.  *See* Employee Interview/Call Notes.

- o   Food waste management support.

- o   Voyage planning support.

- o   Waste offload and waste vendor assessment support.

      *See, e.g.*, CAM Third Annual Report at 75, 137-64.

- That is not to say that no progress has been made. As discussed throughout this Report, the Company has important efforts underway in many of these and other areas.

- In interviews with the CAM Team, crew members from across the Company, particularly deck and technical officers, have expressed their sense that this compliance shortcoming may stem from a lack of appreciation for the maritime operations side of the Company's business, in comparison to the value placed on the (revenue-generating) hotel and entertainment side. *See* Employee Interview/Call Notes. Employees note that the Company emphatically describes itself as "one of the world's largest leisure travel companies"[93] and "the largest cruise vacation company in the world."[94] Those statements are consistent with the business imperative of being a choice leisure destination for a wide range of guests. However, an unintended consequence is the frustration felt by many of the Company's skilled mariners at the Company's failure to emphasize that it is ***also*** a maritime company—a large maritime company with the largest fleet of passenger cruise ships in the world, which it must operate safely (always the number one priority), as well as compliantly. Notably, the language of the Corporate Vision Statement has been revised to state that great guest experience and outstanding shareholder returns are achieved on the "foundation" of "compliance, environmental protection and the health, safety and well-being" of guests, communities, and shipboard and shoreside employees.[95] But the notion of primacy (or at least parity) between meeting the operational and compliance needs of the ships and achieving other business goals is not yet part of the lived experience of the ships. *See* Employee Interview/Call Notes.

- As discussed above, crew members have expressed appreciation for the increased levels of focus and attention to ship and crew needs during the pause, including direct engagement by top Carnival Corp. and Brand executives with the ships, some of which was prompted by the Court's requirement for returning ships to certify their compliance readiness. Crew members have also expressed concerns about the extent to which the Company will prioritize ship and crew member needs as passenger operations resume. *See supra*, Part III.B.2, Part IV.B.3, and Part IV.C.6.

---

[93] *See* Carnival Corporation & plc 2020 Annual Report at 1 ("Carnival Corp. 2020 Annual Report"), *available at* https://www.carnivalcorp.com/static-files/48701769-9f2c-48c6-ac4f-4772bad2ff8b.

[94] *See World's Leading Cruise Lines*, https://www.carnivalcorp.com/corporate-information/worlds-leading-cruise-lines.

[95] *See* Corporate Vision Statement.

2.    *Exhaust Gas Cleaning System Concerns*

a)    *Background*

- Exhaust Gas Cleaning Systems, also called "Advanced Air Quality Systems" (the Company's term) or "scrubbers," are a type of pollution prevention equipment that removes sulfur oxide compounds from a ship's engine and boiler exhaust gases. *See* CAM Third Annual Report at 216-17 (citations omitted). The Company's Exhaust Gas Cleaning Systems use an open loop design, in which seawater drawn from the ocean is used as washwater that is sprayed onto engine exhaust gases, causing a chemical reaction that removes sulfur oxide compounds from the exhaust. The washwater is filtered and mixed with sea water before being discharged back into the sea. *Id.* at 217.

- The Company began installing Exhaust Gas Cleaning Systems on its ships to comply with international regulations that limit sulfur emissions, including: (1) North American and European marine fuel sulfur limits that went into effect in 2015; and (2) the global marine fuel sulfur limit that went into effect in January 2020. *See* CAM Third Annual Report at 217-18; MARPOL Annex VI, Reg. 14.1.3.[96] The Company began testing the systems on its ships in 2006 and installed the first units in 2014. These installations have continued through 2021, and are ongoing. *See* AAQS/EGCS Development and Timeline (Mar. 28, 2021), PCL_ECP00214999-5014 at PCL_ECP00215002. The Company reports that, due to early challenges presented by "fleet size and dry dock schedules," it did "not have the time to test" the equipment on a limited sample of ships "to work out all the issues before expanding production to be ready to meet" the 2015 and 2020 fuel sulfur caps. *Id.* Therefore, the Company did not conduct extended operational trials of the initial units. Instead, the Company decided to move forward with "a significant production flow early," and to make necessary changes or upgrades later (reactively) based on issues identified through ongoing operation of the systems. *See id.*

- Currently, more than 250 Exhaust Gas Cleaning System units are installed on the Company's approximately 93 ships.[97] *See id.* The Company projects to have more than 310 Exhaust Gas Cleaning Systems installed on its ships by the end of Fiscal Year 2024. *Id.*

- As noted above, Exhaust Gas Cleaning Systems are one option for complying with the global sulfur fuel cap. Another option is using low-sulfur fuel. Low-sulfur fuel is generally more expensive than the higher-sulfur fuel that can be burned with an Exhaust Gas Cleaning

---

[96] Under the global sulfur cap, ships must burn fuel with (1) less than 0.50% sulfur content if outside an Emission Control Area; or (2) less than 0.10% sulfur content if inside an Emission Control Area. *See* MARPOL Annex VI, Regulation 14.1.3 and 14.4.3. If higher-sulfur fuel is burned, the ship must use an approved equivalent method to reduce sulfur emissions. *Id.* at 4.1; MEPC.259(68). Exhaust Gas Cleaning Systems are one such method. *See id.*

[97] An Exhaust Gas Cleaning System unit is associated with a single engine. Cruise ships have multiple engines (typically between four and six). Therefore, ships may have multiple Exhaust Gas Cleaning Systems. Many ships have a mixture of both Exhaust Gas Cleaning System-equipped and non-Exhaust Gas Cleaning System-equipped engines.

July 19, 2021

System.  The CAM understands that the Company's decision to install Exhaust Gas Cleaning Systems was primarily a business decision, as relying entirely on low-sulfur fuel would significantly increase annual fuel costs, as well as increase the risk of fuel unavailability as demand for low-sulfur fuel would be expected to intensify after the new sulfur cap regulations went into effect.[98]  *See* Employee Interview/Call Notes; *see also* Carnival plc, Strategic Report and IFRS Financial Statements:  Year Ended November 30, 2013 at 38 ( "[Exhaust gas cleaning] technology will help mitigate higher fuel costs"); Carnival Corp. 2020 Annual Report at 35 ("We manage our exposure to fuel price risk by managing our consumption of fuel.  Substantially all of our exposure to market risk for changes in fuel prices relates to the consumption of fuel on our ships.  We manage fuel consumption through ship maintenance practices, modifying our itineraries and implementing innovative technologies."). The Company does use low-sulfur fuel under certain circumstances, such as when Exhaust Gas Cleaning Systems are out of service, when local restrictions prohibit the use of Exhaust Gas Cleaning Systems,[99] or on engines that are not equipped with Exhaust Gas Cleaning Systems.[100]

> *b)*      *Systemic Concerns*

> *i.*      <u>Background</u>

- Throughout the period of probation, operational issues with the reliability and maintainability of the Company's Exhaust Gas Cleaning Systems have been one of the most common concerns raised by engineering crews to the CAM and TPA teams.  Engineers have also consistently expressed frustrations to the CAM and TPA teams about the extra training and workload demands associated with the units, including voyage planning and execution challenges.  *See* Employee Interview/Call Notes.

- As detailed in prior CAM reports, these issues have resulted in direct compliance impacts, including:  emission limit exceedances; prohibited washwater discharges; and equipment failures or malfunctions.  *See, e.g.*, CAM January 2021 Quarterly Report at 93-94; *see also, e.g.*, Quarterly Issue Tracker (Apr. 9, 2021), Dkt. No. 219-1; Internal Incident Log; HESS

---

[98] As SASB observes, "[f]uel constitutes a major expense for industry players," providing an "incentive for investing in upgrades or retrofits to boost fuel efficiency."  Cruise Lines SASB at 8.

[99] As discussed in prior CAM reports, an increasing number of coastal states and ports around the world (including in Asia, Europe, the Middle East, and the U.S.) have enacted local regulations that restrict or prohibit the use of open loop Exhaust Gas Cleaning Systems in port. *See, e.g.*, North P&I Club, *No Scrubs: Countries and Ports where Restrictions on EGCS Discharges Apply* (Updated May 19, 2021), https://www.nepia.com/industry-news/no-scrubs-more-ports-declare-ban-on-egcs-discharges-update/; *see also* CAM March 2020 Quarterly Report at 148-50.

[100] As discussed in Part VI.C below, the Company has also made significant investments in liquefied natural gas ("LNG") propulsion technology for new build ships, which can reduce toxic air pollutants associated with traditional maritime fuel oils, including sulfur oxides, nitrogen oxides, and particulate matter.  *See infra*, Part VI.C.5(d)(i).

Board Report Q1 FY2021 at PCL_ECP00190506-09 (noting repeated issues with Exhaust Gas Cleaning Systems, including issues related to equipment, alarms, and voyage planning and execution); TPA Third Annual Report at 27-28 (finding that Exhaust Gas Cleaning System issues were the most significant category of Major Non-Conformity findings during ECP Year Three audits); TPA Fourth Annual Report at 20-21, 27 (same for ECP Year Four audits, including "self-reported severe water leaks or wastage of the exhaust piping" and "instances of sensors that were not working or were not calibrated").

- The Company also experienced "an increase in reports regarding soot, discoloration and other surface effect events" during the pause.  *See* Q4 2020 Safety, Environmental & Security Awareness Bulletin at 12; CAM January 2021 Quarterly Report at 93-94.[101]  The Company reports that the rate of soot discharge incidents increased during the pause because ships were being operated at "low engine load" (*i.e.*, low power-generating capacity) for prolonged periods of time compared to normal operations.  These circumstances "led to an accelerated build up of soot in the engine exhaust systems, leading to more inadvertent soot releases to be captured by the exhaust cleaning system."  Company Draft Report Comments.

### ii.  *TPA Systemic Findings*

- During ECP Year Four, the TPA issued two "systemic" findings regarding Exhaust Gas Cleaning Systems:

  o **Soot Discharges:**  The TPA issued a finding regarding "the repeated discharge of soot into oceans and navigable waterways."  Letter from TPA to Company, *Systemic Exhaust Gas Cleaning Systems Soot Discharges* (Jan. 13, 2021) at 1.[102]

    ▪ The TPA identified over 60 such incidents on both Covered and Non-Covered Vessels between June 2017 and October 2020—nearly 50 of which occurred before the pause.  *Id.*

    ▪ The TPA recommended that the Company "more fully investigate and evaluate the reliability, availability, and maintainability" of Exhaust Gas Cleaning Systems "from design through operations," including equipment design and "the efficacy of any mitigation measures (*e.g.*, washwater filters) to determine the underlying causes of the recurring soot discharges and gain some measure of control over their occurrence."  *Id.* at 2.

  o **Equipment Condition and Reliability:**  The TPA also issued a finding regarding "systemic issues with the condition of [Exhaust Gas Cleaning Systems] installed on [Company] vessels."  Letter from TPA to Company, *Systemic Major Non-Conformity on AAQS Systems on Company Vessels* (Feb. 23, 2021).

---

[101] As noted below, the TPA also identified nearly 50 such incidents that occurred before the pause.

[102] Soot discharges are not regulated by MARPOL.

- ▪ The TPA identified, as part of its Compliance Certification Disclosure review, that almost 60% of ships returning to U.S. waters "had indicated the [Exhaust Gas Cleaning Systems] required repair or replacement of components." *Id.* at 1. Additionally, the TPA identified instances of "significant deterioration" and "leaks" during ECP Year Four virtual ship audits. *Id.* at 2.

- ▪ The TPA recommended that the Exhaust Gas Cleaning Systems "be re-evaluated to see if they are suitable for the potentially corrosive conditions of a marine operating environment, or if design changes may be warranted." *Id.* at 3.

- In response to the soot discharge finding, the Company states that it is "working to minimize soot in water events as rapidly as possible" and is planning to conduct both: (1) a "fleet wide survey" to solicit feedback from Exhaust Gas Cleaning System operators; and (2) a "trend analysis to determine specifically whether and how we can further improve the Exhaust Gas Cleaning Systems]." Letter from Company to TPA, *Soot Discharges from Exhaust Gas Cleaning Systems* (Apr. 22, 2021) ("Soot Discharge Response Letter"). The Company has also revised its Exhaust Gas Cleaning System procedures,[103] and required Exhaust Gas Cleaning System operators to attend soot-related training sessions. *See* Soot Discharge Response Letter at 1-2.[104] The Company further reports that it has "installed washwater filters on most ships and the installation process on the remaining ships has continued throughout the pandemic." Company Draft Report Comments. The Company is also "promoting operating techniques, soot cleaning and other methods to minimize soot in water events as rapidly as possible." *Id.*

- In response to the equipment condition and reliability finding, the Company reports that it conducted a "fleetwide review" that included looking at Exhaust Gas Cleaning System equipment status and repair plans. *See* Letter from Environmental Corporate Compliance Manager to TPA, *Systemic Major Non-Conformity on AAQS Systems on Company Vessels*

---

[103] Some procedure revisions could be seen to conflict with the Company's Corporate Vision Statement, which states: "[W]e intend to be an exemplary corporate citizen leaving the people and the places we touch even better." *See supra*, Part III.C.1. For example, an Instructional Notice states that the Company's desire to "minimize the risk of soot in water" is due to "***the perception problems***" that the "events create ***for the Company***." *See ENV/02/2020 Avoiding AAQS / EGCS Surface Effects / Soot in Water Events in Port and at Anchor* (Rev. May 10, 2021) (emphasis added). The procedure also directs ships to "soot blow ***every night*** while underway ***or at anchor***," seemingly to avoid doing so during the day when "perception problems" are more likely. *See ENV/03/2021 Engine Exhaust System Cleaning to Avoid Soot in Water Events in Port and at Anchor* (May 10, 2021). The Company notes that "soot blowing is done in the interests of safety to prevent a soot fire." Company Draft Report Comments.

[104] At the same time, some senior executives have expressed views that minimize the significance of soot discharge incidents. *See, e.g.*, Outside Counsel, Supplemental Report: Handing of [Covered Vessel] Hotline at 3 (senior executive and subject matter expert "advised that soot discharges were never regulated or considered as harmful and soot is normal although unsightly, and can be a cause for concern if it happens in port").

(Mar. 30, 2021).  The CAM also understands that the Ethics & Compliance team recently hired a new Environmental Compliance Manager whose duties will include identifying potential solutions to Exhaust Gas Cleaning System challenges.  *See* Employee Interview/Call Notes; Ethics & Compliance Memorandum.

- Despite the above efforts, to the best of the CAM's knowledge, the Company has not responded to these ***systemic*** TPA findings with a ***systemic*** root cause analysis that looks beyond current technical issues to also examine the entire design, procurement, and installation processes that led to the current situation.  Such an effort could yield lessons about project scoping, procurement, and Management of Change processes that would apply to other major shipboard technical installation projects the Company performs in the future.

### 3.    *EMERGENT FOOD WASTE MANAGEMENT ISSUES*

- As discussed in Part VI.B above, the Company has made tangible progress since the Probation Revocation Agreement on improving its shipboard food waste management, including:  reducing single-use plastics; reducing food waste generation; reducing the frequency of contaminants found in food waste and grey water systems; and installing technologies (*i.e.*, food waste digesters and dryers/dehydrators) designed to minimize the risk of discharges of plastics and other contaminants.  *See supra*, Part VI.B.2.

- However, recent Hotline Reports, incident reports, internal investigation reports, and RAAS reviews have revealed some emergent food waste challenges.  These include concerns related to:

  o **Improper Removal/Disposal of Food Waste Liquids to Reduce Reported Food Waste Numbers (Under Investigation):**  On March 28, 2021, a crew member on a Covered Vessel reported to the shipboard Environmental Officer and Public Health Officer that kitchen galley workers were improperly blending, liquifying, and disposing of food waste down grey water drains instead of weighing it and disposing of it with other food waste—in potential violation of MARPOL Annex V, as well as Company procedures.  A preliminary investigation confirmed (via CCTV footage) that such practices were occurring.  *See* Special Condition No. 13 Report (Apr. 2, 2021).  Similar practices have since been alleged on at least two other ships.  *See* Special Condition No. 13 Report (Apr. 22, 2021); Environmental Open Report #53-2021 (June 8, 2021).  A wider review of ships within the fleet revealed the use of other similar methods, apparently designed "to reduce the measured/reported weight before disposal," including:  straining, filtering, or otherwise removing liquids from food waste; disposing of food waste liquids via galley drains; and dehydrating food waste in ovens.  *See* HESS Weekly Flash Report (Apr. 14, 2021), PCL_ECP00190794-800.  In response to these reports, the Company issued a notice to all ships that the "manipulation of food waste measurement data to create a more favorable (but misleading) result; and the discharge of food waste down galley drains and sinks (or any other similar practices)" are "strictly prohibited and must be discontinued immediately."  Environmental Compliance Notice #01-2021 (Apr. 23, 2021).  The Company has also published a new food waste measurement procedure,

which clarifies that only specified liquids can be removed from food waste.  *See ENV 1304 Measuring, Recording, and Reporting of Food Waste* at § 3.

- ▪ The Incident Analysis Group has launched an investigation "to determine root causes and identify any systemic issues across the fleet."  Special Condition No. 13 Report (Apr. 22, 2021).  That investigation is ongoing.[105]

- ▪ These allegations—of improper actions apparently designed to drive down reported food waste numbers—are concerning, if substantiated.  However, it is a positive sign that crew members felt comfortable speaking up to report them.  In contrast, the activity on the *Caribbean Princess* went on for years before a whistleblower came forward.  The CAM Team will continue to monitor and report on the outcome of the Incident Analysis Group investigation, including the extent to which it examines potential cultural and other systemic causes.

o **Breakdown of Plastic Digester Components and Potential Discharge of Plastic (Under Investigation):**  Two anonymous Hotline Reports in April 2021 alleged that plastic components (small plastic pieces used to house microbes) inside digester units were breaking apart and potentially entering pipework that discharges to the sea—in potential violation of MARPOL Annex V, as well as Company procedures.  *See* Environmental Open Report #49-2021 (Apr. 7, 2021); Environmental Open Report #50-2021 (Apr. 13, 2021).  An initial technical review validated these concerns, and the Company temporarily suspended the use of digesters.  *See ENV/02/2021 Food Waste Digester Biomedia* (Rev. June 18, 2021).  Working with the manufacturers, the Company has developed temporary solutions that allow units to operate without the problematic plastic components.  The Company is working with the manufacturers to develop permanent solutions.  *See* Employee Interview/Call Notes.  An Incident Analysis Group investigation is also ongoing.

o **Food Waste Digester Installations:**  An anonymous Hotline Report in February 2021 alleged concerns about how the food waste digester installation project on a Covered Vessel was planned and executed.  The Incident Analysis Group, supported by RAAS, investigated the allegations and identified opportunities for improving project management, including improving the communications flow between shore and ship, as well as adhering to Management of Change processes.  *See* Final Report, IAG2021004 (May 14, 2021) at 13-14.  In addition, RAAS initiated a cross-brand review of digester installation projects to "assess and benchmark" each Brand's "overall change governance, planning, and review/approval practices."  *Id.* at 1.  That review is underway.

---

[105] As discussed above, in March 2021, RAAS issued a report that highlighted inconsistencies in how ships were measuring food waste, including the removal by some ships of liquids before waste was measured.  *See supra*, Part VI.B.2.  The CAM understands that the RAAS review is not directly tied to the Incident Analysis Group investigation, but that it will be considered as part of the investigation.

o **Grey Water System Drain/Scupper Covers:** Drain/scupper covers are designed to prevent non-food items from entering a ship's grey water and overboard drainage systems. *See DER 2005 Grey Water and Downstream Filtration* ("DER 2005").[106] In May 2021, an Environmental Officer on a Covered Vessel reported that some scupper covers on the ship, including in the galley, could be removed by lifting them up with a finger, even though they were installed with anti-tamper fasteners, as required by Company procedure. *See* HESS Weekly Flash Report (May 12, 2021), PCL_ECP00217339-48. A fleetwide review led by the Environmental Corporate Compliance Manager revealed a similar situation on other ships. *See* Environmental Compliance Notice #02-2021. Preliminary conclusions from the review indicate several possible causes: fasteners were never properly tightened/secured in place upon delivery from the shipyard; fasteners came loose over time due to vibrations or ship movement; or fasteners were not correctly tightened after maintenance or cleaning. *See* Must See Message (June 28, 2021). According to the Company, there were no "reports or comments that the cause could be related to malicious intent." *Id.* For next steps, the Company's new build team is "identifying appropriate measures (preventative actions) to avoid future occurrence on newbuilds," while Technical, Environmental, and Food Waste working groups are "identifying appropriate measures for existing ships." *Id.*; *see also infra*, Part VI.C.5(d) (discussing the integration of compliance considerations into ship design, including new build processes).

- It is notable that the Company's internal reporting and review mechanisms revealed these issues and concerns. In evaluating compliance programs, DOJ considers "whether and how the misconduct was detected, what investigation resources were in place to investigate suspected misconduct, and the nature and thoroughness of the company's remedial efforts." DOJ Corporate Compliance Guidance at 14. As noted above, the Company has several active investigations and reviews into these issues underway. The CAM Team will continue to monitor and report on these efforts.

