UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-20897-CR-PAS

UNITED STATES OF AMERICA,

v.

PRINCESS CRUISE LINES, LTD.,

Defendant.

_____/

## JOINT FACTUAL BASIS FOR DEFENDANT'S GUILTY PLEA
## TO THE PETITION FOR SUMMONS FOR OFFENDER UNDER SUPERVISION
## DATED NOVEMBER 23, 2021 [DE 244]

The United States of America and Defendant Princess Cruise Lines, Ltd., by and through their undersigned counsel, hereby set forth the following evidence that provides a factual basis for the Defendant's guilty plea and conviction to the pending petition to violate probation due to the Defendant's failure to establish and maintain an independent Incident Analysis Group ("IAG") required by the Defendant's Environmental Compliance Plan ("ECP"). Were this matter to proceed to a contested hearing, the United States would prove the following facts by preponderance of the evidence.

## I.     Introduction

An effective and independent internal investigation program is critical for a company's compliance and risk management efforts, as well as for supporting a mature learning culture that seeks to identify and understand systemic and cultural issues that may contribute to risks. Guidance from the Criminal Division of the United States Department of Justice ("DOJ") cites "the existence of a well-functioning and appropriately funded mechanism for . . . timely and thorough investigations" as a "hallmark of a compliance program that is working effectively." DOJ,

*Evaluation of Corporate Compliance Programs* (Updated June 2020), *available at* https://www.justice.gov/criminal-fraud/page/file/937501/download at 16 (last viewed Dec. 15, 2021). In evaluating a compliance program, it is important to consider whether a company has taken measure to "ensure that investigations are properly scoped" and "independent, objective, appropriately conducted, and properly documented." *Id.* at 7, 16. Qualities of an effective and independent internal investigation function include performing "adequate and honest root cause analys[e]s" and identifying "system vulnerabilities, and accountability lapses, including among supervisory managers and senior executives." *Id.* at 14, 16.

At the time of the underlying offense, the Defendant, its parent corporation, and related corporate entities (collectively, the "Company" or "Defendant") did not have an effective and independent internal investigative function. Problems with the internal investigative function have been identified from the outset of probation by the Court, the Court Appointed Monitor ("CAM"), and the Third Party Auditor ("TPA"). When probation concludes in April 2022, it is of critical importance that the Company have the ability not only to conduct thorough and competent independent investigations, but also to learn from them.

Even before the formation of the IAG, Defendant's probation included an ECP that required an independent internal investigation function for investigations related to Health, Environmental, Safety, and Security ("HESS"). *See* ECP § III.B.1 ("CARNIVAL shall maintain its independent [RAAS] department."). At the beginning of the ECP, internal HESS investigations had been performed and/or overseen by the Risk Advisory and Assurances Services ("RAAS") group, which also performs internal audits and non-HESS investigations, among other functions. During the second year of probation, the Company removed its HESS investigations function from RAAS and created a separate department responsible for HESS investigations. The ECP was

amended to require that "CARNIVAL shall establish and maintain an *independent* Incident Analysis Group." Revised ECP § III.C.1 (June 3, 2019) (emphasis added). As the result of Defendant's prior conviction for probation violations in 2019, the Company was required to restructure its compliance functions which resulted in the placement of the IAG within the Company's new Ethics & Compliance department. *See* D.E. 134.

## II.    Background and Timeline on Defendant's Internal Investigation Function

Beginning with the first year of probation, there have been repeated findings that the Company's internal investigation program was and is inadequate. *See* Letter from CAM to Court, *Evaluation of Carnival Corporation & plc Internal Investigation Program* (Oct. 22, 2021) ("CAM/TPA Letter") at 3 and n.6-7 (citing prior CAM, TPA, external consultant, and RAAS reports). For example:

- In May 2018, a report from an outside consultant, retained by RAAS (the entity with responsibility for internal HESS investigations at the time) concluded that the Company suffered from a "lack of a mature learning culture" and that the "challenges with respect to incident investigation extend beyond the control of RAAS and indicate more fundamental challenges for the Carnival Group as a whole." *Id.* at 9, 20 (quoting outside consultant report). The report also made a range of findings and recommendations, including the need for improved and consistent: root cause analysis, training, investigation and reporting methodology, and tracking and trending of investigation findings to support risk management. *See* CAM Second Annual Report at 44 (citing outside consultant report).

