UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 16-20897-CR-PAS

UNITED STATES OF AMERICA,

    Plaintiff,
vs.

PRINCESS CRUISE LINES, LTD.,

    Defendant.
_____/

## ORDER ON JANUARY 28, 2022 STATUS CONFERENCE

THIS MATTER came before the Court for a virtual conference on January 28, 2022 on the efforts of the Defendant, its parent corporation, and related corporate entities (collectively, the "Company") to meet its obligations under the November 23, 2021 Second Revocation Settlement Agreement [DE 253] as well as Company efforts to support compliance more generally. The Company agreed to share with the CAM and TPA the financial information relating to resources identified pursuant to pages 6 and 7 of Exhibit B to the Second Revocation Settlement Agreement.

    The Company's Chief HESS Investigations Officer reported on the status of the tasks and deadlines set forth in Exhibit B to the Second Revocation Settlement Agreement. These are measures designed to enhance the independence and effectiveness of the Company's internal HESS investigation program which are essential to promoting environmental compliance.

    The Court also discussed with Company senior leaders the substantive issues raised by a recent Incident Analysis Group ("IAG") investigation report [IAG2021033]. This IAG report[1]

---

[1] The Court appreciates and applauds that the fact-finding in this IAG report shows improvement over investigative reports of the past. However, it also highlights that IAG reports still need improvement in terms of analyses, the identification of systemic causes, conclusions, and corrective and preventive actions. Additionally, this IAG report

was successful in revealing some important and concerning facts about the operations and working conditions on one of the Company's ships. Such information helps the Company's senior leadership to identify and manage compliance risks and promote environmental compliance.

This IAG investigation was prompted by an anonymous hotline report alleging that there were not enough personnel in the recycling/garbage area of the ship to handle the volume of wastes the ship generated after it started sailing with passengers. Facts that the IAG investigation revealed included the following:

- The ship experienced a surge in the volume of sewage waste after the ship began sailing with passengers.
    - Unlike other ships of the same class, this ship did not have a biowaste dryer, equipment designed to reduce the volume of sewage waste. Although the original design specifications included this equipment, it was removed from the specifications at an early point in the ship design process, without a record of why this change was made or a change management analysis to determine how the change might impact ship operations.
    - The ship's itinerary made it difficult to offload sewage waste ashore.
    - The ship had concerns about discharging sewage waste because it could be contaminated with plastics or other materials that cannot be legally discharged into the sea.
- Given these factors, the ship concluded that its only remaining option was to collect treated sewage waste into plastic bags, which would then be burned in the ship's incinerator.
- The report revealed that doing this work required crew members to work continuously, day and night, for several weeks, hand-bagging treated sewage waste. They did this work in "smelly conditions" where the temperature was up to 100 degrees, and in a room that at one point had to be evacuated because a hydrogen sulfide alarm had sounded. IAG2021033 at 12.
- The plastic-bagged waste then had to be loaded into 55-gallon drums and carried to the incinerator room through an "energy-consuming and time-consuming" process that involved going "up one deck, through two corridors, four fire screen doors, one elevator, and down one deck through a hatch using a chain block . . ." *Id.*

---

described claims as "unsubstantiated" or "partially substantiated" when the evidence in the report supports the claims made.

- The report also found that there had been "no set formula" for determining crew staffing levels on the ship. *Id.* at 6. Preliminary estimates from department heads on "how many crew members were required to operate their respective areas . . . exceeded the maximum number of berths available." *Id.* at 7. Following a review with Shipboard HR personnel, "the total crew required aligned with the available berths." *Id.* Shipboard HR stated "that the initial crew estimates were frequently above the maximum capacity of new ships." *Id.*

The Company's Chairman of the Boards of Directors and Chief Executive Officer agreed that the working conditions described above were unacceptable. They committed to the Court that they would do "everything in [their] power" to make sure crew would not face similar working conditions again. The report's facts also raise broader questions about the adequacy of the Company's processes for ship design, determining crew staffing levels (and crew cabin availability), and itinerary planning to ensure environmental compliance.

Given the seriousness of the situation the investigation report revealed as it relates both to crew working conditions and providing ships with the equipment, staffing, and waste offload support needed for proper waste disposal, the Court requests that the Company provide the Court in writing its proposed plan for making good on the assurances made during this hearing and preventing the re-occurrence of these or similar conditions.

Accordingly, it is hereby ORDERED:

1) By **February 22, 2022**, the Company shall file with the Court its plan for addressing the issues related to crew working conditions and waste management revealed by the investigation report described above.

2) The Company's plan shall include, but need not be limited to:

    a. Actions beyond the corrective and preventive actions identified in the report;

    b. Plans to further examine or address systemic issues related to the Company's new build, shipboard HR, itinerary planning, or other processes so that corrective and preventive actions are not limited to the specific ship or ship class identified in the report, and include the use of management of change analysis when making decisions that impact the inclusion or elimination of waste handling or compliance-related equipment; and

    c. Efforts to recognize and meaningfully recompense the officers and crew on this ship for undertaking extraordinary efforts to avoid improper discharges, including those crew who endured the working conditions described above.

3) The Company shall coordinate with the CAM and TPA to fulfill its agreement to share timely the financial information relating to resources identified pursuant to pages 6 and 7 of Exhibit B to the Second Revocation Settlement Agreement.

DONE AND ORDERED in Miami, Florida, this 31st day of January, 2022.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: All counsel of record