    4.    *SLOW PROGRESS ON IT AND DATA PROJECTS CRITICAL FOR COMPLIANCE*

- As noted in Part VI.B.3 above, progress on IT and data efforts in support of compliance has generally been slow, both before and during the pandemic. This includes slow progress on projects designed to address persistent critical compliance risks. Some of the Company's

---

[106] In June 2019, the TPA found that missing drain/scupper covers were causing non-food items, including plastics, to drain into a ship's grey water system and potentially overboard. The Company confirmed that a similar issue existed on other ships. In December 2019, the Company issued the DER 2005 procedure, which sets time frames for installing drain/scupper covers on various systems. These deadlines were not met on many ships. The Pause Priorities Plan sets a goal of completing any pending drain/scupper cover installations required by DER 2005 before ships return to service. *See* Pause Priorities Plan at 11; CAM January 2021 Quarterly Report at 62-63.

July 19, 2021

most important initiatives in this space have been subject to repeated or significant delays, including:

- o **Voyage Planning Software:** As detailed in earlier CAM reports, in response to voyage planning and execution challenges,[107] the Company began evaluating, around the fall of 2018, potential software solutions to help simplify and automate the voyage planning process. As detailed in prior CAM reports, the current voyage planning process is guided by a complex spreadsheet called "the Matrix."[108] No such software product existed on the market. In late 2019, the Company executed a contract with a vendor to develop a new software solution. The project has since been subject to delays, beginning before the pandemic. *See* CAM January 2021 Quarterly Report at 82-83.

  In late February 2021, the Company began a round of testing of the new software, which involved piloting the software on two ships. The Company reports that the initial testing results were generally disappointing. A second round of testing was completed in late June 2021, "and the remaining defects are being addressed by the vendor," including through bi-weekly releases of software patches. *See* Company Draft Report Comments. The Company will provide an initial decision to the vendor about whether it will move forward with accepting the software by the end of July 2021. If the Company decides to move forward, it "will begin planning for roll out, including needed resources and training, procedure revisions, management of change, etc. and will begin a small ship pilot program to help inform the above." *Id.* The

---

[107] A voyage plan lays out a ship's intended route, along with relevant conditions (such as weather, current, and tides), restrictions, and potential problems or hazards. Each voyage plan includes an environmental plan, which identifies when and where certain environmental operations (such as discharges and emissions) can occur, based on the ship's location and applicable international, national, local, or Company restrictions, such as the special requirements that apply in U.S. marine sanctuary waters. Voyage planning challenges often relate to misunderstandings or miscommunications as to the location of environmental boundary lines and/or the applicable requirements within a set of environmental boundary lines. Accuracy of this information, and effective onboard communication between deck and engineering personnel, is essential for preventing prohibited discharges and emissions. *See* CAM Second Annual Report at 37-39.

[108] The Matrix is periodically updated by shoreside personnel and uploaded to Global HESS. Based on information in this spreadsheet and related online links, deck officers in charge of voyage planning, in consultation with Environmental Officers, are responsible for developing the environmental plan portion of the ship's overall voyage plan, including information about when and where discharges and emissions are permitted or restricted. The CAM has observed that this "time-consuming and labor-intensive approach is rife for potential human error (including, at times, incorrect information within the Matrix itself), and is a frequent source of complaints to the CAM Team by shipboard personnel across the Company's brands." *See, e.g.*, CAM January 2021 Quarterly Report at 90-92; CAM Third Annual Report at 130-31, 159-60. Some crew members have even stated that they are concerned that relying on the information in the Matrix could result in potential personal legal exposure. *See* Employee Interview/Call Notes.

July 19, 2021

vendor will have until December 31, 2021, "to deliver full operating capability which is designed to further automate the voyage planning process." *Id.*

It is unclear if the Company will accept the software. If accepted, the software would be "initially used for environmental regulatory planning support, automated schedule creation and improved environmental regulatory situational awareness during voyage execution." Voyage and Environmental Planning Application (Apr. 2, 2021).

The CAM recognizes that unexpected and uncontrollable delays are not uncommon when working with third-party developers on novel software solutions. In the meantime, however, the Company continues to experience voyage planning and execution-related incidents on its ships, many of which are attributable at least in part to errors in using or interpreting the Matrix, or to inaccurate information within the Matrix itself. *See* CAM January 2021 Quarterly Report at 89-92 (listing examples).

This appears to present a significant compliance risk. In response, the Company has developed training and case study programs that primarily focus on (re-)training ship officers on existing methods and processes (*e.g.*, on using the Matrix and electronic navigational chart systems). *See, e.g.*, Safety & Environmental Awareness Bulletin (Q1 2021) at 3-4. As the CAM has recognized, these efforts are well-intentioned, and are an effort to take prompt action in response to a noted uptick in voyage planning and execution-related incidents while the software solution remains under development. *See* CAM January 2021 Quarterly Report at 89-90.

However, to the best of the CAM's knowledge, there has been no significant effort to conduct a systemic review (following an established root cause analysis methodology) into the root cause(s) of recurrent voyage planning and execution challenges, or to evaluate potential systemic reforms to the voyage planning process outside of the much-delayed software solution. Many crew members have expressed to the CAM Team a desire for a dedicated shoreside-based resource to provide enhanced voyage planning support to ships. *See* Employee Interview/Call Notes. This has not won the support of key senior shoreside management. *See, e.g.*, HESS Committee Meeting Minutes (Feb. 24, 2021), PCL_ECP00211108-13 at PCL_ECP0021112 (non-verbatim statements from meeting minutes that voyage planning support "is not currently a function the Fleet Operations Centers are designed for" and that there is "adequate staffing onboard to resource appropriately for challenging operations"). The messaging that goes to ships is that they need to "[pay] attention to detail" and "stay[] focused" to "work towards zero errors." *See* Safety & Environmental Awareness Bulletin (Q1 2021) at 8. Such messaging is sometimes perceived as fostering a culture of blame and fear among crews. They express concerns that there is the potential for discipline after an incident, but no accountability for those responsible for failing to give the ships adequate voyage planning tools, resources, and support. *See* Employee Interview/Call Notes.

o **MAST Planned Maintenance and Spare Parts Management Software:** The MAST initiative is an effort that began around March 2018 to develop a single, corporate-wide planned maintenance and spare parts management system software.

July 19, 2021

Before the pause, the initial version of the MAST software was approximately 50% complete.  However, completion and subsequent testing on ships was delayed by approximately one year (until about December 2021) due to the pandemic.  In the meantime, the Company has continued to move forward during the pause on efforts to develop standard nomenclature for pollution prevention equipment and related spare parts, as well as common maintenance plans, across the entire fleet—a process referred to as "data globalization" or "data normalization."  *See* CAM January 2021 Quarterly Report at 83-84.

Significant progress on MAST has been made since the last CAM report.  In early 2021, standard nomenclature for bilge and sludge system equipment and related maintenance plans was approved.  Similar approvals are expected soon for Exhaust Gas Cleaning Systems and food waste systems.  A similar process will be undergone for garbage and wastewater systems, although substantial work remains to be done. *See* Employee Interview/Call Notes.

In April 2021, the Company approved the retention of a third-party vendor to assist in speeding along the data globalization effort.  The Company has also approved additional resources to complete the MAST software development, with the goal of having the software ready for beta testing by the end of 2021 or early 2022.  Under the current proposed schedule, the Company aims to implement MAST on 20 ships by the end of 2022, with implementation on the rest of the fleet complete by the end of 2024—a year earlier than the pre-pandemic schedule.[109]  In addition, the Company plans to install MAST on all new build ships starting in 2022.  *See* Employee Interview/Call Notes.

o   **Training Attendance Recording App:**  One of the most frequent and consistent complaints Environmental Officers have expressed to the CAM Team is the lack of an automated system for recording and reporting attendance at shipboard trainings.  Although the process may differ somewhat by Brand or by ship, an Environmental Officer generally must pass around a paper sign-in sheet at each training, manually transcribe this information into a spreadsheet, and send that spreadsheet shoreside.  This is a time-consuming administrative burden.  In contrast, when passengers report for the mandatory safety "mustering" at the beginning of each cruise, their ID cards can be scanned in a matter of seconds (or less), allowing for automatic recording and tracking of which passengers have or have not attended the required briefing.  *See id*.

The Company reports that an initial version of a training attendance recording app was developed in 2019 and tested on ships in 2019 and 2020.  However, it has not yet undergone a full shipboard trial.  *See id.*; Company Draft Report Comments.

The use of such an app has the potential to prevent recurrence of training recordkeeping incidents, such as the training record falsifications by Environmental Officers on two Covered Vessels that led to a violation of probation.  *See* Probation

---

[109] The Company reports that "[t]his is the target and will be validated as part of the project planning activity that is currently in work."  Company Draft Report Comments.

July 19, 2021

Revocation Agreement at 10 (Ex. A, Violation No. 3).[110]  If a reliable automation tool were available, inadvertent errors likely would be avoided, and intentional falsifications likely would be highly impractical, as they would require an Environmental Officer to have access to the crew ID cards of any individuals falsely reported to have attended a training.

- The current status of these and other IT and data initiatives is summarized in Appendix D.

    5.    INTEGRATING COMPLIANCE CONSIDERATIONS INTO SHIP DESIGN

        a)    Background

- The Court has urged the CAM Team to inquire of Company personnel about whether or how compliance concerns and best practices are reflected in the design or re-design of the Company's ships, and how and in what ways compliance demands are impacting dry/wet dock processes.[111]  As to ship design, the Company has stated that the multi-year process of getting a ship built means that the design of ships being built, or about to be built, had long ago largely been set.  *See* Employee Interview/Call Notes.

- The Court has also expressed particular interest in how the Carnival Corp. Chairman of the Board, who is recognized for his leadership role in new ship design, is "making concrete design changes to make sure that the new ships that are coming online are able to address some of the failures in the past."  Status Conf. Tr. at 69-70 (Jan. 8, 2020); *see also, e.g.*, Status Conf. Tr. at 40 (Apr. 30, 2021).

- Now, more than four years of probation have illuminated a range of compliance challenges related, at least in part, to ship design.  For instance, some of these relate to:

    o   Food and other solid waste management, including: garbage room/recycling center design; galley space design; and installations of digester, dryers, and other technologies.

    o   Liquid waste stream management, including: cross-contamination of waste streams from piping and tank arrangements; design of piping (*e.g.*, piping being routed behind other piping or machinery or through tanks) that inhibits the ability to perform repair and maintenance outside of dry/wet docks; and leaks from deteriorated or corroded piping and other equipment or components.

---

[110] As the CAM has observed, the Company's internal investigations into these incidents were cursory, "plac[ing] sole blame on the [Environmental Officer] and lack[ing] any discussion of other possible causes or lessons learned."  *See* CAM First Annual Report at 32.

[111] A dry/wet dock is when a ship is taken out of service and brought to dock in a shipyard to allow for repairs, inspections or surveys, project installations or upgrades, re-modeling/re-furbishing, cleaning, and other technical, renovation, or cosmetic activities.  In a dry dock, the dock is drained of water to allow access to portions of the ship that are normally underwater.  In a wet dock, the ship remains afloat.  A dry dock is typically a longer and more intensive process.

July 19, 2021

    o  Design of Engine Control Room user interfaces and displays, including: alarm integration;[112] alarm fatigue/flooding; accessibility of monitors and controls; and legibility/readability of diagrams and displays.

- The Company has, at times, recognized the role that ship design can play in either promoting compliance or serving as a barrier to compliance, including the impact that ship design has on the ease with which compliant operations can be carried out in an efficient manner. *See* Employee Interview/Call Notes; *see also, e.g.*, Workload Analysis of HA Group Technical and Environmental Officers (Jan. 1, 2019), PCL_ECP00149393-602.  The CAM understands that, before the pandemic, design changes were either being considered, or in the process of being implemented, to:  (1) improve food waste separation; (2) redesign piping to avoid cross-contamination between waste streams; (3) eliminate leaks and redesign piping to minimize bilge water accumulation; and (4) reconfigure piping arrangements to allow for more routine maintenance and more efficient bilge water offloads on select ships. *See* Employee Interview/Call Notes.  Nevertheless, the Company continues to report incidents and near misses related to these issues.

- As discussed in the following sections, during ECP Year Four, the CAM Team has sought to learn more about the Company's new build and dry/wet dock planning and execution processes, including efforts to integrate compliance considerations into the design or re-design of ships.  This review is ongoing and will be a core focus area for ECP Year Five.

        *b)*    *Company New Build Processes*

- The Company's new build process is largely driven by a centralized organization called Carnival Corporate Shipbuilding, based out of Southampton, United Kingdom.  Carnival Corporate Shipbuilding works with shipbuilding companies to contract for and coordinate on the design and construction of each new ship.  It also oversees the warranty process, through which design and construction defects identified in the first two years after a ship is delivered are identified and presented as claims to the shipbuilder.  *See id*.

- To carry out this process, Carnival Corporate Shipbuilding works with the relevant Brand to determine design wants and needs for each new ship.  This includes:

    o  Determining where the ship is intended to sail and how many passengers the ship should carry.

    o  Developing a basic design and specification for the ship, which is used to negotiate a contract for ship construction.  Once contracted, the shipbuilder develops detailed drawings and specifications.  These are reviewed by personnel at both Carnival

---

[112] *See*, *e.g.*, Environmental Compliance Scorecard Q1 FY2021 at PCL_ECP00190460 ("Many of the air emission violations stem from a lack of awareness of the [Exhaust Gas Cleaning System's] status, which can be attributed to a combination of: (1) challenges to maintain situational awareness due to the fact that the [Exhaust Gas Cleaning System] monitoring systems are not fully integrated into all ship integrated monitoring and alarm systems . . .").

Corporate Shipbuilding and the relevant Brand.  Ultimately, Carnival Corporate Shipbuilding signs off on the drawings and specifications.  *See id*.

- Carnival Corporate Shipbuilding personnel are located at each of the shipyards constructing Company ships.  These individuals are responsible for overseeing construction for conformity with the drawings and specifications.  While they may be joined by Brand personnel at various times throughout construction, the day-to-day shipyard construction oversight is performed by Carnival Corporate Shipbuilding personnel.  *See id*.

- During the design and construction of a ship, changes to legal or Company requirements may occur that the ship will be expected to meet when delivered.  When this happens, changes may be made in three possible ways:  (1) a change order is issued to the contract with the shipbuilder, requiring the shipbuilder to make the change; (2) the Company pays for labor and materials that are used to make the change when the ship is still in the shipyard; or (3) the Company makes the change after the ship is delivered.  To determine which approach to take, Carnival Corporate Shipbuilding brings the proposed change to the shipbuilder and requests a pricing estimate.  This pricing information is then provided to the Brand, which will decide its preferred approach.  However, if a change is to be implemented via a change order, then approval from the Carnival Corp. Chairman of the Board of Directors is required.  *See id*.

- Carnival Corporate Shipbuilding uses a dashboard to track the implementation of any changes necessary for compliance with Company requirements.  *See* CCS Newbuild Corporate Standards Dashboard.

- After a ship is delivered, Carnival Corporate Shipbuilding also tracks the ship for the first two years and serves as the conduit for making warranty claims against the shipbuilder for any design or construction deficiencies.  *See* Employee Interview/Call Notes.  The CAM Team intends to learn more about how this process is used to address identified compliance issues, for current as well as future new build ships.

### c)    *Company Dry/Wet Dock Processes*

- In contrast to the new build process, the Company's dry/wet dock processes are handled almost exclusively by personnel at the Brands.  *See id*.

- Generally, a dry/wet dock must be scheduled at least 12-18 months in advance, due to the limited number of locations that have docks large enough to accommodate the Company's ships.  The duration of the dry/wet dock is also set at least 12-18 months in advance.  While a dry/wet dock could be extended, both the Company and the shipyard have an incentive to end on time, even if the work is incomplete.  *See id.*

- The CAM understands that dry/wet dock planning processes differ between Brands.  In general, these processes entail:

    o   Building the specifications for a dry/wet dock, primarily by shoreside personnel, including superintendents from marine, technical, and hotel departments, with input

from shipboard personnel.  One Operating Group, Carnival UK, has formalized the tracking of issues raised by the ships between dry docks in a Business Risk Register.  The other brands track identified issues, but less formally.

o   Prioritizing potential dry/wet dock projects, with highest priority given to projects that must be done due to a legal or Company requirement.  This information is refined by layers of review by marine, technical, and hotel personnel.[113]

o   Submitting the dry/wet dock scope for approval through the Company's annual budgeting process.

*See id.*

- When performing a dry/wet dock, planned work may not be completed, or additional unplanned items may be identified that will need to be completed.  In these cases, the Brands use either existing shipboard employees or riding teams to perform this remaining work following the dry/wet dock.  *See id.*

- The CAM understands that many dry/wet docks were postponed during the pause due to COVID-19.  The CAM also understands that the Company is planning to complete all or most of the planned dry/wet docks before those ships return to service.  *See id.*[114]

### d) *Integration of Compliance Considerations*

### i. *Positive Examples*

- During the period of probation, the Company has implemented several concrete design changes to its existing and new build ships in response to compliance concerns or in support of its sustainability goals.  These include:

o   Ongoing efforts aimed at "identifying appropriate measures (preventative actions) to avoid future occurrence on newbuilds" of drain/scupper covers coming loose and potentially allowing contaminants to enter grey water systems, as discussed in Part VI.C above.  *See supra*, Part VI.C.3.

o   Implementing a dry bilge initiative to minimize the amount of bilge water that is generated on ships.  This requires certain ship design and equipment upgrades, such as re-routing piping and installing "catch-all" containments or trays, to allow for "capturing and managing liquids before they enter the bilge."  *DER 2004 Bilge Water*

---

[113] The Brands must also consider the time allotted and the ability of contractors to work in the limited space available.  This may result in not addressing projects that, while important, would interfere with the ability to accomplish other work.  For example, if there is important work needed on the main engine, the Company may not replace leaking piping over the main engine because contractors would have to be working in the same location at the same time.

[114] The Company reports that it "is conducting the drydocks in accordance with plans and approval by the Flag States."  Company Draft Report Comments.

*Production Minimization Requirements* at § 1.  As noted in Part VI.B above, excess bilge water accumulation was a significant contributing factor to the illegal activity that occurred on the *Caribbean Princess* and other Company ships.  *See supra*, Part VI.B.1(a).

o   Installing a display of the electronic navigational charts used on the bridge (known as an "ECDIS" display) in the Engine Control Room to improve the engine team's awareness of the ship's location when performing discharge operations.  *See* CCS Newbuild Corporate Standards Dashboard.

o   Making significant investments in LNG technology for new build ships, which can reduce toxic air pollutants associated with traditional maritime fuel oils, such as sulfur oxides, nitrogen oxides, and particulate matter.  *See* CAM Third Annual Report at 83-84.  The Company is also working on identifying and implementing new technologies (such as batteries, fuel cells, or biofuels) to power ships to support the Company's goal of reducing its 2008 baseline carbon footprint by 40% by 2030, and by 50% by 2050.  The Company also aspires to build zero emissions ships by 2050.  *See* Initial 2030 Sustainability Goals Announcement.

o   Installing shore power connections on ships that visit ports with shore power hook-up capabilities.  Shore power allows ships to draw power from land-based generation sources, rather than burn fuel to run their engines in port.  The Company's goal is to increase fleetwide shore power connection capability to at least 60% of the fleet by 2030.  *See id.*

• The CAM also understands that Carnival Corporate Shipbuilding has begun to receive feedback directly from the Environmental Corporate Compliance Manager about issues that are being identified on multiple ships in the fleet.  This process is currently informal and ad hoc.  *See* Employee Interview/Call Notes.

*ii.*   *Areas of Concern*

• Throughout the period of probation, audit findings, investigation findings, and discussions with Company personnel by the CAM and TPA teams have illuminated concerns about the Company's processes for integrating compliance considerations into dry/wet dock and new build planning and execution processes.  For example:

o   Many crew members have provided the CAM and TPA teams with examples of compliance-related projects that were rushed or left incomplete during dry/wet docks, resulting in compliance challenges and high workload demands in the often chaotic days and weeks following a dry/wet dock.  *See* Employee Interview/Call Notes.  For example, during one ship audit conducted shortly after a dry dock, the TPA issued a Major Non-Conformity finding regarding a grey water/grease tank that was out of service because a project to replace the tank was not completed during a recent 10-day dry dock period.  A remaining tank that was in service could not contain the volume of grey water that was being generated, leading to overflows into the bilges.  As a result, crew members had to continually pump grey water from the in-service

July 19, 2021

tank using portable pumps and hoses. This operation had to be staffed 24/7, placing a significant workload demand on the engine room crew. The Company's investigation determined that repair of the tank was not prioritized because it was not viewed as "environmentally sensitive equipment." *See* Final Report, IAG2020012 (June 24, 2020) at 1. Notably, the investigation did not look more broadly at how pervasive an issue this is or whether other instances have arisen that did not result in Major Non-Conformities.

o  Multiple ships have been found to have inaccurate ballast water system drawings that "had not been identified during either the pre-installation survey, installation or commissioning" of new ballast water treatment systems. *See, e.g.*, Final Report, IAG2019056 (Mar. 12, 2020) at 1, 5. In at least one instance, this led to a violation of U.S. Coast Guard ballast water regulations. *See id*.

o  One ship's ballast water treatment system could not operate properly because it was "installed and configured incorrectly during new build by the yard." *See* HESS Weekly Flash Report (June 24, 2020), PCL_ECP00166762.

o  Multiple ships have experienced piping corrosion and failures that have resulted in HESS incidents and near misses. *See, e.g.*, Flash Report (June 17, 2020) (failure of piping installed during dry dock attributed to "[p]oor quality materials"); Final Report (May 28, 2021) at 1-2 (blackout while under way caused by corroded and leaking grey water piping and "a poor system design that routed pipes above [high voltage] components, increasing risk of water damage within these components").

o  One ship experienced challenges in responding to a fire due to a loss of communications during the fire because the ship's design did not include a dedicated location for communications equipment that was separate from high-risk fire locations. *See* Final Report (May 26, 2021).

o  As discussed above, recent concerns have emerged that the tamper-resistant fasteners on drain/scupper covers (designed to prevent contaminants from entering the grey water system, such as when kitchen galleys are washed down for cleaning) on some ships "were likely never properly tightened/secured in place upon delivery from the shipyard." *See* Must See Message (June 28, 2021). The Company's new build team is "tasked with identifying appropriate measures (preventative actions) to avoid future occurrence on newbuilds." *Id.*; *see also supra*, Part VI.C.3.