- In June 2018, the CAM issued its First Annual Report which found that the *"Company's internal investigations are critically flawed."* CAM/TPA Letter at 20 (quoting CAM report) (emphasis added). Among other deficiencies, the CAM observed that: "investigations repeatedly failed to identify root cause(s), and the Company lacked a procedure or standard methodology for performing root cause analysis;" "investigation reports often sought to attribute blame to specific shipboard personnel, rather than evaluate the role of broader, systemic issues that may have contributed to the incident;" "relevant policies and procedures provided little guidance on how to conduct investigations, including with respect to preservation of evidence;" and "there was inconsistent information sharing regarding brand/operating line investigation findings between brand/operating line investigators and RAAS." CAM Third Annual Report at n.110.

- The CAM made similar findings and observations in the July 2019 CAM Second Annual Report, the July 2020 CAM Third Annual Report, and the July 2021 CAM Fourth Annual Report. CAM/TPA Letter at 20 (citing additional CAM reports). The TPA made analogous findings in each of its annual reports. *Id.* (citing TPA reports).

- In December 2020, a report from the Company's outside counsel issued a range of findings and recommendations related to IAG independence. It identified the need for "complete independence" between IAG and the operations function during stakeholder reviews of draft investigation reports. CAM/TPA Letter at n.9 (quoting outside counsel report). Other recommendations included clarifying the definition of root cause, providing additional training to investigators, expanding the IAG ranks to include a broader mix of investigative backgrounds, and addressing broader systemic or fleet wide issues. *See* CAM January 2021 Quarterly Report at 48-50 (citing outside counsel report).

- In July 2021 the CAM issued its Fourth Annual Report and found that "it is not yet clear" that IAG is empowered "with the necessary independence and authority to perform its function" or that IAG "has the resources and structures in place to exercise its independence and authority in practice." CAM Fourth Annual Report at 139. The report also noted "ongoing concerns about: investigation and report quality." *Id.* at 26.

- The July 2021 TPA Fourth Annual Report similarly observed that the TPA "continues to have concerns about the Company's investigations process. These concerns are related to the methodology (including independence, scope, and thoroughness), conclusions, and identification of corrective and preventive actions." TPA Fourth Annual Report at 15.

- In October 2021, a RAAS assessment of IAG identified areas for improvement, including: root cause analysis; investigation identification and assignment; investigation management reporting; documentation and review; and resource skill-set diversity. *See* CAM/TPA Letter at 3 (citing RAAS report).

- The October 2021 CAM/TPA Letter, as well as a separate October 2021 TPA "Major Non-Conformity" letter, made findings regarding an ongoing lack of IAG independence, as detailed below.

As repeatedly acknowledged by the Court, the CAM and the TPA, the Company has devoted significant time and resources since the inception of probation toward its internal investigation program in an effort to address these shortcomings. These efforts include: creating the IAG as an investigation unit separate from the audit function; hiring additional investigators and support personnel for the IAG; revising or developing policies, procedures, and manuals;

providing additional training to investigators; and taking steps to increase diversity, equity, and inclusion in the IAG investigator corps. *See* CAM/TPA Letter at 3 and App. B. As indicated in the IAG charter and IAG action plan submitted to the Court on November 5, 2021, the Company has also undertaken or made plans to undertake a range of additional actions in response to recommendations in the October 2021 CAM/TPA Letter.

At the same time, the Company's efforts have been marked by delays and repeat missed deadlines, including the deadlines the defendant submitted to the Court. See CAM/TPA letter, Appendix C.  For example:

- In September 2018, the Company announced its plan to create IAG as an independent group that would be responsible for HESS investigations. The Company launched the IAG in March 2019 under the supervision of a newly-hired leader, who was eventually separated from the Company in June 2020. The current head of IAG was appointed in September 2020. However, this person was also given the additional role and duties of Senior Vice President, Deputy Chief Ethics & Compliance Officer. Thus, the new head of IAG held two positions. *See id.* at 20, 22.