• Concerns raised by such events include:

o  The Company has no formal procedures governing dry/wet dock or new build processes in Global HESS.

o  According to the Company, "the scope of RAAS audits of Carnival Corporate Shipbuilding with regard to new builds, or the Brands with regard to dry/wet docks ha[s] been focused on efficiency and effectiveness of operations and ha[s] not included compliance risks." Company Draft Report Comments.

o The Company does not appear to have a formal process for prioritizing projects based on their actual or potential impacts on compliance. As noted above, one internal investigation revealed that a tank repair was not prioritized during dry dock because it was not viewed as "environmentally sensitive equipment," even though leaving the tank out of service resulted in bilge water management and workload challenges, leading to an audit finding. *See* Final Report, IAG2020012 (June 24, 2020). The investigation did not look more broadly at what may have led to this planning oversight or how pervasive such issues may be throughout the Company.

### e) CAM Team Review

- As directed by the Court, the CAM, in collaboration with its marine engineering consultants, has requested records from the Company related to: (1) "the scope of work undertaken during at least one major drydock that occurred during the probationary period;" and (2) "a select set of newbuilds designed and/or constructed during the probationary period." *See* Order on July 28, 2021 Status Conference (June 8, 2021), Dkt. No. 223 at 3. Once received, the CAM Team plans to evaluate how the Company has integrated some of the compliance considerations identified during the course of the probationary period into the design and renovation of ships.

## VII.   CONTINUOUS IMPROVEMENT (ECP § VI.F.5 REVIEW)

### A.   Potential Post-ECP Goals

As described in Part II.A above, the goals detailed below were compiled by the CAM as of result of its communications with top leaders and senior management. However, in reviewing the draft of this Report, the Company stated that, while it "agree[s] with many of the goals," it "cannot commit to the goals without further discussion across the organization." *See* Company Draft Report Comments.

- ***Compliance as Integral Part of How Business is Done***: The notion that compliance efforts will continue as an integral part of how business is done when probation ends on April 18, 2022, because the ECP requirements, and the additional compliance measures undertaken during probation, are fully integrated into the Company's operations.

- ***Continuous Improvement Beyond April 2022***: A program of continuous improvement to support the Company's compliance efforts beyond the end of probation, including:

  o No repeat of the underlying offenses that led to the criminal conviction in this case.

  o Evolution from the management approaches that created the culture of "excessive frugality" that the Company believes contributed to those crimes.

  o Preservation of support and resources for programs and positions set up during the probationary period, such as the Chief Ethics & Compliance Officer, Environmental Corporate Compliance Manager, shipboard and Fleet Environmental Officers, Incident Analysis Group, and broader Ethics & Compliance organization.

July 19, 2021

    o   Top leadership that embraces a learning culture approach, rather than a defend-and-deflect approach, in response to incidents (including near misses), findings, and other information.

    o   A continuous learning feedback loop between the audit, investigation, legal, operations, risk, training, and broader Ethics & Compliance functions, including the capability to effectively:

        ▪   Operationalize lessons learned.

        ▪   Identify and address systemic causes.

        ▪   Systematically and holistically identify, prioritize, and communicate risks across the Company to the Board of Directors and top executive leadership.

        ▪   Implement robust Management of Change processes.

### B.    Progress

*1.*    NO REPEAT OF THE UNDERLYING OFFENSES

- As in prior years, the CAM is not aware of any evidence of a recurrence on any of the Company's Covered Vessels of the same criminal conduct that occurred on the *Caribbean Princess*. That is, based on the CAM Team's ship and shoreside facility visits and interviews, review of TPA and RAAS audit reports, and assessment of environmental incident reports, there has been no observed evidence of employees on a Covered Vessel intentionally bypassing pollution prevention equipment to discharge oily wastewater coupled with falsification of records and conspiracy to conceal such illegal acts.

- However, violations of environmental laws and the ECP persist. These include: prohibited discharges and emissions; inoperable pollution prevention equipment; and recordkeeping errors, including potential intentional falsifications. *See* Internal Incident Log; Quarterly Issue Tracker (Apr. 9, 2021), Dkt. No. 219-1. ECP Year Four also saw notable upticks in incidents related to voyage planning and execution and Exhaust Gas Cleaning System discharges. *See* CAM January 2021 Quarterly Report at 87-95. The CAM has always emphasized, both in conversations with Company personnel and in earlier CAM reports, that it would be unreasonable to ever expect zero violations in the course of normal operations. Mistakes and mishaps will occur. The central question is: how does the Company learn from them to minimize their future occurrence and continuously improve compliance efforts?

- With the end of probation, the Company will confront the risk to its future freedom to operate illuminated in DOJ's statements at the April 2021 status conference: "The company can put people on the ship that perform the function of our TPA and our CAM in the future. They need to do that because otherwise they will be back. And when I think about that possibility as unpleasant as it is, I think of what the remedy would have to be in the future. In the view of the prosecution team generally, we have kind of shot our bolt on this. I can't imagine an environmental compliance plan that would be significantly more demanding and

effective to any greater degree than what we have right now . . . [W]e need to look ahead. What will be the remedy for any future violation?"  Status Conf. Tr. at 37 (Apr. 30, 2021).

### 2.   COMMITMENT TO PRESERVE COMPLIANCE POSITIONS AND PROGRAMS

- The Company's top leadership has publicly pledged to preserve resources and support for positions and programs set up during the probationary period to support environmental compliance, such as the Chief Ethics & Compliance Officer, Environmental Corporate Compliance Manager, shipboard and Fleet Environmental Officers, Incident Analysis Group, and broader Ethics & Compliance organization.  At the April 30, 2021, Status Conference the Carnival Corp. CEO committed:  "Over the course of the ECP, the company implemented a lot of changes at a structural level, and we are going to carry those forth after the ECP."  Status Conf. Tr. at 6 (Apr. 30, 2021).  He also stated that "there's no question we are going to maintain [the Environmental Corporate Compliance Manager organization] and sustain it."  *Id.* at 64.  The CAM understands that the CEO reiterated these commitments directly to Environmental Officers during coffee chat sessions, as noted in Part III.B above.  *See supra*, Part III.B.2.

- Over the course of probation, Company employees at various levels (primarily at senior management and top leadership levels) have stated that they do not view April 18, 2022, as an end date to the Company's compliance and continuous improvement efforts.  Those statements have been made with increasing vehemence as the end of probation approaches. At the same time, employees (at middle and lower management levels and among shipboard officers and crew) continue to express concerns about management backsliding after probation ends.  These range from concerns that there will be reduced support for maintaining supplies of critical environmental spare parts, to concerns that the role of the Environmental Officer will be diluted with other tasks, as occurred the past.  *See* Employee Interview/Call Notes.  Such concerns are more pronounced among employees who were present for the conclusion of the Company's prior ECP in August 2006— when the criminal activity underlying the current conviction had begun, even before the prior ECP had ended.[115]

- There is no question that, as discussed throughout this Report, the Company has a far more robust compliance program in place now than it did at the end of the prior ECP.  The Company has restructured its corporate governance, creating the position of Chief Ethics & Compliance Officer, a role supported by a large and well-funded group.  There is also greater awareness of the need for effective internal investigation and risk management functions, and efforts are underway to provide IT support on issues ranging from procurement to training to voyage planning—all of which are necessary to support continuous improvement.  The Board of Directors is also taking more active stances on compliance, and the nascent efforts to hold senior executives accountable on compliance holds promise.

---

[115] According to the Joint Factual Statement, the illegal activity on the *Caribbean Princess* and four other ships took place between 2005 and 2013.  *See* Joint Factual Statement (Dec. 1, 2016), Dkt. No. 2-1 at 2-3, 11.

July 19, 2021

3.   *CONTINUED STRENGTH OF SHIPBOARD AND FLEET ENVIRONMENTAL OFFICER PROGRAMS*

a)   *Background*

- The CAM has consistently observed that the development of a strong, cross-brand Environmental Officer program, including the launch of the Fleet Environmental Officer program, "has been one of the Company's most significant achievements over the course of the monitorship." *See, e.g.*, CAM January 2021 Quarterly Report at 72 (quoting CAM/Company Communication). These efforts have been led by the Environmental Corporate Compliance Manager and his talented team, including the Ethics & Compliance Corporate Training Director, with support from CSMART staff and Brand compliance and training personnel, including the Operating Line Compliance Managers and Operating Line Training Managers. Since ECP Year One, these individuals have provided "increasing levels of support, resources, and training to onboard Environmental Officers . . . help[ing] to create a strong corps of Environmental Officers who have consistently impressed the CAM Team with their dedication, knowledge, energy, and commitment to helping the Company improve its environmental compliance performance." CAM Third Annual Report at 123.

- The Company has continued to build on these efforts in ECP Year Four. The goal of these efforts is to have a continuous presence on every ship of at least one individual whose primary purpose is to counsel, guide, inform, and support environmental compliance efforts. In the CAM's view, the Environmental Officer program remains "an example of how strong, centralized management and support (through innovative training and communication tools, among other efforts) can create a high-functioning and integrated cross-brand group." CAM January 2021 Quarterly Report at 72.

b)   *Environmental Officer Training*

- The Company continues to innovate in Environmental Officer training, including developing and delivering:

  o **CSMART Training Courses:** The Company has continued its program of virtual CSMART training courses for Environmental Officers, including Environmental Excellence. *See id.* at 73-78. The first virtual Environmental Excellence course was held in August 2020, and CSMART has delivered six virtual courses as of June 2021. *See* Company Updates Letter at PCL_ECP00225064. At each session, the CAM has been invited to share remarks and engage in a Q&A with the attendees. The CAM continues to be struck by the thoughtfulness and engagement of the Environmental Officers at these sessions. Some recurring themes from recent discussions have related to: IT support, especially for shipboard trainings; return to service challenges, including heavy training loads; the Company's commitment to DEI; and the Company's support for the Environmental Officer role after probation ends. *See* Employee Interview/Call Notes.

  As discussed in earlier CAM reports, the current iteration of this course focuses on providing Level 2 investigation training to Environmental Officers. *See* CAM

January 2021 Quarterly Report at 51-52, App. C.  Increasingly, the CAM Team has become aware of concerns by Environmental Officers about the potential expansion of their role to include that of shipboard investigator.  Even when not acting as investigators, Environmental Officers report that they are sometimes perceived as "police officers" by other crew members, rather than as trusted resources for reporting or seeking guidance on environmental compliance concerns.  This tension could be exacerbated if Environmental Officers take on more of an investigative function.  While Environmental Officers say they are more than willing to serve as subject matter experts to assist an environmental investigation, they feel that it may be optimal for another position to be the lead investigator for Level 1 and 2 ship-led investigations.  *See* Employee Interview/Call Notes.

Environmental Officers have also described the "backsliding" that occurred after the end of the Company's prior ECP as attributable in part to the expansion of the Environmental Officer's role to include other obligations, diluting their environmental compliance counseling role.  *See id.*

The Company has responded that these concerns are "a misunderstanding from [its] [Environmental Officers] attending the investigation training course."  Company Draft Report Comments.  The Company further reports that, since becoming aware of these concerns, the Environmental Corporate Compliance Manager "has personally assured" Environmental Officers "that they will not become the [ships'] HESS investigators."  *Id*.  The Company is also revising its internal procedures "to make it clear that [Environmental Officers] can support Environmental investigations" as needed, but "they won't be in charge to lead them."  *Id.*

o   **Virtual Learning Webinars:**  Previously known as Learning Nuggets, these are environmentally-focused webinars that bring together environmental, deck, and technical personnel.  Topics have included:  recordkeeping; waste vendor vetting and waste offloads; food waste management; voyage planning; and interpreting data from pollution prevention equipment.  *See* Company Updates Letter at PCL_ECP00225063-4; May 2021 Probation Supervision Report Attachment 5 at PCL_ECP00225118; Environmental Excellence Newsletter Issue 03-2021 at 5.

o   **New-Hire Environmental Officer Shipboard Training:**  The Company has revised its training course for new hire Environmental Officers (known as "Environmental Officer 1"), which is now being delivered shipboard by a Fleet Environmental Officer.  Previously, the course was delivered shoreside at CSMART.  *See* Environmental Excellence Newsletter Issue 02-2021 at 10.

- Led by the Ethics & Compliance Corporate Training Director, the Company has also redesigned environmental trainings for both shipboard and shoreside personnel, including:

  o   **Shipboard Environmental Awareness Training:**  The shipboard general environmental awareness training (known as "TRG 2302") for crew members at the beginning of each contract was converted to a computer-based format so that crew

members can take it during their quarantine period.  *See* Company Updates Letter at
PCL_ECP00225064.

o **Shipboard Job-Specific Environmental Workplace Training:**  The shipboard job-specific environmental workplace trainings (known as "TRG 2308" and "TRG 2309") were updated to be better tailored to each crew member's job, and to be delivered "in a more efficient and standardized manner."  *Id.*

o **Shoreside Environmental Awareness Training:**  The environmental awareness training for shoreside personnel (known as "TRG 2307") was simplified from three modules to one module, and updated with "more opportunities for employee engagement."  *Id.*

- In addition to trainings, at least three Operating Line Compliance Managers hold regular Environmental Officer coffee chats.  The Company also launched a coffee chat program with the Carnival Corp. CEO, as discussed in Part III.B above.  *See supra*, Part III.B.2.

- The Company also continues to host the Environmental Hub online chat forum where Environmental Officers can interact, ask questions, and share best practices with one another, as well as shoreside personnel.  *See* CAM January 2021 Quarterly Report at 71-72; Employee Interview/Call Notes.

*c)     Fleet Environmental Officer Program*

- In August 2020, the Company launched a new Fleet Environmental Officer program, under which Fleet Environmental Officers "mentor, coach, and guide new [Environmental Officers] in their roles."  Company Updates Letter at PCL_ECP00225067.  Led by the Director of the Fleet Environmental Officer program, who reports to the Environmental Corporate Compliance Manager, the Company has continued to grow and support the program throughout the pandemic.  As of June 2021, the program has ten officers—including the first two female Fleet Environmental Officers.  *See id.*; May 2021 Probation Supervision Report Attachment 5 at PCL_ECP00225118.  Additional diversity within the Fleet Environmental Officer corps includes one officer from Asia and one officer from South Africa.  *See* Company Draft Report Comments.

- The Fleet Environmental Officers provide a range of support services to both shipboard and shoreside staff, including:

o Serving as mentors to assigned mentees, as well as any Environmental Officers who need assistance.

o Visiting ships before they return to service to assist with training delivery and compliance checks/self-audits.

o Providing shipboard "Environmental Officer 1" training to new hire Environmental Officers.

o Helping to develop and revise environmental policies and procedures.

o   Helping CSMART to develop and deliver environmental trainings and webinars, with one Fleet Environmental Officer assigned to CSMART on a rotating basis.

o   Assisting the Incident Analysis Group in investigations as subject matter experts.

o   Helping to revise the Environmental Officer competency framework and Professional Development Record, discussed in the next section.

See Company Updates Letter at PCL_ECP00190602; Environmental Excellence Newsletter Issue 02-2021 at 5, 10; Environmental Excellence Newsletter Issue 03-2021 at 10; Compliance Committee Q1 2021 Report at 26; May 2021 Probation Supervision Report Attachment 5 at PCL_ECP00225118.

• The Company reports that it "has received positive feedback from crew members" on the Fleet Environmental Officer Program, with "most of the ships asking for an additional visit in the near future." Company Updates Letter at PCL_ECP00225067; May 2021 Probation Supervision Report Attachment 5 at PCL_ECP00225118. The CAM Team has received similarly positive feedback.[116] The CAM Team has also remained in regular contact with the Director of the program, who exhibits dedication and passion for his role and, with support from the Company, has helped drive substantial growth and improvements in the program in a relatively short (less than one year) time period.

### d)   Environmental Officer Career Path

• The Director of the Fleet Environmental Officer program, in coordination with the Maritime Professional Development team,[117] is leading efforts to revise the competency framework and Professional Development Record for Environmental Officers.

o   A competency framework is a defined set of knowledge, skills, and behaviors required for a specific rank or position.[118]

---

[116] As noted in earlier CAM reports, the program is based on the Chief Maritime Officer's Fleet Captain and Fleet Chief Engineer programs, both of which were suspended as part of the COVID-19-related staff reductions announced in May 2020. See CAM January 2021 Quarterly Report at 76. The Company began bringing these programs back in June 2021. See Company Draft Report Comments.

[117] The Maritime Professional Development team reports to the head of CSMART, who in turn reports to the Chief Maritime Officer. The group focuses on developing and implementing operational trainings for deck, technical, and environmental personnel. It also leads the development of competency frameworks and Professional Development Records for non-Environmental Officer maritime crew.

[118] Behavioral competencies may relate to: an individual's response to a specific set of conditions; the way in which they conduct themselves; their action and response to a stimulation; their response to the environment; or the way they conduct themselves when interacting with another individual, group, or event. Examples of behavioral competences include: "Communicates importance of message through change in voice as appropriate to the situation"

o   A Professional Development Record is an individualized career progression map that links each stage of an individual's career path to their attainment of specific competencies from the framework—providing clarity about the knowledge, skills, and behaviors an individual must demonstrate to move forward in their careers.  *See id.* at 22.

• The revised Professional Development Record aims to establish a consistent process for training, evaluating, and promoting Environmental Officers across the Brands.  It lays out a four-stage career progression map, beginning with the initial shipboard new-hire-in-training period and culminating (after at least five years as an Environmental Officer at sea) with the Fleet Environmental Officer position.[119]  Individuals who do not wish to become Fleet Environmental Officers can remain as shipboard Environmental Officers or seek other opportunities, such as moving into a shoreside management or CSMART role (although there is no defined career path or set of competencies for these alternative pathways).  *See* Employee Interview/Call Notes.[120]

• Each stage of this career path will be linked to specific knowledge, skill, or behavioral[121] competencies.  To progress to the next stage, the Environmental Officer must be independently assessed (by a designated "assessor") as "competent" in each competency.  The assessment must also be independently verified (by a designated "verifier," who is different from the assessor).  Assessors and verifiers differ at each stage but may include a Fleet Environmental Officer, CSMART instructor, or shipboard officer such as the Captain, Staff Captain, Chief Engineer, or Staff Chief Engineer.  If an assessment identifies concerns in any competency area, the assessor must provide a plan for additional mentoring or learning opportunities.  The goal of the program is not to shame or penalize, but to help each individual achieve competence.  Detailed written guidance is provided to Environmental Officers, assessors, and verifiers on completing each stage of the process.[122]  Progress is tracked in the GLADIS learning management system.  *See* EO PDR Overview (June 2021), PCL_ECP00219134.

• As of the date of this Report, the program is undergoing finalization and approval, with the goal of rolling it out within the next few months.  The CAM understands that the program will be periodically reviewed and updated, but that there is not yet a formal mechanism

---

and "Applies language appropriately e.g. Includes, but is not limited to, clear phrasing, concise, correct terminology and speed of delivery."  *See* Competency Framework EO PDR Approach – SitRep (June 2021), PCL_ECP00219135 at 16-21.

[119] The Company is also considering establishing a Senior Environmental Officer position before the Fleet Environmental Officer role.  Currently, not all Brands have such a role.

[120] The CAM understands that, except for the final Fleet Environmental Officer stage, there are no compensation increases tied to each promotion in the first three stages.

[121] An effort is underway to integrate the Culture Essentials attributes into the behavioral competencies.

[122] However, the CAM understands that no special training, such as anti-bias training, is currently provided to assessors and verifiers in their role as evaluators.

(outside of the assessments themselves) for soliciting feedback from Environmental Officers or crew members who interact with Environmental Officers (including Global Talent Partner recruits), or for incorporating learnings from audits, investigations, or risk assessments— although there are informal processes through which these activities may occur.  *See* Employee Interview/Call Notes; *see also infra*, Part VII.C.5 (discussing the general lack of a continuous learning feedback loop within the Company between training and other functions).