- In September 2018, the Company promised the Court that it would, in a 90-day period, complete the following: develop and/or revise investigation policies and procedures; design new report formats; implement a competency framework and accreditation program for investigators; and develop and implement a structured approach to root cause analysis. None of these were completed within this time period. These actions were not completed when IAG was formed in March 2019. See *id.* at 20.

- In September 2019, the Company again established, but then failed to meet a new set of internal deadlines, ranging from September-November 2019, for the proposed actions submitted to the Court a year earlier, noted above. *See id.* at 21.

- In February 2020, the Company published a set of revised investigation procedures, report formats, and other associated materials and guidance, including an Investigation Manual. The CAM and the TPA found numerous flaws with this manual, and, consequently, the Company withdrew the Investigation Manual in June 2020. *Id.* at 21. A revised manual was originally expected to be completed by December 2020. The Company did not meet this internal deadline. A draft revised manual was provided to the CAM and TPA in March 2021. The CAM and TPA provided critical feedback in May 2021, including that the draft manual "fails to make clear that IAG has []

independence and authority." *Id.* at 24 (quoting CAM letter). In a June 2021 email in response to an inquiry from the TPA on a subsequent revised draft manual, the head of IAG confirmed that IAG did not at that time have the ability to investigate potential systemic issues arising outside of a specific HESS incident or hotline report at its own instigation. *Id.* at 25 (citing CAM letter quoting TPA email). In a July 2021 correspondence following a June 2021 workshop with the CAM and TPA in which the CAM and TPA raised significant concerns about the inability of IAG to initiate investigations at its own discretion, the head of IAG reiterated that "IAG ha[s] no authority to self-trigger investigations." *Id.* (quoting IAG communication). A final Investigation Manual was published in September 2021, which included the principle that "[i]nvestigations must be independent from other operational parts of the organization." *Id.*; HMP-1302-G *HESS Investigation Manual* at 6.

- In July 2020, the Company received two hotline complaints alleging concerns about the IAG's structure and independence. The initial investigation into these complaints, performed by outside counsel, was found by the CAM to be "deficient in numerous respects." CAM/TPA Letter at 22. Consequently, two additional law firms were retained to conduct investigations related to these allegations.

- Letters from the TPA to the Company in August and October 2020 raised concerns about investigations into the hotline complaints, including that: (1) while the ECP requires the IAG to investigate environmental hotline complaints, the IAG appeared to stand down from investigating one complaint after communications from high-ranking operations personnel; (2) investigations, in particular hotline investigations, "may be too narrowly scoped, which ultimately limits the ability to review issue[s] that may be raised by the complaint;" and (3) investigations did not appear to examine all issues raised by the complaints. *Id.* at 23.

- In December 2020, a report from a different outside counsel re-investigating the July 2020 hotline complaints alleging concerns about IAG's structure and independence recommended that the Company limit the group of non-IAG personnel who comment on draft reports, and that non-IAG personnel restrict their comments to objective errors and omissions. The Company did not fully implement this recommendation. *See id.* at n.9, 24.

- In January 2021, another report from separate outside counsel recommended, among other things, that the Company develop new procedures for scoping investigations. *See id.* at 24 (citing outside counsel report).

- In July 2021, the CAM sent a letter to the Company expressing concerns about the IAG's independence and authority, based on IAG's own admission that it lacked authority to investigate systemic issues on its own initiative. The CAM and TPA concluded that the Company failed to provide IAG with the clear grant of authority to investigate systemic HESS issues. The CAM and TPA concluded

that internal investigations remained inadequate because the Company had constrained the authority of its internal investigators. *See, e.g., id.* at 26. In response, the Company adopted in October 2021 new principles on IAG authority and independence that for the first time formally stated that "IAG is independent and has the authority and discretion to initiate any HESS-related investigation unrelated to any incident." HMP-1302 Incident Analysis Procedure (Oct. 2021).