- This is a critical and promising effort.  The lack of a clear career path for the Environmental Officer position was one of the earliest concerns raised in CAM reports.  This concern reflected statements from numerous Environmental Officers.  *See, e.g.*, CAM September 2018 Quarterly Report at 18; CAM December 2018 Quarterly Report at 19-21.  In addition to supporting the development and retention of skilled Environmental Officers, the program could provide opportunities to bolster the visibility and integration of the Environmental Officer role with other departments on the ships, enhancing the value of the services that Environmental Officers provide.

> *e)*     *Support for Continuous Improvement*

- The CAM Team continues to be impressed by the talent and dedication of the Environmental Officers met through ship and shoreside visits (virtual and in-person), as well as during the interactive sessions held at each Environmental Excellence course.

- As discussed above, continued support and resources for the Environmental Officer program, including the Fleet Environmental Officers, will be critical for the Company's continuous improvement efforts after probation ends.  *See supra*, Part VI.B.2.  The Company has committed, both publicly and internally, to preserving these programs and positions beyond the ECP.  Upholding this commitment is not only the right thing to do, but also in the Company's best interests for avoiding future prosecutions and maintaining its freedom to operate.

> *4.*     *MATURE INTERNAL AUDIT FUNCTION (ECP § VI.F.4 REVIEW)*

> *a)*     *Background*

- The ECP requires the CAM to "conduct a review of [the Company's] internal environmental audits with respect to Covered Vessels and Covered Personnel."  ECP § VI.F.4.  This review "shall assess the ability of [the Company's] internal audit process to accomplish the objectives of the ECP, including any inadequacies with respect to [the Company's] performance, whether personnel-based or related to any of its Covered Vessels, systems, equipment, or components."  *Id.*

- The Company has a mature internal audit function, housed within the independent RAAS department that reports directly to the Carnival Corp. Board of Directors.  *See* CAM Third Annual Report at 225-27 (providing an overview of the RAAS audit process).  Past CAM reports have found that the internal audit program is generally strong, with clear audit protocols and auditors who generally appear knowledgeable, professional, and qualified.

July 19, 2021

*See, e.g.*, CAM Third Annual Report at 224-36. That general assessment has not changed for ECP Year Four. In ECP Year Five, the CAM's primary focus will be on RAAS's capabilities to further integrate with the investigation, operations, risk, training, and broader Ethics & Compliance functions to support continuous improvement beyond the ECP.

b)      *ECP Year Four Audit Activities*

- In ECP Year Four, RAAS experienced significant staff reductions and transitioned to a program of remote audits due to the pandemic. As of June 2020, RAAS's overall staff had been reduced by approximately 60%, with staffing for the internal HESS audit function cut from approximately 32 to 14 employees. *See id.* at 231-32. As of the date of this Report, the staffing for RAAS's internal HESS audit function has increased from approximately 14 to 24 employees, and RAAS anticipates further increases to its staff in 2022. RAAS has begun to conduct in-person audits of some ships and shoreside offices, mainly in Europe. RAAS plans to return to in-person audits on a wider scale when practical. For now, RAAS will continue with remote audits for ships and shoreside facilities that are not safe or practical to visit in-person. *See* Employee Interview/Call Notes.

- In addition to its regular audits, RAAS launched the following programs during ECP Year Four:

  o   **Return to Service Program:** The Company describes the return to service program as "a program of support to management and not a RAAS only project." Company Draft Report Comments. Under this program, RAAS auditors, in conjunction with shoreside management and shipboard crews, conduct HESS reviews on ships returning to service. These reviews are intended to identify and help address HESS-related findings and observations before the ship begins sailing with passengers. As part of the program, RAAS compiles and shares findings and observations with the Brands to raise awareness of issues that may need to be addressed fleetwide. To date, RAAS has conducted approximately eight visits under the return to service program. RAAS plans to follow the return to service visits with an in-person audit within three months of the ship's return to service. *See* Employee Interview/Call Notes.

  o   **Self-Assessment Program:** This program aims to "help maintain HESS awareness during the pause in cruise operations, [] to provide an opportunity to address non-conformity trends identified through internal audit[s,] and to assist in expanding the knowledge and understanding of the Global HESS procedure requirements across the fleet." *See* Global HESS Self-Assessment Program (June 2020), PCL_ECP00167789-90. Under this program, crew members conduct "self-audits" of HESS procedures associated with recurrent or significant audit findings. RAAS notifies the ship about the relevant HESS procedure to be audited; provides a questionnaire to the ship to guide the self-audit; and provides the ship with a set time frame (which varies by procedure) to perform the self-audit. *See* Company Draft Report Comments.

  RAAS has overseen self-assessments on HESS policies and procedures related to: Exhaust Gas Cleaning Systems; refrigerant gases; fleet maintenance management;

July 19, 2021

machinery space fire prevention; and lifesaving appliance maintenance management. The self-assessment findings have been used to develop corporate-wide action plans and to "identify topics or provisions for potential clarifications and modifications to HESS procedures." *See* Company Updates Letter at PCL_ECP00225062.

- As in prior years, RAAS issued periodic reports throughout ECP Year Four synthesizing audit results and key trends from audit findings.  Key findings RAAS identified for Fiscal Year 2020 and the first quarter of Fiscal Year 2021 relate to:  (1) critical spare parts missing for Exhaust Gas Cleaning Systems; (2) crew members missing Exhaust Gas Cleaning System trainings; (3) entries missing in Exhaust Gas Cleaning System record books; (4) waste vendors not assessed before being used for waste disposal; (5) sewage and grey water tank inspections not performed per the required frequency; (6) missing Oil Record Book entries; (7) food waste pulper/vacuum stations found unsupervised while in operation; and (8) work orders in the planned maintenance system found postponed without any evidence of joint review.  *See* RAAS Q1 Report (Apr. 16, 2021), PCL_ECP00190754-72 at PCL_ECP00190767-71; RAAS Q4 Report (Jan. 12, 2021), PCL_ECP00188880-907 at PCL_ECP00188886-89; RAAS HESS Update (Jan 12, 2021), PCL_ECP00217485 at 3-5. Many of these findings correspond to findings and areas of concern identified and reported on by the CAM and TPA.

### c)      Initiatives in Response to Critical Feedback

- As discussed in earlier CAM reports, some Company personnel have provided critical feedback about the internal audit program, including concerns about:

    o   Auditor attitude, audit consistency, and auditor competency (including a focus on "nit-picky" findings).

    o   A tendency for both ship and shoreside management to dispute audit findings, rather than seek to understand, correct, and prevent them.

    *See* CAM Third Annual Report at 225-28.

- RAAS has made significant efforts to address critical feedback and to re-envision and re-invigorate RAAS's role and perception within the Company, including:

    o   **RAAS Maritime Retreat:**  A RAAS Maritime Retreat for auditors was held in August 2019, which highlighted several challenge areas, including:  the group's quality assurance process; perceptions by others within the Company of RAAS and its auditors; and consistency of audit protocols and audit findings.  *See id.* at 234.

    o   **HESS 3.0 Audit Process Initiative:**  This initiative is designed to address several areas for improvement, including:  (1) audit planning; (2) field work and follow-up work; (3) auditor training and competency; (4) group communication and culture; and (5) root cause and data analytical enhancements.  *See id.*  RAAS continues to make progress on the HESS 3.0 initiative, particularly in the area of data analytics as a means to identify correlations between audit findings and other factors (such as crew

July 19, 2021

tenure on a ship, training, and rank or position) that could provide continuous improvement opportunities. *See* Employee Interview/Call Notes.

o **HESS 3.0 Rebranding—Tone from the Top Initiative:** RAAS launched this initiative, in collaboration with the All Brands Group Communications and Marketing group, to improve RAAS's overall perception within the Company. *See* CAM Third Annual Report at 235. Although COVID-19 has slowed the progress of this initiative due to staff departures, RAAS intends to further this initiative as part of the Company's efforts surrounding culture. *See* Employee Interview/Call Notes. The support of top leadership will be critical to this effort.

### d) *Role of RAAS Beyond Audits*

- RAAS's role is not limited to performing audits. As stated by the Chief Audit Officer, the name of the organization, "Risk Advisory and Assurance Services" implies a vision that goes beyond a "narrow construct of inter[nal] audit." Status Conf. Tr. at 54 (Apr. 30, 2021).

- Other functions of RAAS include:

  o Performing risk assessments. *See infra*, Part VII.C.3(b).

  o Generating dashboards to analyze and trend certain HESS metrics. *See supra*, Part VI.B.3(c).

  o Performing non-HESS (*e.g.*, financial, fraud) investigations. *See infra*, Part VII.B.5(a) and Part VI.C.2(d).

  o Performing reviews, known as Focus Reviews, into various business issues, as discussed in the next section.

### e) *Support for Continuous Improvement*

- To support continuous improvement efforts, the Company has recognized the need to better integrate the internal audit function with other functions, including investigations, legal, operations, risk, and training.

- Some efforts toward such integration are underway, including:

  o **Quarterly HESS Lessons Learned Meetings:** As discussed in Part VII.C below, RAAS participates, along with leaders from Ethics & Compliance and Maritime Operations, in quarterly HESS Lessons Learned meetings. These meetings started in early 2020 and focus on identifying issues and trends from different inputs, including audits, investigations, and incident and near miss reports. *See infra*, Part VII.C.5(b).

  o **Revised "Continuous Improvement From Lessons Learned" Processes:** As discussed in Part VII.B below, RAAS is coordinating with the Incident Analysis Group and other stakeholders on revising the Company's internal procedure governing the processes "through which [Global HESS] procedures are continuously

July 19, 2021

improved by incorporating lessons learned from internal and external audit findings,
HESS events, near misses and incident analyses, and to describe how lessons learned
are to be communicated to management and the fleet." *HMP 1303 HESS Procedure
Continuous Improvement from Lessons Learned* ("HMP 1303") at § 1; *see also infra*,
Part VII.B.5(c). The CAM understands that the revised procedure will establish
formal mechanisms for coordination between RAAS, the Incident Analysis Group,
and Maritime Operations on identifying and disseminating lessons learned. *See*
Employee Interview/Call Notes.

**Focus Reviews:** RAAS periodically performs Focus Reviews that analyze business
issues across the corporation, using its internal resources and expertise. Examples of
Focus Reviews into environmental compliance issues, discussed in this and past
CAM reports, include: food waste measurement; food waste digester installations;
environmental critical spare parts for pollution prevention equipment; deck and
engine reporting; and ship superintendent workloads. *See id*.

To the best of the CAM's knowledge, there is no established, formal process for
identifying issues for Focus Reviews. This is one area where there may be an
opportunity for greater coordination between RAAS and the Incident Analysis Group,
including clarifying the relationship between RAAS Focus Reviews and Incident
Analysis Group investigations into potential systemic issues. *See id.*

o **RAAS Audits of the Incident Analysis Group:** RAAS has begun to audit the
Incident Analysis Group. The first audit, related to overall governance of the Incident
Analysis Group, has commenced. This will be followed by a separate audit, which
will focus on compliance with the internal procedures governing internal
investigations (known as the "HMP 1302" procedure) and continuous improvement
and lessons learned processes (known as the "HMP 1303" procedure, as noted
above). Revisions to these procedures are underway. *See* Company Draft Report
Comments; *see also infra*, Part VII.B.5.

o **Root Cause Analysis Process:** According to the Company, RAAS "has developed
new, more detailed categories for its process of determining the root cause of non-
conformities [*i.e.*, audit findings] in order to avoid the over-use of generalized topics
such as 'lack of awareness' as a root cause. The more specific root causes will help
to create more effective action plans." Company Updates Letter at
PCL_ECP00225062.

The CAM Team has not reviewed the RAAS root cause analysis process. The CAM
notes the importance of adopting consistent root cause analysis methodologies across
the different entities in the Company who perform such analyses, including RAAS
and the Incident Analysis Group. This may be another area of opportunity for greater
coordination across different departments.

o **Data Analytics and Predictive Modeling:** RAAS is working to enhance its data
analytics and predictive modeling capabilities to support continuous improvement

efforts, including the dashboards designed to analyze and trend certain HESS metrics. *See supra*, Part VI.B.3(c).

- As the CAM has observed, a large part of RAAS's success depends "on support from the Board and [Senior] Executive Management."  CAM Third Annual Report at 235-36 (citing RAAS Cruise Control Newsletter).  Messaging from leadership has a direct "impact on the effectiveness of support RAAS receives in carrying out its responsibilities." *Id.* (citing same).  For RAAS to reach its full potential, it must be viewed as a set of in-house experts and partners who can work with ships and shoreside personnel alike to identify areas of risk and opportunities for improvement at all levels and across multiple departments within the Company.  The Company has expressed to the Court that "the executive management and the board fully recognize the critical role of RAAS in ensuring that the company has a strong governance model now and . . . post [E]CP."  Status Conf. Tr. at 52 (Apr. 30, 2021).

### 5. *INTERNAL INVESTIGATION PROGRAM IMPROVEMENTS*

#### a) *Background*

- The Company accepts that it historically has had a "critically flawed" internal investigation program for HESS investigations—a CAM finding from ECP Year One supported by similar findings from the TPA and the Company's own consultants.  *See* CAM January 2021 Quarterly Report at 43.  This under-developed investigation function has also more broadly impacted the Company's compliance and risk management efforts.  Without effective analysis of incidents and near misses, the Company has lacked the ability to both understand and address the compliance problems it faces.  *See id.* at 43-44.

- As detailed in earlier CAM reports, the Company's efforts to revamp its internal investigation program were subject to repeated delays and detours.  *See, e.g.*, CAM Third Annual Report at 182-83; CAM January 2021 Quarterly Report at 44.  After missing the internal deadlines set in a September 2018 timeline submission to the Court, the Company launched a new group in March 2019, called the Incident Analysis Group, to lead the Company's internal HESS investigation program.[123]  In September 2020, the Company appointed a new Head of the Incident Analysis Group after the group was failing to make expected progress.  The current Head also serves as the Deputy Chief Ethics & Compliance Officer.

#### b) *Outside Counsel Review and Recommendations*

- As detailed in the last CAM report, the Company retained a law firm in October 2020 to investigate concerns about the Incident Analysis Group's structure and independence, which were initially reported in July 2020 via the Company's Hotline system.  This was the second law firm retained to investigate these concerns, after the CAM identified numerous

---

[123] Before the restructuring of the Company's internal investigation function, RAAS was responsible for HESS investigations (separate and apart from its audit function).  As noted in Part VI.B above, RAAS remains responsible for certain non-HESS investigations (*e.g.*, financial, fraud).  *See supra*, Part VI.B.4(d).

deficiencies in the report produced by the first firm that was retained.  *See* CAM January 2021 Quarterly Report at 46-47.[124]

- The final report from this second investigation included a series of findings and recommendations under the following topics:  (1) Incident Analysis Group independence; (2) blame culture; (3) root cause analysis; (4) overall quality of investigations and reports; (5) Hotline Report investigations, and (6) brand/operating group-level investigator training and independence.  *See* Outside Counsel, Internal Investigation Report: Issues Related to the Incident Analysis Group (Dec. 15, 2020) ("Outside Counsel Report on Incident Analysis Group Issues"); CAM January 2021 Quarterly Report at 48-50 (summarizing findings and recommendations).

  o  In response to one of the recommendations, the Incident Analysis Group was re-structured to fall directly under the leadership of the Incident Analysis Group Head, the Chief Ethics & Compliance Officer, and, importantly, the Compliance Committee of the Boards of Directors.

  o  The status of the Company's implementation of the additional recommendations is summarized in Appendix E.

- In January 2021, a separate report (by yet a third firm) providing the "postmortem" on the first investigation, requested by the Court, was finalized.  *See* Outside Counsel, Investigative Report Regarding the [Redacted] Hotline Complaint Investigation (Jan. 25, 2021).  That report included three recommendations:  (1) ensuring investigations are appropriately scoped, including in light of any broader implications presented by the underlying allegations and the context in which they arise; (2) establishing a clear policy on determining when to engage outside counsel to investigate compliance allegations and the criteria for selecting outside counsel; and (3) promptly escalating significant compliance allegations, along with the plan for investigation them, to the Compliance Committee.  *See id.* at 24-25.  The CAM understands that efforts are underway to draft new procedures in response to each of these recommendations.  *See* Employee Interview/Call Notes.

---

[124] The Company ultimately retained three different law firms to conduct investigations related to these allegations:  (1) the first law firm produced a report in September 2020 that the CAM found to be deficient in numerous respects; (2) the second law firm was engaged by the Compliance Committee of the Boards of Directors to "conduct a fresh review of the work that had been done by the [prior] firm, to supplement the initial investigation as necessary, and to prepare a report that, among other things, addresses the concerns raised" by the CAM, *see* Letter from Outside Counsel to CAM (Oct. 15, 2020); and (3) the third law firm, which also serves as independent counsel to the Compliance Committee of the Boards of Directors, was retained by the Compliance Committee to conduct a "postmortem on how that first decision was made, as to who was selected to do the investigation and what were the lessons learned from that," as directed by the Court.  *See* Status Conf. Tr. at 51 (Oct. 16, 2020); CAM January 2021 Quarterly Report at 46-47.

July 19, 2021

### c)    *Investigation Program Updates*

- Under the leadership of the new Head, the Incident Analysis Group has made progress toward improving the internal investigation program, including implementing many of the recommendations in the Outside Counsel Report on Incident Analysis Group Issues. Highlights of these efforts include:

  o  Hiring additional Incident Analysis Group investigators, bringing the total size of the group to seven investigators.  Two additional recently hired investigators are scheduled to join by the end of September 2021, and recruitment is ongoing for at least three more open positions, including for an investigator with classic (*i.e.*, "law enforcement-type") investigations training and experience.

  o  Hiring additional support personnel, including:  a Director of Training; a Director of Program Management and Quality Assurance; a Technical Editor; and an Executive Assistant.

  o  Delivering new trainings to Incident Analysis Group investigators on report-writing and classic investigative techniques.

  o  Developing a competency framework for Incident Analysis Group investigators.

  o  Launching a new software database platform to assign and track Incident Analysis Group investigations, including investigation descriptions, root cause analysis findings, and corrective and preventive actions.

  o  Creating an investigations manual for Incident Analysis Group investigators.[125]

  o  Working to create a more diverse corps of Incident Analysis Group investigators.

  o  Ongoing efforts to revise internal procedures on:  (1) conducting investigations (known as the "HMP 1302" procedure), which the CAM understands is being revised to correspond with the recently published Investigation Manual; and (2) continuous improvement and lessons learned processes (known as the "HMP 1303" procedure), which, as noted  in Part VII.B above, the CAM understands is being revised to establish formal mechanisms for coordination between RAAS, the Incident Analysis

---

[125] Under the Pause Priorities Plan, a draft manual was originally expected in December 2020. On March 31, 2021, the CAM Team received a draft of the manual for feedback.  In the view of the CAM and TPA teams, the draft "lack[ed] clear direction on critical issues (such as the scope of investigations), fail[ed] to provide clear guidance on investigative techniques, and in some instances . . . would lead to confusion about best practices."  Letter from CAM to Company, *Joint CAM/TPA Feedback on Draft Investigations Manual* (May 7, 2021), at 1.  On June 18, 2021, the CAM Team received an updated draft manual that addressed many of the CAM and TPA's prior concerns.  A final manual was published on July 1, 2021, which the CAM and TPA teams are reviewing.  *See* Incident Analysis Group HESS Investigation Manual (July 1, 2021) ("Investigation Manual").

Group, and Maritime Operations on identifying and disseminating lessons learned. *See supra*, Part VII.B.4(e).

*See* IAG Improvement Plan Tracker, PCL_ECP00190028; *see also infra*, App. E.

- The CAM recognizes this progress, as well as the hard work, dedication, and commitment of the Incident Analysis Group investigators, leaders, and other team members. These efforts are essential for establishing the basic building blocks of an effective internal investigation program. The CAM Team also continues to hear positive reports from Company personnel regarding the leadership and engagement of the new Incident Analysis Group Head. *See* Employee Interview/Call Notes.

- However, as discussed in Part VII.C below, these efforts will fall short if the Company's top leadership does not embrace the central finding from the Outside Counsel Report on Incident Analysis Group Issues: that investigations must be independent, including from the influence of the operations function. To be independent, investigators must be empowered with authority (both in words and in reality) to determine what issues to investigate, to set the scope of investigations, and to follow the facts wherever they lead, including to systemic issues.

## 6.   CONTINUED HIGH LEVELS OF EMPLOYEE COOPERATION AND ENGAGEMENT

- As in prior years, the CAM Team has continued to encounter impressive levels of cooperation, engagement, and support from Company employees, ship and shore, in both formal and informal interactions. Crew members and shoreside personnel from across ranks and departments have candidly shared information and observations on the Company's compliance efforts, and this Report (as with prior CAM reports) aims to be a mirror of what the CAM Team has learned and confirmed from these interactions. The Company also continues to provide the resources and support needed to respond to CAM document and information requests and to produce reports and other documents, as required by the ECP and terms and conditions of probation.