## III.   October 2021 CAM and TPA Findings Regarding Lack of IAG Independence

### A.   CAM and TPA Letter on Internal Investigation Program

On October 29, 2021 the Court held a quarterly hearing that was focused on the status of the Company's internal investigation program, including the extent to which it is empowered with the necessary authority, independence, and resources. D.E. 233 at 2. As directed by the Court, the CAM submitted a letter on October 22, 2021, with the CAM and the TPA's evaluation of the Company's internal investigation program, which evaluation was supported by findings from the Company's own internal and external consultants.The  CAM and TPA concluded that the Company "does not yet have an effective, independent, and empowered internal investigation program." CAM/TPA Letter at 2. In their view:

> [T]he fundamental impediment to an effective IAG does not lie within the IAG itself—although there remains room for improvement in areas such as resources, program design, and investigator training, skills, and diversity. The current state of the program reflects a deeper barrier: a culture that seeks to minimize or avoid information that is negative, uncomfortable, or threatening to the Company, including to top leadership (*i.e.*, the Board of Directors, C-Suite executives, and Brand Presidents/CEOs). This lack of a mature compliance and learning culture is manifested in investigation reports that fail to identify and examine significant risks to the Company.

*Id.*

Additional findings from the CAM/TPA Letter include:

- The Company "has yet to fully implement certain key recommendations aimed at creating an effective investigation unit." *Id.* at 3. This includes the recommendation from the Company's own outside counsel, noted above, that

"the distribution of draft reports be limited to certain categories," and that any input from operations personnel "must be limited to correcting errors and pointing out omissions." *Id.* at n.9 (quoting outside counsel report). The outside counsel also found that "there is no need for . . . high-ranking management officers to weigh in on individual investigative reports. In this regard, we recommend complete independence." *Id.* (quoting same). Although the head of the IAG has always had the discretion to reject or implement comments offered by personnel outside of the IAG, "draft investigation reports continue to be distributed to the Chief Maritime Officer and other operations personnel whose input goes beyond pointing out mere factual corrections or omissions. In at least one instance, a Brand-level operations executive who was the subject of hotline allegations was invited to review and comment on a draft IAG report." *Id.* (quoting investigator notes and correspondence).

- Investigation reports "continue to be impacted by both delay and by limited or superficial analyses," shortcomings which "[b]ased on careful review, the CAM and TPA do not attribute . . . to individual investigators." *Id.* at 4. The CAM/TPA Letter details several examples of investigation reports which "demonstrate an apparent hesitancy to perform an effective root cause analysis," tied to a culture which "continues to manifest in investigation reports that minimize critical issues and risk factors, or bypass them altogether." *Id.* at 7, 10. Examples include reports that: (1) do not ask critical and uncomfortable questions; (2) do not identify systemic causes or issues; (3) minimize, rather than emphasize, significant risk factors, including the risk of regulatory violations; and (4) find that allegations are unsubstantiated or have "no evidence" to support them when there is evidence in support. *Id.* at 10-11.

The CAM/TPA Letter concluded with a list of 13 recommendations for Carnival to take to address the continued shortcomings in its internal investigation program. *See id.* at 11-14. At the hearing on October 29, 2021, the Company pledged to implement the majority of these recommendations.

## B. TPA Major Non-Conformity Finding

Prior to the status hearing on October 29, 2021, the TPA issued a Major Non-Conformity audit finding "with regard to [ECP] Section III.C.1" after finding "instances in which the IAG's investigations are not in compliance with the requirement for independent investigations." Letter from TPA to Environmental Corporate Compliance Manager, #ABSG/CC-049, *Major Non-Conformity Finding on the Incident Analysis Group (IAG)* at 1 (Oct. 21, 2021). The letter discusses

the following *two examples* as "representative of the lack of independent investigation processes," which "indicate that the IAG is not operating independently" and "minimize the risks and impacts of the incidents being investigated, rather than identifying causal factors which could prevent these incidents from re-occurring." *Id.* at 2:

- One IAG report "relied on a legal analysis from the brand being investigated" as to whether one of that brand's ships had violated international marine pollution regulations. *Id.* at 1. The TPA found the conclusion in the brand's legal analysis to be "questionable," and emphasized that, regardless of whether the analysis was correct, "[r]elying on the brand being investigated to assess for itself whether that brand may have violated the law is not operating independently." *Id.* at 1, n.1.