- The CAM continues to appreciate the efforts of those with whom the CAM Team engages most closely: the Ethics & Compliance group, including the Chief Ethics & Compliance Officer, the Environmental Corporate Compliance Manager, and the other members of their teams at both All Brands Group and the individual Brands; CSMART staff involved in developing or implementing environmental and compliance training; RAAS personnel who perform or oversee HESS audits; and shipboard and Fleet Environmental Officers. These individuals continue to display a commitment to environmental compliance and to drive forward compliance efforts.

- The Company's employees are its greatest asset, as well as its greatest protection against future risks of noncompliance. One of the most important things the Company can do to guard against such risks is to ensure employees at all levels have the support they need to both succeed in their jobs and to be unafraid to speak up when something does not seem right or could be improved. This support is not limited to training and equipment, but also includes compensation, mental and physical well-being and safety, and access to mentorship

and career growth opportunities.  The Company's pool of dedicated and talented employees stand ready to help it succeed—and lead—in the area of compliance the same way it has in other business areas.

## C.   Remaining Barriers and Opportunities for Improvement

### 1.   ACHIEVING A LEARNING CULTURE

- As discussed in Part III.C above, the approach by the Company's top leadership to incidents (including near misses), findings, and negative or uncomfortable information has historically been characterized by a tendency to minimize or avoid chronic problems, rather than to seek to understand them and address their root causes and risk factors.  *See supra*, Part III.C.2.  This defend-and-deflect approach has been an obstacle to the learning culture that the Company seeks to achieve.  As recognized above, there are promising indications that this mindset is starting to shift.  *See id.*; *see also supra*, Part VII.B.2.

### 2.   ESTABLISHING A FULLY INDEPENDENT AND EMPOWERED INTERNAL INVESTIGATION PROGRAM

#### a)   Elements of an Effective Internal Investigation Program

- As noted in Part VII.B.5 above, effective internal investigations are critical for the Company's compliance and risk management efforts.  Without this tool, the Company lacks clarity about the nature and scope of the compliance problems it faces, as well as information needed to develop appropriate corrective and preventive actions.  DOJ cites "the existence of a well-functioning and appropriately funded mechanism for . . . timely and thorough investigations" as a "hallmark of a compliance program that is working effectively."  DOJ Corporate Compliance Guidance at 16.  In evaluating compliance programs, DOJ considers steps a company takes to "ensure that investigations are properly scoped" and "independent, objective, appropriately conducted, and properly documented.'"  *Id.* at 7, 16.  DOJ also looks at:  "How high up in the company do investigative findings go?"  *Id.* at 16.

- The value of internal investigations is to provide management with the information necessary to manage the Company's risks.  This information may not always be pleasant, but it should always be welcome—and actively desired.  Top leadership must require, and make clear its support for, "adequate and honest root cause analysis" that "identif[ies] root causes, system vulnerabilities, and accountability lapses, including among supervisory managers and senior executives."  *Id.*

- In response to questions by the Court, the Company agreed that effective internal investigations require, at a minimum, the empowerment of investigators to act with independence and authority.  This includes the ability to expand an investigation's scope to "pursue the facts wherever they lead them."  Status Conf. Tr. at 39 (Apr. 30, 2021).  It also means that "investigators must be independent from other parts of the organization[,] especially from the operations role since operations are usually the typical subject of investigations."  *Id.*  The Company also agreed that investigators must have the authority to initiate further investigations "if the facts reveal systemic issues beyond the individual

circumstances of the incident." *Id.*; *see also id.* at 40, 42 (statements of agreement and support from the Carnival Corp. CEO, Chairman of the Board, and Incident Analysis Group Head).

- At the January 2021 and April 2021 Status Conferences, the Carnival Corp. CEO and Chief Ethics & Compliance Officer also pledged to provide the support and resources that the Incident Analysis Group needs, both now and after probation is over. *See* Status Conf. Tr. at 46 (Jan. 27, 2021); Status Conf. Tr. at 48-50 (Apr. 30, 2021).

     *b)*  *Incident Analysis Group Independence and Authority*

- The Incident Analysis Group cannot fulfill its purpose without clear and unequivocal statements of support by top leadership, including the Board of Directors, that investigators are empowered to act with independence and authority, including to set the scope of investigations and to initiate independent reviews of potential systemic issues as they arise.

- Importantly, the Company's new Investigations Manual, published on July 1, 2021, sets forth the following five principles of an Incident Analysis Group investigation:

  "1. Investigations must be independent from other operational parts of the organization.

  2.  Once the investigation begins, its full scope will be determined by the information gathered during the investigation.  It should not be limited to the parts of the organization whose actions are being investigated.

  3.  Critically, the investigators have the support from leadership and the board of directors to pursue and determine the facts wherever they lead them.

  4.  If the facts reveal systemic issues beyond the individual circumstances of the incident, these should be the basis for further investigations.

  5.  The analysis and learnings of the investigation underpins and drives the process of continuous improvement for areas such as operations, procedures and training, to diversity, sustainability and ship's design."

  Investigation Manual at 6.

- These principles appear designed to empower the Incident Analysis Group with the necessary independence and authority to perform its function.  However, it is not yet clear that they do so fully, or that the Incident Analysis Group has the resources and structures in place to exercise its independence and authority in practice.  For instance:

  o One of the principles states:  "If the facts reveal systemic issues beyond the individual circumstances ***of the incident***, these should be the basis for further investigations." *Id.* (emphasis added).  The reference to the "circumstances ***of the incident***" does not make clear that the Incident Analysis Group can pursue investigations of potential systemic issues that it identifies on its own, based on issues or concerns arising

*outside of an existing HESS incident or Hotline Report investigation*.  The Head of the Incident Analysis Group has acknowledged that there is not currently a process for identifying or assigning such issues to the Incident Analysis Group, but that efforts to establish such a process are underway.[126]  *See* Employee Interview/Call Notes.  Any such process must maintain the ability of the Incident Analysis Group to determine *for itself* what systemic issues will be investigated, and that independence and authority must be promoted by top leadership.  While input from other business functions, such as RAAS or Maritime Operations, may help to flag potential issues for further review, the final decision must rest with the Incident Analysis Group.

o  Employees have also expressed concerns that the Incident Analysis Group does not currently have sufficient resources to perform systemic reviews, as the group is struggling to stay on top of its existing workload.[127]  As noted in Part VII.B above, the Incident Analysis Group recently hired several new investigators and support personnel, and is actively recruiting additional investigators.  *See supra*, Part VII.B.5.  Further resources and support may be needed for the Incident Analysis Group to have the capacity to carry out its directives "to pursue and determine the facts wherever they lead them" and perform "further investigations" into systemic issues.  *See* Employee Interview/Call Notes.

• As discussed in this and earlier CAM reports, the CAM and TPA teams have identified a number of potential systemic issues that could benefit from a further review, including:

o  Exhaust Gas Cleaning System issues, including:  persistent operational and reliability challenges; workload concerns; voyage planning and execution-related challenges; and project scoping, design, and procurement processes.  *See* CAM January 2021 Quarterly Report at 93-95; *see also supra*, Part VI.C.2.

o  Voyage planning and execution issues, including:  persistent incidents; delayed IT development; and adequacy of shoreside support processes.  *See* CAM January 2021 Quarterly Report at 89-92; *see also supra*, Part VI.C.4.

---

[126] Currently, investigation assignments are governed by the Company's Internal HESS Incident Analysis Matrix.  This matrix establishes three levels of investigations:  (1) Level 3, or Incident Analysis Group-led investigations; (2) Level 2, or Brand-led investigations; and (3) Level 1, or ship-led investigations.  For each level, criteria are set out to determine the default investigative body for a HESS incident (*e.g.*, oil discharges are assigned as Level 1, 2, or 3 based on the quantity discharged and whether the discharge was "related to misuse of the bilge system").  *See HMP 1302-A Internal HESS Incident Analysis Matrix*.  However, the matrix does not specify how investigations are to be assigned for issues that arise outside the context of a traditional HESS incident.  There is a general statement that "company shore management may decide to investigate events not listed in this document at their discretion."  *Id.*  But neither "shore management" or "event" are defined.  *See id.*

[127] The CAM understands that an outside law firm was recently retained for an investigation primarily because of resource limitations within the Incident Analysis Group.  *See id.*

July 19, 2021

- o Recordkeeping falsifications, including recurrent incidents where crew members have recorded in the planned maintenance system that planned maintenance tasks (such as inspections, cleanings, and alarm tests) have been completed when the work has not been done. *See* CAM Third Annual Report at 214-14; CAM March 2020 Quarterly Report at 144-45; CAM September 2019 Quarterly Report at 90; *see also, e.g.*, *TEC/02/2021 Verification of Emergency Bilge Valve testing Record Keeping* (June 10, 2021) (corporate-wide Instructional Notice issued following indications on a Company ship that "emergency bilge valves had not been tested in spite of [planned maintenance system] records indicating they had"); Flash Report (June 30, 2021) (noting a "number of discrepancies" and inaccuracies in Planned Maintenance System entries on one ship); Environmental Excellence Newsletter Issue 03-2021 at 2 (noting recent cases "where we have seen record falsification and other[s] that are under investigation where it appears there may have been falsification").

- o Crew staffing and workload issues, including recruitment, hiring, promotion, and training processes that have led to instances where under-qualified individuals were tasked with critical compliance functions. *See* CAM Third Annual Report at 150-58; *see also, e.g.*, Final Report, IAG2021002 (Mar. 26, 2021) ("The premature promotion of the first engineer junior resulted in a situation where the first engineer junior lacked the competency to work as part of a team."); Final Report, IAG2020024 (Feb. 26, 2021) ("The inability to relieve crew members resulted in an engineer who was unfamiliar with the role being assigned as an EOOW."); Final Report, IAG2020050 (Feb. 24, 2021) ("The investigation identified substandard engine watchkeeping practices . . . The operator was a very experienced engineering officer; however, over the last five years, he had only spent limited periods as a watchkeeping engineer.").

- Valuable insights could also have been gleaned had investigations been performed into potential systemic issues that may have contributed to the Company's probation violations, which related to:

  - o Interfering with TPA audits through undisclosed ship visit programs.

  - o Failing to provide the Environmental Corporate Compliance Manager with sufficient authority.

  - o Falsifying training records on multiple ships, which could be tied to potential issues of workload, IT support, and blame culture, among others, that the Company's perfunctory initial investigations did not explore.

  - o Failing to have adequate food waste management practices in place to guard against the discharge of prohibited contaminants, as well as a failure to listen and learn from earlier employee concerns about this issue.

  - o Improperly contacting U.S. Coast Guard officials regarding a disputed ECP term.

  *See* Probation Revocation Agreement at 10-11.

July 19, 2021

### c)   *DEI Among Incident Analysis Group Investigators*

- The Company has expressed that "DEI is of critical importance across the business, but specifically in investigations" because the Incident Analysis Group "interact[s] broadly with the ships . . . if [the Incident Analysis Group] were to have a different reflection of DEI within the team of investigators, then this would most likely improve our investigation program and compliance efforts."  Status Conf. Tr. at 47 (Apr. 30, 2021).  The Carnival Corp. CEO also stated that "there's . . . a commitment and an expectation of inclusion and diversity in the [Incident Analysis Group] team."  *Id.* at 48.

- There is currently a lack of diversity among the existing Incident Analysis Group investigators.  At the time of this Report, the Incident Analysis Group lacks any non-European investigators.  The Incident Analysis Group recently hired its first female investigator, and is making diligent efforts to further increase diversity in its ranks, including engaging a specialist search firm to assist in finding diverse candidates for open investigator positions.  *See* Employee Interview/Call Notes.

### d)   *Other Concerns*

- Other ongoing concerns include:

  o **Investigation and Report Quality:**  The CAM and TPA teams have continued to express concerns with investigation and report quality, including with regard to root cause analysis, corrective actions, and preventive actions, as well as overall report readability.  The Incident Analysis Group has taken steps to improve investigation report quality, including:  providing investigations with training on classic investigative techniques; hiring a Technical Editor; providing investigators with a report writing training; developing new report writing procedures; and developing a new report writing template.  On June 16, 2021, the CAM and TPA teams met with the Incident Analysis Group to discuss these concerns and look forward to continuing to engage on these issues.  *See* Employee Interview/Call Notes.

  o **Investigation Report Timing:**  Final Incident Analysis Group investigation reports are consistently issued many months after an investigation is assigned (sometimes as long as 10 months after an incident occurred).  These delays hinder the Company's ability to implement lessons learned in a timely manner.  The CAM understands that delays may be due in part to a range of factors, including:  pre-existing backlogs of incomplete investigations begun under the prior Head; staff reductions during the initial months of the pause; a continuing lack of sufficient investigators to keep up with the rate of new investigations; recent investigator turnover (including departures and the onboarding of new investigators); recent time investments in additional trainings for both new and existing investigators; and a desire to prioritize report quality over timeliness.  As noted above, these issues raise concerns about whether the Incident Analysis Group has sufficient resources and support to carry out its function.  *See id.*

July 19, 2021

o **Approach to Brand Investigations:**  Brand investigations and Incident Analysis Group investigations continue to lack formal alignment.  For example, there is not yet an investigations manual for Brand-led investigations, nor is there consistent training for Brand investigators.  Brand investigation reports also do not follow a consistent format.  The level of review and oversight by the Incident Analysis Group over Brand-led investigations is poorly defined.  The CAM understands that the Incident Analysis Group Director of Training is working to develop an investigations training for Brand investigators, and that the Company anticipates a Brand-led investigations manual by year end.  *See id*.

o **Approach to Shipboard Investigations:**  Similarly, the CAM understands that there is no formal alignment between Incident Analysis Group and ship-led investigations.  As with Brand-led investigations, the level of review and oversight by the Incident Analysis Group over these investigations is unclear.  The CAM understands that the Incident Analysis Group Director of Training is working to develop a shipboard investigations training, which the Company anticipates will be completed by the end of 2021.  *See id.*

As discussed above, the Company has also been providing investigation training to Environmental Officers through the Environmental Excellence CSMART courses.  Environmental Officers have increasingly expressed concerns to the CAM Team that taking on an investigator role will contribute to their being perceived as "police officers" on the ships, rather than as trusted resources and advocates for compliance.  The Company reports that these concerns are the result of a misunderstanding, and that it is taking steps to address the concerns, including revising its internal procedures to clarify that Environmental Officers may support environmental investigations but will not lead them.  *See supra*, Part VII.B.3(b).

o **Integration with non-HESS Investigations:**  There is a general lack of clarity on how Incident Analysis Group HESS investigations are integrated or coordinated with non-HESS investigations, such as HR investigations carried out by HR personnel, financial investigations carried out by RAAS, or anti-bribery/anti-corruption investigations carried out by RAAS (in coordination with the General Corporate Compliance Manager).  This is a critical gap.  A single incident can have both HESS and non-HESS aspects that need to be investigated—such as a prohibited discharge that may be tied to allegations of a hostile workplace environment, to undue budgetary pressures, or to an improper relationship with an external vendor (such as a fuel supplier or a waste vendor).  The CAM understands that the current approach is to handle such scenarios on a case-by-case basis.  Often, the investigation will be split into its HESS and non-HESS components, with separate investigations led by different groups into the same incident proceeding in parallel.  This practices results in multiple interviews of the same individuals regarding the same incidents, as well as multiple investigation reports.

The CAM understands that the Ethics & Compliance group plans to hold an investigations retreat in the fall of 2021 to bring together the various entities responsible for conducting investigations across the Company to discuss, among

other goals, ways to better integrate and coordinate their efforts.  *See* Employee
Interview/Call Notes.

### e)      Support for Continuous Improvement

- As discussed in Part VII.C below, the Company has recognized the need for better
integration of its audit, investigation, operations, risk, training, and broader Ethics &
Compliance functions to help drive a process of continuous improvement.  *See infra*, Part
VII.C.5.  Internal investigations and internal audits are two of the most critical components
of a continuous improvement program.

- In April and May 2021, the CAM Team held meetings with members of both RAAS and the
Incident Analysis Group to discuss ways to better align their processes.  From these
meetings, the CAM understands that several efforts are underway to support better
coordination between these groups.  For instance, as discussed in Part VII.B above:

    o   The Incident Analysis Group and RAAS are coordinating on revisions to the HMP
    1303 procedure on continuous improvement and lessons learned processes.

    o   The groups have begun coordinating more closely on flagging issues for RAAS Focus
    Reviews that arise out of Incident Analysis Group investigations, including in the
    area of food waste management.

    o   RAAS plans to begin auditing the Incident Analysis Group by year end, which will be
    an important component for identifying continuous improvement opportunities for the
    investigation function as it continues to develop.

    *See supra*, Part VI.C.3 and Part VII.B.4.

- Parties at these meetings agreed on the need to further explore opportunities for improving
coordination between RAAS and the Incident Analysis Group to support the Company's
continuous improvement efforts, as well as clarifying their respective roles in potentially
overlapping functions (such as RAAS Focus Reviews into corporate-wide business issues
and Incident Analysis Group investigations into systemic issues).  *See* Employee
Interview/Call Notes.  The CAM Team looks forward to continuing to engage on these
issues.

### 3.      DEVELOPING A HOLISTIC RISK GOVERNANCE FRAMEWORK

### a)      Background

- The "starting point" for evaluating "whether a company has a well-designed compliance
program" includes "how the company has identified, assessed, and defined its risk profile,
and the degree to which the program devotes appropriate scrutiny and resources to the
spectrum of risks."  DOJ Corporate Compliance Guidance at 2.  This includes "[t]he
effectiveness of the company's risk assessment and the manner in which the company's
compliance program has been tailored based on that risk assessment," as well as "revisions to
corporate compliance programs in light of lessons learned."  *Id.* at 3.

July 19, 2021

- The Company has acknowledged that it continues to lack a coordinated, holistic approach to risk management—including one with clear accountabilities for managing and dealing with risk. *See, e.g.*, CAM January 2021 Quarterly Report at 23-24, 28-30; Status Conf. Tr. at 55-56 (Apr. 30, 2021). The ability to systematically and holistically identify and prioritize risks across the Company—and to determine lines of accountability for those risks—is critical for compliance. This is even more important during economically challenging times when resources are limited. Without such an ability, the Company, including its Board of Directors, will lack critical information to determine which of the many serious risks it faces is in greatest need of those resources.

- Progress toward a holistic approach has been hampered by a lack of clarity at the highest leadership levels about lines of responsibility and accountability between the various entities with a claim to risk management, including RAAS, Maritime Operations, Ethics & Compliance, and Legal, as well as the Brands. Defining a process of cross-departmental, cross-brand coordination will be critical to the Company's ability to identify, mitigate, and manage risks to support continuous improvement.

<em>b)</em>    <em>Current Approach to Risk</em>

- The Company has described its current risk management model as consisting of three lines of defense: (1) the first line of defense is management, who is the "primary owner" of risk and is responsible for managing it; (2) the second line of defense is Ethics & Compliance, which helps management "ensure compliance with laws and regulations;" and (3) the third line of defense is the internal audit function, which "provides independent assurance that management and compliance have controls in place that are reasonably designed and are operating to effectively manage the identified risks." Status Conf. Tr. at 52-53 (Apr. 30. 2021).

- This model has resulted in multiple types of risk assessments being carried out by different entities across the Company, including RAAS, Maritime Operations, Ethics & Compliance, and Legal, as well as the Brands, without any formal Enterprise Risk Management[128] program to integrate these disparate approaches. *See* Employee Interview/Call Notes.

---

[128] Enterprise Risk Management "is the process through which an organization identifies, assesses, monitors and mitigates key risks that impact the mission and objectives of the institution." *Enterprise Risk Management* (June 3, 2021), https://www.temple.edu/about/ethics-compliance/enterprise-risk-management. It is considered a best practice in organizations, in part due to "increasing volatility, complexity and ambiguity of the world." *See Enterprise Risk Management Integrating with Strategy and Performance Executive Summary* at 1 (June 2017), https://www.coso.org/Documents/2017-COSO-ERM-Integrating-with-Strategy-and-Performance-Executive-Summary.pdf (citations omitted). In particular, Enterprise Risk Management allows management to better understand the impact of risk on strategic decisions and allows a Board of Directors to determine what a company's risk appetite should be. *See id.* at 1-2. It also allows large companies, like Carnival Corp., to take a broader view of risk than would be taken by any individual business unit. *See, e.g.*, M. Beasley, *What is Enterprise Risk Management (ERM)*, https://erm.ncsu.edu/library/article/what-is-enterprise-risk-management

July 19, 2021

<em>i.</em>   <u><em>RAAS</em></u>

- Before the Ethics & Compliance group was formed, RAAS was the primary facilitator of risk assessment across the Company.  RAAS still provides risk assessment services to the Brands upon request.  In doing so, they work with each Brand's senior leadership to discuss perceived business risks.  These risk assessments are largely qualitative in nature, with limited quantitative information about the frequency or severity of the risk.  The process does not generate a formal risk mitigation plan.  *See* Employee Interview/Call Notes.

- In addition to these Brand risk assessments, RAAS was directed by All Brands Group leadership to assess the risks created by moving ships into a pause status as a result of the pandemic.  In coordination with the Ethics & Compliance team, RAAS requested information and held discussions with each of the Brands on how they determined the pause-related risks.  This was again a largely qualitative analysis.  As detailed in a past CAM report, the assessment identified the inability to perform all critical maintenance on the ships as the most significant new environmental risk to emerge during the pause.  *See* CAM January 2021 Quarterly Report at 29.