- Another IAG report "was delayed for months, at the request of the brand being investigated." *Id.* at 1. At least once, it was delayed so that a meeting, which included IAG as well as operational personnel, could be held "to apparently reach agreements on how the report would be written, as well as on what documentation would be identified to support the report." *Id.* at 1-2. In addition, "a brand subject matter expert who was the subject of the allegations was invited to review and comment on the draft IAG report." *Id.* at 2.

The TPA letter also raised concerns about whether the Company's current organizational structure actually supported IAG's independence, noting that, in contrast to RAAS, IAG does not have a direct functional reporting line to the Boards of Directors. *Id.* The TPA recommended that "[i]f the IAG [i]nvestigations are to be independent, as required by the ECP and as stated by the Company in its internal procedures, then the IAG's independence should be maintained by having a direct functional reporting line from the Head of IAG to the appropriate Committee or Committees of the Board of Directors." *Id.*

On November 5, 2021, the Company sent a letter to the Court in which it stated its intention to implement the majority of the specific recommendations made by the CAM and TPA.

## IV.    Conclusion

In summary, and for the reasons outlined above, were this matter to proceed to a contested hearing, the United States would be able to prove by preponderance of the evidence that the

Company failed to abide by the conditions of probation, including the revised ECP, by failing to establish and maintain an independent internal investigative function. *See* ECP § III.C.1 (June 4, 2019); Special Condition of Supervision Nos. 3, 4.

**AGREED AND ACCEPTED**

JUAN ANTONIO GONZALEZ
United States Attorney

By: _____
     Thomas Watts-FitzGerald
     Assistant United States Attorney

TODD KIM
   Assistant Attorney General
   Environment & Natural Resources Division
U.S. Department of Justice

By: s/Richard A. Udell
     _____
     Richard A. Udell
     Senior Litigation Counsel
     Environmental Crimes Section
     U.S. Department of Justice

**ON BEHALF OF DEFENDANT:**


_____     Date
David N. Kelley
Counsel for Defendant


_____
David Oscar Marcus
Counsel for Defendant


_____
Arnold Donald
President and Chief Executive Officer
Carnival Corporation and Carnival plc.


**AUTHORIZED BY THE BOARDS OF DIRECTORS
OF CARNIVAL CORPORATION AND CARNIVAL PLC:**


_____
Micky Arison
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.


_____
Arnold Donald
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.


_____
Stuart Subotnick
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.

**ON BEHALF OF DEFENDANT:**

_____        _____
David N. Kelley                                    Date
Counsel for Defendant


_____
David Oscar Marcus
Counsel for Defendant


_____
Arnold Donald
President and Chief Executive Officer
Carnival Corporation and Carnival plc.


**AUTHORIZED BY THE BOARDS OF DIRECTORS
OF CARNIVAL CORPORATION AND CARNIVAL PLC:**


_____
Micky Arison
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.


_____
Arnold Donald
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.


_____
Stuart Subotnick
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.


11

**ON BEHALF OF DEFENDANT:**

<br>

_____          Date
David N. Kelley
Counsel for Defendant

<br>

_____
David Oscar Marcus
Counsel for Defendant

<br>

_____
Arnold Donald
President and Chief Executive Officer
Carnival Corporation and Carnival plc.

**AUTHORIZED BY THE BOARDS OF DIRECTORS
OF CARNIVAL CORPORATION AND CARNIVAL PLC:**

_____
Micky Arison
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.

<br>

_____
Arnold Donald
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.

<br>

_____
Stuart Subotnick
Member of the Executive Committees of
the Boards of Directors
Carnival Corporation and Carnival plc.

11