- RAAS has never been asked to do a comprehensive, cross-brand risk assessment.  Such a review could allow the Company to identify any shared risks across Brands, significant risks being missed by one or more Brands, or differences in how well Brands are mitigating risks.  *See id.*  While Brands may face differing risks, understanding the reasons for those differences could provide insight into how risks can be mitigated across the Company.  Currently, there is some ad hoc sharing of best practices between the Brands through working groups organized by subject matter areas, but these groups are not specifically focused on identifying and mitigating risks.

<em>ii.</em>   <u><em>Maritime Operations</em></u>

- The Maritime Operations group, in conjunction with relevant stakeholders, performs certain risk assessments that are required by maritime codes or certification standards, such as the

---

(July 17, 2020) ("ERM seeks to create a top-down, enterprise view of all the significant risks that might impact the strategic objectives of the business.").  The Committee of Sponsoring Organizations of the Treadway Commission has developed a framework that links Enterprise Risk Management with strategy and business performance.  It also provides a set of principles to guide an organization in tailoring its risk management program to complement and enhance compliance initiatives.  *See Enterprise Risk Management – Integrating with Strategy and Performance* (June 2017), https://www.coso.org/Documents/2017-COSO-ERM-Integrating-with-Strategy-and-Performance-Executive-Summary.pdf.  Guidance on applying the framework was issued in late 2020.  *See Compliance Risk Management: Applying the COSO ERM Framework* (Nov. 2020), https://www.coso.org/Documents/Compliance-Risk-Management-Applying-the-COSO-ERM-Framework.pdf.

Page <strong>146</strong> of <strong>161</strong>

July 19, 2021

ISM Code or the ISO 14001 certification standard for Environmental Management Systems.[129]  These include:

o  **Environmental Aspects and Impacts Register:**  The ISO 14001 certification standard requires companies to evaluate the Environmental Aspects[130] and Impacts[131] of their operations.  *See* ISO 14001 Third Ed. at 8 (Sept. 15, 2015).  Each year, the Company develops an Environmental Aspects and Impacts Register.  It is audited annually by an accredited third-party body.  *See* Employee Interview/Call Notes.

The register has both qualitative and quantitative features:  (1) it qualitatively identifies Environmental Aspects of ship operations that may interact with the environment, as well as the potential Environmental Impacts of each Aspect, including impacts to air, water, and land; (2) it quantitatively rates the significance of each Environmental Aspect, based on ranking the severity and the likelihood of environmental, financial, regulatory, and reputational harms.  The Company considers "Significant" Environmental Aspects to be those in the top 25% of significance scores.[132]  *See ENVC 1006 Establishing Environmental Aspects and Objectives* ("ENVC 1006"); *ENVC 1006-A1 Environmental Aspects and Impacts Register.*

The Company "must take the Significant Environmental Aspects into account when establishing, implementing, and maintaining its environmental procedures within the HESS management system."  ENVC 1006 at § 2.3.  The Company must also consider Significant Environmental Aspects, among other factors, when developing its Environmental Objectives, which appear to correspond to corporate sustainability goals.  *Compare ENV 1006-A2 Carnival Corporation's Environmental Objectives to Carnival Corp. & plc Sustainability 2019 Goals Update,* https://carnivalsustainability.com/2019-goals-update.  In discussions with the CAM and TPA teams, however, Company personnel have not been able to point to a clear

---

[129] An ISO-14001 certification indicates that a company's environmental policies and procedures meet the criteria set out in the standard for setting up an effective Environmental Management System.  A certification confirms that the policies and procedures are in place and that the company is capable of implementing them; it does not confirm that a company is complying with these policies and procedures at all times.  As noted in Part III.C.3 above, ISO 14001 certifications used to be obtained at the Brand level, but they are now obtained at the All Brands Group level.

[130] An Environmental Aspect is an "element of an organization's activities or products or services that interacts or can interact with the environment."  ISO 14001 Third Ed. at 2 (Sept. 15, 2015).

[131] An Environmental Impact is a "change to the environment, whether adverse or beneficial, wholly or partially resulting from an organization's environmental aspects."  *Id.*

[132] The significance score is calculated as:  (Likelihood Environmental * Severity Environmental) + (Likelihood Financial * Severity Financial) + (Likelihood Regulatory * Severity Regulatory) + (Likelihood Reputational * Severity Reputational).

process or protocol for systemically considering Significant Environmental Aspects when developing or revising Global HESS procedures or sustainability goals. *See* Employee Interview/Call Notes.

o **Management Reviews:** To meet ISM Code requirements, the Company requires both shipboard and shoreside management to perform annual Management Reviews of "all elements of the HESS system," including audit findings, incidents, and "any other evidence of system failure." *See HMP 1501 Management Reviews* at § 2. Management Reviews also "must reflect on continuing suitability, adequacy and effectiveness of the management system, opportunities for continual improvement, and necessary changes to the management system." *Id.* Shipboard Management Reviews expressly must examine risk assessments as well as "changes in . . . risks and opportunities." *See id.* at § 2.1. However, the Company's procedures do not appear to provide guidance on how to perform these examinations of risk issues. Overall, there does not appear to be a standardized, cross-brand approach to performing Management Reviews, with each Operating Group issuing its own instructions and report forms. It is also unclear how the Management Review process fits in with the Company's other continuous improvement and lessons learned processes, as discussed in Part VII.C below. *See infra*, Part VII.C.5.

### iii.   *Ethics & Compliance*

- When the Ethics & Compliance group was formed in August 2019, the Company recognized that risk assessment is a key underpinning of any compliance program. A functional leader for risk assessment was brought into the group soon after its inception. As discussed in Part VI.B above, the Ethics & Compliance Risk function reorganized in 2021. It is now known as the Compliance Risk Intelligence Group (or "Group"). *See supra*, Part VI.B.3. Its mandate is "to identify and assess all compliance risks." *See* May 2021 Probation Supervision Report, Attachment 3, PCL_ECP00225102-08 at PCL_ECP00225102. The Compliance Risk Intelligence Group's activities include:

  o **Baseline Compliance Risk Assessment:** As discussed in earlier CAM reports, the Compliance Risk Intelligence Group began developing a Baseline Compliance Risk Assessment in late 2019. It covers all HESS and General compliance areas. In June 2020, the Company provided the CAM Team with a preliminary draft. The CAM provided high-level feedback, including that it was: not comprehensive or internally consistent; largely based on qualitative information from limited sources, not quantitative information; and did not include risks associated with culture. Further work on the draft assessment was put on hold during the pause. *See* CAM January 2021 Quarterly Report at 28-29. The Group has since renewed its efforts to revise and finalize the risk assessment, and has been receptive to the CAM feedback. *See* Ethics & Compliance Program, 2021 Retreat, Presentation Slides (Mar. 23, 2021), PCL_ECP00210214-42; PCL_ECP00210238-40. The updated Baseline Compliance Risk Assessment is expected to be completed in mid-July 2021. *See* Employee Interview/Call Notes.

July 19, 2021

o **Environmental Deep Dive Risk Assessment:**  The Group has also started developing an Environmental Deep Dive Risk Assessment that focuses on environmental compliance risks.  The goal is to identify the top three areas of environmental compliance risk, utilizing the Environmental Aspects and Impacts Register, among other sources.  An initial draft from January 2021 identified the following three top risk areas:  (1) port facility waste handling/disposal; (2) non-compliant discharges to sea; and (3) emissions to atmosphere.  *See* Environmental "Deep Dive" Assessment Update #1 (Jan. 13, 2021).  The assessment has not been finalized.  Further work to be done includes:  reviewing data related to the identified risks; developing measures to reduce the frequency and/or severity of the risks; and evaluating controls to address the risks.  *See* Employee Interview/Call Notes.

After the Baseline Compliance Risk Assessment is complete, the Group plans to perform similar deep dive assessments for both Health/Safety/Security and General compliance risks.  To support these assessments, the Group will utilize existing risk assessments prepared by Maritime Operations in those areas (which are similar to the ISO 14001 Environmental Aspects and Impacts Register) to the extent they exist.  *See id.*

o **Risk Dashboards:**  The Group has developed electronic dashboards to help visualize environmental compliance risks.  The dashboards incorporate data from various sources, including audit findings, Self-Reported Non-Conformities, and incident and near-miss reports.  The Group uses these dashboards to provide regular environmental risk intelligence briefings to Ethics & Compliance and Maritime Operations personnel.  *See* Employee Interview/Call Notes; *see also supra*, Part VI.B.3(c).

The CAM understands that the Group also plans to use the dashboard data to incorporate more quantitative measures into the environmental "deep dive" risk assessment, as well as to help assess the effectiveness of risk mitigation measures.  However, the CAM understands that the Group intends to continue to rely primarily on qualitative information for the baseline compliance risk assessment because of a concern that the lack of data in the General compliance areas (such as anti-bribery and anti-money laundering) could lead to a skewed identification and prioritization of risks.  *See* Employee Interview/Call Notes.[133]

o **Coordination on RAAS and Legal Efforts:**  The Group has also coordinated with RAAS and Legal on risk assessment efforts, including the RAAS pause risk assessment, discussed above, and the legal risk register, discussed in the following section.

*iv.*  <u>Legal</u>

- Historically, the Company's Legal function has focused on managing risks related to litigation and guest and crew claims (*e.g.*, passenger slip-and-falls or workplace injuries).  An

---

[133] It is not clear that the Company has developed a plan to collect and analyze data and metrics in the General compliance space that would resolve this issue going forward.

important goal of the recently realigned Global Legal Services Group, discussed in Part III.B.3 above, is to broaden its engagement on risk activities, including to: "improve focus and integration of the global legal services group with compliance and risk management;" and develop "common practices to lower risk throughout [the] organization." *See* Global Legal Services Group Realignment (May 11, 2020) at 1.

- The Ethics & Compliance team and the Global Legal Services Group are coordinating to develop a legal risk register. The goal is two-fold:

    o On the legal side, to identify the major laws the Company must comply with throughout its various operations around the globe, along with a listing of relevant requirements the Global Legal Services Group will monitor for changes.

    o On the compliance side, to identify risk scenarios for complying with those requirements. *See* Employee Interview/Call Notes.

- This is a profoundly important undertaking. To effectively identify, mitigate, and manage compliance risks, the Company must first understand the scope of its compliance obligations. Notably, the initial version of the legal risk register will not include local laws or requirements in every place the Company operates. Many crew members have expressed to the CAM Team that obtaining and interpreting information about local requirements is a significant burden on shipboard staff. *See id.* To be of most use to the ships, later versions of the legal risk register should include local requirements. Moreover, the Global Legal Services Group team may be better suited to handle this type of analysis.

*c)*     *Deficiencies in Current Approach to Risk*

- The Company's current model does not address key aspects of how the three lines of defense (management, Ethics & Compliance, and internal audits) work with each other and other parts of the corporation. For instance, it does not describe the role of certain key stakeholders, including the Global Legal Services Group and the Board of Directors. In addition, the model does not detail how management of various business areas works with either Ethics & Compliance or RAAS to identify, assess, monitor, and mitigate risks. Nor does the current model address: who has the authority to determine that a risk assessment needs to be conducted; who is responsible for identifying new requirements that generate new or emerging risks; what information management needs in order to appropriately make decisions about how to address a risk; whether Ethics & Compliance can mandate a particular mitigation plan that they view as necessary to mitigating a risk to an acceptable level; whether RAAS has the ability to suggest new mitigation measures; or how Ethics & Compliance, RAAS, and other business functions will implement a continuous feedback loop to ensure consistent monitoring and updates to the risk management process.

- Further, it is not clear to the CAM Team that any of the Company's current disparate approaches is leading to better risk management in a concrete way, or that the risk assessments conducted to date have had significant practical impacts on how the Company makes decisions or allocates resources. For example, while the Company has identified, through both the Environmental Aspects and Impacts Register and the Environmental Deep

Dive Risk Assessment, that the discharge of untreated bilge water is one of its highest environmental compliance risks, the Company does not appear to have mechanisms in place for measuring the effectiveness of its risk mitigation efforts, such as its environmental critical spare parts policy (requiring, among other things, that these parts be air-freighted to ships), the dry bilge initiative, or the ECP-required annual budget certification process (designed to confirm that Covered Vessels are allocated adequate funds for waste offloads and repair and maintenance).  Measuring the effectiveness of mitigation efforts is important to understanding:  (1) how much residual risk remains; (2) whether additional mitigation measures are needed, and (3) the impact of any changes to those measures.

*d)*     *Ongoing Efforts to Address Deficiencies*

- The Company has recognized the need to improve its approach to risk.  Recent ongoing efforts include:

  - **Common Definition of Compliance Risk:**  The Ethics & Compliance function recently developed an internal definition of "compliance risk" as "the threat posed to a company's financial, organizational, or reputational standing resulting from violations of laws, regulations, codes of conduct, or organizational standards of practice."  *See Compliance Risks: What You Don't Contain Can Hurt You* (2017), https://www2.deloitte.com/us/en/pages/finance/articles/cfo-insights-compliance-risks.html).  The Ethics & Compliance team is now seeking agreement from leaders in other parts of the Company on this definition, in part, to help clarify the role and authority of Ethics & Compliance function for risks that may fall into overlapping areas of authority (such as operational risks that are also compliance risks).  *See* Employee Interview/Call Notes.

  **Risk Management Proposal:**  RAAS has developed a concept proposal "to further support the achievement of business goals and objectives through enhanced risk management."  *See* A Concept for Enhancing Risk Management (Mar. 9, 2021), PCL_ECP00223112-15 at PCL_ECP00223113.  The high-level proposal focuses on setting up a process for managing "freedom to operate" risks (which are not defined), utilizing existing resources, structures, and expertise.  *See id.*  It would entail coordination between RAAS, executive leadership at both All Brands Group and the Brands, and existing working groups.  *See id.* at PCL_ECP00223114-15.  The CAM understands that this proposal is still under review.  *See* Employee Interview/Call Notes.

  Formally integrating executive leadership into risk assessment processes is an important step toward the Company's goal of risk-based decision-making.  However, the proposal does not appear to address how these "freedom to operate" risk assessments would be coordinated with other risk activities, including the Ethics & Compliance risk assessments and the legal risk register.  Nor does it indicate how top executive leadership would determine the appropriate focus of the "freedom to operate" risks assessments in the absence of a baseline risk assessment.

July 19, 2021

- Despite the efforts underway, the Company still appears to be far from achieving an integrated approach to risk across the organization, due in large part to historic silos between the audit, operations, compliance, legal, and other functions, along with the perceived need for Brands to maintain control over certain activities.  It is unlikely that such an approach will be achieved within the limited time remaining in the period of probation, but it will be a necessary linchpin of the Company's continuous improvement program beyond the ECP.  Clarifying lines of responsibility and accountability, as well as how relevant groups will work together, is essential for developing a sustainable approach to risk that provides the necessary insight to executive leadership and the Board of Directors when making decisions.

- Even in the absence of this clarity, it is critical that current risk assessment efforts continue to move forward.  As the Company emerges from the pause, it will be crucial for management to understand the most significant compliance risks facing the Company.  This is particularly true in a post-pause world where employees may be acutely aware of funding limitations (perceived or real), which, if underlying risks are not properly identified and managed, could lead to a repeat of the types of behaviors that led to the prosecution in this case.

### 4.   *DEVELOPING A HOLISTIC TRAINING GOVERNANCE FRAMEWORK*

#### a)   *Background*

- An increasing CAM area of focus during ECP Years Four and Five has been the efforts by some within the Company to develop a corporate-wide training governance framework.  *See* CAM January 2021 Quarterly Report at 79-80.  Historically, the Company has lacked a coordinated, holistic approach across its various training regimes.  There is no designated individual or group who looks across the various training efforts and assesses the degree to which they interrelate or work with, or against, each other.  Moreover, the training approach is largely opaque to the employees.  For instance, unlike in many other large organizations, there is no uniform way for an employee to comprehensively see what training they've received, will need to receive in the near future, and—critically to DEI efforts—what training they would need to move to higher level positions within the Company.

- Currently, the training function is siloed, split across a number of departments at both the All Brands Group and individual Brand levels.  Divisions of responsibilities between these groups often intersect and are not always clear.  Relevant entities include:

  o **Ethics & Compliance:**  focuses on HESS and General compliance trainings, as well as competency frameworks and Professional Development Records for Environmental Officers and Incident Analysis Group investigators.

  o **Maritime Operations (CSMART and Maritime Professional Development):** focuses on operational trainings for deck, technical, and environmental personnel.  The Maritime Professional Development group, a part of CSMART, also leads the development of competency frameworks and Professional Development Records for non-Environmental Officer maritime crew.

o **Learning & Development and HR:**[134]  focus on non-HESS, non-operational trainings, including culture, DEI, sexual harassment, and employee orientation.

o **Global Talent Partners:**  focus on recruiting and training many of the Company's (generally non-officer) crew members.  These are external agencies based in countries around the world.  *See* Employee Interview/Call Notes.

- The Company employs many talented individuals at all levels within these different groups who exhibit a genuine commitment to the fields of pedagogy and learning, and to enhancing the Company's ability to develop and deliver impactful trainings.  The CAM is deeply appreciative for the time and candid insights of many of these individuals, who have met with the CAM Team increasingly over the past year, as well as those of the numerous shipboard and shoreside consumers of training who have shared their feedback on the Company's training efforts.  These discussions have helped the CAM Team to understand some of the challenges discussed in the following section.

- Around late 2020, the Company began exploring the development of a corporate-wide training governance framework that would, among other goals, aim to bridge silos between different training areas and establish standardized processes for developing, implementing, and reviewing trainings.  *See* CAM January 2021 Quarterly Report at 72; HESS Board Report Q1 2021 at PCL_ECP00190530.  As discussed further below, an initial training governance framework proposal is currently under review by the Carnival Corp. CEO and the Compliance Committee of the Board of Directors.  *See infra*, Part VII.C.4(d).

*b)    Current Challenges*

- Critically, the Company has no clear methodology for developing, implementing, and reviewing trainings, including no consistent or defined processes for:  identifying training needs/gaps; developing trainings in accord with agreed instructional design principles; establishing learning objectives; and measuring training effectiveness.[135]  These are among the aspects DOJ looks at in evaluating compliance training programs.  *See* DOJ Corporate Compliance Guidance at 5.

- Some Company employees have described the current approach to training as "the wild west" because they see it as almost a shoot-out, in which various individuals initiate training, or make judgements about what training approaches are appropriate, largely on their own.  *See* Employee Interview/Call Notes.  Given the good intent of such efforts, the overriding concern is the challenges described below.  Further, every training program comes with an opportunity cost, as time, attention, and resources must be diverted from other tasks or other training approaches.  The need to consider these and other factors underscores the importance

---

[134] Learning & Development and HR groups are generally set up as separate departments at the Brand level.  However, their functions often overlap in the training space.

[135] The Company states that CSMART trainings, which have a "documented process and 3rd party accreditation," are an exception.  Company Draft Comment Reports.

July 19, 2021

of a coordinated, formalized, risk-based approach to developing and implementing new trainings.

- The current approach creates numerous challenges, including:

  o A heavy training burdens on employees, who may be overloaded with training that may be irrelevant, ineffective, excessive, or poorly timed/coordinated.

  o A tendency for individuals to unilaterally develop and implement new trainings without fully consulting those with training or instructional design expertise, resulting in trainings that are rolled out:

    ▪ Without measurable learning objectives that would enable monitoring of training effectiveness.

    ▪ Without mechanisms for soliciting (anonymized) feedback.

    ▪ Without following management of change principles to consider the potential burdens or impacts of new trainings.

    ▪ Without being linked to specific technical and behavioral competencies that can be tracked on an employee-specific basis.

    ▪ Without an analysis as to how the new training fits into the existing training landscape.

    ▪ Without a considered, consistent approach to evaluating whether the selected training solution is the best approach to addressing the identified need or challenge, based on a thorough and accurate root cause analysis.

      *See* Employee Interview/Call Notes; CAM January 2021 Quarterly Report at 89-96; *see also, e.g.*, Carnival UK 2020 Annual Management Review, PCL_ECP00221757-809 ("Carnival UK 2020 Annual Management Review") at PCL_ECP00221764 (noting "[v]olume of training," as well as "[i]naccuracies" and "inconsistencies" in the implementation of training procedures, as areas of concern).

  o A general inability for employees, including non-officer crew members, to easily access information about further trainings and competencies they need to complete or acquire in order to move up in their career path, or to pursue an alternative career path within the Company.

  o Unrealized opportunities for greater engagement with the Global Talent Partners who provide pre-boarding trainings to the Company's (generally non-officer) crew.

  o Unrealized opportunities for integrating aspects of the Company's core values, Culture Essentials, and other goals into trainings, including those provided by Global Talent Partners. This could include, for example, integrating Stop Work concepts

into equipment training, or integrating Speak Up and Stop Work concepts into language training to help overcome potential barriers to reporting compliance concerns.[136]  As DOJ recognizes, training can be designed "to enable employees to timely identify and raise issues to appropriate compliance, internal audit, or other risk management functions."  DOJ Corporate Compliance Guidance at 5.

- A further challenge to the development of an effective training program has been the Company's general failure to timely deliver IT systems and tools in support of training, such as a training attendance app and voyage planning software.  *See supra*, Part VI.C.4; *see also, e.g.*, Carnival UK 2020 Annual Management Review at PCL_ECP00221764 (noting the lack of "robust [instructor-led training] recording and monitoring capabilities onboard" as an area of concern).

*c)*     *Competency Frameworks and Professional Development Records*

- The Company has also historically lacked corporate-wide competency frameworks and Professional Development Records for many positions.  As discussed above, such programs are designed to provide career roadmaps to employees, allowing them to access information about the knowledge, skill, and behavioral competencies they have achieved, as well as those they still need to achieve to progress in their careers.  *See supra*, Part VII.B.3.

- As discussed in this and earlier CAM reports, the Company has dedicated resources to developing such frameworks.  The Maritime Professional Development group has established a permanent full-time position to focus exclusively on competency frameworks. Efforts are underway for the following positions:

  o Environmental Officers, led by the Director of the Fleet Environmental Officer Program in coordination with Maritime Professional Development.  *See supra*, Part VII.B.3.

  o Non-Environmental Officer maritime crew, with an initial focus on deck and technical officers, led by Maritime Professional Development.  *See* Employee Interview/Call Notes.

  o Incident Analysis Group investigators, led by the Incident Analysis Group Director of Training in coordination with Maritime Professional Development.  *See supra*, Part VI.B.5(c).

---

[136] At the end of ECP Year Two, the CAM observed:  "Currently, the Company does not appear to require the Global Talent Partners to provide training designed to overcome these barriers to reporting.  Global Talent Partner personnel stated that other maritime companies who use their agencies do require such training.  This training takes a variety of forms, ranging from classroom training to role playing . . . The Global Talent Partners indicated they would be willing to incorporate similar such training into the courses provided to the Company's employees."  CAM Second Annual Report at 62.

July 19, 2021

- The CAM Team will continue to monitor and report on these critical ongoing efforts.

        d)      *Training Governance Framework Proposal*

- Led by the All Brands Group Chief Operations Officer, CSMART, and the Ethics & Compliance Corporate Training Director, the Company has developed an initial concept proposal for a training governance framework at the All Brands Group level.  The proposed framework would entail a centralized, All Brands Group training governance group, as well as an All Brands Group steering committee.  Details about the membership and functions of these groups are still being determined.  Under this framework, the training governance group would oversee a six-step process for developing, implementing, and reviewing trainings:

    o   Step 1:  Identify a training need, which could arise from incidents (including near misses), investigations, audit findings, new or revised policies, new or updated regulations, or new initiatives, among other sources.

    o   Step 2:  Analyze the training need, recognizing that sometimes training is not the answer and other solutions may better address the need.

    o   Step 3:  Develop the training, working with appropriate training leads, subject matter experts, and external vendors.

    o   Step 4:  Implement the training, communicating and implementing it in a clear and consistent way.

    o   Step 5:  Measure the training's effectiveness, using a consistent and established system.

    o   Step 6:  Review feedback on the training, stepping back periodically to consider if adjustments should be made.

- Each Operating Group would also be expected to develop its own training governance framework that would align with the All Brands Group framework.  *See, e.g.*, Crew Member Life Cycle, PCL_ECP00223911 at 8-13 (proposed framework for Carnival Cruise Line). The All Brands Group governance group would oversee trainings applicable corporate-wide (*e.g.*, Code of Conduct, environmental compliance, or voyage planning), while the Operating Group governance groups would oversee trainings applicable to specific Brands (*e.g.*, guest-facing topics or employee orientation).

- The CAM understands that the Company intends to develop responsibilities and accountabilities (tied to compensation) for top executive leaders, based on achieving milestones set out in the All Brands Group framework.  *See* Employee Interview/Call Notes.

- The proposal is currently under review by the Carnival Corp. CEO and the Compliance Committee of the Board of Directors.  *See id.*

July 19, 2021

5.   *ACHIEVING A CONTINUOUS LEARNING FEEDBACK LOOP*

   a)   *Background*

- DOJ emphasizes that a "hallmark of an effective compliance program is its capacity to improve and evolve."  DOJ Corporate Compliance Guidance at 15.  This includes the program's capacity to:  adapt in light of lessons learned; collect and analyze compliance data; perform and update risk assessments; review compliance policies, procedures, practices, controls, and training; and collect, track, analyze, and use information from its reporting mechanisms, including audit and investigation findings.  *See id.* at 15-18.

- The Company has acknowledged that it does not yet have a clear continuous learning feedback loop between its audit, investigation, operations, risk, training, and broader Ethics & Compliance functions.  *See* Employee Interview/Call Notes.  Such a mechanism is critical for the Company's compliance efforts, including its capability to effectively:

   o   Operationalize lessons learned and best practices, including into shoreside planning functions like policy and procedure development, procurement, new build specifications, and dry dock planning.

   o   Identify and address systemic causes, going beyond the Company's historic tendency to develop narrowly tailored corrective and preventative actions, such as new or revised trainings when a training solution may not address the actual root cause(s).

   o   Systematically and holistically identify, prioritize, and communicate to the Board of Directors and top executive leadership risks across the Company to enable risk-based decision-making.

- The Company has also recognized the need to better integrate its environmental sustainable development goals into its environmental policies and procedures.  *See id.*; *see also, e.g.*, Carnival UK 2020 Annual Management Review at PCL_ECP00221802 ("Opportunities identified include . . . integrating environmental sustainable development goals into our environmental management system and business values.").  The Chief Maritime Officer has publicly stated:  "Our new 2030 sustainability goals demonstrate our ongoing commitment to **ingraining sustainability in all aspects of our operations** across our nine brands, while providing us clear, measurable targets and metrics to improve our performance and overall efficiency across our shoreside and shipboard operations."  *See* Initial 2030 Sustainability Goals Announcement (emphasis added).

   b)   *Continuous Improvement and Lessons Learned Efforts*

- Efforts are underway to improve continuous learning and lessons learned processes throughout the Company.  These include:

   o   **Quarterly HESS Lessons Learned Meetings:**  In early 2020, the Company began holding "quarterly meetings among HESS leaders to discuss issues, incidents, and trends."  Company Updates Letter at PCL_ECP00225065.  Attendees include the Chief Ethics & Compliance Officer, the Operating Company Ethics & Compliance

Officers, the Chief Maritime Officer, and representatives from RAAS, the Incident Analysis Group, and the Maritime Policy & Analysis group.  The meetings focus on discussing "inputs received from investigations conducted by the Incident Analysis Group, HESS audits conducted by RAAS, and incidents reported through the Maritime Policy & Analysis department (e.g., flash reports and self-reported non-conformities)." *Id.*  Beginning in the third quarter of Fiscal Year 2021, the "results and action plans" from these meetings will be shared with the Compliance and HESS Committees of the Board of Directors.  *Id.*; *see also* Environmental Compliance Scorecard Q1 FY2021 at PCL_ECP00190480-82 (summarizing meetings and action items as of the first quarter of Fiscal Year 2021).

o   **Revised HMP-1303 Continuous Improvement and Lessons Learned Process:**  As discussed above, the Company is revising its internal procedure governing the processes "through which [Global HESS] procedures are continuously improved by incorporating lessons learned from internal and external audit findings, HESS events, near misses and incident analyses, and to describe how lessons learned are to be communicated to management and the fleet."  HMP 1303 at § 1; *see also supra*, Part VII.B.4(3) and Part VII.B.5(c).  The CAM understands that the revised procedure will establish formal mechanisms for coordination between RAAS, the Incident Analysis Group, and Maritime Operations on identifying and disseminating lessons learned.  *See* Employee Interview/Call Notes

o   **Management Reviews:**  As discussed above, the Company requires shipboard and shoreside management to perform annual Management Reviews of "all elements of the HESS system," including audit findings and incidents, and "reflect on continuing suitability, adequacy and effectiveness of the management system, ***opportunities for continual improvement***, and necessary changes to the management system."  *See HMP 1501 Management Reviews* at § 2 (emphasis added); *see also supra*, Part VII.C.3.  However, the Company's procedures do not provide guidance on how to perform this continual improvement analysis.

o   **RAAS Focus Reviews:**  As discussed in Part VII.B above, RAAS periodically performs corporate-wide Focus Reviews into various business issues, including compliance issues (such as food waste measurement and spare parts).  *See supra*, Part VII.B.4.  The CAM understands that there is no established, formal process for identifying issues for Focus Reviews.  However, as discussed in Part VI.C and Part VII.C above, RAAS and the Incident Analysis Group have recently begun to coordinate together more on flagging issues for Focus Reviews, especially in the area of food waste management.  *See* Employee Interview/Call Notes; *see also supra*, Part VI.C.3 and Part VII.C.2.

o   **Operating Line Compliance Manager Best Practices Meetings:**  The Operating Line Compliance Managers from each of the Company's four Operating Groups continue to hold annual Best Practices meetings, which are attended by various additional environmental, compliance, training, and operations personnel.  Topics from the 2021 meeting (held over a series of virtual weekly meetings in February/March 2021) included:  electronic environmental data risk visualization;

Exhaust Gas Cleaning System issues, including the TPA audit findings of systemic issues; Environmental Officer coffee chats; and IT support for training.  *See* Environmental Corporate Compliance Manager Annual Report at PCL_ECP00211349; 2021 Best Practices Workshop Notes, PCL_ECP00217334-38.

- There does not yet appear to be an established mechanism for integrating these various efforts, which may involve different (but overlapping) sets of stakeholders, timing cadences, and subject matter focus areas.

- After probation ends, the Company will need to have systems and practices in place to support the continuous improvement of its compliance program in the absence of Court, CAM, or TPA oversight.  While the Company has made substantial progress in many areas, it is still in the early stages of establishing governance frameworks and feedback loops for critical compliance areas.  The evolution of these efforts will be a core CAM focus area in ECP Year Five.

## VIII.   EVALUATION OF THE EXTERNAL AUDIT FUNCTION (TPA)

### A.   Engagement with TPA

- The ECP requires the CAM to oversee the TPA to confirm that the TPA acts with independence and performs adequate ECP-required audits.  *See* ECP §§ VI.F.1-3.

- Throughout ECP Year Four, the CAM Team has remained in regular contact with the TPA through both calls (weekly and as-needed) and periodic in-person meetings (held virtually since March 2020).  The CAM Team has also continued to oversee the TPA's work by attending TPA ship and shoreside facility audits (performed virtually from March 2020 through early June 2021), speaking with Company personnel who have experienced a TPA audit, and reviewing TPA audit reports, annual reports, and correspondence with the Company.  The CAM Team has also collaborated with the TPA on reviewing and providing feedback on Company materials, such as the draft the draft investigations manual discussed above.  *See supra*, Part VII.B.5(c).

### B.   ECP Year Four Audit Activities

- During ECP Year Four (April 19, 2020 – April 18, 2021), the TPA conducted the following ship and shoreside audits.  All audits were performed virtually:

  o  24 ship audits.

  o  6 shoreside office audits, including 1 follow-up shoreside audit.

  o  1 audit of the virtual CSMART Environmental Excellence training course.

  o  31 Compliance Disclosure Certification verification audits, as discussed below.

- As directed by the Court, in addition to the regular course of ship and shoreside audits, the TPA reviewed the Company's submissions pursuant to the Court's orders on:

July 19, 2021

    o   (1) **Compliance Disclosure Certifications for Ships Returning to U.S. Waters:** As discussed above, the TPA reviewed the 32 Compliance Disclosure Certifications received to date for ships returning to U.S. waters. *See supra*, Part VI.B.1(b).[137] To help verify the accuracy of the information in the submissions, the TPA also conducted virtual audits of 31 of these ships (with an audit of the additional ships still pending), which included the review of additional background documentation. Through its review, the TPA was able to provide the Court with assurances, to the extent feasible based on the inherent limitations of its remote review, that the ships returning to U.S. waters to date were generally capable of operating in compliance with the ECP and environmental laws, provided the ships are adequately staffed and nonconformities identified by the TPA are addressed, including repairs to Exhaust Gas Cleaning Systems. *See* Status Conf. at 24-31 (Apr. 30, 2021).

    o   (2) **Planned Maintenance Task Updates:** The TPA also reviewed and analyzed the information provided in the Company's monthly planned maintenance task update submissions to date. In addition, the TPA had discussions with relevant technical personnel, both ship and shore. Through its review, the TPA was able to provide the Court with assurances, to the extent feasible based on the documentation received, that the Company has facially adequate plans for addressing outstanding Planned Maintenance System items, provided the ships are supplied with adequate staffing and resources. *See id.* at 31.

- During ECP Year Four, the TPA also began issuing "systemic" audit findings based on repeated issues observed during audits that appear to have systemic causes and/or fleetwide applicability. The TPA issued two such findings related to Exhaust Gas Cleaning Systems, as discussed above: (1) a systemic observation related to soot discharges and other surface effects from wash water discharges; and (2) a systemic Major Non-Conformity related to equipment condition and reliability. *See supra*, Part VI.C.2.

- As discussed above, the TPA has also engaged with Incident Analysis Group personnel, through a series of written correspondences and virtual workshops outside of regular audits, to discuss continuing concerns about investigation reports, including scoping, methodology, and root cause analysis. Incident Analysis Group personnel have been receptive to, and expressed appreciation for, this feedback. *See supra*, Part VII.C.2(d).

## C.    General Auditor and Audit Report Assessment

- As in prior years, the TPA auditors appear to be qualified and knowledgeable, with the technical ability and maritime experience necessary to identify and explore a wide range of issues. *See* CAM First Annual Report at 59-60; CAM Second Annual Report at 101; CAM Third Annual Report at 222-23. Auditors have also exhibited high levels of adaptability, focus, and engagement in the challenging circumstances presented by the pandemic, which, as noted above, required the TPA to transition to a fully remote audit program from

---

[137] A 33rd certification was submitted on the date of this Report and has not yet been reviewed by the TPA.

July 19, 2021

approximately March 2020 through early June 2021.[138]  Though inherently limited, the TPA's remote audits continue to yield productive insights into compliance challenges, including the systemic Exhaust Gas Cleaning System issues discussed in Part VI.C above.  *See supra*, Part VI.C.2.

- The CAM Team also did not identify significant shortcomings with the TPA's audit process, nor has the CAM Team seen any indication that the TPA's independence is compromised, even when audit findings are met with disagreement.

- The CAM Team continues to find that TPA audit reports are clear, cover the necessary areas, and sufficiently document the TPA's findings.  TPA representatives also continue to be receptive to the CAM Team's feedback.

### D.    Support for Continuous Improvement

- Throughout the ECP, the TPA has identified numerous systemic issues and compliance challenges that have shaped the course of the monitorship, including those related to:  food waste management; waste vendor assessments; Exhaust Gas Cleaning Systems; investigations; training; recordkeeping; and support for ship operations, including spare parts and reliability of pollution prevention equipment.  *See, e.g.*, TPA Second Annual Report at 18, 21-23; TPA Third Annual Report at 27-29, 31-32, 33-35; TPA Fourth Annual Report at 13-16, 26-37.  Addressing these issues will be critical to the Company's continuous improvement efforts.

- Equally critical will be the Company's ability to identify and respond to such issues on its own.  As discussed in Part VII.C above, without TPA (or CAM and Court) oversight, the Company's internal audit function, along with its investigation, legal, operations, risk, training, and broader Ethics & Compliance functions, will need to play the role of auditor and monitor to support continuous improvement beyond the ECP.  *See supra*, Part VII.C.5. While the Company is making progress toward having continuous improvement processes in place, it is not there yet.

- The Company, TPA, and CAM all share a goal that, when probation ends on April 18, 2022, the Company's compliance program will have become fully internalized and integrated into the Company's operations.

Respectfully Submitted,

STEVEN P. SOLOW
Court Appointed Monitor
July 19, 2021

---

[138] The CAM understands that the TPA has resumed in-person visits for ships in locations that are safe and practical to access, including some U.S. ports.

July 19, 2021

**APPENDIX A:  ETHICS & COMPLIANCE INITIATIVE HIGHLIGHTS**

| Initiative | Description | Status and Updates |
|---|---|---|
| **ECP Communications** | • Communications to share updates, lessons learned, and other information about environmental compliance. | • The Company continues to issue regular communications to its employees, including case studies, newsletters, notices, bulletins, info-graphic posters, signage, and videos. *See* CAM Third Annual Report at App. B. |
| **Employee Incentive Programs** | • Reward and recognition programs for employees who exceed environmental compliance expectations. | • Ongoing programs include:  (1)  Environmental Challenge Coins and Certificates, a program to give away collectible environmental "challenge coins" to employees who go above and beyond on environmental compliance efforts; (2) Environmental Excellence Awards, a program to award ships achieving the highest levels of compliance, based on standardized scoring criteria; (3) HESS Employee of the Month Program, a program to reward employees for their HESS-related compliance performance or leadership, with criteria and awards differing by Brand; and (4) contests and competitions held to commemorate special dates like Earth Day, World Oceans Day, and Global Recycling Day.  *See* CAM Third Annual Report at App. B; Environmental Corporate Compliance Manager Annual Report at PCL_ECP00211346-47; Environmental Excellence Newsletter Issue 02-2021 at 7-9; Environmental Excellence Newsletter Issue 03-2021 at 8. |
| **Operation Oceans Alive** | • A trademarked brand name for the Company's environmental compliance and stewardship program. | • The Company continues to implement a range of initiatives under the Operation Oceans Alive program, including ECP communications, the Top 5 Program, employee incentive programs, and the Environmental Hub and Hotel Operations online chat forums.  *See* CAM Third Annual Report at App. B. |
| **Ship Visit Program** | • Program of ship visits by Ethics & Compliance personnel to introduce themselves to crew members and receive feedback on compliance-related issues. | • In early 2020, before the pandemic, All Brands Group and Operating Group Ethics & Compliance personnel held a series of brief, in-person day visits, which included town-hall style listening sessions.  *See* CAM March 2020 Quarterly Report at 71.<br><br>• During the pause, Operating Company Ethics & Compliance personnel joined virtual visits with Brand Presidents and other shoreside leaders and managers.  The Ethics & Compliance group is working on synthesizing feedback and lessons learned from these visits.  *See* Employee Interview/Call Notes. |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | | • Plans for future visits (in-person and/or virtual), including potential office hours-style sessions by All Brands Group Ethics & Compliance personnel are under consideration. *See id.* |
| **Stop Work** | • Evaluation of possible mechanisms to empower individuals with Stop Work authority beyond the traditional safety context. | • Historically, the Company's Global HESS procedures have empowered crew members with Stop Work authority in the traditional safety context (*e.g.*, to "stop work" if they observe a crew member performing an operation without the proper tools, personal protective equipment, or other safety precautions).[139]<br><br>• The Company's Health/Safety/Security Corporate Compliance Manager is leading efforts to adopt a broader program that would empower employees to Stop Work if they have concerns about programmatic issues, such as a new project, procedure, or initiative. As an initial step, a working group has surveyed current Brand approaches and is considering options for better aligning these approaches to support a more expansive program. *See* Employee Interview/Call Notes. |
| **The Environmental Hub and Hotel Operations Forums** | • Online platforms with discussion forum and polling capabilities. | • The Company continues to provide this online platform for Environmental Officers, hotel staff, and shoreside compliance personnel to share environmental compliance information, as well as solicit feedback on training, procedures, and best practices. *See* CAM Third Annual Report at App. B. |
| **Top 5 Program** | • Program, begun in ECP Year One, to identify five key areas of environmental concerns and prioritize efforts to reduce risks in those areas. | • The current Top 5 list is: (1) Ensure food waste is properly separated; (2) Keep alert and focused while on watch; (3) Ensure compliant waste stream and ballast water discharges; (4) Ensure use of compliant fuels and Exhaust Gas Cleaning System operation; and (5) Report leaks to the bilge and make timely repairs. *See* Environmental Excellence Newsletter Issue 03-2021 at 3. |

---

[139] *See OHS 1001 Job Safety Review* (stating that "[e]very **crew member** has the authority and duty to stop work that they deem to be **unsafe**") (emphasis added). The Company's Global HESS procedures do not make explicit whether existing Stop Work authority also applies to: (1) individuals other than crew members, such as shoreside personnel, vendors, contractors, visitors, passengers, and other third-parties; or (2) HESS areas other than safety, including environmental—such that individuals would be empowered to stop an operation they know or suspect is not environmentally compliant. *See* CAM January 2021 Quarterly Report at 28; CAM December 2019 Quarterly Report at 67, n.48.

APPENDIX A - ETHICS & COMPLIANCE INITIATIVE HIGHLIGHTS | Page **2** of **2**

July 19, 2021

### APPENDIX B:  CULTURE ACTION PLAN INITIATIVE HIGHLIGHTS

| Initiative | Description | Status and Updates |
|---|---|---|
| **Ambassador Programs** | • Peer-to-peer ambassador programs for employees. | • Holland America Group started developing a peer-to-peer ambassador program in 2019 for shoreside employees.  Under this program, Holland America Group Ethics & Compliance personnel identify employees who are interested in receiving additional training on the Code of Conduct, and who are willing to serve as resources for other employees.  These ambassadors receive initial training and are sent "awareness builder" slide decks on a monthly basis.  A pilot program has also been launched on five ships.  *See* Employee Interview/Call Notes; Presentation Notes; Leadership Feedback Updates at 8.<br><br>• Carnival UK is working on a project plan for an ambassador program, prioritizing a shipboard program rather than a shoreside program.  The shipboard ambassadors will be tasked with modeling Culture Essentials and hosting discussion forums.  *See* Employee Interview/Call Notes.<br><br>• Costa Group is implementing an ambassador program, initially prioritizing a shoreside program that will be implemented by the end of 2021.  A similar program will be launched on ships, to be coordinated through the shipboard Learning Managers.  *See* Leadership Updates Feedback at 4; HR Monthly Culture Reports at 15. |
| **Bring Back Selection Strategy** | • A "common set of criteria to be used in re-hiring (ship and shore-side) employees that reflect the priorities within the Corporate Vision Statement and the Culture Essentials," including commitments to: safety and environmental protection; ethics and compliance; and DEI.  *See* Culture Action Plan at 3. | • Much of this work was completed by the Brands before the Culture Action Plan was launched.  Each brand developed and implemented its own "methodology and criteria for bringing back the most competent talent before guest operations resume," with consideration "given to those who have exhibited behavior in line with the principles of the Culture Essentials."  Methodology Brands Are Using to Achieve the PPP Bring Back Selection, PCL_ECP00213877-81.<br><br>• For example, Holland America Group and Carnival Cruise Line developed assessment/evaluation tools to determine which shipboard officers to bring back.  These tools include criteria that are aligned with Culture Essentials attributes.  *See id.*<br><br>• By contrast, Carnival UK "will not be undertaking a 'bring back' exercise" because they "intend to return all ships to service and [] are close to [their] target |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | | establishment" so they "do not have 'capacity' to only bring back [their] 'best' officers first as that would place a significant imbalance in [their] fleet." *Id.* |
| **Courageous Conversations** | • Conversations about culture and DEI initiated by shoreside leadership. | • Holland America Group has completed a pilot of its Courageous Conversations program. *See* HR Monthly Culture Reports at 61. Leaders also hosted "listen and learn" conversations "with teams aboard ships and with shoreside employees at the Director level and above to engage in conversations about culture essentials, defining DEI, and reinforcing the role all leaders play in driving . . . expected behaviors." *See* Leadership Updates Feedback at 7.<br><br>• At Carnival Cruise Line, several shoreside leaders are engaging in Courageous Conversations with shipboard leadership. As of April 30, 2021, shoreside leaders had completed or scheduled over 60 calls, and planned to schedule at least 30 more. *See* HR Monthly Culture Reports at 7. Shoreside managers have also described informal conversations with crew. For example, at least one Carnival Cruise Line manager has multiple WhatsApp chats with employees (both groups and individuals) to discuss concerns surrounding culture. *See* Employee Interview/Call Notes.<br><br>• At Carnival UK, these Courageous Conversations are called "Culture Essentials in Practice." Themes discussed have included employees' "level of empowerment to make decisions or calling out behaviors in meetings that don't feel inclusive." *See* HR Monthly Culture Reports at 50. |
| **Culture Essentials** | • A set of six "key actions and behaviors" that "everyone across all brands needs to remember to help [the Company] live out the top priorities from [its] Vision Statement, as well as [its] shared core values." *See* Culture Action Plan at 4.<br><br>• The six Culture Essentials are: (1) **Speak Up**; (2) **Respect and Protect**; (3) **Improve**; (4) **Communicate**; (5) **Listen** | • The Culture Essentials program was rolled out to ship and shoreside employees in October 2020, with messages from the Carnival Corp. CEO, Chief Ethics & Compliance Officer, and Brand leaders. The Brands will conduct supplemental "welcome back" sessions shortly after each ship returns to service. Among other topics, the sessions will reinforce the Culture Essentials. *See* Pause Priorities Plan at 23.<br><br>• Culture Essentials behaviors are being incorporated into All Brands Group and Brand materials and initiatives, including the Code of Business Conduct and various trainings and HR materials (*e.g.*, job descriptions, interview questions, performance evaluations, exit interview questions). For example:<br><br>    o Carnival Cruise Line has incorporated Culture Essentials into its performance reviews for 2021. *See* 2021 Performance Reviews, PCL ECP00213873. |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | **& Learn**; and (6) **Empower**. *Id.* at 5. | Reviewers will be asked to score each individual on each of the Culture Essentials behaviors as "exceptional," "successful," or "needs improvements." *Id.*<br><br>o  Holland America Group has begun "transforming performance appraisals to become a performance partnership, focusing more on the Culture Essentials behaviors and the joint accountability of performance between the supervisor and the direct report." *See* Leadership Updates Feedback at 8.<br><br>• Carnival UK is rolling out "Recognition Schemes" ship and shore "to recognize people for behaviors that support the Culture Essentials." *See id.* at 6.  Carnival UK is also rolling out "Culture Essentials in Practice" conversations based on "feedback from teams on various cultural themes including their level of empowerment to make decisions or call[] out behaviors." *Id.*  A trial program for shipboard officers is planned this summer.  *Id.*  The Carnival UK Chief People Officer also "publishes a monthly blog to all colleagues, ship and shore, covering topics related to Culture Essentials, DEI, and wellbeing." *Id.* at 5-6.<br><br>• In May 2021, Carnival Cruise Line launched a Culture Essentials Spotlight on "Speak Up" through an employee town hall and Vice Presidents meeting.  Leaders also hosted meetings with Vice Presidents and Directors highlighting Culture Essentials. Vice Presidents were provided with talking points to cascade to their teams and were asked "to routinely recognize employee/team members displaying Culture Essentials." *See* HR Monthly Culture Reports at 2.<br><br>• The President of Costa "is holding monthly Shoreside Townhall and [ship visits]," highlighting Culture Essentials [and] expected behavior[s] and actions to improve [DEI]." *See id.* at 15.  Leaders are also continuing to hold townhall meetings ship and shore, as well as broadcasting videos emphasizing Culture Essentials. *See* Leadership Updates Feedback at 3. |
| **Promoting Team Wellness** | • Activities developed by each Brand to promote crew member wellness aboard ships during the pause. | • Activities vary by Brand but have generally included:  free internet to communicate with friends and family; free mental health counseling resources; training for shipboard leadership on warning signs for mental health issues; moving crew to guest cabins to be more comfortable; and outdoor activities for crew, such as games and |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | | movie screenings.  *See* Employee Interview/Call Notes; Leadership Updates Feedback at 2-9.<br><br>• Holland America Line has also established a new "Life Onboard Committee" to identify "opportunities to improve team members' onboard life" after restart in areas such as:  "communal/recreational area design and operation, food and beverage service and selections, access to guest areas and services, onboard benefits and perks, special events, both on board and on shore, and communication with loved ones at home."  *See* Leadership Updates Feedback at 9. |
| **Trainings** | • New or modified trainings to reflect Culture Essentials and core values. | • The Company has revised trainings on "Code of Business Conduct and Ethics," "Handling Team Members' Concerns," and environmental awareness (*e.g.*, TRG 2302, 2308, 2307, and 2309).  *See* Pause Priorities Plan at 26-28.<br><br>• The Brands are continuing to develop or update a range of other trainings to reflect the Culture Essentials.  *See id.* at PCL_ECP002251544-45.  For example, Holland America Group deployed a computer-based training on personal accountability in May 2021.  *See* HR Monthly Culture Reports at 82. |

July 19, 2021

### APPENDIX C:  BRAND DEI INITIATIVE HIGHLIGHTS

| Category | Description |
|---|---|
| **Conferences** | • Carnival Cruise Line intends to establish annual conferences on DEI and culture topics.  *See* Leadership Updates Feedback at 3. |
| **DEI Goals and Targets** | • Most Brands have either not set or have not determined whether they will set affirmative DEI targets or goals.  *See* Employee Interview/Call Notes. <br><br> • Costa Group has set a target to increase the share of female deck and engine crew members by 25% by the end of 2022.  It has also set a goal to increase the share of non-European Union deck and engine crew members by 20% by the end of 2022.  *See* Diversity, Equity and Inclusion for Deck & Engine Workforce. |
| **Employee Surveys** | • Holland America Group conducted a "ship and shore engagement survey" in spring 2021 to solicit feedback on DEI issues.  *See* Leadership Updates Feedback at 8.  A steering committee with representatives from different departments was created to determine follow-up actions based on the survey results.  One follow-up action is to implement a "Performance Partnership" strategy to standardize performance evaluation templates, while integrating DEI and other Culture Essentials attributes.  *See* Employee Interview/Call Notes; *see also supra*, App. B. |
| **Global Talent Partner Outreach** | • Carnival Cruise Line has provided training and marketing materials to its Global Talent Partners on culture and DEI. It also requires its Global Talent Partners to create culture plans and to take DEI training that matches the training Carnival Cruise Line provides to its internal hiring managers.  *See* Culture Essentials Crew Partners (Apr. 14, 2021). |
| **Inclusion Initiatives** | • Carnival UK initiatives include:  a National Inclusion Week; Fleet Pride activities; and a "Belonging and Inclusion" training program.  *See* Belonging and Inclusion: Be Curious, Be You, Belong! <br><br> • Carnival Cruise Line initiatives include:  shipboard #MeToo presentations; facilitated conversations between shipboard and shoreside leaders on opportunities and barriers to greater inclusion, equity, and accountability, with action plans to follow; and small group discussions with senior shipboard officers on DEI and culture issues.  *See* Leadership Updates Feedback at 2-3. |
| **Management Hires** | • Holland America Group is looking to hire a Senior Manager of Culture and DEI.  *See* Employee Interview/Call Notes. |

July 19, 2021

| Category | Description |
|---|---|
| **Maternity Return Policies** | • Carnival UK's maternity return policy extends the right for women to return to their position for up to five years.  *See* Employee Interview/Call Notes. |
| **Model Ships** | • Carnival Cruise Line intends to identify "DEI/Culture model ships" and create "an actionable plan to convert all ships to DEI/Culture model ships."  *See* Leadership Updates Feedback at 3. |
| **Recruiting** | • Costa Group and Carnival Cruise Line have launched cadet programs to recruit deck and technical officers from non-traditional countries outside of Western Europe, as discussed above.  *See supra*, Part III.C.2.<br><br>• Carnival UK and Costa Group conducted a "gender balancing" review of their recruiting documents to remove gender specific words.  *See* Employee Interview/Call Notes.<br><br>• Holland America Group's Talent Acquisition department "is actively recruiting for several Deck and Technical positions and targeting female and non-traditional nationality candidates."  *See* Leadership Updates Feedback at 8. |
| **Training** | • Carnival Cruise Line conducted a training for its internal recruiters on mitigating unconscious bias.  *See* A Guide to Conducting Behavioral Interviews with Early Career Job Candidates, PCL_ECP00219213; *see also* DEI Hiring For Managers Training (accessible via Company intranet). |

July 19, 2021

## APPENDIX D: IT AND DATA INITIATIVE HIGHLIGHTS

| Initiative | Description | Status and Updates |
|---|---|---|
| **CADIS** | • The "Competency and Development Information System," a subsystem of the GLADIS learning management system. | • This tool is being used to develop competencies for competency frameworks and Professional Development Records. *See* Employee Interview/Call Notes. |
| **CrewTube** | • A smart phone app designed to help new crew members become familiarized with HESS content before they arrive aboard. | • CrewTube has been updated with the latest COVID-19 and cyber training. *See* 2021 Best Practices Workshop Notes at PCL_ECP00217338.<br>• CrewTube "Phase 2" is slated for deployment in mid-2021. In Phase 2, CrewTube will link to GLADIS and contain rank- and ship- specific information, such as "how-to" training videos. *See* HESS Committee Meeting Presentation (Nov. 19, 2020), PCL_ECP00210894 -931 at PCL_ECP00210929. |
| **Data Virtualization** | • An effort to harmonize incompatible data from multiple sources in use across the Company to help enable more sophisticated, corporate-wide data analytics. | • The Company has selected software vendors to support this effort. The timeline remains in progress. *See* Employee Interview/Call Notes. |
| **Drill App** | • An offline, tablet-based app to assess specific competencies via drills. It can be used by individuals or teams. | • The app is currently in pilot with Holland America Group and Carnival UK. *See* 2021 Best Practices Workshop Notes at PCL_ECP0-0217338. |
| **GLADIS** | • The "Global Learning and Development Information System," a corporate-wide Learning Management System that hosts computer-based trainings, among other functions. | • GLADIS was rolled out to all Company ships in 2019. Some Brands also use GLADIS for shoreside training. *See* CAM Third Annual Report at 134.<br>• A new functionality was recently launched to allow some aspects of instructor-led trainings to be managed in GLADIS (such as who attended, who the instructor was, and what the contents were). *See* Employee Interview/Call Notes. |
| **Global HESS** | • The Company's corporate-wide electronic HESS management system. Global HESS contains, among other things: the Company's HESS policies, procedures; newsletters; case studies; compliance notices; videos; internal and external audit reports; investigation reports; and CAM and TPA reports. | • As part of a modernization effort, the current Global HESS software platform (Domino) is being retired. The Company has not yet selected a replacement platform. Once selected, the Company anticipates a conversion to take approximately 12 to 18 months. In the meantime, the Company has decided to extend the use of the current Domino platform for two more years. *See* Employee Interview/Call Notes.<br><br>• Recent improvements to Global HESS include: |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | | o An improved process for tracking and responding to employee-submitted suggestions for revisions to Global HESS procedures, including the creation of a dashboard for tracking procedure revision suggestions. *See* Maritime Operations  Monthly Dashboard, April 2020 (May 14, 2021), PCL_ECP00217609. <br><br> o A rank-specific user interface dashboard to enable users to view information relevant to their specific job responsibilities more easily. *See* CAM January 2021 Quarterly Report at 84. <br><br> o Simplified environmental procedures to increase readability and usability. *See id.* |
| **Investigation Case Management System** | • A case management system used by the Incident Analysis Group to track and trend data related to investigations. | • The platform was launched in early 2021.  All current investigations have been input into the system.  Efforts are underway to input past investigations so that data can be trended. *See* Employee Interview/Call Notes. |
| **MAST** | • The "Marine Assets Strategy Transformation" initiative, which is an effort to adopt a single, corporate-wide planned maintenance and spare parts management (including procurement and logistics) system. | • As discussed above, this effort remains under development.  The Company recently dedicated additional resources to speed up the timeline. *See supra*, Part VI.C.4. |
| **Neptune** | • A proprietary software platform that the Company developed prior to the ECP, which collects raw data from ships in real time and utilizes individual modules for data analytics across a wide range of areas, including engine performance and Exhaust Gas Cleaning System usage. | • Various modules and functionalities related to environmental compliance are being developed and/or rolled out, although some efforts were paused due to COVID-19.  Most efforts in the first quarter of Fiscal Year 2021 were related to remediating cybersecurity incidents. *See* Employee Interview/Call Notes. <br>• Recent updates include: <br> o Modules related to electronic seals have been completed and are ready for roll out. <br><br> o A module for electronic forms and checklists is under development. |
| **SeaEvent** | • A corporate-wide incident and near miss reporting and case management system. | • SeaEvent was rolled out to all Company ships in 2019. |

July 19, 2021

| Initiative | Description | Status and Updates |
|---|---|---|
| | | • Some releases and upgrades scheduled for 2020 were not implemented due to COVID-19. As of the first quarter of Fiscal Year 2021, those upgrades have not yet been rescheduled. However, the Company recently approved a list of SeaEvent enhancements that will be requested as part of the next version that is schedule to roll out at the end of 2021. Examples include a functionality to allow for identifying vendor-related discharge incidents and near misses, as well as enhancements to provide ships with access to historical information about an incident. *See* Employee Interview/Call Notes; SeaEvent v1.10 Enhancements List (June 2021). |
| **Training Attendance App** | • An app to scan crew ID cards to record attendance at shipboard instructor-led trainings. It would link data to and from GLADIS to help automate the recording, reporting, and tracking of training attendance. | • According to the Company, the attendance app was developed in February 2020. However, operational constraints made it challenging to conduct a full shipboard trial. While the proof of concept is ready to test, the app has not yet been rolled out for shipboard use. *See* Employee Interview/Call Notes. |
| **Voyage Planning Software** | • Software designed to help simplify and automate the voyage planning and execution process. | • As discussed above, the software remains in the testing and development phase. *See supra*, Part VI.C.4. |

July 19, 2021

## APPENDIX E:  IMPLEMENTATION OF INVESTIGATION REVIEW RECOMMENDATIONS

| Recommendation | Status |
|---|---|
| **Limit and Define Distribution of Draft Reports and Comments** | The CAM understands that the revised HMP 1302 procedure, which is expected to be published in Global HESS by the end of July 2021, will contain an updated distribution list. *See* Employee Interview/Call Notes. |
| **Conduct a Bi-annual Review of Global Issues** | The Incident Analysis Group intends to use the quarterly HESS Lesson Learned meetings to review identified potential systemic issues.  *See* Employee Interview/Call Notes. |
| **Designate Subject Matter Experts to Review Investigation Reports** | A list of designated subject matter experts has been created.  It is expected to be published in Global HESS by the end of July 2021.  *See* Employee Interview/Call Notes. |
| **Reinforce a Constructive Tone at the Top** | According to the Head of the Incident Analysis Group, the Culture Essential program is the primary avenue to reinforce constructive tone at the top.  *See* Employee Interview/Call Notes; *see also supra*, Part IV.B.3, App. B. |
| **Clarify the Definition of Root Cause** | The revised Investigation Manual defines root cause as the "fundamental reason or reasons for the occurrence of an event in order of priority, if priority can be established." Investigation Manual at 73. |
| **Expand the Incident Analysis Group Investigator Ranks with Former Federal Agents and a Mix of Investigative Backgrounds** | The Incident Analysis Group is in the process of recruiting additional investigators, including at least one with a classic investigations background.  The Incident Analysis Group is also seeking to hire more diverse investigators that better reflect the diversity of the shipboard personnel.  They are using an international recruitment firm to assist in effort.  *See* Employee Interview/Call Notes. |
| **Provide Classic Investigative Training for Incident Analysis Group Investigators** | The Company engaged an outside consultant to provide a series of training sessions on classic investigative techniques.  The Incident Analysis Group investigators have completed the training and have the option to request additional sessions.  All new hires will also receive the training.  *See* Employee Interview/Call Notes. |
| **Create a Single Investigative Guidelines Manual** | The Company published a revised Investigation Manual for Level 3 (Incident Analysis Group-led) investigations on July 1, 2021.  The Company intends to create separate manuals for Level 1 (ship-led) and Level 2 (Brand-led) investigations.  *See* Employee Interview/Call Notes. |
| **Address Broader Systemic or Fleetwide Issues in Separate Incident Analysis Group Reviews** | The CAM understands that the HMP 1303 procedure is being revised to address this issue. The revised procedure is expected to be published in Global HESS by the end of July 2021. *See* Employee Interview/Call Notes. |
| **Designate Brand and Ship Personnel to Assist in Investigations** | The CAM understands that the Incident Analysis Group Director of Training has instructed the Brands to create these lists, in parallel to the development of Level 1 and Level 2 investigation training.  *See* Employee Interview/Call Notes. |
| **Place Oversight Over Corrective Actions with the Ethics & Compliance Program** | The CAM understands that this may be addressed in the revised HMP 1302 procedure.  *See* Employee Interview/Call Notes. |

July 19, 2021

| | |
|---|---|
| **Designate the Incident Analysis Group as the Default Investigative Body for All Environmental Issues** | The HMP 1302 procedure was revised in November 2020 to clarify that the Incident Analysis Group is the default investigative body for all environmental Hotline Reports (but not all environmental issues).  *See HMP 1302-A Internal HESS Incident Analysis Matrix*. |
| **Additional Investigation Improvement Plan Efforts Beyond Review Recommendations** | |
| **Carry Out Continuous Improvement Workshops Every Two Months** | The Incident Analysis Group has been holding continuous improvement workshops every two months since the beginning of 2021.  *See* Employee Interview/Call Notes. |
| **Explore the Option of Having the Incident Analysis Group Investigation Process Externally Certified to an ISO-9001 Quality Management System Standard** | The CAM understands that this effort has not started yet.  *See* Employee Interview/Call Notes. |
| **Hold Consultation Exercises with One Ship from Each Operating Group to Solicit Input on Methods of Disseminating Lessons Learned** | The CAM understands that these consultation exercises are underway.  *See* Employee Interview/Call Notes. |
| **Develop Incident Analysis Group Report Writing Procedures** | Completed. |
| **Develop a Training Matrix for Incident Analysis Group Investigators** | Completed. |
| **Develop a Standard Investigation Report Template** | Completed. |
| **Provide Investigation Report Writing Training to the Incident Analysis Group Team** | Completed. |
| **Consult with Brands and CSMART on Feasibility of Expanding Investigation Training to Select Ship and Shore Personnel Responsible for Carrying out HESS Investigations** | The CAM understands that the Incident Analysis Group Director of Training is developing training for Level 1 (ship-led) and Level 2 (Brand-led) investigations.  *See* Employee Interview/Call Notes. |